Form **1040-X**
(Rev. January 2020)

Department of the Treasury - Internal Revenue Service

# Amended U.S. Individual Income Tax Return

▶ Go to www.irs.gov/Form1040X for instructions and the latest information.

OMB No. 1545-0074

**This return is for calendar year** [X] 2019 [ ] 2018 [ ] 2017 [ ] 2016

**Other year.** Enter one: calendar year **or** fiscal year (month and year ended):

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| TONY D. | TOWNLEY | ▉▉▉▉ |

| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
|---|---|---|
| ELIZABETH A. | TOWNLEY | ▉▉▉▉ |

| Current home address (number and street). If you have a P.O. box, see instructions. | Apt. no. | Your phone number |
|---|---|---|
| 1280 SNOWS MILL ROAD | | 706-353-8107 |

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below. See instructions.
BOGART, GA  30622

| Foreign country name | Foreign province/state/county | Foreign postal code |
|---|---|---|
| | | |

**Amended return filing status. You must** check one box even if you are not changing your filing status. **Caution:** In general, you can't change your filing status from a joint return to separate returns after the due date.

[ ] **Full-year health care coverage (or, for amended 2018 returns only, exempt).** If amending a 2019 return, leave blank. See instructions.

[ ] Single  [X] Married filing jointly  [ ] Married filing separately (MFS)  [ ] Qualifying widow(er) (QW)  [ ] Head of household (HOH)

If you checked the MFS box, enter the name of spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent. ▶

Use Part III on page 2 to explain any changes

| | | A. Original amount reported or as previously adjusted (see instructions) | B. Net change — amount of increase or (decrease) - explain in Part III | C. Correct amount |
|---|---|---|---|---|
| **Income and Deductions** | | | | |
| 1 | Adjusted gross income. If a net operating loss (NOL) carryback is included, check here ▶ [ ] | 1 | 40868075. | | 40868075. |
| 2 | Itemized deductions or standard deduction | 2 | 270,195. | 20173843. | 20444038. |
| 3 | Subtract line 2 from line 1 | 3 | 40597880. | -20173843. | 20424037. |
| 4a | Exemptions (amended 2017 or earlier returns only). **If changing,** complete Part I on page 2 and enter the amount from line 29 | 4a | | | |
| b | Qualified business income deduction (amended 2018 or later returns only) | 4b | 7,724,054. | -3764813. | 3,959,241. |
| 5 | Taxable income. Subtract line 4a or 4b from line 3. If the result is zero or less, enter -0- | 5 | 32873826. | -16409030. | 16464796. |
| **Tax Liability** | | | | |
| 6 | Tax. Enter method(s) used to figure tax: SCH D | 6 | 11997333. | -6071342. | 5,925,991. |
| 7 | Credits. If a general business credit carryback is included, check here ▶ [ ] | 7 | 250,281. | | 250,281. |
| 8 | Subtract line 7 from line 6. If the result is zero or less, enter -0- | 8 | 11747052. | -6071342. | 5,675,710. |
| 9 | Health care: individual responsibility (amended 2018 or earlier returns only) | 9 | | | |
| 10 | Other taxes | 10 | 183,685. | | 183,685. |
| 11 | Total tax. Add lines 8, 9, and 10 | 11 | 11930737. | -6071342. | 5,859,395. |
| **Payments** | | | | |
| 12 | Federal income tax withheld and excess social security and tier 1 RRTA tax withheld. **(If changing,** see instructions.) | 12 | | | |
| 13 | Estimated tax payments, including amount applied from prior year's return | 13 | 7,000,516. | | 7,000,516. |
| 14 | Earned income credit (EIC) | 14 | | | |
| 15 | Refundable credits from: [ ] Schedule 8812 [ ] Form(s) [ ] 2439 [ ] 4136 [ ] 8863 [ ] 8885 [ ] 8962 or [ ] other (specify): | 15 | | | |
| 16 | Total amount paid with request for extension of time to file, tax paid with original return, and additional tax paid after return was filed | | | 16 | 4,930,221. |
| 17 | Total payments. Add lines 12 through 15, column C, and line 16 | | | 17 | 11930737. |
| **Refund or Amount You Owe** | | | | |
| 18 | Overpayment, if any, as shown on original return or as previously adjusted by the IRS | | | 18 | |
| 19 | Subtract line 18 from line 17. (If less than zero, see instructions.) | | | 19 | 11930737. |
| 20 | **Amount you owe.** If line 11, column C, is more than line 19, enter the difference | | | 20 | |
| 21 | If line 11, column C, is less than line 19, enter the difference. This is the amount **overpaid** on this return | | | 21 | 6,071,342. |
| 22 | Amount of line 21 you want **refunded to you** | | | 22 | 6,071,342. |
| 23 | Amount of line 21 you want **applied to you** (enter year): estimated tax | 23 | | | |

**Exhibit C**

sign this form on page 2.

Form 1040-X (Rev. 1-2020)  TONY D. & ELIZABETH A. TOWNLEY    ▮▮▮▮▮▮    Page **2**

| Part I | Exemptions and Dependents |
|---|---|

Complete this part **only** if any information relating to exemptions (to dependents if amending your 2018 or later return) has changed from what you reported on the return you are amending. This would include a change in the number of exemptions  (of dependents if amending your 2018 or later return).

⚠ *For amended 2018 or later returns only, leave lines 24, 28, and 29 blank. Fill in all other applicable lines.*

**Note:** See the Forms 1040 and 1040-SR, or Form 1040A, instructions for the tax year being amended. See also the Form 1040-X instructions.

|  |  | **A. Original number of exemptions or amount** reported or as previously adjusted | **B. Net change** | **C. Correct number or amount** |
|---|---|---|---|---|
| 24 Yourself and spouse. **Caution:** If someone can claim you as a dependent, you can't claim an exemption for yourself. If amending your 2018 or later return, leave line blank | 24 |  |  |  |
| 25 Your dependent children who lived with you | 25 |  |  |  |
| 26 Your dependent children who didn't live with you due to divorce or separation | 26 |  |  |  |
| 27 Other dependents | 27 |  |  |  |
| 28 Total number of exemptions. Add lines 24 through 27. If amending your 2018 or later return, leave line blank | 28 |  |  |  |
| 29 Multiply the number of exemptions claimed on line 28 by the exemption amount shown in the instructions for line 29 for the year you are amending. Enter the result here and on line 4a on page 1 of this form. If amending your 2018 or later return, leave line blank | 29 |  |  |  |

30 List **ALL** dependents (children and others) claimed on this amended return. If more than 4 dependents, see inst. and  √ here ▶ ☐

**Dependents** (see instructions):

| **(a)** First name    Last name | **(b)** Social security number | **(c)** Relationship to you | **(d)** √ if qualifies for (see instr.): Child tax credit | Credit for other dependents (amended 2018 or later returns only) |
|---|---|---|---|---|
|  |  |  | ☐ | ☐ |
|  |  |  | ☐ | ☐ |
|  |  |  | ☐ | ☐ |
|  |  |  | ☐ | ☐ |

| Part II | Presidential Election Campaign Fund |
|---|---|

Checking below won't increase your tax or reduce your refund.

☐ Check here if you didn't previously want $3 to go to the fund, but now do.

☐ Check here if this is a joint return and your spouse did not previously want $3 to go to the fund, but now does.

| Part III | Explanation of Changes. In the space provided below, tell us why you are filing Form 1040-X. |
|---|---|

▶ Attach any supporting documents and new or changed forms and schedules.

SEE ATTACHED EXPLANATION OF AMENDMENT.

**Remember to keep a copy of this form for your records.**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information about which the preparer has any knowledge.

**Sign Here**

| ▶ _____ | _____ | EXECUTIVE |
|---|---|---|
| Your signature | Date | Your occupation |

| ▶ _____ | _____ | _____ |
|---|---|---|
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation |

**Paid Preparer Use Only**

| ▶ BRIDGET J. DUNK | 04/13/22 | BENNETT THRASHER LLP |
|---|---|---|
| Preparer's signature | Date | Firm's name (or yours if self-employed) |

| BRIDGET J. DUNK |  | 3300 RIVERWOOD PARKWAY, #700 ATLANTA, GA 30339 |
|---|---|---|
| Print/type preparer's name | ☐ Check if self-employed | Firm's address and ZIP code |

| PTIN ▮▮▮▮▮ |  | 770-396-2200 | EIN ▮▮▮▮▮ |
|---|---|---|---|
|  |  | Phone number |  |

910702
01-30-20  For forms and publications, visit *www.irs.gov.*    Form **1040-X** (Rev. 1-2020)

# TONY D. and ELIZABETH A. TOWNLEY
## 2019 FORM 1040X

The Townleys and their family partnership, Log Creek LLLP ("Log Creek"), are correcting their earlier returns to properly recognize their 2019 conservation contributions encouraged by Congress. When they learned the IRS was attacking all partnership conservation contributions, they waited to report those 2019 contributions until they could make doubly sure they reported theirs correctly. They also removed their 2018 contribution from their returns until they could make doubly sure they reported that contribution correctly. They waited to report the three contributions they made of vulnerable tracts to the Oconee River Land Trust in 2019 until they could make doubly sure they were correctly reporting those contributions that Congress encourages (and the IRS discourages). That additional work is finally complete. To understand why the Townleys made these contributions, one needs to understand the Townleys.

Tony Townley grew up in Bogart, Georgia, in the country outside of Athens. Starting in high school, he and his father grew Christmas trees on his parents' farm. Even today, Tony and his wife Elizabeth live on a farm in Bogart, next door to his parents. The running joke in the Townley house is that Tony has not gone very far in life.

After high school, Tony enrolled at Georgia Southern in Statesboro. Two wonderful things happened in Statesboro. Tony met Elizabeth, and Tony and his boyhood friend Zach sold almost everything they had to start a little chicken finger restaurant in Statesboro. When Tony finished Georgia Southern and Zach finished UGA, the chicken restaurant could not support them and so, Tony returned home to the Athens area, married Elizabeth, worked with his father on the Christmas tree farm, and started a mortgage business while he and his friend tried to build the chicken business. Through hard work, long hours, and risking everything they had, Tony and his friend built the chicken business into a huge success beyond their wildest dreams, Zaxby's.

Tony chose to invest most of what he made into north Georgia farmland and timberland. Tony and Elizabeth put that land into their family partnership, Log Creek, which they own equally. Both Tony and Elizabeth like preservation. They protected north Georgia timber and farmland east of Atlanta because north Georgia is being eaten by Atlanta sprawl. They bought the old UGA Agriculture Department research farm near their farm. They saved the famous but neglected UGA Red Barn which they moved out to the former UGA farm and restored.

In 2017, a mine contamination caused Tony to take a harder look at the Congressional encouragement to conserve undeveloped land forever. Martin Marietta Materials, a major granite mining company, operated a mine next to land Log Creek owned. Tony discovered that the mine contaminated the water table with a dangerous chemical. That one mine could contaminate the entire water table for that entire area. Tony tried to cure that problem, but started thinking about the Log Creek land that was most vulnerable to mining. His advisors told him that Congress specifically encourages landowners like the Townleys to preserve the land through tax incentives that recognize the full value lost due to anti-development restrictions.

The first site that came to mind was the Norris-Cason tract in Warren County, Georgia that had granite outcroppings Tony and his forester had seen on the surface. After core drilling and an exhausting investigation, Tony and Elizabeth decided Log Creek should contribute a perpetual conservation easement to Oconee River Land Trust, a charitable group in Athens started by UGA professors and other conservation-minded citizens. The Townleys and their family partnership knew they were doing a good thing. They wanted to do more. In 2019, Tony and those helping him identified three other vulnerable tracts with granite outcroppings that Tony believed would be mined sooner or later. Again, the Townleys decided to protect those properties forever. They believe strongly enough in conservation to work through the extraordinary complexity and expense twice.

For all of the tracts, Tony got the best help he could find at the time and now the Townleys and their family partnership have hired a second set of superb geologists, biologists, and appraisers to make doubly sure that Tony, Elizabeth, and their partnership are doing exactly what Congress encourages all forest and farmland owners to do. They not only hired the best geologists they could find, they hired the Georgia real estate appraiser who best understood the mining engineering analysis because that appraiser, Doug Kenny, MAI, holds an engineering degree from Georgia Tech – one of, if not the, top engineering universities in the South.

Through Section 170(h), Congress encourages landowners to prohibit development on their forests and farms *forever* by promising a deduction equal to the full fair market value of the development rights they sacrificed. The Eleventh Circuit recently explained that in *Pine Mountain Preserve, LLP v. Commissioner*, 978 F.3d 1200, 1202-3 (11th Cir. 2020):

> Before diving into the facts and procedural history of this particular case, we set out in some detail the governing statutory framework. Section 170 of the Internal Revenue Code allows tax deductions for charitable contributions and gifts of interests in real property. As a general rule, the Code forbids deductions for conveyances of partial—i.e., less than fee-simple—interests. In 1980, though, Congress amended the Code to permit landowners a deduction for a "qualified conservation contribution" of less than an entire interest in a parcel. See Tax Treatment Extension Act, Pub. L. No. 96-541 § 6(b), 94 Stat. 3204, 3206 (1980), codified at I.R.C § 170(f)(3)(B)(iii). To qualify as a "qualified conservation contribution," a grant must be "(A) of a qualified real property interest," "(B) to a qualified organization," and "(C) exclusively for conservation purposes." I.R.C. § 170(h)(1).

> The parties here agree that the grants at issue were made to a "qualified organization," so our analysis will focus on the other two requirements—that the grants be "qualified real property interest[s]" and "exclusively for conservation purposes." Section 170(h)(2) defines the former, and § 170(h)(5) defines the latter. According to § 170(h)(2)(C), a "qualified real property interest" includes, as relevant here, "a restriction (granted in perpetuity) on the use which may be made of the real property." We'll call this the "granted-in-perpetuity" requirement. According to § 170(h)(5)(A), "[a] contribution shall not be treated as exclusively for conservation purposes" within the meaning of § 170(h)(1) "unless the conservation purpose is protected in perpetuity." We'll call this the "protected-in-perpetuity" requirement.

3

> To sum up then: The Code permits taxpayers to claim deductions for charitable contributions, including contributions of land. If a landowner donates less than its entire interest in a piece of property, the Code allows a deduction, as relevant here, where the landowner makes a "qualified conservation contribution." To qualify—again, as relevant for our purposes — a grant must be a "qualified real property interest" and "exclusively for conservation purposes." To constitute a "qualified real property interest," the grant must satisfy § 170(h)(2)(C)'s granted-in-perpetuity requirement, and to be "exclusively for conservation purposes," the grant must satisfy § 170(h)(5)(A)'s protected-in-perpetuity requirement.

The Eleventh Circuit Court of Appeals confirmed in another recent case that the contribution need only satisfy **one** of a number of different conservation purposes. *Champion's Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d 1033 (11th Cir. 2020). Equally important, the Eleventh Circuit held that the Conservation Deed need only protect that one conservation purpose "BETTER" than having no deed. Certainly true here.

Congress encourages conservation easements for a very good reason. Conservation easements actually ensure conservation much better than outright gifts of land because conservation easements require *perpetual* restrictions against development. By contrast, a charity receiving an outright gift of undeveloped land can turnaround, sell the land to a developer with no restrictions, and use the sales proceeds to pay salaries and other charitable expenses. That congressional encouragement formed the heart of the Eleventh Circuit invalidating Treas. Reg. § 1.170A-14(g)(6) in *Hewitt v. Commissioner*, 21 F.4th 1336, 1352 (11th Cir. 2021).

Congress encourages conservation by recognizing as a deduction every dollar of value lost from barring mining or any other development of that land forevermore. Every President from Teddy Roosevelt through Ronald Reagan, Bill Clinton, Barack Obama, and Donald Trump to Joe Biden's recent 30/30 initiative have recognized how important that conservation remains to all of us. Any understatement of the full value discourages the conservation that Congress tries to encourage and that we and all other species so badly need. Conservation only matters to those who need clean air to breathe, clean water to drink, and farm fresh food to eat.

4

On each of its contributions,[1] Log Creek more than met all three requirements stated by the law.  That is, Section 170(h) defines a "Qualified Conservation Contribution" as the transfer of a "Qualified Real Property Interest" to a "Qualified Organization" "Exclusively for [one or more of four] Conservation Purpose[s]."  Log Creek did that and more:

(i)  "Qualified Real Property Interest."  As the statute and the Eleventh Circuit Court of Appeals precedent in *Pine Mountain* establish, "Qualified Real Property Interest" only requires "*a* [one] restriction (in perpetuity)."  Each of the four Log Creek Conservation Deeds impose at least 12 separate sets of restrictions – plus overarching prohibitions against any exercise of any retained right that may adversely affect the conservation purposes.  Those restrictions, laid out in the legally enforceable Deeds of Conservation Easement, are perpetually binding under Georgia law.

(ii)  "Qualified Organization."  The statute defines this entity as, among other, charitable organizations under Internal Revenue Code Sections 501(c)(3) and 509(a)(2).  The IRS itself issued the IRS Exempt Organization Determination Letter specifically recognizing the Oconee River Land Trust (the charitable donee for each contribution), as qualifying under Sections 501(c)(3) and 509(a)(2).  The Oconee River Land Trusts possesses the experience, expertise, and ability to ensure the perpetual protection of the vulnerable properties.

(iii)  "Exclusively for Conservation Purposes."  As the statute and Eleventh Circuit precedent in *Champions Retreat* establish, the Conservation Deed must only protect (in perpetuity) one or more of four listed conservation purposes.  Of relevance here, all four Log Creek Conservation Deeds protect "relatively natural habitat for plants, wildlife, and similar ecosystems," scenic open space, and open space that furthers any one of many "Federal, State, or local conservation policies."  Satisfaction of any one purpose or policy satisfies the statute.

Five documents for each tract attached to this return for the 2019 Conservation Contributions satisfy all elements of Code Section 170(h) and its regulations.  They include the Conservation Deeds (Ex. A), the Environmental Studies (Ex. B), the Appraisals and underlying geological data (Ex. C), the "Letters of Acknowledgement" from the Oconee River Land Trust (Ex. D), and the Form 8283 Appraisal Summaries included as part of the IRS return form.

---

[1] The Townleys and Log Creek also made a conservation contribution protecting a third potential mining property in 2019 but, unbeknownst to the Townleys, the County adopted a plan that protected that river property and so, the Townleys are not asking for a charitable deduction on that property on that contribution.

5

Those appraisals prove the enormous 2019 mining development value that Log Creek, the Townleys, and their children's children's children sacrificed forevermore. The fair market value of what they contributed to the Oconee River Land Trust was at least $66,290,000 for the tract in Taliaferro County and $53,760,000 for the tract in Wilkes County. With Congressional encouragement, the law requiring that Log Creek recognize a charitable deduction in the sum of those two amounts (or such greater amounts as the IRS, the Court, or the jury determines to be accurate). As a result, Tony and Elizabeth overpaid their 2019 federal income taxes by $6,071,342 (or such greater amount that results from any greater value determined by the IRS, District Court, or Jury) and claim a refund of those overpaid 2019 federal income taxes (plus interest as provided by law). Subject to the determination of a greater value, Tony and Elizabeth believe that their correct 2019 federal income tax is $5,859,395.

Congress encourages conservation but the IRS hates it. The IRS audited the 2018 conservation easement reported by Log Creek. The Townleys and their family partnership simply asked the IRS to follow the law and the facts that govern that contribution. The IRS came up with every excuse it could to justify ignoring the contribution altogether, just as it has **ZEROED** out every other partnership. The Townleys and their advisors have made sure that those excuses do not apply to these 2019 reports. Those excuses remain inaccurate and, in many instances, inconsistent. For example, the IRS second guesses the documentation of the water resources despite the fact that the statute does not authorize that requirement, the wildlife biologist prepared an environmental baseline report that the statute never required, that complied with the permissive examples in the IRS's own regulation, and that the donor and donee both certified as accurate. That information, and more, was provided to the Oconee River Land Trust – whose representatives performed on-site inspections– prior to the donation.

6

Moreover, the IRS documentation attack relies on an invalid regulation, Treas. Reg. § 1.170A-14(g)(5).   The regulation expressly (i) contradicts two parts of the Congressional encouragement statute; (ii) violated the Administrative Procedures Act under the Eleventh Circuit precedent in *Hewitt*, 21 F.4th at 1350-4 (on the theory the IRS is above that law); and (iii) makes up hidden rules after the game is over, as an excuse for ignoring all of the conservation contributions Congress encouraged.

Worse yet, the IRS ignores the 2018 contribution altogether based on the continuing efforts to improve the original appraisal (by implementing suggested changes from two appraisal reviews) and to correct a slight intrusion into the highly protected 200 foot creek and pond buffer Special Natural Areas.   Both instances, prove the genuine commitment to conservation.   But most remarkable, the IRS casts the original *Georgia* real estate appraiser (a Member of the Appraisal Institute, the most respected appraisal institute in the nation) as not a "qualified appraiser" because he relied on full-time qualified geologists -- while the IRS relies solely upon a *Chicago* and *Washington, D.C.* appraiser who never set foot on this east *Georgia* property.

The IRS questions the integrity of everyone who helped make the contribution possible, but we must consider the credibility of how far the IRS goes to ignore the perpetual contribution altogether at page 11 of the Revenue Agent's Report for the 2018 audit.   There, the IRS states, with no prior question, for the first time:

> The baseline documentation report must be accompanied by a statement signed by the donor and a representative of the donee clearly referencing the documentation and in substance saying the baseline document is an accurate representation of the protected property at the time of donation.   [IRS Reg.] § 1.170A-14(g)(5)(k)(D).   ***Such a statement was not included in baseline documentation provided by Taxpayer.   There was no acknowledgement from the donee in the baseline report.***   (Emphasis added).

Could not be more inaccurate.   Here is the certification page in the baseline documentation report received and certified by the Oconee River Land Trust on December 21, 2018:

OCONEE RIVER LAND TRUST                                                    LOG CREEK

In compliance with Section 1.170A - 14(g)(5) of the federal tax regulations, LOG CREEK, LLLP, owner of the Property referenced and described by this report, and the OCONEE RIVER LAND TRUST, INC., do hereby acknowledge that this report is an accurate representation of the Property as of the date of the conveyance of the conservation easement referenced in this report by the landowner ("Grantor") to the Oconee River Land Trust ("Grantee").

Sworn to and subscribed before me                    Log Creek, LLLP

_____                            By: _____
NOTARY PUBLIC                                        Name: Tom D. Townley
This the 21 day of Dec. 2018                          Title: General Partner
My commission expires:                               Date: Dec. 21, 2018

(SEAL)        KAREN E MANE                            By: _____
              OGLETHORPE COUNTY, GEORGIA             Name: Elizabeth A. Townley
              NOTARY PUBLIC                           Title: General Partner
              MY COMMISSION EXPIRES                   Date: Dec. 21, 2018
              DECEMBER 6, 1012

Sworn to and subscribed before me                    Oconee River Land Trust, Inc.

_____                            By: _____
NOTARY PUBLIC                                        Name: Smith Wilson
This the _____ day of _____ 20__                      Title: Chair
My commission expires:                               Date: 12-21-18

(SEAL)


The Townleys and Log Creek ask that the IRS reconsider because conservation contributions must be encouraged by full recognition in order to encourage other owners of forests and farms to restrict their land forever and protect greenspace for generations to come. If the IRS fails to follow the law and the facts again, the Townleys must ask a Federal District Court and a jury of unbiased honest Georgians to do the right thing: follow the law and the facts to the accurate value – not a penny more and not a penny less.

Should you have any questions relating to the contribution, please call David D. Aughtry who represents the Townleys and their family partnership at (404/658-5486). Thank you.

AMENDED

651119

| **Schedule K-1**<br>**(Form 1065)**<br>Department of the Treasury<br>Internal Revenue Service | **2019**<br>For calendar year 2019, or tax year | Final K-1     [X] Amended K-1    OMB No. 1545-0123 |
|---|---|---|

beginning _____ ending _____

**Partner's Share of Income, Deductions, Credits, etc.**   ▶ **See separate instructions.**

**Part III**   **Partner's Share of Current Year Income, Deductions, Credits, and Other Items**

| **Part I**   **Information About the Partnership** | |
|---|---|

**A** Partnership's employer identification number

███████

**B** Partnership's name, address, city, state, and ZIP code

LOG CREEK, LLLP
1280 SNOWS MILL RD.
BOGART, GA  30622

**C** IRS Center where partnership filed return ▶
E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

| **Part II**   **Information About the Partner** | |
|---|---|

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)

███████

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.

TONY D TOWNLEY
1280 SNOWS MILL RD
BOGART, GA  30622

**G** [X] General partner or LLC member-manager    ☐ Limited partner or other LLC member

**H1** [X] Domestic partner    ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
   TIN _____ Name _____

**I1** What type of entity is this partner?   INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 1.0000000 % | 1.0000000 % |
| Loss | 1.0000000 % | 1.0000000 % |
| Capital | 1.0000000 % | 1.0000000 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ | $ |
| Qualified nonrecourse financing | $ | $ |
| Recourse | $ 18,106,589. | $ 18,028,177. |

☐ Check this box if Item K includes liability amounts from lower tier partnerships.

**L**   **Partner's Capital Account Analysis**
SEE STATEMENT

| | |
|---|---|
| Beginning capital account | $ 540,745. |
| Capital contributed during the year | $ 193,000. |
| Current year net income (loss) | $ -1,214,557. |
| Other increase (decrease) (attach explanation) | $ 1,190,732. |
| Withdrawals & distributions | $ ( ) |
| **Ending capital account** | $ 709,920. |

**M** Did the partner contribute property with a built-in gain or loss?
   ☐ Yes   [X] No   If "Yes," attach statement. See instructions.

**N**   **Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)**
   Beginning _____ $
   Ending _____ $

**Part III — right column:**

| 1 | Ordinary business income (loss) | −20,907. |
|---|---|---|
| 2 | Net rental real estate income (loss) | |
| 3 | Other net rental income (loss) | |
| 4a | Guaranteed payments for services | |
| 4b | Guaranteed payments for capital | |
| 4c | Total guaranteed payments | |
| 5 | Interest income | 1,659. |
| 6a | Ordinary dividends | |
| 6b | Qualified dividends | |
| 6c | Dividend equivalents | |
| 7 | Royalties | |
| 8 | Net short-term capital gain (loss) | |
| 9a | Net long-term capital gain (loss) | |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | |
| 10 | Net section 1231 gain (loss) | 5,191. |
| 11 | Other income (loss) | |
| 12 | Section 179 deduction | |
| 13 | Other deductions | C 1,200,500. |
| 14 | Self-employment earnings (loss) | |

| 15 | Credits |
|---|---|
| 16 | Foreign transactions |
| 17 | Alternative min tax (AMT) items |
| 18 | Tax-exempt income and nondeductible expenses |
| 19 | Distributions |
| 20 | Other information   A   1,659. |
| 21 | More than one activity for at-risk purposes* |
| 22 | More than one activity for passive activity purposes* |

*See attached statement for additional information.

For IRS Use Only

911261 12-30-19   LHA   **For Paperwork Reduction Act Notice, see Instructions for Form 1065.**    www.irs.gov/Form1065    **Schedule K-1 (Form 1065) 2019**

1

**AMENDED**

651119

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

**2019**
For calendar year 2019, or tax year

beginning _____  ending _____

**Partner's Share of Income, Deductions, Credits, etc.**

▶ See separate instructions.

Final K-1 ☐   [X] Amended K-1   OMB No. 1545-0123

| **Part III** | **Partner's Share of Current Year Income, Deductions, Credits, and Other Items** |
|---|---|

| | |
|---|---|
| 1 Ordinary business income (loss) | 15 Credits |
| −20,908. | |
| 2 Net rental real estate income (loss) | 16 Foreign transactions |
| 3 Other net rental income (loss) | |
| 4a Guaranteed payments for services | |
| 4b Guaranteed payments for capital | |
| 4c Total guaranteed payments | 17 Alternative min tax (AMT) items |
| 5 Interest income | |
| 1,659. | |
| 6a Ordinary dividends | 18 Tax-exempt income and nondeductible expenses |
| 6b Qualified dividends | |
| 6c Dividend equivalents | |
| 7 Royalties | 19 Distributions |
| 8 Net short-term capital gain (loss) | 20 Other information |
| 9a Net long-term capital gain (loss) | A    1,659. |
| 9b Collectibles (28%) gain (loss) | |
| 9c Unrecaptured section 1250 gain | |
| 10 Net section 1231 gain (loss) | |
| 5,191. | |
| 11 Other income (loss) | |
| 12 Section 179 deduction | |
| 13 Other deductions | |
| C    1,200,500. | |
| 14 Self-employment earnings (loss) | |

**Part I**   **Information About the Partnership**

**A** Partnership's employer identification number

**B** Partnership's name, address, city, state, and ZIP code

LOG CREEK, LLLP
1280 SNOWS MILL RD.
BOGART, GA  30622

**C** IRS Center where partnership filed return ▶
E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

**Part II**   **Information About the Partner**

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.

ELIZABETH A TOWNLEY
1280 SNOWS MILL RD
BOGART, GA  30622

**G** [X] General partner or LLC member-manager   ☐ Limited partner or other LLC member

**H1** [X] Domestic partner   ☐ Foreign partner

**H2** If the partner is a disregarded entity (DE), enter the partner's:
TIN _____  Name _____

**I1** What type of entity is this partner?  INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here _____

**J** Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 1.0000000 % | 1.0000000 % |
| Loss | 1.0000000 % | 1.0000000 % |
| Capital | 1.0000000 % | 1.0000000 % |

Check if decrease is due to sale or exchange of partnership interest _____

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ | $ |
| Qualified nonrecourse financing | $ | $ |
| Recourse | $ 110,821. | $ 28,177. |

☐ Check this box if Item K includes liability amounts from lower tier partnerships.

**L**   **Partner's Capital Account Analysis**
SEE STATEMENT

| | |
|---|---|
| Beginning capital account | $ 540,740. |
| Capital contributed during the year | $ 193,000. |
| Current year net income (loss) | $ −1,214,558. |
| Other increase (decrease) (attach explanation) | $ 1,190,733. |
| Withdrawals & distributions | $( _____ ) |
| **Ending capital account** | $ 709,915. |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes  [X] No  If "Yes," attach statement. See instructions.

**N**  **Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)**
Beginning _____  $ _____
Ending _____  $ _____

21  More than one activity for at-risk purposes*
22  More than one activity for passive activity purposes*
*See attached statement for additional information.

For IRS Use Only

911261 12-30-19  LHA  **For Paperwork Reduction Act Notice, see Instructions for Form 1065.**  www.irs.gov/Form1065  **Schedule K-1 (Form 1065) 2019**

2

651119

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

**2019**
For calendar year 2019, or tax year

beginning _____ ending _____

**Partner's Share of Income, Deductions, Credits, etc.**

▶ See separate instructions.

| | Final K-1 | [X] Amended K-1 | OMB No. 1545-0123 |

**Part III  Partner's Share of Current Year Income, Deductions, Credits, and Other Items**

| 1 Ordinary business income (loss) | 15 Credits |
|---|---|
| −1,024,460. | |
| **2** Net rental real estate income (loss) | **16** Foreign transactions |
| **3** Other net rental income (loss) | |
| **4a** Guaranteed payments for services | |
| **4b** Guaranteed payments for capital | |
| **4c** Total guaranteed payments | **17** Alternative min tax (AMT) items |
| **5** Interest income | |
| 81,299. | |
| **6a** Ordinary dividends | **18** Tax-exempt income and nondeductible expenses |
| **6b** Qualified dividends | |
| **6c** Dividend equivalents | **19** Distributions |
| **7** Royalties | |
| **8** Net short-term capital gain (loss) | **20** Other information |
| **9a** Net long-term capital gain (loss) | A  81,299. |
| **9b** Collectibles (28%) gain (loss) | |
| **9c** Unrecaptured section 1250 gain | |
| **10** Net section 1231 gain (loss) | |
| 254,365. | |
| **11** Other income (loss) | |
| **12** Section 179 deduction | |
| **13** Other deductions | |
| C  58,824,500. | |
| **14** Self-employment earnings (loss) | |

**Part I  Information About the Partnership**

**A** Partnership's employer identification number

**B** Partnership's name, address, city, state, and ZIP code

LOG CREEK, LLLP
1280 SNOWS MILL RD.
BOGART, GA  30622

**C** IRS Center where partnership filed return ▶
E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

**Part II  Information About the Partner**

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.

TONY D TOWNLEY
1280 SNOWS MILL RD
BOGART, GA  30622

**G** ☐ General partner or LLC member-manager  [X] Limited partner or other LLC member

**H1** [X] Domestic partner  ☐ Foreign partner

**H2** If the partner is a disregarded entity (DE), enter the partner's:
TIN _____ Name _____

**I1** What type of entity is this partner? INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 49.0000000% | 49.0000000% |
| Loss | 49.0000000% | 49.0000000% |
| Capital | 49.0000000% | 49.0000000% |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ | $ |
| Qualified nonrecourse financing | $ | $ |
| Recourse | $ 0. | $ 0. |

☐ Check this box if Item K includes liability amounts from lower tier partnerships.

**L**  **Partner's Capital Account Analysis**
SEE STATEMENT

| Beginning capital account | $ | 26,496,407. |
| Capital contributed during the year | $ | 9,457,000. |
| Current year net income (loss) | $ | −59,513,296. |
| Other increase (decrease) (attach explanation) | $ | 58,345,889. |
| Withdrawals & distributions | $( | ) |
| **Ending capital account** | $ | 34,786,000. |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes  [X] No  If "Yes," attach statement. See instructions.

**N**  **Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)**
Beginning _____ $ _____
Ending _____ $ _____

| **21** | More than one activity for at-risk purposes* |
| **22** | More than one activity for passive activity purposes* |
| *See attached statement for additional information. |

For IRS Use Only

911261 12-30-19  LHA  **For Paperwork Reduction Act Notice, see Instructions for Form 1065.**  www.irs.gov/Form1065  **Schedule K-1 (Form 1065) 2019**

AMENDED

651119

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

**2019**
For calendar year 2019, or tax year

beginning _____ ending _____

**Partner's Share of Income, Deductions, Credits, etc.**

▶ See separate instructions.

Final K-1 ☐    [X] Amended K-1    OMB No. 1545-0123

**Part III  Partner's Share of Current Year Income, Deductions, Credits, and Other Items**

| | |
|---|---|
| **1** Ordinary business income (loss) | -1,024,460. |
| **2** Net rental real estate income (loss) | |
| **3** Other net rental income (loss) | |
| **4a** Guaranteed payments for services | |
| **4b** Guaranteed payments for capital | |
| **4c** Total guaranteed payments | |
| **5** Interest income | 81,299. |
| **6a** Ordinary dividends | |
| **6b** Qualified dividends | |
| **6c** Dividend equivalents | |
| **7** Royalties | |
| **8** Net short-term capital gain (loss) | |
| **9a** Net long-term capital gain (loss) | |
| **9b** Collectibles (28%) gain (loss) | |
| **9c** Unrecaptured section 1250 gain | |
| **10** Net section 1231 gain (loss) | 254,364. |
| **11** Other income (loss) | |
| **12** Section 179 deduction | |
| **13** Other deductions | C  58,824,500. |
| **14** Self-employment earnings (loss) | |

| | |
|---|---|
| **15** Credits | |
| **16** Foreign transactions | |
| **17** Alternative min tax (AMT) items | |
| **18** Tax-exempt income and nondeductible expenses | |
| **19** Distributions | |
| **20** Other information | A    81,299. |

**21** More than one activity for at-risk purposes*
**22** More than one activity for passive activity purposes*
*See attached statement for additional information.

**Part I  Information About the Partnership**

**A**  Partnership's employer identification number
████████████

**B**  Partnership's name, address, city, state, and ZIP code

LOG CREEK, LLLP
1280 SNOWS MILL RD.
BOGART, GA  30622

**C**  IRS Center where partnership filed return ▶
E-FILE
**D**  ☐ Check if this is a publicly traded partnership (PTP)

**Part II  Information About the Partner**

**E**  Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
████████████

**F**  Name, address, city, state, and ZIP code for partner entered in E. See instructions.

ELIZABETH A TOWNLEY
1280 SNOWS MILL RD
BOGART, GA  30622

**G**  ☐ General partner or LLC member-manager    [X] Limited partner or other LLC member

**H1** [X] Domestic partner    ☐ Foreign partner
**H2**  If the partner is a disregarded entity (DE), enter the partner's:
TIN _____ Name _____
**I1**  What type of entity is this partner?  INDIVIDUAL
**I2**  If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐
**J**  Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 49.0000000% | 49.0000000% |
| Loss | 49.0000000% | 49.0000000% |
| Capital | 49.0000000% | 49.0000000% |

Check if decrease is due to sale or exchange of partnership interest ☐

**K**  Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ | $ |
| Qualified nonrecourse financing | $ | $ |
| Recourse | $  0. | $  0. |

Check this box if Item K includes liability amounts from lower tier partnerships. ☐

**L**  **Partner's Capital Account Analysis**
SEE STATEMENT

| | |
|---|---|
| Beginning capital account | $  26,496,403. |
| Capital contributed during the year | $  9,457,000. |
| Current year net income (loss) | $  -59,513,297. |
| Other increase (decrease) (attach explanation) | $  58,345,890. |
| Withdrawals & distributions | $( ) |
| **Ending capital account** | $  34,785,996. |

**M**  Did the partner contribute property with a built-in gain or loss?
☐ Yes    [X] No   If "Yes," attach statement. See instructions.

**N**  **Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)**
Beginning _____ $
Ending _____ $

For IRS Use Only

911261  12-30-19   LHA   **For Paperwork Reduction Act Notice, see Instructions for Form 1065.**   www.irs.gov/Form1065   **Schedule K-1 (Form 1065) 2019**

4

**AMENDED**

Form **1040**

Department of the Treasury - Internal Revenue Service

**U.S. Individual Income Tax Return** (99) **2019** OMB No. 1545-0074 | IRS Use Only - Do not write or staple in this space.

**Filing Status**
Check only one box.

[ ] Single [X] Married filing jointly [ ] Married filing separately (MFS) [ ] Head of household (HOH) [ ] Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent. ▶

Your first name and middle initial: TONY D.
Last name: TOWNLEY
Your social security number: ▮▮▮▮▮

If joint return, spouse's first name and middle initial: ELIZABETH A.
Last name: TOWNLEY
Spouse's social security number: ▮▮▮▮▮

Home address (number and street). If you have a P.O. box, see instructions.
1280 SNOWS MILL ROAD
Apt. no.

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. [ ] You [ ] Spouse

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).
BOGART, GA 30622

Foreign country name | Foreign province/state/county | Foreign postal code

If more than four dependents, see instructions and ✓ here ▶ [ ]

**Standard Deduction**
Someone can claim: [ ] You as a dependent [ ] Your spouse as a dependent
[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness** You: [ ] Were born before January 2, 1955 [ ] Are blind   Spouse: [ ] Was born before January 2, 1955 [ ] Is blind

**Dependents** (see instructions):

| (1) First name   Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): Child tax credit | Credit for other dependents |
|---|---|---|---|---|
| C▮▮▮ G▮▮ TOWNLEY ▮▮▮▮ | ▮▮▮▮ | DAUGHTER | X | |
| | | | | |
| | | | | |

Standard Deduction for -
● Single or Married filing separately, $12,200
● Married filing jointly or Qualifying widow(er), $24,400
● Head of household, $18,350
● If you checked any box under Standard Deduction, see instructions.

| | | | | |
|---|---|---|---|---|
| 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 | | 1 | |
| 2a | Tax-exempt interest | 2a | 22,387. | b Taxable interest. Attach Sch. B if required | 2b | 2,494,535. |
| 3a | Qualified dividends | 3a | 23,903. | b Ordinary dividends. Attach Sch. B if required | 3b | 29,634. |
| 4a | IRA distributions | 4a | | b Taxable amount | 4b | |
| c | Pensions and annuities | 4c | | d Taxable amount | 4d | |
| 5a | Social security benefits | 5a | | b Taxable amount | 5b | |
| 6 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ [ ] | | 6 | 683,672. |
| 7a | Other income from Schedule 1, line 9 | | 7a | 37,713,615. |
| b | Add lines 1, 2b, 3b, 4b, 4d, 5b, 6, and 7a. This is your **total income** ▶ | 7b | 40,921,456. |
| 8a | Adjustments to income from Schedule 1, line 22 | | 8a | 53,381. |
| b | Subtract line 8a from line 7b. This is your **adjusted gross income** ▶ | 8b | 40,868,075. |
| 9 | **Standard deduction or itemized deductions** (from Schedule A) | 9 | 20,444,038. | |
| 10 | Qualified business income deduction. Attach Form 8995 or Form 8995-A | 10 | 3,959,241. | |
| 11a | Add lines 9 and 10 | | 11a | 24,403,279. |
| b | **Taxable income.** Subtract line 11a from line 8b. | | | |
| | If zero or less, enter -0- | | 11b | 16,464,796. |

LHA **For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.** Form **1040** (2019)

913921 12-19-19

AMENDED

Form 1040 (2019)  TONY D. & ELIZABETH A. TOWNLEY  [redacted]  Page 2

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12a | **Tax** (see inst.) Check if any from Form(s): 1 ☐ 8814 2 ☐ 4972 3 ☐ ☐ | | | 12a | 5,925,991. | | |
| b | Add Schedule 2, line 3, and line 12a and enter the total | | ▶ | 12b | | 5,925,991. | |
| 13a | Child tax credit or credit for other dependents | | | 13a | | | |
| b | Add Schedule 3, line 7, and line 13a and enter the total | | ▶ | 13b | | 250,281. | |
| 14 | Subtract line 13b from line 12b. If zero or less, enter -0- | | | 14 | | 5,675,710. | |
| 15 | Other taxes, including self-employment tax, from Schedule 2, line 10 | | | 15 | | 183,685. | |
| 16 | Add lines 14 and 15. This is your **total tax** | | ▶ | 16 | | 5,859,395. | |
| 17 | Federal income tax withheld from Forms W-2 and 1099 | | | 17 | | | |
| 18 | Other payments and refundable credits: | | | | | | |
| a | Earned income credit (EIC) | | | 18a | | | |
| b | Additional child tax credit. Attach Schedule 8812 | | | 18b | | | |
| c | American opportunity credit from Form 8863, line 8 | | | 18c | | | |
| d | Schedule 3, line 14 | | | 18d | 10,500,516. | | |
| e | Add lines 18a through 18d. These are your **total other payments and refundable credits** | | ▶ | 18e | | 10,500,516. | |
| 19 | Add lines 17 and 18e. These are your **total payments** | | ▶ | 19 | | 10,500,516. | |

- If you have a qualifying child, attach Sch. EIC.
- If you have nontaxable combat pay, see instructions

| | | | | | |
|---|---|---|---|---|---|
| **Refund** | 20 | If line 19 is more than line 16, subtract line 16 from line 19. This is the amount you **overpaid** | 20 | | 4,641,121. |
| Direct deposit? See instructions. | 21a | Amount of line 20 you want **refunded to you.** If Form 8888 is attached, check here ▶ ☐ | 21a | | |
| ▶ b | Routing number | ▶ c Type: ☐ Checking ☐ Savings | | | |
| ▶ d | Account number | | | | |
| | 22 | Amount of line 20 you want **applied to your 2020 estimated tax** ▶ | 22 | 4,641,121. | |
| **Amount You Owe** | 23 | **Amount you owe.** Subtract line 19 from line 16. For details on how to pay, see instructions ▶ | 23 | | |
| | 24 | Estimated tax penalty (see instructions) ▶ | 24 | | |

| | |
|---|---|
| **Third Party Designee** (Other than paid preparer) | Do you want to allow another person (other than your paid preparer) to discuss this return with the IRS? See instructions ☐ **Yes.** Complete below. ☒ **No** |
| | Designee's name  Phone no.  Personal identification number (PIN) |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| | | |
|---|---|---|
| Your signature | Date | Your occupation: EXECUTIVE |
| | | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation |
| | | If the IRS sent your spouse an Identity Protection PIN, enter it here (see inst.) |

Joint return? See instructions. Keep a copy for your records.

Phone no. 706-353-8107    Email address RWILLS@OTFLLC.COM

| **Paid Preparer Use Only** | | | | |
|---|---|---|---|---|
| Preparer's name: BRIDGET J. DUNK | Preparer's signature: BRIDGET J. DUNK | Date: 04/13/22 | PTIN: [redacted] | Check if: ☒ 3rd Party Designee ☐ Self-employed |
| Firm's name ▶ BENNETT THRASHER LLP | | Phone no. 770-396-2200 | ▼ Firm's EIN [redacted] | |
| Firm's address ▶ 3300 RIVERWOOD PARKWAY, #700 ATLANTA, GA 30339 | | | | |

Go to *www.irs.gov/Form1040* for instructions and the latest information.

Form **1040** (2019)

913922  12-02-19

AMENDED

OMB No. 1545-0074

**SCHEDULE 1**
(Form 1040 or 1040-SR)

Department of the Treasury
Internal Revenue Service

# Additional Income and Adjustments to Income

▶ Attach to Form 1040 or 1040-SR.
▶ Go to www.irs.gov/Form1040 for instructions and the latest information.

**2019**

Attachment
Sequence No. **01**

| Name(s) shown on Form 1040 or 1040-SR | Your social security number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | |

At any time during 2019, did you receive, sell, send, exchange, or otherwise acquire any financial interest in any virtual currency?    ☐ Yes  ☒ No

## Part I    Additional Income
STATEMENT 4

| | | | |
|---|---|---|---|
| 1 | Taxable refunds, credits, or offsets of state and local income taxes    STMT 3    STMT 6 | 1 | 8,825. |
| 2a | Alimony received | 2a | |
| b | Date of original divorce or separation agreement (see instructions) ▶ | | |
| 3 | Business income or (loss). Attach Schedule C | 3 | -467,654. |
| 4 | Other gains or (losses). Attach Form 4797 | 4 | -1,583. |
| 5 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 5 | 37,110,044. |
| 6 | Farm income or (loss). Attach Schedule F | 6 | -43,878. |
| 7 | Unemployment compensation | 7 | |
| 8 | Other income. List type and amount ▶ ZAXBY'S FRANCHISING LLC              1,107,861. | 8 | 1,107,861. |
| 9 | Combine lines 1 through 8. Enter here and on Form 1040 or 1040-SR, line 7a | 9 | 37,713,615. |

## Part II    Adjustments to Income

| | | | |
|---|---|---|---|
| 10 | Educator expenses | 10 | |
| 11 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 | 11 | |
| 12 | Health savings account deduction. Attach Form 8889 | 12 | |
| 13 | Moving expenses for members of the Armed Forces. Attach Form 3903 | 13 | |
| 14 | Deductible part of self-employment tax. Attach Schedule SE | 14 | 35,054. |
| 15 | Self-employed SEP, SIMPLE, and qualified plans | 15 | |
| 16 | Self-employed health insurance deduction | 16 | 18,327. |
| 17 | Penalty on early withdrawal of savings | 17 | |
| 18a | Alimony paid | 18a | |
| b | Recipient's SSN ▶ | | |
| c | Date of original divorce or separation agreement (see instructions) ▶ | | |
| 19 | IRA deduction | 19 | |
| 20 | Student loan interest deduction | 20 | |
| 21 | Tuition and fees. Attach Form 8917 | 21 | |
| 22 | Add lines 10 through 21. These are your **adjustments to income.** Enter here and on Form 1040 or 1040-SR, line 8a | 22 | 53,381. |

LHA    **For Paperwork Reduction Act Notice, see your tax return instructions.**    Schedule 1 (Form 1040 or 1040-SR) 2019

913923  12-23-19

Case 3:22-cv-00107-CDL    Document 1-3    Filed 10/28/22    Page 18 of 600

**SCHEDULE 2**
(Form 1040 or 1040-SR)

Department of the Treasury
Internal Revenue Service

# Additional Taxes

▶ **Attach to Form 1040 or 1040-SR.**

▶ Go to www.irs.gov/Form1040 for instructions and the latest information.

OMB No. 1545-0074

**2019**

Attachment
Sequence No. **02**

Name(s) shown on Form 1040 or 1040-SR

TONY D. & ELIZABETH A. TOWNLEY

Your social security number

| Part I | Tax | | |
|---|---|---|---|
| 1 | Alternative minimum tax. Attach Form 6251 | 1 | 0. |
| 2 | Excess advance premium tax credit repayment. Attach Form 8962 | 2 | |
| 3 | Add lines 1 and 2. Enter here and include on Form 1040 or 1040-SR, line 12b | 3 | 0. |

| Part II | Other Taxes | | |
|---|---|---|---|
| 4 | Self-employment tax. Attach Schedule SE | 4 | 70,108. |
| 5 | Unreported social security and Medicare tax from Form: **a** ☐ 4137 **b** ☐ 8919 | 5 | |
| 6 | Additional tax on IRAs, other qualified retirement plans, and other tax-favored accounts. Attach Form 5329 if required | 6 | |
| 7a | Household employment taxes. Attach Schedule H | 7a | |
| b | Repayment of first-time homebuyer credit from Form 5405. Attach Form 5405 if required | 7b | |
| 8 | Taxes from: **a** ☒ Form 8959 **b** ☒ Form 8960 **c** ☐ Instructions; enter code(s) SEE STATEMENT 7 | 8 | 113,577. |
| 9 | Section 965 net tax liability installment from Form 965-A ........ 9 | | |
| 10 | Add lines 4 through 8. These are your **total other taxes.** Enter here and on Form 1040 or 1040-SR, line 15 | 10 | 183,685. |

LHA    **For Paperwork Reduction Act Notice, see your tax return instructions.**                    Schedule 2 (Form 1040 or 1040-SR) 2019

913924  12-02-19

AMENDED

**SCHEDULE 3**
(Form 1040 or 1040-SR)

Department of the Treasury
Internal Revenue Service

# Additional Credits and Payments

▶ Attach to Form 1040 or 1040-SR.
▶ Go to www.irs.gov/Form1040 for instructions and the latest information.

OMB No. 1545-0074

**2019**

Attachment
Sequence No. **03**

Name(s) shown on Form 1040 or 1040-SR

TONY D. & ELIZABETH A. TOWNLEY

Your social security number

| Part I | Nonrefundable Credits | | |
|---|---|---|---|
| **1** | Foreign tax credit. Attach Form 1116 if required | **1** | 54. |
| **2** | Credit for child and dependent care expenses. Attach Form 2441 | **2** | |
| **3** | Education credits from Form 8863, line 19 | **3** | |
| **4** | Retirement savings contributions credit. Attach Form 8880 | **4** | |
| **5** | Residential energy credits. Attach Form 5695 | **5** | |
| **6** | Other credits from Form: **a** [X] 3800  **b** [ ] 8801  **c** [ ] | **6** | 250,227. |
| **7** | Add lines 1 through 6. Enter here and include on Form 1040 or 1040-SR, line 13b | **7** | 250,281. |
| Part II | Other Payments and Refundable Credits | | |
| **8** | 2019 estimated tax payments and amount applied from 2018 return          STMT 8 | **8** | 7,000,516. |
| **9** | Net premium tax credit. Attach Form 8962 | **9** | |
| **10** | Amount paid with request for extension to file (see instructions) | **10** | 3,500,000. |
| **11** | Excess social security and tier 1 RRTA tax withheld | **11** | |
| **12** | Credit for federal tax on fuels. Attach Form 4136 | **12** | |
| **13** | Credits from Form: **a** [ ] 2439  **b** [ ] Reserved  **c** [ ] 8885  **d** [ ] | **13** | |
| **14** | Add lines 8 through 13. Enter here and on Form 1040 or 1040-SR, line 18d | **14** | 10,500,516. |

LHA    **For Paperwork Reduction Act Notice, see your tax return instructions.**    Schedule 3 (Form 1040 or 1040-SR) 2019

913925  12-23-19

AMENDED

| SCHEDULE A<br>(Form 1040 or 1040-SR)<br>(Rev. January 2020)<br>Department of the Treasury<br>Internal Revenue Service (99) | **Itemized Deductions**<br>▶ Go to www.irs.gov/ScheduleA for instructions and the latest information.<br>▶ Attach to Form 1040 or 1040-SR.<br>**Caution:** If you are claiming a net qualified disaster loss on Form 4684, see the instructions for line 16. | OMB No. 1545-0074<br>**2019**<br>Attachment<br>Sequence No. **07** |
|---|---|---|

Name(s) shown on Form 1040 or 1040-SR | Your social security number

TONY D. & ELIZABETH A. TOWNLEY

| **Medical and Dental Expenses** | **Caution:** Do not include expenses reimbursed or paid by others. | | |
|---|---|---|---|
| | 1 Medical and dental expenses (see instructions) | 1 | |
| | 2 Enter amount from Form 1040 or 1040-SR, line 8b ......... 2 | | |
| | 3 Multiply line 2 by 7.5% (0.075) | 3 | |
| | 4 Subtract line 3 from line 1. If line 3 is more than line 1, enter -0- | 4 | |

| **Taxes You Paid** | 5 State and local taxes. | | |
|---|---|---|---|
| | a State and local income taxes or general sales taxes. You may include either income taxes or general sales taxes on line 5a, but not both. If you elect to include general sales taxes instead of income taxes, check this box    SEE STATEMENT 9   ▶ ☐ | 5a | 1,870,549. |
| | b State and local real estate taxes (see instructions) | 5b | 105,453. |
| | c State and local personal property taxes | 5c | |
| | d Add lines 5a through 5c | 5d | 1,976,002. |
| | e Enter the smaller of line 5d or $10,000 ($5,000 if married filing separately) | 5e | 10,000. |
| | 6 Other taxes. List type and amount ▶ | 6 | |
| | 7 Add lines 5e and 6 | 7 | 10,000. |

| **Interest You Paid**<br>**Caution:** Your mortgage interest deduction may be limited (see instructions). | 8 Home mortgage interest and points. If you didn't use all of your home mortgage loan(s) to buy, build, or improve your home, see instructions and check this box                    ▶ ☐ | | |
|---|---|---|---|
| | a Home mortgage interest and points reported to you on Form 1098. See instructions if limited | 8a | |
| | b Home mortgage interest not reported to you on Form 1098. See instructions if limited. If paid to the person from whom you bought the home, see instructions and show that person's name, identifying no., and address ▶ | 8b | |
| | c Points not reported to you on Form 1098. See instructions for special rules | 8c | |
| | d Mortgage insurance premiums (see instructions) | 8d | |
| | e Add lines 8a through 8d | 8e | |
| | 9 Investment interest. Attach Form 4952 if required. See instructions | 9 | |
| | 10 Add lines 8e and 9 | 10 | |

| **Gifts to Charity**<br>**Caution:** If you made a gift and got a benefit for it, see instructions. | 11 Gifts by cash or check. If you made any gift of $250 or more, see instructions | 11 | 260,195.   STMT 10 |
|---|---|---|---|
| | 12 Other than by cash or check. If you made any gift of $250 or more, see instructions. You **must** attach Form 8283 if over $500 | 12 | 20,173,843. |
| | 13 Carryover from prior year | 13 | 0. |
| | 14 Add lines 11 through 13 | 14 | 20,434,038. |

| **Casualty and Theft Losses** | 15 Casualty and theft loss(es) from a federally declared disaster (other than net qualified disaster losses). Attach Form 4684 and enter the amount from line 18 of that form. See instructions | 15 | |
|---|---|---|---|

| **Other Itemized Deductions** | 16 Other - from list in instructions. List type and amount ▶ | 16 | |
|---|---|---|---|

| **Total Itemized Deductions** | 17 Add the amounts in the far right column for lines 4 through 16. Also, enter this amount on Form 1040 or 1040-SR, line 9 | 17 | 20,444,038. |
|---|---|---|---|
| | 18 If you elect to itemize deductions even though they are less than your standard deduction, check this box ▶ ☐ | | |

LHA  **For Paperwork Reduction Act Notice, see the Instructions for Forms 1040 and 1040-SR.**      **Schedule A (Form 1040 or 1040-SR) 2019**
919501 01-14-20

**AMENDED**

## Schedule A - Charitable Contributions Worksheet Page 1

NAME

TONY D. & ELIZABETH A. TOWNLEY

50% of AGI   **20,434,038.**    AGI   **40,868,075.**

| Year | 100% Limit | 60% Limit | 50% Limit | 30% Limit | Appreciated Property 30% Limit | Appreciated Property 20% Limit | Total Contributions Allowed | Total Contributions Carryover |
|---|---|---|---|---|---|---|---|---|
| **2006** Contributions | | | | | | | | |
| Less: Allowed | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O | | | | | | | | |
| **2007** Contributions | | | | | | | | |
| Less: Allowed | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O | | | | | | | | |
| **2008** Contributions | | | | | | | | |
| Less: Allowed | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O | | | | | | | | |
| **2009** Contributions | | | | | | | | |
| Less: Allowed | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O | | | | | | | | |
| **2010** Contributions | | | | | | | | |
| Less: Allowed | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O | | | | | | | | |
| **2011** Contributions | | | | | | | | |
| Less: Allowed | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O | | | | | | | | |
| **2012** Contributions | | | | | | | | |
| Less: Allowed | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O | | | | | | | | |

912191  04-01-19

AMENDED

## Schedule A - Charitable Contributions Worksheet Page 2

NAME

TONY D. & ELIZABETH A. TOWNLEY

| | | | | 50% of AGI | 20,434,038. | | AGI | 40,868,075. |

| Year | 100% Limit | 60% Limit | 50% Limit | 30% Limit | Appreciated Property 30% Limit | Appreciated Property 20% Limit | Total Contributions Allowed | Total Contributions Carryover |
|---|---|---|---|---|---|---|---|---|
| **2013** Contributions | | | | | | | | |
| Less: Allowed ... | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O ... | | | | | | | | |
| **2014** Contributions | | | | | | | | |
| Less: Allowed ... | | | | | | | | |
| Less: NOL Absorb. | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| Expired ... | | | | | | | | |
| CRP C/O ... | | | | | | | | |
| **2015** Contributions | | | | | | | | |
| Less: Allowed ... | | | | | | | | |
| Less: NOL Absorb. | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| Carryover ... | | | | | | | | |
| CRP C/O ... | | | | | | | | |
| **2016** Contributions | | | | | | | | |
| Less: Allowed ... | | | | | | | | |
| Less: NOL Absorb. | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| Carryover ... | | | | | | | | |
| CRP C/O ... | | | | | | | | |
| **2017** Contributions | | | | | | | | |
| Less: Allowed ... | | | | | | | | |
| Less: NOL Absorb. | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| Carryover ... | | | | | | | | |
| CRP C/O ... | | | | | | | | |

912192 03-16-20

Case 3:22-cv-00107-CDL   Document 1-1   Filed 10/28/22   Page 23 of 600

## Schedule A - Charitable Contributions Worksheet Page 3

NAME

TONY D. & ELIZABETH A. TOWNLEY

50% of AGI **20,434,038.**    AGI **40,868,075.**

| Year | 100% Limit | 60% Limit | 50% Limit | 30% Limit | Appreciated Property 30% Limit | Appreciated Property 20% Limit | Total Contributions Allowed | Total Contributions Carryover |
|---|---|---|---|---|---|---|---|---|
| **2018** Contributions | | | 24,310,630. | | | | | |
| Less: Allowed ... | | | | | | | | |
| Less: NOL Absorb. | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| Carryover ... | | | | | | | | 24,310,630. |
| CRP C/O ... | | | 24,310,630. | | | | | |
| **2019** Contributions | | 260,195. | 120050000. | | | | | |
| Less: Allowed ... | | 260,195. | 20,173,843. | 0. | 0. | 0. | 20,434,038. | |
| Less: NOL Absorb. | | | | | | | | |
| Less: NOL Abs. CRP and Disaster | | | | | | | | |
| Carryover ... | | | | | | | | 99,876,157. |
| CRP C/O ... | | | 99,876,157. | | | | | |
| Disaster C/O | | | | | | | | |
| Charitable contributions to Schedule A, Line 14 | | | | | | | 20,434,038. | |
| | | | | | | | | 124186787. |

912193  12-16-19

**AMENDED**

| Schedule A | Charitable Contributions Limitation |
|---|---|

NAME TONY D. & ELIZABETH A. TOWNLEY

**60% Contributions**

| | | | |
|---|---|---|---|
| 1. | 60% of AGI | 24,520,845. | |
| 2. | Contributions qualifying for 60% limit | 260,195. | |
| 3. | Allowable 60% contributions | | 260,195. |

**50% Contributions**

| | | | |
|---|---|---|---|
| 4. | 50% of AGI | 20,434,038. | |
| 5. | Contributions qualifying for 50% limit | | |
| 6. | Allowable 50% contributions (lesser of Line 4 - Line 3 or Line 5) | | 0. |

**30% Contributions**

| | | | |
|---|---|---|---|
| 7. | Remaining 50% limit (Line 4 less Lines 3 and 6) | 20,173,843. | |
| 8. | Less capital gain property - special 30% limits | | |
| 9. | Balance of 50% of AGI | 20,173,843. | |
| 10. | 30% of AGI | 12,260,423. | |
| 11. | Contributions qualifying for 30% limit | | |
| 12. | Allowable 30% contributions (lesser of Line 9, 10 or 11) | | 0. |

**30% Special Contributions**

| | | | |
|---|---|---|---|
| 13. | 30% of AGI | 12,260,423. | |
| 14. | Contributions qualifying for 30% special limit | | |
| 15. | Remaining 50% limit (Line 4 less the sum of Lines 3, 6 and 12) | 20,173,843. | |
| 16. | Allowable 30% special contribution (lesser of Line 13, 14 or 15) | | 0. |

**20% Contributions**

| | | | |
|---|---|---|---|
| 17. | 20% of AGI | 8,173,615. | |
| 18. | 30% of AGI | 12,260,423. | |
| 19. | Allowed 30% regular contributions | | |
| 20. | Line 18 less Line 19 | 12,260,423. | |
| 21. | Allowed 30% special contributions | | |
| 22. | Line 18 less Line 21 | 12,260,423. | |
| 23. | Remaining 50% limit (Line 4 less the sum of Lines 3, 6, 12, and 16) | 20,173,843. | |
| 24. | Contributions subject to the 20% limitation | | |
| 25. | Allowable 20% contributions (lesser of Line 17, 20, 22, 23 or 24) | | 0. |

**50% and 100% Conservation Real Property Contributions**

| | | | |
|---|---|---|---|
| 26. | Remaining 50% limit (Line 4 less the sum of Lines 3, 6, 12, 16 and 25) | 20,173,843. | |
| 27. | Conservation real property contribution subject to 50% limit | 120,050,000. | |
| 28. | Allowable 50% conservation real property contribution (lesser of Line 26 or 27) | | 20,173,843. |
| 29. | Remaining 100% of AGI | 20,434,037. | |
| 30. | Conservation real property contribution subject to 100% limit | | |
| 31. | Allowable 100% conservation real property contribution (lesser of Line 29 or 30) | | 0. |

**Qualified Disaster Contributions**

| | | | |
|---|---|---|---|
| 32. | Remaining 100% of AGI | 20,434,037. | |
| 33. | Qualified disaster contributions subject to 100% limit | | |
| 34. | Allowable qualified disaster contributions (lesser of Line 32 or 33) | | 0. |

| | | | |
|---|---|---|---|
| 35. | Total 2019 contributions allowed on Schedule A | | 20,434,038. |
| 36. | Total prior year carryovers allowed on Schedule A | | |
| 37. | Total charitable contributions to Schedule A, Line 14 | | 20,434,038. |

922021 06-11-20

**SCHEDULE B**
(Form 1040 or 1040-SR)

Department of the Treasury
Internal Revenue Service (99)

# Interest and Ordinary Dividends

▶ Go to www.irs.gov/ScheduleB for instructions and the latest information.
▶ Attach to Form 1040 or 1040-SR.

OMB No. 1545-0074

**2019**

Attachment
Sequence No. **08**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Your social security number

## Part I
### Interest

**Note:** If you received a Form 1099-INT, Form 1099-OID, or substitute statement from a brokerage firm, list the firm's name as the payer and enter the total interest shown on that form.

| | | Amount |
|---|---|---|
| **1** | List name of payer. If any interest is from a seller-financed mortgage and the buyer used the property as a personal residence, see the instructions and list this interest first. Also, show that buyer's social security number and address ▶ | |
| | SEE STATEMENT 11 | 2,516,922. |
| | | |
| | SUBTOTAL FOR LINE 1 | 2,516,922. |
| | TAX-EXEMPT INTEREST          SEE STATEMENT 12 | -22,387. |
| **2** | Add the amounts on line 1 | **2** 2,494,535. |
| **3** | Excludable interest on series EE and I U.S. savings bonds issued after 1989. Attach Form 8815 | **3** |
| **4** | Subtract line 3 from line 2. Enter the result here and on Form 1040 or 1040-SR, line 2b ▶ | **4** 2,494,535. |

**Note:** If line 4 is over $1,500, you must complete Part III.

## Part II
### Ordinary Dividends

**Note:** If you received a Form 1099-DIV or substitute statement from a brokerage firm, list the firm's name as the payer and enter the ordinary dividends shown on that form.

| | | Amount |
|---|---|---|
| **5** | List name of payer ▶ | |
| | VANGUARD #9138 | 24,633. |
| | COMPUTERSHARE INC. | 67. |
| | FROM K-1 - PLUCKED CHICKEN, INC. | 3,991. |
| | FROM K-1 - CLUCKZ HOLDINGS, LLC | 150. |
| | FROM K-1 - ZAXBY'S OPERATING COMPANY, LP (TDT) | 748. |
| | FROM K-1 - CLUCKZ HOLDINGS, LLC (SECG) | 45. |
| **6** | Add the amounts on line 5. Enter the total here and on Form 1040 or 1040-SR, line 3b ▶ | **6** 29,634. |

**Note:** If line 6 is over $1,500, you must complete Part III.

## Part III
### Foreign Accounts and Trusts

**Caution:** If required, failure to file FinCEN Form 114 may result in substantial penalties. See instructions.

You must complete this part if you **(a)** had over $1,500 of taxable interest or ordinary dividends; **(b)** had a foreign account; or **(c)** received a distribution from, or were a grantor of, or a transferor to, a foreign trust.

| | | Yes | No |
|---|---|---|---|
| **7a** | At any time during 2019, did you have a financial interest in or signature authority over a financial account (such as a bank account, securities account, or brokerage account) located in a foreign country? See instructions | | X |
| | If "Yes," are you required to file FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR), to report that financial interest or signature authority? See FinCEN Form 114 and its instructions for filing requirements and exceptions to those requirements | | |
| **b** | If you are required to file FinCEN Form 114, enter the name of the foreign country where the financial account is located ▶ | | |
| **8** | During 2019, did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust? | | X |
| | If "Yes," you may have to file Form 3520. See instructions | | |

927501  11-19-19

LHA    **For Paperwork Reduction Act Notice, see your tax return instructions.**    Schedule B (Form 1040 or 1040-SR) 2019

**SCHEDULE C**
(Form 1040 or 1040-SR)

Department of the Treasury
Internal Revenue Service  (99)

## Profit or Loss From Business
(Sole Proprietorship)

▶ Go to www.irs.gov/ScheduleC for instructions and the latest information.
▶ Attach to Form 1040, 1040-SR, 1040-NR, or 1041; partnerships generally must file Form 1065.

OMB No. 1545-0074

**2019**

Attachment
Sequence No. **09**

Name of proprietor: TONY D. TOWNLEY

Social security number (SSN)

| A | Principal business or profession, including product or service (see instructions) | B Enter code from instructions ▶ 561210 |
|---|---|---|

MANAGEMENT

| C | Business name. If no separate business name, leave blank. | D Employer ID number (EIN) (see instr.) |
|---|---|---|

OTF MANAGEMENT, LLC

E   Business address (including suite or room no.) ▶ 1280 SNOWS MILL RD
City, town or post office, state, and ZIP code   BOGART, GA 30622

F   Accounting method:   (1) [X] Cash   (2) [ ] Accrual   (3) [ ] Other (specify) ▶

G   Did you "materially participate" in the operation of this business during 2019? If "No," see instructions for limit on losses ........ [X] Yes [ ] No

H   If you started or acquired this business during 2019, check here ................................................. ▶ [ ]

I   Did you make any payments in 2019 that would require you to file Form(s) 1099? (see instructions) ............ [ ] Yes [X] No

J   If "Yes," did you or will you file required Forms 1099? ............................................... [ ] Yes [ ] No

### Part I   Income

| | | | |
|---|---|---|---:|
| 1 | Gross receipts or sales. See instructions for line 1 and check the box if this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked ▶ [ ] | 1 | 661,555. |
| 2 | Returns and allowances | 2 | |
| 3 | Subtract line 2 from line 1 | 3 | 661,555. |
| 4 | Cost of goods sold (from line 42) | 4 | |
| 5 | **Gross profit.** Subtract line 4 from line 3 | 5 | 661,555. |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) | 6 | |
| 7 | **Gross income.** Add lines 5 and 6 ▶ | 7 | 661,555. |

### Part II   Expenses. Enter expenses for business use of your home **only** on line 30.

| | | | | | | | |
|---|---|---|---:|---|---|---|---:|
| 8 | Advertising | 8 | | 18 | Office expense | 18 | 14,430. |
| 9 | Car and truck expenses (see instructions) | 9 | | 19 | Pension and profit-sharing plans | 19 | |
| 10 | Commissions and fees | 10 | | 20 | Rent or lease (see instructions): | | |
| 11 | Contract labor (see instructions) | 11 | | a | Vehicles, machinery, and equipment | 20a | 2,040. |
| 12 | Depletion | 12 | | b | Other business property | 20b | 186,875. |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions) | 13 | 1,810. | 21 | Repairs and maintenance | 21 | 53,765. |
| | | | | 22 | Supplies (not included in Part III) | 22 | 17,520. |
| | | | | 23 | Taxes and licenses | 23 | 12,343. |
| 14 | Employee benefit programs (other than on line 19) | 14 | | 24 | Travel and meals: | | |
| | | | | a | Travel | 24a | 1,682. |
| 15 | Insurance (other than health) | 15 | 13,670. | b | Deductible meals (see instructions) | 24b | 25. |
| 16 | Interest (see instructions): | | | 25 | Utilities | 25 | 12,433. |
| a | Mortgage (paid to banks, etc.) | 16a | | 26 | Wages (less employment credits) | 26 | 803,684. |
| b | Other | 16b | 8,445. | 27a | Other expenses (from line 48) | 27a | |
| 17 | Legal and professional services | 17 | 487. | b | Reserved for future use | 27b | |
| 28 | **Total expenses** before expenses for business use of home. Add lines 8 through 27a ▶ | | | | | 28 | 1,129,209. |
| 29 | Tentative profit or (loss). Subtract line 28 from line 7 | | | | | 29 | -467,654. |

| | | | |
|---|---|---|---:|
| 30 | Expenses for business use of your home. Do not report these expenses elsewhere. Attach Form 8829 unless using the simplified method (see instructions). | | |
| | **Simplified method filers only:** enter the total square footage of: (a) your home: _____ and (b) the part of your home used for business: _____ . Use the Simplified Method Worksheet in the instructions to figure the amount to enter on line 30 | 30 | |
| 31 | **Net profit or (loss).** Subtract line 30 from line 29. | | |
| | ● If a profit, enter on both **Schedule 1 (Form 1040 or 1040-SR), line 3** (or **Form 1040-NR, line 13**) and on **Schedule SE, line 2.** (If you checked the box on line 1, see instructions). Estates and trusts, enter on **Form 1041, line 3.** | 31 | -467,654. |
| | ● If a loss, you **must** go to line 32. | | |

| | | | |
|---|---|---|---|
| 32 | If you have a loss, check the box that describes your investment in this activity (see instructions). | | |
| | ● If you checked 32a, enter the loss on both **Schedule 1 (Form 1040 or 1040-SR), line 3** (or **Form 1040-NR, line 13**) and on **Schedule SE, line 2.** (If you checked the box on line 1, see the line 31 instructions). Estates and trusts, enter on **Form 1041, line 3.** | 32a | [X] All investment is at risk. |
| | ● If you checked 32b, you **must** attach **Form 6198.** Your loss may be limited. | 32b | [ ] Some investment is not at risk. |

LHA   **For Paperwork Reduction Act Notice, see the separate instructions.**

920001  10-09-19

Schedule C (Form 1040 or 1040-SR) 2019

| SCHEDULE D | Capital Gains and Losses | OMB No. 1545-0074 |
|---|---|---|
| **(Form 1040 or 1040-SR)** | ▶ Attach to Form 1040, 1040-SR, or 1040-NR. | **2019** |
| Department of the Treasury<br>Internal Revenue Service (99) | ▶ Go to www.irs.gov/ScheduleD for instructions and the latest information.<br>▶ Use Form 8949 to list your transactions for lines 1b, 2, 3, 8b, 9, and 10. | Attachment<br>Sequence No. **12** |

| Name(s) shown on return | Your social security number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | |

Did you dispose of any investment(s) in a qualified opportunity fund during the tax year?  ☐ Yes  ☒ No

If "Yes," attach Form 8949 and see its instructions for additional requirements for reporting your gain or loss.

### Part I — Short-Term Capital Gains and Losses - Generally Assets Held One Year or Less  (see instructions)

| See instructions for how to figure the amounts to enter on the lines below.<br><br>This form may be easier to complete if you round off cents to whole dollars. | **(d)**<br>Proceeds<br>(sales price) | **(e)**<br>Cost<br>(or other basis) | **(g)**<br>Adjustments<br>to gain or loss from<br>Form(s) 8949, Part I,<br>line 2, column (g) | **(h) Gain or (loss)**<br>Subtract column (e)<br>from column (d) and<br>combine the result<br>with column (g) |
|---|---|---|---|---|
| **1a** Totals for all short-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 1b ............... | | | | |
| **1b** Totals for all transactions reported on Form(s) 8949 with **Box A** checked ............... | | | | |
| **2** Totals for all transactions reported on Form(s) 8949 with **Box B** checked ............... | | | | |
| **3** Totals for all transactions reported on Form(s) 8949 with **Box C** checked ............... | 730,000. | 649,700. | | 80,300. |

| | | |
|---|---|---|
| **4** Short-term gain from Form 6252 and short-term gain or (loss) from Forms 4684, 6781, and 8824 ............... | **4** | |
| **5** Net short-term gain or (loss) from partnerships, S corporations, estates, and trusts<br>from Schedule(s) K-1 ......................... SEE STATEMENT 14 | **5** | <555.> |
| **6** Short-term capital loss carryover. Enter the amount, if any, from line 8 of your **Capital Loss Carryover Worksheet** in the instructions | **6** | ( ) |
| **7** **Net short-term capital gain or (loss).** Combine lines 1a through 6 in column (h). If you have any long-term capital gains or losses, go to Part II below. Otherwise, go to Part III on page 2 | **7** | 79,745. |

### Part II — Long-Term Capital Gains and Losses - Generally Assets Held More Than One Year  (see instructions)

| See instructions for how to figure the amounts to enter on the lines below.<br><br>This form may be easier to complete if you round off cents to whole dollars. | **(d)**<br>Proceeds<br>(sales price) | **(e)**<br>Cost<br>(or other basis) | **(g)**<br>Adjustments<br>to gain or loss from<br>Form(s) 8949, Part II,<br>line 2, column (g) | **(h) Gain or (loss)**<br>Subtract column (e)<br>from column (d) and<br>combine the result<br>with column (g) |
|---|---|---|---|---|
| **8a** Totals for all long-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 8b ............... | | | | |
| **8b** Totals for all transactions reported on Form(s) 8949 with **Box D** checked ............... | | | | |
| **9** Totals for all transactions reported on Form(s) 8949 with **Box E** checked ............... | 985,000. | 1,385,000. | 400,000. | 0. |
| **10** Totals for all transactions reported on Form(s) 8949 with **Box F** checked ............... | 50,450. | 60,000. | 9,550. | 0. |

| | | |
|---|---|---|
| **11** Gain from Form 4797, Part I; long-term gain from Forms 2439 and 6252; and long-term gain or (loss)<br>from Forms 4684, 6781, and 8824 ......................... SEE STATEMENT 13 | **11** | 597,740. |
| **12** Net long-term gain or (loss) from partnerships, S corporations, estates, and trusts from<br>Schedule(s) K-1 ......................... SEE STATEMENT 15 | **12** | 6,187. |
| **13** Capital gain distributions ............... | **13** | |
| **14** Long-term capital loss carryover. Enter the amount, if any, from line 13 of your **Capital Loss Carryover Worksheet** in the instructions | **14** | ( ) |
| **15** **Net long-term capital gain or (loss).** Combine lines 8a through 14 in column (h). Then go to Part III on page 2 | **15** | 603,927. |

LHA    **For Paperwork Reduction Act Notice, see your tax return instructions.**                 Schedule D (Form 1040) 2019

920511  11-14-19

Case 3:22-cv-00107-CDL    Document 1    Filed 10/28/22    Page 28 of 600

Schedule D (Form 1040 or 1040-SR) 2019  TONY D. & ELIZABETH A. TOWNLEY    ███████    Page **2**

| Part III | Summary |
|---|---|

**16** Combine lines 7 and 15 and enter the result ................................ | **16** | 683,672.

- If line 16 is a **gain**, enter the amount from line 16 on Form 1040 or 1040-SR, line 6; or Form 1040-NR, line 14. Then go to line 17 below.
- If line 16 is a **loss**, skip lines 17 through 20 below. Then go to line 21. Also be sure to complete line 22.
- If line 16 is **zero**, skip lines 17 through 21 below and enter -0- on Form 1040 or 1040-SR, line 6; or Form 1040-NR, line 14. Then go to line 22.

**17** Are lines 15 and 16 **both** gains?
[X] **Yes.** Go to line 18.
[ ] **No.** Skip lines 18 through 21, and go to line 22.

**18** If you are required to complete the **28% Rate Gain Worksheet** (see instructions), enter the amount, if any, from line 7 of that worksheet ................................ ▶ | **18** |

**19** If you are required to complete the **Unrecaptured Section 1250 Gain Worksheet** (see instructions), enter the amount, if any, from line 18 of that worksheet  SEE STATEMENT 16 ▶ | **19** | 52,147.

**20** Are lines 18 and 19 **both** zero or blank?
[ ] **Yes.** Complete the **Qualified Dividends and Capital Gain Tax Worksheet** in the instructions for Forms 1040 and 1040-SR, line 12a (or in the instructions for Form 1040-NR, line 42). **Don't** complete lines 21 and 22 below.

[X] **No.** Complete the **Schedule D Tax Worksheet** in the instructions. **Don't** complete lines 21 and 22 below.

**21** If line 16 is a loss, enter here and on Form 1040 or 1040-SR, line 6; or Form 1040-NR, line 14, the **smaller** of:
- The loss on line 16; or
- ($3,000), or if married filing separately, ($1,500)
................................ | **21** | (        )

**Note:** When figuring which amount is smaller, treat both amounts as positive numbers.

**22** Do you have qualified dividends on Form 1040 or 1040-SR, line 3a; or Form 1040-NR, line 10b?

[ ] **Yes.** Complete the **Qualified Dividends and Capital Gain Tax Worksheet** in the instructions for Forms 1040 and 1040-SR, line 12a (or in the instructions for Form 1040-NR, line 42).

[ ] **No.** Complete the rest of Form 1040, 1040-SR, or 1040-NR.

Schedule D (Form 1040 or 1040-SR) 2019

920512  11-14-19

Form **8949**

Department of the Treasury
Internal Revenue Service

# Sales and Other Dispositions of Capital Assets

▶ Go to www.irs.gov/Form8949 for instructions and the latest information.
▶ File with your Schedule D to list your transactions for lines 1b, 2, 3, 8b, 9, and 10 of Schedule D.

OMB No. 1545-0074

**2019**

Attachment
Sequence No. **12A**

| Name(s) shown on return | Social security number or taxpayer identification no. |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | |

*Before you check Box A, B, or C below, see whether you received any Form(s) 1099-B or substitute statement(s) from your broker. A substitute statement will have the same information as Form 1099-B. Either will show whether your basis (usually your cost) was reported to the IRS by your broker and may even tell you which box to check.*

**Part I** **Short-Term.** Transactions involving capital assets you held 1 year or less are generally short-term (see instructions). For long-term transactions, see page 2.

**Note:** You may aggregate all short-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS and for which no adjustments or codes are required. Enter the totals directly on Schedule D, line 1a; you aren't required to report these transactions on Form 8949 (see instructions).

**You must check Box A, B, or C below. Check only one box.** If more than one box applies for your short-term transactions, complete a separate Form 8949, page 1, for each applicable box. If you have more short-term transactions than will fit on this page for one or more of the boxes, complete as many forms with the same box checked as you need.

- ☐ **(A)** Short-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS (see **Note** above)
- ☐ **(B)** Short-term transactions reported on Form(s) 1099-B showing basis **wasn't** reported to the IRS
- ☒ **(C)** Short-term transactions not reported to you on Form 1099-B

| 1 (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold or disposed of (Mo., day, yr.) | (d) Proceeds (sales price) | (e) Cost or other basis. See the **Note** below and see *Column (e)* in the instructions | (f) Code(s) | (g) Amount of adjustment | (h) Gain or (loss). Subtract column (e) from column (d) & combine the result with column (g) |
|---|---|---|---|---|---|---|---|
| GA FILM TAX CREDIT | 10/11/19 | 10/11/19 | 730,000. | 649,700. | | | 80,300. |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| **2 Totals.** Add the amounts in columns (d), (e), (g), and (h) (subtract negative amounts). Enter each total here and include on your Schedule D, **line 1b** (if **Box A** above is checked), **line 2** (if **Box B** above is checked), or **line 3** (if **Box C** above is checked) ▶ | | | 730,000. | 649,700. | | | 80,300. |

**Note:** If you checked Box A above but the basis reported to the IRS was incorrect, enter in column (e) the basis as reported to the IRS, and enter an adjustment in column (g) to correct the basis. See *Column (g)* in the separate instructions for how to figure the amount of the adjustment.

923011  12-11-19    LHA   **For Paperwork Reduction Act Notice, see your tax return instructions.**   Form **8949** (2019)

Case 3:22-cv-00107-CDL    Document 1-3    Filed 10/28/22    Page 30 of 600

**AMENDED**

| Name(s) shown on return. Name and SSN or taxpayer identification no. not required if shown on page 1 | Social security number or taxpayer identification no. |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | |

*Before you check Box D, E, or F below, see whether you received any Form(s) 1099-B or substitute statement(s) from your broker. A substitute statement will have the same information as Form 1099-B. Either will show whether your basis (usually your cost) was reported to the IRS by your broker and may even tell you which box to check.*

**Part II** | **Long-Term.** Transactions involving capital assets you held more than 1 year are generally long-term (see instructions). For short-term transactions, see page 1.

**Note:** You may aggregate all long-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS and for which no adjustments or codes are required. Enter the totals directly on Schedule D, line 8a; you aren't required to report these transactions on Form 8949 (see instructions).

**You must check Box D, E, or F below. Check only one box.** If more than one box applies for your long-term transactions, complete a separate Form 8949, page 2, for each applicable box. If you have more long-term transactions than will fit on this page for one or more of the boxes, complete as many forms with the same box checked as you need.

- ☐ **(D)** Long-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS (see **Note** above)
- ☒ **(E)** Long-term transactions reported on Form(s) 1099-B showing basis **wasn't** reported to the IRS
- ☐ **(F)** Long-term transactions not reported to you on Form 1099-B

| 1 | (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold or disposed of (Mo., day, yr.) | (d) Proceeds (sales price) | (e) Cost or other basis. See the **Note** below and see *Column (e)* in the instructions | (f) Code(s) | (g) Amount of adjustment | (h) Gain or (loss). Subtract column (e) from column (d) & combine the result with column (g) |
|---|---|---|---|---|---|---|---|---|
| | SALE OF 1400 OCEAN BOULEVARD UNIT 1 | 01/19/07 | 09/26/19 | 985,000. | 1385000. | L | 400,000. | 0. |
| | | | | | | | | |

**2 Totals.** Add the amounts in columns (d), (e), (g), and (h) (subtract negative amounts). Enter each total here and include on your Schedule D, **line 8b** (if **Box D** above is checked), **line 9** (if **Box E** above is checked), or **line 10** (if **Box F** above is checked) ▶ | 985,000. | 1385000. | | 400,000. | 0.

**Note:** If you checked Box D above but the basis reported to the IRS was incorrect, enter in column (e) the basis as reported to the IRS, and enter an adjustment in column (g) to correct the basis. See *Column (g)* in the separate instructions for how to figure the amount of the adjustment.

923012  12-11-19                                                                   Form **8949** (2019)

Case 3:22-cv-00107-CDL    Document 1-3    Filed 10/28/22    Page 31 of 600

| Form 8949 (2019) | Attachment Sequence No. **12A** | Page **2** |
|---|---|---|

Name(s) shown on return. Name and SSN or taxpayer identification no. not required if shown on page 1

**TONY D. & ELIZABETH A. TOWNLEY**

Social security number or taxpayer identification no.
▮▮▮▮▮▮▮

*Before you check Box D, E, or F below, see whether you received any Form(s) 1099-B or substitute statement(s) from your broker. A substitute statement will have the same information as Form 1099-B. Either will show whether your basis (usually your cost) was reported to the IRS by your broker and may even tell you which box to check.*

**Part II** | **Long-Term.** Transactions involving capital assets you held more than 1 year are generally long-term (see instructions). For short-term transactions, see page 1.

**Note:** You may aggregate all long-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS and for which no adjustments or codes are required. Enter the totals directly on Schedule D, line 8a; you aren't required to report these transactions on Form 8949 (see instructions).

**You must check Box D, E, or F below. Check only one box.** If more than one box applies for your long-term transactions, complete a separate Form 8949, page 2, for each applicable box. If you have more long-term transactions than will fit on this page for one or more of the boxes, complete as many forms with the same box checked as you need.

☐ **(D)** Long-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS (see **Note** above)

☐ **(E)** Long-term transactions reported on Form(s) 1099-B showing basis **wasn't** reported to the IRS

☒ **(F)** Long-term transactions not reported to you on Form 1099-B

| 1 | **(a)** Description of property (Example: 100 sh. XYZ Co.) | **(b)** Date acquired (Mo., day, yr.) | **(c)** Date sold or disposed of (Mo., day, yr.) | **(d)** Proceeds (sales price) | **(e)** Cost or other basis. See the **Note** below and see *Column (e)* in the instructions | Adjustment, if any, to gain or loss. If you enter an amount in column (g), enter a code in column (f). **See instructions.** | | **(h)** Gain or (loss). Subtract column (e) from column (d) & combine the result with column (g) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | **(f)** Code(s) | **(g)** Amount of adjustment | |
| | SALE OF ANTIQUE CARS | VARIOUS | 11/05/19 | 50,450. | 60,000. | L | 9,550. | 0. |
| | | | | | | | | |

| | | | **(d)** | **(e)** | | **(g)** | **(h)** |
|---|---|---|---|---|---|---|---|
| **2** **Totals.** Add the amounts in columns (d), (e), (g), and (h) (subtract negative amounts). Enter each total here and include on your Schedule D, **line 8b** (if **Box D** above is checked), **line 9** (if **Box E** above is checked), or **line 10** (if **Box F** above is checked) ▶ | | | 50,450. | 60,000. | | 9,550. | 0. |

**Note:** If you checked Box D above but the basis reported to the IRS was incorrect, enter in column (e) the basis as reported to the IRS, and enter an adjustment in column (g) to correct the basis. See *Column (g)* in the separate instructions for how to figure the amount of the adjustment.

923012  12-11-19

Form **8949** (2019)

AMENDED

| SCHEDULE E<br>Form 1040 or 1040-SR<br><br>Department of the Treasury<br>Internal Revenue Service (99) | **Supplemental Income and Loss**<br>(From rental real estate, royalties, partnerships, S corporations, estates, trusts, REMICs, etc.)<br>▶ Attach to Form 1040, 1040-SR, 1040-NR, or 1041.<br>▶ Go to www.irs.gov/ScheduleE for instructions and the latest information. | OMB No. 1545-0074<br>**2019**<br>Attachment<br>Sequence No. **13** |
|---|---|---|

| Name(s) shown on return | Your social security number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | |

**Part I    Income or Loss From Rental Real Estate and Royalties** Note: If you are in the business of renting personal property, use **Schedule C** (see instructions). If you are an individual, report farm rental income or loss from **Form 4835** on page 2, line 40.

**A** Did you make any payments in 2019 that would require you to file Form(s) 1099? (see instructions) .............. ☐ Yes ☒ No

**B** If "Yes," did you or will you file required Forms 1099? .............. ☐ Yes ☐ No

**1a** Physical address of each property (street, city, state, ZIP code)

**A** VARIOUS (FRAZER CREEK), OCONEE COUNTY, GA 30607

**B** VARIOUS (LANE CREEK), GA

**C**

| 1b | Type of Property<br>(from list below) | 2 For each rental real estate property listed above, report the number of fair rental and personal use days. Check the **QJV** box only if you meet the requirements to file as a qualified joint venture. See instructions. | | Fair Rental Days | Personal Use Days | QJV |
|---|---|---|---|---|---|---|
| **A** | 1 | | **A** | 365 | | ☐ |
| **B** | 4 | | **B** | | 14 | ☐ |
| **C** | | | **C** | | | ☐ |

**Type of Property:**

| 1 Single Family Residence | 3 Vacation/Short-Term Rental | 5 Land | 7 Self-Rental |
|---|---|---|---|
| 2 Multi-Family Residence | 4 Commercial | 6 Royalties | 8 Other (describe) |

| Income: | Properties: | | A | B | C |
|---|---|---|---|---|---|
| **3** Rents received | 3 | | 514,650. | 3,891. | |
| **4** Royalties received | 4 | | | | |
| **Expenses:** | | | | | |
| **5** Advertising | 5 | | | | |
| **6** Auto and travel (see instructions) | 6 | | | | |
| **7** Cleaning and maintenance | 7 | | | | |
| **8** Commissions | 8 | | | | |
| **9** Insurance | 9 | | 56,027. | | |
| **10** Legal and other professional fees | 10 | | 70,348. | 51,461. | |
| **11** Management fees | 11 | | | | |
| **12** Mortgage interest paid to banks, etc. (see instructions) | 12 | | | | |
| **13** Other interest | 13 | | | | |
| **14** Repairs | 14 | | 92,209. | | |
| **15** Supplies | 15 | | 21,261. | | |
| **16** Taxes | 16 | | 80,649. | | |
| **17** Utilities | 17 | | 20,383. | | |
| **18** Depreciation expense or depletion | 18 | | 252,258. | 1,519. | |
| **19** Other (list) ▶ STMT 17    STMT 18 | 19 | | 8,309. | 144. | |
| **20** Total expenses. Add lines 5 through 19 | 20 | | 601,444. | 53,124. | |
| **21** Subtract line 20 from line 3 (rents) and/or 4 (royalties). If result is a (loss), see instructions to find out if you must file **Form 6198** | 21 | | -86,794. | -49,233. | |
| **22** Deductible rental real estate loss after limitation, if any, on **Form 8582** (see instructions) | 22 | | (33.) | (17.) | ( ) |

| 23a Total of all amounts reported on line 3 for all rental properties | 23a | 518,541. |
|---|---|---|
| b Total of all amounts reported on line 4 for all royalty properties | 23b | |
| c Total of all amounts reported on line 12 for all properties | 23c | |
| d Total of all amounts reported on line 18 for all properties | 23d | 253,777. |
| e Total of all amounts reported on line 20 for all properties | 23e | 654,568. |

| 24 | **Income.** Add positive amounts shown on line 21. **Do not** include any losses | 24 | 0. |
|---|---|---|---|
| 25 | **Losses.** Add royalty losses from line 21 and rental real estate losses from line 22. Enter total losses here | 25 | 50.) |
| 26 | **Total rental real estate and royalty income or (loss).** Combine lines 24 and 25. Enter the result here. If Parts II, III, IV, and line 40 on page 2 do not apply to you, also enter this amount on Schedule 1 (Form 1040 or 1040-SR), line 5, or Form 1040-NR, line 18. Otherwise, include this amount in the total on line 41 on page 2 | 26 | -50. |

LHA   **For Paperwork Reduction Act Notice, see the separate instructions.**    Schedule E (Form 1040 or 1040-SR) 2019

921491  10-09-19

Schedule E (Form 1040 or 1040-SR) 2019      Attachment Sequence No. **13**      Page **2**

Name(s) shown on return. Do not enter name and social security number if shown on page 1.

**Your social security number**

TONY D. & ELIZABETH A. TOWNLEY

**Caution:** The IRS compares amounts reported on your tax return with amounts shown on Schedule(s) K-1.

**Part II**    **Income or Loss From Partnerships and S Corporations -**    **Note:** If you report a loss, receive a distribution, dispose of stock, or receive a loan repayment from an S corporation, you **must** check the box in column **(e)** on line 28 and attach the required basis computation. If you report a loss from an at-risk activity for which **any** amount is **not** at risk, you **must** check the box in column **(f)** on line 28 and attach **Form 6198** (see instructions).

27   Are you reporting any loss not allowed in a prior year due to the at-risk or basis limitations, a prior year unallowed loss from a passive activity (if that loss was not reported on Form 8582), or unreimbursed partnership expenses? If you answered "Yes," see instructions before completing this section    [X] **Yes**    [ ] **No**

28

| | (a) Name | (b) Enter P for partnership; S for S corporation | (c) Check if foreign partnership | (d) Employer identification number | (e) Check if basis computation is required | (f) Check if any amount is not at risk |
|---|---|---|---|---|---|---|
| A | SEE STATEMENT 20 | | | | | |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |

| | Passive Income and Loss | | Nonpassive Income and Loss | | |
|---|---|---|---|---|---|
| | (g) Passive loss allowed (attach **Form 8582** if required) | (h) Passive income from **Schedule K-1** | (i) Nonpassive loss allowed (see **Schedule K-1**) | (j) Section 179 expense deduction from **Form 4562** | (k) Nonpassive income from **Schedule K-1** |
| A | | | | | |
| B | | | | | |
| C | | | | | |
| D | | | | | |
| 29a Totals | | 324. | | | 44,452,493. |
| b Totals | 274. | | 7,342,449. | | |

30   Add columns (h) and (k) of line 29a    **30**   44,452,817.

31   Add columns (g), (i), and (j) of line 29b    **31**   (7,342,723. )

32   Total partnership and S corporation income or (loss). Combine lines 30 and 31    **32**   37,110,094.

**Part III**    **Income or Loss From Estates and Trusts**

33

| | (a) Name | (b) Employer identification number |
|---|---|---|
| A | ELIZABETH A. TOWNLEY TRUST | |
| B | TONY D. TOWNLEY TRUST | |

| | Passive Income and Loss | | Nonpassive Income and Loss | |
|---|---|---|---|---|
| | (c) Passive deduction or loss allowed (attach **Form 8582** if required) | (d) Passive income from **Schedule K-1** | (e) Deduction or loss from **Schedule K-1** | (f) Other income from **Schedule K-1** |
| A | | 0. | | |
| B | | 0. | | |
| 34a Totals | | | | |
| b Totals | | | | |

35   Add columns (d) and (f) of line 34a    **35**

36   Add columns (c) and (e) of line 34b    **36** (    )

37   Total estate and trust income or (loss). Combine lines 35 and 36    **37**

**Part IV**    **Income or Loss From Real Estate Mortgage Investment Conduits (REMICs) - Residual Holder**

38

| | (a) Name | (b) Employer identification number | (c) Excess inclusion from **Schedules Q**, line 2c (see instructions) | (d) Taxable income (net loss) from **Schedules Q**, line 1b | (e) Income from **Schedules Q**, line 3b |
|---|---|---|---|---|---|
| | | | | | |

39   Combine columns (d) and (e) only. Enter the result here and include in the total on line 41 below    **39**

**Part V**    **Summary**    * ENTIRE DISPOSITION OF ACTIVITY

40   Net farm rental income or (loss) from **Form 4835**. Also, complete line 42 below    **40**

41   **Total income or (loss).** Combine lines 26, 32, 37, 39, and 40. Enter the result here and on Schedule 1 (Form 1040 or 1040-SR), line 5, or Form 1040-NR, line 18 ▶    **41**   37,110,044.

42   **Reconciliation of farming and fishing income.** Enter your **gross** farming and fishing income reported on Form 4835, line 7; Schedule K-1 (Form 1065), box 14, code B; Schedule K-1 (Form 1120-S), box 17, code AC; and Schedule K-1 (Form 1041), box 14, code F (see instructions)    **42**   2,282.

43   **Reconciliation for real estate professionals.** If you were a real estate professional (see instructions), enter the net income or (loss) you reported anywhere on Form 1040, Form 1040-SR, or Form 1040-NR from all real estate activities in which you materially participated under the passive activity loss rules    **43**

921501 10-09-19      **Schedule E (Form 1040 or 1040-SR) 2019**

| SCHEDULE F | **Profit or Loss From Farming** | OMB No. 1545-0074 |
|---|---|---|
| **(Form 1040 or 1040-SR)** | ► Attach to Form 1040, Form 1040-SR, Form 1040-NR, Form 1041, or Form 1065. | **2019** |
| Department of the Treasury Internal Revenue Service (99) | ► Go to www.irs.gov/ScheduleF for instructions and the latest information. | Attachment Sequence No. **14** |

Name of proprietor

LOG CREEK TRUST

Social security number (SSN)

**A** Principal crop or activity
TIMBER

**B** Enter code from Part IV
► 113000

**C** Accounting method:
[X] Cash    [ ] Accrual

**D** Employer ID number (EIN)

**E** Did you "materially participate" in the operation of this business during 2019? If "No," see instructions for limit on passive losses. [X] Yes [ ] No

**F** Did you make any payments in 2019 that would require you to file Form(s) 1099? see instructions ............... [ ] Yes [X] No

**G** If "Yes," did you or will you file required Form(s) 1099? ............... [ ] Yes [ ] No

**Part I | Farm Income - Cash Method.** Complete Parts I and II (Accrual method. Complete Parts II and III, and Part I, line 9.)

| | | | | | |
|---|---|---|---|---|---|
| 1a | Sales of livestock and other resale items (see instructions) ...... | 1a | | | |
| b | Cost or other basis of livestock or other items reported on line 1a | 1b | | | |
| c | Subtract line 1b from line 1a ...... | | | 1c | |
| 2 | Sales of livestock, produce, grains, and other products you raised ...... | | | 2 | |
| 3a | Cooperative distributions (Form(s) 1099-PATR) ...... | 3a | | 3b Taxable amount | 3b |
| 4a | Agricultural program payments (see instructions) ...... | 4a | | 4b Taxable amount | 4b |
| 5a | Commodity Credit Corporation (CCC) loans reported under election ...... | | | 5a | |
| b | CCC loans forfeited ...... | 5b | | 5c Taxable amount | 5c |
| 6 | Crop insurance proceeds and federal crop disaster payments (see instructions): | | | | |
| a | Amount received in 2019 ...... | 6a | | 6b Taxable amount | 6b |
| c | If election to defer to 2020 is attached, check here ...... ► | | | 6d Amount deferred from 2018 | 6d |
| 7 | Custom hire (machine work) income ...... | | | 7 | |
| 8 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) STMT 22 | | | 8 | 8,552. |
| 9 | **Gross income.** Add amounts in the right column (lines 1c, 2, 3b, 4b, 5a, 5c, 6b, 6d, 7, and 8). | | | | |
| | If you use the accrual method, enter the amount from Part III, line 50 ...... ► | | | 9 | 8,552. |

**Part II | Farm Expenses - Cash and Accrual Method.** Do not include personal or living expenses. See instructions.

| | | | | | | |
|---|---|---|---|---|---|---|
| 10 | Car and truck expenses (see instructions). | | 23 | Pension and profit-sharing plans | 23 | |
| | Also attach **Form 4562** | 10 | 24 | Rent or lease (see instructions): | | |
| 11 | Chemicals ...... | 11 | a | Vehicles, machinery, equipment | 24a | |
| 12 | Conservation expenses (see instructions) | 12 | b | Other (land, animals, etc.) | 24b | |
| 13 | Custom hire (machine work) | 13 | 25 | Repairs and maintenance | 25 | |
| 14 | Depreciation and section 179 | | 26 | Seeds and plants ...... | 26 | |
| | expense (see instructions) | 14 | 27 | Storage and warehousing | 27 | |
| 15 | Employee benefit programs | | 28 | Supplies ...... | 28 | |
| | other than on line 23 | 15 | 29 | Taxes ...... | 29 | 12,283. |
| 16 | Feed ...... | 16 | 30 | Utilities ...... | 30 | |
| 17 | Fertilizers and lime ...... | 17 | 31 | Veterinary, breeding, and medicine | 31 | |
| 18 | Freight and trucking ...... | 18 | 32 | Other expenses (specify): | | |
| 19 | Gasoline, fuel, and oil ...... | 19 | a | SEE STATEMENT 21 | 32a | 39,081. |
| 20 | Insurance (other than health) | 20 | 1,066. | b | | 32b | |
| 21 | Interest (see instructions): | | c | | 32c | |
| a | Mortgage (paid to banks, etc.) | 21a | d | | 32d | |
| b | Other ...... | 21b | e | | 32e | |
| 22 | Labor hired (less employment credits) | 22 | f | | 32f | |
| 33 | **Total expenses.** Add lines 10 through 32f. If line 32f is negative, see instructions ...... ► | | | | 33 | 52,430. |
| 34 | **Net farm profit or (loss).** Subtract line 33 from line 9 ...... | | | | 34 | -43,878. |

If a profit, stop here and see instructions for where to report. If a loss, complete lines 35 and 36.

35 Reserved for future use.

36 Check the box that describes your investment in this activity and see instructions for where to report your loss:

a [X] All investment is at risk.    b [ ] Some investment is not at risk.

LHA   **For Paperwork Reduction Act Notice, see the separate instructions.** 　　　　Schedule F (Form 1040 or 1040-SR) 2019

922001 01-03-20

Case 3:22-cv-00107-CDL    Document 1-5    Filed 10/28/22    Page 35 of 600

**SCHEDULE SE**
**(Form 1040 or 1040-SR)**

Department of the Treasury
Internal Revenue Service    (99)

# Self-Employment Tax

▶ Go to www.irs.gov/ScheduleSE for instructions and the latest information.
▶ Attach to Form 1040, 1040-SR, or 1040-NR.

OMB No. 1545-0074

**2019**

Attachment
Sequence No. **17**

| Name of person with self-employment income (as shown on Form 1040, 1040-SR, or 1040-NR) | Social security number of person with **self-employment** income .................. ▶ |
|---|---|
| TONY D. TOWNLEY | |

Before you begin: To determine if you must file Schedule SE, see the instructions.

## May I Use Short Schedule SE or Must I Use Long Schedule SE?

**Note:** Use this flowchart **only** if you must file Schedule SE. If unsure, see *Who Must File Schedule SE* in the instructions.



**Section A–Short Schedule SE. Caution:** Read above to see if you can use Short Schedule SE.

| | | | |
|---|---|---|---|
| **1a** Net farm profit or (loss) from Schedule F, line 34, and farm partnerships, Schedule K-1 (Form 1065), box 14, code A .................................................................. STMT 24 | **1a** | | −84,788. |
| **b** If you received social security retirement or disability benefits, enter the amount of Conservation Reserve Program payments included on Schedule F, line 4b, or listed on Schedule K-1 (Form 1065), box 20, code AH | **1b** | | |
| **2** Net profit or (loss) from Schedule C, line 31; and Schedule K-1 (Form 1065), box 14, code A (other than farming). Ministers and members of religious orders, see instructions for types of income to report on this line. See instructions for other income to report ............... STMT 23 | **2** | | 2,087,227. |
| **3** Combine lines 1a, 1b, and 2 ............................................................... | **3** | | 2,002,439. |
| **4** Multiply line 3 by 92.35% (0.9235). If less than $400, you don't owe self-employment tax; **don't** file this schedule unless you have an amount on line 1b ........................................ ▶ | **4** | | 1,849,252. |
| **Note:** If line 4 is less than $400 due to Conservation Reserve Program payments on line 1b, see instructions. | | | |
| **5** Self-employment tax. If the amount on line 4 is: <br>• $132,900 or less, multiply line 4 by 15.3% (0.153). Enter the result here and on **Schedule 2 (Form 1040 or 1040-SR), line 4,** or **Form 1040-NR, line 55.** <br>• More than $132,900, multiply line 4 by 2.9% (0.029). Then, add $16,479.60 to the result. Enter the total here and on **Schedule 2 (Form 1040 or 1040-SR), line 4,** or **Form 1040-NR, line 55** ......... | **5** | | 70,108. |
| **6** Deduction for one-half of self-employment tax. Multiply line 5 by 50% (0.50). Enter the result here and on **Schedule 1 (Form 1040 or 1040-SR), line 14,** or **Form 1040-NR, line 27** ........ | **6** | 35,054. | |

LHA    **For Paperwork Reduction Act Notice, see your tax return instructions.**    Schedule SE (Form 1040 or 1040-SR) 2019

924501  10-09-19

AMENDED

OMB No. 1545-0895

Form **3800**

Department of the Treasury
Internal Revenue Service    (99)

# General Business Credit

▶ Go to www.irs.gov/Form3800 for instructions and the latest information.
▶ You must attach all pages of Form 3800, pages 1, 2, and 3, to your tax return.

**2019**

Attachment
Sequence No. **22**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Identifying number

| Part I | Current Year Credit for Credits Not Allowed Against Tentative Minimum Tax (TMT) |
|---|---|

(See instructions and complete Part(s) III before Parts I and II.)

| | | | |
|---|---|---|---|
| 1 | General business credit from line 2 of all Parts III with box A checked | **1** | 21,383. |
| 2 | Passive activity credits from line 2 of all Parts III with box B checked | **2** | |
| 3 | Enter the applicable passive activity credits allowed for 2019. See instructions | **3** | |
| 4 | Carryforward of general business credit to 2019. Enter the amount from line 2 of Part III with box C checked. See instructions for statement to attach | **4** | |
| 5 | Carryback of general business credit from 2020. Enter the amount from line 2 of Part III with box D checked | **5** | |
| 6 | Add lines 1, 3, 4, and 5 | **6** | 21,383. |

| Part II | Allowable Credit |
|---|---|

| | | | |
|---|---|---|---|
| 7 | Regular tax before credits: | | |
| | • Individuals. Enter the sum of the amounts from Form 1040 or 1040-SR, line 12a, and Schedule 2 (Form 1040 or 1040-SR), line 2, or the sum of the amounts from Form 1040-NR, lines 42 and 44 | | |
| | • Corporations. Enter the amount from Form 1120, Schedule J, Part I, line 2; or the applicable line of your return | **7** | 5,925,991. |
| | • Estates and trusts. Enter the sum of the amounts from Form 1041, Schedule G, lines 1a and 1b; or the amount from the applicable line of your return | | |
| 8 | Alternative minimum tax: | | |
| | • Individuals. Enter the amount from Form 6251, line 11 | | |
| | • Corporations. Enter -0- | **8** | |
| | • Estates and trusts. Enter the amount from Schedule I (Form 1041), line 54 | | |
| 9 | Add lines 7 and 8 | **9** | 5,925,991. |
| 10a | Foreign tax credit | **10a** | 54. |
| b | Certain allowable credits (see instructions) | **10b** | |
| c | Add lines 10a and 10b | **10c** | 54. |
| 11 | **Net income tax.** Subtract line 10c from line 9. If zero, skip lines 12 through 15 and enter -0- on line 16 | **11** | 5,925,937. |
| 12 | **Net regular tax.** Subtract line 10c from line 7. If zero or less, enter -0- | **12** | 5,925,937. |
| 13 | Enter 25% (0.25) of the excess, if any, of line 12 over $25,000. See instructions | **13** | 1,475,234. |
| 14 | Tentative minimum tax: | | |
| | • Individuals. Enter the amount from Form 6251, line 9 | | |
| | • Corporations. Enter -0- | **14** | 4,584,142. |
| | • Estates and trusts. Enter the amount from Schedule I (Form 1041), line 52 | | |
| 15 | Enter the greater of line 13 or line 14 | **15** | 4,584,142. |
| 16 | Subtract line 15 from line 11. If zero or less, enter -0- | **16** | 1,341,795. |
| 17 | Enter the **smaller** of line 6 or line 16 | **17** | 21,383. |
| | **C corporations:** See the line 17 instructions if there has been an ownership change, acquisition, or reorganization. | | |

LHA    **For Paperwork Reduction Act Notice, see separate instructions.**

Form **3800** (2019)

AMENDED

Form 3800 (2019)                                                                                          Page **2**

| **Part II** | **Allowable Credit** _(continued)_ | | |
|---|---|---|---|

**Note:** If you are not required to report any amounts on line 22 or 24 below, skip lines 18 through 25 and enter -0- on line 26.

| | | | |
|---|---|---|---:|
| 18 | Multiply line 14 by 75% (0.75). See instructions | 18 | |
| 19 | Enter the greater of line 13 or line 18 | 19 | |
| 20 | Subtract line 19 from line 11. If zero or less, enter -0- | 20 | |
| 21 | Subtract line 17 from line 20. If zero or less, enter -0- | 21 | |
| 22 | Combine the amounts from line 3 of all Parts III with box A, C, or D checked | 22 | |
| 23 | Passive activity credit from line 3 of all Parts III with box B checked | 23 | |
| 24 | Enter the applicable passive activity credit allowed for 2019. See instructions | 24 | |
| 25 | Add lines 22 and 24 | 25 | |
| 26 | Empowerment zone and renewal community employment credit allowed. Enter the smaller of line 21 or line 25 | 26 | 0. |
| 27 | Subtract line 13 from line 11. If zero or less, enter -0- | 27 | 4,450,703. |
| 28 | Add lines 17 and 26 | 28 | 21,383. |
| 29 | Subtract line 28 from line 27. If zero or less, enter -0- | 29 | 4,429,320. |
| 30 | Enter the general business credit from line 5 of all Parts III with box A checked | 30 | 228,844. |
| 31 | Reserved | 31 | |
| 32 | Passive activity credits from line 5 of all Parts III with box B checked | 32 | |
| 33 | Enter the applicable passive activity credits allowed for 2019. See instructions | 33 | |
| 34 | Carryforward of business credit to 2019. Enter the amount from line 5 of Part III with box C checked and line 6 of Part III with box G checked. See instructions for statement to attach | 34 | |
| 35 | Carryback of business credit from 2020. Enter the amount from line 5 of Part III with box D checked. See instructions | 35 | |
| 36 | Add lines 30, 33, 34, and 35 | 36 | 228,844. |
| 37 | Enter the **smaller** of line 29 or line 36 | 37 | 228,844. |
| 38 | **Credit allowed for the current year.** Add lines 28 and 37. Report the amount from line 38 (if smaller than the sum of Part I, line 6, and Part II, lines 25 and 36, see instructions) as indicated below or on the applicable line of your return. • Individuals. Schedule 3 (Form 1040 or 1040-SR), line 6, or Form 1040-NR, line 51 • Corporations. Form 1120, Schedule J, Part I, line 5c • Estates and trusts. Form 1041, Schedule G, line 2b | 38 | 250,227. |

Form **3800** (2019)

Case 3:22-cv-00107-CDL     Document 1-3     Filed 10/28/22     Page 38 of 600

**AMENDED**

| Name(s) shown on return | Identifying number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | ▆▆▆▆▆▆▆▆ |

**Part III**  General Business Credits or Eligible Small Business Credits  (see instructions)

Complete a separate Part III for each box checked below. See instructions.

**A** ☐ General Business Credit From a Non-Passive Activity    **E** ☐ Reserved
**B** ☐ General Business Credit From a Passive Activity    **F** ☐ Reserved
**C** ☐ General Business Credit Carryforwards    **G** ☐ Eligible Small Business Credit Carryforwards
**D** ☐ General Business Credit Carrybacks    **H** ☐ Reserved

**I** If you are filing more than one Part III with box A or B checked, complete and attach the first an additional Part III combining amounts from all Parts III with box A or B checked. Check here if this is the consolidated Part III ........................................................... ▶ ☒

**Note:** On any line where the credit is from more than one source, a separate Part III is needed for each pass-through entity.

| | **(a)** Description of credit | **(b)** If claiming the credit from a pass-through entity, enter the EIN | **(c)** Enter the appropriate amount |
|---|---|---|---|
| **1a** | Investment (Form 3468, Part II only) (attach Form 3468) ............ **1a** | | |
| **b** | Reserved .................................................... **1b** | | |
| **c** | Increasing research activities (Form 6765) ................ **1c** | | |
| **d** | Low-income housing (Form 8586, Part I only) ............ **1d** | | |
| **e** | Disabled access (Form 8826) (see instructions for limitation) ... **1e** | | |
| **f** | Renewable electricity, refined coal, and Indian coal production (Form 8835) **1f** | | |
| **g** | Indian employment (Form 8845) ........................ **1g** | | |
| **h** | Orphan drug (Form 8820) .............................. **1h** | | |
| **i** | New markets (Form 8874) .............................. **1i** | | |
| **j** | Small employer pension plan startup costs (Form 8881) (see instructions for limitation) **1j** | | |
| **k** | Employer-provided child care facilities and services (Form 8882) (see instructions for limitation) **1k** | | 21,383. |
| **l** | Biodiesel and renewable diesel fuels (attach Form 8864) ... **1l** | | |
| **m** | Low sulfur diesel fuel production (Form 8896) ............ **1m** | | |
| **n** | Distilled spirits (Form 8906) .......................... **1n** | | |
| **o** | Nonconventional source fuel (carryforward only) .......... **1o** | | |
| **p** | Energy efficient home (Form 8908) ...................... **1p** | | |
| **q** | Energy efficient appliance (carryforward only) ............ **1q** | | |
| **r** | Alternative motor vehicle (Form 8910) .................. **1r** | | |
| **s** | Alternative fuel vehicle refueling property (Form 8911) ... **1s** | | |
| **t** | Enhanced oil recovery credit (Form 8830) ................ **1t** | | |
| **u** | Mine rescue team training (Form 8923) .................. **1u** | | |
| **v** | Agricultural chemicals security (carryforward only) ........ **1v** | | |
| **w** | Employer differential wage payments (Form 8932) ........ **1w** | | |
| **x** | Carbon oxide sequestration (Form 8933) ................ **1x** | | |
| **y** | Qualified plug-in electric drive motor vehicle (Form 8936) **1y** | | |
| **z** | Qualified plug-in electric vehicle (carryforward only) ...... **1z** | | |
| **aa** | Employee retention (Form 5884-A) ...................... **1aa** | | |
| **bb** | General credits from an electing large partnership (carryforward only) **1bb** | | |
| **zz** | Other. Oil and gas production from marginal wells (Form 8904) and certain other credits (see instructions) **1zz** | | |
| **2** | Add lines 1a through 1zz and enter here and on the applicable line of Part I ........ **2** | | 21,383. |
| **3** | Enter the amount from Form 8844 here and on the applicable line of Part II **3** | | |
| **4a** | Investment (Form 3468, Part III) (attach Form 3468) ...... **4a** | | |
| **b** | Work opportunity (Form 5884) .......................... **4b** | | 228,844. |
| **c** | Biofuel producer (Form 6478) .......................... **4c** | | |
| **d** | Low-income housing (Form 8586, Part II) ................ **4d** | | |
| **e** | Renewable electricity, refined coal, and Indian coal production (Form 8835) **4e** | | |
| **f** | Employer social security and Medicare taxes paid on certain employee tips (Form 8846) **4f** | | |
| **g** | Qualified railroad track maintenance (Form 8900) ........ **4g** | | |
| **h** | Small employer health insurance premiums (Form 8941) ... **4h** | | |
| **i** | Increasing research activities (Form 6765) .............. **4i** | | |
| **j** | Employer credit for paid family and medical leave (Form 8994) **4j** | | |
| **z** | Other .................................................. **4z** | | |
| **5** | Add lines 4a through 4z and enter here and on the applicable line of Part II **5** | | 228,844. |
| **6** | Add lines 2, 3, and 5 and enter here and on the applicable line of Part II **6** | | 250,227. |

914403  12-30-19                                                                                                             Form **3800** (2019)

Case 3:22-cv-00107-CDL    Document 1    Filed 10/28/22    Page 39 of 600    AMENDED

| Name(s) shown on return | Identifying number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | ███████████ |

### Part III  General Business Credits or Eligible Small Business Credits (see instructions)

Complete a separate Part III for each box checked below. See instructions.

A [X] General Business Credit From a Non-Passive Activity

B [ ] General Business Credit From a Passive Activity

C [ ] General Business Credit Carryforwards

D [ ] General Business Credit Carrybacks

E [ ] Reserved

F [ ] Reserved

G [ ] Eligible Small Business Credit Carryforwards

H [ ] Reserved

I If you are filing more than one Part III with box A or B checked, complete and attach first an additional Part III combining amounts from all Parts III with box A or B checked. Check here if this is the consolidated Part III ............................................. ▶ [ ]

**Note:** On any line where the credit is from more than one source, a separate Part III is needed for each pass-through entity.

| | (a) Description of credit | | (b) If claiming the credit from a pass-through entity, enter the EIN | (c) Enter the appropriate amount |
|---|---|---|---|---|
| 1a | Investment (Form 3468, Part II only) (attach Form 3468) | 1a | | |
| b | Reserved | 1b | | |
| c | Increasing research activities (Form 6765) | 1c | | |
| d | Low-income housing (Form 8586, Part I only) | 1d | | |
| e | Disabled access (Form 8826) (see instructions for limitation) | 1e | | |
| f | Renewable electricity, refined coal, and Indian coal production (Form 8835) | 1f | | |
| g | Indian employment (Form 8845) | 1g | | |
| h | Orphan drug (Form 8820) | 1h | | |
| i | New markets (Form 8874) | 1i | | |
| j | Small employer pension plan startup costs (Form 8881) (see instructions for limitation) | 1j | | |
| k | Employer-provided child care facilities and services (Form 8882) (see instructions for limitation) | 1k | ██████████ | 17,305. |
| l | Biodiesel and renewable diesel fuels (attach Form 8864) | 1l | | |
| m | Low sulfur diesel fuel production (Form 8896) | 1m | | |
| n | Distilled spirits (Form 8906) | 1n | | |
| o | Nonconventional source fuel (carryforward only) | 1o | | |
| p | Energy efficient home (Form 8908) | 1p | | |
| q | Energy efficient appliance (carryforward only) | 1q | | |
| r | Alternative motor vehicle (Form 8910) | 1r | | |
| s | Alternative fuel vehicle refueling property (Form 8911) | 1s | | |
| t | Enhanced oil recovery credit (Form 8830) | 1t | | |
| u | Mine rescue team training (Form 8923) | 1u | | |
| v | Agricultural chemicals security (carryforward only) | 1v | | |
| w | Employer differential wage payments (Form 8932) | 1w | | |
| x | Carbon oxide sequestration (Form 8933) | 1x | | |
| y | Qualified plug-in electric drive motor vehicle (Form 8936) | 1y | | |
| z | Qualified plug-in electric vehicle (carryforward only) | 1z | | |
| aa | Employee retention (Form 5884-A) | 1aa | | |
| bb | General credits from an electing large partnership (carryforward only) | 1bb | | |
| zz | Other. Oil and gas production from marginal wells (Form 8904) and certain other credits (see instructions) | 1zz | | |
| 2 | Add lines 1a through 1zz and enter here and on the applicable line of Part I | 2 | | 17,305. |
| 3 | Enter the amount from Form 8844 here and on the applicable line of Part II | 3 | | |
| 4a | Investment (Form 3468, Part III) (attach Form 3468) | 4a | | |
| b | Work opportunity (Form 5884) | 4b | ██████████ | 185,191. |
| c | Biofuel producer (Form 6478) | 4c | | |
| d | Low-income housing (Form 8586, Part II) | 4d | | |
| e | Renewable electricity, refined coal, and Indian coal production (Form 8835) | 4e | | |
| f | Employer social security and Medicare taxes paid on certain employee tips (Form 8846) | 4f | | |
| g | Qualified railroad track maintenance (Form 8900) | 4g | | |
| h | Small employer health insurance premiums (Form 8941) | 4h | | |
| i | Increasing research activities (Form 6765) | 4i | | |
| j | Employer credit for paid family and medical leave (Form 8994) | 4j | | |
| z | Other | 4z | | |
| 5 | Add lines 4a through 4z and enter here and on the applicable line of Part II | 5 | | 185,191. |
| 6 | Add lines 2, 3, and 5 and enter here and on the applicable line of Part II | 6 | | 202,496. |

Form 3800 (2019)                                                                                          Page **3**

| Name(s) shown on return | Identifying number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | ███████████ |

**Part III**  General Business Credits or Eligible Small Business Credits (see instructions)

Complete a separate Part III for each box checked below. See instructions.

A  [X]  General Business Credit From a Non-Passive Activity          E  [ ]  Reserved
B  [ ]  General Business Credit From a Passive Activity              F  [ ]  Reserved
C  [ ]  General Business Credit Carryforwards                        G  [ ]  Eligible Small Business Credit Carryforwards
D  [ ]  General Business Credit Carrybacks                           H  [ ]  Reserved
I   If you are filing more than one Part III with box A or B checked, complete and attach first an additional Part III combining amounts from all
    Parts III with box A or B checked. Check here if this is the consolidated Part III ......................................... ▶ [ ]

**Note:** On any line where the credit is from more than one source, a separate Part III is needed for each pass-through entity.

| (a) Description of credit | | (b) If claiming the credit from a pass-through entity, enter the EIN | (c) Enter the appropriate amount |
|---|---|---|---|
| 1a  Investment (Form 3468, Part II only) (attach Form 3468) | 1a | | |
| b  Reserved | 1b | | |
| c  Increasing research activities (Form 6765) | 1c | | |
| d  Low-income housing (Form 8586, Part I only) | 1d | | |
| e  Disabled access (Form 8826) (see instructions for limitation) | 1e | | |
| f  Renewable electricity, refined coal, and Indian coal production (Form 8835) | 1f | | |
| g  Indian employment (Form 8845) | 1g | | |
| h  Orphan drug (Form 8820) | 1h | | |
| i  New markets (Form 8874) | 1i | | |
| j  Small employer pension plan startup costs (Form 8881) (see instructions for limitation) | 1j | | |
| k  Employer-provided child care facilities and services (Form 8882) (see instructions for limitation) | 1k | ████████ | 647. |
| l  Biodiesel and renewable diesel fuels (attach Form 8864) | 1l | | |
| m  Low sulfur diesel fuel production (Form 8896) | 1m | | |
| n  Distilled spirits (Form 8906) | 1n | | |
| o  Nonconventional source fuel (carryforward only) | 1o | | |
| p  Energy efficient home (Form 8908) | 1p | | |
| q  Energy efficient appliance (carryforward only) | 1q | | |
| r  Alternative motor vehicle (Form 8910) | 1r | | |
| s  Alternative fuel vehicle refueling property (Form 8911) | 1s | | |
| t  Enhanced oil recovery credit (Form 8830) | 1t | | |
| u  Mine rescue team training (Form 8923) | 1u | | |
| v  Agricultural chemicals security (carryforward only) | 1v | | |
| w  Employer differential wage payments (Form 8932) | 1w | | |
| x  Carbon oxide sequestration (Form 8933) | 1x | | |
| y  Qualified plug-in electric drive motor vehicle (Form 8936) | 1y | | |
| z  Qualified plug-in electric vehicle (carryforward only) | 1z | | |
| aa  Employee retention (Form 5884-A) | 1aa | | |
| bb  General credits from an electing large partnership (carryforward only) | 1bb | | |
| zz  Other. Oil and gas production from marginal wells (Form 8904) and certain other credits (see instructions) | 1zz | | |
| 2  Add lines 1a through 1zz and enter here and on the applicable line of Part I | 2 | | 647. |
| 3  Enter the amount from Form 8844 here and on the applicable line of Part II | 3 | | |
| 4a  Investment (Form 3468, Part III) (attach Form 3468) | 4a | | |
| b  Work opportunity (Form 5884) | 4b | ████████ | 6,925. |
| c  Biofuel producer (Form 6478) | 4c | | |
| d  Low-income housing (Form 8586, Part II) | 4d | | |
| e  Renewable electricity, refined coal, and Indian coal production (Form 8835) | 4e | | |
| f  Employer social security and Medicare taxes paid on certain employee tips (Form 8846) | 4f | | |
| g  Qualified railroad track maintenance (Form 8900) | 4g | | |
| h  Small employer health insurance premiums (Form 8941) | 4h | | |
| i  Increasing research activities (Form 6765) | 4i | | |
| j  Employer credit for paid family and medical leave (Form 8994) | 4j | | |
| z  Other | 4z | | |
| 5  Add lines 4a through 4z and enter here and on the applicable line of Part II | 5 | | 6,925. |
| 6  Add lines 2, 3, and 5 and enter here and on the applicable line of Part II | 6 | | 7,572. |

914403  12-30-19                                                                                    Form **3800** (2019)

**AMENDED**

Form 3800 (2019)                                                                                              Page **3**

| Name(s) shown on return | Identifying number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | ████████████ |

| Part III | General Business Credits or Eligible Small Business Credits (see instructions) |
|---|---|

Complete a separate Part III for each box checked below. See instructions.

**A** [X] General Business Credit From a Non-Passive Activity  **E** [ ] Reserved
**B** [ ] General Business Credit From a Passive Activity  **F** [ ] Reserved
**C** [ ] General Business Credit Carryforwards  **G** [ ] Eligible Small Business Credit Carryforwards
**D** [ ] General Business Credit Carrybacks  **H** [ ] Reserved

**I** If you are filing more than one Part III with box A or B checked, complete and attach first an additional Part III combining amounts from all
Parts III with box A or B checked. Check here if this is the consolidated Part III ........................................................ ▶ [ ]

| | (a) Description of credit<br>Note: On any line where the credit is from more than one source, a separate Part III is needed for each pass-through entity. | | (b)<br>If claiming the credit from a pass-through entity, enter the EIN | (c)<br>Enter the appropriate amount |
|---|---|---|---|---|
| **1a** | Investment (Form 3468, Part II only) (attach Form 3468) ............. | 1a | | |
| **b** | Reserved .............................................................. | 1b | | |
| **c** | Increasing research activities (Form 6765) ......................... | 1c | | |
| **d** | Low-income housing (Form 8586, Part I only) ....................... | 1d | | |
| **e** | Disabled access (Form 8826) (see instructions for limitation) ...... | 1e | | |
| **f** | Renewable electricity, refined coal, and Indian coal production (Form 8835) | 1f | | |
| **g** | Indian employment (Form 8845) .................................... | 1g | | |
| **h** | Orphan drug (Form 8820) ........................................... | 1h | | |
| **i** | New markets (Form 8874) ........................................... | 1i | | |
| **j** | Small employer pension plan startup costs (Form 8881) (see instructions for limitation) | 1j | | |
| **k** | Employer-provided child care facilities and services (Form 8882) (see instructions for limitation) | 1k | ████████ | 3,238. |
| **l** | Biodiesel and renewable diesel fuels (attach Form 8864) .......... | 1l | | |
| **m** | Low sulfur diesel fuel production (Form 8896) ..................... | 1m | | |
| **n** | Distilled spirits (Form 8906) ...................................... | 1n | | |
| **o** | Nonconventional source fuel (carryforward only) ................... | 1o | | |
| **p** | Energy efficient home (Form 8908) ................................. | 1p | | |
| **q** | Energy efficient appliance (carryforward only) ..................... | 1q | | |
| **r** | Alternative motor vehicle (Form 8910) ............................. | 1r | | |
| **s** | Alternative fuel vehicle refueling property (Form 8911) ........... | 1s | | |
| **t** | Enhanced oil recovery credit (Form 8830) .......................... | 1t | | |
| **u** | Mine rescue team training (Form 8923) ............................. | 1u | | |
| **v** | Agricultural chemicals security (carryforward only) ............... | 1v | | |
| **w** | Employer differential wage payments (Form 8932) .................. | 1w | | |
| **x** | Carbon oxide sequestration (Form 8933) ........................... | 1x | | |
| **y** | Qualified plug-in electric drive motor vehicle (Form 8936) ....... | 1y | | |
| **z** | Qualified plug-in electric vehicle (carryforward only) ............ | 1z | | |
| **aa** | Employee retention (Form 5884-A) ................................. | 1aa | | |
| **bb** | General credits from an electing large partnership (carryforward only) | 1bb | | |
| **zz** | Other. Oil and gas production from marginal wells (Form 8904) and certain other credits (see instructions) | 1zz | | |
| **2** | Add lines 1a through 1zz and enter here and on the applicable line of Part I ........ | 2 | | 3,238. |
| **3** | Enter the amount from Form 8844 here and on the applicable line of Part II | 3 | | |
| **4a** | Investment (Form 3468, Part III) (attach Form 3468) ............... | 4a | | |
| **b** | Work opportunity (Form 5884) ..................................... | 4b | ████████ | 34,659. |
| **c** | Biofuel producer (Form 6478) ...................................... | 4c | | |
| **d** | Low-income housing (Form 8586, Part II) ........................... | 4d | | |
| **e** | Renewable electricity, refined coal, and Indian coal production (Form 8835) | 4e | | |
| **f** | Employer social security and Medicare taxes paid on certain employee tips (Form 8846) | 4f | | |
| **g** | Qualified railroad track maintenance (Form 8900) ................. | 4g | | |
| **h** | Small employer health insurance premiums (Form 8941) ............ | 4h | | |
| **i** | Increasing research activities (Form 6765) ........................ | 4i | | |
| **j** | Employer credit for paid family and medical leave (Form 8994) ... | 4j | | |
| **z** | Other ............................................................. | 4z | | |
| **5** | Add lines 4a through 4z and enter here and on the applicable line of Part II | 5 | | 34,659. |
| **6** | Add lines 2, 3, and 5 and enter here and on the applicable line of Part II | 6 | | 37,897. |

914403  12-30-19                                                                                       Form **3800** (2019)

Case 3:22-cv-00107-CDL    Document 1-3    Filed 10/28/22    Page 42 of 600

| Name(s) shown on return | Identifying number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | ████████ |

| **Part III** | **General Business Credits or Eligible Small Business Credits** (see instructions) |
|---|---|

Complete a separate Part III for each box checked below. See instructions.

A [X] General Business Credit From a Non-Passive Activity    E [ ] Reserved

B [ ] General Business Credit From a Passive Activity    F [ ] Reserved

C [ ] General Business Credit Carryforwards    G [ ] Eligible Small Business Credit Carryforwards

D [ ] General Business Credit Carrybacks    H [ ] Reserved

I  If you are filing more than one Part III with box A or B checked, complete and attach first an additional Part III combining amounts from all
Parts III with box A or B checked. Check here if this is the consolidated Part III .................................................... ▶ [ ]

Note: On any line where the credit is from more than one source, a separate Part III is needed for each pass-through entity.

| | (a) Description of credit | | (b) If claiming the credit from a pass-through entity, enter the EIN | (c) Enter the appropriate amount |
|---|---|---|---|---|
| 1a | Investment (Form 3468, Part II only) (attach Form 3468) | 1a | | |
| b | Reserved | 1b | | |
| c | Increasing research activities (Form 6765) | 1c | | |
| d | Low-income housing (Form 8586, Part I only) | 1d | | |
| e | Disabled access (Form 8826) (see instructions for limitation) | 1e | | |
| f | Renewable electricity, refined coal, and Indian coal production (Form 8835) | 1f | | |
| g | Indian employment (Form 8845) | 1g | | |
| h | Orphan drug (Form 8820) | 1h | | |
| i | New markets (Form 8874) | 1i | | |
| j | Small employer pension plan startup costs (Form 8881)  (see instructions for limitation) | 1j | | |
| k | Employer-provided child care facilities and services (Form 8882) (see instructions for limitation) | 1k | ████████ | 193. |
| l | Biodiesel and renewable diesel fuels (attach Form 8864) | 1l | | |
| m | Low sulfur diesel fuel production (Form 8896) | 1m | | |
| n | Distilled spirits (Form 8906) | 1n | | |
| o | Nonconventional source fuel (carryforward only) | 1o | | |
| p | Energy efficient home (Form 8908) | 1p | | |
| q | Energy efficient appliance (carryforward only) | 1q | | |
| r | Alternative motor vehicle (Form 8910) | 1r | | |
| s | Alternative fuel vehicle refueling property (Form 8911) | 1s | | |
| t | Enhanced oil recovery credit (Form 8830) | 1t | | |
| u | Mine rescue team training (Form 8923) | 1u | | |
| v | Agricultural chemicals security (carryforward only) | 1v | | |
| w | Employer differential wage payments (Form 8932) | 1w | | |
| x | Carbon oxide sequestration (Form 8933) | 1x | | |
| y | Qualified plug-in electric drive motor vehicle (Form 8936) | 1y | | |
| z | Qualified plug-in electric vehicle (carryforward only) | 1z | | |
| aa | Employee retention (Form 5884-A) | 1aa | | |
| bb | General credits from an electing large partnership (carryforward only) | 1bb | | |
| zz | Other. Oil and gas production from marginal wells (Form 8904) and certain other credits (see instructions) | 1zz | | |
| 2 | Add lines 1a through 1zz and enter here and on the applicable line of Part I | 2 | | 193. |
| 3 | Enter the amount from Form 8844 here and on the applicable line of Part II | 3 | | |
| 4a | Investment (Form 3468, Part III only) (attach Form 3468) | 4a | | |
| b | Work opportunity (Form 5884) | 4b | ████████ | 2,069. |
| c | Biofuel producer (Form 6478) | 4c | | |
| d | Low-income housing (Form 8586, Part II) | 4d | | |
| e | Renewable electricity, refined coal, and Indian coal production (Form 8835) | 4e | | |
| f | Employer social security and Medicare taxes paid on certain employee tips (Form 8846) | 4f | | |
| g | Qualified railroad track maintenance (Form 8900) | 4g | | |
| h | Small employer health insurance premiums (Form 8941) | 4h | | |
| i | Increasing research activities (Form 6765) | 4i | | |
| j | Employer credit for paid family and medical leave (Form 8994) | 4j | | |
| z | Other | 4z | | |
| 5 | Add lines 4a through 4z and enter here and on the applicable line of Part II | 5 | | 2,069. |
| 6 | Add lines 2, 3, and 5 and enter here and on the applicable line of Part II | 6 | | 2,262. |

**AMENDED**

Form **4797**

Department of the Treasury
Internal Revenue Service

### Sales of Business Property
(Also Involuntary Conversions and Recapture Amounts
Under Sections 179 and 280F(b)(2))
▶ Attach to your tax return.
▶ Go to www.irs.gov/Form4797 for instructions and the latest information.

OMB No. 1545-0184

**2019**

Attachment
Sequence No. **27**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Identifying number

**1** Enter the gross proceeds from sales or exchanges reported to you for 2019 on Form(s) 1099-B or 1099-S
(or substitute statement) that you are including on line 2, 10, or 20 .......... | **1** |

| Part I | **Sales or Exchanges of Property Used in a Trade or Business and Involuntary Conversions From Other Than Casualty or Theft-Most Property Held More Than 1 Year** (see instructions) |

| **2** (a) Description of property | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) | (d) Gross sales price | (e) Depreciation allowed or allowable since acquisition | (f) Cost or other basis, plus improvements and expense of sale | (g) Gain or (loss) Subtract (f) from the sum of (d) and (e) |
|---|---|---|---|---|---|---|
| SEE STATEMENT 25 | | | 18,000. | | | 545,593. |
| | | | | | | |
| | | | | | | |

| | | | |
|---|---|---|---|
| **3** | Gain, if any, from Form 4684, line 39 ........................... | **3** | |
| **4** | Section 1231 gain from installment sales from Form 6252, line 26 or 37 ............ | **4** | |
| **5** | Section 1231 gain or (loss) from like-kind exchanges from Form 8824 ............ | **5** | |
| **6** | Gain, if any, from line 32, from other than casualty or theft ............... | **6** | 52,147. |
| **7** | Combine lines 2 through 6. Enter the gain or (loss) here and on the appropriate line as follows | **7** | 597,740. |

**Partnerships and S corporations.** Report the gain or (loss) following the instructions for Form 1065, Schedule K, line 10, or Form 1120-S, Schedule K, line 9. Skip lines 8, 9, 11, and 12 below.

**Individuals, partners, S corporation shareholders, and all others.** If line 7 is zero or a loss, enter the amount from line 7 on line 11 below and skip lines 8 and 9. If line 7 is a gain and you didn't have any prior year section 1231 losses, or they were recaptured in an earlier year, enter the gain from line 7 as a long-term capital gain on the Schedule D filed with your return and skip lines 8, 9, 11, and 12 below.

| | | | |
|---|---|---|---|
| **8** | Nonrecaptured net section 1231 losses from prior years. See instructions ......... | **8** | |
| **9** | Subtract line 8 from line 7. If zero or less, enter -0-. If line 9 is zero, enter the gain from line 7 on line 12 below. If line 9 is more than zero, enter the amount from line 8 on line 12 below and enter the gain from line 9 as a long-term capital gain on the Schedule D filed with your return. See instructions ....... | **9** | |

| Part II | **Ordinary Gains and Losses** (see instructions) |

**10** Ordinary gains and losses not included on lines 11 through 16 (include property held 1 year or less):

| | | | | | | |
|---|---|---|---|---|---|---|
| TIMBER | 08/08/19 | 12/31/19 | 14,952. | | 16,535. | -1,583. |
| | | | | | | |
| | | | | | | |

| | | | |
|---|---|---|---|
| **11** | Loss, if any, from line 7 ........................................ | **11** | ( ) |
| **12** | Gain, if any, from line 7 or amount from line 8, if applicable ................ | **12** | |
| **13** | Gain, if any, from line 31 ...................................... | **13** | |
| **14** | Net gain or (loss) from Form 4684, lines 31 and 38a .................... | **14** | |
| **15** | Ordinary gain from installment sales from Form 6252, line 25 or 36 ............ | **15** | |
| **16** | Ordinary gain or (loss) from like-kind exchanges from Form 8824 ............. | **16** | |
| **17** | Combine lines 10 through 16 ..................................... | **17** | -1,583. |
| **18** | For all except individual returns, enter the amount from line 17 on the appropriate line of your return and skip lines a and b below. For individual returns, complete lines a and b below. | | |
| **a** | If the loss on line 11 includes a loss from Form 4684, line 35, column (b)(ii), enter that part of the loss here. Enter the loss from income-producing property on Schedule A (Form 1040 or Form 1040-SR), line 16. (Do not include any loss on property used as an employee.) Identify as from "Form 4797, line 18a." See instructions .......... | **18a** | |
| **b** | Redetermine the gain or (loss) on line 17 excluding the loss, if any, on line 18a. Enter here and on Schedule 1 (Form 1040 or Form 1040-SR), Part I, line 4 ....................... | **18b** | -1,583. |

LHA   **For Paperwork Reduction Act Notice, see separate instructions.**

Form **4797** (2019)

918011 12-04-19

Case 3:22-cv-00107-CDL   Document 1   Filed 10/28/22   Page 44 of 600

**AMENDED**

Form 4797 (2019) TONY D. & ELIZABETH A. TOWNLEY                                   Page **2**

| Part III | Gain From Disposition of Property Under Sections 1245, 1250, 1252, 1254, and 1255 (see instructions) |
|---|---|

| 19 | **(a)** Description of section 1245, 1250, 1252, 1254, or 1255 property: | **(b)** Date acquired (mo., day, yr.) | **(c)** Date sold (mo., day, yr.) |
|---|---|---|---|
| **A** | SALE OF 7065 ZEPHYR PLACE | 09/10/14 | 12/30/19 |
| **B** | | | |
| **C** | | | |
| **D** | | | |

| | These columns relate to the properties on lines 19A through 19D. ▶ | | Property A | Property B | Property C | Property D |
|---|---|---|---|---|---|---|
| 20 | Gross sales price (**Note:** See line 1 before completing.) | 20 | 3,300,000. | | | |
| 21 | Cost or other basis plus expense of sale | 21 | 3,548,348. | | | |
| 22 | Depreciation (or depletion) allowed or allowable | 22 | 300,495. | | | |
| 23 | Adjusted basis. Subtract line 22 from line 21 | 23 | 3,247,853. | | | |
| 24 | Total gain. Subtract line 23 from line 20 | 24 | 52,147. | | | |
| 25 | **If section 1245 property:** | | | | | |
| a | Depreciation allowed or allowable from line 22 | 25a | | | | |
| b | Enter the **smaller** of line 24 or 25a | 25b | | | | |
| 26 | **If section 1250 property:** If straight line depreciation was used, enter -0- on line 26g, except for a corporation subject to section 291. | | | | | |
| a | Additional depreciation after 1975. See instructions | 26a | | | | |
| b | Applicable percentage multiplied by the **smaller** of line 24 or line 26a. See instructions | 26b | | | | |
| c | Subtract line 26a from line 24. If residential rental property **or** line 24 isn't more than line 26a, skip lines 26d and 26e | 26c | | | | |
| d | Additional depreciation after 1969 and before 1976 | 26d | | | | |
| e | Enter the **smaller** of line 26c or 26d | 26e | | | | |
| f | Section 291 amount (corporations only) | 26f | | | | |
| g | Add lines 26b, 26e, and 26f | 26g | | | | |
| 27 | **If section 1252 property:** Skip this section if you didn't dispose of farmland or if this form is being completed for a partnership. | | | | | |
| a | Soil, water, and land clearing expenses | 27a | | | | |
| b | Line 27a multiplied by applicable percentage | 27b | | | | |
| c | Enter the **smaller** of line 24 or 27b | 27c | | | | |
| 28 | **If section 1254 property:** | | | | | |
| a | Intangible drilling and development costs, expenditures for development of mines and other natural deposits, mining exploration costs, and depletion. See instructions | 28a | | | | |
| b | Enter the **smaller** of line 24 or 28a | 28b | | | | |
| 29 | **If section 1255 property:** | | | | | |
| a | Applicable percentage of payments excluded from income under section 126. See instructions | 29a | | | | |
| b | Enter the **smaller** of line 24 or 29a. See instructions | 29b | | | | |

**Summary of Part III Gains.** Complete property columns A through D through line 29b before going to line 30.

| 30 | Total gains for all properties. Add property columns A through D, line 24 | 30 | 52,147. |
|---|---|---|---|
| 31 | Add property columns A through D, lines 25b, 26g, 27c, 28b, and 29b. Enter here and on line 13 | 31 | |
| 32 | Subtract line 31 from line 30. Enter the portion from casualty or theft on Form 4684, line 33. Enter the portion from other than casualty or theft on Form 4797, line 6 | 32 | 52,147. |

| Part IV | Recapture Amounts Under Sections 179 and 280F(b)(2) When Business Use Drops to 50% or Less (see instructions) |
|---|---|

| | | | **(a)** Section 179 | **(b)** Section 280F(b)(2) |
|---|---|---|---|---|
| 33 | Section 179 expense deduction or depreciation allowable in prior years | 33 | | |
| 34 | Recomputed depreciation. See instructions | 34 | | |
| 35 | Recapture amount. Subtract line 34 from line 33. See the instructions for where to report | 35 | | |

918012 12-04-19

Form **4797** (2019)

AMENDED

Form **6251**

Department of the Treasury
Internal Revenue Service   (99)

## Alternative Minimum Tax - Individuals

▶ Go to www.irs.gov/Form6251 for instructions and the latest information.
▶ Attach to Form 1040, 1040-SR, or 1040-NR.

OMB No. 1545-0074

**2019**

Attachment
Sequence No. **32**

Name(s) shown on Form 1040, 1040-SR, or 1040-NR

TONY D. & ELIZABETH A. TOWNLEY

Your social security number

### Part I   Alternative Minimum Taxable Income

| | | | |
|---|---|---|--:|
| 1 | Enter the amount from Form 1040 or 1040-SR, line 11b, if more than zero. If Form 1040 or 1040-SR, line 11b, is zero, subtract lines 9 and 10 of Form 1040 or 1040-SR from line 8b of Form 1040 or 1040-SR and enter the result here. (If less than zero, enter as a negative amount.) | 1 | 16,464,796. |
| 2a | If filing Schedule A (Form 1040 or 1040-SR), enter the taxes from Schedule A, line 7; otherwise, enter the amount from Form 1040 or 1040-SR, line 9 | 2a | 10,000. |
| b | Tax refund from Schedule 1 (Form 1040 or 1040-SR), line 1 or 8 | 2b | -8,825. |
| c | Investment interest expense (difference between regular tax and AMT) | 2c | |
| d | Depletion (difference between regular tax and AMT) | 2d | |
| e | Net operating loss deduction from Schedule 1 (Form 1040 or 1040-SR), line 8. Enter as a positive amount | 2e | |
| f | Alternative tax net operating loss deduction | 2f | |
| g | Interest from specified private activity bonds exempt from the regular tax | 2g | |
| h | Qualified small business stock, see instructions | 2h | |
| i | Exercise of incentive stock options (excess of AMT income over regular tax income) | 2i | |
| j | Estates and trusts (amount from Schedule K-1 (Form 1041), box 12, code A) | 2j | |
| k | Disposition of property (difference between AMT and regular tax gain or loss) | 2k | |
| l | Depreciation on assets placed in service after 1986 (difference between regular tax and AMT)   STMT 28 | 2l | 17,140. |
| m | Passive activities (difference between AMT and regular tax income or loss)   SEE STATEMENT 26 | 2m | 274. |
| n | Loss limitations (difference between AMT and regular tax income or loss)   SEE STATEMENT 27 | 2n | 72,722. |
| o | Circulation costs (difference between regular tax and AMT) | 2o | |
| p | Long-term contracts (difference between AMT and regular tax income) | 2p | |
| q | Mining costs (difference between regular tax and AMT) | 2q | |
| r | Research and experimental costs (difference between regular tax and AMT) | 2r | |
| s | Income from certain installment sales before January 1, 1987 | 2s | |
| t | Intangible drilling costs preference | 2t | |
| 3 | Other adjustments, including income-based related adjustments | 3 | |
| 4 | **Alternative minimum taxable income.** Combine lines 1 through 3. (If married filing separately and line 4 is more than $733,700, see instructions.) | 4 | 16,556,107. |

### Part II   Alternative Minimum Tax (AMT)

| | | | |
|---|---|---|--:|
| 5 | Exemption. (If you were under age 24 at the end of 2019, see instructions.) | | |

| IF your filing status is ... | AND line 4 is not over ... | THEN enter on line 5 ... | | |
|---|---|---|---|--:|
| Single or head of household | $510,300 | $71,700 | | |
| Married filing jointly or qualifying widow(er) | 1,020,600 | 111,700 | 5 | 0. |
| Married filing separately | 510,300 | 55,850 | | |
| If line 4 is **over** the amount shown above for your filing status, see instructions. | | | | |

| | | | |
|---|---|---|--:|
| 6 | Subtract line 5 from line 4. If more than zero, go to line 7. If zero or less, enter -0- here and on lines 7, 9, and 11, and go to line 10 | 6 | 16,556,107. |
| 7 | • If you are filing Form 2555, see instructions for the amount to enter.<br>• If you reported capital gain distributions directly on Form 1040 or 1040-SR, line 6; you reported qualified dividends on Form 1040 or 1040-SR, line 3a; **or** you had a gain on both lines 15 and 16 of Schedule D (Form 1040 or 1040-SR) (as refigured for the AMT, if necessary), complete Part III on the back and enter the amount from line 40 here.<br>• **All others:** If line 6 is $194,800 or less ($97,400 or less if married filing separately), multiply line 6 by 26% (0.26). Otherwise, multiply line 6 by 28% (0.28) and subtract $3,896 ($1,948 if married filing separately) from the result. | 7 | 4,584,196. |
| 8 | Alternative minimum tax foreign tax credit (see instructions) | 8 | 54. |
| 9 | Tentative minimum tax. Subtract line 8 from line 7 | 9 | 4,584,142. |
| 10 | Add Form 1040 or 1040-SR, line 12a (minus any tax from Form 4972), and Schedule 2 (Form 1040 or 1040-SR), line 2. Subtract from the result any foreign tax credit from Schedule 3 (Form 1040 or 1040-SR), line 1. If you used Schedule J to figure your tax on Form 1040 or 1040-SR, line 12a, refigure that tax without using Schedule J before completing this line (see instructions) | 10 | 5,925,937. |
| 11 | **AMT.** Subtract line 10 from line 9. If zero or less, enter -0-. Enter here and on Schedule 2 (Form 1040 or 1040-SR), line 1 | 11 | 0. |

919481 01-02-20   LHA   **For Paperwork Reduction Act Notice, see your tax return instructions.**   Form **6251** (2019)

AMENDED

Form 6251 (2019)    TONY D. & ELIZABETH A. TOWNLEY                                Page **2**

| Part III | Tax Computation Using Maximum Capital Gains Rates |
|---|---|

Complete Part III only if you are required to do so by line 7 or by the Foreign Earned Income Tax Worksheet in the instructions.

| | | | |
|---|---|---|---|
| 12 | Enter the amount from Form 6251, line 6. If you are filing Form 2555, enter the amount from line 3 of the worksheet in the instructions for line 7 | 12 | 16,556,107. |
| 13 | Enter the amount from line 6 of the Qualified Dividends and Capital Gain Tax Worksheet in the Instructions for Forms 1040 and 1040-SR or the amount from line 13 of the Schedule D Tax Worksheet in the Instructions for Schedule D (Form 1040 or 1040-SR), whichever applies (as refigured for the AMT, if necessary) (see instructions). If you are filing Form 2555, see instructions for the amount to enter | 13 | 575,683. |
| 14 | Enter the amount from Schedule D (Form 1040 or 1040-SR), line 19 (as refigured for the AMT, if necessary) (see instructions). If you are filing Form 2555, see instructions for the amount to enter | 14 | 52,147. |
| 15 | If you did not complete a Schedule D Tax Worksheet for the regular tax or the AMT, enter the amount from line 13. Otherwise, add lines 13 and 14, and enter the **smaller** of that result or the amount from line 10 of the Schedule D Tax Worksheet (as refigured for the AMT, if necessary). If you are filing Form 2555, see instructions for the amount to enter | 15 | 627,830. |
| 16 | Enter the **smaller** of line 12 or line 15 | 16 | 627,830. |
| 17 | Subtract line 16 from line 12 | 17 | 15,928,277. |
| 18 | If line 17 is $194,800 or less ($97,400 or less if married filing separately), multiply line 17 by 26% (0.26). Otherwise, multiply line 17 by 28% (0.28) and subtract $3,896 ($1,948 if married filing separately) from the result ▶ | 18 | 4,456,022. |
| 19 | Enter:<br>● $78,750 if married filing jointly or qualifying widow(er),<br>● $39,375 if single or married filing separately, or<br>● $52,750 if head of household. | 19 | 78,750. |
| 20 | Enter the amount from line 7 of the Qualified Dividends and Capital Gain Tax Worksheet or the amount from line 14 of the Schedule D Tax Worksheet, whichever applies (as figured for the regular tax). If you did not complete either worksheet for the regular tax, enter the amount from Form 1040 or 1040-SR, line 11b; if zero or less, enter -0-. If you are filing Form 2555, see instructions for the amount to enter | 20 | 15,889,113. |
| 21 | Subtract line 20 from line 19. If zero or less, enter -0- | 21 | 0. |
| 22 | Enter the **smaller** of line 12 or line 13 | 22 | 575,683. |
| 23 | Enter the **smaller** of line 21 or line 22. This amount is taxed at 0% | 23 | 0. |
| 24 | Subtract line 23 from line 22 | 24 | 575,683. |
| 25 | Enter:<br>● $434,550 if single<br>● $244,425 if married filing separately<br>● $488,850 if married filing jointly or qualifying widow(er)<br>● $461,700 if head of household | 25 | 488,850. |
| 26 | Enter the amount from line 21 | 26 | 0. |
| 27 | Enter the amount from line 7 of the Qualified Dividends and Capital Gain Tax Worksheet or the amount from line 21 of the Schedule D Tax Worksheet, whichever applies (as figured for the regular tax). If you did not complete either worksheet for the regular tax, enter the amount from Form 1040 or 1040-SR, line 11b; if zero or less, enter -0-. If you are filing Form 2555, see instructions for the amount to enter | 27 | 15,836,966. |
| 28 | Add line 26 and line 27 | 28 | 15,836,966. |
| 29 | Subtract line 28 from line 25. If zero or less, enter -0- | 29 | 0. |
| 30 | Enter the smaller of line 24 or line 29 | 30 | 0. |
| 31 | Multiply line 30 by 15% (0.15) ▶ | 31 | |
| 32 | Add lines 23 and 30 | 32 | 0. |
| | **If lines 32 and 12 are the same, skip lines 33 through 37 and go to line 38. Otherwise, go to line 33.** | | |
| 33 | Subtract line 32 from line 22 | 33 | 575,683. |
| 34 | Multiply line 33 by 20% (0.20) ▶ | 34 | 115,137. |
| | **If line 14 is zero or blank, skip lines 35 through 37 and go to line 38. Otherwise, go to line 35.** | | |
| 35 | Add lines 17, 32, and 33 | 35 | 16,503,960. |
| 36 | Subtract line 35 from line 12 | 36 | 52,147. |
| 37 | Multiply line 36 by 25% (0.25) ▶ | 37 | 13,037. |
| 38 | Add lines 18, 31, 34, and 37 | 38 | 4,584,196. |
| 39 | If line 12 is $194,800 or less ($97,400 or less if married filing separately), multiply line 12 by 26% (0.26). Otherwise, multiply line 12 by 28% (0.28) and subtract $3,896 ($1,948 if married filing separately) from the result | 39 | 4,631,814. |
| 40 | Enter the **smaller** of line 38 or line 39 here and on line 7. If you are filing Form 2555, do not enter this amount on line 7. Instead, enter it on line 4 of the worksheet in the instructions for line 7 | 40 | 4,584,196. |

919591 01-02-20                                                                     Form **6251** (2019)

Case 3:22-cv-00107-CDL    Document 1-1    Filed 10/28/22    Page 47 of 600

## Form 6251 - AMT Charitable Contributions Worksheet Page 1

NAME

TONY D. & ELIZABETH A. TOWNLEY

50% of AGI   20,434,038.         AGI   40,868,075.

| Year | 100% Limit | 60% Limit | 50% Limit | 30% Limit | Appreciated Property 30% Limit | Appreciated Property 20% Limit | Total Contributions Allowed | Total Contributions Carryover |
|---|---|---|---|---|---|---|---|---|
| **2006** Contributions | | | | | | | | |
| Less: Allowed | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O | | | | | | | | |
| **2007** Contributions | | | | | | | | |
| Less: Allowed | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O | | | | | | | | |
| **2008** Contributions | | | | | | | | |
| Less: Allowed | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O | | | | | | | | |
| **2009** Contributions | | | | | | | | |
| Less: Allowed | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O | | | | | | | | |
| **2010** Contributions | | | | | | | | |
| Less: Allowed | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O | | | | | | | | |
| **2011** Contributions | | | | | | | | |
| Less: Allowed | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O | | | | | | | | |
| **2012** Contributions | | | | | | | | |
| Less: Allowed | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O | | | | | | | | |

919441  04-01-19

AMENDED

## Form 6251 - AMT Charitable Contributions Worksheet Page 2

NAME

TONY D. & ELIZABETH A. TOWNLEY

50% of AGI    20,434,038.          AGI    40,868,075.

| Year | 100% Limit | 60% Limit | 50% Limit | 30% Limit | Appreciated Property 30% Limit | Appreciated Property 20% Limit | Total Contributions Allowed | Total Contributions Carryover |
|---|---|---|---|---|---|---|---|---|
| **2013** Contributions | | | | | | | | |
| Less: Allowed ... | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| CRP C/O ... | | | | | | | | |
| | | | | | | | | |
| **2014** Contributions | | | | | | | | |
| Less: Allowed ... | | | | | | | | |
| Less: NOL Absorb. | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| Carryover ... | | | | | | | | |
| CRP C/O ... | | | | | | | | |
| | | | | | | | | |
| **2015** Contributions | | | | | | | | |
| Less: Allowed ... | | | | | | | | |
| Less: NOL Absorb. | | | | | | | | |
| Less: NOL Abs. CRP and MWD | | | | | | | | |
| Carryover ... | | | | | | | | |
| CRP C/O ... | | | | | | | | |
| | | | | | | | | |
| **2016** Contributions | | | | | | | | |
| Less: Allowed ... | | | | | | | | |
| Less: NOL Absorb. | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| Carryover ... | | | | | | | | |
| CRP C/O ... | | | | | | | | |
| | | | | | | | | |
| **2017** Contributions | | | | | | | | |
| Less: Allowed ... | | | | | | | | |
| Less: NOL Absorb. | | | | | | | | |
| Less: NOL Abs. CRP | | | | | | | | |
| Carryover ... | | | | | | | | |
| CRP C/O ... | | | | | | | | |

919442  08-29-19

Case 3:22-cv-00107-CDL    Document 1-1    Filed 10/28/22    Page 49 of 600

**Form 6251 - AMT Charitable Contributions Worksheet Page 3**

NAME

TONY D. & ELIZABETH A. TOWNLEY

50% of AGI  20,434,038.       AGI  40,868,075.

| Year | | 100% Limit | 60% Limit | 50% Limit | 30% Limit | Appreciated Property 30% Limit | Appreciated Property 20% Limit | Total Contributions Allowed | Total Contributions Carryover |
|---|---|---|---|---|---|---|---|---|---|
| **2018** | Contributions | | | 24,310,630. | | | | | |
| Less: | Allowed ... | | | | | | | | |
| Less: | NOL Absorb. | | | | | | | | |
| Less: | NOL Abs. CRP | | | | | | | | |
| | Carryover ... | | | | | | | | 24,310,630. |
| | CRP C/O ... | | | 24,310,630. | | | | | |
| **2019** | Contributions | | 260,195. | 120050000. | | | | | |
| Less: | Allowed ... | | 260,195. | 20,173,843. | | | | 20,434,038. | |
| Less: | NOL Absorb. | | | | | | | | |
| Less: | NOL Abs. CRP and disaster | | | | | | | | |
| | Carryover ... | | | | | | | | 99,876,157. |
| | CRP C/O ... | | | 99,876,157. | | | | | |
| | Disaster C/O | | | | | | | | |
| | AMT charitable contributions | | | | | | | 20,434,038. | 124186787. |
| Less: | Charitable contributions allowed under regular tax calculation | | | | | | | 20,434,038. | |
| | Charitable contributions adjustment to Form 6251, line 3 | | | | | | | | |

919443  09-09-19

**AMENDED**

## ALTERNATIVE MINIMUM TAX RECONCILIATION REPORT

Name(s)

TONY D. & ELIZABETH A. TOWNLEY

Social Security Number

| Form Name | Description | Income | Adjustment | | | | |
|---|---|---|---|---|---|---|---|
| | | | Form 6251, Line 2k | Form 6251, Line 2l | Form 6251, Line 2m | Form 6251, Line 2n | Form 6251 Other Adjustment |
| K1- | CLUCKZ HOLDINGS, LLC | | | | | | |
| | *  REGULAR INCOME | 1,345,871. | | | | | |
| | DEPR ADJ | 2,719. | | 2,719. | | | |
| | *  AMT NET INCOME | 1,348,590. | | 2,719. | | | |
| | | | | | | | |
| K1- | ZAXBY'S OPERATING COMPANY, LP (TDT) | | | | | | |
| | *  REGULAR INCOME | 6,760,488. | | | | | |
| | DEPR ADJ | 13,609. | | 13,609. | | | |
| | *  AMT NET INCOME | 6,774,097. | | 13,609. | | | |
| | | | | | | | |
| K1- | CLUCKZ HOLDINGS, LLC (SECG) | | | | | | |
| | *  REGULAR INCOME | 402,077. | | | | | |
| | DEPR ADJ | 812. | | 812. | | | |
| | *  AMT NET INCOME | 402,889. | | 812. | | | |
| | | | | | | | |
| K-1- | PLUCKED CHICKEN, INC. | | | | | | |
| | *  REGULAR INCOME | 37,182,805. | | | | | |
| | BASIS ALLOWED | -37,182,805. | | | | | -37182805. |
| | AMT BASIS ALLOWED | 37,255,527. | | | | | 37,255,527. |
| | AMT BASIS ADJ | -72,722. | | | | | |
| | AMT ADJUSTMENTS | 72,722. | | | | | |
| | *  AMT NET INCOME | 37,255,527. | | | | | 72,722. |

919911
04-01-19

AMENDED

## ALTERNATIVE MINIMUM TAX RECONCILIATION REPORT

| Name(s) | | Social Security Number |
|---|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | | ███████ |

| Form Name | Description | Income | Adjustment | | | | |
|---|---|---|---|---|---|---|---|
| | | | Form 6251, Line 2k | Form 6251, Line 2l | Form 6251, Line 2m | Form 6251, Line 2n | Form 6251 Other Adjustment |
| E- | FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRA | | | | | | |
| | * REGULAR INCOME | -33. | | | | | |
| | AMT DEPR ADJ | -117. | | | -117. | | |
| | PAL CARRYOVER | 5,833. | | | 5,833. | | |
| | PAL DISALLOWED | -92,594. | | | -92,594. | | |
| | AMT PAL DISALLOWED | 86,879. | | | 86,879. | | |
| | * AMT NET INCOME | -32. | | | 1. | | |
| | | | | | | | |
| K1- | PARKER CREEK PROPERTIES 100% DISPOSITION | | | | | | |
| | * REGULAR INCOME | 50. | | | | | |
| | * AMT NET INCOME | 50. | | | | | |
| | | | | | | | |
| K1- | LAND WARRIORS, LLC | | | | | | |
| | * REGULAR INCOME | 662. | | | | | |
| | PAL CARRYOVER | 274. | | | 274. | | |
| | * AMT NET INCOME | 936. | | | 274. | | |
| | | | | | | | |
| E- | LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE | | | | | | |
| | * REGULAR INCOME | -17. | | | | | |
| | PAL DISALLOWED | -49,216. | | | -49,216. | | |
| | AMT PAL DISALLOWED | 49,215. | | | 49,215. | | |
| | * AMT NET INCOME | -18. | | | -1. | | |
| | | | | | | | |
| | ** TOTAL ADJ & PREF ** | | | 17,140. | 274. | 72,722. | |

919911
04-01-19

AMENDED

Form **8995-A**

Department of the Treasury
Internal Revenue Service

## Qualified Business Income Deduction

► Attach to your tax return.
► Go to www.irs.gov/Form8995A for instructions and the latest information.

OMB No. 1545-0123

**2019**

Attachment
Sequence No. **55A**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Your taxpayer identification number

| Part I | Trade, Business, or Aggregation Information |

Complete Schedules A, B, and/or C (Form 8995-A), as applicable, before starting Part I. Attach additional worksheets when needed.
See instructions.

| 1 | (a) Trade, business, or aggregation name | (b) Check if specified service | (c) Check if aggregation | (d) Taxpayer identification number | (e) Check if patron |
|---|---|---|---|---|---|
| A | OGEECHEE TIMBER, LLC | ☐ | ☐ | ███████ | |
| B | CLUCKZ HOLDINGS, LLC | ☐ | ☐ | ███████ | |
| C | M&T AVIATION, LLC | ☐ | ☐ | ███████ | ☐ |

| Part II | Determine Your Adjusted Qualified Business Income |

|   | | | A | B | C |
|---|---|---|---|---|---|
| 2 | Qualified business income from the trade, business, or aggregation. See instructions | 2 | 6,350. | 1,154,237. | 69,288. |
| 3 | Multiply line 2 by 20% (0.20). If your taxable income is $160,700 or less ($160,725 if married filing separately; $321,400 if married filing jointly), skip lines 4 through 12 and enter the amount from line 3 on line 13 | 3 | 1,270. | 230,847. | 13,858. |
| 4 | Allocable share of W-2 wages from the trade, business, or aggregation | 4 | | 1,470,150. | |
| 5 | Multiply line 4 by 50% (0.50) | 5 | | 735,075. | |
| 6 | Multiply line 4 by 25% (0.25) | 6 | | 367,538. | |
| 7 | Allocable share of the unadjusted basis immediately after acquisition (UBIA) of all qualified property | 7 | | 2,808,871. | 1,839,054. |
| 8 | Multiply line 7 by 2.5% (0.025) | 8 | | 70,222. | 45,976. |
| 9 | Add lines 6 and 8 | 9 | | 437,760. | 45,976. |
| 10 | Enter the greater of line 5 or line 9 | 10 | | 735,075. | 45,976. |
| 11 | W-2 wage and qualified property limitation. Enter the smaller of line 3 or line 10 | 11 | | 230,847. | 13,858. |
| 12 | Phased-in reduction. Enter the amount from line 26, if any. See instructions | 12 | | | |
| 13 | Qualified business income deduction before patron reduction. Enter the greater of line 11 or line 12 | 13 | 0. | 230,847. | 13,858. |
| 14 | Patron reduction. Enter the amount from Schedule D (Form 8995-A), line 6, if any. See instructions | 14 | | | |
| 15 | Qualified business income component. Subtract line 14 from line 13 | 15 | 0. | 230,847. | 13,858. |
| 16 | Total qualified business income component. Add all amounts reported on line 15 ▶ | 16 | 7,724,054. | | |

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.

Form **8995-A** (2019)

908411 12-23-19    LHA

AMENDED

Form 8995-A (2019)   TONY D. & ELIZABETH A. TOWNLEY                                                      Page **2**

| **Part III** | **Phased-in Reduction** |
|---|---|

*Complete Part III only if your taxable income is more than $160,700 but not $210,700 ($160,725 and $210,725 if married filing separately; $321,400 and $421,400 if married filing jointly) and line 10 is less than line 3. Otherwise, skip Part III.*

|  |  |  | **A** | **B** | **C** |
|---|---|---|---|---|---|
| 17 | Enter the amounts from line 3 | 17 |  |  |  |
| 18 | Enter the amounts from line 10 | 18 |  |  |  |
| 19 | Subtract line 18 from line 17 | 19 |  |  |  |
| 20 | Taxable income before qualified business income deduction | 20 |  |  |  |
| 21 | Threshold. Enter $160,700 ($160,725 if married filing separately; $321,400 if married filing jointly) | 21 |  |  |  |
| 22 | Subtract line 21 from line 20 | 22 |  |  |  |
| 23 | Phase-in range. Enter $50,000 ($100,000 if married filing jointly) | 23 |  |  |  |
| 24 | Phase-in percentage. Divide line 22 by line 23 | 24 | % |  |  |
| 25 | Total phase-in reduction. Multiply line 19 by line 24 | 25 |  |  |  |
| 26 | Qualified business income after phase-in reduction. Subtract line 25 from line 17. Enter this amount here and on line 12, for the corresponding trade or business | 26 |  |  |  |

| **Part IV** | **Determine Your Qualified Business Income Deduction** |
|---|---|

| 27 | Total qualified business income component from all qualified trades, businesses, or aggregations. Enter the amount from line 16 | 27 | 7,724,054. |
|---|---|---|---|
| 28 | Qualified REIT dividends and publicly traded partnership (PTP) income or (loss). See instructions | 28 |  |
| 29 | Qualified REIT dividends and PTP (loss) carryforward from prior years | 29 | ( ) |
| 30 | Total qualified REIT dividends and PTP income. Combine lines 28 and 29. If less than zero, enter -0- | 30 |  |
| 31 | REIT and PTP component. Multiply line 30 by 20% (0.20) | 31 |  |
| 32 | Qualified business income deduction before the income limitation. Add lines 27 and 31 ▶ | 32 | 7,724,054. |
| 33 | Taxable income before qualified business income deduction | 33 | 20,424,037. |
| 34 | Net capital gain. See instructions | 34 | 627,830. |
| 35 | Subtract line 34 from line 33. If zero or less, enter -0- | 35 | 19,796,207. |
| 36 | Income limitation. Multiply line 35 by 20% (0.20) | 36 | 3,959,241. |
| 37 | Qualified business income deduction before the domestic production activities deduction (DPAD) under section 199A(g). Enter the smaller of line 32 or line 36 ▶ | 37 | 3,959,241. |
| 38 | DPAD under section 199A(g) allocated from an agricultural or horticultural cooperative. Don't enter more than line 33 minus line 37 | 38 |  |
| 39 | Total qualified business income deduction. Add lines 37 and 38 ▶ | 39 | 3,959,241. |
| 40 | Total qualified REIT dividends and PTP (loss) carryforward. Combine lines 28 and 29. If zero or greater, enter -0- | 40 | ( ) |

Form **8995-A** (2019)

908412  12-23-19

Form **8995-A**

Department of the Treasury
Internal Revenue Service

# Qualified Business Income Deduction

▶ Attach to your tax return.
▶ Go to www.irs.gov/Form8995A for instructions and the latest information.

OMB No. 1545-0123

**2019**

Attachment
Sequence No. **55A**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Your taxpayer identification number

| Part I | Trade, Business, or Aggregation Information |
|---|---|

*Complete Schedules A, B, and/or C (Form 8995-A), as applicable, before starting Part I. Attach additional worksheets when needed. See instructions.*

| 1 | (a) Trade, business, or aggregation name | (b) Check if specified service | (c) Check if aggregation | (d) Taxpayer identification number | (e) Check if patron |
|---|---|---|---|---|---|
| A | ZAXBY'S OPERATING COMPANY, LP (TDT) | ☐ | ☐ | ■ | ☐ |
| B | CLUCKZ HOLDINGS, LLC (SECG) | ☐ | ☐ | ■ | ☐ |
| C | PLUCKED CHICKEN, INC. | ☐ | ☐ | ■ | ☐ |

| Part II | Determine Your Adjusted Qualified Business Income |
|---|---|

| | | | A | B | C |
|---|---|---|---|---|---|
| 2 | Qualified business income from the trade, business, or aggregation. See instructions | 2 | 5,845,847. | 349,874. | 31201025. |
| 3 | Multiply line 2 by 20% (0.20). If your taxable income is $160,700 or less ($160,725 if married filing separately; $321,400 if married filing jointly), skip lines 4 through 12 and enter the amount from line 3 on line 13 | 3 | 1,169,169. | 69,975. | 6,240,205. |
| 4 | Allocable share of W-2 wages from the trade, business, or aggregation | 4 | 7,358,063. | 439,204. | 39316046. |
| 5 | Multiply line 4 by 50% (0.50) | 5 | 3,679,032. | 219,602. | 19658023. |
| 6 | Multiply line 4 by 25% (0.25) | 6 | 1,839,516. | 109,801. | 9,829,012. |
| 7 | Allocable share of the unadjusted basis immediately after acquisition (UBIA) of all qualified property | 7 | 14058332. | 839,144. | 75117325. |
| 8 | Multiply line 7 by 2.5% (0.025) | 8 | 351,458. | 20,979. | 1,877,933. |
| 9 | Add lines 6 and 8 | 9 | 2,190,974. | 130,780. | 11706945. |
| 10 | Enter the greater of line 5 or line 9 | 10 | 3,679,032. | 219,602. | 19658023. |
| 11 | W-2 wage and qualified property limitation. Enter the smaller of line 3 or line 10 | 11 | 1,169,169. | 69,975. | 6,240,205. |
| 12 | Phased-in reduction. Enter the amount from line 26, if any. See instructions | 12 | | | |
| 13 | Qualified business income deduction before patron reduction. Enter the greater of line 11 or line 12 | 13 | 1,169,169. | 69,975. | 6,240,205. |
| 14 | Patron reduction. Enter the amount from Schedule D (Form 8995-A), line 6, if any. See instructions | 14 | | | |
| 15 | Qualified business income component. Subtract line 14 from line 13 | 15 | 1,169,169. | 69,975. | 6,240,205. |
| 16 | Total qualified business income component. Add all amounts reported on line 15 ▶ | 16 | | | |

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.

Form **8995-A** (2019)

AMENDED

Form 8995-A (2019) TONY D. & ELIZABETH A. TOWNLEY

Page **2**

## Part III Phased-in Reduction

*Complete Part III only if your taxable income is more than $160,700 but not $210,700 ($160,725 and $210,725 if married filing separately; $321,400 and $421,400 if married filing jointly) and line 10 is less than line 3. Otherwise, skip Part III.*

| | | | A | B | C |
|---|---|---|---|---|---|
| 17 | Enter the amounts from line 3 | 17 | | | |
| 18 | Enter the amounts from line 10 | 18 | | | |
| 19 | Subtract line 18 from line 17 | 19 | | | |
| 20 | Taxable income before qualified business income deduction | 20 | | | |
| 21 | Threshold. Enter $160,700 ($160,725 if married filing separately; $321,400 if married filing jointly) | 21 | | | |
| 22 | Subtract line 21 from line 20 | 22 | | | |
| 23 | Phase-in range. Enter $50,000 ($100,000 if married filing jointly) | 23 | | | |
| 24 | Phase-in percentage. Divide line 22 by line 23 | 24 | % | | |
| 25 | Total phase-in reduction. Multiply line 19 by line 24 | 25 | | | |
| 26 | Qualified business income after phase-in reduction. Subtract line 25 from line 17. Enter this amount here and on line 12, for the corresponding trade or business | 26 | | | |

## Part IV Determine Your Qualified Business Income Deduction

| | | | |
|---|---|---|---|
| 27 | Total qualified business income component from all qualified trades, businesses, or aggregations. Enter the amount from line 16 | 27 | |
| 28 | Qualified REIT dividends and publicly traded partnership (PTP) income or (loss). See instructions | 28 | |
| 29 | Qualified REIT dividends and PTP (loss) carryforward from prior years | 29 | ( ) |
| 30 | Total qualified REIT dividends and PTP income. Combine lines 28 and 29. If less than zero, enter -0- | 30 | |
| 31 | REIT and PTP component. Multiply line 30 by 20% (0.20) | 31 | |
| 32 | Qualified business income deduction before the income limitation. Add lines 27 and 31 ▶ | 32 | |
| 33 | Taxable income before qualified business income deduction | 33 | |
| 34 | Net capital gain. See instructions | 34 | |
| 35 | Subtract line 34 from line 33. If zero or less, enter -0- | 35 | |
| 36 | Income limitation. Multiply line 35 by 20% (0.20) | 36 | |
| 37 | Qualified business income deduction before the domestic production activities deduction (DPAD) under section 199A(g). Enter the smaller of line 32 or line 36 ▶ | 37 | |
| 38 | DPAD under section 199A(g) allocated from an agricultural or horticultural cooperative. Don't enter more than line 33 minus line 37 | 38 | |
| 39 | Total qualified business income deduction. Add lines 37 and 38 ▶ | 39 | |
| 40 | Total qualified REIT dividends and PTP (loss) carryforward. Combine lines 28 and 29. If zero or greater, enter -0- | 40 | ( ) |

Form **8995-A** (2019)

AMENDED

**SCHEDULE C**
**(Form 8995-A)**

Department of the Treasury
Internal Revenue Service

# Loss Netting and Carryforward

▶ Attach to Form 8995-A.
▶ Go to www.irs.gov/Form8995A for instructions and the latest information.

OMB No. 1545-0123

**2019**

Attachment
Sequence No. **55D**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Your taxpayer identification number

| 1 | Trade, business, or aggregation name | (a) Qualified business income/(loss) | (b) Reduction for loss netting (see instructions) | (c) Adjusted qualified business income (Combine (a) and (b). If zero or less, enter -0-.) |
|---|---|---|---|---|
| | SEE STATEMENT 29 | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 2 | Qualified business net (loss) carryforward from prior years. See instructions   SEE STATEMENT 30 | 2 | ( 33.) | |
| 3 | Total of the trades, businesses, or aggregations losses. Combine the negative amounts on lines 1, column (a), and 2 for all trades, businesses, or aggregations .................. | 3 | 5,782,695.) | |
| 4 | Total of the trades, businesses, or aggregations income. Add the positive amounts on line 1, column (a), for all trades, businesses, or aggregations ..................... | 4 | 44,389,900. | |
| 5 | Losses netted with income of other trades, businesses, or aggregations. Enter in the parentheses on line 5, the smaller of the absolute value of line 3 or line 4. Allocate this amount to each of the trades, businesses, or aggregations on line 1, column (b). See instructions ............... | 5 | 5,782,695.) | |
| 6 | Qualified business net (loss) carryforward. Subtract line 5 from line 3. If zero or more, enter -0- ................ | 6 | ( ) | |

LHA   **For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.**

Schedule C (Form 8995-A) 2019

**AMENDED**

Form **8959**

Department of the Treasury
Internal Revenue Service

## Additional Medicare Tax

▶ If any line does not apply to you, leave it blank. See separate instructions.
▶ Attach to Form 1040, 1040-SR, 1040-NR, 1040-PR, or 1040-SS.
▶ Go to www.irs.gov/Form8959 for instructions and the latest information.

OMB No. 1545-0074

**2019**

Attachment
Sequence No. **71**

| Name(s) shown on return | Your social security number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | |

### Part I   Additional Medicare Tax on Medicare Wages

| | | | |
|---|---|---|---|
| 1 | Medicare wages and tips from Form W-2, box 5. If you have more than one Form W-2, enter the total of the amounts from box 5 | 1 | |
| 2 | Unreported tips from Form 4137, line 6 | 2 | |
| 3 | Wages from Form 8919, line 6 | 3 | |
| 4 | Add lines 1 through 3 | 4 | |
| 5 | Enter the following amount for your filing status: | | |
| | Married filing jointly $250,000 | | |
| | Married filing separately $125,000 | | |
| | Single, Head of household, or Qualifying widow(er) $200,000 | 5 | |
| 6 | Subtract line 5 from line 4. If zero or less, enter -0- | | 6 |
| 7 | Additional Medicare Tax on Medicare wages. Multiply line 6 by 0.9% (0.009). Enter here and go to Part II | | 7 |

### Part II   Additional Medicare Tax on Self-Employment Income

| | | | | | |
|---|---|---|---|---|---|
| 8 | Self-employment income from Schedule SE (Form 1040 or 1040-SR), Section A, line 4, or Section B, line 6. If you had a loss, enter -0- (Form 1040-PR or 1040-SS filers, see instructions.) | 8 | 1,849,252. | | |
| 9 | Enter the following amount for your filing status: | | | | |
| | Married filing jointly $250,000 | | | | |
| | Married filing separately $125,000 | | | | |
| | Single, Head of household, or Qualifying widow(er) $200,000 | 9 | 250,000. | | |
| 10 | Enter the amount from line 4 | 10 | | | |
| 11 | Subtract line 10 from line 9. If zero or less, enter -0- | 11 | 250,000. | | |
| 12 | Subtract line 11 from line 8. If zero or less, enter -0- | | | 12 | 1,599,252. |
| 13 | Additional Medicare Tax on self-employment income. Multiply line 12 by 0.9% (0.009). Enter here and go to Part III | | | 13 | 14,393. |

### Part III   Additional Medicare Tax on Railroad Retirement Tax Act (RRTA) Compensation

| | | | |
|---|---|---|---|
| 14 | Railroad retirement (RRTA) compensation and tips from Form(s) W-2, box 14 (see instructions) | 14 | |
| 15 | Enter the following amount for your filing status: | | |
| | Married filing jointly $250,000 | | |
| | Married filing separately $125,000 | | |
| | Single, Head of household, or Qualifying widow(er) $200,000 | 15 | |
| 16 | Subtract line 15 from line 14. If zero or less, enter -0- | | 16 |
| 17 | Additional Medicare Tax on railroad retirement (RRTA) compensation. Multiply line 16 by 0.9% (0.009). Enter here and go to Part IV | | 17 |

### Part IV   Total Additional Medicare Tax

| | | | |
|---|---|---|---|
| 18 | Add lines 7, 13, and 17. Also include this amount on Schedule 2 (Form 1040 or 1040-SR), line 8 (check box a) (Form 1040-NR, 1040-PR, or 1040-SS filers, see instructions), and go to Part V | | 18 | 14,393. |

### Part V   Withholding Reconciliation

| | | | |
|---|---|---|---|
| 19 | Medicare tax withheld from Form W-2, box 6. If you have more than one Form W-2, enter the total of the amounts from box 6 | 19 | |
| 20 | Enter the amount from line 1 | 20 | |
| 21 | Multiply line 20 by 1.45% (0.0145). This is your regular Medicare tax withholding on Medicare wages | 21 | |
| 22 | Subtract line 21 from line 19. If zero or less, enter -0-. This is your Additional Medicare Tax withholding on Medicare wages | | 22 |
| 23 | Additional Medicare Tax withholding on railroad retirement (RRTA) compensation from Form W-2, box 14 (see instructions) | | 23 |
| 24 | **Total Additional Medicare Tax withholding.** Add lines 22 and 23. Also include this amount with federal income tax withholding on Form 1040 or 1040-SR, line 17 (Form 1040-NR, 1040-PR, or 1040-SS filers, see instructions) | | 24 |

923111 12-05-19    LHA    **For Paperwork Reduction Act Notice, see your tax return instructions.**    Form **8959** (2019)

Form **8960**

Department of the Treasury
Internal Revenue Service (99)

## Net Investment Income Tax -
## Individuals, Estates, and Trusts

▶ **Attach to your tax return.**
▶ Go to www.irs.gov/Form8960 for instructions and the latest information.

OMB No. 1545-2227

**2019**

Attachment
Sequence No. **72**

Name(s) shown on your tax return: TONY D. & ELIZABETH A. TOWNLEY

Your social security number or EIN

| Part I | Investment Income | | | | |
|---|---|---|---|---|---|
| | ☐ Section 6013(g) election (see instructions) | | | | |
| | ☐ Section 6013(h) election (see instructions) | | | | |
| | ☐ Regulations section 1.1411-10(g) election (see instructions) | | | | |
| 1 | Taxable interest (see instructions) | | | 1 | 2,494,535. |
| 2 | Ordinary dividends (see instructions) | | | 2 | 29,634. |
| 3 | Annuities (see instructions) | | | 3 | |
| 4a | Rental real estate, royalties, partnerships, S corporations, trusts, etc. (see instructions) | 4a | 37,110,044. | | |
| b | Adjustment for net income or loss derived in the ordinary course of a non-section 1411 trade or business (see instructions) STATEMENT 31 | 4b | -37,110,044. | | |
| c | Combine lines 4a and 4b | | | 4c | 0. |
| 5a | Net gain or loss from disposition of property (see instructions) | 5a | 682,089. | | |
| b | Net gain or loss from disposition of property that is not subject to net investment income tax (see instructions) | 5b | -596,157. | | |
| c | Adjustment from disposition of partnership interest or S corporation stock (see instructions) | 5c | | | |
| d | Combine lines 5a through 5c | | | 5d | 85,932. |
| 6 | Adjustments to investment income for certain CFCs and PFICs (see instructions) | | | 6 | |
| 7 | Other modifications to investment income (see instructions) SEE STATEMENT 32 | | | 7 | 10,000. |
| 8 | Total investment income. Combine lines 1, 2, 3, 4c, 5d, 6, and 7 | | | 8 | 2,620,101. |

| Part II | Investment Expenses Allocable to Investment Income and Modifications | | | | |
|---|---|---|---|---|---|
| 9a | Investment interest expenses (see instructions) | 9a | | | |
| b | State, local, and foreign income tax (see instructions) | 9b | 10,000. | | |
| c | Miscellaneous investment expenses (see instructions) | 9c | | | |
| d | Add lines 9a, 9b, and 9c | | | 9d | 10,000. |
| 10 | Additional modifications (see instructions) | | | 10 | |
| 11 | Total deductions and modifications. Add lines 9d and 10 | | | 11 | 10,000. |

| Part III | Tax Computation | | | | |
|---|---|---|---|---|---|
| 12 | Net investment income. Subtract Part II, line 11, from Part I, line 8. Individuals, complete lines 13-17. Estates and trusts, complete lines 18a-21. If zero or less, enter -0- | | | 12 | 2,610,101. |
| | **Individuals:** | | | | |
| 13 | Modified adjusted gross income (see instructions) | 13 | 40,868,075. | | |
| 14 | Threshold based on filing status (see instructions) | 14 | 250,000. | | |
| 15 | Subtract line 14 from line 13. If zero or less, enter -0- | 15 | 40,618,075. | | |
| 16 | Enter the smaller of line 12 or line 15 | | | 16 | 2,610,101. |
| 17 | Net investment income tax for individuals. Multiply line 16 by 3.8% (0.038). **Enter here and include on your tax return** (see instructions) | | | 17 | 99,184. |
| | **Estates and Trusts:** | | | | |
| 18a | Net investment income (line 12 above) | 18a | | | |
| b | Deductions for distributions of net investment income and deductions under section 642(c) (see instructions) | 18b | | | |
| c | Undistributed net investment income. Subtract line 18b from 18a (see instructions). If zero or less, enter -0- | 18c | | | |
| 19a | Adjusted gross income (see instructions) | 19a | | | |
| b | Highest tax bracket for estates and trusts for the year (see instructions) | 19b | | | |
| c | Subtract line 19b from line 19a. If zero or less, enter -0- | 19c | | | |
| 20 | Enter the smaller of line 18c or line 19c | | | 20 | |
| 21 | Net investment income tax for estates and trusts. Multiply line 20 by 3.8% (0.038). **Enter here and include on your tax return** (see instructions) | | | 21 | |

LHA    **For Paperwork Reduction Act Notice, see your tax return instructions.**

Form **8960** (2019)

923121  01-09-20

**AMENDED**

Form **8582**

Department of the Treasury
Internal Revenue Service (99)

## Passive Activity Loss Limitations

► See separate instructions.
► Attach to Form 1040, Form 1040-SR, or Form 1041.
► Go to www.irs.gov/Form8582 for instructions and the latest information.

OMB No. 1545-1008

**2019**

Attachment
Sequence No. **88**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Identifying number

### Part I    2019 Passive Activity Loss

**Caution:** Complete Worksheets 1, 2, and 3 before completing Part I.

**Rental Real Estate Activities With Active Participation**  (For the definition of active participation, see
**Special Allowance for Rental Real Estate Activities**  in the instructions.)

| | | | |
|---|---|---|---|
| **1a** Activities with net income (enter the amount from Worksheet 1, column (a)) ...... | **1a** | | |
| **b** Activities with net loss (enter the amount from Worksheet 1, column (b)) ......... | **1b** | ( 136,027.) | |
| **c** Prior years' unallowed losses (enter the amount from Worksheet 1, column (c)) ... | **1c** | ( 5,833.) | |
| **d** Combine lines 1a, 1b, and 1c | | **1d** | −141,860. |

**Commercial Revitalization Deductions From Rental Real Estate Activities**

| | | | |
|---|---|---|---|
| **2a** Commercial revitalization deductions from Worksheet 2, column (a) | **2a** | ( ) | |
| **b** Prior year unallowed commercial revitalization deductions from Worksheet 2, column (b) | **2b** | ( ) | |
| **c** Add lines 2a and 2b | | **2c** | ( ) |

**All Other Passive Activities**

| | | | |
|---|---|---|---|
| **3a** Activities with net income (enter the amount from Worksheet 3, column (a)) ...... | **3a** | 324. | |
| **b** Activities with net loss (enter the amount from Worksheet 3, column (b)) ......... | **3b** | ( ) | |
| **c** Prior years' unallowed losses (enter the amount from Worksheet 3, column (c)) ... | **3c** | ( 835.) | |
| **d** Combine lines 3a, 3b, and 3c | | **3d** | −511. |

**4** Combine lines 1d, 2c, and 3d. If this line is zero or more, stop here and include this form with your return; all
losses are allowed, including any prior year unallowed losses entered on line 1c, 2b, or 3c. Report the losses on
the forms and schedules normally used | **4** | −142,371. |

If line 4 is a loss and:    • Line 1d is a loss, go to Part II.
• Line 2c is a loss (and line 1d is zero or more), skip Part II and go to Part III.
• Line 3d is a loss (and lines 1d and 2c are zero or more), skip Parts II and III and go to line 15.

**Caution:** If your filing status is married filing separately and you lived with your spouse at any time during the year,  **do not** complete
Part II or Part III. Instead, go to line 15.

### Part II    Special Allowance for Rental Real Estate Activities With Active Participation

**Note:** Enter all numbers in Part II as positive amounts. See instructions for an example.

| | | | |
|---|---|---|---|
| **5** Enter the **smaller** of the loss on line 1d or the loss on line 4 | | **5** | 141,860. |
| **6** Enter $150,000. If married filing separately, see instructions ................. | **6** | 150,000. | |
| **7** Enter modified adjusted gross income, but not less than zero. See instructions | **7** | 40,903,129. | STATEMENT 41 |
| **Note:** If line 7 is greater than or equal to line 6, skip lines 8 and 9, enter -0- on line 10. Otherwise, go to line 8. | | | |
| **8** Subtract line 7 from line 6 | **8** | | |
| **9** Multiply line 8 by 50% (0.50). **Do not** enter more than $25,000. If married filing separately, see instructions ...... | | **9** | |
| **10** Enter the **smaller** of line 5 or line 9 | | **10** | 0. |

If line 2c is a loss, go to Part III. Otherwise, go to line 15.

### Part III    Special Allowance for Commercial Revitalization Deductions From Rental Real Estate Activities

**Note:** Enter all numbers in Part III as positive amounts. See the example for Part III in the instructions.

| | | |
|---|---|---|
| **11** Enter $25,000 reduced by the amount, if any, on line 10. If married filing separately, see instructions ............. | **11** | |
| **12** Enter the loss from line 4 | **12** | |
| **13** Reduce line 12 by the amount on line 10 | **13** | |
| **14** Enter the **smallest** of line 2c (treated as a positive amount), line 11, or line 13 | **14** | |

### Part IV    Total Losses Allowed

| | | |
|---|---|---|
| **15** Add the income, if any, on lines 1a and 3a and enter the total | **15** | 324. |
| **16** **Total losses allowed from all passive activities for 2019.** Add lines 10, 14,  and 15. See instructions to find out how to report the losses on your tax return ............ SEE STATEMENT 40 | **16** | 324. |

LHA  919761 01-13-20    **For Paperwork Reduction Act Notice, see instructions.**

Form **8582** (2019)

Case 3:22-cv-00107-CDL    Document 1-1    Filed 10/28/22    Page 60 of 600

Form 8582 (2019)  TONY D. & ELIZABETH A. TOWNLEY                                          Page **2**

**Caution:** The worksheets must be filed with your tax return. Keep a copy for your records.

## Worksheet 1 - For Form 8582, Lines 1a, 1b, and 1c  (see instructions)

| Name of activity | Current year | | | Overall gain or loss | |
|---|---|---|---|---|---|
| | **(a)** Net income (line 1a) | **(b)** Net loss (line 1b) | **(c)** Unallowed loss (line 1c) | **(d)** Gain | **(e)** Loss |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | SEE ATTACHED STATEMENT FOR WORKSHEET 1 | | | | |
| **Total.** Enter on Form 8582, lines 1a, 1b, and 1c ............... ▶ | | −136,027. | −5,833. | | |

## Worksheet 2 - For Form 8582, Lines 2a and 2b  (see instructions)

| Name of activity | **(a)** Current year deductions (line 2a) | **(b)** Prior year unallowed deductions (line 2b) | **(c)** Overall loss |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| **Total.** Enter on Form 8582, lines 2a and 2b ............... ▶ | | | |

## Worksheet 3 - For Form 8582, Lines 3a, 3b, and 3c  (see instructions)

| Name of activity | Current year | | | Overall gain or loss | |
|---|---|---|---|---|---|
| | **(a)** Net income (line 3a) | **(b)** Net loss (line 3b) | **(c)** Unallowed loss (line 3c) | **(d)** Gain | **(e)** Loss |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | SEE ATTACHED STATEMENT FOR WORKSHEET 3 | | | | |
| **Total.** Enter on Form 8582, lines 3a, 3b, and 3c ............... ▶ | 324. | | −835. | | |

## Worksheet 4 - Use This Worksheet if an Amount is Shown on Form 8582, Line 10 or 14.  See instructions.

| Name of activity | Form or schedule and line number to be reported on (see instructions) | **(a)** Loss | **(b)** Ratio | **(c)** Special allowance | **(d)** Subtract column (c) from column (a) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Total** ............... ▶ | | | | | |

## Worksheet 5 - Allocation of Unallowed Losses  (see instructions)

| Name of activity | Form or schedule and line number to be reported on (see instructions) | **(a)** Loss | **(b)** Ratio | **(c)** Unallowed loss |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | SEE ATTACHED STATEMENT FOR WORKSHEET 5 | | | |
| **Total** ............... ▶ | | 142,421. | 1.000000000 | 142,371. |

919762  01-13-20                                                                    Form **8582** (2019)

Case 3:22-cv-00107-CDL    Document 1-3    Filed 10/28/22    Page 61 of 600

Form 8582 (2019)  TONY D. & ELIZABETH A. TOWNLEY                          Page **3**

## Worksheet 6 - Allowed Losses (see instructions)

| Name of activity | Form or schedule and line number to be reported on (see instructions) | (a) Loss | (b) Unallowed loss | (c) Allowed loss |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| SEE ATTACHED STATEMENT FOR WORKSHEET 6 | | | | |
| **Total** ▶ | | 142,695. | 142,371. | 324. |

## Worksheet 7 - Activities With Losses Reported on Two or More Forms or Schedules (see instructions)

| Name of activity: | (a) | (b) | (c) Ratio | (d) Unallowed loss | (e) Allowed loss |
|---|---|---|---|---|---|
| **Form or schedule and line number to be reported on (see instructions):** .......... | | | | | |
| **1a** Net loss plus prior year unallowed loss from form or schedule ......... ▶ | | | | | |
| **b** Net income from form or schedule ......... ▶ | | | | | |
| **c** Subtract line 1b from line 1a. If zero or less, enter -0- .......... ▶ | | | | | |
| **Form or schedule and line number to be reported on (see instructions):** .......... | | | | | |
| **1a** Net loss plus prior year unallowed loss from form or schedule ......... ▶ | | | | | |
| **b** Net income from form or schedule ......... ▶ | | | | | |
| **c** Subtract line 1b from line 1a. If zero or less, enter -0- .......... ▶ | | | | | |
| **Form or schedule and line number to be reported on (see instructions):** .......... | | | | | |
| **1a** Net loss plus prior year unallowed loss from form or schedule ......... ▶ | | | | | |
| **b** Net income from form or schedule ......... ▶ | | | | | |
| **c** Subtract line 1b from line 1a. If zero or less, enter -0- .......... ▶ | | | | | |
| **Total** ......... ▶ | | | | | |

Form **8582** (2019)

919763 01-13-20

ALTERNATIVE MINIMUM TAX

**Form 8582**

Department of the Treasury
Internal Revenue Service (99)

# Passive Activity Loss Limitations

► See separate instructions.
► Attach to Form 1040, Form 1040-SR, or Form 1041.
► Go to www.irs.gov/Form8582 for instructions and the latest information.

**AMENDED**

OMB No. 1545-1008

**2019**

Attachment
Sequence No. **88**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Identifying number

| Part I | 2019 Passive Activity Loss | | |
|---|---|---|---|

**Caution:** Complete Worksheets 1, 2, and 3 before completing Part I.

**Rental Real Estate Activities With Active Participation**  (For the definition of active participation, see
**Special Allowance for Rental Real Estate Activities**  in the instructions.)

| | | | |
|---|---|---|---|
| **1a** Activities with net income (enter the amount from Worksheet 1, column (a)) ..... | **1a** | | |
| **b** Activities with net loss (enter the amount from Worksheet 1, column (b)) ........ | **1b** ( | 136,144.) | |
| **c** Prior years' unallowed losses (enter the amount from Worksheet 1, column (c)) | **1c** ( | ) | |
| **d** Combine lines 1a, 1b, and 1c | | **1d** | −136,144. |

**Commercial Revitalization Deductions From Rental Real Estate Activities**

| | | | |
|---|---|---|---|
| **2a** Commercial revitalization deductions from Worksheet 2, column (a) ................. | **2a** ( | ) | |
| **b** Prior year unallowed commercial revitalization deductions from Worksheet 2, column (b) | **2b** ( | ) | |
| **c** Add lines 2a and 2b | | **2c** ( | ) |

**All Other Passive Activities**

| | | | |
|---|---|---|---|
| **3a** Activities with net income (enter the amount from Worksheet 3, column (a)) ..... | **3a** | 50. | |
| **b** Activities with net loss (enter the amount from Worksheet 3, column (b)) ........ | **3b** ( | ) | |
| **c** Prior years' unallowed losses (enter the amount from Worksheet 3, column (c)) | **3c** ( | ) | |
| **d** Combine lines 3a, 3b, and 3c | | **3d** | 50. |

**4** Combine lines 1d, 2c, and 3d. If this line is zero or more, stop here and include this form with your return; all
losses are allowed, including any prior year unallowed losses entered on line 1c, 2b, or 3c. Report the losses on
the forms and schedules normally used    |  **4**  |  −136,094.

If line 4 is a loss and:
  • Line 1d is a loss, go to Part II.
  • Line 2c is a loss (and line 1d is zero or more), skip Part II and go to Part III.
  • Line 3d is a loss (and lines 1d and 2c are zero or more), skip Parts II and III and go to line 15.

**Caution:** If your filing status is married filing separately and you lived with your spouse at any time during the year,  **do not** complete
Part II or Part III. Instead, go to line 15.

| Part II | Special Allowance for Rental Real Estate Activities With Active Participation | | |
|---|---|---|---|

**Note:** Enter all numbers in Part II as positive amounts. See instructions for an example.

| | | | |
|---|---|---|---|
| **5** Enter the **smaller** of the loss on line 1d or the loss on line 4 | | **5** | 136,094. |
| **6** Enter $150,000. If married filing separately, see instructions | **6** 150,000. | | |
| **7** Enter modified adjusted gross income, but not less than zero. See instructions | **7** 40,903,129. | | |
| **Note:** If line 7 is greater than or equal to line 6, skip lines 8 and 9, enter -0- on line 10. Otherwise, go to line 8. | | | |
| **8** Subtract line 7 from line 6 | **8** | | |
| **9** Multiply line 8 by 50% (0.50). **Do not** enter more than $25,000. If married filing separately, see instructions ..... | **9** | | |
| **10** Enter the **smaller** of line 5 or line 9 | | **10** | 0. |

If line 2c is a loss, go to Part III. Otherwise, go to line 15.

| Part III | Special Allowance for Commercial Revitalization Deductions From Rental Real Estate Activities | | |
|---|---|---|---|

**Note:** Enter all numbers in Part III as positive amounts. See the example for Part III in the instructions.

| | | | |
|---|---|---|---|
| **11** Enter $25,000 reduced by the amount, if any, on line 10. If married filing separately, see instructions .............. | | **11** | |
| **12** Enter the loss from line 4 | | **12** | |
| **13** Reduce line 12 by the amount on line 10 | | **13** | |
| **14** Enter the **smallest** of line 2c (treated as a positive amount), line 11, or line 13 | | **14** | |

| Part IV | Total Losses Allowed | | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **15** Add the income, if any, on lines 1a and 3a and enter the total | | **15** | 50. |
| **16** **Total losses allowed from all passive activities for 2019.** Add lines 10, 14,  and 15. See instructions to find out how to report the losses on your tax return ................. SEE STATEMENT 46 | | **16** | 50. |

LHA  919761 01-13-20    **For Paperwork Reduction Act Notice, see instructions.**                Form **8582** (2019)

Case 3:22-cv-00107-CDL    Document 1-1    Filed 10/28/22    Page 63 of 600

ALTERNATIVE MINIMUM TAX

Form 8582 (2019)  TONY D. & ELIZABETH A. TOWNLEY                                          Page **2**

**Caution:** The worksheets must be filed with your tax return. Keep a copy for your records.

## Worksheet 1 - For Form 8582, Lines 1a, 1b, and 1c  (see instructions)

| Name of activity | Current year | | Prior years | Overall gain or loss | |
| --- | --- | --- | --- | --- | --- |
| | **(a)** Net income (line 1a) | **(b)** Net loss (line 1b) | **(c)** Unallowed loss (line 1c) | **(d)** Gain | **(e)** Loss |
| | | | | | |
| | | | | | |
| | | | | | |
| | | SEE ATTACHED STATEMENT FOR WORKSHEET 1 | | | |
| **Total.** Enter on Form 8582, lines 1a, 1b, and 1c ▶ | −136,144. | | | | |

## Worksheet 2 - For Form 8582, Lines 2a and 2b  (see instructions)

| Name of activity | **(a)** Current year deductions (line 2a) | **(b)** Prior year unallowed deductions (line 2b) | **(c)** Overall loss |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| **Total.** Enter on Form 8582, lines 2a and 2b ▶ | | | |

## Worksheet 3 - For Form 8582, Lines 3a, 3b, and 3c  (see instructions)

| Name of activity | Current year | | Prior years | Overall gain or loss | |
| --- | --- | --- | --- | --- | --- |
| | **(a)** Net income (line 3a) | **(b)** Net loss (line 3b) | **(c)** Unallowed loss (line 3c) | **(d)** Gain | **(e)** Loss |
| | | | | | |
| | | | | | |
| | | | | | |
| | | SEE ATTACHED STATEMENT FOR WORKSHEET 3 | | | |
| **Total.** Enter on Form 8582, lines 3a, 3b, and 3c ▶ | 50. | | | | |

## Worksheet 4 - Use This Worksheet if an Amount is Shown on Form 8582, Line 10 or 14.  See instructions.

| Name of activity | Form or schedule and line number to be reported on (see instructions) | **(a)** Loss | **(b)** Ratio | **(c)** Special allowance | **(d)** Subtract column (c) from column (a) |
| --- | --- | --- | --- | --- | --- |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Total** ▶ | | | | | |

## Worksheet 5 - Allocation of Unallowed Losses  (see instructions)

| Name of activity | Form or schedule and line number to be reported on (see instructions) | **(a)** Loss | **(b)** Ratio | **(c)** Unallowed loss |
| --- | --- | --- | --- | --- |
| | | | | |
| | | | | |
| | | | | |
| | | SEE ATTACHED STATEMENT FOR WORKSHEET 5 | | |
| **Total** ▶ | | 136,144. | 1.000000000 | 136,094. |

919762  01-13-20                                                                      Form **8582** (2019)

Case 3:22-cv-00107-CDL    Document 1    Filed 10/28/22    Page 64 of 600

Form 8582 (2019) TONY D. & ELIZABETH A. TOWNLEY ▊▊▊▊▊ Page **3**

## Worksheet 6 - Allowed Losses (see instructions)

| Name of activity | Form or schedule and line number to be reported on (see instructions) | (a) Loss | (b) Unallowed loss | (c) Allowed loss |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  | SEE ATTACHED STATEMENT FOR WORKSHEET 6 | | | |
| Total ▶ | | 136,144. | 136,094. | 50. |

## Worksheet 7 - Activities With Losses Reported on Two or More Forms or Schedules (see instructions)

| Name of activity: | (a) | (b) | (c) Ratio | (d) Unallowed loss | (e) Allowed loss |
|---|---|---|---|---|---|
| **Form or schedule and line number to be reported on (see instructions):** .......... | | | | | |
| **1a** Net loss plus prior year unallowed loss from form or schedule ......... ▶ | | | | | |
| **b** Net income from form or schedule ......... ▶ | | | | | |
| **c** Subtract line 1b from line 1a. If zero or less, enter -0- .......... ▶ | | | | | |
| **Form or schedule and line number to be reported on (see instructions):** .......... | | | | | |
| **1a** Net loss plus prior year unallowed loss from form or schedule ......... ▶ | | | | | |
| **b** Net income from form or schedule ......... ▶ | | | | | |
| **c** Subtract line 1b from line 1a. If zero or less, enter -0- .......... ▶ | | | | | |
| **Form or schedule and line number to be reported on (see instructions):** .......... | | | | | |
| **1a** Net loss plus prior year unallowed loss from form or schedule ......... ▶ | | | | | |
| **b** Net income from form or schedule ......... ▶ | | | | | |
| **c** Subtract line 1b from line 1a. If zero or less, enter -0- .......... ▶ | | | | | |
| **Total** ......... ▶ | | | | | |

Form **8582** (2019)

919763 01-13-20

AMENDED

| Form **4562** | **Depreciation and Amortization**<br>**(Including Information on Listed Property)**<br>▶ Attach to your tax return.  SCHEDULE F- 1<br>▶ Go to www.irs.gov/Form4562 for instructions and the latest information. | OMB No. 1545-0172 |
|---|---|---|

Department of the Treasury
Internal Revenue Service    (99)

**2019**

Attachment
Sequence No. **179**

Name(s) shown on return: TONY D. & ELIZABETH A. TOWNLEY

Business or activity to which this form relates: LOG CREEK TRUST

Identifying number:

## Part I   Election To Expense Certain Property Under Section 179  Note: If you have any listed property, complete Part V before you complete Part I.

| | | |
|---|---|---|
| 1 | Maximum amount (see instructions) | 1 |
| 2 | Total cost of section 179 property placed in service (see instructions) | 2 |
| 3 | Threshold cost of section 179 property before reduction in limitation | 3 |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | 4 |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | 5 |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| | | |
|---|---|---|
| 7 | Listed property. Enter the amount from line 29 ... 7 | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | 8 |
| 9 | Tentative deduction. Enter the **smaller** of line 5 or line 8 | 9 |
| 10 | Carryover of disallowed deduction from line 13 of your 2018 Form 4562 | 10 |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 | 11 |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but don't enter more than line 11 | 12 |
| 13 | Carryover of disallowed deduction to 2020. Add lines 9 and 10, less line 12 ... ▶ 13 | |

**Note:** Don't use Part II or Part III below for listed property. Instead, use Part V.

## Part II   Special Depreciation Allowance and Other Depreciation (Don't include listed property.)

| | | |
|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year | 14 |
| 15 | Property subject to section 168(f)(1) election | 15 |
| 16 | Other depreciation (including ACRS) | 16 |

## Part III   MACRS Depreciation (Don't include listed property. See instructions.)

### Section A

| | | |
|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2019 | 17 |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here ▶ ☐ | |

### Section B - Assets Placed in Service During 2019 Tax Year Using the General Depreciation System

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only - see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| 19a  3-year property | | | | | | |
| b  5-year property | | | | | | |
| c  7-year property | | | | | | |
| d  10-year property | | | | | | |
| e  15-year property | | | | | | |
| f  20-year property | | | | | | |
| g  25-year property | | | 25 yrs. | | S/L | |
| h  Residential rental property | / | | 27.5 yrs. | MM | S/L | |
| | / | | 27.5 yrs. | MM | S/L | |
| i  Nonresidential real property | / | | 39 yrs. | MM | S/L | |
| | / | | | MM | S/L | |

### Section C - Assets Placed in Service During 2019 Tax Year Using the Alternative Depreciation System

| | | | | | | |
|---|---|---|---|---|---|---|
| 20a  Class life | | | | | S/L | |
| b  12-year | | | 12 yrs. | | S/L | |
| c  30-year | / | | 30 yrs. | MM | S/L | |
| d  40-year | / | | 40 yrs. | MM | S/L | |

## Part IV   Summary (See instructions.)

| | | |
|---|---|---|
| 21 | Listed property. Enter amount from line 28 | 21 |
| 22 | **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations - see instr. | 22   0. |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | 23 |

916251 12-12-19    LHA  **For Paperwork Reduction Act Notice, see separate instructions.**    Form **4562** (2019)

**AMENDED**

Form 4562 (2019)    TONY D. & ELIZABETH A. TOWNLEY                                  Page **2**

| Part V | Listed Property (Include automobiles, certain other vehicles, certain aircraft, and property used for entertainment, recreation, or amusement.) |
|---|---|

**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A - Depreciation and Other Information (Caution:** See the instructions for limits for passenger automobiles.)

24a Do you have evidence to support the business/investment use claimed?  ☐ Yes ☐ No  24b If "Yes," is the evidence written? ☐ Yes ☐ No

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/ investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|

25 Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use ................ **25**

26 Property used more than 50% in a qualified business use:

| | | % | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | % | | | | | | |
| | | % | | | | | | |

27 Property used 50% or less in a qualified business use:

| | | % | | | | S/L - | | |
|---|---|---|---|---|---|---|---|---|
| | | % | | | | S/L - | | |
| | | % | | | | S/L - | | |

28 Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1 ....... **28**

29 Add amounts in column (i), line 26. Enter here and on line 7, page 1 ..................... **29**

**Section B - Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other "more than 5% owner," or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | (a) Vehicle | (b) Vehicle | (c) Vehicle | (d) Vehicle | (e) Vehicle | (f) Vehicle |
|---|---|---|---|---|---|---|
| 30 Total business/investment miles driven during the year (**don't** include commuting miles) | | | | | | |
| 31 Total commuting miles driven during the year | | | | | | |
| 32 Total other personal (noncommuting) miles driven | | | | | | |
| 33 Total miles driven during the year. Add lines 30 through 32 | | | | | | |
| 34 Was the vehicle available for personal use during off-duty hours? | Yes No | Yes No | Yes No | Yes No | Yes No | Yes No |
| 35 Was the vehicle used primarily by a more than 5% owner or related person? | | | | | | |
| 36 Is another vehicle available for personal use? | | | | | | |

**Section C - Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons.

| | Yes | No |
|---|---|---|
| 37 Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees? | | |
| 38 Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners | | |
| 39 Do you treat all use of vehicles by employees as personal use? | | |
| 40 Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? | | |
| 41 Do you meet the requirements concerning qualified automobile demonstration use? | | |

**Note:** If your answer to 37, 38, 39, 40, or 41 is "Yes," don't complete Section B for the covered vehicles.

| Part VI | Amortization |
|---|---|

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|

42 Amortization of costs that begins during your 2019 tax year:

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |

43 Amortization of costs that began before your 2019 tax year ............ **43**

44 **Total.** Add amounts in column (f). See the instructions for where to report .... **44**

916252 12-12-19                                                              Form **4562** (2019)

**AMENDED**

OMB No. 1545-0172

Form **4562**

Department of the Treasury
Internal Revenue Service  (99)

# Depreciation and Amortization
### (Including Information on Listed Property)
▶ Attach to your tax return.  SCHEDULE E- 2
▶ Go to www.irs.gov/Form4562 for instructions and the latest information.

**2019**

Attachment
Sequence No. **179**

| Name(s) shown on return | Business or activity to which this form relates | Identifying number |
|---|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | FRAZER CREEK INVESTMENTS, LLC - VARIO | |

## Part I   Election To Expense Certain Property Under Section 179  Note: If you have any listed property, complete Part V before you complete Part I.

| | | |
|---|---|---|
| 1  Maximum amount (see instructions) | **1** | |
| 2  Total cost of section 179 property placed in service (see instructions) | **2** | |
| 3  Threshold cost of section 179 property before reduction in limitation | **3** | |
| 4  Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | **4** | |
| 5  Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | **5** | |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

| | | |
|---|---|---|
| 7  Listed property. Enter the amount from line 29 | **7** | |
| 8  Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | **8** | |
| 9  Tentative deduction. Enter the **smaller** of line 5 or line 8 | **9** | |
| 10  Carryover of disallowed deduction from line 13 of your 2018 Form 4562 | **10** | |
| 11  Business income limitation. Enter the smaller of business income (not less than zero) or line 5 | **11** | |
| 12  Section 179 expense deduction. Add lines 9 and 10, but don't enter more than line 11 | **12** | |
| 13  Carryover of disallowed deduction to 2020. Add lines 9 and 10, less line 12 ▶ | **13** | |

**Note:** Don't use Part II or Part III below for listed property. Instead, use Part V.

## Part II   Special Depreciation Allowance and Other Depreciation (Don't include listed property.)

| | | |
|---|---|---|
| 14  Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year | **14** | |
| 15  Property subject to section 168(f)(1) election | **15** | |
| 16  Other depreciation (including ACRS) | **16** | |

## Part III   MACRS Depreciation (Don't include listed property. See instructions.)

### Section A

| | | |
|---|---|---|
| 17  MACRS deductions for assets placed in service in tax years beginning before 2019 | **17** | 202,084. |
| 18  If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here ▶ ☐ | | |

### Section B - Assets Placed in Service During 2019 Tax Year Using the General Depreciation System

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only - see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| **19a** 3-year property | | | | | | |
| **b** 5-year property | | | | | | |
| **c** 7-year property | | | | | | |
| **d** 10-year property | | | | | | |
| **e** 15-year property | | | | | | |
| **f** 20-year property | | | | | | |
| **g** 25-year property | | | 25 yrs. | | S/L | |
| **h** Residential rental property | / | STATEMENT 47 | 27.5 yrs. | MM | S/L | 50,174. |
| | / | | 27.5 yrs. | MM | S/L | |
| **i** Nonresidential real property | / | | 39 yrs. | MM | S/L | |
| | / | | | MM | S/L | |

### Section C - Assets Placed in Service During 2019 Tax Year Using the Alternative Depreciation System

| | | | | | | |
|---|---|---|---|---|---|---|
| **20a** Class life | | | | | S/L | |
| **b** 12-year | | | 12 yrs. | | S/L | |
| **c** 30-year | / | | 30 yrs. | MM | S/L | |
| **d** 40-year | / | | 40 yrs. | MM | S/L | |

## Part IV   Summary (See instructions.)

| | | |
|---|---|---|
| 21  Listed property. Enter amount from line 28 | **21** | |
| 22  **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations - see instr. | **22** | 252,258. |
| 23  For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | **23** | |

916251 12-12-19   LHA  **For Paperwork Reduction Act Notice, see separate instructions.**   Form **4562** (2019)

**AMENDED**

Form 4562 (2019)          TONY D. & ELIZABETH A. TOWNLEY          Page **2**

| Part V | Listed Property (Include automobiles, certain other vehicles, certain aircraft, and property used for entertainment, recreation, or amusement.) |
|---|---|

**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A - Depreciation and Other Information (Caution:** See the instructions for limits for passenger automobiles.)

24a  Do you have evidence to support the business/investment use claimed?   ☐ Yes   ☐ No   24b If "Yes," is the evidence written?   ☐ Yes   ☐ No

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/ investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|
| 25 Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use | | | | | **25** | | | |
| 26 Property used more than 50% in a qualified business use: | | | | | | | | |
| | : : | % | | | | | | |
| | : : | % | | | | | | |
| | : : | % | | | | | | |
| 27 Property used 50% or less in a qualified business use: | | | | | | | | |
| | : : | % | | | | S/L - | | |
| | : : | % | | | | S/L - | | |
| | : : | % | | | | S/L - | | |
| 28 Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1 | | | | | **28** | | | |
| 29 Add amounts in column (i), line 26. Enter here and on line 7, page 1 | | | | | | | **29** | |

**Section B - Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other "more than 5% owner," or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | (a) Vehicle | | (b) Vehicle | | (c) Vehicle | | (d) Vehicle | | (e) Vehicle | | (f) Vehicle | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 Total business/investment miles driven during the year (**don't** include commuting miles) | | | | | | | | | | | | |
| 31 Total commuting miles driven during the year | | | | | | | | | | | | |
| 32 Total other personal (noncommuting) miles driven | | | | | | | | | | | | |
| 33 Total miles driven during the year. Add lines 30 through 32 | | | | | | | | | | | | |
| 34 Was the vehicle available for personal use during off-duty hours? | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 35 Was the vehicle used primarily by a more than 5% owner or related person? | | | | | | | | | | | | |
| 36 Is another vehicle available for personal use? | | | | | | | | | | | | |

**Section C - Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons.

| | | Yes | No |
|---|---|---|---|
| 37 Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees? | | | |
| 38 Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners | | | |
| 39 Do you treat all use of vehicles by employees as personal use? | | | |
| 40 Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? | | | |
| 41 Do you meet the requirements concerning qualified automobile demonstration use? | | | |

**Note:** If your answer to 37, 38, 39, 40, or 41 is "Yes," don't complete Section B for the covered vehicles.

| Part VI | Amortization |
|---|---|

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|
| 42 Amortization of costs that begins during your 2019 tax year: | | | | | |
| | : : | | | | |
| | : : | | | | |
| 43 Amortization of costs that began before your 2019 tax year | | | | **43** | |
| 44 **Total.** Add amounts in column (f). See the instructions for where to report | | | | **44** | |

916252  12-12-19                                                                 Form **4562** (2019)

Form **4562**

Department of the Treasury
Internal Revenue Service  (99)

## Depreciation and Amortization
### (Including Information on Listed Property)
▶ Attach to your tax return.   SCHEDULE E- 3
▶ Go to www.irs.gov/Form4562 for instructions and the latest information.

OMB No. 1545-0172

**2019**

Attachment
Sequence No. **179**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Business or activity to which this form relates

LANE CREEK INVESTMENTS,
LLC - VARIOUS (LANE CREE

Identifying number

| **Part I** | **Election To Expense Certain Property Under Section 179**  Note: If you have any listed property, complete Part V before you complete Part I. | | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 1 | Maximum amount (see instructions) | **1** | |
| 2 | Total cost of section 179 property placed in service (see instructions) | **2** | |
| 3 | Threshold cost of section 179 property before reduction in limitation | **3** | |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | **4** | |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | **5** | |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

| | | | |
|---|---|---|---|
| 7 | Listed property. Enter the amount from line 29 ............ **7** | | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | **8** | |
| 9 | Tentative deduction. Enter the **smaller** of line 5 or line 8 | **9** | |
| 10 | Carryover of disallowed deduction from line 13 of your 2018 Form 4562 | **10** | |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 | **11** | |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but don't enter more than line 11 | **12** | |
| 13 | Carryover of disallowed deduction to 2020. Add lines 9 and 10, less line 12 ▶ **13** | | |

**Note:** Don't use Part II or Part III below for listed property. Instead, use Part V.

| **Part II** | **Special Depreciation Allowance and Other Depreciation (Don't** include listed property. **)** | | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year | **14** | |
| 15 | Property subject to section 168(f)(1) election | **15** | |
| 16 | Other depreciation (including ACRS) | **16** | |

| **Part III** | **MACRS Depreciation (Don't** include listed property. See instructions.) | | |
|---|---|---|---|

**Section A**

| | | | |
|---|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2019 | **17** | |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here ▶ ☐ | | |

**Section B - Assets Placed in Service During 2019 Tax Year Using the General Depreciation System**

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only - see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| **19a** 3-year property | | | | | | |
| **b** 5-year property | | | | | | |
| **c** 7-year property | | | | | | |
| **d** 10-year property | | | | | | |
| **e** 15-year property | | | | | | |
| **f** 20-year property | | | | | | |
| **g** 25-year property | | | 25 yrs. | | S/L | |
| **h** Residential rental property | / | | 27.5 yrs. | MM | S/L | |
| | / | | 27.5 yrs. | MM | S/L | |
| **i** Nonresidential real property | 12 /19 | 1,421,605. | 39 yrs. | MM | S/L | 1,519. |
| | | | | MM | S/L | |

**Section C - Assets Placed in Service During 2019 Tax Year Using the Alternative Depreciation System**

| | | | | | | |
|---|---|---|---|---|---|---|
| **20a** Class life | | | | | S/L | |
| **b** 12-year | | | 12 yrs. | | S/L | |
| **c** 30-year | / | | 30 yrs. | MM | S/L | |
| **d** 40-year | / | | 40 yrs. | MM | S/L | |

| **Part IV** | **Summary** (See instructions.) | | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 21 | Listed property. Enter amount from line 28 | **21** | |
| 22 | **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations - see instr. | **22** | 1,519. |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | **23** | |

916251  12-12-19     LHA   **For Paperwork Reduction Act Notice, see separate instructions.**

Form **4562** (2019)

Case 3:22-cv-00107-CDL    Document 1    Filed 10/28/22    Page 70 of 600

**AMENDED**

Form 4562 (2019)          **TONY D. & ELIZABETH A. TOWNLEY**                                      Page **2**

| **Part V** | **Listed Property** (Include automobiles, certain other vehicles, certain aircraft, and property used for entertainment, recreation, or amusement.) |
|---|---|

**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A - Depreciation and Other Information (Caution:** See the instructions for limits for passenger automobiles.)

24a  Do you have evidence to support the business/investment use claimed?  ☐ Yes  ☐ No   24b If "Yes," is the evidence written?  ☐ Yes  ☐ No

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/ investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|
| 25 Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use | | | | | 25 | | | |
| 26 Property used more than 50% in a qualified business use: | | | | | | | | |
| | : : | % | | | | | | |
| | : : | % | | | | | | |
| | : : | % | | | | | | |
| 27 Property used 50% or less in a qualified business use: | | | | | | | | |
| | : : | % | | | S/L - | | | |
| | : : | % | | | S/L - | | | |
| | : : | % | | | S/L - | | | |
| 28 Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1 | | | | 28 | | | | |
| 29 Add amounts in column (i), line 26. Enter here and on line 7, page 1 | | | | | | | 29 | |

**Section B - Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other "more than 5% owner," or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | (a) Vehicle | | (b) Vehicle | | (c) Vehicle | | (d) Vehicle | | (e) Vehicle | | (f) Vehicle | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 Total business/investment miles driven during the year (**don't** include commuting miles) | | | | | | | | | | | | |
| 31 Total commuting miles driven during the year | | | | | | | | | | | | |
| 32 Total other personal (noncommuting) miles driven | | | | | | | | | | | | |
| 33 Total miles driven during the year. Add lines 30 through 32 | | | | | | | | | | | | |
| 34 Was the vehicle available for personal use during off-duty hours? | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 35 Was the vehicle used primarily by a more than 5% owner or related person? | | | | | | | | | | | | |
| 36 Is another vehicle available for personal use? | | | | | | | | | | | | |

**Section C - Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons.

| | | Yes | No |
|---|---|---|---|
| 37 | Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees? | | |
| 38 | Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners | | |
| 39 | Do you treat all use of vehicles by employees as personal use? | | |
| 40 | Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? | | |
| 41 | Do you meet the requirements concerning qualified automobile demonstration use? | | |

**Note:** If your answer to 37, 38, 39, 40, or 41 is "Yes," don't complete Section B for the covered vehicles.

| **Part VI** | **Amortization** |
|---|---|

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|
| 42 Amortization of costs that begins during your 2019 tax year: | | | | | |
| | : : | | | | |
| | : : | | | | |
| 43 Amortization of costs that began before your 2019 tax year | | | 43 | | |
| 44 **Total.** Add amounts in column (f). See the instructions for where to report | | | 44 | | |

916252  12-12-19                                                                 Form **4562** (2019)

AMENDED

| Form **4562** | **Depreciation and Amortization**<br>**(Including Information on Listed Property)**<br>▶ Attach to your tax return.  SCHEDULE C- 7<br>▶ Go to www.irs.gov/Form4562 for instructions and the latest information. | OMB No. 1545-0172<br>**2019**<br>Attachment<br>Sequence No. **179** |
|---|---|---|

Department of the Treasury
Internal Revenue Service    (99)

| Name(s) shown on return | Business or activity to which this form relates | Identifying number |
|---|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | OTF MANAGEMENT, LLC | |

**Part I**  Election To Expense Certain Property Under Section 179 **Note:** If you have any listed property, complete Part V before you complete Part I.

| | | |
|---|---|---|
| 1 | Maximum amount (see instructions) | **1** | |
| 2 | Total cost of section 179 property placed in service (see instructions) | **2** | |
| 3 | Threshold cost of section 179 property before reduction in limitation | **3** | |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | **4** | |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | **5** | |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

| | | | |
|---|---|---|---|
| 7 | Listed property. Enter the amount from line 29 | **7** | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | **8** | |
| 9 | Tentative deduction. Enter the **smaller** of line 5 or line 8 | **9** | |
| 10 | Carryover of disallowed deduction from line 13 of your 2018 Form 4562 | **10** | |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 | **11** | |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but don't enter more than line 11 | **12** | |
| 13 | Carryover of disallowed deduction to 2020. Add lines 9 and 10, less line 12 ▶ | **13** | |

**Note:** Don't use Part II or Part III below for listed property. Instead, use Part V.

**Part II**  Special Depreciation Allowance and Other Depreciation (Don't include listed property. )

| | | |
|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year | **14** | |
| 15 | Property subject to section 168(f)(1) election | **15** | |
| 16 | Other depreciation (including ACRS) | **16** | |

**Part III**  MACRS Depreciation (Don't include listed property. See instructions.)

**Section A**

| | | | |
|---|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2019 | **17** | 1,810. |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here ▶ ☐ | | |

**Section B - Assets Placed in Service During 2019 Tax Year Using the General Depreciation System**

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only - see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| **19a** 3-year property | | | | | | |
| **b** 5-year property | | | | | | |
| **c** 7-year property | | | | | | |
| **d** 10-year property | | | | | | |
| **e** 15-year property | | | | | | |
| **f** 20-year property | | | | | | |
| **g** 25-year property | | | 25 yrs. | | S/L | |
| **h** Residential rental property | / | | 27.5 yrs. | MM | S/L | |
| | / | | 27.5 yrs. | MM | S/L | |
| **i** Nonresidential real property | / | | 39 yrs. | MM | S/L | |
| | / | | | MM | S/L | |

**Section C - Assets Placed in Service During 2019 Tax Year Using the Alternative Depreciation System**

| | | | | | | |
|---|---|---|---|---|---|---|
| **20a** Class life | | | | | S/L | |
| **b** 12-year | | | 12 yrs. | | S/L | |
| **c** 30-year | / | | 30 yrs. | MM | S/L | |
| **d** 40-year | / | | 40 yrs. | MM | S/L | |

**Part IV**  Summary (See instructions.)

| | | | |
|---|---|---|---|
| 21 | Listed property. Enter amount from line 28 | **21** | |
| 22 | **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations - see instr. | **22** | 1,810. |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | **23** | |

916251  12-12-19    LHA  **For Paperwork Reduction Act Notice, see separate instructions.**    Form **4562** (2019)

**AMENDED**

Form 4562 (2019)        **TONY D. & ELIZABETH A. TOWNLEY**        Page **2**

**Part V** | **Listed Property** (Include automobiles, certain other vehicles, certain aircraft, and property used for entertainment, recreation, or amusement.)

**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A - Depreciation and Other Information (Caution:** See the instructions for limits for passenger automobiles.)

24a  Do you have evidence to support the business/investment use claimed?  ☐ Yes  ☐ No  24b If "Yes," is the evidence written?  ☐ Yes  ☐ No

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/ investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|

25  Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use | | | | | | **25** | | |

26  Property used more than 50% in a qualified business use:

| | | % | | | | | | |
| | | % | | | | | | |
| | | % | | | | | | |

27  Property used 50% or less in a qualified business use:

| | | % | | | S/L - | | | |
| | | % | | | S/L - | | | |
| | | % | | | S/L - | | | |

28  Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1 ... **28**

29  Add amounts in column (i), line 26. Enter here and on line 7, page 1 ... **29**

**Section B - Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other "more than 5% owner," or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | (a) Vehicle | | (b) Vehicle | | (c) Vehicle | | (d) Vehicle | | (e) Vehicle | | (f) Vehicle | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30  Total business/investment miles driven during the year (**don't** include commuting miles) ... | | | | | | | | | | | | |
| 31  Total commuting miles driven during the year ... | | | | | | | | | | | | |
| 32  Total other personal (noncommuting) miles driven ... | | | | | | | | | | | | |
| 33  Total miles driven during the year. Add lines 30 through 32 ... | | | | | | | | | | | | |
| 34  Was the vehicle available for personal use during off-duty hours? | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 35  Was the vehicle used primarily by a more than 5% owner or related person? ... | | | | | | | | | | | | |
| 36  Is another vehicle available for personal use? | | | | | | | | | | | | |

**Section C - Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons.

| | | Yes | No |
|---|---|---|---|
| 37 | Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees? | | |
| 38 | Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners ... | | |
| 39 | Do you treat all use of vehicles by employees as personal use? | | |
| 40 | Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? | | |
| 41 | Do you meet the requirements concerning qualified automobile demonstration use? | | |

**Note:** If your answer to 37, 38, 39, 40, or 41 is "Yes," don't complete Section B for the covered vehicles.

**Part VI** | **Amortization**

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|

42  Amortization of costs that begins during your 2019 tax year:

| | | | | | |
| | | | | | |

43  Amortization of costs that began before your 2019 tax year ... | | | **43** | |

44  **Total.** Add amounts in column (f). See the instructions for where to report ... | | | **44** | |

Form **4562** (2019)

AMENDED

Form **8990**
(Rev. May 2020)
Department of the Treasury
Internal Revenue Service

# Limitation on Business Interest Expense
## Under Section 163(j)

▶ Attach to your tax return.

▶ Go to www.irs.gov/Form8990 for instructions and the latest information.

OMB No. 1545-0123

| Taxpayer name(s) shown on tax return | Identification number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | |

If Form 8990 relates to an information return for a foreign entity (for example, Form 5471), enter:

Name of foreign entity ▶

Employer identification number, if any ▶

Reference ID number ▶

**Part I**  Computation of Allowable Business Interest Expense

*Part I is completed by all taxpayers subject to section 163(j). Schedule A and Schedule B need to be completed before Part I when the taxpayer is a partner or shareholder of a pass-through entity subject to section 163(j).*

## Section I - Business Interest Expense

| | | | | |
|---|---|---|---|---|
| 1 | Current year business interest expense (not including floor plan financing interest expense), before the section 163(j) limitation | 1 | 2,266,655. | |
| 2 | Disallowed business interest expense carryforwards from prior years. (Does not apply to a partnership) | 2 | | |
| 3 | Partner's excess business interest expense treated as paid or accrued in current year (Schedule A, line 44, column (h)) | 3 | | |
| 4 | Floor plan financing interest expense. See instructions | 4 | | |
| 5 | **Total business interest expense.** Add lines 1 through 4 ▶ | 5 | | 2,266,655. |

## Section II - Adjusted Taxable Income

### Taxable Income

| | | | |
|---|---|---|---|
| 6 | **Taxable income.** See instructions | 6 | 16,464,796. |

### Additions (adjustments to be made if amounts are taken into account on line 6)

| | | | |
|---|---|---|---|
| 7 | Any item of loss or deduction that is not properly allocable to a trade or business of the taxpayer. See instructions | 7 | 20,436,550. |
| 8 | Any business interest expense not from a pass-through entity. See instructions | 8 | 1,364,991. |
| 9 | Amount of any net operating loss deduction under section 172 | 9 | |
| 10 | Amount of any qualified business income deduction allowed under section 199A | 10 | 3,959,241. |
| 11 | Deduction allowable for depreciation, amortization, or depletion attributable to a trade or business. See instructions | 11 | 255,587. |
| 12 | Amount of any loss or deduction items from a pass-through entity. See instructions | 12 | 7,342,723. |
| 13 | Other additions. See instructions | 13 | |
| 14 | Total current year partner's excess taxable income (Schedule A, line 44, column (f)) | 14 | 6,535,895. |
| 15 | Total current year S corporation shareholder's excess taxable income (Schedule B, line 46, column (c)) | 15 | |
| 16 | **Total.** Add lines 7 through 15 ▶ | 16 | 39,894,987. |

### Reductions (adjustments to be made if amounts are taken into account on line 6)

| | | | |
|---|---|---|---|
| 17 | Any item of income or gain that is not properly allocable to a trade or business of the taxpayer. See instructions | 17 | ( ) |
| 18 | Any business interest income not from a pass-through entity. See instructions | 18 | ( ) |
| 19 | Amount of any income or gain items from a pass-through entity. See instructions | 19 | ( 44,452,817.) |
| 20 | Other reductions. See instructions | 20 | ( ) |
| 21 | **Total.** Combine lines 17 through 20 ▶ | 21 | ( 44,452,817.) |
| 22 | **Adjusted taxable income.** Combine lines 6, 16, and 21. (If zero or less, enter -0-.) ▶ | 22 | 11,906,966. |

LHA  **For Paperwork Reduction Act Notice, see the instructions.**   Form **8990** (Rev. 5-2020)

923211 06-29-20

## Section III - Business Interest Income

| | | | |
|---|---|---|---|
| 23 | Current year business interest income. See instructions ................ | 23 | 900,000. |
| 24 | Excess business interest income from pass-through entities (total of Schedule A, line 44, column (g), and Schedule B, line 46, column (d)) ........... | 24 | |
| 25 | **Total.** Add lines 23 and 24 ..................................................... ▶ | 25 | 900,000. |

## Section IV - Section 163(j) Limitation Calculations

### Limitation on Business Interest Expense

| | | | |
|---|---|---|---|
| 26 | Multiply adjusted taxable income (line 22) by the applicable percentage. See instructions .................... | 26 | 5,953,483. |
| 27 | Business interest income (line 25) .......................... | 27 | 900,000. |
| 28 | Floor plan financing interest expense (line 4) ................ | 28 | |
| 29 | **Total.** Add lines 26, 27, and 28 ................................... ▶ | 29 | 6,853,483. |

### Allowable Business Interest Expense

| | | | |
|---|---|---|---|
| 30 | **Total current year business interest expense deduction.** See instructions ................ | 30 | 2,266,655. |

### Carryforward

| | | | |
|---|---|---|---|
| 31 | **Disallowed business interest expense.** Subtract line 29 from line 5. (If zero or less, enter -0-.) ................ | 31 | |

| **Part II** | **Partnership Pass-Through Items** |
|---|---|

*Part II is only completed by a partnership that is subject to section 163(j). The partnership items below are allocated to the partners and are not carried forward by the partnership. See the instructions for more information.*

### Excess Business Interest Expense

| | | | |
|---|---|---|---|
| 32 | **Excess business interest expense.** Enter amount from line 31 ................ | 32 | |

### Excess Taxable Income  (If you entered an amount on line 32, skip lines 33 through 37.)

| | | | |
|---|---|---|---|
| 33 | Subtract the sum of lines 4 and 25 from line 5. (If zero or less, enter -0-.) ................ | 33 | |
| 34 | Subtract line 33 from line 26. (If zero or less, enter -0-.) ................ | 34 | |
| 35 | Divide line 34 by line 26. Enter the result as a decimal. (If line 26 is zero, enter -0-.) ................ | 35 | |
| 36 | **Excess taxable income.** Multiply line 35 by line 22 ................ | 36 | |

### Excess Business Interest Income

| | | | |
|---|---|---|---|
| 37 | **Excess business interest income.** Subtract the sum of lines 1, 2, and 3 from line 25. (If zero or less, enter -0-.) ................ | 37 | |

| **Part III** | **S Corporation Pass-Through Items** |
|---|---|

*Part III is only completed by S corporations that are subject to section 163(j). The S corporation items below are allocated to the shareholders. See the instructions for more information.*

### Excess Taxable Income

| | | | |
|---|---|---|---|
| 38 | Subtract the sum of lines 4 and 25 from line 5. (If zero or less, enter -0-.) ................ | 38 | |
| 39 | Subtract line 38 from line 26. (If zero or less, enter -0-.) ................ | 39 | |
| 40 | Divide line 39 by line 26. Enter the result as a decimal. (If line 26 is zero, enter -0-.) ................ | 40 | |
| 41 | **Excess taxable income.** Multiply line 40 by line 22 ................ | 41 | |

### Excess Business Interest Income

| | | | |
|---|---|---|---|
| 42 | **Excess business interest income.** Subtract the sum of lines 1, 2, and 3 from line 25. (If zero or less, enter -0-.) ................ | 42 | |

Form **8990** (Rev. 5-2020)

AMENDED

Form 8990 (Rev. 5-2020)                                                                                          Page **3**

| **SCHEDULE A** | **Summary of Partner's Section 163(j) Excess Items** |
|---|---|

*Any taxpayer that owns an interest in a partnership subject to section 163(j) should complete Schedule A before completing Part I.*

| | **(a)** Name of partnership | **(b)** EIN | Excess Business Interest Expense | | | **(f)** Current year excess taxable income | **(g)** Current year excess business interest income | **(h)** Excess business interest expense treated as paid or accrued (see instructions) | **(i)** Current year excess business interest expense carryforward ((e) minus (h)) |
|---|---|---|---|---|---|---|---|---|---|
| | | | **(c)** Current year | **(d)** Prior year carryforward | **(e)** Total ((c) plus (d)) | | | | |
| **43** | M&T AVIATION, LLC | | 0. | 0. | 0. | 126,781. | 0. | 0. | 0. |
| | ZAXBY'S OPERATING COMPANY, LP (TDT) | | 0. | 0. | 0. | 6,409,114. | 0. | 0. | 0. |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| **44** | **Total**  ▶ | | | | | 6,535,895. | 0. | 0. | |

| **SCHEDULE B** | **Summary of S Corporation Shareholder's Excess Taxable Income and Excess Business Interest Income** |
|---|---|

*Any taxpayer that is required to complete Part I and is a shareholder in an S corporation that has excess taxable income or excess business interest income should complete Schedule B before completing Part I.*

| | **(a)** Name of S corporation | **(b)** EIN | **(c)** Current year excess taxable income | **(d)** Current year excess business interest income |
|---|---|---|---|---|
| **45** | | | | |
| | | | | |
| | | | | |
| | | | | |
| **46** | **Total**  ▶ | | 0. | 0. |

Form **8990** (Rev. 5-2020)

923213  06-29-20

Case 3:22-cv-00107-CDL    Document 1-1    Filed 10/28/22    Page 76 of 600

AMENDED

**Business Interest Expense**

TONY D. & ELIZABETH A. TOWNLEY

| Description | Prior Disallowed Business Interest Expense | Business Interest Expense | Business Interest Expense Ratio | Limited Business Interest Expense | Disallowed Business Interest Expense |
|---|---|---|---|---|---|
| OTF MANAGEMENT, LLC | | 8,445. | .003726 | 8,445. | |
| FRAZER CREEK INVESTMENTS, LLC | | 0. | | | |
| LANE CREEK INVESTMENTS, LLC | | 0. | | | |
| LOG CREEK TRUST | | 0. | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Total | 0. | 8,445. | .0037 | 8,445. | 0. |

923301 08-28-19

Case 3:22-cv-00107-CDL   Document 1-1   Filed 10/28/22   Page 77 of 600

AMENDED

## Worksheet for Figuring a Shareholder's Stock Basis

*(Keep for your records.)*

Name of Entity: **PLUCKED CHICKEN, INC.**                                        EIN: ▮▮▮▮▮▮▮

| | | |
|---|---|---|
| 1. Your stock basis at the beginning of the year | 1. | 12,876,021. |
| **Increases:** | | |
| 2. Money and your adjusted basis in property contributed to the corporation | 2. | |
| 3. Your share of the corporation's income (including tax-exempt income) reduced by any amount included in income with respect to clean renewable energy or (for bonds issued before October 4, 2008) qualified zone academy bonds | 3. | 40,342,914. |
| 4. Other increases to basis, including your share of the excess of the deductions for depletion (other than oil and gas depletion) over the basis of the property subject to depletion                SEE STATEMENT 48 | 4. | 222,230. |
| **Decreases:** | | |
| 5. Distributions of money and the fair market value of property (excluding dividend distributions reportable on Form 1099-DIV and distributions in excess of basis (the sum of lines 1 through 4)) | 5. | ( 29,255,411.) |
| 6. Enter: **(a)** Your share of the corporation's nondeductible expenses and the depletion deduction for any oil and gas property held by the corporation (but only to the extent your share of the property's adjusted basis exceeds the depletion deduction)  **or (b)** if the election under Regulations section 1.1367-1(g) applies, your share of the corporation's deductions and losses (include your entire share of the section 179 expense deduction even if your allowable section 179 expense deduction is smaller) adjusted, if the corporation made a charitable contribution of property, as described in (4) under <u>Basis</u> <u>Rules</u> | 6. | ( 773,449.) |
| 7. If the election under Regulations section 1.1367-1(g) applies, enter the amount from 6(a) above. Otherwise enter the amount from 6(b) | 7. | ( 1,908,926.) |
| 8. Enter the smaller of **(a)** the excess, as of the beginning of the tax year, of the amount you are owed for loans you made to the corporation over your basis in those loans  **or (b)** the sum of lines 1 through 7. This amount increases your loan basis | 8. | ( ) |
| 9. Your stock basis in the corporation at the end of the year. Combine lines 1 through 8 | 9. | 21,503,379. |

919061
04-01-19

Case 3:22-cv-00107-CDL    Document 1-3    Filed 10/28/22    Page 78 of 600

AMENDED

## Shareholder Debt Basis Worksheet

Name of Entity:

**PLUCKED CHICKEN, INC.**

EIN:

### Debt Basis

| | | | |
|---|---|---|---|
| 10. | Debt basis, beginning of year (Not less than zero) | | 0. |
| 11. | Loans made during the year | | |
| 12. | Restoration of debt basis (from line 8) | | |
| 13. | Subtotal (Add lines 11 and 12) | | |
| 14. | Less: Loan repayments | | |
| 15. | Gain from loan repayments | | |
| 16. | Other adjustments: | | |
| 17. | Subtotal (Combine lines 10, 13, 14, 15 and 16) | | |
| 18. | Applied against excess loss and deductions | | |
| 19. | Debt basis, end of year (Not less than zero) | | 0. |
| 20. | Total shareholder stock and debt basis, end of year (Add lines 9 and 19) (Not less than zero) | | 21,503,379. |

919081
04-01-19

**AMENDED**

TONY D. & ELIZABETH A. TOWNLEY

| FORM 1040 | TAX-EXEMPT INTEREST | STATEMENT 1 |
|---|---|---|

| NAME OF PAYER | AMOUNT |
|---|---|
| VANGUARD #9138 - TE INTEREST | 27,060. |
| VANGUARD #9138 - TE OID | 119. |
| VANGUARD #9138 - TE INTEREST BOND PREMIUM | -4,717. |
| VANGUARD #9138 - TE OID ACQUISITION PREMIUM | -75. |
| TOTAL TO FORM 1040, LINE 2A | 22,387. |

| FORM 1040 | QUALIFIED DIVIDENDS | STATEMENT 2 |
|---|---|---|

| NAME OF PAYER | ORDINARY DIVIDENDS | QUALIFIED DIVIDENDS |
|---|---|---|
| VANGUARD #9138 | 24,633. | 21,730. |
| COMPUTERSHARE INC. | 67. | 67. |
| FROM K-1 - PLUCKED CHICKEN, INC. | 3,991. | 1,705. |
| FROM K-1 - CLUCKZ HOLDINGS, LLC | 150. | 63. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY, LP (TDT) | 748. | 319. |
| FROM K-1 - CLUCKZ HOLDINGS, LLC (SECG) | 45. | 19. |
| TOTAL INCLUDED IN FORM 1040, LINE 3A | | 23,903. |

Case 3:22-cv-00107-CDL   Document 11   Filed 10/28/22   Page 80 of 600

TONY D. & ELIZABETH A. TOWNLEY

| SCHEDULE 1 | STATE AND LOCAL INCOME TAX REFUNDS | | STATEMENT 3 |
|---|---|---|---|
| | 2018 | 2017 | 2016 |

**ALABAMA**

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| GROSS STATE/LOCAL INC TAX REFUNDS | 56,392. | | |
| LESS: TAX PAID IN FOLLOWING YEAR | | | |
| NET TAX REFUNDS   ALABAMA | 56,392. | | |

**GEORGIA**

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| GROSS STATE/LOCAL INC TAX REFUNDS | 752,090. | | |
| LESS: TAX PAID IN FOLLOWING YEAR | | | |
| REFUND RECEIVED IN 2020 | -752,090. | | |
| NET TAX REFUNDS   GEORGIA | 0. | | |

**LOUISIANA**

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| GROSS STATE/LOCAL INC TAX REFUNDS | 8,332. | | |
| LESS: TAX PAID IN FOLLOWING YEAR | | | |
| NET TAX REFUNDS   LOUISIANA | 8,332. | | |

**NORTH CAROLINA**

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| GROSS STATE/LOCAL INC TAX REFUNDS | 182,949. | | |
| LESS: TAX PAID IN FOLLOWING YEAR | | | |
| NET TAX REFUNDS   NORTH CAROLINA | 182,949. | | |

**SOUTH CAROLINA**

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| GROSS STATE/LOCAL INC TAX REFUNDS | 195,530. | | |
| LESS: TAX PAID IN FOLLOWING YEAR | | | |
| NET TAX REFUNDS   SOUTH CAROLINA | 195,530. | | |

**LOUISIANA**

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| GROSS STATE/LOCAL INC TAX REFUNDS | | 8,825. | |
| LESS: TAX PAID IN FOLLOWING YEAR | | | |
| NET TAX REFUNDS   LOUISIANA | | 8,825. | |
| TOTAL NET TAX REFUNDS | 443,203. | 8,825. | |

Case 3:22-cv-00107-CDL    Document 1-13    Filed 10/28/22    Page 81 of 600

TONY D. & ELIZABETH A. TOWNLEY

| SCHEDULE 1 | TAXABLE STATE AND LOCAL INCOME TAX REFUNDS | STATEMENT 4 |
|---|---|---|

|  | 2017 | 2016 |
|---|---|---|
| NET TAX REFUNDS FROM STATE AND LOCAL INCOME TAX REFUNDS STMT. | 8,825. | |
| LESS:REFUNDS-NO BENEFIT DUE TO AMT -SALES TAX BENEFIT REDUCTION | | |
| 1 NET REFUNDS FOR RECALCULATION | 8,825. | |
| 2 TOTAL ITEMIZED DEDUCTIONS BEFORE PHASEOUT | 6,160,748. | |
| 3 DEDUCTION NOT SUBJ TO PHASEOUT | 1,684,362. | |
| 4 NET REFUNDS FROM LINE 1 | 8,825. | |
| 5 LINE 2 MINUS LINES 3 AND 4 | 4,467,561. | |
| 6 MULT LN 5 BY APPL SEC. 68 PCT | 3,574,049. | |
| 7 PRIOR YEAR AGI | 38,440,343. | |
| 8 ITEM. DED. PHASEOUT THRESHOLD | 313,800. | |
| 9 SUBTRACT LINE 8 FROM LINE 7 (IF ZERO OR LESS, SKIP LINES 10 THROUGH 15, AND ENTER AMOUNT FROM LINE 1 ON LINE 16) | 38,126,543. | |
| 10 MULT LN 9 BY APPL SEC. 68 PCT | 1,143,796. | |
| 11 ALLOWABLE ITEMIZED DEDUCTIONS (LINE 5 LESS THE LESSER OF LINE 6 OR LINE 10) | 3,323,765. | |
| 12 ITEM DED. NOT SUBJ TO PHASEOUT | 1,684,362. | |
| 13A TOTAL ADJ. ITEMIZED DEDUCTIONS | 5,008,127. | |
| 13B PRIOR YR. STD. DED. AVAILABLE | 12,700. | |
| 14 PRIOR YR. ALLOWABLE ITEM. DED. | 5,016,952. | |
| 15 SUBTRACT THE GREATER OF LINE 13A OR LINE 13B FROM LINE 14 | 8,825. | |
| 16 TAXABLE REFUNDS (LESSER OF LINE 15 OR LINE 1) | 8,825. | |
| 17 ALLOWABLE PRIOR YR. ITEM. DED. | 5,016,952. | |
| 18 PRIOR YEAR STD. DED. AVAILABLE | 12,700. | |
| 19 SUBTRACT LINE 18 FROM LINE 17 | 5,004,252. | |
| 20 LESSER OF LINE 16 OR LINE 19 | 8,825. | |
| 21 PRIOR YEAR TAXABLE INCOME | 33,423,391. | |
| 22 AMOUNT TO INCLUDE ON SCHEDULE 1, LINE 1 * IF LINE 21 IS -0- OR MORE, USE AMOUNT FROM LINE 20 * IF LINE 21 IS A NEGATIVE AMOUNT, NET LINES 20 AND 21 | | 8,825. |
| STATE AND LOCAL INCOME TAX REFUNDS STMT FOR 2018 STATE AND LOCAL INCOME TAX REFUNDS PRIOR TO 2016 | | |
| TOTAL TO SCHEDULE 1, LINE 1 | | 8,825. |

AMENDED
TONY D. & ELIZABETH A. TOWNLEY

SCHEDULE 1    SELF-EMPLOYED HEALTH INSURANCE DEDUCTION WORKSHEET    STATEMENT 5

TONY D. TOWNLEY

ZAXBY'S OPERATING COMPANY, LP (TDT)

| | | |
|---|---|---:|
| 1 | NONSPECIFIED HEALTH INSURANCE PAYMENTS | 18,327. |
| 2 | NET PROFIT FROM TRADE OR BUSINESS UNDER WHICH INSURANCE PLAN IS ESTABLISHED | 23,759. |
| 3 | TOTAL OF ALL NET PROFITS AND EARNED INCOME. S CORPORATIONS SKIP TO LINE 9 | 2,554,881. |
| 4 | DIVIDE LINE 2 BY LINE 3 | .0093 |
| 5 | DEDUCTIBLE PORTION OF SELF-EMPLOYMENT TAX | 35,054. |
| 6 | LINE 4 TIMES LINE 5 | 326. |
| 7 | LINE 2 MINUS LINE 6 | 23,433. |
| 8 | SELF-EMPLOYED SEP, SIMPLE, AND QUALIFIED PLANS ATTRIBUTABLE TO TRADE OR BUSINESS NAMED ABOVE | 0. |
| 9 | LINE 7 MINUS LINE 8. S CORPORATIONS ENTER WAGES RECEIVED | 23,433. |
| 10 | FORM 2555, LINE 45 ATTRIBUTABLE TO THE TRADE OR BUSINESS NAMED ABOVE | |
| 11 | LINE 9 MINUS LINE 10 | 23,433. |
| 12 | SELF-EMPLOYED HEALTH INSURANCE DEDUCTION.  LESSER OF LINE 1 OR LINE 11 | 18,327. |

Case 3:22-cv-00107-CDL   Document 1-2   Filed 10/28/22   Page 83 of 600

TONY D. & ELIZABETH A. TOWNLEY

---

| SCHEDULE 1 | TAXABLE STATE AND LOCAL INCOME TAX REFUNDS | STATEMENT 6 |
|---|---|---|

| | 2018 |
|---|---|
| NET TAX REFUNDS FROM STATE AND LOCAL INCOME TAX REFUNDS STMT. | 443,203. |

LESS:REFUNDS-NO BENEFIT DUE TO AMT
    -SALES TAX BENEFIT REDUCTION

| | | |
|---|---|---|
| 1 | NET REFUNDS FOR RECALCULATION | 443,203. |
| 2 | AMOUNT FROM PRIOR YEAR SCHEDULE A, LINE 5E | 10,000. |
| 3 | TOTAL OF PRIOR YEAR SCHEDULE A, LINES 5B AND 5C | 59,758. |
| 4 | SUBTRACT LINE 3 FROM LINE 2 IF ZERO OR LESS, STOP HERE NONE OF YOUR REFUND IS TAXABLE | -49,758. |
| 5 | ENTER THE STATE AND LOCAL INCOME TAXES FROM PRIOR YEAR SCHEDULE A, LINE 5A | |
| 6 | ENTER THE AMOUNT FROM LINE 1 | |
| 7 | SUBTRACT LINE 6 FROM LINE 5 | |
| 8 | ADD LINE 7 TO LINE 3 | |
| 9 | SUBTRACT LINE 8 FROM LINE 2 | |
| 10 | ENTER THE LESSER OF LINE 4, LINE 6 OR LINE 9. IF ZERO OR LESS, STOP HERE. NONE OF YOUR REFUND IS TAXABLE. IF GREATER THAN ZERO, PROCEED TO LINE 11 | |
| 11 | ALLOWABLE PRIOR YEAR ITEMIZED DEDUCTIONS | |
| 12 | ENTER YOUR PRIOR YEAR STANDARD DEDUCTION | |
| 13 | SUBTRACT LINE 12 FROM LINE 11 | |
| 14 | ENTER THE SMALLER OF LINE 10 OR LINE 13. | |
| 15 | PRIOR YEAR TAXABLE INCOME | |
| 16 | AMOUNT TO INCLUDE ON SCHEDULE 1, LINE 1 * IF LINE 15 IS -0- OR MORE, USE AMOUNT FROM LINE 14 * IF LINE 15 IS A NEGATIVE AMOUNT, NET LINES 14 AND 15 | |

TOTAL TO SCHEDULE 1, LINE 1
  (IF PRIOR YEAR REFUNDS, AMOUNT IS INCLUDED WITH
  STATEMENT SHOWING PRIOR YEAR REFUNDS)

Case 3:22-cv-00107-CDL   Document 41   Filed 10/28/22   Page 84 of 600

TONY D. & ELIZABETH A. TOWNLEY

---

| SCHEDULE 2 | OTHER TAXES | STATEMENT 7 |
|---|---|---|

---

| DESCRIPTION | AMOUNT |
|---|---|
| FROM FORM 8959 | 14,393. |
| FROM FORM 8960 | 99,184. |
| TOTAL TO SCHEDULE 2, LINE 8 | 113,577. |

---

| SCHEDULE 3 | CURRENT YEAR ESTIMATES AND AMOUNT APPLIED FROM PREVIOUS YEAR | STATEMENT 8 |
|---|---|---|

---

| DESCRIPTION | AMOUNT |
|---|---|
| 3RD QTR ESTIMATE PAYMENT - JOINT | 1,000,000. |
| PRIOR YEAR OVERPAYMENT APPLIED - JOINT | 6,000,516. |
| TOTAL TO SCHEDULE 3, LINE 8 | 7,000,516. |

Case 3:22-cv-00107-CDL   Document 1-1   Filed 10/28/22   Page 85 of 600

TONY D. & ELIZABETH A. TOWNLEY

---

| SCHEDULE A | STATE AND LOCAL INCOME TAXES | STATEMENT 9 |

| DESCRIPTION | AMOUNT |
|---|---:|
| FROM K-1 - PLUCKED CHICKEN, INC. | 743,609. |
| FROM K-1 - CLUCKZ HOLDINGS, LLC | 26,383. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY, LP (TDT) | 137,393. |
| FROM K-1 - CLUCKZ HOLDINGS, LLC (SECG) | 8,200. |
| FROM K-1 - PLUCKED CHICKEN, INC.-ALABAMA | 80,682. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-ALABAMA | 2,917. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-ALABAMA | 871. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-ALABAMA | 14,652. |
| FROM K-1 - PLUCKED CHICKEN, INC.-ARKANSAS | 7,444. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-ARKANSAS | 269. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-ARKANSAS | 80. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-ARKANSAS | 1,348. |
| FROM K-1 - PLUCKED CHICKEN, INC.-KENTUCKY | 15,701. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-KENTUCKY | 598. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-KENTUCKY | 178. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-KENTUCKY | 6,645. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-MISSISSIPPI | 407. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-MISSISSIPPI | 121. |
| FROM K-1 - PLUCKED CHICKEN, INC.-MISSISSIPPI | 14,954. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-MISSISSIPPI | 2,463. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-VIRGINIA | 261. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-VIRGINIA | 856. |
| FROM K-1 - PLUCKED CHICKEN, INC.-VIRGINIA | 26,939. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-VIRGINIA | 4,668. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-LOUISIANA | 6,161. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-LOUISIANA | 1,230. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-LOUISIANA | 368. |
| FROM K-1 - PLUCKED CHICKEN, INC.-LOUISIANA | 31,351. |
| GA FILM TAX CREDIT | 730,000. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-INDIANA | 21. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-INDIANA | 70. |
| FROM K-1 - PLUCKED CHICKEN, INC.-INDIANA | 1,916. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-INDIANA | 351. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-KANSAS | 2. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-KANSAS | 6. |
| FROM K-1 - PLUCKED CHICKEN, INC.-KANSAS | 163. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-KANSAS | 29. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-PENNSYLVANIA | 11. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-PENNSYLVANIA | 37. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-PENNSYLVANIA | 186. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-MISSOURI | 8. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-MISSOURI | 27. |
| FROM K-1 - PLUCKED CHICKEN, INC.-MISSOURI | 752. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-MISSOURI | 136. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-OKLAHOMA | 57. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-UTAH | 28. |
| TOTAL TO SCHEDULE A, LINE 5A | 1,870,549. |

Case 3:22-cv-00107-CDL   Document 1   Filed 10/28/22   Page 86 of 600

TONY D. & ELIZABETH A. TOWNLEY

---

| SCHEDULE A | CASH CONTRIBUTIONS | STATEMENT 10 |

---

| DESCRIPTION | AMOUNT 100% LIMIT | AMOUNT 60% LIMIT | AMOUNT 30% LIMIT |
|---|---|---|---|
| OCONEE YOUTH PLAYHOUSE | | 150,000. | |
| WATKINSVILLE FIRST UNITED METHODIST CHURCH | | 10,800. | |
| EXTRA SPECIAL PEOPLE, INC. | | 25,000. | |
| GEORGIA SOUTHERN UNIVERSITY | | 249. | |
| UNITED WAY OF NORTHEAST GEORGIA | | 1,500. | |
| COMMIT TO GEORGIA | | 2,950. | |
| FAMILIES 4 FAMILIES | | 100. | |
| FROM K-1 - PLUCKED CHICKEN, INC. | | 56,321. | |
| FROM K-1 - CLUCKZ HOLDINGS, LLC | | 2,106. | |
| FROM K-1 - ZAXBY'S OPERATING COMPANY, LP (TDT) | | 10,540. | |
| FROM K-1 - CLUCKZ HOLDINGS, LLC (SECG) | | 629. | |
| SUBTOTALS | | 260,195. | |
| TOTAL TO SCHEDULE A, LINE 11 | | | 260,195. |

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

| SCHEDULE B | INTEREST INCOME | STATEMENT 11 |
|---|---|---|

| NAME OF PAYER | AMOUNT |
|---|---|
| AFB&T A DIVISION OF SYNOVUS BANK #2011 | 4,478. |
| AFB&T A DIVISION OF SYNOVUS BANK #4283 | 43,201. |
| AFB&T A DIVISION OF SYNOVUS BANK #5497 | 14. |
| AFB&T A DIVISION OF SYNOVUS BANK #6340 & #0467 | 91. |
| AFB&T A DIVISION OF SYNOVUS BANK #6358 | 24. |
| AFB&T A DIVISION OF SYNOVUS BANK #6366 | 63. |
| AFB&T A DIVISION OF SYNOVUS BANK #6633 | 31. |
| AFB&T A DIVISION OF SYNOVUS BANK #9768 | 960. |
| TRUIST BANK FKA BRANCH BANKING & TRUST CO #0793 | 158. |
| FIRST AMERICAN BANK & TRUST #8313 & #8324 | 69. |
| FIRST AMERICAN BANK & TRUST #8335 | 121. |
| FIRST AMERICAN BANK & TRUST CO #8225 | 35. |
| LOG CREEK, LLLP | 900,000. |
| PARKER CREEK PROPERTIES, LLC | 554. |
| CADENCE BANK #3428 | 27. |
| CADENCE BANK #8239 | 46. |
| CADENCE BANK #8259 | 46. |
| CADENCE BANK #8279 | 45. |
| SYNOVUS BANK #2649 | 560. |
| VANGUARD #9138 - TE INTEREST | 27,060. |
| VANGUARD #9138 - TE OID | 119. |
| VANGUARD #9138 - TE INTEREST BOND PREMIUM | -4,717. |
| VANGUARD #9138 - TE OID ACQUISITION PREMIUM | -75. |
| NORTHWESTERN MUTUAL #Y406 | 29. |
| NORTHWESTERN MUTUAL #Y575 | 44. |
| NORTHWESTERN MUTUAL #Y642 | 111. |
| FROM K-1 - PLUCKED CHICKEN, INC. | 1,375,413. |
| FROM K-1 - LOG CREEK, LLLP | 81,299. |
| FROM K-1 - LOG CREEK, LLLP | 81,299. |
| FROM K-1 - TONY D. TOWNLEY TRUST | 22. |
| FROM K-1 - ELIZABETH A. TOWNLEY TRUST | 22. |
| FROM K-1 - CLUCKZ HOLDINGS, LLC | 389. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY, LP (TDT) | 1,950. |
| FROM K-1 - CLUCKZ HOLDINGS, LLC (SECG) | 116. |
| FROM K-1 - LOG CREEK, LLLP | 1,659. |
| FROM K-1 - LOG CREEK, LLLP | 1,659. |
| TOTAL TO SCHEDULE B, LINE 1 | 2,516,922. |

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

═══════════════════════════════════════════════════════════════

| SCHEDULE B | TAX-EXEMPT INTEREST | STATEMENT 12 |
|---|---|---|

───────────────────────────────────────────────────────────────

| NAME OF PAYER | AMOUNT |
|---|---|
| VANGUARD #9138 - TE INTEREST | 27,060. |
| VANGUARD #9138 - TE OID | 119. |
| VANGUARD #9138 - TE INTEREST BOND PREMIUM | -4,717. |
| VANGUARD #9138 - TE OID ACQUISITION PREMIUM | -75. |
| TOTAL TAX-EXEMPT INTEREST TO SCHEDULE B, LINE 1 | 22,387. |


═══════════════════════════════════════════════════════════════

| SCHEDULE D | NET LONG-TERM GAIN OR LOSS FROM FORMS 4797, 2439, 6252, 4684, 6781 AND 8824 | STATEMENT 13 |
|---|---|---|

───────────────────────────────────────────────────────────────

| DESCRIPTION OF PROPERTY | GAIN OR LOSS | 28% GAIN |
|---|---|---|
| FORM 4797 | 597,740. | |
| TOTAL TO SCHEDULE D, PART II, LINE 11 | 597,740. | |


═══════════════════════════════════════════════════════════════

| SCHEDULE D | NET SHORT-TERM GAIN OR LOSS FROM PARTNERSHIPS, S CORPORATIONS, AND FIDUCIARIES | STATEMENT 14 |
|---|---|---|

───────────────────────────────────────────────────────────────

| DESCRIPTION OF ACTIVITY | GAIN OR LOSS |
|---|---|
| PLUCKED CHICKEN, INC. | -449. |
| CLUCKZ HOLDINGS, LLC | -17. |
| ZAXBY'S OPERATING COMPANY, LP (TDT) | -84. |
| CLUCKZ HOLDINGS, LLC (SECG) | -5. |
| TOTAL TO SCHEDULE D, PART I, LINE 5 | -555. |

Case 3:22-cv-00107-CDL   Document 1   Filed 10/28/22   Page 89 of 600
AMENDED

TONY D. & ELIZABETH A. TOWNLEY

---

| SCHEDULE D | NET LONG-TERM GAIN OR LOSS FROM PARTNERSHIPS, S CORPORATIONS, AND FIDUCIARIES | STATEMENT 15 |

---

| DESCRIPTION OF ACTIVITY | GAIN OR LOSS | 28% GAIN |
|---|---|---|
| PLUCKED CHICKEN, INC. | 3,801. | |
| CLUCKZ HOLDINGS, LLC | 142. | |
| ZAXBY'S OPERATING COMPANY, LP (TDT) | 711. | |
| CLUCKZ HOLDINGS, LLC (SECG) | 42. | |
| PARKER CREEK PROPERTIES | 1,491. | |
| TOTAL TO SCHEDULE D, PART II, LINE 12 | 6,187. | |

Case 3:22-cv-00107-CDL   Document 1-1   Filed 10/28/22   Page 90 of 600

TONY D. & ELIZABETH A. TOWNLEY

| | | |
|---|---|---|
| SCHEDULE D | UNRECAPTURED SECTION 1250 GAIN | STATEMENT 16 |

1. IF YOU HAVE A SECTION 1250 PROPERTY IN PART III OF FORM
   4797 FOR WHICH YOU MADE AN ENTRY IN PART I OF FORM 4797,
   ENTER THE SMALLER OF LINE 22 OR LINE 24 OF FORM 4797 FOR
   THAT PROPERTY. IF YOU DID NOT HAVE ANY SUCH PROPERTY, GO
   TO LINE 4 .................................................. 52,147.
2. ENTER THE AMOUNT FROM FORM 4797, LINE 26G, FOR THE
   PROPERTY FOR WHICH YOU MADE AN ENTRY ON LINE 1 ...........
                                                              _____

3. SUBTRACT LINE 2 FROM LINE 1 .............................. 52,147.
4. ENTER THE TOTAL UNRECAPTURED SECTION 1250 GAIN INCLUDED
   ON LINE 26 OR LINE 37 OF FORM(S) 6252 FROM INSTALLMENT
   SALES OF TRADE OR BUSINESS PROPERTY HELD MORE THAN 1 YEAR
5. ENTER THE TOTAL OF ANY AMOUNTS REPORTED TO YOU ON A
   SCHEDULE K-1 FROM A PARTNERSHIP OR AN S CORPORATION AS
   "UNRECAPTURED SECTION 1250 GAIN" ..........................
                                                              _____

6. ADD LINES 3 THROUGH 5 .................................... 52,147.
7. ENTER THE SMALLER OF LINE 6 OR THE GAIN
   FROM FORM 4797, LINE 7                            52,147.
8. ENTER THE AMOUNT, IF ANY, FROM FORM 4797,
   LINE 8
9. SUBTRACT LINE 8 FROM LINE 7. IF ZERO OR LESS, ENTER -0- ... 52,147.
10. ENTER THE AMOUNT OF ANY GAIN FROM THE SALE OR EXCHANGE OF
    AN INTEREST IN A PARTNERSHIP ATTRIBUTABLE TO UNRECAPTURED
    SECTION 1250 GAIN
11. ENTER THE TOTAL OF ANY AMOUNTS REPORTED TO YOU ON A
    SCHEDULE K-1, FORMS 1099-DIV, OR FORM 2439 AS "UNRECAPTURED
    SECTION 1250 GAIN" FROM AN ESTATE, TRUST, REAL ESTATE
    INVESTMENT TRUST, OR MUTUAL FUND (OR OTHER REGULATED
    INVESTMENT COMPANY)
12. ENTER THE TOTAL OF ANY UNRECAPTURED SECTION 1250 GAIN FROM SALES
    (INCLUDING INSTALLMENT SALES) OR OTHER DISPOSITIONS OF SECTION
    1250 PROPERTY HELD MORE THAN 1 YEAR FOR WHICH YOU DID NOT
    MAKE AN ENTRY IN PART I OF FORM 4797 FOR THE YEAR OF SALE
                                                              _____

13. ADD LINES 9 THROUGH 12 .................................. 52,147.
14. IF YOU HAD ANY SECTION 1202 GAIN OR COLLECTIBLE
    GAIN OR (LOSS), ENTER THE TOTAL OF LINES 1 THROUGH
    4 OF THE 28% RATE GAIN WORKSHEET
15. ENTER THE (LOSS), IF ANY, FROM SCH D, LINE 7.
    IF SCH D, LINE 7, IS ZERO OR A GAIN ENTER -0-          0.
16. ENTER YOUR LONG-TERM CAPITAL LOSS CARRYOVERS FROM
    SCHEDULE D, LINE 14, AND SCHEDULE K-1 (FORM 1041),
    BOX 11, CODE C
17. COMBINE LINES 14 THROUGH 16. IF THE RESULT IS A (LOSS), ENTER
    IT AS A POSITIVE AMOUNT. IF THE RESULT IS ZERO OR A GAIN,
    ENTER -0- ................................................. 0.
                                                              _____

18. SUBTRACT LINE 17 FROM LINE 13. IF ZERO OR LESS,  ENTER -0-.
    IF MORE THAN ZERO, ENTER THE RESULT HERE AND ON SCHEDULE D,
    LINE 19 ................................................... 52,147.
                                                              ===========

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

====================================================================

| SCHEDULE E | OTHER EXPENSES | STATEMENT 17 |

--------------------------------------------------------------------

FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE COUNTY, GA 30

| DESCRIPTION | AMOUNT |
| --- | --- |
| PEST CONTROL | 8,255. |
| POSTAGE | 27. |
| BANK CHARGES | 27. |
| TOTAL TO SCHEDULE E, PAGE 1, LINE 19 | 8,309. |

====================================================================

| SCHEDULE E | OTHER EXPENSES | STATEMENT 18 |

--------------------------------------------------------------------

LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE CREEK), GA

| DESCRIPTION | AMOUNT |
| --- | --- |
| BANK CHARGES | 144. |
| TOTAL TO SCHEDULE E, PAGE 1, LINE 19 | 144. |

====================================================================

| SCHEDULE E | OTHER INCOME | STATEMENT 19 |

FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE COUNTY, GA 30

| DESCRIPTION | AMOUNT |
| --- | --- |
| RENTAL FEES | 1,104. |
| RENTAL INCOME | 513,546. |
| TOTAL TO SCHEDULE E, PAGE 1 | 514,650. |

AMENDED

TONY D. & ELIZABETH A. TOWNLEY                                    █████████

SCHEDULE E    INCOME OR (LOSS) FROM PARTNERSHIPS AND S CORPS    STATEMENT 20

NAME
____

EMP ID NO.
_____

| CODE | X IF FRN | BASIS COMP REQ | ANY NOT AT RISK | PASSIVE LOSS | PASSIVE INCOME | NONPASSIVE LOSS | SEC. 179 DEDUCTION | NONPASSIVE INCOME |
|------|----------|----------------|-----------------|--------------|----------------|-----------------|--------------------|--------------------|
| OGEECHEE TIMBER, LLC ████████ | | | | | | | | |
| P | | | * | | | | | 7,399. |
| PLUCKED CHICKEN, INC. ████████ | | | | | | | | |
| S | | X | | | | | | 35856370. |
| LAND WARRIORS, LLC ████████ | | | | | | | | |
| P | | | | | 274. | | | 662. |
| PRIOR YEAR PAL ████████ | | | | | | | | |
| P | | | | 274. | | | | |
| LOG CREEK, LLLP ████████ | | | | | | | | |
| P | | | | | 1,024,460. | | | |
| LOG CREEK, LLLP ████████ | | | | | | | | |
| P | | | | | 1,024,460. | | | |
| TOWNLEY FAMILY PARTNERSHIP, LLLP ████████ | | | | | | | | |
| P | | | | | 39,070. | | | |
| TOWNLEY FAMILY PARTNERSHIP, LLLP ████████ | | | | | | | | |
| P | | | | | 1,953,496. | | | |
| TOWNLEY FAMILY PARTNERSHIP, LLLP ████████ | | | | | | | | |
| P | | | | | 1,914,425. | | | |
| CLUCKZ HOLDINGS, LLC ████████ | | | | | | | | |
| P | | | | | | | | 1,345,871. |
| M&T AVIATION, LLC ████████ | | | | | | | | |
| P | | | | | | | | 79,626. |
| ZAXBY'S OPERATING COMPANY, LP (TDT) ████████ | | | | | | | | |
| P | | | | | | | | 6,760,488. |
| CLUCKZ HOLDINGS, LLC (SECG) ████████ | | | | | | | | |
| P | | | | | | | | 402,077. |
| INTEREST EXPENSE - LOG CREEK | | | | | | | | |
| P | | | | | 670,470. | | | |
| INTEREST EXPENSE - TOWNLEY FAMILY PARTNERSHIP | | | | | | | | |
| P | | | | | 672,649. | | | |

AMENDED

TONY D. & ELIZABETH A. TOWNLEY ███████

PARKER CREEK PROPERTIES, LLC
███████
  P                    *              50.
LOG CREEK, LLLP
███████
  P                              20,907.
LOG CREEK, LLLP
███████
  P                              20,908.
INTEREST EXPENSE - LAND WARRIORS

  P                                 844.
INTEREST EXPENSE - OGEECHEE TIMBER

  P                                 760.
                    _____  _____  _____           _____
TOTALS TO SCH. E, LN. 29   274.    324. 7,342,449.        44452493.
                    =========  =========  =========           =========
          * ENTIRE DISPOSITION OF ACTIVITY

---

| SCHEDULE F | OTHER EXPENSES | STATEMENT 21 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| LEGAL FEES | 15,034. |
| REFORESTATION EXPENSE | 9,120. |
| PROFESSIONAL FEES | 10,624. |
| AMORTIZATION EXPENSE | 4,303. |
| TOTAL TO SCHEDULE F, PART II, LINE 32 | 39,081. |

---

| SCHEDULE F | OTHER INCOME - CASH METHOD | STATEMENT 22 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| HUNTING LEASE REVENUE | 8,552. |
| TOTAL TO SCHEDULE F, PART I, LINE 8 | 8,552. |

Case 3:22-cv-00107-CDL   Document 1-2   Filed 10/28/22   Page 94 of 600

TONY D. & ELIZABETH A. TOWNLEY

| SCHEDULE SE | NON-FARM INCOME | STATEMENT 23 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| MANAGEMENT | -467,654. |
| OGEECHEE TIMBER, LLC | 7,399. |
| LAND WARRIORS, LLC | 686. |
| CLUCKZ HOLDINGS, LLC | 1,415,126. |
| ZAXBY'S OPERATING COMPANY, LP (TDT) | 23,759. |
| PARKER CREEK PROPERTIES, LLC | 50. |
| ZAXBY'S FRANCHISING LLC | 1,107,861. |
| TOTAL TO SCHEDULE SE, LINE 2 | 2,087,227. |

| SCHEDULE SE | FARM INCOME | STATEMENT 24 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| TOWNLEY FAMILY PARTNERSHIP, LLLP | -40,910. |
| TIMBER | -43,878. |
| TOTAL TO SCHEDULE SE, LINE 1A | -84,788. |

| FORM 4797 | PROPERTY HELD MORE THAN ONE YEAR | | | | | STATEMENT 25 |
|---|---|---|---|---|---|---|

| DESCRIPTION | DATE ACQUIRED | DATE SOLD | SALES PRICE | DEPR. | COST OR BASIS | GAIN OR LOSS |
|---|---|---|---|---|---|---|
| SALE OF AMS EQUIPMENT | VARIOUS | 01/17/19 | 18,000. | | 0. | 18,000. |
| LOG CREEK, LLLP | | | | | | 254,365. |
| LOG CREEK, LLLP | | | | | | 254,364. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | | | | | | 85. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | | | | | | 4,241. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | | | | | | 4,156. |
| LOG CREEK, LLLP | | | | | | 5,191. |
| LOG CREEK, LLLP | | | | | | 5,191. |
| TOTAL TO 4797, PART I, LINE 2 | | | 18,000. | | 0. | 545,593. |

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

---

FORM 6251                     PASSIVE ACTIVITIES                  STATEMENT 26

---

NET INCOME (LOSS)

| NAME OF ACTIVITY | FORM | AMT | REGULAR | ADJUSTMENT |
|---|---|---|---|---|
| PARKER CREEK PROPERTIES | SCH E | 50. | 50. | |
| FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE COUNTY, GA 3 | SCH E | -32. | -33. | 1. |
| LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE CREEK), GA | SCH E | -18. | -17. | -1. |
| ADJUSTMENT FOR PAL CARRYOVER - LAND WARRIORS, LLC | | | | 274. |
| TOTAL TO FORM 6251, LINE 2M | | | | 274. |

---

FORM 6251                      LOSS LIMITATIONS                   STATEMENT 27

---

NET INCOME (LOSS)

| NAME OF ACTIVITY | FORM | AMT | REGULAR | ADJUSTMENT |
|---|---|---|---|---|
| PLUCKED CHICKEN, INC. | SCH E | 37,255,527. | 37,182,805. | 72,722. |
| TOTAL TO FORM 6251, LINE 2N | | | | 72,722. |

---

FORM 6251      DEPRECIATION ON ASSETS PLACED IN SERVICE AFTER 1986 STATEMENT 28

---

| DESCRIPTION | AMOUNT |
|---|---|
| FROM K-1 - CLUCKZ HOLDINGS, LLC | 2,719. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY, LP (TDT) | 13,609. |
| FROM K-1 - CLUCKZ HOLDINGS, LLC (SECG) | 812. |
| TOTAL TO FORM 6251, LINE 2L | 17,140. |

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

| FORM 8995-A | QUALIFIED BUSINESS INCOME | STATEMENT 29 |
| --- | --- | --- |
| SCHEDULE C | | |

| ACTIVITY NAME | INCOME | LOSS REDUCTION | ADJUSTED QBI |
| --- | --- | --- | --- |
| OGEECHEE TIMBER, LLC | 7,297. | 947. | 6,350. |
| CLUCKZ HOLDINGS, LLC | 1,326,455. | 172,218. | 1,154,237. |
| M&T AVIATION, LLC | 79,626. | 10,338. | 69,288. |
| ZAXBY'S OPERATING COMPANY, LP (TDT) | 6,718,076. | 872,229. | 5,845,847. |
| CLUCKZ HOLDINGS, LLC (SECG) | 402,077. | 52,203. | 349,874. |
| PLUCKED CHICKEN, INC. | 35856369. | 4,655,344. | 31201025. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | -39,070. | | |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | -1953496. | | |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | -1914425. | | |
| CLUCKZ HOLDINGS, LLC | -19,416. | | |
| INTEREST EXPENSE - LOG CREEK | -670,470. | | |
| INTEREST EXPENSE - TOWNLEY FAMILY PARTNERSHIP | -672,649. | | |
| INTEREST EXPENSE - LAND WARRIORS | -844. | | |
| INTEREST EXPENSE - OGEECHEE TIMBER | -760. | | |
| LOG CREEK TRUST | -43,878. | | |
| OTF MANAGEMENT, LLC | -467,654. | | |

| FORM 8995-A | QUALIFIED BUSINESS NET LOSS CARRYOVER | STATEMENT 30 |
| --- | --- | --- |
| SCHEDULE C | FROM PRIOR YEARS | |

| TRADE OR BUSINESS NAME | AMOUNT |
| --- | --- |
| FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CR | 33. |
| TOTAL TO FORM 8995-A SCHEDULE C, LINE 2 | 33. |

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

---

| FORM 8960 | TRADE OR BUSINESS INCOME | STATEMENT 31 |
|---|---|---|

| | |
|---|---:|
| ROYALTIES DERIVED IN THE ORDINARY COURSE OF BUSINESS | 0. |
| OGEECHEE TIMBER, LLC | -7,399. |
| PLUCKED CHICKEN, INC. | -35,856,370. |
| LAND WARRIORS, LLC | -662. |
| LOG CREEK, LLLP | 1,024,460. |
| LOG CREEK, LLLP | 1,024,460. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | 39,070. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | 1,953,496. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | 1,914,425. |
| CLUCKZ HOLDINGS, LLC | -1,345,871. |
| M&T AVIATION, LLC | -79,626. |
| ZAXBY'S OPERATING COMPANY, LP (TDT) | -6,760,488. |
| CLUCKZ HOLDINGS, LLC (SECG) | -402,077. |
| INTEREST EXPENSE - LOG CREEK | 670,470. |
| INTEREST EXPENSE - TOWNLEY FAMILY PARTNERSHIP | 672,649. |
| LOG CREEK, LLLP | 20,908. |
| LOG CREEK, LLLP | 20,907. |
| INTEREST EXPENSE - LAND WARRIORS | 844. |
| INTEREST EXPENSE - OGEECHEE TIMBER | 760. |
| AMOUNT TO FORM 8960, LINE 4B | -37,110,044. |

---

| FORM 8960 | OTHER MODIFICATIONS TO INVESTMENT INCOME | STATEMENT 32 |
|---|---|---|

| | | |
|---|---:|---:|
| AMOUNT FROM LINE 7 WORKSHEET, LINE 13 FOR GA | 10,000. | |
| AMOUNT FROM LINE 7 WORKSHEET, LINE 13 FOR SC | 5,018. | |
| TOTAL LIMITED TO PRIOR YEAR FORM 8960, LINE 9B | -5,018. | 10,000. |
| AMOUNT TO FORM 8960, LINE 7 | | 10,000. |

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

---

FORM 8582          ACTIVE RENTAL OF REAL ESTATE - WORKSHEET 1     STATEMENT 36

---

| | CURRENT YEAR | | PRIOR YEAR | OVERALL GAIN OR LOSS | |
| | | | UNALLOWED | | |
| NAME OF ACTIVITY | NET INCOME | NET LOSS | LOSS | GAIN | LOSS |
|---|---|---|---|---|---|
| FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE C | 0. | -86,794. | -5,833. | | -92,627. |
| LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE CREEK), GA | 0. | -49,233. | | | -49,233. |
| TOTALS | 0. | -136,027. | -5,833. | | -141,860. |

---

FORM 8582          OTHER PASSIVE ACTIVITIES - WORKSHEET 3          STATEMENT 37

---

| | CURRENT YEAR | | PRIOR YEAR | OVERALL GAIN OR LOSS | |
| | | | UNALLOWED | | |
| NAME OF ACTIVITY | NET INCOME | NET LOSS | LOSS | GAIN | LOSS |
|---|---|---|---|---|---|
| TOWNLEY FAMILY PARTNERSHIP, LLLP | 0. | 0. | -6. | | -6. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | 0. | 0. | -280. | | -280. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | 0. | 0. | -275. | | -275. |
| PARKER CREEK PROPERTIES | 50. | 0. | | 50. | |
| LAND WARRIORS, LLC | 274. | 0. | -274. | | |
| TOTALS | 324. | 0. | -835. | 50. | -561. |

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

---

FORM 8582          ALLOCATION OF UNALLOWED LOSSES - WORKSHEET 5   STATEMENT 38

---

| NAME OF ACTIVITY | FORM OR SCHEDULE | LOSS | RATIO | UNALLOWED LOSS |
|---|---|---|---|---|
| TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | 6. | .000042129 | 6. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | 280. | .001966002 | 280. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | 275. | .001930895 | 275. |
| FRAZER CREEK INVESTMENTS, LLC - | SCH E | | | |
| VARIOUS (FRAZER CREEK), OCONEE C | | 92,627. | .650374594 | 92,594. |
| LANE CREEK INVESTMENTS, LLC - | SCH E | | | |
| VARIOUS (LANE CREEK), GA | | 49,233. | .345686380 | 49,216. |
| TOTALS | | 142,421. | 1.000000000 | 142,371. |

---

FORM 8582               ALLOWED LOSSES - WORKSHEET 6            STATEMENT 39

---

| NAME OF ACTIVITY | FORM OR SCHEDULE | LOSS | UNALLOWED LOSS | ALLOWED LOSS |
|---|---|---|---|---|
| TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | 6. | 6. | |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | 280. | 280. | |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | 275. | 275. | |
| FRAZER CREEK INVESTMENTS, LLC - | SCH E | | | |
| VARIOUS (FRAZER CREEK), OCONEE C | | 92,627. | 92,594. | 33. |
| LANE CREEK INVESTMENTS, LLC - | SCH E | | | |
| VARIOUS (LANE CREEK), GA | | 49,233. | 49,216. | 17. |
| LAND WARRIORS, LLC | SCH E | 274. | 0. | 274. |
| TOTALS | | 142,695. | 142,371. | 324. |

Case 3:22-cv-00107-CDL    Document 1    Filed 10/28/22    Page 100 of 600

TONY D. & ELIZABETH A. TOWNLEY

---

FORM 8582                    SUMMARY OF PASSIVE ACTIVITIES                    STATEMENT 40

---

| R R E A | NAME | FORM OR SCHEDULE | GAIN/LOSS | PRIOR YEAR C/O | NET GAIN/LOSS | UNALLOWED LOSS | ALLOWED LOSS |
|---|---|---|---|---|---|---|---|
| | TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | 0. | -6. | -6. | 6. | |
| | TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | 0. | -280. | -280. | 280. | |
| | TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | 0. | -275. | -275. | 275. | |
| | PARKER CREEK PROPERTIES | SCH E | 50. | | 50. | | |
| X | FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE C | SCH E | -86,794. | -5,833. | -92,627. | 92,594. | 33. |
| X | LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE CREEK), GA | SCH E | -49,233. | | -49,233. | 49,216. | 17. |
| | LAND WARRIORS, LLC | SCH E | 274. | -274. | 0. | | |
| | TOTALS | | -135,703. | -6,668. | -142,371. | 142,371. | 50. |

PRIOR YEAR CARRYOVERS ALLOWED DUE TO CURRENT YEAR NET ACTIVITY INCOME          274.

TOTAL TO FORM 8582, LINE 16          324.

Case 3:22-cv-00107-CDL   Document 1-1   Filed 10/28/22   Page 101 of 600

TONY D. & ELIZABETH A. TOWNLEY

| FORM 8582 | MODIFIED AGI | STATEMENT 41 |
|---|---|---|

### INCOME

| | | |
|---|---|---|
| WAGES, SALARIES, TIPS ETC. | | |
| DIVIDEND INCOME | | 29,634. |
| TAXABLE REFUNDS | | 8,825. |
| ALIMONY RECEIVED | | |
| TAXABLE IRA DISTRIBUTIONS | | |
| TAXABLE PENSIONS AND ANNUITIES | | |
| UNEMPLOYMENT COMPENSATION | | |
| OTHER INCOME | | 1,107,861. |
| | | |
| INTEREST INCOME | 2,494,535. | |
| ADD: SERIES EE AND I EXCLUSION | | |
| | ─────────── | |
| | | 2,494,535. |
| BUSINESS INCOME OR LOSS | -467,654. | |
| ADD: PASSIVE LOSSES | | |
| SUBTRACT: PASSIVE INCOME | | |
| | ─────────── | |
| | | -467,654. |
| SALE OF ASSETS | 682,089. | |
| ADD: PASSIVE/RREA PROFESSIONAL LOSSES | | |
| SUBTRACT: PASSIVE INCOME | | |
| | ─────────── | |
| | | 682,089. |
| RENTAL, ROYALTY OR PASSTHROUGH INCOME OR LOSS | 37,110,044. | |
| ADD: PASSIVE/RREA PROFESSIONAL LOSSES | 324. | |
| SUBTRACT: PASSIVE INCOME | -324. | |
| | ─────────── | |
| | | 37,110,044. |
| FARM OR FARM RENTAL INCOME OR LOSS | -43,878. | |
| ADD: PASSIVE/RREA PROFESSIONAL LOSSES | | |
| SUBTRACT: PASSIVE INCOME | | |
| | ─────────── | |
| | | -43,878. |
| TOTAL INCOME | | 40,921,456. |

### ADJUSTMENTS

| | | |
|---|---|---|
| MOVING EXPENSES | | |
| SELF-EMPLOYED HEALTH INSURANCE DEDUCTION | 18,327. | |
| PENALTY ON EARLY WITHDRAWAL OF SAVINGS | | |
| ALIMONY PAID | | |
| KEOGH/SEP DEDUCTION | | |
| OTHER ADJUSTMENTS | | |
| | ─────────── | |
| TOTAL ADJUSTMENTS | | 18,327. |
| TOTAL TO FORM 8582, LINE 7 | | 40,903,129. |

Case 3:22-cv-00107-CDL    Document 1-1    Filed 10/28/22    Page 102 of 600

TONY D. & ELIZABETH A. TOWNLEY

---

| FORM 8582 | ALTERNATIVE MINIMUM TAX | STATEMENT 42 |

**ACTIVE RENTAL OF REAL ESTATE - WORKSHEET 1**

---

| NAME OF ACTIVITY | CURRENT YEAR NET INCOME | CURRENT YEAR NET LOSS | PRIOR YEAR UNALLOWED LOSS | OVERALL GAIN OR LOSS GAIN | OVERALL GAIN OR LOSS LOSS |
|---|---|---|---|---|---|
| FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE C | 0. | -86,911. | | | -86,911. |
| LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE CREEK), GA | 0. | -49,233. | | | -49,233. |
| TOTALS | 0. | -136,144. | | | -136,144. |

---

| FORM 8582 | ALTERNATIVE MINIMUM TAX | STATEMENT 43 |

**OTHER PASSIVE ACTIVITIES - WORKSHEET 3**

---

| NAME OF ACTIVITY | CURRENT YEAR NET INCOME | CURRENT YEAR NET LOSS | PRIOR YEAR UNALLOWED LOSS | OVERALL GAIN OR LOSS GAIN | OVERALL GAIN OR LOSS LOSS |
|---|---|---|---|---|---|
| PARKER CREEK PROPERTIES | 50. | 0. | | 50. | |
| TOTALS | 50. | 0. | | 50. | |

---

| FORM 8582 | ALTERNATIVE MINIMUM TAX | STATEMENT 44 |

**ALLOCATION OF UNALLOWED LOSSES - WORKSHEET 5**

---

| NAME OF ACTIVITY | FORM OR SCHEDULE | LOSS | RATIO | UNALLOWED LOSS |
|---|---|---|---|---|
| FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE C | SCH E | 86,911. | .638375544 | 86,879. |
| LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE CREEK), GA | SCH E | 49,233. | .361624456 | 49,215. |
| TOTALS | | 136,144. | 1.000000000 | 136,094. |

Case 3:22-cv-00107-CDL    Document 31    Filed 10/28/22    Page 103 of 600

TONY D. & ELIZABETH A. TOWNLEY

---

| FORM 8582 | ALTERNATIVE MINIMUM TAX ALLOWED LOSSES - WORKSHEET 6 | | | STATEMENT 45 |

| NAME OF ACTIVITY | FORM OR SCHEDULE | LOSS | UNALLOWED LOSS | ALLOWED LOSS |
|---|---|---|---|---|
| FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE C | SCH E | 86,911. | 86,879. | 32. |
| LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE CREEK), GA | SCH E | 49,233. | 49,215. | 18. |
| TOTALS | | 136,144. | 136,094. | 50. |

---

| FORM 8582AMT | SUMMARY OF PASSIVE ACTIVITIES - AMT | | | | | STATEMENT 46 |

| R R E A | NAME | FORM OR SCHEDULE | GAIN/LOSS | PRIOR YEAR C/O | NET GAIN/LOSS | UNALLOWED LOSS | ALLOWED LOSS |
|---|---|---|---|---|---|---|---|
| | PARKER CREEK PROPERTIES | SCH E | 50. | | 50. | | |
| X | FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE C | SCH E | -86,911. | | -86,911. | 86,879. | 32. |
| X | LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE CREEK), GA | SCH E | -49,233. | | -49,233. | 49,215. | 18. |
| | TOTALS | | -136,094. | | -136,094. | 136,094. | 50. |

PRIOR YEAR CARRYOVERS ALLOWED DUE TO CURRENT YEAR NET ACTIVITY INCOME

| | | |
|---|---|---|
| TOTAL TO FORM 8582AMT, LINE 16 | | 50. |

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

| FORM 4562 | PART III - RESIDENTIAL RENTAL PROPERTY | | STATEMENT 47 |

| (A)<br>DESCRIPTION OF PROPERTY | (B)<br>MO/YR | (C)<br>BASIS | (G)<br>DEDUCTION |
|---|---|---|---|
| BUILDING - 1250 HODGES MILL ROA | 3/19 | 185,699. | 5,346. |
| BUILDING - 1561 HODGES MILL RD | 2/19 | 219,360. | 6,980. |
| BUILDING - 1351 HODGES MILL RD | 2/19 | 209,718. | 6,673. |
| BUILDING - 1371 HODGES MILL RD | 2/19 | 220,099. | 7,003. |
| BUILDING - 1270 HODGES MILL RD | 3/19 | 184,059. | 5,299. |
| IMPROVEMENTS - 1290/1292 MALCOM | 3/19 | 139,133. | 4,005. |
| IMPROVEMENTS - 1330/1332 MALCOM | 3/19 | 147,256. | 4,239. |
| IMPROVEMENTS - 1340/1342 MALCOM | 3/19 | 145,665. | 4,193. |
| IMPROVEMENTS - 1350/1352 MALCOM | 3/19 | 151,034. | 4,348. |
| BUILDING - 1290/1292 MALCOM | 5/19 | 11,409. | 259. |
| BUILDING - 1330/1332 MALCOM | 5/19 | 12,131. | 276. |
| BUILDING - 1340/1342 MALCOM | 5/19 | 10,634. | 242. |
| BUILDING - 1350/1352 MALCOM | 5/19 | 11,621. | 264. |
| IMPROVEMENTS - 1061 ROCKY BRANCH | 4/19 | 6,000. | 155. |
| IMPROVEMENTS - 1120 MATTHEWS RD | 6/19 | 13,200. | 260. |
| IMPROVEMENTS - 1080 ROCKY BRANCH | 8/19 | 10,800. | 147. |
| IMPROVEMENTS - 2001 LANE CREEK | 1/19 | 5,100. | 178. |
| IMPROVEMENTS - 1330 COLE SPRINGS RD | 4/19 | 6,600. | 170. |
| IMPROVEMENTS - 1030 CARRIAGE COURT | 4/19 | 5,300. | 137. |
| TOTAL TO FORM 4562, PART III, LINE 19H | | 1,694,818. | 50,174. |

| S-CORP BASIS WORKSHEET | INCREASES IN BASIS | STATEMENT 48 |

PLUCKED CHICKEN, INC.

| DESCRIPTION | AMOUNT |
|---|---|
| LEGAL EXPENSES | 222,230. |
| INCLUDED IN BASIS WORKSHEET, LINE 4 | 222,230. |

| S-CORP BASIS WORKSHEET | DECREASES IN BASIS | STATEMENT 49 |

PLUCKED CHICKEN, INC.

| DESCRIPTION | AMOUNT |
|---|---|
| FOREIGN TAXES PAID | 44. |
| INCLUDED IN BASIS WORKSHEET, LINE 6 OR 7 | 44. |

STATEMENT(S) 47, 48, 49

Case 3:22-cv-00107-CDL   Document 51   Filed 10/28/22   Page 105 of 600

ALTERNATIVE MINIMUM TAX
**Worksheet for Figuring a Shareholder's Stock Basis**

*(Keep for your records.)*

Name of Entity:  **PLUCKED CHICKEN, INC.**                     EIN:

| | | |
|---|---|---:|
| **1.** | Your stock basis at the beginning of the year .................................................................... **1.** | 12,177,714. |
| | **Increases:** | |
| **2.** | Money and your adjusted basis in property contributed to the corporation ................... **2.** | |
| **3.** | Your share of the corporation's income (including tax-exempt income) reduced by any amount included in income with respect to clean renewable energy or (for bonds issued before October 4, 2008) qualified zone academy bonds .................................................................... **3.** | 40,415,636. |
| **4.** | Other increases to basis, including your share of the excess of the deductions for depletion (other than oil and gas depletion) over the basis of the property subject to depletion                                               SEE STATEMENT 50  **4.** | 222,230. |
| | **Decreases:** | |
| **5.** | Distributions of money and the fair market value of property (excluding dividend distributions reportable on Form 1099-DIV and distributions in excess of basis (the sum of lines 1 through 4)) ................... **5.** | ( 29,255,411.) |
| **6.** | Enter: **(a)** Your share of the corporation's nondeductible expenses and the depletion deduction for any oil and gas property held by the corporation (but only to the extent your share of the property's adjusted basis exceeds the depletion deduction)  **or (b)** if the election under Regulations section 1.1367-1(g) applies, your share of the corporation's deductions and losses (include your entire share of the section 179 expense deduction even if your allowable section 179 expense deduction is smaller) adjusted, if the corporation made a charitable contribution of property, as described in (4) under Basis Rules .................................................................... **6.** | ( 773,449.) |
| **7.** | If the election under Regulations section 1.1367-1(g) applies, enter the amount from 6(a) above. Otherwise enter the amount from 6(b) .................................................................... **7.** | ( 1,908,926.) |
| **8.** | Enter the smaller of **(a)** the excess, as of the beginning of the tax year, of the amount you are owed for loans you made to the corporation over your basis in those loans  **or (b)** the sum of lines 1 through 7. This amount increases your loan basis .................................................................... **8.** | ( ) |
| **9.** | Your stock basis in the corporation at the end of the year. Combine lines 1 through 8 ................... **9.** | 20,877,794. |

919061
04-01-19

AMENDED

## Shareholder Debt Basis Worksheet

Name of Entity:

**PLUCKED CHICKEN, INC.**

EIN:

### Debt Basis

| | | |
|---|---|---:|
| 10. | Debt basis, beginning of year (Not less than zero) | 0. |
| 11. | Loans made during the year | |
| 12. | Restoration of debt basis (from line 8) | |
| 13. | Subtotal (Add lines 11 and 12) | |
| 14. | Less: Loan repayments | |
| 15. | Gain from loan repayments | |
| 16. | Other adjustments: | |
| 17. | Subtotal (Combine lines 10, 13, 14, 15 and 16) | |
| 18. | Applied against excess loss and deductions | |
| 19. | Debt basis, end of year (Not less than zero) | 0. |
| 20. | Total shareholder stock and debt basis, end of year (Add lines 9 and 19) (Not less than zero) | 20,877,794. |

919081
04-01-19

AMENDED

STATEMENT OF DISCLOSURE OF ACTIVITY GROUPINGS PURSUANT TO IRC
SEC. 469 AND REG. 1.469-4

NAME: TONY D. TOWNLEY
TAXPAYER ID NUMBER:
███████████████

FOR THE TAX YEAR ENDING DECEMBER 31, 2019

THE TAXPAYER HEREBY CONFIRMS THEIR EXISTING ELECTION TO GROUP THE
FOLLOWING ACTIVITIES AS A SINGLE ACTIVITY.  THE ACTIVITIES THAT ARE
GROUPED INTO ONE ACTIVITY CONSTITUTE AN APPROPRIATE ECONOMIC UNIT FOR
THE MEASUREMENT OF GAIN OR LOSS FOR THE PURPOSES OF IRC SECTION 469.

THE ACTIVITIES THAT ARE BEING GROUPED ARE AS FOLLOWS:

NAME: PLUCKED CHICKEN, INC. - PLUCKED CHICKEN, INC.
ADDRESS: 1040 FOUNDERS BLVD., ATHENS, GA 30606
EIN:
███████████

NAME: LAND WARRIORS, LLC - LAND WARRIORS, LLC
ADDRESS: 1280 SNOWS MILL RD, BOGART, GA 30622
EIN:
███████████

NAME: CLUCKZ HOLDINGS, LLC
ADDRESS: 1040 FOUNDERS BLVD., ATHENS, GA 30606
EIN:
███████████

NAME: M&T AVIATION, LLC
ADDRESS: 1040 FOUNDERS BLVD, ATHENS, GA 30606
EIN:
███████████

NAME: ZAXBY'S OPERATING COMPANY, LP (TDT)
ADDRESS: 1040 FOUNDERS BLVD., ATHENS, GA 30606
EIN:
███████████

NAME: CLUCKZ HOLDINGS, LLC (SECG)
ADDRESS: 1040 FOUNDERS BLVD., ATHENS, GA 30606
EIN:
███████████

926340
04-01-19

AMENDED

STATEMENT OF DISCLOSURE OF ACTIVITY GROUPINGS PURSUANT TO IRC
SEC. 469 AND REG. 1.469-4

NAME: TONY D. TOWNLEY
TAXPAYER ID NUMBER:
████████████

FOR THE TAX YEAR ENDING DECEMBER 31, 2019

THE TAXPAYER HEREBY CONFIRMS THEIR EXISTING ELECTION TO GROUP THE
FOLLOWING ACTIVITIES AS A SINGLE ACTIVITY.  THE ACTIVITIES THAT ARE
GROUPED INTO ONE ACTIVITY CONSTITUTE AN APPROPRIATE ECONOMIC UNIT FOR
THE MEASUREMENT OF GAIN OR LOSS FOR THE PURPOSES OF IRC SECTION 469.

THE ACTIVITIES THAT ARE BEING GROUPED ARE AS FOLLOWS:

NAME: OTF MANAGEMENT, LLC
ADDRESS: 1280 SNOWS MILL RD, BOGART, GA 30622

NAME: OGEECHEE TIMBER, LLC - OGEECHEE TIMBER, LLC
ADDRESS: 1280 SNOWS MILL RD., BOGART, GA 30622
EIN:
█████████7

NAME: LOG CREEK, LLLP - LOG CREEK, LLLP
ADDRESS: 1280 SNOWS MILL RD., BOGART, GA 30622
EIN:
████████

NAME: LOG CREEK, LLLP - LOG CREEK, LLLP
ADDRESS: 1280 SNOWS MILL RD., BOGART, GA 30622
EIN:
████████

NAME: TOWNLEY FAMILY PARTNERSHIP, LLLP
ADDRESS: 1280 SNOWS MILL ROAD, BOGART, GA 30622
EIN:
████████

NAME: TOWNLEY FAMILY PARTNERSHIP, LLLP
ADDRESS: 1280 SNOWS MILL ROAD, BOGART, GA 30622
EIN:
████████

NAME: TOWNLEY FAMILY PARTNERSHIP, LLLP
ADDRESS: 1280 SNOWS MILL ROAD, BOGART, GA 30622
EIN:
████████

926340
04-01-19

AMENDED

NAME: INTEREST EXPENSE - LOG CREEK

NAME: INTEREST EXPENSE - TOWNLEY FAMILY PARTNERSHIP

NAME: LOG CREEK, LLLP - LOG CREEK, LLLP
ADDRESS: 1280 SNOWS MILL RD., BOGART, GA 30622
EIN:
██████████

NAME: LOG CREEK, LLLP - LOG CREEK, LLLP
ADDRESS: 1280 SNOWS MILL RD., BOGART, GA 30622
EIN:
██████████

NAME: INTEREST EXPENSE - OGEECHEE TIMBER

926340
04-01-19

**AMENDED**

TONY D. & ELIZABETH A. TOWNLEY

---

| AMT S-CORP<br>BASIS WKST | INCREASES IN BASIS | STATEMENT 50 |
|---|---|---|

PLUCKED CHICKEN, INC.

| DESCRIPTION | AMOUNT |
|---|---|
| LEGAL EXPENSES | 222,230. |
| INCLUDED IN BASIS WORKSHEET, LINE 4 | 222,230. |

---

| AMT S-CORP<br>BASIS WKST | DECREASES IN BASIS | STATEMENT 51 |
|---|---|---|

PLUCKED CHICKEN, INC.

| DESCRIPTION | AMOUNT |
|---|---|
| FOREIGN TAXES PAID | 44. |
| INCLUDED IN BASIS WORKSHEET, LINE 6 OR 7 | 44. |

# FORM 8283 2019 BROWN/HARRIS

**Form 8283**
(Rev. December 2021)
Department of the Treasury
Internal Revenue Service

## Noncash Charitable Contributions

▶ Attach one or more Forms 8283 to your tax return if you claimed a total deduction of over $500 for all contributed property.
▶ Go to *www.irs.gov/Form8283* for instructions and the latest information.

OMB No. 1545-0074

Attachment Sequence No. **155**

Name(s) shown on your income tax return

**LOG CREEK, LLLP**

Identifying number

**Note:** Figure the amount of your contribution deduction before completing this form. See your tax return instructions.

**Section A. Donated Property of $5,000 or Less and Publicly Traded Securities**—List in this section **only** an item (or a group of similar items) for which you claimed a deduction of $5,000 or less. Also list publicly traded securities and certain other property even if the deduction is more than $5,000. See instructions.

**Part I — Information on Donated Property**—If you need more space, attach a statement.

| 1 | (a) Name and address of the donee organization | (b) If donated property is a vehicle (see instructions), check the box. Also enter the vehicle identification number (unless Form 1098-C is attached). | (c) Description and condition of donated property (For a vehicle, enter the year, make, model, and mileage. For securities and other property, see instructions.) |
|---|---|---|---|
| A | | ☐ | |
| B | | ☐ | |
| C | | ☐ | |
| D | | ☐ | |
| E | | ☐ | |

**Note:** If the amount you claimed as a deduction for an item is $500 or less, you do not have to complete columns (e), (f), and (g).

| | (d) Date of the contribution | (e) Date acquired by donor (mo., yr.) | (f) How acquired by donor | (g) Donor's cost or adjusted basis | (h) Fair market value (see instructions) | (i) Method used to determine the fair market value |
|---|---|---|---|---|---|---|
| A | | | | | | |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |
| E | | | | | | |

**Section B. Donated Property Over $5,000 (Except Publicly Traded Securities, Vehicles, Intellectual Property or Inventory Reportable in Section A)**—Complete this section for one item (or a group of similar items) for which you claimed a deduction of more than $5,000 per item or group (except contributions reportable in Section A). Provide a separate form for each item donated unless it is part of a group of similar items. A qualified appraisal is generally required for items reportable in Section B. See instructions.

**Part I — Information on Donated Property**

2  Check the box that describes the type of property donated.

- a ☐ Art* (contribution of $20,000 or more)
- b ☑ Qualified Conservation Contribution
- c ☐ Equipment
- d ☐ Art* (contribution of less than $20,000)
- e ☐ Other Real Estate
- f ☐ Securities
- g ☐ Collectibles**
- h ☐ Intellectual Property
- i ☐ Vehicles
- j ☐ Clothing and household items
- k ☐ Other

\* Art includes paintings, sculptures, watercolors, prints, drawings, ceramics, antiques, decorative arts, textiles, carpets, silver, rare manuscripts, historical memorabilia, and other similar objects.

\*\* Collectibles include coins, stamps, books, gems, jewelry, sports memorabilia, dolls, etc., but not art as defined above.

**Note:** In certain cases, you must attach a qualified appraisal of the property. See instructions.

| 3 | (a) Description of donated property (if you need more space, attach a separate statement) | (b) If any tangible personal property or real property was donated, give a brief summary of the overall physical condition of the property at the time of the gift. | (c) Appraised fair market value |
|---|---|---|---|
| A | **CONSERVATION EASEMENT UNDER IRC 170(H)** | | 66,290,000 |
| B | **(SEE ATTACHED)** | | |
| C | | | |

| | (d) Date acquired by donor (mo., yr.) | (e) How acquired by donor | (f) Donor's cost or adjusted basis | (g) For bargain sales, enter amount received | (h) Amount claimed as a deduction (see instructions) | (i) Date of contribution (see instructions) |
|---|---|---|---|---|---|---|
| A | 12/2012 | OMNIBUS DEED | 477,408 | | | |
| B | (SEE ATTACHED) | | | | | |
| C | | | | | | |

For Paperwork Reduction Act Notice, see separate instructions.    Cat. No. 62299J    Form **8283** (Rev. 12-2021)

Form 8283 (Rev. 12-2021)

Page **2**

| Name(s) shown on your income tax return | Identifying number |
| --- | --- |

**Part II** — **Partial Interests and Restricted Use Property (Other Than Qualified Conservation Contributions)—** Complete lines 4a through 4e if you gave less than an entire interest in a property listed in Section B, Part I. Complete lines 5a through 5c if conditions were placed on a contribution listed in Section B, Part I; also attach the required statement. See instructions.

**4a** Enter the letter from Section B, Part I that identifies the property for which you gave less than an entire interest ▶

If Section B, Part II applies to more than one property, attach a separate statement.

**b** Total amount claimed as a deduction for the property listed in Section B, Part I: **(1)** For this tax year . . ▶

**(2)** For any prior tax years ▶

**c** Name and address of each organization to which any such contribution was made in a prior year (complete only if different from the donee organization in Section B, Part V, below):

Name of charitable organization (donee)

| Address (number, street, and room or suite no.) | City or town, state, and ZIP code |
| --- | --- |

**d** For tangible property, enter the place where the property is located or kept ▶

**e** Name of any person, other than the donee organization, having actual possession of the property ▶

| | Yes | No |
| --- | --- | --- |
| **5a** Is there a restriction, either temporary or permanent, on the donee's right to use or dispose of the donated property? | | |
| **b** Did you give to anyone (other than the donee organization or another organization participating with the donee organization in cooperative fundraising) the right to the income from the donated property or to the possession of the property, including the right to vote donated securities, to acquire the property by purchase or otherwise, or to designate the person having such income, possession, or right to acquire? . . . . . . . . . . . . | | |
| **c** Is there a restriction limiting the donated property for a particular use? . . . . . . . . . . . . . | | |

**Part III** — **Taxpayer (Donor) Statement**—List each item included in Section B, Part I above that the appraisal identifies as having a value of $500 or less. See instructions.

I declare that the following item(s) included in Section B, Part I above has to the best of my knowledge and belief an appraised value of not more than $500 (per item). Enter identifying letter from Section B, Part I and describe the specific item. See instructions.

▶

| Signature of taxpayer (donor) ▶ | Date ▶ |
| --- | --- |

**Part IV** — **Declaration of Appraiser**

I declare that I am not the donor, the donee, a party to the transaction in which the donor acquired the property, employed by, or related to any of the foregoing persons, or married to any person who is related to any of the foregoing persons. And, if regularly used by the donor, donee, or party to the transaction, I performed the majority of my appraisals during my tax year for other persons.

Also, I declare that I perform appraisals on a regular basis; and that because of my qualifications as described in the appraisal, I am qualified to make appraisals of the type of property being valued. I certify that the appraisal fees were not based on a percentage of the appraised property value. Furthermore, I understand that a false or fraudulent overstatement of the property value as described in the qualified appraisal or this Form 8283 may subject me to the penalty under section 6701(a) (aiding and abetting the understatement of tax liability). I understand that my appraisal will be used in connection with a return or claim for refund. I also understand that, if there is a substantial or gross valuation misstatement of the value of the property claimed on the return or claim for refund that is based on my appraisal, I may be subject to a penalty under section 6695A of the Internal Revenue Code, as well as other applicable penalties. I affirm that I have not been at any time in the three-year period ending on the date of the appraisal barred from presenting evidence or testimony before the Department of the Treasury or the Internal Revenue Service pursuant to 31 U.S.C. 330(c).

**Sign Here**

| Appraiser signature ▶ | | Date ▶ |
| --- | --- | --- |
| Appraiser name ▶ Rick Kenny / Doug Kenny | Title ▶ Appraiser / Appraiser | |

Business address (including room or suite no.) 327 Dahlonega St., Suite 104

Identifying number

City or town, state, and ZIP code Cumming, GA 30040

**Part V** — **Donee Acknowledgment**

This charitable organization acknowledges that it is a qualified organization under section 170(c) and that it received the donated property as described in Section B, Part I, above on the following date ▶ **DECEMBER 30, 2019**

Furthermore, this organization affirms that in the event it sells, exchanges, or otherwise disposes of the property described in Section B, Part I (or any portion thereof) within 3 years after the date of receipt, it will file **Form 8282**, Donee Information Return, with the IRS and give the donor a copy of that form. This acknowledgment does not represent agreement with the claimed fair market value.

Does the organization intend to use the property for an unrelated use? . . . . . . . . . . . . . . . ▶ ☐ Yes ☑ No

| Name of charitable organization (donee) | Employer identification number |
| --- | --- |
| **OCONEE RIVER LAND TRUST** | |
| Address (number, street, and room or suite no.) | City or town, state, and ZIP code |
| **675 PULASKI ST., #2300** | **ATHENS, GA 30601** |
| Authorized signature | Title **EXECUTIVE DIRECTOR** | Date 3-31-2022 |

Form **8283** (Rev. 12-2021)

Form 8283: Noncash Charitable Contributions
Attachment for Information on Donated Property

Name:                              Log Creek, LLLP
Identifying Number:

**5(a). Description of the Property:** The donated property is a conservation easement donated as a "qualified conservation contribution" under I.R.C. §170(h). The conservation easement encompasses approximately 272.98 acres located in Taliaferro County, Georgia. The property is primarily pine forest with narrow stream buffers of hardwood forest.

**Conservation Purposes:**

    The Property consists of pine forests, hardwood forests, wildlife food plots, and streams. The Property contains a managed pine forest, and permanently protecting the Property with this Conservation Easement will therefore provide for the maintenance of forestry land, which is a conservation purpose recognized by the State of Georgia as providing significant public benefit and therefore worthy of permanent protection (*See* the Georgia Conservation Tax Credit Program ("GCTCP") at O.C.G.A. §48-7-29.12 and Ga. R. & Regs. 391-1-6- .03(5)(d)).

    The Property is located in the Little River Watershed, portions of which have been designated by the Georgia Department of Natural Resources as high priority watersheds due to their importance in protecting or restoring aquatic species diversity, natural flow regimes, and other conservation activities as defined in the Georgia State Wildlife Action Plan ("2015 SWAP")(*See* the SWAP, final report dated September 2015). The Property borders Reedy Creek for approximately 2,560 feet, and contains two perennial tributaries of the creek that flow approximately 5,370 fee through the Property, and six ephemeral and intermittent streams that run through it.

    The Property is made up of a number of habitats, including Mesic Hardwood Forest, Bottomland Forest, and Streams, which are classified as high priority by the State of Georgia due to their importance in protecting or restoring biodiversity, preserving functional ecosystems, and other conservation efforts as defined in the 2015 SWAP.

    This Conservation Easement of the Property ensures "the preservation of open space (including farmland and forest land) where such preservation is pursuant to a clearly delineated Federal, State, or local governmental conservation policy, and will yield a significant public benefit," within the meaning of §170(h)(4)(A)(iii)(II) of the Internal Revenue Code of 1986, as amended, in that the State of Georgia has clearly delineated conservation policy and programs that recognize the significant public benefit associated with the preservation of open space, as follows:

FORM 8283 - 2019 - BROWN / HARRIS

a. The State of Georgia, recognizing the public benefit of protecting certain habitats and natural resources, has created the GCTCP in which a state income tax credit is awarded to qualifying conservation easements that further state-designated conservation purposes;

b. The following conservation purposes, which are recognized by the GCTCP, are served by this Conservation Easement: (i) the protection of high priority habitats, Mesic Hardwood Forest and Streams, and the resulting significant public benefit includes the preservation of varied critical Georgia ecosystems that support a diversity of wildlife and provide habitat connectivity; (ii) the protection of water quality through the conservation of streams, wetlands, and buffers to these features, and the resulting significant public benefit is the protection of water quality and quantity necessary to support in-stream species and enhance public drinking water; and (iii) the protection of productive forestry and agricultural land, and the resulting significant public benefit is the creation of natural resource-based economic benefits to the State, including resource-based tourism, hunting, and resource-related employment, and the protection of important soils; and

By ensuring that the varied and critical high quality natural habitats mentioned above, as identified in the Baseline Documentation Report, remain undisturbed and intact, this Conservation Easement will therefore provide for "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem ... ," as set forth in IRC §170(h)(4)(A)(ii).

**Appraised Valuations:**

| | |
|---|---|
| Market Value Before Grant of Conservation Easement: | $68,210,000 |
| Market Value after Grant of Conservation Easement: | $ 1,920,000 |
| Value of Conservation Easement/Contribution: | $66,290,000 |

An appraisal by a qualified Appraiser, indicating the above valuations, is attached to this Form 8283.

**Statement of Purpose:**
This donation was not used to obtain a permit or any other approval by a local or other governing authority. This donation was not required by contract.

**Nearby Property Interests:** There is no enhancement to the value of nearby properties as a result of the placement of the conservation easement.

**5(b). Summary of overall physical condition of the property at the time of gift:** The Property consists of pine with narrow stream buffers of hardwood forest, with a dirt and gravel road system providing access for recreation and future timber harvests; conservation easement donated on December 30, 2019 and recorded in Taliaferro County the same day.

**5(c). Appraised fair market value:**     Easement Value:     $66,290,000

2

**5(d). Dates acquired by donor:** Mr. and Mrs. Townley contributed this Property to Log Creek, LLLP in December 2012.

**5(e). How acquired by donor:** Contribution in 2012.

**5(f). Donor's cost or adjusted basis:** The acquisition cost/basis of the property was $477,408.

4035929

3

| Form **8283** (Rev. December 2021) Department of the Treasury Internal Revenue Service | **Noncash Charitable Contributions** ▶ Attach one or more Forms 8283 to your tax return if you claimed a total deduction of over $500 for all contributed property. ▶ Go to *www.irs.gov/Form8283* for instructions and the latest information. | OMB No. 1545-0074 Attachment Sequence No. **155** |
|---|---|---|

| Name(s) shown on your income tax return | Identifying number |
|---|---|
| **LOG CREEK, LLLP** | [redacted] |

**Note:** Figure the amount of your contribution deduction before completing this form. See your tax return instructions.

**Section A. Donated Property of $5,000 or Less and Publicly Traded Securities**—List in this section **only** an item (or a group of similar items) for which you claimed a deduction of $5,000 or less. Also list publicly traded securities and certain other property even if the deduction is more than $5,000. See instructions.

### Part I    Information on Donated Property—If you need more space, attach a statement.

| 1 | (a) Name and address of the donee organization | (b) If donated property is a vehicle (see instructions), check the box. Also enter the vehicle identification number (unless Form 1098-C is attached). | (c) Description and condition of donated property (For a vehicle, enter the year, make, model, and mileage. For securities and other property, see instructions.) |
|---|---|---|---|
| A | | ☐ | |
| B | | ☐ | |
| C | | ☐ | |
| D | | ☐ | |
| E | | ☐ | |

**Note:** If the amount you claimed as a deduction for an item is $500 or less, you do not have to complete columns (e), (f), and (g).

| | (d) Date of the contribution | (e) Date acquired by donor (mo., yr.) | (f) How acquired by donor | (g) Donor's cost or adjusted basis | (h) Fair market value (see instructions) | (i) Method used to determine the fair market value |
|---|---|---|---|---|---|---|
| A | | | | | | |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |
| E | | | | | | |

**Section B. Donated Property Over $5,000 (Except Publicly Traded Securities, Vehicles, Intellectual Property or Inventory Reportable in Section A)**—Complete this section for one item (or a group of similar items) for which you claimed a deduction of more than $5,000 per item or group (except contributions reportable in Section A). Provide a separate form for each item donated unless it is part of a group of similar items. A qualified appraisal is generally required for items reportable in Section B. See instructions.

### Part I    Information on Donated Property

2    Check the box that describes the type of property donated.

- a ☐ Art* (contribution of $20,000 or more)
- b ☑ Qualified Conservation Contribution
- c ☐ Equipment
- d ☐ Art* (contribution of less than $20,000)
- e ☐ Other Real Estate
- f ☐ Securities
- g ☐ Collectibles**
- h ☐ Intellectual Property
- i ☐ Vehicles
- j ☐ Clothing and household items
- k ☐ Other

\* Art includes paintings, sculptures, watercolors, prints, drawings, ceramics, antiques, decorative arts, textiles, carpets, silver, rare manuscripts, historical memorabilia, and other similar objects.

\*\* Collectibles include coins, stamps, books, gems, jewelry, sports memorabilia, dolls, etc., but not art as defined above.

**Note:** In certain cases, you must attach a qualified appraisal of the property. See instructions.

| 3 | (a) Description of donated property (if you need more space, attach a separate statement) | (b) If any tangible personal property or real property was donated, give a brief summary of the overall physical condition of the property at the time of the gift. | (c) Appraised fair market value |
|---|---|---|---|
| A | **CONSERVATION EASEMENT UNDER IRC 170(H)** | | 53,760,000 |
| B | **(SEE ATTACHED)** | | |
| C | | | |

| | (d) Date acquired by donor (mo., yr.) | (e) How acquired by donor | (f) Donor's cost or adjusted basis | (g) For bargain sales, enter amount received | (h) Amount claimed as a deduction (see instructions) | (i) Date of contribution (see instructions) |
|---|---|---|---|---|---|---|
| A | 10/2006 | **OMNIBUS DEED** | 499,049 | | | |
| B | **(SEE ATTACHED)** | | | | | |
| C | | | | | | |

For Paperwork Reduction Act Notice, see separate instructions.        Cat. No. 62299J        Form **8283** (Rev. 12-2021)

**FORM 8283 - 2019 HEARD ROAD**

Form 8283 (Rev. 12-2021)

Page **2**

| Name(s) shown on your income tax return | Identifying number |
|---|---|

---

**Part II**    **Partial Interests and Restricted Use Property (Other Than Qualified Conservation Contributions)**—Complete lines 4a through 4e if you gave less than an entire interest in a property listed in Section B, Part I. Complete lines 5a through 5c if conditions were placed on a contribution listed in Section B, Part I; also attach the required statement. See instructions.

**4a**   Enter the letter from Section B, Part I that identifies the property for which you gave less than an entire interest ▶

If Section B, Part II applies to more than one property, attach a separate statement.

**b**   Total amount claimed as a deduction for the property listed in Section B, Part I: **(1)** For this tax year . . ▶

**(2)** For any prior tax years ▶

**c**   Name and address of each organization to which any such contribution was made in a prior year (complete only if different from the donee organization in Section B, Part V, below):

Name of charitable organization (donee)

| Address (number, street, and room or suite no.) | City or town, state, and ZIP code |
|---|---|

**d**   For tangible property, enter the place where the property is located or kept ▶

**e**   Name of any person, other than the donee organization, having actual possession of the property ▶

|  | Yes | No |
|---|---|---|
| **5a**   Is there a restriction, either temporary or permanent, on the donee's right to use or dispose of the donated property? |  |  |
| **b**   Did you give to anyone (other than the donee organization or another organization participating with the donee organization in cooperative fundraising) the right to the income from the donated property or to the possession of the property, including the right to vote donated securities, to acquire the property by purchase or otherwise, or to designate the person having such income, possession, or right to acquire? . . . . . . . . . . . . |  |  |
| **c**   Is there a restriction limiting the donated property for a particular use? . . . . . . . . . . . . . |  |  |

**Part III**    **Taxpayer (Donor) Statement**—List each item included in Section B, Part I above that the appraisal identifies as having a value of $500 or less. See instructions.

I declare that the following item(s) included in Section B, Part I above has to the best of my knowledge and belief an appraised value of not more than $500 (per item). Enter identifying letter from Section B, Part I and describe the specific item. See instructions.

▶

Signature of taxpayer (donor) ▶       Date ▶

**Part IV**    **Declaration of Appraiser**

I declare that I am not the donor, the donee, a party to the transaction in which the donor acquired the property, employed by, or related to any of the foregoing persons, or married to any person who is related to any of the foregoing persons. And, if regularly used by the donor, donee, or party to the transaction, I performed the majority of my appraisals during my tax year for other persons.

Also, I declare that I perform appraisals on a regular basis; and that because of my qualifications as described in the appraisal, I am qualified to make appraisals of the type of property being valued. I certify that the appraisal fees were not based on a percentage of the appraised property value. Furthermore, I understand that a false or fraudulent overstatement of the property value as described in the qualified appraisal or this Form 8283 may subject me to the penalty under section 6701(a) (aiding and abetting the understatement of tax liability). I understand that my appraisal will be used in connection with a return or claim for refund. I also understand that, if there is a substantial or gross valuation misstatement of the value of the property claimed on the return or claim for refund that is based on my appraisal, I may be subject to a penalty under section 6695A of the Internal Revenue Code, as well as other applicable penalties. I affirm that I have not been at any time in the three-year period ending on the date of the appraisal barred from presenting evidence or testimony before the Department of the Treasury or the Internal Revenue Service pursuant to 31 U.S.C. 330(c).

**Sign Here**

Appraiser signature ▶       Date ▶

Appraiser name ▶   Ri·ck Kenny + Dow Kenny    Title ▶ Appraiser / Appraiser

Business address (including room or suite no.)

327 Dublanega St., Suite 104

City or town, state, and ZIP code

Cumming, GA 30040

Identifying number

**Part V**    **Donee Acknowledgment**

This charitable organization acknowledges that it is a qualified organization under section 170(c) and that it received the donated property as described in Section B, Part I, above on the following date ▶    **DECEMBER 30, 2019**

Furthermore, this organization affirms that in the event it sells, exchanges, or otherwise disposes of the property described in Section B, Part I (or any portion thereof) within 3 years after the date of receipt, it will file **Form 8282**, Donee Information Return, with the IRS and give the donor a copy of that form. This acknowledgment does not represent agreement with the claimed fair market value.

Does the organization intend to use the property for an unrelated use? . . . . . . . . . . . . . . . . ▶ ☐ Yes ☑ No

| Name of charitable organization (donee) | Employer identification number |
|---|---|
| **OCONEE RIVER LAND TRUST** |  |
| Address (number, street, and room or suite no.) | City or town, state, and ZIP code |
| **675 PULASKI ST., #2300** | **ATHENS, GA 30601** |

| Authorized signature | Title | Date |
|---|---|---|
|  | **EXECUTIVE DIRECTOR** | 3-31-2022 |

Form **8283** (Rev. 12-2021)

Form 8283: Noncash Charitable Contributions
Attachment for Information on Donated Property

Name:                                   Log Creek, LLLP
Identifying Number:                     

**5(a). Description of the Property:** The donated property is a conservation easement donated as a "qualified conservation contribution" under I.R.C. §170(h). The conservation easement encompasses approximately 280.776 acres located in Wilkes County, Georgia. The property is primarily pine forest with narrow stream buffers of hardwood forest.

**Conservation Purposes:**

The Property consists of pine forests, hardwood forests, wildlife food plots, and streams. The Property contains a managed pine forest, and permanently protecting the Property with this Conservation Easement will therefore provide for the maintenance of forestry land, which is a conservation purpose recognized by the State of Georgia as providing significant public benefit and therefore worthy of permanent protection (*See* the Georgia Conservation Tax Credit Program ("GCTCP") at O.C.G.A. §48-7-29.12 and Ga. R. & Regs. 391-1-6- .03(5)(d)).

The Property is located in the Upper Savannah River Watershed, portions of which have been designated by the Georgia Department of Natural Resources as high priority watersheds due to their importance in protecting or restoring aquatic species diversity, natural flow regimes, and other conservation activities as defined in the Georgia State Wildlife Action Plan ("2015 SWAP")(*See* the SWAP, final report dated September 2015). A major tributary of Newford Creek forms the southern property line for approximately 4,010 feet. The Property also contains several ephemeral and intermittent streams that feed into this tributary.

The Property is made up of a number of habitats, including Mesic Hardwood Forest, Bottomland Forest, and Streams, which are classified as high priority by the State of Georgia due to their importance in protecting or restoring biodiversity, preserving functional ecosystems, and other conservation efforts as defined in the 2015 SWAP.

This Conservation Easement of property ensures "the preservation of open space (including farmland and forest land) where such preservation is pursuant to a clearly delineated Federal, State, or local governmental conservation policy, and will yield a significant public benefit," within the meaning of §170(h)(4)(A)(iii)(II) of the Internal Revenue Code of 1986, as amended, in that the State of Georgia has clearly delineated conservation policy and programs that recognize the significant public benefit associated with the preservation of open space, as follows:

a. The State of Georgia, recognizing the public benefit of protecting certain habitats and natural resources, has created the GCTCP in which a state income tax credit is awarded to qualifying conservation easements that further state-designated conservation purposes;

b. The following conservation purposes, which are recognized by the GCTCP, are served by this Conservation Easement: (i) the protection of high priority habitats, Mesic Hardwood Forest and Streams, and the resulting significant public benefit includes the preservation of varied critical Georgia ecosystems that support a diversity of wildlife and provide habitat connectivity; (ii) the protection of water quality through the conservation of streams, wetlands, and buffers to these features, and the resulting significant public benefit is the protection of water quality and quantity necessary to support in-stream species and enhance public drinking water; and (iii) the protection of productive forestry and agricultural land, and the resulting significant public benefit is the creation of natural resource-based economic benefits to the State, including resource-based tourism, hunting, and resource-related employment, and the protection of important soils; and

By ensuring that the varied and critical high quality natural habitats mentioned above, as identified in the Baseline Documentation Report, remain undisturbed and intact, this Conservation Easement will therefore provide for "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem ... ," as set forth in IRC §170(h)(4)(A)(ii).

**Appraised Valuations:**

| | |
|---|---|
| Market Value Before Grant of Conservation Easement: | $54,060,000 |
| Market Value after Grant of Conservation Easement: | $    300,000 |
| Value of Conservation Easement/Contribution: | $53,760,000 |

An appraisal by a qualified Appraiser, indicating the above valuations, is attached to this Form 8283.

**Statement of Purpose:**
This donation was not used to obtain a permit or any other approval by a local or other governing authority. This donation was not required by contract.

**Nearby Property Interests:** There is no enhancement to the value of nearby properties as a result of the placement of the conservation easement.

**5(b). Summary of overall physical condition of the property at the time of gift:** The Property consists of pine with narrow stream buffers of hardwood forest, with a dirt and gravel road system providing access for recreation and future timber harvests; conservation easement donated on December 30, 2019 and recorded in Wilkes County the same day.

**5(c). Appraised fair market value:**        Easement Value:        $53,760,000

**5(d). Dates acquired by donor:** The predecessor entity to Log Creek, LLLP, MTSL Holdings, LLC, acquired the property via Limited Warranty Deed from Southern Pine Plantations of Georgia, LLC on November 20, 2006.

**5(e). How acquired by donor:** Purchase in 2006.

**5(f). Donor's cost or adjusted basis:** The acquisition cost/basis of the property was $499,049.

GEORGIA TALIAFERRO COUNTY
CLERK SUPERIOR COURT
FILED _Dec 31, 2019_
RECORDED _9:30 AM_
DEED BOOK _109_ PAGE _324-350_
_Sandra L. Greene_
CLERK

After filing, please return to:
Oconee River Land Trust
675 Pulaski St., #2300
Athens, Georgia 30601

Cross reference to that certain
Omnibus Deed dated
December 14, 2012, and recorded
December 19, 2012 in Deed Book
84, Pages 153-171,
Taliaferro County, Georgia Records

STATE OF GEORGIA
COUNTY OF TALIAFERRO

## DEED OF CONSERVATION EASEMENT

**THIS DEED OF CONSERVATION EASEMENT** (hereinafter "Conservation Easement") is made this 30th day of December, 2019, by and between **Log Creek, LLLP**, a limited liability limited partnership formed under the laws of Georgia (hereinafter "Grantor"), and the **Oconee River Land Trust, Inc.**, a Georgia nonprofit corporation (hereinafter "Grantee").

## WITNESSETH

**WHEREAS**, Grantor owns in fee simple certain real property located in Taliaferro County, Georgia, comprising approximately 272.98 acres more or less, and being more particularly described in **Exhibit A**, attached hereto and incorporated herein, and more particularly depicted on the "Conservation Easement Map" which is attached hereto as **Exhibit B** and incorporated herein (hereinafter the "Property"); and

**WHEREAS**, the Property borders a stream and is made up of planted pine forests and hardwood buffers along the streams; and

**WHEREAS**, the Property contains a managed pine forest, and permanently protecting the Property with this Conservation Easement will therefore provide for the maintenance of forestry

1

land, which is a conservation purpose recognized by the State of Georgia as providing significant public benefit and therefore worthy of permanent protection (See the Georgia Conservation Tax Credit Program ("GCTCP") at O.C.G.A. §48-7-29.12 and Ga. R. & Regs. 391-1-6-.03(5)(d)); and

**WHEREAS**, the forestry uses of the Property shall be conducted according to a professionally prepared Forest Management Plan (as defined below), and such management shall meet or exceed the then current Best Management Practices ("BMPs"), as defined by the Georgia Soil and Water Conservation Commission ("GSWCC"), the Georgia Forestry Commission, or successor agencies; and

**WHEREAS**, the Property is located in the Little River Watershed, segments of which have been designated by the Georgia Department of Natural Resources as a high priority watershed due to their importance in protecting or restoring aquatic species diversity, natural flow regimes, and other conservation activities as defined in the Georgia State Wildlife Action Plan ("SWAP") (See the SWAP, final report dated September 2015), and the Property borders Reedy Creek for approximately 2,560 feet, and contains two perennial tributaries of the creek that flow approximately 5,370 feet through the Property, and six ephemeral streams that run through the Property for 3,200 feet ; and

**WHEREAS**, this Conservation Easement protects the water quality of streams, a conservation purpose recognized by the State of Georgia as providing significant public benefit and worthy of permanent protection, by (i) limiting the development on, and disturbances to, the Property; and (ii) protecting the stream and wetlands with buffers where disturbances to the soil and vegetation are prohibited (See the GCTCP at O.C.G.A. §48-7-29.12(a)(2)(A) and Ga. R. & Regs. 391-1-6-.03(5)(a)); and

**WHEREAS**, the Property is made up of a number of habitats, including Mesic Hardwood Forest and Streams, which are classified as high priority by the State of Georgia due to their importance in protecting or restoring biodiversity, preserving functional ecosystems, and other conservation efforts as defined in the SWAP (See the SWAP, final report dated September 2015); and

**WHEREAS**, this Conservation Easement, by permanently protecting the Property and preventing most disturbances, ensures the protection of these high priority habitats, and therefore provides for the "[p]rotection of wildlife habitat consistent with state wildlife conservation policies," a conservation purpose recognized by the State of Georgia as providing significant public benefit and worthy of protection (See the GCTCP at O.C.G.A. §48-7-29.12 and Ga. R. & Regs. 391-1-6-.03(5)(b), and the SWAP, final report dated September 2015); and

**WHEREAS**, this Conservation Easement ensures "the preservation of open space (including farmland and forest land) where such preservation is pursuant to a clearly delineated Federal, State, or local governmental conservation policy, and will yield a significant public benefit," within the meaning of §170(h)(4)(A)(iii)(II) (the "Government Policy Purpose") of the Internal Revenue Code of 1986, *as amended* ("IRC"), in that the State of Georgia has clearly delineated

conservation policy and programs that recognize the significant public benefit associated with the preservation of open space, as follows:

    a. The State of Georgia, recognizing the public benefit of protecting certain habitats and natural resources, has created the GCTCP in which a state income tax credit is awarded to qualifying conservation easements that further state-designated conservation purposes;

    b. The following conservation purposes, which are recognized by the GCTCP, are served by this Conservation Easement: (i) the protection of high priority habitats, Mesic Hardwood Forest and Streams, and the resulting significant public benefit includes the preservation of varied critical Georgia ecosystems that support a diversity of wildlife and provide habitat connectivity; (ii) the protection of water quality through the conservation of streams, wetlands, and buffers to these features, and the resulting significant public benefit is the protection of water quality and quantity necessary to support in-stream species and enhance public drinking water; and (iii) the protection of productive forestry and agricultural land, and the resulting significant public benefit is the creation of natural resource-based economic benefits to the State, including resource-based tourism, hunting, and resource-related employment, and the protection of important soils; and

**WHEREAS**, by ensuring that the varied and critical high quality natural habitats mentioned above, as identified in the Baseline Documentation Report (as defined below), remain undisturbed and intact, this Conservation Easement will therefore provide for "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem…," as set forth in IRC §170(h)(4)(A)(ii) (the "Natural Habitat Purpose", along with the Government Policy Purpose, collectively referred to as the "IRC Purposes"); and

**WHEREAS**, Grantor intends that the multiple conservation purposes protected on the Property will not negatively impact each other and that uses inconsistent with these purposes will not be permitted; and

**WHEREAS**, the Property, in its protected state, will ensure the preservation of significant conservation values, including the preservation and protection of various significant natural wildlife and plant habitats, hydrologic resources, productive forest and agricultural resources, and open space values (collectively, "Conservation Values"), and thus is of great importance to the people of Taliaferro County, the State of Georgia, and the United States, and therefore is worthy of perpetual protection; and

**WHEREAS**, preventing the development and disturbance of the Property will ensure that the high quality Conservation Values found on the Property will not be disturbed and will continue to benefit the public; and

**WHEREAS**, the Conservation Values are more particularly documented in the Conservation Easement baseline documentation report ("Baseline Documentation Report"), dated October 28, 2019, and prepared by Grantee, which consists of reports, maps, photographs, and other documentation regarding the present condition, uses, and Conservation Values of the Property as of the effective date of this Conservation Easement, as required by Treasury Regulations, §1.170A-14(g)(5); the Baseline Documentation Report is incorporated herein by this reference,

3

and is intended to serve as an objective, though non-exclusive, basis for monitoring compliance with the terms and conditions of this Conservation Easement; and

**WHEREAS**, Grantor intends that the Conservation Values of the Property be preserved and maintained by restricting and limiting those certain land uses on the Property set forth in more detail herein, and further, Grantor intends to convey to Grantee the right to preserve and protect the Conservation Values of the Property in perpetuity; and

**WHEREAS**, Grantee is (i) a publicly supported, nonprofit organization, created primarily for the conservation of the environment, and is tax exempt within the meaning of §501(c)(3) and §170(b)(1)(A)(vi) of the IRC; (ii) a "qualified organization" within the meaning of §170(h) of the IRC and §1.170A-14(c) of the Treasury Regulations; and (iii) a "holder" within the meaning of O.C.G.A. §44-10-1, *et seq.*, and, as such, is qualified to accept, hold, and administer conservation easements by the laws of the State of Georgia; Grantee's primary purpose is the preservation and protection of land in its scenic, forested, and open space condition in the Oconee River Watershed and other watersheds within the State of Georgia; and

**NOW, THEREFORE**, as an absolute charitable gift without payment of monetary consideration by Grantee to Grantor, but in consideration of the mutual covenants, terms, conditions, and restrictions hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, and pursuant to O.C.G.A. §44-10-1, *et seq.*, which expressly authorizes the conveyance herein contained, Grantor hereby unconditionally and irrevocably grants and conveys unto Grantee, forever and in perpetuity, a Conservation Easement of the nature and character and to the extent hereinafter set forth over the Property, including the right to preserve and protect the Conservation Values of the Property. Grantee, by its execution hereof, accepts the foregoing grant of this Conservation Easement, and the recordation of this instrument shall constitute a "recordation of the acceptance" by Grantee within the meaning of O.C.G.A. §44-10-3(b). The above recitals, which form a material part of this Conservation Easement, are incorporated herein and made a part hereof by this reference.

## ARTICLES OF AGREEMENT

## ARTICLE 1. PURPOSE

It is the exclusive purpose of this Conservation Easement to assure that the Property will be retained forever in its predominantly relatively natural, forested, open space, and relatively undeveloped condition, and to preserve and protect the IRC Purposes and the Conservation Values of the Property, including productive forestry resources, the water quality of streams and wetlands, and a variety of significant natural habitats (collectively, the "Purpose"). Grantor will limit the use of the Property to activities that are consistent with the Purpose of this Conservation Easement and will prevent any use of the Property that will impair or interfere with the Conservation Values of the Property.

## ARTICLE 2. DURATION OF EASEMENT

EXHIBIT A-2019 BROWN-HARRIS

This Conservation Easement shall be perpetual. It is an easement in gross, constitutes a real property interest, runs with the land, and is enforceable by Grantee against Grantor, its successors, assigns, lessees, agents, and licensees.

## ARTICLE 3.  RIGHTS OF GRANTEE

To accomplish the Purpose, the following rights are conveyed to Grantee by this Conservation Easement:

**A.** To preserve and protect the Conservation Values of the Property pursuant to the terms hereof;

**B.** To enter upon the Property at reasonable times in order to monitor compliance with, and otherwise enforce the terms of, this Conservation Easement in accordance with Article 9, except in cases where Grantee determines in its reasonable discretion that immediate entry is required to prevent, terminate, or mitigate an existing or imminent violation of this Conservation Easement which would significantly damage the Conservation Values of the Property;

**C.** To prevent any activity on, or use of, the Property, that is inconsistent with the Purpose of this Conservation Easement and to require the restoration of such areas or features of the Property that may be damaged by any inconsistent activity or use to their condition as of the date of this Conservation Easement; and

**D.** To post signs and other boundary markers within this Conservation Easement identifying the boundary of lands subject to this Conservation Easement, provided such signs are professionally prepared.

## ARTICLE 4.  RESERVED RIGHTS OF GRANTOR

Except as limited in this Conservation Easement, Grantor reserves all rights as fee owner of the Property; provided, however, that Grantor shall notify Grantee in writing, as required by Treasury Regulations, §1.170A-14(g)(5)(ii), prior to the exercise of any reserved or permitted right hereunder that may adversely impact the Conservation Values or the Purpose. Without limiting the generality of the foregoing, the following rights are expressly reserved unto the Grantor and are expressly permitted; provided, however, that notwithstanding any other provision of this Conservation Easement, the rights set forth in this Article shall only be exercised to the extent that they do not destroy or impair the Conservation Values and are not inconsistent with the Purpose of this Conservation Easement:

**A.  Vegetation Management**

  1.  Except as provided below, Grantor reserves the right to plant non-invasive, native species and remove exotic species, according to a restoration plan which is subject to approval by Grantee in accordance with the approval procedures in Article 7, in order to (i) enhance vegetated habitat; (ii) protect the water quality of the streams and wetlands; and (iii)

increase the Property's plant diversity; and any disturbed area shall be restored and re-vegetated so as to minimize sediment runoff and erosion.

2. The planting of invasive species listed in Category 1, Category 1 Alert, or Category 2 of the "List of Non-Native Invasive Plants in Georgia," published by the Georgia Exotic Pest Council or successor agency, is prohibited.

3. Grantor reserves the right to remove dead, insect-infested, and diseased trees if said trees pose a threat to human safety or to the health of the stand as a whole. In the event that more than single tree removal is required, then Grantor shall obtain Grantee approval of any clearing activity as provided in Article 7.

## B. Special Natural Areas

1. There are Mesic Hardwood Forest and Streams on the Property, and these habitats are designated as Special Natural Areas ("SNAs"), as shown in **Exhibit B**, and shall be afforded additional protection because they are examples of significant and fragile natural communities.

2. The SNAs shall include Riparian Buffers which are defined as that portion of the Property that extends one hundred (100) feet from the bank of ephemeral streams or gullies, and two hundred (200) feet from the bank of any perennial and intermittent stream or the edge of any jurisdictional wetland, as delineated by the U.S. Army Corps of Engineers pursuant to Section 404 of the Clean Water Act, 33 U.S.C. §1251, *et seq.*

3. Except as provided herein, soil and vegetation disturbing or clearing activities and new construction, are prohibited in the SNA, including, but not limited to, the creation and maintenance of food plots and wildlife openings, and forestry and agricultural uses.

4. Grantor reserves the right to restore and enhance the health and diversity of the SNA subject to a restoration plan that has been approved by Grantee in accordance with the approval procedures in Article 7 herein. The restoration goals of these areas, which shall be set forth in the restoration plan, shall be to (i) maintain and enhance the health, diversity, integrity, and quality of the natural habitats; (ii) prevent erosion; and (iii) protect the conservation purposes. In addition to setting out these goals, the restoration plan shall set out the methods for achieving these goals. Any restoration action within the SNAs must not adversely impact any buffers, streams, and wetlands. Grantor may also include management or restoration activities in its Forest Management Plan as defined below.

5. Restoration activities may include, without limitation, the removal of (i) exotic or non-native species and plants; (ii) diseased trees and other vegetation specified with Grantee's prior written consent; and (iii) damage caused by storms, insects, acts of God, disease, fire, unauthorized acts of third-parties, and other causes beyond the reasonable control of Grantor.

6

Case 3:22-cv-... Document... Filed... Page 127 of 600

6. In addition to the activities listed above, restoration activities may include the planting of native, non-invasive species in order to restore natural habitat and thinning or removing pine trees in order to promote the ecological diversity and health of the forest.

7. Trails are permitted in the SNAs, as provided below. Use of said trails in the SNAs shall not cause or contribute to erosion and sediment runoff and shall minimize impact to the conservation purposes. Trails shall avoid impacting rare and endangered plant species.

8. New or additional roads are prohibited in the SNAs, except that Grantor may construct unpaved roads as part of a restoration plan approved by Grantee in accordance with Paragraph B of Article 7.

C. **Forest Management.** Grantor reserves the right to conduct the following commercial forest management activities, in the area designated as "Forestry Envelope" in **Exhibit B**, according to an approved Forest Management Plan ("FMP"), as provided for in Paragraph C(7) of this Article:

1. Grantor may conduct forest management activities that affect species quantity and quality of the trees in the Forestry Envelope, including herbicide application, site preparation, planting, prescribed burning, thinning and harvesting of trees, and such activities necessary for the sale, trade, or other removal of forest products from the Property.

2. Forest management activities shall meet or exceed then current BMPs as defined by the GSWCC, the Georgia Forestry Commission, or successor agencies.

3. Grantor may construct firebreaks on the portion of the Property that lies outside of the Riparian Buffers and SNAs and in accordance with then current state BMPs. The construction of firebreaks shall not cause or contribute to erosion and sediment runoff.

4. Grantor shall provide Grantee a written notice of harvest at least thirty (30) days prior to commencement of harvesting activities. The notice shall include the location of the harvest, anticipated dates of harvesting, and a summary of the planned activities and disturbances, including construction of any staging areas, loading docks, and roads. Timber harvesting shall be supervised by a professional forester registered in the State of Georgia.

5. Any staging areas, skid trails, loading docks, trails, and roads constructed as a necessary component of timber harvesting must be constructed and located so as to minimize erosion and sediment runoff. After a harvest, trails and roads must be stabilized in order to prevent erosion and sediment runoff. Stabilization efforts may include seeding with non-invasive vegetation.

6. Grantor reserves the right to create and maintain up to ten (10) acres of open habitat or foodplots in the Forestry Envelope for the benefit of wildlife, including birds, and to provide a diversity of habitats. These wildlife openings shall be created and maintained according to the approved FMP as set forth below.

7. All forest management activities shall be conducted according to a Forest Management Plan ("FMP"), which shall be prepared by a professional forester registered in the State of Georgia or other qualified natural resource specialist as approved by Grantee, and the FMP must comply with the terms, conditions, and provisions of this Conservation Easement. The FMP shall describe how forest management activities will be consistent with the Purpose of this Conservation Easement. The FMP is subject to the approval by Grantee in accordance with the provisions of Article 7, except that the initial FMP shall be provided to Grantee for review and written approval sixty (60) days before any forest management activities occur on the Property. The FMP shall include, at a minimum, the following:

    a. A statement of Grantor's forest management goals, including, but not limited to: (i) maintenance of soil productivity; (ii) protection of the water quality of the streams and wetlands; (iii) protection of the Riparian Buffers and SNAs; (iv) conservation of the scenic and aesthetic quality of the Property; (v) minimization of grading and alteration of the Property's topography; (vi) promotion of biologic diversity and maintenance and enhancement of wildlife habitat; and (vii) conservation of native plants and animals species;

    b. Identification of the Riparian Buffers and SNAs as no-disturbance areas;

    c. Forest stand descriptions, including, but not limited to, species composition, age classes, area, and, where available, soil types and erodibility classes;

    d. Maps showing (i) predominant topographic and hydrologic features; (ii) forest types; (iii) existing roads and the approximate location of future roads such as might be permitted hereunder and anticipated at the time the FMP is written; and (iv) the location of other existing or proposed improvements, including, but not limited to, firebreaks, staging areas, and loading docks;

    e. Identification of erosion control measures; and

    f. Anticipated date of harvesting and replanting, if so planned.

8. Grantor reserves the right to cease forestry operations at any time and to resume them any time thereafter. In the event of the cessation of forestry, the vegetation shall be managed as set forth above in Paragraph A of this Article.

## D. Roads

1. Grantor reserves the right to maintain and repair the existing unpaved roads as shown in **Exhibit B**, which are to be used for (i) access to the Property; (ii) vehicular, pedestrian, bike, and equestrian use; and (iii) agricultural and forest management activities, so long as such uses do not cause or contribute to erosion and sediment runoff and the roads are maintained according to then current BMPs, as defined by the GSWCC, the Georgia

Forestry Commission, or successor agencies. The right to maintain includes the right to grade, apply gravel, install drainage culverts, and other improvements intended to minimize sediment and storm water runoff, with Grantee approval, so as to prevent impact to wetlands and other Conservation Values.

2. Grantor reserves the right to construct additional unpaved roads as provided for in an approved FMP. All construction activities must (i) minimize the impact on adjacent vegetation; (ii) minimize sediment and storm water runoff; (iii) minimize the impact on the Conservation Values, streams, and wetlands of the Property; and (iv) comply with any existing BMPs as established by relevant state and federal agencies.

3. The width of the area impacted by the clearing and construction of the roads and road improvements, including, but not limited to, the road bed, shoulders, and drainage structures, shall not exceed twenty (20) feet.

4. Prior to the construction of any roads, Grantor must provide notice to Grantee of the proposed construction as provided in Article 7. All construction activities must minimize (i) the impact on adjacent vegetation; (ii) sediment and storm water runoff; and (iii) the impact on the Conservation Values, streams, and wetlands of the Property. All construction activity will comply with any existing BMPs as established by relevant state and federal agencies.

**E. Structures**

1. Structures are defined to mean and include any building or facility, including, but not limited to, any house, garage, barn, shed, outbuilding, tower, and pavilion. Except as specifically permitted herein, placement, installation, or construction of any temporary or permanent buildings, structures, facilities, or other improvements on the Property is prohibited.

2. Grantor reserves the right to create one (1) Residential Envelope ("RE") no greater than two (2) acres in area, as shown in **Exhibit B**. Grantor reserves the right to construct, maintain, repair, remove, and replace one residential dwelling within the RE. Grantor may also construct, maintain, repair, remove, and replace support structures associated with residential use within the RE, such as garages, sheds, pools, and gardens, and conduct residential landscaping in the RE.

3. Prior to any construction within the RE, Grantor must provide notice to Grantee of the proposed construction as provided in Article 7. Said notice shall include a survey of the RE prepared by a registered surveyor. Prior to construction, the boundaries of the RE shall be marked on the ground

4. Grantor reserves the right to construct temporary or permanent nonresidential structures in support of approved forestry uses, including but not limited to, equipment sheds, in a two (2) acre Barn Envelope ("BE"), as identified on **Exhibit B**. Prior to construction

9

within the BE, Grantor must provide notice to Grantee of the proposed construction as provided in Article 7.

5. All construction, maintenance, and repair activities for all permitted structures must minimize (i) the impact on adjacent vegetation; (ii) sediment and storm water runoff; and (iii) the impact on the Conservation Values, streams, and wetlands of the Property. All construction activity will comply with any then existing BMPs as established by the relevant local, state, and federal agencies.

6. The total area of the foundations of all permanent structures of any kind, including agricultural and forest management structures, shall not exceed one percent (1%) of the Property's acreage. The area of the foundation or base of the structure shall constitute the area of the structure for purposes of this paragraph.

7. Grantor reserves the right to construct, place, and maintain temporary structures, such as picnic tables, hunting stands, blinds, and other temporary hunting structures upon the Property, provided that construction of such structures does not cause or contribute to sediment runoff.

**F. Trails**

1. Grantor reserves the right to construct and maintain permeable pedestrian, equestrian, and bicycle trails on the Property for non-motorized recreational and educational purposes and for the occasional use by all terrain vehicles so long as such use does not cause or contribute to erosion and sediment runoff. Trail location shall not impact rare and endangered species. The cleared width of the trails shall not exceed five (5) feet. Construction and maintenance of trails shall be done so as to (i) minimize disturbance to surrounding vegetation; and (ii) not cause or contribute to erosion and sediment runoff; and shall take into account the topography of the Property, with no portion of the trail running perpendicular (90 degrees) to the contour.

2. At least thirty (30) days prior to any trail construction activity, Grantor shall provide Grantee with written notice of such construction as provided in Article 7.

3. Grantor reserves the right to place picnic tables and benches along trails.

**E. Fences.** Grantor reserves the right to install, maintain, or replace any fences, from time to time, as is customary on the Property consistent with the Purpose of this Conservation Easement, except that such fences shall not impede the passage of wildlife.

**G. Lighting.** Only shielded outdoor lighting that directs the light downwards may be used on the Property.

**H. Utilities.** Grantor reserves the right to construct, maintain, and replace utilities, including power, water, septic systems, and communication, to support approved structures or uses on the Property. Prior to any clearing or construction activity, Grantor shall obtain Grantee's

approval of the location of any additional utilities, as provided in Article 7, and shall notify Grantee, as provided in Article 7, before actual construction begins. All utility location, construction, and maintenance shall be done so as to minimize the impact on the Conservation Values and Purpose, and shall not impact the Riparian Buffers and SNAs.

**I. Education.** Grantor reserves the right to use the Property for the scientific and environmental education of the public, provided that the Conservation Values protected by this Conservation Easement are not diminished.

**J. Recreational Uses.** Grantor reserves the right to use the Property for recreational purposes, including, but not limited to, bird watching, hunting, fishing, swimming, equestrian use, bicycling, hiking, and the use of off-road and all-terrain vehicles, provided that such uses do not impair the Conservation Values, do not create a permanent track, and do not cause or contribute to erosion and sediment runoff.

## ARTICLE 5. PROHIBITED AND RESTRICTED ACTIVITIES

Except for the rights expressly reserved by Grantor in Article 4, any activity on, or use of, the Property inconsistent with the Purpose of this Conservation Easement, or that would significantly and adversely impair or interfere with the Conservation Values of the Property, is prohibited. Furthermore, the Property shall be subject to the following restrictions:

**A. Disturbance of Natural Features.** Grantor shall not change, disturb, alter, or impair any of the natural, scenic, and aesthetic features of the Property, except as permitted pursuant to Article 4.

**B. Motorized Vehicles.** Motorized vehicles on the Property are prohibited, except as set forth in Article 4.

**C. Industrial and Agricultural Use.** Industrial, manufacturing, and agricultural uses, except as provided in Article 4, are prohibited.

**D. Commercial Use.** Commercial activities are prohibited except as expressly provided herein.

**E. Subdivision.** Subdivision or partitioning of the Property for any purpose is prohibited.

**F. Signage.** Display of billboards, advertisements, or signs is prohibited on or over the Property, except that the following are permitted: (i) no trespass signs, no hunting signs, trail signs, educational signs, and signs that identify (a) the lands subject to this Conservation Easement, (b) the Grantor as owner of the Property, and (c) the participation of the landowner in state or county programs; and (ii) as provided in Article 3.

**G. Construction.** Except as permitted in Article 4 above, construction and placement of structures, impervious surfaces, or improvements of any kind is prohibited.

**H. Dumping.** The dumping or disposal of trash, garbage, or hazardous material on the Property is prohibited, except that biodegradable material generated on the Property may be permitted to remain there. The installation of underground storage tanks is prohibited.

**I. Mineral Use, Excavation, Dredging.** The exploration for, or the extraction of, oil, hydrocarbons, natural gas, minerals, soil, rock aggregate, or other materials located on or below the surface of the Property, or using any exploration or extraction method that disturbs the surface or subsurface of the land, is prohibited. Grantor shall not transfer, lease, or otherwise separate the minerals or mineral rights from the Property. Excavation and land filling are prohibited except as necessary to carry out the provisions of Article 4.

**J. Water Quality and Drainage Patterns.** Except as provided for in Article 4, there shall be (i) no pollution, sedimentation, alteration, depletion, or extraction of surface water or natural water courses, subsurface water, or any other water bodies on or within the Property; (ii) no manipulation, diversion, or other alteration of wetlands or streams; and (iii) no activities conducted on the Property that would be detrimental to water quality or that could alter the natural water level or flow in or over the Property.

**K. Road Construction.** The construction of additional roads within the Property is prohibited, except as set forth in Article 4.

## ARTICLE 6. PUBLIC ACCESS

This Conservation Easement does not create or convey a right of access by the general public to the Property.

## ARTICLE 7. NOTICE AND APPROVAL

**A. Notice of Intention to Undertake Certain Permitted Actions.** The purpose of requiring Grantor to notify Grantee prior to undertaking permitted activities is to afford Grantee a timely opportunity to ensure that the activities in question are designed and carried out in a manner consistent with the Purpose of this Conservation Easement. Therefore, when notice is required, Grantor shall notify Grantee in writing not less than thirty (30) days prior to the date Grantor intends to undertake the activity in question. Said notice shall describe the nature, scope, design, location, and any other material aspect of the proposed activity in sufficient detail to permit Grantee to make an informed judgment as to its consistency with the Purpose of this Conservation Easement.

**B. Grantee's Approval.** Where Grantee's approval is required, Grantee shall either deny or grant its approval in writing within thirty (30) days of receipt of Grantor's written request. Grantor's written request shall describe the nature, scope, design, location, and any other material aspect of the proposed activity for which Grantor seeks approval. Grantee's approval may be withheld only upon a determination by Grantee that the action as proposed would be inconsistent with the Purpose of this Conservation Easement.

## ARTICLE 8. MEDIATION

**A. Mediation.** If a dispute arises between the Grantor and Grantee (the "Parties" and each a "Party") concerning the consistency of any proposed use or activity with the Purpose of this Conservation Easement, and Grantor agrees not to proceed with the use or activity pending the resolution of the dispute, either Party may refer the dispute to mediation by written request to the other Party. Within twenty (20) days of the receipt of such a request, the Parties shall select a single trained and impartial mediator. If the Parties are unable to agree on the selection of a single mediator, then the Parties shall, within forty-five (45) days of receipt of the initial request, jointly apply to a proper court for the appointment of a trained and impartial mediator. The venue for the mediation shall be in a location mutually agreed to by the Parties. Mediation shall then proceed in accordance with the following guidelines:

1. Purpose. The purpose of the mediation is to (i) promote discussion between the Parties; (ii) assist the Parties to develop and exchange pertinent information concerning the issues in dispute; and (iii) assist the Parties to develop proposals that will enable them to arrive at a mutually acceptable resolution of the controversy. The mediation is not intended to result in any express or *de facto* modification or amendment of the terms, conditions, or restrictions of this Conservation Easement.

2. Participation. The mediator may meet with the Parties and their counsel jointly or *ex parte*. The Parties agree that they will participate in the mediation process in good faith and expeditiously, attending all sessions scheduled by the mediator. Representatives of the Parties with settlement authority will attend mediation sessions as requested by the mediator.

3. Confidentiality. All information presented to the mediator shall be deemed confidential and shall be disclosed by the mediator only with the consent of the Parties or their respective counsel. The mediator shall not be subject to subpoena by any Party. No statements made or documents prepared for mediation sessions shall be disclosed in any subsequent proceeding or construed as an admission of a Party.

4. Time Period. Neither Party shall be obligated to continue the mediation process beyond a period of ninety (90) days from the date of receipt of the initial request or if the mediator concludes that there is no reasonable likelihood that continuing mediation will result in a mutually agreeable resolution of the dispute.

5. Costs. The costs of the mediator shall be borne equally by the Parties, but each Party shall bear its own expenses, including attorneys' fees, individually.

## ARTICLE 9. GRANTEE'S REMEDIES

**A. Notice of Violation; Corrective Action.** If Grantee knows or reasonably believes that a violation of the terms of this Conservation Easement has occurred or is threatened, Grantee shall give written notice to Grantor of such violation and demand corrective action sufficient to cure or abate such violation and, where the violation involves injury to the Property resulting from any use or activity inconsistent with the Purpose of this Conservation

Easement, to restore the portion of the Property so injured to the condition that existed as of the date of this Conservation Easement, in accordance with a plan approved by Grantee.

**B. Remedies.** If Grantor fails to cause discontinuance, abatement, or such other corrective action of a violation as may be requested by Grantee within thirty (30) days after receipt of notice thereof from Grantee (or, under circumstances where the corrective action cannot reasonably be completed within such thirty (30) day period, Grantor fails to begin such corrective action within the thirty (30) day period, Grantor fails to continue diligently to perform such corrective action within the thirty (30) day period, or Grantor fails to continue diligently to perform such corrective action until completion), Grantee, after seven (7) days written notice to Grantor, may bring an action at law or in equity in a court of competent jurisdiction to enforce the terms of this Conservation Easement, to enjoin the violation by temporary or permanent injunction, to require the restoration of the Property to the condition that existed as of the date of this Conservation Easement, and/or to seek the recovery of damages arising from such non-compliance (including, without limitation, damages for the loss of scenic, aesthetic, or environmental values). Without limiting Grantor's liability therefore, Grantee, in its sole discretion, may apply any damages recovered to the cost of undertaking any corrective action on the Property.

**C. Emergency Enforcement.** If Grantee, in its reasonably exercised discretion, determines that circumstances require immediate action to prevent or mitigate significant damage to the Conservation Values of the Property, Grantee may pursue its remedies under this Article without prior notice to Grantor and without waiting for the period provided for cure to expire.

**D. Scope of Relief.** Grantor agrees that Grantee's remedies at law for any violation of the terms of this Conservation Easement may be inadequate and that Grantee shall be entitled to seek injunctive relief described in Paragraph B of this Article, both prohibitive and mandatory, in addition to such other relief to which Grantee may be entitled, including specific performance of the terms of this Conservation Easement. Grantee's remedies described in this Article shall be cumulative and shall be in addition to all remedies now or hereafter existing at law or in equity.

**E. Costs of Enforcement.** If a court or other decision-maker chosen by mutual consent of the Parties determines that any provision of this Conservation Easement has been breached by Grantor, Grantor will reimburse Grantee for any reasonable costs of enforcement, including, without limitation, costs of suit and reasonable attorneys' fees, monitoring fees, any costs of restoration necessitated by Grantor's violation of the terms of this Conservation Easement, the value of any lost Conservation Values, and any other payments ordered by such court or decision-maker. If Grantor prevails in any action to enforce the terms of this Conservation Easement, each Party shall bear its own costs of suit, including, without limitation, reasonable attorneys' fees. Grantor shall not be responsible for the costs of a frivolous action, or an action brought in bad faith by the Grantee, as determined by a court of competent jurisdiction.

**F. Forbearance.** Enforcement of the terms of this Conservation Easement shall be at the discretion of Grantee, and any forbearance by Grantee to exercise its rights under this

Conservation Easement in the event of any breach of any term of this Conservation Easement by Grantor shall not be deemed or construed to be a waiver by Grantee of such term, or of any subsequent breach of the same or any other term of this Conservation Easement, or of any of Grantee's rights under this Conservation Easement. No delay or omission by Grantee in the exercise of any right or remedy upon any breach by Grantor shall impair such right or remedy or be construed as a waiver.

**G. Waiver of Certain Defenses.** Grantor hereby waives any defense of laches, estoppel, or prescription.

**H. Acts Beyond Grantor's Control.** Nothing contained in this Conservation Easement shall be construed to entitle Grantee to bring any action against Grantor for any injury to or change in the Property resulting from causes beyond Grantor's control, including, without limitation, fire, flood, storm, earth movement, insect infestation, disease, airborne or waterborne pollutants introduced by third parties, or from any prudent action taken by any person under emergency conditions to prevent, abate, or mitigate significant injury to any person or the Property resulting from such causes. In the event the terms of this Conservation Easement are violated by acts of trespassers that Grantor could not reasonably have anticipated or prevented, Grantor agrees at Grantee's option to join in any suit or to assign its right of action to Grantee, for the purposes of pursuing enforcement action against the responsible parties.

## ARTICLE 10. GRANTOR REPRESENTATIONS, WARRANTIES, AND INDEMNIFICATION

**A. Title.** Grantor hereby represents and warrants that Grantor has good and marketable title to the Property in fee simple and has the right to grant and convey this Conservation Easement, that the Property is free and clear of any and all encumbrances, except as set forth on **Exhibit C** attached hereto and incorporated herein or, if the Property is subject to any mortgage or security deed, such mortgage or security deed has been subordinated to this Conservation Easement, and that Grantee and its successors and assigns shall have the use and enjoyment of all the benefits derived from and arising out of this Conservation Easement. Grantor hereby warrants and shall forever defend title to the Property against the claims of all persons owning, holding or claiming by, through or under Grantor.

**B. Representations and Warranties.** Grantor represents and warrants that to the best of its knowledge:

1. No substance defined, listed, or otherwise classified pursuant to any federal, state, or local law as hazardous, toxic, polluting, or otherwise contaminating to the air, water, or soil, or in any way harmful or threatening to human health or the environment, exists or has been released, generated, treated, stored, used, disposed of, deposited, abandoned, or transported in, on, from, or across the Property in violation of applicable law;

2. There are no underground storage tanks located on the Property, whether presently in service or closed, abandoned, or decommissioned, and no underground storage tanks

have been removed from the Property in a manner not in compliance with applicable federal, state, and local laws;

3. Grantor and the Property are in compliance with all federal, state, and local laws applicable to the Property and its uses;

4. There is no pending or threatened litigation in any way affecting, involving, or relating to the Property; no civil or criminal proceedings or investigations have been instigated at any time or are now pending relating to the Property; no notices, claims, demands, or orders have been received, arising out of any violation or alleged violation of, or failure to comply with, any federal, state, or local law, regulation, or requirement applicable to the Property or its use; and there are no facts or circumstances that Grantor might reasonably expect to form the basis for any such proceedings, investigations, notices, claims, demands, or orders; and

5. No person has retained a qualified mineral interest in the Property of a nature that would disqualify this Conservation Easement for purposes of Treasury Regulations, §1.170A-14(g)(4).

C. **Remediation.** If, at any time, there occurs, or has occurred, a release in, on, or about the Property of any substance now or hereafter defined, listed, or otherwise classified pursuant to any federal, state, or local law as hazardous, toxic, polluting, or otherwise contaminating to the air, water, or soil, or in any way harmful or threatening to human health or to the environment, Grantor agrees to take all steps to assure its containment and remediation, including any cleanup that may be required by applicable law.

D. **Control.** Nothing in this Conservation Easement shall be construed as giving rise, in the absence of a judicial decree, to any right or ability in Grantee to exercise physical or managerial control over the day-to-day operations of the Property, or any of Grantor's activities on the Property, or otherwise to become an owner or operator with respect to the Property within the meaning of The Comprehensive Environmental Response, Compensation, and Liability Act of 1980, *as amended* ("CERCLA"), and Georgia's hazardous waste statutes.

E. **Indemnification.** Grantor hereby acknowledges that Grantee has no possessory rights in the Property nor any right or responsibility to operate, control, or maintain the Property. Grantor releases and shall hold harmless, indemnify, and defend Grantee and its members, directors, officers, employees, agents, and contractors, and the heirs, personal representatives, successors, and assigns of each of them (collectively, "Indemnified Parties"), from and against any and all liabilities, penalties, fines, charges, costs, losses, damages, expenses, causes of action, claims, demands, orders, judgments, or administrative actions, including, without limitation, reasonable attorneys' fees, arising from or in any way connected with: (i) injury to or the death of any person, or physical damage to any property, resulting from any act, omission, condition, or other matter related to or occurring on or about the Property, regardless of causes, unless due to the negligent act or intentional misconduct of any of the Indemnified Parties; (ii) the violation or alleged violation of, or other failure to comply with,

16

any federal, state, or local law, regulation, rule, requirement, or ordinance, including, without limitation, CERCLA and Georgia hazardous waste statutes, by any person other than any of the Indemnified Parties, in any way affecting, involving, or relating to the Property; and (iii) the presence or release in, on, from, or about the Property, at any time, of any substance now or hereafter defined or classified pursuant to any federal, state, or local law, regulation, or requirement as hazardous, toxic, polluting, or otherwise contaminating to the air, water, or soil, or in any way harmful or threatening to human health or the environment, unless caused by any of the Indemnified Parties.

## ARTICLE 11. EXTINGUISHMENT, CONDEMNATION, AND PROCEEDS

A. **Extinguishment**. It is the unequivocal intention of Grantor and Grantee that the Purpose of this Conservation Easement be carried out in perpetuity. If circumstances arise in the future such as render the Purpose of this Conservation Easement impossible to accomplish, this Conservation Easement can only be terminated or extinguished, whether in whole or in part, by judicial proceedings in a court of competent jurisdiction, under applicable Georgia and Federal laws. The amount of the proceeds to which Grantee shall be entitled shall be determined in accordance with the Proceeds paragraph below. Any and all prior claims shall first be satisfied by Grantor's portion of the proceeds before Grantee's portion is diminished in any way. Grantee shall use all such proceeds in a manner consistent with the Purpose of this Conservation Easement including but not limited to the costs to monitor, enforce and preserve any portions of the Property that remain subject to this Easement, or, if no remaining portion of the Property is subject to this Easement, to monitor and enforce other easements held by Grantee that are comparable to this Easement and to conserve properties subject to such other easements in a manner consistent with Grantee's conservation purposes under this Easement. Grantor and Grantee agree that changed economic conditions shall not be considered as circumstances justifying the termination or extinguishment of this Conservation Easement.

B. **Condemnation.** If this Property is taken, in whole or in part, by exercise of the power of eminent domain or acquired by purchase in lieu of condemnation, Grantee shall be entitled to that portion of the proceeds from the Property's subsequent sale, exchange, or involuntary conversion in accordance with the Proceeds paragraph below, unless state law provides otherwise, and Grantor and Grantee agree to join in all necessary and appropriate actions to recover the full value of such condemnation, including all incidental damages.

C. **Proceeds.** This Conservation Easement constitutes a real property interest, immediately vested in Grantee at the time Grantor conveys this Conservation Easement to Grantee and constitutes a perpetual conservation restriction. As required under Treas. Reg. § 1.170A-14(g)(6)(ii), the parties stipulate that the donation of the perpetual conservation restriction gives rise to a property right, immediately vested in the Grantee, with a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift, bears to the value of the Property as a whole at that time. For the purposes of this Paragraph, that proportionate value of the Grantee's property right shall remain constant.

Accordingly, when a change in conditions give rise to the extinguishment of the perpetual conservation restriction granted by the Conservation Easement , the Grantee, on a subsequent sale, exchange, or involuntary conversion of the subject property, must be entitled to a portion of the proceeds at least equal to that proportionate value of the perpetual conservation restriction, unless state law provides that the Grantor is entitled to the full proceeds from the conversion without regard to the terms of the prior perpetual conservation restriction. This paragraph C and Article 11 shall be interpreted to adhere to and be consistent with 26 C.F.R. Section 1.170A-14(g)(6)(ii).

D. **Application of Proceeds.** Grantee shall use any proceeds received under the circumstances described in this Article in a manner consistent with the Purpose, which is exemplified by this Conservation Easement.

## ARTICLE 12. ASSIGNMENT/SUCCESSOR GRANTEE

A. **Assignment**. This Conservation Easement is transferable, but Grantee may assign its rights and obligations under this Conservation Easement only to an organization that is a qualified organization at the time of transfer under Section 170(h) of the Code and 26 C.F.R. Section 1.170A-14 (or any successor provision then applicable), and authorized to acquire and hold conservation easements under Georgia law or the laws of the United States. As a condition of such transfer, Grantee shall require that the conservation purposes that this Conservation Easement is intended to advance, continue to be carried out and the transferee has a commitment to protect the conservation purposes and the resources to enforce this Conservation Easement. Grantee agrees to give written notice to Grantor of any assignment at least sixty (60) days prior to the date of such assignment. The failure of Grantee to give such notice shall not affect the validity of such assignment nor shall it impair the validity of this Conservation Easement or limit its enforceability in any way.

B. **Successor Grantee**. If, at any time, Grantee shall be unwilling or unable to continue as grantee hereunder, including, but not limited to, if Grantee ceases to exist or to be a qualified organization under Section 170(h) of the Code and 26 C.F.R. Section 1.170A-14, or to be authorized to acquire and hold conservation easements under the Georgia Act, then Grantee shall assign its rights and obligations under this Easement only to an organization that is a qualified organization at the time of transfer under Section 170(h) of the Code and 26 C.F.R. Section 1.170A-14 (or any successor provision then applicable), and authorized to acquire and hold conservation easements under the Georgia Act or any successor provision then applicable or the laws of the United States. As a condition of such transfer, Grantee shall require that the conservation purposes that this grant is intended to advance, continue to be carried out, and the transferee has a commitment to protect the conservation purposes and the resources to enforce this Easement. Grantee agrees to give written notice to Grantor of any assignment at least sixty (60) days prior to the date of such assignment. If Grantee cannot assign this Easement to a qualified successor Grantee, the rights and obligations under this Easement shall vest in such organization as a court of competent jurisdiction shall direct pursuant to applicable Georgia law and consistent with the requirements for an assignment

EXHIBIT A – 2019 BROWN-HARRIS

pursuant to Article 12 including that such successor grantee satisfies all of the requirements for an assignment pursuant to this Article 12.

## ARTICLE 13.

[Intentionally Omitted.]

## ARTICLE 14. SUBSEQUENT TRANSFERS

**A. Transfer.** Grantor agrees to incorporate the terms of this Conservation Easement by reference in any subsequent deed or other legal instrument by which it transfers any interest in all or a portion of the Property, including, without limitation, a leasehold interest. Grantor further agrees to give written notice to Grantee of the transfer of any interest at least twenty (20) days prior to the date of such transfer, and to provide the name and address of the new Grantor. The failure of Grantor to perform any act required by this Article shall not impair the validity of this Conservation Easement or limit its enforceability in any way.

**B. Merger.** The parties agree that, notwithstanding the operation of Georgia common law, the terms of this Conservation Easement shall survive any merger of the fee and easement interest in the Property. No deed, transfer, or assignment of any fee title interest in the Property to the Grantee, or any successor holder of this Easement, shall be effective if it will result in the merger of this Conservation Easement with the fee title interest in the Property. The provisions of this paragraph are intended to prevent such merger. The provisions of this paragraph shall apply, and shall be construed to apply, to the Grantee, as holder, and to any successor holder (which must be a qualified organization within the meaning of § 170(h) of the IRC and the corresponding Treasury Regulations) of this Easement.

**C. Documentation of Present Status.** Upon written request by Grantor, Grantee shall have thirty (30) days to execute and deliver to Grantor any document, including an estoppel certificate, that certifies Grantor's compliance with any obligation of Grantor contained in this Conservation Easement. Such documentation shall describe the condition of the Property, as known by Grantee, as of the date of Grantee's most recent inspection. If Grantor requests more current status information, then Grantee shall conduct an inspection and provide said information at Grantor's sole expense within forty-five (45) days following receipt of Grantor's request.

## ARTICLE 15. NOTICES

Any notice, demand, request, consent, approval, or communication that either Party desires or is required to give to the other shall be in writing and either delivered personally or sent by commercial courier service or first class mail, postage prepaid, return receipt requested, and addressed as follows:

To Grantor: Log Creek, LLLP
1280 Snows Mill Rd.
Bogart, GA 30622

Attention:  General Partners

To Grantee:    Oconee River Land Trust, Inc.
675 Pulaski St., #2300
Athens, Georgia 30601

## ARTICLE 16.  RECORDATION

Grantee shall record this instrument in timely fashion in the official records of Taliaferro County, Georgia, and may re-record it at any time as may be required to preserve its rights in this Conservation Easement.

## ARTICLE 17.  GENERAL PROVISIONS

**A.  Controlling Law.**  The interpretation and performance of this Conservation Easement shall be governed by the laws of the State of Georgia.

**B.  Liberal Construction.**  Any general rule of construction to the contrary notwithstanding, this Easement shall be liberally construed in favor of the grant to effect the purpose of this Easement and the policy and purpose of O.C.G.A. §§ 44-10-1, et seq. (the "Georgia Act"), and to qualify as a qualified conservation contribution under the Code and 26 C.F.R. Section 1.170A-14 (the "Conservation Easement Regulations").  The Georgia Act and the Conservation Easement Regulations are sometimes referred to herein collectively as the "Conservation Easement Laws". If any provision in this instrument is found to be ambiguous, an interpretation consistent with the purpose of this Easement that would render the provision valid shall be favored over any interpretation that would render it invalid. This Easement is made pursuant to the Conservation Easement Laws, but the invalidity of such Conservation Easement Laws or any part thereof shall not affect the validity and enforceability of this Easement according to its terms, it being the intent of the parties to agree and to bind themselves, their successors, and their assigns in perpetuity to each term of this instrument whether this instrument be enforceable by reason of any statute, common law, or private agreement in existence either now or hereafter.

**C.  Severability.**  If any provision of this Conservation Easement, or the application thereof to any person or circumstance, is found to be invalid, the remainder of the provisions of this Conservation Easement, or the application of such provision to persons or circumstances other than those as to which it is found to be invalid, as the case may be, shall not be affected thereby.

**D.  Entire Agreement.**  This instrument and the documents incorporated herein by reference set forth the entire agreement of the Parties with respect to this Conservation Easement and supersede all prior discussions, negotiations, understandings, or agreements relating to this Conservation Easement, all of which are merged herein.

E. **No Forfeiture.** Nothing contained herein will result in a forfeiture or reversion of Grantor's title in any respect.

F. **Joint Obligation.** The obligations imposed by this Conservation Easement upon Grantor shall be joint and several.

G. **Successors.** The covenants, terms, conditions, and restrictions of this Conservation Easement shall be binding upon, and inure to the benefit of, Grantor and Grantee and shall continue as a servitude running in perpetuity with the Property. Except as expressly provided otherwise herein, the terms "Grantor" and "Grantee," wherever used herein, and any pronouns used in place thereof, shall include, respectively, the above-named Grantor and its personal representatives and heirs, and successors and assigns in interest in the Property after the date hereof, and the above-named Grantee and its personal representatives, heirs, successors, and assigns.

H. **Termination of Rights and Obligation.** A Party's rights and obligations under this Conservation Easement terminate upon transfer of the Party's interest in this Conservation Easement or Property, except that liability for acts or omissions occurring prior to transfer shall survive transfer.

I. **Captions.** The captions in this instrument have been inserted solely for convenience of reference and are not a part of this instrument and shall have no effect upon construction or interpretation.

J. **Counterparts.** The Parties may execute this instrument in two or more counterparts, that shall be signed by both Parties, and each counterpart shall be deemed an original instrument as against any Party who has signed it. In the event of any disparity between the counterparts produced, the recorded counterpart shall be controlling.

K. **Interpretation Consistent with Conservation Easement Regulations.** In the event of any ambiguity, inconsistency or conflict between the provisions contained herein and the provisions of Section 170(h) of the Code and 26 C.F.R. Section 1.170A-14 (collectively, the "Conservation Easement Regulations"), this Conservation Easement shall be interpreted and construed so that the provisions of the Conservation Easement Regulations shall control.

## ARTICLE 18. EXHIBITS; DOCUMENTATION

A. **Exhibits.** **Exhibit A**, Legal Description of the Property, is attached hereto and made a part hereof by reference. **Exhibit B**, Conservation Easement Map, is attached hereto and made a part hereof by reference. **Exhibit C**, Exceptions to Title is attached hereto and made a part hereof by reference.

B. **Baseline Documentation Report.** The Parties acknowledge that the Baseline Documentation Report, dated October 28, 2019 executed by both Grantor and Grantee, and a copy of which is on file at the office of Grantee, accurately and completely describes, to the

best of Grantor's and Grantee's knowledge, the uses, structures, Conservation Values, and condition of the Property as of the date hereof.

**TO HAVE AND TO HOLD** this Conservation Easement unto Grantee and its successors and assigns, together with all and singular rights, members, and appurtenances thereof to the same being, belonging or in anywise appertaining, to the only proper use, benefit, and behoove of Grantee forever.

<div align="center">

**SIGNATURE PAGE IMMEDIATELY FOLLOWS**

</div>

**IN WITNESS WHEREOF**, the Parties hereto have set their hands and seals and caused these presents to be executed in their respective names by authority duly given, and their seals affixed, the day and year first above written.

Signed, sealed, and delivered
in the presence of:

Name: _Russell Wills_
      Unofficial Witness

Name: _Karen E. Mims_
      Notary Public

My Commission Expires:
_11/11/23_

Karen E Mims
NOTARY PUBLIC
OGLETHORPE COUNTY, GEORGIA
My Commission Expires
11/11/2023

[Affix Notary Seal]

**GRANTOR:**

Log Creek, LLLP

By: _____ (L.S.)
Name: Tony D. Townley
Title:  General Partner

By: _____ (L.S.)
Name: Elizabeth A. Townley
Title:  General Partner

<div align="center">

*[Signatures continue on following page]*

</div>

Case 3:22-cv-... Document ... Filed ... Page 143 of 600

Signed, sealed, and delivered
in the presence of:

Name: _Steffney Thompson_
      Unofficial Witness

Name: _Caroline Johnson Hall_
      Notary Public

My Commission Expires:
_October 31st, 2022_

**GRANTEE:**

Oconee River Land Trust, Inc.,
a Georgia nonprofit corporation

By: _John S. Willis_
Name: John S. Willis
Title: Vice Chair

Attest: _Roger Nielsen_
Name: Roger Nielsen
Title: Secretary

[Affix Notary Seal]



23

EXHIBIT A 2019 BROWN-HARRIS

## EXHIBIT A
## Legal Description

All that tract or parcel of land situate, lying and being in the 172nd District, G.M., Taliaferro County, Georgia, lying at the westerly corner of the intersection of Sharon-Raytown Road (an 80' right of way) and the centerline of the right of way of Fairplay Road (unpaved), containing 272.98 acres, more or less, as shown on plat of survey entitled "CERTIFY TO: LOG CREEK, LLLP" by Baseline Surveying & Engineering, Inc., Matthew D. Ulmer, Registered Land Surveyor, dated October 16, 2019, recorded in Plat Book ___10___, page ___63___, in the Office of the Clerk of the Superior Court of Taliaferro County, Georgia, which plat by reference thereto is incorporated herein.

EXHIBIT A 2019 BROWN HARRIS

## EXHIBIT B
## Conservation Easement Map



Taliaferro County, GA

0 feet 750
1 in to 750 ft

**EXHIBIT C**

**Exceptions to Title**

*Page 1 of 2*

1. State, county and school district ad valorem taxes for the year 2019 which, while a lien, are not yet due and payable.

2. Such matters as may be revealed by a current accurate survey and inspection of the subject property.

3. Rights of upper and lower riparian owners in and to any body of water running through or lying within the subject property or along any of its boundary lines, free from diminution or pollution.

4. All matters shown on plat of survey entitled "CERTIFY TO: LOG CREEK, LLLP" by Baseline Surveying & Engineering, Inc., Matthew D. Ulmer, Registered Land Surveyor, dated October 16, 2019, recorded in Plat Book ___10___, page ___63___, in the Office of the Clerk of the Superior Court of Taliaferro County, Georgia.

5. Forest Land Conservation Use Assessment Covenant recorded at Deed Book 85, Page 479, in said Clerk's Office.

6. Covenant for Forest Land Protection Act of 2008 recorded at Deed Book 76, Page 283, in said Clerk's Office.

7. Application and Questionnaire for Forest Land Conservation Use Property recorded at Deed Book 76, Page 165, in said Clerk's Office.

8. Easement in favor of Georgia Power Company dated October 3, 1997, recorded in Deed Book 47, Page 223, in said Clerk's Office.

9. Easement in favor of Georgia Power Company dated August 30, 2005, recorded in Deed Book 62, Page 464, in said Clerk's Office.

10. Easement in favor of Georgia Power Company dated February 15, 1938, recorded in Deed Book T, Page 456, in said Clerk's Office.

11. Easement in favor of Georgia Power Company dated February 15, 1938, recorded in Deed Book T, Page 458, in said Clerk's Office.

12. Easement in favor of Georgia Power Company dated January 4, 1957, recorded in Deed Book 25, Page 351, in said Clerk's Office.

EXHIBIT A 2019 BROWN HARRIS

## EXHIBIT C

### Exceptions to Title

*Page 2 of 2*

13.     Easement in favor of Georgia Power Company dated January 1959, recorded in Deed Book 25, Page 497, in said Clerk's Office.

14.     Rights of the public in and to that portion of the subject property lying within the right of way of Fairplay Road (unpaved) running within and along the northerly and northeasterly boundary line of the subject property (which is the centerline of Fairplay Road).

15.     Easement in favor of Rayle Electric Membership Corporation dated August 30, 1946, recorded in Deed Book W, Page 48, in said Clerk's Office.

16.     Covenants and conditions (including, without limitation, the right of first offer) set forth in that certain Limited Warranty Deed from Augusta Woodlands, LLC, to Tony Townley dated June 14, 2007, recorded in Deed Book 69, page 274, in said Clerk's Office.

Deed     Doc: EASE

**Recorded 12/30/2019 09:35AM**

Mildred Peeler

Clerk Superior Court, Wilkes County, Ga.

Bk **00367**    Pg **0418-0443**

Penalty:

After filing, please return to:
Oconee River Land Trust
675 Pulaski St., #2300
Athens, Georgia 30601

Cross reference to that certain
<u>Limited Warranty</u> Deed dated
<u>November 20, 2006</u>, and recorded
<u>January 3, 2007</u>, in Deed Book
<u>  253  </u>, Pages <u> 518    </u>
Wilkes County, Georgia Records

STATE OF GEORGIA
COUNTY OF WILKES

## DEED OF CONSERVATION EASEMENT

**THIS DEED OF CONSERVATION EASEMENT** (hereinafter "Conservation Easement") is made this $\cancel{10}^{th}$ day of December, 2019, by and between **Log Creek, LLLP**, a limited liability limited partnership formed under the laws of Georgia (hereinafter "Grantor"), and the **Oconee River Land Trust, Inc.**, a Georgia nonprofit corporation (hereinafter "Grantee").

## WITNESSETH

**WHEREAS**, Grantor owns in fee simple certain real property located in Wilkes County, Georgia, comprising approximately 280.776 acres more or less, and being more particularly described in **Exhibit A**, attached hereto and incorporated herein, and more particularly depicted on the "Conservation Easement Map" which is attached hereto as **Exhibit B** and incorporated herein (hereinafter the "Property"); and

**WHEREAS**, the Property borders a stream for over three quarters of a mile, and contains other streams, and is made up of planted pine forests with hardwood forest buffers along the streams; and

1

**WHEREAS**, the Property contains a managed pine forest, and permanently protecting the Property with this Conservation Easement will therefore provide for the maintenance of forestry land, which is a conservation purpose recognized by the State of Georgia as providing significant public benefit and therefore worthy of permanent protection (See the Georgia Conservation Tax Credit Program ("GCTCP") at O.C.G.A. §48-7-29.12 and Ga. R. & Regs. 391-1-6-.03(5)(d)); and

**WHEREAS**, the forestry uses of the Property shall be conducted according to a professionally prepared Forest Management Plan (as defined below), and such management shall meet or exceed the then current Best Management Practices ("BMPs"), as defined by the Georgia Soil and Water Conservation Commission ("GSWCC"), the Georgia Forestry Commission, or successor agencies; and

**WHEREAS**, the Property is located in the Upper Savannah River Watershed, segments of which have been designated by the Georgia Department of Natural Resources as a high priority watershed due to their importance in protecting or restoring aquatic species diversity, natural flow regimes, and other conservation activities as defined in the Georgia State Wildlife Action Plan ("SWAP") (See the SWAP, final report dated September 2015), and the Property borders a perennial stream for approximately 4,010 feet and contains approximately 7,320 feet of other streams; and

**WHEREAS**, this Conservation Easement protects the water quality of streams, a conservation purpose recognized by the State of Georgia as providing significant public benefit and worthy of permanent protection, by (i) limiting the development on, and disturbances to, the Property; and (ii) protecting the stream and wetlands with buffers where disturbances to the soil and vegetation are prohibited (See the GCTCP at O.C.G.A. §48-7-29.12(a)(2)(A) and Ga. R. & Regs. 391-1-6-.03(5)(a)); and

**WHEREAS**, the Property is made up of a number of habitats, including Bottomland Hardwood Forest, Mesic Hardwood Forest, and Streams, which are classified as high priority by the State of Georgia due to their importance in protecting or restoring biodiversity, preserving functional ecosystems, and other conservation efforts as defined in the SWAP (See the SWAP, final report dated September 2015); and

**WHEREAS**, this Conservation Easement, by permanently protecting the Property and preventing most disturbances, ensures the protection of these high priority habitats, and therefore provides for the "[p]rotection of wildlife habitat consistent with state wildlife conservation policies," a conservation purpose recognized by the State of Georgia as providing significant public benefit and worthy of protection (See the GCTCP at O.C.G.A. §48-7-29.12 and Ga. R. & Regs. 391-1-6-.03(5)(b), and the SWAP, final report dated September 2015); and

**WHEREAS**, this Conservation Easement ensures "the preservation of open space (including farmland and forest land) where such preservation is pursuant to a clearly delineated Federal, State, or local governmental conservation policy, and will yield a significant public benefit," within the meaning of §170(h)(4)(A)(iii)(II) (the "Government Policy Purpose") of the Internal Revenue Code of 1986, *as amended* ("IRC"), in that the State of Georgia has clearly delineated

2

conservation policy and programs that recognize the significant public benefit associated with the preservation of open space, as follows:

a.  The State of Georgia, recognizing the public benefit of protecting certain habitats and natural resources, has created the GCTCP in which a state income tax credit is awarded to qualifying conservation easements that further state-designated conservation purposes;

b.  The following conservation purposes, which are recognized by the GCTCP, are served by this Conservation Easement: (i) the protection of high priority habitats, including Bottomland Hardwood Forest, Mesic Hardwood Forest, and Steams, and the resulting significant public benefit includes the preservation of varied critical Georgia ecosystems that support a diversity of wildlife and provide habitat connectivity; (ii) the protection of water quality through the conservation of streams, wetlands, and buffers to these features, and the resulting significant public benefit is the protection of water quality and quantity necessary to support in-stream species and enhance public drinking water; and (iii) the protection of productive forestry and agricultural land, and the resulting significant public benefit is the creation of natural resource-based economic benefits to the State, including resource-based tourism, hunting, and resource-related employment, and the protection of important soils; and

**WHEREAS**, by ensuring that the varied and critical high quality natural habitats mentioned above, as identified in the Baseline Documentation Report (as defined below), remain undisturbed and intact, this Conservation Easement will therefore provide for "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem…," as set forth in IRC §170(h)(4)(A)(ii) (the "Natural Habitat Purpose", along with the Government Policy Purpose, collectively referred to as the "IRC Purposes"); and

**WHEREAS**, Grantor intends that the multiple conservation purposes protected on the Property will not negatively impact each other and that uses inconsistent with these purposes will not be permitted; and

**WHEREAS**, the Property, in its protected state, will ensure the preservation of significant conservation values, including the preservation and protection of various significant natural wildlife and plant habitats, hydrologic resources, productive forest and agricultural resources, and open space values (collectively, "Conservation Values"), and thus is of great importance to the people of Wilkes County, the State of Georgia, and the United States, and therefore is worthy of perpetual protection; and

**WHEREAS**, preventing the development and disturbance of the Property will ensure that the high quality Conservation Values found on the Property will not be disturbed and will continue to benefit the public; and

**WHEREAS**, the Conservation Values are more particularly documented in the Conservation Easement baseline documentation report ("Baseline Documentation Report"), dated November 4, 2019, and prepared by Grantee, which consists of reports, maps, photographs, and other documentation regarding the present condition, uses, and Conservation Values of the Property as

of the effective date of this Conservation Easement, as required by Treasury Regulations, §1.170A-14(g)(5); the Baseline Documentation Report is incorporated herein by this reference, and is intended to serve as an objective, though non-exclusive, basis for monitoring compliance with the terms and conditions of this Conservation Easement; and

**WHEREAS**, Grantor intends that the Conservation Values of the Property be preserved and maintained by restricting and limiting those certain land uses on the Property set forth in more detail herein, and further, Grantor intends to convey to Grantee the right to preserve and protect the Conservation Values of the Property in perpetuity; and

**WHEREAS**, Grantee is (i) a publicly supported, nonprofit organization, created primarily for the conservation of the environment, and is tax exempt within the meaning of §501(c)(3) and §170(b)(1)(A)(vi) of the IRC; (ii) a "qualified organization" within the meaning of §170(h) of the IRC and §1.170A-14(c) of the Treasury Regulations; and (iii) a "holder" within the meaning of O.C.G.A. §44-10-1, *et seq.*, and, as such, is qualified to accept, hold, and administer conservation easements by the laws of the State of Georgia; Grantee's primary purpose is the preservation and protection of land in its scenic, forested, and open space condition in the Oconee River Watershed and other watersheds within the State of Georgia; and

**NOW, THEREFORE**, as an absolute charitable gift without payment of monetary consideration by Grantee to Grantor, but in consideration of the mutual covenants, terms, conditions, and restrictions hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, and pursuant to O.C.G.A. §44-10-1, *et seq.*, which expressly authorizes the conveyance herein contained, Grantor hereby unconditionally and irrevocably grants and conveys unto Grantee, forever and in perpetuity, a Conservation Easement of the nature and character and to the extent hereinafter set forth over the Property, including the right to preserve and protect the Conservation Values of the Property. Grantee, by its execution hereof, accepts the foregoing grant of this Conservation Easement, and the recordation of this instrument shall constitute a "recordation of the acceptance" by Grantee within the meaning of O.C.G.A. §44-10-3(b). The above recitals, which form a material part of this Conservation Easement, are incorporated herein and made a part hereof by this reference.

## ARTICLES OF AGREEMENT

## ARTICLE 1. PURPOSE

It is the exclusive purpose of this Conservation Easement to assure that the Property will be retained forever in its predominantly relatively natural, forested, open space, and relatively undeveloped condition, and to preserve and protect the IRC Purposes and the Conservation Values of the Property, including productive forestry resources, the water quality of streams and wetlands, and a variety of significant natural habitats (collectively, the "Purpose"). Grantor will limit the use of the Property to activities that are consistent with the Purpose of this Conservation Easement and will prevent any use of the Property that will impair or interfere with the Conservation Values of the Property.

## ARTICLE 2. DURATION OF EASEMENT

This Conservation Easement shall be perpetual. It is an easement in gross, constitutes a real property interest, runs with the land, and is enforceable by Grantee against Grantor, its successors, assigns, lessees, agents, and licensees.

## ARTICLE 3.  RIGHTS OF GRANTEE

To accomplish the Purpose, the following rights are conveyed to Grantee by this Conservation Easement:

**A.** To preserve and protect the Conservation Values of the Property pursuant to the terms hereof;

**B.** To enter upon the Property at reasonable times in order to monitor compliance with, and otherwise enforce the terms of, this Conservation Easement in accordance with Article 9, except in cases where Grantee determines in its reasonable discretion that immediate entry is required to prevent, terminate, or mitigate an existing or imminent violation of this Conservation Easement which would significantly damage the Conservation Values of the Property;

**C.** To prevent any activity on, or use of, the Property, that is inconsistent with the Purpose of this Conservation Easement and to require the restoration of such areas or features of the Property that may be damaged by any inconsistent activity or use to their condition as of the date of this Conservation Easement; and

**D.** To post signs and other boundary markers within this Conservation Easement identifying the boundary of lands subject to this Conservation Easement, provided such signs are professionally prepared.

## ARTICLE 4.  RESERVED RIGHTS OF GRANTOR

Except as limited in this Conservation Easement, Grantor reserves all rights as fee owner of the Property; provided, however, that Grantor shall notify Grantee in writing, as required by Treasury Regulations, §1.170A-14(g)(5)(ii), prior to the exercise of any reserved or permitted right hereunder that may adversely impact the Conservation Values or the Purpose. Without limiting the generality of the foregoing, the following rights are expressly reserved unto the Grantor and are expressly permitted; provided, however, that notwithstanding any other provision of this Conservation Easement, the rights set forth in this Article shall only be exercised to the extent that they do not destroy or impair the Conservation Values and are not inconsistent with the Purpose of this Conservation Easement:

**A.  Vegetation Management**

1. Except as provided below, Grantor reserves the right to plant non-invasive, native species and remove exotic species, according to a restoration plan which is subject to approval by Grantee in accordance with the approval procedures in Article 7, in order to (i) enhance

vegetated habitat; (ii) protect the water quality of the streams and wetlands; and (iii) increase the Property's plant diversity; and any disturbed area shall be restored and re-vegetated so as to minimize sediment runoff and erosion.

2. The planting of invasive species listed in Category 1, Category 1 Alert, or Category 2 of the "List of Non-Native Invasive Plants in Georgia," published by the Georgia Exotic Pest Council or successor agency, is prohibited.

3. Grantor reserves the right to remove dead, insect-infested, and diseased trees if said trees pose a threat to human safety or to the health of the stand as a whole. In the event that more than single tree removal is required, then Grantor shall obtain Grantee's approval of any clearing activity as provided in Article 7.

## B. Special Natural Areas

1. There are Bottomland Hardwood Forest, Mesic Hardwood Forest, and Streams on the Property, and these habitats are designated as Special Natural Areas ("SNAs"), as shown in **Exhibit B**, and shall be afforded additional protection because they are examples of significant and fragile natural communities.

2. The SNAs shall include Riparian Buffers which are defined as that portion of the Property that extends one hundred (100) feet from the bank of ephemeral streams or gullies, and two hundred feet (200) from the bank of any perennial and intermittent stream or the edge of any jurisdictional wetland, as delineated by the U.S. Army Corps of Engineers pursuant to Section 404 of the Clean Water Act, 33 U.S.C. §1251, *et seq.*

3. Except as provided herein, soil and vegetation disturbing or clearing activities and new construction, are prohibited in the SNA, including, but not limited to, the creation and maintenance of food plots and wildlife openings, and forestry and agricultural uses.

4. Grantor reserves the right to restore and enhance the health and diversity of the SNA subject to a restoration plan that has been approved by Grantee in accordance with the approval procedures in Article 7 herein. The restoration goals of these areas, which shall be set forth in the restoration plan, shall be to (i) maintain and enhance the health, diversity, integrity, and quality of the natural habitats; (ii) prevent erosion; and (iii) protect the conservation purposes. In addition to setting out these goals, the restoration plan shall set out the methods for achieving these goals. Any restoration action within the SNAs must not adversely impact any buffers, streams, and wetlands. Grantor may also include management or restoration activities in its Forest Management Plan as defined below.

5. Restoration activities may include, without limitation, the removal of (i) exotic or non-native species and plants; (ii) diseased trees and other vegetation specified with Grantee's prior written consent; and (iii) damage caused by storms, insects, acts of God, disease, fire, unauthorized acts of third-parties, and other causes beyond the reasonable control of Grantor.

6. In addition to the activities listed above, restoration activities may include the planting of native, non-invasive species in order to restore natural habitat and thinning or removing pine trees in order to promote the ecological diversity and health of the forest.

7. Trails are permitted in the SNAs, as provided below. Use of said trails in the SNAs shall not cause or contribute to erosion and sediment runoff and shall minimize impact to the conservation purposes. Trails shall avoid impacting rare and endangered plant species.

8. New or additional roads are prohibited in the SNAs, except that Grantor may construct unpaved roads as part of a restoration plan approved by Grantee in accordance with Paragraph B of Article 7.

C. **Forest Management.** Grantor reserves the right to conduct the following commercial forest management activities, in the area designated as "Forestry Envelope" in **Exhibit B**, according to an approved Forest Management Plan ("FMP"), as provided for in Paragraph C(7) of this Article:

1. Grantor may conduct forest management activities that affect species quantity and quality of the trees in the Forestry Envelope, including herbicide application, site preparation, planting, prescribed burning, thinning and harvesting of trees, and such activities necessary for the sale, trade, or other removal of forest products from the Property.

2. Forest management activities shall meet or exceed then current BMPs as defined by the GSWCC, the Georgia Forestry Commission, or successor agencies.

3. Grantor may construct firebreaks on the portion of the Property that lies outside of the Riparian Buffers and SNAs and in accordance with then current state BMPs. The construction of firebreaks shall not cause or contribute to erosion and sediment runoff.

4. Grantor shall provide Grantee a written notice of harvest at least thirty (30) days prior to commencement of harvesting activities. The notice shall include the location of the harvest, anticipated dates of harvesting, and a summary of the planned activities and disturbances, including construction of any staging areas, loading docks, and roads. Timber harvesting shall be supervised by a professional forester registered in the State of Georgia.

5. Any staging areas, skid trails, loading docks, trails, and roads constructed as a necessary component of timber harvesting must be constructed and located so as to minimize erosion and sediment runoff. After a harvest, trails and roads must be stabilized in order to prevent erosion and sediment runoff. Stabilization efforts may include seeding with non-invasive vegetation.

6. Grantor reserves the right to create and maintain up to fifteen (15) acres of open habitat or foodplots in the Forestry Envelope for the benefit of wildlife, including birds, and to provide a diversity of habitats. These wildlife openings shall be created and maintained according to the approved FMP as set forth below.

7. All forest management activities shall be conducted according to a Forest Management Plan ("FMP"), which shall be prepared by a professional forester registered in the State of Georgia or other qualified natural resource specialist as approved by Grantee, and the FMP must comply with the terms, conditions, and provisions of this Conservation Easement. The FMP shall describe how forest management activities will be consistent with the Purpose of this Conservation Easement. The FMP is subject to the approval by Grantee in accordance with the provisions of Article 7, except that the initial FMP shall be provided to Grantee for review and written approval sixty (60) days before any forest management activities occur on the Property. The FMP shall include, at a minimum, the following:

    a. A statement of Grantor's forest management goals, including, but not limited to: (i) maintenance of soil productivity; (ii) protection of the water quality of the streams and wetlands; (iii) protection of the Riparian Buffers and SNAs; (iv) conservation of the scenic and aesthetic quality of the Property; (v) minimization of grading and alteration of the Property's topography; (vi) promotion of biologic diversity and maintenance and enhancement of wildlife habitat; and (vii) conservation of native plants and animals species;

    b. Identification of the Riparian Buffers and SNAs as no-disturbance areas;

    c. Forest stand descriptions, including, but not limited to, species composition, age classes, area, and, where available, soil types and erodibility classes;

    d. Maps showing (i) predominant topographic and hydrologic features; (ii) forest types; (iii) existing roads and the approximate location of future roads such as might be permitted hereunder and anticipated at the time the FMP is written; and (iv) the location of other existing or proposed improvements, including, but not limited to, firebreaks, staging areas, and loading docks;

    e. Identification of erosion control measures; and

    f. Anticipated date of harvesting and replanting, if so planned.

8. Grantor reserves the right to cease forestry operations at any time and to resume them any time thereafter. In the event of the cessation of forestry, the vegetation shall be managed as set forth above in Paragraph A of this Article.

## D. Roads

1. Grantor reserves the right to maintain and repair the existing unpaved roads as shown in **Exhibit B**, which are to be used for (i) access to the Property; (ii) vehicular, pedestrian, bike, and equestrian use; and (iii) agricultural and forest management activities, so long as such uses do not cause or contribute to erosion and sediment runoff and the roads are maintained according to then current BMPs, as defined by the GSWCC, the Georgia

Forestry Commission, or successor agencies. The right to maintain includes the right to grade, apply gravel, install drainage culverts, and other improvements intended to minimize sediment and storm water runoff, with Grantee approval, so as to prevent impact to wetlands and other Conservation Values.

2. Grantor reserves the right to construct additional unpaved roads in the Forestry Envelope as provided for in an approved FMP. All construction activities must (i) minimize the impact on adjacent vegetation; (ii) minimize sediment and storm water runoff; (iii) minimize the impact on the Conservation Values, streams, and wetlands of the Property; and (iv) comply with any existing BMPs as established by relevant state and federal agencies.

3. The width of the area impacted by the clearing and construction of the roads and road improvements, including, but not limited to, the road bed, shoulders, and drainage structures, shall not exceed twenty (20) feet.

4. Prior to the construction of any roads, Grantor must provide notice to Grantee of the proposed construction as provided in Article 7. All construction activities must minimize (i) the impact on adjacent vegetation; (ii) sediment and storm water runoff; and (iii) the impact on the Conservation Values, streams, and wetlands of the Property. All construction activity will comply with any existing BMPs as established by relevant state and federal agencies.

## E. Structures

1. Structures are defined to mean and include any building or facility, including, but not limited to, any house, garage, barn, shed, outbuilding, tower, and pavilion. Except as specifically permitted herein, placement, installation, or construction of any temporary or permanent buildings, structures, facilities, or other improvements on the Property is prohibited.

2. Grantor reserves the right to create one (1) Residential Envelope ("RE") no greater than two (2) acres in area, as shown in **Exhibit B**. Grantor reserves the right to construct, maintain, repair, remove, and replace one residential dwelling within the RE. Grantor may also construct, maintain, repair, remove, and replace support structures associated with residential use within the RE, such as garages, sheds, pools, and gardens, and conduct residential landscaping in the RE.

3. Prior to any construction within the RE, Grantor must provide notice to Grantee of the proposed construction as provided in Article 7. Said notice shall include a survey of the RE prepared by a registered surveyor. Prior to construction, the boundaries of the RE shall be marked on the ground

4. Grantor reserves the right to construct temporary or permanent nonresidential structures in support of approved forestry uses, including but not limited to, equipment sheds, in a two (2) acre Barn Envelope ("BE"), as identified on **Exhibit B**. Prior to construction

within the BE, Grantor must provide notice to Grantee of the proposed construction as provided in Article 7.

5. All construction, maintenance, and repair activities for all permitted structures must minimize (i) the impact on adjacent vegetation; (ii) sediment and storm water runoff; and (iii) the impact on the Conservation Values, streams, and wetlands of the Property. All construction activity will comply with any then existing BMPs as established by the relevant local, state, and federal agencies.

6. The total area of the foundations of all permanent structures of any kind, including agricultural and forest management structures, shall not exceed one percent (1%) of the Property's acreage. The area of the foundation or base of the structure shall constitute the area of the structure for purposes of this paragraph.

7. Grantor reserves the right to construct, place, and maintain temporary structures, such as picnic tables, hunting stands, blinds, and other temporary hunting structures upon the Property, provided that construction of such structures does not cause or contribute to sediment runoff.

## F. Trails

1. Grantor reserves the right to construct and maintain permeable pedestrian, equestrian, and bicycle trails on the Property for non-motorized recreational and educational purposes and for the occasional use by all terrain vehicles so long as such use does not cause or contribute to erosion and sediment runoff. Trail location shall not impact rare and endangered species. The cleared width of the trails shall not exceed five (5) feet. Construction and maintenance of trails shall be done so as to (i) minimize disturbance to surrounding vegetation; and (ii) not cause or contribute to erosion and sediment runoff; and shall take into account the topography of the Property, with no portion of the trail running perpendicular (90 degrees) to the contour.

2. At least thirty (30) days prior to any trail construction activity, Grantor shall provide Grantee with written notice of such construction as provided in Article 7.

3. Grantor reserves the right to place picnic tables and benches along trails.

## E. Fences.
Grantor reserves the right to install, maintain, or replace any fences, from time to time, as is customary on the Property consistent with the Purpose of this Conservation Easement, except that such fences shall not impede the passage of wildlife.

## G. Lighting.
Only shielded outdoor lighting that directs the light downwards may be used on the Property.

## H. Utilities.
Grantor reserves the right to construct, maintain, and replace utilities, including power, water, septic systems, and communication, to support approved structures or uses on the Property. Prior to any clearing or construction activity, Grantor shall obtain Grantee's

approval of the location of any additional utilities, as provided in Article 7, and shall notify Grantee, as provided in Article 7, before actual construction begins. All utility location, construction, and maintenance shall be done so as to minimize the impact on the Conservation Values and Purpose, and shall not impact the Riparian Buffers and SNAs.

**I. Education.** Grantor reserves the right to use the Property for the scientific and environmental education of the public, provided that the Conservation Values protected by this Conservation Easement are not diminished.

**J. Recreational Uses.** Grantor reserves the right to use the Property for recreational purposes, including, but not limited to, bird watching, hunting, fishing, swimming, equestrian use, bicycling, hiking, and the use of off-road and all-terrain vehicles, provided that such uses do not impair the Conservation Values, do not create a permanent track, and do not cause or contribute to erosion and sediment runoff.

## ARTICLE 5. PROHIBITED AND RESTRICTED ACTIVITIES

Except for the rights expressly reserved by Grantor in Article 4, any activity on, or use of, the Property inconsistent with the Purpose of this Conservation Easement, or that would significantly and adversely impair or interfere with the Conservation Values of the Property, is prohibited. Furthermore, the Property shall be subject to the following restrictions:

**A. Disturbance of Natural Features.** Grantor shall not change, disturb, alter, or impair any of the natural, scenic, and aesthetic features of the Property, except as permitted pursuant to Article 4.

**B. Motorized Vehicles.** Motorized vehicles on the Property are prohibited, except as set forth in Article 4.

**C. Industrial and Agricultural Use.** Industrial, manufacturing, and agricultural uses, except as provided in Article 4, are prohibited.

**D. Commercial Use.** Commercial activities are prohibited except as expressly provided herein.

**E. Subdivision.** Subdivision or partitioning of the Property for any purpose is prohibited.

**F. Signage.** Display of billboards, advertisements, or signs is prohibited on or over the Property, except that the following are permitted: (i) no trespass signs, no hunting signs, trail signs, educational signs, and signs that identify (a) the lands subject to this Conservation Easement, (b) the Grantor as owner of the Property, and (c) the participation of the landowner in state or county programs; and (ii) as provided in Article 3.

**G. Construction.** Except as permitted in Article 4 above, construction and placement of structures, impervious surfaces, or improvements of any kind is prohibited.

**H. Dumping.** The dumping or disposal of trash, garbage, or hazardous material on the Property is prohibited, except that biodegradable material generated on the Property may be permitted to remain there. The installation of underground storage tanks is prohibited.

**I. Mineral Use, Excavation, Dredging.** The exploration for, or the extraction of, oil, hydrocarbons, natural gas, minerals, soil, rock aggregate, or other materials located on or below the surface of the Property, or using any exploration or extraction method that disturbs the surface or subsurface of the land, is prohibited. Grantor shall not transfer, lease, or otherwise separate the minerals or mineral rights from the Property. Excavation and land filling are prohibited except as necessary to carry out the provisions of Article 4.

**J. Water Quality and Drainage Patterns.** Except as provided for in Article 4, there shall be (i) no pollution, sedimentation, alteration, depletion, or extraction of surface water or natural water courses, subsurface water, or any other water bodies on or within the Property; (ii) no manipulation, diversion, or other alteration of wetlands or streams; and (iii) no activities conducted on the Property that would be detrimental to water quality or that could alter the natural water level or flow in or over the Property.

**K. Road Construction.** The construction of additional roads within the Property is prohibited, except as set forth in Article 4.

## ARTICLE 6. PUBLIC ACCESS

This Conservation Easement does not create or convey a right of access by the general public to the Property.

## ARTICLE 7. NOTICE AND APPROVAL

**A. Notice of Intention to Undertake Certain Permitted Actions.** The purpose of requiring Grantor to notify Grantee prior to undertaking permitted activities is to afford Grantee a timely opportunity to ensure that the activities in question are designed and carried out in a manner consistent with the Purpose of this Conservation Easement. Therefore, when notice is required, Grantor shall notify Grantee in writing not less than thirty (30) days prior to the date Grantor intends to undertake the activity in question. Said notice shall describe the nature, scope, design, location, and any other material aspect of the proposed activity in sufficient detail to permit Grantee to make an informed judgment as to its consistency with the Purpose of this Conservation Easement.

**B. Grantee's Approval.** Where Grantee's approval is required, Grantee shall either deny or grant its approval in writing within thirty (30) days of receipt of Grantor's written request. Grantor's written request shall describe the nature, scope, design, location, and any other material aspect of the proposed activity for which Grantor seeks approval. Grantee's approval may be withheld only upon a determination by Grantee that the action as proposed would be inconsistent with the Purpose of this Conservation Easement.

## ARTICLE 8. MEDIATION

**A. Mediation.** If a dispute arises between the Grantor and Grantee (the "Parties" and each a "Party") concerning the consistency of any proposed use or activity with the Purpose of this Conservation Easement, and Grantor agrees not to proceed with the use or activity pending the resolution of the dispute, either Party may refer the dispute to mediation by written request to the other Party. Within twenty (20) days of the receipt of such a request, the Parties shall select a single trained and impartial mediator. If the Parties are unable to agree on the selection of a single mediator, then the Parties shall, within forty-five (45) days of receipt of the initial request, jointly apply to a proper court for the appointment of a trained and impartial mediator. The venue for the mediation shall be in a location mutually agreed to by the Parties. Mediation shall then proceed in accordance with the following guidelines:

1. Purpose. The purpose of the mediation is to (i) promote discussion between the Parties; (ii) assist the Parties to develop and exchange pertinent information concerning the issues in dispute; and (iii) assist the Parties to develop proposals that will enable them to arrive at a mutually acceptable resolution of the controversy. The mediation is not intended to result in any express or *de facto* modification or amendment of the terms, conditions, or restrictions of this Conservation Easement.

2. Participation. The mediator may meet with the Parties and their counsel jointly or *ex parte*. The Parties agree that they will participate in the mediation process in good faith and expeditiously, attending all sessions scheduled by the mediator. Representatives of the Parties with settlement authority will attend mediation sessions as requested by the mediator.

3. Confidentiality. All information presented to the mediator shall be deemed confidential and shall be disclosed by the mediator only with the consent of the Parties or their respective counsel. The mediator shall not be subject to subpoena by any Party. No statements made or documents prepared for mediation sessions shall be disclosed in any subsequent proceeding or construed as an admission of a Party.

4. Time Period. Neither Party shall be obligated to continue the mediation process beyond a period of ninety (90) days from the date of receipt of the initial request or if the mediator concludes that there is no reasonable likelihood that continuing mediation will result in a mutually agreeable resolution of the dispute.

5. Costs. The costs of the mediator shall be borne equally by the Parties, but each Party shall bear its own expenses, including attorneys' fees, individually.

## ARTICLE 9. GRANTEE'S REMEDIES

**A. Notice of Violation; Corrective Action.** If Grantee knows or reasonably believes that a violation of the terms of this Conservation Easement has occurred or is threatened, Grantee shall give written notice to Grantor of such violation and demand corrective action sufficient to cure or abate such violation and, where the violation involves injury to the Property resulting from any use or activity inconsistent with the Purpose of this Conservation

Easement, to restore the portion of the Property so injured to the condition that existed as of the date of this Conservation Easement, in accordance with a plan approved by Grantee.

**B. Remedies.** If Grantor fails to cause discontinuance, abatement, or such other corrective action of a violation as may be requested by Grantee within thirty (30) days after receipt of notice thereof from Grantee (or, under circumstances where the corrective action cannot reasonably be completed within such thirty (30) day period, Grantor fails to begin such corrective action within the thirty (30) day period, Grantor fails to continue diligently to perform such corrective action within the thirty (30) day period, or Grantor fails to continue diligently to perform such corrective action until completion), Grantee, after seven (7) days written notice to Grantor, may bring an action at law or in equity in a court of competent jurisdiction to enforce the terms of this Conservation Easement, to enjoin the violation by temporary or permanent injunction, to require the restoration of the Property to the condition that existed as of the date of this Conservation Easement, and/or to seek the recovery of damages arising from such non-compliance (including, without limitation, damages for the loss of scenic, aesthetic, or environmental values). Without limiting Grantor's liability therefore, Grantee, in its sole discretion, may apply any damages recovered to the cost of undertaking any corrective action on the Property.

**C. Emergency Enforcement.** If Grantee, in its reasonably exercised discretion, determines that circumstances require immediate action to prevent or mitigate significant damage to the Conservation Values of the Property, Grantee may pursue its remedies under this Article without prior notice to Grantor and without waiting for the period provided for cure to expire.

**D. Scope of Relief.** Grantor agrees that Grantee's remedies at law for any violation of the terms of this Conservation Easement may be inadequate and that Grantee shall be entitled to seek injunctive relief described in Paragraph B of this Article, both prohibitive and mandatory, in addition to such other relief to which Grantee may be entitled, including specific performance of the terms of this Conservation Easement. Grantee's remedies described in this Article shall be cumulative and shall be in addition to all remedies now or hereafter existing at law or in equity.

**E. Costs of Enforcement.** If a court or other decision-maker chosen by mutual consent of the Parties determines that any provision of this Conservation Easement has been breached by Grantor, Grantor will reimburse Grantee for any reasonable costs of enforcement, including, without limitation, costs of suit and reasonable attorneys' fees, monitoring fees, any costs of restoration necessitated by Grantor's violation of the terms of this Conservation Easement, the value of any lost Conservation Values, and any other payments ordered by such court or decision-maker. If Grantor prevails in any action to enforce the terms of this Conservation Easement, each Party shall bear its own costs of suit, including, without limitation, reasonable attorneys' fees. Grantor shall not be responsible for the costs of a frivolous action, or an action brought in bad faith by the Grantee, as determined by a court of competent jurisdiction.

**F. Forbearance.** Enforcement of the terms of this Conservation Easement shall be at the discretion of Grantee, and any forbearance by Grantee to exercise its rights under this

Conservation Easement in the event of any breach of any term of this Conservation Easement by Grantor shall not be deemed or construed to be a waiver by Grantee of such term, or of any subsequent breach of the same or any other term of this Conservation Easement, or of any of Grantee's rights under this Conservation Easement. No delay or omission by Grantee in the exercise of any right or remedy upon any breach by Grantor shall impair such right or remedy or be construed as a waiver.

**G. Waiver of Certain Defenses.** Grantor hereby waives any defense of laches, estoppel, or prescription.

**H. Acts Beyond Grantor's Control.** Nothing contained in this Conservation Easement shall be construed to entitle Grantee to bring any action against Grantor for any injury to or change in the Property resulting from causes beyond Grantor's control, including, without limitation, fire, flood, storm, earth movement, insect infestation, disease, airborne or waterborne pollutants introduced by third parties, or from any prudent action taken by any person under emergency conditions to prevent, abate, or mitigate significant injury to any person or the Property resulting from such causes. In the event the terms of this Conservation Easement are violated by acts of trespassers that Grantor could not reasonably have anticipated or prevented, Grantor agrees at Grantee's option to join in any suit or to assign its right of action to Grantee, for the purposes of pursuing enforcement action against the responsible parties.

## ARTICLE 10. GRANTOR REPRESENTATIONS, WARRANTIES, AND INDEMNIFICATION

**A. Title.** Grantor hereby represents and warrants that Grantor has good and marketable title to the Property in fee simple and has the right to grant and convey this Conservation Easement, that the Property is free and clear of any and all encumbrances, except as set forth on **Exhibit C** attached hereto and incorporated herein or, if the Property is subject to any mortgage or security deed, such mortgage or security deed has been subordinated to this Conservation Easement, and that Grantee and its successors and assigns shall have the use and enjoyment of all the benefits derived from and arising out of this Conservation Easement. Grantor hereby warrants and shall forever defend title to the Property against the claims of all persons owning, holding or claiming by, through or under Grantor.

**B. Representations and Warranties.** Grantor represents and warrants that to the best of its knowledge:

1. No substance defined, listed, or otherwise classified pursuant to any federal, state, or local law as hazardous, toxic, polluting, or otherwise contaminating to the air, water, or soil, or in any way harmful or threatening to human health or the environment, exists or has been released, generated, treated, stored, used, disposed of, deposited, abandoned, or transported in, on, from, or across the Property in violation of applicable law;

2. There are no underground storage tanks located on the Property, whether presently in service or closed, abandoned, or decommissioned, and no underground storage tanks

have been removed from the Property in a manner not in compliance with applicable federal, state, and local laws;

3. Grantor and the Property are in compliance with all federal, state, and local laws applicable to the Property and its uses;

4. There is no pending or threatened litigation in any way affecting, involving, or relating to the Property; no civil or criminal proceedings or investigations have been instigated at any time or are now pending relating to the Property; no notices, claims, demands, or orders have been received, arising out of any violation or alleged violation of, or failure to comply with, any federal, state, or local law, regulation, or requirement applicable to the Property or its use; and there are no facts or circumstances that Grantor might reasonably expect to form the basis for any such proceedings, investigations, notices, claims, demands, or orders; and

5. No person has retained a qualified mineral interest in the Property of a nature that would disqualify this Conservation Easement for purposes of Treasury Regulations, §1.170A-14(g)(4).

**C. Remediation.** If, at any time, there occurs, or has occurred, a release in, on, or about the Property of any substance now or hereafter defined, listed, or otherwise classified pursuant to any federal, state, or local law as hazardous, toxic, polluting, or otherwise contaminating to the air, water, or soil, or in any way harmful or threatening to human health or to the environment, Grantor agrees to take all steps to assure its containment and remediation, including any cleanup that may be required by applicable law.

**D. Control.** Nothing in this Conservation Easement shall be construed as giving rise, in the absence of a judicial decree, to any right or ability in Grantee to exercise physical or managerial control over the day-to-day operations of the Property, or any of Grantor's activities on the Property, or otherwise to become an owner or operator with respect to the Property within the meaning of The Comprehensive Environmental Response, Compensation, and Liability Act of 1980, *as amended* ("CERCLA"), and Georgia's hazardous waste statutes.

**E. Indemnification.** Grantor hereby acknowledges that Grantee has no possessory rights in the Property nor any right or responsibility to operate, control, or maintain the Property. Grantor releases and shall hold harmless, indemnify, and defend Grantee and its members, directors, officers, employees, agents, and contractors, and the heirs, personal representatives, successors, and assigns of each of them (collectively, "Indemnified Parties"), from and against any and all liabilities, penalties, fines, charges, costs, losses, damages, expenses, causes of action, claims, demands, orders, judgments, or administrative actions, including, without limitation, reasonable attorneys' fees, arising from or in any way connected with: (i) injury to or the death of any person, or physical damage to any property, resulting from any act, omission, condition, or other matter related to or occurring on or about the Property, regardless of causes, unless due to the negligent act or intentional misconduct of any of the Indemnified Parties; (ii) the violation or alleged violation of, or other failure to comply with,

any federal, state, or local law, regulation, rule, requirement, or ordinance, including, without limitation, CERCLA and Georgia hazardous waste statutes, by any person other than any of the Indemnified Parties, in any way affecting, involving, or relating to the Property; and (iii) the presence or release in, on, from, or about the Property, at any time, of any substance now or hereafter defined or classified pursuant to any federal, state, or local law, regulation, or requirement as hazardous, toxic, polluting, or otherwise contaminating to the air, water, or soil, or in any way harmful or threatening to human health or the environment, unless caused by any of the Indemnified Parties.

## ARTICLE 11. EXTINGUISHMENT, CONDEMNATION, AND PROCEEDS

A. **Extinguishment**. It is the unequivocal intention of Grantor and Grantee that the Purpose of this Conservation Easement be carried out in perpetuity. If circumstances arise in the future such as render the Purpose of this Conservation Easement impossible to accomplish, this Conservation Easement can only be terminated or extinguished, whether in whole or in part, by judicial proceedings in a court of competent jurisdiction, under applicable Georgia and Federal laws. The amount of the proceeds to which Grantee shall be entitled shall be determined in accordance with the Proceeds paragraph below. Any and all prior claims shall first be satisfied by Grantor's portion of the proceeds before Grantee's portion is diminished in any way. Grantee shall use all such proceeds in a manner consistent with the Purpose of this Conservation Easement including but not limited to the costs to monitor, enforce and preserve any portions of the Property that remain subject to this Easement, or, if no remaining portion of the Property is subject to this Easement, to monitor and enforce other easements held by Grantee that are comparable to this Easement and to conserve properties subject to such other easements in a manner consistent with Grantee's conservation purposes under this Easement. Grantor and Grantee agree that changed economic conditions shall not be considered as circumstances justifying the termination or extinguishment of this Conservation Easement.

B. **Condemnation.** If this Property is taken, in whole or in part, by exercise of the power of eminent domain or acquired by purchase in lieu of condemnation, Grantee shall be entitled to that portion of the proceeds from the Property's subsequent sale, exchange, or involuntary conversion in accordance with the Proceeds paragraph below, unless state law provides otherwise, and Grantor and Grantee agree to join in all necessary and appropriate actions to recover the full value of such condemnation, including all incidental damages.

C. **Proceeds.** This Conservation Easement constitutes a real property interest, immediately vested in Grantee at the time Grantor conveys this Conservation Easement to Grantee and constitutes a perpetual conservation restriction. As required under Treas. Reg. § 1.170A-14(g)(6)(ii), the parties stipulate that the donation of the perpetual conservation restriction gives rise to a property right, immediately vested in the Grantee, with a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift, bears to the value of the Property as a whole at that time. For the purposes of this Paragraph, that proportionate value of the Grantee's property right shall remain constant.

17

Accordingly, when a change in conditions give rise to the extinguishment of the perpetual conservation restriction granted by the Conservation Easement , the Grantee, on a subsequent sale, exchange, or involuntary conversion of the subject property, must be entitled to a portion of the proceeds at least equal to that proportionate value of the perpetual conservation restriction, unless state law provides that the Grantor is entitled to the full proceeds from the conversion without regard to the terms of the prior perpetual conservation restriction. This paragraph C and Article 11 shall be interpreted to adhere to and be consistent with 26 C.F.R. Section 1.170A-14(g)(6)(ii).

**D. Application of Proceeds.** Grantee shall use any proceeds received under the circumstances described in this Article in a manner consistent with the Purpose, which is exemplified by this Conservation Easement.

## ARTICLE 12. ASSIGNMENT/SUCCESSOR GRANTEE

**A. Assignment.** This Conservation Easement is transferable, but Grantee may assign its rights and obligations under this Conservation Easement only to an organization that is a qualified organization at the time of transfer under Section 170(h) of the Code and 26 C.F.R. Section 1.170A-14 (or any successor provision then applicable), and authorized to acquire and hold conservation easements under Georgia law or the laws of the United States. As a condition of such transfer, Grantee shall require that the conservation purposes that this Conservation Easement is intended to advance, continue to be carried out and the transferee has a commitment to protect the conservation purposes and the resources to enforce this Conservation Easement. Grantee agrees to give written notice to Grantor of any assignment at least sixty (60) days prior to the date of such assignment. The failure of Grantee to give such notice shall not affect the validity of such assignment nor shall it impair the validity of this Conservation Easement or limit its enforceability in any way.

**B. Successor Grantee.** If, at any time, Grantee shall be unwilling or unable to continue as grantee hereunder, including, but not limited to, if Grantee ceases to exist or to be a qualified organization under Section 170(h) of the Code and 26 C.F.R. Section 1.170A-14, or to be authorized to acquire and hold conservation easements under the Georgia Act, then Grantee shall assign its rights and obligations under this Easement only to an organization that is a qualified organization at the time of transfer under Section 170(h) of the Code and 26 C.F.R. Section 1.170A-14 (or any successor provision then applicable), and authorized to acquire and hold conservation easements under the Georgia Act or any successor provision then applicable or the laws of the United States. As a condition of such transfer, Grantee shall require that the conservation purposes that this grant is intended to advance, continue to be carried out, and the transferee has a commitment to protect the conservation purposes and the resources to enforce this Easement. Grantee agrees to give written notice to Grantor of any assignment at least sixty (60) days prior to the date of such assignment. If Grantee cannot assign this Easement to a qualified successor Grantee, the rights and obligations under this Easement shall vest in such organization as a court of competent jurisdiction shall direct pursuant to applicable Georgia law and consistent with the requirements for an assignment

pursuant to Article 12 including that such successor grantee satisfies all of the requirements for an assignment pursuant to this Article 12.

## ARTICLE 13.

[Intentionally Omitted.]
## ARTICLE 14. SUBSEQUENT TRANSFERS

**A. Transfer.** Grantor agrees to incorporate the terms of this Conservation Easement by reference in any subsequent deed or other legal instrument by which it transfers any interest in all or a portion of the Property, including, without limitation, a leasehold interest. Grantor further agrees to give written notice to Grantee of the transfer of any interest at least twenty (20) days prior to the date of such transfer, and to provide the name and address of the new Grantor. The failure of Grantor to perform any act required by this Article shall not impair the validity of this Conservation Easement or limit its enforceability in any way.

**B. Merger.** The parties agree that, notwithstanding the operation of Georgia common law, the terms of this Conservation Easement shall survive any merger of the fee and easement interest in the Property. No deed, transfer, or assignment of any fee title interest in the Property to the Grantee, or any successor holder of this Easement, shall be effective if it will result in the merger of this Conservation Easement with the fee title interest in the Property. The provisions of this paragraph are intended to prevent such merger. The provisions of this paragraph shall apply, and shall be construed to apply, to the Grantee, as holder, and to any successor holder (which must be a qualified organization within the meaning of § 170(h) of the IRC and the corresponding Treasury Regulations) of this Easement.

**C. Documentation of Present Status.** Upon written request by Grantor, Grantee shall have thirty (30) days to execute and deliver to Grantor any document, including an estoppel certificate, that certifies Grantor's compliance with any obligation of Grantor contained in this Conservation Easement. Such documentation shall describe the condition of the Property, as known by Grantee, as of the date of Grantee's most recent inspection. If Grantor requests more current status information, then Grantee shall conduct an inspection and provide said information at Grantor's sole expense within forty-five (45) days following receipt of Grantor's request.

## ARTICLE 15. NOTICES

Any notice, demand, request, consent, approval, or communication that either Party desires or is required to give to the other shall be in writing and either delivered personally or sent by commercial courier service or first class mail, postage prepaid, return receipt requested, and addressed as follows:

> To Grantor: Log Creek, LLLP
> 1280 Snows Mill Rd.
> Bogart, GA 30622
> Attention: General Partners

To Grantee:    Oconee River Land Trust, Inc.
675 Pulaski St., #2300
Athens, Georgia 30601

## ARTICLE 16. RECORDATION

Grantee shall record this instrument in timely fashion in the official records of Wilkes County, Georgia, and may re-record it at any time as may be required to preserve its rights in this Conservation Easement.

## ARTICLE 17. GENERAL PROVISIONS

**A. Controlling Law.** The interpretation and performance of this Conservation Easement shall be governed by the laws of the State of Georgia.

**B. Liberal Construction.** Any general rule of construction to the contrary notwithstanding, this Easement shall be liberally construed in favor of the grant to effect the purpose of this Easement and the policy and purpose of O.C.G.A. §§ 44-10-1, et seq. (the "Georgia Act"), and to qualify as a qualified conservation contribution under the Code and 26 C.F.R. Section 1.170A-14 (the "Conservation Easement Regulations"). The Georgia Act and the Conservation Easement Regulations are sometimes referred to herein collectively as the "Conservation Easement Laws". If any provision in this instrument is found to be ambiguous, an interpretation consistent with the purpose of this Easement that would render the provision valid shall be favored over any interpretation that would render it invalid. This Easement is made pursuant to the Conservation Easement Laws, but the invalidity of such Conservation Easement Laws or any part thereof shall not affect the validity and enforceability of this Easement according to its terms, it being the intent of the parties to agree and to bind themselves, their successors, and their assigns in perpetuity to each term of this instrument whether this instrument be enforceable by reason of any statute, common law, or private agreement in existence either now or hereafter.

**C. Severability.** If any provision of this Conservation Easement, or the application thereof to any person or circumstance, is found to be invalid, the remainder of the provisions of this Conservation Easement, or the application of such provision to persons or circumstances other than those as to which it is found to be invalid, as the case may be, shall not be affected thereby.

**D. Entire Agreement.** This instrument and the documents incorporated herein by reference set forth the entire agreement of the Parties with respect to this Conservation Easement and supersede all prior discussions, negotiations, understandings, or agreements relating to this Conservation Easement, all of which are merged herein.

**E. No Forfeiture.** Nothing contained herein will result in a forfeiture or reversion of Grantor's title in any respect.

**F. Joint Obligation.** The obligations imposed by this Conservation Easement upon Grantor shall be joint and several.

**G. Successors.** The covenants, terms, conditions, and restrictions of this Conservation Easement shall be binding upon, and inure to the benefit of, Grantor and Grantee and shall continue as a servitude running in perpetuity with the Property. Except as expressly provided otherwise herein, the terms "Grantor" and "Grantee," wherever used herein, and any pronouns used in place thereof, shall include, respectively, the above-named Grantor and its personal representatives and heirs, and successors and assigns in interest in the Property after the date hereof, and the above-named Grantee and its personal representatives, heirs, successors, and assigns.

**H. Termination of Rights and Obligation.** A Party's rights and obligations under this Conservation Easement terminate upon transfer of the Party's interest in this Conservation Easement or Property, except that liability for acts or omissions occurring prior to transfer shall survive transfer.

**I. Captions.** The captions in this instrument have been inserted solely for convenience of reference and are not a part of this instrument and shall have no effect upon construction or interpretation.

**J. Counterparts.** The Parties may execute this instrument in two or more counterparts, that shall be signed by both Parties, and each counterpart shall be deemed an original instrument as against any Party who has signed it. In the event of any disparity between the counterparts produced, the recorded counterpart shall be controlling.

**K. Interpretation Consistent with Conservation Easement Regulations.** In the event of any ambiguity, inconsistency or conflict between the provisions contained herein and the provisions of Section 170(h) of the Code and 26 C.F.R. Section 1.170A-14 (collectively, the "Conservation Easement Regulations"), this Conservation Easement shall be interpreted and construed so that the provisions of the Conservation Easement Regulations shall control.

## ARTICLE 18. EXHIBITS; DOCUMENTATION

**A. Exhibits.** **Exhibit A**, Legal Description of the Property, is attached hereto and made a part hereof by reference. **Exhibit B**, Conservation Easement Map, is attached hereto and made a part hereof by reference. **Exhibit C**, Exceptions to Title is attached hereto and made a part hereof by reference.

**B. Baseline Documentation Report.** The Parties acknowledge that the Baseline Documentation Report, dated November 4, 2019 executed by both Grantor and Grantee, and a copy of which is on file at the office of Grantee, accurately and completely describes, to the best of Grantor's and Grantee's knowledge, the uses, structures, Conservation Values, and condition of the Property as of the date hereof.

**TO HAVE AND TO HOLD** this Conservation Easement unto Grantee and its successors and assigns, together with all and singular rights, members, and appurtenances thereof to the same being, belonging or in anywise appertaining, to the only proper use, benefit, and behoove of Grantee forever.

## SIGNATURE PAGE IMMEDIATELY FOLLOWS

**IN WITNESS WHEREOF**, the Parties hereto have set their hands and seals and caused these presents to be executed in their respective names by authority duly given, and their seals affixed, the day and year first above written.

Signed, sealed, and delivered
in the presence of:

Name: _Russell Wills_
      Unofficial Witness

Name: _Karen E. Mims_
      Notary Public

My Commission Expires:
_11/11/23_

**GRANTOR:**

Log Creek, LLLP

By: _____
Name: Tony D. Townley
Title: General Partner

By: _____
Name: Elizabeth A. Townley
Title: General Partner

[Affix Notary Seal]
Karen E Mims
NOTARY PUBLIC
OGLETHORPE COUNTY, GEORGIA
My Commission Expires
11/11/2023

*[Signatures continue on following page]*

22

Case 3:22-cv-00149-TES Document 54-1 Filed 10/28/22 Page 170 of 600

Signed, sealed, and delivered
in the presence of:

Name: _Steffrey Thompson_
      Unofficial Witness

Name: _Caroline Johnson Hall_
      Notary Public

My Commission Expires:
_October 31st, 2022_

**GRANTEE:**

Oconee River Land Trust, Inc.,
a Georgia nonprofit corporation

By: _John S. Willis_
Name: John S. Willis
Title: Vice Chair

Attest: _____
Name: Roger Nielsen
Title: Secretary

[Affix Notary Seal]



CAROLINE JOHNSON HALL
NOTARY PUBLIC
EXP. OCT 31, 2022
OCONEE COUNTY, GEORGIA

# EXHIBIT A
## Legal Description

(Tax Parcel No. 071-001) (Compartment Nos. 636-1 & 636-2E) P. E. SAMUEL TRACT
Compartment 1153636

All that certain lot, tract or parcel of land situate, lying and being in Wilkes County, Georgia containing Sixty-four and no/100 (64.00) acres, more or less, and being the property conveyed to The Champion Paper and Fibre Company by P. E. Samuels by Deed recorded in the Office of the Clerk of Superior Court of Wilkes County, Georgia, at Book A72, page 322, to which deed reference is hereby specially made; and

## SARAH W. THORNTON TRACT Compartment 1153636

All that certain lot, tract or parcel of land situate, lying and being in Wilkes County, Georgia containing Two Hundred Eighteen and 57/100 (218.57) acres, more or less, and being the property conveyed to The Champion Paper and Fibre Company by Mrs. Sarah W. Thornton by Deed recorded in the Office of the Clerk of Superior Court of Wilkes County, Georgia, at Book A75, page 349, to which deed reference is hereby specially made;

LESS AND EXCEPT from the property hereinabove described that certain 1.794 acres, more or less, of the SARAH W. THORNTON TRACT conveyed by Champion International Corporation to Harrison Brothers, Inc. by Warranty Deed dated December 29, 1981, recorded in Deed Book 115, Page 445, in the Office of the Clerk of Superior Court of Wilkes County, Georgia. Reference is hereby made to that certain Boundary Line Agreement between Don J. Harrison and Log Creek, LLLP, dated December 17, 2019, recorded in Deed Book 367, page 267, in said Clerk's Office.

**EXHIBIT B**
**Conservation Easement Map**



00628560.2/011119-000143

## EXHIBIT C

### Exceptions to Title

1.  State, county and school district ad valorem taxes for the year 2019 which, while a lien, are not yet due and payable.

2.  Such matters as may be revealed by a current accurate survey and inspection of the subject property.

3.  Rights of upper and lower riparian owners in and to any body of water running through or lying within the subject property or along any of its boundary lines, free from diminution or pollution.

4.  Easement in favor of Rayle Electric Membership Corporation dated July 28, 1939, recorded in Deed Book A63, Page 581, in the Office of the Clerk of the Superior Court of Wilkes County, Georgia.

5.  Forest Land Conservation Use Assessment Covenant recorded in Deed Book 313, Page 201, in said Clerk's Office.

6.  Rights of the public in and to that portion of the subject property lying within the right of way of Heard Road (unpaved) running within and along the northerly boundary line of the subject property as shown on plat of survey recorded in Plat Book 2, page 13, in said Clerk's Office.

7.  Boundary Line Agreement between Don J. Harrison and Log Creek, LLLP, dated December 17, 2019, recorded in Deed Book 367, page 267, in said Clerk's Office.

EXHIBIT B-2019 BROWN HARRIS

OCONEE RIVER LAND TRUST LOG CREEK 3



# Log Creek 3
## TALIAFERRO COUNTY, GA

## BASELINE DOCUMENTATION REPORT

**Prepared by Elizabeth Branch**
**As a project for the Oconee River Land Trust**

**Date of Report: 10/28/19**

**Project/Property Name:   Log Creek, LLLP (also referred to as "Property" in this report)**

**Baseline Gathered By:   ELIZABETH BRANCH**

**Qualifications**: Elizabeth Branch holds a Master of Science in Wildlife Biology with a certificate in Conservation Ecology and Sustainable Development from the University of Georgia.  She has been principal and owner of Natural Resource Consultants, LLC since 1998 and has extensive experience in land conservation and land management.   She is on the Advisory Board and served as President of the Madison Morgan Conservancy.

**Purpose of Baseline Documentation Report:**
This Baseline Documentation Report (BDR) has been prepared in order to document the subject Property's existing conditions, including conservation values, location, and man-made features. This BDR will also be used by Oconee River Land Trust (ORLT) as a reference point for future monitoring and enforcement activities.

## I. GENERAL INFORMATION

**A. Date Visited**
The Property was visited on October 17, 2019 by Elizabeth Branch. All portions of the tract and each habitat type were inspected on foot and by vehicle.

**B. Owner**
The current owner of the Property is **Log Creek, LLLP,** (Grantor). The current Property owner's address is 1280 Snows Mill Road, Bogart, GA 30622.

**C. Location**
The entrance to this tract is located at Raytown Rd NE, Crawfordville, GA 30631 in Taliaferro County, approximately 6 miles east of Crawfordville, GA. See **Attachment 1** for a location map.

**D. Directions from Crawfordville, GA**
To reach the Property from the center of Crawfordville, GA, travel east on Broad St for approximately 0.4 miles. Then turn left onto GA Hwy 47 (Sharon Rd NE) for approximately 5.7 miles. Continue straight onto Raytown Rd NE for approximately 1.5 miles and the Property is on the left. See the location map in **Attachment 1**.

**E. Survey and Legal Description**
The legal boundary (survey) of the Property is shown in **Attachment 2**. The legal description is shown in **Attachment 3**.

**F. Name of Quad Map, Series, Coordinates of Property**
USGS 7.5 min series Sharon, GA, Quadrangle Map. The center of the Property is at **33°34'12.13"N,  82°46'24.74"W.**

2

**G. Size**
The Property is approximately 272.98 acres.

## II.  INVENTORY REPORT

This baseline documents conditions on the Property as of the date of the report. It is not an exhaustive inventory, and conditions may change over time.

**A.  General Description of Property**
The Property exists as one tract in central Taliaferro County, GA. It is in the Little River Watershed HUC 03060105.

The Property is in a rural area surrounded by farms and timber properties.

The Property is primarily planted loblolly with narrow stream buffers along Reedy Creek and its tributaries.

An extensive road system provides access for recreation and future timber harvests. The interior roads are dirt and gravel.

See **Attachment 4** for an aerial view of the Property. For photos of the Property, see **Attachments 13** and **14**.

**B.  Topography**
The Property is gently rolling. Elevation varies between 460 and 580 feet above MSL, with the lowest points along Reedy Creek and the highest point near the entrance at Raytown Road NE. These topographic features can be seen in **Attachment 5**.

**C**.  **Soils and Geology**
The Property is located in the Southern Outer Piedmont Ecoregion of Georgia. **Attachment 19** shows the Property's location within Georgia's ecoregions. The soils in this region tend to be finer-textured than soils in the Coastal Plain Ecoregion. Once widely cultivated, much of Georgia's Piedmont has reverted to pine and hardwood woodlands.

Soils of the Chataula coarse sandy loam, Cataula-Cecil complex, Chewacla silt loam, Hard Labor-Appling complex, Helena loamy sand, Pacolet loamy sand, Prosperity-Helena complex, and Prosperity-Helena-Bush River complex make up the majority of the Property. A general soils map is presented in **Attachment 6**.

The USDA/NRCS classifies farmland based on how valuable it is for agriculture. The Property has approximately 71.7 acres (26%) of land that is classed as **Farmland of Statewide Importance** and 36.9 acres (14%) of **Prime Farmland**.

3

## D. Water Resources

Reedy Creek is a perennial stream that runs through the northwestern portion of the Property for approximately 2,560 feet.  A perennial tributary of Reedy Creek runs through the middle of the Property for approximately 4,780 ft before joining it. Another perennial tributary flows through the northern portion of the Property for approximately 590 ft and then joins Reedy Creek.  There are six ephemeral streams on the Property that feed into Reedy Creek and its tributaries and total 3,200 ft. After leaving the Property, Reedy Creek flows in a northeasterly direction for approximately 19,000 ft and then joins the Little River.

Reedy Creek is approximately 10 to 15 feet across with a sandy bottom and some bouldery shoals.  It has deep incising along some of its banks.

Reedy Creek and its tributaries are in the Little River Watershed, portions of which have been designated as **high priority watersheds** by Georgia Department of Natural Resources (GA DNR).  Streams are listed by the GA DNR and State Wildlife Action Plan documents as **high priority habitats** in the Piedmont Ecoregion of Georgia. See **Attachment 16** for descriptions of the kinds of high priority habitat that are found on the Property.

The Property's water resources are identified in **Attachment 7**, which shows a 200-foot riparian buffer on the perennial streams and a 100-foot riparian buffer on the ephemeral streams. **Attachment 20** shows the Property's location in the Little River Watershed. **Attachment 15** describes the Little River's journey through the Little River Watershed into the Savannah River Basin.

## E. Vegetation and Habitat

Current habitat and land use types are identified in the Ecological Features Map in **Attachment 9**.  The approximate acreage of each type is as follows: mature planted pine (168.4 acres), young planted pine (79.4), Mesic Hardwood (21.4 acres), and foodplots (3.0 acres)**. Mesic Hardwood Forest** and **Streams** are listed by the GA DNR and State Wildlife Action Plan documents as **high priority habitats** in the Piedmont Ecoregion of Georgia. See **Attachment 16** for descriptions of the kinds of high priority habitat that are found on the Property.

The majority of the Property is made up of planted pine. There are two stands of loblolly pine trees.  The largest was planted in 2006 and the other stand – which was previously Mesic Hardwood and Oak-Hickory-Pine forest – was harvested 4 years ago and planted in 2015. These stands are made up of loblolly pine, dog fennel, blackberries, sweetgum saplings and grasses.

The **Mesic Hardwood Forests** are located along Reedy Creek and its tributaries.  These stands are narrow and have a mature overstory of white oak, water oak, American sycamore, red maple, northern red oak, southern red oak, and sweetgum. The mid- and understories consist of overstory saplings, paw paw, river cane, wood oats, wild ginger, smartweed, greenbrier, matelea vine, and Christmas fern.

4

There are several small wildlife foodplots on the Property.  Some of these are well-maintained and have recently been planted.

Chinese privet, Chinaberry, Nepalese browntop, Japanese honeysuckle, and lespedeza – non-native species that are considered invasive by the Georgia Exotic Pest Council – were observed on the Property. See **Attachment 8** for a list of native and exotic plant species found on the Property, organized according to the kind of habitat in which they were observed.

## F.  Agricultural Resources
The Property is being utilized for timber production.

## G.  Wildlife
Field signs and individual sightings during the field surveys noted coyotes, gray squirrels, and white-tailed deer. Numerous resident and migrant songbirds, and other common landbirds, were also seen and heard while inspecting the tract, including cardinals, nuthatches, and blue jays. Though not observed on the Property, a host of other species typical of the Georgia Piedmont may be present. **Attachment 17** lists some of these species.

## H.  Rare or Endangered Species Known to Exist
No endangered or threatened species are known to occur on the Property. A full rare species survey was not conducted, but the Property has suitable habitat for some rare or endangered plant and animal species. **Attachment 18** lists some of these species.

## I. Cultural Resources
No cultural resources were observed on the Property.

## J. Scenic Character and Views from Public Roads/Waters
Scenic views of the Property are available from Raytown Road and Fairplay Road.

## K. Existing Man-Made Structures
The only man-made structures on the Property are roads and firebreaks. See **Attachment 11** for a map showing the locations of these man-made features.

## L. Evidence of Past Disturbances
No evidence of heavy storms, fires, or other large scale events was noted during visit.

## M. Former Land Uses
The Property has been used for timber production for the last several decades.  Timber production is evidenced by the young, even-aged planted pine and timber loading docks.

## N. Current Land Uses
The Property is used for timber production and outdoor recreation.

**O. Management Plan in Effect, If Any**
No management plan currently exists for the tract. Frank Willis, the landowner's forester, will complete an FMP for the Property.

**P. Zoning and Local Planning Restrictions, If Relevant**
There are no known zoning or planning restrictions in force that affect the use of this Property.

**Q. Adjacent Land Attributes and Uses; Existing and Potential Conflicts**
The Property is adjacent to farms and forested tracts of various sizes. There are no known conflicts with adjacent landowners.

**R. Amount and Type of Current Public Access and Public Use**
The landowner and invited guests hike, hunt, and observe wildlife on the Property at this time. No formal plans for public use exist.

**S. Evidence of Presence of Hazardous Waste**
No evidence of hazardous waste was noted during field visit.

**T. Proximity to Other Protected Land**
ORLT holds 2 conservation easments located within 5 miles of the Property – Harden and Aiken. See **Attachment 12** for a map showing nearby protected properties. A. H. Stephens State Park and various other county and city parks are also located within 10 miles of the Property.

**U. Benefits of Conservation**
The current owner has decided to place the Property under a conservation easement (CE) that protects its conservation values. These conservation values include **high priority streams**, **high priority watersheds**, and **high priority habitats** in the state of Georgia. Protecting these values benefits the public, and the plants and animals that live on the Property and in the larger watershed.

This CE protects streams and plant habitat in the Little River Watershed, segments of which have been designated **high priority watersheds**, by enhancing stream buffers and reducing non-point source pollution which is critical for protecting water quality. Non-point source pollution – a type of pollution consisting of mud, litter, bacteria, pesticides, fertilizers, and a variety of other pollutants that are washed into rivers and streams by rainwater – is common in Georgia's rivers and streams. Stream buffers reduce the amount of these pollutants entering the waterways, thereby improving surface and groundwater quality which benefits people by providing cleaner drinking water and better recreational opportunities. Good water quality also provides healthy habitat for plants and animals living in the watershed. In addition, rivers and riparian buffers on the Property act as valuable dispersal corridors for plant and animal species passing through the Property.

6

This CE protects **high priority habitats** as well, including habitat combinations that are important for many species of plants and animals. High priority habitats that the Property protects include: **Mesic Hardwood Forest** and **Streams**. See **Attachment 9** for the location of these habitats.

In addition, the Property supports active forestry lands, which also have conservation value. See **Attachment 10** for the location of the Forestry Envelope.

A two-acre Residential Envelope (RE) and a two-acre Barn Envelope (BE) are proposed for flat areas in the planted pine and along an existing interior roads. Given that the RE and BE are located in a flat areas along an existing road, and are not near any of the streams on the Property, the proposed RE and BE and uses will not impact the Property's conservation value. See **Attachment 10** for the location of the RE and BE.

Properly exercised, reserved rights and the permitted uses will not negatively impact the conservation values.

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

In compliance with Section 1.170A - 14(g)(5) of the federal tax regulations, LOG CREEK, LLLP, owner of the Property referenced and described by this report, and the OCONEE RIVER LAND TRUST, INC., do hereby acknowledge that this report is an accurate representation of the Property as of the date of the conveyance of the conservation easement referenced in this report by the landowner ("Grantor") to the Oconee River Land Trust ("Grantee").

Sworn to and subscribed before me

_Karen E Mims_

NOTARY PUBLIC

This the  23  day of  Dec  20 19

My commission expires:

(SEAL)   Karen E Mims
         NOTARY PUBLIC
   OGLETHORPE COUNTY, GEORGIA
      My Commission Expires
          11/11/2023


Sworn to and subscribed before me

_Caroline Johnson Hall_

NOTARY PUBLIC

This the  20th  day of  Dec  20 19

My commission expires: 10 - 31 - 2022

(SEAL)

**Log Creek, LLLP**

By: _____

Name: Tony D. Townley_

Title: General Partner

Date: _____

By: _____

Name: Elizabeth A. Townley

Title: General Partner

Date: _____


**Oconee River Land Trust, Inc.**

By: _John S. Willis_

Name: _John S. Willis_

Title: _Vice-chair_

Date: _Dec. 20, 2019_

8

## III. ATTACHMENTS

1. Location Map
2. Survey
3. Legal Description
4. Aerial Photograph
5. Topographic Map
6. Soils Map
7. Riparian Buffer Map
8. Plant List
9. Ecological Features Map
10. Conservation Easement Map
11. Man-Made Features Map
12. Nearby Protected Properties Map
13. Photo Location Map
14. Photos
15. Appendix 1: Water Resources
16. Appendix 2: Vegetation and Habitat
17. Appendix 3: Wildlife
18. Appendix 4: Rare or Endangered Species
19. Georgia Ecoregions Map
20. Georgia Watersheds Map

Map Disclaimer: Maps contained in this report are not surveys and must not be construed as surveys. The information imparted with these maps is meant to assist the parties in their efforts to clearly depict Property boundaries, describe placement of certain retained and reserved rights, and to calculate acreage figures. Property boundaries, while approximate, were established using the best available information that may include: surveys, tax maps, and field mapping using G.P.S. and/or ortho photos.

Unless otherwise noted, maps were created on October 24, 2019.

OCONEE RIVER LAND TRUST                                          LOG CREEK 3

## ATTACHMENT 1:  LOCATION MAP



10

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

## ATTACHMENT 2: SURVEY



OCONEE RIVER LAND TRUST                         LOG CREEK 3

## ATTACHMENT 3: LEGAL DESCRIPTION.

All that tract or parcel of land situate, lying and being in the 172nd District, G.M., Taliaferro County, Georgia, lying at the westerly corner of the intersection of Sharon-Raytown Road (an 80' right of way) and the centerline of the right of way of Fairplay Road (unpaved), containing 272.98 acres, more or less, as shown on plat of survey entitled "CERTIFY TO:  LOG CREEK, LLLP" by Baseline Surveying & Engineering, Inc., Matthew D. Ulmer, Registered Land Surveyor, dated October 16, 2019, recorded in Plat Book ___10_____, page ____63____, in the Office of the Clerk of the Superior Court of Taliaferro County, Georgia, which plat by reference thereto is incorporated herein.

OCONEE RIVER LAND TRUST                                        LOG CREEK 3

## ATTACHMENT 4:  AERIAL PHOTOGRAPH



OCONEE RIVER LAND TRUST                                      LOG CREEK 3

## ATTACHMENT 5: TOPOGRAPHIC MAP



Taliaferro County, GA

0    feet    750

1 in to 750 ft

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

## ATTACHMENT 6: SOILS MAP



Taliaferro County, GA

RLoGIS | Date: 10/22/2019                          NAIP (10/17/2017)

0    feet    750
1 in to 750 ft

15

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

## SOILS MAP LEGEND

| Map unit symbol | Map unit name | Farmland Classification | Acres | Percent |
|---|---|---|---|---|
| CaB | Cataula coarse sandy loam, 2 to 6 percent slopes, very bouldery | Not prime farmland | 31.3 | 11.47% |
| CaD | Cataula coarse sandy loam, 6 to 15 percent slopes, very bouldery | Not prime farmland | 2.3 | 0.84% |
| CcB2 | Cataula-Cecil complex, 2 to 6 percent slopes, moderately eroded | Farmland of statewide importance | 0.8 | 0.29% |
| ChA | Chewacla silt loam, 0 to 2 percent slopes, frequently flooded | Farmland of statewide importance | 34 | 12.46% |
| HbB | Hard Labor-Appling complex, 2 to 6 percent slopes | All areas are prime farmland | 26.1 | 9.56% |
| HbD | Hard Labor-Appling complex, 6 to 15 percent slopes | Not prime farmland | 8.1 | 2.97% |
| HnB | Helena loamy coarse sand, 2 to 6 percent slopes | All areas are prime farmland | 10.8 | 3.96% |
| HoC | Helena loamy sand, 6 to 10 percent slopes | Farmland of statewide importance | 32.3 | 11.84% |
| PaB | Pacolet loamy sand, 2 to 6 percent slopes | Not prime farmland | 10.6 | 3.88% |
| PaD | Pacolet loamy sand, 6 to 15 percent slopes, bouldery | Not prime farmland | 23.6 | 8.65% |
| PrE | Prosperity-Helena complex, 15 to 25 percent slopes, stony | Not prime farmland | 22.5 | 8.24% |
| PsB | Prosperity-Helena-Bush River complex, 2 to 6 percent slopes | Farmland of statewide importance | 4.6 | 1.69% |
| PsD | Prosperity-Helena-Bush River complex, 6 to 15 percent slopes | Not prime farmland | 65.9 | 24.15% |
| **Totals for Area of Interest** | | | **272.9** | **100%** |

16

EXHIBIT B - 2019 BROWN-HARRIS

OCONEE RIVER LAND TRUST                                      LOG CREEK 3

## ATTACHMENT 7: RIPARIAN BUFFER MAP



OCONEE RIVER LAND TRUST                                    LOG CREEK 3

## ATTACHMENT 8: PLANT LIST (List of Dominant, Co-Dominant and Understory Plant Species Identified on Property)

### Pine Forests

| Common Name | Scientific Name |
|---|---|
| **Dominant Species** | |
| Pine (Loblolly) | *Pinus taeda* |
| **Understory Species** | |
| Bluestem | *Andropogon* spp. |
| Asters | *Aster* spp. |
| American Beautyberry | *Callicarpa americana* |
| Trumpetcreeper | *Campsis radicans* |
| Spotted Wintergreen | *Chimaphila maculata* |
| Dogwood (Flowering) | *Cornus florida* |
| Dog Fennel | *Eupatorium capillifolium* |
| Carolina Jessamine | *Gelsemium sempervirens* |
| Lespedeza** | *Lespedeza* spp. |
| Sweetgum | *Liquidambar styraciflua* |
| Japanese Honeysuckle** | *Loniceria japonica* |
| Panic Grass | *Panicum* spp. |
| Oak (Southern Red) | *Quercus falcata* |
| Oak (Water) | *Quercus nigra* |
| Sumac | *Rhus* spp. |
| Plume Grass | *Saccharum alopecuroides* |
| Greenbrier | *Smilax* spp. |
| Goldenrod | *Solidago* spp. |
| Poison Ivy | *Toxicodendron radicans* |
| Muscadine Grape | *Vitus rotundifolia* |

18

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

## Mesic Hardwood Forests

| Common Name | Scientific Name |
|---|---|
| **Dominant Species** ||
| Sweetgum | *Liquidambar styraciflua* |
| Yellow Poplar | *Liriodendron tulipifera* |
| Oak (White) | *Quercus alba* |
| Oak (Southern Red) | *Quercus falcata* |
| Oak (Northern Red) | *Quercus rubra* |
| Oak (Water) | *Quercus nigra* |
| **Co-Dominant Species** ||
| Maple (Red) | *Acer rubrum* |
| Musclewood | *Carpinus caroliniana* |
| Dogwood (Flowering) | *Cornus florida* |
| Persimmon | *Diospyros virginiana* |
| Ash (Green) | *Fraxinus pennsylvanica* |
| American hophornbeam | *Ostrya virginiana* |
| American sycamore | *Platanus occidentalis* |
| Black Cherry | *Prunus serotina* |
| Elm (Winged) | *Ulmus alata* |
| **Understory Species** ||
| Wild ginger | *Asarum* spp. |
| River cane | *Arundinaria gigantea* |
| American beautyberry | *Callicarpa americana* |
| River oats | *Chasmanthium latifolium* |
| Longleaf woodoats | *Chasmanthium sessiliflorum* |
| Carolina jasmine | *Gelsemium sempervirens* |
| Japanese Honeysuckle** | *Lonicera japonica* |

19

EXHIBIT B 2019 BROWN HARRIS

OCONEE RIVER LAND TRUST                                           LOG CREEK 3

| | |
|---|---|
| Milkvine | *Matelea* spp. |
| Christmas fern | *Polystichum acrostichoides* |
| Blackberry | *Rubus* spp. |
| Greenbrier | *Smilax* spp. |
| Sparkleberry | *Vaccinium arboreum* |
| Muscadine Grape | *Vitus rotundifolia* |
| Netted chainfern | *Woodwardia areolata* |

**\*\* Denotes exotic species**

20

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

## ATTACHMENT 9: ECOLOGICAL FEATURES MAP



OCONEE RIVER LAND TRUST

LOG CREEK 3

## ATTACHMENT 10: CONSERVATION EASEMENT MAP



Taliaferro County, GA

22

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

## ATTACHMENT 11:  TOPOGRAPHIC MAP WITH MAN-MADE FEATURES



Taliaferro County, GA

0 feet 750
1 in to 750 ft

23

## ATTACHMENT 12: NEARBY PROTECTED PROPERTIES MAP



**ATTACHMENT 13: PHOTO LOCATION MAP**



Taliaferro County, GA

0 feet 750
1 in to 750 ft

OCONEE RIVER LAND TRUST

**ATTACHMENT 14: PHOTOGRAPHIC LOG**
**Photographer: Elizabeth Branch**          **Camera:   iPhone 7**
**Date: October 17, 2019**                        **Time: 11:00 AM**
**Weather: Sunny, 60° F, Calm Winds**



**CP1a:  Entrance to Property from Raytown Road**
**(33º 33' 54.38'' N, 82º 46' 13.31'' W, 55°)**



**CP1b: View of Property from Raytown Road facing west**
**(33º 33' 54.38'' N, 82º 46' 13.31'' W, 280°)**

26



**CP2a: Interior road through planted pine leading to potential Residential Envelope**
**(33º 34' 1.56'' N, 82º 46' 20.61'' W, 285°)**



**CP2b: View of road through pine facing south towards Raytown Road**
**(33º 34' 1.56'' N, 82º 46' 20.61'' W, 175°)**

Case 3:22-cv-... Document ... Filed ... Page 201 of 600



**CP3a: Small foodplot in young pine plantation with ephemeral stream in the distance**
**(33º 34' 8.19'' N, 82º 46' 28.77'' W, 250°)**



**CP3b: Foodplot along interior road**
**(33º 34' 8.19'' N, 82º 46' 28.77'' W, 80°)**

28

EXHIBIT B · 2019 BROWN-HARRIS

Case 3:22-cv-... Document ... Filed ... Page 202 of 600



**CP4a: Ephemeral stream in Mesic Hardwood Forest with red maple, sweetgum, river cane, and netted chain fern (33° 34' 9.76" N, 82° 46' 32.48" W, 275°)**



**CP4b: Mesic Hardwood Forest with Chasmanthium, muscadine, and beautyberry (33° 34' 9.76" N, 82° 46' 32.48" W, 165°)**

OCONEE RIVER LAND TRUST

EXHIBIT B 2019 BROWN HARRIS



**CP5a: Foodplot near ephemeral stream and planted pine**
(33º 34' 13.37'' N, 82º 46' 42.78'' W, 290º)



**CP5b: Planted loblolly pine with sweetgum, blackberry and broomsedge in understory**
(33º 34' 13.37'' N, 82º 46' 42.78'' W, 75º)

Case 3:22-cv-EXHIBIT B-2019 BROWN-HARRIS Page 204 of 600



**CP6a: Reedy Creek with river cane, river oats, dogwood, musclewood, red maple, Christmas fern, and American hop hornbeam along the banks (33º 34' 18.44'' N, 82º 46' 52.28'' W, 120°)**



**CP6b: Boulders along the banks of Reedy Creek with sand and silt along the bottom (33º 34' 18.44'' N, 82º 46' 52.28'' W, 270°)**



**CP7a: Firebreak between 2006 and 2015 planted pine
(33º 34' 19.17" N, 82º 46' 48.41" W, 45º)**



**CP7b: View over young planted pine with hardwood along the banks of Reedy Creek in the
distance (33º 34' 19.17" N, 82º 46' 48.41" W, 285º)**

Case 3:22-cv-... Document... Page 206 of 600



**CP8a: Interior woods road through planted pine**
**(33° 34' 16.24'' N, 82° 46' 39.43'' W, 70°)**



**CP8b: Loblolly pine planted in 2006**
**(33° 34' 16.24'' N, 82° 46' 39.43'' W, 110°)**



**CP9: View of young planted pine with Reedy Creek in the distance from firebreak overgrown with broomsedge and dog fennel (33° 34' 20.31" N, 82° 46' 36.93" W, 260°)**



**CP10a: Pine plantation with broomsedge, sweetgum, dog fennel and smilax in the understory (33° 34' 10.61" N, 82° 46' 24.18" W, 120°)**

Case 3:22-cv-00049-ELR Document 42-2 Filed 10/24/23 Page 208 of 600



**CP10b: Recently plowed firebreak between 2006 and 2015 planted pine**
**(33° 34' 10.61'' N, 82° 46' 24.18'' W, 210°)**



**CP11a: Boulders along the banks of tributary to Reedy Creek**
**(33° 34' 8.21'' N, 82° 46' 16.66'' W, 110°)**

Case 3:22-cv-00049-CDL   Document 41-1   Filed 10/24/23   Page 209 of 600



**CP11b: Narrow riparian buffer along stream with poplar, white oak, green ash, river oats, jasmine, and Christmas fern (33° 34' 8.21'' N, 82° 46' 16.66'' W, 320°)**



**CP12a: Interior woods road near entrance off of Fairplay Road**
**(33° 34' 16.68'' N, 82° 46' 12.04'' W, 85°)**

Case 3:22-cv-00149-CDL  Document 43-1  Filed 07/17/23  Page 210 of 600



**CP12b:  Well-maintained interior woods road through planted pine**
**(33º 34' 16.68'' N, 82º 46' 12.04'' W, 265º)**



**CP13a: Ephemeral stream with river cane, netted chain fern, and white oak**
**(33º 34' 21.31'' N, 82º 46' 22.23'' W, 280º)**

OCONEE RIVER LAND TRUST LOG CREEK 3



**CP13b: Hardwood along stream with water oak, Chasmanthium, sweetgum and red maple**
**(33° 34' 21.31'' N, 82° 46' 22.23'' W, 70°)**



**CP14a: Foodplot within young planted pine near ephemeral stream**
**(33° 34' 22.15'' N, 82° 46' 25.78'' W, 260°)**

Case 3:22-cv-00149 Document 41-9 Filed 10/13/23 Page 212 of 600



**CP14b: Firebreak utilized as four-wheeler trail leading to foodplot**
**(33º 34' 22.15" N, 82º 46' 25.78" W, 80º)**



**C15a: Hardwood adjacent to tributary of Reedy Creek**
**(33º 34' 21.72" N, 82º 46' 28.6" W, 60º)**

Case 3:22-cv-00069 Document 41-9 Filed 02/17/25 Page 213 of 600



**CP15b: Tributary of Reedy Creek with incised banks and sandy bottom
(33º 34' 21.72'' N, 82º 46' 28.6'' W, 160°)**



**CP16a: Hardwood adjacent to Reedy Creek with musclewood, Chasmanthium, and
Christmas fern (33º 34' 29.91'' N, 82º 46' 37.97'' W, 160°)**

Case 3:22-cv-... Document 41... Filed 0... Page 214 of 600



**CP16b: Reedy Creek flowing through hardwood near the lowest point on the Property**
**(33º 34' 29.91" N, 82º 46' 37.97" W, 215º)**



**CP17a:  Deeply incised banks along Reedy Creek at juncture where it merges with tributary**
**(33º 34' 29.41" N, 82º 46' 38.93" W, 50º)**

Case 3:22-cv-00049 Document 41-3 Filed 01/17/24 Page 215 of 600
EXHIBIT B - 2019 BROWN-HARRIS



**CP17b: Reedy Creek with sandy bottom running through hardwood forest**
**(33º 34' 29.41" N, 82º 46' 38.93" W, 120º)**



**CP18a: Foodplot near tributary to Reedy Creek**
**(33º 34' 30.32" N, 82º 46' 44.37" W, 115º)**

42



**CP18b: Firebreak near tributary to Reedy Creek between 2006 and 2015 planted pine (33° 34' 30.32" N, 82° 46' 44.37" W, 195°)**



**CP19a: Interior road near northwestern property line traveling over tributary to Reedy Creek (33° 34' 31.73" N, 82° 46' 45.33" W, 30°)**



**CP19b: Culvert pipe under road for tributary of Reedy Creek**
**(33° 34' 31.73" N, 82° 46' 45.33" W, 320°)**



**CP20a: Bridge on Fairplay Road over Reedy Creek**
**(33° 34' 32.8" N, 82° 46' 36.41" W, 10°)**

EXHIBIT B 2019 BROWN-HARRIS



**CP20b: Hardwood adjacent to Reedy Creek with river cane, American sycamore, sweetgum, and matelea vine (33° 34' 32.8" N, 82° 46' 36.41" W, 170°)**



**CP20c:  Reedy Creek**
**(33° 34' 32.8" N, 82° 46' 36.41" W, 250°)**

## ATTACHMENT 15: APPENDIX ON WATER RESOURCES

The Little River Watershed is approximately 765 square miles. The Little River is the dominant river in the watershed. It originates in Greene and Oglethorpe Counties and flows east in a slightly northeast direction until it merges with the Savannah River at Clarks Hill Lake at the downstream reach of the reservoir. The backwater from the lake extends far up into the Little River creating an arm of the lake. The Little River Watershed is part of the greater Savannah River basin. The Savannah River originates in Hart County at the confluence of the Tugaloo and Seneca Rivers and flows in a southerly direction for over 300 miles until it empties in the Atlantic Ocean. It also forms the Georgia/South Carolina border. The Savannah River Basin drains approximately 10,577 square miles.

## ATTACHMENT 16: APPENDIX ON VEGETATION AND HABITAT*

**Mesic Hardwood Forests**: Non-wetland forests of floodplains, ravines, and north-facing slopes in the Piedmont. These may include species such as American beech, white oak, northern red oak, bitternut hickory, pignut hickory, shagbark hickory, bigleaf magnolia, yellow poplar, blackgum, dogwood, black cherry, and loblolly pine. Typical shrubs include spicebush, sweetshrub, pawpaw, Oconee azalea, rusty viburnum, and pinxter-flower.

**Streams:** In the upper Piedmont, streams are low to moderate gradient and typically contain well-defined riffles and pools. Substrate consists of gravel, pebble, sand, and silt; some bedrock may also be present. Lower Piedmont streams are lower gradient, have fewer riffles and pools, and their substrates have a higher proportion of silt, clay, and detritus than upper Piedmont streams. Turbidity is highly variable, but most of these streams become highly turbid after rain.

*These habitat descriptions are quoted from Appendix pages A-23 and A-25 in Georgia DNR's "Georgia State Wildlife Action Plan."

## ATTACHMENT 17: APPENDIX ON WILDLIFE*

Small mammals such as fox squirrels, wood rats, voles, and shrews may be present. A varity of native reptiles and amphibians may also live here, including various non-venomous water snakes, rat snakes, copperhead snakes, canebrake rattlesnakes, green tree frogs, fence lizards, and green anoles. In addition, neotropical migrants like the gray catbird, field sparrow, pine warbler, and prairie warbler could utilize the forests that occur on this Property.

*See Appendices in Georgia DNR's "Georgia State Wildlife Action Plan."

## ATTACHMENT 18: APPENDIX ON RARE OR ENDANGERED SPECIES*

Among plants that are rare and unusual in the Georgia Piedmont, and therefore classified by the GA DNR as high priority species in that ecoregion, the following species are known to occur in the kinds of forests and ecosystems that are found on the Property:

> *Quercus Taliaferronsis* (Taliaferro Oak)
> *Trepocarpus aethusae* (Trepocarpus)

46

Among the animal species that are classified as species of concern in the Georgia Piedmont, the following species are known to occur in the kinds of habitats that are found on the Property:

*Cambarus strigosus* (Lean Crayfish)
*Lampropeltis rhombomaculata* (Mole Kingsnake)
*Moxostoma sp. 4* (Brassy Jumprock)
*Notropis scepticus* (Sandbar Shiner)
*Peucaea aestivalis* (Bachman's Sparrow)

\*See Appendices in Georgia DNR's 2015 "Georgia State Wildlife Action Plan."

Case 3:22-cv-XXXX-XXXX Document XX-X Filed XX/XX/XX Page 221 of 600

## ATTACHMENT 19: GEORGIA ECOREGIONS MAP



Case 3:22-cv-00049 Document 49 Filed 10-17 Page 222 of 600

# EXHIBIT B 2049 BROWN-HARRIS

## ATTACHMENT 20: GEORGIA WATERSHEDS MAP



Property is in the Little River Watershed



# Log Creek 4
## WILKES COUNTY, GA

## BASELINE DOCUMENTATION REPORT

### Prepared by Elizabeth Branch
### As a project for the Oconee River Land Trust

### Date of Report: 11/4/19

**Project/Property Name:   Log Creek, LLLP (also referred to as "Property" in this report)**

**Baseline Gathered By:   ELIZABETH BRANCH**

**Qualifications**: Elizabeth Branch holds a Master of Science in Wildlife Biology with a certificate in Conservation Ecology and Sustainable Development from the University of Georgia. She has been principal and owner of Natural Resource Consultants, LLC since 1998 and has extensive experience in land conservation and land management. She is on the Advisory Board and served as President of the Madison Morgan Conservancy.

**Purpose of Baseline Documentation Report:**
This Baseline Documentation Report (BDR) has been prepared in order to document the subject Property's existing conditions, including conservation values, location, and man-made features. This BDR will also be used by Oconee River Land Trust (ORLT) as a reference point for future monitoring and enforcement activities.

## I.  GENERAL INFORMATION

### A.  Date Visited
The Property was visited on October 23, 2019 by Elizabeth Branch. All portions of the tract and each habitat type were inspected on foot and by vehicle.

### B.  Owner
The current owner of the Property is **Log Creek, LLLP,** (Grantor). The current Property owner's address is 1280 Snows Mill Road, Bogart, GA 30622.

### C.  Location
The entrance to this tract is located at Heard Road, Tignall, GA 30668 in Wilkes County, approximately 13 miles north of Washington, GA. See **Attachment 1** for a location map.

### D.  Directions from Washington, GA
To reach the Property from the center of Washington, GA, travel east on E. Robert Toombs Ave. (Hwy 78) for approximately 0.4 miles. Then turn left onto Poplar Dr (Hwy 44). Continue to follow Hwy 44 for 0.9 miles. Turn left onto Tignall Rd. (Hwy 17) for approximately 8.9 miles. Make a slight right onto Delhi Rd. for approximately 1 mile. Turn right onto Heard Rd. The Property is approximately 0.3 miles down on the left. See the location map in **Attachment 1**.

### E.  Survey and Legal Description
A composit Plat of the Property is shown in **Attachment 2**. The legal description is shown in **Attachment 3**.

2

### F.  Name of Quad Map, Series, Coordinates of Property
USGS 7.5 min series Broad and Tignall, GA, Quadrangle Map. The center of the Property is at **33º 52' 33.24" N, 82º 43' 12.86" W.**

### G.  Size
The Property is approximately 280.776 acres.

## II.  INVENTORY REPORT

This baseline documents conditions on the Property as of the date of the report. It is not an exhaustive inventory, and conditions may change over time.

### A.  General Description of Property
The Property exists as one tract in central Wilkes County, GA. It is in the Upper Savannah River Watershed HUC 03060103.

The Property is in a rural area surrounded by farms and timber properties.

The Property is primarily planted loblolly with narrow stream buffers along the streams.

An extensive road system provides access for recreation and future timber harvests. The interior roads are dirt and gravel.

See **Attachment 4** for an aerial view of the Property. For photos of the Property, see **Attachments 15** and **16**.

### B.  Topography
The Property is gently rolling. Elevation varies between 470 and 610 feet above MSL, with the lowest points along the tributary of Newford Creek and the highest point near the entrance at Heard Road. These topographic features can be seen in **Attachment 5**.

### C.  Soils and Geology
The Property is located in the Southern Outer Piedmont Ecoregion of Georgia. **Attachment 6** shows the Property's location within Georgia's ecoregions. The soils in this region tend to be finer-textured than soils in the Coastal Plain Ecoregion. Once widely cultivated, much of Georgia's Piedmont has reverted to pine and hardwood woodlands.

Soils of the Cartecay loam, Georgeville silt loam, Georgeville clay loam, and Tocoaa loam make up the majority of the Property. A general soils map is presented in **Attachment 7**.

The USDA/NRCS classifies farmland based on how valuable it is for agriculture. The Property has approximately 6.3 acres (2.3%) of land that is classed as **Farmland of Statewide Importance** and 66 acres (24%) of **Prime Farmland**.

3

### D. Water Resources

A major tributary of Newford Creek forms the southern property line for approximately 4,010 ft. This is a perennial stream which is approximately 5 to 8 feet across with a sandy bottom and some boulders along the bottom.  There are 9 ephemeral streams which total 5,640 ft and 2 intermittent streams that total approximately 1,680 ft that feed into the perennial tributary of Newford Creek. There are some eroded gullies and deep incising along some of these streams.  After leaving the Property, the major tributary joins Newford Creek in approximately 580 feet. Newford Creek flows in a northeasterly direction for approximately 45,000 ft and then joins the J. Strom Thurmond Reservior.

Newford Creek and its tributaries are in the Upper Savannah River Watershed, portions of which have been designated as **high priority watersheds** by Georgia Department of Natural Resources (GA DNR).  Streams are listed by the GA DNR and State Wildlife Action Plan documents as **high priority habitats** in the Piedmont Ecoregion of Georgia. See **Attachment 18** for descriptions of the kinds of high priority habitat that are found on the Property.

The Property's water resources are identified in **Attachment 9**, which shows a 200-foot riparian buffer on the perennial streams and 100-foot riparian buffer on the ephemeral streams. **Attachment 8** shows the Property's location in the Upper Savannah River Watershed. **Attachment 17** describes the Upper Savannah River Watershed and the Savannah River's journey into the Savannah River Basin.

### E. Vegetation and Habitat

Current habitat and land use types are identified in the Ecological Features Map in **Attachment 11**. The approximate acreage of each type is as follows: thinned planted pine (203.3 acres), young planted pine (hardwood cutover – 38.6 acres), Mesic Hardwood (19.9 acres), Bottomland Hardwood (11 acres), and foodplots (4.7 acres)**. Mesic Hardwood Forest, Bottomland Hardwood Forest** and **Streams** are listed by the GA DNR and State Wildlife Action Plan documents as **high priority habitats** in the Piedmont Ecoregion of Georgia. See **Attachment 18** for descriptions of the kinds of high priority habitat that are found on the Property.

The majority of the Property is made up of planted pine. There are two stands of loblolly pine trees.  The largest is a mature open stand which was thinned in 2010.  The second stand was previously mature hardwood and was clearcut in 2011 and planted in 2012 and 2013. These stands are made up of loblolly pine, dog fennel, blackberries, sweetgum saplings and grasses.

The **Mesic Hardwood Forests** are located along the ephemeral streams.  These stands are narrow and have a mature overstory of white oak, water oak, Carolina silverbell, red maple, northern red oak, southern red oak, and sweetgum. The mid- and understories consist of overstory saplings, paw paw, Chasmanthium, wild ginger, smartweed, greenbrier, and Christmas fern.

4

The **Bottomland Hardwood Forest** is located in the frequently flooded areas adjacent to the tributary of Newford Creek. This habitat's overstory contains hophornbeam, musclewood, green ash, river birch, yellow poplar, red maple, sweetgum, black gum, and water oak. The understory and midstory contain Chasmanthium, river cane, ground cedar, Chinese privet, and grasses.

There are several small wildlife foodplots on the Property. Some of these are well-maintained and have recently been planted.

Chinese privet, Chinaberry, Nepalese browntop, Japanese honeysuckle, and lespedeza – non-native species that are considered invasive by the Georgia Exotic Pest Council – were observed on the Property. See **Attachment 10** for a list of native and exotic plant species found on the Property, organized according to the kind of habitat in which they were observed.

**F. Agricultural Resources**
The Property is being utilized for timber production.

**G. Wildlife**
Field signs and individual sightings during the field surveys noted coyotes, gray squirrels, and white-tailed deer. Numerous resident and migrant songbirds, and other common landbirds, were also seen and heard while inspecting the tract, including cardinals, nuthatches, and blue jays. Though not observed on the Property, a host of other species typical of the Georgia Piedmont may be present. **Attachment 19** lists some of these species.

**H. Rare or Endangered Species Known to Exist**
No endangered or threatened species are known to occur on the Property. A full rare species survey was not conducted, but the Property has suitable habitat for some rare or endangered plant and animal species. **Attachment 20** lists some of these species.

**I. Cultural Resources**
No cultural resources were observed on the Property.

**J. Scenic Character and Views from Public Roads/Waters**
Scenic views of the Property are available from Heard Road.

**K. Existing Man-Made Structures**
The only man-made structures on the Property are roads and a hunt camp which is made up of RV trailers. See **Attachment 13** for a map showing the locations of these man-made features.

**L. Evidence of Past Disturbances**
No evidence of heavy storms, fires, or other large scale events was noted during visit.

5

**M. Former Land Uses**
The Property has been used for timber production for the last several decades. Timber production is evidenced by the young, even-aged planted pine and timber loading docks.

**N. Current Land Uses**
The Property is used for timber production and outdoor recreation.

**O. Management Plan in Effect, If Any**
A management plan is currently in progress by Frank P. Wills.

**P. Zoning and Local Planning Restrictions, If Relevant**
There are no known zoning or planning restrictions in force that affect the use of this Property.

**Q. Adjacent Land Attributes and Uses; Existing and Potential Conflicts**
The Property is adjacent to farms and forested tracts of various sizes. There are no known conflicts with adjacent landowners.

**R. Amount and Type of Current Public Access and Public Use**
The landowner and invited guests hike, hunt, and observe wildlife on the Property at this time. No formal plans for public use exist.

**S. Evidence of Presence of Hazardous Waste**
No evidence of hazardous waste was noted during field visit.

**T. Proximity to Other Protected Land**
See **Attachment 14** for a map showing nearby protected properties. Wilkes County Wildlife Management Area, Washington-Wilkes Park and Recreation Area and various other county and city parks are also located within 10 miles of the Property. Creekside, an ORLT conservation easement, is located approximately 10 miles northeast of the Property.

**U. Benefits of Conservation**
The current owner has decided to place the Property under a conservation easement (CE) that protects its conservation values. These conservation values include **high priority streams**, **high priority watersheds**, and **high priority habitats** in the state of Georgia. Protecting these values benefits the public, and the plants and animals that live on the Property and in the larger watershed.

This CE protects streams and plant habitat in the Upper Savannah River Watershed, segments of which have been designated **high priority watersheds**, by enhancing stream buffers and reducing non-point source pollution which is critical for protecting water quality. Non-point source pollution – a type of pollution consisting of mud, litter, bacteria, pesticides, fertilizers, and a variety of other pollutants that are washed into rivers and streams by

rainwater – is common in Georgia's rivers and streams. Stream buffers reduce the amount of these pollutants entering the waterways, thereby improving surface and groundwater quality which benefits people by providing cleaner drinking water and better recreational opportunities. Good water quality also provides healthy habitat for plants and animals living in the watershed. In addition, rivers and riparian buffers on the Property act as valuable dispersal corridors for plant and animal species passing through the Property.

This CE protects **high priority habitats** as well, including habitat combinations that are important for many species of plants and animals. High priority habitats that the Property protects include: **Bottomland Hardwood Forest, Mesic Hardwood Forest** and **Streams**. See **Attachment 11** for the location of these habitats.

In addition, the Property supports active forestry lands, which also have conservation value. See **Attachment 10** for the location of the Forestry Envelope.

A two-acre Residential Envelope (RE) is proposed for a flat area in the planted pine, along an existing interior road. A 2- acre Barn Envelope is is proposed for a flat area at the top of a hill along an interior road in the forestry envelope. Given that the envelopes are both near existing roads, in flat areas, and not in close proximity to streams, wetlands, and hardwood forests, they will not negatively impact the Property's conservation value. See **Attachment 10** for the location of the RE.

Properly exercised, reserved rights and the permitted uses will not negatively impact the conservation values.

OCONEE RIVER LAND TRUST                                          LOG CREEK 4

In compliance with Section 1.170A - 14(g)(5) of the federal tax regulations, LOG CREEK, LLLP, owner of the Property referenced and described by this report, and the OCONEE RIVER LAND TRUST, INC., do hereby acknowledge that this report is an accurate representation of the Property as of the date of the conveyance of the conservation easement referenced in this report by the landowner ("Grantor") to the Oconee River Land Trust ("Grantee").

Sworn to and subscribed before me

NOTARY PUBLIC

This the ___23___ day of _Dec_ 20_19_

My commission expires:

(SEAL)
Karen E Mims
NOTARY PUBLIC
OGLETHORPE COUNTY, GEORGIA
My Commission Expires
11/11/2023

**Log Creek, LLLP**

By: _____

Name: Tony D. Townley

Title: General Partner

Date: _____

By: _____

Name: Elizabeth A. Townley

Title: General Partner

Date: _____

Sworn to and subscribed before me

NOTARY PUBLIC

This the _20th_ day of _Dec_ 20_19_

My commission expires: _Oct-31-2022_

(SEAL)

CAROLINE JOHNSON HALL
NOTARY PUBLIC
OCONEE COUNTY, GEORGIA
EXP. OCT. 31, 2022

**Oconee River Land Trust, Inc.**

By: _John L. Willis_

Name: _John G. Willis_

Title: _Vice-chair_

Date: _Dec. 20, 2019_

8

OCONEE RIVER LAND TRUST                                                    LOG CREEK 4

# III. ATTACHMENTS

1. Location Map
2. Composit Plat
3. Legal Description
4. Aerial Photograph
5. Topographic Map
6. Georgia Ecoregions Map
7. Soils Map
8. Georgia Watersheds Map
9. Riparian Buffer Map
10. Plant List
11. Ecological Features Map
12. Conservation Easement Map
13. Man-Made Features Map
14. Nearby Protected Properties Map
15. Photo Location Map
16. Photos
17. Appendix 1: Water Resources
18. Appendix 2: Vegetation and Habitat
19. Appendix 3: Wildlife
20. Appendix 4: Rare or Endangered Species

Map Disclaimer: Maps contained in this report are not surveys and must not be construed as surveys. The information imparted with these maps is meant to assist the parties in their efforts to clearly depict Property boundaries, describe placement of certain retained and reserved rights, and to calculate acreage figures. Property boundaries, while approximate, were established using the best available information that may include: surveys, tax maps, and field mapping using G.P.S. and/or ortho photos.

Unless otherwise noted, maps were created on October 30, 2019.

OCONEE RIVER LAND TRUST

LOG CREEK 4

## ATTACHMENT 1: LOCATION MAP



OCONEE RIVER LAND TRUST                                    LOG CREEK 4

## ATTACHMENT 2: COMPOSIT PLAT



OCONEE RIVER LAND TRUST

LOG CREEK 4

## ATTACHMENT 3:  LEGAL DESCRIPTION

(Tax Parcel No. 071-001) (Compartment Nos. 636-1 & 636-2E) P. E. SAMUEL TRACT Compartment 1153636

All that certain lot, tract or parcel of land situate, lying and being in Wilkes County, Georgia containing Sixty-four and no/100 (64.00) acres, more or less, and being the property conveyed to The Champion Paper and Fibre Company by P. E. Samuels by Deed recorded in the Office of the Clerk of Superior Court of Wilkes County, Georgia, at Book A72, page 322, to which deed reference is hereby specially made; and

SARAH W. THORNTON TRACT Compartment 1153636

All that certain lot, tract or parcel of land situate, lying and being in Wilkes County, Georgia containing Two Hundred Eighteen and 57/100 (218.57) acres, more or less, and being the property conveyed to The Champion Paper and Fibre Company by Mrs. Sarah W. Thornton by Deed recorded in the Office of the Clerk of Superior Court of Wilkes County, Georgia, at Book A75, page 349, to which deed reference is hereby specially made;

LESS AND EXCEPT from the property hereinabove described that certain 1.794 acres, more or less, of the SARAH W. THORNTON TRACT conveyed by Champion International Corporation to Harrison Brothers, Inc. by Warranty Deed dated December 29, 1981, recorded in Deed Book 115, Page 445, in the Office of the Clerk of Superior Court of Wilkes County, Georgia.  Reference is hereby made to that certain Boundary Line Agreement between Don J. Harrison and Log Creek, LLLP, dated December 17, 2019, recorded in Deed Book 367, page 267, in said Clerk's Office.

12

OCONEE RIVER LAND TRUST

LOG CREEK 4

## ATTACHMENT 4: AERIAL PHOTOGRAPH



Wilkes County, GA

0   feet   700
1 in to  700 ft

13

OCONEE RIVER LAND TRUST                                    LOG CREEK 4

## ATTACHMENT 5: TOPOGRAPHIC MAP



Wilkes County, GA

0    feet   1,100
1 in to  1,100 ft

14

OCONEE RIVER LAND TRUST                                    LOG CREEK 4

## ATTACHMENT 6: GEORGIA ECOREGIONS MAP



# EXHIBIT B: 2019 HEARD ROAD

OCONEE RIVER LAND TRUST                                    LOG CREEK 4

## ATTACHMENT 7: SOILS MAP



Wilkes County, GA

OCONEE RIVER LAND TRUST

LOG CREEK 4

## SOILS MAP LEGEND

| Map unit symbol | Map unit name | Farmland Classification | Acres | Percent |
|---|---|---|---|---|
| Ca | Cartecay loam, 0 to 2 percent slopes, frequently flooded | Farmland of statewide importance | 1.8 | 0.50% |
| GeB | Georgeville silt loam, 2 to 6 percent slopes | All areas are prime farmland | 66 | 23.90% |
| GeC | Georgeville silt loam, 6 to 10 percent slopes | Not prime farmland | 12.9 | 4.70% |
| GeE | Georgeville silt loam, 10 to 25 percent slopes | Not prime farmland | 9 | 3.20% |
| GoC2 | Georgeville clay loam, 6 to 10 percent slopes, eroded | Not prime farmland | 107.2 | 38.80% |
| GoE2 | Georgeville clay loam, 10 to 25 percent slopes, eroded | Not prime farmland | 76.1 | 27.20% |
| To | Toccoa loam, occasionally flooded | Farmland of statewide importance | 4.5 | 1.60% |
| **Totals for Area of Interest** | | | **277.5** | **100%** |

17

OCONEE RIVER LAND TRUST                                    LOG CREEK 4

## ATTACHMENT 8: GEORGIA WATERSHEDS MAP



OCONEE RIVER LAND TRUST                                    LOG CREEK 4

## ATTACHMENT 9: RIPARIAN BUFFER MAP



Wilkes County, GA

EXHIBIT D - HEARD ROAD

OCONEE RIVER LAND TRUST                                    LOG CREEK 4

## ATTACHMENT 10: PLANT LIST (List of Dominant, Co-Dominant and Understory Plant Species Identified on Property)

### Pine Forests

| Common Name | Scientific Name |
|---|---|
| **Dominant Species** | |
| Pine (Loblolly) | *Pinus taeda* |
| **Understory Species** | |
| Bluestem | *Andropogon* spp. |
| Asters | *Aster* spp. |
| American Beautyberry | *Callicarpa americana* |
| Trumpetcreeper | *Campsis radicans* |
| Dogwood (Flowering) | *Cornus florida* |
| Dog Fennel | *Eupatorium capillifolium* |
| Carolina Jessamine | *Gelsemium sempervirens* |
| Lespedeza** | *Lespedeza* spp. |
| Sweetgum | *Liquidambar styraciflua* |
| Japanese Honeysuckle** | *Loniceria japonica* |
| Panic Grass | *Panicum* spp. |
| Oak (Southern Red) | *Quercus falcata* |
| Oak (Water) | *Quercus nigra* |
| Sumac | *Rhus* spp. |
| Blackberry | *Rubus* spp |
| Plume Grass | *Saccharum alopecuroides* |
| Greenbrier | *Smilax spp.* |
| Goldenrod | *Solidago* spp. |
| Poison Ivy | *Toxicodendron radicans* |
| Muscadine Grape | *Vitus rotundifolia* |

OCONEE RIVER LAND TRUST                                    LOG CREEK 4

### Mesic Hardwood Forests

| Common Name | Scientific Name |
|---|---|
| **Dominant Species** | |
| Sweetgum | *Liquidambar styraciflua* |
| Yellow Poplar | *Liriodendron tulipifera* |
| Oak (White) | *Quercus alba* |
| Oak (Southern Red) | *Quercus falcata* |
| Oak (Northern Red) | *Quercus rubra* |
| Oak (Water) | *Quercus nigra* |
| **Co-Dominant Species** | |
| Maple (Red) | *Acer rubrum* |
| Musclewood | *Carpinus caroliniana* |
| Dogwood (Flowering) | *Cornus florida* |
| Persimmon | *Diospyros virginiana* |
| Ash (Green) | *Fraxinus pennsylvanica* |
| Carolina silverbell | *Halesia carolina* |
| American hophornbeam | *Ostrya virginiana* |
| Black Cherry | *Prunus serotina* |
| Elm (Winged) | *Ulmus alata* |
| **Understory Species** | |
| Wild ginger | *Asarum* spp. |
| River cane | *Arundinaria gigantea* |
| Paw paw | *Asimina triloba* |
| American beautyberry | *Callicarpa americana* |
| River oats | *Chasmanthium latifolium* |
| Longleaf woodoats | *Chasmanthium sessiliflorum* |

21

EXHIBIT D 2019 HEARD ROAD

OCONEE RIVER LAND TRUST                                    LOG CREEK 4

| Carolina jasmine | Gelsemium sempervirens |
|---|---|
| Japanese Honeysuckle** | Loniceria japonica |
| Smartweed | Polygonum spp. |
| Christmas fern | Polystichum acrostichoides |
| Blackberry | Rubus spp. |
| Greenbrier | Smilax spp. |
| Sparkleberry | Vaccinium arboreum |
| Muscadine Grape | Vitus rotundifolia |

### Bottomland Hardwood Forests

| Common Name | Scientific Name |
|---|---|
| **Dominant Species** | |
| Maple (Red) | Acer rubrum |
| Sweetgum | Liquidambar styraciflua |
| Yellow Poplar | Liriodendron tulipifera |
| Oak (Water) | Quercus nigra |
| **Co-Dominant Species** | |
| Boxelder | Acer negundo |
| Green Ash | Faxinus pennsylcanica |
| Musclewood | Magnolia virginiana |
| American Hophornbeam | Ostrya virginiana |
| **Understory Species** | |
| River Cane | Arundinaria gigantea |
| Longleaf Woodoats | Chasmanthium sessiliflorum |
| Sedge | Cyperus spp. |
| Ground cedar | Diphasianstrum digitatum |
| Japanese Honeysuckle** | Loniceria japonica |
| Chinese Privet** | Lugustrum sinense |

22

OCONEE RIVER LAND TRUST                                          LOG CREEK 4

| Nepalese Browntop** | *Microstegium vimineum* |
| Smartweed | *Polygonum* spp. |
| Christmas Fern | *Polystichum acrostichoides* |
| Greenbrier | *Smilax* spp. |
| Muscadine Grape | *Vitus rotundifolia* |

**\*\* Denotes exotic species**

OCONEE RIVER LAND TRUST                                LOG CREEK 4

## ATTACHMENT 11: ECOLOGICAL FEATURES MAP



Wilkes County, GA

OCONEE RIVER LAND TRUST                                        LOG CREEK 4

## ATTACHMENT 12:  CONSERVATION EASEMENT MAP



OCONEE RIVER LAND TRUST                                    LOG CREEK 4

## ATTACHMENT 13: TOPOGRAPHIC MAP WITH MAN-MADE FEATURES



## ATTACHMENT 14: NEARBY PROTECTED PROPERTIES MAP



## ATTACHMENT 15: PHOTO LOCATION MAP



**Wilkes County, GA**

**ATTACHMENT 16: PHOTOGRAPHIC LOG**

| | |
|---|---|
| Photographer: Elizabeth Branch | Camera: iPhone 7 |
| Date: October 23, 2019 | Time: 12:00 PM |

Weather: Sunny, 60° F, Calm Winds



**CP1a: Entrance to Property from Heard Road**
(33º 52' 57.27" N, 82º 43' 10.71" W, 100°)



**CP1b: View of Property from Heard Road facing northwest**
(33º 52' 57.27" N, 82º 43' 10.71" W, 285°)



**CP2a: Mature planted pine near Heard Road and potential Residential Envelope near interior roads (33° 52' 52.77" N, 82° 43' 11.35" W, 275°)**



**CP2b: Smaller interior road through pine also accessing potential Residential Envelope (33° 52' 52.77" N, 82° 43' 11.35" W, 85°)**



**CP3a: Hunt camp in mature planted pine along interior road near Heard Rd**
(33º 52' 49.23'' N, 82º 42' 59.15'' W, 250°)



**CP3b: Hunt camp along interior road near Heard Rd**
(33º 52' 49.23'' N, 82º 42' 59.15'' W, 80°)

Case 3:22-cv-00114-... Document 1-1 Filed 10/14/22 Page 254 of 600



**CP4a: Interior road through planted pine**
(33º 52' 43.49'' N, 82º 42' 57.72'' W, 285°)



**CP4b: Juncture of two interior roads and foodplot within planted pine stand**
(33º 52' 43.49'' N, 82º 42' 57.72'' W, 190°)



**CP5a: Foodplot in planted pine in southeastern portion of Property**
**(33º 52' 40.35'' N, 82º 42' 52.7'' W, 140º)**



**CP5b: Road to foodplot through planted pine**
**(33º 52' 40.35'' N, 82º 42' 52.7'' W, 325º)**



**CP6a: Transition between mature pine and young planted pine near ephemeral stream along eastern property line (33° 52' 40.99'' N, 82° 42' 48.88'' W, 250°)**



**CP6b: View from same CP looking towards young planted pine
(33° 52' 40.99'' N, 82° 42' 48.88'' W, 70°)**



**CP7a: Loblolly pine plantation that was thinned in 2010**
**(33º 52' 35.53'' N, 82º 42' 50.91'' W, 45°)**



**CP7b: Interior woods road through planted pine**
**(33º 52' 35.53'' N, 82º 42' 50.91'' W, 285°)**



**CP8a: Tributary of Newford Creek along southern property line with northern red oak, sweetgum and Christmas fern (33° 52' 28.16'' N, 82° 42' 47.94'' W, 260°)**



**CP8b: Perennial tributary of Newford Creek with boulders and sandy bottom (33° 52' 28.16'' N, 82° 42' 47.94'' W, 110°)**



**CP9a: Ephemeral stream that flows into major tributary of Newford Creek**
**(33° 52' 27.23'' N, 82° 42' 50.11'' W, 160°)**



**CP9b: Ephemeral stream with sweetgum, hophornbeam, musclewood, and Christmas fern**
**(33° 52' 27.23'' N, 82° 42' 50.11'' W, 340°)**

Case 3:22-cv-0... Document ... Filed ... Page 260 of 600



**CP10a: Bottomland Hardwood Forest adjacent to Newford Creek tributary along southern property line (33º 52' 25.4'' N, 82º 42' 54.12'' W, 170º)**



**CP10b: Bottomland Hardwood with Chasmanthium, paw paw, osage orange, sweetgum ground cedar and water oak (33º 52' 25.4'' N, 82º 42' 54.12'' W, 290º)**



**CP11a: Bottomland Hardwood Forest adjacent to perennial tributary of Newford Creek (33° 52' 22.31'' N, 82° 43' 3.57'' W, 320°)**



**CP11b: Bottomland Hardwood Forest with wild ginger, paw, paw, Chasmanthium, sweetgum and green ash (33° 52' 22.31'' N, 82° 43' 3.57'' W, 85°)**



**CP12a: Intermittent stream just above tributary of Newford Creek showing signs of erosion**
**(33° 52' 23.39'' N, 82° 43' 7.25'' W, 185°)**



**CP12b: Intermittent stream with river cane, Christmas fern, sweetgum and white oak**
**(33° 52' 23.39'' N, 82° 43' 7.25'' W, 280°)**



**CP13a: Intermittent stream in narrow strip of Mesic Hardwood Forest in center of Property**
**(33° 52' 27.95" N, 82° 43' 7.91" W, 20°)**



**CP13b: Transition between Mesic Hardwood Forest and young planted pine**
**(33° 52' 27.95" N, 82° 43' 7.91" W, 80°)**

41



**CP14: Transition between young planted pine and mature, thinned pine (33º 52' 28.92'' N, 82º 43' 10.93'' W, 190º)**



**C15a: View of young planted pine from foodplot with dog fennel, erigeron, broomsedge, and lespedeza (33º 52' 33.24'' N, 82º 43' 12.86'' W, 60°)**



**CP15b: Mature, thinned loblolly pine adjacent to foodplot**
**(33° 52' 33.24" N, 82° 43' 12.86" W, 160°)**



**CP16a: Newford Creek tributary flowing through hardwood along southern property line**
**(33° 52' 25.48" N, 82° 43' 18.49" W, 280°)**



**CP16b: Perennial tributary of Newford Creek**
**(33º 52' 25.48'' N, 82º 43' 18.49'' W, 115°)**



**CP17a: Hardwood adjacent to intermittent stream with Chasmanthium, wild ginger and**
**sweetgum (33º 52' 28.13'' N, 82º 43' 17.72'' W, 290°)**



**CP17b: Hardwood adjacent to intermittent stream with black gum, Carolina silverbell, northern red oak, dogwood, and Christmas fern (33° 52' 28.13" N, 82° 43' 17.72" W, 290°)**



**CP17c: Intermittent stream just south of stream crossing (33° 52' 28.13" N, 82° 43' 17.72" W, 210°)**



**CP18: Erosion on interior road in southern portion of Property**
**(33° 52' 29.92" N, 82° 43' 20.68" W, 305°)**



**CP19: Thinned loblolly pine with understory of sweetgum saplings, smilax, Carolina jasmine**
**and blackberry (33° 52' 40.51" N, 82° 43' 25.3" W, 25°)**



**CP20a:  Interior road near northwestern property line leading to foodplot**
**(33º 52' 48.07'' N, 82º 43' 34.09'' W, 30º)**



**CP20b: Foodplot within thinned pine stand in northwestern portion of Property**
**(33º 52' 48.07'' N, 82º 43' 34.09'' W, 320º)**

## ATTACHMENT 17: APPENDIX ON WATER RESOURCES

The Savannah River is the dominant waterbody in the Upper Savannah River Watershed HUC 03060103. It creates the border between Georgia and South Carolina. The Chattooga and Tallulah Rivers join the Savannah River headwaters to form the Tugaloo River. The Chattooga River is one of the longest and largest free-flowing mountain streams in the southeast. The Savannah River originates in Hart County at the confluence of the Tugaloo and Seneca Rivers and flows in a southerly direction for over 300 miles until it empties in the Atlantic Ocean. The Savannah River Basin drains approximately 10,577 square miles.

## ATTACHMENT 18: APPENDIX ON VEGETATION AND HABITAT*

**Bottomland Hardwood Forests:** Forested wetlands of alluvial river floodplains, characterized by a diverse association of deciduous hardwood trees. Canopy dominants vary, but may include water oak, willow oak, overcup oak, cherrybark oak, swamp chestnut oak, green ash, sweetgum, bitternut hickory, and pignut hickory. Shrub layer may be dense or relatively sparse, containing a variety of mesophytic or hydrophytic woody plants and often a significant woody vine component. Many of these habitats have been impacted by invasive exotic species such as Chinese privet and Nepalese browntop.

**Mesic Hardwood Forests**: Non-wetland forests of floodplains, ravines, and north-facing slopes in the Piedmont. These may include species such as American beech, white oak, northern red oak, bitternut hickory, pignut hickory, shagbark hickory, bigleaf magnolia, yellow poplar, blackgum, dogwood, black cherry, and loblolly pine. Typical shrubs include spicebush, sweetshrub, pawpaw, Oconee azalea, rusty viburnum, and pinxter-flower.

**Streams:** In the upper Piedmont, streams are low to moderate gradient and typically contain well-defined riffles and pools. Substrate consists of gravel, pebble, sand, and silt; some bedrock may also be present. Lower Piedmont streams are lower gradient, have fewer riffles and pools, and their substrates have a higher proportion of silt, clay, and detritus than upper Piedmont streams. Turbidity is highly variable, but most of these streams become highly turbid after rain.

*These habitat descriptions are quoted from Appendix pages A-23 and A-25 in Georgia DNR's "Georgia State Wildlife Action Plan."

## ATTACHMENT 19: APPENDIX ON WILDLIFE*

Small mammals such as fox squirrels, wood rats, voles, and shrews may be present. A varity of native reptiles and amphibians may also live here, including various non-venomous water snakes, rat snakes, copperhead snakes, canebrake rattlesnakes, green tree frogs, fence lizards, and green anoles. In addition, neotropical migrants like the gray catbird, field sparrow, pine warbler, and prairie warbler could utilize the forests that occur on this Property.

*See Appendices in Georgia DNR's "Georgia State Wildlife Action Plan."

## ATTACHMENT 20: APPENDIX ON RARE OR ENDANGERED SPECIES*

48

Among plants that are rare and unusual in the Georgia Piedmont, and therefore classified by the GA DNR as high priority species in that ecoregion, the following species are known to occur in the kinds of forests and ecosystems that are found on the Property:

*Trillium discolor* (Pale Yellow Trillium)

Among the animal species that are classified as species of concern in the Georgia Piedmont, the following species are known to occur in the kinds of habitats that are found on the Property:

*Distocambarus devexus (Broad River Burrowing Crayfish)*
*Hemidactylium scutatum (Four-toed Salamander)*
*Lampropeltis rhombomaculata* (Mole Kingsnake)
*Peucaea aestivalis* (Bachman's Sparrow)


*See Appendices in Georgia DNR's 2015 "Georgia State Wildlife Action Plan."

EXHIBIT C - 2019 BROWN-PARRIS
Case 3:22-cv-... Document 44-1 Filed 0... Page 272 of 600

# Appraisal Report

**Log Creek LLLP**



**272.98 Acres of Land**
**From Larger 1,242.12 Acre Tract**
**Along the North Side of Raytown Road and**
**the South and West Side of Fair Play Road,**
**Taliaferro County**
**Georgia, 30631**

**Valuation of the**
**Conservation Easement**

**Kenny & Associates**
**Real Estate Appraisers**

# Table of Contents

| SECTION | PAGE NUMBER |
|---|---|
| Table of Contents | 2 |
| Introduction | 5 |
| Value Summary | 5 |
| Appraisal Intent | 9 |
| Intended Use | 9 |
| Client and Intended User | 9 |
| Purpose | 12 |
| Liability Limitations and User Agreements | 15 |
| Appraiser Competency | 15 |
| Certification | 16 |
|  |  |
| SECTION 1 – EXECUTIVE SUMMARY |  |
|  |  |
| 1.1. Appraisal Problem | 18 |
| 1.2. Appraisal Purpose | 18 |
| 1.3. Executive Summary | 19 |
| 1.4. Subject Photos | 21 |
|  |  |
| SECTION 2 – APPRAISAL CONDITIONS |  |
| 2.1. Basic Assumptions and Limiting Conditions | 28 |
| 2.2. Extraordinary Assumptions | 30 |
| 2.3. Hypothetical Conditions | 30 |
|  |  |
| SECTION 3 – APPLICABLE TERMS |  |
| 3.1. Conservation Easement | 31 |
| 3.2. Charitable Gift Through an Easement | 32 |
| 3.3. Qualified Appraisal & Qualified Appraiser | 33 |
| 3.4. Property Rights Appraised | 39 |
| 3.5. Market Value | 39 |
| 3.6. Value Opinion | 39 |
| 3.7. Report Type | 40 |
|  |  |
| SECTION 4 – Area and Market Analysis |  |
| 4.1. Southeastern United States | 42 |
| 4.2. Regional Area Data | 60 |
| 4.3. Metropolitan Statistical Area | 74 |
|  |  |
| SECTION 5 – SUBJECT CHARACTERISTICS |  |
| 5.1. Marketing and Exposure | 84 |
| 5.1.1. Marketing Time | 84 |

Case 3:22-cv-02071-N Document 41-1 Filed 10/12/23 Page 274 of 600

EXHIBIT C – 2019 BROWN PARRIS

| SECTION | PAGE NUMBER |
|---|---|

| | |
|---|---|
| 5.1.2. Exposure Time | 85 |
| 5.2. History | 85 |
| 5.2.1. Current Contracts, Options or Offerings | 86 |
| 5.2.2. Zoning | 86 |
| 5.2.3. Taxes | 87 |
| 5.3. Legal Description | 88 |
| Subject Maps | 90 |
| 5.3.1. Survey | 90 |
| 5.3.2. Location | 91 |
| 5.3.3. Neighborhood | 92 |
| 5.3.4. Aerial Map | 93 |
| 5.3.5. Flood | 94 |
| 5.3.6. Subject Plat | 96 |
| 5.4. Site Description | 96 |
| | |
| SECTION 6 – ANALYSIS | |
| 6.1. Conservation Easement/Contiguous Parcel Overview | 103 |
| 6.1.1. Contiguous/Non-Contiguous Parcel | 104 |
| 6.1.2. Conservation Easement Parcel/Larger Parcel ID | 106 |
| 6.1.3. Enhancement Analysis | 107 |
| 6.1.4. Appraisal Approach | 109 |
| 6.2. Scope of Work | 109 |
| 6.3. Before Conservation Easement | 124 |
| 6.3.1. Highest and Best Use | 124 |
| 6.3.2. Approaches to Value | 143 |
| 6.3.2.1. Income Approach | 143 |
| Value Estimate | 196 |
| 6.3.2.2. Sales Comparison Approach | 197 |
| 6.3.3. Highest and Best Use (Excluded Tracts) | 200 |
| 6.3.3.1. Sales Comparison Approach | 202 |
| 6.3.3.2. Comparable Land Sales Descriptions | 215 |
| Value Reconciliation | 228 |
| 6.4. After Conservation Easement | 230 |
| 6.4.1. Highest and Best Use | 230 |
| 6.4.2. Income Approach | 232 |
| 6.4.3. Sales Comparison Approach | 233 |
| 6.4.4. Easement Encumbered Land Sales | 234 |
| Value Estimate | 236 |
| 6.4.4.1. Comparable Sales Description | 237 |
| Comparable Sales Locations | 251 |
| 6.4.5. Value Reconciliation | 251 |
| 6.4.5.1. Sales Comparison Approach | 251 |
| 6.4.5.2. Sales Comparison Approach | 251 |
| 6.4.5.3. Fair Market Value Indication | 252 |

EXHIBIT C - 2019 BROWN-HARRIS

| SECTION | PAGE NUMBER |
|---|---|
| SECTION 7 – FINAL RECONCILIATION | 253 |
| 7.1. Summary of Values | 253 |
| 7.2. Easement Valuation | 253 |
| 7.3. Conservation Easement Property Impact | 253 |
| | |
| SECTION 8 – ADDENDA | |
| 8.1. Professional Qualifications | |
| 8.2. Liability Insurance | |
| 8.3. Baseline Documentation Report | |
| 8.4. Technical Due Diligence Business Plan and Market Analysis | |
| 8.5. Deed of Conservation Easement | |

EXHIBIT C 2019 BROWN-HARRIS

Log Creek LLLP
EIN: ████████
1280 Snows Mill Road,
Bogart, Georgia 30622

Dear Sir/Madam:

At your request, we have estimated the Fair Market Value of the Conservation Easement, located along the north side of Raytown Road and the South and West Side of Fair Play Road, just east of Georgia Highway 47 and just north of Interstate 20, in Taliaferro County, Georgia. The purpose of this report is to determine the impact of the conservation easement on the subject property; thus, we have valued the subject property before and after the donation of the Conservation Easement. The effective date of the appraisal (and the valuation conclusions reached herein) is the date of recording of the conservation easement deed on the subject property.

It is our opinion that the Fair Market Value in Fee Simple Estate, before the conservation easement, of the total Contiguous Family-Owned Parcel of 1,242.12 Acres, consisting of 272.98 Acres of land encumbered by the conservation easement, a 600.25-Acre Tract Excluded (Southern Tract), and a 368.89-Acre Tract Excluded (Northern Tract), based on the Highest and Best Use of the 272.98 Acres as a Mining Development, 600.25 Acres as Recreational Land, and the 368.89 Acres as Recreational Land, located along the north side of Raytown Road and the South and West Side of Fair Play Road, just east of Georgia Highway 47 and just north of Interstate 20, in Taliaferro County, Georgia, as of December 31, 2019 is:

| Area Encumbered (272.98 Ac) | + | Southern Tract (600.25 Ac) | + | Northern Tract (368.89 Ac) | = | Reconciled Value Before |
|---|---|---|---|---|---|---|
| $66,590,000 | + | $990,000 | + | $630,000 | = | $68,210,000 |

**SIXTY-EIGHT MILLION TWO HUNDRED TEN THOUSAND DOLLARS**

**($68,210,000)**

EXHIBIT C 2019 BROWN-PARRIS

Case 3:22-cv-... Document... Filed... Page 277 of 600

It is our opinion that the Fair Market Value in Fee Simple Estate subject to the conservation easement for the total Contiguous Family-Owned Parcel of 1,242.12 acres, consisting of 272.98 Acres encumbered by the conservation easement, a 600.25-Acre Tract Excluded (Southern Tract), and a 368.89-Acre Tract Excluded (Northern Tract), located along the north side of Raytown Road and the South and West Side of Fair Play Road, just east of Georgia Highway 47 and just north of Interstate 20, in Taliaferro County, Georgia, as of December 31, 2019 is:

| Area Encumbered (272.98 Ac) | + | Southern Tract (600.25 Ac) | + | Northern Tract (368.89 Ac) | = | Reconciled Value After |
|---|---|---|---|---|---|---|
| $300,000 | + | $990,000 | + | $630,000 | = | $1,920,000 |

**ONE MILLION NINE HUNDRED TWENTY THOUSAND DOLLARS**

**($1,920,000)**

It is our opinion that the Fair Market Value of the Conservation Easement located along the north side of Raytown Road and the South and West Side of Fair Play Road, just east of Georgia Highway 47 and just north of Interstate 20, in Taliaferro County, Georgia, as of December 31, 2019 is:

| Reconciled Value Before | - | Reconciled Value After | - | Enhancement Value | = | Value of CE |
|---|---|---|---|---|---|---|
| $68,210,000 | - | $1,920,000 | - | $0 | = | $66,290,000 |
| | | | | Rounded | = | $66,290,000 |

**SIXTY-SIX MILLION TWO HUNDRED NINETY THOUSAND DOLLARS**

**($66,290,000)**

| | |
|---|---|
| Value Before the Conservation Easement | $68,210,000 |
| Land Value After the Conservation Easement | $ 1,920,000 |
| Minus Enhancement Value | $ 0.00 |
| Value of the Conservation Easement | $66,290,000 rd. |

As of the date of appraisal, Log Creek LLLP does not own any property that would benefit from the conservation easement and there are no known partnerships or individuals considered to be a "related person" under Internal Revenue Code Sections 267(b) and 707(b) that would benefit from the conservation easement. Accordingly, no reduction in value has been assessed due to the enhancement in value of any other property. As stated throughout this report, approximately 8,099.28 acres of contiguous and non-contiguous land is owned by Log Creek LLLP (an entity considered to be a "related person" as defined by Treas. Reg. §267(b)).

Of note, 969.14 Acres (Southern Tract and Northern Tract) (Parcel 048-017 - 91.85 Acres, Parcel 047-012 – 314.3 Acres, and Parcel 048-006 – 562.99 Acres) is contiguous to the subject property (272.98 Acres). It is the appraisers' opinion that the contiguous land owned by Log Creek LLLP does not benefit from the conservation easement placed on the 272.98 acres of the subject property. This determination is based on the location of the subject property in rural Taliaferro County and the contiguous acreage being located across Fair Play Road and Raytown Road. It is the appraisers' opinion that a buyer would not pay more for any of the properties considered for enhancement due to the location of the parcels compared to the location of the subject property and as the majority of the land in the area is rural land or agricultural land. It is the appraisers' opinion that a buyer would not be influenced by a conservation easement due to the rural nature of the area and the availability of undeveloped land. A list of the parcels can be found in the chart below.

| Parcels Considered for Enhancement - Contiguous | | |
|---|---|---|
| Owner | Parcel # | Acreage |
| Log Creek LLLP | 048-017 | 91.85 |
| Log Creek LLLP | 047-012 | 314.30 |
| Log Creek LLLP | 048-006 | 562.99 |
| Total: | | 969.14 |

It is the appraisers' opinion that the non-contiguous land owned by Log Creek LLLP does not benefit from the conservation easement placed on the 272.98 acres of the subject property. This determination is based on the location of the subject property in rural Taliaferro County. It is the appraisers' opinion that a buyer would not pay more for any of the properties considered for enhancement due to the location of the parcels compared to the location of the subject property and as the majority of the land in the area is rural land or agricultural land. It is the appraisers' opinion that a buyer would not be influenced by a conservation easement due to the rural nature of the area and the availability of undeveloped land. A list of the parcels can be found in the chart below.

| Parcels Considered for Enhancement - Non-Contiguous | | |
|---|---|---|
| Owner | Parcel # | Acreage |
| Log Creek LLLP | 014-004 | 108.80 |
| Log Creek LLLP | 014-005 | 227.24 |
| Log Creek LLLP | 016-019 | 129.15 |
| Log Creek LLLP | 021-013B | 683.41 |
| Log Creek LLLP | 029-012 | 20.70 |
| Log Creek LLLP | 030-009 | 149.40 |
| Log Creek LLLP | 030-036 | 242.63 |
| Log Creek LLLP | 032-006 | 117.22 |
| Log Creek LLLP | 035-042 | 58.16 |
| Log Creek LLLP | 036-004 | 676.40 |
| Log Creek LLLP | 037-007 | 28.42 |
| Log Creek LLLP | 037-054 | 278.00 |
| Log Creek LLLP | 038-003 | 63.76 |
| Log Creek LLLP | 038-017 | 29.42 |
| Log Creek LLLP | 043-024C | 54.24 |
| Log Creek LLLP | 044-001 | 701.41 |
| Log Creek LLLP | 044-001X | 43.00 |
| Log Creek LLLP | 044-043 | 120.72 |
| Log Creek LLLP | 045-002 | 1,554.16 |
| Log Creek LLLP | 048-024 | 152.00 |
| Log Creek LLLP | 048-025 | 85.77 |
| Log Creek LLLP | 049-012 | 234.85 |
| Log Creek LLLP | 049-014 | 15.69 |
| Log Creek LLLP | 051-017B | 294.00 |
| Log Creek LLLP | 052-009 | 1,016.28 |
| Log Creek LLLP | 052-009B | 18.17 |
| Log Creek LLLP | 052-009C | 27.14 |
| Total: | | 7,130.14 |

For the purpose of this report, the subject property refers to the 272.98 acres encumbered by the conservation easement.

For the purpose of this report, the Southern Tract refers to the 600.25 acres excluded from the conservation easement.

For the purpose of this report, the Northern Tract refers to the 368.89 acres excluded from the conservation easement.

For the purpose of this report, the Contiguous Parcel refers to the 1,242.12 acres which includes the 272.98 acres encumbered by the conservation easement, the Southern Tract (600.25 Acres), and the Northern Tract (368.89 Acres) excluded from the conservation easement.

EXHIBIT C - 2019 BROWN-PARRIS



## **Intent of Appraisal**

## **Intended Use**

This report is intended for use only by Log Creek LLLP and the Oconee River Land Trust, Inc. The report was prepared for use and submission to aid the IRS and the United States District Court in accurately determining the value of the conservation easement. It is prepared for the owner's use and submission to the IRS and District Court as evidence of the value of a charitable contribution for the subject property due to the placement of a conservation easement. Use of this report by others is not intended by the appraisers. This report is not intended for any other purpose.

## **Client and Intended User**

The sole intended users of this report are Log Creek LLLP and Oconee River Land Trust, Inc. The client is Log Creek LLLP. The intended users of review are the IRS and the United States District Court in determining the accurate fair market value for federal tax purposes. Intended users include current members and all entities and/or individuals considering an ownership interest in Log Creek LLLP. Other parties or entities who obtain a copy of the report may not rely upon any opinions or conclusions contained in the report unless such party or entity has expressly been identified by Kenny & Associates, Inc. as an intended user.

EXHIBIT C - 2019 BROWN-PARRIS

This appraisal is a qualified appraisal prepared by qualified appraisers under applicable Treasury Regulations. The appraisal was prepared for Income Tax purposes, according to Treasury Regulations. It is not to be distributed or relied upon by others without our express written consent. This letter and express written consent must remain attached to the appraisal report for the opinion of fair market value set forth herein to be valid. Our employment was not conditional upon producing a specific value or any value within a given range. Future employment prospects are not dependent upon producing a specific value. No part of the fee arrangement nor portion of the appraisal fee was based on a percentage of the appraised value. Treas. Reg. § 1.170A-17. The appraisers understand that an intentionally false or fraudulent overstatement of the value of the property described in the qualified appraisal or appraisal summary may subject the appraisers to civil penalty under Section 6701 for aiding and abetting an understatement of tax liability, in addition to the appraisal being disregarded pursuant to 31 U.S.C. 330 (c).

According to Treas. Reg. § 1.170A-17(a)(8) with regard to the timing of receipt of a qualified appraisal: "The qualified appraisal must be received by the donor before the due date, including extensions, of the return on which a deduction is first claimed, or reported in the case of a donor that is a partnership or S corporation, under section 170 with respect to the donated property, or, in the case of a deduction first claimed, or reported, on an amended return, the date on which the return is filed."

The appraisers understand that the Treasury Regulations require the following declaration be made within the appraisal report: "I understand that my appraisal will be used in connection with a return or claim for refund. I also understand that, if there is a substantial or gross valuation misstatement of the value of the property claimed on the return or claim for refund that is based on my appraisal, I may be subject to a penalty under section 6695A of the Internal Revenue Code, as well as other applicable penalties. I affirm that We have not been at any time in the three-year period ending on the date of the appraisal barred from presenting evidence or testimony before the Department of the Treasury or the Internal Revenue Service pursuant to 31 U.S.C. section 330(c)" Treas. Reg. § 1.170A-17(a)(3)(vi). Accordingly, this declaration by the appraiser is made under the section entitled, "Certification."

The analyses, opinions, and conclusions contained herein were developed, and this report prepared, in accordance with the reporting requirements and Standards of OTS 12 CFR 323 and 564. Additionally, the requirements of the Code of Professional Ethics, the Standards of Professional Appraisal Practice of the Appraisal Institute, and the Uniform Standards of Professional Appraisal Practice (USPAP) as promulgated by the Appraisal Foundation and Title XI of the Federal Financial Institutions Reform Act of 1989 were followed in the development of this report.

In preparing this appraisal report we relied on, referenced, reproduced information from, and used sources including, but not limited to, the following: the Uniform Standards of Professional Appraisal Practice (USPAP) by the Appraisal Foundation Code of Professional Ethics; the Standards of Professional Appraisal Practice of the Appraisal Institute; the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants; Treas. Reg. § 1.170A-13; Treas. Reg. §1.170A-1; Treas. Reg. §1.170A-17; United States Census Bureau data; The Dictionary of Real Estate Appraisal, published by the Appraisal Institute; Title XI of the Federal Financial Institutions Reform Act of 1989; PwC Real Estate Investor Survey; and the publication Valuing Land Affected by Conservation Easements: Guidance from Federal Law and Regulation published by Stephen J. Small for the Lincoln Institute of Land Policy.

Case 3:22-cv-01056-TKW-ZTA Document 41-4 Filed 01/12/23 Page 282 of 600

EXHIBIT C 2019 BROWN-PARRIS

Information was also utilized and conveyed based on interviews with market participants, personal research, and third-party services. Sources include, but are not limited to: U.S. Census Bureau, Regional Commission, brokers and owners, the County Development Authority, State Department of Labor Office, Federal and State Department of Transportation, Environmental Protection Division, Utility Corporations, and additional resources.

The Discounted Cash Flow analysis in this report is based on the Extraordinary Assumption that all necessary permits for mining operations are obtainable as indicated by Burgex Inc. Mining Consultants. This is in accordance with the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants, and included in the Addenda, which provides: "It is not anticipated that any permitting difficulties will be encountered for the operation as planned. Georgia is currently ranked 12th in value of nonfuel minerals by state, according to the USGS. A large portion of this value comes from aggregate operations, primarily crushed stone. These statistics indicate a sophistication in the permitting and regulatory framework in the State of Georgia and serve as an indicator of how mining friendly the state is. Based on a review of active aggregate permits and timelines in the state, it is estimated that the entire permitting process for the subject property can be completed within a window of six to twelve months for a total cost of under $900,000 (including surety bond)." Further, according to Mr. Paul W. Hitchcock, Hitchcock & Hitchcock, P.C., from a land use perspective, the proposed use of the property as a mine is allowed within the agricultural district with a variance granted by the planning commission, and the likelihood of obtaining a permit to operate a rock quarry is good because the concerns of those who wish to preserve the Dark Sky area can be addressed by the hours of operation of the quarry itself. At the time of appraisal, the conservation easement was in place. Therefore, the "before-easement" analysis is based on the hypothetical condition of the conservation easement not being in place and encumbering the subject property since the conservation easement does exist as of the date of this appraisal.

EXHIBIT C - 2019 BROWN-PARRIS

## Purpose

The purpose of this report is to provide an opinion of the Fair Market Value of the Conservation Easement. In order to provide a full understanding of the impact of the conservation easement on the subject property, an analysis of the conservation easement value is included in this report. The Income Approach (Discounted Cash Flow Analysis) detailed and utilized in this report is based on the premise that an owner would hire a contract miner to mine and operate the quarry on the subject property.

The appraisal of property with subsurface material requires a number of different disciplines. A qualified drilling company under the guidance of a Professional Geologist to drill the property, a Qualified Laboratory for testing of the material, a Professional Geologist along with a Professional Engineer to evaluate the reserves on-site based on the physical characteristics of a property, a mining consultant working in tandem with the Professional Geologist and Professional Engineer to evaluate the supply and demand as well as the target market. Further, the mining consultant will establish the permitting schedule, the market pricing, production schedule, the capital expenditures, the operating costs, and the life of mine. Finally, a qualified appraiser, one who specializes in appraisals with subsurface material, will analyze all of the data provided from the experts/professionals above to perform a qualified appraisal. All of the above is only possible on a unique property that has the quality and quantity of material on-site that is financially feasible to extract. The subject property within this appraisal report is unique as detailed in each of the professional reports provided and included in the addenda of this appraisal report.

Due to the use of a contract miner based on what a typical contract miner would charge (market rate), the valuation within this report represents the Fair Market Value of the property not the business value. Conversely, Business Value is the value of the business; the summation of all its parts, tangible (real estate, equipment, fixed assets, etc.) and intangible (enterprise value).

Intangible value is defined as the present value of excess earning power of an entity over the normal rate of return. *The Dictionary of Real Estate Appraisal 5th Edition* defines intangible property as nonphysical assets, including but not limited to franchises, trademarks, patents, copy rights, goodwill, equities, securities, and contracts as distinguished from physical assets such as facilities and equipment.

When valuing land with subsurface material, the subsurface material is a commodity that sells for specific amount in the market. This is similar to a lease or sale of commercial space. The commercial space is a commodity where the price is dictated by the market. The quality of the space, the location, and the size are contributing factors that dictate the value. Similarly, the type of material, the amount of reserves, and the quality of the material are contributing factors that dictate the value of the land. For instance, the value of real property sitting on an economically mineable oil reserve exceeds the value of similar property without an oil reserve even if all things remain equal. Therefore, the value of the subsurface material must be incorporated in the value of real property.

Further, consumers are not willing to pay more for stone due to branding. i.e. No consumer is willing to pay more for subsurface material because it was mined by Vulcan versus a smaller operator. Therefore, it is our opinion, there is not additional intangible value associated with the value of subsurface material as the price is set by the market not based on branding or marketing.

EXHIBIT C 2019 BROWN-PARRIS

Our analysis is based on anyone who is well capitalized coming in and starting a mining operation. This includes hiring competent mining personnel found in the open market. If we were to value the property based on a specific contract i.e. a long term contract with a local concrete company, a contract that was above market, or based on a contract with a contract miner that could not be found in the open market, or if there were down-market synergies due to an ongoing business, this would constitute as business value. Whereas, our analysis is based on typical/market start-up costs, typical/market operating costs, typical/market (conservative) pricing, and typical/market discounting with additional discounting added to account for the risk of a new market entrant and entrepreneurial incentive. All costs associated with the business are deducted. Therefore, our analysis represents Fair Market Value of the land, not the value of the business.

Further, in order to mine a property, there are a variety of components associated with the mining including machinery, equipment, improvements on-site, etc. However, when a piece of land is mined out, the value of the machinery, equipment, and improvements becomes null as they no longer have any usefulness to the site and typically do not contribute to the value of the property. For land with subsurface material, when the material is gone, there no additional value to the land due to the improvements, machinery, or equipment. In theory, the equipment can be sold; however, for our analysis we have chosen to be conservative and not add any additional salvage value to the DCF.

To help with the understanding of valuing the land:

When appraising a subdivision, the appraiser models within a DCF, the typical/market pricing of the lots, the typical/market capital costs to prepare the lots for sale, the typical operating costs, and the typical/market absorption of the lots. This is then discounted back to the date of valuation to come up with the value of the land. This is the methodology used when appraising the land for a subdivision, not the business value. This is typical appraisal practice to value the land for a subdivision. Just as what was described within my report is typical appraisal practice to value the land with subsurface material, specifically a mineral reserve as defined by the SME Guide for Reporting Exploration Information, Mineral Resources, and Mineral Reserves (SME Guide).

The purpose of this report is to aid the IRS and any court to accurately determine the fair market value of the contribution.

The same valuation analysis and principles generally applies to appraisals in all contexts; however special rules are put in place for conservation easements.

When there is no substantial record of sales of similar conservation easement encumbered properties, the generally accepted method recommends a comparison between the fair market value of the subject property prior to the donation of the conservation easement and the fair market value after the donation of the conservation easement. Moreover, any offsetting increase in value of additional properties owned by the donor is also considered when establishing the fair market value derived from the difference between the subject property before and after the establishment of the conservation easement.

At the time of the appraisal, no viable direct conservation easement sales were available.

EXHIBIT C - 2019 BROWN-HARRIS

As such, the appraisers utilized the "before and after" appraisal valuation technique, calculating the difference between the fair market value of the total property before granting the conservation easement and the fair market value of the subject property after granting the conservation easement.

While this report is being prepared for federal income tax purposes, the actual amount of any potential deduction arising from the donation of a conservation easement may depend on a taxpayer's individual circumstances and should be calculated by an accountant or other tax professional of competent skill and knowledge. Therefore, these appraisers have not provided an estimate of the potential tax impact of any charitable deduction associated with the conservation easement.

No special legal instructions exist. Attached is a narrative Appraisal Report, prepared in accordance with USPAP, to substantiate our findings.

Douglas R. Kenny, MAI
KENNY AND ASSOCIATES, INC
RAK/tlk
File Number CE1563221
doug@kennyappraisal.com
kennyappraisal.com
770-823-3816
SSN:
Kenny & Associates, Inc.
327 Dahlonega Street, Suite 104
Cumming, GA 30040
EIN:

Rick A. Kenny, MAI, SRA
KENNY AND ASSOCIATES, INC
rick@kennyappraisal.com
770-664-8922
SSN:

## APPRAISER'S LIABILITY LIMITATIONS AND INTENDED USER AGREEMENTS

The acceptance of this report and its use by the intended user in any manner, or for any purpose, is an acknowledgement by the intended user that this report is a satisfactory professional product, the intended user has personally read the report, and agrees that the data herein is accurate to the best of the appraisers' ability. It is agreed that the intended user shall limit any and all liability for any damage on account of any error, omission or other professional negligence to a sum not to exceed the fee collected for this report; and only in the case of a gross error that would have materially affected the appraisers' value opinion as of the date of valuation.

Acceptance of this report by the intended user validates that a value opinion is a product of a professionally trained mind and acknowledges that the views and conclusions expressed in this report represent an opinion only, and not provable fact. Thus, the appraisers warrant only that the value conclusions are his/her best opinion estimates as of the date of valuation and not any other period in time.

The appraisers do not make any claims, assertions or guarantees regarding professional services outside the scope of the appraisal valuation or the expertise of the appraisers. The appraisers have the right to reevaluate and/or change the content of this report, including, but not limited to, the value conclusion if any information relied upon changes or other facts present themselves. Such professional services include, but are not limited to: deed restrictions, land use covenants, or other limitations on the property rights that may be revealed by an abstract or title insurance policy; easements, encroachments, or other limitations of the title that may be revealed by a survey; legal matters that require specialized knowledge beyond that ordinarily employed by a real estate appraiser; information typically disclosed by an engineering study or environmental survey; the resulting value of any tax advantage as a result of the conservation easement; and any other services covered by the Basic Assumptions and Limiting Conditions as set forth in this report.

The sole intended users of this report are Log Creek LLLP, Oconee River Land Trust, Inc., the IRS, and the District Court. Kenny & Associates, Inc. assumes no responsibility for this report if it is used or relied upon by anyone other than the intended users without written permission.

## APPRAISER COMPETENCY

Doug Kenny, MAI, State Certified General Real Property Appraiser in Tennessee, Alabama, South Carolina, and Georgia has been appraising land for over ten years. Over the past six years, Kenny & Associates, Inc. has experience appraising land throughout the country, completing numerous appraisal valuations of properties similar to the subject property of this appraisal. Doug Kenny, MAI, has specifically appraised conservation easements, and in addition has sought the appropriate level of competency through extensive research and classwork, including the Valuation of Conservation Easements (Appraisal Institute) ultimately obtaining the required knowledge in order to become competent in the appraisal of conservation easements. Therefore, he has met the requirements of the USPAP Competency Rule.

Rick Kenny, MAI, SRA, a State Certified General Real Property Appraiser in Alabama, Arkansas, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Ohio, Florida, South Carolina, Tennessee, Texas, and Virginia, has been appraising land for over 30 years. Over the past six years, Kenny & Associates, Inc. has experience appraising land throughout the

country, completing numerous appraisal valuations of properties similar to the subject property of this appraisal. Rick Kenny, MAI, SRA has specifically appraised conservation easements, in addition has sought the appropriate level of competency through extensive research and classwork, including the Valuation of Conservation Easements (Appraisal Institute) ultimately obtaining the required knowledge to become competent in the appraisal of conservation easements. Therefore, he has met the requirements of the USPAP Competency Rule.

# <u>CERTIFICATION</u>

I certify that, to the best of my knowledge and belief:

− The statements of fact contained in this report are true and correct.

− The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and is my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

− I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved. I am not a person described in Treasury Regulation 1.170A-13(c)(5)(iv).

− The Discounted Cash Flow analysis in this report is based on the Extraordinary Assumption that all necessary permits for mining operations are obtainable as indicated by Burgex Inc. Mining Consultants. This is in accordance with the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants and included in the Addenda, which provides: "It is not anticipated that any permitting difficulties will be encountered for the operation as planned. Georgia is currently ranked 12th in value of nonfuel minerals by state, according to the USGS. A large portion of this value comes from aggregate operations, primarily crushed stone. These statistics indicate a sophistication in the permitting and regulatory framework in the State of Georgia and serve as an indicator of how mining friendly the state is. Based on a review of active aggregate permits and timelines in the state, it is estimated that the entire permitting process for the subject property can be completed within a window of six to twelve months for a total cost of under $900,000 (including surety bond)." Further, according to Mr. Paul W. Hitchcock, Hitchcock & Hitchcock, P.C., from a land use perspective, the proposed use of the property as a mine is allowed within the agricultural district with a variance granted by the planning commission, and the likelihood of obtaining a permit to operate a rock quarry is good because the concerns of those who wish to preserve the Dark Sky area can be addressed by the hours of operation of the quarry itself. At the time of the appraisal, the conservation easement was in place. Therefore, the "before-easement" analysis is based on the hypothetical condition of the conservation easement not being in place and encumbering the subject property since the conservation easement does exist as of the date of this appraisal.

− The sole intended users of this report are Log Creek LLLP and Oconee River Land Trust, Inc. The intended user of review is the Internal Revenue Service.

− I have performed no services, as an appraiser or in any other capacity regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

− I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

− My engagement in this assignment was not contingent upon developing or reporting predetermined results.

− The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, the Uniform Standards of Professional Appraisal Practice (USPAP) as promulgated by the Appraisal Foundation, and the real estate appraiser license law, Georgia Statutes administered and enforced by the Georgia Real Estate Appraisal Board. This assignment has met the requirements by a recognized professional appraiser organization (Appraisal Institute). This assignment has been performed within the Competency Provision of USPAP.

− No one provided significant real property appraisal assistance to the undersigned. The appraisers referenced several reports prepared by industry leaders as an aid in determining an appropriate value conclusion. The reports referenced, and included in the Addenda to the Report, include the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants, the Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement prepared by GeoLogic, LLC (Consulting Geologists), and the Baseline

EXHIBIT C 2019 BROWN-PARRIS

Documentation Report prepared by Oconee River Land Trust, Inc. Finally, Betty L. Stilwell, Esq. assisted in the analysis and composition of the Area and Market Analysis Section.

− Doug Kenny, MAI and Rick Kenny, MAI, SRA **have** made a personal inspection of the subject property.

− The appraiser has developed opinions of value and appraisal reviews for a variety of mineral properties, including granite aggregates, dimension stone, sandstone, limestone, sand, sand and gravel, and a variety of other subsurface material. This appraiser has had the opportunity to work with a variety of mining experts (geologists, quarry operators, marketing experts, etc.), and has performed due diligence related to all of the previous quarry and mine appraisal work. The appraiser has developed opinions of value for a substantial number and variety of conservation easement properties.

− This report is a "qualified appraisal" as that term is defined in applicable Internal Revenue Service regulations (Treas. Reg. § 1.170A-17(a)).

− The appraiser regularly performs appraisals for which the individuals receive compensation; meets such other requirements as prescribed by the Secretary in regulations or other guidance; has not been prohibited from practicing before the IRS any time in the three-year period ending on the date of the appraisal, IRC § 170(f)(11)(E)(iii); holds himself out to the public as an appraiser or performs appraisals on a regular basis; is qualified to make appraisals of the type of property being valued; and is not a person specifically prohibited from being a qualified appraiser of a particular property (such as the donor, the donee, or others with a connection to the donor or donee).

− My compensation is not contingent upon the reporting of a predetermined Fair Market Value or direction in Fair Market Value that favors the cause of the client, the amount of the Fair Market Value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event. Further, my fee has not been based in whole or in part upon a percentage of the appraised Fair Market Value of the property, nor has the fee in any way been contingent upon the appraised Fair Market Value.

− Doug Kenny, MAI has successfully completed professional coursework specifically related to mineral properties. Doug Kenny, MAI has successfully completed Mineral Property Valuation 1 – Standards and Guidelines, Mineral Property Valuation 2 – Approaches and Methods, and Environmental Awareness for Resource Planning, these classes were provided by Edumine – Online Continuing Education for Professionals in Mining and the Geosciences (Treas. Reg. § 1.170A-17(b)(2)(A)).

− Rick Kenny, MAI, SRA has successfully completed professional coursework specifically related to mineral properties. Rick Kenny, MAI, SRA has successfully completed International Valuation of Mineral Estates – Mining and Oil & Gas which was provided by the Appraisal Institute (Treas. Reg. § 1.170A-17(b)(2)(A)).

− Rick Kenny, MAI, SRA and Doug Kenny, MAI do a majority of their appraisals for others during the taxable year. Rick Kenny, MAI, SRA and Doug Kenny, MAI have performed less than 50.0% of their appraisals for this client and/or sponsor. (Treas. Reg. § 1.170A-17(b)(5)).

− Neither appraiser is employed by or related to the client and will not receive a benefit in connection with the potential donation discussed herein.

− I understand that my appraisal will be used in connection with an income return or claim for refund. I also understand that, if there is substantial or gross valuation misstatement of the value of the property claimed on the income tax return or claim for refund that is based on my appraisal, I may be subject to a penalty under section 6695A of the Internal Revenue Code, as well as other applicable penalties. I affirm that I have not been at any time in the three-year period ending on the date of the appraisal barred from presenting evidence or testimony before the Department of the Treasury or the Internal Revenue Service pursuant to 31 U.S.C. 330(c).

− The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

− There has been no exclusion of items pertinent to the assignment, nor exclusion of items beyond this assignment.

− The Fair Market Value of the subject property before the conservation easement is $68,210,000. The Fair Market Value of the conservation easement is $66,290,000. The Fair Market Value of the subject property after easement (residual) is $1,920,000, and the value enhancement on the contiguous parcel is $0.00.

− − Doug Kenny inspected the property on December 1, 2021 and Rick Kenny inspected the property was March 24, 2021, the date of appraisal is December 31, 2019, the date of the report is March 28, 2022, the donation date is December 30, 2019, and the donation recording date is December 31, 2019.

EXHIBIT C 2019 BROWN-HARRIS

‒ As of the date of this report, neither Doug Kenny, MAI nor Rick Kenny, MAI, SRA have been prohibited from practicing before the IRS at any time during the three years preceding the date of the appraisal.

‒ As of the date of this report, Doug Kenny, MAI and Rick Kenny, MAI, SRA have completed the continuing education program for Designated Members of the Appraisal Institute.

Doug R. Kenny, MAI
Federal Tax ID #
Georgia State Certified General #344167
Alabama State Certified General #G01326
Tennessee State Certified General #5435
South Carolina State Certified General #AB.7804CG
SSN: 8689 (Last four digits)

Rick A. Kenny, MAI, SRA
Tennessee State Certified General #5434
Georgia State Certified General #628
Alabama State Certified General #G01327
South Carolina State Certified General #AB.7161CG
North Carolina State Certified General #A8280
Louisiana Certified General APR.0000004307-CGA
Kentucky State Certified General #5397
Texas Certified General #TX 1380945 G
Arkansas State Certified General #CG-4649
Mississippi Certified General #GA-1339
Missouri Certified General #2020031001
Ohio Certified General #
Virginia Certified General #4001017925
Florida State Certified General #RZ4090
SSN: 1541 (Last four digits)

# SECTION 1 – EXECUTIVE SUMMARY

## 1.1. Appraisal Problem

The appraisal problem is to determine the Fair Market Value of the conservation easement for the protection of 272.98 Acres of land located along the north side of Raytown Road and the South and West Side of Fair Play Road, just east of Georgia Highway 47 and just north of Interstate 20, Taliaferro County, Georgia. No special appraisal problems exist. The appraisers have exercised due diligence in determining that the correct property was appraised.

## 1.2. Appraisal Purpose

The purpose of this appraisal is to provide an opinion of the Fair Market Value of a conservation easement for the protection of 272.98 Acres of land located along the north side of Raytown Road and the South and West Side of Fair Play Road, just east of Georgia Highway 47 and just north of Interstate 20, Taliaferro County, Georgia. The purpose of this report is to determine the Fair Market Value of the conservation easement. Additionally, in compliance with the Tax Reform Act of 1984, this appraisal was performed for Income Tax purposes. The date of the inspection was March 24, 2021 and the date of the appraisal is as of December 31, 2019. The associated market and area were analyzed as of the effective date of the report indicated on the attached letter of transmittal. Based on the analysis, an exposure time of twelve months is reasonable, defensible and appropriate.

## 1.3. Executive Summary

QUALIFICATIONS : Due to the appraisers' qualifications as described in the appraisal (i.e. experience and education), the appraisers are qualified to make appraisals of the type of property being valued. [Treas. Reg. 1.170A-17(b)]

PROPERTY LOCATION : Log Creek LLLP; 272.98 Acres of land located along the north side of Raytown Road and the South and West Side of Fair Play Road, just east of Georgia Highway 47 and just north of Interstate 20, Taliaferro County, Georgia

INSPECTION DATE : March 24, 2021

APPRAISAL DATE : December 31, 2019

DATE OF REPORT : March 28, 2022

DONATION DATE : December 30, 2019

DONATION RECORDING DATE: December 31, 2019

INTEREST APPRAISED : BEFORE : Fee Simple
: AFTER : Fee Simple Subject to Conservation Easement

LAND AREA : Conservation Easement: 272.98 Acres (11,891,009 sq. ft.)
Southern Tract: 600.25 Acres (26,146,890 sq. ft.)
Northern Tract: 368.89 Acres (16,068,848 sq. ft.)
Total Contiguous Owned Parcel: 1,242.12 Acres (54,106,747 sq. ft.)

PARCEL : Conservation Easement: 048-006[1]
Southern Tract: 048-017 & 048-006[2]
Northern Tract: 047-012 & 048-006[3]

ZONING : A-1 Agricultural District[4]

ACCESS : Ingress/egress to and from Raytown Road and Fair Play Road

FLOOD HAZARD AREA : A portion of the subject property is located in Zone X, an area not prone to flooding.[5] Based on mapping provided by GeoLogic, LLC,

---

[1] 272.98 Acres separated from this parcel.
[2] 508.4 Acres separated from this parcel.
[3] 54.59 Acres separated from this parcel.
[4] According to Mr. Paul W. Hitchcock, Hitchcock & Hitchcock, P.C., from a land use perspective, the proposed use of the property as a mine is allowed within the agricultural district with a variance granted by the planning commission, and the likelihood of obtaining a permit to operate a rock quarry is good because the concerns of those who wish to preserve the Dark Sky area can be addressed by the hours of operation of the quarry itself.
[5] According to the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants, it is believed that wetland potential can be easily managed on the subject property based on an analysis of National Wetland Inventory Maps. A contingency budget has been allocated within startup funds for a full wetland study prior to operations. While the mine plan avoids wetland impacts, a substantial mitigation budget has still been included as a contingency within startup costs.

EXHIBIT C — 2019 BROWN-HARRIS

there are a few streams running through the subject property. Burgex Inc. Mining Consultants have included a wetland contingency of $1,000,000. An additional $500,000 has been budgeted and included in the year one start-up costs for a total of $1,500,000 for wetland contingency in year one. Therefore, any potential wetlands or streams on-site are not considered to affect the highest and best use of the subject property as a granite mine.

DONOR : Log Creek LLLP (EIN# ███████████)
1280 Snows Mill Road,
Bogart, Georgia 30622

DONEE : Oconee River Land Trust, Inc.
675 Pulaski Street, Suite 2300,
Athens, Georgia 30601

EASEMENT PROVISIONS : The conservation easement provisions are located in the subject property's deed of conservation easement in the Addenda of this report.

DONOR'S RESERVED RIGHTS : The conservation easement reserved rights are located in the subject property's deed of conservation easement in the Addenda of this report.

HIGHEST AND BEST USE (Before Easement) : Granite Mining (272.98 Acres) and Recreational Land (Northern & Southern Tract)

HIGHEST AND BEST USE (After Easement) : Agricultural/Recreational/Forestry

SUMMARY OF SALIENT FACTS : No direct conservation easement sales were available at the time of appraisal. The appraisers have utilized the "before and after" appraisal valuation technique. This method calculates the difference between the fair market value of the subject property before granting the conservation easement and the fair market value of the subject property after granting the conservation easement.

VALUATION METHODOLOGY : Before: Encumbered Tract: Income Approach (DCF)
Before: Unencumbered Tracts: Sales Comparison Approach

After: Encumbered Tract: Sales Comparison Approach
After: Unencumbered Tracts: Sales Comparison Approach

**VALUE INDICATION**

**FAIR MARKET VALUE**
  **BEFORE CONSERVATION EASEMENT** : $68,210,000

**FAIR MARKET VALUE**
  **AFTER CONSERVATION EASEMENT** : $1,920,000

**FAIR MARKET VALUE OF CONSERVATION EASEMENT** : $66,290,000

### 1.4. Subject Photos



SITE VIEW



RAYTOWN ROAD

EXHIBIT C 2019 BROWN HARRIS
Case 3:22-cv-... Document ... Filed ... Page 293 of 600



RAYTOWN ROAD



SITE VIEW

EXHIBIT C 2019 BROWN HARRIS

Case 3:22-cv-... Document 4-... Filed ... Page 294 of 600



SITE VIEW



SITE VIEW

EXHIBIT C 2019 BROWN HARRIS



SITE VIEW



SITE VIEW

EXHIBIT C 2019 BROWN HARRIS



SITE VIEW



SITE VIEW

EXHIBIT C 2019 BROWN HARRIS

Case 3:22-cv-... Document ... Filed ... Page 297 of 600



SITE VIEW



SITE VIEW

EXHIBIT C 2019 BROWN HARRIS

Case 3:22-cv-01213-TAD-KDM Document 4-1 Filed 05/02/22 Page 298 of 600



SITE VIEW



SITE VIEW

EXHIBIT C - 2019 BROWN APPRAISAL

## SECTION 2 – APPRAISAL CONDITIONS

### 2.1    Basic Assumptions and Limiting Conditions

This appraisal is subject to the following conditions:

1. This appraisal is for no other purpose than property valuation, and the appraiser(s) are
   neither qualified nor attempting to go beyond that narrow scope.  The reader should be aware that there are also inherent limitations to the accuracy of the information and analyses contained in this appraisal. Before making any decision based on the information and analyses contained in this report, it is critically important to read this entire section to understand these limitations.

2. The legal description/survey furnished is assumed to be correct.  No responsibility is assumed for matters legal in character nor is any opinion rendered as to the title, which is assumed to be good and marketable.  The value estimate is given without regard to any questions of title, boundaries, encumbrances, or encroachments.

3. All existing liens and encumbrances have been disregarded unless otherwise stated, and the property is appraised as though free and clear under responsible ownership and competent management.

4. It is assumed that any proposed or incomplete improvements included in this report are to be completed in accordance with approved plans and specifications and in a workmanlike manner.

5. Information furnished by others is believed to be reliable, but no responsibility is assumed for its accuracy.  Information (including projections of income and expenses) provided by local sources, such as government agencies, financial institutions, accountants, attorneys, and others is assumed to be true, correct, and reliable.  No responsibility for the accuracy of such information is assumed by the appraiser(s).
   The comparable sales data relied upon in the appraisal are believed to be from reliable sources.  Though all the comparables were examined, it was not possible to inspect them all in detail.  The value conclusions are subject to the accuracy of this data.

6. Any sketches, plats, or drawings included in this report are included to assist the reader in visualizing the property.  We have made no survey of the property and assume no responsibility in connection with such matters. Any maps, plats, or drawings reproduced and included in this report are intended only for the purpose of showing spatial relationships.  The reliability of the information contained on any such map or drawing is assumed by the appraiser(s) and cannot be guaranteed to be correct.  A surveyor should be consulted if there is any concern on boundaries, setbacks, encroachments, or other survey matters.

7. Unless otherwise noted herein, it is assumed that there are no encroachments, zoning restrictions, or violations existing on the subject property.  It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless nonconformity has been stated, defined, and considered in the appraisal report. Information and analysis shown in this report concerning these items is based on a thorough investigation. Any significant question should be addressed to local zoning or land use officials and/or an attorney.

8. It is assumed that all required licenses, consents, or other legislative or administrative authority from any local, state, national government or private entity or organization has been, or can be obtained or renewed for any use on which the value estimate contained in this report is based.  Appropriate government officials and/or an attorney should be consulted if an interested party has any questions or concerns on these items since we have not made a comprehensive examination of laws and regulations affecting the subject property.

9. We are not required to give testimony or attendance in court by reason of this appraisal, with reference to the property in question, unless arrangements have been made previously thereof.

10. No responsibility is assumed for engineering matters, either structural or mechanical.  Good structural and mechanical conditions are assumed to exist, and no opinion as to these matters is to be inferred or construed from this report.  Although the appraisal may contain information about the physical items being appraised (including their adequacy and/or condition), it should be clearly understood that this information is only to be used as a general guide for property valuation and not as a complete or detailed physical report.  The appraiser(s) are not construction, engineering, environmental, or legal experts, and any statement given on these matters in this report should be considered preliminary in nature.

11.  Disclosure of the contents of this appraisal report is governed by the Bylaws and Regulations of the Appraisal Institute.

One (or more) of the signatories of this appraisal report is a Member (or Candidate Member) of the Appraisal Institute. The Bylaws and Regulations of the Appraisal Institute require each Member and Candidate Member to control the use and distribution of each appraisal report signed by such Member or Candidate Member. Therefore, except as hereinafter provided, the party for whom this appraisal report was prepared may distribute copies of this appraisal report, in its entirety, to such third parties as may be selected by the party for whom this appraisal report was prepared; however, selected portions of this appraisal report shall not be given to third parties without the prior written consent of the signatories of this appraisal report.  Further, neither all nor any part of this appraisal report shall be disseminated to the general public by the use of advertising media or other media for public communication without the prior written consent of the signatories of this appraisal report.

12.  The value estimate applies only to the entire property and cannot be prorated to individual portions or fractional interests. Any proration or division of interest will invalidate the value estimate, unless such proration or division of interests is set forth in the report.

The forecasts or projections included in this report are utilized to assist in the valuation process. They are based on current market conditions, current short-term supply and demand factors, and a continued stable economy. These forecasts are therefore subject to changes in future conditions, which cannot be accurately predicted by the appraiser(s), and these changes could affect the future income and/or value estimates.  Since projected mathematical models and other projections are based on estimates and assumptions, which are inherently subject to uncertainty and variation depending upon evolving events, we do not represent them as results that will actually be achieved.

13.  In this appraisal assignment, the existence of potentially hazardous material such as asbestos, urea formaldehyde foam insulation, radon gas, or any other toxic material, has not been considered.  The appraiser(s) are not qualified to detect such substances and, if desired, recommend that the client retain an expert in this field.

Non-disclosure of environmental problems should not be taken as an indication that such a problem does not exist, however, an expert in the field should be consulted if any interested party has questions on environmental factors. No chemical or scientific tests were performed by the appraiser(s) on the subject property, and it is assumed that the air, water, ground, and general environment associated with the property presents no physical or health hazard of any kind unless otherwise noted in the report.  It is further assumed that the property does not contain any type of dump site and that there are no underground tanks (or any underground source) leaking toxic or hazardous chemicals into the groundwater or the environment unless otherwise noted in the report.

14.  It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations unless noncompliance is stated, defined, and considered in the appraisal report.  A comprehensive examination of laws and regulations affecting the subject property was not performed for this appraisal.

15.  The subject property may or may not be located in or adjacent to a wetlands area.  The appraiser(s) are not qualified in the area of engineering pertaining to the determination of wetlands; therefore, the appraiser(s) are unable to determine the wetlands status of the subject property.  In this report, it is assumed the appropriate permit, if required, can be or has been obtained from the U.S. Army Corps of Engineers.  It is also assumed that the jurisdictional determination study and/or permit regarding construction in a wetlands area, if required, does not result in the alteration of the subject property description contained in this appraisal report.  The appraiser(s) recommend that a pre-application consultation be completed by the property owner with the Corps of Engineers if no permit has been obtained.  The client is urged to retain an expert in this field, if desired.

16.  The Americans with Disabilities Act (ADA) became effective January 26, 1992.  We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA.  It is possible that a compliance survey of the property together with a detailed analysis of the requirements of the ADA could reveal that the property is not in compliance with one or more of the requirements of the act.  If so, this fact could have a negative effect upon the value of the property.  Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

17. Opinions and estimates expressed herein represent our best judgment, but should not be construed as advice or recommendation to act. Any actions taken by you, the client, or any others should be based on your own judgment, and the decision process should consider many factors other than just the value estimate and information given in this report.

18. Acceptance and or use of this appraisal report by the client or any third party constitutes acceptance of these limiting conditions. Appraisal liability extends only to the stated client, not subsequent parties or uses, and is limited to the amount of the fee received by the appraiser(s).

19. This appraisal is an opinion of value. It is not a guarantee. No guarantee is warranted nor intended

## 2.2. Extraordinary Assumptions

USPAP defines an Extraordinary Assumption as: "an assignment specific assumption as of the effective date regarding uncertain information used in an analysis, which if found to be false, could alter the appraiser's opinion or conclusions."

> "Comment: Uncertain information might include physical, legal, or economic characteristics of the subject property, or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis."

The Discounted Cash Flow analysis in this report is based on the Extraordinary Assumption that all necessary permits for mining operations are obtainable as indicated by Burgex Inc. Mining Consultants. This is in accordance with the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants, and included in the Addenda, which provides: "It is not anticipated that any permitting difficulties will be encountered for the operation as planned. Georgia is currently ranked 12th in value of nonfuel minerals by state, according to the USGS. A large portion of this value comes from aggregate operations, primarily crushed stone. These statistics indicate a sophistication in the permitting and regulatory framework in the State of Georgia and serve as an indicator of how mining friendly the state is. Based on a review of active aggregate permits and timelines in the state, it is estimated that the entire permitting process for the subject property can be completed within a window of six to twelve months for a total cost of under $900,000 (including surety bond)." Further, according to Mr. Paul W. Hitchcock, Hitchcock & Hitchcock, P.C., from a land use perspective, the proposed use of the property as a mine is allowed within the agricultural district with a variance granted by the planning commission, and the likelihood of obtaining a permit to operate a rock quarry is good because the concerns of those who wish to preserve the Dark Sky area can be addressed by the hours of operation of the quarry itself.

## 2.3 Hypothetical Conditions

The Uniform Standards of Professional Appraisal Practice (USPAP) defines an extraordinary assumption as: "*An assumption, directly related to a specific assignment, as of the effective date of the appraisal results, which, if found to be false, could alter the appraiser's opinions or conclusions.*"

> "Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

USPAP SR 1-2(g) comment states: "A hypothetical condition may be used in an assignment only if the use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis, or for purposes of comparison; use of the hypothetical condition results in a credible analysis; and the appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions."

If used in the assignment, extraordinary assumptions and hypothetical conditions may affect the assignment results, and for that reason must be clearly and conspicuously disclosed in the report.

At the time of appraisal, the conservation easement was signed and to the best of the appraisers' knowledge has been recorded. Therefore, the "before-easement" analysis is based on the hypothetical condition of the conservation easement not being in place and encumbering the subject property since the conservation easement does exist as of the date of this appraisal.

## SECTION 3 – APPLICABLE TERMS

### 3.1. Conservation Easement

As defined by the Appraisal Institute: "An interest in real estate restricting future land use to preservation, conservation, wildlife habitat or some combination of those uses. A conservation easement may permit farming, timber harvesting, or other uses of a rural nature as well as some types of conservation-oriented development to continue, subject to the easement."[6]

According to the U.S. Internal Revenue Service's Conservation Easement Audit Techniques Guide, a conservation easement is: "the generic term for easements granted for preservation of land areas for outdoor recreation, protection of a relatively natural habitat for fish, wildlife, or plants, or a similar ecosystem, preservation of open space for the scenic enjoyment of the public or pursuant to a Federal, State, or local governmental conservation policy, and preservation of a historically important land area or historic building. Conservation easements permanently restrict how land or buildings are used. The "deed of conservation easement" describes the conservation purpose, the restrictions and the permissible uses of the property. The deed must be recorded in the public record and must contain legally binding restrictions enforceable by the donee organization. The donor gives up certain rights specified in the Deed of Conservation Easement, but retains ownership of the underlying property. The extent and nature of the donee organization's control depends on the terms of the conservation easement deed. The organization has an interest in the encumbered property that runs with the land, which means that its restrictions are binding not only on the landowner who grants the easement but also on all future owners of the property."

A conservation easement is also defined as: "A nonpossessory interest of a holder in real property imposing limitations or affirmative obligations the purposes of which include retaining or protecting natural, scenic, or open-space values of real property, assuring its availability for agricultural, forest, recreational, or open-space use, protecting

---

[6] The *Dictionary of Real Estate Appraisal,* 6th ed. Chicago: Appraisal Institute, 2015.

natural resources, maintaining or enhancing air or water quality, or preserving the historical, architectural, archaeological, or cultural aspects of real property."[7]

Finally, an additional way to describe a conservation easement is: "A legal agreement between a landowner and a qualified organization that restricts future activities on the land to protect its conservation values."[8]

## 3.2. Charitable Gift Through a Conservation Easement

The value of the charitable gift through the conservation easement vehicle depends on the difference in utility and permitted uses prior to the establishment of a conservation easement and after the establishment of a conservation easement. The consideration given to clearly permitted and prohibited uses is established through the estimation of the extent to which prohibited uses contribute, individually and collectively, to the pre-conservation easement market value of the property compared against how the loss of each prohibited use ultimately affects the property's value post-conservation easement.

For example, the post-conservation easement properties consist of the property rights remaining after the severing of ownership into two groups of rights, the rights of the donor and the rights of the donee. Generally, the donor, and any subsequent owners, retain the right to use the property in ways consistent with the specific terms of the conservation easement and the owner's remaining reserved rights.

Specified uses permitted only after the review and approval of the easement holder possess inherent risks, costs and delays that must be considered by the appraisers. For example, the appraisers must assess the likelihood that any requested usage changes will be approved by the conservation easement holder as well as considering the delays, costs and inconvenience, which may arise when seeking review and approval for a change. Furthermore, the appraisers must consider the likelihood of additional expenses required to comply with any conditions the conservation easement holding organization may place on an approval of requested changes, such as a requirement to use higher quality material, updated designs, additional reviews adding time and cost constraints to the proposed change and the potential requirements to relocate access roads.

Grantors often retain the ability to continue limited recreational uses, subject to the conservation easement in perpetuity. The common appraisal metaphor regarding a "bundle" of property rights helps to illustrate this point. A person granting a conservation easement to a donee relinquishes one or several "sticks" associated with the "bundle" of rights regarding ownership of the burdened land. By relinquishing the ability to develop the land, the property owner diminishes the value if the land is otherwise suitable for development, in addition to any limitations on timbering, hunting lodges, surface mining and other revenue generating activities.

Conservation easements have a significant, but varying impact on the fair market value of conservation easement-burdened property. Statistics show that property tax

---

[7] Uniform Conservation Easement Act, 1981, amended 2007.
[8] *The Conservation Easement Handbook,* 2nd ed. Washington, DC: Land Trust Alliance, 2005.

assessments and federal tax appraisals of conservation easement-burdened lands vary considerably in the weight given to conservation easements in determining the value of the property. An example from the *Boston College Environmental Affairs Law Review*, 1990; Stanley Works v. Commissioner [Stanley Works, 87 TC 389 (1986)], one tax court found that a conservation easement diminished fair market value of the property by 75.0%. Similarly, Stotler v. Commissioner [Stotler, TCM 1987-275], the court held that a conservation easement decreased the market value of the now burdened property by over 91.4%.

Much of the variation in the degree to which conservation easements diminish fair market value can be attributed to the terms of the easements and the individual characteristics of the affected properties. Land Trust entities typically classify easements into three categories based on the extent to which the easement limits development on the subject property: (1) "Forever wild" easements preserve properties in their natural state and are the most restrictive; (2) "Resource protection" easements emphasize the protection and controlled use of natural resources; and (3) "Limited development" easements, the least restrictive conservation easements, generally restrict the amount or kind of development to a greater extent than local zoning.

### 3.3. Qualified Appraisal & Qualified Appraiser

This appraisal for Log Creek LLLP; EIN# ⬛⬛⬛⬛⬛⬛ is a "qualified appraisal" and Doug Kenny, MAI and Rick Kenny, MAI, SRA are "qualified appraisers":

Treas. Reg. Section 1.170A-17

(a) *Qualified appraisal— (1) Definition.* For purposes of section 170(f)(11) and § 1.170A–16(d)(1)(ii) and (e)(1)(ii), the term *qualified appraisal* means an appraisal document that is prepared by a qualified appraiser (as defined in paragraph (b)(1) of this section) in accordance with generally accepted appraisal standards (as defined in paragraph (a)(2) of this section) and otherwise complies with the requirements of this paragraph (a).

(2) *Generally accepted appraisal standards defined.* For purposes of paragraph (a)(1) of this section, generally accepted appraisal standards means the substance and principles of the Uniform Standards of Professional Appraisal Practice, as developed by the Appraisal Standards Board of the Appraisal Foundation.

(3) *Contents of qualified appraisal.* A qualified appraisal must include—

(i) The following information about the contributed property:

(A) A description in sufficient detail under the circumstances, taking into account the value of the property, for a person who is not generally familiar with the type of property to ascertain that the appraised property is the contributed property.

(B) In the case of real property or tangible personal property, the condition of the property.

EXHIBIT C - 2019 BROWN PARRIS

(C) The valuation effective date, as defined in paragraph (a)(5)(i) of this section.

(D) The fair market value, within the meaning of § 1.170A–1(c)(2), of the contributed property on the valuation effective date;

(ii) The terms of any agreement or understanding by or on behalf of the donor and donee that relates to the use, sale, or other disposition of the contributed property, including, for example, the terms of any agreement or understanding that—

(A) Restricts temporarily or permanently a donee's right to use or dispose of the contributed property;

(B) Reserves to, or confers upon, anyone, other than a donee or an organization participating with a donee in cooperative fundraising, any right to the income from the contributed property or to the possession of the property, including the right to vote contributed securities, to acquire the property by purchase or otherwise, or to designate the person having income, possession, or right to acquire; or

(C) Earmarks contributed property for a particular use;

(iii) The date, or expected date, of the contribution to the donee;

(iv) The following information about the appraiser:

(A) Name, address, and taxpayer identification number.

(B) Qualifications to value the type of property being valued, including the appraiser's education and experience.

(C) If the appraiser is acting in his or her capacity as a partner in a partnership, an employee of any person, whether an individual, corporation, or partnership, or an independent contractor engaged by a person other than the donor, the name, address, and taxpayer identification number of the partnership or the person who employs or engages the qualified appraiser;

(v) The signature of the appraiser and the date signed by the appraiser (appraisal report date);

(vi) The following declaration by the appraiser: "I understand that my appraisal will be used in connection with a return or claim for refund. I also understand that, if there is a substantial or gross valuation misstatement of the value of the property claimed on the return or claim for refund that is based on my appraisal, I may be subject to a penalty under section 6695A of the Internal Revenue Code, as well as other applicable penalties. I affirm that I have not been at any time in the three-year period ending on the date of the appraisal barred from presenting evidence or testimony before the Department of the Treasury or the Internal Revenue Service pursuant to 31 U.S.C. section 330(c)";

(vii) A statement that the appraisal was prepared for income tax purposes;

EXHIBIT C 2019 BROWN PARRS

(viii) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, or the replacement-cost-less-depreciation approach; and

(ix) The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

*(4) Timely appraisal report.* A qualified appraisal must be signed and dated by the qualified appraiser no earlier than 60 days before the date of the contribution and no later than—

(i) The due date, including extensions, of the return on which the deduction for the contribution is first claimed;

(ii) In the case of a donor that is a partnership or S corporation, the due date, including extensions, of the return on which the deduction for the contribution is first reported; or

(iii) In the case of a deduction first claimed on an amended return, the date on which the amended return is filed.

*(5) Valuation effective date—(i) Definition.* The valuation effective date is the date to which the value opinion applies.

(ii) *Timely valuation effective date.* For an appraisal report dated before the date of the contribution, as described in § 1.170A–1(b), the valuation effective date must be no earlier than 60 days before the date of the contribution and no later than the date of the contribution. For an appraisal report dated on or after the date of the contribution, the valuation effective date must be the date of the contribution.

*(6) Exclusion for donor knowledge of falsity.* An appraisal is not a qualified appraisal for a particular contribution, even if the requirements of this paragraph (a) are met, if the donor either failed to disclose or misrepresented facts, and a reasonable person would expect that this failure or misrepresentation would cause the appraiser to misstate the value of the contributed property.

*(7) Number of appraisals required.* A donor must obtain a separate qualified appraisal for each item of property for which an appraisal is required under section 170(f)(11)(C) and (D) and paragraph (d) or (e) of § 1.170A–16 and that is not included in a group of similar items of property, as defined in § 1.170A–13(c)(7)(iii). For rules regarding the number of appraisals required if similar items of property are contributed, see section 170(f)(11)(F) and § 1.170A–13(c)(3)(iv)(A).

*(8) Time of receipt of qualified appraisal.* The qualified appraisal must be received by the donor before the due date, including extensions, of the return on which a deduction is first claimed, or reported in the case of a donor that is a partnership or S corporation, under section 170 with respect to the donated property, or, in the case of a

EXHIBIT C – 2019 BROWN-PARRIS

deduction first claimed, or reported, on an amended return, the date on which the return is filed.

*(9) Prohibited appraisal fees.* The fee for a qualified appraisal cannot be based to any extent on the appraised value of the property. For example, a fee for an appraisal will be treated as based on the appraised value of the property if any part of the fee depends on the amount of the appraised value that is allowed by the Internal Revenue Service after an examination.

*(10) Retention of qualified appraisal.* The donor must retain the qualified appraisal for so long as it may be relevant in the administration of any internal revenue law.

*(11) Effect of appraisal disregarded pursuant to 31 U.S.C. section 330(c).* If an appraiser has been prohibited from practicing before the Internal Revenue Service by the Secretary under 31 U.S.C. section 330(c) at any time during the three-year period ending on the date the appraisal is signed by the appraiser, any appraisal prepared by the appraiser will be disregarded as to value, but could constitute a qualified appraisal if the requirements of this section are otherwise satisfied, and the donor had no knowledge that the signature, date, or declaration was false when the appraisal and Form 8283 (Section B) were signed by the appraiser.

*(12) Partial interest.* If the contributed property is a partial interest, the appraisal must be of the partial interest.

*(b) Qualified appraiser—(1) Definition.* For purposes of section 170(f)(11) and § 1.170A–16(d)(1)(ii) and (e)(1)(ii), the term qualified appraiser means an individual with verifiable education and experience in valuing the type of property for which the appraisal is performed, as described in paragraphs (b)(2) through (4) of this section.

*(2) Education and experience in valuing the type of property—(i) In general.* An individual is treated as having education and experience in valuing the type of property within the meaning of paragraph (b)(1) of this section if, as of the date the individual signs the appraisal, the individual has—

(A) Successfully completed (for example, received a passing grade on a final examination) professional or college-level coursework, as described in paragraph (b)(2)(ii) of this section, in valuing the type of property, as described in paragraph (b)(3) of this section, and has two or more years of experience in valuing the type of property, as described in paragraph (b)(3) of this section; or

(B) Earned a recognized appraiser designation, as described in paragraph (b)(2)(iii) of this section, for the type of property, as described in paragraph (b)(3) of this section.

*(ii) Coursework must be obtained from an educational organization, generally recognized professional trade or appraiser organization, or employer educational program.* For purposes of paragraph (b)(2)(i)(A) of this section, the coursework must be obtained from—

EXHIBIT C - 2019 BROWN-PARRIS
Case 3:22-cv... Document 1-4 Filed 01/18/22 Page 308 of 600

(A) A professional or college-level educational organization described in section 170(b)(1)(A)(ii);

(B) A generally recognized professional trade or appraiser organization that regularly offers educational programs in valuing the type of property; or

(C) An employer as part of an employee apprenticeship or educational program substantially similar to the educational programs described in paragraphs (b)(2)(ii)(A) and (B) of this section.

*(iii) Recognized appraiser designation defined. A recognized appraiser designation means* a designation awarded by a generally recognized professional appraiser organization on the basis of demonstrated competency.

*(3) Type of property defined—(i) In general.* The type of property means the category of property customary in the appraisal field for an appraiser to value.

*(ii) Examples.* The following examples illustrate the rule of paragraphs (b)(2)(i) and (b)(3)(i) of this section:

*Example (1). Coursework in valuing type of property.* There are very few professional-level courses offered in widget appraising, and it is customary in the appraisal field for personal property appraisers to appraise widgets. Appraiser A has successfully completed professional-level coursework in valuing personal property generally but has completed no coursework in valuing widgets. The coursework completed by Appraiser A is for the type of property under paragraphs (b)(2)(i) and (b)(3)(i) of this section.

*Example (2). Experience in valuing type of property.* It is customary for professional antique appraisers to appraise antique widgets. Appraiser B has 2 years of experience in valuing antiques generally and is asked to appraise an antique widget. Appraiser B has obtained experience in valuing the type of property under paragraphs (b)(2)(i) and (b)(3)(i) of this section.

*Example (3). No experience in valuing type of property.* It is not customary for professional antique appraisers to appraise new widgets. Appraiser C has experience in appraising antiques generally but no experience in appraising new widgets. Appraiser C is asked to appraise a new widget. Appraiser C does not have experience in valuing the type of property under paragraphs (b)(2)(i) and (b)(3)(i) of this section.

*(4) Verifiable.* For purposes of paragraph (b)(1) of this section, education and experience in valuing the type of property are verifiable if the appraiser specifies in the appraisal the appraiser's education and experience in valuing the type of property, as described in paragraphs (b)(2) and (3) of this section, and the appraiser makes a declaration in the appraisal that, because of the appraiser's education and experience, the appraiser is qualified to make appraisals of the type of property being valued.

EXHIBIT C - 2019 BROWN PARTS

*(5) Individuals who are not qualified appraisers.* The following individuals are not qualified appraisers for the appraised property:

(i) An individual who receives a fee prohibited by paragraph (a)(9) of this section for the appraisal of the appraised property.

(ii) The donor of the property.

(iii) A party to the transaction in which the donor acquired the property (for example, the individual who sold, exchanged, or gave the property to the donor, or any individual who acted as an agent for the transferor or for the donor for the sale, exchange, or gift), unless the property is contributed within 2 months of the date of acquisition and its appraised value does not exceed its acquisition price.

(iv) The donee of the property.

(v) Any individual who is either—

(A) Related, within the meaning of section 267(b), to, or an employee of, an individual described in paragraph (b)(5)(ii), (iii), or (iv) of this section;

(B) Married to an individual described in paragraph (b)(5)(v)(A) of this section; or

(C) An independent contractor who is regularly used as an appraiser by any of the individuals described in paragraph (b)(5)(ii), (iii), or (iv) of this section, and who does not perform a majority of his or her appraisals for others during the taxable year.

(vi) An individual who is prohibited from practicing before the Internal Revenue Service by the Secretary under 31 U.S.C. section 330(c) at any time during the three-year period ending on the date the appraisal is signed by the individual.

*(c) Effective and applicability date.* This section applies to contributions made on or after January 1, 2019. Taxpayers may rely on the rules of this section for appraisals prepared for returns or submissions filed after August 17, 2006.

IRS Form 8283, "Noncash Charitable Contributions Appraisal Summary," is to be completed and included as part of the appraisal. The purpose of this report is to determine the fair market value of the conservation easement. The appraisers have complied with the requirements for a qualified appraiser and this report is a qualified appraisal in compliance with the Tax Reform Act of 1984. Further, although, Treas. Reg. Section 1.170A-17 effective on January 1, 2019, the regulation states, "Taxpayers may rely on the rules of this section for appraisals prepared for returns or submissions filed after August 17, 2006." Therefore, Treas. Reg. Section 1.170A-17 was utilized for the purpose of Qualified Appraisal and Qualified Appraiser.

3.4     **Property Rights Appraised**

One or more of the following underlined legal estates or interests are valued in this report. Definitions of these estates are quoted from *The Dictionary of Real Estate Appraisal*, Sixth Edition; published by the Appraisal Institute, copyright 2015.

- Fee Simple Estate: *"Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."*

- Leased Fee Interest: *"The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires."*

- Leasehold Interest: *"The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease."*

The opinion of value developed in this report relates to the **Fee Simple Estate** of the Conservation Easement and not a leased interest.

3.5     **Market Value**

"The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. If the contribution is made in property of a type which the taxpayer sells in the course of business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property in the usual market in which he customarily sells, at the time and place of the contribution and, in the case of a contribution of goods in quantity, in the quantity contributed. The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom the he customarily sells, but if he sells only at retail the usual market consists of his retail customers" 26 C.F.R. § 1.170A-1(c)(2).

3.6     **Value Opinion**

Opinions of value are typically developed on the basis of one or more of the following dates or situations.

- Fair Market Value "As Is" on the Appraisal Date: Market Value "As Is" on the appraisal date is an opinion of the market value of a property in the condition observed upon inspection and as it physically and legally exists without hypothetical conditions, assumptions, or qualifications as of the date the appraisal is prepared.

- Prospective Market Value "Upon Completion" of Construction: Prospective market value "upon completion" of construction is the future value of a property on the date that construction, conversion, or rehabilitation is completed, based upon market conditions forecast to exist as of that completion date.

- Prospective Market Value "Upon Reaching Stabilized Occupancy:" Prospective market value "upon reaching stabilized occupancy" is the future value of a property when all improvements have been physically constructed and the property has been leased to its optimum level of long-term occupancy at the market rent level.

The value opinion for the subject property encumbered by the conservation easement has been reported on the basis of **Fair Market Value "As Is."** At the time of appraisal, the conservation easement was in place. Therefore, the "before-easement" analysis is based on the hypothetical condition of the conservation easement not being in place and encumbering the subject property since the conservation easement does exist as of the date of this appraisal.

## 3.7  Report Type

According to the Uniform Standards of Professional Appraisal Practice (USPAP), Standards Rule 2-2, an appraisal report must be prepared under one of the following options and prominently state the option used: Appraisal Report or Restricted Appraisal Report. These report types are described as follows:

- Appraisal Report:  The content must be consistent with the intended use of the appraisal and, at minimum: (i) state the identity of the client and any intended users, by name or type; (ii) state the intended use of the appraisal; (iii) summarize information sufficient to identify the real estate involved in the appraisal, including the physical, legal, and economic property characteristics relevant to the assignment; (iv) state the real property interest to be appraised; (v) state the type and definition of value and cite the source of the definition; (vi) state the effective date of appraisal and the date of the report; (vii) summarize the scope of work used to develop the appraisal; (viii) summarize the information analyzed, the appraisal methods and techniques employed, and reasoning that supports the analysis, opinions, and conclusions; exclusion of the Sales Comparison Approach, Cost Approach, or Income Approach must be explained; (ix) state the use of the real estate existing as of the date of value and the use of the real estate reflected in the appraisal; (x) when an opinion of highest and best use was developed by the appraiser, summarize the support and rational for that opinion; (xi) clearly and conspicuously: (1) state all extraordinary assumptions and hypothetical conditions; and (2) state that their use might have affected the assignment results; (xii) include a signed certification in accordance with Standards Rule 2-3.

- Restricted Appraisal Report:   The content must be consistent with the intended use of the appraisal and, at minimum: (i) state the identity of the client, by name or type, and state a prominent use restriction that limits the use of the report to the client and warns that the rational for how the appraiser arrived at the opinions and conclusions set forth in the report may not be understood property without additional information in the appraiser's work file; (ii) state the intended use of the appraisal; (iii) state information sufficient to identify the real estate involved in the appraisal; (iv) state the real property interest appraised; (v) state the type of value and cite the source of the definition; (vi) state the effective date of appraisal and the date of the report; (vii) state the scope of work used to develop the appraisal; (viii) state the appraisal methods and techniques employed, state the value opinion(s) and conclusion(s) reached, and reference the work file; exclusion of the Sales Comparison Approach, Cost Approach, or Income Approach must be explained;

EXHIBIT C - 2019 BROWN HARRIS

(ix) state the use of the real estate existing as of the date of value and the use of the real estate reflected in the appraisal; (x) when an opinion of highest and best use was developed by the appraiser, state the opinion; (xi) clearly and conspicuously: (1) state all extraordinary assumptions and hypothetical conditions; and (2) state that their use might have affected the assignment results; (xii) include a signed certification in accordance with Standards Rule 2-3.

This report is prepared as an **Appraisal Report.**

## SECTION 4 – AREA AND MARKET ANALYSIS

A study and analysis were conducted focusing on the regional market area relevant to the subject property. The resulting analysis begins with a wide scope concentrating on the Southeastern United States, transitioning to a discussion on the State of Georgia, and concluding with a macro-level analysis of the metropolitan, county and city statistical area. A combined statistical area is composed of metropolitan statistical areas that have a common nexus, often sharing labor and media markets.

### 4.1 SOUTHEASTERN UNITED STATES REGIONAL ANALYSIS



**Location**

According to the U.S. Census Bureau, the southern region of the United States consists of 16 states as indicated on the map above. However, the southeastern region of the United States commonly excludes Texas, Oklahoma, Missouri, West Virginia and Maryland. The Southeast experiences unique locational advantages due to its positioning and access to major commerce ports and as a result of being bordered on two sides by major bodies of water.

Additionally, the climate in the Southeast allows for additional commerce centers and transit routes for goods through the extensive waterways and rail systems running strategically throughout the region and free of the negative impacts of seasonal weather issues. The southeastern region has also seen an influx of businesses, contributing to an increase in population, workforce, and infrastructure.

**Demographics**

The southern region of the United States is the most populous region in the country with the U.S. Census Bureau 2019 estimate of 125.6 million people accounting for approximately 40.0% of the overall U.S. population. Furthermore, the southeastern region of the United States is estimated to have a population exceeding 84.9 million people,[9] accounting for 26% of the overall U.S. population alone, employing over 58 million people.  Often, with an influx in population, regions and states struggle to maintain a low unemployment rate. However, the unemployment rate for states in the Southeast all remain near the nationwide unemployment rate

---

[9] *Federal Reserve Bank of St. Louis (FRED)*

of 3.5%[10] as demonstrated by the below chart, and as exemplified by South Carolina with 2.3%, Alabama with 2.7% and Florida with 3.0% in December of 2019.





## Most Populous States in the Southeast

Based on 2019 estimates, the most populous state in the region is Florida (21,477,737), followed by Georgia (10,617,423) and North Carolina (10,488,084).[11]

| State | 2019 Estimate | 2010 Census | Change | Area (in square miles) | Density (people per square mile) |
|---|---|---|---|---|---|
| | | | | | |

---

[10] *Federal Reserve Bank of St. Louis (FRED)*
[11] *U.S. Census Bureau*

EXHIBIT C 2019 BROWN HARRIS

Case 3:22-cv-01213-TAD-KDM Document 178-2 Filed 01/02/23 Page 315 of 600

| State | 2019 Estimate | 2010 Census | Change | Area (in square miles) | Density (people per square mile) |
|---|---|---|---|---|---|
| **Alabama** | 4,903,185 | 4,779,736 | +2.6% | 50,645 | 96 |
| **Arkansas** | 3,017,804 | 2,915,918 | +3.5% | 52,035 | 58 |
| **Florida** | 21,477,737 | 18,801,310 | +14.2% | 53,624 | 397 |
| **Georgia** | 10,617,423 | 9,687,653 | +9.6% | 57,513 | 181 |
| **Kentucky** | 4,467,673 | 4,339,367 | +3.00% | 39,486 | 113 |
| **Louisiana** | 4,648,794 | 4,533,372 | +2.5% | 43,203 | 108 |
| **Mississippi** | 2,976,149 | 2,967,297 | +0.3% | 46,923 | 64 |
| **North Carolina** | 10,488,084 | 9,535,483 | +10.0% | 48,617 | 213 |
| **South Carolina** | 5,148,714 | 4,625,364 | +11.3% | 30,060 | 169 |
| **Tennessee** | 6,829,174 | 6,346,105 | +7.6% | 41,234 | 164 |
| **Virginia** | 8,535,519 | 8,001,024 | +6.7% | 39,490 | 215 |
| **West Virginia** | 1,792,147 | 1,852,994 | −3.3% | 24,038 | 75 |

EXHIBIT C 2019 BROWN-PARRIS

Case 3:22-cv-... Document ... Filed ... Page 316 of 600

Below is a chart that provides the change in total population for the U.S. and Southeast region from 2000 to 2030.

| Change in Total Population for U.S. and South Atlantic States: 2000 to 2030 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Numerical Change | | | | Percent Change | | |
| | 2000 to 2010 | 2010 to 2020 | 2020 to 2030 | 2000 to 2030 | 2000 to 2010 | 2010 to 2020 | 2020 to 2030 | 2000 to 2030 |
| United States | 27,513,675 | 26,868,965 | 27,779,889 | 82,162,529 | 9.8 | 8.7 | 8.3 | 29.2 |
| South Atlantic Region | 8,022,621 | 8,650,245 | 9,651,190 | 26,324,056 | 15.5 | 14.5 | 14.1 | 50.8 |
| South Carolina | 434,692 | 375,873 | 325,992 | 1,136,557 | 10.8 | 8.5 | 6.8 | 28.3 |
| North Carolina | 1,296,510 | 1,363,466 | 1,518,450 | 4,178,426 | 16.1 | 14.6 | 14.2 | 51.9 |
| Georgia | 1,402,627 | 1,254,673 | 1,174,085 | 3,831,385 | 17.1 | 13.1 | 10.8 | 46.8 |
| Florida | 3,269,313 | 4,154,834 | 5,279,244 | 12,703,391 | 20.5 | 21.6 | 22.6 | 79.5 |
| Virginia | 931,730 | 907,150 | 907,624 | 2,746,504 | 13.2 | 11.3 | 10.2 | 38.8 |
| West Virginia | 20,797 | -28,029 | -81,153 | -88,385 | 1.2 | -1.5 | -4.5 | -4.9 |
| District of Columbia | -42,274 | -49,245 | -47,126 | -138,645 | -7.4 | -9.3 | -9.8 | -24.2 |
| Maryland | 608,484 | 592,656 | 524,625 | 1,725,765 | 11.5 | 10.0 | 8.1 | 32.6 |
| Delaware | 100,742 | 78,867 | 49,449 | 229,058 | 12.9 | 8.9 | 5.1 | 29.2 |

*Source: U.S. Census Bureau, Population Division, Interim State Population Projections, 2005.*

The below map reflects the forecasted population growth by state, of particular interest is the fact that the southern U.S. is expected to grow by 23.6% over the next 20 years.



*Figure 26: Population growth by state. The southern US is expected to grow by 23.6% over the next 20 years. The region ranked second in growth rate is the west at 13.5%. Georgia and the Florida panhandle will help fuel Alabama's construction aggregate industry in the future.*

By 2060 the population is projected to reach 404 million with the largest age group being between 18 and 44 years old at 132.3 million with the 45- to 64-year-old age group being close at 97 million.

EXHIBIT C - 2019 BROWN-HARRIS

**Population by Age Group: Projections 2020 to 2060**
The population is projected to reach 404 million by 2060.
(In millions)

| Characteristic | Population | | | | | | Change from 2016 to 2060 | |
|---|---|---|---|---|---|---|---|---|
| | 2016 | 2020 | 2030 | 2040 | 2050 | 2060 | Number | Percent |
| Total population . . . . . . . | 323.1 | 332.6 | 354.8 | 373.1 | 388.3 | 403.7 | 80.6 | 24.9 |
| Under 18 years . . . . . . . . . . . . . . | 73.6 | 73.9 | 75.4 | 76.8 | 77.9 | 79.8 | 6.2 | 8.4 |
| 18 to 44 years . . . . . . . . . . . . . . . | 116.0 | 119.2 | 125.0 | 126.3 | 129.3 | 132.3 | 16.3 | 14.1 |
| 45 to 64 years . . . . . . . . . . . . . . | 84.3 | 83.4 | 81.3 | 89.1 | 95.4 | 97.0 | 12.8 | 15.1 |
| 65 years and over . . . . . . . . . . | 49.2 | 56.1 | 73.1 | 80.8 | 85.7 | 94.7 | 45.5 | 92.3 |
| 85 years and over . . . . . . . . . . | 6.4 | 6.7 | 9.1 | 14.4 | 18.6 | 19.0 | 12.6 | 197.8 |
| 100 years and over . . . . . . . . . . | 0.1 | 0.1 | 0.1 | 0.2 | 0.4 | 0.6 | 0.5 | 618.3 |

Note: The official population estimates for the United States are shown for 2016; the projections use the vintage 2016 population estimate for July 1, 2016, as the base population for projecting from 2017 to 2060.
Source: U.S. Census Bureau, 2017 National Population Projections.

## Economy

The Southeast has experienced an economic renaissance over the last 35 years due to exponential growth in tourism, financial services, manufacturing, and high-technology industries. Leading this transformation is a wealth of automotive manufacturing drawn by attractive government incentives, research hubs, and in certain cases, access to trade ports.

Increasing levels of global growth boosted economic activity in the Southeast U.S. in the past several years, as rising exports fueled gains at the region's factories and natural resource producers. The region's manufacturing sector is seeing strong demand across many key industries. Output, shipments, and employment are all solidly up in 2019, and the region continues to attract a wealth of capital investment. Energy and petrochemicals account for the bulk of exports from Louisiana.[12]

For the first time in more than a decade, every major industrial economy grew in 2017 and continued to grow in 2019, and the south benefitted as home to five of the nation's most export-intensive states as measured by exports as a share of state Gross Domestic Product (GDP).[13] The region boasts four of the top ten states in the US for tourism: Florida (2), Virginia (6), South Carolina (7), and Georgia (9).[14] The Southeast's unemployment rate averaged 3.2% during the fourth quarter of 2019, with declines in five of the eight states. South Carolina had the lowest rate in the region at 2.2%.[15]

---

[12] *Wells Fargo Economics Group, Special Commentary, April 20, 2018*
[13] *U.S. Department of Commerce*
[14] *Business Insider*
[15] *Blount, Casey M. (2019) HUD PD&R Regional Report: Region 4: Southeast/Caribbean.*
*https://www.huduser.gov/portal/periodicals/USHMC/reg//Southeast-Caribbean-RR-3rd Q19.pdf*





The unemployment rate declined in five of the eight states in the Southeast/Caribbean region and was unchanged in Tennessee during the fourth quarter of 2019 relative to a year ago.

4Q = fourth quarter.
Source: U.S. Bureau of Labor Statistics

The rate of job growth remained strong in the Southeastern region during 2019, continuing a trend of relatively rapid economic expansion that began in 2011. Nonfarm payrolls averaged 29.54 million during the third quarter of 2019, an increase of 574,000 jobs, or 2.0%, compared with an increase of 558,300 jobs, or 2.0%, during the third quarter of 2018. Each state in the region added jobs during the past year, ranging from 1.2% growth in Kentucky to 2.7% growth in Florida. All nonfarm payroll sectors added jobs in the region, led by the education and health services sector, which expanded by 122,800 jobs, or 3.1%. The fastest job growth was in the leisure and hospitality sector, which added 114,800 jobs, or 3.3%. The unemployment rate for the region averaged 3.9% during the third quarter of 2019, down from 4.0% during the third quarter of 2018, with declines in four of eight states. In Alabama, the rate fell from 4.0% to 2.9%, the largest percentage point decline of any state in the nation. The largest increase in the region, from 4.8 to 5.9%, was in Mississippi.[16] During the third quarter of 2019, in Florida, nonfarm payrolls averaged 8.96 million, an increase of 233,000 jobs, or 2.7%. The education and health services sector in Florida expanded by 63,250 jobs, or 4.8%, the largest and fastest growth rate of any sector in the state. Multiple hospital expansions contributed to gains in the sector including more than 100 jobs at Orlando Health's new $69 million emergency care center in the city of Kissimmee. Job growth exceeded the 1.5% rate for the nation in seven of the eight states in the region including Alabama and North Carolina, where nonfarm payrolls expanded by 41,350 and 81,350 jobs, or 2.0 and 1.8%, respectively. Nonfarm payroll growth accelerated in four of eight states in the region, with the most significant change in Mississippi, which added 18,050 jobs, or 1.4%, up from an increase of 2,225 jobs, or 0.2%, a year ago. The leisure and hospitality sector, which expanded by 5,150 jobs, or 3.8%, led job gains as sports wagering, which was legalized in the state in mid-2018, generated $9.7 million in taxable revenue during the third quarter of 2019, up 55.0% from the third quarter of 2018.[17]

---

[16] Blount, Casey M., *HUD PD&R Regional Report: Region 4: Southeast/Caribbean,3rd Q2019*
*https://www.huduser.gov/portal/periodicals/USHMC/reg/Southeast-Caribbean-RR-3rd Q19.pdf*
[17] Blount, Casey M., *HUD PD&R Regional Report: Region 4: Southeast/Caribbean, 3rd Q2019*
*https://www.huduser.gov/portal/periodicals/USHMC/reg/Southeast-Caribbean-RR-3rd Q19.pdf*

# EXHIBIT C 2019 BROWN-PARRS

All nonfarm payroll sectors added jobs in the Southeast/Caribbean region during the third quarter of 2019.

| | Third Quarter | | Year-Over-Year Change | |
|---|---|---|---|---|
| | 2018 (Thousands) | 2019 (Thousands) | Absolute (Thousands) | Percent |
| Total Nonfarm Payrolls | 28,965.9 | 29,539.9 | 574.0 | 2.0 |
| Goods-Producing Sectors | 4,095.5 | 4,165.2 | 69.7 | 1.7 |
| Mining, Logging, & Construction | 1,499.4 | 1,535.5 | 36.1 | 2.4 |
| Manufacturing | 2,596.1 | 2,629.8 | 33.7 | 1.3 |
| Service-Providing Sectors | 24,870.4 | 25,374.7 | 504.3 | 2.0 |
| Wholesale & Retail Trade | 4,553.1 | 4,598.9 | 45.8 | 1.0 |
| Transportation & Utilities | 1,205.4 | 1,243.3 | 37.9 | 3.1 |
| Information | 477.3 | 479.6 | 2.3 | 0.5 |
| Financial Activities | 1,615.1 | 1,656.8 | 41.7 | 2.6 |
| Professional & Business Services | 4,105.1 | 4,194.1 | 89.0 | 2.2 |
| Education & Health Services | 3,959.8 | 4,082.6 | 122.8 | 3.1 |
| Leisure & Hospitality | 3,474.2 | 3,589.0 | 114.8 | 3.3 |
| Other Services | 1,088.3 | 1,109.1 | 20.8 | 1.9 |
| Government | 4,392.2 | 4,421.3 | 29.1 | 0.7 |

Note: Numbers may not add to totals due to rounding.
Source: U.S. Bureau of Labor Statistics

*Source: U.S. Bureau of Labor Statistics*

In the fourth quarter of 2019, nonfarm payrolls in the region averaged 30.00 million, an increase of 546,100 jobs, or 1.9%, compared with an increase of 527,600 jobs, or 1.8%, during the fourth quarter of 2018. Each state in the region added jobs during the past year, ranging from 0.7 % growth in Mississippi to 2.5% growth in Florida. All but one nonfarm payroll sector added jobs in the region; the leisure and hospitality and the education and health services sectors, which expanded by 133,900 and 126,900 jobs, or 3.9 and 3.1%, respectively, led job growth. Notable gains also occurred in the professional and business services and the mining, logging, and construction sectors, which added 63,500 and 33,000 jobs, or 1.5 and 2.2%, respectively. The information sector, which declined slightly, was the only sector in the region to lose jobs during the past year. The unemployment rate for the region fell in five of the eight states and averaged 3.2% during the fourth quarter of 2019, down from 3.6% during the fourth quarter of 2018. South Carolina had the lowest rate in the region at 2.2%. By comparison, the unemployment rate for the nation was 3.3%, down from 3.6% a year ago.[18]



4Q = fourth quarter.
Source: U.S. Bureau of Labor Statistics

During the fourth quarter of 2019, in Florida nonfarm payrolls average 9.15 million, an increase of 221,400 jobs, or 2.5%. The education and health services sector, which added 57,700 jobs or 4.3%, led job growth in Florida. The fastest rate of growth was in the mining, logging, and construction sector, however, which expanded 4.6%, or by 25,350 jobs; that expansion was due in part to a 7.0% increase in the number of residential units (single-family and multifamily)

[18] Blount, Casey M., HUD PD&R Regional Report: Region 4: Southeast/Caribbean,4th Q2019

permitted in the state. Job growth also exceeded the national rate of 1.8% in Alabama and North Carolina, where nonfarm payrolls expanded to 2.11 million and 4.62 million jobs, increases of 2.3 and 2.0%, respectively, or 46,9 and 90,500 jobs, respectively, from a year ago.[19]

In the fourth quarter of 2019, nonfarm payroll growth accelerated in four of the eight states in the region, with the most significant change in Kentucky, which added 22,550 jobs, or 1.2%, more than triple the increase of 7,125 jobs, or 0.3%, a year ago. The education and health services sector, which expanded by 11,500 jobs, or 4.1%, led job growth in the state. That job growth occurred in part because of the completion of the first two phases of a $78.3 million expansion of the Norton Children's Hospital in Louisville.[20]

The rate of job growth in Mississippi was nearly unchanged, at 0.1%. Nonfarm payrolls in Georgia, South Carolina, and Tennessee increased 1.6, 1.5, and 1.5%, respectively, down from respective rates of 1.9, 2.4, and 1.7% during the fourth quarter of 2018.[21]

During the fourth quarter of 2019, all but one nonfarm payroll sector added jobs in the Southeast/Caribbean region.

| | Fourth Quarter | | Year-Over-Year Change | |
| | 2018 (Thousands) | 2019 (Thousands) | Absolute (Thousands) | Percent |
|---|---|---|---|---|
| Total Nonfarm Payrolls | 29,455.2 | 30,001.3 | 546.1 | 1.9 |
| Goods-Producing Sectors | 4,112.0 | 4,168.9 | 56.9 | 1.4 |
| Mining, Logging, & Construction | 1,503.0 | 1,536.0 | 33.0 | 2.2 |
| Manufacturing | 2,608.9 | 2,632.9 | 24.0 | 0.9 |
| Service-Providing Sectors | 25,343.2 | 25,832.3 | 489.1 | 1.9 |
| Wholesale & Retail Trade | 4,654.2 | 4,699.3 | 45.1 | 1.0 |
| Transportation & Utilities | 1,251.9 | 1,279.5 | 27.6 | 2.2 |
| Information | 483.7 | 483.6 | -0.1 | 0.0 |
| Financial Activities | 1,628.1 | 1,659.2 | 31.1 | 1.9 |
| Professional & Business Services | 4,186.1 | 4,249.6 | 63.5 | 1.5 |
| Education & Health Services | 4,042.5 | 4,169.4 | 126.9 | 3.1 |
| Leisure & Hospitality | 3,433.2 | 3,567.1 | 133.9 | 3.9 |
| Other Services | 1,088.5 | 1,111.5 | 23.0 | 2.1 |
| Government | 4,575.1 | 4,613.1 | 38.0 | 0.8 |

Note: Numbers may not add to totals due to rounding.
Source: U.S. Bureau of Labor Statistics

The fracking revolution is producing huge quantities of oil and natural gas, which has ignited a boom in energy infrastructure investment that should support exports for years to come. It should come as no surprise then that the energy sector was the driver of the south's economy in 2019, leading to a robust rebound in jobs in energy-producing states such as Texas, Oklahoma, Louisiana, and West Virginia.[22]

Transportation-related equipment is a major export for the region. Historically, the category has been dominated by motor vehicles but now has shifted to aerospace and aviation products. Over the past decade, the Southeast has seen an upswing in the automotive industry. Numerous new automobile production plants are proliferating, including Mercedes-Benz in Tuscaloosa, Alabama; Hyundai in Montgomery, Alabama; Toyota Motors in Blue Springs, Mississippi; Kia Motors in West Point, Georgia; the BMW production plant in Greer, South Carolina; Volkswagen in Chattanooga, Tennessee; the Ford assembly plant in Louisville, KY; the GM manufacturing plant in Spring Hill, Tennessee; and the Nissan North American headquarters in Franklin, Tennessee. The future is bright for auto manufacturing in the region. In 2015, Volvo Car Corp. announced its plans to invest $500 million in a factory in South Carolina, which was set to open in 2018 and projected to provide 4,000 jobs. Volvo is reported to have received more than $200 million in incentives from the state government, including $120 million

---

[19] Blount, Casey M., HUD PD&R Regional Report: Region 4: Southeast/Caribbean,4th[d] Q2019
[20] Blount, Casey M., HUD PD&R Regional Report: Region 4: Southeast/Caribbean,4th Q2019
[21] Blount, Casey M., HUD PD&R Regional Report: Region 4: Southeast/Caribbean,4th Q2019
[22] U.S. Bureau of Labor Statistics

EXHIBIT C - 2019 BROWN-HARRIS

Case 3:22-cv-... Document 4... Filed 0.../.../... Page 321 of 600

in economic development bonds. Overall, the Southeast is home to almost a quarter of the total U.S. auto manufacturing plants in America (see map below).

**Automotive Manufacturing Plants in the Southeast**



Source: *Bureau of Economic Analysis, U.S. Department of Commerce*

Because of the auto industry, opportunities have expanded for support companies such as automobile engine manufacturing, as well as parts, especially tires. The southeast is home to 36.8% of the country's tire manufacturing facilities. The graph below illustrates the region's growth in tire manufacturing which includes the opening of the Yokohama Tire plant in West Point, Mississippi and the major expansion of the Toyo Tire facility in Bartow County, Georgia.



Source: *U.S. Bureau of Labor Statistics*

Aerospace and aviation are also powerful economic drivers in the region, including a number of NASA facilities such as the Kennedy Space Center in Florida and the Stennis Space Center in southern Mississippi (see map below). The region is home to more than 20.0% of total space vehicle and missile manufacturing facilities in the country. For example, Lockheed Martin, a major player in the industry, operates aeronautics facilities in Mississippi, West Virginia, Florida, and South Carolina. In aircraft engine and parts manufacturing, the Southeast is home to 16.9% of the country's total. In 2015, Boeing opened a $6 million technology and research facility in Huntsville, Alabama. Other operators in the region include Raytheon, Airbus and Embraer. Mobile, Alabama is home to the final assembly line of Airbus' A320 jetliner at a facility which opened in 2015. Mobile, Alabama is also home to a massive, state-of-the art manufacturing facility for the giant German steel company ThyssenKrupp.

### Sampling of Aviation Facilities in Southeast



Source: *Southeast Aerospace Industry/Courtesy Dorchester County*

In summary, the benefits of economic vitality in the Southeast U.S. include some of the lowest unemployment rates in the nation; the attraction of Fortune 500 companies to establish their headquarters (20 in Virginia, 16 in Florida, 15 in North Carolina, and 14 in Georgia); and population growth (see Most Populous States under Demographics above). The business community has taken note of the economic attractiveness of the Southeast, as three of the top 10 states for business according to Forbes are in the region. The Southeast's population and economic growth has resulted in a Gross Domestic Product (GDP) of nearly $4.598 trillion[23] as of the fourth quarter of 2019, outpacing the rest of the U.S., and boasting the fifth largest GDP in the world (see chart below).[24]



---

[23] *https://fred.stlouisfed.org*
[24] *U.S. Bureau of Economic Analysis*

EXHIBIT C 2019 BROWN-HARRIS



## Transportation

Contributing to the Southeast's rapid growth over the last several years is the access to major transportation corridors. Most of the major cities in the Southeast are connected via a robust Interstate system, allowing for the smooth transport of goods, services, personnel, and raw materials. In addition to the Interstate system, the U.S. Department of Transportation (USDOT) is currently in the process of expanding the passenger rail system in the Southeast. USDOT is currently three to four years into the planning and research associated with the development of the Southeastern Rail Corridor, a passenger rail network linking Washington, DC to Atlanta, Savannah, GA, and Jacksonville, FL, as well as several cities in between.

Not only is passenger rail and transportation making strides and investing in the southeast, major rail lines are following suit, or leading the way, by increasing the infrastructure required to support these increased demands. Norfolk Southern Rail and CSX Rail currently operate two of the most extensive industrial rail networks in the southeast region.

Additionally, Norfolk Southern Rail is currently working on the $2.5 billion rail infrastructure project, the Crescent Corridor. The corridor is expected to provide 30 new rail lines along the 2,500-mile Crescent Corridor and in excess of 122,000 jobs through 2030 with connections in Charlotte, NC, Knoxville, TN, Atlanta, GA, Chattanooga, TN, and Birmingham, AL in an effort to meet the growing industry boom in the Southeast.

EXHIBIT C 2019 BROWN HARRIS



This expansion is being fueled by both import and export activity, as well as increases in manufacturing employment throughout the region, most notably from port markets such as Savannah, GA, Miami, FL, and Charleston, SC with continued growth expected as the Panama Canal is widened to support larger vessels.[25] The expansion, coupled with the Southeast being one of the fastest growing regional markets in the United States, attracts businesses from all market sectors along with influx of a talented workforce spanning multiple generations.

### Housing

The economic indicators in the Southeast point to the region becoming one of the fastest growing housing markets in the United States. New and developing businesses are being drawn to the region, creating new jobs and new opportunities for many relocating residents as well as locals who are choosing to stay in their geographic area where they are currently employed. In order to meet the demand generated by population and economic growth, the housing market has ramped up single- and multi-family home production throughout most of the region.




According to the U.S. Department of Housing and Urban Development (HUD), almost every state in the region has seen a year-over-year increase in the number of homes sold, simultaneously with a decrease in vacancy rates for both sales and rentals, in addition to every state seeing at least a 2.0% increase in home value.[26] Specifically, the average price for a home in the region increased 5.0% to approximately $237,200 following an increase of 6.0% during the previous 12 months. Home prices increased in seven of the eight states in the region, ranging from a 7.0% increase in Alabama to a 3.0% increase in Kentucky. (Charts of the First Quarter of 2019 are in green below.)

---

[25] *Wagner, D. (2017). Southeastern U.S. Experiencing a Growth Spurt. National Real Estate Investor.*
[26] *Blount, Casey M. (2019) HUD PD&R Regional Report: Region 4: Southeast/Caribbean.*
*https://www.huduser.gov/portal/periodicals/USHMC/reg//Southeast-Caribbean-RR-2Q19.pdf*

EXHIBIT C 2019 BROWN PARRIS

However, according to the U.S. Department of Housing and Urban Development (HUD) in the second quarter of 2019, the sales market conditions were mixed ranging from slightly tight to slightly soft. Declines in available inventory limited the volume of home sales activity in some markets, although home prices rose throughout much of the region.  The inventory of available homes in the region decreased to 3.8 months in May 2019 (Corelogic, Inc.). During the 12 months ending May 2019, a total of 1.52 million new and existing homes were sold in the region, a decline of 1.0% from the previous 12 months.  The number of homes sold decreased in five of the eight states in the region during the 12 months ending May 2019 with Alabama, North Carolina, and Mississippi being the only states where home sales increased.  The average new and existing home price increased 5.0% in the region.  The vacancy rates for multi-family homes declined throughout most of the region, however, the decline in vacancy rates led to an increase in rent growth exceeding the 5.0% rate for the nation in five of the eight states in the region. The number of single-family homes permitted in the region declined 3.0% and multi-family homes permitted increased by 2.0%. (Charts for Second Quarter of 2019 are in orange below.)

Again, in the third quarter of 2019, according to the U.S. Department of Housing and Urban Development (HUD, the sales market conditions ranged from slightly tight to slightly soft. The volume of home sales activity declined in several major markets due in part to declining levels of available inventory. Home prices rose throughout much of the region, however, as economic conditions continued to strengthen. The inventory of available homes in the region decreased from 3.9 months in August 2018 to 3.6 months in August 2019; it is currently 63.0% below the August high of 11.0 months in 2010, during the peak of the housing crisis (CoreLogic, Inc., with adjustments by the analyst). The level of for-sale inventory is particularly low in Kentucky, where the supply of available homes was only 2.7 months in August 2019, down from 2.9 months in August 2018, and the lowest figure in the region. During the 12 months ending August 2019, 1.56 million new and existing homes (including single-family homes, townhomes, and condominiums) were sold in the region, down 2.0% from the previous 12 months. The number of homes sold decreased in seven of the eight states in the region during the 12 months ending August 2019 with Alabama, where home sales rose 1.0%, the only state where home sales increased. The fastest decrease, 6.0%, was in Kentucky. The average new and existing home price increased 4.0% in the region during the most recent 12 months and is approximately 12.0% higher than the previous peak of $215,100 in 2006, prior to the housing market crisis. Home sales prices increased in every state in the region except Mississippi, where home prices declined 1.0%.  Home prices increased at least 5.0% in four of the eight states in the region with the fastest increase, 7.0%, in Tennessee. New home construction increased throughout much of the region in response to rising home prices during the past year. The total number of single-family homes permitted in the Southeastern region rose 6.0% during the third quarter of 2019, with increases in seven of the eight states. During the third quarter of 2019 (preliminary data), the number of single-family homes permitted in the region totaled approximately 65,150, up 6.0% from 61,300 a year ago. In Florida, the number of single-family homes increased 6.0% to 24,550, the largest increase in the region. The fastest increases in the region were in Alabama and South Carolina, where the number of single-family homes permitted increased 15.0 and 13.0%, to 3,450 and 7,200, respectively. The number of single-family homes permitted declined 1.0% in Georgia but increases ranged from 3.0% to 8.0% in the remaining four states in the region.[27] (Charts for Third Quarter of 2019 are in red below.)

---

[27] *Blount, Casey M. (2019) HUD PD&R Regional Report: Region 4: Southeast/Caribbean, 3rd Q2019*

**The number of homes sold increased in six of the eight states in the Southeast/Caribbean region during the past year while the average sales price increased in all but one.**

| | 12 Months Ending | Number of Homes Sold | | | Price | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2018 | 2019 | Percent Change | Average or Median | 2018 ($) | 2019 ($) | Percent Change |
| Alabama (N&E) | February | 97,900 | 101,900 | 4 | AVG | 161,800 | 173,200 | 7 |
| Florida (N&E) | February | 596,600 | 600,200 | 1 | AVG | 260,900 | 276,200 | 6 |
| Georgia (N&E) | February | 232,400 | 237,100 | 2 | AVG | 216,800 | 226,400 | 4 |
| Kentucky (N&E) | February | 78,550 | 78,250 | 0 | AVG | 161,300 | 166,900 | 3 |
| Mississippi (N&E) | February | 12,250 | 12,700 | 4 | AVG | 219,000 | 212,400 | -3 |
| North Carolina (N&E) | February | 221,000 | 227,600 | 3 | AVG | 221,500 | 230,500 | 4 |
| South Carolina (N&E) | February | 122,300 | 124,500 | 2 | AVG | 214,600 | 225,300 | 5 |
| Tennessee (N&E) | February | 170,500 | 168,400 | -1 | AVG | 192,500 | 204,300 | 6 |

AVG = average. N&E = new and existing.
Notes: Data include new and existing single-family homes, townhomes, and condominiums. Data for Mississippi exclude Hinds County, the most populous county in the Jackson metropolitan area.
Source: CoreLogic, Inc., with adjustments by the analyst

**The number of homes sold decreased in five of the eight states in the Southeast/Caribbean region during the past year, while the average sales prices increased in all but one state.**

| | 12 Months Ending | Number of Homes Sold | | | Price | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2018 | 2019 | Percent Change | Average or Median | 2018 ($) | 2019 ($) | Percent Change |
| Alabama (N&E) | May | 100,600 | 102,900 | 2.3 | AVG | 166,500 | 177,900 | 7 |
| Florida (N&E) | May | 602,000 | 596,000 | -1.0 | AVG | 265,700 | 278,300 | 5 |
| Georgia (N&E) | May | 237,500 | 232,400 | -2.1 | AVG | 218,400 | 227,400 | 4 |
| Kentucky (N&E) | May | 81,050 | 77,500 | -4.4 | AVG | 160,100 | 168,800 | 5 |
| Mississippi (N&E) | May | 12,550 | 12,700 | 1.2 | AVG | 218,600 | 211,500 | -3 |
| North Carolina (N&E) | May | 224,300 | 229,000 | 2.1 | AVG | 224,300 | 232,600 | 4 |
| South Carolina (N&E) | May | 106,200 | 104,500 | -1.6 | AVG | 216,200 | 226,200 | 5 |
| Tennessee (N&E) | May | 170,500 | 167,800 | -1.7 | AVG | 196,000 | 208,200 | 6 |

AVG = average. N&E = new and existing.
Notes: Data include new and existing single-family homes, townhomes, and condominiums. Data for Mississippi exclude Hinds County, the most populous county in the Jackson metropolitan area.
Source: CoreLogic, Inc., with adjustments by the analyst

**The number of homes sold decreased in seven of the eight states in the Southeast/Caribbean region during the past year while the average sales price increased at least 5 percent in four of them.**

| | 12 Months Ending | Number of Homes Sold | | | Price | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2018 | 2019 | Percent Change | Average or Median | 2018 ($) | 2019 ($) | Percent Change |
| Alabama (N&E) | August | 103,200 | 104,300 | 1 | AVG | 169,600 | 178,700 | 5 |
| Florida (N&E) | August | 604,900 | 594,200 | -2 | AVG | 269,700 | 280,300 | 4 |
| Georgia (N&E) | August | 242,100 | 237,400 | -2 | AVG | 221,300 | 230,900 | 4 |
| Kentucky (N&E) | August | 85,050 | 80,150 | -6 | AVG | 157,400 | 166,400 | 6 |
| Mississippi (N&E) | August | 21,350 | 20,250 | -5 | AVG | 201,100 | 199,900 | -1 |
| North Carolina (N&E) | August | 233,100 | 231,700 | -1 | AVG | 225,500 | 235,900 | 5 |
| South Carolina (N&E) | August | 130,600 | 125,200 | -4 | AVG | 219,400 | 228,400 | 4 |
| Tennessee (N&E) | August | 172,500 | 167,800 | -3 | AVG | 198,700 | 212,100 | 7 |

AVG = average. N&E = new and existing.
Notes: Data include new and existing single-family homes, townhomes, and condominiums. Data for Mississippi exclude Hinds County, the most populous county in the Jackson metropolitan area.
Source: CoreLogic, Inc., with adjustments by the analyst

**Apartment vacancy rates declined in six of the eight major markets within the Southeast/Caribbean region during the first quarter of 2019, with rent growth of at least 5 percent in seven of them.**

| | Market Condition | Vacancy Rate | | | Average Monthly Rent | | |
|---|---|---|---|---|---|---|---|
| | | 1Q 2018 (%) | 1Q 2019 (%) | Percentage Point Change | 1Q 2018 ($) | 1Q 2019 ($) | Percent Change |
| Atlanta | Balanced | 5.9 | 5.2 | -0.7 | 1,157 | 1,232 | 6 |
| Birmingham | Balanced | 6.6 | 5.6 | -1.0 | 888 | 958 | 8 |
| Charlotte | Balanced | 5.2 | 5.2 | 0.0 | 1,054 | 1,123 | 7 |
| Columbia | Balanced | 6.7 | 6.5 | -0.2 | 885 | 927 | 5 |
| Jackson | Balanced | 6.1 | 6.6 | 0.5 | 826 | 850 | 3 |
| Louisville | Balanced | 5.3 | 4.9 | -0.4 | 839 | 879 | 5 |
| Miami | Slightly Tight | 4.5 | 4.3 | -0.3 | 1,521 | 1,808 | 6 |
| Nashville | Balanced | 5.5 | 5.3 | -0.2 | 1,126 | 1,212 | 8 |

1Q = first quarter.
Sources: Market condition—Economic and Market Analysis Division; vacancy rate and average monthly rent—RealPage, Inc.

During the second quarter of 2019, rent growth exceeded the national rate of 5 percent in five of the eight major markets in the Southeast/Caribbean region.

| | Market Condition | Vacancy Rate | | | Average Monthly Rent | | |
|---|---|---|---|---|---|---|---|
| | | 2Q 2018 (%) | 2Q 2019 (%) | Percentage Point Change | 2Q 2018 ($) | 2Q 2019 ($) | Percent Change |
| Atlanta | Balanced | 5.4 | 4.8 | -0.7 | 1,169 | 1,247 | 7 |
| Birmingham | Balanced | 6.0 | 5.0 | -1.0 | 917 | 976 | 6 |
| Charlotte | Slightly Tight | 4.8 | 4.3 | -0.5 | 1,079 | 1,144 | 6 |
| Columbia | Balanced | 6.1 | 5.1 | -1.1 | 897 | 936 | 4 |
| Jackson | Balanced | 6.2 | 5.6 | -0.6 | 819 | 856 | 5 |
| Louisville | Slightly Tight | 5.0 | 4.1 | -0.9 | 845 | 902 | 7 |
| Miami | Slightly Tight | 4.4 | 3.9 | -0.5 | 1,539 | 1,622 | 5 |
| Nashville | Balanced | 5.2 | 4.5 | -0.7 | 1,139 | 1,230 | 8 |

2Q = second quarter.
Sources: Market condition—Economic and Market Analysis Division; vacancy rate and average monthly rent—RealPage, Inc.

During the third quarter of 2019, rent growth exceeded the national rate of 5 percent in five of the eight major markets in the Southeast/Caribbean region.

| | Market Condition | Vacancy Rate | | | Average Monthly Rent | | |
|---|---|---|---|---|---|---|---|
| | | 3Q 2018 (%) | 3Q 2019 (%) | Percentage Point Change | 3Q 2018 ($) | 3Q 2019 ($) | Percent Change |
| Atlanta | Balanced | 4.8 | 4.4 | -0.4 | 1,196 | 1,273 | 6.4 |
| Birmingham | Balanced | 5.1 | 4.2 | -0.9 | 944 | 1,007 | 6.7 |
| Charlotte | Slightly Tight | 4.3 | 3.8 | -0.5 | 1,094 | 1,173 | 7.2 |
| Columbia | Balanced | 5.1 | 4.6 | -0.5 | 910 | 950 | 4.4 |
| Jackson | Balanced | 5.6 | 4.6 | -1.0 | 846 | 880 | 4.0 |
| Louisville | Slightly Tight | 4.1 | 3.9 | -0.2 | 866 | 908 | 4.8 |
| Miami | Slightly Tight | 4.4 | 4.0 | -0.4 | 1,553 | 1,643 | 5.8 |
| Nashville | Balanced | 4.5 | 3.7 | -0.8 | 1,162 | 1,269 | 9.2 |

3Q = third quarter.
Sources: Market condition—Economic and Market Analysis Division; vacancy rate and average monthly rent—RealPage, Inc.













Sales market conditions in the Southeast region were mixed during the fourth quarter of 2019, ranging from slightly tight to slightly soft. Declines in available inventory limited the volume of home sales activity in some markets, although home prices rose throughout the region, as economic conditions continued to strengthen. The inventory of available homes in the region decreased from 3.8 months in December 2018 to 3.4 months in December 2019. For-sale inventory declined or remained unchanged in every state in the region except Alabama and ranged from a low of 2.3 months in Kentucky to a high of 4.0 months in Mississippi. During the 12 months ending November 2019, 1.57 million new and existing homes (including single-family homes, townhomes, and condominiums) sold in the region, an increase of 1.0% from the previous 12 months (CoreLogic, Inc., and Metrostudy, A Hanley Wood Company, with adjustments by the analyst). The number of homes sold increased in five of the eight states in the region during the 12 months ending November 2019. Georgia, Kentucky, and Mississippi were the only states where home sales decreased. North Carolina had the fastest increase, at 5.0%. The average new and existing home price in the region increased 5.0% to $245,300 during the most recent 12 months (CoreLogic, Inc., with adjustments by the analyst). Home sales prices increased at least 2.0% in every state in the region except Mississippi, where the average home price increased less than 1.0%, to $212,800. The fastest increases, 5.0%, were in Alabama, Kentucky, and Tennessee. In Tennessee, the inventory of available homes for sale declined from four months during December 2018 to 3.2 months during December 2019, the largest decline of any state in the region.[28]

---

[28] Blount, Casey M. (2019) HUD PD&R Regional Report: Region 4: Southeast/Caribbean, 4th Q2019

# EXHIBIT C 2019 BROWN-HARRIS

During the past year, the number of homes sold increased in five of the eight states in the Southeast/Caribbean region, and the average sales price increased in all of them.

| | 12 Months Ending | Number of Homes Sold | | | Price | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2018 | 2019 | Percent Change | Average | 2018 ($) | 2019 ($) | Percent Change |
| Alabama (N&E)** | November | 103,400 | 104,700 | 1 | AVG | 171,500 | 180,700 | 5 |
| Florida (N&E)* | November | 588,500 | 591,800 | 1 | AVG | 294,800 | 302,100 | 2 |
| Georgia (N&E)** | November | 248,300 | 244,700 | -1 | AVG | 237,000 | 247,300 | 4 |
| Kentucky (N&E)** | November | 82,400 | 80,100 | -3 | AVG | 160,800 | 169,400 | 5 |
| Mississippi (N&E)** | November | 17,550 | 16,700 | -5 | AVG | 211,900 | 212,800 | 0 |
| North Carolina (N&E)* | November | 229,300 | 239,700 | 5 | AVG | 242,500 | 252,900 | 4 |
| South Carolina (N&E)* | November | 120,300 | 122,800 | 2 | AVG | 243,400 | 248,900 | 2 |
| Tennessee (N&E)* | November | 164,000 | 168,300 | 3 | AVG | 225,600 | 236,900 | 5 |

AVG = average. N&E = new and existing.
Notes: Data include new and existing single-family homes, townhomes, and condominiums. Data for Mississippi exclude Hinds County, the most populous county in the Jackson metropolitan area.
Sources: Metrostudy, A Hanley Wood Company, with adjustments by the analyst*; CoreLogic, Inc., with adjustments by the analyst**

Developers responded to declining levels of for-sale inventory throughout much of the Southeast region with increased single-family home construction during the fourth quarter of 2019. Single-family home permitting increased in every state in the region except Kentucky, where the number of single-family homes permitted was unchanged, at 1,550.[29]

During the fourth quarter of 2019 (preliminary data), the number of single-family homes permitted in the region rose 12.0%, to approximately 60,650, after a 4.0% increase during the fourth quarter of 2018. Following a 13.0% increase a year ago, the number of single-family homes permitted in Florida rose 11.0%, or by 2,400 homes, to 23,400, the largest increase in the region. The fastest increases in single-family home permitting were in Alabama and Tennessee, where the number of homes permitted rose 25.0% and 21.0%, respectively, to 3,025 and 5,625, respectively. The Birmingham and Nashville markets, where single-family home permitting rose 23.0% and 33.0%, respectively, accounted for much of the increased permitting activity in the two states. The number of single-family homes permitted increased 17.0% and 15.0%, to 9,175 and 1,350 homes, respectively, in Georgia and Mississippi. The number of single-family homes permitted increased 9.0% and 4.0%, to 9,975 and 6,550 homes, respectively, in North Carolina and South Carolina.[30]



Single-family home permitting increased in seven of the eight states in the Southeast/Caribbean region during the fourth quarter of 2019 relative to a year ago.

4Q = fourth quarter.
Note: Based on preliminary data.
Source: U.S. Census Bureau, Building Permits Survey

---

[29] *Blount, Casey M. (2019) HUD PD&R Regional Report: Region 4: Southeast/Caribbean, 4th Q2019*
[30] *Blount, Casey M. (2019) HUD PD&R Regional Report: Region 4: Southeast/Caribbean, 4th Q2019*

EXHIBIT C - 2019 BROWN-PARRIS

Apartment market conditions in the Southeast region were mixed during the fourth quarter of 2019, ranging from balanced to slightly tight; those conditions were unchanged from a year ago. Apartment vacancy rates declined throughout much of the region. The largest decline of 1.0 percentage point was in the Jackson metropolitan area, where slow multifamily permitting during much of the past decade allowed for significant absorption of existing inventory (RealPage, Inc.). Average apartment rents increased in each of the eight major markets in the region, with rent growth exceeding the 4.0% rate for the nation in six of the markets (RealPage, Inc.). Birmingham and Nashville had the fastest growth rate in the region, at 8.0%. In Birmingham, the apartment vacancy rate declined 0.7 of a percentage point, and in Nashville, approximately 4,000 new, primarily high-end apartment units came online. During the fourth quarter of 2019, Miami remained one of the most expensive apartment markets in the region; the average rent was $1,668, up 5.0% from a year ago, and more than 17.0% higher than the national average of $1,421.[31]

Annual rent growth exceeded the national rate of 4 percent in six of the eight major markets in the Southeast/Caribbean region during the fourth quarter of 2019.

| | Market Condition | Vacancy Rate | | | Average Monthly Rent | | |
|---|---|---|---|---|---|---|---|
| | | 4Q 2018 (%) | 4Q 2019 (%) | Percentage Point Change | 4Q 2018 ($) | 4Q 2019 ($) | Percent Change |
| Atlanta | Balanced | 5.3 | 5.1 | -0.2 | 1,204 | 1,276 | 6 |
| Birmingham | Balanced | 5.5 | 4.7 | -0.7 | 952 | 1,026 | 8 |
| Charlotte | Balanced | 3.8 | 4.6 | 0.8 | 1,101 | 1,171 | 6 |
| Columbia | Balanced | 4.6 | 5.5 | 0.9 | 920 | 941 | 2 |
| Jackson | Balanced | 6.6 | 5.7 | -1.0 | 844 | 888 | 5 |
| Louisville | Balanced | 4.9 | 4.8 | -0.1 | 870 | 904 | 4 |
| Miami | Slightly Tight | 4.7 | 4.2 | -0.4 | 1,591 | 1,668 | 5 |
| Nashville | Slightly Tight | 3.7 | 4.3 | 0.6 | 1,191 | 1,284 | 8 |

4Q = fourth quarter.
Sources: Market condition—Economic and Market Analysis Division; vacancy rate and average monthly rent—RealPage, Inc.

Multifamily permitting in the region declined during the past year despite declining apartment vacancy rates; developers in some markets slowed new production in response to significant numbers of units currently under construction. During the fourth quarter of 2019, 26,500 multifamily units were permitted in the region; that number declined by 2,250 units or 8.0% from a year ago, as compared with an increase of 9,250 units, or 47.0%, during the fourth quarter of 2018. Multifamily permitting declined in five of the eight states in the region, although strong rent growth contributed to increased development activity in several major markets, particularly in Alabama and Tennessee.[32] During the fourth quarter of 2019 (preliminary data), the 13,100 units permitted in Florida was down less than 1.0% from a year ago but was the highest number of units permitted of any state in the region. A 47.0% increase in Tampa largely offset respective declines of 17.0% and 29.0% in the number of units permitted in the Miami and Orlando markets. Multifamily permitting more than tripled to 850 units in Alabama; and increased 36.0% and 38.0% to 3,650 and 360 units, respectively, in Tennessee and Mississippi. The combined 610 units permitted in Auburn and Tuscaloosa, up from 210 units a year ago, accounted for much of the increase in Alabama. The number of units rose 65.0% in Nashville, which contributed significantly to the increase in Tennessee. The most significant declines in the region were in Georgia and South Carolina, where the number of multifamily units permitted fell 51.0% and 49.0%, to 2,625 and 850 units, respectively. The number of units permitted in Atlanta declined 64.0%, which accounted for much of the decrease in Georgia. A combined 39.0% decline in the number of units permitted in the coastal markets of Charleston, Hilton Head

---

[31] *Blount, Casey M. (2019) HUD PD&R Regional Report: Region 4: Southeast/Caribbean, 4th Q2019*
[32] *Blount, Casey M. (2019) HUD PD&R Regional Report: Region 4: Southeast/Caribbean, 4th Q2019*

EXHIBIT C 2019 BROWN-HARRIS

Island, and Myrtle Beach contributed significantly to the decline in South Carolina. In North Carolina and Kentucky, the number of multifamily units permitted decreased 4.0% and 15.0%, to 4,050 and 1,000 units, respectively.[33]



## 4.2 GEORGIA REGIONAL AREA DATA

**Location**

The State of Georgia is located within the southeastern section of the United States, located between Florida to the south, Tennessee to the north, Alabama to the west, and both South Carolina and the Atlantic Ocean forming its eastern border.



---

[33] *Blount, Casey M. (2019) HUD PD&R Regional Report: Region 4: Southeast/Caribbean, 4th Q2019*

EXHIBIT C-2019 BROWN-HARRIS

Georgia covers approximately 58,910 square miles with an estimated population of 10.66 Million in 2019, ranking as the eighth most populous state in the nation and largest state east of the Mississippi River in terms of land mass.

Georgia is almost entirely landlocked; however, it contains approximately 110 miles of coastline along the Atlantic Ocean and operates the Port of Savannah, the second largest port on the east coast and largest port in the southeast. Georgia is strategically positioned to provide access and transit to the southeastern regional market with established routes of transportation and freight coupled with the capability of handling immense amounts of freight with the largest single container terminal in North America.

## Geography

Due to its unique positioning within the southeast, Georgia experiences a range of geographic profiles from its northern mountain ranges to Florida at its southern border and eastern coastline. The northern regions of Georgia experience mostly mountainous topography, a result of being the southern point of the Appalachian Mountain Range and the Blue Ridge Mountain area.

Central Georgia is comprised of the Piedmont Region, an area characterized by rolling hills between the mountains of North Georgia and the Coastal Plains of Southern Georgia, while the largest geographic region, the Upper and Lower Coastal Plains of southern Georgia, is characterized by a plethora of waterways, hardwood swamps and several marshes.

Perhaps one of the most well-known areas is the Okefenokee Swamp, near the lower/Atlantic Coastal Plain.



## Demographics

Georgia has an estimated 2019 population of 10.66 million, ranking as the eighth most populous state in the country. Georgia's population has increased 9.6% since the 2010 U.S. Census. From 2018 to 2019, the population of Georgia increased 9.0% or approximately 140,525 people. The projected population by 2020 is 10.7 million for Georgia. Georgia has the 10th fastest population growth rate of 1.19%. As for the present and future, continued population growth is expected to grow at greater than 1.1% each year, which makes Georgia one of the faster growing states in the country.[34] According to the state of Georgia, the population is expected to reach 11.2 million by 2025.[35] According to the U.S. Census estimate as of July 2019, the current median household income is estimated at $58,700 while the estimated median home value is $176,000. As of December 2019, Georgia's estimated unemployment percentage is 3.3%.[36]

As workers have begun relocating to the state drawn by the competitive business environment and prospective job growth, so too has Georgia seen an influx of retirement age individuals seeking warmer climates and an attractive cost of living. According to the Georgia Department of Human Services, Georgia currently has the 11th fastest growing population for residents over 60 years old and a top 10 projected fastest growing population for residents over the age of 85 between 2010 and 2030.





The state of Georgia is poised to continue its growth trend, demographically and economically as new business, employees and people relocate to the state. However, the aging population shown in the graphs above must be considered regarding planning for increased housing and economic requirements. The graphs above depict an aging population continuing to grow throughout the next several decades, and not by a small margin. The projected percentage of change for each age group over 65 is poised to double over the next decade. The economy and housing demand must be prepared to meet the increased demand for the aging population, whether as retirement or assisted living communities.

---

[34] *World Population Review*
[35] *Governor's Office of Planning and Budget Series 2019, https://census.georgia.gov/census-data/social-and-economic-data*
[36] *Georgia Department of Labor*

## Economy

Georgia offers attractive business incentives to businesses looking to either expand or grow their business in the state as evidenced by the State of Georgia being ranked sixth by Forbes, and first by Site Selection Magazine, for the best States for Business for the seventh year in a row.[37] Several major corporations either call Georgia home or are providing major investments in the infrastructure, transportation, manufacturing and business, ultimately providing more jobs for the workforce and recording a $625.714 billion Gross Domestic Product produced in 2019.[38] The GDP value of Georgia represents 0.03% of the world economy. Georgia is estimated to be the ninth-largest economy in the United States.[39] In Georgia, nonfarm payrolls increased 1.6% during the fourth quarter of 2019. Georgia's Gross Domestic Product expanded 5.1% year-on-year in the fourth quarter of 2019, slowing from a 5.8% advance in the third quarter of 2019. Output growth eased for: construction (1.4% vs 17.1%), information and communication (17.0% vs 18.2%), other service activities (5.1% vs 7.7%). Output growth accelerated mainly for: manufacturing (6.3% vs 4.9%), transport (8.3% vs 2.2%), real estate activities (7.0% vs 3.8%), arts, entertainment and recreation (25.2% vs 19.9%), electricity, gas and water supply (4.2% vs 2.6%), wholesale and retail trade; repair of motor vehicles, motorcycles and personal and household goods (12.4% vs 9.8%), education (11.2% vs 6.3%), while that of mining and quarrying rebounded (0.4% vs -2.2%). Conversely, output shrank for: agriculture, hunting and forestry, fishing (-5.1% vs 2.1%), insurance activities (-10.3% vs -2.2%), and public administration (-2.6% vs -4.0%). Considering full year 2019, the economy grew 5.1% from a year earlier, after expanding by 4.8% in 2018.[40]



A major contributing factor to the economic growth of Georgia is their industry leading Quick Start Program, a training initiative focused on developing the skills of employees for the present and the future.

In 2019, Georgia added 69,400 jobs for a growth rate of 1.5%, before seasonal adjustments. As a comparison, job growth for the nation for the calendar year 2019 was 1.4%.[41] Part of the basis for the low unemployment rate for the state is an influx of workers entering the workforce, the majority of which have relocated to Georgia.[42]

---

[37] *Arend, Mark (2018). Site Selection*
[38] *Federal Reserve Bank of St. Louis (FRED)*
[39] *https://www.ibisworld.com*
[40] *https://tradingeconomics.com/georgia/'gdp-growth-annual*
[41] *Georgia Labor Report, www.GeorgiaLaborReport.com*
[42] *Kanell, Michael E. (2017) Burst of jobs in Georgia in June, unemployment dips. AJC.com*

EXHIBIT C 2019 BROWN-HARRIS

Case 3:22-cv-...  Document 4  Filed ...  Page 335 of 600



Source: U.S. Bureau of Labor Statistics

Employers added 3,900 jobs across the state of Georgia during December 2019. Georgia's economy has strong momentum headed into 2020. Job growth moderated across Georgia in 2019, but the state still ended 2019 with a cumulative net reported gain of 66,700 jobs.  Wells Fargo estimates that when the employment estimates are revised in February, the data will reflect that Georgia actually added around 75,000 jobs in 2019 for the year. While employers continue to add jobs across most major industry categories, slower global economic growth is clearly exerting some drag on Georgia's economy. Employment in manufacturing fell 0.2% in December 2019, or by 900 jobs, and is roughly flat over the past year. Transportation & warehousing and wholesale trade, which play an outsized role in Georgia's economy, both slowed during the second half of 2019. Transportation & warehousing still ended the year with a modest job gain, but employment in wholesale trade fell 0.5%, or by roughly 1,000 jobs. Despite the slowdown in Georgia's logistics sector job growth, the Port of Savannah reported another strong year. Container traffic through the Port of Savannah grew 7.3% in fiscal year 2019 to a record 4.5 million equivalent container units. Hiring in professional & technical services is up a robust 3.6%, reflecting the addition of 10,300 jobs. Professional & technical services capture the bulk of tech sector job growth. The number of employed Georgians rose by 12,000 in December 2019, while the number of Georgians either working or looking for work rose by just 7,800. The number of unemployed fell by the difference, about 4,000. Atlanta remains a top destination for young, college-educated workers but not as many young people are choosing to relocate compared to prior years as there is now more competition from other parts of the country.[43]

---

[43] *Vitner, Mark, Wells Fargo Economics Group, Georgia Saw Solid Job Gains in December 2019*







Georgia's Quick Start Program is the longest running initiative of its kind and, to date, has trained over one million employees across multiple industries.[44] In an attempt to attract further businesses to invest in the state, Georgia has created attractive incentive programs. One of the main draws to the state is its competitive tax climate prior to the implementation of any tax credits. Georgia is on the forefront of business development by instituting the single-factor apportionment tax basis. Property and business taxes in Georgia are kept low through this process, wherein a company's corporate income tax rate of 6.0% is only applied to the portion of a company's sales which occur within the state. In addition, as a way of attracting more business for the state's burgeoning film and entertainment industry, the state has offered production incentives by means of the Georgia Entertainment Industry Investment Act, which offers a 20.0% base transferable tax credit, and an additional 10.0% uplift can be earned if the Georgia logo and state website link are included on promotional materials for approved projects.

Furthermore, as demonstrated in the chart below, Georgia offers additional tax credit incentives to businesses for creating jobs in counties around the state.

---

[44] *Georgia Quick Start (2017). www.georgia.org*

EXHIBIT C 2019 BROWN-PARRIS



The top five industries in Georgia are agriculture, film, energy, automotive industry and tourism followed closely by the aerospace industry, business and finance and logistics and transportation. Georgia ranks fourth in the nation for the number of individuals employed in the aviation field, and the job growth outlook for the industry exceeds national averages over the next 10 years. The new program at Chattahoochee Technical College's new $35 Million Aviation Academy at Silver Comet Field at Paulding Northwest Atlanta Airport is projected to fill the deficit in aerospace mechanic jobs. Additionally, several major corporations, such as Home Depot, Coca-Cola, Delta Airlines, UPS, Aflac, Southern Company and both Porsche (US) and Mercedes-Benz, have chosen to establish their headquarters in Georgia. In 2019, the film industry supported 28,960 new jobs and generated more than $7.4 billion in investment through the location of 332 projects while 399 productions filmed in Georgia resulted in a record $2.9 billion invested in the state.[45] The tourism industry is a leading contributor to Georgia's economic growth and prosperity Governor Brian P. Kemp stated. According to the Georgia Department of Economic Development, in 2019, travel and tourism generated an economic impact of $66.2 billion in sales revenue, created more than 478,000 jobs, more than $3.4 billion in tax revenue in Georgia, generated $36.9 billion in revenue, and 111.7 million international and domestic visitors came to Georgia. [46]

Currently the largest employer in the state is Delta Air Lines, Inc. with their hub and headquarters located at the busiest airport in the world at Hartsfield-Jackson International Airport in Atlanta, Georgia. Hartsfield-Jackson International Airport served 111 million passengers, employed more than 63,000 people, and had a direct economic impact of $64.0 billion in metro Atlanta in 2019. Delta Airlines recently partnered with the Savannah College of Art and Design (SCAD) to engage students with the company and address researching, creating and solving a range of topics facing air travel. Georgia now ranks as the top location in the world for the film industry.

Not only is Georgia first in the film industry and has the world's busiest airport, but also the Southern United States busiest port in Savannah. Georgia has a wide range of Department of Defense organizations, the Air Force Reserve Command at Robbins AFB and Ft Benning, home to the US Army's Airborne School, both of which call Georgia home. In addition to the wide range of military bases, Department of Defense industry titans such as Boeing, Lockheed-Martin, BAE Systems, Airbus and Northrop Grumman are all major government contractors in the area.

[45] *Georgia Department of Economic Development, September 16, 2019*
[46] *www.georgia.org, Georgia Department of Economic Development, May 6, 2019*

EXHIBIT C 2019 BROWN-PARRIS

Due in part to the increase in manufacturing and industrial development, major rail lines such as CSX Rail and Norfolk Southern are investing in the area to create cleaner, more efficient ways to transport goods, materials and final products to ports of call. Their commitment to the growth of the state is demonstrated by the joint effort between the State of Georgia and CSX Rail to create the 42-acre Appalachian Regional Port. The Appalachian Regional Port is a joint effort to provide a 388-mile direct rail route from the regional inland port located in Northwest Georgia to the Port of Savannah, decreasing the distance required for trucks from the region to travel to get product to the worldwide market through Savannah. In December 2018, the Georgia Ports Authority announced plans for a new inland port in Gainesville, just northeast of Atlanta, to provide further freight rail service to and from the Port of Savannah.[47] Additionally, to foster freight and rail service, the Georgia Ports Authority inaugurated an in inland port in Murray County, also in northern Georgia.  The Georgia Ports Authority saw more than 4.6 million TEUs (20-foot equivalent unit used to measure a ship's cargo) pass through in 2019, an increase of 14.0%.[48] Georgia's deep-water ports and inland barge terminals support more than 439,000 jobs throughout the state annually and contribute $25 billion in income, $106 billion in revenue and $2.0 billion in state and local taxes to Georgia's economy. The Port of Savannah handled 8.5% of U.S. containerized cargo volume and 10.0% of all U.S. containerized exports in the past fiscal year.[49] Furthermore, businesses continue to increase their presence and support the economy by investing large sums of money to expand or develop their footprints, with the automotive manufacturing industry being one of the largest partners.  German manufacturer Porsche invested $100 million to build and develop their North American Headquarters and experience center in Atlanta, while Mercedes-Benz is investing $93 million to build a new state of the art headquarters with the capability to double its workforce in the next five years.

| Industry | 2016 Base Employment | 2018 Projected Employment | Employment Change |
|---|---|---|---|
| Food Services and Drinking Places | 357,640 | 386,750 | 29,110 |
| Professional, Scientific, and Technical Services | 239,740 | 255,430 | 15,690 |
| Specialty Trade Contractors | 104,190 | 119,050 | 14,860 |
| Ambulatory Health Care Services | 195,900 | 209,510 | 13,610 |
| Administrative and Support Services | 274,700 | 285,700 | 11,000 |
| Educational Services | 377,440 | 388,390 | 10,950 |
| Warehousing and Storage | 37,580 | 48,030 | 10,450 |
| Hospitals | 181,360 | 190,800 | 9,440 |
| Crop Production | 73,430 | 79,800 | 6,370 |
| Motor Vehicle and Parts Dealers | 63,150 | 68,530 | 5,380 |
| General Merchandise Stores | 104,840 | 109,940 | 5,100 |
| Heavy and Civil Engineering Construction | 22,950 | 27,460 | 4,510 |
| Real Estate | 42,310 | 146,760 | 4,450 |
| Transportation Equipment Manufacturing | 50,730 | 55,000 | 4,270 |
| Merchant Wholesalers, Nondurable Goods | 57,560 | 61,800 | 4,240 |
| Merchant Wholesalers, Durable Goods | 104,060 | 108,290 | 4,230 |
| Management of Companies and Enterprises | 64,090 | 67,820 | 3,730 |
| Construction of Buildings | 36,230 | 39,790 | 3,560 |
| Truck Transportation | 48,380 | 51,640 | 3,260 |
| Rental and Leasing Services | 18,070 | 20,730 | 2,660 |



---

[47] Georgia.org
[48] Georgia Ports Authority
[49] Georgia Ports Authority

EXHIBIT C - 2019 BROWN-PARRIS
Case 3:22-cv-... Document ... Filed ... Page 339 of 600

Companies in Georgia benefit from a robust international ecosystem and seamless access to global markets. Exports sustain thousands of businesses across the state, and nearly 90.0% of Georgia exporters are small and medium-sized firms. 2018 delivered the highest value of Georgia exports on record, reflecting the importance of trade to the state's competitiveness. Exports exceeded $40.5 billion, a 9.0% increase over 2017. Georgia reclaimed its rank as the 11th largest exporting state in the nation.  Companies exported to 212 unique markets, with Canada, Mexico, China, Germany and Singapore among the top five destinations. Georgia's international representatives in 12 strategic markets including Brazil, Canada, Chile, China, Colombia, Europe, Israel, Japan, Korea, Mexico, Peru and the United Kingdom and Ireland play an important role in facilitating global trading relationships. In 2018, 60.0% of exports and 68.0% of total trade involved markets where Georgia has international representation. Total trade exceeded $139.3 billion, spanning 223 countries and territories, an 8.3% increase over the previous year. Georgia ranks 7th among U.S. states for total trade. The state's top trading partners include China, Germany, Mexico, Canada and Japan. Imports grew to $98.7 billion in 2018, led by strong growth from Singapore (521.0%), Japan (23.0%), and the United Kingdom (28.0%). Top import partners include China, Germany, Mexico, Japan and Korea.[50]

The state's export profile reflects the strength and diversity of Georgia's industry base. Georgia is home to more than 800 aerospace companies, generating $9.1 billion in exports. Aerospace remains the leading export industry in Georgia. The top five markets include Singapore, Germany, China, United Kingdom and Japan. Among U.S. states, Georgia ranks 5th for aerospace exports. Agriculture contributes $73.7 billion to Georgia's economy. Despite a challenging year, exports held steady at $4.2 billion in 2018, bolstered by strong poultry sales and growth in dairy, cotton and peanut exports (93.0%, 13.0% and 9.0%, respectively). Top markets for Georgia agriculture include Canada, China, Mexico, Vietnam and the United Kingdom.  Exports of medical devices and pharmaceuticals reached a record $1.7 billion in 2018, a 13.0% increase over 2017. Top markets include Belgium, China, Canada, Japan and Germany. Eight of the top 10 markets experienced double-digit export growth. Georgia plays a strategic role in the automotive supply chain, with more than 300 facilities generating $3.3 billion in automotive-related exports. Top markets in 2018 include Canada, Mexico, United Arab Emirates, Germany and China. The Port of Brunswick is the second busiest port in the U.S. for import and export vehicles and #1 for new import vehicles.[51]

---

[50] *https://www.georgia.org, 2018 International Trade Report, 2018 Georgia Global Trade Summary, Global Insight, Global Connections*
[51] *https://www.georgia.org, 2018 International Trade Report, 2018 Georgia Global Trade Summary, Global Insight, Global Connections*





Georgia's Top Exported Products

Data Source: Global Trade Atlas; prepared by Georgia Department of Economic Development

## Housing

As a result of the growing economy in Georgia, both businesses and prospective workers are flocking to the area and as mentioned above, each is looking for a share of the almost $625.714 billion in gross national product produced each year. Georgia looks forward to continuing its year-over-year growth as the country moves further away from the recession. Almost in parallel to the growing economic environment that made Georgia the #6 or #1, depending on the source, State to do business in, the Real Estate and housing market in the state are increasing. Georgia's jobs and wages are increasing, and home sales are rising fast. However, inventory levels are still below historical norms, but prices continue to rise.  For single-family homes the median sales price increased 6.0% to $228,000; closed sales increased 6.7% to 142,915; average sales price increased 4.0% to $272,207; and the month supply of inventory decreased 10.8% to 3.3 months in 2019. Overall, all pending sales increased 6.7%, finishing 2019 at 145,087.  Closed sales were up 4.9% to end 2019 at 142,915 in 2019. The overall median sales price increased 6.0% to $228,000 for 2019.  Single-family home prices were up 5.0% compared to 2018, and Townhouse-condo home prices were up 5.0% in 2019.[52]



EXHIBIT C - 2019 BROWN-PARRIS

| Top Areas: New Construction Market Share in 2019 | |
|---|---|
| 30354 – Hapeville | 30.8% |
| 30317 – Kirkwood, Edgewood, East Lake | 20.2% |
| 30316 – Cabbagetwn, E At Vllg, Ormewd Pk, S DeKalb | 19.1% |
| 30319 – Brookhaven, North Atlanta, Dunwoody | 17.5% |
| 30318 – Home Pk, NW Atl, Colr Hlls, Undrwd Hlts, Westsde or Mdtwn W | 16.7% |
| 30324 – Mrngside/Lenox Pk, Piedmont Hts, Lenox, Lavista Pk | 15.5% |
| 30342 – Buckhead, N Buckhead, Chastain Pk, N Atlanta | 15.1% |
| 30033 – Decatur, North Decatur | 14.2% |
| 30345 – Briarcliff Woods, Oak Grove, Northlake | 13.0% |
| 30329 – Emory University, Toco Hills, Briarcliff | 12.1% |
| 30315 – Carver Homes, Grant Park, Peoplestown | 11.5% |
| 30312 – Downtown Atlanta, Grant Park, Old Fourth Ward | 10.1% |
| 30030 – City of Decatur, Winnona Park, Oakhurst | 8.4% |
| 30307 – Cndlr Pk, Drd Hlls, Edgwd, Emory U, Inrnn Pk, Lk Clre, Little 5 Pnts | 7.8% |
| 30306 – Virg-H'land, Mrngside/Lenox Pk, Poncey-H'land, Druid Hills | 6.9% |
| 30337 – College Park | 6.5% |
| 30027 – Buckhead, North Atlanta | 6.0% |
| 30308 – Midtown | 5.5% |
| 30326 – Lenox | 4.9% |
| 30310 – Adair Pk, Atl Univ Ctr, Mechanicsville, W End | 4.6% |
| 30344 – East Point | 4.1% |
| 30311 – Cascade Heights, Greenbriar, Southwest Atlanta | 3.6% |
| 30341 – Ashford Park, Chamblee, Dunwoody | 3.2% |
| 30305 – Buckhead, Garden Hills, Haynes Manor, Peachtree Hills | 3.0% |
| 30339 – Vinings | 2.3% |
| 30002 – Avondale Estates | 2.2% |

From 2018 to 2019 median home prices in Metro-Atlanta grew 3.3%. The latest Atlanta real estate market forecast is that home prices will continue to increase by 4.7% in 2020,[53] but remain below the average median home value for almost all other States in the top 10 for business. Additionally, the home equity in the area has grown by more than 57.0% since 2015 through the end of 2019.[54]

With the influx in population due to the growing economy, more and more residents are moving to the area and looking to enter into the housing market. It is not uncommon for the residential housing market in Georgia to demand higher than asking prices for listed homes within days if not hours. According to the Michael Kanell, first time home buyers account for approximately 42.0% of purchases and add credence to the need for new homes.[55] The numbers for 2019 presented in the charts below are through the end of the 2019. The number of single-family homes permitted increased 17.0% in the fourth quarter of 2019, but overall, the numbers were down from 2018 at the end of 2019 (see chart below). However, the number of multi-family units permitted fell 51.0%, to 2,625 units in Georgia for the fourth quarter of 2019.[56] The number of multi-family units permitted fell 41.0%, from 17,028 in 2018 to 10,032 units at the end of 2019 in Georgia (see chart below).

[53] *Santarelli, Norada, Atlanta Real Estate Market Forecast and Trends in 2020*
[54] *Santarelli, Norada, Atlanta Real Estate Market Forecast and Trends in 2020*
[55] *Kanell, Michael (2017). Young homebuyers hit "crazy" market in Metro Atlanta. myajc.com*
[56] *Blount, Casey M., HUD PD&R Regional Reports, Region 4: Southeast/Caribbean, 4th Q2019*









Meeting the housing demand for an increase in population is not restricted to the development of single family and multifamily housing. Senior housing is also a contributing factor to the growing housing development throughout the state. The region, state and local areas have all recognized a need to be met in the future and are taking steps to ensure the demand is met prior to the need, as senior housing occupancy is projected to increase by approximately 65.0% over the next year as more and more Baby Boomers reach retirement age. According to the Census Bureau, the number of Americans age 55 or older will grow to 98.2 million in 2020, see graph below.[57]





EXHIBIT C - 2019 BROWN HARRIS

Over the next two decades, more than 27.7 million people will join the 50-and over age group. Most of the increase, however, will be among the population aged 65 and over, projected to surge by 65.0% by 2030.



One way to determine whether the expectations are reflected in the market is to examine the number of construction starts relevant to a particular sector. In the case of an aging population, the number of dedicated senior housing construction starts. If the number of construction starts indicates an increase in activity similar to the overall projected sector increase, more than likely there is a current shortage relative to the anticipated demand. Conversely, if the number of construction starts falls dramatically below the expected sector increase, the real estate sector most likely has experienced a surplus that must be filled prior to the start of any new construction. In the case of senior housing, construction expectations over the next 12 months are projected to increase by approximately 60.0%, lending credence to the need for additional senior housing development.



## Transportation

With the economy improving, new business arriving in the state and multiple generations of workforce flocking to the area, transportation is more important than ever. The majority of the

EXHIBIT C 2019 BROWN PARRIS

labor force in Georgia commute within the state placing a premium on transportation throughout the state as population growth continues.

The Georgia Transportation Authority is trying to stay ahead of the projected growth through the Transportation Funding Act, increasing the dedicated dollars by roughly $400 million per year to transportation expansion and improvement throughout the state.

Additionally, by operating the busiest airport in the world, 80.0% of the U.S. Market is within a two-hour flight time from Georgia; and Georgia's extensive highway and interstate system allows for multiple avenues of travel into and around the state for a diverse and dedicated workforce in addition to business logistics.[58]

The Georgia Ports Authority manages two deep-water seaports, at Savannah and Brunswick, and two river ports, at Bainbridge and Columbus.  The Port of Savannah is a major U.S. seaport on the Atlantic coast.

With over 4,600 miles of active rail lines, Georgia has the largest rail network in the Southeast.  Georgia's location provides direct rail access to the Mid-Atlantic, Northeast and Midwest regions of the U.S. Georgia boasts one of the most extensive freight rail systems in the U.S. that transports more than 196 million tons of freight.  The railroad system in Georgia includes 28 freight railroads, including two Class I railroads, Norfolk Southern and CSX Transportation, as well as the largest intermodal facility on the East Coast. The state also has 26 Class III railroads that operate 1,012 route miles in the state. Intercity passenger rail service is provided by the National Railroad Passenger Corporation, known as "Amtrak." A two-tiered intercity passenger rail network has been proposed for Georgia as reflected in the box below.[59]

---

**First Priority Corridors**
- Atlanta to Macon via Lovejoy and Griffin
- Savannah to Jacksonville via Vidalia
- Macon to Savannah via Vidalia or via Jesup
- Macon to Albany via Americus

**Second Priority Corridors**
- Atlanta to Augusta via Madison
- Atlanta to Columbus via Griffin
- Atlanta to Greenville via Gainesville and Toccoa

---

Daily passenger rail service in Georgia is served by four Amtrak routes, three of which serve coastal Georgia, the Palmetto, Silver Meteor, and Silver Star. The Palmetto operates between New York and Savannah, while the Silver Star and Silver Meteor operate between New York and Miami.  Each of the three coastal trains stop in Savannah, and the Silver Star adds a stop in Jesup.  This route uses the CSX rail corridor.  North Georgia is served by Amtrak's Crescent route, which travels between New Orleans and New York City with stops in Atlanta, Gainesville, and Toccoa.  This route uses the Norfolk Southern rail corridor. The stations in Atlanta and Savannah are the most heavily used stations, accounting for approximately 88.0% of Georgia's ridership.  In 2018, about 141,500 people boarded or alighted in Georgia, of which just over half were in Atlanta and about 38.0% were in Savannah.[60]

---

[58] *Georgia Transportation Authority*
[59] *www.dot.ga.gov*
[60] *www.dot.ga.gov*

EXHIBIT C 2019 BROWN-HARRIS



## 4.3. METROPOLITAN STATISTICAL AREA

**Location**





*Taliaferro County, GA*
*(highlighted in red in above map)*

EXHIBIT C - 2019 BROWN-PARRIS
Case 3:22-cv-... Document 4 Filed 0... Page 346 of 600

 

*Athens-Clarke County, GA MSA*      *Augusta-Richmond, GA-SC MSA*

     Taliaferro County, GA is located in the north east portion of the state of Georgia (see highlighted area on the map of Georgia at left above). The county seat is Crawfordville. It is not included in a metropolitan statistical area (MSA). The closest and most relevant metropolitan statistical areas to Taliaferro County are the Athens-Clarke County, GA Metropolitan Statistical Area and the Augusta-Richmond County, GA-SC Metropolitan Statistical Area. Hence, a discussion of the Athens-Clarke County, GA Metropolitan Statistical Area (see highlighted area on map of Georgia above) and the Augusta-Richmond County, GA-SC Metropolitan Statistical Area (see highlighted area on the map of Georgia above) will be included. A MSA is a geographical region with a relatively high population density at its core and close economic ties throughout the area.

**Geography/Geology**

     Taliaferro County, GA encompasses 195 square miles which is composed of 195 square miles of land and 0.7 square miles of water. Counties adjacent to Taliaferro County include Wiles to the north, Oglethorpe to the north, Warren to the southeast, Hancock to the south, and Greene to the west. Taliaferro County is drained by the tributaries of the Ogeechee and Little Rivers. The northern half of Taliaferro County, north of Crawfordville, is located in the Little River sub-basin of the Savannah River basin. The southern half of the county is located in the Upper Ogeechee River sub-basin of the Ogeechee River basin.[61]

     The Athens-Clarke County, GA Metropolitan Statistical Area (MSA) is a consolidated-city-county in the state of Georgia, anchored by the principal city of Athens. The MSA consists of four counties, Clarke, Madison, Oconee and Oglethorpe. Athens lies about 70 miles northeast of downtown Atlanta, a global city. Athens-Clarke County, GA MSA encompasses an area 118.2 square miles composed of 117.8 square miles of land and 0.5 square miles of water. The MSA is located along the north Oconee River in the rolling Piedmont of northeast Georgia.

     Augusta-Richmond County, GA is located approximately halfway up the Savannah River on the fall line, which creates a number of small falls on the river. Augusta, GA marks the end of a navigable waterway for the river and the entry to the Georgia Piedmont section of the state.

     For more on the geography of northwest Georgia, see the Georgia Area Market Analysis.

---

[61] *Georgia Soil and Water Commission Interactive Mapping Experience.*

EXHIBIT C 2019 BROWN PARRIS

## Demographics

As of July 1, 2019, the U.S. Census Bureau estimated, in Taliaferro County, GA, there were 1,537 people, a decrease of minus 10.5% since the 2010 Census, with a median age of 44.2. In 2019, there were 593 households in Taliaferro County, GA and the average household size was 2.71 people. The median income for a household in the county was $37,446, about two-thirds of the amount in Georgia of $58,700; and the per capita income was $21,416, about two-thirds of the amount in Georgia of $31,067.[62] The Governor's Office of Planning and Budget estimated the 2020 population in Taliaferro County as 1,578, and projects the population of Taliaferro County, GA in 2025 to be 1,534 people and projects a population of 1,516 people in 2030. Taliaferro County is expected to continue to lose population over the course of the next 30 years. According to calculations based on the statewide projections, between 2015 and 2030, Taliaferro County will experience a total loss of 15.0% percent of residents. This contradicts the trend being experienced by Georgia which is projected to continue adding residents.[63] The Governor's Office of Planning and Budget estimates the population of ages 65 and over at 432 in 2025 and projects a slight increase of the 65 and over age group to 451 in 2030. Taliaferro County has the distinction of being the least populous county in Georgia.[64]

The racial composition of Taliaferro County consists 41.1% White only; 55.1% Black or African American; 0.2% American Indian; 1.3% Asian alone; 2.3% Two or More Races; and 4.0% Hispanic or Latino. The breakdown of Taliaferro County by age cohort consists of 6.0% age 9 and below; 14.0% between the ages of 10 and 29; 26.0% between the ages of 30 and 49; 29.0% between the ages of 50 and 69; and 16.0% ages 70 and older. In 2019 there were 109 veterans in the county.[65]



In terms of education, in 2019, 71.0% of the residents of the county had a high school degree and 8.1% had a bachelor's degree or higher.[66] Residents of the county have access to the University of Georgia in Athens, GA only 46 miles away.

The Athens-Clarke County, GA MSA had a population of 212,706 in 2019 with a median household income of $51,503; and the median age was 32.6 years. In 2019, there were 82,655 households in the MSA with an average of 2.4 persons per household.[67] In terms of education, in 2019, 89.7% of the MSA population had a high school degree and 42.4% had a bachelor's

---

[62] *DataUSA*
[63] *Taliaferro County Comprehensive Plan*
[64] *World Population Review*
[65] *U.S. Census Bureau; Census Reporter*
[66] *U.S. Census Bureau*
[67] *Census Reporter*

degree or higher.[68] As of October 2019, the population in the MSA was estimated at 214,300, an average annual increase of 2,275 people, or 1.1%, since April 2010. Job growth in the MSA contributed to net in-migration of 1,425 a year to the MSA, which accounted for 63.0% of population growth. As of November 1, 2019, the number of households was estimated at 81,200, an average annual increase of 1.1% since April 1, 2010.[69] The most recent U.S. Census data estimates show Athens-Clarke County as the 19th most populous of Georgia's 159 counties and the fifth most populous of Georgia's 535 cities.

In 2019, the population of Augusta, GA was 197,888, the median age was 33, which is lower than Georgia's median age, the median household income in 2019 was $42,592 and the homeownership rate was 66.0%, down from 67.4% as of April 2010. In terms of education, 83.5% of the population had at least a high school degree and 21.5% had a bachelor's degree or higher in July 2018.[70] The Augusta-Richmond County GA-SC MSA had a population of 608,980 in 2019,[71] the median age was 38.2, which is slightly higher than the median age for Georgia of 37.2, the median household income in 2019 was $55,143, and the homeownership rate was 61.0%.[72] In terms of education, 89.2% of the population had a bachelor's degree or higher, and 27.4% of the population had a bachelor's degree or higher in 2019.[73] The population of the MSA is expected to increase at an average annual rate of 0.9%, for the next several years, as continued economic growth and military expansion attracts workers to the area. The number of households in the MSA is expected to grow by 0.8%, annually during the next several years. Renter household growth is expected to account for only 55.0% of total household growth, as a strengthening economy and increased confidence in the housing market attract prospective households to homeownership. Within the next few years, Augusta is expected to have rapid population growth of 10,000 plus residents due to the announcement of the United States Army Cyber Command that will be located in Fort Gordon.



Figure 5. Components of Population Change in the Augusta HMA, 2000 to Forecast

Notes: The current date is June 1, 2017. The forecast date is June 1, 2020.
Sources: 2000 and 2010–2000 Census and 2010 Census; current and forecast—estimates by analyst

## Economy

The economy of Taliaferro County, GA employed 539 people in 2019.[74] The largest industries in the county are manufacturing (150 people), public administration (76 people), and other services (38 people). The highest paying jobs in the county are in construction ($41,250),

---

[68] https://censusreporter.org/profiles
[69] PD&R/Economic & Market Analysis Division, Southeast/Caribbean Regional Office, Market at a Glance
[70] U.S. Census Bureau
[71] Federal Reserve Bank of St. Louis (FRED)
[72] Census Reporter
[73] Census Reporter
[74] Georgia Area Labor Profile, Taliaferro County

EXHIBIT C 2019 BROWN-PARRIS

finance and insurance ($37,500), and public administration ($36,429).[75] The unemployment rate in Taliaferro County was 4.7% in December 2019. The chart below shows the share breakdown of the primary industries for residents in Taliaferro County, GA.[76]



According to the Georgia Department of Labor, the 2019 annual averages in Taliaferro County reflect a labor force of 567 with 539 employed and an unemployment rate of 4.9%.[77] Major employers in Taliaferro County include Bradleys Assisted Living, Community Health Care Systems, Inc., Georgia Wood Preserving Co., Inc., Harvestland Constructors, Inc., Keystone Automotive Industries, Inc., Long Branch Diary, LLC, Polyurethane Machinery Corp., Twin W. Enterprises, and Watson Enterprises, Inc.[78] The main industries in Taliaferro County are government, primarily the Taliaferro County Sheriff's Department, which patrols I-20 and issues many traffic tickets per capita compared to other counties in the state. For instance, Fulton County, the largest county by population in Georgia, gains $16.98 per capita in traffic ticket revenue. By comparison, Taliaferro County gains $1,614.33 per capita, which is around a hundred times more. Agriculture is still an important industry in Taliaferro County, as evidenced by the investment of $70,000 million by Harrison Poultry, Inc. in a new feed mill and hatchery, which will create more than 200 new jobs. Another boost to the economy of Taliaferro County is tourism. The county has a rich array of historic properties and cultural resources that rival any in the state. Taliaferro County contains Locust Grove Cemetery and the City of Sharon as the cradle of Catholicity in the state, the Georgia state park and historic house of notable Georgian A.H. Stephens, the Taliaferro County Courthouse, the city of Crawfordville whose buildings are used for movie settings, and the vital Deerlick Astronomy Village; as well as historic residences dating back to the late 18th century.

A new $2.0 million bridge built in Taliaferro County enabled the Taliaferro County Development Authority to buy land for a new industrial park. The 200-acre park will be the county's first. The industrial park will be an accessory to Interstate 20, which runs through the central part of the county.

In addition to the State of Georgia's tax incentives, Taliaferro County also offers local tax incentives to attract new businesses and existing businesses based on net new jobs and capital investment.[79] Taliaferro County is a Camera-Ready Community. Thirteen movies, made for theatre and television, have been made in Taliaferro County/Crawfordville since 1978. Most notable are Sweet Home Alabama, Get Low, and Coward of the County. Taliaferro County is also certified by the State of Georgia as a Work Ready Community. Certified Work Ready

---

[75] *DataUSA*
[76] *DataUSA*
[77] *Georgia Area Labor Profile, Taliaferro County*
[78] *Georgia Area Labor Profile, Taliaferro County*
[79] *Barnesville Lamar County Industrial Development Authority*

Communities have the skilled workforce that business demands and the educational infrastructure to drive economic growth and prosperity.

The economy of the Athens-Clarke County, GA MSA employed 89,299 people as of December 2019.[80] The Athens-Clarke County, GA MSA had an unemployment rate of 2.6% in December 2019.[81] Forbes rated Athens-Clarke County, GA MSA as the Number One for Best Places to retire; the BLS rated the MSA 6th in the nation in cities adding jobs; and the University of Georgia in Athens is in the Top 5 among U.S. universities in new products reaching the marketplace for the fourth consecutive year.[82]

The Athens-Clarke County, GA MSA is home to a growing number of young technology companies including Docebo, Roundsphere, and Cogent Education. The MSA is also home to more established technology companies such as Partner Software, Peachtree Medical Billing, and Digital Insight. The anchor city of the MSA, Athens, is home to the University of Georgia. The MSA is also home to several pharmaceutical manufacturing and biotechnology companies such as Merial and Janssen Pharmaceuticals, Inc. The University of Georgia also hosts its own biotechnology research centers. Independent publisher Hill Street Press is headquartered here. The largest employer in the MSA is the University of Georgia. Athens, the anchor city of the MSA, is the center for commerce and trade, health services, and cultural arts for all of northeast Georgia. Other major employers in the MSA include University of Georgia (10,700), Piedmont Athens Regional (3,300), Clarke County School District (2,400), Unified Government of Athens-Clarke County (2,100), St. Mary's Health Care System (2,100), Caterpillar Athens Plant (1,600), and Pilgrim's (1,350).[83]

The Augusta-Richmond, GA-SC MSA is a regional center of medicine, biotechnology, and cyber security. The MSA also is a center for telecommunications services and call centers, and a major hub for the life sciences industry.

Augusta University, the state's only public health sciences graduate university, employs over 7,000 people. The Augusta-Richmond County, GA-SC MSA employed 260,600 people overall in December 2019.[84] Economic conditions in the MSA are strong. The unemployment rate in the MSA as of December 2019 was 3.1%.[85]

Augusta's three largest employers are Augusta University, the Savannah River Site (a Department of Energy nuclear facility), and the U.S. Army Cyber Center of Excellence at Fort Gordon, which oversees training for Cyber, Signal Corps, and Electronic Warfare. In fact, Fort Gordon, home of the U.S. Army Signal Corps and U.S. Army Cyber Command, is the largest employer in Augusta-Richmond County GA, with approximately 26,000 military, civilian, and contractor employees and an estimated economic impact of $2.26 billion. Augusta University, the state's only public health sciences graduate university, employs over 7,000 people. Along with University Hospital, the Medical District of Augusta employs over 25,000 people and has an economic impact of over $2 Billion.

---

[80] *Bureau of Labor Statistics*
[81] *Federal Reserve Bank of St. Louis (FRED)*
[82] *Athens-Clarke County Economic Development*
[83] *Athens-Clarke County Economic Development*
[84] *Bureau of Labor Statistics*
[85] *Federal Reserve Bank of St. Louis (FRED)*

Between 2017 and 2020, when the U.S. Cyber Command Headquarters is complete, Fort Gordon is expected to expand by an additional 1,200 military and civilian personnel. Due to Fort Gordon's Cyber Command Center, the state of Georgia is focusing its cyber activities in Augusta, utilizing the Georgia Cyber Center at Augusta University to train cybersecurity support workers.[86] Augusta's economy will benefit from the continuation of the controversial construction of two nuclear power plants at Plant Vogtle.[87] Companies that have facilities, headquarters or distribution centers in Augusta include CareSouth, T-Mobile, Coviden, Solo Cup Company, Automatic Data Processing, Graphic Packaging International, Teleperformance, Sitel, E-Z GO, Elanco, Club Car (Worldwide Headquarters), John Deere, Kellogg's, and Delta Air Lines' baggage call center. Augusta's famous golf course, the Augusta National Golf Club, hosts the first major golf tournament each Spring, known Internationally as The Masters. The Masters brings over 200,000 visitors from across the world to the Augusta National Golf Club. Augusta also is home to a minor league baseball club, professional minor league ice hockey team, a rugby football team, and an all-female flat track roller derby team. Major colleges and universities in Augusta include Augusta Technical College, Augusta University, Paine College and satellite campuses for East Georgia State College and Georgia Military College.

**Table 2.** Major Employers in the Augusta HMA

| Name of Employer | Nonfarm Payroll Sector | Number of Employees |
|---|---|---|
| Fort Gordon | Government | 26,000 |
| Savannah River Site | Government | 11,500 |
| Augusta University | Government | 4,650 |
| University Hospital Summerville | Education & health services | 3,200 |
| Augusta University Health | Education & health services | 3,050 |
| Charlie Norwood VA Medical Center | Government | 2,100 |
| Bridgestone Americas Inc. | Manufacturing | 1,850 |
| East Central Regional Hospital Gracewood campus | Government | 1,500 |
| E-Z-Go/Textron, Inc. | Manufacturing | 1,275 |
| Doctors Hospital Augusta | Education & health services | 1,225 |

Notes: Excludes local school districts. Savannah River Site and Fort Gordon employment figures include uniform military personnel, federal civilian personnel, and contractors.
Sources: Augusta Economic Development Authority; Economic Development Partnership; estimates by analyst

*Source: https://www.huduser.gov/portal/pulications/pdf/AugustaGA-comp-17.pdf*

## Housing

As of July 1, 2019, Taliaferro County, GA, had 1,026 housing units with a homeownership rate of 69.0%, above the national rate for the same time period. The number of housing units represents a 6.5% decline in the number of housing units since the 2010 Census.[88] In 2019, the median property value in the county was $80,200,[89] compared to the median property value in Georgia of $176,000.[90] The median monthly housing cost (with a mortgage) was $1,083 and the median monthly rent was $547 in 2019.[91] In 2019, no building permits were issued in Taliaferro County.

In 2019, the Athens-Clarke County, GA MSA had 88,056 housing units with a median property value of $204,300, about the same amount in Georgia of $202,500.[92] In 2019, the

---

[86] *The University of Georgia, Terry College of Business, Economic Outlook*
[87] *The University of Georgia, Terry College of Business, Economic Outlook*
[88] *Taliaferro County Comprehensive Plan*
[89] *U.S. Census Bureau*
[90] *Census Reporter*
[91] *DataUSA*
[92] *Census Reporter*

median monthly home cost with a mortgage was $1,260 and the median monthly rent was $856.[93] In the MSA there were 82,838 households with an average household size of 2.49 people.[94] The homeownership rate was estimated at 53.9% as of November 2019, down from 56.3% as of April 2010.[95]

The home sales market in the Athens-Clarke County, GA MSA is currently balanced. The number of homes sold totaled 4,125 during the 12 months ending July 2019, a 4.0% decrease from the 4,300 homes during the previous 12 months (CoreLogic, Inc. with adjustments by analyst). The average sales price increased 3.1% to $220,100. Based on preliminary data, single-family home construction, as measured by the number of homes permitted, totaled 510 homes during the 12 months ending May 2019, a 16.0% decrease from 605 during the previous 12 months. The apartment market in the MSA is balanced.  The apartment vacancy rate in the MSA was approximately 3.5% higher than 3.0% a year ago. The average asking rent was approximately $800, up 10.0% from a year ago.  Based on preliminary data, multifamily construction, as measured by the number of units permitted, totaled 560 units during the 12 months ending August 2019, up from 200 units during the 12 months ending August 2018.  An average of 330 units were permitted each year from 2013 through 2018, up from an average of only 70 units a year from 2008 through 2012.  By comparison, an average of 480 units were permitted each year from 2000 through 2007.[96] For the entire year of 2019, a total of 1,591 units were permitted, both single-family and multifamily are included in the total.[97] (see graphs below).[98]




The Augusta-Richmond County, GA-SC MSA had 262,287 housing units in 2019. The median property value in 2019 was $161,800 and the homeownership rate was 69.2%.[99]  The number of homes sold totaled 14,275 during the 12 months ending May 2019 (CoreLogic, Inc., with adjustments by analyst). The average sales price increased 8.0% to $170,600. Based on preliminary data, single-family home construction, as measured by the number of homes permitted, totaled 2,375 homes during the 12 months ending May 2019. The apartment market in the MSA is balanced. The apartment vacancy rate was approximately 4.0% during May 2019. Multifamily permitting activity in the MSA increased during the past year and has generally been at high levels since the mid-2010s. Based on preliminary data, 300 multifamily units were permitted during the 12 months ending May 2019. An average of 430 units was permitted each

---

[93] *U.S. Census Bureau*
[94] *Census Reporter*
[95] *PD&R/Economic & Market Analysis Division, Southeast/Caribbean Regional Office*
[96] *https://www.huduser.gov/portals/MCCharts/*
[97] *National Home Builders Association*
[98] *PD & R/Economic & Market Analysis Division, Market at a Glance/Athens-Clarke County, GA MSA*
[99] *https://censusreporter.org*

year from 2014 through 2018, the highest figure for a four-year period since 1999 through 2002.[100] From 2017 to 2020, HUD projects demand for 6,325 new homes in Augusta-Richmond, County GA-SC MSA. Demand is expected to be greatest in the $50,00 to $249,999 price range. The below table shows the estimated demand for market-rate sales housing by price range.

**Table 4.** Estimated Demand for New Market-Rate Sales Housing in the Augusta HMA During the Forecast Period

| Price Range ($) | | Units of Demand | Percent of Total |
|---|---|---|---|
| From | To | | |
| 130,000 | 149,999 | 550 | 8.0 |
| 150,000 | 199,999 | 1,775 | 26.0 |
| 200,000 | 249,999 | 1,775 | 26.0 |
| 250,000 | 299,999 | 1,375 | 20.0 |
| 300,000 | 349,999 | 680 | 10.0 |
| 350,000 | 399,999 | 340 | 5.0 |
| 400,000 | 499,999 | 200 | 3.0 |
| 500,000 | and higher | 140 | 2.0 |

Notes: The 800 homes currently under construction and a portion of the estimated 20,500 other vacant units in the submarket will likely satisfy some of the forecast demand. The forecast period is June 1, 2017, to June 1, 2020.
Source: Estimates by analyst

*Source: https://www.huduser.gov/portal/pulications/pdf/AugustaGA-comp-17.pdf*

The home sales market in the Augusta-Richmond County, GA-SC MSA is currently slightly soft. The number of homes sold totaled 14,600 during the 12 months ending September 2019. The average sales price increased 10.0% to $176,800. Based on preliminary data, single-family home construction, as measured by the number of homes permitted, totaled 2,655 homes during the 12 months ending December 2019, an increase of 71 homes from 2018. The apartment market in the MSA is balanced. The apartment vacancy rate was approximately 5.0% during October 2019. Multifamily permitting activity in the MSA increased from 283 units in 2018 to 546 units in 2019, nearly a 50.0% increase. An average of 430 units was permitted each year from 2014 through 2019, up from an average of 100 units a year from 2008 through 2013.[101]

The graphs below show 2,655 single-family homes were permitted and 546 multi-family units were permitted for the entire year of 2019.[102]




Meeting the housing demand for an increase in population is not restricted to the development of single family and multifamily housing. Senior housing is also a contributing factor to the growing housing development throughout the state. The region, state and local areas

---

[100] *PD&R/Economic & Market Analysis Division, Market at a Glance/Augusta-Richmond County, GA-SC MSA*
[101] *PD & R/Economic & Market Analysis Division, Market at a Glance/Augusta-Richmond County, GA-SC MSA*
[102] *https://www.huduser.gov*

EXHIBIT C 2019 BROWN-PARRIS

have all recognized a need to be met in the future and are taking steps to ensure the demand is met prior to the need, as senior housing occupancy is projected to increase by approximately 65.0% over the next year as more and more Baby Boomers reach retirement age. According to the Census Bureau, the number of Americans age 55 or older will grow to 98.2 million in 2020, see graph below.[103]



Over the next two decades, more than 27.7 million people will join the 50-and over age group. Most of the increase, however, will be among the population aged 65 and over, projected to surge by 65.0% by 2030.



## Transportation

Through the center of Taliaferro County, GA runs Interstate 20, the primary interstate running west to east. Taliaferro County is also served by U.S. Highway 178, which runs east to west through the county. Additionally, Taliaferro County is traversed by State Routes 278, 12, 22, 44, 47, and 402. The Augusta-Atlanta railroad serves the county by providing freight service and connecting to the other major rail yards. Residents of Taliaferro County have access to the Athens Ben-Epps Airport in Athens, GA less than 50 miles away; and to the Augusta Regional Airport in Augusta, GA approximately 58 miles away. For International flights, residents of the county can travel to the Hartsfield-Jackson Atlanta International Airport in Atlanta, GA approximately 90 miles to the west.

Athens, GA is the anchor city of the Athens-Clarke County, GA MSA.  Athens is the focus of U.S. Highways 29, 78, 129, 441, and Georgia State Routes 72, 316, 106, 8, 15, 10, 78, 15, and 78 Business. Athens, GA is 23 miles from Interstate 85, 30 miles from Interstate 20, and 68 miles from Interstate 75. The Athens-Ben Epps Airport is east of downtown Athens.  SeaPort Airlines provides commercial air service to Nashville International Airport, TN; and US Airways provides service to Charlotte. Freight service is provided by CSX Railway, Norfolk Southern

---

[103] *https://www.winchester.us/documentcenter*

EXHIBIT C - 2019 BROWN-PARRIS

Shortline and Athens Line TAL, the latter having leased tracks from Norfolk Southern. Residents of the Athens-Clark County MSA have access to the Hartsfield-Jackson International Airport in Atlanta, 79 miles to the west of Athens.

Augusta, GA is linked to Atlanta to the west and Columbia South Carolina, to the east by Interstate 20. I-520 (Bobby Jones Expressway) extends from I-20 exit 196 through Augusta's western and southern suburban areas, eventually crossing the Savannah River to South Carolina, in which it is known as Palmetto Parkway. Major roads and expressways include Interstates 20 and 520, U.S. Highways 1, 25, and 79 and eleven State Routes. Parts of Augusta are served by the city transit service Augusta Public Transit. Augusta has two airports, Augusta Regional Airport and Daniel Field. Freight service is handled by Norfolk Southern Railway's Georgia Division and Piedmont Division through their Augusta Yard and Nixon Yard located near the city. CSX Transportation Atlanta Division and Florence Division Trains serve the Augusta, Georgia area too from the CSX Augusta Yard near Gordon Highway southwest of the city.

**Conclusion**

Taliaferro County, GA is located in a significant geographic region of this economically vibrant state. Thanks to an excellent state transportation system, the area is readily accessible to Atlanta, Athens, Augusta, and the neighboring state of South Carolina. The locale is endowed with a temperate climate and a wealth of natural recreational amenities that are attractive to visitors and residents alike. The area surrounding the subject property has been home to viable mining operations and offers the existing and projected labor force needed to support future ventures. Even though Taliaferro County itself is relatively small, it can draw people from regions with a large and growing population. The low cost of housing makes it attractive for existing workers and those wishing to relocate to the area. In addition, local governments and economic development entities in Georgia warmly welcome new business ventures by streamlining regulations, minimizing the regulatory burden on developers, and providing financial incentives where appropriate. All these factors combine to contribute to the projected profitability of a granite mine.

## SECTION 5 – SUBJECT CHARACTERISTICS

For purposes of this Section 5 in its entirety, except where otherwise identified, subject property shall mean the total Contiguous Owned Family-Owned Parcel of 1,242.12 acres, consisting of 272.98 acres to be encumbered by the conservation easement, the 600.25-Acre Tract (Southern Tract) excluded form the conservation easement, and the 368.89-Acre Tract (Northern Tract) excluded from the conservation easement.

### 5.1. Marketing and Exposure

#### 5.1.1. Marketing Time

*Marketing time* is an opinion regarding the amount of time it may take to sell a real or personal property interest at the concluded market value during the period immediately following the effective date of an appraisal. Marketing time differs from exposure time, as exposure time is presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Appraisal Standards Board of The Appraisal Foundation and Statement

EXHIBIT C 2019 BROWN PARRIS

on Appraisal Standards No. 6, "Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions" address the determination of reasonable exposure and marketing time.) The appraisers analyzed an estimated marketing period for the subject property.

Several real estate brokers and practitioners were consulted to determine the length of time required for the subject property or a property comparable to the subject property to sell, if exposed on the open market for sale at a reasonable and fair price. Our survey of real estate market participants suggests that most properties in the subject market area, if realistically priced, considering current supply and demand, can be marketed and sold (i.e., closed) within a six to 15-month period. Further, according to market participants, FMLS and Costar listing services, the contiguous property without subsurface material would require a marketing time of approximately nine to 12 months.

### 5.1.2. Exposure Time

*Exposure time* is the time period to have occurred prior to the date of the appraisal as required in the definition of the market value. The subject property would be exposed on the market for a reasonable period of time, and then the sale takes place as of the appraisal date. Stated another way, exposure time is an opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market.

The exposure time estimated for the subject property is estimated to be twelve months.

### 5.2. History

According to the county records of Taliaferro County, Georgia, the subject property's surface and mineral estates are owned by Log Creek LLLP. Previous to Log Creek LLLP owning Parcel 048-006, this parcel was owned by Tony D. Townley. Tony D. Townley conveyed Parcel 048-006 to Log Creek LLLP by means of a Quit Claim Deed on December 14, 2012 (Deed Book/Page 84-153) for no consideration. Of note, this parcel is to be included in the conservation easement; and the Highest and Best Use prior to the conservation easement is mining.

According to the county records of Taliaferro County, Georgia, Parcel 048-017 is owned by Log Creek LLLP. Previous to Log Creek LLLP owning Parcel 048-017, this parcel was owned by John Robert Moore II. John Robert Moore II conveyed Parcel 048-017 to Log Creek LLLP by means of a Warranty Deed on April 7, 2017 (Deed Book/Page 95-424) for $82,669. This transaction appears to be an arm-length transaction of a parcel adjoining a parcel already owned by Log Creek LLLP. Every reasonable effort was made to contact the parties involved in this transaction; however, neither party was able to be contacted. Of note, no portion of this parcel has been included in the mine plan. As of the date of this appraisal, it is unknown whether this parcel has substantial granite reserves on-site. Therefore, as stated throughout this report, it is the appraisers' opinion this parcel's Highest and Best Use is as agricultural/recreational land.

According to the county records of Taliaferro County, Georgia, Parcel 047-012 is owned by Log Creek LLLP. Previous to Log Creek LLLP owning Parcel 047-012, this parcel was owned by Andrews Realty Partnership LP. Andrews Realty Partnership LP conveyed Parcel 047-012 to Log Creek LLLP by means of a Limited Warranty Deed on May 7, 2019 (Deed Book/Page 101-233) for $354,902. This transaction appears to be an arm-length transaction of a parcel adjoining a parcel already owned by Log Creek LLLP. Every reasonable effort was made to contact the parties involved in this transaction; however, neither party was able to be contacted. Of note, no portion of this parcel has been included in the mine plan. As of the date of this appraisal, it is unknown whether this parcel has substantial granite reserves on-site. Therefore, as stated throughout this report, it is the appraisers' opinion this parcel's Highest and Best Use is as agricultural/recreational land.

To the best of our knowledge, no other sales involving the subject property have occurred during the last three years. To the best of our knowledge, there have been no other qualified donations of record made in the preceding five years within the subject of this appraisal other than the conservation easement placed on the subject property as of the date of valuation. It should be noted that an acquisition price of a property may be based on land prices in the area and not on the development potential of the property. As is common in these transactions, the seller may not understand the value of the development potential of the property, while the buyer may understand and have the capacity to develop the property. Therefore, the highest and best use as a development property may not be reflected in the purchase price.

### 5.2.1.  Current Contracts, Options or Offerings

Treas. Reg. 1.170A-17(a)(3)(ii) states that the appraisal must include the terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donee or donor that relates to the use, sale, or other disposition of the property (in addition to the deed of conservation easement).

Of note, according to the Taliaferro County Tax Assessor's Office, the subject property has been in a Forest Land Protection Act (FLIPA) covenant since 2009 with an ending date of 2023.

Based on the appraisers' research, and excluding the deed of conservation easement, the subject property is not encumbered by any contracts or options affecting the subject property, except what is otherwise noted above. Additionally, there were no other contracts or options entered into by the donee or donor that relates to the use, sale or other disposition of the subject property that were revealed by the appraisers' research. See Treas. Reg. 1.170A-17(a)(3)(ii).

### 5.2.2.  Zoning

According to the Taliaferro County Zoning Department, the subject property is zoned A-1 Agricultural District. Further, according to Mr. Hitchcock, Hitchcock & Hitchcock, P.C., "From a land use perspective, the proposed use of the property as a mine is allowed within the agricultural district with a variance granted by the planning commission, and the likelihood of obtaining a permit to operate a rock quarry is good

because the concerns of those who wish to preserve the Dark Sky area can be addressed by the hours of operation of the quarry itself." The full Zoning Opinion Letter can be found below.

Therefore, it is reasonably probable the stated Highest and Best Use before the conservation easement of the 272.98 acres to be encumbered by the conservation easement, is as a granite mine, would be permitted.

### 5.2.3. Taxes

According to the Appraisal of Real Estate 15th edition p.92, "real estate taxes are based on the assessed value of real property, hence the term ad valorem ("according to value") taxes. The assessed value of property is normally based on, but not necessarily equivalent to, its market value. The objective of tax assessment is the equitable distribution of the tax burden based on real property value, but tax assessors do not attempt to develop opinions of value for specific parcels of property for use outside of ad valorem taxation."

Parcel 048-006, of which 272.98 acres have been separated from and encumbered by a conservation easement, is taxed by Taliaferro County based on an assessment made by the Taliaferro County Tax Assessor. The statutory assessment rate is 40.0% of "fair market value." The subject property's taxes are based on the total building structures and land. The 2019 tax records indicate a total value of $819,000 and a 40.0% assessment of $327,600. Therefore, based on the 38.502 millage rate, the 2019 taxes would be $12,613.26. Of note, according to the Taliaferro County Tax Assessor's Office, this parcel has been in a Forest Land Protection Act (FLIPA) covenant since 2009 with an ending date of 2023. According to Mr. Alan Hornaday, the Chief Appraiser for Taliaferro County Tax Assessor's Office, the estimated cost to breach the FLIPA in 2020 would be approximately $107,000. According to the Taliaferro County Tax Assessor's Office, the Forest Land Protection Act is easily broken; the cost to breach the FLIPA is included in the year one start-up costs. The existence of the Forest Land Protection Act does not hinder or affect the Legally Permissibility of the subject property as a granite mine.

Of note, the taxes within this section represent the whole parcel the 272.98 acres of the subject property has been separated from. It is assumed that the subject property, the 272.98 acres encumbered by the conservation easement, will be reassessed separately in 2020 as new parcels. It is typical for properties under a deed of conservation easement to be reassessed after the conservation easement is in place. It will be the responsibility of the Taliaferro County tax assessors to reassess the subject property based on their time frame and protocol, hence establishing the new assessed value.

EXHIBIT C 2019 BROWN HARRIS

## 5.3. Legal Description

A tract or parcel of land containing 272.98 Acres is located in 172nd District, G.M. of Taliaferro County Georgia, and more specifically described on the following page. The Legal Description can be found below.

A narrative metes and bounds legal description is available. Furthermore, the exhibits and descriptions included in this report help to sufficiently identify and describe the real estate being appraised. This is in compliance with the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP), as adopted and published by the Appraisal Standards Board of The Appraisal Foundation. The applicable requirements in Standards Rule 2-2 (iii) state: "The appraisal report must summarize information sufficient to identify the real estate involved in the appraisal, including the physical, legal, and economic property characteristics relevant to the assignment." USPAP comments on this requirement as follows:

"Identifying the physical real estate can be accomplished by any combination of a legal description, address, map reference, copy of a survey or map, property sketch and/or photographs."

EXHIBIT

## EXHIBIT A
### Legal Description

All that tract or parcel of land situate, lying and being in the 172nd District, G.M., Taliaferro County, Georgia, lying at the westerly corner of the intersection of Sharon-Raytown Road (an 80' right of way) and the centerline of the right of way of Fairplay Road (unpaved), containing 272.98 acres, more or less, as shown on plat of survey entitled "CERTIFY TO: LOG CREEK, LLLP" by Baseline Surveying & Engineering, Inc., Matthew D. Ulmer, Registered Land Surveyor, dated October 16, 2019, recorded in Plat Book __10____, page ___63___, in the Office of the Clerk of the Superior Court of Taliaferro County, Georgia, which plat by reference thereto is incorporated herein.

24

EXHIBIT C 2019 BROWN HARRIS

## Subject Maps

### 5.3.1. Provided Survey



### 5.3.2. Location Map



### 5.3.3. Neighborhood Map



### 5.3.4. Aerial Map



### 5.3.5. Flood Map



EXHIBIT C 2019 BROWN HARRIS



**Figure 3. Delineated Resources Overview**
GeoLogic LLC
Brown Harris #1 Site Ecological Field Survey
**Taliaferro County, GA**

Legend
— Study Area
— Streams
■ Wetlands
⊙ Culverts
△ Intermittent/Perennial Breakpoint

1 inch equals 800 feet

0    400    800    1,600
Feet

Project #: 233364.02
Map Created: September 2020

Third Party GIS Disclaimer: This map is for reference and graphical purposes only and should not be relied upon by third parties for any legal decisions. Any reliance upon the map or data contained herein shall be at the users' sole risk. **Data Sources: ESRI World imagery 2020**

EXHIBIT C 2019 BROWN HARRIS

Case 3:22-cv-... Document 43 Filed ... Page 367 of 600

### 5.3.6. Subject Plat[104]



## 5.4. Site Description

For purposes of this Section 5.4, subject property shall refer to the 272.98 Acres encumbered by the conservation easement.

<u>**Location**</u>

The subject property is located along the north side of Raytown Road and the south and west Side of Fair Play Road, just east of Georgia Highway 47 and just north of Interstate 20, outside the city limits of Sharon, Taliaferro County, Georgia. Ingress/egress into and from the subject property is along Raytown Road and Fair Play Road. Of note, the Contiguous Parcel, has access and frontage along Raytown Road and Fair Play Road. As of the date of this appraisal, the subject property did not have a physical address.

---

[104] The subject property is 272.98 acres separated from Parcel 048-006.

## Topography, Flood Hazard Area, and Soil Conditions

It is the appraisers' opinion that the subject property has adequate drainage with positive flow. According to Flood Insurance Maps (FIRM) 13265C0110A, dated June 18, 2010, a portion of the subject property is located within Zone X, an area not prone to flooding. According to the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants, it is believed that wetland potential can be easily managed on the subject property based on an analysis of National Wetland Inventory Maps. A contingency budget has been allocated within startup funds for a full wetland study prior to operations. While the mine plan avoids wetland impacts, a substantial mitigation budget has still been included as a contingency within startup costs.

Based on mapping provided by GeoLogic, LLC, there are a few streams running through the subject property. Burgex Inc. Mining Consultants have included a wetland contingency of $1,000,000. An additional $500,000 has been budgeted and included in the year one start-up costs for a total of $1,500,000 for wetland contingency in year one. Therefore, any potential wetlands or streams on-site are not considered to affect the highest and best use of the subject property as a granite mine.

The physical inspection of the subject property did not reveal any evidence of adverse soil or subsoil conditions. A formal study was not undertaken and we are not qualified to detect such soil conditions. Therefore, we recommend that the client retain an expert in this field of study, if desired.

Currently, the subject property is wooded land with scenic wood views and open land. It should be noted that information provided for this appraisal indicates geologists have conducted adequate geological studies to prove a sufficient quantity of granite available for mining development on the subject property. Historically, the surrounding area has remained a noteworthy granite producer in eastern Georgia.

## Land Use

The subject property is appropriate for a variety of different uses including mining, agriculture/forestry, commercial recreation and residential development. Currently, the subject property is located in an area south of Washington, Georgia, northwest of Thomson, Georgia, west of Augusta, Georgia, and southeast of Athens, Georgia. The area immediately surrounding the subject property consists of primarily agricultural development and raw undeveloped land. As detailed in the Zoning section of this report, the subject property is currently zoned A-1 Agricultural District. This zoning district is comprised primarily of raw land, open farmland and land used for agricultural, livestock, and poultry production. As detailed earlier in this report, according to Mr. Hitchcock, Hitchcock & Hitchcock, P.C., from a land use perspective, the proposed use of the property as a mine is allowed within the agricultural district with a variance granted by the planning commission, and the likelihood of obtaining a permit to operate a rock quarry is good because the concerns of those who wish to preserve the Dark Sky area can be addressed by the hours of operation of the quarry itself.

Therefore, it is reasonably probable the stated Highest and Best Use of the subject property before the conservation easement, can be utilized as a granite mine.

EXHIBIT C – 2019 BROWN HARRIS

**Transportation**

The subject property has ingress/egress to and from Raytown Road and Fair Play Road that provides ground transportation by truck to local County, State and Federal Highways. Georgia Highway 47, a two-lane highway, is located approximately 1.7 mile west of the subject property, U.S. Highway 278, a two-lane highway, is located approximately five miles southwest of the subject property, Georgia Highway 80, a two-lane highway, is located approximately 16.2 miles east of the subject property, and U.S. Highway 78, a four-lane highway, is located approximately 14 miles northeast of the subject property. Finally, Interstate 20 is approximately 6.7 miles south of the subject property. The two primary modes of transportation available to the subject property are as follows:

1. Trucks – The commonly used means of transportation for shorter distances and as an intermediate form of transportation to rail lines. The expense of operating truck transport is influenced by Federal and State load restrictions, which are generally limited to 20.0 - 25.0 tons and diesel fuel costs.

2. Rail – The CSX Railroad is located in Taliaferro County, Georgia.



EXHIBIT C — 2019 BROWN PARKS

Due to the subject property's location in eastern Georgia, it is near not only Washington, Georgia, but also Thomson, Georgia, Augusta, Georgia, and Athens, Georgia. The subject property's proximity to these markets influences the shipping cost the consumer will incur and thereby the total cost of the product to the end user. Added to this are the demands for new infrastructure as the region continues to attract manufacturing to the area based on its aggressive tax incentives and lack of union demands. Aggregates are a common building and paving material and a necessary component of asphalt concrete, a necessary part of all new building construction and infrastructure repair and maintenance. The table below displays some of the projected expenditure for the State of Georgia Department of Transportation.

### Georgia Department of Transportation

| HWY Table 4: FY 2018-2021 Summary of Highway Projects by MPO Area * | | | | | |
|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | Total |
| Albany | $5,841,487 | $295,000 | $45,000 | $230,000 | $6,411,487 |
| Athens | $4,975,000 | $3,000,000 | $4,300,000 | $12,833,480 | $25,108,480 |
| Atlanta TMA | $779,707,512 | $799,551,146 | $846,234,428 | $564,821,088 | $2,990,314,174 |
| Augusta TMA | $1,913,589 | $77,753,014 | $7,261,167 | $25,200,970 | $112,128,740 |
| Brunswick | $0 | $1,450,000 | $1,000,000 | $2,250,000 | $4,700,000 |
| Cartersville | $11,915,702 | $6,983,850 | $500,000 | $0 | $19,399,551 |
| Chattanooga TMA | $18,556,500 | $3,485,500 | $6,517,500 | $267,500 | $28,827,000 |
| Columbus TMA | $17,500 | $2,318,000 | $9,237,248 | $12,970,646 | $24,543,394 |
| Dalton | $410,000 | $3,546,736 | $250,000 | $0 | $4,206,736 |
| Gainesville | $44,150,018 | $46,044,547 | $14,630,261 | $27,179,837 | $132,004,662 |
| Hinesville | $2,583,000 | $260,100 | $2,518,015 | $0 | $5,361,115 |
| Macon | $0 | $2,330,800 | $40,393,872 | $245,817,447 | $288,542,119 |
| Rome | $3,101,000 | $1,124,000 | $3,750,000 | $7,622,154 | $15,597,154 |
| Savannah TMA | $76,103,146 | $53,342,500 | $111,041,819 | $123,617,500 | $364,104,965 |
| Valdosta | $0 | $41,070,306 | $250,000 | $2,000,000 | $43,320,306 |
| Warner Robins | $6,040,573 | $600,000 | $500,000 | $0 | $7,140,573 |
| MPO Total | $955,315,027 | $1,043,155,499 | $1,048,429,309 | $1,024,810,621 | $4,071,710,457 |
| Rural Area | $990,049,216 | $1,045,088,083 | $1,206,278,199 | $828,632,993 | $4,070,048,490 |
| State Total | $1,945,364,243 | $2,088,243,582 | $2,254,707,508 | $1,853,443,614 | $8,141,758,947 |

\* excludes Transit projects    Rural Area includes the Lump Sum Banks

EXHIBIT C 2019 BROWN-PARKS

# Department of Transportation
### Department Financial Summary

| Program/Fund Sources | FY 2017 Expenditures | FY 2018 Expenditures | FY 2019 Original Budget | Amended FY 2019 Budget | FY 2020 Budget |
|---|---|---|---|---|---|
| Capital Construction Projects | $1,453,114,390 | $1,636,931,401 | $1,752,750,821 | $1,752,750,821 | $1,752,750,821 |
| Capital Maintenance Projects | 644,007,140 | 408,777,446 | 447,431,862 | 447,431,862 | 459,498,110 |
| Construction Administration | 131,234,356 | 142,068,174 | 155,934,165 | 155,934,165 | 155,934,165 |
| Data Collection, Compliance, and Reporting | 10,668,403 | 13,166,246 | 11,995,584 | 11,995,584 | 11,995,584 |
| Departmental Administration (DOT) | 80,073,434 | 77,427,070 | 81,012,970 | 81,012,970 | 81,237,970 |
| Intermodal | 110,585,014 | 125,922,938 | 112,090,384 | 112,090,384 | 113,506,110 |
| Local Maintenance and Improvement Grants | 169,545,810 | 176,973,499 | 189,544,365 | 189,544,365 | 192,586,631 |
| Local Road Assistance Administration | 68,086,607 | 45,544,677 | 62,002,378 | 62,002,378 | 62,002,378 |
| Planning | 21,186,658 | 20,314,292 | 25,059,893 | 25,059,893 | 25,259,893 |
| Routine Maintenance | 425,265,865 | 470,356,078 | 455,381,537 | 455,381,537 | 456,358,057 |
| Traffic Management and Control | 127,880,368 | 122,294,834 | 151,857,637 | 151,857,637 | 151,857,637 |
| **SUBTOTAL** | **$3,241,648,045** | **$3,239,776,655** | **$3,445,061,596** | **$3,445,061,596** | **$3,462,987,356** |
| **(Excludes Attached Agencies)** | | | | | |
| **Attached Agencies** | | | | | |
| Payments to State Road and Tollway Authority | $262,242,251 | $254,403,900 | $238,396,986 | $238,396,986 | $238,282,386 |
| **SUBTOTAL (ATTACHED AGENCIES)** | **$262,242,251** | **$254,403,900** | **$238,396,986** | **$238,396,986** | **$238,282,386** |
| **Total Funds** | **$3,503,890,296** | **$3,494,180,555** | **$3,683,458,582** | **$3,683,458,582** | **$3,701,269,742** |
| **Less:** | | | | | |
| Federal Funds | 1,438,261,438 | 1,477,491,810 | 1,600,016,484 | 1,600,016,484 | 1,600,016,484 |
| Federal Recovery Funds | 66 | | | | |
| Other Funds | 214,564,254 | 188,465,829 | 98,044,213 | 98,044,213 | 98,044,213 |
| Prior Year State Funds | 239,497,865 | 198,861,858 | | | |
| **SUBTOTAL** | **$1,892,323,623** | **$1,864,819,497** | **$1,698,060,697** | **$1,698,060,697** | **$1,698,060,697** |
| State General Funds | 85,738,217 | 104,487,542 | 89,954,240 | 89,954,240 | 77,342,738 |
| Motor Fuel Funds | 1,525,828,458 | 1,524,873,516 | 1,895,443,645 | 1,895,443,645 | 1,925,866,307 |
| **TOTAL STATE FUNDS** | **$1,611,566,675** | **$1,629,361,058** | **$1,985,397,885** | **$1,985,397,885** | **$2,003,209,045** |

## Easements and Encroachments

It is the appraisers' opinion that the subject property does not have any adverse easements or encroachments. A study of the plat and an inspection of the subject property revealed the subject property has ingress/egress to and from Raytown Road and Fair Play Road. As noted earlier in this report, the Contiguous Parcel has frontage and ingress/egress along Raytown Road and Fair Play Road. Furthermore, it is assumed that any access easements to the subject property or various components of the subject property are in place and enforceable. It is the appraisers' opinion that any utility easements do not affect the development potential of the subject property. To the best of the appraisers' knowledge, the subject property does not have any exceptions to title that could potentially preclude the operation of a quarry on the subject property.

Finally, as stated earlier in this report, according to Mr. Alan Hornaday, the Chief Appraiser for Taliaferro County Tax Assessor's Office, the estimated cost to breach the FLIPA in 2020 would be approximately $107,000. According to the Taliaferro County Tax Assessor's Office, the Forest Land Protection Act is easily broken; the cost to breach the FLIPA is included in the year one start-up costs. The existence of the Forest Land Protection Act does not hinder or affect the Legally Permissibility of the subject property as a granite mine.

## Utilities and Services

Utilities and services in the area of the subject property include police/fire protection, electricity, natural gas by a provider of choice and telephone service. Water/sewer service is typically provided by well and septic systems in rural areas of Taliaferro County.

## Size, Shape, and Frontage

The subject property is irregular in shape and located along the north side of Raytown Road and the south and west side of Fair Play Road, just east of Georgia Highway 47 and just north of Interstate 20. The subject property has the potential for road development within the subject property in order to facilitate the mining of granite and its transport to market. The Southern Tract consists of a 600.25-Acre tract that is irregular in shape with ingress/egress to and from Raytown Road and the Northern Tract consists of a 368.89-Acre tract that is irregular in shape with ingress/egress to and from Raytown Road and Fair Play Road.

## Environmental Hazards

The appraisers are not experts in locating or identifying hazardous waste material. However, during a physical exterior inspection of the subject property, there were not any hazardous material obvious to the appraisers. If hazardous waste is a concern to the owner, a qualified expert in the field should be engaged.

## Site Improvements

There are no known significant improvements on the subject property. Furthermore, upon physical inspection of the subject property, the appraisers did not witness any improvements on-site.

## Neighboring Land Uses and Views

Neighboring uses generally include clear to partially wooded agricultural, residential, recreational, vacant, and quarry land.

## Products or Other Components

The subject property is in a predominately undeveloped area just east of the Oconee National Forest, east of AH Stephens State Park, northeast of Lake Oconee, southwest of Clarks Hill Lake, and southwest of the Savannah River. This is a predominately rural area with a large portion of the surrounding land being utilized for agriculture and raw undeveloped land. To the best of the appraisers' knowledge, as detailed earlier in this report, the subject property is not being utilized for farming. Furthermore, to the best of the appraisers' knowledge and based on geological reports, the predominately mineable natural resource below ground level is granite. The appraisers reserve the right to adjust their opinion of value if there are other marketable commercial products on the subject property that were not apparent at the time of inspection.

## Outstanding Rights

There are no known outstanding rights impacting the subject property such as water, mineral, hunting or fishing rights.

## Reservations

There are no known reservations of rights, products or components that affect the value of the subject property.

## Post-Conservation Easement Property Description

Post-conservation easement, there are no known significant changes that impact the subject property's physical characteristics such as location, size, shape, frontage, topography, flood zone, soil/environmental conditions, ingress, egress, utilities and views. There are no other easements or encroachments affecting the subject property, except as permitted by the conservation easement. Based on the terms and restrictions stated in the conservation easement, there is no significant change in products, outstanding rights, or other components.

## Conclusion

The subject property in its present state possesses significant recreational, educational, natural, aesthetic, wildlife, forest, agricultural, open space and plant habitat features. Several properties in the surrounding area and region have been mined for construction aggregate materials such as granite during the last several years. The subject property has good physical utility for a variety of uses. This opinion is based on the subject property's configuration, usable topography, average accessibility and exposure, and availability of utilities. Prior to granting the conservation easement, the subject property has been undeveloped. Post-conservation easement, the subject property no longer retains the rights associated with mining, development, or subdivision of the subject property.

# SECTION 6 – ANALYSIS

## 6.1.    Conservation Easement/Contiguous Parcel Overview

As directed by Treasury Regulation §1.170A-14 (h)(3)(i), the Internal Revenue Service requires the entire contiguous parcel (Contiguous Family-Owned Parcel) be evaluated when a conservation easement appraisal is performed for review by the Internal Revenue Service. The entire parcel must be considered to evaluate any potential impact the conservation easement may have on surrounding parcels, contiguous or non-contiguous that are owned by the donor, related parties and/or the donor's family. If any of these parcels are considered improved or to have benefited in anyway by the presence of the conservation easement, an analysis of the entire parcel is required.

The standard for determining the larger parcel is taken from the Uniform Appraisal Standards for Federal Land Acquisitions, also known as the "Yellowbook." The UASFLA defines the larger parcel as "that tract, or those tracts, of lands which possess a unity of ownership and have the same, or an integrated, highest and best use. Elements of consideration by the appraiser in making a determination in this regard are contiguity, or proximity, as it bears on the highest and best use of the property, unity of ownership, and unity of highest and best use."

The "Contiguous Parcel Rule," Treas. Reg. § 1.170A-14(h)(3)(i), provides that "the amount of the deduction in the case of a charitable contribution of a perpetual conservation restriction covering a portion of the contiguous property owned by a donor and the donor's family as defined Code Section 267(c)(4) is the difference between the fair market value of the entire contiguous parcel of property before and after the granting of the restriction." In the case of this regulation, for tax purposes, "family" does not include a regarded entity such as a partnership.

The "Enhancement Rule," set forth in the fifth sentence of Treas. Reg. § 1.170A-14(h)(3)(i), states that if an easement is donated by a taxpayer over land contiguous or non-contiguous to unencumbered land owned by the taxpayer (donor) or "related parties" as defined in Code § 267(c)(4), the appraiser must offset any enhancement in value attributable to such properties in estimating the value of an easement. Therefore, when a property is owned by the taxpayer (donor), the "donor's family" or a "related person," that benefits from the conservation easement, the property is considered an enhanced parcel, whether or not such property is contiguous." The appraisal must include an analysis of all contiguous and noncontiguous property owned by the donor, the donor's family, or "related persons" (as defined by the U.S. Treasury code) that could potentially be enhanced due to the placement of the conservation easement on the subject property.

Code § 267(c)(4) states that the "donor's family" is limited to the donor's "brothers and sisters (whether by the whole or half-blood), spouse, ancestors and lineal descendants." Parents, children, grandparents, grandchildren, half-brothers, and half-sisters are included in the definition of family. Cousins, nieces, nephews, in-laws, and step relations are not included. Included in the "donor's family" definition is a corporation, a partnership, or a trust, in any combination if they share certain common links. According to the relationships listed in § 267(b) a "related person" includes, the relationships between (1) an individual and members of a family, and (2) an individual and a corporation more than 50.0% in value

of the outstanding stock of which is owned, directly or indirectly, by or for such individual. The relationships listed in § 707(b) are those between (1) a partnership and a person owning, directly or indirectly, more than 50.0% of the capital interest, or the profits interest, in such partnership, and (2) two partnerships in which the same persons own, directly or indirectly, more than 50.0% of the capital interests or profits interests.

When evaluating a conservation easement, the subject property and any additional land contiguous or non-contiguous is required by the Internal Revenue Service to be considered. In the case of a charitable contribution of a perpetual conservation restriction, covering a portion of any contiguous property owned by a donor or the donor's family, the amount of the deduction, is the resulting difference between the fair market value of the entire contiguous parcel or property before granting the restriction and the fair market value of the entire contiguous property after granting of the restriction. Conservation easements may increase the value of property in the vicinity, and IRS regulations require that when such increases benefit the donor of the easement, or a member of the donor's family, the easement deduction must be reduced. The "enhancement rule" states that if granting of a perpetual conservation restriction, after 1986, has the effect of increasing the value of any other property owned by the donor or a related person, the amount of the deduction for the conservation contribution shall be reduced by the amount of the increase in the value of the other property, regardless of whether such property is contiguous.

The State of Georgia is fostering a program that encourages the preservation of natural resources, wildlife habitat and botanical species for the enjoyment of future generations. The subject property in its present state has not been developed and possesses significant natural, aesthetic, watershed, wildlife, forest, open space, and plant habitat features. Therefore, its preservation not only benefits the environment, but helps to maintain air quality by prohibiting future development. Furthermore, preservation of the subject property is in line with the overall goals of the state and other environmental protection agencies.

In summation, the subject property is currently native or undisturbed land. By placing it in a conservation easement, the forest ecosystem will be maintained in its natural structure and diversity.

### 6.1.1.    Contiguous/Non-Contiguous Parcel Analysis

Treasury Regulation Section 1.170A-14(h)(3)(i) requires that to value the conservation easement, the appraiser must consider contiguous and non-contiguous property owned by a donor and the donor's family (as defined in section 267(c)(4)). As of the date of appraisal, Log Creek LLLP does own property that is contiguous and non-contiguous to the subject property.

As of the date of appraisal, Log Creek LLLP does not own any property that would benefit from the conservation easement and there are no known partnerships or individuals considered to be a "related person" under Internal Revenue Code Sections 267(b) and 707(b) that would benefit from the conservation easement. Accordingly, no reduction in value has been assessed due to the enhancement in value of any other property. As stated throughout this report, approximately 8,099.28 acres of contiguous and non-contiguous land is owned by Log Creek LLLP (an entity considered to be a "related person" as defined by Treas. Reg. §267(b)).

EXHIBIT C 2019 BROWN-PARRS
Case 3:22-cv-... Document ... Filed ... Page 376 of 600

Of note, 969.14 Acres (Parcel 048-017 - 91.85 Acres, Parcel 047-012 – 314.3 Acres, and Parcel 048-006 – 562.99 Acres) is contiguous to the subject property (272.98 Acres to be encumbered by the conservation easement). It is the appraisers' opinion that the contiguous land owned by Log Creek LLLP does not benefit from the conservation easement placed on the 272.98 acres of the subject property. This determination is based on the location of the subject property in rural Taliaferro County and the contiguous acreage being located across Fair Play Road and Raytown Road. It is the appraisers' opinion that a buyer would not pay more for any of the properties considered for enhancement due to the location of the parcels compared to the location of the subject property and as the majority of the land in the area is rural land or agricultural land. It is the appraisers' opinion that a buyer would not be influenced by a conservation easement due to the rural nature of the area and the availability of undeveloped land. A list of the parcels can be found in the chart below.

| Parcels Considered for Enhancement - Contiguous | | |
|---|---|---|
| Owner | Parcel # | Acreage |
| Log Creek LLLP | 048-017 | 91.85 |
| Log Creek LLLP | 047-012 | 314.30 |
| Log Creek LLLP | 048-006 | 562.99 |
| Total: | | 969.14 |

It is the appraisers' opinion that the non-contiguous land owned by Log Creek LLLP does not benefit from the conservation easement placed on the 272.98 acres of the subject property. This determination is based on the location of the subject property in rural Taliaferro County. It is the appraisers' opinion that a buyer would not pay more for any of the properties considered for enhancement due to the location of the parcels compared to the location of the subject property and as the majority of the land in the area is rural land or agricultural land. It is the appraisers' opinion that a buyer would not be influenced by a conservation easement due to the rural nature of the area and the availability of undeveloped land. A list of the parcels can be found in the chart below.

EXHIBIT C 2019 BROWN-PARRIS

| Parcels Considered for Enhancement - Non-Contiguous | | |
|---|---|---|
| Owner | Parcel # | Acreage |
| Log Creek LLLP | 014-004 | 108.80 |
| Log Creek LLLP | 014-005 | 227.24 |
| Log Creek LLLP | 016-019 | 129.15 |
| Log Creek LLLP | 021-013B | 683.41 |
| Log Creek LLLP | 029-012 | 20.70 |
| Log Creek LLLP | 030-009 | 149.40 |
| Log Creek LLLP | 030-036 | 242.63 |
| Log Creek LLLP | 032-006 | 117.22 |
| Log Creek LLLP | 035-042 | 58.16 |
| Log Creek LLLP | 036-004 | 676.40 |
| Log Creek LLLP | 037-007 | 28.42 |
| Log Creek LLLP | 037-054 | 278.00 |
| Log Creek LLLP | 038-003 | 63.76 |
| Log Creek LLLP | 038-017 | 29.42 |
| Log Creek LLLP | 043-024C | 54.24 |
| Log Creek LLLP | 044-001 | 701.41 |
| Log Creek LLLP | 044-001X | 43.00 |
| Log Creek LLLP | 044-043 | 120.72 |
| Log Creek LLLP | 045-002 | 1,554.16 |
| Log Creek LLLP | 048-024 | 152.00 |
| Log Creek LLLP | 048-025 | 85.77 |
| Log Creek LLLP | 049-012 | 234.85 |
| Log Creek LLLP | 049-014 | 15.69 |
| Log Creek LLLP | 051-017B | 294.00 |
| Log Creek LLLP | 052-009 | 1,016.28 |
| Log Creek LLLP | 052-009B | 18.17 |
| Log Creek LLLP | 052-009C | 27.14 |
| Total: | | 7,130.14 |

### 6.1.2. Conservation Easement Parcel/Larger Parcel Identification

As stated throughout this report, Log Creek LLLP does own property that is considered to be a contiguous parcel. The total Contiguous Family-Owned Parcel of 1,242.12 acres, consists of 272.98 acres to be encumbered by the conservation easement, a 600.25-Acre tract (Southern Tract) excluded from the conservation easement, and a 368.89-Acre tract (Northern Tract) excluded from the conservation easement. The 272.98 acres will be valued based on the highest and best use of Mining Development and the Southern Tract and Northern Tract will be valued based on the highest and best use as Agricultural/Recreational Development. As stated throughout this report, to the best of the appraisers' knowledge, there is not significant marketable granite reserves on either the Southern Tract or the Northern Tract. In the "after" method, each tract of land will be valued separately in order to accurately ascertain the value of the Conservation Easement. Finally, it is the appraisers' opinion that there is a not value enhancement for the area excluded from encumbrance by the conservation easement. As stated earlier, this determination is based on the location of the subject property in rural Taliaferro County and the contiguous acreage is located across Fair Play Road and Raytown Road. It is the appraisers' opinion that a buyer would not pay more for any of the properties considered for enhancement due to the location of the parcels compared to the

location of the subject property and as the majority of the land in the area is rural land or agricultural land.

Based on information provided to the appraisers and their research, no portion or portions of the subject property, the 272.98 acres to be encumbered by the conservation easement, will be excluded from the conservation easement, except for what is noted above, and there are no other adjacent or nearby properties under the same or related ownership that might benefit from the placement of a conservation easement.

### 6.1.3. Enhancement Analysis

The appraisers evaluated recent market trends in regard to an increase in value attributed to developments that were near large sections of undeveloped land. It is of note that such properties tend to sell for approximately 5.0% to 25.0% more than comparable properties without such proximity to natural habitats. However, the data is very limited in regards specifically, to a conservation easement adjoining a property. As of the date of appraisal, Log Creek LLLP does not own any property that would benefit from the conservation easement and there are no known partnerships or individuals considered to be a "related person" under Treas. Reg. §1.170A that would benefit from the conservation easement. Accordingly, no reduction in value has been assessed due to the enhancement in value of any other property.

| Parcels Considered for Enhancement - Contiguous | | |
|---|---|---|
| Owner | Parcel # | Acreage |
| Log Creek LLLP | 048-017 | 91.85 |
| Log Creek LLLP | 047-012 | 314.30 |
| Log Creek LLLP | 048-006 | 562.99 |
| Total: | | 969.14 |

As stated throughout this report, land non-contiguous to the subject property, is owned by an entity considered to be a "related person" as defined by Treas. Reg. §267(b). It is the appraisers' opinion that the contiguous and non-contiguous land owned by a related person does not benefit from the conservation easement being placed on the 272.98 acres of the subject property. This determination is based on the location of the subject property in rural Taliaferro County. It is the appraisers' opinion that a buyer would not pay more for a property located near to a property with a conservation easement as the majority of the land in the area is rural land or agricultural land. Further, the contiguous property is located across Fair Play Road and Raytown Road. It is the appraisers' opinion that a buyer would not be influenced by a conservation easement due to the rural nature of the area and the availability of undeveloped land. A list of the parcels can be found in the chart below.

EXHIBIT C - 2019 BROWN-HARRIS

| Parcels Considered for Enhancement - Non-Contiguous | | |
|---|---|---|
| Owner | Parcel # | Acreage |
| Log Creek LLLP | 014-004 | 108.80 |
| Log Creek LLLP | 014-005 | 227.24 |
| Log Creek LLLP | 016-019 | 129.15 |
| Log Creek LLLP | 021-013B | 683.41 |
| Log Creek LLLP | 029-012 | 20.70 |
| Log Creek LLLP | 030-009 | 149.40 |
| Log Creek LLLP | 030-036 | 242.63 |
| Log Creek LLLP | 032-006 | 117.22 |
| Log Creek LLLP | 035-042 | 58.16 |
| Log Creek LLLP | 036-004 | 676.40 |
| Log Creek LLLP | 037-007 | 28.42 |
| Log Creek LLLP | 037-054 | 278.00 |
| Log Creek LLLP | 038-003 | 63.76 |
| Log Creek LLLP | 038-017 | 29.42 |
| Log Creek LLLP | 043-024C | 54.24 |
| Log Creek LLLP | 044-001 | 701.41 |
| Log Creek LLLP | 044-001X | 43.00 |
| Log Creek LLLP | 044-043 | 120.72 |
| Log Creek LLLP | 045-002 | 1,554.16 |
| Log Creek LLLP | 048-024 | 152.00 |
| Log Creek LLLP | 048-025 | 85.77 |
| Log Creek LLLP | 049-012 | 234.85 |
| Log Creek LLLP | 049-014 | 15.69 |
| Log Creek LLLP | 051-017B | 294.00 |
| Log Creek LLLP | 052-009 | 1,016.28 |
| Log Creek LLLP | 052-009B | 18.17 |
| Log Creek LLLP | 052-009C | 27.14 |
| Total: | | 7,130.14 |

EXHIBIT C 2019 BROWN-PARRIS

### 6.1.4.  Appraisal Approach

Typically, two approaches are available for determining the Fair Market Value of a conservation easement. The appraisers may value the conservation easement through direct comparison with similar conservation easements previously purchased when data is available, or the appraisers may value the difference in whole interest of the subject property before the conservation easement donation and after the conservation easement donation. The difference is widely considered as the "fair market value of the conservation easement given up" and is substantiated by the IRS regulation 1.170A-14(h)(3) and the publication, Appraising Conservation and Historic Preservation Easement, Second Edition, published by the Appraisal Institute. Both substantiating documents provide guidance for when a lack of adequate conservation easement sales are available by stating: "If no substantial record of comparable marketplace sales (of similarly encumbered properties) exists as a general rule the fair market value of an easement equals the fair market value of the unencumbered property (pre-conservation easement) minus the fair market value of the encumbered property (post-conservation easement). IRS Ruling 73-339 states that the proper method of or valuation of a "before and after" appraisal calculates "the difference between the fair market value of the total property before the granting of the conservation easement and the fair market value after the grant." Of note, it is common for the "before and after" methodology to be used in appraisal practice; specifically, appraisals where condemnation has taken place.

## 6.2.  Scope of Work

The 2016 *Uniform Standards of Professional Appraisal Practice* (effective January 1, 2016) establishes the "Scope of Work Rule" to guide the process of developing assignment results. Scope of Work is simply the work undertaken in developing the assignment and defined as "the type and extent of research and analyses in an assignment." The focus of the scope of work rule is on ensuring that work undertaken is sufficient to develop credible assignment results.

The purpose of this report is to provide an opinion of the Fair Market Value of the Conservation Easement. In order to provide a full understanding of the impact of the conservation easement on the subject property, an analysis of the conservation easement value is included in this report.

An appraisal is generally defined as an opinion of value based on the parameters of the assignment as of a specified date. The valuation of real estate is based on a process of data collection, analysis and conclusions by a nonbiased third party. The purpose and date of this appraisal, along with the property rights appraised, have been previously defined. The Scope of the Appraisal is based on these definitions as follows:

Improved (or proposed) income producing property is best valued through the application of the three traditional approaches to value, i.e., the **Cost Approach**, the **Sales Comparison Approach** and the **Income Approach**.  The initial step in the appraisal process is the market research phase, whereby basic data is collected and refined from all available sources. Data sources include local municipal governments, public records, chambers of commerce, private real estate professionals, owners/investors of comparable properties, on-site management and/or leasing agents at comparable properties, the actual subject property history (when applicable), and real estate publications. The geographic extent of the data

EXHIBIT C - 2019 BROWN-PARRIS

research is consistent with the investment market in which the subject property competes. This information is verified and cross checked for accuracy and applicability.

Information relating to the subject property collected also includes ad valorem tax data, zoning information, utility availability, floodplain information, topography, frontage, access and existing improvements. Building plans are reviewed (if applicable) and the site plan studied as to the relationship of the site and the improvements. The improvements are inspected to determine the physical condition and functional utility. Other properties in the neighborhood are inspected to develop an overall opinion of the character, composition, and future trends of the submarket. The consideration of all these factors, acting in concert, leads to a conclusion of the highest and best use for the subject property, which is the basis of the valuation methodology.

The **Cost Approach** is based on the understanding that market participants relate value to cost. A prudent investor would pay no more for a property than the cost to acquire an equally desirable site and construct improvements of equal desirability and utility without undue delay in time. The Appraisal of Real Estate, 15th Edition, provides the following definition for the Cost Approach. "In the cost approach, the value of a property is derived by adding the appraiser's opinion of the value of the land to an estimated current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation (i.e., deterioration and obsolescence) in the structures from all causes. This approach is particularly useful in valuing new or nearly new improvements and properties that are not frequently exchanged in the market." An inherent weakness in the Cost Approach is the required estimation of depreciation. Depreciation from all causes, especially obsolescence, can exist even in new properties. The difficulty in accurately estimating depreciation tends to weaken the validity of the Cost Approach. Of note, Cost Approach techniques can also be employed to derive information needed in the sales comparison and income capitalization approaches to value, such as cost-related adjustments to account for specific building features and cost-to-cure adjustments to address deferred maintenance.

The first step in the Cost Approach is a valuation of the subject property as though vacant. Recent land sales, listings, and contracts are analyzed, along with the most recent purchase involving the subject property (if appropriate), to estimate a current value for the subject property.

The second phase of the Cost Approach is estimating the replacement cost of the improvements. Replacement cost-new considers typical direct construction costs, plus normal indirect costs and entrepreneurial profit. The replacement costs are typically based on actual construction costs of similar properties and checked by means of a national cost manual. Estimated depreciation, which may include physical deterioration, functional obsolescence, and external (economic) obsolescence, is deducted from replacement cost-new to derive an indication of depreciated replacement cost. The final step is the summation of the land value and the depreciated replacement cost, providing an indication of total property value. It should be noted that the subject property is vacant land, thus the Cost Approach is not applicable.

The **Sales Comparison Approach** is also based upon the theory of substitution as the value is estimated by direct comparison of the subject property with comparable properties which have recently sold. These comparable properties are verified, with differences between the comparables and the subject property noted. The comparable sales are analyzed

EXHIBIT C 2019 BROWN-PARRIS

with sale prices delineated on an appropriate per unit basis. The sale price per unit reflects the relationship between sale price and value per unit. The analysis of the sales data includes adjustments to the units of comparison based on various dissimilar features and investment characteristics.

The scope of an appraisal for a tract of land is best explained in the 15th Edition of The Appraisal of Real Estate (Page 339), published by the Appraisal Institute, as follows: "Sales comparison may be used to value land that is actually vacant or land that is being considered as though vacant for valuation purposes. Sales comparison is the most common technique for valuing land, and it is the preferred method when comparable sales are available. To apply this method, data on sales of similar parcels of land is collected, analyzed, compared, and adjusted to provide a value indication for the site being appraised. In the comparison process, the similarity or dissimilarity of the parcels is considered."

"The appraiser must perform several tasks in developing an opinion of site value:

1. Gather data on actual sales as well as listings, offers, and options based on the highest and best use.

2. Identify the similarities and differences in the data.

3. Identify the highest and best use of each potential comparable sale and then choose the appropriate sales for analysis.

4. Identify units of comparison that explain market behavior.

5. Adjust the appropriate unit prices of the comparable sales to account for the dissimilar characteristics of the site being appraised

6. Form a conclusion as to the market value of the subject property."

During the course of researching applicable properties for use in determining a valuation for the conservation easement, sales were located throughout the United States. As many comparable sales as possible were located either within the State of Georgia, the Southeast or that had similar defining characteristics to that of the subject property within the United States. However, an inherent weakness of the Sales Comparison Approach for mining developments hinges on the complexity of multi-property sales and the unique physical characteristics of each mining site sale being proprietary information. Many of the sales associated with mining development involve multiple properties, all of which often include differing physical characteristics or mineral resources. Much of the information required to adequately analyze the sale, such as quantity and quality of reserves or annual production volume and the value of equipment are typically considered confidential and propriety, thereby shielded from public knowledge. Furthermore, market participants indicate that comparable data is difficult to find with all the information necessary to make appropriate adjustments as demonstrated by the mineral appraiser, T.R. Ellis of Ellis International Service. Mr. Ellis states: "Minerals Appraisers/Valuers often find great difficulty or failure in attempting to employ the Sales Comparison Approach to the Market Value Appraisal of development and operating stage of mineral properties.

An important factor generally overlooked is a comparison of net operating income (NOI) margins on a per-unit-of-production basis between mineral properties, whether these be demonstrated or forecast margins. NOI margins can vary greatly between mines or quarries that are producing similar products. Ultimately, the expected NOI margin determines what a buyer is willing to pay for an income producing property." As a result of the difficulty and plethora of work required to adequately use the Sale Comparison Approach in determining a supportable value conclusion for properties with subsurface material, Mr. Ellis argues in his paper, *Sales Comparison Valuation of Development and Operating Stage Mineral Properties*, "the great majority of appraisals of the market value of development and operating stage mineral properties are prepared using only an Income Approach Method. The method most commonly used is the Discounted Cash Flow (DCF) method, better known in the mining industry as the net Present Value (NPV) Method."

According to Robert H. Paschall, in *The Appraisal of Mineral Producing Properties*, ASA Valuation, American Society of Appraisers, 1974, "The capitalized income method is the only method appropriate to appraise an active construction-rock operation." Furthermore, according to Donald W. Gentry and Thomas J. O'Neil, Dr., *Mining Investment Analysis*, Society of Mining Engineers, American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc. New York, New York, 1986, page 14, "the preferred method for mining property valuation and the one universally used in the commercial practice is the income approach. Because mines have limited operating horizons and because there are well established markets for mineral commodities, the income approach is widely used in valuing mineral properties. The approach is used commonly by the mining industry in assessing investment rates of return and determining appropriate purchase prices for mines or mineral prospects."

Surface mining facilities are typically purchased for future income based on remaining deposits, grades of material, cost to mine, and processing cost. Mining properties are unique, each located in differing markets, possessing differing material, and operating at differing levels of development and production. Individual site data is often proprietary and considered confidential by the mine operator. Therefore, an investor would place more emphasis on an income approach utilizing known site data when considering an investment in this type of property.

Of note, according to the SME Guide for Reporting Exploration Information, Mineral Resources, and Mineral Reserves, prepared by the Resources and Reserves Committee of The Society for Mining, Metallurgy, and Exploration, Inc., published in July 2017, there are three types of technical studies. These studies are:

- Scoping Study: A Scoping Study is an order of magnitude technical and economic study of the potential viability of Mineral Resources that includes appropriate assessments of realistically assumed Modifying Factors together with any other relevant operational factors that are necessary to demonstrate that at the time of reporting that progress to a Pre-Feasibility Study can be reasonably justified.

- Pre-Feasibility Study: A Pre-Feasibility Study is a comprehensive study that may include a range of options for the technical and economic viability of a mineral project that has advanced to a stage where a preferred mining method, in the case of

EXHIBIT C - 2019 BROWN PARRIS

underground mining, or the pit configuration, in the case of an open pit (surface) mine, is established and an effective method of mineral processing is determined. It includes a financial analysis based on applicable Modifying Factors and the evaluation of any other relevant factors which are sufficient for a Competent Person, acting reasonably, to determine if all or part of the Mineral Resource may be converted to a Mineral Reserve at the time of reporting. A Pre-Feasibility Study is at a lower confidence level than a Feasibility Study.

- Feasibility Study: A Feasibility Study is a comprehensive technical and economic study of the selected development option for a mineral project that includes appropriately detailed assessments of applicable Modifying Factors together with any other relevant operational factors and detailed financial analysis that are necessary to demonstrate at the time of reporting that extraction is reasonably justified (economically mineable). The results of the study may reasonably serve as the basis for a final decision by a proponent or financial institution to proceed with, or finance, the development of the project. The confidence level of the study will be higher than that of a Pre-Feasibility Study.

Further, according to the CIMVAL Code for the Valuation of Mineral Properties prepared by the Special Committee of the Canadian Institute of Mining, Metallurgy and Petroleum on the Valuation of Mineral Properties (CIMVAL) published on November 29, 2019, the valuation approach depends on the stage of exploration or development of the subject property. Properties with subsurface material or Mineral Properties can be categorized for convenience into four types; however, it should be noted that there are no clear-cut boundaries between these types, that the Mineral Property category may change over time, and that it may be difficult to classify some Mineral Properties so they fit in only one specific category. These categories are:

- Exploration Properties: A Mineral Property that does not contain Mineral Reserves or Mineral Resources and for which economic viability has not been demonstrated.

- Mineral Resource Properties: A Mineral Property that contains a Mineral Resource as defined in the CIM Definition Standards, as defined in National Reporting Standards, or other estimates of quantity and grade of mineralization that are reconciled the with the CIM Definition Standards.

- Development Properties: A Mineral Property that contains Mineral Reserves and/or Mineral Resources and for which economic viability has been demonstrated by a Feasibility Study or Pre-Feasibility Study and includes a Mineral Property that has a current positive Feasibility Study or Pre-Feasibility Study but that is not yet in production.

- Production Properties: A Mineral Property with an operating mine, with or without a processing plant, which has been fully commissioned and is in production.

As presented in the chart below, the type of valuation methodology is dependent on the type of property classification (Exploration, Mineral Property, Development, Production) which is derived based on the type of study completed (Scoping, Pre-Feasibility, Feasibility).



Figure 3: Valuation methods depending on the stage of development on the mineral property

Source: MVENMYN

It is the appraisers' opinion, due to the professional reports provided, the subject property is classified as a Development Property with a Pre-Feasibility Study completed at a minimum as of the date of this appraisal. A qualified drilling company under the guidance of a Professional Geologist drilled the subject property, a Qualified Laboratory tested the material, a Professional Geologist along with a Professional Engineer evaluated the reserves on-site based on the physical characteristics of a subject property, a mining consultant working in tandem with the Professional Geologist and Professional Engineer evaluated the supply and demand as well as the target market. Further, the mining consultant established the permitting schedule, the market pricing, production schedule, the capital expenditures, the operating costs, and the life of mine. All of the above is only possible on the subject property as it is a unique property that has the quality and quantity of material on-site that is financially feasible to extract. The subject property within this appraisal report is unique as detailed in each of the professional reports provided and included in the addenda of this appraisal report.

Due to the indicated challenges, based on our research and experience, we have concluded that the Sales Comparison Approach is limited and was not utilized as additional support for the Income Approach – Discounted Cash Flow analysis used in determining a value opinion. Of note, the appraisers recognize that the Sales Comparison Approach should be utilized when it is feasible to do so. However, as is the case with this appraisal report, an inherent weakness of the Sales Comparison Approach for mining developments hinges on the complexity of multi-property and speculative sales. Many of the sales associated with mining development include differing physical characteristics or

EXHIBIT C - 2019 BROWN-PARRIS

mineral resources. Much of the information required to adequately analyze the sale, such as quantity and quality of reserves or annual production volume and the value of equipment are typically considered confidential and propriety, thereby shielded from public knowledge.

The appraisers endeavored to find sales of land where both the buyer and seller had reasonable knowledge of the relevant facts. Specifically, land sales where the seller had a qualified drilling company under the guidance of a Professional Geologist drill the property, a Qualified Laboratory test the material found from the drill results, a Professional Geologist along with a Professional Engineer evaluate the reserves on-site based on the physical characteristics of the property, a mining consultant working in tandem with the Professional Geologist and Professional Engineer evaluate the supply and demand as well as the target market. Further, the mining consultant would have established the permitting schedule, the market pricing, production schedule, the capital expenditures, the operating costs, and the life of mine. All of the above is only possible on a property is unique and has the quality and quantity of material on-site that is financially feasible to extract. However, the appraisers were unable to find any land sales that had all the above-described due diligence similar to the subject property.

The appraisers analyzed sales of mining properties as well as mergers and acquisitions of mining companies. It is the appraisers' opinion that the development of the Sales Comparison Approach may provide a misleading value and thus was not utilized within this appraisal report.

Finally, due to the availability of conservation easement encumbered sales, the Sales Comparison Approach was utilized in determining the value opinion for the subject property post-conservation easement.

The **Income Approach** analyzes the subject property as an investment recognizing the present value of future cash flows. The income approach is integral to investors in understanding when considering potential investment properties as it indicates the potential return on investment, or future income possibilities, based on the current investment. Typically, there are two primary methods in utilizing the income approach, the direct capitalization method and the yield capitalization method, often considered the discounted cash flow analysis (DCF). According to David Lennhoff, MAI, SRA, there is one constant between both methods, the value conclusion as the final value does not change based on which method is used.[105] Understanding the income approach can be difficult, and as such, most appraisers lean towards using the direct capitalization method as it is often easier to follow than a DCF.[106]

The Direct Capitalization approach utilizes a five-step process to indicate the anticipated future income based on a present-day investment. The five-steps are outlined and briefly discussed in the following analysis, in addition to the yield capitalization approach to determine the appropriate method for evaluating any income generation from potential operations on the subject land. However, the appraisers believe the Yield Capitalization Approach, or the DCF method, is the most applicable income approach for the valuation of the mine.

---

[105] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*
[106] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*

**Fundamental Elements of Investment Evaluation**

Income-producing real estate is typically purchased as an investment and investors typically value earning power as the critical element affecting property value. One basic investment premise holds that the higher the earnings, the higher the value, provided the amount of risk remains constant. An investor who purchases income-producing real estate is essentially trading present dollars for the expectation of receiving future dollars.

Step 1 is perhaps the most overlooked, but ultimately one of the most important steps in the process. Defining the length of the investment, the holding period, allows for the proper analysis to be conducted. Without defining the length of time the investor plans on holding the property, or a generally used length of time such as five or ten years to aid in an estimated Return on Investment, determining the appropriate investment amount for future returns over the defined period becomes too arbitrary to adequately predict.

Step 2 in the process is determining which income period is appropriate for analyzing the first year's income. "For most real estate investments, the first income period will be one year's net operating income."[107] Deciding what constitutes the first year's income period establishes the starting point for establishing the following periods income, and as such, establishing the correct income period for the start of the analysis becomes imperative. The potential income periods available for use include the net income expected during the first year of ownership, the net income for the trailing year (the income from the year prior to new ownership), a stabilized year's income or the net income before or after replacement allowance deductions.[108] Establishing the starting point for net income analysis leads directly into the third step, analyzing the potential income from each subsequent period of the investment.

Step 3 pertains to evaluating and analyzing the income in each subsequent period of the investment. This step is important as it allows for the investor to evaluate any anticipated income from the following periods. The primary items to consider during step three regarding expected future income are whether the income will remain level, will it rise and if it rises, will it rise at a standard or variable rate, will it decline or will it be irregular.[109]

Step 4 focuses on reversion. Step 4 and the principle of reversion is directly tied to Step 1 in establishing the length of the holding period for the investment. Reversion literally applies to the moment when the investment property reverts back to its previous or new ownership. This transaction typically has a value associated with the transfer of ownership and reversion attempts to capture this value through its analysis. "In a discounted cash flow analysis, the reversion amount is frequently estimated as some percentage of the unknown present value or by using a terminal capitalization rate and applying direct capitalization at the end of the holding period, i.e., dividing one year's income by a terminal cap rate."[110]

Step 5, also the final step in the process, determines the yield rate for the investment. The yield rate of an investment pertains to the rate of return, inclusive of the initial investment, investors expect to receive from the original real estate investment. This yield rate helps the investors to decide whether a particular investment property provides adequate potential yield compared to the risk associated with the investment. "The present worth of

---

[107] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*
[108] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*
[109] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*
[110] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*

EXHIBIT C - 2019 BROWN PARRIS

the cash flows, discounted at the yield rate, results in the amount the investor can afford to pay for the investment (its value) if that yield is to be achieved."[111]

**Direct Capitalization Method**

The direct capitalization method is often considered the more straight forward of the two methods as a result of requiring only two components for calculation. The two components required for the direct capitalization method are the year's income and the overall capitalization rate. The accuracy of this method hinges on the ability to determine the correct capitalization rate.[112] Examining the contents of *The Appraisal of Real Estate* reveals five methods for determining the overall capitalization rate: Derivation from comparable sales, band of investments- mortgage and equity components, band of investments- land and building components, derivation from effective gross income multipliers and net income ratios and finally, the debt coverage formula.

The first method takes sales comparables in the area where a net income for the property is available, and then divides the income generated by the sale price. Once the rates for the varying sales comparables is generated, the appraiser must reconcile these rates into one established rate, similar to the sales comparison approach of valuation.

The second method, band of investments involving mortgage and equity components, uses one formula to determine the capitalization rate and then another formula to establish a value based on the found capitalization rate. The two formulas are as follows, where Ro is the capitalization rate, M is the loan-to-value ratio, Rm is the Mortgage constant and Re is the Equity Cap Rate. For the second formula Vo is the value, NOI is the net operating income and Ro is the Cap Rate.

$$Ro = M \times Rm + (1-M) \times Re$$

For Value:

$$Vo = NOI \div Ro$$

The remaining methods of the direct capitalization process only concentrate on using one year's net income rather than a combination of values to determine the overall value of the property.[113] As such, simplifying the direct capitalization approach arrives at one formula for determining the overall value of the property: Vo = NOI ÷ Ro. Because the direct capitalization method boils down to this one formula, most appraisers tend to lean towards it use, both because it is straight forward to the reader, the process is relatively simple (despite requiring the same level of analysis) and in an attempt to eliminate as much confusion as possible from those who do not understand real estate valuations fully. Ultimately, the value estimate derived from direct capitalization reflects an amount an investor should be justified in paying to receive an annual income over the holding period of the property, plus the reversionary value at the end of the ownership period.

---

[111] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*
[112] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*
[113] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*

EXHIBIT C 2019 BROWN-PARRS

### Yield Capitalization Method

The yield capitalization method is similar to the direct capitalization approach in analyzing the potential income of a property to determine the real estate's overall value. However, the yield capitalization method, most often analyzed through discounted cash flow analysis, differs from the direct capitalization approach by explicitly accounting for each of the investment criteria examined in the overall income approach. "The income capitalization method using yield capitalization explicitly accounts for each of the five investment criteria".[114]

To perform Yield Capitalization, an appraiser must select an appropriate projection period, forecast all future cash flows or cash flow patterns (including the reversion, if any), choose an appropriate yield (or discount) rate, convert future benefits into present value by discounting each annual future benefit or by developing an overall rate that reflects the income pattern, value change, and yield rate using one of the various yield capitalization formulas. This method is often played out through the use of the discounted cash flow (DCF) method. Using the DCF method, various techniques are used to convert a series of future cash flows received into an indication of value as indicated in the formula expressed below where DCF represents the potential Cash Flow over the holding period of the investment, CFo is the Cash Flow for a respective year and R represents the discount rate. The calculated future cash flow indicates the minimum return acceptable over the life of the investment based on the initial risk accepted.

$$DCF = (CFo \div ((1+R)^{\wedge}1)) + ((CFn \div ((1+R)^{\wedge}n))$$

Trevor R. Ellis, MCA, CPG, M. AusIMM, and J. Ballard, Resource Finance Consultant of Ellis International Services in Denver, Colorado discuss and present rational strategies for discounted cash flow methodologies and net present value in *Valuation Methodologies for Mines and Mineral Tenements.* They both recommend DCF as the primary method for valuing operating mines, or mineral assets with an indicated resource and a feasibility study containing engineering, production and capital estimates and operating cost data.

Mr. Dennis Kenney, Titan Environmental & Construction Company, Inc., Mr. Stuart Burgess, Burgex Inc. Mining Consultants, Mr. Hans E. Naumann, Jr., P.E., Marshall Miller & Associates, Inc., Mr. David Grayson, formerly a Division President of a Fortune 500 mining company, Mr. Chris Summers, Burgex Inc. Mining Consultants and formerly a Senior Business Analyst of Nyrstar Corporation and formerly a Principal Analyst of Rio Tinto, and finally, Dr. Capps, Capps Geoscience, LLC, all indicate the appropriate methodology for valuing property with proven mineral reserves is the Income Approach, specifically the Discounted Cash Flow.

Detailed property information from the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants, is included in the Addenda. The Technical Due Diligence Business Plan and Market Analysis details market information, experience as a consultant and expertise in mine development. The information contained in the aforementioned report profiles the income stream and all the necessary expenditures, expenses, and yearly operation of the mine. The appraisers have determined that the most preferred approach to value is the Discounted Cash Flow

---

[114] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*

EXHIBIT C - 2019 BROWN-PARRS

analysis supported with reliable market data made available in the Technical Due Diligence Business Plan. The DCF method is further supported as evidenced by *Whitney Benefits and Peter Kiewit Sons' v. The United States, 1989 (18-CL. CT. 394),* where the plaintiffs allege their land mineable for coal was taken without fair market compensation by the defendants, the United States. After establishing the existence of a sustainable market and ability to mine the coal, the plaintiff and defendants presented arguments pertaining to the appropriate method for establishing the fair market value of the land without the ability to physically mine. The defendants urged the courts to consider the Sales Comparison Approach as the primary method of valuation in addition to presenting the Royalty Method as an alternate to the DCF analysis presented by the plaintiffs as the appropriate method for determining the fair market value of the land. The courts dismissed the Sales Comparison approach as a reliable method in determining the fair market value, due in part, to the vast differences found between mineable land within a given market area. As such, the courts focused on determining the reliability of the DCF analysis and the royalty method, determining the DCF as the most reliable method for determining the fair market value of mineable land. The court stated: "Rather than value the Whitney coal as a fee interest of the two plaintiffs as lessor and lessee, defendant's valuations focus only on the interest held by Whitney Benefits. Thus, in both of its valuations, defendant has disregarded the leasehold interest owned by PKS and merely analyzed the royalty income Whitney could have expected to receive." The key component of the DCF analysis is its ability to determine the value of the land based on the fee simple interest rather than either one or the other, the leased fee interest or the leasehold interest individually. Furthermore, the defendant's expert witness, Dr. John Weir, stated the royalty method exists as a subsection of the Discounted Cash Flow analysis rather than a stand-alone method separate from the DCF analysis.

According to Svetlana Baurens in, *Valuation of Metals and Mining Companies*, the DCF method is not applicable without "reasonably assured mineral reserves." This plan should include rates, test results, capital and operating cost, environmental and reclamation cost, and any other necessary projections. Ms. Baurens states, "It must be taken into consideration that DCF is not applicable to early-stage projects without reasonably assured mineral reserves, workable mining plants with rates, metallurgical test results and process recoveries, capital and operating cost estimates, environmental and reclamation cost estimates and commodity price projections. The reason of this is the theory behind DCF: the value of every asset is simply the present value of the cash flows this asset produces over the lifetime. One must have enough information that we can reasonably estimate cash flows from production. Therefore, DCF is only appropriate for mineral properties in production, very near production or for mineral properties at the stage of development. In these cases, the economic viability of the property will be based on preliminary estimates of production, revenue and cost. Despite the preliminary nature of the underlying estimates, it is still generally accepted that discounted cash flow analysis is the best method of valuing mineral properties at this stage of development."

As stated throughout this report, the subject property has proven mineral reserves. Further, this report details projected pricing, test results, capital and operating costs, environmental and reclamation costs, and other necessary projections for the use of a DCF analysis. Therefore, it is the appraisers' opinion the use of the DCF method was applicable.

EXHIBIT C-2019 BROWN PARRIS

The subject property's location in Georgia and its physical characteristics (existing granite deposits), along with the information and recommendations from Mr. Burgess's Technical Due Diligence Business Plan and Market Analysis, suggest a discounted cash flow analysis reflecting a mining property is appropriate and has been developed. The mine plan provides enough information that the appraisers can reasonably estimate a value opinion using a cash flow.

**<u>Royalty Method</u>**

An additional approach, the Royalty Method, is the present value of the income stream based on market comparable royalty rates for mined material over the extraction period. Royalty payments are usage-based payments made by one party (the lessee) to another (the lessor) for use of an asset in order to execute the right to extract mineral reserves. Royalties are typically paid as a percentage of gross sales and alternatively paid as a percentage of net profits or, in some instances, a fixed price per unit sold. A royalty is the right to collect a stream of future royalty payments based on usage and the royalty stream method present values the royalty revenues to provide an estimate of value.

The most significant weakness in the royalty stream method is that the present value of an income stream derived from royalties would reflect only a lessor interest in the mineral right and, therefore, fails to take into account all of the value of fee simple ownership. This is because fee simple ownership of a mineral interest carries a greater bundle of rights than that of a lessor interest, as it would include both lessor AND leasehold ownership rights. Thus, the royalty stream method captures fewer sticks within the bundle of ownership, whereas much greater rights are accorded to a fee simple interest. The royalty stream method can estimate only the value associated with a lessor's ownership interest. In contrast, the DCF method can capture all of the rights associated with the fee simple interest in a site that specifically considers the location and mine plan.

Simply stated, the royalty stream method fails to capture the value of all of the rights of fee simple ownership in real estate that is successfully captured in a correctly conducted discounted cash flow valuation. It does not take into account the benefits from determining a specific mine plan for the subject property or where the mineral reserves will be processed and sold. It does not capture the economic benefits that may accrue in excess of royalty payments derived from market 'comparable' data to a fee simple owner, or properly consider the quality of mineral reserves at a particular location, nor does it capture unique characteristics of the mine site that result in lower costs or better access to markets. It is still a useful method of support to a cash flow method. However, the DCF method enables the appraiser to measure all issues that must be considered in any valuation assignment so that value is not overlooked. Fee simple ownership of a mineral interest is more valuable than a lessor interest only, which does not consider the real estate value that may accrue to the lessee as a leasehold interest. Fee simple ownership carries with it the power and incentive to develop the owner's unique plan to mine and derive maximum value from the property. The DCF method, as outlined here, captures all of the fee simple rights retained by the owner of the subject property to an extent that the royalty stream method cannot.

EXHIBIT C - 2019 BROWN-PARRIS

Industry professionals and peers were consulted to determine whether the Royalty Method held merit in determining the market value of a conservation easement, with the consensus of the industry being, the Royalty Method does not adequately provide a strong indication of overall value due to its challenge in expressing a value based on fee simple ownership. The mineable land condemnation court case from 1989, *Whiney Benefits and Peter Kiewit Sons' v. The United States, 1989 (18-CL. CT. 394)*, clearly supports the industry consensus and determines that the DCF analysis provides a reliable method for determining the fair market value of a potential mining development, while rejecting the royalty method. In summary, the defendant, The United States, presented a valuation based on the Royalty Method technique by means of two separate streams of income in an attempt to countermand the DCF analysis presented by the plaintiffs in the case. The court primarily rejected the royalty method for valuation based on its inability to provide a valuation based on a fee simple interest, composed of both the leased fee position and the leasehold position. The court stated: "Rather than value the Whitney coal as a fee interest of the two plaintiffs as lessor and lessee, defendant's valuations focus only on the interest held by Whitney Benefits. Thus, in both of its valuations, defendant has disregarded the leasehold interest owned by PKS and merely analyzed the royalty income Whitney could have expected to receive." Furthermore, the defendant's expert witness, Dr. John Weir, stated the royalty method exists as a subsection of the Discounted Cash Flow analysis rather than a stand-alone method separate from the DCF analysis.

Regardless, and in an effort to ensure due diligence regarding the valuation of the conservation easement, the appraisers sought royalty rates data, ultimately locating information on royalty rates. However, the data collected from the market is general, non-specific to a property, and has been determined by the appraisers to be unverifiable and inapplicable to the valuation of a conservation easement. As such, the appraisers believe that the royalty method does not appropriately value the overall property. Therefore, based on the above analysis, it is the appraisers' opinion the royalty method does not adequately provide a measure of value and is not used in the appraisal.

## Geographical Area Covered

The subject property is a unique property in that its most probable highest and best use is as a mining site. Additionally, according to the guidelines established by the Appraisal Institute in the 15th Edition of The Appraisal of Real Estate, "The nature of the data collected is greatly dependent on the scope of the assignment, the property type being appraised, and the market conditions within the market area identified by the appraiser...A good comparable sale is a competitive alternative, i.e., a property that the buyer of the subject property would also consider. The selection of comparable sales is directed to some extent by the availability of data." The Appraisal of Real Estate further discusses the importance of including regional or national markets based on the subject's property type or scope of the intended use. "The geographic limits of the appraiser's search for sales data depend on the nature and type of real estate being valued and the available sales information. Certain types of properties have regional, national, and even international markets. Similarly, an appraiser may gather data from a wide geographic area to find competitive properties for a regional shopping mall, large office building, resort hotel, large multiuse complex, or large industrial property" (Page 384).

As such, comparable land sale requirements for conservation easements are much more specific and encompass wider search parameters in terms of proximity to the subject property, the 272.98 acres to be encumbered by the conservation easement, than would be typical for a standard property valuation.

Sales of properties with similar unique characteristics, specifically, proven mineral reserves, similar market, similar physical site characteristics, quality and quantity of the reserves, etc. were researched. A further limiting characteristic of the subject area revolves around the transportation costs associated with the transport and distribution of any resources mined within the subject area, as presented further in the Highest and Best Use and Discounted Cash Flow sections. Due to the unique nature of the subject property's Highest and Best Use, as well as the transportation barriers, the comparable sales utilized from other states are impacted by the same transportation cost restraints, solidifying their applicability as comparable sales. Of note, the typical purchasers of properties with a similar highest and best use as the subject property (mining) are often mining companies that seek opportunities for expanding operations on a regional or national basis. Surface mining facilities are typically purchased for future income based on remaining deposits, grades of material, cost to mine, and processing cost. Mining properties are unique, each located in differing markets, possessing differing material, and operating at differing levels of development and production. Individual site data is often proprietary and considered confidential by the mine operator. Therefore, an investor would place more emphasis on an income approach utilizing known site data when considering an investment in this type of property.

**Time Period Searched**

Due to the uniqueness of the subject property being appraised, every effort was made to find the most current data available relative to the sales analyzed in this report from 2015 through the effective date of the appraisal. The specific nature of the highest and best use of the subject property required broader search parameters considering the date of sale to capture an adequate quantity for analysis both for land sales before implementation of a conservation easement as well as land sales encumbered by a conservation easement.

**Types of Market Data Researched**

Land sales with similar locations, physical traits, zoning and highest and best use characteristics were analyzed in conjunction with ad valorem taxes, zoning information, utility availability, floodplain information, topography, existing improvements and the relevant frontage and access. Furthermore, the appraisers consulted agencies (non-inclusive) such as the Chamber of Commerce, the County Development Authority, State Department of Labor Office, Regional Commission, Federal and State Department of Transportation, U.S. Census Bureau, Environmental Protection Division, Utility Corporations and local websites.

EXHIBIT C - 2019 BROWN-PARRIS

## Extent of Market Data Confirmation

When dealing with a specialized property, such as a property with mineral reserves, appraisers are encouraged, to consider any available reports from competent experts in that field. The appraisers took sufficient steps, common in the industry, to ensure the market data presented in this report are deemed accurate and reliable. The appraisers have made every attempt to confirm and authenticate any expert provided information. The reviewed expert provided information was determined to be reliable and to the best of the appraisers' knowledge, accurate. Market data included in this report was verified through multiple sources such as, public records of deeds and easements, subscription data sources, including CoStar among others, and interviews with brokers and/or grantors and grantees. Based on the credentials of Burgex Inc. Mining Consultants and GeoLogic, LLC, Professional Geologist, there is no reason at this time to suspect that the provided information is not credible. Based on the credentials and appraisers' investigation of that information, the appraisers found the analyses credible and reliable.

## References and Data Sources Used

The appraisers referenced several reports prepared by industry leaders as an aid in determining an appropriate value conclusion. The reports referenced, and included in the Addenda to the Report, include the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants, the Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement prepared by GeoLogic, LLC (Consulting Geologists), and the Baseline Documentation Report was prepared by Oconee River Land Trust, Inc.

The appraisal of property with subsurface material requires a number of different disciplines. A qualified drilling company under the guidance of a Professional Geologist to drill the property, a Qualified Laboratory for testing of the material, a Professional Geologist along with a Professional Engineer to evaluate the reserves on-site based on the physical characteristics of a property, a mining consultant working in tandem with the Professional Geologist and Professional Engineer to evaluate the supply and demand as well as the target market. Further, the mining consultant will establish the permitting schedule, the market pricing, production schedule, the capital expenditures, the operating costs, and the life of mine. Finally, a qualified appraiser, one who specializes in appraisals with subsurface material, will analyze all of the data provided from the experts/professionals above to perform a qualified appraisal. All of the above is only possible on a unique property that has the quality and quantity of material on-site that is financially feasible to extract. The subject property within this appraisal report is unique as detailed in each of the professional reports provided and included in the addenda of this appraisal report.

## Conclusion

The information included in this report associated with the subject property regarding the tonnage estimates, expected yield, expenses, expenditures, reserves and resources over the life of the mine lends itself to use of the Income Approach in determining a value opinion. As such, we have utilized the Income Approach as the primary method in arriving at a value conclusion. The Sales Comparison Approach was

EXHIBIT C - 2019 BROWN-HARRIS

deemed nonapplicable. The Royalty Method is not a meaningful indicator of fee simple value and there are no on-site improvements on the subject property. Thus, the Cost Approach and the Royalty Method were not utilized in determining a value opinion for the Fee Simple Interest of the property.

## 6.3. Before Conservation Easement

### 6.3.1. Highest and Best Use

Highest and Best Use is defined in Chapter 17 Page No. 305, in the 15th edition of "The Appraisal of Real Estate," published by the Appraisal Institute, and adopted by Treasury Regulation § 170, as the reasonably probable use of property that results in the highest value, as of the date of the appraisal.

One must consider the facts known as of the valuation date. At the time there was core drilling, lab testing, geological analysis, and market analysis completed and considered. These specific aspects changed the highest and best use of the subject property.

The highest and best use is described by the Appraisal Institute as the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible and results in the highest value. The four criteria of the highest and best use include legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved specific property with respect to the user and timing of the use is adequately supported and results in the highest present value. This determination is not based on quantitative means nor is it a fact to be found, but instead relies heavily on the appraisers' judgment as well as his analytical skill. It is of note that the highest and best use may differ from the existing use when there are existing improvements, or changes such as the discovery of oil or core drilling of other minerals.

The purpose of determining the Highest and Best use for a specific property is to identify the demand for most profitable potential uses, identify demand for particular property types, compare cost and value if specific market criteria are fulfilled, then of the appropriate potential uses to determine the use that produces the maximum value.

**Potential Income From Mining Development**

Our research and analysis of the subject property, reinforced by drill site tests and geological scrutiny by Stuart Burgess of Burgex Inc. Mining Consultants, has resulted in the conclusion that the subject property has the potential to become a granite mine. Granite is the best-known igneous rock. Granite is the rock most often quarried as dimension stone (a natural rock material that has been cut into blocks or slabs of specific length, width, and thickness). Granite is hard enough to resist most abrasion, strong enough to bear significant weight, inert enough to resist weathering, and it accepts a brilliant polish. These characteristics make it a very desirable and useful dimension stone. Most of the granite dimension stone produced in the United States comes from high-quality deposits in five states: Massachusetts, Georgia, New Hampshire, South Dakota, and Idaho. Granite has been used for thousands of years in both interior and exterior

applications. Rough-cut and polished granite is used in buildings, bridges, paving, monuments, and many other exterior projects. Indoors, polished granite slabs and tiles are used in countertops, tile floors, stair treads, and many other practical and decorative features. Granite is frequently selected because it is a prestige material, used in projects to produce impressions of elegance, durability, and lasting quality. Granite is also used as a crushed stone or aggregate. In this form it is used as a base material at construction sites, as an aggregate in road construction, railroad ballast, foundations, and anywhere that a crushed stone is useful as fill. The high price often reduces the popularity of a construction material, and granite often costs significantly more than man-made materials in most projects, however, granite is most frequently selected due to its durability. [115]

Aggregates are the most commonly mined materials in the world and have a wide market demand for buildings and infrastructure projects. The potential income analysis and detailed business plan, as a result of the mining development, was supplied by Stuart Burgess of Burgex Inc. Mining Consultants and provided in the Addenda.

### **Products/Materials Available on the Subject Property**

The subject property is located within the inner Piedmont geologic province of Georgia, which is primarily characterized by high grade metamorphic rocks. More specifically, the subject property is located between the Modoc Fault Zone to the southwest and the Cat Square Terrane – Carolina Superterrane contact boundary to the northwest. The bedrock found during drilling was relatively uniform with some variation's in mineralogy, color, texture, hardness, weathering, and was described by GeoLogic, LLC in their report entitled "Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement" as "*Light to dark gray, black, pink/orangish pink, and milky white, phaneritic texture, slightly foliated locally, medium grained. Anhedral to subhedral plagioclase, anhedral to subhedral orthoclase, anhedral quartz, euhedral to subhedral biotite, and euhedral to subhedral hornblende. Contains minor quartz veins with feldspathic zones. Granitic texture, hard to very hard (R4-R5), (Granite Gneiss/Granite – gg6, and Granite Undifferentiated – gr1).*"[116]

Georgia is well known for its quality stone of various colors and patterns. There are 18 active crushed stone quarries located within 50 miles of the subject property which demonstrate the abundance of quality stone in the region.

---

[115] Geology.com/rocks/granite
[116] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

EXHIBIT C - 2019 BROWN HARRIS



Figure 3: Sample of Brown Harris bedrock found during the drilling program.



Figure 4: Generalized geology overview map of the Brown Harris property and surrounding area.



Figure 29: A stone outcrop on the Brown Harris property. Phone included for scale. Photo taken during a site visit by Burgex.

The geological evaluation of the subject property was conducted by GeoLogic, LLC (GeoLogic) of Woodstock, Georgia. This evaluation included site visits, drill target selection, drilling supervision, core logging, and testing coordination. Controlled Blasting

Inc, under the guidance of GeoLogic, LLC advanced a total of five air track borings on the subject property prior to core drilling. The purpose of the air track drilling was to make a preliminary determination of overburden thickness at the site. Data on these borings are shown as BHB-1 through BHB-4 in the table below. The bedrock surface was encountered in all five of the borings, which occurred at depths ranging from 13 to 64 feet below existing grades. [117]

Upon completion of the air track drilling, Premier Drilling conducted core drilling of the formation also under the supervision of the GeoLogic, LLC team. Five holes were drilled from August 7 to August 15 of 2019. These holes were drilled to a minimum depth of 66 feet, with an average depth of 1226 feet. Boring BHB-5 encountered refusal material at 46 feet below the ground surface, which proved to be a small boulder upon investigation. BHB-5 was extended to a termination depth of 66 feet below the ground surface and did not encounter the bedrock surface. The total program depth was 835 feet. This program indicates consistent usable stone across the subject property with an average of approximately 34 feet of overburden. For the mine plan, an approximate average depth of 32 feet was used for overburden calculations.[118]

| Drilling Program Summary | | | |
|---|---|---|---|
| Drill Hole | Total Depth | Overburden Depth | Granite/Rock Thickness |
| BHB-1 | 43 | 13 | 30 |
| BHB-1 OS | 28 | 15 | 13 |
| BHB-2 | 48 | 32 | 16 |
| BHB-3 | 73 | 64 | 9 |
| BHB-4 | 73 | 63 | 10 |
| BHB-5 | 66 | 66 | 0 |
| BHB-6 (Core) | 81 | 25 | 56 |
| BHB-7 (Core) | 206 | 6 | 200 |
| BHB-8 (Core) | 126 | 47 | 79 |
| BHB-9 (Core) | 91 | 6 | 85 |
| Total | 835 | | |
| Average | 126* | 34 | 105* |

Figure 5: Summary of the 2019 Brown Harris core drilling program. * Averages for core holes only. *105 feet is the arithmetic average of all drill holes. GeoLogic, LLC estimates actual rock thickness to be at least 200 feet.

[117] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[118] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants



*Figure 2: Approximate location boundary map and drill hole locations of the Brown Harris property.*

Benjamin R. Black, PG, RPG, EIT from GeoLogic, LLC (GeoLogic), was retained to produce a Report of Resource and Reserve Estimate for the subject property. Utilizing the drill hole and other geological data collected by Timely Engineering, Mr. Black was able to determine that the subject property contains a total resource of approximately 51.7 million tons and an in place mineable reserve of approximately 36.2 million mineable tons of aggregate.

A computer-generated model was created by utilizing drill logs, core samples, and other site observations. This model was used to create a 72-acre theoretical pit, including a 32-foot initial overburden layer. Total depth of stone was assumed to be approximately 200 feet below competent bedrock. In September of 2020, this model and associated mine plans were updated to incorporate the results of a wetland study and to further refine the site layout to accommodate regulatory requirements. The updated model, reserve calculations, and plans have been incorporated into the Technical Due Diligence Business Plan and Market Analysis. Rock cores collected during the geological investigation were transported to Timely Engineering Soil Tests, LLC Services of Tucker, Georgia (Timely Engineering) to be tested for suitability as a general and transportation construction aggregate. The tests performed on the cores included: Los Angeles abrasion, magnesium sulfate soundness, and specific gravity. The results of these tests confirm suitability for Georgia and South Carolina Departments of Transportation (GDOT and SCDOT, respectively) usage as well as that of many construction

applications. A summary of results can be found in the table below and full results can be found in the appendices of the Technical Due Diligence Business Plan and Market Analysis. [119]

| Mineable Stone Calculations for 72 Acre Potential Quarry | | |
|---|---|---|
| Description | Unit | Quantity |
| Pit Acreage | Acres | 72 |
| Approximate Overburden | Cubic Yards | 3,650,000 |
| Total Resource | US Tons | 51,699,099 |
| Total In-place Reserve | US Tons | 43,944,234 |
| Mineable Reserve | US Tons | 36,230,000 |

*Figure 6: Mineable reserves as calculated using information collected by Geologic. An example mining plan is included in the appendix of this report.*



| Crushed Granite Sample Test Results | | | |
|---|---|---|---|
| Test | Result | GDOT Standard | SCDOT Standard |
| Los Angeles Abrasion Test | 25% loss | ≤50% | <55% |
| Soundness Test | 99.8% retention | >85% | >85% |
| Bulk SSD Specific Gravity | 2.642 tons per cubic yard | >2.55 | >2.55 |

*Figure 8: Results of Timely Engineering core sample tests from the Brown Harris property with comparison to GDOT and SCDOT standards for coarse aggregates used for transportation construction.*

The American Society for Testing Materials (ASTM) develops their standards through a consensus of its members and these standards are used throughout the world. The AASHTO is a standards-setting body which publishes specifications, test protocols, and guidelines that are used in highway design and construction throughout the United States. The AASHTO also represents not only highways but air, rail, water, and public transportation as well. Furthermore, the AASHTO develops its standards by subcommittees with representation from Departments of Transportation across America as well as the Federal Government. It is not uncommon for AASHTO Standards to reference an ASTM standard, thereby making it essentially a part of their specification, which allows those AASHTO certified labs to test multiple states by following those standards.

In the following analysis, the term "aggregate" is used to identify all classes of crushed stone used in construction materials.

## LA Abrasion

The Los Angeles (L.A.) abrasion test is a common test method used to indicate aggregate toughness and abrasion characteristics. Aggregate abrasion characteristics are important because the constituent aggregate in hot mix asphalt (HMA) must resist crushing, degradation and disintegration in order to produce a high quality HMA. Aggregates undergo substantial wear and tear throughout their life. In general, they should be hard and tough enough to resist crushing, degradation and disintegration from any associated activities including manufacturing, stockpiling, production, placing and compaction. Furthermore, they must be able to adequately transmit loads from the pavement surface to the underlying layers and eventually the sub-grade. Aggregates not adequately resistant to abrasion and polishing may cause premature structural failure and/or a loss of skid resistance. There is no federal standard L.A. abrasion specification for Superpave mix design; specifications are typically established by state or local agencies. Typically, U.S. state specifications limit the abrasion of coarse aggregate for HMA use to a maximum ranging from 25.0% to 55.0%, with most states using a specification of 40.0% to 45.0%. (South Carolina DOT standards require an L.A. Abrasion loss of not more than 55.0% and Georgia has a standard of less than or equal to 50.0% for group II aggregates including slag, gravel, granitic and gneissic rocks, quartzite, synthetic aggregate, or any combination thereof. According to the GDOT, Group I aggregate must have an L.A. Abrasion loss of not more than 45.0%. Group I aggregate includes limestone, dolomite and marble.) The LA Abrasion test on the subject property yielded an average of 25.0%.

EXHIBIT C - 2019 BROWN PARRIS

**The value for this property of coarse aggregates averaged 25.0%**.

The standard utilized by most states is AASHTO T96 or ASTM C131/D131/535: Resistance to Degradation of Small-Size Coarse Aggregate by Abrasion and Impact in the Los Angeles Machine.

## Coarse Aggregate Specific Gravity

Aggregate specific gravity is needed to determine weight-to-volume relationships and to calculate various volume-related quantities such as voids in mineral aggregate (VMA), and voids filled by asphalt (VFA). The standard coarse aggregate specific gravity test is ASTM D854. Specific gravities can vary widely depending upon aggregate type. Typically, aggregate used in Hot Mix Asphalt (HMA) production will have a bulk specific gravity between about 2.550 and 3.000 with 2.700 being fairly typical of granite used for aggregates.

**The specific gravity for this property averaged 2.642, which is not only good for HMA material but also good for many other applications.**

## Soundness Test

The soundness test (AASHTO T-104, ASTM C-88) determines an aggregate's resistance to disintegration by weathering and, in particular, freeze-thaw cycles. The most common soundness test involves repeatedly submerging an aggregate sample in a saturated solution of sodium or magnesium sulfate. This process causes salt crystals to form in the aggregate pores, which simulate ice crystal formation. The basic procedure is as follows (from Roberts et al., 1996[1]): (1) Oven dry the sample and separate it into specific sieve sizes. (2) Immerse the sample in a saturated solution of sodium or magnesium sulfate and let it remain at a constant temperature for 18 hours. (3) Remove the sample from the solution and dry to a constant weight at $110 \pm 5oC$ ($230 \pm 9oF$). (4) Repeat this cycle five times. (5) Wash the sample to remove the salt; then dry. (6) Determine the loss in weight for each specific sieve size and compute a weighted average percent loss for the entire sample. SCDOT and GDOT specification is less than 15.0%.

**This property has a Sodium Sulfate Soundness loss of 0.2%.**

The tests for percentage calcium carbonate, porosity, hydraulic conductivity are general tests to determine the quality of the granite but are less important than the ones reported above. These tests all showed good quality granite as indicators.

A review of all test results indicates the granite material passes the Georgia Department of Transportation standards for use in all coarse aggregate applications. Since Departments of Transportation have the most stringent test requirements and the materials do meet DOT standards, they also meet the specifications and requirements for general construction applications, they can and will be used as such.

The geologic investigation of the area examining drilling and other considerations for mining feasibility include whether mining is legally permissible, financially feasible and existing market data, with the resulting analysis of the granite deposit classified as

"Proven Mineral Reserves." In addition, there are several other mining operations mining the same deposit in the region.

**Therefore, Proven Mineral Reserves are ≈ 43.1 million tons of granite that is GDOT and SCDOT Road Base and general construction material.**

| Mineable Stone Calculations for 72 Acre Potential Quarry | | |
|---|---|---|
| Description | Unit | Quantity |
| Approximate Overburden | Cubic Yards | 3,650,000 |
| Mineable Reserve | Tons | 36,230,000 |

*Figure 6: Mineable reserves as calculated using information collected by Geologic. An updated example mining plan is included in the appendix of this report.*

**Legally Permissible**

The subject property consists of 272.98 acres and is located along the north side of Raytown Road and the south and west side of Fair Play Road, just east of Georgia Highway 47 and just north of Interstate 20 in Taliaferro County, Georgia. The surrounding area primarily consists of residential and agricultural land uses. The concentration of population and supportive commercial and industrial development is located in Washington, Georgia to the north, Augusta, Georgia to the east, and Athens, Georgia to the northwest.

As stated throughout this report, according to the Taliaferro County Zoning Department, the subject property is zoned A-1 Agricultural District. Further, according to Mr. Hitchcock, Hitchcock & Hitchcock, P.C., from a land use perspective, the proposed use of the property as a mine is allowed within the agricultural district with a variance granted by the planning commission, and the likelihood of obtaining a permit to operate a rock quarry is good because the concerns of those who wish to preserve the Dark Sky area can be addressed by the hours of operation of the quarry itself.

Therefore, it is reasonably probable the Highest and Best Use, based on the information available and provided by the Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Estimate prepared by GeoLogic, LLC as well as the Technical Due Diligence Business Plan and Market Analysis, prepared by Burgex Inc. Mining Consultants, before the conservation easement of the 272.98 acres to be encumbered by the conservation easement, is as a granite mine, would be permitted.

There are a variety of uses permitted (based on the reasonably probable zoning being approved), including the stated Highest and Best Use of the subject property before the conservation easement, a granite mine. Therefore, there are not any zoning limitations that would hinder the subject property to be utilized as a mining operation.

EXHIBIT C - 2019 BROWN HARRIS
Case 3:22-cv-XXXXX Document 1 Filed XX/XX/XX Page 405 of 600

Although, the immediate area consists of primarily agricultural and raw undeveloped properties, there are quarries in the region including the Warren County Quarry owned by CRH PLC located southeast of the subject property as well as the Warrenton Quarry owned by Martin Marietta Materials Inc. located southeast of the subject property and the Siloam Quarry owned by Vulcan Materials Company located west of the subject property. Furthermore, there are several mines and dimension stone quarries in the regional area. These mines are located in a primarily residential and agricultural area, demonstrating the acceptance of mining in the surrounding area. Further, the subject property has no legal deed restrictions for operation as a granite quarry.



Figure 22: Production activity is very apparent at the Warren County Quarry located about 10 miles southeast of the Brown Harris property. Photo courtesy of Google Earth.

The State of Georgia requires mining permits for any mining operations in order to comply with federal, state, and local regulations. Government regulations are necessary for mining operations in order to protect the environment and citizenry as well as the safety of the workers. Several properties in the surrounding area have been previously developed with mining uses, validating the obtainability of the necessary permits.

Predicated on the stated regulations of Taliaferro County it is reasonably probable all necessary permits to operate a granite mine on the subject property can be obtained. According to Stuart Burgess of Burgex Inc. Mining Consultants, the estimated time to acquire a permit is six months to twelve months. Therefore, the subject property could be legally used for granite mining based on the nature of the region.

The analysis herein validates the legally permissible use of the subject property as a granite mine based on the reasonable probability of a variance being granted by the

EXHIBIT C-2019 BROWN-PARRIS

planning commission that would allow for a mining operation by Taliaferro County and the lack of legal deed restrictions.

**Physically Possible**

The physical characteristics of a site affecting its possible use(s) include, but are not limited to, location, street frontage, size, shape, street access, availability of utilities, easements, soils and subsoils, and topography.

The subject property is considered to have an average shape. The subject property is just east of Georgia Highway 47 and just north of Interstate 20; thus, the subject property has average accessibility to major highways in the region. Specifically, there is accessibility to the subject property from Raytown Road and Fair Play Road. According to Ben Black, P.G., the owner could legally improve its interior roads to be load bearing ready.

The subject property has a gently rolling topography and is currently wooded and open land. The subject property is east of the Oconee National Forest, northeast of Lake Oconee, southwest of Clarks Hill Lake, and southwest of the Savannah River. This is a mostly rural area. According to Flood Insurance Maps (FIRM) 13265C0110A, dated June 18, 2010, a portion of the subject property is located within Zone X, an area not prone to flooding. According to the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants, it is believed that wetland potential can be easily managed on the subject property based on an analysis of National Wetland Inventory Maps. A contingency budget has been allocated within startup funds for a full wetland study prior to operations. While the mine plan avoids wetland impacts, a substantial mitigation budget has still been included as a contingency within startup costs.

Based on mapping provided by GeoLogic, LLC, there are a few streams running through the subject property. Burgex Inc. Mining Consultants have included a wetland contingency of $1,000,000. An additional $500,000 has been budgeted and included in the year one start-up costs for a total of $1,500,000 for wetland contingency in year one. Therefore, any potential wetlands or streams on-site are not considered to affect the highest and best use of the subject property as a granite mine. No soils or sub-soils are known to adversely affect the development potential of the subject property.

According to the geological report in the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants and the core drilling, substantial granite resources are located on the subject property. Therefore, the subject property has the characteristics and the ability to be a granite mine.

There are a variety of physically possible uses for the subject property, due to the subject property's location and restrictions that would conform with the subject property's location, size, shape, soils and subsoils, and topography, including a granite mine.

The geological report that provides evidence of significant granite reserves and the subject property's proximity to transportation routes as well as other mining operations substantiates the physically possible use of the subject property as a granite mine.

**Financially Feasible**

The subject property is located in an area comprised primarily of rural/agricultural/recreational land use. There is residential development to the southeast in the City of Thomson and north in the City of Washington as well as in the surrounding smaller cities. Additional population epicenters include Augusta, Georgia to the east and Athens, Georgia to the northwest. Directly surrounding the subject property, there are some agricultural uses and mostly wooded land. The State of Georgia has several programs in place to expand job growth in the region. Based on the Hierarchy of Economic Development, job growth will lead to an increased demand for housing, commercial development and infrastructure.

**Domestic Production and Use**

According to the U.S. Geological Survey, Mineral Industry Surveys, an estimated 446 million metric tons (Mt) of crushed stone was produced and shipped for consumption in the United States in the third quarter of 2019, an increase of 9.0% compared with that of the third quarter of 2018. The estimated production for consumption in the first nine months of 2019 was 1.14 billion metric tons (Gt), an increase of 8.0% compared with that of the same period of 2018.

Furthermore, the estimated U.S. output of construction sand and gravel produced and shipped for consumption in the third quarter of 2019 was 298 Mt, an increase of 5.0% compared with that of the third quarter of 2018. The estimated production for consumption in the first nine months of 2019 was 727 Mt, an increase of 3.0% compared with that of the same period of 2018.

Finally, an estimated 744 Mt of total construction aggregates was produced and shipped for consumption in the United States in the third quarter of 2019, an increase of 8.0% compared with that of the third quarter of 2018. The estimated production for consumption in the first nine months of 2019 was 1.87 Gt, an increase of 6.0% compared with that of the same period of 2018.

The estimated production for consumption of crushed stone in the third quarter of 2019 increased in seven of the nine geographic divisions compared with that sold or used in the third quarter of 2018. The five leading States were, in descending order of production for consumption, Texas, Pennsylvania, Missouri, Ohio, and Florida. Their combined total production for consumption in the first nine months of 2019 was 380 Mt, an increase of 10.0% compared with that of the same period of 2018 and represented 33.0% of the U.S. total.

The estimated production for consumption of construction sand and gravel in the third quarter of 2019 increased in seven of the nine geographic divisions compared with that sold or used in the third quarter of 2018. The five leading States were, in descending order of production for consumption, California, Texas, Minnesota, Michigan, and Washington. Their combined total production for consumption in the first nine months of 2019 was 261 Mt, an increase of 3.0% compared with that of the same period of 2018 and represented 36.0% of the U.S. total.

EXHIBIT C 2019 BROWN PARRIS

The estimated production for consumption of construction aggregates in the third quarter of 2019 increased in eight of the nine geographic divisions compared with that sold or used in the third quarter of 2018. The five leading States were, in descending order of production-for-consumption, Texas, California, Ohio, Michigan, and Pennsylvania. Their combined total production for consumption in the first nine months of 2019 was 541 Mt, an increase of 3.0% compared with that of the same period of 2018. The above estimates are based on information reported to the U.S. Geological Survey (USGS) on its quarterly sample survey by construction aggregates producers.

**TABLE 1**
**CRUSHED STONE SOLD OR USED BY PRODUCERS IN THE UNITED STATES, BY DIVISION[1]**

(Thousand metric tons and thousand dollars)

| Region/Division[2] | 2018 | | | | | | 2019 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Quantity | | | | | Value | Quantity | Percent | Quantity | Percent | Quantity | Percent |
| | 1st qtr. | 2d qtr. | 3d qtr. | 4th qtr. | 1st–4th qtr.[3] | 1st–4th qtr.[3] | 1st qtr. | change[4] | 2d qtr. | change[4] | 3d qtr. | change[4] |
| **Northeast:** | | | | | | | | | | | | |
| New England | 2,620 | 12,500 | 14,100 | 10,400 | 39,700 | 509,000 | 2,560 | -2.3 | 11,900 | -5.3 | 13,500 | -5.0 |
| Middle Atlantic | 17,600 | 43,400 | 47,600 | 42,800 | 151,000 | 2,010,000 | 20,400 | 15.9 | 44,400 | 2.4 | 49,300 | 3.5 |
| **Midwest:** | | | | | | | | | | | | |
| East North Central | 30,100 | 63,800 | 73,300 | 61,600 | 229,000 | 2,240,000 | 30,400 | 1.0 | 63,000 | -1.3 | 79,800 | 8.1 |
| West North Central | 19,600 | 41,000 | 43,700 | 30,400 | 135,000 | 1,290,000 | 19,900 | 1.4 | 46,600 | 13.7 | 52,300 | 16.5 |
| **South:** | | | | | | | | | | | | |
| South Atlantic | 62,900 | 88,100 | 88,800 | 80,500 | 320,000 | 4,820,000 | 78,200 | 24.4 | 98,600 | 11.9 | 96,300 | 7.7 |
| East South Central | 25,700 | 39,600 | 40,700 | 38,300 | 144,000 | 1,690,000 | 31,400 | 22.0 | 41,800 | 5.5 | 46,000 | 11.7 |
| West South Central | 54,000 | 64,100 | 58,700 | 57,300 | 234,000 | 2,600,000 | 58,400 | 8.2 | 63,200 | -1.5 | 68,500 | 14.3 |
| **West:** | | | | | | | | | | | | |
| Mountain | 13,500 | 17,000 | 18,200 | 14,000 | 69,600 | 590,000 | 14,200 | 5.2 | 19,500 | 14.4 | 19,800 | 8.1 |
| Pacific | 17,100 | 24,900 | 24,200 | 20,400 | 86,600 | 914,000 | 13,500 | -21.1 | 21,200 | -14.6 | 23,900 | -1.5 |
| U.S. total[5] | 251,000 | 396,000 | 408,000 | 360,000 | 1,420,000 | 16,800,000 | 284,000 | 13.0 | 411,000 | 3.8 | 446,000 | 9.2 |

[1]Quarterly totals shown are estimates based on a sample survey. Estimated quantities for prior quarters have been recalculated.
[2]Sales region equivalent to U.S. Census Bureau Geographic Division as follows: New England (CT, MA, ME, NH, RI, VT); Middle Atlantic (NJ, NY, PA); East North Central (IL, IN, MI, OH, WI); West North Central (IA, KS, MN, MO, NE, ND, SD); South Atlantic (DE, FL, GA, MD, NC, SC, VA, WV); East South Central (AL, KY, MS, TN); West South Central (AR, LA, OK, TX); Mountain (AZ, CO, ID, MT, NM, NV, UT, WY); Pacific (AK, CA, HI, OR, WA).
[3]Data may not add to totals shown because of independent rounding and differences between projected totals by States and by divisions.
[4]Compared with same period of preceding year; all percentages are calculated using unrounded totals.
[5]Includes all 50 States.

**TABLE 5**
**CONSTRUCTION AGGREGATES SOLD OR USED BY PRODUCERS IN THE UNITED STATES, BY DIVISION[1]**

(Thousand metric tons and thousand dollars)

| Region/Division[2] | 2018 | | | | | | 2019 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Quantity | | | | | Value | Quantity | Percent | Quantity | Percent | Quantity | Percent |
| | 1st qtr. | 2d qtr. | 3d qtr. | 4th qtr. | 1st–4th qtr.[3] | 1st–4th qtr.[3] | 1st qtr. | change[4] | 2d qtr. | change[4] | 3d qtr. | change[4] |
| **Northeast:** | | | | | | | | | | | | |
| New England | 4,610 | 20,100 | 24,800 | 17,000 | 78,600 | 856,000 | 4,050 | -12.1 | 19,000 | -5.5 | 23,300 | -6.5 |
| Middle Atlantic | 24,800 | 57,900 | 63,600 | 56,900 | 203,000 | 2,550,000 | 28,300 | 14.3 | 59,600 | 2.9 | 65,900 | 3.6 |
| **Midwest:** | | | | | | | | | | | | |
| East North Central | 41,700 | 99,200 | 115,000 | 92,200 | 376,000 | 3,320,000 | 42,500 | 2.0 | 98,100 | -1.1 | 126,000 | 8.4 |
| West North Central | 27,700 | 70,700 | 89,900 | 58,400 | 247,000 | 2,020,000 | 28,000 | 1.1 | 83,900 | 18.7 | 103,000 | 12.6 |
| **South:** | | | | | | | | | | | | |
| South Atlantic | 76,300 | 106,000 | 107,000 | 96,900 | 386,000 | 5,470,000 | 93,600 | 22.6 | 117,000 | 10.5 | 114,000 | 6.3 |
| East South Central | 30,000 | 47,700 | 49,300 | 45,200 | 184,000 | 1,990,000 | 36,300 | 20.8 | 50,100 | 5.0 | 55,600 | 11.4 |
| West South Central | 82,900 | 98,000 | 90,600 | 87,800 | 359,000 | 3,960,000 | 89,600 | 8.0 | 97,900 | 0.0 | 103,000 | 12.3 |
| **West:** | | | | | | | | | | | | |
| Mountain | 45,000 | 70,100 | 73,400 | 57,800 | 253,000 | 2,140,000 | 44,400 | -1.2 | 73,300 | 4.6 | 78,400 | 6.3 |
| Pacific | 48,200 | 70,000 | 72,900 | 61,900 | 253,000 | 2,860,000 | 40,600 | -15.8 | 64,900 | -7.3 | 73,500 | 0.8 |
| U.S. total[5] | 411,000 | 657,000 | 691,000 | 594,000 | 2,350,000 | 25,400,000 | 447,000 | 8.8 | 677,000 | 3.0 | 744,000 | 7.7 |

[1]Quarterly totals shown are estimates based on a sample survey. Estimated quantities for prior quarters have been recalculated.
[2]Sales region equivalent to U.S. Census Bureau Geographic Division as follows: New England (CT, MA, ME, NH, RI, VT); Middle Atlantic (NJ, NY, PA); East North Central (IL, IN, MI, OH, WI); West North Central (IA, KS, MN, MO, NE, ND, SD); South Atlantic (DE, FL, GA, MD, NC, SC, VA, WV); East South Central (AL, KY, MS, TN); West South Central (AR, LA, OK, TX); Mountain (AZ, CO, ID, MT, NM, NV, UT, WY); Pacific (AK, CA, HI, OR, WA).
[3]Data may not add to totals shown because of independent rounding and differences between projected totals by States and by divisions.
[4]Compared with same period of preceding year; all percentages are calculated using unrounded totals.
[5]Includes all 50 States.

EXHIBIT C - 2019 BROWN-PARRIS

EXHIBIT C - 2019 BROWN-PARRIS

**TABLE 3**

**CONSTRUCTION SAND AND GRAVEL SOLD OR USED BY PRODUCERS IN THE UNITED STATES, BY DIVISION[1]**

(Thousand metric tons and thousand dollars)

| | 2018 | | | | | | 2019 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Quantity | | | | | Value | Quantity | Percent | Quantity | Percent | Quantity | Percent |
| Region/Division[2] | 1st qtr. | 2d qtr. | 3d qtr. | 4th qtr. | 1st–4th qtr.[3] | 1st–4th qtr.[3] | 1st qtr. | change[4] | 2d qtr. | change[4] | 3d qtr. | change[4] |
| **Northeast:** | | | | | | | | | | | | |
| New England | 1,990 | 7,620 | 10,700 | 6,600 | 38,900 | 348,000 | 1,500 | -25.0 | 7,180 | -5.8 | 9,830 | -8.7 |
| Middle Atlantic | 7,160 | 14,600 | 16,000 | 14,100 | 51,800 | 537,000 | 7,890 | 10.1 | 15,200 | 4.3 | 16,600 | 3.7 |
| **Midwest:** | | | | | | | | | | | | |
| East North Central | 11,600 | 35,400 | 42,000 | 30,600 | 147,000 | 1,090,000 | 12,100 | 4.8 | 35,100 | -0.8 | 46,100 | 8.9 |
| West North Central | 8,050 | 29,700 | 46,200 | 28,000 | 112,000 | 730,000 | 8,080 | 0.3 | 37,300 | 25.6 | 50,600 | 8.6 |
| **South:** | | | | | | | | | | | | |
| South Atlantic | 13,500 | 17,900 | 17,900 | 16,400 | 66,200 | 651,000 | 15,400 | 14.4 | 18,500 | 3.4 | 17,600 | -1.9 |
| East South Central | 4,300 | 8,110 | 8,590 | 6,820 | 40,100 | 297,000 | 4,890 | 13.8 | 8,340 | 2.8 | 9,530 | 9.8 |
| West South Central | 29,000 | 33,800 | 31,800 | 30,600 | 125,000 | 1,360,000 | 31,200 | 7.8 | 34,700 | 2.7 | 34,800 | 8.5 |
| **West:** | | | | | | | | | | | | |
| Mountain | 31,400 | 53,100 | 55,200 | 43,800 | 184,000 | 1,550,000 | 30,200 | -4.0 | 53,800 | 1.4 | 58,600 | 5.7 |
| Pacific | 31,100 | 45,100 | 48,700 | 41,500 | 166,000 | 1,950,000 | 27,100 | -12.9 | 43,700 | -3.2 | 49,600 | 1.9 |
| U.S. total[5] | 159,000 | 261,000 | 283,000 | 234,000 | 937,000 | 8,570,000 | 163,000 | 2.3 | 266,000 | 1.8 | 298,000 | 5.4 |

[1]Quarterly totals shown are estimates based on a sample survey. Estimated quantities for prior quarters have been recalculated.

[2]Sales region equivalent to U.S. Census Bureau Geographic Division as follows: New England (CT, MA, ME, NH, RI, VT); Middle Atlantic (NJ, NY, PA); East North Central (IL, IN, MI, OH, WI); West North Central (IA, KS, MN, MO, NE, ND, SD); South Atlantic (DE, FL, GA, MD, NC, SC, VA, WV); East South Central (AL, KY, MS, TN); West South Central (AR, LA, OK, TX); Mountain (AZ, CO, ID, MT, NM, NV, UT, WY); Pacific (AK, CA, HI, OR, WA).

[3]Data may not add to totals shown because of independent rounding and differences between projected totals by States and by divisions.

[4]Compared with same period of preceding year; all percentages are calculated using unrounded totals.

[5]Includes all 50 States.



Figure 1. Percentage change in the amount of construction aggregates produced and shipped for consumption in the United States each quarter from 2008 through 2018. All comparisons are versus the same quarter of the prior year.

EXHIBIT C 2019 BROWN PARRS

Case 3:22-cv-... Document 41-1 Filed 0... Page 410 of 600



Figure 2. Estimated annual output of construction aggregates produced and shipped for consumption in the United States from 1945 through 2018.

## Aggregate Demand Generators Impacting the Subject Property

Granite is a light-colored igneous rock with grains large enough to be visible with the unaided eye. It forms from the slow crystallization of magma below the Earth's surface. Granite is composed mainly of quartz and feldspar with minor amounts of mica, amphiboles, and other minerals. This mineral composition usually gives granite a red, pink, gray or white color with dark mineral grains visible throughout the rock.

Granite is the best-known igneous rock. Many people recognize granite because it is the most common igneous rock found at the Earth's surface and because granite is used to make many objects that we encounter in daily life. These include counter tops, floor tiles, paving stone, curbing, stair treads, building veneer, and cemetery monuments. Granite is the rock most often quarried as dimension stone (a natural rock material that has been cut into blocks or slabs of specific length, width, and thickness). Granite is hard enough to resist most abrasion, strong enough to bear significant weight, inert enough to resist weathering, and it accepts a brilliant polish. These characteristics make it a very desirable and useful dimension stone. Most of the granite dimension stone produced in the United States comes from high-quality deposits in five states: Massachusetts, Georgia, New Hampshire, South Dakota, and Idaho. Granite has been used for thousands of years in both interior and exterior applications. Rough-cut and polished granite is used in buildings, bridges, paving, monuments, and many other exterior projects. Indoors, polished granite slabs and tiles are used in countertops, tile floors, stair treads, and many other practical and decorative features. Granite is frequently selected because it is a prestige material, used in projects to produce impressions of elegance, durability, and lasting quality. Granite is also used as a crushed stone or aggregate. In this form it is used as a base material at construction sites, as an aggregate in road construction, railroad

EXHIBIT C 2019 BROWN PARRIS

ballast, foundations, and anywhere that a crushed stone is useful as fill. The high price often reduces the popularity of a construction material, and granite often costs significantly more than man-made materials in most projects, however, granite is most frequently selected due to its durability. [120]

The subject property has the characteristics and the potential to be a granite mining development as evidenced by the significant presence of substantial granite as verified by the geological survey testing and sampling. The Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants included in the Addenda illustrates the financial feasibility of a granite mining development on the subject property.

According to Vulcan Materials Company there is a list of the factors that will drive future demand for aggregates and thereby driving the future supply of aggregates. On the demand side, these include:

- A growing population of 400 million by 2043, according to the U.S. Census.

- An increase in non-residential construction such as stores, offices, schools and government buildings driven by the increasing population; a decline in the number of people per household, and new home development and the replacement of structurally sound buildings with more energy efficient and technologically advanced ones (i.e., configured for advanced computer networks).

- An aging, baby boomer population with increased demand for second homes along with the need for more long- and short-term health care facilities and more elderly friendly multifamily developments.

- Aging infrastructure of all types that will need to be upgraded and/or replaced. In particular, highways, roads, ports and rail facilities will be required to handle increased car and truck traffic along with increased imports and exports.

- An increase in the use of Portland cement concrete in the construction of both residential and non-residential buildings due to concrete's resistance to wind damage, environmental efficiency and construction flexibility.

[120] Geology.com/rocks/granite

# EXHIBIT C 2019 BROWN HARRIS



*Most recent graph available*

Additionally, population is increasing in the region as new highway projects are on the horizon, new business development is rebounding in the region and transportation in and out of the region is not limited validating the potential need for increased aggregate production. Further evidence is provided by Burgex Inc. Mining Consultants in the Technical Due Diligence Business Plan and Market Analysis, which states: "Based on the average per-capita consumption rates that have been calculated for the Southeast region of the United States, there is an estimated annual regional demand for over 7,277,900 tons of aggregate materials within the subject property's 50-mile market radius. With an estimated annual regional supply of 5,703,000 tons, and a net deficit of 1,574,000 tons, the subject property's competitive pricing and high-quality stone should allow it to capture more than enough market share to effectively compete in its rapidly growing market area."[121]

| Construction Aggregate Market Highlights for 50-Mile Brown Harris Region | |
|---|---|
| Estimated Regional Market Demand | 7,277,000 |
| Reported Regional 2019 Supply | 5,703,000 |
| Construction Aggregate Supply Deficit | (1,574,000) |

*Figure 25: Construction aggregate market highlights for the 50-mile market radius for Brown Harris. These numbers have been calculated based on regional population as estimated by the US Census Bureau and per capita consumption trends as calculated by the National Stone Sand and Gravel Association (NSSGA), the USGS, and others. An average of 8.74 tons of aggregate per-capita has been used in this calculation.*

[121] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

EXHIBIT C 2019 BROWN-PARRIS

In summary, the subject property's marketing area for granite is Georgia and South Carolina. Transportation of the granite to the various markets can be accomplished in bulk loads by truck and rail. The system of roadways leading to and from the subject property is extensive with U.S. Highway 78 located just east of the subject property, U.S. Highway 278 located just southwest of the subject property, and Interstate 20 located just north of the subject property.

The Discounted Cash Flow Approach indicates a granite mining development, such as the subject property, is capable of producing a positive net income. Therefore, granite mining meets the financially feasible requirement.

## **Maximally Productive**

In order to determine the type of development that would result in maximum productivity from the subject property, an analysis was performed. There are physically possible and legally permissible uses that could produce a positive cash flow such as residential development with large tracts of natural forest and recreational amenities, golf courses, forestry or agricultural uses, or hunting grounds and associated recreational uses. The chart below provides a sampling of recreational land sales in Alabama, Georgia and South Carolina from 2015 to 2019.

| Recreational Land | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 | Sale 7 | Sale 8 |
| Location | Pickens Co., GA | Bulloch Co., GA | Newton Co., GA | Walton Co., GA | Bibb Co., AL | Franklin Co., AL | Williamsburg Co., SC | Choctaw Co., AL |
| Date of Sale | 7/31/2019 | 8/23/2018 | 4/12/2016 | 3/1/2016 | 12/16/2015 | 5/14/2015 | 4/30/2015 | 2/3/2015 |
| Price | $195,000 | $355,000 | $1,137,500 | $379,500 | $205,000 | $253,000 | $140,000 | $55,000 |
| Size (Acres) | 50 | 114.81 | 218.05 | 122.00 | 108.00 | 240.00 | 53.20 | 47.00 |
| Price/Acre | $3,900 | $3,092 | $5,217 | $3,111 | $1,898 | $1,054 | $2,632 | $1,170 |
| Use | Recreation | Recreation | Recreation | Recreation | Recreation/Hold | Recreation | Recreation | Recreation |

However, current market conditions in eastern Georgia and Taliaferro County, indicate a limited demand and price point for the residential and recreational properties for the aforementioned property types in today's market compared to the anticipated demand for supportive building materials. Based on the definition of maximally productive, the selected land use must yield the highest value of the possible uses.[122] As provided above, there are several possible uses that are legally permissible, physically possible, and potentially financially feasible; however, it is the appraisers' opinion based on the core drillings, geological analysis, and market study, the use that yields the highest value of the land and the highest and best use of the subject property is as a granite mine. As presented in the Discounted Cash Flow section found later in this report, a granite mine, such as the subject property, is capable of producing a significantly higher positive net income. Furthermore, due to the amount and quality of the granite found on the subject property and the positive net income indicated by the DCF, the result is a superior return to the cost of the investment; higher than any other physically possible, legally permissible, and financially feasible use. Therefore, a granite mine is considered to be the maximally productive use of the subject property.

---

[122] *The Dictionary of Real Estate*, Fifth Edition, page 124

**Conclusion**

The foregoing Highest and Best Use analysis is used to establish the basis for valuation and demonstrate the most feasible use of the subject property. The subject property could be used for residential development, forestry uses or hunting grounds and associated recreational uses. Projected population and economic growth in the area will increase the demand for properties with commercial aggregate reserves, thus making the development of said property types more economically feasible. Furthermore, as presented throughout this report, the subject property has sufficient granite resources for a mine.

Due to the granite found on the subject property and considering the foregoing possible land uses compared to developing the subject property as a granite mine; the greatest return on the land under current market conditions is a granite mine development. This conclusion is based on granite resources being present in sufficient quantity to initiate and sustain production, and that it is technically feasible to extract the materials, is legal to mine, continue to mine, or to expand the mine at this location, and that it is economically feasible to exploit the granite resources at this location.

When determining the value of the subject property in the "before" scenario, the appraisers must consider the current use of the subject property as well as objectively assess the likelihood that the subject property would be developed absent the conservation easement restriction. As detailed throughout this report, there are proven resources on the subject property, and market demand for the resources due to their quality, as referenced by the geological studies, independent lab results, various market information, and the Technical Due Diligence Business Plan and Market Analysis provided by Burgex Inc. Mining Consultants. Due to the proven resources on the subject property, the quality of the resources, and the market demand for the resources it is reasonably probable that the subject property, absent the restrictions of the conservation easement, would be developed as indicated by the Highest and Best Use conclusion before the conservation easement.

Based on current market conditions, the subject property's location and the abundance of granite reserves on the subject property, the highest and best use of the subject property is as a granite mine.

### 6.3.2.    Approaches to Value

#### 6.3.2.1.    Income Approach (Potential Granite Mining Development)

Mining facilities are unique and differ greatly in their characteristics, location, the type of product mined and the remaining economic life of the mine. The potential buyer must assimilate a variety of information and often makes a decision with little specific data provided by the mine owner, since it is considered confidential. Generally, the decision to purchase a mine is based on remaining deposits, grades of material, and the cost to mine and process the resource and other known data that is applicable to the Income Approach. Primary considerations when valuing a mine are cash flows both potential and actual, royalties, current market conditions and physicality of the mine. Within the Income Approach, the Discounted Cash Flow Analysis is the preferred

EXHIBIT C - 2019 BROWN-PARRS

methodology as opposed to the capitalization of income since mining operations are not static and have a finite economic life. This is further supported in the article *Valuation Methodologies for Mines and Mineral Tenements* by Trevor R. Ellis, CMA, CPG, M. AusIMM; Ellis International Services, Denver, CO as published in the newsletter, American Institute of Minerals Appraisers, Vol. 1, No. 5, December 1995, page 1, where "Resource finance consultant, J. Ballard, and other authors discuss discounted cash flow (DCF) methodologies and net present value (NPV). They all recommend DCF as the primary method for valuing operating mines, or mineral assets with at least indicated resources and some form of feasibility study containing engineering, production and capital and operating cost data. However, R. Grant of Grant Samuel & Associates, emphasizes the need for a "sanity check" on the validity of DCF based valuations, by using the comparable sales method. This need is due to the highly subjective nature of the DCF methodology. Discussing exploration properties for which there are no technical studies, the authors agree that DCF methods should only be used as a secondary method of valuation. But, as Ballard said, NPV forms a very useful check."

Later in the, *Valuation Methodologies for Mines and Mineral Tenements* by Trevor R. Ellis, CMA, CPG, M. AusIMM; Ellis International Services, Denver, CO as published in the newsletter, American Institute of Minerals Appraisers, Vol. 1, No. 5, December 1995, "R. Grant is Director of Grant Samuel & Associates, a firm of corporate advisors. He observes that the comparable sales method of valuation rarely finds favor as a methodology for valuing mining and exploration properties. For mineral properties the limitations are obvious. These include: limited number of sales; limitations on comparability; transaction data loses relevancy with time; and, adequate data on many transactions are not made public. Grant notes that comparable sales data are much more difficult to come by for the mining industry than for the petroleum business. However, he proposes that the real benefit of the comparable sales method for valuing mineral assets is in its use as a validity or "sanity" check. Cash flows from mining operations are influenced by a wide range of variables. The DCF valuation methodology involves a great deal of subjectivity, which makes it fragile. Grant Samuel endeavors to establish benchmarks from comparable sales, or stock market values, to test the validity of valuations produced by DCF models. An example involves comparing sales of coal mines by the calculation of cost per annual unit of production. For other minerals, it can involve a complex set of adjustments to get the "comparable" data onto a similar basis. He provides an example involving comparison of two properties on alternate sides of the world. Grant concludes that valuation is an art, not a science."

As stated earlier in this report, it is the appraisers' opinion, due to the professional reports provided, the subject property is classified as a Development Property with a Pre-Feasibility Study completed at a minimum as of the date of this appraisal. Therefore, the DCF valuation methodology was relied upon for this appraisal report. Of note, the appraisers recognize that the Sales Comparison Approach should be utilized when it is feasible to do so. However, as is the case with this appraisal report, an inherent weakness of the Sales Comparison Approach for mining developments hinges on the complexity of multi-property and speculative sales. Many of the sales associated with mining development include differing physical characteristics or mineral resources. Much of the information required to adequately analyze the sale, such as quantity and quality of reserves or annual production volume and the value of equipment are typically considered confidential and propriety, thereby shielded from public knowledge. The appraisers analyzed sales of mining properties as well as mergers and acquisitions of

EXHIBIT C 2019 BROWN-HARRIS

mining companies. It is the appraisers' opinion that the development of the Sales Comparison Approach may provide a misleading value and thus was not utilized within this appraisal report.

The Discounted Cash Flow methodology identifies market conditions investors are anticipating as of the date of value and is an appropriate tool for valuing any pattern of regular or irregular income. The Discounted Cash Flow analysis is a procedure in which a yield rate is applied to a set of income streams and a reversion to determine whether the investment property will produce a required yield given a known acquisition price. If the rate of return is known, the Discounted Cash Flow analysis can be used to solve for the present value of the property. If the property's purchase price is known, the Discounted Cash Flow analysis can be applied to find the rate of return. Investors typically employ a Discounted Cash Flow Analysis (DCF) on properties like the subject property and require a minimum of five years of reserves before investing in a mining development. Ultimately, it is the NOI margin that determines what an investor is willing to pay for such a property.

Because subsurface minerals can never be fully and absolutely quantified until they are extracted and because mines have a finite economic life there are multiple variables to consider when estimating the value of a mining development. Therefore, the Discounted Cash Flow methodology is the preferred method since it is appropriate for irregular income. The DCF method is also a commonly used, market accepted method for valuing mining properties in development and production, considering the finite life of a mine and the well-established market for commodities. The appropriateness of the Discounted Cash Flow Analysis in valuing mining properties is based on the following: resources deplete over time, allows the forecasting of production, takes into consideration the time value of money, pricing and operating costs, and allows the calculation of the discount rate.

In summation, the Discounted Cash Flow Analysis is utilized to provide an estimate of Market Value of the subject property. The Market Value derived from the Discounted Cash Flow Analysis is estimated utilizing the potential income from mining operations, the expenses, and the net income levels over a projection period. The Value by the Discounted Cash Flow Analysis is estimated by adding the present value of the projected income streams and the present value of the reversion. The assumptions employed in the Discounted Cash Flow Analysis are discussed further below. It should be noted that a reversionary value was not included in this analysis. The subject property at the end of the projected Discounted Cash Flow Analysis would have value due to the additional reserves; however, based on the principle of conservatism, the reversionary value was not included.

## U.S. Stone Market Overview

This section contains retroactive market information as was available in December 2019.

The U.S. Stone Mining industry consists of companies that advance mine sites, excavate and quarry dimension stone (i.e., rough blocks or slabs of stone), mine and quarry crushed and broken stone (such as granite and limestone), or beneficiate stone by crushing, grinding, washing, screening, pulverizing, and sizing. The principal product sold by the Stone Mining industry is crushed stone which is primarily used as aggregate in infrastructure, residential, and nonresidential construction projects.



*Figure 9: US Stone market products and services segmentation for 2019. It is estimated that 14.6% of the overall US stone market is made up of crushed granite.*

The Stone Mining industry is firmly rooted in the U.S. economy, generating critical base materials for a wide range of construction industries. This industry mines a range of rock types, including granite, limestone, sandstone, basalt, trap rock, pumice, and talc. The majority of these rocks are crushed and transported for use in downstream construction and manufacturing markets. Crushed stone is used as aggregate in foundations for infrastructure, road base, and buildings. Crushed stone is also an input to cement, concrete products, and personal consumer goods. The dimensional stone produced by the industry includes high-quality cut and treated stone products, such as marble and slate, which are used in building applications like kitchen countertops, tile, and pavers. The U.S. Stone Quarrying industry is estimated to account for about 90.0% of the volume of domestic supply of stone. The remaining 10.0% is generated by sand and gravel aggregate producers, road construction companies through recycling, and companies operating in the nonmetallic mineral product industries.[123]

---

[123] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

EXHIBIT C – 2019 BROWN PARRIS

| US Stone Mining Revenue Outlook (Revised 2019) | | |
|---|---|---|
| Year | Revenue (millions) | Growth |
| 2019 | 17,606.70 | 0.30% |
| 2020 | 17,883.10 | 1.57% |
| 2021 | 18,199.30 | 1.77% |
| 2022 | 18,503.60 | 1.67% |
| 2023 | 18,739.90 | 1.28% |
| 2024 | 18,875.10 | 0.72% |

**U.S. Stone Market – Current Industry Performance**

Over the five years through 2019, industry revenue grew at an annualized rate of 3.7%. This rate has been impacted by the continuing recovery in downstream construction markets that has been occurring since 2012. Infrastructure construction, as well as residential and commercial construction has experienced strong growth in the past five years, boosting demand for stone industry products. As a result, total industry revenue climbed to $17.2 billion in 2019, resulting from the continuing construction demand and market recovery. Over the next five years to 2024, industry revenue is forecasted to continue to climb at a robust annualized rate of 1.6% to $18.6 billion. This growth is projected to come from sustained demand for commercial and residential construction as well as from large increases in infrastructure spending for road, street, and highway construction. This industry revenue growth will be driven primarily by increases in production, but also through steady price increases for stone products. [124]

The chief source of demand for crushed stone is for downstream use as aggregate in the construction of roads, highways, and other infrastructure as well as residential and nonresidential construction.

Highway and street funding is principally derived from the public sector. Demand from highway, street, bridge, and tunnel construction is expected to increase in 2019, presenting a likely growth opportunity for the industry. National transportation spending for the construction and maintenance of streets, highways, railways, and other public transportation systems is positively linked with industry performance. Companies contracted by the government for these activities purchase material from the stone industry. As road and infrastructure construction represents such a large portion of the stone market, fluctuations in federal funding for transportation can pose a threat to the industry since they are exposed to changing political considerations and interests. Federal funding for transportation increased in 2018 and is seen as a positive sign for continued industry growth, however, is projected to have fallen slightly in 2019. [125]

---

[124] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[125] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants



Figure 11: The value of highway and street construction is expected to increase through 2022 at an annualized rate of 3%.

**Residential and Nonresidential Construction**

Aggregate is broadly used in the construction of nonresidential buildings and is typically blended with cement to form concrete. Aggregate is also used in other concrete products such as blocks, tiles, and pipes. Dimension stone is also widely used in the construction of buildings, particularly as pavers, floor tiles, panels, and countertops. The value of private nonresidential construction is expected to decrease in 2019, posing a potential threat to the industry.

The housing construction market is a significant consumer of stone products. Contractors use either concrete, concrete products (which are often blended using aggregate crushed stone), or dimensional stone used for roof tiles, floor tiles, and countertops for virtually every project in the residential construction sector. The value of this residential construction is expected to have increased approximately 3.2% for the five years through 2019. Projected performance for these three external drivers will be detailed in the Industry Outlook section of the Technical Due Diligence Business Plan and Market Analysis.

# EXHIBIT C 2019 BROWN-PARRIS



Figure 12: The value of residential and nonresidential construction is forecast to grow at annual rates of 4.5% and 3.9% respectively through 2022.

**U.S. Stone Market – Current Performance**

The Stone Mining industry has experienced robust growth since 2012, after enduring declines in each year from 2007 to 2011. The real estate industry's recovery and ensuing boom has translated into increased demand for stone products, as the construction of new homes and commercial buildings surge. Due to raw stone's relative abundance in comparison to other minerals and commodities, there are currently few raw stone source supply concerns for the industry. Furthermore, the price of crushed and dimensional stone products has been steadily increasing over the past decade. It is projected that industry revenue has grown at an annualized rate of 3.7% over the last five years; this overall industry revenue increased to $17.2 billion in 2019. [126]

As empty homes and offices became occupied in the early years of this recovery period, the open supply of housing and commercial space declined, thus driving demand for new construction. Not only is stone a principal construction material in residential and nonresidential construction, but it is also a key component for road construction and maintenance as well as an input for cement manufacturing. Consequently, as new housing and commercial spaces are developed, these projects require stone for building foundations, parking lots, sidewalks, driveways, roads and for other various construction purposes. In the five years through 2019, the national value of construction is anticipated to have grown at an annualized rate of 1.4%. [127]

As demand circumstances have been improving, profitability has followed in turn, rising from 9.1% of revenue in 2014 to 10.4% in 2019. Industry operators have boosted production in the past five years, due to an increase in construction activity, yet crushed stone supply has not been able to keep up with demand, leading to higher sales prices.

---

[126] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[127] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

EXHIBIT C – 2019 BROWN-PARRIS

Additionally, transportation costs for the industry have decreased with the decline in the crude oil price. Nevertheless, the heavy weight of crushed stone ensures that downstream companies generally seek the closest and most affordable crushed stone supplier. This focus on proximity and price also ensures that long distance trade in the crushed stone segment is quite low. Because of this, both imports and exports only account for a marginal portion of overall crushed stone segment activity. [128]

The significance of the Stone Mining industry as a supplier to the government's infrastructure plans has been a large factor in enabling a solid recovery for the industry following the recession. The association with the U.S. government's ongoing attempts to boost job creation by means of infrastructure development will remain vital to the stone industry. In the five years through 2019, federal funding for transportation is only anticipated to fall slightly. According to the White House's fiscal 2019 budget, the Department of Transportation was allocated $57.4 billion in discretionary and mandatory funding to encourage job creation by means of infrastructure investment for that year. This is along with $478 billion in funding for a four-year investment to progress surface transportation by improving infrastructure projects such as roads, bridges, transit systems and railways. According to the White House's Fiscal 2019 budget, mandatory spending on infrastructure programs will increase by $131 billion over the next ten years. This will continue to encourage job creation by means of infrastructure investment and is expected to greatly augment demand for stone products in 2020 and beyond. [129]

**U.S. Stone Market – Industry Outlook**

The Stone Mining industry will continue to have heavy reliance on demand generated from downstream construction industries and, to a lesser extent, on the level of price stability in the crushed stone market. Over the five years to 2024, the volume of stone production, which includes both crushed and dimensional stone, is anticipated to grow steadily. Expected solid growth and demand from road and highway construction and residential construction will drive industry growth over the next five years. Private nonresidential construction is anticipated to decrease slightly at a rate of 0.4%. Also, any major swings in construction activity will have the potential to positively and/or negatively impact operators in the industry. [130]

Due to the solid growth profile for downstream markets, industry revenue is estimated to grow at an average rate of 1.6% per year, reaching $18.6 billion in 2024. Furthermore, increasing funding for infrastructure programs is expected to help augment demand for the industry's products. However, it should be noted that federal funding considerations could adversely impact the industry moving forward if administrative interests decrease the available funding for transportation infrastructure. Investment in construction is likely to drive demand for stone products over the next five years. The principal market for crushed stone is road, street, and highway construction, which is projected to experience strong growth through 2024. This growth will be buoyed by ongoing multi-year federal funding pursuant to the Moving Ahead for Progress in the 21st Century Act (MAP-21). The demand for crushed stone will also be reinforced by

---

[128] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[129] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[130] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

EXHIBIT C 2019 BROWN-HARRIS

solid growth in several other infrastructure markets, such as the railroads, pipelines, and water supply markets.[131]

Inside the downstream building markets, the demand for stone products will primarily be supported by booming housing construction and, to a lesser extent, by the growth in the institutional construction market. New housing construction is projected to rise for the next five years through 2024, driving demand for dimensional stone products such as marble and granite countertops, slate tiles, and crushed stone used in foundations and concrete products. Commercial building construction is projected to strengthen moving forward, underpinning demand for dimensional stone used in foyers, and crushed stone used as foundation aggregate and for paving parking lots. In the five years to 2024, the value of combined construction is expected to increase.

Global cement giants Lafarge and Holcim finalized a union of equals in 2015, establishing the industry tone for the next five years. The stone industry is expected to undergo additional merger and acquisition (M&A) activity, as leading industry players and large-scale building product manufacturers continue to look to join their access to stone quarrying capability across wider regional markets. Nevertheless, additional demand for stone products is expected to encourage smaller local operators to enter the industry, balancing out industry amalgamation. Over the five years to 2024, the number of enterprises is expected to remain relatively stagnant, rising at an annualized rate of 0.1% to 1,220. These smaller operators are likely to enter the industry in regions such as the Southwestern U.S. where abundant supplies of quality stone that meet standards for use in downstream markets are located. [132]

It is anticipated that ongoing industry consolidation will lead freshly merged enterprises to seek synergies in the form of operational cost savings. This will result in the streamlining of operational processes and reduce the need for labor, thereby suppressing employment and wage growth. Employment is forecast to reach an estimated 43,156 workers by 2024, representing an average annual growth rate of 1.1%. Employment growth is projected to lag behind revenue growth not only due to consolidation in mine ownership but also due to ongoing advancements in labor-saving technology. Total U.S. stone mining wages have remained steady at $2.8 billion from 2007 to 2019. Limited wage growth with increased productivity looks to continue beyond 2020.[133]

The industry will also find increased value in upgraded production efficiencies stemming from the consolidation of mine ownership and the reorganization activity that has taken place over the past decade. As a result, these cost savings will also serve to boost industry profitability over the next five years. Profit growth will be indicative of the expanding housing, infrastructure, and road markets, as increases in supply are expected to be slower than demand growth. Demand for crushed stone is greatly dependent on investment in publicly funded infrastructure, which is generally subject to long-term budgetary planning to meet population growth and industrial expansion. Over the 10 years from 2014 to 2024, industry value added (IVA), which measures the industry's contribution to the overall economy, is projected to rise at an average annual rate of

[131] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[132] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[133] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

2.8%, while U.S. GDP is projected to grow at an average annual rate of 2.1%. This is a good indicator of industry health.[134]

## U.S. Stone Market – Products Outlook



Figure 13: The total US stone market value for 2019 is expected to be $17.2 billion. Source: www.IBISWorld.com

Crushed Stone

The principal product sold by the Stone Mining industry is crushed stone. Crushed stone is used as aggregate in construction projects and as an input to construction materials and other manufactured products. The production of crushed stone is expected to account for an estimated 97.1% of the value of domestic stone production. The remaining value of domestic production consists of dimensional stone. The revenue share of all product segments has remained relatively stable over the past five years because they are all tied to the construction sector, which has uniformly affected demand across products. Crushed rock is typically produced at the mine site, where it is crushed, ground, washed, screened, pulverized, and sized until it is ready for transport to downstream construction markets, construction material markets (e.g., asphalt and concrete), chemical and metallurgical manufacturers, and agricultural markets. According to the U.S. Geological Survey, an estimated 68.0% of the volume of crushed stone production is limestone and dolomite; 15.0% is granite; 6.0% is trap rock (i.e., igneous rocks widely known as black granite); and 11.0% includes sandstone, greenstone, quartzite, marble, calcareous marl, slate, volcanic cinder, scoria, and shell. [135]

Dimension Stone

In 2019, an estimated 2.9% of Stone Mining industry production value is composed of dimension stone. Dimension stone is typically dressed or sold as rough blocks.

[134] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[135] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

Producers of dimensional stone extract the stone at a quarry or mine site and fabricate the stone for building interiors and exteriors, memorials, and landscape uses. Products include blocks, tiles, facades, paving, flooring, steps, curbing, countertops, columns, and other architectural applications. According to the U.S. Geological Survey, an estimated 48.0% of the volume of dimension stone sold is limestone; 18.0% is granite; 23.0% is sandstone; 4.0% is marble, and the remainder is slate and miscellaneous stone. Rough block production, as opposed to dressed stone, represents about 54.0% of annual dimensional stone tonnage. The main uses for rough block are construction (51.0%) and irregular shaped stone (49.0%). [136]

Dimension stone is a globally traded commodity, and the United States is a net importer of dimension stone products. In fact, domestic dimension stone consumption consists of roughly similar amounts of imports and domestic products. The United States will continue to increase its dependence on imported dimension stone due to the high level of demand for quality granites, marbles, and specialist stones that are only sourced in other countries. A good example of imported dimension stone is the well-known Carrara marble that has been mined since ancient Roman times in Italy. Many thousands of tons of this marble are imported into the United States annually.



Figure 14: Over the next five years to 2024. imports are projected to grow annually at 1.6% to $342.7 million.

<u>Infrastructure Construction</u>

The stone industry derives the majority of its sales from the supply of crushed stone aggregate to the infrastructure construction market, particularly for the construction and maintenance of highways and streets. Aggregate composed of crushed stone, sand, and gravel comprise the principal materials mixed into the base, sub-base and surface pavement of roads throughout the United States. This aggregate is also an important input into the construction of other heavy infrastructure (e.g., dams, levies, railroads, and harbors). The main source of funding for U.S. road construction comes from federal, state, and local governments, while funding for other heavy infrastructure projects is evenly divided between the public and private sectors. In the five years through 2019,

EXHIBIT C — 2019 BROWN HARRIS

federal funding for transportation remained relatively steady. The supply of aggregate for use in the infrastructure construction market regularly generates more than 70.0% of the Stone Mining industry revenue, growing consistently on an annual basis to have reached an expected 72.8% in 2019. [137]

The Road and Highway Construction industry experienced a host of issues in the five years leading up through 2017, including budgetary constraints and weak investment in transport infrastructure early in the period. Local and state governments, which are the largest sources of infrastructure industry specific project funding, have maintained prudent budgets since the recession, while federal programs like the Highway Trust Fund have stayed somewhat precarious. The industry has only recently resumed to solid growth, due to greater local government spending and the passing of the five-year FAST Act in 2015. These improvements will continue to lead to growth in the infrastructure construction segment of the U.S. stone market. [138]



*Figure 15: Federal, state, and local funding for transportation and infrastructure projects represents an important indicator of stone market health.*

---

[137] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[138] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

EXHIBIT C — 2019 BROWN HARRIS

**Georgia Crushed Stone Market Overview**



*Figure 18: The Central and Northern regions of Georgia are geologically significant producers of crushed granite and limestone as well as dimensional stone. Triangles on the map represent current producers of crushed stone and circles represent active dimensional stone quarries.*

The Southeast region of the U.S., which alone accounts for nearly 25.7% of U.S. residential population and construction activity, ranks as the largest and most significant region for stone mining and quarrying. This region accounts for a disproportionately large share of industry activity, with 27.8% of establishments, approximately 28.6% of production, and 33.4% of industry employment. This region includes four of the ten largest states in the production of crushed stone (i.e., Georgia, Florida, North Carolina,

and Virginia), which partly reflects the existence of adequate raw material deposits in the Southeast, but principally reflects the substantial demand generated by robust construction activity within the region.[139]



Figure 19: The Southeast region of the US is the largest region for stone mining and quarrying.

With large mineral deposits and strong transportation infrastructure, Georgia is an important producer of crushed stone, limestone, and sand and gravel for both construction and industrial uses. This production comes primarily from the northern and central regions of the state. According to the latest USGS Mineral Industry Summary, Georgia accounts for approximately 4.5% of the total U.S. crushed stone with an estimated value of $1.01 billion in production. In 2019, construction aggregate quarries from across the State of Georgia will produce an estimated 74.3 million tons of crushed stone for a total estimated wholesale value of $1.05 billion.[140]



Figure 20: The GDP of Georgia has experienced strong and steady growth since the recession of 2008.

---

[139] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[140] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

EXHIBIT C 2019 BROWN PARRIS

Sales of crushed stone in Georgia during 2019 saw an increase of 10.9% from sales in 2018 according to the latest USGS Mineral Industry Survey. Strong production in the first two quarters boosted otherwise moderate growth in the final two quarters of the year. Production in quarters one and two of 2019 were up significantly by 24.5% and 13.1% respectively over the same quarters in 2018. Moderate growth is expected to continue through 2020 and beyond. Georgia's population growth from 2010 to 2020 is projected at 1.07% a year, which ranks it as the 14th fastest growing state. The population of Georgia has shown strong and consistent growth over the past decade, with a current estimated population of 10.73 million according to U.S. Census Projections. Along with population growth, Georgia's real gross domestic product is expected to have grown by a strong 7.8% in 2019 to around $634 billion. This steady economic growth should result in the undertaking of new residential, business, industrial, and infrastructure construction projects that will utilize the crushed stone and dimensional products produced by the stone industry in the state. [141]

Approximately 8.74 tons of aggregates are required per-capita on an annual basis within the Southern United States. This calculation has been made based on dividing the total amount of aggregate production in the region by the total population. Based on this per-capita consumption, it is estimated that a total Georgia aggregate demand of approximately 93.7 million tons will exist in 2020 and 103.4 million tons by 2030.[142]

Georgia – Infrastructure Construction

The road and highway construction market constitute a major market segment for the Georgia stone mining industry, keeping in trend with the overall U.S. market. The State of Georgia has allocated a total of $8.811 billion in funding for State Transportation Improvement Program (STIP) highway projects through 2021. Of this funding, approximately $2.2 billion is scheduled to be spent in each year of the program. This funding includes $4.94 billion in federal-aid, $1.92 billion in state funds and $1.28 billion in local funds. The State of Georgia instituted a 6.7% gas tax increase in July of 2015 in order to fund highway and infrastructure improvement projects within the state. This increase was adopted along with a new formula for calculating the state's tax rate and will allow for future rate increases along with inflation and vehicle fuel-efficiency improvements. It is anticipated that this tax will add approximately one billion dollars in new transportation project funding each year.[143]

In order to qualify for use in GDOT projects, several tests are required to ensure aggregates meet certain specifications. The tests include the Los Angeles (LA) abrasion test, the coarse aggregate specific gravity, and the soundness test. The LA abrasion test is a common method used to indicate aggregate toughness and abrasion characteristics. The characteristics are important because the constituent aggregate in hot mix asphalt must resist crushing, degradation, and disintegration in order to produce a high-quality asphalt product. The coarse aggregate specific gravity test is needed to determine the weight-to-volume relationships and to calculate various volume-related quantities such as voids in mineral aggregate (VMA), and voids filled by asphalt (VFA). The soundness test determines an aggregate's resistance to disintegration by weathering and, in particular,

---

[141] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[142] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[143] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

EXHIBIT C 2019 BROWN-PARKS

freeze-thaw cycles. Operators with crushed stone products that pass these tests will qualify for not only GDOT projects but will also meet requirements for use in other construction projects.[144]

<u>Georgia – Building Construction</u>

  Within the State of Georgia, almost 15.0% of crushed stone consumption falls within the residential and nonresidential construction market. Improvements in the economy have led to consistent growth over the five-year period leading up through 2018 with a leveling off in 2019. New home starts in the Atlanta region decreased slightly in 2019 after very strong performance coming out of the recession. According to Eugene James, Senior Regional Director for Metrostudy, growth has been limited by the availability of new lots. He estimates that this level of growth will sustain or increase in 2020 and beyond as lots become available. According to Cumming Corporation, a leader in construction consulting, the Atlanta nonresidential construction spending will remain strong through 2020, although down slightly from recent highs. It is estimated that building construction for the education and healthcare sectors will buoy the overall nonresidential construction industry[145]

**Competitive Landscape**

  A moderate level of concentration is characteristic of the Stone Mining industry, with the three principal enterprises accounting for just over half of industry revenue. The past decade has seen a movement toward increased ownership concentration (i.e., consolidation), with several largescale players acquiring the operations of competitors in order to establish or strengthen their position in strategically significant regional markets. Industry mergers are expected to continue over the long term as international players enter the industry, and the leading national players seek to expand through acquisitions which provide a spread of assets across several geographic and product markets. Most recently, large industry operators Lafarge and Holcim completed their plans to merge, forming LafargeHolcim. Meanwhile Martin Marietta recently acquired Texas Industries to become the industry's largest global company. Vulcan Materials, one of the largest competitors in the Southeastern United States and the largest producer of construction aggregates nationwide, recently acquired Aggregates USA, LLC in December of 2017 for $290 million. While these large companies enjoy operational and other advantages, they have had some difficulty competing on a project-by-project basis with smaller companies that are located in logistically superior locations.[146]

  While the crushed stone segment of the industry has been subject to a heightened degree of takeover activity over the past five years, its fragmented structure remains evident from the concentration of employees per establishment. Roughly 73.0% of establishments have fewer than 20 employees, including about 30.0% employing fewer than five people. It should be noted, however, that the leading players operate multiple establishments across many geographic markets. The trend towards the consolidation of ownership in this industry has led to somewhat heightened competition since the mid-1990s. Consolidation within the dimensional stone segment of the industry has been

---

[144] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[145] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[146] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

EXHIBIT C 2019 BROWN-PARRIS

Case 3:22-cv-... Document 4... Filed 0... Page 430 of 600

limited and it is still predominantly controlled by individual operators and family quarrying operations. [147]

There is a relative abundance of suitable aggregate raw material deposits spread throughout the United States, but high transport costs limit the volume of shipments from each mine or quarry. In addition, tightening environmental regulations and zoning restrictions have limited the number of mines and impose higher transportation costs on the industry by forcing operators to locate mine sites further away from construction sites. Moreover, competition within the crushed stone segment of this industry is based on pricing and the capacity to maintain supply to customers. Production is geographically dispersed in locations close to raw material deposits and end-users. As discussed above, the industry is highly fragmented, with many small-scale local operations servicing state or municipal governments for highway and street construction projects. However, the industry also includes several large-scale multi-establishment companies, which tend to dominate the construction aggregate market at a regional level. These large-scale companies typically have other construction material operations, such as cement production, and can utilize an established distribution and marketing network along with greater financial resources to compete with smaller localized producers. [148]

The relatively high costs associated with the transport of crushed stone limits the economically efficient threshold of product delivery. Hence, the location of the quarry or mine can significantly influence the price of products. Producers are increasingly looking to alternative modes of transportation, such as railroad or ship transport, to lower costs and to develop a competitive edge. These alternatives to road transport allow for a more cost-effective distribution system which enables producers to expand the market radius and increase the volume of output per mine or quarry.

---

[147] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[148] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

EXHIBIT C 2019 BROWN HARRIS

## Market Supply Analysis

For the purpose of this report, the competition and their reported production will be found below.

| | | | | Regional Construction Aggregate Producers Summary | | | | |
|---|---|---|---|---|---|---|---|---|
| Site Name | Product | MSHA ID | DISTANCE FROM SITE | 2019 EST. PRODUCTION (000 tons) | Distance Factor | Production Modified for Distance (000 tons) | Competition Factor | 2019 EST. SUPPLY TO MARKET REGION (000 tons) |
| Avant Mine | Construction Sand and Gravel | 901088 | 39 | 614.90 | 0.50 | 307.45 | 0.50 | 153.72 |
| Starrette Trucking Co. Pit | Construction Sand and Gravel | 901207 | 40 | 129.65 | 0.50 | 64.83 | 0.50 | 32.41 |
| Redland Sand | Construction Sand and Gravel | 901196 | 32 | 140.91 | 0.50 | 70.46 | 0.50 | 35.23 |
| Southeast Sand and Aggregates LLC | Construction Sand and Gravel | 901234 | 41 | 66.13 | 0.50 | 33.06 | 0.50 | 16.53 |
| Siloam Quarry | Crushed, Broken Granite | 901114 | 17 | 345.88 | 1.00 | 345.88 | 1.00 | 345.88 |
| Warren County Quarry | Crushed, Broken Granite | 901204 | 10 | 1,172.14 | 1.00 | 1,172.14 | 1.00 | 1,172.14 |
| Sample | Crushed, Broken Granite | 901209 | 30 | 19.64 | 0.75 | 14.73 | 1.00 | 14.73 |
| Sparta Quarry | Crushed, Broken Granite | 901210 | 22 | 841.95 | 0.75 | 631.46 | 1.00 | 631.46 |
| Broad River Crushed Stone, LLC | Crushed, Broken Granite | 901225 | 35 | 151.07 | 0.50 | 75.54 | 1.00 | 75.54 |
| Augusta Quarry | Crushed, Broken Granite | 900065 | 42 | 1,616.09 | 0.50 | 808.04 | 1.00 | 808.04 |
| Athens Quarry | Crushed, Broken Granite | 900033 | 42 | 435.19 | 0.50 | 217.60 | 1.00 | 217.60 |
| Warrenton Quarry | Crushed, Broken Granite | 900580 | 15 | 737.76 | 1.00 | 737.76 | 1.00 | 737.76 |
| Mc Lanahan Crushed Stone | Crushed, Broken Granite | 900050 | 36 | 414.47 | 0.50 | 207.24 | 1.00 | 207.24 |
| Sparta Quarry | Crushed, Broken Granite | 901033 | 23 | 199.94 | 0.75 | 149.95 | 1.00 | 149.95 |
| Augusta Quarry | Crushed, Broken Granite | 900907 | 30 | 821.62 | 0.75 | 616.21 | 1.00 | 616.21 |
| Appling Quarry | Crushed, Broken Granite | 901083 | 31 | 584.63 | 0.50 | 292.31 | 1.00 | 292.31 |
| Morgan County Quarry | Crushed, Broken Quartzite | 901126 | 34 | 291.99 | 0.50 | 146.00 | 1.00 | 146.00 |
| North Georgia Aggregates | Crushed, Broken Stone NEC | 901213 | 43 | 100.87 | 0.50 | 50.44 | 1.00 | 50.44 |
| | | | Total: | 8,684.82 | | 5,941.09 | | 5,703.19 |
| | | | Average: | 482.49 | | 330.06 | | 316.84 |

Figure 24: List of crushed stone and sand producers within 50 miles of Brown Harris as taken from various sources. Tonnages listed in thousand US tons.

*Source: Production Estimates from Burgex Inc. Mining Consultants proprietary analysis*

The principle of substitution must be considered when attempting to analyze a regional market for construction aggregates. Two main factors, among others, impact the supply and demand of crushed stone and other construction aggregates. These factors are

resource location and high transportation costs. Available construction aggregate resources are limited by geology, permitting, zoning and federal, state and local regulation. Mineable resources of crushed stone, sand, and gravel are not often all available in a given market. In this case, two options exist: either pay higher transportation costs to bring product into the area from outside markets or find a suitable substitute product within the market if available. For example, natural gravel can often be crushed and substituted for crushed stone and crushed stone mines can also produce manufactured sand to replace natural sand if the market requires it. While substitution alone is generally not cost effective in areas where a variety of construction materials are prevalent, it is often used in regions where only one type of resource exists.

According to Burgex Inc. Mining Consultants, there are three major companies that operate multiple quarries in region and supplied a combined 83.28% of construction aggregates to the subject property's market. The largest of these producers is Martin Marietta (1.984 million tons and 34.79% of market) followed by Vulcan Materials (1.594 million tons and 27.94% of market) and CRH PLC (1.172 million tons and 20.55% of market).[149]

| Estimated 2019 Brown Harris Market Area Major Competitor Penetration | | |
|---|---|---|
| Company | 2018 Estimated Market Production (K Tons) | Estimated 2018 Market Share |
| Martin Marietta Materials Inc | 1,984 | 34.79% |
| Vulcan Materials Company | 1,594 | 27.94% |
| CRH PLC | 1,172 | 20.55% |

Figure 23: Estimated 2019 Brown Harris market share calculations for major regional competitors.

The nearest potential competitor of the subject property's operation is the CRH PLC (Midsouth Aggregates) Warren County Quarry, which is located approximately ten miles from the subject property. In 2019, the Warren County Quarry produced approximately 292,000 tons of crushed stone and is a well-established regional producer. With strong production and a long history, this quarry demonstrates the quality and market desirability of the regional crushed stone.

Including the Warren County, there are 18 active mines within the 50-mile market radius of subject property that produce construction aggregates products. Of these 18 quarries, 12 are crushed granite quarries, one produces crushed quartzite, and the remaining produces unclassified crushed stone. There are also four construction sand and gravel producers in the region. These quarries each produce an estimated average of 482 thousand tons of aggregates annually. The largest of the subject property's proposed operation's primary competitors is Martin Marietta's Augusta Quarry which produced approximately 1.6 million tons in 2019.[150]

In order to understand the true supply and demand for the 50-mile market area, the output of these potential competitors is weighted based on distance from the subject

[149] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[150] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

property as well as by product type. Industry standards also indicate the customer is responsible for coordinating transportation from the subject property to the final destination, including all costs associated with the transport and insurance as Free on Board- Origin or Plant (FOB-Origin). Under FOB-Origin/Inspection and Acceptance-Origin terms and conditions, the customer takes full responsibility of the shipment at the producer's site, thereby releasing the producer of all responsibility and liability once the goods are picked up.



*Figure 22: Production activity is very apparent at the Warren County Quarry located about 10 miles southeast of the Brown Harris property. Photo courtesy of Google Earth.*



Figure 21: Brown Harris potential market radius and regional competition map. Composed by Burgex. A high-resolution copy of this map can be found in the appendix of this report.

EXHIBIT C 2019 BROWN HARRIS

Case 3:22-cv-... Document 41 Filed 01/... Page 435 of 600

**Market Demand Analysis**

Aggregates are basic and fundamental inputs to the building blocks of society and a strong economy. Population is increasing in the region, new highway projects are on the horizon, new business development is rebounding in the region, and transportation in and out of the region is uninhibited. On average, data provided by the industry provides estimates for end users and shows construction-related uses consume 97.0% percent of the total aggregate consumption further split with 44.0% for government end use and 56.0% for private sector end use.



Increasing federal and state funding of infrastructure improvement projects along with an increase in residential and nonresidential construction has led to an increase in demand for crushed and dimension stone products within the State of Georgia. A consistent rise in production from regional stone quarries over the next five years is projected to meet some, but not all of this increased demand. Georgia is in-line with the overall U.S. stone industry in that half or more of production comes from major producers such as Martin Marietta, Hanson, and Vulcan Materials while the other half comes from smaller local operators. These larger operators enjoy several operational and strategic advantages, but have difficulty overtaking smaller operators who are located in logistically favorable positions.[151]

Consistently strong pricing is a key economic factor that indicates unsatisfied demand in a market. In the context with the overall U.S. stone market data and regional economic data, there is an established statewide demand for crushed rock and products that is not being adequately met with current production levels. This represents an opportunity for new entrants into the market who have virgin resources, strong

[151] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

EXHIBIT C - 2019 BROWN-PARRIS

capitalization, favorable transportation advantages, and the fortitude to overcome the barriers to entry listed later in this report, to establish small to mid-sized operations within the region and gain a market foothold. Furthermore, it also represents a noteworthy opportunity for existing operators with established networks and sales contracts to expand their operations where the stone resources and logistics will allow. This opportunity for entry into the crushed and dimensional stone market of Georgia is expected to remain open until production has increased to a level where the strong pricing and potential margins currently available have reduced significantly.[152]



*Figure 22: Georgia was ranked number five in the US for new construction starts by value in 2019 with over $52.5 billion in new construction. Source: United States Census Bureau – Building Permits Survey.*

Within 50 miles of the subject property, there are approximately 832,990 people. This radius has been defined as the local market region for the subject property's proposed operation and has been primarily determined based on transportation logistics. Aggregate products are typically only marketable within a certain radius due to the high costs of delivering these materials to end-users. Outside of this market region, higher transportation costs will likely overtake any competitive pricing advantages. Beyond these market demand analysis considerations, freight costs are not considered within the scope of this report. It is normal for aggregate customers to arrange their own transportation, either through third parties or with their own fleet. Most materials will be sold from the subject property as Free on Board (FOB); this leaves the individual buyers with responsibility for all freight costs and liabilities. Generally, a 40 to 50-mile market is utilized for aggregate operations that primarily utilize trucking for market access. Under

---

[152] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

certain market conditions, a larger market radius of 70 miles is appropriate. The subject property's market could be substantially larger if they decide to partner with Georgia Woodlands Railroad to build a rail siding along the borders of the subject property. The rail line currently runs through the town of Sharon, Georgia less than 1.5 miles to the west.[153]

The subject property is advantageously placed between Augusta and Athens Georgia, giving it the potential to competitively market products in both relatively high growth areas. Atlanta is within easy market reach by rail.

Based on the average per-capita consumption rates that have been calculated for the Southeast region of the United States, there is an estimated annual regional demand for over 7,277,900 tons of aggregate materials within the subject property's 50-mile market radius. With an estimated annual regional supply of 5,703,000 tons, and a net deficit of 1,574,000 tons, the subject property's competitive pricing and high-quality stone should allow it to capture more than enough market share to effectively compete in its rapidly growing market area.[154]

| Construction Aggregate Market Highlights for 50-Mile Brown Harris Region | |
|---|---|
| Estimated Regional Market Demand | 7,277,000 |
| Reported Regional 2019 Supply | 5,703,000 |
| Construction Aggregate Supply Deficit | (1,574,000) |

*Figure 25: Construction aggregate market highlights for the 50-mile market radius for Brown Harris. These numbers have been calculated based on regional population as estimated by the US Census Bureau and per capita consumption trends as calculated by the National Stone Sand and Gravel Association (NSSGA), the USGS, and others. An average of 8.74 tons of aggregate per-capita has been used in this calculation.*

The GDOT 2018-2021 Statewide Transportation Improvement Program (STIP) calls for the commencement of several large road and bridge projects within the market region of the subject property's proposed operation. These projects present a significant near-term opportunity for the subject property's proposed operation to demonstrate its ability to provide quality aggregates to the road construction market. Testing during the geological evaluation of the subject property has demonstrated that the stone on the property is of a quality to readily meet these key market applications. Approximately 1.6 billion dollars' worth of GDOT projects are scheduled to begin construction from 2020 - 2030 in the counties within the subject property's market radius. The full GDOT STIP report is included in the appendices of the Technical Due Diligence Business Plan and Market Analysis.[155]

**Proposed Operation**

The subject property's market area was analyzed using spatial competition data to generate a Voronoi Diagram. This method of market analysis enables the analyst to estimate the expected market share for a proposed mining operation based on production statistics and physical characteristics from its nearest competitors.

---

[153] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[154] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[155] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants



Figure 27: Brown Harris Voronoi diagram with distance to nearest competitors.

# EXHIBIT C 2019 BROWN HARRIS

| Regional Construction Aggregate Producers Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| Company Name | Site Name | Product | MSHA ID | DISTANCE FROM SITE | 2019 EST. PRODUCTION (000 tons) | Target Market Share | Production Forecast |
| Vulcan Materials Company | Sparta Quarry | Crushed, Broken Granite | 901210 | 22 | 841.95 | 0.25 | 210.49 |
| Vulcan Materials Company | Siloam Quarry | Crushed, Broken Granite | 901114 | 17 | 345.88 | 0.33 | 114.14 |
| Martin Marietta Materials Inc | Warrenton Quarry | Crushed, Broken Granite | 900580 | 15 | 737.76 | 0.33 | 243.46 |
| Summit Materials LLC | Broad River Crushed Stone, LLC | Crushed, Broken Granite | 901225 | 35 | 151.07 | 0.15 | 22.66 |
| Summit Materials LLC | Mc Lanahan Crushed Stone | Crushed, Broken Granite | 900050 | 36 | 414.47 | 0.15 | 62.17 |
| Heidelberg Cement AG | Sparta Quarry | Crushed, Broken Granite | 901033 | 23 | 199.94 | 0.25 | 49.98 |
| CRH PLC | Warren County Quarry | Crushed, Broken Granite | 901204 | 10 | 1,172.14 | 0.50 | 586.07 |
| | | | | Total: | 3,863.21 | | 1,288.97 |

*Figure 28: Brown Harris Voronoi analysis and production forecast.*

The Voronoi analysis indicates that, given the current market, the subject property's proposed operation should be able sell approximately 1.29 million tons of aggregate by capturing market share from its nearest competitors. Prior to mining, the overburden will be stripped and moved to stockpiles to expose the underlying material. A 100-foot buffer will be created around the perimeter of the subject property and overburden will be stripped at an approximate 3:1 slope. The reserves of the deposit were calculated by GeoLogic, LLC based on these practical and regulatory requirements. [156]

No first-year production is planned with a ramp up to 1,000,000 tons by year ten, followed by a 3.0% annual increase through year 15. No growth is planned for years 16 through 20. The first year will primarily be spent in obtaining permits, site preparation, road construction, hiring management, overburden stripping, and plant setup, with no production or sales. At these production levels, the subject property's proposed operation will have an aggregate market share of 2.75% in year two and 4.81% by year three at current aggregate demand levels. When adjusted for a projected market demand growth of 2.0% annually, the operation will have a 4.62% market share in year three. With the current growing opportunity in the market region, this should be realistic to accomplish as the subject property's proposed operation will be filling an important market need. It is anticipated that total production over a 20-year mine life will be approximately 16.8 million tons. The bulk of production will serve the road construction market, while the rest of the material will find market in the commercial and residential construction sectors. The proposed operation, over its 20-year mine life as projected in this plan, will mine 39.0% of the available mineable reserves including the 15.0% loss factor. [157]

---

[156] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants
[157] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

EXHIBIT C 2019 BROWN HARRIS
Case 3:22-cv-... Document 4... Filed 0... Page 440 of 600



*Figure 1: A boring location on the Brown Harris property. Photo taken by Burgex during a site visit.*

Under this plan, the subject property's proposed operation would enter the market as a small to average sized producer within its 50-mile market radius and significantly smaller than other producers within the southeast region. With newer equipment and modern planning and efficiencies, the subject property's proposed operation will have the ability to institute better pricing in order to capture the projected market share from existing supply deficits as well as from some of the older and smaller operations within the region. It is estimated that this newer equipment and improved operating efficiencies will lead to an estimated cost savings of 10.0% to 15.0% less operating expense, on average. Some of these operating efficiencies include improvements that have been made over the last several years in motor efficiency, screening, wash plant designs, and overall safety and maintenance advancements that lead to less accidents and downtime. The improvements also result in the need for less operating labor, which represents one of the largest expenses in mining.[158]

The subject property has access to Georgia Highway 269 and Interstate 20 from Raytown Road with improvement of existing roads and is about an hour by truck to both Athens and August, Georgia. It is anticipated that most aggregates would be trucked to market, but rail options may be considered in the future to meet market demand for larger contracts. Power transmission lines run along Raytown Road and would take little cost to extend it to the subject property. Access to volumes of water suitable to mining and processing needs should be easy and inexpensive to obtain. An overburden stockpile area has been designated as well as an area for a plant setup.

---

[158] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

EXHIBIT C 2019 BROWN HARRIS
Case 3:22-cv-... Document ... Filed ... Page 441 of 600

The logistics planning to be able to meet the demand of shipping, in excess of 1.159 million tons per year, is calculated as follows based on the maximum available time for loading and shipping, which is 16 hours/day, 312 days/year:

1.159 million TPY ÷ 312 days/year = 3,715 tons/day ÷ 16 hours/day = 232 tons/hour
232 tons/hour ÷ 25 tons/truck = 9.29 trucks/hour.
9.29 trucks/hour requires loading one truck per 6.46 minutes.

A Caterpillar Rubber tiered loader with an 8-cubic yard bucket can load a truck in two passes in under two minutes. The assumption has to be made to have at least one loaders of this size and it is possible to load two trucks every two minutes which gives a capacity of approximately 30 trucks per hour, well above the 9.29 trucks per hour required to move the quantity of material. Logistically, if the trucks are available, moving this tonnage is not a problem. Almost all producers sell from the plant FOB pricing, which is Freight-On-Board. This pricing is based on the customer providing transportation from the mine to the job and the appropriate quantity of trucks for the project. From past experience in Georgia, there is no limit to trucks on the highways and surface roads in this rural area where mining operations have been ongoing for many years.

Additional market research performed by Burgex Inc. Mining Consultants included the following sources:

- **Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Estimate – Brown Harris, Taliaferro County, Georgia** – November 2019 – GeoLogic, LLC

- **IBISWorld Industry Report 21231 Stone Mining in the U.S.** – December 2019 – Darshan Kalyani IBISWorld Inc. of Los Angeles, California
- **SME Standards and Guidelines for the Valuation of Mineral Properties (SME Valuation Standards)** -Second Edition, 2017 – Society for Mining, Metallurgy, and Exploration, Inc.

- **Advance Data Release of the 2015 Annual Tables for Crushed Stone** – January 2019 –United States Geological Survey

- **Fourth Quarter 2018 Minerals Industry Surveys for Crushed Stone and Sand and Gravel** – March 2019 –United States Geological Survey

- **U.S. National & State Aggregates Forecast for 2015-2020** – January 2016 – National Stone Sand and Gravel Association of Alexandria, Virginia.

- **Aggregate Industry Outlook** – October 2016 – Pit & Quarry Magazine of Cleveland, Ohio

- **MSHA Mine Data Retrieval System Extended Mine Search** – U.S. Department of Labor Mine Safety and Health Administration

EXHIBIT C 2019 BROWN-HARRIS

- **Georgia Department of Transportation Statewide Transportation Improvement Program for Years 2018-2021** – June 2017 – Georgia Department of Transportation

- **South Carolina of Transportation Statewide Transportation Improvement Program for Years 2017-2022** – June 2018 – South Carolina Department of Transportation

- **Geologic Map of Georgia** – 1976 - Lawton, D.E., Moye, F.J., Murray, J.B., O'Connor, B.J., Penley, H.M., Sandrock, G.S., Marsalis, W.E., Friddell, M.S., Hetrick, J.H., Huddlestun, P.F., Hunter, R.E., Mann, W.R., Martin, B.F., Pickering, S.M., Schneeberger, F.J., and Wilson, J.D.

## Permitting

It is not anticipated that any permitting difficulties will be encountered for the operation as planned. Georgia is currently ranked 12th in value of nonfuel minerals by state, according to the USGS. A large portion of this value comes from aggregate operations, primarily crushed stone. These statistics indicate a sophistication in the permitting and regulatory framework in the State of Georgia and serve as an indicator of how mining friendly the state is. Based on a review of active aggregate permits and timelines in the state, it is estimated that the entire permitting process for the subject property can be completed within a window of six to twelve months for a total cost of approximately $900,000 (including surety bond). A breakdown of the specific permitting processes and application steps can be found in the sections below.[159]

<u>Surface Mining Permit</u>

The Georgia Environmental Protection Division (GEPD) of the Georgia Department of Natural Resources (DNR) regulates mining activities within the state of Georgia. The Surface Mining Unit of the Land Protection branch of GEPD specifically oversees the issuance, and regulation, of mining permits and activities. Under the regulations set forth by the SMU, a Surface Mining Land Use Plan (SMLUP) is required to be submitted as part of the permitting process. This SMLUP is required to include:

1. A title sheet with site location, name, and contact information for the mine operator, plant designer, and a 24-hour emergency contact.

2. A boundary survey with metes and bounds description.

3. An existing conditions description with topographic survey of elevation contours, roads, utilities, streams, wetlands, and easements.

4. A proposed mining plan showing permit boundary, affected acreage, undisturbed buffers and limits of mining, direction of mining progression, proposed contours, mining features (haul roads, stockpiles, plant operations site), a cross section showing anticipated depth of mine pits, potential impacts on neighboring properties, and a comprehensive mitigation and reclamation plan.

---

[159] Technical Due Diligence Business Plan and Market Analysis Burgex Inc. Mining Consultants

5. An erosion and sedimentation control plan, details and notes showing undisturbed buffers for permit boundary and streams, wetlands, site drainage, and a plan using best management practices to control erosion and sedimentation.

6. A posted bond of approximately $2,500 on each acre of proposed disturbance.

## U.S. Army Corps of Engineer Section 404 Permit

A delineation of wetlands and streams within the property boundary is required by the SMLUP. Once these wetlands have been delineated, a buffer is required on all wetlands and streams. If an impact on wetlands is anticipated to occur, permits will be required under Section 404 of the Clean Water Act of 1972. This permit will require coordination with the U.S. Fish and Wildlife Service regarding federally protected species. If stream and wetland impacts are to occur, compensatory mitigation will be required. This compensation can be achieved through the construction of artificial wetlands, or through the purchase of mitigation credits from an approved mitigation bank. It is believed that wetland potential can be easily managed on the subject property based on an analysis of National Wetland Inventory Maps. A contingency budget has been allocated within startup funds for a full wetland study prior to operations. While the mine plan avoids wetland impacts, a substantial mitigation budget has still been included as a contingency within startup costs.

Based on mapping provided by GeoLogic, LLC, there are a few streams running through the subject property. Burgex Inc. Mining Consultants have included a wetland contingency of $1,000,000. An additional $500,000 has been budgeted and included in the year one start-up costs for a total of $1,500,000 for wetland contingency in year one. Therefore, any potential wetlands or streams on-site are not considered to affect the highest and best use of the subject property as a granite mine.

## Storm Water and Wastewater Discharge

The Water Protection Branch of the GEPD oversees storm and wastewater discharges. A general permit for storm water discharges associated with industrial activities are issued under the National Pollutant Discharge Elimination System framework. Receiving one of these permits requires the preparation of a Storm Water Pollution Prevention Plan (SWPPP), which discusses potential pollutants, best management practices, good housekeeping measures, sampling and inspection procedures, record keeping plans, maintenance, and a plan for emergency procedures.

Notable for the specific requirements of the subject property is the fact that sediments are considered to be a potential pollutant and will need to be planned for in the SWPPP. These sediments become a key monitoring condition for the wastewater requirements under the NPDES General Permit for Mining and Processing Facilities. When storm water comes in contact with mine process water or wash water, it is also considered to be wastewater and is therefore regulated. These wastewater emissions need to be monitored as follows when they are discharged into waters of the United States:

1. Flow is monitored once per month in million gallons per day.

2. Total Suspended Solids shall not exceed a 50mg/L daily average and a 75mg/L daily maximum as measured once per month.

3. Oil and grease shall not exceed 10mg/L daily average and a 15mg/L daily maximum as measured twice per year.

4. Effluent turbidity (NTU) shall be monitored once per month.

5. Instream turbidity (NTU) shall be monitored once per month at the effluent discharge point. Upstream and downstream of the discharge point will also be measured, if applicable.

6. pH shall not be less than 6.0 or greater than 8.5 as measured once per month.

<u>Ground Water Withdrawal Permit</u>

Unless existing water wells have already been identified for use in dust control for mining and processing activities as outlined in the mine plan as detailed in the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants, a Ground Water Withdrawal Permit from the Water Protection Branch of GEPD will be required to install a production well. This permit will be required for water withdrawals of greater than 100,000 gallons per day. A submission to GEPD in order to demonstrate that existing domestic wells will not be adversely impacted by the new production well is required.

<u>Air Permitting</u>

Crushed stone mines are known sources of particulate matter, primarily due to the generation of fugitive dust. This dust is generated and distributed by a variety of mining related activities from the moving of mining vehicles to the screening and stockpiling of materials. When determining if an air permit is needed, the emissions from diesel engines and other greenhouse gas emitters will need to be considered. It is anticipated that a permit may be required and that a minor source air construction permit (<100,000 tons of particulate per year) should be adequate. Making a final determination on whether this permit is needed or not will require a detailed evaluation of the proposed mining activities and specific equipment to be used on the site. If required, this permit would be obtained from the GEPD Air Protection Branch.

<u>Mine Safety and Health Administration (MSHA)</u>

Mining activities at the subject property fall within the jurisdiction of the Southeast Division of MSHA in Birmingham, Alabama**.** An MSHA license and identification number will need to be applied for from this office. In addition to the license, certain daily logs, safety training, and other safety and health related requirements will need to be followed by the mine. It is likely that most of the available mine laborers and management will have experience and requisite training in MSHA safety techniques prior to beginning work at the subject property.

**Start-Up Costs (Exploration, Permitting, Plant-Equipment)**

EXHIBIT C - 2019 BROWN HARRIS

Total start-up costs for a mining development vary due to a range of factors such as site characteristics, materials to be mined, depth of deposits and permitting requirements.

As previously discussed, the subject property contains ample granite deposits and is located in an area of Georgia with permitted aggregate mines existing and operating, indicating the permitting process to not be overly burdensome or costly. It should be noted that, the subject property is a self-contained property potentially resulting in minimal impact on surrounding properties allowing a more streamlined and efficient permit process.

The subject property's proposed operation will begin production utilizing a contract mining company which greatly reduces initial capital expenditures. Site preparation, first year management, infrastructure improvements, permitting and other expenses as needed to begin production has been calculated at $4,039,180. Stripping of overburden will continue as needed through year 15 with no capital planned in the final five years of the planned life of mine. The following table breaks down the capital costs further. As presented throughout this report, an additional $500,000 has been added to these costs for any additional possible wetland mitigation required. Further, as stated in the taxes section earlier in this report, according to Alan Hornaday, Taliaferro County Tax Assessor's Chief Appraiser, the subject property is within a Forest Land Protection Act (FLIPA) covenant. Mr. Hornaday indicated the estimated cost to breach the FLIPA would be approximately $107,000, this has been included in the year one start-up costs. The total Year 1 start-up costs are estimated to be $4,646,180.

| Brown Harris Capital Expenditures | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 - 15 | Total |
| Zoning, Permitting and Legal | $500,000 | | | | | | | $500,000 |
| Overburden Removal | $753,483 | | | | | | | $753,483 |
| Earthworks, Roads, Utilities | $650,000 | | | | | | | $650,000 |
| First Year Management | $262,500 | | | | | | | $262,500 |
| Scale House / Scales | $200,000 | | | | | | | $200,000 |
| Wetland Mitigation | $1,000,000 | | | | | | | $1,000,000 |
| Sub-Total | $3,365,983 | | | | | | | $3,365,983 |
| Contingency (20%) | $673,197 | | | | | | | $673,197 |
| Initial Capex | $4,039,180 | | | | | | | $4,039,180 |
| | | | | | | | | |
| Plant and Equipment | | | | | | $15,940,000 | | $15,940,000 |
| | | | | | | | | |
| Sustaining Capex* | | $435,073 | $435,073 | $435,073 | $435,073 | $435,073 | $435,073 | $6,091,017 |
| Total Capital Costs | $4,039,180 | $435,073 | $435,073 | $435,073 | $435,073 | $16,375,073 | $435,073 | $26,070,197 |

*Figure 30: Generalized anticipated capital costs. The use of a contract miner eliminates the upfront costs for mobile equipment and processing plants. There are several reliable contract miners ready to prepare the site, set up a portable crushing plant and initiate production for Brown Harris. The permanent plant and mobile equipment will be purchased and installed in year six for production beginning in year seven. Sustaining capex (overburden removal) is forecast at $435,073 per year through year 15.*

**Market Pricing**

EXHIBIT C - 2019 BROWN-PARRIS

According to 2019 wholesale pricing based on the latest USGS statistics on crushed stone pricing by geographic region, the average value of crushed stone was highest in the South Atlantic ($13.66 per ton), followed by the Middle Atlantic New England ($12.08 per ton), and New England ($11.63 per ton). According to 2018 wholesale pricing based on the latest USGS statistics on crushed stone pricing by geographic region, the average value of crushed stone was highest in the South Atlantic ($13.52 per ton), followed by the New England and Middle Atlantic ($11.90 per ton), and East South-Central Region ($10.95 per ton). These wholesale prices can vary greatly between different types of crushed stone at various locations in the United States, owing to tighter supplies and higher production costs in certain regions of the country. For example, the average value of crushed stone varies from $4.44 per ton in Wyoming to $28.41 per ton in Mississippi. These wholesale numbers are used in USGS commodity summaries in order to protect the individual retail pricing models of each company. Within the State of Georgia, the average estimated wholesale 2019 price is $14.37 per ton. To calculate a fair retail commodity price for crushed stone within the subject property's region, a reasonable industry multiplier of 1.5 will be used, giving a fair 2019 market retail FOB price of $21.56 per ton. For the subject property's pro forma, a weighted price of $19.50/ ton will be used which includes a $2.06 discount to ensure market share gains. This price will offer the subject property's proposed operation the competitive advantage it needs to gain the target market share as outlined in this plan. Some major competitors, such as Vulcan Materials, have distributed letters to contractors indicating that they plan on raising pricing by a full dollar on all crushed stone products beginning in January of 2020.[160]

---

[160] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

| Wholesale USGS Crushed Stone Pricing by Year (US Tons) | | | | |
|---|---|---|---|---|
| State | 2016 | 2017 | 2018 | 2019* |
| Georgia | 12.61 | 13.53 | 13.95 | 14.37 |
| Estimated Retail | 18.92 | 20.30 | 20.93 | 21.56 |

Figure 31: Wholesale and estimated retail pricing for crushed stone products in Georgia. Years 2016 through 2018 are as reported by the USGS Mineral Commodities Survey. *2019 prices have been estimated based on historical pricing escalation



Figure 32: The gross value of the Stone Mining and Quarrying industry in the United States has been on a consistent climb since 1998. This trend has only been broken by the great recession of 2008 but has since recovered and exceeded previous levels. Consistently high prices for construction aggregates have been a primary contributor to this gross output growth.

According to the USGS Commodity Summary (USGS Mineral Commodity Survey 1st Quarter 2020), the calculation of the price per ton based on the total production of crushed stone in the State of Georgia and the State of South Carolina for the year 2019 results in the following analysis based on average wholesale pricing from producers in an attempt to protect any proprietary pricing structures of competitors:

| State | Metric Tonnes Sold/Used | Value | % of Region Pop. |
|---|---|---|---|
| South Carolina | 30,800,000 | $412,000,000 | 20.0% |
| Georgia | 61,000,000 | $1,010,000,000 | 80.0% |

The above pricing is based on average pricing from producers and is given in wholesale numbers, not retail pricing, to protect proprietary prices of competitors. Based on the above percentage sales allocation within each market for the subject property this gives a wholesale price of $15.92 per metric tonne, which needs to be converted to short tons used in the United States by dividing this price by a factor of 1.102 ton per metric tonne. This price equates to $14.45 per ton (short ton).

**EXHIBIT C — 2019 BROWN HARRIS**

Using an estimated industry standard retail conversion factor of 1.5, arrives at a retail commodity fair market price for inclusion in the DCF.

$14.45/ton          x          1.5 retail factor          =          $21.67/ton

Therefore, the pricing at $19.50/ton is conservative and considered reasonable.

Finally, as presented below, in the several price sheets, but specifically in the Vulcan Materials Company, Inc. pricing sheet for Georgia in June 2019, the minimum amount per ton of GDOT aggregate was $18.00 per ton. Further, based on the Market-Specific Pricing Plan Announcement, there was a minimum of $1.00 per ton increase effective January 1, 2020. Therefore, for the pro forma a starting price of $19.50/ton is utilized. This is considered reasonable and conservative for this market.

## Vulcan Materials Company — 2019 CASH List Prices*

| Products ** | Metro Atlanta | North Georgia | Middle Georgia | Southwest Georgia | Coastal Yards | S. Georgia Yards |
|---|---|---|---|---|---|---|
| Crusher Run | $28.00 | $26.00 | $19.05 | $28.00 | $33.60 | $22.35 |
| GAB | $28.00 | $26.00 | $19.05 | $28.00 | $33.60 | $22.35 |
| 3 / 34's / 4's | $29.50 | $28.00 | $22.05 | $29.50 | $34.85 | $28.85 |
| 57's / 56's / 5's | $30.75 | $29.25 | $23.05 | $30.75 | $36.60 | $26.35 |
| 67's / 6's | $30.75 | $29.75 | $25.05 | $31.25 | $36.10 | |
| 7's / 78's | $35.00 | $33.50 | $26.55 | $35.75 | $39.35 | $31.85 |
| 89's | $35.75 | $34.25 | $27.05 | $35.75 | $39.35 | $31.85 |
| 810's | $29.50 | $27.75 | - | $29.25 | - | |
| Man Sand | $34.00 | $32.50 | | $34.00 | $33.85 | |
| Type 1 RR | $33.75 | $32.25 | | $34.25 | | |
| Type 3 RR | $35.75 | $36.25 | $27.55 | $37.75 | $51.35 | |
| Surge | $30.75 | $29.00 | $23.05 | $30.50 | - | |

Metro Atlanta: *Norcross, Kennesaw, Lithonia, Friendship, Cherokee, Grayson, Siloam, Stockbridge, Forest Park, Griffin, Madras, Lithia Springs, Villa Rica, Aragon, Bartow, Adairsville*

North Georgia: *Rabun, Blairsville, Dalton, Dahlonega*

Middle Georgia: *Macon, Postel, Sparta, Augusta*

Southwest Georgia: *Barin, Lagrange*

Coastal Yards: *Savannah, Garden City, Ellabell, Rincon, Springfield, Atkinson*

S. Georgia Yards: *Jesup, Surrency, Lenox, Valdosta, Waycross, Meigs, Douglas*

\* Prices are subject to change without written notice

\*\* Not all Products are available at every plant. Each Plant produces products specific for that plant/geology. Any questions on specific product availability should be directed to your Sales Representative

EXHIBIT C 2018 BROWN-HARRIS



**2018 CASH List Prices***

| Products ** | Metro Atlanta | North Georgia | Middle Georgia | Southwest Georgia | Coastal Yards | S. Georgia Yards |
|---|---|---|---|---|---|---|
| Crusher Run | $27.50 | $25.30 | $18.50 | $27.25 | $32.75 | $25.25 |
| GAB | $27.50 | $25.30 | $18.50 | $27.25 | $32.75 | $25.25 |
| 3 / 34's / 4's | $28.75 | $27.25 | $21.50 | $28.75 | $34.00 | $30.25 |
| 57's / 56's / 5's | $30.00 | $28.50 | $22.50 | $30.00 | $35.75 | $32.00 |
| 67's / 6's | $30.00 | $29.00 | $24.50 | $30.50 | $35.25 | $32.00 |
| 7's / 78's | $34.15 | $32.50 | $25.75 | $34.00 | $38.50 | $34.25 |
| 89's | $34.85 | $33.50 | $26.25 | $34.75 | $38.50 | $34.00 |
| 810's | $28.75 | $27.00 | $28.75 | $28.50 | $28.75 | $28.75 |
| Man Sand | $33.15 | $31.75 | $33.15 | $33.15 | $33.00 | $33.00 |
| Type 1 RR | $33.00 | $31.50 | $33.00 | $33.50 | $50.00 | $50.00 |
| Type 3 RR | $34.80 | $35.25 | $26.75 | $36.75 | $50.00 | $50.00 |
| Surge | $30.00 | $28.25 | $22.50 | $29.75 | $29.75 | $29.75 |

| | |
|---|---|
| Metro Atlanta | *Norcross, Kennesaw, Lithonia, Friendship, Cherokee, Grayson, Siloam, Stockbridge, Forest Park, Griffin, Madras, Lithia Springs, Villa Rica Aragon, Bartow, Adairsville* |
| North Georgia | *Rabun, Blairsville, Dalton, Dahloneg, Ellijay* |
| Middle Georgia | *Macon, Postel, Sparta, Augusta* |
| Southwest Georgia | *Barin, Lagrange* |
| Coastal Yards | *Savannah, Garden City, Ellabell, Rincon, Springfield,* |
| S. Georgia Yards | *Jesup, Surrency, Lenox, Valdosta, Waycross, Meigs, Douglas,Atkinson* |

*  Prices are subject to change without written notice
** Not all Products are available at every plant.  Each Plant produces products specific for that plant/geology.  Any questions on specific product availability
   should be directed to your Sales Representative

## Martin Marietta

### 2017 List Prices
Effective January 1, 2017*

North Georgia District
3325 Paddocks Pkwy, Suite 350
Atlanta, GA 30024
Ph: (678) 965-8555

| PRODUCTS | | Forsyth (770) 887-6711 | Jefferson (706) 693-2453 | Auburn (770) 963-6123 | Lithonia (770) 381-1815 | Newton (770) 385-1818 | Red Oak (404) 720-5789 | Tyrone (770) 487-4387 | Six Mile (706) 235-6041 | Paulding (770) 445-0906 | Chattanooga (423) 891-8900 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BASE | Crusher Run (Commercial) | $24.50 | $24.50 | $24.50 | $24.50 | $24.50 | $24.50 | $24.50 | $24.50 | $24.50 | $23.50 |
| | GAB / DGA Pug (GDOT/TDOT) | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $24.00 |
| COARSE | #3 / #4 Stone | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $25.00 |
| | #5 / #57 Stone | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $25.00 |
| | #6 / #67 Stone | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $25.00 |
| | #7 / #78 Stone | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $28.00 |
| | #89 / #9 Stone | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $28.00 |
| FINE | M-10 / #810 Screenings | $27.00 | $27.00 | $27.00 | $27.00 | $27.00 | $27.00 | $27.00 | $27.00 | $27.00 | $25.00 |
| | FM10 / SM10 / W10 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $29.00 |
| | Pond Sand | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 |
| LARGE | Surge | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 | $26.00 |
| | Rip Rap I & III / Class A & B | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $30.00 |
| | Shot / Graded Solid Rock | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $30.00 |

| Sales Rep: | James Tuten | Jud Dunlevy | Tom Thach |
|---|---|---|---|
| Phone: | (404) 456-0087 | (404) 821-9921 | (404) 456-3350 |

*Prices subject to change without written notice.
Sales tax and freight are not included.
Product pricing does not guarantee availability.
Please call with questions or for verification prior to shipment.

For more information about our locations, please visit: www.martinmarietta.com/products/ag_locator.asp



# 2018 Pricing
Prices are Per Net Ton in Trucks. F.O.B. Plant

**HEIDELBERG**CEMENT Group

| Product | Athens | Fayette | Gainesville | Habersham | Lithonia | Monroe | Savannah | Sparta | Toccoa | Walton |
|---|---|---|---|---|---|---|---|---|---|---|
| Product | | | | | | | | | $ - | |
| #2 | | | | | N/A | N/A | N/A | N/A | $ 28.00 | |
| #3/#34 | N/A | N/A | $ 24.25 | N/A | $ 27.00 | $ 23.25 | $ 39.25 | $ 23.25 | N/A | N/A |
| #4 | $ 25.25 | $ 24.25 | $ 24.25 | | $ 27.00 | $ 23.25 | | $ 23.25 | | |
| #5 | $ 25.50 | $ 26.25 | $ 25.75 | | $ 27.50 | $ 24.25 | | | | |
| #6 | $ 25.75 | $ 25.00 | $ 26.00 | N/A | $ 26.50 | $ 24.25 | | N/A | N/A | N/A |
| #7 | $ 30.25 | | | | | | | | | |
| #8 | | | | | | | | | | |
| #467 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| #57 | $ 27.25 | | | $ 27.00 | $ 28.00 | | | $ 27.25 | | |
| #67 | | | | | | N/A | | | | |
| #78 | N/A | N/A | N/A | N/A | N/A | $ 31.25 | N/A | N/A | N/A | N/A |
| #89 | | $ 31.00 | | | $ 31.50 | | $ 41.25 | | | |
| #810 | N/A | $ 23.00 | N/A | | N/A | $ 26.00 | N/A | Call | N/A | N/A | N/A |
| #10 Screening | $ 23.00 | $ 24.00 | $ 26.00 | $ 26.00 | $ 23.50 | $ 21.50 | $ 27.25 | $ 21.25 | $ 23.75 | $ 25.00 |
| Manufactured | $ 25.25 | $ 27.60 | | $ 28.00 | | | | | $ 28.00 | |
| Pond Sand | $ 17.50 | $ 17.50 | N/A | $ 18.75 | N/A | N/A | N/A | | $ 18.00 | |
| Fill Sand | $ 17.50 | $ 17.50 | $ 20.25 | $ 19.25 | $ 20.50 | $ 14.00 | N/A | $ 18.25 | N/A | $ 18.00 |
| GAB | $ 23.00 | $ 24.00 | $ 23.00 | $ 23.00 | $ 23.50 | $ 21.75 | $ 37.50 | $ 20.25 | $ 23.00 | $ 23.00 |
| Commercial GAB | | N/A | | | | | | | | |
| Recycled Conc | N/A | $ 22.75 | N/A | | N/A | $ 22.25 | N/A | N/A | N/A | N/A | N/A |
| Surge | $ 26.25 | $ 25.25 | $ 26.00 | $ 26.75 | $ 26.50 | $ 25.25 | $ - | $ 25.25 | $ 24.50 | N/A |
| Type 1 Rip Rap | $ 32.25 | $ 28.50 | $ 31.25 | $ 31.00 | $ 31.50 | $ 31.25 | $ 55.00 | $ 31.25 | $ 29.50 | $ 30.00 |
| Type 3 Rip Rap | $ 28.75 | $ 27.00 | $ 30.00 | $ 29.50 | | $ 29.25 | | | $ 28.50 | |
| Shot Rock | $ 30.00 | $ 27.00 | $ 31.25 | $ 28.75 | | | | | $ 28.50 | |

\*\*Products are subject to availability and prices are subject to change

Products do not necessarily meet Department of Transportation specifications.

For certification, please contact the respective quarry. Prices are subject to Georgia Sales Tax, if applicable.

Terms: Net 30 Days (Subject to credit approval.)



June, 2019

**Market-Specific Pricing Plan Announcement**

Dear Valued Partner,

We would like to share with you our pricing plans moving into the second half of 2019. We feel that these prices are necessary going forward to continue to maintain the outstanding quality and service you deserve from us. The prices below reflect the _minimum pricing_ at each location and market outlined below that we will offer going forward on _bid and quoted work_, effective 7/1/2019. Existing sales orders will remain in effect through their specified expiration date. As always, we encourage you to speak to your sales representative to confirm your pricing, which may be higher than listed below. In addition, in order to help you prepare for the future, Vulcan will have a minimum of $1.00 per ton increase on bid and quoted work effective January 1, 2020. If you have any questions about specific projects already quoted, we will be happy to discuss them. All quotes prior to 7/1/2019 will be honored if executed by 8/1/2019.

| Product | Metro Atlanta | | North Georgia | Southwest Georgia | Middle Georgia | South Georgia | | Coastal Georgia |
|---|---|---|---|---|---|---|---|---|
| | • Bartow  • Kennesaw  • Cherokee  • Lithia Springs  • Dahlonega  • Lithonia  • Forest Park  • Madras  • Friendship  • Norcross  • Grayson  • Stockbridge  • Griffin  • Villa Rica | | • Aragon  • Adairsville  • Blairsville  • Dalton  • Ellijay  • Rabun | • Barin  • LaGrange | • Macon  • Pastel  • Sparta  • Augusta  • Siloam | • Jesup  • Surrency  • Lenox  • Valdosta  • Waycross  • Meigs  • Douglas  • Atkinson | | • Savannah  • Garden City |
| | Minimum | | Minimum | Minimum | Minimum | Minimum | | Minimum |
| GAB | $13.00 | | $13.00 | $13.00 | $12.00 | $25.00 | | $25.00 |
| 3's / 34's / 4's | $19.00 | | $19.00 | $19.00 | $18.00 | $32.00 | | $32.00 |
| 57's / 56's / 5's | $19.00 | | $19.00 | $19.00 | $18.00 | $32.00 | | $32.00 |
| Surge | $19.00 | | $19.00 | $19.00 | $18.00 | $39.00 | | $48.00 |
| Rip Rap | $21.00 | | $21.00 | $21.00 | $21.00 | $50.00 | | $52.00 |

Sincerely,

Stephen Ashworth
Vice President of Sales – Georgia

**Price Escalation**

Industry, construction and finance departments are constantly trying to measure fluctuations in supply and demand and therefore the price or cost of materials or goods sold during the lifetime of projects. Trying to constantly manage the costs associated with fluctuations in the market for most raw materials used in multi-year, large dollar-value projects that require a robust supply of aggregates and raw materials becomes time intensive, inefficient and costly to constantly manage and monitor. As such, most firms employ some method of pre-determined price escalations, a set rate increase, attempting to mitigate large fluctuations in the market prices of aggregates mutually beneficial to both parties over the life of the contract by avoiding large losses or gains by either party. The industry standard for price escalation estimates is typically the Producer Price Index (PPI) produced by the Bureau of Labor Statistics and widely accepted by contracting parties nationwide. The chart below demonstrates the PPI typically used in determining the monthly escalation rates in the cost of raw materials.



Figure 33: US Bureau of Labor Producer Price Index Economic Research compiled by the Federal Reserve Bank of St. Louis (FRED) shows a clear trend in rising prices for crushed stone in the US.

A key component in projects being completed on time and within budget is ensuring agreed upon fair and equitable price escalations, at least as far as known material costs are concerned. This necessary consideration, often established in contracts, is demonstrated by the *Mineral Commodity Summaries* published by the U.S. Geological Survey in 2017, "The estimated total output of crushed stone produced for consumption in 2017 was 1.35 billion metric tons."

The importance of an agreed upon rate of escalation is further demonstrated by a study into the percentage increases in metric tons of crushed stone between 2013 and 2014. According to the *U.S. Geological Survey Minerals Yearbook* from 2015: "In 2014, 1,045 operations reported the monetary value of their production with an average unit value of $10.74 per metric ton. In 2015, 1,032 operations reported the monetary value of their production with an average unit value of $11.31 per metric ton, which was an increase of 5.0% compared with that of 2014. Leading U.S. producers reported that prices increased by 7.0% to 8.0% in 2015, which exceeded the historic average for year-over-year increases."

The trend in the increase of the price of crushed stone for the past 15 years has been calculated based on USGS price per ton reported numbers. Based on a least squares statistical method, the price increase for crushed stone products has historically been 4.9% over this period. This data is in line with the Producer Price Index (PPI) for crushed stone products as reported by the Bureau of Labor Statistics. The PPI for the last 15 years has ranged, on an annual change basis, from 1.7% to 9.3% with an average percentage change of 4.3%. Based on these two pricing escalation methods, an annual increase of 4.6% could be used as an average. For the purpose of the subject property's pro forma, a conservative annual price increase of 4.0% will be used after the initial price period in Year 1 for crushed stone products.[161]

## Expenses

Operating expenses for the mining and processing of crushed stone are broken down into several different categories, including the actual mining costs themselves, GSA, property tax, surety bond, reserves for replacement, and reclamation. Many of these costs have been determined based on experience and proprietary information, including information collected from other mineral development properties in the Southern U.S. region. These costs are explored further below.

## Transportation Costs

Transportation costs are generally the responsibility of customer, thus are not included in the Discounted Cash Flow. This pricing is based on the customer providing transportation from the mine to the job and also up to the customer to provide the appropriate quantity of trucks for the project.

## Management/Administrative Costs/Sales/Marketing

Based on the mining operations nationwide and the Technical Due Diligence Business Plan and Market Analysis prepared by Stuart Burgess of Burgex Inc. Mining Consultants, for a privately-owned mining operation the administrative and management cost is generally between 2.0% and 4.0% depending on the commodity mined, the size of the operation, and the size of the operating entity. For the subject property, a GSA cost of 3.0% of annual revenue has been used in the pro forma. This higher percentage has been selected to provide the management of the subject property with additional allocated capital for emergence into an established marketplace.

## Surety Bond

A surety bond will need to be posted as part of the permitting process. This bond is $2,500 per each acre of proposed disturbance in the State of Georgia and can be rotated to new areas as the mining progresses, as long as the areas of previous disturbance have been reclaimed to the satisfaction of the GDOL. For the subject property's pro forma, a disturbance area of 273 acres will be assumed at a cost of approximately $682,500. Although the original pit is assumed to be 72 acres, the entire acreage is assumed for the

---

[161] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

surety bond to be conservative and account for the potential expansion of the quarry in the future.

## Property Taxes

Property taxes are calculated based on the existing use and zoning of the property. The subject property is currently being taxed at approximately $15.09/acre. Once the subject property has been reassessed as a mining property, this tax rate is likely to increase to approximately $32.27/acre, the current property tax rate for mining properties near the subject property in neighboring Warren County. A $40.00/acre tax rate has been assumed as a conservative estimate for the subject property. This will start in year two, when it is assumed the subject property will be reassessed.

## Reserve for Replacements

According to the Technical Due Diligence Business Plan and Market Analysis prepared by Mr. Stuart Burgess, cash reserves are held for replacement of any equipment requiring repairs necessitating capital but can be expensed. This rate is generally set at 1.0% of gross revenue, but a 2.0% figure is used conservatively in the pro forma in order to maintain the operating efficiencies needed to maintain competitiveness within the regional market.

Based on the above information and only considering the period of active mining operations, a replacement allowance of $81,120 is used for year 2, $147,638 is used for year 3, and $197,414 is used for year 4, increasing as revenue increases to maintain the 2.0% of gross revenue.

## Contingency

According to Burgex Inc. Mining Consultants, most mining operations maintain a contingency expense for unknown expenses that may arise during operations and that fall outside of normal Operations and Management (O&M) budgets. These unexpected circumstances may range from increases in mining regulations, to changing market conditions, to increases in property taxes. This contingency would also include the repair and replacement of equipment if it were to exceed the cash reserves for replacement in any given year. This contingency is generally placed in a range between 1.0% and 3.0%, for the subject property a contingency of 2.0% has been assumed. Of note, according to the Technical Due Diligence Business Plan and Market Analysis the contingency expense is estimated to be 1.5%. For the purposes of this analysis, a contingency of 2.0% has been assumed.

## Reclamation

Reclamation at the end of a mining operation involves plant deconstruction, land grading and planting. The surety bond amount is used to calculate the expenses due as a result of the reclamation once mining operations have ceased. The surety bond amount times the total acreage adjusted at 2.5% per year future value will be due in the final year. The 2.5% is indicative of normal growth rates for reclamation bonds. An adjustment for reclamation expense is reduced by 50.0% to take into account the remaining actual land

that requires grading and planting. Most quarries are either left to fill up with water over time and do not require immediate reclamation or are reclaimed in stages as mining operations are moved throughout the property.

Using the above process, reclamation cost at the end of mining operations is estimated to be $341,250 escalated to a future value by 2.50% per year.

## Materials Harvest Cost

The Technical Due Diligence Business Plan and Market Analysis prepared by Stuart Burgess of Burgex Inc. Mining Consultants, states: The actual mining and processing costs themselves are the expenses that contribute the greatest to the final production costs. At the subject property's proposed operation, these, costs will include, labor costs, loading operation costs, fuel, water, maintenance, power, site waste storage/removal, equipment leasing, and other contingencies. The subject property's proposed operation will employ a contractor to mine and process the rock on site. Contract miners generally charge between $7.50 and $9.00 per ton for their services and equipment. This cost does not include diesel fuel which we estimate to be approximately $0.42 per ton. For this analysis, the subject property's proposed operation will use $9.42 per ton during the contract period with a 2.0% escalator each year. This cost is inclusive of fuel expense. A 2.0% annual increase in production costs should be adequate to compensate for increasing labor and material costs to operate the mine and processing facility.

Mining operation profits are taken from net income after accounting treatment of depreciation, amortization, depletion, taxes, etc., whereas the GSA expenses for the management of the plant are usually not taken by the investors/developers and are therefore a straight expense to operations.

## Summary of DCF

According to the Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants, found in the addenda of this report, no first-year production is planned with a ramp up to 1,000,000 tons by year ten, followed by a 3.0% annual increase through year 15. No growth is planned for years 16 through 20. The first year will primarily be spent in obtaining permits, site preparation, road construction, hiring management, overburden stripping, and plant setup, with no production or sales. At these production levels, the subject property's proposed operation will have an aggregate market share of 2.75% in year two and 4.81% by year three at current aggregate demand levels. When adjusted for a projected market demand growth of 2.0% annually, the operation will have a 4.62% market share in year three. With the current growing opportunity in the market region, this should be realistic to accomplish as the subject property's proposed operation will be filling an important market need. It is anticipated that total production over a 20-year mine life will be approximately 16.8 million tons. The bulk of production will serve the road construction market, while the rest of the material will find market in the commercial and residential construction sectors. The proposed operation, over its 20-year mine life as projected in this plan, will mine 39.0% of the available mineable reserves including the 15.0% loss factor.[162]

---

[162] Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants

EXHIBIT C — 2019 BROWN-PARRS

Based on the above analysis by the Technical Due Diligence Business Plan and Market Analysis, Burgex Inc. Mining Consultants, the ability to quickly ramp up production, utilize new and more efficient equipment, account for changes in current and future market pricing trends, and the current deficit in the market area, results in a viable endeavor with a high probability of success. Furthermore, the report states that the granite is of a quality that is currently being utilized by customers within a wider market with shipping available on site and can be easily transported to different regions of the United States should the market conditions dictate.

Additionally, capital requirements for equipment vary from provider to provider. The values provided function as a starting point for cash flow requirements and budget analysis.

## Entrepreneurial Incentive

When analyzing a property with the discounted cash flow analysis detailed in this report, entrepreneurial profit should be considered. Entrepreneurial profit is defined as: "A market-derived figure that represents the amount an entrepreneur receives for his or her contribution to a project and risk; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represents the entrepreneur's compensation for the risk and expertise associated with the development. An entrepreneur is motivated by the prospect of future value enhancement (i.e., the entrepreneurial incentive)."[163] Entrepreneurial incentive is defined as: "The amount an entrepreneur expects to receive for his or her contribution to a project. Entrepreneurial incentive may be distinguished from entrepreneurial profit (often called developer's profit) in that it is the expectation of future profit as opposed to the profit actually earned on a development or improvement."[164] Finally, developer's profit is defined as: "the profit anticipated or earned by the developer of a real estate project."[165] According to market participants, entrepreneurial incentive is typically not included as a line item in the financial analysis of mining operations. Therefore, for purposes of this analysis, entrepreneurial inventive is not included as a line item and considered in the selection of the discount rate.

We have done extensive investigation and continue to do so with respect to the industry methods and standards in regard to entrepreneurial incentive. we have spoke with industry experts and have concluded that within the mining industry, the entrepreneurial incentive is incorporated into the discount rate. Therefore, for the purpose of this appraisal, the entrepreneurial incentive will be considered in the selection of the discount rate.

## Discount Rate

Discount rates as they apply to the appraisal of real estate are best explained using information presented by the Appraisal Institute in the publication *The Appraisal of Real*

---

[163] Dictionary of Real Estate Appraisal, Fifth Edition, pages 67-68
[164] Dictionary of Real Estate Appraisal, Fifth Edition, pages 67
[165] Dictionary of Real Estate Appraisal, Fifth Edition, pages 57

EXHIBIT C 2019 BROWN PARRS

*Estate, 15th Edition*, Pages 429-430. The following quotes provide a brief introduction and summary of discount rates and how they apply to the appraisal of real estate.

"Different discount rates are used to discount cash flows applicable to a specific position or interest in defined real estate. Discount rates are different from capitalization rates. With a discount rate, any anticipated changes in income or value are explicit in the cash flows. With capitalization rates, the changes are implicitly accounted for in the rate."

"A yield rate is a rate of return on capital. It is usually expressed as a compound annual percentage rate. The yield rate considers all expected property benefits (both positive and negative over time), including the proceeds from disposition at the termination of the investment, if any. The term interest rate usually refers to the yield rate for debt capital, not equity capital."

"An internal rate of return (IRR) is the yield rate that is earned for a given capital investment over the period of ownership. The internal rate of return for an investment is the yield rate that equates the present value of the future benefits of the investment to the amount of capital invested. The internal rate of return applies to all expected benefits, including all periodic cash flows and the net proceeds from disposition at the investment's termination. It can be used to measure the return on any capital investment, before or after income taxes."

"An overall yield rate ($Y_0$), or property yield rate, is a rate of return on the total capital invested. It considers all changes in income over the investment projection period as well as the reversion at the end of the projection period. It does not, however, consider the effect of debt financing. Rather, it is calculated as if the property were purchased with no debt capital and thus is sometimes called an unleveraged rate or an unlevered rate. The overall yield rate can be viewed as the combined yield on both the debt and equity capital."

"A discount rate reflects the relationship between income and the value that a market will attribute to that income. Four key components can be identified within a discount rate: the safe rate plus considerations of illiquidity, management, and various risks."

"The suitability of a particular rate of return cannot be proven with market evidence, but the rate estimated should be consistent with the data available. Estimating rates requires appraisal judgment and knowledge of prevailing market attitudes and economic indicators."

Furthermore, according to the American Institute of Minerals Appraisers (Dec. 1995, 1:5, 4), there are times when mining operations fail to account for the differing market expectations associated with the mining community. "O'Connor and McMahon believe that the high discount rates commonly applied to mining projects fail to take into account some fundamental issues. Mining companies are part of an international community and as such should devise their cost of capital accordingly. Using rates significantly above this level, they maintain, is clearly not taking into account market expectations."

Based on the above recommendations from the American Institute of Minerals Appraisers, the appropriate discount rate is settled on only after considering market

EXHIBIT C - 2019 BROWN PARRIS

expectations based on the subject property's location and any potential competition from surrounding properties. As discussed previously, the subject property is located amid an area rich with granite deposits, however, other properties in the area also benefit from the plethora of resources. Despite the abundance of mineral deposits, it is difficult to predict if any surrounding properties will undertake the development of a mining operation. A non-inclusive list of five (5) factors which impact the probability of a surrounding property undergoing the development of a mining operation and thereby creating competition for the subject property's mining operation include:

1. The property owner's motivation and desire to operate a mine

2. The property owner's capital resources and ability to undertake a mining development

3. The specific product mixes on a site and the ease of extracting the materials

4. The access to transportation specific to a property

5. Known plans of the property owner to begin operating a mine on the property.

Moreover, the discount rate for a mineral project is primarily comprised of three (3) principal components:

1. Risk-Free Interest Rate: The value of the long-term, risk-free, real (no inflation) interest rate is approximately 2.5%. Long term averages range from 2.3% to 2.6%.

2. Mineral Project Risk: includes risks associated with reserves (tonnage, mine life, grade), mining (mining method, mining recovery, dilution, mine layout), process (labor factors, plant availability, metallurgy, recoveries, material balances, reagent consumption), construction (costs, schedules, delays), environmental compliance, new technology, cost estimation (capital and operating), and price and market.

3. Country Risk: refers to risks that are related to country-specific social, economic, and political factors.

For the purpose of this analysis, a 12.0% discount rate has been selected to derive the net income levels and arrive at a present worth. This discount rate is appropriate given the risks associated with this type of property and anticipated changes in the investor yield rates over the projection period. The selected discount rate is supported by the property specific range of discount rates provided by surveys of market participants conducted by RealtyRates.com. RealtyRates.com for industrial properties indicate a range of 5.28% to 14.42% (10.27% avg.) and for special purpose properties a range of 6.73% to 19.05% (12.57% avg.). Therefore, based on the investor surveys, a discount range of 12.00% is reasonable and supported.

| RealtyRates.com INVESTOR SURVEY - 4th Quarter 2019* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **DISCOUNT RATES** | | | | | | | | |
| | New Development | | | Acquisitions | | | Recapitalizations | | |
| **Property Type** | **Min.** | **Max.** | **Avg.** | **Min.** | **Max.** | **Avg.** | **Min.** | **Max.** | **Avg.** |
| Apartments | 5.09% | 14.14% | 9.39% | 4.43% | 12.30% | 8.17% | 5.04% | 14.00% | 9.30% |
| Garden/Suburban TH | 5.09% | 12.92% | 8.67% | 4.43% | 11.24% | 7.54% | 5.04% | 12.79% | 8.58% |
| Hi-Rise/Urban TH | 5.97% | 14.14% | 9.50% | 5.20% | 12.30% | 8.27% | 5.91% | 14.00% | 9.41% |
| Student Housing | 5.71% | 13.76% | 9.84% | 4.97% | 11.97% | 8.56% | 5.65% | 13.62% | 9.74% |
| Golf | 5.87% | 19.96% | 14.00% | 5.11% | 17.36% | 12.18% | 5.81% | 19.76% | 13.86% |
| Public Daily Fee Courses | 8.36% | 19.70% | 13.74% | 7.27% | 17.14% | 11.96% | 8.27% | 19.50% | 13.61% |
| Semi-Private Clubs | 6.54% | 19.96% | 14.20% | 5.69% | 17.36% | 12.35% | 6.47% | 19.76% | 14.06% |
| Private Clubs | 5.87% | 18.36% | 13.20% | 5.11% | 15.97% | 11.48% | 5.81% | 18.17% | 13.07% |
| Health Care/Senior Housing | 5.60% | 18.78% | 9.69% | 4.87% | 16.34% | 8.43% | 5.54% | 18.59% | 9.59% |
| Acute Care Facilities | 6.66% | 19.88% | 11.27% | 5.79% | 17.30% | 9.81% | 6.59% | 19.68% | 11.16% |
| Out-Patient Care Facilities | 5.60% | 13.63% | 8.50% | 4.87% | 11.86% | 7.39% | 5.54% | 13.49% | 8.41% |
| Congregate Care Facilities | 6.48% | 15.28% | 9.53% | 5.64% | 13.29% | 8.29% | 6.42% | 15.13% | 9.44% |
| Assisted Living Facilities | 5.84% | 14.07% | 8.70% | 5.08% | 12.24% | 7.57% | 5.79% | 13.93% | 8.61% |
| Industrial | 5.28% | 14.42% | 10.27% | 4.44% | 12.11% | 8.63% | 5.34% | 14.56% | 10.37% |
| Warehouse/Distribution | 5.28% | 12.28% | 9.12% | 4.44% | 10.32% | 7.66% | 5.34% | 12.41% | 9.21% |
| R&D/Flex | 6.35% | 14.42% | 10.60% | 5.33% | 12.11% | 8.90% | 6.41% | 14.56% | 10.71% |
| Climate Controlled/Manufacturing | 5.85% | 13.79% | 9.66% | 4.92% | 11.58% | 8.12% | 5.91% | 13.93% | 9.76% |
| Lodging | 5.73% | 17.53% | 11.92% | 4.81% | 14.73% | 10.01% | 5.56% | 17.00% | 11.56% |
| Full Service Facilities | 5.73% | 14.83% | 12.07% | 4.81% | 12.45% | 10.14% | 5.56% | 14.38% | 11.71% |
| Limited Service Facilities | 6.84% | 17.53% | 12.27% | 5.75% | 14.73% | 10.31% | 6.64% | 17.00% | 11.91% |
| Golf/Gaming/Resort | 6.41% | 16.48% | 11.20% | 5.38% | 13.84% | 9.41% | 6.22% | 15.99% | 10.87% |
| Mobile Home/RV Park/Camping | 5.30% | 16.77% | 10.84% | 4.30% | 13.58% | 8.78% | 5.30% | 16.77% | 10.84% |
| RV Parks/Campgrounds | 6.12% | 16.77% | 11.34% | 4.96% | 13.58% | 9.19% | 6.12% | 16.77% | 11.34% |
| Manufactured Housing | 5.30% | 15.00% | 10.05% | 4.30% | 12.15% | 8.14% | 5.30% | 15.00% | 10.05% |
| Mobile Home Parks | 5.97% | 15.24% | 10.80% | 4.83% | 12.35% | 8.75% | 5.97% | 15.24% | 10.80% |
| Office | 5.38% | 14.05% | 10.31% | 4.68% | 12.22% | 8.97% | 5.33% | 13.91% | 10.21% |
| Suburban | 5.38% | 12.73% | 9.58% | 4.68% | 11.08% | 8.34% | 5.33% | 12.61% | 9.49% |
| CBD | 6.47% | 14.05% | 10.52% | 5.63% | 12.22% | 9.15% | 6.41% | 13.91% | 10.41% |
| Medical | 6.52% | 14.06% | 9.57% | 5.67% | 12.24% | 8.33% | 6.46% | 13.92% | 9.48% |
| Restaurants | 6.59% | 18.57% | 13.69% | 5.60% | 15.79% | 11.63% | 6.32% | 17.83% | 13.14% |
| Full Service | 9.60% | 18.57% | 13.69% | 8.16% | 15.79% | 11.63% | 9.22% | 17.83% | 13.14% |
| Fast Food | 6.59% | 17.51% | 12.74% | 5.60% | 14.88% | 10.83% | 6.32% | 16.81% | 12.23% |
| Retail | 5.48% | 15.70% | 11.00% | 4.71% | 13.50% | 9.46% | 5.37% | 15.38% | 10.78% |
| Anchored | 5.48% | 14.26% | 11.03% | 4.71% | 12.26% | 9.49% | 5.37% | 13.97% | 10.81% |
| Un-Anchored | 6.28% | 15.70% | 11.78% | 5.40% | 13.50% | 10.13% | 6.15% | 15.38% | 11.55% |
| Convenience/Gas | 6.61% | 15.80% | 9.62% | 5.69% | 13.59% | 8.27% | 6.48% | 15.49% | 9.42% |
| Free Standing | 5.88% | 15.28% | 11.56% | 5.06% | 13.14% | 9.94% | 5.76% | 14.97% | 11.33% |
| Self-Storage | 5.47% | 13.57% | 11.08% | 4.65% | 11.53% | 9.42% | 5.47% | 13.57% | 11.08% |
| Climate Controlled | 5.60% | 13.57% | 10.92% | 4.76% | 11.53% | 9.28% | 5.60% | 13.57% | 10.92% |
| Mini Storage | 5.47% | 14.60% | 11.09% | 4.65% | 12.41% | 9.43% | 5.47% | 14.60% | 11.09% |
| Special Purpose | 6.73% | 19.05% | 12.57% | 5.79% | 16.38% | 10.81% | 6.60% | 18.66% | 12.32% |
| Schools/Day Care Centers | 6.73% | 16.08% | 11.16% | 5.79% | 13.83% | 9.60% | 6.60% | 15.76% | 10.94% |
| Churches/Temples/Synagogues | 8.09% | 19.05% | 12.67% | 6.96% | 16.38% | 10.90% | 7.93% | 18.66% | 12.42% |
| All Properties | 5.09% | 19.96% | 11.05% | 4.30% | 17.36% | 9.43% | 5.04% | 19.76% | 10.90% |

*3rd Quarter 2019 Data                                    Copyright 2019 RealtyRates.com ™

EXHIBIT C 2019 BROWN PARRIS

**Burgex Inc. Mining Consultants Discount Rate**

There are several ways to estimate the applicable discount rate. Utilizing the Built-Up Method that considers the degree of risk associated with a safe rate, burden of management, lack of liquidity and perceived additional risk, the rate can be derived as follows:

| Appropriate Discount Rate Calculation by Built-Up Method | |
|---|---|
| Safe Rate for 10-20 year investments | 1.85% - 2.11% |
| PLUS Burden of Management | 2.00% - 3.00% |
| PLUS Lack of Liquidity | 2.50% - 3.00% |
| PLUS General Risk | 2.00% - 3.00% |
| PLUS Preliminary Planning/Development Risk | 1.00% - 2.00% |
| **Total Estimated Discount Rate** | 9.35% - 13.11% |

*Figure 36: A table for calculating an appropriate discount rate range for an aggregate mining operation using the Built-Up Method.*

- The Safe Rate is based on the 10-year and 20-year Treasury Notes.

- The Burden of Management is based on the investor's confidence of having management capable of operating the business in the given sector. Crushed stone operations are considered low risk, especially when compared to other types of mining ventures. The available pool of experienced managers available in the marketplace is high for crushed stone and other aggregate operations.

- The Lack of Liquidity is the risk stemming from the lack of marketability of an investment that cannot be bought or sold quickly enough to prevent or minimize a loss. Aggregate operations present a low risk given the need for construction materials in a given market and relatively low capital investment for the return.

- The General risk factor includes items such as: size, access to capital markets, breadth of customer base, geographic area, key executive dependency, limited product line, litigation / regulatory risk, and volatility of the industry. All of these items can be considered as low risk in the crushed stone industry. The overall aggregate industry is generally considered to be much more stable and less volatile than other mineral markets, such as metal mining.

- The Preliminary Planning/Development Risk is based on the operation being in the planning stage and not an existing mine. Planning stage mining operations have no current cash flow, but are projections based upon research, industry knowledge and experience.

Based on the above, a discount rate of 12.0% is considered realistic and supportable for this project.

## Mining Survey Discount Rates

Below is the PKF Mining Survey from October of 2009. As shown below, it is a summary of discount rates from companies across the world. Further, as shown below, the simple average of the survey below is 11.16%. Excluding the above discount rates for Gem Diamond's Lesotho project and Highland Gold's Rouble denominated cash flows, which reflect higher political or currency risk, the simple average discount rate would be 10.19%.[166]

| Summary of discount rates | |
|---|---|
| Company | % |
| Caledon Resources | 12.00% |
| DiamondCorp | 10.00% |
| Gem Diamonds (Australia project) | 8.60% |
| Gem Diamonds (Lesotho project) | 17.40% |
| GMA Resources | 10.00% |
| Highland Gold (USD) | 10.75% |
| Highland Gold (Rouble) | 14.63% |
| KazakhGold | 10.00% |
| Kenmare Resources | 8.00% |
| Metals Exploration | 10.00% |
| Oxus Gold | 10.00% |
| UK Coal | 12.50% |
| Simple average | 11.16% |

Source: Latest statutory accounts

Furthermore, according to the *KPMG Mining Report 2016*: "the discount rates disclosed by 20 companies ranged from 3.0% to 14.5%. The low end of the range likely applied to producing properties in low-risk jurisdictions, while the high end of the range likely applied to development properties, and/or properties facing moderate-to-high country risk." It should be noted that the United States is considered to have a very low country risk factor. KPMG publishes the results of a survey of reporting major mining companies from across the globe. [167]

## Mining Professionals Opinion on Discount Rates

Mr. Chris Summers, Burgex Inc., Mining Consultants is a senior financial professional with extensive experience in mining and exploration activities and over 20 years in financial management. Mr. Summers has held various senior finance and business analysis roles with Rio Tinto and Nyrstar and has represented several mining companies as a senior consultant in finance M&A related roles. He has played a vital role in analyzing and reviewing key mining and exploration projects and has helped secure funding used to advance several high-profile projects. Mr. Summers indicates mining and exploration projects generally employ one of three project valuation approaches. These approaches or methodologies tend to be applied based on the stage of the project and how much information is available. Further, Mr. Summers explains, when there is sufficient information available the preferred approach is almost always the income approach. It is

---

[166] Most recent chart available from PKF LLP
[167] Most recent KPMG Mining Report specifically referencing discount rates.

EXHIBIT C 2019 BROWN PARRIS

used by the majority of companies in the industry and is generally accepted by industry analysts and management alike.

Mr. Summers states: "The income approach employs the use of the discounted cash flow analysis where future project cash flows are discounted back to their current value. Key components of the analysis are: capital costs, operating costs, revenues and the discount rate. In addition, all cost and revenue forecasts are in cash terms and accounting methodologies and measurements like "accruals" and "profit" do not apply to the valuation."

Mr. Summers indicates larger companies with sophisticated management in place use discount rates between 4.0% to 7.0%. Mid-sized companies with less access to capital and higher risk profiles generally use discount rates between 7.0% to 10.0%. Smaller companies with higher risk profiles use discount rates between 10.0% to 15.0%. According to Mr. Summers, rarely has he seen a project in this industry employ a discount rate above 15.0%. In conclusion, Mr. Summers is of the opinion with sand, gravel and stone operations of small to mid-size generally employ discount rates between 10.0% to 12.0%.

## Conclusion

A Discount Rate is now reconciled from the results of the following methods applied.

- Investor Surveys 5.28% to 14.42%

- Based on the Technical Due Diligence Business Plan and Market Analysis prepared by Stuart Burgess of Burgex Inc. Mining Consultants at 12.0%.

- KPMG Mining Report discount rates ranging from 3.0% to 14.5%

- PKF Mining Survey reports a discount rate range of 8.0% to 12.5% with a weighted average of 10.19%[168]

- Mr. Chris Summers concludes to 10.0% to 12.0%

It is our opinion that a discount rate of 12.0% is considered realistic and supportable for this project. Mr. Burgess is a mining consultant with extensive experience in mining consultation and his analysis of the subject property is based on a discount rate of 12.0%.

The appraisers have considered the Discount Rate estimate from several methods. Therefore, an overall discount rate of 12.0% is utilized herein. The value opinion of the subject property by the Income Approach is presented below and on the following pages.

---

[168] As indicated above the two with higher political or currency risk were not included.

**Mid-Year Convention**

The discounted cash flow projections, calculations and analysis included in this report are based on a discount factor derived using mid-year convention analysis. Mid-year convention discount factor analysis uses organization mid-year revenue to establish the discount factor, rather than new-year or end-of-year (EoY) revenue numbers to determine the factor as an alternate method. The appraisers believe using mid-year revenue arrives at a more reasonable estimate for the average monthly revenue generated for the year. This opinion is substantiated by John A. Bogdanksi in the Federal Tax Valuation (para. 3.05[5][b][vi], at 3-135, 2012), "Mid-year convention better reflects the fact that operating revenues are often received throughout the year." Based on the above position regarding discount factor calculations, the present value factor calculated on a mid-year cash flow basis is $\frac{1}{(1+r)^{(n-0.5)}}$

The appraisers analyzed the findings of Mr. Stuart Burgess, Burgex Inc. Mining Consultants and GeoLogic, LLC as well as previous reports of subsurface material across the Southeast from other mining experts. It is the appraisers' opinion that the analysis provided from Burgex Inc. Mining Consultants, found in this report and in the addenda of this report supports the conclusions found herein. The appraisers relied on the analyses of the professional geologists and mining consultants provided and referenced throughout this report. However, based on the appraisers' extensive experience appraising properties with subsurface rights and with respect to the aforementioned, the conclusion of value is the appraisers' conclusion.

# EXHIBIT C 2019 BROWN HARRIS

| Discounted Cash Flow | 272.98 Acres | | | | | |
|---|---|---|---|---|---|---|
| | | | Year 1 | Year 2 | Year 3 | Year 4 |
| Product Produced | % Product Sold in Market | Price Per Short Ton | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold |
| Total Volume (Short Tons) Start up 1-3 | | | 0 | 200,000 | 350,000 | 450,000 |
| Weighted Average Price Per Short Ton of Material | | $19.50 | $19.50 | $20.28 | $21.09 | $21.93 |
| Price Appreciation | 4.0% | | | | | |
| | | | | | | |
| Gross Income | | | $0 | $4,056,000 | $7,381,920 | $9,870,682 |
| | | | | | | |
| Expenses | | | 1 | 2 | 3 | 4 |
| Start-Up Costs (Exploration-Permiting-Plant-Equipment) | | | $4,646,180 | | | |
| Mining Cost Per Short Ton of Material | $9.42 | 2.00% | $9.42 | $9.61 | $9.80 | $10.00 |
| Total Mining Cost | | | $0 | $1,921,680 | $3,430,199 | $4,498,461 |
| General Management/ Sales/Marketing/Administration | 3% | | $0 | $121,680 | $221,458 | $296,120 |
| Surety Bond Total Acres Bonded | $2,500 | 273 Acres | $682,500 | $0 | $0 | $0 |
| Property Taxes $15.09/Acre, then $40.00/Acre | 2.0% | | $2,664 | $11,138 | $11,360 | $11,588 |
| Reserves for Replacement | | 2% | $0 | $81,120 | $147,638 | $197,414 |
| Contingency Expenses | 2.0% | | $0 | $81,120 | $147,638 | $197,414 |
| Sustaining Capex | | | $0 | $435,073 | $435,073 | $435,073 |
| Reclamation at End of Life | $341,250 | 2.5% | | | | |
| | | | | | | |
| Total Annual Expenses | | | $5,331,344 | $2,651,811 | $4,393,367 | $5,636,069 |
| Total Annual Expenses Less Capital Costs | | | $685,164 | $2,651,811 | $4,393,367 | $5,636,069 |
| Total Expenses Per Short Ton Less Capital Costs | | | 0 | $13.26 | $12.55 | $12.52 |
| | | | | | | |
| Average Selling Price Short Ton of Material | | | $19.50 | $20.28 | $21.09 | $21.93 |
| Net Income per Short Ton of Material | | | $19.50 | $7.02 | $8.54 | $9.41 |
| Cost as Percent of Revenue | | | 0.00% | 65.38% | 59.52% | 57.10% |
| | | | | | | |
| Net Annual Income | | | -$5,331,344 | $1,404,189 | $2,988,553 | $4,234,613 |
| | | | | | | |
| Present Value of $1 Based on Discount Rate Below | | | 0.94491 | 0.84367 | 0.75328 | 0.67257 |
| Discount Rate | 12% | | | | | |
| Yearly Present Value of Net Income | | | -$5,037,646 | $1,184,673 | $2,251,210 | $2,848,070 |
| | | | | | | |
| Running Total of Present Value | | | -$5,037,646 | -$3,852,973 | -$1,601,763 | $1,246,307 |

| Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|
| Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold |
| 550,000 | 650,000 | 750,000 | 850,000 | 950,000 | 1,000,000 | 1,030,000 | 1,060,900 |
| $22.81 | $23.72 | $24.67 | $25.66 | $26.69 | $27.75 | $28.86 | $30.02 |
| $12,546,733 | $15,421,076 | $18,505,291 | $21,811,569 | $25,352,742 | $27,754,580 | $29,730,706 | $31,847,533 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| $10.20 | $10.40 | $10.61 | $10.82 | $11.04 | $11.26 | $11.48 | $11.71 |
| $5,608,081 | $6,760,287 | $7,956,337 | $9,197,526 | $10,485,180 | $11,257,772 | $11,827,415 | $12,425,882 |
| $376,402 | $462,632 | $555,159 | $654,347 | $760,582 | $832,637 | $891,921 | $955,426 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $11,819 | $12,056 | $12,297 | $12,543 | $12,794 | $13,049 | $13,310 | $13,577 |
| $250,935 | $308,422 | $370,106 | $436,231 | $507,055 | $555,092 | $594,614 | $636,951 |
| $250,935 | $308,422 | $370,106 | $436,231 | $507,055 | $555,092 | $594,614 | $636,951 |
| $435,073 | $435,073 | $435,073 | $435,073 | $435,073 | $435,073 | $435,073 | $435,073 |
| $6,933,245 | $8,286,891 | $9,699,078 | $11,171,952 | $12,707,738 | $13,648,715 | $14,356,948 | $15,103,859 |
| $6,933,245 | $8,286,891 | $9,699,078 | $11,171,952 | $12,707,738 | $13,648,715 | $14,356,948 | $15,103,859 |
| $12.61 | $12.75 | $12.93 | $13.14 | $13.38 | $13.65 | $13.94 | $14.24 |
| $22.81 | $23.72 | $24.67 | $25.66 | $26.69 | $27.75 | $28.86 | $30.02 |
| $10.21 | $10.98 | $11.74 | $12.52 | $13.31 | $14.11 | $14.93 | $15.78 |
| 55.26% | 53.74% | 52.41% | 51.22% | 50.12% | 49.18% | 48.29% | 47.43% |
| $5,613,488 | $7,134,185 | $8,806,213 | $10,639,618 | $12,645,003 | $14,105,865 | $15,373,758 | $16,743,673 |
| 0.60051 | 0.53617 | 0.47872 | 0.42743 | 0.38163 | 0.34074 | 0.30424 | 0.27164 |
| $3,370,945 | $3,825,121 | $4,215,723 | $4,547,690 | $4,825,760 | $4,806,495 | $4,677,252 | $4,548,241 |
| $4,617,252 | $8,442,373 | $12,658,096 | $17,205,786 | $22,031,547 | $26,838,042 | $31,515,294 | $36,063,535 |

EXHIBIT C 2019 BROWN HARRIS

| Year 13 | Year 14 | Year 15 | Year 16 | Year 17 | Year 18 | Year 19 | Year 20 | Total |
|---|---|---|---|---|---|---|---|---|
| Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | |
| 1,092,727 | 1,125,509 | 1,159,274 | 1,159,274 | 1,159,274 | 1,159,274 | 1,159,274 | 1,159,274 | 17,014,780 |
| $31.22 | $32.47 | $33.77 | $35.12 | $36.52 | $37.98 | $39.50 | $41.08 | |
| $34,115,077 | $36,544,071 | $39,146,008 | $40,711,849 | $42,340,323 | $44,033,936 | $45,795,293 | $47,627,105 | $534,592,492 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | Total |
| | | | | | | | | $4,646,180 |
| $11.95 | $12.19 | $12.43 | $12.68 | $12.93 | $13.19 | $13.45 | $13.72 | |
| $13,054,632 | $13,715,197 | $14,409,185 | $14,697,369 | $14,991,317 | $15,291,143 | $15,596,966 | $15,908,905 | $203,033,534 |
| $1,023,452 | $1,096,322 | $1,174,380 | $1,221,355 | $1,270,210 | $1,321,018 | $1,373,859 | $1,428,813 | $16,037,775 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $682,500 |
| $13,848 | $14,125 | $14,408 | $14,696 | $14,990 | $15,290 | $15,595 | $15,907 | $257,053 |
| $682,302 | $730,881 | $782,920 | $814,237 | $846,806 | $880,679 | $915,906 | $952,542 | $10,691,850 |
| $682,302 | $730,881 | $782,920 | $814,237 | $846,806 | $880,679 | $915,906 | $952,542 | $10,691,850 |
| $435,073 | $435,073 | $435,073 | | | | | | $6,091,022 |
| | | | | | | | $559,178 | $559,178 |
| $15,891,609 | $16,722,480 | $17,598,887 | $17,561,894 | $17,970,129 | $18,388,808 | $18,818,232 | $19,817,887 | $252,690,941 |
| $15,891,609 | $16,722,480 | $17,598,887 | $17,561,894 | $17,970,129 | $18,388,808 | $18,818,232 | $19,817,887 | $248,044,761 |
| $14.54 | $14.86 | $15.18 | $15.15 | $15.50 | $15.86 | $16.23 | $17.10 | |
| $31.22 | $32.47 | $33.77 | $35.12 | $36.52 | $37.98 | $39.50 | $41.08 | |
| $16.68 | $17.61 | $18.59 | $19.97 | $21.02 | $22.12 | $23.27 | $23.99 | |
| 46.58% | 45.76% | 44.96% | 43.14% | 42.44% | 41.76% | 41.09% | 41.61% | |
| $18,223,468 | $19,821,591 | $21,547,122 | $23,149,954 | $24,370,194 | $25,645,128 | $26,977,061 | $27,809,217 | $281,901,551 |
| 0.24254 | 0.21655 | 0.19335 | 0.17263 | 0.15414 | 0.13762 | 0.12288 | 0.10971 | |
| $4,419,832 | $4,292,351 | $4,166,083 | $3,996,417 | $3,756,312 | $3,529,307 | $3,314,830 | $3,050,966 | $66,589,632 |
| $40,483,367 | $44,775,718 | $48,941,801 | $52,938,218 | $56,694,530 | $60,223,837 | $63,538,667 | $66,589,632 | $66,589,632 |

EXHIBIT C 2019 BROWN-PARRIS

### 6.3.2.2.    Sales Comparison Approach

A fundamental part of the Sales Comparison Approach is using properties with similar highest and best uses; thus, it was necessary to determine the highest and best use of the subject property prior to employing the sales comparison approach. As stated on page 338 of The Appraisal of Real Estate, 15th Edition published by the Appraisal Institute: "Regardless of how physically similar a potentially comparable site is to the subject site, the most comparable sales would have the same or a similar highest and best use. Markets without recent sales of comparable sites are problematic and may require analysis of competing sites where sufficient data are available or alternative land valuation methods may be considered." There are a limited number of mine sales in the United States.

Mr. Trevor R. Ellis, MCA, CPG, M. AusIMM, and J. Ballard, Resource Finance Consultant of Ellis International Services in Denver, Colorado discuss and present rational strategies for discounted cash flow methodologies and net present value in *Valuation Methodologies for Mines and Mineral Tenements.* They both recommend DCF as the primary method for valuing operating mines, or mineral assets with an indicated resource and a feasibility study containing engineering, production and capital estimates and operating cost data.

Not only are there significant obstacles to finding comparable mining sales, the owners of said mines are often averse to discussing the details of transactions. The appraisers performed extensive research and were extremely persistent in the quest for pertinent information relevant to any mine sales. However, since the comparable sales are often in very different geographic and demographic areas, vary in the type of product mined, and limited sales data is attainable from market participants, the Sales Comparison Approach is deemed not applicable in determining the value of a mine. The Income Approach is deemed the preferred method of analysis. According to Mr. Trevor Ellis, Ellis International Services, in the *Sales Comparison Valuation of Development and Operating Stage Mineral Properties*, "Large value adjustments are generally necessary when conducting mineral property transaction comparisons. These can be greater than 100.0% for each fundamental deposit factor such as tonnage, grade, depth, or thickness, and also for non-physical factors such as political or regulatory risk. Adjustments for mineral deposits are typically multiplicative. Therefore, total adjustments may be greater than 10-fold." Therefore, the appraisers did not utilize the Sales Comparison Approach.

Furthermore, predicated on information from mining industry appraisers and engineers and publications such the *Valuation of Properties in the Extractive Industries*, Guidance Note (GN) 14 of the *International Valuation Standards Eighth Edition 2007* (IVSs), "The income approach calculates fair value by discounting estimated future cash flows. Given the difficulties associated with the cost and market approaches, fair values of minerals or oil and gas properties are normally derived using the Income Approach."

Detailed property information from the Technical Due Diligence Business Plan and Market Analysis prepared by Burgex Inc. Mining Consultants, is included in the Addenda. Mr. Burgess's analysis details market information, experience as a consultant and expertise in mine development. The information contained in the aforementioned report profiles the income stream and all the necessary expenditures, expenses, and yearly operation of the mine. The appraisers have determined that the most preferred

EXHIBIT C - 2019 BROWN-PARRIS

approach to value is the Discounted Cash Flow analysis supported with reliable market data made available in the Technical Due Diligence Business Plan and Market Analysis.

According to Robert H. Paschall, in *The Appraisal of Mineral Producing Properties*, ASA Valuation, American Society of Appraisers, 1974, "The capitalized income method is the only method appropriate to appraise an active construction-rock operation." Furthermore, according to Donald W. Gentry and Thomas J. O'Neil, Dr., *Mining Investment Analysis*, Society of Mining Engineers, American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc. New York, New York, 1986, page 14, "the preferred method for mining property valuation and the one universally used in the commercial practice is the income approach. Because mines have limited operating horizons and because there are well established markets for mineral commodities, the income approach is widely used in valuing mineral properties. The approach is used commonly by the mining industry in assessing investment rates of return and determining appropriate purchase prices for mines or mineral prospects."

As stated earlier in this report, it is the appraisers' opinion, due to the professional reports provided, the subject property is classified as a Development Property with a Pre-Feasibility Study completed at a minimum as of the date of this appraisal. A qualified drilling company under the guidance of a Professional Geologist drilled the subject property, a Qualified Laboratory tested the material, a Professional Geologist along with a Professional Engineer evaluated the reserves on-site based on the physical characteristics of a subject property, a mining consultant working in tandem with the Professional Geologist and Professional Engineer evaluated the supply and demand as well as the target market. Further, the mining consultant established the permitting schedule, the market pricing, production schedule, the capital expenditures, the operating costs, and the life of mine. All of the above is only possible on the subject property as it is a unique property that has the quality and quantity of material on-site that is financially feasible to extract. The subject property within this appraisal report is unique as detailed in each of the professional reports provided and included in the addenda of this appraisal report.

According to Svetlana Baurens in, *Valuation of Metals and Mining Companies*, the DCF method is not applicable without "reasonably assured mineral reserves." This plan should include rates, test results, capital and operating cost, environmental and reclamation cost, and any other necessary projections. Ms. Baurens states, "It must be taken into consideration that DCF is not applicable to early-stage projects without reasonably assured mineral reserves, workable mining plants with rates, metallurgical test results and process recoveries, capital and operating cost estimates, environmental and reclamation cost estimates and commodity price projections. The reason of this is the theory behind DCF: the value of every asset is simply the present value of the cash flows this asset produces over the lifetime. One must have enough information that we can reasonably estimate cash flows from production. Therefore, DCF is only appropriate for mineral properties in production, very near production or for mineral properties at the stage of development. In these cases, the economic viability of the property will be based on preliminary estimates of production, revenue and cost. Despite the preliminary nature of the underlying estimates, it is still generally accepted that discounted cash flow analysis is the best method of valuing mineral properties at this stage of development."

EXHIBIT C 2019 BROWN-HARRIS

As stated throughout this report, the subject property has proven mineral reserves. Further, this report details projected pricing, test results, capital and operating costs, environmental and reclamation costs, and other necessary projections for the use of a DCF analysis. Therefore, it is the appraisers' opinion the use of the DCF method was applicable.

The subject property's location in the Southeast and its physical characteristics (existing granite deposits), along with the information and recommendations from the Technical Due Diligence Business Plan and Market Analysis, suggest a discounted cash flow analysis reflecting a mining property is appropriate and has been developed. The technical reports analyzed, provide enough information that the appraisers can reasonably estimate a value opinion using a cash flow.

**Determination of Larger Parcel**

Appraisals of conservation easements for income tax purposes must consider the conservation easement's impact on any contiguous property, referred to as Contiguous Family-Owned Property (CFOP), owned by the donor or the donor's family. As stated throughout this report, Log Creek LLLP owns contiguous acreage. Since the highest and best use for the subject property is different from the highest and best use of the Southern Tract and Northern Tract, each will be valued separately in the pre-conservation easement scenario and the post-conservation easement scenario.

EXHIBIT C 2019 BROWN PARRIS

### 6.3.3.   Highest and Best Use (Southern Tract & Northern Tract)

Highest and Best Use is defined in Chapter 17 Page No. 305, in the 15th edition of "The Appraisal of Real Estate," published by the Appraisal Institute, and adopted by Treasury Regulation § 170, as the reasonably probable use of property that results in the highest value, as of the date of the appraisal.

The highest and best use is further described by the Appraisal Institute as the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible and results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physically possible, financially feasible, and maximum productivity. Alternatively, the probable use of land or improved specific property with respect to the user and timing of the use is adequately supported and results in the highest present value. This determination is not based on quantitative means nor is it a fact to be found, but instead relies heavily on the appraiser's judgment as well as his analytical skill. It is of note that the highest and best use may differ from the existing use when there are existing improvements. However, the existing use will continue unless and until the land value in its highest and best use, represents the premise upon which value is based.

The purpose of determining the Highest and Best use for a specific property is to identify the demand for appropriate potential uses, identify demand for a particular property type, compare cost and value if specific market criteria are fulfilled, then of the appropriate potential uses determine the use that produces the maximum value. Based on the determination of the Highest and Best Use, the appropriate comparable properties are then selected for the Sales Comparison Approach

**Legally Permissible**

The excluded property, the Southern Tract (600.25 Acres) is located on the south side of Raytown Road and the Northern Tract (368.89 Acres) is located along the north side of Raytown Road and the north and east side of Fair Play Road. The surrounding area primarily consists of residential and agricultural land uses. The concentration of population and supportive commercial and industrial development is located in Washington, Georgia to the north, Augusta, Georgia to the east, and Athens, Georgia to the northwest of the subject property. As stated throughout this report, the subject property is currently zoned A-1 Agricultural District. This zoning district is comprised primarily of raw land, open farmland and land used for agricultural, livestock, and poultry production.

The owners own no other lands that are contiguous to the subject property. Therefore, the total acreage unencumbered by the conservation easement is the 600.25-Acre Tract (Southern Tract) and the 368.89-Acre Tract (Northern Tract). In general, the area surrounding the Northern and Southern tracts is suited for agricultural/recreational development due to its location along Raytown Road and Fair Play Road in close proximity to the City of Washington.

**Physically Possible**

The Southern Tract and the Northern Tract and their uses are affected by their physical characteristics which include, but are not limited to: location, street frontage,

size, shape, street access, availability of utilities, easements, soils and subsoils, and topography.

Due to the Southern Tract's positioning and ingress/egress to and from Raytown Road, it is considered to have average access. Due to the Northern Tract's positioning and ingress/egress to and from Raytown Road and Fair Play Road, it is considered to have average access. Both the Southern Tract and the Northern Tract have gently sloping topography and is wooded and open land. Therefore, the Southern Tract and Northern Tract have the characteristics and the potential for agricultural or recreational development. There are a variety of physically possible uses for the Southern Tract and Northern Tract due to their location that would conform with the Southern Tract's and Northern Tract's location, size, shape, and topography.

**Financially Feasible**

The Southern Tract and Northern Tract are located within an agricultural and recreational area. A number of agricultural and recreational uses are located in the area, surrounding the Southern Tract and Northern Tract. This area is well known as recreational land. In the market area, properties such as the Southern Tract and Northern Tract's appeal to owners interested in properties that are suited for recreation and/or agricultural uses. The Southern Tract and Northern Tract are suited for recreational or agricultural development as evidenced by its location near other recreational land and agricultural land. Land prices vary based on location, access, visibility, on-site improvements, size, and site development quality. As demonstrated in the Sales Comparison Approach found within this report, sufficient demand exists for an adequate return to the land. In summary, a financially possible use for both the Southern Tract and Northern Tract would be recreational or agricultural development.

**Maximally Productive**

The Southern Tract and Northern Tract were analyzed, and it was determined that the most reasonably probable use that would produce the most benefits was the use of the Southern Tract and Northern Tract as recreational or agricultural land. Although, there were other uses that would potentially produce a positive cash flow, the development that would generate the highest return was agricultural or recreational land. This conclusion was supported by current market conditions, the level of current economic growth in Taliaferro County and the surrounding area and existence of other agricultural developments in the area.

**Conclusion**

The foregoing Highest and Best Use analysis is used to establish the basis for valuation and demonstrate the most feasible use of the Southern Tract and Northern Tract. The Southern Tract and Northern Tract could be used as agricultural development or recreational use development.

Due to the location of the Southern Tract and Northern Tract, and considering the foregoing possible land uses, developing the Southern Tract and Northern Tract as an agricultural or recreational development establishes the greatest return to the land under

EXHIBIT C - 2019 BROWN-HARRIS

current market conditions. This conclusion is based on the population growth, the economic growth in Georgia, and the aesthetics of the natural surroundings.

Based on current market conditions, the Southern Tract's location and the Northern Tract's location, and the demand in the area, the highest and best use is as an agricultural or recreational development for both the Southern Tract and Northern Tract.

### 6.3.3.1.    Sales Comparison Approach (Southern Tract & Northern Tract)

The Sales Comparison Approach is used to determine the fair market value of the Southern Tract and Northern Tract. A fundamental part of the Sales Comparison Approach is using properties with similar highest and best uses; thus, it was necessary to determine the highest and best use of the Southern Tract and Northern Tract prior to employing the sales comparison approach. As indicated on page 363 of The Appraisal of Real Estate, 14th Edition published by the Appraisal Institute, "Regardless of how physically similar a potentially comparable property is to the subject property, the sale property is not truly comparable if it does not have a similar highest and best use as the subject property, and in that case the potentially comparable property should be dismissed from further consideration in the analysis of the subject property."

Valuation of the Southern Tract and Northern Tract by the Sales Comparison Approach, based on the following, utilizes the sales price per lot. Detailed analysis of the comparable sales and a location map follow this discussion.

The Southern Tract and Northern Tract consist of vacant land with no significant improvements or site improvements in Taliaferro County, Georgia; therefore, neither the Cost Approach nor the Income Approach were applicable or meaningful to this analysis.

**Methodology**

The comparable sales utilized in this analysis represent the most recent transactions of properties considered to be most similar to the highest and best use of the Southern Tract and Northern Tract, with respect to location and use characteristics. Due to the Southern and Northern Tract's physical characteristics, comparable properties with similar highest and best uses from the region are considered. The adjustments found within this report (qualitative adjustments) are not calculated by a mathematical formula, but represent our professional judgment based on our experience in this market and knowledge of the Southern Tract and Northern Tract, the Southern Tract's and the Northern Tract's market area, the comparable sales, and information from brokers, property owners, and other market participants involved in the transactions analyzed or transactions similar to the subject property. As stated throughout this report, the Southern Tract's and the Northern Tract's Highest and Best Use is as agricultural or recreational development. Based on our professional opinion and an in-depth study of the market, it has been determined the Highest and Best Use of the Southern Tract and the Northern Tract before the donation of the conservation easement on the 272.98 acres, is for development as agricultural or recreational development. Therefore, an analysis of comparable land, was conducted to determine the estimated value of the Southern Tract and the Northern Tract. Additionally, as the adjustments presented in the report are qualitative adjustments, the appraisers utilize the

EXHIBIT C 2019 BROWN PARRIS

[+] symbol to indicate a comparable property is inferior to the Southern Tract and the Northern Tract and the [-] symbol to indicate a comparable property is superior to the Southern Tract and the Northern Tract, with multiple symbols indicating varying levels of superiority or inferiority. Finally, the appraisers reserve the right to adjust their opinion of value if the development costs are significantly higher or lower than originally anticipated and provided to the appraisers.

**Participant Interviews**

The appraisers interviewed a variety of brokers and market participants that are familiar with rural residential and agricultural properties. According to the brokers and market participants, each piece of land is unique, and each buyer or developer is focused on different types of characteristics of each individual property.

All the market participants agreed that every sale is unique, and each sale has its own set of challenges. The appraisers inquired about the importance of physical characteristics to a property and although all agreed that physical characteristics such as location, size, on-site improvements, utility, topography, etc. were important, there was a difference in the overall weight placed on each one. It should be noted that all those interviewed indicated that there was a demand for similar properties and that the demand is driven by local population and economic factors in the area.

The adjustments made throughout this report, were based on market participants interviews, and our general and specific knowledge of rural residential and agricultural land. It should be noted that the professionals interviewed, indicated that due to the uniqueness of each property and each deal, analyzing physical property characteristics based on experience and professional judgment may be appropriate.

**Paired Sales, Grouped Sales, and Secondary Data Analyses**

Paired Data Analysis is based on the premise that two properties are equivalent in all respects but one, the resulting difference can be measured by the difference in price between the two properties. Grouped Data Analysis extends the logic of paired sales analysis to larger data sets. Comparable sales in the Grouped Data Analysis are grouped by an independent variable such as location or date of sale and then the groups are studied as pairs. "Paired data analysis should be developed with extreme care to ensure that the properties are truly comparable and that other differences do not exist". "Although paired data analysis of sales or rents is a theoretically sound method, it may be impractical and produce unreliable results when only a narrow sampling of sufficiently similar properties is available."[169] Finally, Secondary Data Analysis, is utilized to support adjustments derived by other methods that does not directly pertain to the subject or comparable properties. Secondary data describes the general real estate market and is typically collected by a data vendor research firm or government agency like the U.S. Census Bureau or county assessor. It is the appraisers' opinion that the Paired Sales, Grouped Sales, and Secondary Data Analyses are unreliable and impractical due to the amount of relevant data.

---

[169] *The Appraisal of Real Estate 14th Edition*, *(Pages 398-399).*

**Statistical Data Analysis**

Furthermore, statistical data methods may be used to calculate adjustments to comparable sales. As stated in the *Appraisal of Real Estate* using statistical analysis requires the appraiser to understand and properly apply fundamental statistical concepts. "In applying statistical analysis, the appraiser must be careful not to develop a result that is mathematically precise yet logically meaningless or inappropriate for the particular appraisal."[170] Due to the uniqueness of the Southern Tract and the Northern Tract, and the relative size of the data sample, statistical analysis is not considered a reliable technique for this property.

**Trend Analysis**

Trend analysis is a technique to analyze comparable properties and measure/identify trends in the sale prices. It is useful when sales data on highly comparable properties is absent, but a broad database on properties with less similar characteristics is available. Testing various factors that influence sale prices is then performed to measure market sensitivity. Typically, trend analysis is applicable when a large amount of market data is available. However, as in the case of the Southern Tract and the Northern Tract, there is not a large pool of relevant data to perform a trend analysis, thus it is the appraisers' opinion that it would not provide a meaningful basis for adjustments to the comparable sales.

**Graphic Analysis**

Graphic analysis is a variant of statistical analysis which involves quantitative techniques used to identify and measure adjustments to the sale prices of comparable properties. Upon graphing the comparable data, an appraiser interprets the graphically displayed data visually or through curve fit analysis. The limitations for graphical analysis are similar to statistical analysis as stated earlier in this report.

**Transactional Adjustments**

**Financing Terms**

When developing an opinion of the value of a property, the appraisers must ascertain whether or not any existing financing is assumable, retireable, or replaceable. Also, the appraisers must estimate the potential value impact of the cost items such as finder's fees, points, and prepayment penalties and the effect of the present worth of participation by lenders, if any. The appraisers should also judge the duration of any favorable or unfavorable influence from mortgages or participations. It should not be assumed that the benefits or detriment due to financing will continue throughout the stated amortization or participation terms. The value impact of a mortgage fluctuates as interest rates rise and fall. The possibility of retiring unfavorable financing prior to its full payout period should also be considered.[171] Based on the aforementioned analysis, the transaction price of one property may differ from that of an identical property due to different financing arrangements. The terms of sale are analyzed individually on each

---

[170] *The Appraisal of Real Estate 14th Edition, (Page 400).*
[171] Appraisal Institute, *Cash Equivalency in Valuations*

comparable sale included in this report. Cash equivalency adjustments for atypical financing, if required, are made to the individual comparable sales. To the best of the appraisers' knowledge, the terms of the individual comparable sales were all cash to the seller sales; therefore, additional adjustments in this analysis are not required.





*Projected Annual Inflation Rate in the United States from 2010 to 2021 (Statista)*

### Conditions of Sale

The conditions of sale adjustments are made to reflect the motivations of the buyer and seller. Many transactions are completed with either one side or the other being motivated beyond the typical motivation found within a market, i.e., seller wants

EXHIBIT C 2019 BROWN-HARRIS

to sell quickly and is willing to sell under market or a buyer owns an adjacent parcel and wants the new parcel (plottage) and is willing to pay over market. Furthermore, it is not uncommon for sales to occur due to some type of seller financial duress, where the seller needs the money and is willing to sell under market in order to liquidate quickly. The majority of comparable sales utilized in this analysis represent transactions of typical market conditions. Finally, discussions with real estate brokers that have active listings of similar properties have indicated that, through knowledge of the market, negotiations, and due diligence, a prudent investor would typically make an offer below asking price ranging from 5.0% to 30.0%.

**Market Conditions**

Adjustments to the comparable properties for market conditions (date of sale) reflect changes in the market during the time period covered by the data. Real estate and price expectations varies from asset to asset and is based on location. According to the National Association of REALTORS®, Research Division, the U.S. Economic Outlook: April 2020, the annual growth rate in the 4th quarter of 2019 was 1.8%, and an overall 2019 growth rate of 2.1%.[172] Furthermore, the chart presented below, includes the increases in the Real GDP, interest rates, and other market data. Due to the increase in the national economy and commercial real estate in general, a positive adjustment in this analysis for market conditions would be considered appropriate for sales from the first quarter of 2016 and older.

[172] www.realtors.org/research-and-statistics

**U.S. Economic Outlook: As of April 29, 2020**

| | 2019 Q1 | 2019 Q2 | 2019 Q3 | 2019 Q4 | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 | 2021 Q1 | 2021 Q2 | Annual 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | History | | | | | Forecast | | | | | History | | Forecast | |
| **U.S. Economy** *Annual Growth Rate* | | | | | | | | | | | | | | |
| Real GDP | 3.1 | 2.0 | 2.1 | 1.8 | ? | ? | ? | ? | ? | ? | 2.9 | 2.1 | -4.5 | 3.0 |
| Nonfarm Payroll Employment | 1.7 | 1.2 | 1.4 | 1.5 | ? | ? | ? | ? | ? | ? | 1.6 | 1.7 | -3.0 | 3.5 |
| Consumer Prices | 0.9 | 2.9 | 1.8 | 2.6 | 2.4 | 0.0 | 0.0 | 0.5 | 2.0 | 2.5 | 2.1 | 2.4 | 0.5 | 2.0 |
| Consumer Confidence | 126 | 128 | 132 | 126 | 128 | 75 | 80 | 85 | 90 | 90 | 130 | 128 | 92 | 95 |
| *Percent* | | | | | | | | | | | | | | |
| Unemployment | 3.9 | 3.6 | 3.6 | 3.5 | 3.5 | 20.0 | 17.0 | 11.0 | 9.0 | 7.0 | 3.9 | 3.7 | 13.0 | 6.5 |
| *Interest Rates, Percent* | | | | | | | | | | | | | | |
| Fed Funds Rate | 2.4 | 2.4 | 2.2 | 1.7 | 1.3 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 1.8 | 2.2 | 0.4 | 0.1 |
| 3-Month T-Bill Rate | 2.4 | 2.3 | 2.0 | 1.6 | 1.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 2.0 | 2.1 | 0.4 | 0.1 |
| Prime Rate | 5.4 | 5.4 | 5.2 | 4.7 | 3.8 | 3.2 | 3.2 | 3.2 | 3.2 | 3.2 | 4.9 | 5.3 | 3.4 | 3.2 |
| 10-Year Government Bond | 2.7 | 2.3 | 1.8 | 1.8 | 1.4 | 0.7 | 0.7 | 0.8 | 0.9 | 0.9 | 2.9 | 2.1 | 0.9 | 1.0 |
| 30-Year Government Bond | 3.0 | 2.8 | 2.3 | 2.3 | 1.9 | 1.2 | 1.2 | 1.3 | 1.3 | 1.4 | 3.1 | 2.6 | 1.4 | 1.4 |
| *Mortgage Rates, percent* | | | | | | | | | | | | | | |
| 30-Year Fixed Rate | 4.4 | 4.0 | 3.7 | 3.7 | 3.5 | 3.1 | 2.9 | 2.9 | 3.0 | 3.1 | 4.5 | 3.9 | 3.1 | 3.1 |
| 5/1-Year Hybrid Adjustable | 3.9 | 3.6 | 3.4 | 3.4 | 3.3 | 3.0 | 2.8 | 2.8 | 2.8 | 2.9 | 3.8 | 3.6 | 3.0 | 2.9 |
| **Housing Indicators** *Thousands* | | | | | | | | | | | | | | |
| Existing Home Sales* | 5207 | 5287 | 5427 | 5443 | 5480 | 3200 | 4700 | 5100 | 5200 | 5300 | 5340 | 5340 | 4620 | 5300 |
| New Single-Family Sales | 669 | 661 | 698 | 710 | 715 | 460 | 560 | 640 | 680 | 710 | 617 | 683 | 590 | 710 |
| Housing Starts | 1213 | 1256 | 1282 | 1440 | 1467 | 930 | 990 | 1110 | 1180 | 1220 | 1250 | 1290 | 1120 | 1250 |
| Single-Family Units | 864 | 847 | 894 | 970 | 962 | 660 | 690 | 770 | 830 | 860 | 876 | 888 | 770 | 890 |
| Multifamily Units | 349 | 409 | 388 | 470 | 505 | 270 | 300 | 340 | 350 | 360 | 374 | 402 | 350 | 360 |
| *Percent Change -- Year Ago* | | | | | | | | | | | | | | |
| Existing Home Sales | -5.4 | -2.2 | 2.3 | 5.8 | 5.2 | -39.5 | -13.4 | -6.3 | -5.1 | 65.6 | -3.1 | 0.0 | -13.5 | 14.7 |
| New Single-Family Sales | 4.1 | 4.5 | 15.0 | 20.7 | 6.9 | -30.4 | -19.8 | -9.9 | -4.9 | 54.3 | 0.7 | 10.7 | -13.6 | 20.3 |
| Housing Starts | -8.2 | -0.3 | 3.9 | 21.6 | 20.9 | -26.0 | -22.8 | -22.9 | -19.6 | 31.2 | 3.9 | 3.2 | -13.2 | 11.6 |
| Single-Family Units | -3.2 | -5.3 | 2.0 | 17.5 | 11.3 | -22.1 | -22.8 | -20.6 | -13.7 | 30.3 | 3.2 | 1.4 | -13.3 | 15.6 |
| Multifamily Units | -18.4 | 12.0 | 8.7 | 31.1 | 44.7 | -34.0 | -22.7 | -27.7 | -30.7 | 33.3 | 5.7 | 7.5 | -12.9 | 2.9 |
| **Median Home Prices** *Thousands of Dollars* | | | | | | | | | | | | | | |
| Existing Home Prices | 253.0 | 276.8 | 276.9 | 272.3 | 272.4 | 282.3 | 276.9 | 269.6 | 272.4 | 288.0 | 259.3 | 271.9 | 275.3 | 280.0 |
| New Home Prices | 312.3 | 321.1 | 317.0 | 326.6 | 326.8 | 310.0 | 310.0 | 320.0 | 320.0 | 320.0 | 326.4 | 321.5 | 316.7 | 320.0 |
| *Percent Change -- Year Ago* | | | | | | | | | | | | | | |
| Existing Home Prices | 3.8 | 4.2 | 4.9 | 6.5 | 6.1 | 2.0 | 0.0 | -1.0 | 0.0 | 2.0 | 5.7 | 4.9 | 1.3 | 1.7 |
| New Home Prices | -5.6 | 2.3 | -2.7 | 1.0 | 0.7 | -1.4 | 2.0 | 0.7 | 2.5 | 2.3 | 5.0 | -1.5 | -1.5 | 1.0 |

Quarterly figures are seasonally adjusted annual rates
* Existing home sales of single-family homes and condo/coops

## Physical Adjustments

### Location

Location adjustments are based on locational characteristics, which are different from the Southern Tract and the Northern Tract. Location adjustments consider several factors, but focus mainly on macro level economics in each area, such as, the demand for commercial properties in general is higher in Augusta, Georgia than rural Taliaferro County. Adjustments for location reflect distance to infrastructure, distance to metropolitan areas, and economic status of the comparable metropolitan area. It should be noted that no specific adjustment could be determined from participant interviews; however, knowledge of the comparable market area, and economic indicators found have been applied.

**Visibility**

Visibility adjustments are based on the visibility of the Southern Tract and the Northern Tract or comparable properties from the road or any additional visibility afforded to a property based on its location. According to market participants, developers and buyers will pay more for a property if it has additional visibility along another road even if it does not have direct ingress/egress from said road. Furthermore, developers and buyers may pass on a property that has poor or atypical visibility due to its location above or below road grade. Research and interviews with commercial real estate brokers/developers indicated that visibility would be a typical factor for recreational and agricultural properties. Therefore, the appraisers have determined that an adjustment for visibility may be required.

**Utility/Topography/Shape**

The Utility/Topography/Shape adjustment is based on several factors. The utility component of this adjustment is based on the development potential of the Southern Tract and the Northern Tract and comparable properties. This adjustment is based on interviews and verification of each comparable. The topography component of this adjustment is based on the topography of the Southern Tract and the Northern Tract versus the topography of the comparable properties. According to market participants, the topography of a site can greatly affect the development costs of the site, i.e., a property with severely sloping topography will cost significantly higher to develop than a similar site with level topography. Finally, the shape component of this adjustment is based on the shape of the Southern Tract and the Northern Tract versus the relative shape of the comparables. Market participants have indicated that the shape of a property can directly correlate to the development potential of the property. It should be noted that no specific adjustment could be determined from participant interviews; however, knowledge of the comparable market area, and utility/topography/shape of each comparable found have been applied.

**On-Site Improvements**

The on-site improvement adjustment was based upon the improvements on the Southern Tract and the Northern Tract and comparable properties. According to market participants, the cost to develop a property can be decreased if the property has been cleared and graded versus a property that is currently heavily wooded. The exact amount a property is increased or decreased based on its on-site improvements varies from property to property and is dependent on a variety of factors. Therefore, this adjustment is based on verification of the comparable properties.

**Zoning**

Zoning adjustments reflect differences in the zoning classifications relative to zoning as compared to the Southern Tract and the Northern Tract and based on the comparable zoning classification. As stated throughout this report, the Southern Tract and the Northern Tract are zoned A-1 Agricultural District.

EXHIBIT C - 2019 BROWN-PARRIS

## Comparable Land Sales – Southern Tract

| Land Comparison Adjustments Grid - Southern Tract (Parcel 048-017 & Portion of Parcel 048-006) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
| Location | Taliaferro Co, GA | Washington Co, GA | Polk Co, GA | Warren Co, GA | Washington Co, GA | Hancock Co, GA | Oglethorpe Co, GA |
| Date of sale | N/A | 8/9/2019 | 8/7/2017 | 1/17/2020 | 12/10/2019 | 2/9/2018 | 6/28/2019 |
| Price | N/A | $250,700 | $625,000 | $859,900 | $700,000 | $457,500 | $409,653 |
| Size (Acres) | 600.250 | 175.93 | 1,185.65 | 521.10 | 258.25 | 237.98 | 154.5864 |
| Price/Acre | N/A | $1,425 | $527 | $1,650 | $2,711 | $1,922 | $2,650 |
| Size (Sq. Ft.) | 26,146,890 | 7,663,511 | 51,646,914 | 22,699,116 | 11,249,370 | 10,366,409 | 6,733,784 |
| Price/Sq. Ft. | N/A | $0.03 | $0.01 | $0.04 | $0.06 | $0.04 | $0.06 |
| Location | Average | Average | Average | Average | Average | Average | Average |
| Visibility | Average | Average | Average | Average | Average | Average | Average |
| External Influences | Average | Average | Average | Average | Average | Average | Average |
| Utility/Topography/Shape | Average | Average | Average | Average | Average | Average | Average |
| Accessibility | Average | Average | Average | Average | Average | Average | Average |
| View Amenity | None | None | None | None | None | None | None |
| On-Site Improvements | Raw Land | Raw Land | Raw Land | Raw Land | Partial Farmland | Barns/Pond/ Partial Timber | Raw Land |
| Rights | Fee Simple | Fee Simple | Conservation | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Zoning/Property Type | Agricultural/Res. | Agricultural/Res. | Agricultural/Res. | Agricultural/Res. | Agricultural/Res. | Agricultural/Res. | Agricultural/Res. |
| Transactional Adjustments | | | | | | | |
| Unadjusted Price/Acre | | $1,425 | $527 | $1,650 | $2,711 | $1,922 | $2,650 |
| Property rights conveyed | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$1,425* | *$527* | *$1,650* | *$2,711* | *$1,922* | *$2,650* |
| Financing terms | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$1,425* | *$527* | *$1,650* | *$2,711* | *$1,922* | *$2,650* |
| Expenditures Immediately After Sale | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$1,425* | *$527* | *$1,650* | *$2,711* | *$1,922* | *$2,650* |
| Conditions of sale | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$1,425* | *$527* | *$1,650* | *$2,711* | *$1,922* | *$2,650* |
| Market Conditions | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Physical Adjustments | | | | | | | |
| *Intermediate adjusted price* | | *$1,425* | *$527* | *$1,650* | *$2,711* | *$1,922* | *$2,650* |
| Location | | Similar | Similar | Similar | Similar | Similar | Similar |
| Visibility | | Similar | Similar | Similar | Similar | Similar | Similar |
| External Influences | | Similar | Similar | Similar | Similar | Similar | Similar |
| Utility/Topography/Shape | | Similar | Similar | Similar | Similar | Similar | Similar |
| Accessibility | | Similar | Similar | Similar | Similar | Similar | Similar |
| View Amenity | | Similar | Similar | Similar | Similar | Similar | Similar |
| On-Site Improvements | | Similar | Similar | Similar | - | - | Similar |
| Zoning | | Similar | Similar | Similar | Similar | Similar | Similar |
| Rights | | Similar | +++ | Similar | Similar | Similar | Similar |
| Size | | - - | + | Similar | - | - | - - |
| Subject by comparison | | - - | ++++ | Similar | - - | - - | - - |

## Adjustment Explanation

Sale 1, at $1,425/acre for 175.93 acres required a downward adjustment in order to reflect the Southern Tract's larger size: according to the Law of Marginal Utility as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 1 indicates that it is superior to the Southern Tract.

Sale 2, at $527/acre for 1,185.65 acres warranted an upward adjustment in order to reflect the Southern Tract's superior rights: Sale 2 at the time of sale had a conservation easement restriction, while the Southern Tract is not encumbered by a conservation easement. Sale 2 also warranted an update adjustment in order to reflect the Southern Tract's smaller size: according to the Law of Marginal Utility as the acreage increases, the price per acre

decreases. After the appropriate adjustments, Sale 2 indicates that it is inferior to the Southern Tract.

Sale 3, at $1,650/acre for 521.10 acres did not warrant any overall adjustments, Sale 3 indicates that it is similar to the Southern Tract.

Sale 4, at $2,711/acre for 258.25 acres required a downward adjustment in order to reflect the Southern Tract's inferior on-site improvements: Sale 4 was partial farmland at the time of sale, while the Southern Tract is raw land. Sale 4 also required a downward adjustment in order to reflect the Southern Tract's larger size: according to the Law of Marginal Utility as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 4 indicates that it is superior to the Southern Tract.

Sale 5, at $1,922/acre for 237.98 acres required a downward adjustment in order to reflect the Southern Tract's inferior on-site improvements: Sale 5 had barns, a pond, and partial timberland at the time of sale, while the Southern Tract is raw land. Sale 5 also required a downward adjustment in order to reflect the Southern Tract's larger size: according to the Law of Marginal Utility as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 5 indicates that it is superior to the Southern Tract.

Sale 6, at $2,650/acre for 154.59 acres required a downward adjustment in order to reflect the Southern Tract's larger size: according to the Law of Marginal Utility as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 6 indicates that it is superior to the Southern Tract.

| Sales Comparison Array - Southern Tract | | |
|---|---|---|
| Sales | Adjustments | Sales Price/Acre |
| Sale 4 | - - | $2,711 |
| Sale 6 | - - | $2,650 |
| Sale 5 | - - | $1,922 |
| Sale 1 | - - | $1,425 |
| Sale 3 | = | $1,650 |
| Sale 2 | ++++ | $527 |

Based on the adjustments made above, the sales were put into an array to show the where the Southern Tract should be arranged in the array. As presented in the chart above, the Southern Tract is inferior to Sales 4, 5, 1, and 6, similar to Sale 3, and superior to Sale 2. Of note, Sale 1 is considered an outlier and give little weight.

After considering all of the comparable sales with respect to time, location, size, on-site improvements, road frontage, and market demand, a sale price per acre of $1,650 is considered reasonable.

The value estimate by the Sales Comparison Approach is as follows:

| 600.25 Acres | x | $1,650 | = | $990,413 |
|---|---|---|---|---|
| **CORRELATED AND ROUNDED** | | | **=** | **$990,000** |

# EXHIBIT C – 2019 BROWN-FARRIS

## Comparable Land Sales – Northern Tract

| Land Comparison Adjustments Grid - Northern Tract (Parcel 047-012 & Portion of Parcel 048-006) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
| Location | Taliaferro Co, GA | Washington Co, GA | Polk Co, GA | Warren Co, GA | Washington Co, GA | Hancock Co, GA | Oglethorpe Co, GA |
| Date of sale | N/A | 8/9/2019 | 8/7/2017 | 1/17/2020 | 12/10/2019 | 2/9/2018 | 6/28/2019 |
| Price | N/A | $250,700 | $625,000 | $859,900 | $700,000 | $457,500 | $409,653 |
| Size (Acres) | 368.890 | 175.93 | 1,185.65 | 521.10 | 258.25 | 237.98 | 154.5864 |
| Price/Acre | N/A | $1,425 | $527 | $1,650 | $2,711 | $1,922 | $2,650 |
| Size (Sq. Ft.) | 16,068,848 | 7,663,511 | 51,646,914 | 22,699,116 | 11,249,370 | 10,366,409 | 6,733,784 |
| Price/Sq. Ft. | N/A | $0.03 | $0.01 | $0.04 | $0.06 | $0.04 | $0.06 |
| Location | Average | Average | Average | Average | Average | Average | Average |
| Visibility | Average | Average | Average | Average | Average | Average | Average |
| External Influences | Average | Average | Average | Average | Average | Average | Average |
| Utility/Topography/Shape | Average | Average | Average | Average | Average | Average | Average |
| Accessibility | Average | Average | Average | Average | Average | Average | Average |
| View Amenity | None | None | None | None | None | None | None |
| On-Site Improvements | Raw Land | Raw Land | Raw Land | Raw Land | Partial Farmland | Barns/Pond/ Partial Timber | Raw Land |
| Rights | | | Conservation | | | | |
| Zoning/Property Type | Agricultural/Res. | Agricultural/Res. | Agricultural/Res. | Agricultural/Res. | Agricultural/Res. | Agricultural/Res. | Agricultural/Res. |
| Transactional Adjustments | | | | | | | |
| Unadjusted Price/Acre | | $1,425 | $527 | $1,650 | $2,711 | $1,922 | $2,650 |
| Property rights conveyed | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$1,425* | *$527* | *$1,650* | *$2,711* | *$1,922* | *$2,650* |
| Financing terms | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$1,425* | *$527* | *$1,650* | *$2,711* | *$1,922* | *$2,650* |
| Expenditures Immediately After Sale | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$1,425* | *$527* | *$1,650* | *$2,711* | *$1,922* | *$2,650* |
| Conditions of sale | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$1,425* | *$527* | *$1,650* | *$2,711* | *$1,922* | *$2,650* |
| Market Conditions | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Physical Adjustments | | | | | | | |
| *Intermediate adjusted price* | | *$1,425* | *$527* | *$1,650* | *$2,711* | *$1,922* | *$2,650* |
| Location | | Similar | Similar | Similar | Similar | Similar | Similar |
| Visibility | | Similar | Similar | Similar | Similar | Similar | Similar |
| External Influences | | Similar | Similar | Similar | Similar | Similar | Similar |
| Utility/Topography/Shape | | Similar | Similar | Similar | Similar | Similar | Similar |
| Accessibility | | Similar | Similar | Similar | Similar | Similar | Similar |
| View Amenity | | Similar | Similar | Similar | Similar | Similar | Similar |
| On-Site Improvements | | Similar | Similar | Similar | - | - | Similar |
| Zoning | | Similar | Similar | Similar | Similar | Similar | Similar |
| Rights | | Similar | +++ | Similar | Similar | Similar | Similar |
| Size | | - | ++ | + | Similar | Similar | - |
| Subject by comparison | | - | +++++ | + | - | - | - |

## Adjustment Explanation

Sale 1, at $1,425/acre for 175.93 acres required a downward adjustment in order to reflect the Northern Tract's larger size: according to the Law of Marginal Utility as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 1 indicates that it is superior to the Northern Tract.

Sale 2, at $527/acre for 1,185.65 acres warranted an upward adjustment in order to reflect the Northern Tract's superior rights: Sale 2 at the time of sale had a conservation easement restriction, while the Northern Tract is not encumbered by a conservation easement. Sale 2 also warranted an update adjustment in order to reflect the Northern Tract's smaller size: according to the Law of Marginal Utility as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 2 indicates that it is inferior to the Northern Tract.

EXHIBIT C - 2019 BROWN-PARRIS
Case 3:22-cv-... Document 1... Filed ... Page 483 of 600

Sale 3, at $1,650/acre for 521.10 acres warranted an upward adjustment in order to reflect the Northern Tract's smaller size: according to the Law of Marginal Utility as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 3 indicates that it is inferior to the Northern Tract.

Sale 4, at $2,711/acre for 258.25 acres required a downward adjustment in order to reflect the Northern Tract's inferior on-site improvements: Sale 4 was partial farmland at the time of sale, while the Northern Tract is raw land. After the appropriate adjustments, Sale 4 indicates that it is superior to the Northern Tract.

Sale 5, at $1,922/acre for 237.98 acres required a downward adjustment in order to reflect the Northern Tract's inferior on-site improvements: Sale 5 had barns, a pond, and partial timberland at the time of sale, while the Northern Tract is raw land. After the appropriate adjustments, Sale 5 indicates that it is superior to the Northern Tract.

Sale 6, at $1,592/acre for 257.26 acres required a downward adjustment in order to reflect the Northern Tract's larger size: according to the Law of Marginal Utility as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 6 indicates that it is superior to the Northern Tract.

| Sales Comparison Array - Northern Tract | | |
|---|---|---|
| Sales | Adjustments | Sales Price/Acre |
| Sale 4 | - | $2,711 |
| Sale 6 | - | $2,650 |
| Sale 5 | - | $1,922 |
| Sale 1 | - | $1,425 |
| Sale 3 | + | $1,650 |
| Sale 2 | +++++ | $527 |

Based on the adjustments made above, the sales were put into an array to show the where the Northern Tract should be arranged in the array. As presented in the chart above, the Northern Tract is inferior to Sales 1, 4, 6, and 5, and superior to Sales 3 and 2. Of note, Sale 1 is considered an outlier and give little weight.

After considering all of the comparable sales with respect to time, location, size, on-site improvements, road frontage, and market demand, a sale price per acre of $1,700 is considered reasonable.

The value estimate by the Sales Comparison Approach is as follows:

| 368.89 Acres | x | $1,700 | = | $627,113 |
|---|---|---|---|---|
| **CORRELATED AND ROUNDED** | | | **=** | **$630,000** |

### Conclusion

All of the comparable sales analyzed are considered relevant to the analysis involved in deriving an opinion of value. As detailed in the adjustments found within

this section, percentage adjustments were not utilized. Qualitative adjustments were utilized as percentage adjustments are highly subjective. The qualitative analysis provides confidence to the opinion of value. Unique factors certainly impact the price of each comparable. Macro location factors such as proximity to the cities and infrastructure play an important role in determining value. Prices are also impacted by the micro location factors such as, distance to local amenities and conveniences.

The sales presented in this analysis were utilized as they were considered the most comparable to the Southern Tract and the Northern Tract, based on the Southern Tract's and the Northern Tract's location and physical characteristics. As secondary consideration and support, other sales have been analyzed and researched. These sales have been excluded from the analysis as they were not considered true comparable properties of the Southern Tract and the Northern Tract based on the Southern Tract's and the Northern Tract's highest and best use or because a full understanding/verification of the comparable sale was not attainable. The appraisers attempted to verify every comparable utilized and analyzed. It is the appraisers' opinion that the marketing for the Southern Tract and the Northern Tract would be on a regional level attracting developers from other geographic locations other than the immediate subject area or region.

The final value indication was determined by the appraisers' judgment and knowledge of the comparable sales and market area. The average of the value indications is not used nor was the weighted averages applied to the value indication. Although the value opinion is based on the comparable sales that are considered most applicable, the opinion indication was a blend of the comparable sales results. The comparable sales are consistent with the Southern Tract's and the Northern Tract's highest and best use and provide meaningful indications of value.

Appraisers have broad flexibility in determining appropriate comparable sales for a property. However, this does not alleviate the necessity for a significant responsibility in applying creditable, relevant, and logical evidence. The reasoning behind a sale cannot always be measured in the context of the transaction. Therefore, the appraisers have utilized the information contained in the Sales Comparison approach to assist in developing an opinion of value.

Of note, as presented in the map below, these two parcels also owned by Log Creek LLLP were purchased in 2019. Parcel 047-012 (also a part of the Contiguous Parcel) was purchased for $354,902 or $1,129.18 per acre. Parcel 051-017B was purchased for $305,000 or $1,037.41 per acre. However, neither sale was able to be verified. Therefore, although these appear to be arms-length transactions, little weight was placed on either sale as the details of each transaction were unable to be verified.

EXHIBIT C 2019 BROWN HARRIS



### 6.3.3.2. Comparable Land Sales Descriptions

### LAND SALE NO. 1

| | |
|---|---|
| LOCATION | : 1771 Old Davisboro Road, Davisboro, Washington County, Georgia |
| GRANTOR | : John T. & John W. Verbeck |
| GRANTEE | : John Diggers |
| VERIFICATION | : Mr. Zack Webb, Town & Country Real Estate |
| SALE DATE | : August 9, 2019 |
| SALE PRICE | : $250,700 |
| DEED BOOK/PAGE | : 24-318 |
| NUMBER OF ACRES | : 175.93 |
| NUMBER OF SQ. FT. | : 7,663,511 |
| PRICE PER ACRE | : $1,425 |
| PRICE PER SQ. FT. | : $0.03 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple |
| PARCEL ID # | : 167-006A |

**REMARKS:**

The property is in an agricultural area with average accessibility and average exposure. According to Mr. Webb, the listing agent, the irregularly shaped site was mostly flat and currently raw land with some timber on-site. Mr. Webb also stated this property was sold on October 26, 2016 for $206,713 with the grantor being Taylor T. R. Sr. Residual Trust and the grantee being John T. & John W. Verbeck according to Deed Book/Page 19N-274. Mr. Webb indicated that in his opinion the difference in price was indicative of market conditions. Mr. Webb also stated this property was purchased as an arms-length transaction and in his opinion sold at market.

This site is located on the northwest side of Old Davisboro Road, just east of Georgia Highway 231, in Washington County. The neighboring properties are agricultural with some residential development scattered in the area.

EXHIBIT C 2019 BROWN HARRIS

Case 3:22-cv-00101-DHB-BKE Document 43-3 Filed 10/13/23 Page 487 of 600





EXHIBIT C 2019 BROWN PARRIS

**LAND SALE NO. 2**

| | |
|---|---|
| LOCATION | : Old Jackson Chapel Road, Polk County, Georgia |
| GRANTOR | : Mossy Rock LLC |
| GRANTEE | : Cedar Chapel LLC |
| VERIFICATION | : Mr. Mike Newsome, US Land & Farm & Polk County Tax Assessor's Office |
| SALE DATE | : August 7, 2017 |
| SALE PRICE | : $625,000 |
| NUMBER OF ACRES | : 1,185.65 |
| NUMBER OF SQ. FT. | : 51,646,914 |
| PRICE PER ACRE | : $527 |
| PRICE PER SQ. FT. | : $0.01 |
| PARCEL NUMBER | : 005-013A |
| DEED BOOK/PAGE | : 1636-435 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple Subject to the Restriction of the Conservation Easement |
| EASEMENT DONEE | : Atlantic Coast Conservancy Inc. |

**REMARKS:**

The property is in an agricultural area with below average accessibility and average exposure. According to Mr. Newsome, the listing agent, the irregularly shaped site was gently rolling and currently raw land. Mr. Newsome also indicated that the site is currently encumbered by a conservation easement currently held by Atlantic Coast Conservancy Inc. It should be noted that the Polk County Tax Assessor's Office also verified that this property was encumbered by a conservation easement. Finally, Mr. Newsome also stated that the conservation easement would restrict any new development or new roads. Mr. Newsome stated that the buyer intended to use the property for recreational use. According to the Deed of Conservation for this property, no more than three subdivisions on the property are allowed and not more than three home sites are allowed on the property.

This site is located on the west side of Old Jackson Chapel Road, in Polk County, Georgia, the neighboring properties are agricultural.





EXHIBIT C 2019 BROWN-HARRIS

### LAND SALE NO. 3

| | |
|---|---|
| LOCATION | : Mayfield Road, Warrenton, Warren County, Georgia |
| GRANTOR | : McNeely Real Estate Holdings LLC |
| GRANTEE | : Grammas Girls Property Ii LLC |
| VERIFICATION | : Mr. Jason Williams, Plantation Property and Land Investment |
| SALE DATE | : January 17, 2020[173] |
| SALE PRICE | : $859,900 |
| DEED BOOK/PAGE | : 9V-80 |
| NUMBER OF ACRES | : 521.10 |
| NUMBER OF SQ. FT. | : 22,699,116 |
| PRICE PER ACRE | : $1,650 |
| PRICE PER SQ. FT. | : $0.04 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple |
| PARCEL ID # | : 025-005, 025-006, 025-004, 025-009, and 025-001 |

**REMARKS:**

The property is in an agricultural area with average accessibility and average exposure. According to Mr. Williams, the listing agent, the irregularly shaped site was gently rolling and raw land at the time of sale. Finally, Mr. Williams indicated that this property was zoned agricultural and it was an arm-length transaction and in his opinion sold at market.

This site is located on the north side of Mayfield Road and the east and west side of County Road 51, just west of County Road 175, in Warren County. The neighboring properties are agricultural with some residential development scattered in the area.

---

[173] Of note, this property was under contract as of the date of this appraisal December 31, 2019.

EXHIBIT C 2019 BROWN HARRIS

Case 3:22-cv-... Document 4... Filed... Page 491 of 600





EXHIBIT C 2019 BROWN-HARRIS

## LAND SALE NO. 4

| | |
|---|---|
| LOCATION | : Highway 231, Davisboro, Washington County, Georgia. |
| GRANTOR | : DB R US LLC |
| GRANTEE | : State Route Creek LLC |
| VERIFICATION | : Mr. Jim Branch, Branch Farm and Timberland Inc. |
| SALE DATE | : December 10, 2019 |
| SALE PRICE | : $700,000 |
| DEED BOOK/PAGE | : 28-163 |
| NUMBER OF ACRES | : 258.25 |
| NUMBER OF SQ. FT. | : 11,249,370 |
| PRICE PER ACRE | : $2,711 |
| PRICE PER SQ. FT. | : $0.06 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple |
| PARCEL ID # | : 167-009, 167-010, and 167-010B |

**REMARKS:**

The property is in a residential and agricultural area with average accessibility and average exposure. According to Mr. Branch, the listing agent, this property is currently in longleaf pine, dry-land row crop and hardwood. The approximately 60 acres of dry-land row crop is ready to plant in row crops or longleaf pine. Mr. Branch stated this sale was an arms-length transaction and in his opinion sold at market. Of note, this property was sold on December 2, 2019 for $438,600 according to Deed Book/Page 27-667.

This site is located on the east side of Georgia Highway 231, just north of Georgia Highway 242 in Washington County. The neighboring properties are agricultural with scattered residential in the area.

# EXHIBIT C - 2019 BROWN HARRIS





EXHIBIT C-2019 BROWN-PARRIS

**LAND SALE NO. 5**

| | |
|---|---|
| LOCATION | : Young Road, Milledgeville, Hancock County, Georgia. |
| GRANTOR | : Laree Black |
| GRANTEE | : William M. & Claudie M. Finney II |
| VERIFICATION | : Mr. Ted Baker, Lake Oconee Land & Home |
| SALE DATE | : February 9, 2018 |
| SALE PRICE | : $457,500 |
| DEED BOOK/PAGE | : 514-255 |
| NUMBER OF ACRES | : 237.98 |
| NUMBER OF SQ. FT. | : 10,366,409 |
| PRICE PER ACRE | : $1,922 |
| PRICE PER SQ. FT. | : $0.04 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple |
| PARCEL ID # | : 080-008 |

**REMARKS:**

The property is in a residential and agricultural area with average accessibility and average exposure. According to Mr. Baker, the listing agent, this property has a couple of barns on-site that contributed to the value of the property, a pond on-site, and partial timberland. Mr. Baker also indicated that the buyer was planning on using the property as recreational land. Mr. Baker stated this sale was an arms-length transaction and in his opinion sold at market.

This site is located on the east side of Young Road, just south of Arthur Trawick Road and just east of Georgia Highway 22 in Hancock County. The neighboring properties are agricultural with scattered residential in the area.

EXHIBIT C 2019 BROWN HARRIS





**EXHIBIT C — 2019 BROWN-HARRIS**

## LAND SALE NO. 6

| | |
|---|---|
| LOCATION | : Buddy Faust Road, Lexington, Oglethorpe County, Georgia. |
| GRANTOR | : LBC Family Investments LLC & JFI Partners LLLP |
| GRANTEE | : Wayne J. Norris |
| VERIFICATION | : Mr. Gerry Whitworth, Whitworth Land Corporation |
| SALE DATE | : June 28, 2019 |
| SALE PRICE | : $409,653 |
| DEED BOOK/PAGE | : 112-308 & 112-321 |
| NUMBER OF ACRES | : 154.5864 |
| NUMBER OF SQ. FT. | : 6,733,784 |
| PRICE PER ACRE | : $2,650 |
| PRICE PER SQ. FT. | : $0.06 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple |
| PARCEL ID # | : 075-022A01 & 093-031 |

**REMARKS:**

The property is in a residential and agricultural area with average accessibility and average exposure. According to Mr. Whitworth, the listing agent, this property was raw land at the time of sale. Mr. Whitworth also indicated that the buyer was planning on using the property as recreational land. Mr. Whitworth stated this sale was an arms-length transaction and in his opinion sold at market.

This site is located on the south side of Buddy Faust Road, just northeast of U.S. Highway 78 and west of Comer Road in Oglethorpe County. The neighboring properties are agricultural with scattered residential in the area.

EXHIBIT C 2019 BROWN HARRIS

Case 3:22-cv-01221-MPS Document 41 Filed 10/09/23 Page 497 of 600





**Location Map**[174]



[174] Of note, Sale 2 is located west of the map limit. Further, Sale 2 was utilized as it was a large tract that has sold in Georgia. Larger land sales are rare in Georgia.

EXHIBIT C – 2019 BROWN-PARRIS

## Reconciliation

The Fair Market Value indicators before the conservation easement are as follows:

SALES COMPARISON APPROACH             N/A
INCOME APPROACH (Subject Property)
  $66,590,000[175]

SALES COMPARISON APPROACH (Southern Tract)      $990,000

SALES COMPARISON APPROACH (Northern Tract)      $630,000

The Sales Comparison Approach is based upon the theory of substitution. The value is estimated by direct comparison of the subject property with comparable properties which have recently sold, thereby reflecting the actions of buyers and sellers in the marketplace. However, an inherent weakness of the Sales Comparison Approach for mining developments hinges on the complexity of multi-property sales and the unique physical characteristics of each mining site sale being proprietary information. Many of the sales associated with mining development involve multiple properties, all of which often include differing physical characteristics or mineral resources. As stated throughout this report, market participants, buyers and sellers of mines are unwilling to share the physical characteristics of the mines such as the reserves that can be mined as it is proprietary information. Conversely, the Income Approach - Overall Capitalization analysis is an excellent indicator of value, particularly for investment properties, as investors emphasize income generation when underwriting property acquisitions. Due to the indicated challenges, based on our research and experience, the Sales Comparison Approach is limited and inadequate for the valuation of the subject property. The Income Approach – Discounted Cash Flow analysis is used in determining a value opinion. As stated earlier in this report, the Sales Comparison Approach was utilized for the Southern Tract and the Northern Tract.

The Income Approach analyzes the subject property as an investment based on the subject property's highest and best use to recognize the present value of future cash flows.  The value estimate derived from the Income Approach reflects the amount an investor would justify paying to receive an annual income over the holding period of the property, plus the reversionary value at the end of the holding period. The subject property is unique in its location and physical characteristics as the highest and best use for the subject property would be as a granite mine. As resources are mined, the raw materials diminish, creating a situation where the mine's income and expenses are neither constant nor stable. Therefore, the DCF, useful in forecasting unstable income and expenses, is a more appropriate valuation method ultimately providing a more reliable value indication. The Income Approach, based on a Discounted Cash Flow analysis, indicates a value of $66,590,000.

---

[175] Rounded from the DCF found earlier in this report

EXHIBIT C - 2019 BROWN-HARRIS

Case 3:22-cv-... Document 4... Filed 0.../.../... Page 500 of 600

Final reconciliation relies on the proper application of appraisal techniques and the appraisers' judgment.[176] Due to the complex nature of the subject property and the challenges associated with finding comparable sales, the value opinion relies on the Income Approach.

It is our opinion that the Fair Market Value in Fee Simple Estate, before the conservation easement, of the total Contiguous Family-Owned Parcel of 1,242.12 Acres, consisting of 272.98 Acres of land encumbered by the conservation easement, a 600.25-Acre Tract Excluded (Southern Tract), and a 368.89-Acre Tract Excluded (Northern Tract), based on the Highest and Best Use of the 272.98 Acres as a Mining Development, 600.25 Acres as Recreational Land, and the 368.89 Acres as Recreational Land, located along the north side of Raytown Road and the South and West Side of Fair Play Road, just east of Georgia Highway 47 and just north of Interstate 20, in Taliaferro County, Georgia, as of December 31, 2019 is:

| Area Encumbered | + | Southern Tract | + | Northern Tract | = | Reconciled Value Before |
|-----------------|---|----------------|---|----------------|---|-------------------------|
| (272.98 Ac) | | (600.25 Ac) | | (368.89 Ac) | | |
| $66,590,000 | + | $990,000 | + | $630,000 | = | $68,210,000 |

**SIXTY-EIGHT MILLION TWO HUNDRED TEN THOUSAND DOLLARS**

**($68,210,000)**

---

[176] The Appraisal of Real Estate, 15th Edition, p. 600

EXHIBIT C - 2019 BROWN PARRIS

## 6.4.  After Conservation Easement

For the purpose of this Section 6.4 in its entirety, subject property shall refer to the 272.98 acres to be encumbered by the conservation easement, except where otherwise identified.

### 6.4.1.  Highest and Best Use – Conservation Encumbered Area (272.98 Acres)

Highest and Best Use is defined in Chapter 17 Page No. 305, in the 15th edition of "The Appraisal of Real Estate," published by the Appraisal Institute, and adopted by Treasury Regulation § 170, as the reasonably probable use of property that results in the highest value, as of the date of the appraisal.

The highest and best use is further described by the Appraisal Institute as the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible and results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved specific property with respect to the user and timing of the use is adequately supported and results in the highest present value. This determination is not based on quantitative means nor is it a fact to be found, but instead relies heavily on the appraisers' judgment as well as his analytical skill. It is of note that the highest and best use may differ from the existing use when there are existing improvements. However, the existing use will continue unless and until the land value in its highest and best use, represents the premise upon which value is based.

The purpose of determining the Highest and Best use for a specific property is to identify the demand for appropriate potential uses, identify demand for a particular property type, compare cost and value if specific market criteria are fulfilled, then of the appropriate potential uses determine the use that produces the maximum value. Based on the determination of the Highest and Best Use, the appropriate comparables are then selected for the Sales Comparison Approach.

**Legally Permissible**

The subject property consists of 272.98 acres of land located along the north side of Raytown Road and the south and west Side of Fair Play Road just east of Georgia Highway 47 and just north of Interstate 20 in Taliaferro County, Georgia. The surrounding area primarily consists of agricultural land uses. The concentration of population and supportive commercial, residential, and industrial development is located in Washington, Georgia to the north, Augusta, Georgia to the east, and Athens, Georgia to the northwest. As stated throughout this report, the subject property is zoned A-1 Agricultural District. Furthermore, other than the conservation easement, there are no legal deed restrictions.

After the conservation easement is in place the subject property forfeits the rights associated with the development of the subject property for granite mining or any other purpose that requires construction or placement of any building structures. Further, any changes or disturbance to the natural habitat are expressly prohibited or restricted.

EXHIBIT C 2019 BROWN-PARRIS

However, the subject property's owner still can continue agricultural and forestry uses that are subject to an approved management plan.

The restrictive nature of the conservation easement limits potential buyers and minimizes the possible uses of the subject property. It especially prohibits the exploration of natural resources harbored in the ground, thereby limiting the competitive value of the land and prohibiting the potential use that would allow it to reach its maximum value. Therefore, the establishment of a conservation easement on the subject property has transformed the highest and best use of the subject property.

The conservation easement is located in the Addenda of this report and fully describes the limitations on the subject property. The limitations can be summarized as legally allowing only activities that do not disturb the subject property in any way, such as agriculture, recreational uses, and forestry.

## Physically Possible

The subject property and its uses are affected by its physical characteristics which include, but are not limited to: location, street frontage, size, shape, street access, availability of utilities, easements, soils and subsoils, and topography. The placement of the subject property does not make any changes in the physical characteristics of the subject property.

However, the conservation easement prohibits all types of development that disturbs the natural environment in any way, including granite mining, which is particularly disruptive. All other commercial, industrial, or residential uses are also prohibited.

In summation, the conservation easement prohibits the use of the subject property for all types of development that are not specifically noted in the legal requirements of the conservation easement. These limitations include all types of commercial, industrial, residential development and mining. The owner of the subject property may continue to use the subject property for agricultural, forestry, and recreational uses as well as allowing for public enjoyment as specifically outlined in the conservation easement. Therefore, the highest and best use of the subject property has been permanently altered by the placement of the subject property in a conservation easement.

## Maximally Productive

The subject property was analyzed, and it was determined that the most reasonably probable use that would produce the most benefits was the use of the subject property as a granite mining development. Although, there were other uses that would potentially produce a positive cash flow, the development that would generate the highest return was the development of a granite mine. This conclusion was supported by current market conditions, the level of current population and economic growth in Taliaferro County and existence of other mining operations in the area.

However, post-conservation easement the owners forfeit the right to develop the subject property to its maximally productive use. Instead, the owner elects to preserve the subject property in its natural state and abide by the restrictive language of the legal requirements of the conservation easement. Therefore, the highest and best use of the

subject property post-conservation easement for perpetuity will be agricultural, forestry or recreational uses.

## Conclusion

In conclusion, the subject property had the potential for various uses that could produce a positive cash flow and an adequate return to the cost of the investment, such as development into a large residential complex with an array of amenities or a commercial recreation area. Other uses included a granite mining development due to the large granite deposits in the area, which was concluded to be the development that would generate the highest return on investment. As stated throughout this report, it is the appraisers' opinion that the highest and best use of the subject property is as a granite mine.

However, the owner by placing the subject property in a conservation easement alters the highest and best use since the conservation easement requirements are very restrictive and permanent. Therefore, the financial feasibility and legal permissibility of the subject property are drastically altered. As a result, the highest and best use, after placing a conservation easement on the subject property, is agricultural or forestry use, recreational use as outlined by the conservation easement or conservation of the land for public enjoyment and the preservation of natural forested areas for the benefit of botanical species and wildlife.

### 6.4.2. Income Approach

## Methodology

The Income Approach is typically used to evaluate income producing properties and forecast their worth. Investors are interested in how much future income can be produced by a property purchased with today's dollars. The Appraisal of Real Estate, 15th Edition, defines the Income Approach as follows: "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principal of anticipation is the fundamental to the approach." Any property that has the capacity to generate income can be evaluated by the income approach. The Appraisal of Real Estate, 15th Edition, further states: "When more than one approach to value is used to develop an opinion of value for an income - producing property, the value indication produced by the income capitalization approach might be given greater weight than that of other approaches in the final reconciliation."

The subject property is restricted by a conservation easement into perpetuity, which changes its potential uses regarding: legally permissible, physically possible, financially feasible, and maximally productive. Thereby, drastically altering its highest and best use. The subject property is no longer a potential income producing mine, but a property that will be maintained as a mature forest to enhance the tranquility of the area, provide recreational opportunities and preserve native ecosystems. Therefore, the Income approach is not applicable to the subject property when restricted by a deed of conservation easement.

### 6.4.3. Sales Comparison Approach

**Methodology**

When valuing a conservation easement, it is necessary to discern the applicability of the Sales Comparison Approach and the appropriate methodology within that approach. Treasury Regulation § 1.170A-14(h)(3)(i) and (ii) allow for two different types of valuation: direct comparison and the indirect analysis. The indirect analysis utilizes the before and after technique. This process focuses on the value of the property after the conservation easement is in place as compared to the value of the property before the conservation easement. This is the procedure most commonly used. The direct comparison technique is used to compare the actual prices paid for conservation easements with similar characteristics and restrictions in a relatively recent time frame. Because conservation easement sales are very limited within a given region, nationwide sales are usually required. However, an overview of the actual prices paid for conservation easements, when available can be used to support the results of the before and after technique.

The utilization of the sales comparison approach for conservation easement valuation not only requires the identification of comparable sales, but also a thorough review of the conservation easement documents and restrictions, to ensure comparability and allow the appraisers to formulate a fully educated opinion of value. Precedent has been established in the judicial system that in-depth knowledge of the restrictions on the conservation easements and specific characteristics of encumbered conservation easements are necessary to obtain a favorable outcome. This can be seen in the court case from 1991, Estate of Elizabeth G. Hughan, Deceased, John W. Hughan, Executor v. Commissioner, Docket No. 23221-88 (61 T.C.M. 2932 (1991)). The comparable sales utilized are considered the best comparable sales available and were fully analyzed in regard to all conservation easement characteristics and restrictions.

### 6.4.4. Conservation Easement Encumbered Land Sales Analysis

The fair market value of the subject property post-conservation easement has been estimated by an analysis of comparable conservation easement encumbered land sales in the southeastern region. These sales are the most recent and relevant within the parameters specific to the subject property. Detailed analyses of the comparable sales and a location map follow this discussion.

| Land Comparison Adjustments Grid - Post Easement | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 | Sale 7 |
| Location | Taliaferro Co, GA | Van Buren Co, TN | St. Clair Co, AL | Cleveland Co, NC | Polk Co, GA | Jones Co, GA | Webster Co, GA | Haralson Co, GA |
| Date of sale | N/A | 7/21/2018 | 03/01/19 | 9/20/2017 | 8/7/2017 | 7/21/2017 | 06/16/17 | 04/11/19 |
| Price | N/A | $138,600 | $325,000 | $140,000 | $625,000 | $500,000 | $199,010 | $750,000 |
| Size (Acres) | 272.980 | 395.43 | 165.00 | 39.27 | 1,185.65 | 261.05 | 203.77 | 284.67 |
| Price/Acre | N/A | $351 | $1,970 | $3,565 | $527 | $1,915 | $977 | $2,635 |
| Price/ Sq. Ft. | N/A | $0.01 | $0.05 | $0.08 | $0.01 | $0.04 | $0.02 | $0.06 |
| Location | Average | Average | Average | Average | Average | Average | Average | Average |
| Access | Average | Average | Below Ave. | Average | Average | Average | Average | Average |
| Visibility | Average | Average | Average | Average | Average | Average | Average | Average |
| Topography/Shape | Average | Average | Average | Average | Average | Average | Average | Average |
| Utility | Average | Average | Mountain View | Average | Average | Average | Average | River Access |
| On-Site Improvements | Raw Land | Raw Land | Single Family Res. | Raw Land | Raw Land | Small Barn | Raw Land | Raw Land |
| Rights | Restrictive | Similar | Similar | Similar | Similar | Similar | Similar | Similar |
| Transactional Adjustments | | | | | | | | |
| Unadjusted Price/Acre | | $351 | $1,970 | $3,565 | $527 | $1,915 | $977 | $2,635 |
| Property rights conveyed | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$351* | *$1,970* | *$3,565* | *$527* | *$1,915* | *$977* | *$2,635* |
| Financing terms | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$351* | *$1,970* | *$3,565* | *$527* | *$1,915* | *$977* | *$2,635* |
| Expenditures Immediately After Sale | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$351* | *$1,970* | *$3,565* | *$527* | *$1,915* | *$977* | *$2,635* |
| Conditions of sale | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$351* | *$1,970* | *$3,565* | *$527* | *$1,915* | *$977* | *$2,635* |
| Market Conditions | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Physical Adjustments | | | | | | | | |
| *Intermediate adjusted price* | | *$351* | *$1,970* | *$3,565* | *$527* | *$1,915* | *$977* | *$2,635* |
| Location | | Similar | Similar | Similar | Similar | Similar | Similar | Similar |
| Access | | Similar | + | Similar | Similar | Similar | Similar | Similar |
| Visibility | | Similar | Similar | Similar | Similar | Similar | Similar | Similar |
| Topography/Shape | | Similar | Similar | Similar | Similar | Similar | Similar | Similar |
| Utility | | Similar | - - | Similar | Similar | Similar | Similar | - - |
| On-Site Improvements | | Similar | - - | Similar | Similar | - | Similar | Similar |
| Rights | | Similar | Similar | Similar | Similar | Similar | Similar | Similar |
| Size | | + | - | - - - | +++ | Similar | Similar | Similar |
| Subject by comparison | | + | - - - - | - - - | +++ | - | Similar | - - |

### Adjustment Explanation

Sale 1, at $351/acre for 395.43 acres warranted an upward adjustment in order to reflect the subject property's smaller size: according to the Law of Marginal Utility, as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 1 indicates that it is inferior to the subject property.

Sale 2, at $1,970/acre for 165 acres warranted an upward adjustment in order to reflect the subject property's superior access: Sale 2 is accessible through an access easement and considered to have below average access, while the subject property has average access. Sale 2 required a downward adjustment in order to reflect the subject property's inferior utility: according to Ms. Finch the listing broker, Sale 2 has mountain views and considered to have

above average utility, while the subject property is considered to have average utility. Sale 2 also required a downward adjustment in order to reflect the subject property's inferior on-site improvements: according to Ms. Finch, Sale 2 has a single-family residence on-site, while the subject property is currently raw land. Finally, Sale 2 required a downward adjustment in order to reflect the subject property's larger size: according to the Law of Marginal Utility as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 2 indicates that it is superior to the subject property.

Sale 3, at $3,565/acre for 39.27 acres required a downward adjustment in order to reflect the subject property's larger size: according to the Law of Marginal Utility as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 3 indicates that it is superior to the subject property.

Sale 4, at $527/acre for 1,185.65 acres warranted an upward adjustment in order to reflect the subject property's smaller size: according to the Law of Marginal Utility, as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 4 indicates that it is inferior to the subject property.

Sale 5, at $1,915/acre for 261.05 acres required a downward adjustment in order to reflect the subject property's inferior on-site improvements: Sale 5 has a barn on-site, while the subject property is raw land. After the appropriate adjustments, Sale 5 indicates that it is superior to the subject property.

Sale 6, at $977/acre for 203.77 acres did not warrant any overall adjustments, Sale 6 indicates that it is similar to the subject property.

Sale 7, at $2,635/acre for 284.67 acres required a downward adjustment in order to reflect the subject property's inferior utility: Sale 7 has access to the Tallapoosa River and considered to have above average utility, while the subject property is considered to have average utility. After the appropriate adjustments, Sale 7 indicates that it is superior to the subject property.

| Sales Comparison Array | | |
|---|---|---|
| Sales | Adjustments | Sales Price/Acre |
| Sale 2 | - - - - | $1,970 |
| Sale 3 | - - - | $3,565 |
| Sale 7 | - - | $2,635 |
| Sale 5 | - | $1,915 |
| Sale 6 | = | $977 |
| Sale 1 | + | $351 |
| Sale 4 | +++ | $527 |

Based on the adjustments made above, the sales were put into an array to show where the subject property should be arranged in the array. As presented in the chart above, the subject property is inferior to Sales 3, 2, 7, and 5, similar to Sale 6, and superior to Sales 1 and 4.

EXHIBIT C 2019 BROWN-PARRIS

After considering all of the comparable sales with respect to time, location, size, on-site improvements, road frontage, and market demand, a sale price per acre of $1,100, is considered reasonable.

The value estimate by the Sales Comparison Approach is as follows:

272.98 Acres  x $1,100                =                $300,278

**CORRELATED AND ROUNDED        =                $300,000**

### 6.4.4.1.  Comparable Land Sales Descriptions

## LAND SALE NO. 1

| | |
|---|---|
| LOCATION | : 395 Van Buren Drive, Spencer, Van Buren County, Tennessee |
| GRANTOR | : Cumberland Property Holdings |
| GRANTEE | : Sullivan Christopher Doan & Donnie Mark Sullivan |
| VERIFICATION | : Mr. Mike Williford, American Forest Management |
| SALE DATE | : July 21, 2018 |
| SALE PRICE | : $138,600 |
| NUMBER OF ACRES | : 395.43 |
| NUMBER OF SQ. FT. | : 17,224,931 |
| PRICE PER ACRE | : $351 |
| PRICE PER SQ. FT. | : $0.01 |
| PARCEL NUMBER | : 053-002.00 |
| DEED BOOK/PAGE | : RB95-277 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple Subject to the Restriction of the Conservation Easement |
| EASEMENT DONEE | : Foothills Land Conservancy Inc. |

**REMARKS:**

The property is in an agricultural area. According to Mr. Williford, the listing agent, the mostly rectangular shaped site was rolling and currently raw land. Mr. Williford also stated that the conservation easement in place would restrict any new development and any significant improvements. Mr. Williford indicated that this property can be used for agricultural, forestry, or recreational purposes. Mr. Clabough with the Foothills Land Conservancy Inc. indicated that this tract can be parceled into four separate parcels with one two-acre residential building envelope per tract. Mr. Clabough also stated that the smallest parcel allowed is a 50-acre parcel. Finally, Mr. Clabough indicated that any forestry or agricultural uses would have to follow an approved management plan.


This site is located in Van Buren County, the neighboring properties are agricultural.

EXHIBIT C 2019 BROWN HARRIS

Case 3:22-cv... Document ... Page 509 of 600





**LAND SALE NO. 2**

| | |
|---|---|
| LOCATION | : Gulf Creek Canyon Preserve, St. Clair County, Alabama. |
| GRANTOR | : The Nature Conservancy |
| GRANTEE | : Caitlin and Garett Harper |
| VERIFICATION | : Ms. Beth Finch, Cyprus Partners |
| SALE DATE | : March 2019 |
| SALE PRICE | : $325,000 |
| NUMBER OF ACRES | : 165.00 |
| NUMBER OF SQ. FT. | : 7,187,400 |
| PRICE PER ACRE | : $1,970 |
| PRICE PER SQ. FT. | : $0.05 |
| PARCEL NUMBER | : 060306000008000 |
| DEED BOOK/PAGE | : 2019-2396 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple Subject to the Restriction of the Conservation Easement |
| EASEMENT DONEE | : The Nature Conservancy |

**REMARKS:**

The property is in an agricultural area with average accessibility and average exposure. According to Ms. Finch, the listing broker for this sale, the mostly rectangular site was sloped and currently raw land. Ms. Finch also stated that this property is encumbered by a conservation easement held by The Nature Conservancy. Ms. Finch indicated that the buyers are planning on using this property for recreational use. Finally, Ms. Finch also stated that the conservation easement restricts any new development. According to the deed of conservation, a four-acre building envelope is allowed around the currently existing cabin on the site.

This site is located on the west side of County Road 42, in St. Clair County, the neighboring properties are primarily agricultural.

EXHIBIT C 2019 BROWN HARRIS
Case 3:22-cv-... Document ... Filed ... Page 511 of 600





**LAND SALE NO. 3**

| | |
|---|---|
| LOCATION | : Highway 150/Cherryville Road, Cherryville, Cleveland County, North Carolina |
| GRANTOR | : Conservation Trust of North Carolina |
| GRANTEE | : Donald Dedmon Jr. |
| VERIFICATION | : Mr. Rusty Painter, Seller representative |
| SALE DATE | : September 20, 2017 |
| SALE PRICE | : $140,000 |
| NUMBER OF ACRES | : 39.27 |
| NUMBER OF SQ. FT. | : 1,710,601 |
| PRICE PER ACRE | : $3,565 |
| PRICE PER SQ. FT. | : $.08 |
| PARCEL NUMBER | : 2568770620 |
| DEED BOOK/PAGE | : 1751-0441 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple Subject to the Restriction of the Conservation Easement |
| EASEMENT DONEE | : Conservation Trust of North Carolina |

**REMARKS:**

The property is in an agricultural area. According to Mr. Painter, the seller's representative, the irregularly shaped site was gently rolling and currently raw land. Mr. Painter also indicated that the site is currently encumbered by a conservation easement held by Conservation Trust of North Carolina. Mr. Painter also stated that the conservation easement would restrict any new development or new roads, except for those specifically permitted by an approved forestry or agricultural plan. Mr. Painter indicated that the conservation easement allows for one residential building envelope with three related agricultural buildings. Mr. Painter stated that the buyer was the adjacent property owner.

This site is located on the east side of Highway 150/Cherryville Road, in Cleveland County, North Carolina, the neighboring properties are agricultural and residential.





EXHIBIT C - 2019 BROWN-PARRIS

## LAND SALE NO. 4

| | |
|---|---|
| LOCATION | : Old Jackson Chapel Road, Polk County, Georgia |
| GRANTOR | : Mossy Rock LLC |
| GRANTEE | : Cedar Chapel LLC |
| VERIFICATION | : Mr. Mike Newsome, US Land & Farm & Polk County Tax Assessor's Office |
| SALE DATE | : August 7, 2017 |
| SALE PRICE | : $625,000 |
| NUMBER OF ACRES | : 1,185.65 |
| NUMBER OF SQ. FT. | : 51,646,914 |
| PRICE PER ACRE | : $527 |
| PRICE PER SQ. FT. | : $0.01 |
| PARCEL NUMBER | : 005-013A |
| DEED BOOK/PAGE | : 1636-435 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple Subject to the Restriction of the Conservation Easement |
| EASEMENT DONEE | : Atlantic Coast Conservancy Inc. |

**REMARKS:**

The property is in an agricultural area with below average accessibility and average exposure. According to Mr. Newsome, the listing agent, the irregularly shaped site was gently rolling and currently raw land. Mr. Newsome also indicated that the site is currently encumbered by a conservation easement currently held by Atlantic Coast Conservancy Inc. It should be noted that the Polk County Tax Assessor's Office also verified that this property was encumbered by a conservation easement. Finally, Mr. Newsome also stated that the conservation easement would restrict any new development or new roads. Mr. Newsome stated that the buyer intended to use the property for recreational use. According to the Deed of Conservation for this property, no more than three subdivisions on the property are allowed and not more than three home sites are allowed on the property.

This site is located on the west side of Old Jackson Chapel Road, in Polk County, Georgia, the neighboring properties are agricultural.





**LAND SALE NO. 5**

| | |
|---|---|
| LOCATION | : Homer Chiles Road, Jones County, Georgia |
| GRANTOR | : Dasher Holdings LLC |
| GRANTEE | : Grice Gregory R |
| VERIFICATION | : Mr. Mike Newsome, US Land & Farm |
| SALE DATE | : July 21, 2017 |
| SALE PRICE | : $500,000 |
| NUMBER OF ACRES | : 261.05 |
| NUMBER OF SQ. FT. | : 11,371,338 |
| PRICE PER ACRE | : $1,915 |
| PRICE PER SQ. FT. | : $0.04 |
| PARCEL NUMBER | : J11-00-053 |
| DEED BOOK/PAGE | : 953-320 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple Subject to the Restriction of the Conservation Easement |
| EASEMENT DONEE | : Georgia Agricultural Land Trust |

**REMARKS:**

     The property is in an agricultural area with average accessibility and average exposure. According to Mr. Newsome, the listing agent, the irregularly shaped site was rolling and currently raw land. Mr. Newsome also stated that the current conservation easement in place restricts any new development, commercial development, industrial development, residential development, or new roads. Mr. Newsome stated that the use of this property is recreational use. According to the Deed of Conservation, two two-acre building envelopes are allowed and there is an agricultural envelope allowed. Mr. Newsome also indicated there was a barn on-site.

This site is located on Homer Chiles Road, in Jones County, the neighboring properties are agricultural.

# EXHIBIT C 2019 BROWN HARRIS





Sale 5

**LAND SALE NO. 6**

| | |
|---|---|
| LOCATION | : 39 Jordan Road, Preston, Webster County, Georgia |
| GRANTOR | : Copper Hill Investments LLC |
| GRANTEE | : Marvin D Conger and Joyce H. Conger |
| VERIFICATION | : Mr. Mike Matre, Matre Forestry Consulting Inc. |
| SALE DATE | : June 16, 2017 |
| SALE PRICE | : $199,010 |
| NUMBER OF ACRES | : 203.77 |
| NUMBER OF SQ. FT. | : 8,876,221 |
| PRICE PER ACRE | : $977 |
| PRICE PER SQ. FT. | : $0.02 |
| PARCEL NUMBER | : D07-024 |
| DEED BOOK/PAGE | : 139-230 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple Subject to the Restriction of the Conservation Easement |
| EASEMENT DONEE | : Chattahoochee Valley Land Trust |

**REMARKS:**

The property is in an agricultural area with average accessibility and average exposure. According to Mr. Matre, the broker familiar with this sale, the irregularly shaped site was gently rolling and currently raw land. Mr. Matre also stated that the conservation easement for this property is currently held by the Chattahoochee Valley Land Trust. Mr. Matre indicated that the buyers are planning on using this property for recreational use. Finally, Mr. Matre also stated that the conservation easement restricts any new development. According to the Deed of Conservation, one building envelope of two acres is allowed and construction of a three-acre pond is allowed on-site.

This site is located on the east side of Jordan Road, the north side of Poplar Springs Road and the east side of Highway 41 in Webster County, the neighboring properties are residential and agricultural.

# EXHIBIT C - 2019 BROWN HARRIS





EXHIBIT C 2019 BROWN-PARRIS

## LAND SALE NO. 7

| | |
|---|---|
| LOCATION | : North side of Ivy Pope Road, Tallapoosa, Haralson County, GA |
| GRANTOR | : Foxwoods Land Group, LLC |
| GRANTEE | : Howell D. Wood (via prior Quitclaim Deed to Sunbelt of Alabama, Series 76) |
| VERIFICATION | : Haralson County Tax Assessor; Peer Appraiser Information; The Atlantic Coast Conservancy, Inc., Grantor Signature on Warranty Deed, Deemed Reliable |
| SALE DATE | : April 11, 2015 |
| SALE PRICE | : $750,000 |
| NUMBER OF ACRES | : 284.67 |
| NUMBER OF SQ. FT. | : 12,400,225 |
| PRICE PER ACRE | : $2,634.63 |
| PRICE PER SQ. FT. | : $0.06 |
| PARCEL NUMBER | : 0031-0040 & 0047-0040A |
| DEED BOOK/PAGE | : 1228-217 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple Subject to the Restriction of the Conservation Easement |
| EASEMENT DONEE | : Atlantic Coast Conservancy, Inc. |

**REMARKS:**

The property is in an agricultural area with average accessibility and average exposure. The irregularly shaped site was gently rolling and currently wooded and partially cleared land. According to the Deed of Conservation Easement held by Atlantic Coast Conservancy, Inc. the owner has the right to subdivide the property into two parcels. The owner also has the right to develop a one two-acre homesite and the right to develop a forty-foot access road from Ivy Pope Road to the homesite. Finally, the owner has the right for crop cultivation and livestock for commercial purposes as long as the conservation attributes are not damaged. Finally, the owner has the right to the timber on the property with an approved timber management plan.

This site is located on the north side of Ivy Pope Road with river frontage along the Tallapoosa River, in Haralson County, Georgia. The neighboring properties are residential and agricultural.

EXHIBIT C 2019 BROWN HARRIS

Case 3:22-cv-... Document 4... Filed 0.../2... Page 521 of 600





**Location Map[177]**



### 6.4.6.   After Conservation Easement Reconciliation

#### 6.4.6.1.     Sales Comparison Approach

In the Sales Comparison Approach a comparison is made between the subject property and sales of similar properties, usually in the subject property's market area, with adjustments made for the differences in the properties. Therefore, the Sales Comparison Approach reflects the perceived value of the subject property in a given submarket.

#### 6.4.6.2.   Sales Comparison Approach (Conservation Easement Encumbered Sales)

A scenario similar to the situation stated in Section 6.4.6.1 above, exists when using the Sales Comparison Approach for Conservation Easement Encumbered Sales. For instance, there are a limited number of sales, they are generally dispersed over a wide geographic area and they have different physical qualities. This makes discernment of the market value problematic and clouds the motivation of market participants when dealing with conservation easements. For these reasons, in our analysis we have chosen to use $300,000 as the indicator of value.

---

[177] Location arrows are approximate.

Overall, in selecting a value for the subject property, post-conservation easement, each of value indicators were considered and evaluated by the appraisers using their professional judgment and experience. Thus, the following guidelines set forth in the Appraisal of Real Estate, 15th Edition published by the Appraisal Institute, state: "The final value opinion is not the average of the different value indications derived. No mechanical formula is used to select one indication of value over the others. The strengths and weaknesses of each of the approaches used, and the quantity and quality of the data analyzed, must be considered and addressed in an appraisal report, and an appraiser must explain why one approach may have been relied upon more than another in a particular assignment. Final reconciliation relies on the proper application of appraisal techniques and the appraiser's judgment" [Pages 599-600].

Our final value conclusion is stated in Section 6.4.6.3, Fair Market Value Indication After Conservation Easement shown below. The approach to value reflects the highest and best use of the subject property.

### 6.4.6.3.   Fair Market Value Indication After The Conservation Easement

The Fair Market Value indications for the Contiguous Family-Owned Parcel after the conservation easement are as follows:

| | |
|---|---|
| SALES COMPARISON APPROACH (Encumbered Sales) | $300,000 |
| SALES COMPARISON APPROACH  (Southern Tract) | $990,000 |
| SALES COMPARISON APPROACH  (Northern Tract) | $630,000 |

It is our opinion that the Fair Market Value in Fee Simple Estate subject to the conservation easement for the total Contiguous Family-Owned Parcel of 1,242.12 acres, consisting of 272.98 Acres encumbered by the conservation easement, a 600.25-Acre Tract Excluded (Southern Tract), and a 368.89-Acre Tract Excluded (Northern Tract), located along the north side of Raytown Road and the South and West Side of Fair Play Road, just east of Georgia Highway 47 and just north of Interstate 20, in Taliaferro County, Georgia, as of December 31, 2019 is:

| Area Encumbered | + | Southern Tract | + | Northern Tract | = | Reconciled Value After |
|---|---|---|---|---|---|---|
| (272.98 Ac) | | (600.25 Ac) | | (368.89 Ac) | | |
| $300,000 | + | $990,000 | + | $630,000 | = | $1,920,000 |

**ONE MILLION NINE HUNDRED TWENTY THOUSAND DOLLARS**

**($1,920,000)**

EXHIBIT C - 2019 BROWN-HARRIS

## Section 7 – Final Reconciliation

### 7.1. SUMMARY OF VALUES

| | |
|---|---|
| Value Before the Conservation Easement | $68,210,000 |
| Residual Value After the Conservation Easement | $ 1,920,000 |
| Minus Enhancement Value | $ 0.00 |
| Value of the Conservation Easement | $66,290,000 rd. |

### 7.2. Conservation Easement Valuation

The permissible uses of the subject property of 272.98 acres as encumbered by the conservation easement have been reviewed and it has been determined that these diminished uses have altered the highest and best use of the subject property, and consequently have exerted a downward influence on the fair market value of the subject property. The subject property's owner is permitted various rights, or uses, provided by the reserved rights of the subject property's conservation easement located in the Addenda of this report. However, the uses permitted fall far short of the maximum potential use for the subject property.

### 7.3. Conservation Easement Impact on Property

**7.3.1.** The subject property contains forest and open land that will be permanently protected from future development or conversion.

**7.3.2.** The preservation of the subject property for outdoor recreation by, or the education of, the general public is within the meaning of Section 170(h)(4)(A)(i) of the Code. Further detail can be found in the in the Deed of Conservation Easement found in the addenda of this report.

**7.3.3.** Prohibited Uses - The prohibited or restricted uses are delineated in detail in the Deed of Conservation Easement included in the Addenda of this report and incorporated by reference into this appraisal report. The detailed list and description are not repeated here.

**7.3.4.** Reserved Rights - The reserved rights and permitted uses are delineated in detail in the Deed of Conservation Easement included in the Addenda of this report and incorporated by reference into this appraisal report. The detailed list and description are not repeated here.

**Section 8 – Addenda**

**EXHIBIT 8.1**

**PROFESSIONAL QUALIFICATIONS**



**Rick A. Kenny MAI, SRA**

327 Dahlonega Street Suite 104 • Cumming, GA 30040
770.664.8922 • rick@kennyre.com

## EDUCATION

**FLORIDA STATE UNIVERSITY, College of Business**                                                                Tallahassee, Florida
**Bachelor of Science in Real Estate and Marketing**

APPRAISAL EDUCATION- Society of Real Estate Appraisers and Appraisal Institute
- A.I.R.E.A. Course-       Standards of Professional Practice
- S.R.E.A. Course 101-     Introduction to Appraising Real Property
- S.R.E.A. Course 102-     Applied Residential Property Valuation
- S.R.E.A. Course 201-     Principles of Income Property Valuation
- S.R.E.A. Course 202-     Applied Income Property Valuation
- S.R.E.A. Seminar-        R41B & R41C
- S.R.E.A. Seminar-        Depreciation Analysis
- CCIM Course 101-         Fundamentals of Real Estate Investment & Taxation
- CCIM Course 102-         Fundamentals of Creating a Real Estate Investment
- A.I.R.E.A. Course-       State Certified/Licensed Real Estate Appraisers
- A.I.R.E.A. Course 530- Advanced Sales Comparison
- A.I.R.E.A. Course 510- Advanced Income Capitalization
- A.I.R.E.A. Course 420- Business Practice and Ethics
- A.I.R.E.A. Course 520- Market Analysis Highest and Best Use
- A.I.R.E.A. Course 540- Report Writing and Valuation Analysis
- A.I.R.E.A. Course 550- Advanced Applications
- Valuation of Conservation Easements (Appraisal Institute) (Passed)

## WORK EXPERIENCE

| | |
|---|---|
| **Kenny and Associates, Inc.-** Owner/Appraiser | *1991 – Present* |
| **The Fulton County Board of Assessors** | *2006-2013* |
| **Weibel & Associates, Inc. -** Appraiser | *1991-1991* |
| **FDIC Atlanta Consolidated Office-** Appraisal Manager | *1990-1990* |
| **FSLIC Atlanta-** National Appraiser Director | *1989-1990* |
| **FSLIC as Rec. for Sunrise Savings & Loan-** Chief Appraiser | 1986-1989 |
| **Sunrise Mortgage Corporation-** Commercial Real Estate Appraiser | 1984-1986 |
| **Appraisal & Acquisition Consultants-** Appraiser Associate | 1984-1984 |
| **Phagan & Associates-** Appraiser Associate | 1983-1984 |

Experience includes 30 years of commercial and residential real estate appraisal and appraisal reviews, real estate sales, feasibility studies and consultations.

## PROFESSIONAL AFFILIATIONS

**MAI, SRA Designation, Appraisal Institute (No. 66318)**
**Georgia Certified General Real Estate Appraiser (No. 628)**
**Atlanta Board of Realtors**
**Licensed Georgia Real Estate Broker**
**Licensed Florida Real Estate Broker**
**National Association of Realtors**
**International Association of Assessing Officers**
**Former Chairman, Fulton County Board of Tax Assessors**

## Instructor for the Following Seminars Given to FSLIC & FDIC Personnel

HP-12C Fundamentals and Application to Real Estate Appraising, Introduction to Real Estate Practices and Principles, Advanced Income Property Valuation, Applied Income Property Valuation, Introduction to Real Estate Appraising, Introduction to Reviewing Appraisals



# State of Alabama

This is to certify that

## Rick Andrew Kenny

*having given satifactory evidence of the necessary
qualifications required by the laws of the State of Alabama
is licensed to transact business in Alabama as a*

### Certified General Real Property Appraiser

*With all rights, privileges and obligations
appurtenant thereto.*

LICENSE NUMBER: **G01327**
EXPIRATION DATE: **09/30/2023**

Executive Director
ALABAMA REAL ESTATE APPRAISERS BOARD

000008611



Ron DeSantis, Governor

Julie I. Brown, Secretary

# STATE OF FLORIDA

## DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

### FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED GENERAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

**KENNY, RICK ANDREW**

327 DAHLONEGA ST SUITE 104
CUMMING          GA 30040

**LICENSE NUMBER: RZ4090**

**EXPIRATION DATE: NOVEMBER 30, 2022**

Always verify licenses online at MyFloridaLicense.com

Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.



COMMONWEALTH of VIRGINIA
Department of Professional and Occupational Regulation
9960 Mayland Drive, Suite 400, Richmond, VA 23233
Telephone: (804) 367-8500

REAL ESTATE APPRAISER BOARD

CERTIFIED GENERAL REAL ESTATE APPRAISER

RICKY ANDREW KENNY
327 DAHLONEGA ST STE 104
CUMMING, GA 30040

EXPIRES ON
02-28-2022

NUMBER
4001017925

DPOR

Mary Broz-Vaughan, Director

DPOR-LIC (02/2017)
(DETACH HERE)

---

COMMONWEALTH of VIRGINIA
Department of Professional and Occupational Regulation

REAL ESTATE APPRAISER BOARD
CERTIFIED GENERAL REAL ESTATE APPRAISER
NUMBER: 4001017925   EXPIRES: 02-28-2022

RICKY ANDREW KENNY
327 DAHLONEGA ST STE 104
CUMMING, GA 30040

(SEE REVERSE SIDE FOR PRIVILEGES AND INSTRUCTIONS)

Status can be verified at http://www.dpor.virginia.gov

(FOLD)

DPOR-PC (02/2017)

PATENTS 5,197,765  5,943,183

Status can be verified at http://www.dpor.virginia.gov

EXHIBIT C 2019 BROWN-HARRIS

Rick Andrew Kenny
Kenny And Associated, Inc
327 Dahlonega St Suite 104
Cumming, GA  30040

**STATE OF OHIO**
**DIVISION OF REAL ESTATE**
**AND PROFESSIONAL LICENSING**

AN APPRAISER LICENSE/CERTIFICATE
has been issued under ORC Chapter 4763 to:

NAME: Rick Andrew Kenny
LIC/CERT NUMBER: 2020000529
LIC LEVEL: Cert. General R. E. Appraiser - Out of State
CURRENT ISSUE DATE: 02/11/2020
EXPIRATION DATE: 02/11/2021
USPAP DUE DATE: 02/11/2022

**State of Missouri**

*Division of Professional Registration*
**State Certified General Real Estate Appraiser**

**VALID THROUGH JUNE 30, 2022**
**ORIGINAL CERTIFICATE/LICENSE NO. 2020031001**
**RICK KENNY**
**4170 CUMBERLAND POINT DR**
**GAINESVILLE GA 30504**
**USA**

RICK KENNY
4170 CUMBERLAND POINT DR
GAINESVILLE GA 30504
USA

**State of Missouri**

*Missouri Department of Commerce and Insurance*
*Division of Professional Registration*
*Real Estate Appraisers Commission*
**State Certified General Real Estate Appraiser**

**VALID THROUGH JUNE 30, 2022**
**ORIGINAL CERTIFICATE/LICENSE NO. 2020031001**

**RICK KENNY**
**4170 CUMBERLAND POINT DR**
**GAINESVILLE GA 30504**
**USA**

**EXECUTIVE DIRECTOR**

**DIVISION DIRECTOR**

EXHIBIT C 2019 BROWN PARRIS



WYOMING REAL ESTATE
COMMISSION & CERTIFIED APPRAISER BOARD

License Number  AP-1953                                    NON TRANSFERABLE

# CER TIFIED REAL EST  ATE APPRAISER PERMIT

Issued : 10/29/2020
Expires: 10/28/2022

## Rick A. Kenny

Certified General Appraiser Permit
AS PROVIDED FOR BY THE LAWS OF WYOMING.

Kenny and Associates Inc                    AUTHORIZED BY THE WYOMING CERTIFIED
327 Dahlonega St                            REAL ESTATE APPRAISER BOARD
Cumming GA 30040                            WITNESS MY HAND AND THE
                                            OFFICIAL SEAL AT CHEYENNE, WYOMING.

                                            *Nicole Novotny Smith*

                                            Nicole Novotny Smith Executive Director





STATE OF ARKANSAS



APPRAISER LICENSING & CERTIFICATION BOARD

*Attests that*

Rick Andrew Kenny

On this date was certified as a

STATE CERTIFIED GENERAL APPRAISER

The Arkansas Appraiser Licensing and Certification Board hereby affirms that this Certification is issued in accordance with all the requirements of Arkansas Code Annotated, Section 17-14-101 et seq., and subsequently adopted "Rules and Regulations" and shall remain in force when properly supported by a current pocket identification card.

2/13/2021
Date Issued

CG-4649
Certification Number

*Cary C. Martin*

Chairman, AALCB

# EXHIBIT C - BROWN-HARRS

# STATE OF GEORGIA
# REAL ESTATE APPRAISERS BOARD

## RICK ANDREW KENNY

### 628

IS AUTHORIZED TO TRANSACT BUSINESS IN GEORGIA AS A
## CERTIFIED GENERAL REAL PROPERTY APPRAISER

THE PRIVILEGE AND RESPONSIBILITIES OF THIS APPRAISER CLASSIFICATION SHALL CONTINUE IN EFFECT AS LONG AS THE APPRAISER PAYS REQUIRED APPRAISER FEES AND COMPLIES WITH ALL OTHER REQUIREMENTS OF THE OFFICIAL CODE OF GEORGIA ANNOTATED, CHAPTER 43-39-A. THE APPRAISER IS SOLELY RESPONSIBLE FOR THE PAYMENT OF ALL FEES ON A TIMELY BASIS.

D. SCOTT MURPHY
Chairperson

JEFF A. LAWSON
Vice Chairperson

JEANMARIE HOLMES
KEITH STONE
WILLIAM A. MURRAY

1073710477556726

---

**RICK ANDREW KENNY**

|   | # | 628 |
|---|---|---|
| Status | | ACTIVE |

END OF RENEWAL
08/31/2022

CERTIFIED GENERAL REAL PROPERTY APPRAISER

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605

LYNN DEMPSEY
Real Estate Commissioner

1073710477556726

---

**RICK ANDREW KENNY**

|   | # | 628 |
|---|---|---|
| Status | | ACTIVE |

END OF RENEWAL
08/31/2022

CERTIFIED GENERAL REAL PROPERTY APPRAISER

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.



State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605

LYNN DEMPSEY
Real Estate Commissioner

1073710477556726

KENNY, RICK ANDREW
4170 CUMBERLAND POINT DR
GAINESVILLE, GA 30504

State of South Carolina
Department of Labor, Licensing and Regulation
**Real Estate Appraisers Board**
BCD **1305232**

**RICK A KENNY**

Is hereby entitled in practice as a:

**Certified General Appraiser**

License Number: **7161**

Expiration Date: 06/30/2022
**POCKET CARD**

*Laura L. Smith*
**Administrator**

State of South Carolina
Department of Labor, Licensing and Regulation
**Real Estate Appraisers Board**
BCD **1305232**

**RICK A KENNY**

Is hereby entitled in practice as a:

**Certified General Appraiser**

License Number: **7161**

Expiration Date: 06/30/2022
**OFFICE COPY**

*Laura L. Smith*
**Administrator**

*DO NOT PEEL CARD FROM A CORNER*

**To remove card from backing**
- **Bend** form back from the outside edge
- Pull card off backing



**State of Mississippi**
**MISSISSIPPI REAL ESTATE APPRAISER LICENSING**
**AND CERTIFICATION BOARD**
LICENSE # GA-1339 N.R.                    STATUS:   ACTIVE

**RICK ANDREW KENNY**

HAS BEEN GRANTED A LICENSE AS A
**STATE CERTIFIED GENERAL APPRAISER**
Effective Date:                                 Expiration Date:
12/01/2021                                      11/30/2023

SIGNATURE OF LICENSEE
Robert E. Praytor, Administrator

RICKY ANDREW KENNY
327 DAHLONEGA ST STE 104
CUMMING, GA 30040

TALCB
TEXAS APPRAISER LICENSING & CERTIFICATION BOARD

# Certified General Real Estate Appraiser

Appraiser: **Ricky Andrew Kenny**
License #: **TX 1380945 G**
License Expires: **11/30/2023**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Occupations Code, Chapter 1103, authorization is granted to use this title: Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB at www.talcb.texas.gov.

Chelsea Buchholtz
Commissioner

EXHIBIT C-2019 BROWN-HARRIS



# Commonwealth of Kentucky

## Kentucky Real Estate Appraiser's Board

2021 - 22

*Hereby grants a*

Certified General Real Property Appraiser

*To* Rick Kenny
Kenny and Associates, Inc.
327 Dahlonega St.
Suite 104
Cumming, GA 30040

License № 5397

*who has complied with the provisions of Chapter 324A of the Kentucky Revised Statutes IN WITNESS WHEREOF, we have caused the official seal to be fixed and attested for the year shown above.*

John G. Kenkel, Jr., Chair
Russ C. Lohan, Vice Chair
Justin W. Noble
William Jeffrey Fultz
John Brewer

**This certificate expires** 6/30/2022

EXHIBIT C 2049 BROWN-HARRIS

4307

APR-CGA





EXHIBIT C 2019 BROWN-HARRIS



NORTH CAROLINA
APPRAISAL BOARD

**APPRAISER QUALIFICATION CARD**

REGISTRATION / LICENSE / CERTIFICATE HOLDER

**RICK A KENNY**

| A8280 | G | Y |
|---|---|---|
| APPRAISER NUMBER | TYPE | NATIONAL REGISTRY |

Appraiser's Signature        Executive Director

**EXPIRES JUNE 30, 2022**

EXHIBIT C-2019

STATE OF TENNESSEE
COMMERCE AND INSURANCE

**RICK ANDREW KENNY**

33991

ID NUMBER: 5434
LIC STATUS: ACTIVE
EXPIRATION DATE: December 06, 2023

**TENNESSEE REAL ESTATE APPRAISER COMMISSION**
**CERTIFIED GENERAL REAL ESTATE APPRAISER**
THIS IS TO CERTIFY THAT ALL REQUIREMENTS
OF THE STATE OF TENNESSEE HAVE BEEN MET

ATTN:KENNY AND ASSOCIATES, INC
RICK ANDREW KENNY
327 DAHLONEGA STREET
SUITE 104
CUMMING GA  30040

# State of Tennessee

12774414

**TENNESSEE REAL ESTATE APPRAISER COMMISSION**
**CERTIFIED GENERAL REAL ESTATE APPRAISER**
**RICK ANDREW KENNY**

*This is to certify that all requirements of the State of Tennessee have been met.*



**ID NUMBER: 5434**
**LIC STATUS: ACTIVE**
**EXPIRATION DATE: December 06, 2023**

**IN-1313**
**DEPARTMENT OF**
**COMMERCE AND INSURANCE**

# STATE OF GEORGIA
# REAL ESTATE APPRAISERS BOARD

## RICK ANDREW KENNY

### 628

IS AUTHORIZED TO TRANSACT BUSINESS IN GEORGIA AS A
## CERTIFIED GENERAL REAL PROPERTY APPRAISER

THE PRIVILEGE AND RESPONSIBILITIES OF THIS APPRAISER CLASSIFICATION SHALL CONTINUE IN EFFECT AS LONG AS THE APPRAISER PAYS REQUIRED APPRAISER FEES AND COMPLIES WITH ALL OTHER REQUIREMENTS OF THE OFFICIAL CODE OF GEORGIA ANNOTATED, CHAPTER 43-39-A. THE APPRAISER IS SOLELY RESPONSIBLE FOR THE PAYMENT OF ALL FEES ON A TIMELY BASIS.

D. SCOTT MURPHY
Chairperson

JEFF A. LAWSON
Vice Chairperson

JEANMARIE HOLMES
KEITH STONE
WILLIAM A. MURRAY

1073710477558728

---

KENNY, RICK ANDREW
4170 CUMBERLAND POINT DR
GAINESVILLE, GA 30504

**RICK ANDREW KENNY**

| # | 628 | |
| Status | ACTIVE | END OF RENEWAL 08/31/2022 |

CERTIFIED GENERAL REAL PROPERTY APPRAISER

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605

LYNN DEMPSEY
Real Estate Commissioner

1073710477556726

---

**RICK ANDREW KENNY**

| # | 628 | |
| Status | ACTIVE | END OF RENEWAL 08/31/2022 |

CERTIFIED GENERAL REAL PROPERTY APPRAISER

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605

LYNN DEMPSEY
Real Estate Commissioner

1073710477556726

---

Report Version 8

Generated on 8/2/2021 at 1.28.21 PM

# OFFICIAL ACADEMIC RECORD
## for APPRAISERS – GEORGIA

*This document certifies that*

## Rick A. Kenny, MAI, SRA

**GA Appraiser License Number: 628**

Kenny and Associates, Inc.
327 Dahlonega Highway, Suite 104
Cumming, GA 30040

*has attended and passed the exam for this Appraisal Institute program*

**Valuation of Conservation Easements**

*(GA Program License Number: 67553, expires 12/31/2017)*
*at Chicago Chapter Education Center in Chicago, IL.*

*03/20/2017 - 03/23/2017.*

Attendance Hours: 28.0  Exam Hours: 2.0

**The Georgia Real Estate Appraisers Board has approved**
**this program for 28.0 classroom hours and 2.0 exam hours.**

Attendance was 100% with a passing grade.

Verified by  on 03/24/2017
**Suzanne M. Siradas**
Director, Education Resources
State Certification/Licensing

Appraisal
Institute®

*Professionals Providing*
*Real Estate Solutions*

EXHIBIT C 2019 BROWNPARRIS

# Douglas Kenny, MAI

327 Dahlonega Street, Suite 104 • Cumming, GA 30040
770.823.3816 • doug@kennyre.com

## EDUCATION

**GEORGIA INSTITUTE OF TECHNOLOGY, College of Engineering**          **Atlanta, Georgia**
**Bachelor of Science in Industrial Engineering**          *August 2007 – December 2010*
- General Track          GPA: 3.08

**APPRAISAL EDUCATION**          *January 2011 - Present*
- General Appraiser Income Approach Parts One & Two
- General Market Analysis and Highest and Best Use
- General Appraiser Sales Comparison Approach
- General Appraiser Site Valuation & Cost Approach
- General Appraiser Report Writing and Case Studies
- Real Estate Finance Statistics and Valuation Modeling
- Advanced Concepts and Case Studies
- Advanced Income Approach
- Valuation of Conservation Easements (Appraisal Institute) (Passed)
- Mineral Property Valuation 1 – Standards and Guidelines (Edumine)
- Mineral Property Valuation 2 – Approaches and Methods (Edumine)
- Environmental Awareness for Resource Planning (Edumine)

## WORK EXPERIENCE

**Kenny and Associates, Inc.**          **Cumming, Georgia**
*MAI Designated Member*          *April 2016 – Present*

**Kenny and Associates, Inc.**          **Cumming, Georgia**
*Certified General Appraiser*          *January 2014 – Present*

**Kenny and Associates, Inc.**          **Cumming, Georgia**
*Appraiser Trainee*          *January 2011 – January 2014*
- Research assistant
- Performs property inspections under the supervision of Rick Kenny
- Performs data analysis while creating forecast models to project future market trends

## PROFESSIONAL AFFILIATIONS

**MAI Designation, Appraisal Institute**

**Certified General Real Property Appraiser: Georgia (#344167), Alabama (#G01326), Tennessee (#5435),**

**Oklahoma (#13326CGA), Arkansas (#CG-4471), South Carolina (#AB.7804CG)**

**Licensed Georgia Real Estate Agent**

**Georgia Institute of Technology Alumni Association**

## PROFESSIONAL SKILLS

- Coursework: Engineering Optimization; Safety Engineering; Stochastic; Quality Control Engineering; Engineering Economics; Engineering Statistics; Life Cycle Cost Analysis; Engineering Economy
- Group projects: Gained invaluable leadership experience while working with the admissions department for Georgia Tech: reworking the admissions process, increasing efficiency, and finding the ideal Georgia Tech student more cost effectively.
- Programs: Proficient in Microsoft Excel, Word, PowerPoint, Wintotal, and Apex Medina.

## AWARDS AND ACHIEVEMENTS
- Georgia Tech Tennis Player
- Total Person Award given to one athlete per team for leadership and excellence through the year

# State of South Carolina
# Real Estate Appraisers Board

Having Complied With The Requirements Prescribed By Law, Is Hereby Entitled To Practice As A
Having Satisfied The Qualifications Of The South Carolina Real Estate Appraisers Board And

## CERTIFIED GENERAL APPRAISER

### DOUG ROSS KENNY

7804

In Witness Thereof, The State Of South Carolina Real Estate Appraisers Board By Virtue Of The
Authority Vested In It By Chapter 60, Title 40, Code Of Laws Of South Carolina Has Caused This
Document To Be Issued With Its Seal Imprinted Hereon.

*Laura G. Smith*

Administrator

Property of South Carolina Real Estate Appraisers Board

DEPARTMENT OF
COMMERCE AND INSURANCE

DOUGLAS ROSS KENNY

ID NUMBER: 5435
LIC STATUS: ACTIVE
EXPIRATION DATE: December 06, 2023

34111

TENNESSEE REAL ESTATE APPRAISER COMMISSION
CERTIFIED GENERAL REAL ESTATE APPRAISER
THIS IS TO CERTIFY THAT ALL REQUIREMENTS
OF THE STATE OF TENNESSEE HAVE BEEN MET

ATTN:KENNY AND ASSOCIATES, INC
DOUGLAS ROSS KENNY
327 DAHLONEGA ST.
SUITE 104
CUMMING GA  30040

# State of Tennessee

12801174

### TENNESSEE REAL ESTATE APPRAISER COMMISSION
#### CERTIFIED GENERAL REAL ESTATE APPRAISER
#### DOUGLAS ROSS KENNY

*This is to certify that all requirements of the State of Tennessee have been met.*



ID NUMBER: 5435
LIC STATUS: ACTIVE
EXPIRATION DATE: December 06, 2023

IN-1313
DEPARTMENT OF
COMMERCE AND INSURANCE

EXHIBIT C 2019 BROWN-PARRIS

# STATE OF GEORGIA
# REAL ESTATE APPRAISERS BOARD

### DOUGLAS R KENNY

### 344167

IS AUTHORIZED TO TRANSACT BUSINESS IN GEORGIA AS A
### CERTIFIED GENERAL REAL PROPERTY APPRAISER

THE PRIVILEGE AND RESPONSIBILITIES OF THIS APPRAISER CLASSIFICATION SHALL CONTINUE IN EFFECT AS LONG AS THE APPRAISER PAYS REQUIRED APPRAISER FEES AND COMPLIES WITH ALL OTHER REQUIREMENTS OF THE OFFICIAL CODE OF GEORGIA ANNOTATED, CHAPTER 43-39-A. THE APPRAISER IS SOLELY RESPONSIBLE FOR THE PAYMENT OF ALL FEES ON A TIMELY BASIS.

D. SCOTT MURPHY
Chairperson

JEANMARIE HOLMES
KEITH STONE
WILLIAM A. MURRAY

JEFF A. LAWSON
Vice Chairperson

1514531340235046

---

KENNY, DOUGLAS R
327 DAHLONEGA STREET SUITE 104
CUMMING, GA 30040

**DOUGLAS R KENNY**

\# 344167
Status ACTIVE

END OF RENEWAL
02/28/2022

**CERTIFIED GENERAL REAL PROPERTY APPRAISER**

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605



LYNN DEMPSEY
Real Estate Commissioner

1514531340235046

**DOUGLAS R KENNY**

\# 344167
Status ACTIVE

END OF RENEWAL
02/28/2022

**CERTIFIED GENERAL REAL PROPERTY APPRAISER**

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605

LYNN DEMPSEY
Real Estate Commissioner

1514531340235046

EXHIBIT C - 2019 - BROWN HARRIS

Case 3:22-cv-... Document ... Filed ... Page 548 of 600

# State of Alabama

This is to certify that

## Douglas Ross Kenny

*having given satisfactory evidence of the necessary qualifications required by the laws of the State of Alabama is licensed to transact business in Alabama as a*

**Certified General Real Property Appraiser**

*With all rights, privileges and obligations appurtenant thereto.*

LICENSE NUMBER: **G01326**

EXPIRATION DATE: **09/30/2023**

Executive Director

ALABAMA REAL ESTATE APPRAISERS BOARD



# OFFICIAL ACADEMIC RECORD
# for APPRAISERS – GEORGIA

*This document certifies that*

## Doug Kenny, MAI

**GA Appraiser License Number: 344167**

Kenny & Associates
215 Lake Heights Drive 215 Lake Heights Drive
Alpharetta, GA 30022

*has attended and passed the exam for this Appraisal Institute program*

**Valuation of Conservation Easements**

*(GA Program License Number: 67553, expires 12/31/2017)
at Chicago Chapter Education Center in Chicago, IL*

*03/20/2017 - 03/23/2017.*

Attendance Hours: 28.0  Exam Hours: 2.0

**The Georgia Real Estate Appraisers Board has approved
this program for 28.0 classroom hours and 2.0 exam hours.**

Attendance was 100% with a passing grade.

Verified by  *Suzanne M. Siradas*  on 03/24/2017

**Suzanne M. Siradas**
Director, Education Resources
State Certification/Licensing

Appraisal Institute®

*Professionals Providing
Real Estate Solutions*

EXHIBIT C 2019 BROWN-HARRIS



# CERTIFICATE
## OF COMPLETION

This certifies that

# Doug Kenny

has successfully completed requirements for certification in the online course

## Environmental Awareness for Resource Planning

and was awarded  0.5  Continuing Education Units

The International Association for Continuing Education and Training (IACET) has approved Edumine as a provider of continuing education and training. Edumine can award Continuing Education Units to those who complete the requirements for certification in an online course.

Katja Freitag, VP Education Solutions

August 15, 2019

EXHIBIT C 2019 BROWN-HARRIS
Case 3:22-cv-01616-AGS-DDL Document 4-10 Filed 01/24/22 PageID.818 Page 551 of 600



# CERTIFICATE
## OF COMPLETION

This certifies that

# Doug Kenny

has successfully completed requirements for certification in the online course

## Mineral Property

## Valuation 2 - Approaches and Methods

and was awarded  1.0  Continuing Education Units

The International Association for Continuing Education and Training (IACET) has approved Edumine as a provider of continuing education and training. Edumine can award Continuing Education Units to those who complete the requirements for certification in an online course.

*Kfreitag*

Katja Freitag, VP Education Solutions

August 13, 2019

EXHIBIT C 2019 BROWN-HARRIS



# CERTIFICATE
## OF COMPLETION

This certifies that

# Doug Kenny

has successfully completed requirements for certification in the online course

## Mineral Property Valuation

## 1 - Standards and Guidelines

and was awarded  0.6  Continuing Education Units

The International Association for Continuing Education and Training (IACET)
has approved Edumine as a provider of continuing education and training.
Edumine can award Continuing Education Units to those who complete the
requirements for certification in an online course.

*Katja Freitag, VP Education Solutions*

July 31, 2019

**EXHIBIT 8.2**

**LIABILITY INSURANCE**



# LIA Administrators & Insurance Services



ASPEN

## APPRAISAL, VALUATION AND PROPERTY SERVICES
## PROFESSIONAL LIABILITY INSURANCE POLICY

### DECLARATIONS

**Aspen American Insurance Company**

(Referred to below as the "Company")
590 Madison Avenue, 7th Floor
New York, NY 10022
877-245-3510

| Date Issued | Policy Number | Previous Policy Number |
|---|---|---|
| 5/11/2021 | AAI000894-07 | AAI000894-06 |

THIS IS A **CLAIMS** MADE AND REPORTED POLICY. COVERAGE IS LIMITED TO LIABILITY FOR ONLY THOSE **CLAIMS** THAT ARE FIRST MADE AGAINST THE **INSURED** DURING THE **POLICY PERIOD** AND THEN REPORTED TO THE COMPANY IN WRITING NO LATER THAN SIXTY (60) DAYS AFTER EXPIRATION OR TERMINATION OF THIS POLICY, OR DURING THE **EXTENDED REPORTING PERIOD**, IF APPLICABLE, FOR A **WRONGFUL ACT** COMMITTED ON OR AFTER THE **RETROACTIVE DATE** AND BEFORE THE END OF THE **POLICY PERIOD**. PLEASE READ THE POLICY CAREFULLY.

1. Customer ID:  117387
   Named Insured:
   KENNY AND ASSOCIATES, INC.
   RICK KENNY AND ASSOCIATES INC,
   Rick Kenny
   327 Dahlonega St., Suite 104
   Cumming, GA 30040

2. **Policy Period:** From: 05/23/2021  To: 05/23/2022
   12:01 A.M. Standard Time at the address stated in 1 above.

3. **Deductible:** $1000  Each **Claim**

4. **Retroactive Date:** 05/23/1994

5. **Inception Date:** 05/23/2015

6. Limits of Liability:  A. $1,000,000  Each Claim
   B. $2,000,000  Aggregate

   Subpoena Response: $5,000 Supplemental Payment Coverage
   Pre-Claim Assistance: $5,000 Supplemental Payment Coverage
   Disciplinary Proceeding: $12,500 Supplemental Payment Coverage
   Loss of Earnings: $500 per day Supplemental Payment Coverage

7. **Covered Professional Services (as defined in the Policy and/or by Endorsement):**

   | | Yes | No | |
   |---|---|---|---|
   | Real Estate Appraisal and Valuation: | | | |
   | Residential Property: | X | | |
   | Commercial Property: | X | | |
   | Bodily Injury and Property Damage Caused During Appraisal Inspection ($100,000 Sub-Limit): | X | | (If "yes", added by endorsement) |
   | Right of Way Agent and Relocation: | | X | |
   | Machinery and Equipment Valuation: | | X | |
   | Personal Property Appraisal: | | X | (If "yes", added by endorsement) |
   | Real Estate Sales/Brokerage: | | X | (If "yes", added by endorsement) |

**EXHIBIT 8.3.**

**BASELINE DOCUMENTATION REPORT**

EXHIBIT C - 2019 BROWN-HARRIS



# Log Creek 3
## TALIAFERRO COUNTY, GA

## BASELINE DOCUMENTATION REPORT

**Prepared by Elizabeth Branch**
**As a project for the Oconee River Land Trust**

**Date of Report:  10/28/19**

1

OCONEE RIVER LAND TRUST                                          LOG CREEK 3

**Project/Property Name:   Log Creek, LLLP (also referred to as "Property" in this report)**

**Baseline Gathered By:   ELIZABETH BRANCH**

**Qualifications**: Elizabeth Branch holds a Master of Science in Wildlife Biology with a certificate in Conservation Ecology and Sustainable Development from the University of Georgia.  She has been principal and owner of Natural Resource Consultants, LLC since 1998 and has extensive experience in land conservation and land management.   She is on the Advisory Board and served as President of the Madison Morgan Conservancy.

**Purpose of Baseline Documentation Report:**
This Baseline Documentation Report (BDR) has been prepared in order to document the subject Property's existing conditions, including conservation values, location, and man-made features. This BDR will also be used by Oconee River Land Trust (ORLT) as a reference point for future monitoring and enforcement activities.

## I. GENERAL INFORMATION

**A. Date Visited**
The Property was visited on October 17, 2019 by Elizabeth Branch. All portions of the tract and each habitat type were inspected on foot and by vehicle.

**B. Owner**
The current owner of the Property is **Log Creek, LLLP,** (Grantor). The current Property owner's address is 1280 Snows Mill Road, Bogart, GA 30622.

**C. Location**
The entrance to this tract is located at Raytown Rd NE, Crawfordville, GA 30631 in Taliaferro County, approximately 6 miles east of Crawfordville, GA. See **Attachment 1** for a location map.

**D. Directions from Crawfordville, GA**
To reach the Property from the center of Crawfordville, GA, travel east on Broad St for approximately 0.4 miles. Then turn left onto GA Hwy 47 (Sharon Rd NE) for approximately 5.7 miles. Continue straight onto Raytown Rd NE for approximately 1.5 miles and the Property is on the left. See the location map in **Attachment 1**.

**E. Survey and Legal Description**
The legal boundary (survey) of the Property is shown in **Attachment 2**. The legal description is shown in **Attachment 3**.

**F. Name of Quad Map, Series, Coordinates of Property**
USGS 7.5 min series Sharon, GA, Quadrangle Map. The center of the Property is at **33°34'12.13"N,  82°46'24.74"W.**

2

**G. Size**
The Property is approximately 272.98 acres.

## II. INVENTORY REPORT

This baseline documents conditions on the Property as of the date of the report. It is not an exhaustive inventory, and conditions may change over time.

**A. General Description of Property**
The Property exists as one tract in central Taliaferro County, GA. It is in the Little River Watershed HUC 03060105.

The Property is in a rural area surrounded by farms and timber properties.

The Property is primarily planted loblolly with narrow stream buffers along Reedy Creek and its tributaries.

An extensive road system provides access for recreation and future timber harvests. The interior roads are dirt and gravel.

See **Attachment 4** for an aerial view of the Property. For photos of the Property, see **Attachments 13** and **14**.

**B. Topography**
The Property is gently rolling. Elevation varies between 460 and 580 feet above MSL, with the lowest points along Reedy Creek and the highest point near the entrance at Raytown Road NE. These topographic features can be seen in **Attachment 5**.

**C. Soils and Geology**
The Property is located in the Southern Outer Piedmont Ecoregion of Georgia. **Attachment 19** shows the Property's location within Georgia's ecoregions. The soils in this region tend to be finer-textured than soils in the Coastal Plain Ecoregion. Once widely cultivated, much of Georgia's Piedmont has reverted to pine and hardwood woodlands.

Soils of the Chataula coarse sandy loam, Cataula-Cecil complex, Chewacla silt loam, Hard Labor-Appling complex, Helena loamy sand, Pacolet loamy sand, Prosperity-Helena complex, and Prosperity-Helena-Bush River complex make up the majority of the Property. A general soils map is presented in **Attachment 6**.

The USDA/NRCS classifies farmland based on how valuable it is for agriculture. The Property has approximately 71.7 acres (26%) of land that is classed as **Farmland of Statewide Importance** and 36.9 acres (14%) of **Prime Farmland**.

3

**D.  Water Resources**
Reedy Creek is a perennial stream that runs through the northwestern portion of the Property for approximately 2,560 feet.  A perennial tributary of Reedy Creek runs through the middle of the Property for approximately 4,780 ft before joining it. Another perennial tributary flows through the northern portion of the Property for approximately 590 ft and then joins Reedy Creek.  There are six ephemeral streams on the Property that feed into Reedy Creek and its tributaries and total 3,200 ft. After leaving the Property, Reedy Creek flows in a northeasterly direction for approximately 19,000 ft and then joins the Little River.

Reedy Creek is approximately 10 to 15 feet across with a sandy bottom and some bouldery shoals.  It has deep incising along some of its banks.

Reedy Creek and its tributaries are in the Little River Watershed, portions of which have been designated as **high priority watersheds** by Georgia Department of Natural Resources (GA DNR).  Streams are listed by the GA DNR and State Wildlife Action Plan documents as **high priority habitats** in the Piedmont Ecoregion of Georgia. See **Attachment 16** for descriptions of the kinds of high priority habitat that are found on the Property.

The Property's water resources are identified in **Attachment 7**, which shows a 200-foot riparian buffer on the perennial streams and a 100-foot riparian buffer on the ephemeral streams. **Attachment 20** shows the Property's location in the Little River Watershed. **Attachment 15** describes the Little River's journey through the Little River Watershed into the Savannah River Basin.

**E.  Vegetation and Habitat**
Current habitat and land use types are identified in the Ecological Features Map in **Attachment 9**.  The approximate acreage of each type is as follows: mature planted pine (168.4 acres), young planted pine (79.4), Mesic Hardwood (21.4 acres), and foodplots (3.0 acres)**. Mesic Hardwood Forest** and **Streams** are listed by the GA DNR and State Wildlife Action Plan documents as **high priority habitats** in the Piedmont Ecoregion of Georgia. See **Attachment 16** for descriptions of the kinds of high priority habitat that are found on the Property.

The majority of the Property is made up of planted pine. There are two stands of loblolly pine trees.  The largest was planted in 2006 and the other stand – which was previously Mesic Hardwood and Oak-Hickory-Pine forest – was harvested 4 years ago and planted in 2015. These stands are made up of loblolly pine, dog fennel, blackberries, sweetgum saplings and grasses.

The **Mesic Hardwood Forests** are located along Reedy Creek and its tributaries.  These stands are narrow and have a mature overstory of white oak, water oak, American sycamore, red maple, northern red oak, southern red oak, and sweetgum. The mid- and understories consist of overstory saplings, paw paw, river cane, wood oats, wild ginger, smartweed, greenbrier, matelea vine, and Christmas fern.

4

There are several small wildlife foodplots on the Property.  Some of these are well-maintained and have recently been planted.

Chinese privet, Chinaberry, Nepalese browntop, Japanese honeysuckle, and lespedeza – non-native species that are considered invasive by the Georgia Exotic Pest Council – were observed on the Property. See **Attachment 8** for a list of native and exotic plant species found on the Property, organized according to the kind of habitat in which they were observed.

**F.  Agricultural Resources**
The Property is being utilized for timber production.

**G.  Wildlife**
Field signs and individual sightings during the field surveys noted coyotes, gray squirrels, and white-tailed deer. Numerous resident and migrant songbirds, and other common landbirds, were also seen and heard while inspecting the tract, including cardinals, nuthatches, and blue jays. Though not observed on the Property, a host of other species typical of the Georgia Piedmont may be present. **Attachment 17** lists some of these species.

**H.  Rare or Endangered Species Known to Exist**
No endangered or threatened species are known to occur on the Property. A full rare species survey was not conducted, but the Property has suitable habitat for some rare or endangered plant and animal species. **Attachment 18** lists some of these species.

**I.  Cultural Resources**
No cultural resources were observed on the Property.

**J.  Scenic Character and Views from Public Roads/Waters**
Scenic views of the Property are available from Raytown Road and Fairplay Road.

**K.  Existing Man-Made Structures**
The only man-made structures on the Property are roads and firebreaks. See **Attachment 11** for a map showing the locations of these man-made features.

**L.  Evidence of Past Disturbances**
No evidence of heavy storms, fires, or other large scale events was noted during visit.

**M.  Former Land Uses**
The Property has been used for timber production for the last several decades.  Timber production is evidenced by the young, even-aged planted pine and timber loading docks.

**N.  Current Land Uses**
The Property is used for timber production and outdoor recreation.

**O. Management Plan in Effect, If Any**
No management plan currently exists for the tract. Frank Willis, the landowner's forester, will complete an FMP for the Property.

**P. Zoning and Local Planning Restrictions, If Relevant**
There are no known zoning or planning restrictions in force that affect the use of this Property.

**Q. Adjacent Land Attributes and Uses; Existing and Potential Conflicts**
The Property is adjacent to farms and forested tracts of various sizes. There are no known conflicts with adjacent landowners.

**R. Amount and Type of Current Public Access and Public Use**
The landowner and invited guests hike, hunt, and observe wildlife on the Property at this time. No formal plans for public use exist.

**S. Evidence of Presence of Hazardous Waste**
No evidence of hazardous waste was noted during field visit.

**T. Proximity to Other Protected Land**
ORLT holds 2 conservation easments located within 5 miles of the Property – Harden and Aiken. See **Attachment 12** for a map showing nearby protected properties. A. H. Stephens State Park and various other county and city parks are also located within 10 miles of the Property.

**U. Benefits of Conservation**
The current owner has decided to place the Property under a conservation easement (CE) that protects its conservation values. These conservation values include **high priority streams**, **high priority watersheds**, and **high priority habitats** in the state of Georgia. Protecting these values benefits the public, and the plants and animals that live on the Property and in the larger watershed.

This CE protects streams and plant habitat in the Little River Watershed, segments of which have been designated **high priority watersheds**, by enhancing stream buffers and reducing non-point source pollution which is critical for protecting water quality. Non-point source pollution – a type of pollution consisting of mud, litter, bacteria, pesticides, fertilizers, and a variety of other pollutants that are washed into rivers and streams by rainwater – is common in Georgia's rivers and streams. Stream buffers reduce the amount of these pollutants entering the waterways, thereby improving surface and groundwater quality which benefits people by providing cleaner drinking water and better recreational opportunities. Good water quality also provides healthy habitat for plants and animals living in the watershed. In addition, rivers and riparian buffers on the Property act as valuable dispersal corridors for plant and animal species passing through the Property.

6

This CE protects **high priority habitats** as well, including habitat combinations that are important for many species of plants and animals. High priority habitats that the Property protects include: **Mesic Hardwood Forest** and **Streams**. See **Attachment 9** for the location of these habitats.

In addition, the Property supports active forestry lands, which also have conservation value. See **Attachment 10** for the location of the Forestry Envelope.

A two-acre Residential Envelope (RE) and a two-acre Barn Envelope (BE) are proposed for flat areas in the planted pine and along an existing interior roads. Given that the RE and BE are located in a flat areas along an existing road, and are not near any of the streams on the Property, the proposed RE and BE and uses will not impact the Property's conservation value. See **Attachment 10** for the location of the RE and BE.

Properly exercised, reserved rights and the permitted uses will not negatively impact the conservation values.

EXHIBIT C - 2019 BROWN-PARRIS

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

In compliance with Section 1.170A - 14(g)(5) of the federal tax regulations, LOG CREEK, LLLP, owner of the Property referenced and described by this report, and the OCONEE RIVER LAND TRUST, INC., do hereby acknowledge that this report is an accurate representation of the Property as of the date of the conveyance of the conservation easement referenced in this report by the landowner ("Grantor") to the Oconee River Land Trust ("Grantee").

Sworn to and subscribed before me

NOTARY PUBLIC

This the _23_ day of _Dec_ 20_19_

My commission expires:

(SEAL)   Karen E Mims
         NOTARY PUBLIC
OGLETHORPE COUNTY, GEORGIA
    My Commission Expires
         11/11/2023

**Log Creek, LLLP**

By: _____

Name: Tony D. Townley_

Title: General Partner

Date: _____

By: _____

Name: Elizabeth A. Townley

Title: General Partner

Date: _____

Sworn to and subscribed before me

Caroline Johnson Hall

NOTARY PUBLIC

This the _20th_ day of _Dec_ 20_19_

My commission expires: _10-31-2022_

(SEAL)

**Oconee River Land Trust, Inc.**

By: _John S. Willis_

Name: _John S. Willis_

Title: _Vice-chair_

Date: _Dec. 20, 2019_

8

## III. ATTACHMENTS

1. Location Map
2. Survey
3. Legal Description
4. Aerial Photograph
5. Topographic Map
6. Soils Map
7. Riparian Buffer Map
8. Plant List
9. Ecological Features Map
10. Conservation Easement Map
11. Man-Made Features Map
12. Nearby Protected Properties Map
13. Photo Location Map
14. Photos
15. Appendix 1: Water Resources
16. Appendix 2: Vegetation and Habitat
17. Appendix 3: Wildlife
18. Appendix 4: Rare or Endangered Species
19. Georgia Ecoregions Map
20. Georgia Watersheds Map

Map Disclaimer: Maps contained in this report are not surveys and must not be construed as surveys. The information imparted with these maps is meant to assist the parties in their efforts to clearly depict Property boundaries, describe placement of certain retained and reserved rights, and to calculate acreage figures. Property boundaries, while approximate, were established using the best available information that may include: surveys, tax maps, and field mapping using G.P.S. and/or ortho photos.

Unless otherwise noted, maps were created on October 24, 2019.

EXHIBIT C - 2019 BROWN HARRIS

OCONEE RIVER LAND TRUST                                          LOG CREEK 3

## ATTACHMENT 1:  LOCATION MAP



10

EXHIBIT C 2019 BROWN-HARRIS

OCONEE RIVER LAND TRUST                                           LOG CREEK 3

## ATTACHMENT 2: SURVEY



11

EXHIBIT C-2019 BROWN-HARRIS

OCONEE RIVER LAND TRUST

LOG CREEK 3

## ATTACHMENT 3:  LEGAL DESCRIPTION.

All that tract or parcel of land situate, lying and being in the 172nd District, G.M., Taliaferro County, Georgia, lying at the westerly corner of the intersection of Sharon-Raytown Road (an 80' right of way) and the centerline of the right of way of Fairplay Road (unpaved), containing 272.98 acres, more or less, as shown on plat of survey entitled "CERTIFY TO:  LOG CREEK, LLLP" by Baseline Surveying & Engineering, Inc., Matthew D. Ulmer, Registered Land Surveyor, dated October 16, 2019, recorded in Plat Book ___10_____, page ____63____, in the Office of the Clerk of the Superior Court of Taliaferro County, Georgia, which plat by reference thereto is incorporated herein.

12

EXHIBIT C 2019 BROWN-HARRIS

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

## ATTACHMENT 4:  AERIAL PHOTOGRAPH



Taliaferro County, GA

13

EXHIBIT C-2019 BROWN-HARRIS

OCONEE RIVER LAND TRUST                                     LOG CREEK 3

## ATTACHMENT 5:  TOPOGRAPHIC MAP



Taliaferro County, GA

0    feet    750

1 in to  750 ft

14

EXHIBIT C-2019 BROWN-HARRIS

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

## ATTACHMENT 6: SOILS MAP



Taliaferro County, GA

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

## SOILS MAP LEGEND

| Map unit symbol | Map unit name | Farmland Classification | Acres | Percent |
|---|---|---|---|---|
| CaB | Cataula coarse sandy loam, 2 to 6 percent slopes, very bouldery | Not prime farmland | 31.3 | 11.47% |
| CaD | Cataula coarse sandy loam, 6 to 15 percent slopes, very bouldery | Not prime farmland | 2.3 | 0.84% |
| CcB2 | Cataula-Cecil complex, 2 to 6 percent slopes, moderately eroded | Farmland of statewide importance | 0.8 | 0.29% |
| ChA | Chewacla silt loam, 0 to 2 percent slopes, frequently flooded | Farmland of statewide importance | 34 | 12.46% |
| HbB | Hard Labor-Appling complex, 2 to 6 percent slopes | All areas are prime farmland | 26.1 | 9.56% |
| HbD | Hard Labor-Appling complex, 6 to 15 percent slopes | Not prime farmland | 8.1 | 2.97% |
| HnB | Helena loamy coarse sand, 2 to 6 percent slopes | All areas are prime farmland | 10.8 | 3.96% |
| HoC | Helena loamy sand, 6 to 10 percent slopes | Farmland of statewide importance | 32.3 | 11.84% |
| PaB | Pacolet loamy sand, 2 to 6 percent slopes, bouldery | Not prime farmland | 10.6 | 3.88% |
| PaD | Pacolet loamy sand, 6 to 15 percent slopes, bouldery | Not prime farmland | 23.6 | 8.65% |
| PrE | Prosperity-Helena complex, 15 to 25 percent slopes, stony | Not prime farmland | 22.5 | 8.24% |
| PsB | Prosperity-Helena-Bush River complex, 2 to 6 percent slopes | Farmland of statewide importance | 4.6 | 1.69% |
| PsD | Prosperity-Helena-Bush River complex, 6 to 15 percent slopes | Not prime farmland | 65.9 | 24.15% |
| **Totals for Area of Interest** | | | **272.9** | **100%** |

16

EXHIBIT C 2019 BROWN-HARRIS

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

## ATTACHMENT 7: RIPARIAN BUFFER MAP



17

EXHIBIT C - LOG CREEK 3 BROWN PARRIS

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

**ATTACHMENT 8: PLANT LIST (List of Dominant, Co-Dominant and Understory Plant Species Identified on Property)**

**Pine Forests**

| Common Name | Scientific Name |
|---|---|
| *Dominant Species* | |
| Pine (Loblolly) | *Pinus taeda* |
| **Understory Species** | |
| Bluestem | *Andropogon* spp. |
| Asters | *Aster* spp. |
| American Beautyberry | *Callicarpa americana* |
| Trumpetcreeper | *Campsis radicans* |
| Spotted Wintergreen | *Chimaphila maculata* |
| Dogwood (Flowering) | *Cornus florida* |
| Dog Fennel | *Eupatorium capillifolium* |
| Carolina Jessamine | *Gelsemium sempervirens* |
| Lespedeza** | *Lespedeza* spp. |
| Sweetgum | *Liquidambar styraciflua* |
| Japanese Honeysuckle** | *Loniceria japonica* |
| Panic Grass | *Panicum* spp. |
| Oak (Southern Red) | *Quercus falcata* |
| Oak (Water) | *Quercus nigra* |
| Sumac | *Rhus* spp. |
| Plume Grass | *Saccharum alopecuroides* |
| Greenbrier | *Smilax* spp. |
| Goldenrod | *Solidago* spp. |
| Poison Ivy | *Toxicodendron radicans* |
| Muscadine Grape | *Vitus rotundifolia* |

18

EXHIBIT C 2019 BROWN-PARRIS

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

## Mesic Hardwood Forests

| Common Name | Scientific Name |
| --- | --- |
| **Dominant Species** | |
| Sweetgum | *Liquidambar styraciflua* |
| Yellow Poplar | *Liriodendron tulipifera* |
| Oak (White) | *Quercus alba* |
| Oak (Southern Red) | *Quercus falcata* |
| Oak (Northern Red) | *Quercus rubra* |
| Oak (Water) | *Quercus nigra* |
| **Co-Dominant Species** | |
| Maple (Red) | *Acer rubrum* |
| Musclewood | *Carpinus caroliniana* |
| Dogwood (Flowering) | *Cornus florida* |
| Persimmon | *Diospyros virginiana* |
| Ash (Green) | *Fraxinus pennsylvanica* |
| American hophornbeam | *Ostrya virginiana* |
| American sycamore | *Platanus occidentalis* |
| Black Cherry | *Prunus serotina* |
| Elm (Winged) | *Ulmus alata* |
| **Understory Species** | |
| Wild ginger | *Asarum* spp. |
| River cane | *Arundinaria gigantea* |
| American beautyberry | *Callicarpa americana* |
| River oats | *Chasmanthium latifolium* |
| Longleaf woodoats | *Chasmanthium sessiliflorum* |
| Carolina jasmine | *Gelsemium sempervirens* |
| Japanese Honeysuckle** | *Lonicera japonica* |

19

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

| Milkvine | *Matelea* spp. |
|---|---|
| Christmas fern | *Polystichum acrostichoides* |
| Blackberry | *Rubus* spp. |
| Greenbrier | *Smilax* spp. |
| Sparkleberry | *Vaccinium arboreum* |
| Muscadine Grape | *Vitus rotundifolia* |
| Netted chainfern | *Woodwardia areolata* |

**\*\* Denotes exotic species**

20

EXHIBIT C 2019 BROWN-HARRIS

OCONEE RIVER LAND TRUST　　　　　　　　　　　　　　　　LOG CREEK 3

## ATTACHMENT 9: ECOLOGICAL FEATURES MAP



EXHIBIT C 2019 BROWN-HARRIS

OCONEE RIVER LAND TRUST                                    LOG CREEK 3

## ATTACHMENT 10:  CONSERVATION EASEMENT MAP



OCONEE RIVER LAND TRUST

LOG CREEK 3

## ATTACHMENT 11: TOPOGRAPHIC MAP WITH MAN-MADE FEATURES



Taliaferro County, GA

23

## ATTACHMENT 12:  NEARBY PROTECTED PROPERTIES MAP



OCONEE RIVER LAND TRUST
EXHIBIT C 2019 BROWN-HARRIS
LOG CREEK 3

## ATTACHMENT 13: PHOTO LOCATION MAP



**ATTACHMENT 14: PHOTOGRAPHIC LOG**
**Photographer: Elizabeth Branch**       **Camera:  iPhone 7**
**Date: October 17, 2019**               **Time: 11:00 AM**
**Weather: Sunny, 60° F, Calm Winds**



**CP1a:  Entrance to Property from Raytown Road**
**(33° 33' 54.38'' N, 82° 46' 13.31'' W, 55°)**



**CP1b: View of Property from Raytown Road facing west**
**(33° 33' 54.38'' N, 82° 46' 13.31'' W, 280°)**

26

Case 3:22-cv-... Document 4... Filed 0... Page 582 of 600



**CP2a: Interior road through planted pine leading to potential Residential Envelope**
**(33º 34' 1.56'' N, 82º 46' 20.61'' W, 285º)**



**CP2b: View of road through pine facing south towards Raytown Road**
**(33º 34' 1.56'' N, 82º 46' 20.61'' W, 175º)**



**CP3a: Small foodplot in young pine plantation with ephemeral stream in the distance**
**(33° 34' 8.19" N, 82° 46' 28.77" W, 250°)**



**CP3b: Foodplot along interior road**
**(33° 34' 8.19" N, 82° 46' 28.77" W, 80°)**

Case 3:22-cv-00049-CDL　Document 43-1　Filed 10/14/24　Page 584 of 600



**CP4a: Ephemeral stream in Mesic Hardwood Forest with red maple, sweetgum, river cane, and netted chain fern (33° 34' 9.76" N, 82° 46' 32.48" W, 275°)**



**CP4b: Mesic Hardwood Forest with Chasmanthium, muscadine, and beautyberry (33° 34' 9.76" N, 82° 46' 32.48" W, 165°)**

29



**CP5a: Foodplot near ephemeral stream and planted pine**
(33º 34' 13.37'' N, 82º 46' 42.78'' W, 290º)



**CP5b: Planted loblolly pine with sweetgum, blackberry and broomsedge in understory**
(33º 34' 13.37'' N, 82º 46' 42.78'' W, 75º)

30

Case 3:22-cv-00149 Document 43-1 Filed 01/06/25 Page 586 of 600



**CP6a: Reedy Creek with river cane, river oats, dogwood, musclewood, red maple, Christmas fern, and American hop hornbeam along the banks (33º 34' 18.44" N, 82º 46' 52.28" W, 120°)**



**CP6b: Boulders along the banks of Reedy Creek with sand and silt along the bottom (33º 34' 18.44" N, 82º 46' 52.28" W, 270°)**

31



**CP7a: Firebreak between 2006 and 2015 planted pine
(33° 34' 19.17" N, 82° 46' 48.41" W, 45°)**



**CP7b: View over young planted pine with hardwood along the banks of Reedy Creek in the
distance (33° 34' 19.17" N, 82° 46' 48.41" W, 285°)**

Case 3:22-cv-... Document ... Filed ... Page 588 of 600



**CP8a: Interior woods road through planted pine**
**(33° 34' 16.24'' N, 82° 46' 39.43'' W, 70°)**



**CP8b: Loblolly pine planted in 2006**
**(33° 34' 16.24'' N, 82° 46' 39.43'' W, 110°)**



**CP9: View of young planted pine with Reedy Creek in the distance from firebreak overgrown with broomsedge and dog fennel (33º 34' 20.31" N, 82º 46' 36.93" W, 260°)**



**CP10a: Pine plantation with broomsedge, sweetgum, dog fennel and smilax in the understory (33º 34' 10.61" N, 82º 46' 24.18" W, 120°)**

34

Case 3:22-cv-00149-CDL Document 43-1 Filed 01-11-24 Page 590 of 600
EXHIBIT C - 2019 BROWN-HARRIS



**CP10b: Recently plowed firebreak between 2006 and 2015 planted pine**
**(33° 34' 10.61'' N, 82° 46' 24.18'' W, 210°)**



**CP11a: Boulders along the banks of tributary to Reedy Creek**
**(33° 34' 8.21'' N, 82° 46' 16.66'' W, 110°)**

35



**CP11b: Narrow riparian buffer along stream with poplar, white oak, green ash, river oats, jasmine, and Christmas fern (33° 34' 8.21" N, 82° 46' 16.66" W, 320°)**



**CP12a: Interior woods road near entrance off of Fairplay Road (33° 34' 16.68" N, 82° 46' 12.04" W, 85°)**

Case 3:22-cv-00049-CDL Document 43-1 Filed 10/24/24 Page 592 of 600



**CP12b: Well-maintained interior woods road through planted pine**
**(33º 34' 16.68'' N, 82º 46' 12.04'' W, 265º)**



**CP13a: Ephemeral stream with river cane, netted chain fern, and white oak**
**(33º 34' 21.31'' N, 82º 46' 22.23'' W, 280º)**

37

Case 3:22-cv-00049 Document 41 Filed 04/04/2 Page 593 of 600



**CP13b: Hardwood along stream with water oak, Chasmanthium, sweetgum and red maple**
**(33° 34' 21.31" N, 82° 46' 22.23" W, 70°)**



**CP14a: Foodplot within young planted pine near ephemeral stream**
**(33° 34' 22.15" N, 82° 46' 25.78" W, 260°)**

Case 3:22-cv-... Document ... Filed ... Page 594 of 600



**CP14b: Firebreak utilized as four-wheeler trail leading to foodplot**
**(33º 34' 22.15" N, 82º 46' 25.78" W, 80º)**



**C15a: Hardwood adjacent to tributary of Reedy Creek**
**(33º 34' 21.72" N, 82º 46' 28.6" W, 60º)**

Case 3:22-cv-00149 Document 43-1 Filed 01/24/23 Page 595 of 600



**CP15b: Tributary of Reedy Creek with incised banks and sandy bottom
(33º 34' 21.72" N, 82º 46' 28.6" W, 160°)**



**CP16a: Hardwood adjacent to Reedy Creek with musclewood, Chasmanthium, and
Christmas fern (33º 34' 29.91" N, 82º 46' 37.97" W, 160°)**

Case 3:22-cv-... Document 43... Filed ... Page 596 of 600



**CP16b: Reedy Creek flowing through hardwood near the lowest point on the Property**
**(33º 34' 29.91" N, 82º 46' 37.97" W, 215º)**



**CP17a: Deeply incised banks along Reedy Creek at juncture where it merges with tributary**
**(33º 34' 29.41" N, 82º 46' 38.93" W, 50º)**

Case 3:22-cv-00049-CDL Document 43-1 Filed 04/12/24 Page 597 of 600



**CP17b:  Reedy Creek with sandy bottom running through hardwood forest**
**(33° 34' 29.41" N, 82° 46' 38.93" W, 120°)**



**CP18a: Foodplot near tributary to Reedy Creek**
**(33° 34' 30.32" N, 82° 46' 44.37" W, 115°)**

42

OCONEE RIVER LAND TRUST EXHIBIT C-2019 BROWN-HARRIS



**CP18b: Firebreak near tributary to Reedy Creek between 2006 and 2015 planted pine (33° 34' 30.32'' N, 82° 46' 44.37'' W, 195°)**



**CP19a: Interior road near northwestern property line traveling over tributary to Reedy Creek (33° 34' 31.73'' N, 82° 46' 45.33'' W, 30°)**



**CP19b:  Culvert pipe under road for tributary of Reedy Creek**
**(33° 34' 31.73" N, 82° 46' 45.33" W, 320°)**



**CP20a: Bridge on Fairplay Road over Reedy Creek**
**(33° 34' 32.8" N, 82° 46' 36.41" W, 10°)**

Case 3:22-cv-... Document ... Filed ... Page 600 of 600



**CP20b: Hardwood adjacent to Reedy Creek with river cane, American sycamore, sweetgum, and matelea vine (33° 34' 32.8" N, 82° 46' 36.41" W, 170°)**



**CP20c: Reedy Creek**
**(33° 34' 32.8" N, 82° 46' 36.41" W, 250°)**