**Form 1040-X**
(Rev. January 2020)

Department of the Treasury - Internal Revenue Service

# Amended U.S. Individual Income Tax Return

▶ Go to www.irs.gov/Form1040X for instructions and the latest information.

OMB No. 1545-0074

**This return is for calendar year** 2019 ☐ 2018 ☐ 2017 ☐ 2016
**Other year.** Enter one: calendar year 2020 or fiscal year (month and year ended):

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| TONY D. | TOWNLEY | ▉▉▉▉▉ |
| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
| ELIZABETH A. | TOWNLEY | ▉▉▉▉▉ |

Current home address (number and street). If you have a P.O. box, see instructions. — 1280 SNOWS MILL ROAD — Apt. no. — Your phone number 706-353-8107

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below. See instructions. — BOGART, GA 30622

| Foreign country name | Foreign province/state/county | Foreign postal code |
|---|---|---|
| | | |

**Amended return filing status. You must** check one box even if you are not changing your filing status. **Caution:** In general, you can't change your filing status from a joint return to separate returns after the due date.

**Full-year health care coverage (or, for amended 2018 returns only, exempt).** If amending a 2019 return, leave blank. See instructions.

☐ Single  ☒ Married filing jointly  ☐ Married filing separately (MFS)  ☐ Qualifying widow(er) (QW)  ☐ Head of household (HOH)

If you checked the MFS box, enter the name of spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent. ▶

Use Part III on page 2 to explain any changes

| | | A. Original amount reported or as previously adjusted (see instructions) | B. Net change — amount of increase or (decrease) — explain in Part III | C. Correct amount |
|---|---|---|---|---|
| **Income and Deductions** | | | | |
| 1 | Adjusted gross income. If a net operating loss (NOL) carryback is included, check here ▶ | 985025987. | | 985025987. |
| 2 | Itemized deductions or standard deduction | 282,107. | 124186787. | 124468894. |
| 3 | Subtract line 2 from line 1 | 984743880. | -124186787 | 860557093. |
| 4a | Exemptions (amended 2017 or earlier returns only). **If changing,** complete Part I on page 2 and enter the amount from line 29 | | | |
| 4b | Qualified business income deduction (amended 2018 or later returns only) | 7,587,470. | -7587470. | 0. |
| 5 | Taxable income. Subtract line 4a or 4b from line 3. If the result is zero or less, enter -0- | 977156410. | -116599317 | 860557093. |
| **Tax Liability** | | | | |
| 6 | Tax. Enter method(s) used to figure tax: SCH D; F6251 | 202565159. | -30485506. | 172079653. |
| 7 | Credits. If a general business credit carryback is included, check here ▶ | 201,012. | -15,582. | 185,430. |
| 8 | Subtract line 7 from line 6. If the result is zero or less, enter -0- | 202364147. | -30469924. | 171894223. |
| 9 | Health care: individual responsibility (amended 2018 or earlier returns only) | | | |
| 10 | Other taxes | 161,002. | | 161,002. |
| 11 | Total tax. Add lines 8, 9, and 10 | 202525149. | -30469924. | 172055225. |
| **Payments** | | | | |
| 12 | Federal income tax withheld and excess social security and tier 1 RRTA tax withheld. **(If changing,** see instructions.) | | | |
| 13 | Estimated tax payments, including amount applied from prior year's return | 13200000. | | 13200000. |
| 14 | Earned income credit (EIC) | | | |
| 15 | Refundable credits from: ☐ Schedule 8812 ☐ Form(s) ☐ 2439 ☐ 4136 ☐ 8863 ☐ 8885 ☐ 8962 or ☐ other (specify): | | | |
| 16 | Total amount paid with request for extension of time to file, tax paid with original return, and additional tax paid after return was filed | | | 189325149. |
| 17 | Total payments. Add lines 12 through 15, column C, and line 16 | | | 202525149. |
| **Refund or Amount You Owe** | | | | |
| 18 | Overpayment, if any, as shown on original return or as previously adjusted by the IRS | | | |
| 19 | Subtract line 18 from line 17. (If less than zero, see instructions.) | | | 202525149. |
| 20 | **Amount you owe.** If line 11, column C, is more than line 19, enter the difference | | | |
| 21 | If line 11, column C, is less than line 19, enter the difference. This is the amount **overpaid** on this return | | | 30469924. |
| 22 | Amount of line 21 you want **refunded to you** | | | 30469924. |
| 23 | Amount of line 21 you want **applied to your** (enter year): estimated tax ☐ 23 | | | |

Complete and sign this form on page 2.

**Exhibit E**

Form 1040-X (Rev. 1-2020)  TONY D. & ELIZABETH A. TOWNLEY  ███████ Page **2**

| **Part I** | **Exemptions and Dependents** |
|---|---|

Complete this part **only** if any information relating to exemptions (to dependents if amending your 2018 or later return) has changed from what you reported on the return you are amending. This would include a change in the number of exemptions  (of dependents if amending your 2018 or later return).

⚠️ *For amended 2018 or later returns only, leave lines 24, 28, and 29 blank. Fill in all other applicable lines.*

**Note:** See the Forms 1040 and 1040-SR, or Form 1040A, instructions for the tax year being amended. See also the Form 1040-X instructions.

| | | **A. Original number of exemptions or amount** reported or as previously adjusted | **B. Net change** | **C. Correct number or amount** |
|---|---|---|---|---|
| 24 | Yourself and spouse. **Caution:** If someone can claim you as a dependent, you can't claim an exemption for yourself. If amending your 2018 or later return, leave line blank ................ **24** | | | |
| 25 | Your dependent children who lived with you **25** | | | |
| 26 | Your dependent children who didn't live with you due to divorce or separation ................ **26** | | | |
| 27 | Other dependents **27** | | | |
| 28 | Total number of exemptions. Add lines 24 through 27. If amending your 2018 or later return, leave line blank ................ **28** | | | |
| 29 | Multiply the number of exemptions claimed on line 28 by the exemption amount shown in the instructions for line 29 for the year you are amending. Enter the result here and on line 4a on page 1 of this form. If amending your 2018 or later return, leave line blank **29** | | | |

30  List **ALL** dependents (children and others) claimed on this amended return. If more than 4 dependents, see inst. and  √ here ▶ ☐

**Dependents** (see instructions):

| **(a)** First name | Last name | **(b)** Social security number | **(c)** Relationship to you | **(d)** √ if qualifies for (see instr.): | |
|---|---|---|---|---|---|
| | | | | Child tax credit | Credit for other dependents (amended 2018 or later returns only) |
| | | | | ☐ | ☐ |
| | | | | ☐ | ☐ |
| | | | | ☐ | ☐ |
| | | | | ☐ | ☐ |

| **Part II** | **Presidential Election Campaign Fund** |
|---|---|

Checking below won't increase your tax or reduce your refund.

☐  Check here if you didn't previously want $3 to go to the fund, but now do.

☐  Check here if this is a joint return and your spouse did not previously want $3 to go to the fund, but now does.

| **Part III** | **Explanation of Changes.** In the space provided below, tell us why you are filing Form 1040-X. |
|---|---|

▶  Attach any supporting documents and new or changed forms and schedules.

SEE ATTACHED EXPLANATION OF AMENDMENT.

**Remember to keep a copy of this form for your records.**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information about which the preparer has any knowledge.

**Sign Here**

▶ _____     _____     EXECUTIVE
Your signature                         Date                 Your occupation

▶ _____     _____     _____
Spouse's signature. If a joint return, **both** must sign.  Date   Spouse's occupation

**Paid Preparer Use Only**

▶  BRIDGET J. DUNK          04/13/22     BENNETT THRASHER LLP
Preparer's signature               Date          Firm's name (or yours if self-employed)

BRIDGET J. DUNK                              3300 RIVERWOOD PARKWAY, #700
                                             ATLANTA, GA 30339
Print/type preparer's name        ☐ Check if self-employed   Firm's address and ZIP code

PTIN ████████                                770-396-2200                  EIN ████████
                                             Phone number

010702
03-22-21   For forms and publications, visit *www.irs.gov.*                        Form **1040-X** (Rev. 1-2020)

## TONY D. and ELIZABETH A. TOWNLEY
## 2020 FORM 1040X

The Townleys and their family partnership, Log Creek LLLP ("Log Creek"), are correcting their earlier returns to properly recognize the 2018 and 2019 conservation contributions encouraged by Congress.  When they learned the IRS was attacking all partnership conservation contributions, they waited to report those 2019 contributions until they could make doubly sure they reported theirs correctly.  They also removed their 2018 contribution from their returns until they could make doubly sure they reported that contribution correctly.  They waited to report the three contributions they made of vulnerable tracts to the Oconee River Land Trust in 2019 until they could make doubly sure they were correctly reporting those contributions that Congress encourages. That additional work is complete. The 2018 and 2019 conservation contributions result in carryovers that require the filing of this Amended Form 1040 for 2020. To understand why they made these contributions, one needs to understand the Townleys.

Tony Townley grew up in Bogart, Georgia, in the country outside of Athens.  Starting in high school, he and his father grew Christmas trees on his parents' farm.  Even today, Tony and his wife Elizabeth live on a farm in Bogart, next door to his parents.  The running joke in the Townley house is that Tony has not gone very far in life.

After high school, Tony enrolled at Georgia Southern in Statesboro.  Two wonderful things happened in Statesboro.  Tony met Elizabeth, and Tony and his boyhood friend Zach sold almost everything they had to start a little chicken finger restaurant in Statesboro.  When Tony finished Georgia Southern and Zach finished UGA, the chicken restaurant could not support them and so, Tony returned home to the Athens area, married Elizabeth, worked with his father on the Christmas tree farm, and started a mortgage business while he and his friend tried to build the chicken business.  Through hard work, long hours, and risking everything they had, Tony and his friend built the chicken business into a huge success beyond their wildest dreams, Zaxby's.

Tony chose to invest most of what he made into north Georgia farmland and timberland. Tony and Elizabeth put that land into their family partnership, Log Creek, which they own equally. Both Tony and Elizabeth like preservation. They protected north Georgia timber and farmland east of Atlanta because north Georgia is being eaten by Atlanta sprawl. They bought the old UGA Agriculture Department research farm near their farm. They saved the famous but neglected UGA Red Barn which they moved out to the former UGA farm and restored.

In 2017, a mine contamination caused Tony to take a harder look at the Congressional encouragement to conserve undeveloped land forever. Martin Marietta Materials, a major granite mining company, operated a mine next to land Log Creek owned. Tony discovered that the mine contaminated the water table with a dangerous chemical. That one mine could contaminate the entire water table for that entire area. Tony tried to cure that problem, but started thinking about the Log Creek land that was most vulnerable to mining. His advisors told him that Congress specifically encourages landowners like the Townleys to preserve the land through tax incentives that recognize the full value lost due to anti-development restrictions.

The first site that came to mind was the Norris-Cason tract in Warren County, Georgia that had granite outcroppings Tony and his forester had seen on the surface. After core drilling and an exhausting investigation, Tony and Elizabeth decided Log Creek should contribute a perpetual conservation easement to Oconee River Land Trust, a charitable group in Athens started by UGA professors and other conservation-minded citizens. The Townleys and their family partnership knew they were doing a good thing. They wanted to do more. In 2019, Tony and those helping him identified three other vulnerable tracts with granite outcroppings that Tony believed would be mined sooner or later. Again, the Townleys decided to protect those properties forever. They believe strongly enough in conservation to work through the extraordinary complexity and expense twice.

2

For all of the tracts, Tony got the best help he could find at the time and now the Townleys and their family partnership have hired a second set of superb geologists, biologists, and appraisers to make doubly sure that Tony, Elizabeth, and their partnership are doing exactly what Congress encourages all forest and farmland owners to do.  They not only hired the best geologists they could find, they hired the Georgia real estate appraiser who best understood the mining engineering analysis because that appraiser, Doug Kenny, MAI, holds an engineering degree from Georgia Tech – one of, if not the, top engineering universities in the South.

Through Section 170(h), Congress encourages landowners to prohibit development on their forests and farms *forever* by promising a deduction equal to the full fair market value of the development rights they sacrificed.  The Eleventh Circuit recently explained that in *Pine Mountain Preserve, LLP v. Commissioner*, 978 F.3d 1200, 1202-3 (11th Cir. 2020):

> Before diving into the facts and procedural history of this particular case, we set out in some detail the governing statutory framework.  Section 170 of the Internal Revenue Code allows tax deductions for charitable contributions and gifts of interests in real property.  As a general rule, the Code forbids deductions for conveyances of partial—i.e., less than fee-simple—interests.  In 1980, though, Congress amended the Code to permit landowners a deduction for a "qualified conservation contribution" of less than an entire interest in a parcel.  See Tax Treatment Extension Act, Pub. L. No. 96-541 § 6(b), 94 Stat. 3204, 3206 (1980), codified at I.R.C § 170(f)(3)(B)(iii).  To qualify as a "qualified conservation contribution," a grant must be "(A) of a qualified real property interest," "(B) to a qualified organization," and "(C) exclusively for conservation purposes."  I.R.C. § 170(h)(1).

> The parties here agree that the grants at issue were made to a "qualified organization," so our analysis will focus on the other two requirements—that the grants be "qualified real property interest[s]" and "exclusively for conservation purposes."  Section 170(h)(2) defines the former, and § 170(h)(5) defines the latter.  According to § 170(h)(2)(C), a "qualified real property interest" includes, as relevant here, "a restriction (granted in perpetuity) on the use which may be made of the real property."  We'll call this the "granted-in-perpetuity" requirement.  According to § 170(h)(5)(A), "[a] contribution shall not be treated as exclusively for conservation purposes" within the meaning of § 170(h)(1) "unless the conservation purpose is protected in perpetuity."  We'll call this the "protected-in-perpetuity" requirement.

3

> To sum up then: The Code permits taxpayers to claim deductions for charitable contributions, including contributions of land. If a landowner donates less than its entire interest in a piece of property, the Code allows a deduction, as relevant here, where the landowner makes a "qualified conservation contribution." To qualify—again, as relevant for our purposes — a grant must be a "qualified real property interest" and "exclusively for conservation purposes." To constitute a "qualified real property interest," the grant must satisfy § 170(h)(2)(C)'s granted-in-perpetuity requirement, and to be "exclusively for conservation purposes," the grant must satisfy § 170(h)(5)(A)'s protected-in-perpetuity requirement.

The Eleventh Circuit Court of Appeals confirmed in another recent case that the contribution need only satisfy ***one*** of a number of different conservation purposes. *Champion's Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d 1033 (11th Cir. 2020). Equally important, the Eleventh Circuit held that the Conservation Deed need only protect that one conservation purpose "BETTER" than having no deed. Certainly true here.

Congress encourages conservation easements for a very good reason. Conservation easements actually ensure conservation much better than outright gifts of land because conservation easements require *perpetual* restrictions against development. By contrast, a charity receiving an outright gift of undeveloped land can turnaround, sell the land to a developer with no restrictions, and use the sales proceeds to pay salaries and other charitable expenses. That congressional encouragement formed the heart of the Eleventh Circuit invalidating Treas. Reg. § 1.170A-14(g)(6) in *Hewitt v. Commissioner*, 21 F.4th 1336, 1352 (11th Cir. 2021).

Congress encourages conservation by recognizing as a deduction every dollar of value lost from barring mining or any other development of that land forevermore. Every President from Teddy Roosevelt through Ronald Reagan, Bill Clinton, Barack Obama, and Donald Trump to Joe Biden's recent 30/30 initiative have recognized how important that conservation remains to all of us. Any understatement of the full value discourages the conservation that Congress tries to encourage and that we and all other species so badly need. Conservation only matters to those who need clean air to breathe, clean water to drink, and farm fresh food to eat.

4

On each of its contributions,[1] Log Creek more than met all three requirements stated by the law. That is, Section 170(h) defines a "Qualified Conservation Contribution" as the transfer of a "Qualified Real Property Interest" to a "Qualified Organization" "Exclusively for [one or more of four] Conservation Purpose[s]." Log Creek did that and more:

(i)    "Qualified Real Property Interest." As the statute and the Eleventh Circuit Court of Appeals precedent in *Pine Mountain* establish, "Qualified Real Property Interest" only requires "*a* [one] restriction (in perpetuity)." Each of the four Log Creek Conservation Deeds impose at least 12 separate sets of restrictions – plus overarching prohibitions against any exercise of any retained right that may adversely affect the conservation purposes. Those restrictions, laid out in the legally enforceable Deeds of Conservation Easement, are perpetually binding under Georgia law.

(ii)   "Qualified Organization." The statute defines this entity as, among other, charitable organizations under Internal Revenue Code Sections 501(c)(3) and 509(a)(2). The IRS itself issued the IRS Exempt Organization Determination Letter specifically recognizing the Oconee River Land Trust (the charitable donee for each contribution), as qualifying under Sections 501(c)(3) and 509(a)(2). The Oconee River Land Trusts possesses the experience, expertise, and ability to ensure the perpetual protection of the vulnerable properties.

(iii)  "Exclusively for Conservation Purposes." As the statute and Eleventh Circuit precedent in *Champions Retreat* establish, the Conservation Deed must only protect (in perpetuity) one or more of four listed conservation purposes. Of relevance here, all four Log Creek Conservation Deeds protect "relatively natural habitat for plants, wildlife, and similar ecosystems," scenic open space, and open space that furthers any one of many "Federal, State, or local conservation policies." Satisfaction of any one purpose or policy satisfies the statute.

Five documents for each tract attached to this return for the 2020 Conservation Contributions satisfy all elements of Code Section 170(h) and its regulations. They include the Conservation Deeds (Ex. A), the Environmental Studies (Ex. B), the Appraisals and underlying geological data (Ex. C), the "Letters of Acknowledgement" from the Oconee River Land Trust (Ex. D), and the Form 8283 Appraisal Summaries included as part of the IRS return form.

---

[1] The Townleys and Log Creek also made a conservation contribution protecting a third potential mining property in 2019 but, unbeknownst to the Townleys, the County adopted a plan that protected that river property and so, the Townleys are not asking for a charitable deduction on that property on that contribution.

Those appraisals prove the enormous 2018 and 2019 mining development value that Log Creek, the Townleys, and their children's children's children sacrificed forevermore. The fair market values of what they contributed to the Oconee River Land Trust were at least $46,399,000 for the tract in Warren County, $66,290,000 for the tract in Taliaferro County and $53,760,000 for the tract in Wilkes County. Under the statutory Congressional encouragement Log Creek should receive a charitable contribution deduction in that amount or such greater amount as the IRS, the Court, or the jury determines to be accurate. As a result, Tony and Elizabeth overpaid their 2020 federal income taxes by $30,424,607 (or such greater amount that results from any greater value determined by the IRS, District Court, or Jury) and claim a refund of those overpaid 2020 federal income taxes (plus interest as provided by law). Subject to the determination of a greater value, Tony and Elizabeth believe that their correct 2020 federal income tax is $172,100,542. They previously paid that $172,100,542 to the IRS.

Congress encourages conservation but the IRS hates it. The IRS audited the 2018 conservation easement reported by Log Creek. The Townleys and their family partnership simply asked the IRS to follow the law and the facts that govern that contribution. The IRS came up with every excuse it could to justify ignoring the contribution altogether, just as it has **ZEROED** out every other partnership. The Townleys and their advisors have made sure that those excuses do not apply to these 2018 and 2019 reports. Those excuses remain inaccurate and, in many instances, inconsistent. For example, the IRS second guesses the documentation of the water resources despite the fact that the statute does not authorize that requirement, the wildlife biologist prepared an environmental baseline report that the statute never required, that complied with the permissive examples in the IRS's own regulation, and that the donor and donee both certified as accurate. That information, and more, was provided to the Oconee River Land Trust – whose representatives performed on-site inspections– prior to the donation.

6

Moreover, the IRS documentation attack relies on an invalid regulation, Treas. Reg. § 1.170A-14(g)(5).  The regulation expressly (i) contradicts two parts of the Congressional encouragement statute; (ii) violated the Administrative Procedures Act under the Eleventh Circuit precedent in *Hewitt*, 21 F.4th at 1350-4 (on the theory the IRS is above that law); and (iii) makes up hidden rules after the game is over, as an excuse for ignoring all of the conservation contributions Congress encouraged.

Worse yet, the IRS ignores the 2018 contribution altogether based on the continuing efforts to improve the original appraisal (by implementing suggested changes from two appraisal reviews) and to correct a slight intrusion into the highly protected 200 foot creek and pond buffer Special Natural Areas.  Both instances, prove the genuine commitment to conservation.  But most remarkable, the IRS casts the original *Georgia* real estate appraiser (a Member of the Appraisal Institute, the most respected appraisal institute in the nation) as not a "qualified appraiser" because he relied on full-time qualified geologists -- while the IRS relies solely upon a *Chicago* and *Washington, D.C.* appraiser who never set foot on this east *Georgia* property.

The IRS questions the integrity of everyone who helped make the contribution possible, but we must consider the credibility of how far the IRS goes to ignore the perpetual contribution altogether at page 11 of the Revenue Agent's Report for the 2018 audit.  There, the IRS states, with no prior question, for the first time:

> The baseline documentation report must be accompanied by a statement signed by the donor and a representative of the donee clearly referencing the documentation and in substance saying the baseline document is an accurate representation of the protected property at the time of donation.  [IRS Reg.] § 1.170A-14(g)(5)(k)(D).  ***Such a statement was not included in baseline documentation provided by Taxpayer.  There was no acknowledgement from the donee in the baseline report.***  (Emphasis added).

Could not be more inaccurate.  Here is the certification page in the baseline documentation report received and certified by the Oconee River Land Trust on December 21, 2018:

OCONEE RIVER LAND TRUST                                          LOG CREEK

In compliance with Section 1.170A - 14(g)(5) of the federal tax regulations, LOG CREEK, LLLP, owner of the Property referenced and described by this report, and the OCONEE RIVER LAND TRUST, INC., do hereby acknowledge that this report is an accurate representation of the Property as of the date of the conveyance of the conservation easement referenced in this report by the landowner ("Grantor") to the Oconee River Land Trust ("Grantee").

Sworn to and subscribed before me                    Log Creek, LLLP

NOTARY PUBLIC                                        By: _____
                                                    Name: John D. Townley
This the 21 day of Dec. 2018                         Title: General Partner
My commission expires:                               Date: Dec. 21, 2018

(SEAL)    KAREN E. MIMS                              By: _____
          OGLETHORPE COUNTY, GEORGIA                 Name: Elizabeth A. Townley
          NOTARY PUBLIC                              Title: General Partner
          MY COMMISSION EXPIRES                      Date: Dec. 21, 2018
          DECEMBER 6, 1019


Sworn to and subscribed before me                    Oconee River Land Trust, Inc.

NOTARY PUBLIC                                        By: _____
                                                    Name: Smith Wilson
This the ____ day of ____ 20__                        Title: Chair
My commission expires:                               Date: 12-21-18

(SEAL)

The Townleys and Log Creek ask that the IRS reconsider because conservation contributions must be encouraged by full recognition in order to encourage other owners of forests and farms to restrict their land forever and protect greenspace for generations to come.  If the IRS fails to follow the law and the facts again, the Townleys must ask a Federal District Court and a jury of unbiased honest Georgians to do the right thing:  follow the law and the facts to the accurate value – not a penny more and not a penny less.

Should you have any questions relating to the contribution, please call David D. Aughtry who represents the Townleys and their family partnership at (404/658-5486).  Thank you.

**AMENDED**

Form **1040**

Department of the Treasury - Internal Revenue Service
**U.S. Individual Income Tax Return**   (99)   **2020**   OMB No. 1545-0074   IRS Use Only - Do not write or staple in this space.

**Filing Status**
Check only one box.

[ ] Single   [X] Married filing jointly   [ ] Married filing separately (MFS)   [ ] Head of household (HOH)   [ ] Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of your spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent. ▶

| | |
|---|---|
| Your first name and middle initial | Last name |
| TONY D. | TOWNLEY |

Your social security number ▮▮▮▮▮

| | |
|---|---|
| If joint return, spouse's first name and middle initial | Last name |
| ELIZABETH A. | TOWNLEY |

Spouse's social security number ▮▮▮▮▮

Home address (number and street). If you have a P.O. box, see instructions.
1280 SNOWS MILL ROAD   Apt. no.

City, town, or post office. If you have a foreign address, also complete spaces below.
BOGART   State GA   ZIP code 30622

Foreign country name   Foreign province/state/county   Foreign postal code

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.
[ ] You   [ ] Spouse

At any time during 2020, did you receive, sell, send, exchange, or otherwise acquire any financial interest in any virtual currency? [ ] Yes   [X] No

**Standard Deduction**
Someone can claim: [ ] You as a dependent   [ ] Your spouse as a dependent
[ ] Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**   You: [ ] Were born before January 2, 1956   [ ] Are blind   Spouse: [ ] Was born before January 2, 1956   [ ] Is blind

**Dependents** (see instructions):
If more than four dependents, see instr. and check here ▶ [ ]

| (1) First name | Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): |  |
|---|---|---|---|---|---|
| | | | | Child tax credit | Credit for other dependents |
| C▮▮▮▮ G▮▮▮▮ TOWNLEY | | ▮▮▮▮▮ | DAUGHTER | [X] | |

Attach Sch. B if required.

| | | | | |
|---|---|---|---|---|
| 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 | | 1 | |
| 2a | Tax-exempt interest | 2a 27,321. | b Taxable interest | 2b 1,503,302. |
| 3a | Qualified dividends | 3a 74,165. | b Ordinary dividends | 3b 81,485. |
| 4a | IRA distributions | 4a | b Taxable amount | 4b |
| 5a | Pensions and annuities | 5a | b Taxable amount | 5b |
| 6a | Social security benefits | 6a | b Taxable amount | 6b |

**Standard Deduction for -**
● Single or Married filing separately, $12,400
● Married filing jointly or Qualifying widow(er), $24,800
● Head of household, $18,650
● If you checked any box under Standard Deduction, see instructions.

| | | | |
|---|---|---|---|
| 7 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ [ ] | 7 | 935,802,322. |
| 8 | Other income from Schedule 1, line 9 | 8 | 47,692,128. |
| 9 | Add lines 1, 2b, 3b, 4b, 5b, 6b, 7, and 8. This is your **total income** ▶ | 9 | 985,079,237. |
| 10 | Adjustments to income: | | |
| a | From Schedule 1, line 22 | 10a 53,250. | |
| b | Charitable contributions if you take the standard deduction. See instr. | 10b | |
| c | Add lines 10a and 10b. These are your **total adjustments to income** ▶ | 10c | 53,250. |
| 11 | Subtract line 10c from line 9. This is your **adjusted gross income** ▶ | 11 | 985,025,987. |
| 12 | **Standard deduction or itemized deductions** (from Schedule A) | 12 | 124,468,894. |
| 13 | Qualified business income deduction. Attach Form 8995 or Form 8995-A | 13 | |
| 14 | Add lines 12 and 13 | 14 | 124,468,894. |
| 15 | **Taxable income.** Subtract line 14 from line 11. If zero or less, enter -0- | 15 | 860,557,093. |

LHA   **For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**   Form **1040** (2020)

013921 12-11-20

Case 3:22-cv-00107-CDL   Document 1   Filed 10/28/22   Page 12 of 666

**AMENDED**

Form 1040 (2020)   TONY D. & ELIZABETH A. TOWNLEY                                      Page **2**

STMT 3

| | | | |
|---|---|---|---:|
| **16** | **Tax** (see instructions). Check if any from Form(s): **1** ☐ 8814 **2** ☐ 4972 **3** ☐ _____ | **16** | 172,074,589. |
| **17** | Amount from Schedule 2, line 3 | **17** | 5,064. |
| **18** | Add lines 16 and 17 | **18** | 172,079,653. |
| **19** | Child tax credit or credit for other dependents | **19** | |
| **20** | Amount from Schedule 3, line 7 | **20** | 185,430. |
| **21** | Add lines 19 and 20 | **21** | 185,430. |
| **22** | Subtract line 21 from line 18. If zero or less, enter -0- | **22** | 171,894,223. |
| **23** | Other taxes, including self-employment tax, from Schedule 2, line 10 | **23** | 161,002. |
| **24** | Add lines 22 and 23. This is your total tax ▶ | **24** | 172,055,225. |
| **25** | Federal income tax withheld from: | | |

| | | | | |
|---|---|---|---|---:|
| **a** | Form(s) W-2 | **25a** | | |
| **b** | Form(s) 1099 | **25b** | | |
| **c** | Other forms (see instructions) | **25c** | | |
| **d** | Add lines 25a through 25c | | **25d** | |

| | | | |
|---|---|---|---:|
| **26** | 2020 estimated tax payments and amount applied from 2019 return   STATEMENT 4 | **26** | 13,200,000. |
| **27** | Earned income credit (EIC) | **27** | |
| **28** | Additional child tax credit. Attach Schedule 8812 | **28** | |
| **29** | American opportunity credit from Form 8863, line 8 | **29** | |
| **30** | Recovery rebate credit. See instructions | **30** | |
| **31** | Amount from Schedule 3, line 13 | **31** | 185,000,000. |
| **32** | Add lines 27 through 31. These are your **total other payments and refundable credits** ▶ | **32** | 185,000,000. |
| **33** | Add lines 25d, 26, and 32. These are your **total payments** ▶ | **33** | 198,200,000. |

● If you have a qualifying child, attach Sch. EIC.

● If you have nontaxable combat pay, see instructions

**Refund**

Direct deposit?
See instructions.

| | | | |
|---|---|---|---:|
| **34** | If line 33 is more than line 24, subtract line 24 from line 33. This is the amount you **overpaid** | **34** | 26,144,775. |
| **35a** | Amount of line 34 you want **refunded to you**. If Form 8888 is attached, check here ☐ | **35a** | |

▶ **b** Routing number _____   ▶ **c** Type: ☐ Checking ☐ Savings
▶ **d** Account number _____

| | | | |
|---|---|---|---:|
| **36** | Amount of line 34 you want **applied to your 2021 estimated tax** ▶ | **36** | 26,144,775. |

**Amount You Owe**

For details on how to pay, see instructions.

| | | | |
|---|---|---|---:|
| **37** | Subtract line 33 from line 24. This is the **amount you owe now** ▶ | **37** | |
| | **Note:** Schedule H and Schedule SE filers, line 37 may not represent all of the taxes you owe for 2020. See Schedule 3, line 12e, and its instructions for details. | | |
| **38** | Estimated tax penalty (see instructions) ▶ | **38** | |

**Third Party Designee**

Do you want to allow another person to discuss this return with the IRS? See instructions ▶ ☒ **Yes.** Complete below.   ☐ **No**

Designee's name ▶ BRIDGET J. DUNK   Phone no. ▶ 770-396-2200   Personal identification number (PIN) ▶ 99999

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your signature   Date   Your occupation   EXECUTIVE   If the IRS sent you an Identity Protection PIN, enter it here (see inst.)

Joint return? See instructions. Keep a copy for your records.

Spouse's signature. If a joint return, **both** must sign.   Date   Spouse's occupation   If the IRS sent your spouse an Identity Protection PIN, enter it here (see inst.) ▶

Phone no. 706-353-8107   Email address RWILLS@OTFLLC.COM

**Paid Preparer Use Only**

| Preparer's name | Preparer's signature | Date | PTIN | Check if: |
|---|---|---|---|---|
| BRIDGET J. DUNK | BRIDGET J. DUNK | 04/13/22 | ▮▮▮ | ☐ Self-employed |

Firm's name ▶ BENNETT THRASHER LLP   Phone no. 770-396-2200
Firm's address ▶ 3300 RIVERWOOD PARKWAY, #700
ATLANTA, GA 30339   Firm's EIN ▶ ▮▮▮

Go to *www.irs.gov/Form1040* for instructions and the latest information.   Form **1040** (2020)

013922 12-11-20

**AMENDED**

| SCHEDULE 1<br>(Form 1040)<br><br>Department of the Treasury<br>Internal Revenue Service | **Additional Income and Adjustments to Income**<br><br>▶ Attach to Form 1040, 1040-SR, or 1040-NR.<br>▶ Go to www.irs.gov/Form1040 for instructions and the latest information. | OMB No. 1545-0074<br><br>**2020**<br>Attachment<br>Sequence No. **01** |
|---|---|---|

| Name(s) shown on Form 1040, 1040-SR, or 1040-NR | Your social security number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | |

**Part I**   **Additional Income**

| | | | | |
|---|---|---|---:|---:|
| 1 | Taxable refunds, credits, or offsets of state and local income taxes | STMT 5     STMT 7 | **1** | 0. |
| 2a | Alimony received | | **2a** | |
| b | Date of original divorce or separation agreement (see instructions) ▶ | | | |
| 3 | Business income or (loss). Attach Schedule C | | **3** | −469,194. |
| 4 | Other gains or (losses). Attach Form 4797 | | **4** | −12,564. |
| 5 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | | **5** | 47,140,694. |
| 6 | Farm income or (loss). Attach Schedule F | | **6** | −37,862. |
| 7 | Unemployment compensation | | **7** | |
| 8 | Other income. List type and amount ▶<br>ZAXBY'S FRANCHISING, LLC                1,071,054. | | **8** | 1,071,054. |
| 9 | Combine lines 1 through 8. Enter here and on Form 1040, 1040-SR, or 1040-NR, line 8 | | **9** | 47,692,128. |

**Part II**   **Adjustments to Income**

| | | | |
|---|---|---|---:|
| 10 | Educator expenses | **10** | |
| 11 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 | **11** | |
| 12 | Health savings account deduction. Attach Form 8889 | **12** | |
| 13 | Moving expenses for members of the Armed Forces. Attach Form 3903 | **13** | |
| 14 | Deductible part of self-employment tax. Attach Schedule SE | **14** | 32,746. |
| 15 | Self-employed SEP, SIMPLE, and qualified plans | **15** | |
| 16 | Self-employed health insurance deduction | **16** | 20,504. |
| 17 | Penalty on early withdrawal of savings | **17** | |
| 18a | Alimony paid | **18a** | |
| b | Recipient's SSN | ▶ | |
| c | Date of original divorce or separation agreement (see instructions) ▶ | | |
| 19 | IRA deduction | **19** | |
| 20 | Student loan interest deduction | **20** | |
| 21 | Tuition and fees deduction. Attach Form 8917 | **21** | |
| 22 | Add lines 10 through 21. These are your **adjustments to income.** Enter here and on Form 1040, 1040-SR, or 1040-NR, line 10a | **22** | 53,250. |

LHA   **For Paperwork Reduction Act Notice, see your tax return instructions.**                    Schedule 1 (Form 1040) 2020

013923  12-10-20

AMENDED

| SCHEDULE 2 (Form 1040) | **Additional Taxes** | OMB No. 1545-0074 |
|---|---|---|

Department of the Treasury
Internal Revenue Service

► **Attach to Form 1040, 1040-SR, or 1040-NR.**
► **Go to www.irs.gov/Form1040 for instructions and the latest information.**

**2020**
Attachment Sequence No. **02**

Name(s) shown on Form 1040, 1040-SR, or 1040-NR
TONY D. & ELIZABETH A. TOWNLEY

Your social security number

| **Part I** | **Tax** | | |
|---|---|---|---|
| **1** | Alternative minimum tax. Attach Form 6251 | **1** | 5,064. |
| **2** | Excess advance premium tax credit repayment. Attach Form 8962 | **2** | |
| **3** | Add lines 1 and 2. Enter here and on Form 1040, 1040-SR, or 1040-NR, line 17 | **3** | 5,064. |
| **Part II** | **Other Taxes** | | |
| **4** | Self-employment tax. Attach Schedule SE | **4** | 65,492. |
| **5** | Unreported social security and Medicare tax from Form:   **a** ☐ 4137   **b** ☐ 8919 | **5** | |
| **6** | Additional tax on IRAs, other qualified retirement plans, and other tax-favored accounts. Attach Form 5329 if required | **6** | |
| **7a** | Household employment taxes. Attach Schedule H | **7a** | |
| **b** | Repayment of first-time homebuyer credit from Form 5405. Attach Form 5405 if required | **7b** | |
| **8** | Taxes from:   **a** ☒ Form 8959   **b** ☒ Form 8960   **c** ☐ Instructions; enter code(s)   SEE STATEMENT 8 | **8** | 95,510. |
| **9** | Section 965 net tax liability installment from Form 965-A ................ **9** | | |
| **10** | Add lines 4 through 8. These are your **total other taxes.** Enter here and on Form 1040 or 1040-SR, line 23, or Form 1040-NR, line 23b | **10** | 161,002. |

LHA    **For Paperwork Reduction Act Notice, see your tax return instructions.**

Schedule 2 (Form 1040) 2020

AMENDED

**SCHEDULE 3**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service

# Additional Credits and Payments

▶ Attach to Form 1040, 1040-SR, or 1040-NR.
▶ Go to www.irs.gov/Form1040 for instructions and the latest information.

OMB No. 1545-0074

**2020**

Attachment
Sequence No. **03**

| Name(s) shown on Form 1040, 1040-SR, or 1040-NR | Your social security number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | |

## Part I   Nonrefundable Credits

| | | | |
|---|---|---|---|
| **1** | Foreign tax credit. Attach Form 1116 if required | **1** | 8. |
| **2** | Credit for child and dependent care expenses. Attach Form 2441 | **2** | |
| **3** | Education credits from Form 8863, line 19 | **3** | |
| **4** | Retirement savings contributions credit. Attach Form 8880 | **4** | |
| **5** | Residential energy credits. Attach Form 5695 | **5** | |
| **6** | Other credits from Form: **a** [X] 3800 **b** ☐ 8801 **c** ☐ | **6** | 185,422. |
| **7** | Add lines 1 through 6. Enter here and on Form 1040, 1040-SR, or 1040-NR, line 20 | **7** | 185,430. |

## Part II   Other Payments and Refundable Credits

| | | | | |
|---|---|---|---|---|
| **8** | Net premium tax credit. Attach Form 8962 | | **8** | |
| **9** | Amount paid with request for extension to file (see instructions) | | **9** | 185,000,000. |
| **10** | Excess social security and tier 1 RRTA tax withheld | | **10** | |
| **11** | Credit for federal tax on fuels. Attach Form 4136 | | **11** | |
| **12** | Other payments or refundable credits: | | | |
| **a** | Form 2439 | **12a** | | |
| **b** | Qualified sick and family leave credits from Schedule(s) H and Form(s) 7202 | **12b** | | |
| **c** | Health coverage tax credit from Form 8885 | **12c** | | |
| **d** | Other: | **12d** | | |
| **e** | Deferral for certain Schedule H or SE filers (see instructions) | **12e** | | |
| **f** | Add lines 12a through 12e | | **12f** | |
| **13** | Add lines 8 through 12f. Enter here and on Form 1040, 1040-SR, or 1040-NR, line 31 | | **13** | 185,000,000. |

LHA   **For Paperwork Reduction Act Notice, see your tax return instructions.**    Schedule 3 (Form 1040) 2020

013925  12-11-20

AMENDED

# SCHEDULE A
**(Form 1040)**

Department of the Treasury
Internal Revenue Service  (99)

## Itemized Deductions

▶ Go to www.irs.gov/ScheduleA for instructions and the latest information.
▶ Attach to Form 1040 or 1040-SR.

**Caution:** If you are claiming a net qualified disaster loss on Form 4684, see the instructions for line 16.

OMB No. 1545-0074

**2020**

Attachment
Sequence No. **07**

Name(s) shown on Form 1040 or 1040-SR

**TONY D. & ELIZABETH A. TOWNLEY**

Your social security number

| | | | |
|---|---|---|---|
| **Medical and Dental Expenses** | **Caution:** Do not include expenses reimbursed or paid by others. | | |
| | **1** Medical and dental expenses (see instructions) | **1** | |
| | **2** Enter amount from Form 1040 or 1040-SR, line 11 ......... **2** | | |
| | **3** Multiply line 2 by 7.5% (0.075) | **3** | |
| | **4** Subtract line 3 from line 1. If line 3 is more than line 1, enter -0- | **4** | |
| **Taxes You Paid** | **5** State and local taxes. | | |
| | **a** State and local income taxes or general sales taxes. You may include either income taxes or general sales taxes on line 5a, but not both. If you elect to use general sales taxes instead of income taxes, check this box     SEE STATEMENT 9   ▶ ☐ | **5a** | 1,011,888. |
| | **b** State and local real estate taxes (see instructions) | **5b** | 49,780. |
| | **c** State and local personal property taxes | **5c** | |
| | **d** Add lines 5a through 5c | **5d** | 1,061,668. |
| | **e** Enter the smaller of line 5d or $10,000 ($5,000 if married filing separately) | **5e** | 10,000. |
| | **6** Other taxes. List type and amount ▶ _____ | **6** | |
| | **7** Add lines 5e and 6 | **7** | 10,000. |
| **Interest You Paid**<br>**Caution:** Your mortgage interest deduction may be limited (see instructions). | **8** Home mortgage interest and points. If you didn't use all of your home mortgage loan(s) to buy, build, or improve your home, see instructions and check this box ▶ ☐ | | |
| | **a** Home mortgage interest and points reported to you on Form 1098. See instructions if limited | **8a** | |
| | **b** Home mortgage interest not reported to you on Form 1098. See instructions if limited. If paid to the person from whom you bought the home, see instructions and show that person's name, identifying no., and address ▶ _____ | **8b** | |
| | **c** Points not reported to you on Form 1098. See instructions for special rules | **8c** | |
| | **d** Mortgage insurance premiums (see instructions) | **8d** | |
| | **e** Add lines 8a through 8d | **8e** | |
| | **9** Investment interest. Attach Form 4952 if required. See instructions | **9** | |
| | **10** Add lines 8e and 9 | **10** | |
| **Gifts to Charity**<br>**Caution:** If you made a gift and got a benefit for it, see instructions. | **11** Gifts by cash or check. If you made any gift of $250 or more, see instructions | **11** | 45,524.   STMT 10 |
| | **12** Other than by cash or check. If you made any gift of $250 or more, see instructions. You **must** attach Form 8283 if over $500 | **12** | 226,583. |
| | **13** Carryover from prior year | **13** | 4,186,787. |
| | **14** Add lines 11 through 13 | **14** | 4,458,894. |
| **Casualty and Theft Losses** | **15** Casualty and theft loss(es) from a federally declared disaster (other than net qualified disaster losses). Attach Form 4684 and enter the amount from line 18 of that form. See instructions | **15** | |
| **Other Itemized Deductions** | **16** Other - from list in instructions. List type and amount ▶ _____ | **16** | |
| **Total Itemized Deductions** | **17** Add the amounts in the far right column for lines 4 through 16. Also, enter this amount on Form 1040 or 1040-SR, line 12 | **17** | 4,468,894. |
| | **18** If you elect to itemize deductions even though they are less than your standard deduction, check this box ▶ ☐ | | |

LHA   **For Paperwork Reduction Act Notice, see the Instructions for Forms 1040 and 1040-SR.**

019501  12-09-20

Schedule A (Form 1040) 2020

AMENDED

**SCHEDULE B**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service (99)

# Interest and Ordinary Dividends

▶ Go to www.irs.gov/ScheduleB for instructions and the latest information.
▶ Attach to Form 1040 or 1040-SR.

OMB No. 1545-0074

**2020**

Attachment
Sequence No. **08**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Your social security number

| Part I **Interest** | | | | Amount |
|---|---|---|---|---|
| | **1** | List name of payer. If any interest is from a seller-financed mortgage and the buyer used the property as a personal residence, see the instructions and list this interest first. Also, show that buyer's social security number and address ▶ | | |
| | | SEE STATEMENT 11 | | 1,536,550. |
| Note: If you received a Form 1099-INT, Form 1099-OID, or substitute statement from a brokerage firm, list the firm's name as the payer and enter the total interest shown on that form. | | | **1** | |
| | | SUBTOTAL FOR LINE 1 | | 1,536,550. |
| | | TAX-EXEMPT INTEREST                  SEE STATEMENT 12 | | -27,321. |
| | | ABP ADJUSTMENT                       SEE STATEMENT 13 | | -5,927. |
| | **2** | Add the amounts on line 1 | **2** | 1,503,302. |
| | **3** | Excludable interest on series EE and I U.S. savings bonds issued after 1989. Attach Form 8815 | **3** | |
| | **4** | Subtract line 3 from line 2. Enter the result here and on Form 1040 or 1040-SR, line 2b ▶ | **4** | 1,503,302. |
| | | **Note:** If line 4 is over $1,500, you must complete Part III. | | |

| Part II **Ordinary Dividends** | | | | Amount |
|---|---|---|---|---|
| | **5** | List name of payer ▶ | | |
| | | COMPUTERSHARE INC. | | 70. |
| | | VANGUARD #9138 | | 78,607. |
| | | SYNOVUS TRUST CO | | 227. |
| | | FROM K-1 - PLUCKED CHICKEN, INC. | | 2,041. |
| | | FROM K-1 - CLUCKZ HOLDINGS, LLC | | 128. |
| | | FROM K-1 - ZAXBY'S OPERATING COMPANY, LP (TDT) | | 389. |
| | | FROM K-1 - CLUCKZ HOLDINGS, LLC (SECG) | | 23. |
| Note: If you received a Form 1099-DIV or substitute statement from a brokerage firm, list the firm's name as the payer and enter the ordinary dividends shown on that form. | | | **5** | |
| | **6** | Add the amounts on line 5. Enter the total here and on Form 1040 or 1040-SR, line 3b ▶ | **6** | 81,485. |
| | | **Note:** If line 6 is over $1,500, you must complete Part III. | | |

| Part III **Foreign Accounts and Trusts** | | | Yes | No |
|---|---|---|---|---|
| | | You must complete this part if you **(a)** had over $1,500 of taxable interest or ordinary dividends; **(b)** had a foreign account; or **(c)** received a distribution from, or were a grantor of, or a transferor to, a foreign trust. | | |
| **Caution:** If required, failure to file FinCEN Form 114 may result in substantial penalties. See instructions. | **7a** | At any time during 2020, did you have a financial interest in or signature authority over a financial account (such as a bank account, securities account, or brokerage account) located in a foreign country? See instructions | | X |
| | | If "Yes," are you required to file FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR), to report that financial interest or signature authority? See FinCEN Form 114 and its instructions for filing requirements and exceptions to those requirements | | |
| | **b** | If you are required to file FinCEN Form 114, enter the name of the foreign country where the financial account is located ▶ | | |
| | **8** | During 2020, did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust? If "Yes," you may have to file Form 3520. See instructions | | X |

027501  11-05-20

LHA    **For Paperwork Reduction Act Notice, see your tax return instructions.**                                   Schedule B (Form 1040) 2020

AMENDED

**SCHEDULE C**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service (99)

# Profit or Loss From Business
(Sole Proprietorship)

▶ Go to www.irs.gov/ScheduleC for instructions and the latest information.
▶ Attach to Form 1040, 1040-SR, 1040-NR, or 1041; partnerships generally must file Form 1065.

OMB No. 1545-0074

**2020**

Attachment
Sequence No. **09**

| Name of proprietor | Social security number (SSN) |
|---|---|
| TONY D. TOWNLEY | |

| A | Principal business or profession, including product or service (see instructions) | B | Enter code from instructions |
|---|---|---|---|
| | MANAGEMENT | | ▶ 561210 |

| C | Business name. If no separate business name, leave blank. | D | Employer ID number (EIN) (see instr.) |
|---|---|---|---|
| | OTF MANAGEMENT, LLC | | |

| E | Business address (including suite or room no.) ▶ | 1280 SNOWS MILL RD |
|---|---|---|
| | City, town or post office, state, and ZIP code | BOGART, GA 30622 |

F   Accounting method:   (1) [X] Cash   (2) [ ] Accrual   (3) [ ] Other (specify) ▶ _____

| G | Did you "materially participate" in the operation of this business during 2020? If "No," see instructions for limit on losses | [X] Yes [ ] No |
|---|---|---|
| H | If you started or acquired this business during 2020, check here | ▶ [ ] |
| I | Did you make any payments in 2020 that would require you to file Form(s) 1099? See instructions | [X] Yes [ ] No |
| J | If "Yes," did you or will you file required Form(s) 1099? | [X] Yes [ ] No |

## Part I   Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. See instructions for line 1 and check the box if this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked ▶ [ ] | 1 | 780,820. |
| 2 | Returns and allowances | 2 | |
| 3 | Subtract line 2 from line 1 | 3 | 780,820. |
| 4 | Cost of goods sold (from line 42) | 4 | |
| 5 | **Gross profit.** Subtract line 4 from line 3 | 5 | 780,820. |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) | 6 | |
| 7 | **Gross income.** Add lines 5 and 6 ▶ | 7 | 780,820. |

## Part II   Expenses. Enter expenses for business use of your home **only** on line 30.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8 | Advertising | 8 | | 18 | Office expense | 18 | 15,248. |
| 9 | Car and truck expenses (see instructions) | 9 | | 19 | Pension and profit-sharing plans | 19 | |
| 10 | Commissions and fees | 10 | | 20 | Rent or lease (see instructions): | | |
| 11 | Contract labor (see instructions) | 11 | 225. | a | Vehicles, machinery, and equipment | 20a | 2,252. |
| 12 | Depletion | 12 | | b | Other business property | 20b | 172,500. |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions) | 13 | 19,393. | 21 | Repairs and maintenance | 21 | 42,459. |
| | | | | 22 | Supplies (not included in Part III) | 22 | 96,358. |
| | | | | 23 | Taxes and licenses | 23 | 13,130. |
| 14 | Employee benefit programs (other than on line 19) | 14 | | 24 | Travel and meals: | | |
| 15 | Insurance (other than health) | 15 | 13,812. | a | Travel | 24a | 1,925. |
| 16 | Interest (see instructions): | | | b | Deductible meals (see instructions) | 24b | 18. |
| a | Mortgage (paid to banks, etc.) | 16a | 4,395. | 25 | Utilities | 25 | 12,520. |
| b | Other | 16b | | 26 | Wages (less employment credits) | 26 | 848,947. |
| 17 | Legal and professional services | 17 | 6,832. | 27 a | Other expenses (from line 48) | 27a | |
| | | | | b | Reserved for future use | 27b | |

| | | | |
|---|---|---|---|
| 28 | **Total expenses** before expenses for business use of home. Add lines 8 through 27a ▶ | 28 | 1,250,014. |
| 29 | Tentative profit or (loss). Subtract line 28 from line 7 | 29 | -469,194. |
| 30 | Expenses for business use of your home. Do not report these expenses elsewhere. Attach Form 8829 unless using the simplified method. See instructions.
  **Simplified method filers only:** Enter the total square footage of (a) your home: _____ and (b) the part of your home used for business: _____ .
  Use the Simplified Method Worksheet in the instructions to figure the amount to enter on line 30 | 30 | |
| 31 | **Net profit or (loss).** Subtract line 30 from line 29.
  ● If a profit, enter on both **Schedule 1 (Form 1040), line 3,** and on **Schedule SE, line 2.** (If you checked the box on line 1, see instructions). Estates and trusts, enter on **Form 1041, line 3.**
  ● If a loss, you **must** go to line 32. | 31 | -469,194. |
| 32 | If you have a loss, check the box that describes your investment in this activity. See instructions.
  ● If you checked 32a, enter the loss on both **Schedule 1 (Form 1040), line 3,** and on **Schedule SE, line 2.** (If you checked the box on line 1, see the line 31 instructions). Estates and trusts, enter on **Form 1041, line 3.**
  ● If you checked 32b, you **must** attach **Form 6198.** Your loss may be limited. | 32a [X] All investment is at risk. 32b [ ] Some investment is not at risk. |

LHA   **For Paperwork Reduction Act Notice, see the separate instructions.**                    Schedule C (Form 1040) 2020
020001  11-16-20

AMENDED

| SCHEDULE D<br>(Form 1040)<br><br>Department of the Treasury<br>Internal Revenue Service  (99) | Capital Gains and Losses<br><br>► Attach to Form 1040, 1040-SR, or 1040-NR.<br>► Go to www.irs.gov/ScheduleD for instructions and the latest information.<br>► Use Form 8949 to list your transactions for lines 1b, 2, 3, 8b, 9, and 10. | OMB No. 1545-0074<br><br>**2020**<br>Attachment<br>Sequence No. **12** |
| --- | --- | --- |

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Your social security number

Did you dispose of any investment(s) in a qualified opportunity fund during the tax year?  ☐ Yes  ☒ No
If "Yes," attach Form 8949 and see its instructions for additional requirements for reporting your gain or loss.

### Part I  Short-Term Capital Gains and Losses - Generally Assets Held One Year or Less  (see instructions)

| See instructions for how to figure the amounts to enter on the lines below.<br><br>This form may be easier to complete if you round off cents to whole dollars. | (d)<br>Proceeds<br>(sales price) | (e)<br>Cost<br>(or other basis) | (g)<br>Adjustments<br>to gain or loss from<br>Form(s) 8949, Part I,<br>line 2, column (g) | (h) Gain or (loss)<br>Subtract column (e)<br>from column (d) and<br>combine the result<br>with column (g) |
| --- | --- | --- | --- | --- |
| **1a** Totals for all short-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 1b | | | | |
| **1b** Totals for all transactions reported on Form(s) 8949 with **Box A** checked | 489,910. | 252,203. | | 237,707. |
| **2** Totals for all transactions reported on Form(s) 8949 with **Box B** checked | | | | |
| **3** Totals for all transactions reported on Form(s) 8949 with **Box C** checked | | | | |

| | | |
| --- | --- | --- |
| **4** Short-term gain from Form 6252 and short-term gain or (loss) from Forms 4684, 6781, and 8824 | **4** | |
| **5** Net short-term gain or (loss) from partnerships, S corporations, estates, and trusts from Schedule(s) K-1                SEE STATEMENT 15 | **5** | 15,703. |
| **6** Short-term capital loss carryover. Enter the amount, if any, from line 8 of your **Capital Loss Carryover Worksheet** in the instructions | **6** | (                    ) |
| **7** **Net short-term capital gain or (loss).** Combine lines 1a through 6 in column (h). If you have any long-term capital gains or losses, go to Part II below. Otherwise, go to Part II on page 2 | **7** | 253,410. |

### Part II  Long-Term Capital Gains and Losses - Generally Assets Held More Than One Year  (see instructions)

| See instructions for how to figure the amounts to enter on the lines below.<br><br>This form may be easier to complete if you round off cents to whole dollars. | (d)<br>Proceeds<br>(sales price) | (e)<br>Cost<br>(or other basis) | (g)<br>Adjustments<br>to gain or loss from<br>Form(s) 8949, Part II,<br>line 2, column (g) | (h) Gain or (loss)<br>Subtract column (e)<br>from column (d) and<br>combine the result<br>with column (g) |
| --- | --- | --- | --- | --- |
| **8a** Totals for all long-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 8b | | | | |
| **8b** Totals for all transactions reported on Form(s) 8949 with **Box D** checked | 10,000. | 10,478. | | <478.> |
| **9** Totals for all transactions reported on Form(s) 8949 with **Box E** checked | | | | |
| **10** Totals for all transactions reported on Form(s) 8949 with **Box F** checked | | | | |

| | | |
| --- | --- | --- |
| **11** Gain from Form 4797, Part I; long-term gain from Forms 2439 and 6252; and long-term gain or (loss) from Forms 4684, 6781, and 8824                SEE STATEMENT 14 | **11** | 2,841,493. |
| **12** Net long-term gain or (loss) from partnerships, S corporations, estates, and trusts from Schedule(s) K-1                SEE STATEMENT 16 | **12** | 932707897. |
| **13** Capital gain distributions | **13** | |
| **14** Long-term capital loss carryover. Enter the amount, if any, from line 13 of your **Capital Loss Carryover Worksheet** in the instructions | **14** | (                    ) |
| **15** **Net long-term capital gain or (loss).** Combine lines 8a through 14 in column (h). Then, go to Part III on page 2 | **15** | 935548912. |

LHA  **For Paperwork Reduction Act Notice, see your tax return instructions.**                    Schedule D (Form 1040) 2020

AMENDED

Schedule D (Form 1040) 2020        TONY D. & ELIZABETH A. TOWNLEY                            Page **2**

| **Part III** | **Summary** |
| --- | --- |

**16** Combine lines 7 and 15 and enter the result ....................................................    **16**    935802322.

- If line 16 is a **gain,** enter the amount from line 16 on Form 1040, 1040-SR, or 1040-NR, line 7. Then, go to line 17 below.
- If line 16 is a **loss,** skip lines 17 through 20 below. Then, go to line 21. Also be sure to complete line 22.
- If line 16 is **zero,** skip lines 17 through 21 below and enter -0- on Form 1040, 1040-SR, or 1040-NR, line 7. Then, go to line 22.

**17** Are lines 15 and 16 **both** gains?
  [X] **Yes.** Go to line 18.
  [ ] **No.** Skip lines 18 through 21, and go to line 22.

**18** If you are required to complete the **28% Rate Gain Worksheet** (see instructions), enter the amount, if any, from line 7 of that worksheet ....................................  ▶    **18**

**19** If you are required to complete the **Unrecaptured Section 1250 Gain Worksheet** (see instructions), enter the amount, if any, from line 18 of that worksheet   SEE STATEMENT 17  ▶   **19**   2,721,241.

**20** Are lines 18 and 19 both zero or blank and are you not filing Form 4952?

  [ ] **Yes.** Complete the **Qualified Dividends and Capital Gain Tax Worksheet** in the instructions for Forms 1040 and 1040-SR, line 16. **Don't** complete lines 21 and 22 below.

  [X] **No.** Complete the **Schedule D Tax Worksheet** in the instructions. **Don't** complete lines 21 and 22 below.

**21** If line 16 is a loss, enter here and on Form 1040, 1040-SR, or 1040-NR, line 7, the **smaller** of:

- The loss on line 16; or
- ($3,000), or if married filing separately, ($1,500)   }  ....................................    **21**  (                    )

**Note:** When figuring which amount is smaller, treat both amounts as positive numbers.

**22** Do you have qualified dividends on Form 1040, 1040-SR, or 1040-NR, line 3a?

  [ ] **Yes.** Complete the **Qualified Dividends and Capital Gain Tax Worksheet** in the instructions for Forms 1040 and 1040-SR, line 16.

  [ ] **No.** Complete the rest of Form 1040, 1040-SR, or 1040-NR.

Schedule D (Form 1040) 2020

020512  12-23-20

AMENDED

Form **8949**

Department of the Treasury
Internal Revenue Service

## Sales and Other Dispositions of Capital Assets

▶ Go to www.irs.gov/Form8949 for instructions and the latest information.
▶ File with your Schedule D to list your transactions for lines 1b, 2, 3, 8b, 9, and 10 of Schedule D.

OMB No. 1545-0074

**2020**

Attachment
Sequence No. **12A**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Social security number or
taxpayer identification no.

*Before you check Box A, B, or C below, see whether you received any Form(s) 1099-B or substitute statement(s) from your broker. A substitute statement will have the same information as Form 1099-B. Either will show whether your basis (usually your cost) was reported to the IRS by your broker and may even tell you which box to check.*

| Part I | **Short-Term.** Transactions involving capital assets you held 1 year or less are generally short-term (see instructions). For long-term transactions, see page 2. |

**Note:** You may aggregate all short-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS and for which no adjustments or codes are required. Enter the totals directly on Schedule D, line 1a; you aren't required to report these transactions on Form 8949 (see instructions).

**You must check Box A, B, or C below. Check only one box.** If more than one box applies for your short-term transactions, complete a separate Form 8949, page 1, for each applicable box. If you have more short-term transactions than will fit on this page for one or more of the boxes, complete as many forms with the same box checked as you need.

- [X] **(A)** Short-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS (see **Note** above)
- [ ] **(B)** Short-term transactions reported on Form(s) 1099-B showing basis **wasn't** reported to the IRS
- [ ] **(C)** Short-term transactions not reported to you on Form 1099-B

| 1 | **(a)** Description of property (Example: 100 sh. XYZ Co.) | **(b)** Date acquired (Mo., day, yr.) | **(c)** Date sold or disposed of (Mo., day, yr.) | **(d)** Proceeds (sales price) | **(e)** Cost or other basis. See the **Note** below and see *Column (e)* in the instructions | **(f)** Code(s) | **(g)** Amount of adjustment | **(h)** Gain or (loss). Subtract column (e) from column (d) & combine the result with column (g) |
|---|---|---|---|---|---|---|---|---|
| | 4600.098 SH - DUNKIN BRANDS GRP INC | VARIOUS | 12/18/20 | 489,910. | 252,203. | | | 237,707. |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**2 Totals.** Add the amounts in columns (d), (e), (g), and (h) (subtract negative amounts). Enter each total here and include on your Schedule D, **line 1b** (if **Box A** above is checked), **line 2** (if **Box B** above is checked), or **line 3** (if **Box C** above is checked)  ▶ | 489,910. | 252,203. | | | 237,707.

**Note:** If you checked Box A above but the basis reported to the IRS was incorrect, enter in column (e) the basis as reported to the IRS, and enter an adjustment in column (g) to correct the basis. See *Column (g)* in the separate instructions for how to figure the amount of the adjustment.

023011  12-11-20    **LHA    For Paperwork Reduction Act Notice, see your tax return instructions.**    Form **8949** (2020)

Case 3:22-cv-00107-CDL   Document 1-3   Filed 10/28/22   Page 22 of 666

Form 8949 (2020)

Attachment Sequence No. **12A**                    Page **2**

Name(s) shown on return. Name and SSN or taxpayer identification no. not required if shown on page 1

**Social security number or taxpayer identification no.**

TONY D. & ELIZABETH A. TOWNLEY

*Before you check Box D, E, or F below, see whether you received any Form(s) 1099-B or substitute statement(s) from your broker. A substitute statement will have the same information as Form 1099-B. Either will show whether your basis (usually your cost) was reported to the IRS by your broker and may even tell you which box to check.*

**Part II** | **Long-Term.** Transactions involving capital assets you held more than 1 year are generally long-term (see instructions). For short-term transactions, see page 1.

**Note:** You may aggregate all long-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS and for which no adjustments or codes are required. Enter the totals directly on Schedule D, line 8a; you aren't required to report these transactions on Form 8949 (see instructions).

**You must check Box D, E, or F below. Check only one box.** If more than one box applies for your long-term transactions, complete a separate Form 8949, page 2, for each applicable box. If you have more long-term transactions than will fit on this page for one or more of the boxes, complete as many forms with the same box checked as you need.

[X] **(D)** Long-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS (see **Note** above)

[ ] **(E)** Long-term transactions reported on Form(s) 1099-B showing basis **wasn't** reported to the IRS

[ ] **(F)** Long-term transactions not reported to you on Form 1099-B

| 1 (a)<br>Description of property<br>(Example: 100 sh. XYZ Co.) | (b)<br>Date acquired<br>(Mo., day, yr.) | (c)<br>Date sold or<br>disposed of<br>(Mo., day, yr.) | (d)<br>Proceeds<br>(sales price) | (e)<br>Cost or other<br>basis. See the<br>**Note** below and<br>see *Column (e)* in<br>the instructions | (f)<br>Code(s) | (g)<br>Amount of<br>adjustment | (h)<br>Gain or (loss).<br>Subtract column (e)<br>from column (d) &<br>combine the result<br>with column (g) |
|---|---|---|---|---|---|---|---|
| 10000.000 SH –<br>ATLANTA GA | 04/16/18 | 11/02/20 | 10,000. | 10,478. | | | <478.> |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**2 Totals.** Add the amounts in columns (d), (e), (g), and (h) (subtract negative amounts). Enter each total here and include on your Schedule D, **line 8b** (if **Box D** above is checked), **line 9** (if **Box E** above is checked), or **line 10** (if **Box F** above is checked)   ▶ | 10,000. | 10,478. | | | <478.>

**Note:** If you checked Box D above but the basis reported to the IRS was incorrect, enter in column (e) the basis as reported to the IRS, and enter an adjustment in column (g) to correct the basis. See *Column (g)* in the separate instructions for how to figure the amount of the adjustment.

023012  12-11-20                                                                                          Form **8949** (2020)

AMENDED

| SCHEDULE E<br>(Form 1040)<br><br>Department of the Treasury<br>Internal Revenue Service      (99) | **Supplemental Income and Loss**<br>(From rental real estate, royalties, partnerships, S corporations, estates, trusts, REMICs, etc.)<br>▶ Attach to Form 1040, 1040-SR, 1040-NR, or 1041.<br>▶ Go to www.irs.gov/ScheduleE for instructions and the latest information. | OMB No. 1545-0074<br><br>**2020**<br>Attachment<br>Sequence No. **13** |
|---|---|---|

Name(s) shown on return | Your social security number

TONY D. & ELIZABETH A. TOWNLEY

**Part I** **Income or Loss From Rental Real Estate and Royalties**  Note: If you are in the business of renting personal property, use Schedule C. See instructions. If you are an individual, report farm rental income or loss from **Form 4835** on page 2, line 40.

| | | | | |
|---|---|---|---|---|
| **A** | Did you make any payments in 2020 that would require you to file Form(s) 1099? See instructions | | X Yes | No |
| **B** | If "Yes," did you or will you file required Form(s) 1099? | | X Yes | No |

**1a** Physical address of each property (street, city, state, ZIP code)

**A** VARIOUS (FRAZER CREEK), OCONEE COUNTY, GA 30607
**B** VARIOUS (LANE CREEK), GA
**C** VARIOUS (OGEECHEE), GA

| 1b | Type of Property<br>(from list below) | 2 | For each rental real estate property listed above, report the number of fair rental and personal use days. Check the **QJV** box only if you meet the requirements to file as a qualified joint venture. See instructions. | | Fair Rental Days | Personal Use Days | QJV |
|---|---|---|---|---|---|---|---|
| **A** | 1 | | | **A** | 366 | | |
| **B** | 4 | | | **B** | 366 | | |
| **C** | 5 | | | **C** | 366 | | |

**Type of Property:**

| | | | |
|---|---|---|---|
| 1 Single Family Residence | 3 Vacation/Short-Term Rental | 5 Land | 7 Self-Rental |
| 2 Multi-Family Residence | 4 Commercial | 6 Royalties | 8 Other (describe) |

| Income: | | Properties: | **A** | **B** | **C** |
|---|---|---|---|---|---|
| **3** Rents received | **3** | | 640,764. | 784,031. | 23,515. |
| **4** Royalties received | **4** | | | | |
| **Expenses:** | | | | | |
| **5** Advertising | **5** | | | | |
| **6** Auto and travel (see instructions) | **6** | | | | |
| **7** Cleaning and maintenance | **7** | | | | |
| **8** Commissions | **8** | | | | |
| **9** Insurance | **9** | | 43,011. | 13,996. | 541. |
| **10** Legal and other professional fees | **10** | | 60,727. | 165,824. | 3,022. |
| **11** Management fees | **11** | | | | |
| **12** Mortgage interest paid to banks, etc. (see instructions) | **12** | | | | |
| **13** Other interest | **13** | | | | 346. |
| **14** Repairs | **14** | | 41,901. | | |
| **15** Supplies | **15** | | 16,176. | | |
| **16** Taxes | **16** | | 94,447. | | 14,130. |
| **17** Utilities | **17** | | 9,030. | 330. | |
| **18** Depreciation expense or depletion | **18** | | 308,155. | 141,291. | |
| **19** Other (list) ▶ STMT 18    STMT 19 | **19** | | 10,487. | 1,045. | |
| **20** Total expenses. Add lines 5 through 19 | **20** | | 583,934. | 322,486. | 18,039. |
| **21** Subtract line 20 from line 3 (rents) and line 4 (royalties). If result is a (loss), see instructions to find out if you must file **Form 6198** | **21** | | 56,830. | 461,545. | 5,476. |
| **22** Deductible rental real estate loss after limitation, if any, on Form 8582 (see instructions) | **22** | | ( 92,594.) | ( 49,216.) | ( ) |

| | | | |
|---|---|---|---|
| **23a** Total of all amounts reported on line 3 for all rental properties | **23a** | 1,448,310. | |
| **b** Total of all amounts reported on line 4 for all royalty properties | **23b** | | |
| **c** Total of all amounts reported on line 12 for all properties | **23c** | | |
| **d** Total of all amounts reported on line 18 for all properties | **23d** | 449,446. | |
| **e** Total of all amounts reported on line 20 for all properties | **23e** | 924,459. | |

| | | | |
|---|---|---|---|
| **24** **Income.** Add positive amounts shown on line 21. **Do not** include any losses | | **24** | 523,851. |
| **25** **Losses.** Add royalty losses from line 21 and rental real estate losses from line 22. Enter total losses here | | **25** | 141,810.) |
| **26** **Total rental real estate and royalty income or (loss).** Combine lines 24 and 25. Enter the result here. If Parts II, III, IV, and line 40 on page 2 do not apply to you, also enter this amount on Schedule 1 (Form 1040), line 5. Otherwise, include this amount in the total on line 41 on page 2 | | **26** | 382,041. |

LHA   **For Paperwork Reduction Act Notice, see the separate instructions.**    Schedule E (Form 1040) 2020

021491 12-01-20

Case 3:22-cv-00107-CDL    Document 61    Filed 10/28/22    Page 24 of 666

Schedule E (Form 1040) 2020

Attachment Sequence No. **13**

Page **2**

Name(s) shown on return. Do not enter name and social security number if shown on page 1.

**Your social security number**

TONY D. & ELIZABETH A. TOWNLEY

**Caution:** The IRS compares amounts reported on your tax return with amounts shown on Schedule(s) K-1.

| Part II | **Income or Loss From Partnerships and S Corporations -** **Note:** If you report a loss, receive a distribution, dispose of |
|---|---|

stock, or receive a loan repayment from an S corporation, you **must** check the box in column **(e)** on line 28 and attach the required basis computation. If you report a loss from an at-risk activity for which **any** amount is **not** at risk, you **must** check the box in column **(f)** on line 28 and attach **Form 6198.** See instructions.

27  Are you reporting any loss not allowed in a prior year due to the at-risk or basis limitations, a prior year unallowed loss from a passive activity (if that loss was not reported on Form 8582), or unreimbursed partnership expenses? If you answered "Yes," see instructions before completing this section .......................................... [X] Yes  [ ] No

28

| | **(a)** Name | **(b)** Enter **P** for partnership; **S** for S corporation | **(c)** Check if foreign partnership | **(d)** Employer identification number | **(e)** Check if basis computation is required | **(f)** Check if any amount is not at risk |
|---|---|---|---|---|---|---|
| A | SEE STATEMENT 23 | | | | | |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |

| | Passive Income and Loss | | Nonpassive Income and Loss | | |
|---|---|---|---|---|---|
| | **(g)** Passive loss allowed (attach **Form 8582** if required) | **(h)** Passive income from **Schedule K-1** | **(i)** Nonpassive loss allowed (see **Schedule K-1**) | **(j)** Section 179 expense deduction from **Form 4562** | **(k)** Nonpassive income from **Schedule K-1** |
| A | | | | | |
| B | | | | | |
| C | | | | | |
| D | | | | | |
| 29a | Totals | | | | | 51,879,351. |
| b | Totals | 26,409. | | 5,094,289. | | |

| 30 | Add columns (h) and (k) of line 29a | 30 | 51,879,351. |
|---|---|---|---|
| 31 | Add columns (g), (i), and (j) of line 29b | 31 | (5,120,698. ) |
| 32 | Total partnership and S corporation income or (loss). Combine lines 30 and 31 | 32 | 46,758,653. |

| Part III | **Income or Loss From Estates and Trusts** |
|---|---|

33

| | **(a)** Name | **(b)** Employer identification number |
|---|---|---|
| A | ELIZABETH A. TOWNLEY TRUST | |
| B | TONY D. TOWNLEY TRUST | |

| | Passive Income and Loss | | Nonpassive Income and Loss | |
|---|---|---|---|---|
| | **(c)** Passive deduction or loss allowed (attach **Form 8582** if required) | **(d)** Passive income from **Schedule K-1** | **(e)** Deduction or loss from **Schedule K-1** | **(f)** Other income from **Schedule K-1** |
| A | | 0. | | |
| B | | 0. | | |
| 34a | Totals | | | |
| b | Totals | | | |

| 35 | Add columns (d) and (f) of line 34a | 35 | |
|---|---|---|---|
| 36 | Add columns (c) and (e) of line 34b | 36 | ( ) |
| 37 | Total estate and trust income or (loss). Combine lines 35 and 36 | 37 | |

| Part IV | **Income or Loss From Real Estate Mortgage Investment Conduits (REMICs) - Residual Holder** |
|---|---|

38

| | **(a)** Name | **(b)** Employer identification number | **(c)** Excess inclusion from **Schedules Q**, line 2c (see instructions) | **(d)** Taxable income (net loss) from **Schedules Q**, line 1b | **(e)** Income from **Schedules Q**, line 3b |
|---|---|---|---|---|---|
| | | | | | |

| 39 | Combine columns (d) and (e) only. Enter the result here and include in the total on line 41 below | 39 | |
|---|---|---|---|

| Part V | **Summary**    **ENTIRE DISPOSITION OF NONPASSIVE ACTIVITY** |
|---|---|

| 40 | Net farm rental income or (loss) from **Form 4835**. Also, complete line 42 below | 40 | |
|---|---|---|---|
| 41 | **Total income or (loss).** Combine lines 26, 32, 37, 39, and 40. Enter the result here and on Schedule 1 (Form 1040), line 5 ▶ | 41 | 47,140,694. |

42  **Reconciliation of farming and fishing income.** Enter your **gross** farming and fishing income reported on Form 4835, line 7; Schedule K-1 (Form 1065), box 14, code B; Schedule K-1 (Form 1120-S), box 17, code AD; and Schedule K-1 (Form 1041), box 14, code F. See instructions.   | 42 | 5,148.

43  **Reconciliation for real estate professionals.** If you were a real estate professional (see instructions), enter the net income or (loss) you reported anywhere on Form 1040, Form 1040-SR, or Form 1040-NR from all real estate activities in which you materially participated under the passive activity loss rules ......   | 43 |

021501  11-17-20

Schedule E (Form 1040) 2020

**AMENDED**

SCHEDULE F
(Form 1040)
Department of the Treasury
Internal Revenue Service   (99)

OMB No. 1545-0074

# Profit or Loss From Farming

▶ **Attach to Form 1040, Form 1040-SR, Form 1040-NR, Form 1041, or Form 1065.**
▶ **Go to www.irs.gov/ScheduleF for instructions and the latest information.**

**2020**
Attachment
Sequence No. **14**

Name of proprietor

LOG CREEK TRUST

Social security number (SSN)

| A Principal crop or activity | B Enter code from Part IV | C Accounting method: | D Employer ID number (EIN) |
|---|---|---|---|
| TIMBER | ▶ 113000 | [X] Cash   [ ] Accrual | |

E Did you "materially participate" in the operation of this business during 2020? If "No," see instructions for limit on passive losses  [X] Yes  [ ] No

F Did you make any payments in 2020 that would require you to file Form(s) 1099? see instructions  .................................  [ ] Yes  [X] No

G If "Yes," did you or will you file required Form(s) 1099?  .................................  [ ] Yes  [ ] No

## Part I   Farm Income - Cash Method.   Complete Parts I and II (Accrual method. Complete Parts II and III, and Part I, line 9.)

| | | | | | |
|---|---|---|---|---|---|
| 1a | Sales of livestock and other resale items (see instructions) ........... | 1a | | | |
| b | Cost or other basis of livestock or other items reported on line 1a | 1b | | | |
| c | Subtract line 1b from line 1a ................................................... | | | 1c | |
| 2 | Sales of livestock, produce, grains, and other products you raised ................................................ | | | 2 | |
| 3a | Cooperative distributions (Form(s) 1099-PATR) ........... | 3a | | 3b Taxable amount ....... | 3b | |
| 4a | Agricultural program payments (see instructions) ........... | 4a | | 4b Taxable amount ....... | 4b | |
| 5a | Commodity Credit Corporation (CCC) loans reported under election ................................ | | | 5a | |
| b | CCC loans forfeited ................................... | 5b | | 5c Taxable amount ....... | 5c | |
| 6 | Crop insurance proceeds and federal crop disaster payments (see instructions): | | | | |
| a | Amount received in 2020 ................................ | 6a | | 6b Taxable amount ....... | 6b | |
| c | If election to defer to 2021 is attached, check here ........... ▶ [ ] | | 6d Amount deferred from 2019 | 6d | |
| 7 | Custom hire (machine work) income ................................................ | | | 7 | |
| 8 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) STMT 25 | | | 8 | 9,022. |
| 9 | **Gross income.** Add amounts in the right column (lines 1c, 2, 3b, 4b, 5a, 5c, 6b, 6d, 7, and 8). | | | | |
| | If you use the accrual method, enter the amount from Part III, line 50 ................................ ▶ | | | 9 | 9,022. |

## Part II   Farm Expenses - Cash and Accrual Method.   Do not include personal or living expenses. See instructions.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10 | Car and truck expenses (see instructions). | | | 23 | Pension and profit-sharing plans | 23 | |
| | Also attach **Form 4562** | 10 | | 24 | Rent or lease (see instructions): | | |
| 11 | Chemicals | 11 | | a | Vehicles, machinery, equipment | 24a | |
| 12 | Conservation expenses (see instructions) | 12 | | b | Other (land, animals, etc.) | 24b | |
| 13 | Custom hire (machine work) | 13 | | 25 | Repairs and maintenance | 25 | 2,149. |
| 14 | Depreciation and section 179 | | | 26 | Seeds and plants | 26 | |
| | expense (see instructions) | 14 | | 27 | Storage and warehousing | 27 | |
| 15 | Employee benefit programs | | | 28 | Supplies | 28 | |
| | other than on line 23 | 15 | | 29 | Taxes | 29 | 8,150. |
| 16 | Feed | 16 | | 30 | Utilities | 30 | |
| 17 | Fertilizers and lime | 17 | | 31 | Veterinary, breeding, and medicine | 31 | |
| 18 | Freight and trucking | 18 | | 32 | Other expenses (specify): | | |
| 19 | Gasoline, fuel, and oil | 19 | | a | SEE STATEMENT 24 | 32a | 34,198. |
| 20 | Insurance (other than health) | 20 | 1,098. | b | | 32b | |
| 21 | Interest (see instructions): | | | c | | 32c | |
| a | Mortgage (paid to banks, etc.) ........... | 21a | | d | | 32d | |
| b | Other | 21b | | e | | 32e | |
| 22 | Labor hired (less employment credits) ........... | 22 | 1,289. | f | | 32f | |
| 33 | **Total expenses.** Add lines 10 through 32f. If line 32f is negative, see instructions ................................ ▶ | | | | | 33 | 46,884. |
| 34 | **Net farm profit or (loss).** Subtract line 33 from line 9 | | | | | 34 | -37,862. |

If a profit, stop here and see instructions for where to report. If a loss, complete lines 35 and 36.

35 Reserved for future use.

36 Check the box that describes your investment in this activity and see instructions for where to report your loss:

a [X] All investment is at risk.   b [ ] Some investment is not at risk.

LHA   **For Paperwork Reduction Act Notice, see the separate instructions.**                    Schedule F (Form 1040) 2020

**AMENDED**

| SCHEDULE SE<br>(Form 1040)<br><br>Department of the Treasury<br>Internal Revenue Service  (99) | **Self-Employment Tax**<br><br>▶ Go to www.irs.gov/ScheduleSE for instructions and the latest information.<br>▶ Attach to Form 1040, 1040-SR, or 1040-NR. | OMB No. 1545-0074<br><br>**2020**<br>Attachment<br>Sequence No.  17 |

| Name of person with self-employment income (as shown on Form 1040, 1040-SR, or 1040-NR)<br>TONY D. TOWNLEY | Social security number of person<br>with **self-employment** income ▶ |

**Part I    Self-Employment Tax**

**Note:** If your only income subject to self-employment tax is **church employee income,** see instructions for how to report your income and the definition of church employee income.

**A**   If you are a minister, member of a religious order, or Christian Science practitioner **and** you filed Form 4361, but you had
$400 or more of **other** net earnings from self-employment, check here and continue with Part I ........................... ▶ ☐

Skip lines 1a and 1b if you use the farm optional method in Part II. See instructions.    **SEE STATEMENT 27**

| | | | |
|---|---|---|---|
| **1a** | Net farm profit or (loss) from Sch. F, line 34, and farm partnerships, Sch. K-1 (Form 1065), box 14, code A ... | **1a** | −65,219. |
| **b** | If you received social security retirement or disability benefits, enter the amount of Conservation Reserve<br>Program payments included on Schedule F, line 4b, or listed on Schedule K-1 (Form 1065), box 20, code AH | **1b** | |

Skip line 2 if you use the nonfarm optional method in Part II. See instructions.

| | | | |
|---|---|---|---|
| **2** | Net profit or (loss) from Schedule C, line 31; and Schedule K-1 (Form 1065), box 14, code A<br>(other than farming). See instructions for other income to report or if you are a minister or member<br>of a religious order .................................................    **SEE STATEMENT 26** | **2** | 1,873,061. |
| **3** | Combine lines 1a, 1b, and 2 ............................................................... | **3** | 1,807,842. |
| **4a** | If line 3 is more than zero, multiply line 3 by 92.35% (0.9235). Otherwise, enter amount from line 3 ............ | **4a** | 1,669,542. |
| | **Note:** If line 4a is less than $400 due to Conservation Reserve Program payments on line 1b, see instructions | | |
| **b** | If you elect one or both of the optional methods, enter the total of lines 15 and 17 here ........................ | **4b** | |
| **c** | Combine lines 4a and 4b. If less than $400, **stop;** you don't owe self-employment tax. **Exception:** If<br>less than $400 and you had **church employee income,** enter -0- and continue ...................... ▶ | **4c** | 1,669,542. |
| **5a** | Enter your **church employee income** from Form W-2. See instructions for<br>definition of church employee income | **5a** | |
| **b** | Multiply line 5a by 92.35% (0.9235). If less than $100, enter -0- ................ | **5b** | |
| **6** | Add lines 4c and 5b ...................................................................... | **6** | 1,669,542. |
| **7** | Maximum amount of combined wages and self-employment earnings subject to social security tax or<br>the 6.2% portion of the 7.65% railroad retirement (tier 1) tax for 2020 ...................................... | **7** | 137,700 |
| **8a** | Total social security wages and tips (total of boxes 3 and 7 on Form(s) W-2)<br>and railroad retirement (tier 1) compensation. If $137,700 or more, skip lines<br>8b through 10, and go to line 11 ................... | **8a** | |
| **b** | Unreported tips subject to social security tax from Form 4137, line 10 | **8b** | |
| **c** | Wages subject to social security tax from Form 8919, line 10 | **8c** | |
| **d** | Add lines 8a, 8b, and 8c .................................................................. | **8d** | |
| **9** | Subtract line 8d from line 7. If zero or less, enter -0- here and on line 10 and go to line 11 ........... ▶ | **9** | 137,700. |
| **10** | Multiply the **smaller** of line 6 or line 9 by 12.4% (0.124) ......................................... | **10** | 17,075. |
| **11** | Multiply line 6 by 2.9% (0.029) .......................................................... | **11** | 48,417. |
| **12** | **Self-employment tax.** Add lines 10 and 11. Enter here and on **Schedule 2 (Form 1040), line 4** .......... | **12** | 65,492. |
| **13** | Deduction for one-half of self-employment tax.<br>Multiply line 12 by 50% (0.50). Enter here and on **Schedule 1 (Form 1040),**<br>line 13 | **13**  32,746. | |

**Part II    Optional Methods To Figure Net Earnings** (see instructions)

**Farm Optional Method.** You may use this method **only** if **(a)** your gross farm income [1] wasn't more than
$8,460, **or (b)** your net farm profits [2] were less than $6,107.

| | | | |
|---|---|---|---|
| **14** | Maximum income for optional methods ....................................................... | **14** | 5,640 |
| **15** | Enter the **smaller** of: two-thirds (2/3) of gross farm income [1] (not less than zero) **or** $5,640. Also, include<br>this amount on line 4b above .............................................................. | **15** | |

**Nonfarm Optional Method.** You may use this method **only** if **(a)** your net nonfarm profits [3] were less than $6,107
and also less than 72.189% of your gross nonfarm income, [4] **and (b)** you had net earnings from self-employment
of at least $400 in 2 of the prior 3 years. **Caution:** You may use this method no more than five times.

| | | | |
|---|---|---|---|
| **16** | Subtract line 15 from line 14 ............................................................... | **16** | |
| **17** | Enter the **smaller** of: two-thirds (2/3) of gross nonfarm income [4] (not less than zero) **or** the amount on<br>line 16. Also, include this amount on line 4b above .......................................... | **17** | |

[1] From Sch. F, line 9; and Sch. K-1 (Form 1065), box 14, code B.
[2] From Sch. F, line 34; and Sch. K-1 (Form 1065), box 14, code A - minus the amount
you would have entered on line 1b had you not used the optional method.
[3] From Sch. C, line 31; and Sch. K-1 (Form 1065), box 14, code A.
[4] From Sch. C, line 7; and Sch. K-1 (Form 1065), box 14, code C.

For Paperwork Reduction Act Notice, see your tax return instructions.          024501  11-17-20      LHA          **Schedule SE (Form 1040) 2020**

AMENDED

TONY D. TOWNLEY

Schedule SE (Form 1040) 2020                                   Attachment Sequence No. **17**                    Page **2**

| Part III | Maximum Deferral of Self-Employment Tax Payments |
|---|---|

If line 4c is zero, skip lines 18 through 20, and enter -0- on line 21.

| | | | |
|---|---|---|---|
| **18** | Enter the portion of line 3 that can be attributed to March 27, 2020, through December 31, 2020 | **18** | |
| **19** | If line 18 is more than zero, multiply line 18 by 92.35% (0.9235); otherwise, enter the amount from line 18 | **19** | |
| **20** | Enter the portion of lines 15 and 17 that can be attributed to March 27, 2020, through December 31, 2020 | **20** | |
| **21** | Combine lines 19 and 20 | **21** | |

If line 5b is zero, skip line 22 and enter -0- on line 23.

| | | | |
|---|---|---|---|
| **22** | Enter the portion of line 5a that can be attributed to March 27, 2020, through December 31, 2020 | **22** | |
| **23** | Multiply line 22 by 92.35% (0.9235) | **23** | |
| **24** | Add lines 21 and 23 | **24** | |
| **25** | Enter the smaller of line 9 or line 24 | **25** | |
| **26** | Multiply line 25 by 6.2% (0.062). Enter here and see the instructions for line 12e of Schedule 3 (Form 1040) | **26** | |

024502  11-17-20

**Schedule SE (Form 1040) 2020**

AMENDED

Form **3800**

Department of the Treasury
Internal Revenue Service  (99)

# General Business Credit

▶ Go to www.irs.gov/Form3800 for instructions and the latest information.
▶ You must attach all pages of Form 3800, pages 1, 2, and 3, to your tax return.

OMB No. 1545-0895

**2020**

Attachment
Sequence No. **22**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Identifying number

| Part I | Current Year Credit for Credits Not Allowed Against Tentative Minimum Tax (TMT) |
|---|---|

(See instructions and complete Part(s) III before Parts I and II.)

| | | | |
|---|---|---|---|
| 1 | General business credit from line 2 of all Parts III with box A checked | **1** | 15,582. |
| 2 | Passive activity credits from line 2 of all Parts III with box B checked ........ **2** | | |
| 3 | Enter the applicable passive activity credits allowed for 2020. See instructions | **3** | |
| 4 | Carryforward of general business credit to 2020. Enter the amount from line 2 of Part III with box C checked. See instructions for statement to attach | **4** | |
| | Check this box if the carryforward was changed or revised from the original reported amount ▶ ☐ | | |
| 5 | Carryback of general business credit from 2021. Enter the amount from line 2 of Part III with box D checked | **5** | |
| 6 | Add lines 1, 3, 4, and 5 | **6** | 15,582. |

| Part II | Allowable Credit |
|---|---|

| | | | |
|---|---|---|---|
| 7 | Regular tax before credits: | | |
| | • Individuals. Enter the sum of the amounts from Form 1040, 1040-SR, or 1040-NR, line 16, and Schedule 2 (Form 1040), line 2 | | |
| | • Corporations. Enter the amount from Form 1120, Schedule J, Part I, line 2; or the applicable line of your return | **7** | 172,074,589. |
| | • Estates and trusts. Enter the sum of the amounts from Form 1041, Schedule G, lines 1a and 1b; or the amount from the applicable line of your return | | |
| 8 | Alternative minimum tax: | | |
| | • Individuals. Enter the amount from Form 6251, line 11 | | |
| | • Corporations. Enter -0- | **8** | 5,064. |
| | • Estates and trusts. Enter the amount from Schedule I (Form 1041), line 54 | | |
| 9 | Add lines 7 and 8 | **9** | 172,079,653. |
| 10a | Foreign tax credit .................................... **10a** 8. | | |
| b | Certain allowable credits (see instructions) ............... **10b** | | |
| c | Add lines 10a and 10b | **10c** | 8. |
| 11 | **Net income tax.** Subtract line 10c from line 9. If zero, skip lines 12 through 15 and enter -0- on line 16 | **11** | 172,079,645. |
| 12 | **Net regular tax.** Subtract line 10c from line 7. If zero or less, enter -0- ........ **12** 172,074,581. | | |
| 13 | Enter 25% (0.25) of the excess, if any, of line 12 over $25,000. See instructions | **13** 43,012,395. | |
| 14 | Tentative minimum tax: | | |
| | • Individuals. Enter the amount from Form 6251, line 9 | | |
| | • Corporations. Enter -0- | **14** 172,079,645. | |
| | • Estates and trusts. Enter the amount from Schedule I (Form 1041), line 52 | | |
| 15 | Enter the greater of line 13 or line 14 | **15** | 172,079,645. |
| 16 | Subtract line 15 from line 11. If zero or less, enter -0- | **16** | 0. |
| 17 | Enter the **smaller** of line 6 or line 16 | **17** | 0. |
| | **C corporations:** See the line 17 instructions if there has been an ownership change, acquisition, or reorganization. | | |

LHA   **For Paperwork Reduction Act Notice, see separate instructions.**

Form **3800** (2020)

014401  09-13-2021

Case 3:22-cv-00107-CDL   Document 61   Filed 10/28/22   Page 29 of 666

AMENDED

| Part II | Allowable Credit *(continued)* |

**Note:** If you are not required to report any amounts on line 22 or 24 below, skip lines 18 through 25 and enter -0- on line 26.

| | | | |
|---|---|---|---|
| 18 | Multiply line 14 by 75% (0.75). See instructions | 18 | |
| 19 | Enter the greater of line 13 or line 18 | 19 | |
| 20 | Subtract line 19 from line 11. If zero or less, enter -0- | 20 | |
| 21 | Subtract line 17 from line 20. If zero or less, enter -0- | 21 | |
| 22 | Combine the amounts from line 3 of all Parts III with box A, C, or D checked | 22 | |
| 23 | Passive activity credit from line 3 of all Parts III with box B checked | **23** | |
| 24 | Enter the applicable passive activity credit allowed for 2020. See instructions | 24 | |
| 25 | Add lines 22 and 24 | 25 | |
| 26 | Empowerment zone and renewal community employment credit allowed. Enter the smaller of line 21 or line 25 | 26 | 0. |
| 27 | Subtract line 13 from line 11. If zero or less, enter -0- | 27 | 129,067,250. |
| 28 | Add lines 17 and 26 | 28 | |
| 29 | Subtract line 28 from line 27. If zero or less, enter -0- | 29 | 129,067,250. |
| 30 | Enter the general business credit from line 5 of all Parts III with box A checked | 30 | 185,422. |
| 31 | Reserved | 31 | |
| 32 | Passive activity credits from line 5 of all Parts III with box B checked | **32** | |
| 33 | Enter the applicable passive activity credits allowed for 2020. See instructions | 33 | |
| 34 | Carryforward of business credit to 2020. Enter the amount from line 5 of Part III with box C checked and line 6 of Part III with box G checked. See instructions for statement to attach | 34 | |
| | Check this box if the carryforward was changed or revised from the original reported amount ▶ ☐ | | |
| 35 | Carryback of business credit from 2021. Enter the amount from line 5 of Part III with box D checked. See instructions | 35 | |
| 36 | Add lines 30, 33, 34, and 35 | 36 | 185,422. |
| 37 | Enter the **smaller** of line 29 or line 36 | 37 | 185,422. |
| 38 | **Credit allowed for the current year.** Add lines 28 and 37. Report the amount from line 38 (if smaller than the sum of Part I, line 6, and Part II, lines 25 and 36, see instructions) as indicated below or on the applicable line of your return. | | |
| | • Individuals. Schedule 3 (Form 1040), line 6 | | |
| | • Corporations. Form 1120, Schedule J, Part I, line 5c | | |
| | • Estates and trusts. Form 1041, Schedule G, line 2b | 38 | 185,422. |

014402  12-04-20

Form 3800 (2020)                                                                                                      Page **3**

| Name(s) shown on return | Identifying number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | ▊▊▊▊▊▊ |

**Part III** | **General Business Credits or Eligible Small Business Credits** (see instructions)

Complete a separate Part III for each box checked below. See instructions.

| | | | |
|---|---|---|---|
| **A** ☐ | General Business Credit From a Non-Passive Activity | **E** ☐ | Reserved |
| **B** ☐ | General Business Credit From a Passive Activity | **F** ☐ | Reserved |
| **C** ☐ | General Business Credit Carryforwards | **G** ☐ | Eligible Small Business Credit Carryforwards |
| **D** ☐ | General Business Credit Carrybacks | **H** ☐ | Reserved |

**I** If you are filing more than one Part III with box A or B checked, complete and attach first an additional Part III combining amounts from all
Parts III with box A or B checked. Check here if this is the consolidated Part III ............................................ ▶ ☒

| (a) Description of credit | | (b) Enter EIN if claiming the credit from a pass-through entity. | (c) Enter the appropriate amount. |
|---|---|---|---|
| **Note:** On any line where the credit is from more than one source, a separate Part III is needed for each pass-through entity. | | | |
| **1a** Investment (Form 3468, Part II only) (attach Form 3468) ............ | 1a | | |
| **b** Reserved ............................................................ | 1b | | |
| **c** Increasing research activities (Form 6765) ........................ | 1c | | |
| **d** Low-income housing (Form 8586, Part I only) ...................... | 1d | | |
| **e** Disabled access (Form 8826)* .................................... | 1e | | |
| **f** Renewable electricity, refined coal, and Indian coal production (Form 8835) | 1f | | |
| **g** Indian employment (Form 8845) .................................. | 1g | | |
| **h** Orphan drug (Form 8820) ........................................ | 1h | | |
| **i** New markets (Form 8874) ........................................ | 1i | | |
| **j** Small employer pension plan startup costs and auto-enrollment (Form 8881) | 1j | | |
| **k** Employer-provided child care facilities and services (Form 8882)* ... | 1k | | 13,457. |
| **l** Biodiesel and renewable diesel fuels (attach Form 8864) ........... | 1l | | |
| **m** Low sulfur diesel fuel production (Form 8896) ..................... | 1m | | |
| **n** Distilled spirits (Form 8906) ...................................... | 1n | | |
| **o** Nonconventional source fuel (carryforward only) .................. | 1o | | |
| **p** Energy efficient home (Form 8908) ............................... | 1p | | |
| **q** Energy efficient appliance (carryforward only) .................... | 1q | | |
| **r** Alternative motor vehicle (Form 8910) ............................ | 1r | | |
| **s** Alternative fuel vehicle refueling property (Form 8911) ............ | 1s | | |
| **t** Enhanced oil recovery credit (carryforward only) .................. | 1t | | |
| **u** Mine rescue team training (Form 8923) ........................... | 1u | | |
| **v** Agricultural chemicals security (carryforward only) ............... | 1v | | |
| **w** Employer differential wage payments (Form 8932) ................. | 1w | | |
| **x** Carbon oxide sequestration (Form 8933) ......................... | 1x | | |
| **y** Qualified plug-in electric drive motor vehicle (Form 8936) ........ | 1y | | |
| **z** Qualified plug-in electric vehicle (carryforward only) ............. | 1z | | |
| **aa** Employee retention (Form 5884-A) ............................... | 1aa | | 2,125. |
| **bb** General credits from an electing large partnership (carryforward only) | 1bb | | |
| **zz** Other. Oil and gas production from marginal wells (Form 8904) and certain other credits (see instructions) ........... | 1zz | | |
| **2** Add lines 1a through 1zz and enter here and on the applicable line of Part I | 2 | | 15,582. |
| **3** Enter the amount from Form 8844 here and on the applicable line of Part II | 3 | | |
| **4a** Investment (Form 3468, Part III) (attach Form 3468) ............... | 4a | | |
| **b** Work opportunity (Form 5884) ................................... | 4b | | 185,422. |
| **c** Biofuel producer (Form 6478) .................................... | 4c | | |
| **d** Low-income housing (Form 8586, Part II) ......................... | 4d | | |
| **e** Renewable electricity, refined coal, and Indian coal production (Form 8835) | 4e | | |
| **f** Employer social security and Medicare taxes paid on certain employee tips (Form 8846) ............... | 4f | | |
| **g** Qualified railroad track maintenance (Form 8900) ................. | 4g | | |
| **h** Small employer health insurance premiums (Form 8941) ........... | 4h | | |
| **i** Increasing research activities (Form 6765) ....................... | 4i | | |
| **j** Employer credit for paid family and medical leave (Form 8994) .... | 4j | | |
| **z** Other ........................................................... | 4z | | |
| **5** Add lines 4a through 4z and enter here and on the applicable line of Part II | 5 | | 185,422. |
| **6** Add lines 2, 3, and 5 and enter here and on the applicable line of Part II | 6 | | 201,004. |

* See instructions for limitation on this credit.          014403  12-04-20                          Form **3800** (2020)

Form 3800 (2020)                                                            **Page 3**

| Name(s) shown on return | Identifying number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | ▮▮▮▮▮▮▮ |

**Part III**   **General Business Credits or Eligible Small Business Credits** (see instructions)

Complete a separate Part III for each box checked below. See instructions.

A ☒ General Business Credit From a Non-Passive Activity      E ☐ Reserved

B ☐ General Business Credit From a Passive Activity      F ☐ Reserved

C ☐ General Business Credit Carryforwards      G ☐ Eligible Small Business Credit Carryforwards

D ☐ General Business Credit Carrybacks      H ☐ Reserved

I   If you are filing more than one Part III with box A or B checked, complete and attach first an additional Part III combining amounts from all Parts III with box A or B checked. Check here if this is the consolidated Part III      ▶ ☐

| (a) Description of credit | | (b) Enter EIN if claiming the credit from a pass-through entity. | (c) Enter the appropriate amount. |
|---|---|---|---|
| **Note:** On any line where the credit is from more than one source, a separate Part III is needed for each pass-through entity. | | | |
| 1a Investment (Form 3468, Part II only) (attach Form 3468) | 1a | | |
| b Reserved | 1b | | |
| c Increasing research activities (Form 6765) | 1c | | |
| d Low-income housing (Form 8586, Part I only) | 1d | | |
| e Disabled access (Form 8826)* | 1e | | |
| f Renewable electricity, refined coal, and Indian coal production (Form 8835) | 1f | | |
| g Indian employment (Form 8845) | 1g | | |
| h Orphan drug (Form 8820) | 1h | | |
| i New markets (Form 8874) | 1i | | |
| j Small employer pension plan startup costs and auto-enrollment (Form 8881) | 1j | | |
| k Employer-provided child care facilities and services (Form 8882)* | 1k | ▮▮▮▮▮ | 10,647. |
| l Biodiesel and renewable diesel fuels (attach Form 8864) | 1l | | |
| m Low sulfur diesel fuel production (Form 8896) | 1m | | |
| n Distilled spirits (Form 8906) | 1n | | |
| o Nonconventional source fuel (carryforward only) | 1o | | |
| p Energy efficient home (Form 8908) | 1p | | |
| q Energy efficient appliance (carryforward only) | 1q | | |
| r Alternative motor vehicle (Form 8910) | 1r | | |
| s Alternative fuel vehicle refueling property (Form 8911) | 1s | | |
| t Enhanced oil recovery credit (carryforward only) | 1t | | |
| u Mine rescue team training (Form 8923) | 1u | | |
| v Agricultural chemicals security (carryforward only) | 1v | | |
| w Employer differential wage payments (Form 8932) | 1w | | |
| x Carbon oxide sequestration (Form 8933) | 1x | | |
| y Qualified plug-in electric drive motor vehicle (Form 8936) | 1y | | |
| z Qualified plug-in electric vehicle (carryforward only) | 1z | | |
| aa Employee retention (Form 5884-A) | 1aa | ▮▮▮▮▮ | 1,681. |
| bb General credits from an electing large partnership (carryforward only) | 1bb | | |
| zz Other. Oil and gas production from marginal wells (Form 8904) and certain other credits (see instructions) | 1zz | | |
| 2 Add lines 1a through 1zz and enter here and on the applicable line of Part I | 2 | | 12,328. |
| 3 Enter the amount from Form 8844 here and on the applicable line of Part II | 3 | | |
| 4a Investment (Form 3468, Part III) (attach Form 3468) | 4a | | |
| b Work opportunity (Form 5884) | 4b | | 146,695. |
| c Biofuel producer (Form 6478) | 4c | | |
| d Low-income housing (Form 8586, Part II) | 4d | | |
| e Renewable electricity, refined coal, and Indian coal production (Form 8835) | 4e | | |
| f Employer social security and Medicare taxes paid on certain employee tips (Form 8846) | 4f | | |
| g Qualified railroad track maintenance (Form 8900) | 4g | | |
| h Small employer health insurance premiums (Form 8941) | 4h | | |
| i Increasing research activities (Form 6765) | 4i | | |
| j Employer credit for paid family and medical leave (Form 8994) | 4j | | |
| z Other | 4z | | |
| 5 Add lines 4a through 4z and enter here and on the applicable line of Part II | 5 | | 146,695. |
| 6 Add lines 2, 3, and 5 and enter here and on the applicable line of Part II | 6 | | 159,023. |

* See instructions for limitation on this credit.      014403 12-04-20      Form **3800** (2020)

Form 3800 (2020)                                                                                     Page **3**

| Name(s) shown on return | Identifying number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | ■■■■■■■■ |

| **Part III** | **General Business Credits or Eligible Small Business Credits** (see instructions) |
|---|---|

Complete a separate Part III for each box checked below. See instructions.

A ☒ General Business Credit From a Non-Passive Activity   E ☐ Reserved

B ☐ General Business Credit From a Passive Activity   F ☐ Reserved

C ☐ General Business Credit Carryforwards   G ☐ Eligible Small Business Credit Carryforwards

D ☐ General Business Credit Carrybacks   H ☐ Reserved

I   If you are filing more than one Part III with box A or B checked, complete and attach first an additional Part III combining amounts from all
Parts III with box A or B checked. Check here if this is the consolidated Part III ........................................ ► ☐

**Note:** On any line where the credit is from more than one source, a separate Part III is needed for each pass-through entity.

| | (a) Description of credit | | (b) Enter EIN if claiming the credit from a pass-through entity. | (c) Enter the appropriate amount. |
|---|---|---|---|---|
| 1a | Investment (Form 3468, Part II only) (attach Form 3468) | 1a | | |
| b | Reserved | 1b | | |
| c | Increasing research activities (Form 6765) | 1c | | |
| d | Low-income housing (Form 8586, Part I only) | 1d | | |
| e | Disabled access (Form 8826)* | 1e | | |
| f | Renewable electricity, refined coal, and Indian coal production (Form 8835) | 1f | | |
| g | Indian employment (Form 8845) | 1g | | |
| h | Orphan drug (Form 8820) | 1h | | |
| i | New markets (Form 8874) | 1i | | |
| j | Small employer pension plan startup costs and auto-enrollment (Form 8881) | 1j | | |
| k | Employer-provided child care facilities and services (Form 8882)* | 1k | ■■■■ | 664. |
| l | Biodiesel and renewable diesel fuels (attach Form 8864) | 1l | | |
| m | Low sulfur diesel fuel production (Form 8896) | 1m | | |
| n | Distilled spirits (Form 8906) | 1n | | |
| o | Nonconventional source fuel (carryforward only) | 1o | | |
| p | Energy efficient home (Form 8908) | 1p | | |
| q | Energy efficient appliance (carryforward only) | 1q | | |
| r | Alternative motor vehicle (Form 8910) | 1r | | |
| s | Alternative fuel vehicle refueling property (Form 8911) | 1s | | |
| t | Enhanced oil recovery credit (carryforward only) | 1t | | |
| u | Mine rescue team training (Form 8923) | 1u | | |
| v | Agricultural chemicals security (carryforward only) | 1v | | |
| w | Employer differential wage payments (Form 8932) | 1w | | |
| x | Carbon oxide sequestration (Form 8933) | 1x | | |
| y | Qualified plug-in electric drive motor vehicle (Form 8936) | 1y | | |
| z | Qualified plug-in electric vehicle (carryforward only) | 1z | | |
| aa | Employee retention (Form 5884-A) | 1aa | ■■■■ | 105. |
| bb | General credits from an electing large partnership (carryforward only) | 1bb | | |
| zz | Other. Oil and gas production from marginal wells (Form 8904) and certain other credits (see instructions) | 1zz | | |
| 2 | Add lines 1a through 1zz and enter here and on the applicable line of Part I | 2 | | 769. |
| 3 | Enter the amount from Form 8844 here and on the applicable line of Part II | 3 | | |
| 4a | Investment (Form 3468, Part III) (attach Form 3468) | 4a | | |
| b | Work opportunity (Form 5884) | 4b | | 9,158. |
| c | Biofuel producer (Form 6478) | 4c | | |
| d | Low-income housing (Form 8586, Part II) | 4d | | |
| e | Renewable electricity, refined coal, and Indian coal production (Form 8835) | 4e | | |
| f | Employer social security and Medicare taxes paid on certain employee tips (Form 8846) | 4f | | |
| g | Qualified railroad track maintenance (Form 8900) | 4g | | |
| h | Small employer health insurance premiums (Form 8941) | 4h | | |
| i | Increasing research activities (Form 6765) | 4i | | |
| j | Employer credit for paid family and medical leave (Form 8994) | 4j | | |
| z | Other | 4z | | |
| 5 | Add lines 4a through 4z and enter here and on the applicable line of Part II | 5 | | 9,158. |
| 6 | Add lines 2, 3, and 5 and enter here and on the applicable line of Part II | 6 | | 9,927. |

* See instructions for limitation on this credit.           014403  12-04-20                                Form **3800** (2020)

AMENDED

Form 3800 (2020)                                                                                     Page **3**

| Name(s) shown on return | Identifying number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | ▉▉▉▉▉▉▉▉ |

**Part III**  **General Business Credits or Eligible Small Business Credits**  (see instructions)

Complete a separate Part III for each box checked below. See instructions.

| | | | | | |
|---|---|---|---|---|---|
| **A** | [X] | General Business Credit From a Non-Passive Activity | **E** | ▉ | Reserved |
| **B** | [ ] | General Business Credit From a Passive Activity | **F** | ▉ | Reserved |
| **C** | [ ] | General Business Credit Carryforwards | **G** | ▉ | Eligible Small Business Credit Carryforwards |
| **D** | [ ] | General Business Credit Carrybacks | **H** | ▉ | Reserved |

**I**  If you are filing more than one Part III with box A or B checked, complete and attach first an additional Part III combining amounts from all
Parts III with box A or B checked. Check here if this is the consolidated Part III ........................................................ ▶ [ ]

| (a) Description of credit | | (b) Enter EIN if claiming the credit from a pass-through entity. | (c) Enter the appropriate amount. |
|---|---|---|---|
| **Note:** On any line where the credit is from more than one source, a separate Part III is needed for each pass-through entity. | | | |
| **1a** Investment (Form 3468, Part II only) (attach Form 3468) | 1a | | |
| **b** Reserved | 1b | | |
| **c** Increasing research activities (Form 6765) | 1c | | |
| **d** Low-income housing (Form 8586, Part I only) | 1d | | |
| **e** Disabled access (Form 8826)* | 1e | | |
| **f** Renewable electricity, refined coal, and Indian coal production (Form 8835) | 1f | | |
| **g** Indian employment (Form 8845) | 1g | | |
| **h** Orphan drug (Form 8820) | 1h | | |
| **i** New markets (Form 8874) | 1i | | |
| **j** Small employer pension plan startup costs and auto-enrollment (Form 8881) | 1j | | |
| **k** Employer-provided child care facilities and services (Form 8882)* | 1k | ▉▉▉▉▉▉ | 2,027. |
| **l** Biodiesel and renewable diesel fuels (attach Form 8864) | 1l | | |
| **m** Low sulfur diesel fuel production (Form 8896) | 1m | | |
| **n** Distilled spirits (Form 8906) | 1n | | |
| **o** Nonconventional source fuel (carryforward only) | 1o | | |
| **p** Energy efficient home (Form 8908) | 1p | | |
| **q** Energy efficient appliance (carryforward only) | 1q | | |
| **r** Alternative motor vehicle (Form 8910) | 1r | | |
| **s** Alternative fuel vehicle refueling property (Form 8911) | 1s | | |
| **t** Enhanced oil recovery credit (carryforward only) | 1t | | |
| **u** Mine rescue team training (Form 8923) | 1u | | |
| **v** Agricultural chemicals security (carryforward only) | 1v | | |
| **w** Employer differential wage payments (Form 8932) | 1w | | |
| **x** Carbon oxide sequestration (Form 8933) | 1x | | |
| **y** Qualified plug-in electric drive motor vehicle (Form 8936) | 1y | | |
| **z** Qualified plug-in electric vehicle (carryforward only) | 1z | | |
| **aa** Employee retention (Form 5884-A) | 1aa | ▉▉▉▉▉▉ | 320. |
| **bb** General credits from an electing large partnership (carryforward only) | 1bb | | |
| **zz** Other. Oil and gas production from marginal wells (Form 8904) and certain other credits (see instructions) | 1zz | | |
| **2** Add lines 1a through 1zz and enter here and on the applicable line of Part I | 2 | | 2,347. |
| **3** Enter the amount from Form 8844 here and on the applicable line of Part II | 3 | | |
| **4a** Investment (Form 3468, Part III) (attach Form 3468) | 4a | | |
| **b** Work opportunity (Form 5884) | 4b | | 27,930. |
| **c** Biofuel producer (Form 6478) | 4c | | |
| **d** Low-income housing (Form 8586, Part II) | 4d | | |
| **e** Renewable electricity, refined coal, and Indian coal production (Form 8835) | 4e | | |
| **f** Employer social security and Medicare taxes paid on certain employee tips (Form 8846) | 4f | | |
| **g** Qualified railroad track maintenance (Form 8900) | 4g | | |
| **h** Small employer health insurance premiums (Form 8941) | 4h | | |
| **i** Increasing research activities (Form 6765) | 4i | | |
| **j** Employer credit for paid family and medical leave (Form 8994) | 4j | | |
| **z** Other | 4z | | |
| **5** Add lines 4a through 4z and enter here and on the applicable line of Part II | 5 | | 27,930. |
| **6** Add lines 2, 3, and 5 and enter here and on the applicable line of Part II | 6 | | 30,277. |

\* See instructions for limitation on this credit.             014403  12-04-20                             Form **3800** (2020)

AMENDED

Form 3800 (2020)                                                                                                                    Page **3**

| Name(s) shown on return | Identifying number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | ▓▓▓▓▓▓▓▓ |

| **Part III** | **General Business Credits or Eligible Small Business Credits** (see instructions) |
|---|---|

Complete a separate Part III for each box checked below. See instructions.

**A** [X] General Business Credit From a Non-Passive Activity    **E** [ ] Reserved

**B** [ ] General Business Credit From a Passive Activity    **F** [ ] Reserved

**C** [ ] General Business Credit Carryforwards    **G** [ ] Eligible Small Business Credit Carryforwards

**D** [ ] General Business Credit Carrybacks    **H** [ ] Reserved

**I**   If you are filing more than one Part III with box A or B checked, complete and attach first an additional Part III combining amounts from all
Parts III with box A or B checked. Check here if this is the consolidated Part III .......................................... ▶ [ ]

| | (a) Description of credit | | (b) Enter EIN if claiming the credit from a pass-through entity. | (c) Enter the appropriate amount. |
|---|---|---|---|---|
| **Note:** On any line where the credit is from more than one source, a separate Part III is needed for each pass-through entity. | | | | |
| 1a | Investment (Form 3468, Part II only) (attach Form 3468) | 1a | | |
| b | Reserved | 1b | | |
| c | Increasing research activities (Form 6765) | 1c | | |
| d | Low-income housing (Form 8586, Part I only) | 1d | | |
| e | Disabled access (Form 8826)* | 1e | | |
| f | Renewable electricity, refined coal, and Indian coal production (Form 8835) | 1f | | |
| g | Indian employment (Form 8845) | 1g | | |
| h | Orphan drug (Form 8820) | 1h | | |
| i | New markets (Form 8874) | 1i | | |
| j | Small employer pension plan startup costs and auto-enrollment (Form 8881) | 1j | | |
| k | Employer-provided child care facilities and services (Form 8882)* | 1k | ▓▓▓▓▓ | 119. |
| l | Biodiesel and renewable diesel fuels (attach Form 8864) | 1l | | |
| m | Low sulfur diesel fuel production (Form 8896) | 1m | | |
| n | Distilled spirits (Form 8906) | 1n | | |
| o | Nonconventional source fuel (carryforward only) | 1o | | |
| p | Energy efficient home (Form 8908) | 1p | | |
| q | Energy efficient appliance (carryforward only) | 1q | | |
| r | Alternative motor vehicle (Form 8910) | 1r | | |
| s | Alternative fuel vehicle refueling property (Form 8911) | 1s | | |
| t | Enhanced oil recovery credit (carryforward only) | 1t | | |
| u | Mine rescue team training (Form 8923) | 1u | | |
| v | Agricultural chemicals security (carryforward only) | 1v | | |
| w | Employer differential wage payments (Form 8932) | 1w | | |
| x | Carbon oxide sequestration (Form 8933) | 1x | | |
| y | Qualified plug-in electric drive motor vehicle (Form 8936) | 1y | | |
| z | Qualified plug-in electric vehicle (carryforward only) | 1z | | |
| aa | Employee retention (Form 5884-A) | 1aa | ▓▓▓▓▓ | 19. |
| bb | General credits from an electing large partnership (carryforward only) | 1bb | | |
| zz | Other. Oil and gas production from marginal wells (Form 8904) and certain other credits (see instructions) | 1zz | | |
| 2 | Add lines 1a through 1zz and enter here and on the applicable line of Part I | 2 | | 138. |
| 3 | Enter the amount from Form 8844 here and on the applicable line of Part II | 3 | | |
| 4a | Investment (Form 3468, Part III) (attach Form 3468) | 4a | | |
| b | Work opportunity (Form 5884) | 4b | ▓▓▓▓▓ | 1,639. |
| c | Biofuel producer (Form 6478) | 4c | | |
| d | Low-income housing (Form 8586, Part II) | 4d | | |
| e | Renewable electricity, refined coal, and Indian coal production (Form 8835) | 4e | | |
| f | Employer social security and Medicare taxes paid on certain employee tips (Form 8846) | 4f | | |
| g | Qualified railroad track maintenance (Form 8900) | 4g | | |
| h | Small employer health insurance premiums (Form 8941) | 4h | | |
| i | Increasing research activities (Form 6765) | 4i | | |
| j | Employer credit for paid family and medical leave (Form 8994) | 4j | | |
| z | Other | 4z | | |
| 5 | Add lines 4a through 4z and enter here and on the applicable line of Part II | 5 | | 1,639. |
| 6 | Add lines 2, 3, and 5 and enter here and on the applicable line of Part II | 6 | | 1,777. |

\* See instructions for limitation on this credit.      014403 12-04-20      Form **3800** (2020)

| Form **4797** | **Sales of Business Property** | OMB No. 1545-0184 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | (Also Involuntary Conversions and Recapture Amounts Under Sections 179 and 280F(b)(2)) ▶ **Attach to your tax return.** ▶ Go to www.irs.gov/Form4797 for instructions and the latest information. | **2020** Attachment Sequence No. **27** |

| Name(s) shown on return | Identifying number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | ███████ |

**1** Enter the gross proceeds from sales or exchanges reported to you for 2020 on Form(s) 1099-B or 1099-S (or substitute statement) that you are including on line 2, 10, or 20 ........ **1**

### Part I  Sales or Exchanges of Property Used in a Trade or Business and Involuntary Conversions From Other Than Casualty or Theft-Most Property Held More Than 1 Year (see instructions)

| 2 **(a)** Description of property | **(b)** Date acquired (mo., day, yr.) | **(c)** Date sold (mo., day, yr.) | **(d)** Gross sales price | **(e)** Depreciation allowed or allowable since acquisition | **(f)** Cost or other basis, plus improvements and expense of sale | **(g)** Gain or (loss) Subtract (f) from the sum of (d) and (e) |
|---|---|---|---|---|---|---|
| SEE STATEMENT 28 | | | | | | 2,841,493. |
| | | | | | | |
| | | | | | | |

| | | | |
|---|---|---|---|
| **3** | Gain, if any, from Form 4684, line 39 | **3** | |
| **4** | Section 1231 gain from installment sales from Form 6252, line 26 or 37 | **4** | |
| **5** | Section 1231 gain or (loss) from like-kind exchanges from Form 8824 | **5** | |
| **6** | Gain, if any, from line 32, from other than casualty or theft | **6** | |
| **7** | Combine lines 2 through 6. Enter the gain or (loss) here and on the appropriate line as follows | **7** | 2,841,493. |

**Partnerships and S corporations.** Report the gain or (loss) following the instructions for Form 1065, Schedule K, line 10, or Form 1120-S, Schedule K, line 9. Skip lines 8, 9, 11, and 12 below.

**Individuals, partners, S corporation shareholders, and all others.** If line 7 is zero or a loss, enter the amount from line 7 on line 11 below and skip lines 8 and 9. If line 7 is a gain and you didn't have any prior year section 1231 losses, or they were recaptured in an earlier year, enter the gain from line 7 as a long-term capital gain on the Schedule D filed with your return and skip lines 8, 9, 11, and 12 below.

| | | | |
|---|---|---|---|
| **8** | Nonrecaptured net section 1231 losses from prior years. See instructions | **8** | |
| **9** | Subtract line 8 from line 7. If zero or less, enter -0-. If line 9 is zero, enter the gain from line 7 on line 12 below. If line 9 is more than zero, enter the amount from line 8 on line 12 below and enter the gain from line 9 as a long-term capital gain on the Schedule D filed with your return. See instructions | **9** | |

### Part II  Ordinary Gains and Losses (see instructions)

**10** Ordinary gains and losses not included on lines 11 through 16 (include property held 1 year or less):

| | | | | | | |
|---|---|---|---|---|---|---|
| TIMBER | 10/01/19 | 08/18/20 | 156,582. | | 169,146. | -12,564. |
| | | | | | | |
| | | | | | | |

| | | | |
|---|---|---|---|
| **11** | Loss, if any, from line 7 | **11** | ( ) |
| **12** | Gain, if any, from line 7 or amount from line 8, if applicable | **12** | |
| **13** | Gain, if any, from line 31 | **13** | |
| **14** | Net gain or (loss) from Form 4684, lines 31 and 38a | **14** | |
| **15** | Ordinary gain from installment sales from Form 6252, line 25 or 36 | **15** | |
| **16** | Ordinary gain or (loss) from like-kind exchanges from Form 8824 | **16** | |
| **17** | Combine lines 10 through 16 | **17** | -12,564. |
| **18** | For all except individual returns, enter the amount from line 17 on the appropriate line of your return and skip lines a and b below. For individual returns, complete lines a and b below. | | |
| **a** | If the loss on line 11 includes a loss from Form 4684, line 35, column (b)(ii), enter that part of the loss here. Enter the loss from income-producing property on Schedule A (Form 1040), line 16. (Do not include any loss on property used as an employee.) Identify as from "Form 4797, line 18a." See instructions | **18a** | |
| **b** | Redetermine the gain or (loss) on line 17 excluding the loss, if any, on line 18a. Enter here and on Schedule 1 (Form 1040), Part I, line 4 | **18b** | -12,564. |

LHA   **For Paperwork Reduction Act Notice, see separate instructions.**                                      Form **4797** (2020)

018011  12-18-20

AMENDED

Form 4797 (2020)  TONY D. & ELIZABETH A. TOWNLEY                                                    Page **2**

### Part III  Gain From Disposition of Property Under Sections 1245, 1250, 1252, 1254, and 1255  (see instructions)

| 19 | (a) Description of section 1245, 1250, 1252, 1254, or 1255 property: | | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) |
|---|---|---|---|---|
| A | | | | |
| B | | | | |
| C | | | | |
| D | | | | |

| These columns relate to the properties on lines 19A through 19D. ▶ | | Property A | Property B | Property C | Property D |
|---|---|---|---|---|---|
| 20 | Gross sales price (**Note:** See line 1 before completing.) | 20 | | | | |
| 21 | Cost or other basis plus expense of sale | 21 | | | | |
| 22 | Depreciation (or depletion) allowed or allowable | 22 | | | | |
| 23 | Adjusted basis. Subtract line 22 from line 21 | 23 | | | | |
| 24 | Total gain. Subtract line 23 from line 20 | 24 | | | | |
| 25 | **If section 1245 property:** | | | | | |
| a | Depreciation allowed or allowable from line 22 | 25a | | | | |
| b | Enter the **smaller** of line 24 or 25a | 25b | | | | |
| 26 | **If section 1250 property:** If straight line depreciation was used, enter -0- on line 26g, except for a corporation subject to section 291. | | | | | |
| a | Additional depreciation after 1975. See instructions | 26a | | | | |
| b | Applicable percentage multiplied by the **smaller** of line 24 or line 26a. See instructions | 26b | | | | |
| c | Subtract line 26a from line 24. If residential rental property **or** line 24 isn't more than line 26a, skip lines 26d and 26e | 26c | | | | |
| d | Additional depreciation after 1969 and before 1976 | 26d | | | | |
| e | Enter the **smaller** of line 26c or 26d | 26e | | | | |
| f | Section 291 amount (corporations only) | 26f | | | | |
| g | Add lines 26b, 26e, and 26f | 26g | | | | |
| 27 | **If section 1252 property:** Skip this section if you didn't dispose of farmland or if this form is being completed for a partnership. | | | | | |
| a | Soil, water, and land clearing expenses | 27a | | | | |
| b | Line 27a multiplied by applicable percentage | 27b | | | | |
| c | Enter the **smaller** of line 24 or 27b | 27c | | | | |
| 28 | **If section 1254 property:** | | | | | |
| a | Intangible drilling and development costs, expenditures for development of mines and other natural deposits, mining exploration costs, and depletion. See instructions | 28a | | | | |
| b | Enter the **smaller** of line 24 or 28a | 28b | | | | |
| 29 | **If section 1255 property:** | | | | | |
| a | Applicable percentage of payments excluded from income under section 126. See instructions | 29a | | | | |
| b | Enter the **smaller** of line 24 or 29a. See instructions | 29b | | | | |

**Summary of Part III Gains.**  Complete property columns A through D through line 29b before going to line 30.

| 30 | Total gains for all properties. Add property columns A through D, line 24 | 30 | |
|---|---|---|---|
| 31 | Add property columns A through D, lines 25b, 26g, 27c, 28b, and 29b. Enter here and on line 13 | 31 | |
| 32 | Subtract line 31 from line 30. Enter the portion from casualty or theft on Form 4684, line 33. Enter the portion from other than casualty or theft on Form 4797, line 6 | 32 | |

### Part IV  Recapture Amounts Under Sections 179 and 280F(b)(2) When Business Use Drops to 50% or Less
(see instructions)

| | | | (a) Section 179 | (b) Section 280F(b)(2) |
|---|---|---|---|---|
| 33 | Section 179 expense deduction or depreciation allowable in prior years | 33 | | |
| 34 | Recomputed depreciation. See instructions | 34 | | |
| 35 | Recapture amount. Subtract line 34 from line 33. See the instructions for where to report | 35 | | |

018012  12-18-20

Form **4797** (2020)

AMENDED

| Form **6251** | **Alternative Minimum Tax - Individuals** | OMB No. 1545-0074 |
|---|---|---|
| Department of the Treasury Internal Revenue Service (99) | ▶ Go to www.irs.gov/Form6251 for instructions and the latest information. ▶ Attach to Form 1040, 1040-SR, or 1040-NR. | **2020** Attachment Sequence No. **32** |

Name(s) shown on Form 1040, 1040-SR, or 1040-NR

**TONY D. & ELIZABETH A. TOWNLEY**

Your social security number

### Part I   Alternative Minimum Taxable Income

| | | | |
|---|---|---|---|
| 1 | Enter the amount from Form 1040 or 1040-SR, line 15, if more than zero. If Form 1040 or 1040-SR, line 15, is zero, subtract lines 12 and 13 of Form 1040 or 1040-SR from line 11 of Form 1040 or 1040-SR and enter the result here. (If less than zero, enter as a negative amount.) | 1 | 860,557,093. |
| 2a | If filing Schedule A (Form 1040), enter the taxes from Schedule A, line 7; otherwise, enter the amount from Form 1040 or 1040-SR, line 12 | 2a | 10,000. |
| b | Tax refund from Schedule 1 (Form 1040), line 1 or line 8 | 2b | |
| c | Investment interest expense (difference between regular tax and AMT) | 2c | |
| d | Depletion (difference between regular tax and AMT) | 2d | |
| e | Net operating loss deduction from Schedule 1 (Form 1040), line 8. Enter as a positive amount | 2e | |
| f | Alternative tax net operating loss deduction | 2f | |
| g | Interest from specified private activity bonds exempt from the regular tax | 2g | |
| h | Qualified small business stock, see instructions | 2h | |
| i | Exercise of incentive stock options (excess of AMT income over regular tax income) | 2i | |
| j | Estates and trusts (amount from Schedule K-1 (Form 1041), box 12, code A) | 2j | |
| k | Disposition of property (difference between AMT and regular tax gain or loss) | 2k | 41. |
| l | Depreciation on assets placed in service after 1986 (difference between regular tax and AMT)   STMT 31 | 2l | 1,879. |
| m | Passive activities (difference between AMT and regular tax income or loss)   SEE STATEMENT 29 | 2m | 6,126. |
| n | Loss limitations (difference between AMT and regular tax income or loss)   SEE STATEMENT 30 | 2n | 7,277. |
| o | Circulation costs (difference between regular tax and AMT) | 2o | |
| p | Long-term contracts (difference between AMT and regular tax income) | 2p | |
| q | Mining costs (difference between regular tax and AMT) | 2q | |
| r | Research and experimental costs (difference between regular tax and AMT) | 2r | |
| s | Income from certain installment sales before January 1, 1987 | 2s | |
| t | Intangible drilling costs preference | 2t | |
| 3 | Other adjustments, including income-based related adjustments | 3 | |
| 4 | **Alternative minimum taxable income.** Combine lines 1 through 3. (If married filing separately and line 4 is more than $745,200, see instructions.) | 4 | 860,582,416. |

### Part II   Alternative Minimum Tax (AMT)

| | | | |
|---|---|---|---|
| 5 | Exemption. | | |

| IF your filing status is ... | AND line 4 is not over ... | THEN enter on line 5 ... | | |
|---|---|---|---|---|
| Single or head of household | $518,400 | $72,900 | | |
| Married filing jointly or qualifying widow(er) | 1,036,800 | 113,400 | } ... | 5     0. |
| Married filing separately | 518,400 | 56,700 | | |
| If line 4 is **over** the amount shown above for your filing status, see instructions. | | | | |

| | | | |
|---|---|---|---|
| 6 | Subtract line 5 from line 4. If more than zero, go to line 7. If zero or less, enter -0- here and on lines 7, 9, and 11, and go to line 10 | 6 | 860,582,416. |
| 7 | ● If you are filing Form 2555, see instructions for the amount to enter. ● If you reported capital gain distributions directly on Form 1040 or 1040-SR, line 7; you reported qualified dividends on Form 1040 or 1040-SR, line 3a; **or** you had a gain on both lines 15 and 16 of Schedule D (Form 1040) (as refigured for the AMT, if necessary), complete Part III on the back and enter the amount from line 40 here. ● All others: If line 6 is $197,900 or less ($98,950 or less if married filing separately), multiply line 6 by 26% (0.26). Otherwise, multiply line 6 by 28% (0.28) and subtract $3,958 ($1,979 if married filing separately) from the result | 7 | 172,079,653. |
| 8 | Alternative minimum tax foreign tax credit (see instructions) | 8 | 8. |
| 9 | Tentative minimum tax. Subtract line 8 from line 7 | 9 | 172,079,645. |
| 10 | Add Form 1040 or 1040-SR, line 16 (minus any tax from Form 4972), and Schedule 2 (Form 1040), line 2. Subtract from the result any foreign tax credit from Schedule 3 (Form 1040), line 1. If you used Schedule J to figure your tax on Form 1040 or 1040-SR, line 16, refigure that tax without using Schedule J before completing this line (see instructions) | 10 | 172,074,581. |
| 11 | **AMT.** Subtract line 10 from line 9. If zero or less, enter -0-. Enter here and on Schedule 2 (Form 1040), line 1 | 11 | 5,064. |

019481 12-16-20  LHA    **For Paperwork Reduction Act Notice, see your tax return instructions.**    Form **6251** (2020)

Case 3:22-cv-00107-CDL Document 10-1 Filed 10/28/22 Page 38 of 666

AMENDED

Form 6251 (2020)   TONY D. & ELIZABETH A. TOWNLEY   Page **2**

| | |
|---|---|
| **Part III** | **Tax Computation Using Maximum Capital Gains Rates** |

Complete Part III only if you are required to do so by line 7 or by the Foreign Earned Income Tax Worksheet in the instructions.

| | | |
|---|---|---:|
| **12** | Enter the amount from Form 6251, line 6. If you are filing Form 2555, enter the amount from line 3 of the worksheet in the instructions for line 7 | **12** 860,582,416. |
| **13** | Enter the amount from line 4 of the Qualified Dividends and Capital Gain Tax Worksheet in the Instructions for Forms 1040 and 1040-SR or the amount from line 13 of the Schedule D Tax Worksheet in the Instructions for Schedule D (Form 1040), whichever applies (as refigured for the AMT, if necessary) (see instructions). If you are filing Form 2555, see instructions for the amount to enter | **13** 932,901,836. |
| **14** | Enter the amount from Schedule D (Form 1040), line 19 (as refigured for the AMT, if necessary) (see instructions). If you are filing Form 2555, see instructions for the amount to enter | **14** 2,721,241. |
| **15** | If you did not complete a Schedule D Tax Worksheet for the regular tax or the AMT, enter the amount from line 13. Otherwise, add lines 13 and 14, and enter the **smaller** of that result or the amount from line 10 of the Schedule D Tax Worksheet (as refigured for the AMT, if necessary). If you are filing Form 2555, see instructions for the amount to enter | **15** 935,623,077. |
| **16** | Enter the **smaller** of line 12 or line 15 | **16** 860,582,416. |
| **17** | Subtract line 16 from line 12 | **17** 0. |
| **18** | If line 17 is $197,900 or less ($98,950 or less if married filing separately), multiply line 17 by 26% (0.26). Otherwise, multiply line 17 by 28% (0.28) and subtract $3,958 ($1,979 if married filing separately) from the result ▶ | **18** |
| **19** | Enter: <br> • $80,000 if married filing jointly or qualifying widow(er), <br> • $40,000 if single or married filing separately, or <br> • $53,600 if head of household. | **19** 80,000. |
| **20** | Enter the amount from line 5 of the Qualified Dividends and Capital Gain Tax Worksheet or the amount from line 14 of the Schedule D Tax Worksheet, whichever applies (as figured for the regular tax). If you did not complete either worksheet for the regular tax, enter the amount from Form 1040 or 1040-SR, line 15; if zero or less, enter -0-. If you are filing Form 2555, see instructions for the amount to enter | **20** 0. |
| **21** | Subtract line 20 from line 19. If zero or less, enter -0- | **21** 80,000. |
| **22** | Enter the **smaller** of line 12 or line 13 | **22** 860,582,416. |
| **23** | Enter the **smaller** of line 21 or line 22. This amount is taxed at 0% | **23** 80,000. |
| **24** | Subtract line 23 from line 22 | **24** 860,502,416. |
| **25** | Enter: <br> • $441,450 if single <br> • $248,300 if married filing separately <br> • $496,600 if married filing jointly or qualifying widow(er) <br> • $469,050 if head of household | **25** 496,600. |
| **26** | Enter the amount from line 21 | **26** 80,000. |
| **27** | Enter the amount from line 5 of the Qualified Dividends and Capital Gain Tax Worksheet or the amount from line 21 of the Schedule D Tax Worksheet, whichever applies (as figured for the regular tax). If you did not complete either worksheet for the regular tax, enter the amount from Form 1040 or 1040-SR, line 15; if zero or less, enter -0-. If you are filing Form 2555, see instructions for the amount to enter | **27** |
| **28** | Add line 26 and line 27 | **28** 80,000. |
| **29** | Subtract line 28 from line 25. If zero or less, enter -0- | **29** 416,600. |
| **30** | Enter the smaller of line 24 or line 29 | **30** 416,600. |
| **31** | Multiply line 30 by 15% (0.15) ▶ | **31** 62,490. |
| **32** | Add lines 23 and 30 | **32** 496,600. |
| | **If lines 32 and 12 are the same, skip lines 33 through 37 and go to line 38. Otherwise, go to line 33.** | |
| **33** | Subtract line 32 from line 22 | **33** 860,085,816. |
| **34** | Multiply line 33 by 20% (0.20) ▶ | **34** 172,017,163. |
| | **If line 14 is zero or blank, skip lines 35 through 37 and go to line 38. Otherwise, go to line 35.** | |
| **35** | Add lines 17, 32, and 33 | **35** 860,582,416. |
| **36** | Subtract line 35 from line 12 | **36** |
| **37** | Multiply line 36 by 25% (0.25) ▶ | **37** |
| **38** | Add lines 18, 31, 34, and 37 | **38** 172,079,653. |
| **39** | If line 12 is $197,900 or less ($98,950 or less if married filing separately), multiply line 12 by 26% (0.26). Otherwise, multiply line 12 by 28% (0.28) and subtract $3,958 ($1,979 if married filing separately) from the result | **39** 240,959,118. |
| **40** | Enter the **smaller** of line 38 or line 39 here and on line 7. If you are filing Form 2555, do not enter this amount on line 7. Instead, enter it on line 4 of the worksheet in the instructions for line 7 | **40** 172,079,653. |

019591 12-16-20   Form **6251** (2020)

AMENDED

**ALTERNATIVE MINIMUM TAX RECONCILIATION REPORT**

Name(s)

TONY D. & ELIZABETH A. TOWNLEY

Social Security Number

| Form Name | Description | Income | Form 6251, Line 2k | Form 6251, Line 2l | Form 6251, Line 2m | Form 6251, Line 2n | Form 6251 Other Adjustment |
|---|---|---|---|---|---|---|---|
| K1- | CLUCKZ HOLDINGS, LLC | | | | | | |
| | * REGULAR INCOME | 1,244,573. | | | | | |
| | DEPR ADJ | 444. | | 444. | | | |
| | ADJ GAIN/LOSS, LN | 9. | 9. | | | | |
| | * AMT NET INCOME | 1,245,026. | 9. | 444. | | | |
| | | | | | | | |
| K1- | ZAXBY'S OPERATING COMPANY, LP (TDT) | | | | | | |
| | * REGULAR INCOME | 20,770,514. | | | | | |
| | DEPR ADJ | 1,355. | | 1,355. | | | |
| | ADJ GAIN/LOSS, LN | 30. | 30. | | | | |
| | * AMT NET INCOME | 20,771,899. | 30. | 1,355. | | | |
| | | | | | | | |
| K1- | CLUCKZ HOLDINGS, LLC (SECG) | | | | | | |
| | * REGULAR INCOME | 352,531. | | | | | |
| | DEPR ADJ | 80. | | 80. | | | |
| | ADJ GAIN/LOSS, LN | 2. | 2. | | | | |
| | * AMT NET INCOME | 352,613. | 2. | 80. | | | |

019911
04-01-20

AMENDED

**ALTERNATIVE MINIMUM TAX RECONCILIATION REPORT**

| Name(s) | | | | | | | Social Security Number |
|---|---|---|---|---|---|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | | | | | | | ▆▆▆▆▆▆▆ |

| Form Name | Description | Income | Adjustment | | | | |
|---|---|---|---|---|---|---|---|
| | | | Form 6251, Line 2k | Form 6251, Line 2l | Form 6251, Line 2m | Form 6251, Line 2n | Form 6251 Other Adjustment |
| K-1- | PLUCKED CHICKEN, INC. | | | | | | |
| | *   REGULAR INCOME | 596,970,838. | | | | | |
| | BASIS ALLOWED | -597810229. | | | | -597810229. | |
| | AMT BASIS ALLOWED | 597,817,506. | | | | 597817506. | |
| | AMT BASIS ADJ | -7,277. | | | | | |
| | AMT ADJUSTMENTS | 7,277. | | | | | |
| | *   AMT NET INCOME | 596,978,115. | | | | 7,277. | |
| | | | | | | | |
| E- | FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRA | | | | | | |
| | *   REGULAR INCOME | 56,830. | | | | | |
| | AMT DEPR ADJ | -151. | | | -151. | | |
| | PAL CARRYOVER | 92,594. | | | 92,594. | | |
| | AMT PAL CARRYOVER | -86,879. | | | -86,879. | | |
| | *   AMT NET INCOME | 62,394. | | | 5,564. | | |
| | | | | | | | |
| K1- | TOWNLEY FAMILY PARTNERSHIP, LLLP | | | | | | |
| | *   REGULAR INCOME | -6. | | | | | |
| | PAL CARRYOVER | 6. | | | 6. | | |
| | AMT PAL CARRYOVER | -96. | | | -96. | | |
| | AMT PAL DISALLOWED | 96. | | | 96. | | |
| | *   AMT NET INCOME | 0. | | | 6. | | |

019911
04-01-20

**ALTERNATIVE MINIMUM TAX RECONCILIATION REPORT**

Name(s)

TONY D. & ELIZABETH A. TOWNLEY

Social Security Number

| Form Name | Description | Income | Adjustment | | | | |
|---|---|---|---|---|---|---|---|
| | | | Form 6251, Line 2k | Form 6251, Line 2l | Form 6251, Line 2m | Form 6251, Line 2n | Form 6251 Other Adjustment |
| K1– | TOWNLEY FAMILY PARTNER SHIP, LLLP | | | | | | |
| | * REGULAR INCOME | -280. | | | | | |
| | PAL CARRYOVER | 280. | | | 280. | | |
| | AMT PAL CARRYOVER | -4,776. | | | -4,776. | | |
| | AMT PAL DISALLOWED | 4,776. | | | 4,776. | | |
| | * AMT NET INCOME | 0. | | | 280. | | |
| | | | | | | | |
| K1– | TOWNLEY FAMILY PARTNER SHIP, LLLP | | | | | | |
| | * REGULAR INCOME | -275. | | | | | |
| | PAL CARRYOVER | 275. | | | 275. | | |
| | AMT PAL CARRYOVER | -4,680. | | | -4,680. | | |
| | AMT PAL DISALLOWED | 4,680. | | | 4,680. | | |
| | * AMT NET INCOME | 0. | | | 275. | | |
| | | | | | | | |
| K1– | AIR HIGHWAY, LLC | | | | | | |
| | * REGULAR INCOME | -25,848. | | | | | |
| | * AMT NET INCOME | -25,848. | | | | | |
| | | | | | | | |
| E– | LANE CREEK INVESTMENTS , LLC – VARIOUS (LANE | | | | | | |
| | * REGULAR INCOME | 412,329. | | | | | |
| | PAL CARRYOVER | 49,216. | | | 49,216. | | |
| | AMT PAL CARRYOVER | -49,215. | | | -49,215. | | |
| | * AMT NET INCOME | 412,330. | | | 1. | | |
| | | | | | | | |
| | ** TOTAL ADJ & PREF ** | | 41. | 1,879. | 6,126. | 7,277. | |

019911
04-01-20

AMENDED

| Form **8995-A** | **Qualified Business Income Deduction** | OMB No. 1545-2994 |
|---|---|---|
| Department of the Treasury<br>Internal Revenue Service | ▶ **Attach to your tax return.**<br>▶ Go to www.irs.gov/Form8995A for instructions and the latest information. | **2020**<br>Attachment<br>Sequence No. **55A** |

| Name(s) shown on return | Your taxpayer identification number |
|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | ████████ |

**Note:** *You can claim the qualified business income deduction* **only** *if you have qualified business income from a qualified trade or business, real estate investment trust dividends, publicly traded partnership income, or a domestic production activities deduction passed through from an agricultural or horticultural cooperative. See instructions. Use this form if your taxable income, before your qualified business income deduction, is above $163,300 ($326,600 if married filing jointly), or you're a patron of an agricultural or horticultural cooperative.*

| Part I | Trade, Business, or Aggregation Information |
|---|---|

*Complete Schedules A, B, and/or C (Form 8995-A), as applicable, before starting Part I. Attach additional worksheets when needed. See instructions.*

| 1 | (a) Trade, business, or aggregation name | (b) Check if specified service | (c) Check if aggregation | (d) Taxpayer identification number | (e) Check if patron |
|---|---|---|---|---|---|
| A | CLUCKZ HOLDINGS, LLC | ☐ | ☐ | ██████ | ☐ |
| B | M&T AVIATION, LLC | ☐ | ☐ | ██████ | ☐ |
| C | ZAXBY'S OPERATING COMPANY, LP (TDT) | ☐ | ☐ | ██████ | ☐ |

| Part II | Determine Your Adjusted Qualified Business Income |
|---|---|

| | | | A | B | C |
|---|---|---|---|---|---|
| 2 | Qualified business income from the trade, business, or aggregation. See instructions | 2 | 725,286. | 79,363. | 18293677. |
| 3 | Multiply line 2 by 20% (0.20). If your taxable income is $163,300 or less ($326,600 if married filing jointly), skip lines 4 through 12 and enter the amount from line 3 on line 13 | 3 | 145,057. | 15,873. | 3,658,735. |
| 4 | Allocable share of W-2 wages from the trade, business, or aggregation | 4 | 3,354,777. | | 10231181. |
| 5 | Multiply line 4 by 50% (0.50) | 5 | 1,677,389. | | 5,115,591. |
| 6 | Multiply line 4 by 25% (0.25) | 6 | 838,694. | | 2,557,795. |
| 7 | Allocable share of the unadjusted basis immediately after acquisition (UBIA) of all qualified property | 7 | 4,532,754. | 1,839,054. | 13823696. |
| 8 | Multiply line 7 by 2.5% (0.025) | 8 | 113,319. | 45,976. | 345,592. |
| 9 | Add lines 6 and 8 | 9 | 952,013. | 45,976. | 2,903,387. |
| 10 | Enter the greater of line 5 or line 9 | 10 | 1,677,389. | 45,976. | 5,115,591. |
| 11 | W-2 wage and UBIA of qualified property limitation. Enter the smaller of line 3 or line 10 | 11 | 145,057. | 15,873. | 3,658,735. |
| 12 | Phased-in reduction. Enter the amount from line 26, if any. See instructions | 12 | | | |
| 13 | Qualified business income deduction before patron reduction. Enter the greater of line 11 or line 12 | 13 | 145,057. | 15,873. | 3,658,735. |
| 14 | Patron reduction. Enter the amount from Schedule D (Form 8995-A), line 6, if any. See instructions | 14 | | | |
| 15 | Qualified business income component. Subtract line 14 from line 13 | 15 | 145,057. | 15,873. | 3,658,735. |
| 16 | Total qualified business income component. Add all amounts reported on line 15 ▶ | 16 | 7,587,470. | | |

**For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.** Form **8995-A** (2020)

008411 01-29-21    LHA

Case 3:22-cv-00107-CDL   Document 61   Filed 10/28/22   Page 43 of 666

**AMENDED**

Form 8995-A (2020) TONY D. & ELIZABETH A. TOWNLEY        Page **2**

| Part III | Phased-in Reduction |
|---|---|

*Complete Part III only if your taxable income is more than $163,300 but not $213,300 ($326,600 and $426,600 if married filing jointly) and line 10 is less than line 3. Otherwise, skip Part III.*

| | | | A | B | C |
|---|---|---|---|---|---|
| 17 | Enter the amounts from line 3 | 17 | | | |
| 18 | Enter the amounts from line 10 | 18 | | | |
| 19 | Subtract line 18 from line 17 | 19 | | | |
| 20 | Taxable income before qualified business income deduction | 20 | | | |
| 21 | Threshold. Enter $163,300 ($326,600 if married filing jointly) | 21 | | | |
| 22 | Subtract line 21 from line 20 | 22 | | | |
| 23 | Phase-in range. Enter $50,000 ($100,000 if married filing jointly) | 23 | | | |
| 24 | Phase-in percentage. Divide line 22 by line 23 | 24 | % | | |
| 25 | Total phase-in reduction. Multiply line 19 by line 24 | 25 | | | |
| 26 | Qualified business income after phase-in reduction. Subtract line 25 from line 17. Enter this amount here and on line 12, for the corresponding trade or business | 26 | | | |

| Part IV | Determine Your Qualified Business Income Deduction |
|---|---|

| 27 | Total qualified business income component from all qualified trades, businesses, or aggregations. Enter the amount from line 16 | 27 | 7,587,470. | |
| 28 | Qualified REIT dividends and publicly traded partnership (PTP) income or (loss). See instructions | 28 | | |
| 29 | Qualified REIT dividends and PTP (loss) carryforward from prior years | 29 | ( ) | |
| 30 | Total qualified REIT dividends and PTP income. Combine lines 28 and 29. If less than zero, enter -0- | 30 | | |
| 31 | REIT and PTP component. Multiply line 30 by 20% (0.20) | 31 | | |
| 32 | Qualified business income deduction before the income limitation. Add lines 27 and 31 ▶ | 32 | 7,587,470. |
| 33 | Taxable income before qualified business income deduction | 33 | 60,557,093. |
| 34 | Net capital gain. See instructions | 34 | 35,623,077. |
| 35 | Subtract line 34 from line 33. If zero or less, enter -0- | 35 | 0. |
| 36 | Income limitation. Multiply line 35 by 20% (0.20) | 36 | |
| 37 | Qualified business income deduction before the domestic production activities deduction (DPAD) under section 199A(g). Enter the smaller of line 32 or line 36 ▶ | 37 | |
| 38 | DPAD under section 199A(g) allocated from an agricultural or horticultural cooperative. Don't enter more than line 33 minus line 37 | 38 | |
| 39 | Total qualified business income deduction. Add lines 37 and 38 ▶ | 39 | |
| 40 | Total qualified REIT dividends and PTP (loss) carryforward. Combine lines 28 and 29. If zero or greater, enter -0- | 40 | ( ) |

Form **8995-A** (2020)

008412 01-29-21

AMENDED

Form **8995-A**

Department of the Treasury
Internal Revenue Service

**Qualified Business Income Deduction**

▶ Attach to your tax return.
▶ Go to www.irs.gov/Form8995A for instructions and the latest information.

OMB No. 1545-2994

**2020**

Attachment
Sequence No. **55A**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Your taxpayer identification number

**Note:** *You can claim the qualified business income deduction* **only** *if you have qualified business income from a qualified trade or business, real estate investment trust dividends, publicly traded partnership income, or a domestic production activities deduction passed through from an agricultural or horticultural cooperative. See instructions. Use this form if your taxable income, before your qualified business income deduction, is above $163,300 ($326,600 if married filing jointly), or you're a patron of an agricultural or horticultural cooperative.*

| Part I | Trade, Business, or Aggregation Information |
| --- | --- |

*Complete Schedules A, B, and/or C (Form 8995-A), as applicable, before starting Part I. Attach additional worksheets when needed. See instructions.*

| 1 | **(a)** Trade, business, or aggregation name | **(b)** Check if specified service | **(c)** Check if aggregation | **(d)** Taxpayer identification number | **(e)** Check if patron |
| --- | --- | --- | --- | --- | --- |
| **A** | CLUCKZ HOLDINGS, LLC (SECG) | ☐ | ☐ | ▇▇▇▇ | ☐ |
| **B** | PLUCKED CHICKEN, INC. | ☐ | ☐ | ▇▇▇▇ | ☐ |
| **C** | FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZ | ☐ | ☐ | ▇▇▇▇ | ☐ |

| Part II | Determine Your Adjusted Qualified Business Income |
| --- | --- |

| | | | A | B | C |
| --- | --- | --- | --- | --- | --- |
| 2 | Qualified business income from the trade, business, or aggregation. See instructions | 2 | 211,156. | 18577753. | 50,116. |
| 3 | Multiply line 2 by 20% (0.20). If your taxable income is $163,300 or less ($326,600 if married filing jointly), skip lines 4 through 12 and enter the amount from line 3 on line 13 | 3 | 42,231. | 3,715,551. | 10,023. |
| 4 | Allocable share of W-2 wages from the trade, business, or aggregation | 4 | 600,285. | 54985533. | |
| 5 | Multiply line 4 by 50% (0.50) | 5 | 300,143. | 27492767. | |
| 6 | Multiply line 4 by 25% (0.25) | 6 | 150,071. | 13746383. | |
| 7 | Allocable share of the unadjusted basis immediately after acquisition (UBIA) of all qualified property | 7 | 811,066. | 72603903. | 8,961,891. |
| 8 | Multiply line 7 by 2.5% (0.025) | 8 | 20,277. | 1,815,098. | 224,047. |
| 9 | Add lines 6 and 8 | 9 | 170,348. | 15561481. | 224,047. |
| 10 | Enter the greater of line 5 or line 9 | 10 | 300,143. | 27492767. | 224,047. |
| 11 | W-2 wage and UBIA of qualified property limitation. Enter the smaller of line 3 or line 10 | 11 | 42,231. | 3,715,551. | 10,023. |
| 12 | Phased-in reduction. Enter the amount from line 26, if any. See instructions | 12 | | | |
| 13 | Qualified business income deduction before patron reduction. Enter the greater of line 11 or line 12 | 13 | 42,231. | 3,715,551. | 10,023. |
| 14 | Patron reduction. Enter the amount from Schedule D (Form 8995-A), line 6, if any. See instructions | 14 | | | |
| 15 | Qualified business income component. Subtract line 14 from line 13 | 15 | 42,231. | 3,715,551. | 10,023. |
| 16 | Total qualified business income component. Add all amounts reported on line 15 ▶ | 16 | | | |

**For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.**

Form **8995-A** (2020)

008411 01-29-21    LHA

Case 3:22-cv-00107-CDL   Document 31-5   Filed 10/28/22   Page 45 of 666

**AMENDED**

TONY D. & ELIZABETH A. TOWNLEY                                         Page **2**

| Part III | Phased-in Reduction |
| --- | --- |

*Complete Part III only if your taxable income is more than $163,300 but not $213,300 ($326,600 and $426,600 if married filing jointly) and line 10 is less than line 3. Otherwise, skip Part III.*

|  |  |  | **A** | **B** | **C** |
| --- | --- | --- | --- | --- | --- |
| 17 | Enter the amounts from line 3 | 17 |  |  |  |
| 18 | Enter the amounts from line 10 | 18 |  |  |  |
| 19 | Subtract line 18 from line 17 | 19 |  |  |  |
| 20 | Taxable income before qualified business income deduction | 20 |  |  |  |
| 21 | Threshold. Enter $163,300 ($326,600 if married filing jointly) | 21 |  |  |  |
| 22 | Subtract line 21 from line 20 | 22 |  |  |  |
| 23 | Phase-in range. Enter $50,000 ($100,000 if married filing jointly) | 23 |  |  |  |
| 24 | Phase-in percentage. Divide line 22 by line 23 | 24 | % |  |  |
| 25 | Total phase-in reduction. Multiply line 19 by line 24 | 25 |  |  |  |
| 26 | Qualified business income after phase-in reduction. Subtract line 25 from line 17. Enter this amount here and on line 12, for the corresponding trade or business | 26 |  |  |  |

| Part IV | Determine Your Qualified Business Income Deduction |
| --- | --- |

| | | | |
| --- | --- | --- | --- |
| 27 | Total qualified business income component from all qualified trades, businesses, or aggregations. Enter the amount from line 16 | 27 | |
| 28 | Qualified REIT dividends and publicly traded partnership (PTP) income or (loss). See instructions | 28 | |
| 29 | Qualified REIT dividends and PTP (loss) carryforward from prior years | 29 | ( ) |
| 30 | Total qualified REIT dividends and PTP income. Combine lines 28 and 29. If less than zero, enter -0- | 30 | |
| 31 | REIT and PTP component. Multiply line 30 by 20% (0.20) | 31 | |
| 32 | Qualified business income deduction before the income limitation. Add lines 27 and 31 ▶ | 32 | |
| 33 | Taxable income before qualified business income deduction | 33 | |
| 34 | Net capital gain. See instructions | 34 | |
| 35 | Subtract line 34 from line 33. If zero or less, enter -0- | 35 | |
| 36 | Income limitation. Multiply line 35 by 20% (0.20) | 36 | |
| 37 | Qualified business income deduction before the domestic production activities deduction (DPAD) under section 199A(g). Enter the smaller of line 32 or line 36 ▶ | 37 | |
| 38 | DPAD under section 199A(g) allocated from an agricultural or horticultural cooperative. Don't enter more than line 33 minus line 37 | 38 | |
| 39 | Total qualified business income deduction. Add lines 37 and 38 ▶ | 39 | |
| 40 | Total qualified REIT dividends and PTP (loss) carryforward. Combine lines 28 and 29. If zero or greater, enter -0- | 40 | ( ) |

Form **8995-A** (2020)

008412 01-29-21

Case 3:22-cv-00107-CDL    Document 31-1    Filed 10/28/22    Page 46 of 666

**SCHEDULE C**
**(Form 8995-A)**

Department of the Treasury
Internal Revenue Service

# Loss Netting and Carryforward

▶ **Attach to Form 8995-A.**
▶ Go to www.irs.gov/Form8995A for instructions and the latest information.

OMB No. 1545-2294

**2020**

Attachment
Sequence No. **55D**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Your taxpayer identification number

*If you have more than three trades, businesses, or aggregations, complete and attach as many Schedules C as needed. See instructions.*

| 1 | Trade, business, or aggregation name | (a) Qualified business income/(loss) | (b) Reduction for loss netting (see instructions) | (c) Adjusted qualified business income (Combine (a) and (b). If zero or less, enter -0-.) |
|---|---|---|---|---|
| | SEE STATEMENT 32 | | ( ) | |
| | | | ( ) | |
| | | ( | ) | |

| | | | |
|---|---|---|---|
| 2 | Qualified business net (loss) carryforward from prior years. See instructions   SEE STATEMENT 33 | 2 | ( 92,594. ) |
| 3 | Total of the trades, businesses, or aggregations losses. Combine the negative amounts on lines 1, column (a), and 2 for all trades, businesses, or aggregations ............................ | 3 | 5,099,980. |
| 4 | Total of the trades, businesses, or aggregations income. Add the positive amounts on line 1, column (a), for all trades, businesses, or aggregations ............................ | 4 | 43,019,930. |
| 5 | Losses netted with income of other trades, businesses, or aggregations. Enter in the parentheses on line 5 the smaller of the absolute value of line 3 or line 4. Allocate this amount to each of the trades, businesses, or aggregations on line 1, column (b). See instructions ............................ | 5 | 5,099,980. |
| 6 | Qualified business net (loss) carryforward. Subtract line 5 from line 3. If zero or more, enter -0- ............................ | 6 | ( ) |

LHA   **For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.**

**Schedule C (Form 8995-A) 2020**

008416 01-27-21

AMENDED

Form **8959**

Department of the Treasury
Internal Revenue Service

### Additional Medicare Tax

▶ If any line does not apply to you, leave it blank. See separate instructions.
▶ Attach to Form 1040, 1040-SR, 1040-NR, 1040-PR, or 1040-SS.
▶ Go to www.irs.gov/Form8959 for instructions and the latest information.

OMB No. 1545-0074

**2020**

Attachment
Sequence No. **71**

Name(s) shown on return
TONY D. & ELIZABETH A. TOWNLEY

Your social security number

| | Part I | Additional Medicare Tax on Medicare Wages | | | |
|---|---|---|---|---|---|
| 1 | Medicare wages and tips from Form W-2, box 5. If you have more than one Form W-2, enter the total of the amounts from box 5 | | 1 | | |
| 2 | Unreported tips from Form 4137, line 6 | | 2 | | |
| 3 | Wages from Form 8919, line 6 | | 3 | | |
| 4 | Add lines 1 through 3 | | 4 | | |
| 5 | Enter the following amount for your filing status: | | | | |
| | Married filing jointly | $250,000 | | | |
| | Married filing separately | $125,000 | | | |
| | Single, Head of household, or Qualifying widow(er) | $200,000 | 5 | | |
| 6 | Subtract line 5 from line 4. If zero or less, enter -0- | | | 6 | |
| 7 | Additional Medicare Tax on Medicare wages. Multiply line 6 by 0.9% (0.009). Enter here and go to Part II | | | 7 | |

| | Part II | Additional Medicare Tax on Self-Employment Income | | | |
|---|---|---|---|---|---|
| 8 | Self-employment income from Schedule SE (Form 1040), Part I, line 6. If you had a loss, enter -0- (Form 1040-PR or 1040-SS filers, see instructions.) | | 8 | 1,669,542. | |
| 9 | Enter the following amount for your filing status: | | | | |
| | Married filing jointly | $250,000 | | | |
| | Married filing separately | $125,000 | | | |
| | Single, Head of household, or Qualifying widow(er) | $200,000 | 9 | 250,000. | |
| 10 | Enter the amount from line 4 | | 10 | | |
| 11 | Subtract line 10 from line 9. If zero or less, enter -0- | | 11 | 250,000. | |
| 12 | Subtract line 11 from line 8. If zero or less, enter -0- | | | 12 | 1,419,542. |
| 13 | Additional Medicare Tax on self-employment income. Multiply line 12 by 0.9% (0.009). Enter here and go to Part III | | | 13 | 12,776. |

| | Part III | Additional Medicare Tax on Railroad Retirement Tax Act (RRTA) Compensation | | | |
|---|---|---|---|---|---|
| 14 | Railroad retirement (RRTA) compensation and tips from Form(s) W-2, box 14 (see instructions) | | 14 | | |
| 15 | Enter the following amount for your filing status: | | | | |
| | Married filing jointly | $250,000 | | | |
| | Married filing separately | $125,000 | | | |
| | Single, Head of household, or Qualifying widow(er) | $200,000 | 15 | | |
| 16 | Subtract line 15 from line 14. If zero or less, enter -0- | | | 16 | |
| 17 | Additional Medicare Tax on railroad retirement (RRTA) compensation. Multiply line 16 by 0.9% (0.009). Enter here and go to Part IV | | | 17 | |

| | Part IV | Total Additional Medicare Tax | | | |
|---|---|---|---|---|---|
| 18 | Add lines 7, 13, and 17. Also include this amount on Schedule 2 (Form 1040), line 8 (check box a) (Form 1040-PR or 1040-SS filers, see instructions), and go to Part V | | | 18 | 12,776. |

| | Part V | Withholding Reconciliation | | | |
|---|---|---|---|---|---|
| 19 | Medicare tax withheld from Form W-2, box 6. If you have more than one Form W-2, enter the total of the amounts from box 6 | | 19 | | |
| 20 | Enter the amount from line 1 | | 20 | | |
| 21 | Multiply line 20 by 1.45% (0.0145). This is your regular Medicare tax withholding on Medicare wages | | 21 | | |
| 22 | Subtract line 21 from line 19. If zero or less, enter -0-. This is your Additional Medicare Tax withholding on Medicare wages | | | 22 | |
| 23 | Additional Medicare Tax withholding on railroad retirement (RRTA) compensation from Form W-2, box 14 (see instructions) | | | 23 | |
| 24 | **Total Additional Medicare Tax withholding.** Add lines 22 and 23. Also include this amount with federal income tax withholding on Form 1040, 1040-SR, or 1040-NR, line 25c (Form 1040-PR or 1040-SS filers, see instructions) | | | 24 | |

023111 11-17-20   LHA   **For Paperwork Reduction Act Notice, see your tax return instructions.**   Form **8959** (2020)

AMENDED

Form **8960**

Department of the Treasury
Internal Revenue Service (99)

### Net Investment Income Tax -
### Individuals, Estates, and Trusts

▶ **Attach to your tax return.**
▶ Go to www.irs.gov/Form8960 for instructions and the latest information.

OMB No. 1545-2227

**2020**

Attachment
Sequence No. **72**

Name(s) shown on your tax return
TONY D. & ELIZABETH A. TOWNLEY

Your social security number or EIN

| Part I | Investment Income | | | |
|---|---|---|---|---|
| | ☐ Section 6013(g) election (see instructions) | | | |
| | ☐ Section 6013(h) election (see instructions) | | | |
| | ☐ Regulations section 1.1411-10(g) election (see instructions) | | | |
| 1 | Taxable interest (see instructions) | | 1 | 1,503,302. |
| 2 | Ordinary dividends (see instructions) | | 2 | 81,485. |
| 3 | Annuities (see instructions) | | 3 | |
| 4a | Rental real estate, royalties, partnerships, S corporations, trusts, etc. (see instructions) | 4a | 47,140,694. | |
| b | Adjustment for net income or loss derived in the ordinary course of a non-section 1411 trade or business (see instructions) STATEMENT 34 | 4b | -46,785,062. | |
| c | Combine lines 4a and 4b | | 4c | 355,632. |
| 5a | Net gain or loss from disposition of property (see instructions) | 5a | 935,789,758. | |
| b | Net gain or loss from disposition of property that is not subject to net investment income tax (see instructions) | 5b | -2,828,929. | |
| c | Adjustment from disposition of partnership interest or S corporation stock (see instructions) | 5c | -932,723,600. | |
| d | Combine lines 5a through 5c | | 5d | 237,229. |
| 6 | Adjustments to investment income for certain CFCs and PFICs (see instructions) | | 6 | |
| 7 | Other modifications to investment income (see instructions) SEE STATEMENT 35 | | 7 | 9,555. |
| 8 | Total investment income. Combine lines 1, 2, 3, 4c, 5d, 6, and 7 | | 8 | 2,187,203. |

| Part II | Investment Expenses Allocable to Investment Income and Modifications | | | |
|---|---|---|---|---|
| 9a | Investment interest expenses (see instructions) | 9a | | |
| b | State, local, and foreign income tax (see instructions) | 9b | 10,000. | |
| c | Miscellaneous investment expenses (see instructions) | 9c | | |
| d | Add lines 9a, 9b, and 9c | | 9d | 10,000. |
| 10 | Additional modifications (see instructions) | | 10 | |
| 11 | Total deductions and modifications. Add lines 9d and 10 | | 11 | 10,000. |

| Part III | Tax Computation | | | |
|---|---|---|---|---|
| 12 | Net investment income. Subtract Part II, line 11, from Part I, line 8. Individuals, complete lines 13-17. Estates and trusts, complete lines 18a-21. If zero or less, enter -0- | | 12 | 2,177,203. |
| | **Individuals:** | | | |
| 13 | Modified adjusted gross income (see instructions) | 13 | 985,025,987. | |
| 14 | Threshold based on filing status (see instructions) | 14 | 250,000. | |
| 15 | Subtract line 14 from line 13. If zero or less, enter -0- | 15 | 984,775,987. | |
| 16 | Enter the smaller of line 12 or line 15 | | 16 | 2,177,203. |
| 17 | Net investment income tax for individuals. Multiply line 16 by 3.8% (0.038). **Enter here and include on your tax return** (see instructions) | | 17 | 82,734. |
| | **Estates and Trusts:** | | | |
| 18a | Net investment income (line 12 above) | 18a | | |
| b | Deductions for distributions of net investment income and deductions under section 642(c) (see instructions) | 18b | | |
| c | Undistributed net investment income. Subtract line 18b from 18a (see instructions). If zero or less, enter -0- | 18c | | |
| 19a | Adjusted gross income (see instructions) | 19a | | |
| b | Highest tax bracket for estates and trusts for the year (see instructions) | 19b | | |
| c | Subtract line 19b from line 19a. If zero or less, enter -0- | 19c | | |
| 20 | Enter the smaller of line 18c or line 19c | | 20 | |
| 21 | Net investment income tax for estates and trusts. Multiply line 20 by 3.8% (0.038). **Enter here and include on your tax return** (see instructions) | | 21 | |

LHA   **For Paperwork Reduction Act Notice, see your tax return instructions.**

Form **8960** (2020)

023121 01-26-21

AMENDED

Form **8582**

Department of the Treasury
Internal Revenue Service (99)

## Passive Activity Loss Limitations

▶ See separate instructions.
▶ Attach to Form 1040, 1040-SR, or 1041.
▶ Go to www.irs.gov/Form8582 for instructions and the latest information.

OMB No. 1545-1008

**2020**

Attachment
Sequence No. **858**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Identifying number

| Part I | 2020 Passive Activity Loss |
|---|---|

**Caution:** Complete Worksheets 1, 2, and 3 before completing Part I.

**Rental Real Estate Activities With Active Participation**  (For the definition of active participation, see
**Special Allowance for Rental Real Estate Activities**  in the instructions.)

| | | | | |
|---|---|---|---|---|
| **1a** Activities with net income (enter the amount from Worksheet 1, column (a)) | **1a** | 518,375. | | |
| **b** Activities with net loss (enter the amount from Worksheet 1, column (b)) | **1b** | ( ) | | |
| **c** Prior year unallowed losses (enter the amount from Worksheet 1, column (c)) | **1c** | ( 141,810.) | | |
| **d** Combine lines 1a, 1b, and 1c | | | **1d** | 376,565. |

**Commercial Revitalization Deductions From Rental Real Estate Activities**

| | | | | |
|---|---|---|---|---|
| **2a** Commercial revitalization deductions from Worksheet 2, column (a) | **2a** | ( ) | | |
| **b** Prior year unallowed commercial revitalization deductions from Worksheet 2, column (b) | **2b** | ( ) | | |
| **c** Add lines 2a and 2b | | | **2c** | ( ) |

**All Other Passive Activities**

| | | | | |
|---|---|---|---|---|
| **3a** Activities with net income (enter the amount from Worksheet 3, column (a)) | **3a** | | | |
| **b** Activities with net loss (enter the amount from Worksheet 3, column (b)) | **3b** | ( 25,848.) | | |
| **c** Prior years' unallowed losses (enter the amount from Worksheet 3, column (c)) | **3c** | ( 561.) | | |
| **d** Combine lines 3a, 3b, and 3c | | | **3d** | -26,409. |

| | | | |
|---|---|---|---|
| **4** Combine lines 1d, 2c, and 3d. If this line is zero or more, stop here and include this form with your return; all losses are allowed, including any prior year unallowed losses entered on line 1c, 2b, or 3c. Report the losses on the forms and schedules normally used | | **4** | 350,156. |

If line 4 is a loss and:
- Line 1d is a loss, go to Part II.
- Line 2c is a loss (and line 1d is zero or more), skip Part II and go to Part III.
- Line 3d is a loss (and lines 1d and 2c are zero or more), skip Parts II and III and go to line 15.

**Caution:** If your filing status is married filing separately and you lived with your spouse at any time during the year,  **do not** complete Part II or Part III. Instead, go to line 15.

| Part II | Special Allowance for Rental Real Estate Activities With Active Participation |
|---|---|

**Note:** Enter all numbers in Part II as positive amounts. See instructions for an example.

| | | | |
|---|---|---|---|
| **5** Enter the **smaller** of the loss on line 1d or the loss on line 4 | | **5** | |
| **6** Enter $150,000. If married filing separately, see instructions | **6** | | |
| **7** Enter modified adjusted gross income, but not less than zero. See instructions | **7** | | |
| **Note:** If line 7 is greater than or equal to line 6, skip lines 8 and 9, enter -0- on line 10. Otherwise, go to line 8. | | | |
| **8** Subtract line 7 from line 6 | **8** | | |
| **9** Multiply line 8 by 50% (0.50). **Do not** enter more than $25,000. If married filing separately, see instructions | | **9** | |
| **10** Enter the **smaller** of line 5 or line 9 | | **10** | |

If line 2c is a loss, go to Part III. Otherwise, go to line 15.

| Part III | Special Allowance for Commercial Revitalization Deductions From Rental Real Estate Activities |
|---|---|

**Note:** Enter all numbers in Part III as positive amounts. See the example for Part III in the instructions.

| | | | |
|---|---|---|---|
| **11** Enter $25,000 reduced by the amount, if any, on line 10. If married filing separately, see instructions | | **11** | |
| **12** Enter the loss from line 4 | | **12** | |
| **13** Reduce line 12 by the amount on line 10 | | **13** | |
| **14** Enter the **smallest** of line 2c (treated as a positive amount), line 11, or line 13 | | **14** | |

| Part IV | Total Losses Allowed |
|---|---|

| | | | |
|---|---|---|---|
| **15** Add the income, if any, on lines 1a and 3a and enter the total | | **15** | |
| **16** **Total losses allowed from all passive activities for 2020.** Add lines 10, 14, and 15. See instructions to find out how to report the losses on your tax return | | **16** | |

LHA  019761 12-01-20   **For Paperwork Reduction Act Notice, see instructions.**

Form **8582** (2020)

AMENDED

Form 8582 (2020)   TONY D. & ELIZABETH A. TOWNLEY                                    Page **2**

**Caution:** The worksheets must be filed with your tax return. Keep a copy for your records.

## Worksheet 1 - For Form 8582, Lines 1a, 1b, and 1c  (see instructions)

| Name of activity | Current year | | | Overall gain or loss | |
| --- | --- | --- | --- | --- | --- |
| | **(a)** Net income (line 1a) | **(b)** Net loss (line 1b) | **(c)** Unallowed loss (line 1c) | **(d)** Gain | **(e)** Loss |
| | | | | | |
| | | | | | |
| | | | | | |
| | SEE ATTACHED STATEMENT FOR WORKSHEET 1 | | | | |
| **Total.** Enter on Form 8582, lines 1a, 1b, and 1c ▶ | 518,375. | | −141,810. | | |

## Worksheet 2 - For Form 8582, Lines 2a and 2b  (see instructions)

| Name of activity | **(a)** Current year deductions (line 2a) | **(b)** Prior year unallowed deductions (line 2b) | **(c)** Overall loss |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| **Total.** Enter on Form 8582, lines 2a and 2b ▶ | | | |

## Worksheet 3 - For Form 8582, Lines 3a, 3b, and 3c  (see instructions)

| Name of activity | Current year | | | Overall gain or loss | |
| --- | --- | --- | --- | --- | --- |
| | **(a)** Net income (line 3a) | **(b)** Net loss (line 3b) | **(c)** Unallowed loss (line 3c) | **(d)** Gain | **(e)** Loss |
| | | | | | |
| | | | | | |
| | | | | | |
| | SEE ATTACHED STATEMENT FOR WORKSHEET 3 | | | | |
| **Total.** Enter on Form 8582, lines 3a, 3b, and 3c ▶ | | −25,848. | −561. | | |

## Worksheet 4 - Use This Worksheet if an Amount is Shown on Form 8582, Line 10 or 14.  See instructions.

| Name of activity | Form or schedule and line number to be reported on (see instructions) | **(a)** Loss | **(b)** Ratio | **(c)** Special allowance | **(d)** Subtract column (c) from column (a) |
| --- | --- | --- | --- | --- | --- |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Total** ▶ | | | | | |

## Worksheet 5 - Allocation of Unallowed Losses  (see instructions)

| Name of activity | Form or schedule and line number to be reported on (see instructions) | **(a)** Loss | **(b)** Ratio | **(c)** Unallowed loss |
| --- | --- | --- | --- | --- |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **Total** ▶ | | | | |

019762  12-01-20                                                        Form **8582** (2020)

ALTERNATIVE MINIMUM TAX

**AMENDED**

# Passive Activity Loss Limitations

Form **8582**

Department of the Treasury
Internal Revenue Service (99)

▶ See separate instructions.
▶ Attach to Form 1040, 1040-SR, or 1041.
▶ Go to www.irs.gov/Form8582 for instructions and the latest information.

OMB No. 1545-1008

**2020**

Attachment
Sequence No. **858**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Identifying number

## Part I    2020 Passive Activity Loss

**Caution:** Complete Worksheets 1, 2, and 3 before completing Part I.

**Rental Real Estate Activities With Active Participation**  (For the definition of active participation, see
**Special Allowance for Rental Real Estate Activities**  in the instructions.)

| | | |
|---|---|---|
| **1a** Activities with net income (enter the amount from Worksheet 1, column (a)) ...... | **1a** | 518,224. |
| **b** Activities with net loss (enter the amount from Worksheet 1, column (b)) ......... | **1b** ( | ) |
| **c** Prior years' unallowed losses (enter the amount from Worksheet 1, column (c)) ... | **1c** ( | 136,094. ) |
| **d** Combine lines 1a, 1b, and 1c | **1d** | 382,130. |

**Commercial Revitalization Deductions From Rental Real Estate Activities**

| | | |
|---|---|---|
| **2a** Commercial revitalization deductions from Worksheet 2, column (a) ................. | **2a** ( | ) |
| **b** Prior year unallowed commercial revitalization deductions from Worksheet 2, column (b) ................. | **2b** ( | ) |
| **c** Add lines 2a and 2b | **2c** ( | ) |

**All Other Passive Activities**

| | | |
|---|---|---|
| **3a** Activities with net income (enter the amount from Worksheet 3, column (a)) ...... | **3a** | |
| **b** Activities with net loss (enter the amount from Worksheet 3, column (b)) ......... | **3b** ( | 25,848. ) |
| **c** Prior years' unallowed losses (enter the amount from Worksheet 3, column (c)) ... | **3c** ( | ) |
| **d** Combine lines 3a, 3b, and 3c | **3d** | -25,848. |

**4** Combine lines 1d, 2c, and 3d. If this line is zero or more, stop here and include this form with your return; all
losses are allowed, including any prior year unallowed losses entered on line 1c, 2b, or 3c. Report the losses on
the forms and schedules normally used ..... | **4** | 356,282.

If line 4 is a loss and:    • Line 1d is a loss, go to Part II.
                            • Line 2c is a loss (and line 1d is zero or more), skip Part II and go to Part III.
                            • Line 3d is a loss (and lines 1d and 2c are zero or more), skip Parts II and III and go to line 15.

**Caution:** If your filing status is married filing separately and you lived with your spouse at any time during the year,  **do not** complete
Part II or Part III. Instead, go to line 15.

## Part II    Special Allowance for Rental Real Estate Activities With Active Participation

**Note:** Enter all numbers in Part II as positive amounts. See instructions for an example.

| | | |
|---|---|---|
| **5** Enter the **smaller** of the loss on line 1d or the loss on line 4 ........................ | **5** | |
| **6** Enter $150,000. If married filing separately, see instructions ............ | **6** | |
| **7** Enter modified adjusted gross income, but not less than zero. See instructions ... | **7** | |
| **Note:** If line 7 is greater than or equal to line 6, skip lines 8 and 9, enter -0- on line 10. Otherwise, go to line 8. | | |
| **8** Subtract line 7 from line 6 | **8** | |
| **9** Multiply line 8 by 50% (0.50). **Do not** enter more than $25,000. If married filing separately, see instructions ...... | **9** | |
| **10** Enter the **smaller** of line 5 or line 9 | **10** | |

If line 2c is a loss, go to Part III. Otherwise, go to line 15.

## Part III    Special Allowance for Commercial Revitalization Deductions From Rental Real Estate Activities

**Note:** Enter all numbers in Part III as positive amounts. See the example for Part III in the instructions.

| | | |
|---|---|---|
| **11** Enter $25,000 reduced by the amount, if any, on line 10. If married filing separately, see instructions ............. | **11** | |
| **12** Enter the loss from line 4 | **12** | |
| **13** Reduce line 12 by the amount on line 10 | **13** | |
| **14** Enter the **smallest** of line 2c (treated as a positive amount), line 11, or line 13 | **14** | |

## Part IV    Total Losses Allowed

| | | |
|---|---|---|
| **15** Add the income, if any, on lines 1a and 3a and enter the total ......................... | **15** | |
| **16** **Total losses allowed from all passive activities for 2020.** Add lines 10, 14, and 15. See instructions to find out how to report the losses on your tax return .............. | **16** | |

LHA   019761 12-01-20   **For Paperwork Reduction Act Notice, see instructions.**                Form **8582** (2020)

Case 3:22-cv-00107-CDL   Document 60-1   Filed 10/28/22   Page 52 of 666

Form 8582 (2020)   TONY D. & ELIZABETH A. TOWNLEY                                      Page **2**

**Caution:** The worksheets must be filed with your tax return. Keep a copy for your records.

## Worksheet 1 - For Form 8582, Lines 1a, 1b, and 1c (see instructions)

| Name of activity | Current year | | Prior years | Overall gain or loss | |
|---|---|---|---|---|---|
| | **(a)** Net income (line 1a) | **(b)** Net loss (line 1b) | **(c)** Unallowed loss (line 1c) | **(d)** Gain | **(e)** Loss |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | SEE ATTACHED STATEMENT FOR WORKSHEET 1 | | | | |
| **Total.** Enter on Form 8582, lines 1a, 1b, and 1c ▶ | 518,224. | | −136,094. | | |

## Worksheet 2 - For Form 8582, Lines 2a and 2b (see instructions)

| Name of activity | **(a)** Current year deductions (line 2a) | **(b)** Prior year unallowed deductions (line 2b) | **(c)** Overall loss |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| **Total.** Enter on Form 8582, lines 2a and 2b ▶ | | | |

## Worksheet 3 - For Form 8582, Lines 3a, 3b, and 3c (see instructions)

| Name of activity | Current year | | Prior years | Overall gain or loss | |
|---|---|---|---|---|---|
| | **(a)** Net income (line 3a) | **(b)** Net loss (line 3b) | **(c)** Unallowed loss (line 3c) | **(d)** Gain | **(e)** Loss |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | SEE ATTACHED STATEMENT FOR WORKSHEET 3 | | | | |
| **Total.** Enter on Form 8582, lines 3a, 3b, and 3c ▶ | | | −25,848. | | |

## Worksheet 4 - Use This Worksheet if an Amount is Shown on Form 8582, Line 10 or 14. See instructions.

| Name of activity | Form or schedule and line number to be reported on (see instructions) | **(a)** Loss | **(b)** Ratio | **(c)** Special allowance | **(d)** Subtract column (c) from column (a) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Total** ▶ | | | | | |

## Worksheet 5 - Allocation of Unallowed Losses (see instructions)

| Name of activity | Form or schedule and line number to be reported on (see instructions) | **(a)** Loss | **(b)** Ratio | **(c)** Unallowed loss |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **Total** ▶ | | | | |

019762  12-01-20                                                                     Form **8582** (2020)

AMENDED

**Form 8283**

(Rev. December 2020)

Department of the Treasury
Internal Revenue Service

# Noncash Charitable Contributions

▶ Attach one or more Forms 8283 to your tax return if you claimed a total deduction
of over $500 for all contributed property.
▶ Go to www.irs.gov/Form8283 for instructions and the latest information.

OMB. No. 1545-0074

Attachment
Sequence No. **155**

Name(s) shown on your income tax return

TONY D. & ELIZABETH A. TOWNLEY

Identifying number

**Note:** Figure the amount of your contribution deduction before completing this form. See your tax return instructions.

**Section A.** **Donated Property of $5,000 or Less and Publicly Traded Securities -** List in this section **only** an item
(or a group of similar items) for which you claimed a deduction of $5,000 or less. Also list publicly traded
securities and certain other property even if the deduction is more than $5,000. See instructions.

**Part I** | Information on Donated Property - If you need more space, attach a statement.

| 1 | (a) Name and address of the donee organization | (b) If donated property is a vehicle, check the box. Also enter the vehicle identification number (unless Form 1098-C is attached) | (c) Description and condition of donated property (For a vehicle, enter the year, make, model, and mileage. For securities and other property, see instructions.) |
|---|---|---|---|
| **A** | PIEDMONT ATHENS REGIONAL FDN 1199 PRINCE, ATHENS, GA 30606 | ☐ | 345 SHS OF CHIPOTLE MEXICAN GRILL PUBLICLY TR |
| **B** | | ☐ | |
| **C** | | ☐ | |
| **D** | | ☐ | |
| **E** | | ☐ | |

**Note:** If the amount you claimed as a deduction for an item is $500 or less, you do not have to complete columns (e), (f), and (g).

| | (d) Date of the contribution | (e) Date acquired by donor (mo., yr.) | (f) How acquired by donor | (g) Donor's cost or adjusted basis | (h) Fair market value (see instructions) | (i) Method used to determine the fair market value |
|---|---|---|---|---|---|---|
| **A** | 12/21/20 | 03/20 | PURCHASE | 226,583. | 485,557. | HIGH LOW METHOD |
| **B** | | | | | | |
| **C** | | | | | | |
| **D** | | | | | | |
| **E** | | | | | | |

**Section B.** **Donated Property Over $5,000 (Except Publicly Traded Securities, Vehicles, Intellectual Property or Inventory Reportable**

**in Section A)** - Complete this section for one item (or a group of similar items) for which you claimed a deduction of more than
$5,000 per item or group (except contributions reportable in Section A). Provide a separate form for each item donated unless it
is part of a group of similar items. A qualified appraisal is generally required for items reportable in Section B. See instructions.

**Part I** | Information on Donated Property

2  Check the box that describes the type of property donated.

| a | ☐ Art* (contribution of $20,000 or more) | e | ☐ Other Real Estate | i | ☐ Vehicles |
|---|---|---|---|---|---|
| b | ☐ Qualified Conservation Contribution | f | ☐ Securities | j | ☐ Clothing and household items |
| c | ☐ Equipment | g | ☐ Collectibles** | k | ☐ Other |
| d | ☐ Art* (contribution of less than $20,000) | h | ☐ Intellectual Property | | |

*Art includes paintings, sculptures, watercolors, prints, drawings, ceramics, antiques, decorative arts, textiles, carpets, silver, rare manuscripts,
historical memorabilia, and other similar objects.

**Collectibles include coins, stamps, books, gems, jewelry, sports memorabilia, dolls, etc., but not art as defined above.

**Note:** In certain cases, you must attach a qualified appraisal of the property. See instructions.

| 3 | (a) Description of donated property (if you need more space, attach a separate statement) | (b) If any tangible personal property or real property was donated, give a brief summary of the overall physical condition of the property at the time of the gift | (c) Appraised fair market value |
|---|---|---|---|
| **A** | | | |
| **B** | | | |
| **C** | | | |

| | (d) Date acquired by donor (mo., yr.) | (e) How acquired by donor | (f) Donor's cost or adjusted basis | (g) For bargain sales, enter amount received and attach a separate statement. | (h) Amount claimed as a deduction (see instructions) | (i) Date of contribution (see instructions) |
|---|---|---|---|---|---|---|
| **A** | | | | | | |
| **B** | | | | | | |
| **C** | | | | | | |

LHA  **For Paperwork Reduction Act Notice, see separate instructions.**

Form **8283** (Rev. 12-2020)

019931  12-01-20

AMENDED

| Form **4562** | **Depreciation and Amortization** | OMB No. 1545-0172 |
|---|---|---|
| | **(Including Information on Listed Property)** | **2020** |
| Department of the Treasury Internal Revenue Service   (99) | ▶ Attach to your tax return.  SCHEDULE F- 1 ▶ Go to www.irs.gov/Form4562 for instructions and the latest information. | Attachment Sequence No. **179** |

| Name(s) shown on return | Business or activity to which this form relates | Identifying number |
|---|---|---|
| TONY D. & ELIZABETH A. TOWNLEY | LOG CREEK TRUST | |

**Part I**  Election To Expense Certain Property Under Section 179  **Note:** If you have any listed property, complete Part V before you complete Part I.

| | | |
|---|---|---|
| 1 | Maximum amount (see instructions) | **1** |
| 2 | Total cost of section 179 property placed in service (see instructions) | **2** |
| 3 | Threshold cost of section 179 property before reduction in limitation | **3** |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | **4** |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | **5** |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| 7 | Listed property. Enter the amount from line 29 | **7** | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | **8** | |
| 9 | Tentative deduction. Enter the **smaller** of line 5 or line 8 | **9** | |
| 10 | Carryover of disallowed deduction from line 13 of your 2019 Form 4562 | **10** | |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 | **11** | |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but don't enter more than line 11 | **12** | |
| 13 | Carryover of disallowed deduction to 2021. Add lines 9 and 10, less line 12 ▶ | **13** | |

**Note:** Don't use Part II or Part III below for listed property. Instead, use Part V.

**Part II**  Special Depreciation Allowance and Other Depreciation (Don't include listed property.)

| | | |
|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year | **14** |
| 15 | Property subject to section 168(f)(1) election | **15** |
| 16 | Other depreciation (including ACRS) | **16** |

**Part III**  MACRS Depreciation (Don't include listed property. See instructions.)

**Section A**

| | | |
|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2020 | **17** |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here ▶ ☐ | |

**Section B - Assets Placed in Service During 2020 Tax Year Using the General Depreciation System**

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only - see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| 19a   3-year property | | | | | | |
| b   5-year property | | | | | | |
| c   7-year property | | | | | | |
| d   10-year property | | | | | | |
| e   15-year property | | | | | | |
| f   20-year property | | | | | | |
| g   25-year property | | | 25 yrs. | | S/L | |
| h   Residential rental property | / | | 27.5 yrs. | MM | S/L | |
| | / | | 27.5 yrs. | MM | S/L | |
| i   Nonresidential real property | / | | 39 yrs. | MM | S/L | |
| | / | | | MM | S/L | |

**Section C - Assets Placed in Service During 2020 Tax Year Using the Alternative Depreciation System**

| | | | | | | |
|---|---|---|---|---|---|---|
| 20a   Class life | | | | | S/L | |
| b   12-year | | | 12 yrs. | | S/L | |
| c   30-year | / | | 30 yrs. | MM | S/L | |
| d   40-year | / | | 40 yrs. | MM | S/L | |

**Part IV**  Summary (See instructions.)

| | | |
|---|---|---|
| 21 | Listed property. Enter amount from line 28 | **21** |
| 22 | **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations - see instr. | **22**   0. |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | **23** |

016251 12-18-20   LHA  **For Paperwork Reduction Act Notice, see separate instructions.**   Form **4562** (2020)

**AMENDED**

Form 4562 (2020)    TONY D. & ELIZABETH A. TOWNLEY    Page **2**

| Part V | **Listed Property** (Include automobiles, certain other vehicles, certain aircraft, and property used for entertainment, recreation, or amusement.) |
|---|---|

**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A - Depreciation and Other Information (Caution:** See the instructions for limits for passenger automobiles. **)**

24a Do you have evidence to support the business/investment use claimed?  [ ] Yes [ ] No   24b If "Yes," is the evidence written?  [ ] Yes [ ] No

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/ investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|
| 25 Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use | | | | | | 25 | | |
| 26 Property used more than 50% in a qualified business use: | | | | | | | | |
| | : : | % | | | | | | |
| | : : | % | | | | | | |
| | : : | % | | | | | | |
| 27 Property used 50% or less in a qualified business use: | | | | | | | | |
| | : : | % | | | S/L - | | | |
| | : : | % | | | S/L - | | | |
| | : : | % | | | S/L - | | | |
| 28 Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1 | | | | | | 28 | | |
| 29 Add amounts in column (i), line 26. Enter here and on line 7, page 1 | | | | | | | 29 | |

**Section B - Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other "more than 5% owner," or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | | (a) Vehicle | | (b) Vehicle | | (c) Vehicle | | (d) Vehicle | | (e) Vehicle | | (f) Vehicle | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 Total business/investment miles driven during the year (**don't** include commuting miles) | | | | | | | | | | | | | |
| 31 Total commuting miles driven during the year | | | | | | | | | | | | | |
| 32 Total other personal (noncommuting) miles driven | | | | | | | | | | | | | |
| 33 Total miles driven during the year. Add lines 30 through 32 | | | | | | | | | | | | | |
| 34 Was the vehicle available for personal use during off-duty hours? | | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 35 Was the vehicle used primarily by a more than 5% owner or related person? | | | | | | | | | | | | | |
| 36 Is another vehicle available for personal use? | | | | | | | | | | | | | |

**Section C - Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons.

| | Yes | No |
|---|---|---|
| 37 Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees? | | |
| 38 Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners | | |
| 39 Do you treat all use of vehicles by employees as personal use? | | |
| 40 Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? | | |
| 41 Do you meet the requirements concerning qualified automobile demonstration use? | | |

**Note:** If your answer to 37, 38, 39, 40, or 41 is "Yes," don't complete Section B for the covered vehicles.

| Part VI | Amortization |
|---|---|

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|
| 42 Amortization of costs that begins during your 2020 tax year: | | | | | |
| | : : | | | | |
| | : : | | | | |
| 43 Amortization of costs that began before your 2020 tax year | | | | 43 | |
| 44 **Total.** Add amounts in column (f). See the instructions for where to report | | | | 44 | |

016252  12-18-20    Form **4562** (2020)

AMENDED

OMB No. 1545-0172

Form **4562**

**Depreciation and Amortization**
**(Including Information on Listed Property)**

▶ Attach to your tax return.  SCHEDULE E- 2

▶ Go to www.irs.gov/Form4562 for instructions and the latest information.

Department of the Treasury
Internal Revenue Service    (99)

**2020**

Attachment
Sequence No. **179**

Name(s) shown on return

TONY D. & ELIZABETH A. TOWNLEY

Business or activity to which this form relates

FRAZER CREEK
INVESTMENTS, LLC - VARIO

Identifying number

**Part I**  Election To Expense Certain Property Under Section 179  **Note:**  If you have any listed property, complete Part V before you complete Part I.

| | | | |
|---|---|---|---|
| 1 | Maximum amount (see instructions) | **1** | |
| 2 | Total cost of section 179 property placed in service (see instructions) | **2** | |
| 3 | Threshold cost of section 179 property before reduction in limitation | **3** | |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | **4** | |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | **5** | |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| 7 | Listed property. Enter the amount from line 29 | **7** | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | **8** | |
| 9 | Tentative deduction. Enter the **smaller** of line 5 or line 8 | **9** | |
| 10 | Carryover of disallowed deduction from line 13 of your 2019 Form 4562 | **10** | |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 | **11** | |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but don't enter more than line 11 | **12** | |
| 13 | Carryover of disallowed deduction to 2021. Add lines 9 and 10, less line 12 ▶ | **13** | |

**Note:** Don't use Part II or Part III below for listed property. Instead, use Part V.

**Part II**  Special Depreciation Allowance and Other Depreciation (Don't include listed property.)

| | | | |
|---|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year | **14** | |
| 15 | Property subject to section 168(f)(1) election | **15** | |
| 16 | Other depreciation (including ACRS) | **16** | |

**Part III**  MACRS Depreciation (Don't include listed property. See instructions.)

**Section A**

| | | | |
|---|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2020 | **17** | 268,370. |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here ▶ ☐ | | |

**Section B - Assets Placed in Service During 2020 Tax Year Using the General Depreciation System**

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only - see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| **19a** 3-year property | | | | | | |
| **b** 5-year property | | | | | | |
| **c** 7-year property | | | | | | |
| **d** 10-year property | | | | | | |
| **e** 15-year property | | | | | | |
| **f** 20-year property | | | | | | |
| **g** 25-year property | | | 25 yrs. | | S/L | |
| **h** Residential rental property | / | STATEMENT 51 | 27.5 yrs. | MM | S/L | 39,785. |
| | / | | 27.5 yrs. | MM | S/L | |
| **i** Nonresidential real property | / | | 39 yrs. | MM | S/L | |
| | / | | | MM | S/L | |

**Section C - Assets Placed in Service During 2020 Tax Year Using the Alternative Depreciation System**

| | | | | | | |
|---|---|---|---|---|---|---|
| **20a** Class life | | | | | S/L | |
| **b** 12-year | | | 12 yrs. | | S/L | |
| **c** 30-year | / | | 30 yrs. | MM | S/L | |
| **d** 40-year | / | | 40 yrs. | MM | S/L | |

**Part IV**  Summary (See instructions.)

| | | | |
|---|---|---|---|
| 21 | Listed property. Enter amount from line 28 | **21** | |
| 22 | **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations - see instr. | **22** | 308,155. |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | **23** | |

016251  12-18-20    LHA  **For Paperwork Reduction Act Notice, see separate instructions.**    Form **4562** (2020)

AMENDED

Form 4562 (2020)    **TONY D. & ELIZABETH A. TOWNLEY**    Page **2**

| Part V | **Listed Property** (Include automobiles, certain other vehicles, certain aircraft, and property used for entertainment, recreation, or amusement.) |

**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A - Depreciation and Other Information (Caution:** See the instructions for limits for passenger automobiles.**)**

24a Do you have evidence to support the business/investment use claimed? ☐ Yes ☐ No   24b If "Yes," is the evidence written? ☐ Yes ☐ No

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/ investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|
| **25** Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use | | | | | **25** | | | |
| **26** Property used more than 50% in a qualified business use: | | | | | | | | |
| | : : | % | | | | | | |
| | : : | % | | | | | | |
| | : : | % | | | | | | |
| **27** Property used 50% or less in a qualified business use: | | | | | | | | |
| | : : | % | | | S/L - | | | |
| | : : | % | | | S/L - | | | |
| | : : | % | | | S/L - | | | |
| **28** Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1 | | | | | **28** | | | |
| **29** Add amounts in column (i), line 26. Enter here and on line 7, page 1 | | | | | | | **29** | |

**Section B - Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other "more than 5% owner," or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | | (a) Vehicle | | (b) Vehicle | | (c) Vehicle | | (d) Vehicle | | (e) Vehicle | | (f) Vehicle | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **30** Total business/investment miles driven during the year (**don't** include commuting miles) | | | | | | | | | | | | | |
| **31** Total commuting miles driven during the year | | | | | | | | | | | | | |
| **32** Total other personal (noncommuting) miles driven | | | | | | | | | | | | | |
| **33** Total miles driven during the year. Add lines 30 through 32 | | | | | | | | | | | | | |
| **34** Was the vehicle available for personal use during off-duty hours? | | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| **35** Was the vehicle used primarily by a more than 5% owner or related person? | | | | | | | | | | | | | |
| **36** Is another vehicle available for personal use? | | | | | | | | | | | | | |

**Section C - Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons.

| | Yes | No |
|---|---|---|
| **37** Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees? | | |
| **38** Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners | | |
| **39** Do you treat all use of vehicles by employees as personal use? | | |
| **40** Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? | | |
| **41** Do you meet the requirements concerning qualified automobile demonstration use? | | |

**Note:** If your answer to 37, 38, 39, 40, or 41 is "Yes," don't complete Section B for the covered vehicles.

| Part VI | **Amortization** |

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|
| **42** Amortization of costs that begins during your 2020 tax year: | | | | | |
| | : : | | | | |
| | : : | | | | |
| **43** Amortization of costs that began before your 2020 tax year | | | | **43** | |
| **44 Total.** Add amounts in column (f). See the instructions for where to report | | | | **44** | |

016252  12-18-20    Form **4562** (2020)

Case 3:22-cv-00107-CDL    Document 1    Filed 10/28/22    Page 58 of 666

Form **4562**

Department of the Treasury
Internal Revenue Service (99)

**Depreciation and Amortization**
**(Including Information on Listed Property)**

▶ Attach to your tax return.  SCHEDULE E- 3
▶ Go to www.irs.gov/Form4562 for instructions and the latest information.

OMB No. 1545-0172

**2020**

Attachment
Sequence No. **179**

Name(s) shown on return: TONY D. & ELIZABETH A. TOWNLEY

Business or activity to which this form relates: LANE CREEK INVESTMENTS, LLC – VARIOUS (LANE CREE

Identifying number:

**Part I**  Election To Expense Certain Property Under Section 179  **Note:** If you have any listed property, complete Part V before you complete Part I.

| | | |
|---|---|---|
| 1 | Maximum amount (see instructions) | 1 |
| 2 | Total cost of section 179 property placed in service (see instructions) | 2 |
| 3 | Threshold cost of section 179 property before reduction in limitation | 3 |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | 4 |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | 5 |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| 7 | Listed property. Enter the amount from line 29 | 7 | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | 8 | |
| 9 | Tentative deduction. Enter the **smaller** of line 5 or line 8 | 9 | |
| 10 | Carryover of disallowed deduction from line 13 of your 2019 Form 4562 | 10 | |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 | 11 | |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but don't enter more than line 11 | 12 | |
| 13 | Carryover of disallowed deduction to 2021. Add lines 9 and 10, less line 12   ▶ | 13 | |

**Note:** Don't use Part II or Part III below for listed property. Instead, use Part V.

**Part II**  Special Depreciation Allowance and Other Depreciation (Don't include listed property.)

| | | |
|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year | 14 |
| 15 | Property subject to section 168(f)(1) election | 15 |
| 16 | Other depreciation (including ACRS) | 16 |

**Part III**  MACRS Depreciation (Don't include listed property. See instructions.)

**Section A**

| | | |
|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2020 | 17 | 36,451. |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here   ▶ ☐ | | |

**Section B - Assets Placed in Service During 2020 Tax Year Using the General Depreciation System**

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only - see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| 19a  3-year property | | | | | | |
| b  5-year property | | | | | | |
| c  7-year property | | | | | | |
| d  10-year property | | | | | | |
| e  15-year property | | | | | | |
| f  20-year property | | | | | | |
| g  25-year property | | | 25 yrs. | | S/L | |
| h  Residential rental property | / | | 27.5 yrs. | MM | S/L | |
| | / | | 27.5 yrs. | MM | S/L | |
| i  Nonresidential real property | / | STATEMENT 52 | 39 yrs. | MM | S/L | |
| | / | | | MM | S/L | 104,840. |

**Section C - Assets Placed in Service During 2020 Tax Year Using the Alternative Depreciation System**

| | | | | | | |
|---|---|---|---|---|---|---|
| 20a  Class life | | | | | S/L | |
| b  12-year | | | 12 yrs. | | S/L | |
| c  30-year | / | | 30 yrs. | MM | S/L | |
| d  40-year | / | | 40 yrs. | MM | S/L | |

**Part IV**  Summary (See instructions.)

| | | |
|---|---|---|
| 21 | Listed property. Enter amount from line 28 | 21 | |
| 22 | **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations - see instr. | 22 | 141,291. |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | 23 | |

016251  12-18-20    LHA  **For Paperwork Reduction Act Notice, see separate instructions.**

Form **4562** (2020)

**AMENDED**

Form 4562 (2020)          TONY D. & ELIZABETH A. TOWNLEY                                          Page **2**

| **Part V** | **Listed Property** (Include automobiles, certain other vehicles, certain aircraft, and property used for entertainment, recreation, or amusement.) |

**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A - Depreciation and Other Information (Caution:** See the instructions for limits for passenger automobiles. **)**

24a Do you have evidence to support the business/investment use claimed? ☐ Yes ☐ No  24b If "Yes," is the evidence written? ☐ Yes ☐ No

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/ investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|
| 25 Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use | | | | | **25** | | | |
| 26 Property used more than 50% in a qualified business use: | | | | | | | | |
| | : : | % | | | | | | |
| | : : | % | | | | | | |
| | : : | % | | | | | | |
| 27 Property used 50% or less in a qualified business use: | | | | | | | | |
| | : : | % | | | S/L - | | | |
| | : : | % | | | S/L - | | | |
| | : : | % | | | S/L - | | | |
| 28 Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1 | | | | **28** | | | | |
| 29 Add amounts in column (i), line 26. Enter here and on line 7, page 1 | | | | | | | **29** | |

**Section B - Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other "more than 5% owner," or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | (a) Vehicle | | (b) Vehicle | | (c) Vehicle | | (d) Vehicle | | (e) Vehicle | | (f) Vehicle | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 Total business/investment miles driven during the year (**don't** include commuting miles) | | | | | | | | | | | | |
| 31 Total commuting miles driven during the year | | | | | | | | | | | | |
| 32 Total other personal (noncommuting) miles driven | | | | | | | | | | | | |
| 33 Total miles driven during the year. Add lines 30 through 32 | | | | | | | | | | | | |
| 34 Was the vehicle available for personal use during off-duty hours? | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 35 Was the vehicle used primarily by a more than 5% owner or related person? | | | | | | | | | | | | |
| 36 Is another vehicle available for personal use? | | | | | | | | | | | | |

**Section C - Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons.

| | Yes | No |
|---|---|---|
| 37 Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees? | | |
| 38 Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners | | |
| 39 Do you treat all use of vehicles by employees as personal use? | | |
| 40 Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? | | |
| 41 Do you meet the requirements concerning qualified automobile demonstration use? | | |

**Note:** If your answer to 37, 38, 39, 40, or 41 is "Yes," don't complete Section B for the covered vehicles.

| **Part VI** | **Amortization** |

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|
| 42 Amortization of costs that begins during your 2020 tax year: | | | | | |
| | : : | | | | |
| | : : | | | | |
| 43 Amortization of costs that began before your 2020 tax year | | | | **43** | |
| 44 **Total.** Add amounts in column (f). See the instructions for where to report | | | | **44** | |

016252  12-18-20                                                                               Form **4562** (2020)

**AMENDED**

OMB No. 1545-0172

Form **4562**

Department of the Treasury
Internal Revenue Service  (99)

# Depreciation and Amortization
## (Including Information on Listed Property)
▶ Attach to your tax return.  SCHEDULE C- 7
▶ Go to www.irs.gov/Form4562 for instructions and the latest information.

**2020**

Attachment
Sequence No. **179**

Name(s) shown on return: TONY D. & ELIZABETH A. TOWNLEY

Business or activity to which this form relates: OTF MANAGEMENT, LLC

Identifying number:

### Part I — Election To Expense Certain Property Under Section 179  Note: If you have any listed property, complete Part V before you complete Part I.

| | | |
|---|---|---|
| 1 Maximum amount (see instructions) | **1** | |
| 2 Total cost of section 179 property placed in service (see instructions) | **2** | |
| 3 Threshold cost of section 179 property before reduction in limitation | **3** | |
| 4 Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | **4** | |
| 5 Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | **5** | |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| 7 Listed property. Enter the amount from line 29 | **7** | | |
| 8 Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | | **8** | |
| 9 Tentative deduction. Enter the **smaller** of line 5 or line 8 | | **9** | |
| 10 Carryover of disallowed deduction from line 13 of your 2019 Form 4562 | | **10** | |
| 11 Business income limitation. Enter the smaller of business income (not less than zero) or line 5 | | **11** | |
| 12 Section 179 expense deduction. Add lines 9 and 10, but don't enter more than line 11 | | **12** | |
| 13 Carryover of disallowed deduction to 2021. Add lines 9 and 10, less line 12 ▶ | **13** | | |

**Note:** Don't use Part II or Part III below for listed property. Instead, use Part V.

### Part II — Special Depreciation Allowance and Other Depreciation (Don't include listed property.)

| | | |
|---|---|---|
| 14 Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year | **14** | |
| 15 Property subject to section 168(f)(1) election | **15** | |
| 16 Other depreciation (including ACRS) | **16** | |

### Part III — MACRS Depreciation (Don't include listed property. See instructions.)

#### Section A

| | | |
|---|---|---|
| 17 MACRS deductions for assets placed in service in tax years beginning before 2020 | **17** | 1,293. |
| 18 If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here ▶ ☐ | | |

#### Section B - Assets Placed in Service During 2020 Tax Year Using the General Depreciation System

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only - see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| 19a  3-year property | | | | | | |
| b  5-year property | | | | | | |
| c  7-year property | | | | | | |
| d  10-year property | | | | | | |
| e  15-year property | | | | | | |
| f  20-year property | | | | | | |
| g  25-year property | | | 25 yrs. | | S/L | |
| h  Residential rental property | / | | 27.5 yrs. | MM | S/L | |
| | / | | 27.5 yrs. | MM | S/L | |
| i  Nonresidential real property | / | | 39 yrs. | MM | S/L | |
| | / | | | MM | S/L | |

#### Section C - Assets Placed in Service During 2020 Tax Year Using the Alternative Depreciation System

| | | | | | | |
|---|---|---|---|---|---|---|
| 20a  Class life | | | | | S/L | |
| b  12-year | | | 12 yrs. | | S/L | |
| c  30-year | / | | 30 yrs. | MM | S/L | |
| d  40-year | / | | 40 yrs. | MM | S/L | |

### Part IV — Summary (See instructions.)

| | | |
|---|---|---|
| 21 Listed property. Enter amount from line 28 | **21** | 18,100. |
| 22 **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations - see instr. | **22** | 19,393. |
| 23 For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | **23** | |

016251 12-18-20    LHA  **For Paperwork Reduction Act Notice, see separate instructions.**                Form **4562** (2020)

**AMENDED**

Form 4562 (2020)　　　　TONY D. & ELIZABETH A. TOWNLEY　　　　　　　　　　　Page **2**

**Part V** | Listed Property (Include automobiles, certain other vehicles, certain aircraft, and property used for entertainment, recreation, or amusement.)

**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A - Depreciation and Other Information (Caution:** See the instructions for limits for passenger automobiles. **)**

| 24a Do you have evidence to support the business/investment use claimed? | [X] Yes | No | 24b If "Yes," is the evidence written? | [X] Yes | No |
|---|---|---|---|---|---|

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/ investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|
| **25** Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use | | | | | | **25** | 18,100. | |
| **26** Property used more than 50% in a qualified business use: | | | | | | | | |
| 2021 LINCOLN | | % | | | | | | |
| NAVIGATOR | 122320 | 100.00 % | 91,406. | 73,306. | 5.00 | 200DB-MQ | | |
| | | % | | | | | | |
| **27** Property used 50% or less in a qualified business use: | | | | | | | | |
| | : : | % | | | | S/L - | | |
| | : : | % | | | | S/L - | | |
| | : : | % | | | | S/L - | | |
| **28** Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1 | | | | | | **28** | 18,100. | |
| **29** Add amounts in column (i), line 26. Enter here and on line 7, page 1 | | | | | | | **29** | |

**Section B - Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other "more than 5% owner," or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | (a) Vehicle | (b) Vehicle | (c) Vehicle | (d) Vehicle | (e) Vehicle | (f) Vehicle |
|---|---|---|---|---|---|---|
| **30** Total business/investment miles driven during the year (**don't** include commuting miles) | | 1 0 | | | | |
| **31** Total commuting miles driven during the year | | | | | | |
| **32** Total other personal (noncommuting) miles driven | | | | | | |
| **33** Total miles driven during the year. Add lines 30 through 32 | | 0 | | | | |
| **34** Was the vehicle available for personal use during off-duty hours? | Yes　No | Yes　No | Yes　No | Yes　No | Yes　No | Yes　No |
| **35** Was the vehicle used primarily by a more than 5% owner or related person? | | | | | | |
| **36** Is another vehicle available for personal use? | | | | | | |

**Section C - Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons.

| | Yes | No |
|---|---|---|
| **37** Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees? | | |
| **38** Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners | | |
| **39** Do you treat all use of vehicles by employees as personal use? | | |
| **40** Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? | | |
| **41** Do you meet the requirements concerning qualified automobile demonstration use? | | |
| **Note:** If your answer to 37, 38, 39, 40, or 41 is "Yes," don't complete Section B for the covered vehicles. | | |

**Part VI** | Amortization

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|
| **42** Amortization of costs that begins during your 2020 tax year: | | | | | |
| | : : | | | | |
| | : : | | | | |
| **43** Amortization of costs that began before your 2020 tax year | | | **43** | | |
| **44 Total.** Add amounts in column (f). See the instructions for where to report | | | **44** | | |

016252  12-18-20　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Form **4562** (2020)

Case 3:22-cv-00107-CDL    Document 1-1    Filed 10/28/22    Page 62 of 666

AMENDED

Form **8990**
(Rev. May 2020)
Department of the Treasury
Internal Revenue Service

## Limitation on Business Interest Expense Under Section 163(j)

▶ Attach to your tax return.

▶ Go to www.irs.gov/Form8990 for instructions and the latest information.

OMB No. 1545-0123

Taxpayer name(s) shown on tax return
TONY D. & ELIZABETH A. TOWNLEY

Identification number

If Form 8990 relates to an information return for a foreign entity (for example, Form 5471), enter:

Name of foreign entity ▶

Employer identification number, if any ▶

Reference ID number ▶

| Part I | Computation of Allowable Business Interest Expense |
|---|---|

*Part I is completed by all taxpayers subject to section 163(j). Schedule A and Schedule B need to be completed before Part I when the taxpayer is a partner or shareholder of a pass-through entity subject to section 163(j).*

### Section I - Business Interest Expense

| | | | | | |
|---|---|---|---|---|---|
| 1 | Current year business interest expense (not including floor plan financing interest expense), before the section 163(j) limitation | 1 | 1,008,452. | | |
| 2 | Disallowed business interest expense carryforwards from prior years. (Does not apply to a partnership) | 2 | | | |
| 3 | Partner's excess business interest expense treated as paid or accrued in current year (Schedule A, line 44, column (h)) | 3 | | | |
| 4 | Floor plan financing interest expense. See instructions | 4 | | | |
| 5 | **Total business interest expense.** Add lines 1 through 4 | ▶ | 5 | 1,008,452. |

### Section II - Adjusted Taxable Income

**Taxable Income**

| | | | |
|---|---|---|---|
| 6 | **Taxable income.** See instructions | 6 | 860,557,093. |

**Additions** (adjustments to be made if amounts are taken into account on line 6)

| | | | | | |
|---|---|---|---|---|---|
| 7 | Any item of loss or deduction that is not properly allocable to a trade or business of the taxpayer. See instructions | 7 | 124,232,311. | | |
| 8 | Any business interest expense not from a pass-through entity. See instructions | 8 | 620,924. | | |
| 9 | Amount of any net operating loss deduction under section 172 | 9 | | | |
| 10 | Amount of any qualified business income deduction allowed under section 199A | 10 | | | |
| 11 | Deduction allowable for depreciation, amortization, or depletion attributable to a trade or business. See instructions | 11 | 468,839. | | |
| 12 | Amount of any loss or deduction items from a pass-through entity. See instructions | 12 | 5,120,698. | | |
| 13 | Other additions. See instructions | 13 | | | |
| 14 | Total current year partner's excess taxable income (Schedule A, line 44, column (f)) | 14 | 49,079,588. | | |
| 15 | Total current year S corporation shareholder's excess taxable income (Schedule B, line 46, column (c)) | 15 | | | |
| 16 | **Total.** Add lines 7 through 15 | ▶ | 16 | 179,522,360. |

**Reductions** (adjustments to be made if amounts are taken into account on line 6)

| | | | | | |
|---|---|---|---|---|---|
| 17 | Any item of income or gain that is not properly allocable to a trade or business of the taxpayer. See instructions | 17 | ( ) | | |
| 18 | Any business interest income not from a pass-through entity. See instructions | 18 | ( ) | | |
| 19 | Amount of any income or gain items from a pass-through entity. See instructions | 19 | ( 51,879,351.) | | |
| 20 | Other reductions. See instructions | 20 | ( ) | | |
| 21 | **Total.** Combine lines 17 through 20 | ▶ | 21 | ( 51,879,351.) |
| 22 | **Adjusted taxable income.** Combine lines 6, 16, and 21. (If zero or less, enter -0-.) | ▶ | 22 | 988,200,102. |

LHA  **For Paperwork Reduction Act Notice, see the instructions.**

Form **8990** (Rev. 5-2020)

023211 06-29-20

Case 3:22-cv-00107-CDL    Document 1-3    Filed 10/28/22    Page 63 of 666

## Section III - Business Interest Income

| | | | |
|---|---|---|---|
| 23 | Current year business interest income. See instructions | 23 | 386,301. |
| 24 | Excess business interest income from pass-through entities (total of Schedule A, line 44, column (g), and Schedule B, line 46, column (d)) | 24 | |
| 25 | **Total.** Add lines 23 and 24 ▶ | 25 | 386,301. |

## Section IV - Section 163(j) Limitation Calculations

### Limitation on Business Interest Expense

| | | | |
|---|---|---|---|
| 26 | Multiply adjusted taxable income (line 22) by the applicable percentage. See instructions | 26 | 494,100,051. |
| 27 | Business interest income (line 25) | 27 | 386,301. |
| 28 | Floor plan financing interest expense (line 4) | 28 | |
| 29 | **Total.** Add lines 26, 27, and 28 ▶ | 29 | 494,486,352. |

### Allowable Business Interest Expense

| | | | |
|---|---|---|---|
| 30 | **Total current year business interest expense deduction.** See instructions | 30 | 1,008,452. |

### Carryforward

| | | | |
|---|---|---|---|
| 31 | **Disallowed business interest expense.** Subtract line 29 from line 5. (If zero or less, enter -0-.) | 31 | |

| Part II | Partnership Pass-Through Items |
|---|---|

*Part II is only completed by a partnership that is subject to section 163(j). The partnership items below are allocated to the partners and are not carried forward by the partnership. See the instructions for more information.*

### Excess Business Interest Expense

| | | | |
|---|---|---|---|
| 32 | **Excess business interest expense.** Enter amount from line 31 | 32 | |

### Excess Taxable Income  (If you entered an amount on line 32, skip lines 33 through 37.)

| | | | |
|---|---|---|---|
| 33 | Subtract the sum of lines 4 and 25 from line 5. (If zero or less, enter -0-.) | 33 | |
| 34 | Subtract line 33 from line 26. (If zero or less, enter -0-.) | 34 | |
| 35 | Divide line 34 by line 26. Enter the result as a decimal. (If line 26 is zero, enter -0-.) | 35 | |
| 36 | **Excess taxable income.** Multiply line 35 by line 22 | 36 | |

### Excess Business Interest Income

| | | | |
|---|---|---|---|
| 37 | **Excess business interest income.** Subtract the sum of lines 1, 2, and 3 from line 25. (If zero or less, enter -0-.) | 37 | |

| Part III | S Corporation Pass-Through Items |
|---|---|

*Part III is only completed by S corporations that are subject to section 163(j). The S corporation items below are allocated to the shareholders. See the instructions for more information.*

### Excess Taxable Income

| | | | |
|---|---|---|---|
| 38 | Subtract the sum of lines 4 and 25 from line 5. (If zero or less, enter -0-.) | 38 | |
| 39 | Subtract line 38 from line 26. (If zero or less, enter -0-.) | 39 | |
| 40 | Divide line 39 by line 26. Enter the result as a decimal. (If line 26 is zero, enter -0-.) | 40 | |
| 41 | **Excess taxable income.** Multiply line 40 by line 22 | 41 | |

### Excess Business Interest Income

| | | | |
|---|---|---|---|
| 42 | **Excess business interest income.** Subtract the sum of lines 1, 2, and 3 from line 25. (If zero or less, enter -0-.) | 42 | |

Form **8990** (Rev. 5-2020)

AMENDED

| **SCHEDULE A** | **Summary of Partner's Section 163(j) Excess Items** | | | | | | | | |

*Any taxpayer that owns an interest in a partnership subject to section 163(j) should complete Schedule A before completing Part I.*

| | **(a)** Name of partnership | **(b)** EIN | Excess Business Interest Expense | | | **(f)** Current year excess taxable income | **(g)** Current year excess business interest income | **(h)** Excess business interest expense treated as paid or accrued (see instructions) | **(i)** Current year excess business interest expense carryforward ((e) minus (h)) |
| | | | **(c)** Current year | **(d)** Prior year carryforward | **(e)** Total ((c) plus (d)) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **43** | CLUCKZ HOLDINGS, LLC | | 0. | 0. | 0. | 35972055. | 0. | 0. | 0. |
| | M&T AVIATION, LLC | | 0. | 0. | 0. | 137,150. | 0. | 0. | 0. |
| | ZAXBY'S OPERATING COMPANY, LP (TDT) | | 0. | 0. | 0. | 6,533,743. | 0. | 0. | 0. |
| | CLUCKZ HOLDINGS, LLC (SECG) | | 0. | 0. | 0. | 6,436,640. | 0. | 0. | 0. |
| | | | | | | | | | |
| | | | | | | | | | |
| **44** | **Total** ▶ | | | | | 49079588. | 0. | 0. | |

| **SCHEDULE B** | **Summary of S Corporation Shareholder's Excess Taxable Income and Excess Business Interest Income** | | |

*Any taxpayer that is required to complete Part I and is a shareholder in an S corporation that has excess taxable income or excess business interest income should complete Schedule B before completing Part I.*

| | **(a)** Name of S corporation | **(b)** EIN | **(c)** Current year excess taxable income | **(d)** Current year excess business interest income |
|---|---|---|---|---|
| **45** | | | | |
| | | | | |
| | | | | |
| | | | | |
| **46** | **Total** ▶ | | 0. | 0. |

023213 06-29-20

Case 3:22-cv-00107-CDL    Document 9    Filed 10/28/22    Page 65 of 666

**Business Interest Expense**

TONY D. & ELIZABETH A. TOWNLEY

| Description | Prior Disallowed Business Interest Expense | Business Interest Expense | Business Interest Expense Ratio | Limited Business Interest Expense | Disallowed Business Interest Expense |
|---|---|---|---|---|---|
| OTF MANAGEMENT, LLC | | 0. | | | |
| FRAZER CREEK INVESTMENTS, LLC | | 0. | | | |
| LANE CREEK INVESTMENTS, LLC | | 0. | | | |
| OGEECHEE TIMBER, LLC | | 346. | .000343 | 346. | |
| LOG CREEK TRUST | | 0. | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Total | | 0. | 346. | .0003 | 346. | 0. |

023301 04-01-20

AMENDED

**Worksheet for Figuring a Shareholder's Stock Basis**

*(Keep for your records.)*

Name of Entity: **PLUCKED CHICKEN, INC.**                    EIN: ▮▮▮▮▮▮▮

| | | |
|---|---|---:|
| 1. | Your stock basis at the beginning of the year | **1.** 21,503,379. |
| | **Increases:** | |
| 2. | Money and your adjusted basis in property contributed to the corporation | **2.** |
| 3. | Your share of the corporation's income (including tax-exempt income) reduced by any amount included in income with respect to clean renewable energy or (for bonds issued before October 4, 2008) qualified zone academy bonds | **3.** 906,516,216. |
| 4. | Other increases to basis, including your share of the excess of the deductions for depletion (other than oil and gas depletion) over the basis of the property subject to depletion                    SEE STATEMENT 53 | **4.** 790,714. |
| | **Decreases:** | |
| 5. | Distributions of money and the fair market value of property (excluding dividend distributions reportable on Form 1099-DIV and distributions in excess of basis (the sum of lines 1 through 4)) | **5.** ( 928,810,309.) |
| 6. | Enter: **(a)** Your share of the corporation's nondeductible expenses and the depletion deduction for any oil and gas property held by the corporation (but only to the extent your share of the property's adjusted basis exceeds the depletion deduction)  **or (b)** if the election under Regulations section 1.1367-1(g) applies, your share of the corporation's deductions and losses (include your entire share of the section 179 expense deduction even if your allowable section 179 expense deduction is smaller) adjusted, if the corporation made a charitable contribution of property, as described in (4) under <u>Basis Rules</u> | **6.** ( 531,748.) |
| 7. | If the election under Regulations section 1.1367-1(g) applies, enter the amount from 6(a) above. Otherwise enter the amount from 6(b) | **7.** ( 839,397.) |
| 8. | Enter the smaller of **(a)** the excess, as of the beginning of the tax year, of the amount you are owed for loans you made to the corporation over your basis in those loans  **or (b)** the sum of lines 1 through 7. This amount increases your loan basis | **8.** ( ) |
| 9. | Your stock basis in the corporation at the end of the year. Combine lines 1 through 8 | **9.** 0. |

019061
04-01-20

Case 3:22-cv-00107-CDL    Document 61    Filed 10/28/22    Page 67 of 666

## Shareholder Debt Basis Worksheet

Name of Entity:

**PLUCKED CHICKEN, INC.**

EIN:

### Debt Basis

| | | |
|---|---|---|
| 10. | Debt basis, beginning of year (Not less than zero) | 0. |
| 11. | Loans made during the year | |
| 12. | Restoration of debt basis (from line 8) | |
| 13. | Subtotal (Add lines 11 and 12) | |
| 14. | Less: Loan repayments | |
| 15. | Gain from loan repayments | |
| 16. | Other adjustments: | |
| 17. | Subtotal (Combine lines 10, 13, 14, 15 and 16) | |
| 18. | Applied against excess loss and deductions | |
| 19. | Debt basis, end of year (Not less than zero) | 0. |
| 20. | Total shareholder stock and debt basis, end of year (Add lines 9 and 19) (Not less than zero) | 0. |

019081
04-01-20

**AMENDED**
ALTERNATIVE MINIMUM TAX
**Worksheet for Figuring a Shareholder's Stock Basis**

*(Keep for your records.)*

Name of Entity:  **PLUCKED CHICKEN, INC.**                                   EIN: ▮▮▮▮▮▮▮

| | |
|---|---|
| 1. Your stock basis at the beginning of the year | 1. _20,877,794._ |
| **Increases:** | |
| 2. Money and your adjusted basis in property contributed to the corporation | 2. _____ |
| 3. Your share of the corporation's income (including tax-exempt income) reduced by any amount included in income with respect to clean renewable energy or (for bonds issued before October 4, 2008) qualified zone academy bonds | 3. _906,523,493._ |
| 4. Other increases to basis, including your share of the excess of the deductions for depletion (other than oil and gas depletion) over the basis of the property subject to depletion              **SEE STATEMENT 55** | 4. _790,714._ |
| **Decreases:** | |
| 5. Distributions of money and the fair market value of property (excluding dividend distributions reportable on Form 1099-DIV and distributions in excess of basis (the sum of lines 1 through 4)) | 5. ( 928,192,001.) |
| 6. Enter: **(a)** Your share of the corporation's nondeductible expenses and the depletion deduction for any oil and gas property held by the corporation (but only to the extent your share of the property's adjusted basis exceeds the depletion deduction)  **or (b)** if the election under Regulations section 1.1367-1(g) applies, your share of the corporation's deductions and losses (include your entire share of the section 179 expense deduction even if your allowable section 179 expense deduction is smaller) adjusted, if the corporation made a charitable contribution of property, as described in (4) under Basis Rules | 6. ( 531,748.) |
| 7. If the election under Regulations section 1.1367-1(g) applies, enter the amount from 6(a) above. Otherwise enter the amount from 6(b) | 7. ( 839,397.) |
| 8. Enter the smaller of **(a)** the excess, as of the beginning of the tax year, of the amount you are owed for loans you made to the corporation over your basis in those loans  **or (b)** the sum of lines 1 through 7. This amount increases your loan basis | 8. ( _____ ) |
| 9. Your stock basis in the corporation at the end of the year. Combine lines 1 through 8 | 9. _0._ |

019061
04-01-20

Case 3:22-cv-00107-CDL    Document 92    Filed 10/28/22    Page 69 of 666

## Shareholder Debt Basis Worksheet

Name of Entity:

**PLUCKED CHICKEN, INC.**

EIN: ███████████

### Debt Basis

| | | |
|---|---|---:|
| 10. | Debt basis, beginning of year (Not less than zero) | 0. |
| 11. | Loans made during the year | |
| 12. | Restoration of debt basis (from line 8) | |
| 13. | Subtotal (Add lines 11 and 12) | |
| 14. | Less: Loan repayments | |
| 15. | Gain from loan repayments | |
| 16. | Other adjustments: | |
| 17. | Subtotal (Combine lines 10, 13, 14, 15 and 16) | |
| 18. | Applied against excess loss and deductions | |
| 19. | Debt basis, end of year (Not less than zero) | 0. |
| 20. | Total shareholder stock and debt basis, end of year (Add lines 9 and 19) (Not less than zero) | 0. |

019081
04-01-20

AMENDED

STATEMENT OF DISCLOSURE OF ACTIVITY GROUPINGS PURSUANT TO IRC
SEC. 469 AND REG. 1.469-4

NAME: TONY D. TOWNLEY
TAXPAYER ID NUMBER:
████████████

FOR THE TAX YEAR ENDING DECEMBER 31, 2020

THE TAXPAYER HEREBY CONFIRMS THEIR EXISTING ELECTION TO GROUP THE
FOLLOWING ACTIVITIES AS A SINGLE ACTIVITY.  THE ACTIVITIES THAT ARE
GROUPED INTO ONE ACTIVITY CONSTITUTE AN APPROPRIATE ECONOMIC UNIT FOR
THE MEASUREMENT OF GAIN OR LOSS FOR THE PURPOSES OF IRC SECTION 469.

THE ACTIVITIES THAT ARE BEING GROUPED ARE AS FOLLOWS:

NAME: PLUCKED CHICKEN, INC. - PLUCKED CHICKEN, INC.
ADDRESS: 1040 FOUNDERS BLVD., ATHENS, GA 30606
EIN:
████████████

NAME: LAND WARRIORS, LLC - LAND WARRIORS, LLC
ADDRESS: 1280 SNOWS MILL RD, BOGART, GA 30622
EIN:
████████████

NAME: CLUCKZ HOLDINGS, LLC
ADDRESS: 1040 FOUNDERS BLVD., ATHENS, GA 30606
EIN:
████████████

NAME: M&T AVIATION, LLC
ADDRESS: 1040 FOUNDERS BLVD, ATHENS, GA 30606
EIN:
████████████

NAME: ZAXBY'S OPERATING COMPANY, LP (TDT)
ADDRESS: 1040 FOUNDERS BLVD., ATHENS, GA 30606
EIN:
████████████

NAME: CLUCKZ HOLDINGS, LLC (SECG)
ADDRESS: 1040 FOUNDERS BLVD., ATHENS, GA 30606
EIN:
████████████

AMENDED

```
STATEMENT OF DISCLOSURE OF ACTIVITY GROUPINGS PURSUANT TO IRC
SEC. 469 AND REG. 1.469-4

NAME: TONY D. TOWNLEY
TAXPAYER ID NUMBER:
████████████

FOR THE TAX YEAR ENDING DECEMBER 31, 2020

THE TAXPAYER HEREBY CONFIRMS THEIR EXISTING ELECTION TO GROUP THE
FOLLOWING ACTIVITIES AS A SINGLE ACTIVITY.  THE ACTIVITIES THAT ARE
GROUPED INTO ONE ACTIVITY CONSTITUTE AN APPROPRIATE ECONOMIC UNIT FOR
THE MEASUREMENT OF GAIN OR LOSS FOR THE PURPOSES OF IRC SECTION 469.

THE ACTIVITIES THAT ARE BEING GROUPED ARE AS FOLLOWS:

NAME: OTF MANAGEMENT, LLC
ADDRESS: 1280 SNOWS MILL RD, BOGART, GA 30622

NAME: LOG CREEK, LLLP - LOG CREEK, LLLP
ADDRESS: 1280 SNOWS MILL RD., BOGART, GA 30622
EIN:
████████████

NAME: LOG CREEK, LLLP - LOG CREEK, LLLP
ADDRESS: 1280 SNOWS MILL RD., BOGART, GA 30622
EIN:
████████

NAME: TOWNLEY FAMILY PARTNERSHIP, LLLP
ADDRESS: 1280 SNOWS MILL ROAD, BOGART, GA 30622
EIN:
████████

NAME: TOWNLEY FAMILY PARTNERSHIP, LLLP
ADDRESS: 1280 SNOWS MILL ROAD, BOGART, GA 30622
EIN:
████████

NAME: TOWNLEY FAMILY PARTNERSHIP, LLLP
ADDRESS: 1280 SNOWS MILL ROAD, BOGART, GA 30622
EIN:
████████

NAME: INTEREST EXPENSE - LOG CREEK

NAME: INTEREST EXPENSE - TOWNLEY FAMILY PARTNERSHIP
```

026340
04-01-20

```
NAME: LOG CREEK, LLLP - LOG CREEK, LLLP
ADDRESS: 1280 SNOWS MILL RD., BOGART, GA 30622
EIN:
```

█████████

```
NAME: LOG CREEK, LLLP - LOG CREEK, LLLP
ADDRESS: 1280 SNOWS MILL RD., BOGART, GA 30622
EIN:
```

█████████

```
NAME: INTEREST EXPENSE - OGEECHEE TIMBER
```

AMENDED

Section 1.263(a)-1(f) De Minimis Safe Harbor Election


Tony D. & Elizabeth A. Townley
1280 Snows Mill Road
Bogart, GA  30622

Taxpayer Identification Number: ██████████

For the Year Ending December 31, 2020

Tony D. & Elizabeth A. Townley are making the de minimis safe harbor election under Reg. Sec. 1.263(a)-1(f).

Case 3:22-cv-00107-CDL    Document 61    Filed 10/28/22    Page 74 of 666

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

---

| FORM 1040 | TAX-EXEMPT INTEREST | STATEMENT 1 |
|---|---|---|

| NAME OF PAYER | AMOUNT |
|---|---|
| VANGUARD #9138 - TE INTEREST | 27,275. |
| VANGUARD #9138 - TE OID | 46. |
| TOTAL TO FORM 1040, LINE 2A | 27,321. |

---

| FORM 1040 | QUALIFIED DIVIDENDS | STATEMENT 2 |
|---|---|---|

| NAME OF PAYER | ORDINARY DIVIDENDS | QUALIFIED DIVIDENDS |
|---|---|---|
| COMPUTERSHARE INC. | 70. | 70. |
| VANGUARD #9138 | 78,607. | 73,327. |
| FROM K-1 - PLUCKED CHICKEN, INC. | 2,041. | 608. |
| FROM K-1 - CLUCKZ HOLDINGS, LLC | 128. | 38. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY, LP (TDT) | 389. | 115. |
| FROM K-1 - CLUCKZ HOLDINGS, LLC (SECG) | 23. | 7. |
| TOTAL INCLUDED IN FORM 1040, LINE 3A | | 74,165. |

---

| FORM 1040 | TAX | STATEMENT 3 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| FROM SCHEDULE D WORKSHEET | 172,074,589. |
| TOTAL TO FORM 1040, LINE 16 | 172,074,589. |

---

| FORM 1040 | CURRENT YEAR ESTIMATES AND AMOUNT APPLIED FROM PREVIOUS YEAR | STATEMENT 4 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| 3RD QTR ESTIMATE PAYMENT - JOINT | 10,000,000. |
| 4TH QTR ESTIMATE PAYMENT - JOINT | 3,200,000. |
| TOTAL TO FORM 1040, LINE 26 | 13,200,000. |

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

| SCHEDULE 1 | STATE AND LOCAL INCOME TAX REFUNDS | | STATEMENT 5 |
|---|---|---|---|

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| **ALABAMA** | | | |
| GROSS STATE/LOCAL INC TAX REFUNDS | 30,070. | | |
| LESS: TAX PAID IN FOLLOWING YEAR | | | |
| NET TAX REFUNDS   ALABAMA | 30,070. | | |
| **LOUISIANA** | | | |
| GROSS STATE/LOCAL INC TAX REFUNDS | 4,634. | | |
| LESS: TAX PAID IN FOLLOWING YEAR | | | |
| NET TAX REFUNDS   LOUISIANA | 4,634. | | |
| **SOUTH CAROLINA** | | | |
| GROSS STATE/LOCAL INC TAX REFUNDS | 303,944. | | |
| LESS: TAX PAID IN FOLLOWING YEAR | | | |
| NET TAX REFUNDS   SOUTH CAROLINA | 303,944. | | |
| **GEORGIA** | | | |
| GROSS STATE/LOCAL INC TAX REFUNDS | | 752,090. | |
| LESS: TAX PAID IN FOLLOWING YEAR | | | |
| NET TAX REFUNDS   GEORGIA | | 752,090. | |
| TOTAL NET TAX REFUNDS | 338,648. | 752,090. | |

**AMENDED**

TONY D. & ELIZABETH A. TOWNLEY

═══════════════════════════════════════════════════════════════════════════

SCHEDULE 1   SELF-EMPLOYED HEALTH INSURANCE DEDUCTION WORKSHEET   STATEMENT 6

───────────────────────────────────────────────────────────────────────────

TONY D. TOWNLEY

ZAXBY'S OPERATING COMPANY, LP (TDT)

| | | |
|---|---|---|
| 1 | NONSPECIFIED HEALTH INSURANCE PAYMENTS | 20,504. |
| 2 | NET PROFIT FROM TRADE OR BUSINESS UNDER WHICH INSURANCE PLAN IS ESTABLISHED | 25,942. |
| 3 | TOTAL OF ALL NET PROFITS AND EARNED INCOME. S CORPORATIONS SKIP TO LINE 9 | 2,342,255. |
| 4 | DIVIDE LINE 2 BY LINE 3 | .0111 |
| 5 | DEDUCTIBLE PORTION OF SELF-EMPLOYMENT TAX | 32,746. |
| 6 | LINE 4 TIMES LINE 5 | 363. |
| 7 | LINE 2 MINUS LINE 6 | 25,579. |
| 8 | SELF-EMPLOYED SEP, SIMPLE, AND QUALIFIED PLANS ATTRIBUTABLE TO TRADE OR BUSINESS NAMED ABOVE | 0. |
| 9 | LINE 7 MINUS LINE 8. S CORPORATIONS ENTER WAGES RECEIVED | 25,579. |
| 10 | FORM 2555, LINE 45 ATTRIBUTABLE TO THE TRADE OR BUSINESS NAMED ABOVE | |
| 11 | LINE 9 MINUS LINE 10 | 25,579. |
| 12 | SELF-EMPLOYED HEALTH INSURANCE DEDUCTION.  LESSER OF LINE 1 OR LINE 11 | 20,504. |

Case 3:22-cv-00107-CDL   Document 61   Filed 10/28/22   Page 77 of 666

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

═══════════════════════════════════════════════════════════════════════════

SCHEDULE 1              TAXABLE STATE AND LOCAL INCOME TAX REFUNDS   STATEMENT 7

───────────────────────────────────────────────────────────────────────────

|  |  | 2018 | 2019 |
|---|---|---|---|
| | NET TAX REFUNDS FROM STATE AND LOCAL INCOME TAX REFUNDS STMT. | 752,090. | 338,648. |
| | LESS:REFUNDS-NO BENEFIT DUE TO AMT<br>     -SALES TAX BENEFIT REDUCTION | | |
| 1 | NET REFUNDS FOR RECALCULATION | 752,090. | 338,648. |
| 2 | AMOUNT FROM PRIOR YEAR<br>   SCHEDULE A, LINE 5E | 10,000. | 10,000. |
| 3 | TOTAL OF PRIOR YEAR<br>   SCHEDULE A, LINES 5B AND 5C | 59,758. | 105,453. |
| 4 | SUBTRACT LINE 3 FROM LINE 2<br>   IF ZERO OR LESS, STOP HERE<br>   NONE OF YOUR REFUND IS TAXABLE | -49,758. | -95,453. |
| 5 | ENTER THE STATE AND LOCAL<br>   INCOME TAXES FROM PRIOR YEAR<br>   SCHEDULE A, LINE 5A | | |
| 6 | ENTER THE AMOUNT FROM LINE 1 | | |
| 7 | SUBTRACT LINE 6 FROM LINE 5 | | |
| 8 | ADD LINE 7 TO LINE 3 | | |
| 9 | SUBTRACT LINE 8 FROM LINE 2 | | |
| 10 | ENTER THE LESSER OF LINE 4,<br>   LINE 6 OR LINE 9. IF ZERO OR<br>   LESS, STOP HERE. NONE OF YOUR<br>   REFUND IS TAXABLE. IF GREATER<br>   THAN ZERO, PROCEED TO LINE 11 | | |
| 11 | ALLOWABLE PRIOR YEAR ITEMIZED<br>   DEDUCTIONS | | |
| 12 | ENTER YOUR PRIOR YEAR STANDARD<br>   DEDUCTION | | |
| 13 | SUBTRACT LINE 12 FROM LINE 11 | | |
| 14 | ENTER THE SMALLER OF LINE 10<br>   OR LINE 13. | | |
| 15 | PRIOR YEAR TAXABLE INCOME | | |
| 16 | AMOUNT TO INCLUDE ON SCHEDULE 1, LINE 1<br>   * IF LINE 15 IS -0- OR MORE, USE AMOUNT FROM LINE 14<br>   * IF LINE 15 IS A NEGATIVE AMOUNT, NET LINES 14 AND 15 | | |
| | TOTAL TO SCHEDULE 1, LINE 1<br>   (IF PRIOR YEAR REFUNDS, AMOUNT IS INCLUDED WITH<br>    STATEMENT SHOWING PRIOR YEAR REFUNDS) | | |

Case 3:22-cv-00107-CDL   Document 61   Filed 10/28/22   Page 78 of 666

TONY D. & ELIZABETH A. TOWNLEY

| SCHEDULE 2 | OTHER TAXES | STATEMENT 8 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| FROM FORM 8959 | 12,776. |
| FROM FORM 8960 | 82,734. |
| TOTAL TO SCHEDULE 2, LINE 8 | 95,510. |

| SCHEDULE A | STATE AND LOCAL INCOME TAXES | STATEMENT 9 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| FROM K-1 - PLUCKED CHICKEN, INC. | 9,098,311. |
| FROM K-1 - CLUCKZ HOLDINGS, LLC | 409,093. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY, LP (TDT) | 144,010. |
| FROM K-1 - CLUCKZ HOLDINGS, LLC (SECG) | 111,679. |
| FROM K-1 - PLUCKED CHICKEN, INC.-ALABAMA | 651,442. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-ALABAMA | 9,294. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-ALABAMA | 51,842. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-ALABAMA | 9,239. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-LOUISIANA | 27,269. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-LOUISIANA | 6,330. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-LOUISIANA | 22,654. |
| FROM K-1 - PLUCKED CHICKEN, INC.-LOUISIANA | 19,527. |
| FROM K-1 - PLUCKED CHICKEN, INC.-ARKANSAS | 56,520. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-ARKANSAS | 818. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-ARKANSAS | 287. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-ARKANSAS | 2,941. |
| FROM K-1 - PLUCKED CHICKEN, INC.-MISSOURI | 24,306. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-MISSOURI | 1,523. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-OKLAHOMA | 52. |
| FROM K-1 - CLUCKZ HOLDINGS LLC-OKLAHOMA | 280. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY LP-OKLAHOMA | 53. |
| GEORGIA PRIOR YEAR BALANCE DUE AND EXTENSION PAYMENTS | 95,145. |
| NORTH CAROLINA PRIOR YEAR BALANCE DUE AND EXTENSION PAYMENTS | 7,560. |
| KENTUCKY WITHHOLDING FROM FORM PTE-WH | 261,713. |
| TOTAL TO SCHEDULE A, LINE 5A | 11,011,888. |

Case 3:22-cv-00107-CDL   Document 61   Filed 10/28/22   Page 79 of 666

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

---

| SCHEDULE A | CASH CONTRIBUTIONS | STATEMENT 10 |

| DESCRIPTION | AMOUNT 100% LIMIT | AMOUNT 60% LIMIT | AMOUNT 30% LIMIT |
|---|---|---|---|
| EXTRA SPECIAL PEOPLE, INC. | | 10,000. | |
| PIEDMONT ATHENS REGIONAL FOUNDATION | | 14,254. | |
| FROM K-1 - CLUCKZ HOLDINGS, LLC | | 5,030. | |
| FROM K-1 - ZAXBY'S OPERATING COMPANY, LP (TDT) | | 15,340. | |
| FROM K-1 - CLUCKZ HOLDINGS, LLC (SECG) | | 900. | |
| SUBTOTALS | | 45,524. | |
| TOTAL TO SCHEDULE A, LINE 11 | | | 45,524. |

---

| SCHEDULE B | INTEREST INCOME | STATEMENT 11 |

| NAME OF PAYER | AMOUNT |
|---|---|
| SYNOVUS BANK #2011 | 691. |
| SYNOVUS BANK #4283 | 6,865. |
| SYNOVUS BANK #5497 | 28. |
| SYNOVUS BANK #6340 & #0467 | 38. |
| LOG CREEK, LLLP | 386,301. |
| PARKER CREEK PROPERTIES, LLC | 19,655. |
| SYNOVUS BANK #2649 | 153. |
| VANGUARD #9138 - TE INTEREST | 33,103. |
| VANGUARD #9138 - TE OID | 145. |
| BOBBIN MILL HOLDINGS | 3,470. |
| IRS | 285. |
| NORTHWESTERN MUTUAL #2150 | 37. |
| SYNOVUS BANK #2114 | 258. |
| GA DOR | 29,617. |
| FROM K-1 - PLUCKED CHICKEN, INC. | 621,195. |
| FROM K-1 - LOG CREEK, LLLP | 212,935. |
| FROM K-1 - LOG CREEK, LLLP | 212,935. |
| FROM K-1 - TONY D. TOWNLEY TRUST | 52. |
| FROM K-1 - ELIZABETH A. TOWNLEY TRUST | 52. |
| FROM K-1 - CLUCKZ HOLDINGS, LLC | 11. |
| FROM K-1 - ZAXBY'S OPERATING COMPANY, LP (TDT) | 31. |
| FROM K-1 - CLUCKZ HOLDINGS, LLC (SECG) | 2. |
| FROM K-1 - LOG CREEK, LLLP | 4,345. |
| FROM K-1 - LOG CREEK, LLLP | 4,346. |
| TOTAL TO SCHEDULE B, LINE 1 | 1,536,550. |

Case 3:22-cv-00107-CDL   Document 60   Filed 10/28/22   Page 80 of 666

TONY D. & ELIZABETH A. TOWNLEY

| SCHEDULE B | TAX-EXEMPT INTEREST | STATEMENT 12 |
| --- | --- | --- |

| NAME OF PAYER | AMOUNT |
| --- | --- |
| VANGUARD #9138 - TE INTEREST | 27,275. |
| VANGUARD #9138 - TE OID | 46. |
| TOTAL TAX-EXEMPT INTEREST TO SCHEDULE B, LINE 1 | 27,321. |

| SCHEDULE B | AMORTIZABLE BOND PREMIUM ADJUSTMENT | STATEMENT 13 |
| --- | --- | --- |

| NAME OF PAYER | AMOUNT |
| --- | --- |
| VANGUARD #9138 - TE INTEREST | 5,828. |
| VANGUARD #9138 - TE OID | 99. |
| TOTAL ABP ADJUSTMENT TO SCHEDULE B, LINE 1 | 5,927. |

| SCHEDULE D | NET LONG-TERM GAIN OR LOSS FROM FORMS 4797, 2439, 6252, 4684, 6781 AND 8824 | STATEMENT 14 |
| --- | --- | --- |

| DESCRIPTION OF PROPERTY | GAIN OR LOSS | 28% GAIN |
| --- | --- | --- |
| FORM 4797 | 2,841,493. | |
| TOTAL TO SCHEDULE D, PART II, LINE 11 | 2,841,493. | |

| SCHEDULE D | NET SHORT-TERM GAIN OR LOSS FROM PARTNERSHIPS, S CORPORATIONS, AND FIDUCIARIES | STATEMENT 15 |
| --- | --- | --- |

| DESCRIPTION OF ACTIVITY | GAIN OR LOSS |
| --- | --- |
| PLUCKED CHICKEN, INC. | 12,423. |
| CLUCKZ HOLDINGS, LLC | 776. |
| ZAXBY'S OPERATING COMPANY, LP (TDT) | 2,365. |
| CLUCKZ HOLDINGS, LLC (SECG) | 139. |
| TOTAL TO SCHEDULE D, PART I, LINE 5 | 15,703. |

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

| SCHEDULE D | NET LONG-TERM GAIN OR LOSS FROM PARTNERSHIPS, S CORPORATIONS, AND FIDUCIARIES | STATEMENT 16 |
|---|---|---|

| DESCRIPTION OF ACTIVITY | GAIN OR LOSS | 28% GAIN |
|---|---|---|
| GAIN ON SALE OF PARTNERSHIP INTEREST - ZAXBY'S OPERATING COMPANY, LP | 51,256,927. | |
| LOSS ON SALE OF PARTNERSHIP INTEREST - CLUCKZ HOLDINGS, LLC (SECG) | -1,225,312. | |
| GAIN FROM REDEMPTION - PLUCKED CHICKEN, INC | 306,430,231. | |
| PLUCKED CHICKEN, INC. | 566,280,262. | |
| CLUCKZ HOLDINGS, LLC | 1,693,659. | |
| ZAXBY'S OPERATING COMPANY, LP (TDT) | 1,963. | |
| CLUCKZ HOLDINGS, LLC (SECG) | 8,270,167. | |
| TOTAL TO SCHEDULE D, PART II, LINE 12 | 932,707,897. | |

Case 3:22-cv-00107-CDL    Document 60-1    Filed 10/28/22    Page 82 of 666

TONY D. & ELIZABETH A. TOWNLEY

| SCHEDULE D | UNRECAPTURED SECTION 1250 GAIN | STATEMENT 17 |
|---|---|---|

```
 1. IF YOU HAVE A SECTION 1250 PROPERTY IN PART III OF FORM
    4797 FOR WHICH YOU MADE AN ENTRY IN PART I OF FORM 4797,
    ENTER THE SMALLER OF LINE 22 OR LINE 24 OF FORM 4797 FOR
    THAT PROPERTY. IF YOU DID NOT HAVE ANY SUCH PROPERTY, GO
    TO LINE 4
 2. ENTER THE AMOUNT FROM FORM 4797, LINE 26G, FOR THE
    PROPERTY FOR WHICH YOU MADE AN ENTRY ON LINE 1                   _____

 3. SUBTRACT LINE 2 FROM LINE 1
 4. ENTER THE TOTAL UNRECAPTURED SECTION 1250 GAIN INCLUDED
    ON LINE 26 OR LINE 37 OF FORM(S) 6252 FROM INSTALLMENT
    SALES OF TRADE OR BUSINESS PROPERTY HELD MORE THAN 1 YEAR
 5. ENTER THE TOTAL OF ANY AMOUNTS REPORTED TO YOU ON A
    SCHEDULE K-1 FROM A PARTNERSHIP OR AN S CORPORATION AS
    "UNRECAPTURED SECTION 1250 GAIN"                                   2,721,241.

 6. ADD LINES 3 THROUGH 5                                              2,721,241.
 7. ENTER THE SMALLER OF LINE 6 OR THE GAIN
    FROM FORM 4797, LINE 7                              2,721,241.
 8. ENTER THE AMOUNT, IF ANY, FROM FORM 4797,
    LINE 8
 9. SUBTRACT LINE 8 FROM LINE 7. IF ZERO OR LESS, ENTER -0-           2,721,241.
10. ENTER THE AMOUNT OF ANY GAIN FROM THE SALE OR EXCHANGE OF
    AN INTEREST IN A PARTNERSHIP ATTRIBUTABLE TO UNRECAPTURED
    SECTION 1250 GAIN
11. ENTER THE TOTAL OF ANY AMOUNTS REPORTED TO YOU ON A
    SCHEDULE K-1, FORMS 1099-DIV, OR FORM 2439 AS "UNRECAPTURED
    SECTION 1250 GAIN" FROM AN ESTATE, TRUST, REAL ESTATE
    INVESTMENT TRUST, OR MUTUAL FUND (OR OTHER REGULATED
    INVESTMENT COMPANY) OR IN CONNECTION WITH A FORM 1099-R
12. ENTER THE TOTAL OF ANY UNRECAPTURED SECTION 1250 GAIN FROM SALES
    (INCLUDING INSTALLMENT SALES) OR OTHER DISPOSITIONS OF SECTION
    1250 PROPERTY HELD MORE THAN 1 YEAR FOR WHICH YOU DID NOT
    MAKE AN ENTRY IN PART I OF FORM 4797 FOR THE YEAR OF SALE           _____

13. ADD LINES 9 THROUGH 12                                            2,721,241.
14. IF YOU HAD ANY SECTION 1202 GAIN OR COLLECTIBLE
    GAIN OR (LOSS), ENTER THE TOTAL OF LINES 1 THROUGH
    4 OF THE 28% RATE GAIN WORKSHEET
15. ENTER THE (LOSS), IF ANY, FROM SCH D, LINE 7.
    IF SCH D, LINE 7, IS ZERO OR A GAIN ENTER -0-                0.
16. ENTER YOUR LONG-TERM CAPITAL LOSS CARRYOVERS FROM
    SCHEDULE D, LINE 14, AND SCHEDULE K-1 (FORM 1041),
    BOX 11, CODE D
17. COMBINE LINES 14 THROUGH 16. IF THE RESULT IS A (LOSS), ENTER
    IT AS A POSITIVE AMOUNT. IF THE RESULT IS ZERO OR A GAIN,
    ENTER -0-                                                                 0.

18. SUBTRACT LINE 17 FROM LINE 13. IF ZERO OR LESS,  ENTER -0-.
    IF MORE THAN ZERO, ENTER THE RESULT HERE AND ON SCHEDULE D,
    LINE 19                                                          2,721,241.
```

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

| SCHEDULE E | OTHER EXPENSES | STATEMENT 18 |
|---|---|---|

FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE COUNTY, GA 30

| DESCRIPTION | AMOUNT |
|---|---|
| PEST CONTROL | 9,323. |
| TRAVEL | 769. |
| BANK CHARGES | 395. |
| TOTAL TO SCHEDULE E, PAGE 1, LINE 19 | 10,487. |

| SCHEDULE E | OTHER EXPENSES | STATEMENT 19 |
|---|---|---|

LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE CREEK), GA

| DESCRIPTION | AMOUNT |
|---|---|
| BANK CHARGES | 540. |
| TRAVEL | 505. |
| TOTAL TO SCHEDULE E, PAGE 1, LINE 19 | 1,045. |

| SCHEDULE E | OTHER INCOME | STATEMENT 20 |
|---|---|---|

FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE COUNTY, GA 30

| DESCRIPTION | AMOUNT |
|---|---|
| RENTAL FEES | 756. |
| RENTAL INCOME | 640,008. |
| TOTAL TO SCHEDULE E, PAGE 1 | 640,764. |

| SCHEDULE E | OTHER INCOME | STATEMENT 21 |
|---|---|---|

LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE CREEK), GA

| DESCRIPTION | AMOUNT |
|---|---|
| TAX REIMBURSEMENTS | 27,723. |
| RENTAL INCOME | 756,308. |
| TOTAL TO SCHEDULE E, PAGE 1 | 784,031. |

Case 3:22-cv-00107-CDL   Document 61   Filed 10/28/22   Page 84 of 666
TONY D. & ELIZABETH A. TOWNLEY

| SCHEDULE E | OTHER INCOME | STATEMENT 22 |
|---|---|---|

OGEECHEE TIMBER, LLC - VARIOUS (OGEECHEE), GA

| DESCRIPTION | AMOUNT |
|---|---|
| HUNTING LEASE REVENUE | 19,524. |
| REFUNDS FROM CREDITORS | 3,991. |
| TOTAL TO SCHEDULE E, PAGE 1 | 23,515. |

TONY D. & ELIZABETH A. TOWNLEY                                    ████████

SCHEDULE E    INCOME OR (LOSS) FROM PARTNERSHIPS AND S CORPS    STATEMENT 23

NAME
____

EMP ID NO.
_____

| CODE | X IF FRN | BASIS COMP REQ | ANY NOT AT RISK | PASSIVE LOSS | PASSIVE INCOME | NONPASSIVE LOSS | SEC. 179 DEDUCTION | NONPASSIVE INCOME |
|------|----------|----------------|-----------------|--------------|----------------|-----------------|--------------------|--------------------|
| PLUCKED CHICKEN, INC. | | | | | | | | |
| ████████ | | | | | | | | |
| S | X | | * | | | | | 29420802. |
| LAND WARRIORS, LLC | | | | | | | | |
| ████████ | | | | | | | | |
| P | | | | | | | | 936. |
| LOG CREEK, LLLP | | | | | | | | |
| ████████ | | | | | | | | |
| P | | | | | 751,533. | | | |
| LOG CREEK, LLLP | | | | | | | | |
| ████████ | | | | | | | | |
| P | | | | | 751,534. | | | |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | | | | | | | | |
| ████████ | | | | | | | | |
| P | | | | | 29,491. | | | |
| PRIOR YEAR PAL | | | | | | | | |
| ████████ | | | | | | | | |
| P | | | | | 6. | | | |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | | | | | | | | |
| ████████ | | | | | | | | |
| P | | | | | 1,474,595. | | | |
| PRIOR YEAR PAL | | | | | | | | |
| ████████ | | | | | | | | |
| P | | | | | 280. | | | |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | | | | | | | | |
| ████████ | | | | | | | | |
| P | | | | | 1,445,102. | | | |
| PRIOR YEAR PAL | | | | | | | | |
| ████████ | | | | | | | | |
| P | | | | | 275. | | | |
| CLUCKZ HOLDINGS, LLC | | | | | | | | |
| ████████ | | | | | | | | |
| P | | | * | | | | | 1,244,573. |
| M&T AVIATION, LLC | | | | | | | | |
| ████████ | | | | | | | | |
| P | | | | | | | | 89,995. |
| ZAXBY'S OPERATING COMPANY, LP (TDT) | | | | | | | | |
| ████████ | | | | | | | | |
| P | | | | | | | | 20770514. |
| CLUCKZ HOLDINGS, LLC (SECG) | | | | | | | | |
| ████████ | | | | | | | | |
| P | | | * | | | | | 352,531. |
| INTEREST EXPENSE - LOG CREEK | | | | | | | | |
| | | | | | | | | |
| P | | | | | 304,992. | | | |

**AMENDED**

TONY D. & ELIZABETH A. TOWNLEY

```
INTEREST EXPENSE - TOWNLEY FAMILY
PARTNERSHIP

  P                                        305,983.
LOG CREEK, LLLP

  P                                         15,337.
LOG CREEK, LLLP

  P                                         15,338.
INTEREST EXPENSE - LAND WARRIORS

  P                                            384.
INTEREST EXPENSE - OGEECHEE TIMBER

  P                                              0.
AIR HIGHWAY, LLC

  P                          25,848.
```

| TOTALS TO SCH. E, LN. 29 | 26,409. | | 5,094,289. | | 51879351. |
|---|---|---|---|---|---|

        * ENTIRE DISPOSITION OF NONPASSIVE ACTIVITY

---

| SCHEDULE F | OTHER EXPENSES | STATEMENT 24 |
|---|---|---|
| **DESCRIPTION** | | **AMOUNT** |
| REFORESTATION EXPENSE | | 27,262. |
| PROFESSIONAL FEES | | 2,469. |
| AMORTIZATION EXPENSE | | 4,467. |
| TOTAL TO SCHEDULE F, PART II, LINE 32 | | 34,198. |

---

| SCHEDULE F | OTHER INCOME - CASH METHOD | STATEMENT 25 |
|---|---|---|
| **DESCRIPTION** | | **AMOUNT** |
| HUNTING LEASE REVENUE | | 9,022. |
| TOTAL TO SCHEDULE F, PART I, LINE 8 | | 9,022. |

Case 3:22-cv-00107-CDL   Document 91   Filed 10/28/22   Page 87 of 666

TONY D. & ELIZABETH A. TOWNLEY

| SCHEDULE SE | NON-FARM INCOME | STATEMENT 26 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| MANAGEMENT | -469,194. |
| LAND WARRIORS, LLC | 686. |
| CLUCKZ HOLDINGS, LLC | 1,244,573. |
| ZAXBY'S OPERATING COMPANY, LP (TDT) | 25,942. |
| ZAXBY'S FRANCHISING, LLC | 1,071,054. |
| TOTAL TO SCHEDULE SE, LINE 2 | 1,873,061. |

| SCHEDULE SE | FARM INCOME | STATEMENT 27 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| TOWNLEY FAMILY PARTNERSHIP, LLLP | -27,357. |
| TIMBER | -37,862. |
| TOTAL TO SCHEDULE SE, LINE 1A | -65,219. |

| FORM 4797 | PROPERTY HELD MORE THAN ONE YEAR | STATEMENT 28 |
|---|---|---|

| DESCRIPTION | DATE ACQUIRED | DATE SOLD | SALES PRICE | DEPR. | COST OR BASIS | GAIN OR LOSS |
|---|---|---|---|---|---|---|
| PLUCKED CHICKEN, INC. | | | | | | 1,473,506. |
| LOG CREEK, LLLP | | | | | | 479,700. |
| LOG CREEK, LLLP | | | | | | 479,700. |
| CLUCKZ HOLDINGS, LLC | | | | | | 91,993. |
| ZAXBY'S OPERATING COMPANY, LP (TDT) | | | | | | 280,553. |
| CLUCKZ HOLDINGS, LLC (SECG) | | | | | | 16,461. |
| LOG CREEK, LLLP | | | | | | 9,790. |
| LOG CREEK, LLLP | | | | | | 9,790. |
| TOTAL TO 4797, PART I, LINE 2 | | | | | | 2,841,493. |

**AMENDED**

TONY D. & ELIZABETH A. TOWNLEY

---

FORM 6251                          PASSIVE ACTIVITIES                     STATEMENT 29

---

|  | | NET INCOME (LOSS) | | |
| NAME OF ACTIVITY | FORM | AMT | REGULAR | ADJUSTMENT |
|---|---|---|---|---|
| TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | | -6. | 6. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | | -280. | 280. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | | -275. | 275. |
| AIR HIGHWAY, LLC | SCH E | -25,848. | -25,848. | |
| FRAZER CREEK INVESTMENTS, LLC – VARIOUS (FRAZER CREEK), OCONEE COUNTY, GA 3 | SCH E | -30,200. | -35,764. | 5,564. |
| LANE CREEK INVESTMENTS, LLC – VARIOUS (LANE CREEK), GA | SCH E | 412,330. | 412,329. | 1. |
| TOTAL TO FORM 6251, LINE 2M | | | | 6,126. |

---

FORM 6251                           LOSS LIMITATIONS                      STATEMENT 30

---

|  | | NET INCOME (LOSS) | | |
| NAME OF ACTIVITY | FORM | AMT | REGULAR | ADJUSTMENT |
|---|---|---|---|---|
| PLUCKED CHICKEN, INC. | SCH E | 597,817,506. | 597,810,229. | 7,277. |
| PLUCKED CHICKEN, INC. | SCH E | 306,430,231. | 306,430,231. | |
| TOTAL TO FORM 6251, LINE 2N | | | | 7,277. |

---

FORM 6251      DEPRECIATION ON ASSETS PLACED IN SERVICE AFTER 1986 STATEMENT 31

---

| DESCRIPTION | AMOUNT |
|---|---|
| FROM K-1 – CLUCKZ HOLDINGS, LLC | 444. |
| FROM K-1 – ZAXBY'S OPERATING COMPANY, LP (TDT) | 1,355. |
| FROM K-1 – CLUCKZ HOLDINGS, LLC (SECG) | 80. |
| TOTAL TO FORM 6251, LINE 2L | 1,879. |

AMENDED
TONY D. & ELIZABETH A. TOWNLEY

| FORM 8995-A | QUALIFIED BUSINESS INCOME | STATEMENT 32 |
| --- | --- | --- |
| SCHEDULE C | | |

| ACTIVITY NAME | INCOME | LOSS REDUCTION | ADJUSTED QBI |
| --- | ---: | ---: | ---: |
| CLUCKZ HOLDINGS, LLC | 822,455. | 97,169. | 725,286. |
| M&T AVIATION, LLC | 89,995. | 10,632. | 79,363. |
| ZAXBY'S OPERATING COMPANY, LP (TDT) | 20744535. | 2,450,858. | 18293677. |
| CLUCKZ HOLDINGS, LLC (SECG) | 239,445. | 28,289. | 211,156. |
| PLUCKED CHICKEN, INC. | 21066670. | 2,488,917. | 18577753. |
| FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZ | 56,830. | 6,714. | 50,116. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | -29,491. | | |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | -1474595. | | |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | -1445102. | | |
| CLUCKZ HOLDINGS, LLC | -17,400. | | |
| LOG CREEK, LLLP | -15,337. | | |
| LOG CREEK, LLLP | -15,338. | | |
| LOG CREEK, LLLP | -751,533. | | |
| LOG CREEK, LLLP | -751,534. | | |
| LOG CREEK TRUST | -37,862. | | |
| OTF MANAGEMENT, LLC | -469,194. | | |

| FORM 8995-A | QUALIFIED BUSINESS NET LOSS CARRYOVER | STATEMENT 33 |
| --- | --- | --- |
| SCHEDULE C | FROM PRIOR YEARS | |

| TRADE OR BUSINESS NAME | AMOUNT |
| --- | ---: |
| FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CR | 5,800. |
| FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CR | 86,794. |
| TOTAL TO FORM 8995-A SCHEDULE C, LINE 2 | 92,594. |

Case 3:22-cv-00107-CDL    Document 60    Filed 10/28/22    Page 90 of 666

TONY D. & ELIZABETH A. TOWNLEY

---

| FORM 8960 | TRADE OR BUSINESS INCOME | STATEMENT 34 |
|---|---|---|

| | |
|---|---:|
| ROYALTIES DERIVED IN THE ORDINARY COURSE OF BUSINESS | 0. |
| PLUCKED CHICKEN, INC. | -29,420,802. |
| LAND WARRIORS, LLC | -936. |
| LOG CREEK, LLLP | 751,533. |
| LOG CREEK, LLLP | 751,534. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | 29,491. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | 1,474,595. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | 1,445,102. |
| CLUCKZ HOLDINGS, LLC | -1,244,573. |
| M&T AVIATION, LLC | -89,995. |
| ZAXBY'S OPERATING COMPANY, LP (TDT) | -20,770,514. |
| CLUCKZ HOLDINGS, LLC (SECG) | -352,531. |
| INTEREST EXPENSE - LOG CREEK | 304,992. |
| INTEREST EXPENSE - TOWNLEY FAMILY PARTNERSHIP | 305,983. |
| LOG CREEK, LLLP | 15,338. |
| LOG CREEK, LLLP | 15,337. |
| INTEREST EXPENSE - LAND WARRIORS | 384. |
| | ————————— |
| AMOUNT TO FORM 8960, LINE 4B | -46,785,062. |

---

| FORM 8960 | OTHER MODIFICATIONS TO INVESTMENT INCOME | STATEMENT 35 |
|---|---|---|

| | | |
|---|---:|---:|
| AMOUNT FROM LINE 7 WORKSHEET, LINE 13 FOR SC | 9,555. | |
| TOTAL RECOVERY OF PRIOR YEAR FORM 8960, LINE 9B | 9,555. | 9,555. |
| | | ————————— |
| AMOUNT TO FORM 8960, LINE 7 | | 9,555. |

---

| FORM 8582 | ACTIVE RENTAL OF REAL ESTATE - WORKSHEET 1 | STATEMENT 45 |
|---|---|---|

| NAME OF ACTIVITY | CURRENT YEAR NET INCOME | CURRENT YEAR NET LOSS | PRIOR YEAR UNALLOWED LOSS | OVERALL GAIN OR LOSS GAIN | OVERALL GAIN OR LOSS LOSS |
|---|---:|---:|---:|---:|---:|
| FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE C | 56,830. | 0. | -92,594. | | -35,764. |
| LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE CREEK), GA | 461,545. | 0. | -49,216. | 412,329. | |
| TOTALS | 518,375. | 0. | -141,810. | 412,329. | -35,764. |

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

| FORM 8582 | OTHER PASSIVE ACTIVITIES - WORKSHEET 3 | STATEMENT 46 |
|---|---|---|

| NAME OF ACTIVITY | CURRENT YEAR NET INCOME | CURRENT YEAR NET LOSS | PRIOR YEAR UNALLOWED LOSS | OVERALL GAIN OR LOSS GAIN | OVERALL GAIN OR LOSS LOSS |
|---|---|---|---|---|---|
| TOWNLEY FAMILY PARTNERSHIP, LLLP | 0. | 0. | -6. | | -6. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | 0. | 0. | -280. | | -280. |
| TOWNLEY FAMILY PARTNERSHIP, LLLP | 0. | 0. | -275. | | -275. |
| AIR HIGHWAY, LLC | 0. | -25,848. | | | -25,848. |
| TOTALS | 0. | -25,848. | -561. | | -26,409. |

| FORM 8582 | SUMMARY OF PASSIVE ACTIVITIES | STATEMENT 47 |
|---|---|---|

| RREA | NAME | FORM OR SCHEDULE | GAIN/LOSS | PRIOR YEAR C/O | NET GAIN/LOSS | UNALLOWED LOSS | ALLOWED LOSS |
|---|---|---|---|---|---|---|---|
| | TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | 0. | -6. | -6. | | 6. |
| | TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | 0. | -280. | -280. | | 280. |
| | TOWNLEY FAMILY PARTNERSHIP, LLLP | SCH E | 0. | -275. | -275. | | 275. |
| | AIR HIGHWAY, LLC | SCH E | -25,848. | | -25,848. | | 25,848. |
| X | FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE C | SCH E | 56,830. | -92,594. | -35,764. | | 35,764. |
| X | LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE CREEK), GA | SCH E | 461,545. | -49,216. | 412,329. | | |
| | TOTALS | | 492,527. | -142,371. | 350,156. | | 62,173. |

PRIOR YEAR CARRYOVERS ALLOWED DUE TO CURRENT YEAR NET ACTIVITY INCOME 106,046.

TOTAL                                                                                     168,219.

Case 3:22-cv-00107-CDL   Document 81   Filed 10/28/22   Page 92 of 666

TONY D. & ELIZABETH A. TOWNLEY

---

| FORM 8582 | ALTERNATIVE MINIMUM TAX | STATEMENT 48 |
| --- | --- | --- |
| | ACTIVE RENTAL OF REAL ESTATE - WORKSHEET 1 | |

| | CURRENT YEAR | | PRIOR YEAR UNALLOWED | OVERALL GAIN OR LOSS | |
| --- | --- | --- | --- | --- | --- |
| NAME OF ACTIVITY | NET INCOME | NET LOSS | LOSS | GAIN | LOSS |
| FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE C | 56,679. | 0. | -86,879. | | -30,200. |
| LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE CREEK), GA | 461,545. | 0. | -49,215. | 412,330. | |
| TOTALS | 518,224. | 0. | -136,094. | 412,330. | -30,200. |

---

| FORM 8582 | ALTERNATIVE MINIMUM TAX | STATEMENT 49 |
| --- | --- | --- |
| | OTHER PASSIVE ACTIVITIES - WORKSHEET 3 | |

| | CURRENT YEAR | | PRIOR YEAR UNALLOWED | OVERALL GAIN OR LOSS | |
| --- | --- | --- | --- | --- | --- |
| NAME OF ACTIVITY | NET INCOME | NET LOSS | LOSS | GAIN | LOSS |
| AIR HIGHWAY, LLC | 0. | -25,848. | | | -25,848. |
| TOTALS | 0. | -25,848. | | | -25,848. |

Case 3:22-cv-00107-CDL   Document 61   Filed 10/28/22   Page 93 of 666

TONY D. & ELIZABETH A. TOWNLEY

---

FORM 8582AMT          SUMMARY OF PASSIVE ACTIVITIES - AMT          STATEMENT 50

| R R E A | NAME | FORM OR SCHEDULE | GAIN/LOSS | PRIOR YEAR C/O | NET GAIN/LOSS | UNALLOWED LOSS | ALLOWED LOSS |
|---|---|---|---|---|---|---|---|
| | AIR HIGHWAY, LLC | SCH E | -25,848. | | -25,848. | | 25,848. |
| X | FRAZER CREEK INVESTMENTS, LLC - VARIOUS (FRAZER CREEK), OCONEE C | SCH E | 56,679. | -86,879. | -30,200. | | 30,200. |
| X | LANE CREEK INVESTMENTS, LLC - VARIOUS (LANE CREEK), GA | SCH E | 461,545. | -49,215. | 412,330. | | |
| | TOTALS | | 492,376. | -136,094. | 356,282. | | 56,048. |

PRIOR YEAR CARRYOVERS ALLOWED DUE TO CURRENT YEAR NET ACTIVITY INCOME   105,894.

TOTAL                                                                    161,942.

---

FORM 4562          PART III - RESIDENTIAL RENTAL PROPERTY          STATEMENT 51

| (A) DESCRIPTION OF PROPERTY | (B) MO/YR | (C) BASIS | (G) DEDUCTION |
|---|---|---|---|
| BUILDING - 1036 CRIMSON CT | 5/20 | 235,475. | 5,352. |
| BUILDING - 1341 HODGES MILL RD | 1/20 | 187,820. | 6,545. |
| BUILDING - 1282 CRIMSON CT | 5/20 | 214,915. | 4,884. |
| BUILDING - 1281 CRIMSON CT | 5/20 | 251,189. | 5,709. |
| BUILDING - 1231 CRIMSON CT | 5/20 | 228,904. | 5,202. |
| BUILDING - 1109 CRIMSON CT | 5/20 | 239,662. | 5,447. |
| BUILDING - 1120 MATTHEWS RD | 12/20 | 734. | 1. |
| BUILDING - 1240 ECHO TRAIL | 3/20 | 203,179. | 5,849. |
| IMPROVEMENTS - 1061 AYCOCK RD | 9/20 | 5,625. | 60. |
| IMPROVEMENTS - 4761 HOG MOUNTAIN | 7/20 | 4,350. | 72. |
| IMPROVEMENTS - 1040 ROCKY BRANCH RD | 6/20 | 4,700. | 93. |
| IMPROVEMENTS - 1080 ROCKY BRANCH | 1/20 | 8,128. | 283. |
| IMPROVEMENTS - 1120 ROCKY BRANCH | 6/20 | 14,600. | 288. |
| TOTAL TO FORM 4562, PART III, LINE 19H | | 1,599,281. | 39,785. |

AMENDED

TONY D. & ELIZABETH A. TOWNLEY

---

FORM 4562          PART III - NONRESIDENTIAL REAL PROPERTY     STATEMENT 52

| (A) DESCRIPTION OF PROPERTY | (B) MO/YR | (C) BASIS | (D) PERIOD | (G) DEDUCTION |
|---|---|---|---|---|
| BUILDING - 4803 GOLDEN PARKWAY | 1/20 | 5,635. | 39.0 YRS | 138. |
| BUILDING - DUNKIN THOMASTON | 3/20 | 1,250,328. | 39.0 YRS | 25,381. |
| BUILDING - 1101 BROOKHAVEN DR | 3/20 | 1,826,900. | 39.0 YRS | 37,085. |
| BUILDING - 485 US HWY 29 | 3/20 | 1,725,593. | 39.0 YRS | 35,028. |
| BUILDING - 2072 EAGLE DR | 10/20 | 1,036,181. | 39.0 YRS | 5,535. |
| BUILDING - 2115 W EVANS ST | 12/20 | 1,565,690. | 39.0 YRS | 1,673. |
| TOTAL TO FORM 4562, PART III, LINE 19I | | 7,410,327. | | 104,840. |

---

S-CORP BASIS WORKSHEET          INCREASES IN BASIS          STATEMENT 53

PLUCKED CHICKEN, INC.

| DESCRIPTION | AMOUNT |
|---|---|
| LEGAL EXPENSES | 790,714. |
| INCLUDED IN BASIS WORKSHEET, LINE 4 | 790,714. |

---

S-CORP BASIS WORKSHEET          DECREASES IN BASIS          STATEMENT 54

PLUCKED CHICKEN, INC.

| DESCRIPTION | AMOUNT |
|---|---|
| FOREIGN TAXES PAID | 6. |
| INCLUDED IN BASIS WORKSHEET, LINE 6 OR 7 | 6. |

AMENDED
TONY D. & ELIZABETH A. TOWNLEY

| AMT S-CORP BASIS WKST | INCREASES IN BASIS | STATEMENT 55 |
|---|---|---|

PLUCKED CHICKEN, INC.

| DESCRIPTION | AMOUNT |
|---|---|
| LEGAL EXPENSES | 790,714. |
| INCLUDED IN BASIS WORKSHEET, LINE 4 | 790,714. |

| AMT S-CORP BASIS WKST | DECREASES IN BASIS | STATEMENT 56 |
|---|---|---|

PLUCKED CHICKEN, INC.

| DESCRIPTION | AMOUNT |
|---|---|
| FOREIGN TAXES PAID | 6. |
| INCLUDED IN BASIS WORKSHEET, LINE 6 OR 7 | 6. |

Form **8283**
(Rev. December 2021)
Department of the Treasury
Internal Revenue Service

# Noncash Charitable Contributions

► Attach one or more Forms 8283 to your tax return if you claimed a total deduction
of over $500 for all contributed property.

► Go to *www.irs.gov/Form8283* for instructions and the latest information.

OMB No. 1545-0074

Attachment
Sequence No. **155**

Name(s) shown on your income tax return

LOG CREEK, LLLP

Identifying number

**Note:** Figure the amount of your contribution deduction before completing this form. See your tax return instructions.

**Section A. Donated Property of $5,000 or Less and Publicly Traded Securities**—List in this section **only** an item (or a group of similar items) for which you claimed a deduction of $5,000 or less. Also list publicly traded securities and certain other property even if the deduction is more than $5,000. See instructions.

| Part I | Information on Donated Property—If you need more space, attach a statement. |

**1**

| | (a) Name and address of the donee organization | (b) If donated property is a vehicle (see instructions), check the box. Also enter the vehicle identification number (unless Form 1098-C is attached.) | (c) Description and condition of donated property (For a vehicle, enter the year, make, model, and mileage. For securities and other property, see instructions.) |
|---|---|---|---|
| A | | | |
| B | | | |
| C | | | |
| D | | | |
| E | | | |

**Note:** If the amount you claimed as a deduction for an item is $500 or less, you do not have to complete columns (e), (f), and (g).

| | (d) Date of the contribution | (e) Date acquired by donor (mo., yr.) | (f) How acquired by donor | (g) Donor's cost or adjusted basis | (h) Fair market value (see instructions) | (i) Method used to determine the fair market value |
|---|---|---|---|---|---|---|
| A | | | | | | |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |
| E | | | | | | |

**Section B. Donated Property Over $5,000 (Except Publicly Traded Securities, Vehicles, Intellectual Property or Inventory Reportable in Section A)**—Complete this section for one item (or a group of similar items) for which you claimed a deduction of more than $5,000 per item or group (except contributions reportable in Section A). Provide a separate form for each item donated unless it is part of a group of similar items. A qualified appraisal is generally required for items reportable in Section B. See instructions.

| Part I | Information on Donated Property |

**2** Check the box that describes the type of property donated.

- **a** ☐ Art* (contribution of $20,000 or more)
- **b** ☑ Qualified Conservation Contribution
- **c** ☐ Equipment
- **d** ☐ Art* (contribution of less than $20,000)
- **e** ☐ Other Real Estate
- **f** ☐ Securities
- **g** ☐ Collectibles**
- **h** ☐ Intellectual Property
- **i** ☐ Vehicles
- **j** ☐ Clothing and household items
- **k** ☐ Other

* Art includes paintings, sculptures, watercolors, prints, drawings, ceramics, antiques, decorative arts, textiles, carpets, silver, rare manuscripts, historical memorabilia, and other similar objects.

** Collectibles include coins, stamps, books, gems, jewelry, sports memorabilia, dolls, etc., but not art as defined above.

**Note:** In certain cases, you must attach a qualified appraisal of the property. See instructions.

| **3** | (a) Description of donated property (if you need more space, attach a separate statement) | (b) If any tangible personal property or real property was donated, give a brief summary of the overall physical condition of the property at the time of the gift. | (c) Appraised fair market value |
|---|---|---|---|
| A | CONSERVATION EASEMENT UNDER IRC 170(H) | | 46,399,000.00 |
| B | (SEE ATTACHED) | | |
| C | | | |

| | (d) Date acquired by donor (mo., yr.) | (e) How acquired by donor | (f) Donor's cost or adjusted basis | (g) For bargain sales, enter amount received | (h) Amount claimed as a deduction (see instructions) | (i) Date of contribution (see instructions) |
|---|---|---|---|---|---|---|
| A | 12/2012 | OMNIBUS DEED | 300,603 | | | |
| B | (SEE ATTACHED) | | | | | |
| C | | | | | | |

For Paperwork Reduction Act Notice, see separate instructions.

Cat. No. 62299J

Form **8283** (Rev. 12-2021)

Form 8283 (Rev. 12-2021)

Page **2**

Name(s) shown on your income tax return

LOG CREEK, LLLP

Identifying number

| **Part II** | **Partial Interests and Restricted Use Property (Other Than Qualified Conservation Contributions)—** Complete lines 4a through 4e if you gave less than an entire interest in a property listed in Section B, Part I. Complete lines 5a through 5c if conditions were placed on a contribution listed in Section B, Part I; also attach the required statement. See instructions. |

**4a** Enter the letter from Section B, Part I that identifies the property for which you gave less than an entire interest ▶ _____

If Section B, Part II applies to more than one property, attach a separate statement.

**b** Total amount claimed as a deduction for the property listed in Section B, Part I: **(1)** For this tax year . . ▶ _____

**(2)** For any prior tax years ▶ _____

**c** Name and address of each organization to which any such contribution was made in a prior year (complete only if different from the donee organization in Section B, Part V, below):

Name of charitable organization (donee)

| Address (number, street, and room or suite no.) | City or town, state, and ZIP code |

**d** For tangible property, enter the place where the property is located or kept ▶ _____

**e** Name of any person, other than the donee organization, having actual possession of the property ▶ _____

|  | | Yes | No |
|---|---|---|---|
| **5a** | Is there a restriction, either temporary or permanent, on the donee's right to use or dispose of the donated property? | | |
| **b** | Did you give to anyone (other than the donee organization or another organization participating with the donee organization in cooperative fundraising) the right to the income from the donated property or to the possession of the property, including the right to vote donated securities, to acquire the property by purchase or otherwise, or to designate the person having such income, possession, or right to acquire? . . . . . . . . . . . . . . . | | |
| **c** | Is there a restriction limiting the donated property for a particular use? . . . . . . . . . . . . | | |

| **Part III** | **Taxpayer (Donor) Statement**—List each item included in Section B, Part I above that the appraisal identifies as having a value of $500 or less. See instructions. |

I declare that the following item(s) included in Section B, Part I above has to the best of my knowledge and belief an appraised value of not more than $500 (per item). Enter identifying letter from Section B, Part I and describe the specific item. See instructions.

▶ _____

Signature of
taxpayer (donor) ▶

Date ▶

| **Part IV** | **Declaration of Appraiser** |

I declare that I am not the donor, the donee, a party to the transaction in which the donor acquired the property, employed by, or related to any of the foregoing persons, or married to any person who is related to any of the foregoing persons. And, if regularly used by the donor, donee, or party to the transaction, I performed the majority of my appraisals during my tax year for other persons.

Also, I declare that I perform appraisals on a regular basis; and that because of my qualifications as described in the appraisal, I am qualified to make appraisals of the type of property being valued. I certify that the appraisal fees were not based on a percentage of the appraised property value. Furthermore, I understand that a false or fraudulent overstatement of the property value as described in the qualified appraisal or this Form 8283 may subject me to the penalty under section 6701(a) (aiding and abetting the understatement of tax liability). I understand that my appraisal will be used in connection with a return or claim for refund. I also understand that, if there is a substantial or gross valuation misstatement of the value of the property claimed on the return or claim for refund that is based on my appraisal, I may be subject to a penalty under section 6695A of the Internal Revenue Code, as well as other applicable penalties. I affirm that I have not been at any time in the three-year period ending on the date of the appraisal barred from presenting evidence or testimony before the Department of the Treasury or the Internal Revenue Service pursuant to 31 U.S.C. 330(c).

| **Sign Here** | Appraiser signature ▶ | | Date ▶ 03/09/2022 |
|---|---|---|---|
| | Appraiser name ▶ Rick Kenny    Doug Kenny | Title ▶ President | 3-9-2022 |

Business address (including room or suite no.)

327 Dahlonega St., Suit 104

Identifying number

City or town, state, and ZIP code

Cumming, GA 30040

| **Part V** | **Donee Acknowledgment** |

This charitable organization acknowledges that it is a qualified organization under section 170(c) and that it received the donated property as described in Section B, Part I, above on the following date ▶ **DECEMBER 21, 2018**

Furthermore, this organization affirms that in the event it sells, exchanges, or otherwise disposes of the property described in Section B, Part I (or any portion thereof) within 3 years after the date of receipt, it will file **Form 8282**, Donee Information Return, with the IRS and give the donor a copy of that form. This acknowledgment does not represent agreement with the claimed fair market value.

Does the organization intend to use the property for an unrelated use? . . . . . . . . . . . . . . . ▶ ☐ Yes ☑ No

| Name of charitable organization (donee) | Employer identification number |
|---|---|
| **OCONEE RIVER LAND TRUST** | |
| Address (number, street, and room or suite no.) | City or town, state, and ZIP code |
| **675 PULASKI ST., #2300** | **ATHENS, GA 30601** |
| Authorized signature | Title **EXECUTIVE DIRECTOR** | Date 3/9/2022 |

Form **8283** (Rev. 12-2021)

Form 8283: Noncash Charitable Contributions
Attachment for Information on Donated Property

Name:                           Log Creek, LLLP
Identifying Number:

**5(a). Description of the Property:** The donated property is a conservation easement donated as a "qualified conservation contribution" under I.R.C. § 170(h). The conservation easement encompasses approximately 240.00 acres of a 2,637.64 acre parcel located in Warren County, Georgia. The property is primarily wooded with pine trees and hardwoods.

**Conservation Purposes:**

The Property borders a stream and consists of diverse hardwood and planted pine forests with granite outcrops. The Property contains a managed pine forest, and permanently protecting the Property with this Conservation Easement will therefore provide for the maintenance of forestry land, which is a conservation purpose recognized by the State of Georgia as providing significant public benefit and therefore worthy of permanent protection (*See* the Georgia Conservation Tax Credit Program ("GCTCP") at O.C.G.A. § 48-7-29.12 and Ga. R. & Regs. 391-1-6- .03(5)(d)).

The Property is located in the Ogeechee River Watershed, segments of which have been designated by the Georgia Department of Natural Resources as a high priority watershed due to their importance in protecting or restoring aquatic species diversity, natural flow regimes, and other conservation activities as defined in the Georgia State Wildlife Action Plan (*See* SWAP, final report dated September 2015 ("2015 SWAP"), and contains three tributaries to the Ogeechee River which run through the Property for 5,920 feet.

The Property is made up of a number of habitats, including Mesic Hardwood Forest, Granite Outcrops, and Streams, which are classified as high priority by the State of Georgia due to their importance in protecting or restoring biodiversity, preserving functional ecosystems, and other conservation efforts as defined in the 2015 SWAP.

This Conservation Easement ensures "the preservation of open space (including farmland and forest land) where such preservation is pursuant to a clearly delineated Federal, State, or local governmental conservation policy, and will yield a significant public benefit," within the meaning of §170(h)(4)(A)(iii)(II) of the Internal Revenue Code of 1986, as amended, in that the State of Georgia has clearly delineated conservation policy and programs that recognize the significant public benefit associated with the preservation of open space, as follows:

a. The State of Georgia, recognizing the public benefit of protecting certain habitats and natural resources, has created the GCTCP in which a state income tax credit is awarded to qualifying conservation easements that further state-designated conservation purposes;

b. The following conservation purposes, which are recognized by the GCTCP, are served by this Conservation Easement: (i) the protection of high priority habitats, Mesic Hardwood

Forest, Granite Outcrops, and Streams, and the resulting significant public benefit includes the preservation of varied critical Georgia ecosystems that support a diversity of wildlife and provide habitat connectivity; (ii) the protection of water quality through the conservation of streams, wetlands, and buffers to these features, and the resulting significant public benefit is the protection of water quality and quantity necessary to support in-stream species and enhance public drinking water; and (iii) the protection of productive forestry and agricultural land, and the resulting significant public benefit is the creation of natural resource-based economic benefits to the State, including resource-based tourism, hunting, and resource-related employment, and the protection of important soils; and

By ensuring that the varied and critical high quality natural habitats mentioned above, as identified in the Baseline Documentation Report, remain undisturbed and intact, this Conservation Easement will therefore provide for "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem ... ," as set forth in IRC §170(h)(4)(A)(ii).

**Appraised Valuation:**

Market Value Before Grant of Conservation Easement: $51,550,000
Market Value after Grant of Conservation Easement: $4,920,000
Value of Conservation Easement/Contribution: $46,630,000

Less Value of Enhancement to Excluded Parcels: $230,500
Fair market Value Including Impact of Enhancement: $46,399,000 (R)

Pursuant to IRC § 1.170 A-14(h)(3)(i), " ... if the granting of a conservation easement has had an effect of the value increasing other property owned by the donor or a related person, the amount of the deduction for the conservation contribution shall be reduced by the amount of the increase in the value of the other property ... . "The enhancement value has been evaluated and an appropriate reduction has been taken as set forth above."

An appraisal by a qualified Appraiser, indicating the above valuations, is attached to this Form 8283.

**Statement of Purpose:**
This donation was not used to obtain a permit or any other approval by a local or other governing authority. This donation was not required by contract.

**Nearby Property Interests:**  The nearby property interests have been identified and valued for enhancement.  An appropriate reduction for their value has been made as identified above.

**5(b). Summary of overall physical condition of the property at the time of gift:**  The property consists of mostly undeveloped vacant acres, wooded with county maintained road access as well as frontage along the south side of the CSX Georgia Railroad; conservation easement donated on December 21, 2018 and recorded in Warren County on December 28, 2018.

**5(c). Appraised fair market value:**     Easement Value:     $46,399,000

**5(d). Dates acquired by donor:**  The member partner in Log Creek, LLLP, Tony D. Townley, acquired the property via Limited Warranty Deed from State Bank and Trust Company on June 30, 2010.  The property was subsequently contributed to Log Creek, LLLP on December 14, 2012 via Omnibus Deed.

**5(e). How acquired by donor:**  Contribution to Log Creek, LLLP through an Omnibus Deed.

**5(f). Donor's cost or adjusted basis:**  The acquisition cost/basis of the property was $300,603.

FILED IN OFFICE
12/28/2018 09:45AM
Deed          Doc: EASE
Recorded 12/28/2018 09:45AM

CYNTHIA CHEELEY-LAZENBY
Clerk Superior Court, WARREN County, Ga.
Bk 0009Q   Pg 0686-0714
Rec# 35091

After filing, please return to:
Oconee River Land Trust
675 Pulaski St., #2300
Athens, Georgia 30601

Cross reference to that certain
Omnibus Deed dated
December 14, 2012, and recorded
December 17, 2012, in Deed Book
8V, Pages 0772-0789
Warren County, Georgia Records

STATE OF GEORGIA
COUNTY OF OCONEE

### DEED OF CONSERVATION EASEMENT

**THIS DEED OF CONSERVATION EASEMENT** (hereinafter "Conservation Easement") is made this 21 day of December, 2018, by and between **Log Creek, LLLP**, a limited liability limited partnership formed under the laws of Georgia (hereinafter "Grantor"), and the **Oconee River Land Trust, Inc.**, a Georgia nonprofit corporation (hereinafter "Grantee").

### WITNESSETH

**WHEREAS**, Grantor owns in fee simple certain real property located in Warren County, Georgia, comprising approximately 240 acres more or less, and being more particularly described in **Exhibit A**, attached hereto and incorporated herein, and more particularly depicted on the "Conservation Easement Map" which is attached hereto as **Exhibit B** and incorporated herein (hereinafter the "Property"); and

**WHEREAS**, the Property borders a stream and consists of diverse hardwood and planted pine forests with granite outcrops; and

**WHEREAS**, the Property contains a managed pine forest, and permanently protecting the Property with this Conservation Easement will therefore provide for the maintenance of forestry land, which is a conservation purpose recognized by the State of Georgia as providing significant

1

public benefit and therefore worthy of permanent protection (See the Georgia Conservation Tax Credit Program ("GCTCP") at O.C.G.A. §48-7-29.12 and Ga. R. & Regs. 391-1-6-.03(5)(d)); and

**WHEREAS**, the forestry uses of the Property shall be conducted according to a professionally prepared Forest Management Plan (as defined below), and such management shall meet or exceed the then current Best Management Practices ("BMPs"), as defined by the Georgia Soil and Water Conservation Commission ("GSWCC"), the Georgia Forestry Commission, or successor agencies; and

**WHEREAS**, the Property is located in the Ogeechee River Watershed, segments of which have been designated by the Georgia Department of Natural Resources as a high priority watershed due to their importance in protecting or restoring aquatic species diversity, natural flow regimes, and other conservation activities as defined in the Georgia State Wildlife Action Plan ("SWAP") (See the SWAP, final report dated September 2015), and contains three tributaries to the Ogeechee River which run through the Property for 5,920 feet; and

**WHEREAS**, this Conservation Easement protects the water quality of streams, a conservation purpose recognized by the State of Georgia as providing significant public benefit and worthy of permanent protection, by (i) limiting the development on, and disturbances to, the Property; and (ii) protecting the stream and wetlands with buffers where disturbances to the soil and vegetation are prohibited (See the GCTCP at O.C.G.A. §48-7-29.12(a)(2)(A) and Ga. R. & Regs. 391-1-6-.03(5)(a)); and

**WHEREAS**, the Property is made up of a number of habitats, including Mesic Hardwood Forest, Granite Outcrops, and Streams, which are classified as high priority by the State of Georgia due to their importance in protecting or restoring biodiversity, preserving functional ecosystems, and other conservation efforts as defined in the SWAP (See the SWAP, final report dated September 2015); and

**WHEREAS**, this Conservation Easement, by permanently protecting the Property and preventing most disturbances, ensures the protection of these high priority habitats, and therefore provides for the "[p]rotection of wildlife habitat consistent with state wildlife conservation policies," a conservation purpose recognized by the State of Georgia as providing significant public benefit and worthy of protection (See the GCTCP at O.C.G.A. §48-7-29.12 and Ga. R. & Regs. 391-1-6-.03(5)(b), and the SWAP, final report dated September 2015); and

**WHEREAS**, this Conservation Easement ensures "the preservation of open space (including farmland and forest land) where such preservation is pursuant to a clearly delineated Federal, State, or local governmental conservation policy, and will yield a significant public benefit," within the meaning of §170(h)(4)(A)(iii)(II) (the "Government Policy Purpose") of the Internal Revenue Code of 1986, *as amended* ("IRC"), in that the State of Georgia has clearly delineated conservation policy and programs that recognize the significant public benefit associated with the preservation of open space, as follows:

 

2

a. The State of Georgia, recognizing the public benefit of protecting certain habitats and natural resources, has created the GCTCP in which a state income tax credit is awarded to qualifying conservation easements that further state-designated conservation purposes;

b. The following conservation purposes, which are recognized by the GCTCP, are served by this Conservation Easement: (i) the protection of high priority habitats, Mesic Hardwood Forest, Granite Outcrops, and Streams, and the resulting significant public benefit includes the preservation of varied critical Georgia ecosystems that support a diversity of wildlife and provide habitat connectivity; (ii) the protection of water quality through the conservation of streams, wetlands, and buffers to these features, and the resulting significant public benefit is the protection of water quality and quantity necessary to support in-stream species and enhance public drinking water; and (iii) the protection of productive forestry and agricultural land, and the resulting significant public benefit is the creation of natural resource-based economic benefits to the State, including resource-based tourism, hunting, and resource-related employment, and the protection of important soils; and

WHEREAS, by ensuring that the varied and critical high quality natural habitats mentioned above, as identified in the Baseline Documentation Report (as defined below), remain undisturbed and intact, this Conservation Easement will therefore provide for "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem…," as set forth in IRC §170(h)(4)(A)(ii) (the "Natural Habitat Purpose", along with the Government Policy Purpose, collectively referred to as the "IRC Purposes"); and

WHEREAS, Grantor intends that the multiple conservation purposes protected on the Property will not negatively impact each other and that uses inconsistent with these purposes will not be permitted; and

WHEREAS, the Property, in its protected state, will ensure the preservation of significant conservation values, including the preservation and protection of various significant natural wildlife and plant habitats, hydrologic resources, productive forest and agricultural resources, and open space values (collectively, "Conservation Values"), and thus is of great importance to the people of Warren County, the State of Georgia, and the United States, and therefore is worthy of perpetual protection; and

WHEREAS, preventing the development and disturbance of the Property will ensure that the high quality Conservation Values found on the Property will not be disturbed and will continue to benefit the public; and

WHEREAS, the Conservation Values are more particularly documented in the Conservation Easement baseline documentation report ("Baseline Documentation Report"), dated December 14, 2018, and prepared by Grantee, which consists of reports, maps, photographs, and other documentation regarding the present condition, uses, and Conservation Values of the Property as of the effective date of this Conservation Easement, as required by Treasury Regulations, §1.170A-14(g)(5); the Baseline Documentation Report is incorporated herein by this reference,

3





and is intended to serve as an objective, though non-exclusive, basis for monitoring compliance with the terms and conditions of this Conservation Easement; and

**WHEREAS**, Grantor intends that the Conservation Values of the Property be preserved and maintained by restricting and limiting those certain land uses on the Property set forth in more detail herein, and further, Grantor intends to convey to Grantee the right to preserve and protect the Conservation Values of the Property in perpetuity; and

**WHEREAS**, Grantee is (i) a publicly supported, nonprofit organization, created primarily for the conservation of the environment, and is tax exempt within the meaning of §501(c)(3) and §170(b)(1)(A)(vi) of the IRC; (ii) a "qualified organization" within the meaning of §170(h) of the IRC and §1.170A-14(c) of the Treasury Regulations; and (iii) a "holder" within the meaning of O.C.G.A. §44-10-1, *et seq.*, and, as such, is qualified to accept, hold, and administer conservation easements by the laws of the State of Georgia; Grantee's primary purpose is the preservation and protection of land in its scenic, forested, and open space condition in the Oconee River Watershed and other watersheds within the State of Georgia; and

**NOW, THEREFORE**, as an absolute charitable gift without payment of monetary consideration by Grantee to Grantor, but in consideration of the mutual covenants, terms, conditions, and restrictions hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, and pursuant to O.C.G.A. §44-10-1, *et seq.*, which expressly authorizes the conveyance herein contained, Grantor hereby unconditionally and irrevocably grants and conveys unto Grantee, forever and in perpetuity, a Conservation Easement of the nature and character and to the extent hereinafter set forth over the Property, including the right to preserve and protect the Conservation Values of the Property. Grantee, by its execution hereof, accepts the foregoing grant of this Conservation Easement, and the recordation of this instrument shall constitute a "recordation of the acceptance" by Grantee within the meaning of O.C.G.A. §44-10-3(b). The above recitals, which form a material part of this Conservation Easement, are incorporated herein and made a part hereof by this reference.

## ARTICLES OF AGREEMENT

### ARTICLE 1. PURPOSE

It is the exclusive purpose of this Conservation Easement to assure that the Property will be retained forever in its predominantly relatively natural, forested, open space, and relatively undeveloped condition, and to preserve and protect the IRC Purposes and the Conservation Values of the Property, including productive forestry and agricultural resources, the water quality of streams and wetlands, and a variety of significant natural habitats (collectively, the "Purpose"). Grantor will limit the use of the Property to activities that are consistent with the Purpose of this Conservation Easement and will prevent any use of the Property that will impair or interfere with the Conservation Values of the Property.

### ARTICLE 2. DURATION OF EASEMENT





4

This Conservation Easement shall be perpetual. It is an easement in gross, constitutes a real property interest, runs with the land, and is enforceable by Grantee against Grantor, its successors, assigns, lessees, agents, and licensees.

## ARTICLE 3. RIGHTS OF GRANTEE

To accomplish the Purpose, the following rights are conveyed to Grantee by this Conservation Easement:

**A.** To preserve and protect the Conservation Values of the Property pursuant to the terms hereof;

**B.** To enter upon the Property at reasonable times in order to monitor compliance with, and otherwise enforce the terms of, this Conservation Easement in accordance with Article 9, except in cases where Grantee determines in its reasonable discretion that immediate entry is required to prevent, terminate, or mitigate an existing or imminent violation of this Conservation Easement which would significantly damage the Conservation Values of the Property;

**C.** To prevent any activity on, or use of, the Property, that is inconsistent with the Purpose of this Conservation Easement and to require the restoration of such areas or features of the Property that may be damaged by any inconsistent activity or use to their condition as of the date of this Conservation Easement; and

**D.** To post signs and other boundary markers within this Conservation Easement identifying the boundary of lands subject to this Conservation Easement, provided such signs are professionally prepared.

## ARTICLE 4. RESERVED RIGHTS OF GRANTOR

Except as limited in this Conservation Easement, Grantor reserves all rights as fee owner of the Property; provided, however, that Grantor shall notify Grantee in writing, as required by Treasury Regulations, §1.170A-14(g)(5)(ii), prior to the exercise of any reserved or permitted right hereunder that may adversely impact the Conservation Values or the Purpose. Without limiting the generality of the foregoing, the following rights are expressly reserved unto the Grantor and are expressly permitted; provided, however, that notwithstanding any other provision of this Conservation Easement, the rights set forth in this Article shall only be exercised to the extent that they do not destroy or impair the Conservation Values and are not inconsistent with the Purpose of this Conservation Easement:

## A. Vegetation Management

1. Except as provided below, Grantor reserves the right to plant non-invasive, native species and remove exotic species, according to a restoration plan which is subject to approval by Grantee in accordance with the approval procedures in Article 7, in order to (i) enhance vegetated habitat; (ii) protect the water quality of the streams and wetlands; and (iii)

5





increase the Property's plant diversity; and any disturbed area shall be restored and re-vegetated so as to minimize sediment runoff and erosion.

2. The planting of invasive species listed in Category 1, Category 1 Alert, or Category 2 of the "List of Non-Native Invasive Plants in Georgia," published by the Georgia Exotic Pest Council or successor agency, is prohibited.

3. Grantor reserves the right to remove dead, insect-infested, and diseased trees if said trees pose a threat to human safety or to the health of the stand as a whole. In the event that more than single tree removal is required, then Grantor shall obtain Grantee approval of any clearing activity as provided in Article 7.

## B. Special Natural Areas

1. There are Mesic Hardwood Forests, Granite Outcrops, and Streams, on the Property, and these habitats are designated as Special Natural Areas ("SNAs"), as shown in **Exhibit B**, and shall be afforded additional protection because they are examples of significant and fragile natural communities.

2. The SNAs shall include twenty-five (25) foot buffers around each granite outcrop as measured from the edge of the exposed rock.

3. There shall be no clearing or disturbances in or to the SNAs, including no harvesting or cutting of trees or other vegetation except as provided in this paragraph.

4. Grantor reserves the right to restore and enhance the SNAs subject to a restoration plan that has been approved by Grantee in accordance with the approval procedures in Article 7. The restoration goals of these areas, which shall be set forth in the restoration plan, shall be to (i) maintain and enhance the health, diversity, and quality of the habitats; (ii) prevent erosion; and (iii) protect the Conservation Values in order to support the ecological integrity and diversity of the Property. In addition to setting out these goals, the restoration plan shall set out the methods for achieving these goals. Any restoration action within the SNAs must not adversely impact the buffers, streams, granite outcrops, and wetlands. Grantor may also include management or restoration activities in its Forest Management Plan, as defined below.

5. Restoration activities may include, without limitation, the removal of (i) exotic or non-native species and plants; (ii) other vegetation specified with Grantee's prior written consent; and (iii) damage caused by storms, insects, acts of God, disease, fire, unauthorized acts of third-parties, and other causes beyond the reasonable control of Grantor.

6. In addition to the activities listed above, restoration activities may include the planting of native, non-invasive species in order to restore natural habitat.



6



7. Trails are permitted in the SNAs, as provided below, except that trails may not be located in or on the exposed granite outcrops, and trails located in the granite outcrop twenty five (25) foot buffer shall be limited to pedestrian use only. Use of said trails in the SNAs shall not cause or contribute to erosion and sediment runoff and shall minimize impact to the Conservation Values. Trails must avoid impacting rare and endangered plant species.

8. New or additional roads are prohibited in the SNAs, except that Grantor may construct unpaved roads as part of an approved restoration plan or Forest Management Plan, as defined below; provided, however, that no roads may be placed in or on the granite outcrops or buffer.

9. Harvesting of timber and other soil and vegetation disturbing activities, including, but not limited to, food plots, wildlife openings, and commercial forestry activities, are prohibited in the "Riparian Buffer," which is defined as any portion of the Property that lies within two hundred (200) feet of the banks of any perennial and intermittent stream, upland depression swamp, or jurisdictional wetland, as delineated by the U.S. Army Corps of Engineers pursuant to Section 404 of the Clean Water Act, 33 U.S.C. §1251, *et seq.*. and fifty (50) feet of any ephemeral stream. Except that, in order to enhance the health and diversity of the Riparian Buffer, however, Grantor reserves the right, with Grantee's written approval, to (i) remove diseased trees, invasive exotic species, and other vegetation; (ii) replant and restore the hardwood forest in the Riparian Buffer using native, non-invasive species; and (iii) thin or remove pine in order to promote the ecological diversity and health of the forest.

C. **Forest Management.** Grantor reserves the right to conduct the following commercial forest management activities, in the area designated as "Forestry Envelope" in **Exhibit B**, according to an approved Forest Management Plan ("FMP"), as provided for in Paragraph C(7) of this Article:

1. Grantor may conduct forest management activities that affect species quantity and quality of the trees in the Forestry Envelope, including herbicide application, site preparation, planting, prescribed burning, thinning and harvesting of trees, and such activities necessary for the sale, trade, or other removal of forest products from the Property.

2. Forest management activities shall meet or exceed then current BMPs as defined by the GSWCC, the Georgia Forestry Commission, or successor agencies.

3. Grantor may construct firebreaks on the portion of the Property that lies outside of the Riparian Buffers and SNAs and in accordance with then current state BMPs. The construction of firebreaks shall not cause or contribute to erosion and sediment runoff.

4. Grantor shall provide Grantee a written notice of harvest at least thirty (30) days prior to commencement of harvesting activities. The notice shall include the location of the harvest, anticipated dates of harvesting, and a summary of the planned activities and disturbances, including construction of any staging areas, loading docks, and roads.

7





Timber harvesting shall be supervised by a professional forester registered in the State of Georgia.

5. Any staging areas, skid trails, loading docks, trails, and roads constructed as a necessary component of timber harvesting must be constructed and located so as to minimize erosion and sediment runoff. After a harvest, trails and roads must be stabilized in order to prevent erosion and sediment runoff. Stabilization efforts may include seeding with non-invasive vegetation.

6. Grantor reserves the right to create and maintain up to five (5) acres of open habitat or foodplots in the Forestry Envelope for the benefit of wildlife, including birds, and to provide a diversity of habitats. These wildlife openings shall be created and maintained according to the approved FMP as set forth below.

7. All forest management activities shall be conducted according to a Forest Management Plan ("FMP"), which shall be prepared by a professional forester registered in the State of Georgia or other qualified natural resource specialist as approved by Grantee, and the FMP must comply with the terms, conditions, and provisions of this Conservation Easement. The FMP shall describe how forest management activities will be consistent with the Purpose of this Conservation Easement. The FMP is subject to the approval by Grantee in accordance with the provisions of Article 7, except that the initial FMP shall be provided to Grantee for review and written approval sixty (60) days before any forest management activities occur on the Property. The FMP shall include, at a minimum, the following:

    a. A statement of Grantor's forest management goals, including, but not limited to: (i) maintenance of soil productivity; (ii) protection of the water quality of the streams and wetlands; (iii) protection of the Riparian Buffers and SNAs; (iv) conservation of the scenic and aesthetic quality of the Property; (v) minimization of grading and alteration of the Property's topography; (vi) promotion of biologic diversity and maintenance and enhancement of wildlife habitat; and (vii) conservation of native plants and animals species;

    b. Identification of the Riparian Buffers and SNAs as no-disturbance areas;

    c. Forest stand descriptions, including, but not limited to, species composition, age classes, area, and, where available, soil types and erodibility classes;

    d. Maps showing (i) predominant topographic and hydrologic features; (ii) forest types; (iii) existing roads and the approximate location of future roads such as might be permitted hereunder and anticipated at the time the FMP is written; and (iv) the location of other existing or proposed improvements, including, but not limited to, firebreaks, staging areas, and loading docks;

    e. Identification of erosion control measures; and

8



      f.   Anticipated date of harvesting and replanting, if so planned.

8.  Grantor reserves the right to cease forestry operations at any time and to resume them any time thereafter. In the event of the cessation of forestry, the vegetation shall be managed as set forth above in Paragraph A of this Article.

## D. Roads

1.  Grantor reserves the right to maintain and repair the existing unpaved roads as shown in **Exhibit B**, which are to be used for (i) access to the Property; (ii) vehicular, pedestrian, bike, and equestrian use; and (iii) agricultural and forest management activities, so long as such uses do not cause or contribute to erosion and sediment runoff and the roads are maintained according to then current BMPs, as defined by the GSWCC, the Georgia Forestry Commission, or successor agencies. The right to maintain includes the right to grade, apply gravel, install drainage culverts, and other improvements intended to minimize sediment and storm water runoff, with Grantee approval, so as to prevent impact to wetlands and other Conservation Values.

2.  Grantor reserves the right to construct additional unpaved roads as provided for in an approved FMP. All construction activities must (i) minimize the impact on adjacent vegetation; (ii) minimize sediment and storm water runoff; (iii) minimize the impact on the Conservation Values, streams, and wetlands of the Property; and (iv) comply with any existing BMPs as established by relevant state and federal agencies.

3.  The width of the area impacted by the clearing and construction of the roads and road improvements, including, but not limited to, the road bed, shoulders, and drainage structures, shall not exceed twenty (20) feet.

4.  Prior to the construction of any roads, Grantor must provide notice to Grantee of the proposed construction as provided in Article 7. All construction activities must minimize (i) the impact on adjacent vegetation; (ii) sediment and storm water runoff; and (iii) the impact on the Conservation Values, streams, and wetlands of the Property. All construction activity will comply with any existing BMPs as established by relevant state and federal agencies.

## E. Structures

1.  Structures are defined to mean and include any building or facility, including, but not limited to, any house, garage, barn, shed, outbuilding, tower, and pavilion. Except as specifically permitted herein, placement, installation, or construction of any temporary or permanent buildings, structures, facilities, or other improvements on the Property is prohibited.

2.  All construction, maintenance, and repair activities for all permitted structures must minimize (i) the impact on adjacent vegetation; (ii) sediment and storm water runoff; and (iii) the impact on the Conservation Values, streams, and wetlands of the Property. All

9



construction activity will comply with any then existing BMPs as established by the relevant local, state, and federal agencies.

3. The total area of the foundations of all permanent structures of any kind, including agricultural and forest management structures, shall not exceed one percent (1%) of the Property's acreage. The area of the foundation or base of the structure shall constitute the area of the structure for purposes of this paragraph.

4. Grantor reserves the right to construct, place, and maintain temporary structures, such as picnic tables, hunting stands, blinds, and other temporary hunting structures upon the Property, provided that construction of such structures does not cause or contribute to sediment runoff and provided that no temporary structure is located on or within the granite outcrops..

## F. Trails

1. Grantor reserves the right to construct and maintain permeable pedestrian, equestrian, and bicycle trails on the Property for non-motorized recreational and educational purposes and for the occasional use by all terrain vehicles so long as such use does not cause or contribute to erosion and sediment runoff. Trail location shall not impact rare and endangered species. The cleared width of the trails shall not exceed five (5) feet. Construction and maintenance of trails shall be done so as to (i) minimize disturbance to surrounding vegetation; and (ii) not cause or contribute to erosion and sediment runoff; and shall take into account the topography of the Property, with no portion of the trail running perpendicular (90 degrees) to the contour.

2. At least thirty (30) days prior to any trail construction activity, Grantor shall provide Grantee with written notice of such construction as provided in Article 7.

3. Grantor reserves the right to place picnic tables and benches along trails.

## E. Fences.
Grantor reserves the right to install, maintain, or replace any fences, from time to time, as is customary on the Property consistent with the Purpose of this Conservation Easement, except that such fences shall not impede the passage of wildlife.

## G. Lighting.
Only shielded outdoor lighting that directs the light downwards may be used on the Property.

## H. Utilities.
Grantor reserves the right to construct, maintain, and replace utilities, including power, water, septic systems, and communication, to support approved structures or uses on the Property. Prior to any clearing or construction activity, Grantor shall obtain Grantee's approval of the location of any additional utilities, as provided in Article 7, and shall notify Grantee, as provided in Article 7, before actual construction begins. All utility location, construction, and maintenance shall be done so as to minimize the impact on the Conservation Values and Purpose, and shall not impact the Riparian Buffers and SNAs.

10





**I. Education.** Grantor reserves the right to use the Property for the scientific and environmental education of the public, provided that the Conservation Values protected by this Conservation Easement are not diminished.

**J. Recreational Uses.** Grantor reserves the right to use the Property for recreational purposes, including, but not limited to, bird watching, hunting, fishing, swimming, equestrian use, bicycling, hiking, and the use of off-road and all-terrain vehicles, provided that such uses do not impair the Conservation Values, do not create a permanent track, and do not cause or contribute to erosion and sediment runoff.

## ARTICLE 5. PROHIBITED AND RESTRICTED ACTIVITIES

Except for the rights expressly reserved by Grantor in Article 4, any activity on, or use of, the Property inconsistent with the Purpose of this Conservation Easement, or that would significantly and adversely impair or interfere with the Conservation Values of the Property, is prohibited. Furthermore, the Property shall be subject to the following restrictions:

**A. Disturbance of Natural Features.** Grantor shall not change, disturb, alter, or impair any of the natural, scenic, and aesthetic features of the Property, except as permitted pursuant to Article 4.

**B. Motorized Vehicles.** Motorized vehicles on the Property are prohibited, except as set forth in Article 4.

**C. Industrial and Agricultural Use.** Industrial, manufacturing, and agricultural uses, except as provided in Article 4, are prohibited.

**D. Commercial Use.** Commercial activities are prohibited except as expressly provided herein.

**E. Subdivision.** Subdivision or partitioning of the Property for any purpose is prohibited.

**F. Signage.** Display of billboards, advertisements, or signs is prohibited on or over the Property, except that the following are permitted: (i) no trespass signs, no hunting signs, trail signs, educational signs, and signs that identify (a) the lands subject to this Conservation Easement, (b) the Grantor as owner of the Property, and (c) the participation of the landowner in state or county programs; and (ii) as provided in Article 3.

**G. Construction.** Except as permitted in Article 4 above, construction and placement of structures, impervious surfaces, or improvements of any kind is prohibited.

**H. Dumping.** The dumping or disposal of trash, garbage, or hazardous material on the Property is prohibited, except that biodegradable material generated on the Property may be permitted to remain there. The installation of underground storage tanks is prohibited.

**I. Mineral Use, Excavation, Dredging.** The exploration for, or the extraction of, oil, hydrocarbons, natural gas, minerals, soil, rock aggregate, or other materials located on or



below the surface of the Property, or using any exploration or extraction method that disturbs the surface or subsurface of the land, is prohibited. Grantor shall not transfer, lease, or otherwise separate the minerals or mineral rights from the Property. Excavation and land filling are prohibited except as necessary to carry out the provisions of Article 4.

**J. Water Quality and Drainage Patterns.** Except as provided for in Article 4, there shall be (i) no pollution, sedimentation, alteration, depletion, or extraction of surface water or natural water courses, subsurface water, or any other water bodies on or within the Property; (ii) no manipulation, diversion, or other alteration of wetlands or streams; and (iii) no activities conducted on the Property that would be detrimental to water quality or that could alter the natural water level or flow in or over the Property.

**K. Road Construction.** The construction of additional roads within the Property is prohibited, except as set forth in Article 4.

## ARTICLE 6. PUBLIC ACCESS

This Conservation Easement does not create or convey a right of access by the general public to the Property.

## ARTICLE 7. NOTICE AND APPROVAL

**A. Notice of Intention to Undertake Certain Permitted Actions.** The purpose of requiring Grantor to notify Grantee prior to undertaking permitted activities is to afford Grantee a timely opportunity to ensure that the activities in question are designed and carried out in a manner consistent with the Purpose of this Conservation Easement. Therefore, when notice is required, Grantor shall notify Grantee in writing not less than thirty (30) days prior to the date Grantor intends to undertake the activity in question. Said notice shall describe the nature, scope, design, location, and any other material aspect of the proposed activity in sufficient detail to permit Grantee to make an informed judgment as to its consistency with the Purpose of this Conservation Easement.

**B. Grantee's Approval.** Where Grantee's approval is required, Grantee shall either deny or grant its approval in writing within thirty (30) days of receipt of Grantor's written request. Grantor's written request shall describe the nature, scope, design, location, and any other material aspect of the proposed activity for which Grantor seeks approval. Grantee's approval may be withheld only upon a determination by Grantee that the action as proposed would be inconsistent with the Purpose of this Conservation Easement.

## ARTICLE 8. MEDIATION

**A. Mediation.** If a dispute arises between the Grantor and Grantee (the "Parties" and each a "Party") concerning the consistency of any proposed use or activity with the Purpose of this Conservation Easement, and Grantor agrees not to proceed with the use or activity pending the resolution of the dispute, either Party may refer the dispute to mediation by written request to the other Party. Within twenty (20) days of the receipt of such a request, the

12

Parties shall select a single trained and impartial mediator. If the Parties are unable to agree on the selection of a single mediator, then the Parties shall, within forty-five (45) days of receipt of the initial request, jointly apply to a proper court for the appointment of a trained and impartial mediator. The venue for the mediation shall be in a location mutually agreed to by the Parties. Mediation shall then proceed in accordance with the following guidelines:

1. Purpose. The purpose of the mediation is to (i) promote discussion between the Parties; (ii) assist the Parties to develop and exchange pertinent information concerning the issues in dispute; and (iii) assist the Parties to develop proposals that will enable them to arrive at a mutually acceptable resolution of the controversy. The mediation is not intended to result in any express or *de facto* modification or amendment of the terms, conditions, or restrictions of this Conservation Easement.

2. Participation. The mediator may meet with the Parties and their counsel jointly or *ex parte*. The Parties agree that they will participate in the mediation process in good faith and expeditiously, attending all sessions scheduled by the mediator. Representatives of the Parties with settlement authority will attend mediation sessions as requested by the mediator.

3. Confidentiality. All information presented to the mediator shall be deemed confidential and shall be disclosed by the mediator only with the consent of the Parties or their respective counsel. The mediator shall not be subject to subpoena by any Party. No statements made or documents prepared for mediation sessions shall be disclosed in any subsequent proceeding or construed as an admission of a Party.

4. Time Period. Neither Party shall be obligated to continue the mediation process beyond a period of ninety (90) days from the date of receipt of the initial request or if the mediator concludes that there is no reasonable likelihood that continuing mediation will result in a mutually agreeable resolution of the dispute.

5. Costs. The costs of the mediator shall be borne equally by the Parties, but each Party shall bear its own expenses, including attorneys' fees, individually.

## ARTICLE 9. GRANTEE'S REMEDIES

**A. Notice of Violation; Corrective Action.** If Grantee knows or reasonably believes that a violation of the terms of this Conservation Easement has occurred or is threatened, Grantee shall give written notice to Grantor of such violation and demand corrective action sufficient to cure or abate such violation and, where the violation involves injury to the Property resulting from any use or activity inconsistent with the Purpose of this Conservation Easement, to restore the portion of the Property so injured to the condition that existed as of the date of this Conservation Easement, in accordance with a plan approved by Grantee.

**B. Remedies.** If Grantor fails to cause discontinuance, abatement, or such other corrective action of a violation as may be requested by Grantee within thirty (30) days after receipt of notice thereof from Grantee (or, under circumstances where the corrective action cannot

13



reasonably be completed within such thirty (30) day period, Grantor fails to begin such corrective action within the thirty (30) day period, Grantor fails to continue diligently to perform such corrective action within the thirty (30) day period, or Grantor fails to continue diligently to perform such corrective action until completion), Grantee, after seven (7) days written notice to Grantor, may bring an action at law or in equity in a court of competent jurisdiction to enforce the terms of this Conservation Easement, to enjoin the violation by temporary or permanent injunction, to require the restoration of the Property to the condition that existed as of the date of this Conservation Easement, and/or to seek the recovery of damages arising from such non-compliance (including, without limitation, damages for the loss of scenic, aesthetic, or environmental values). Without limiting Grantor's liability therefore, Grantee, in its sole discretion, may apply any damages recovered to the cost of undertaking any corrective action on the Property.

**C. Emergency Enforcement.** If Grantee, in its reasonably exercised discretion, determines that circumstances require immediate action to prevent or mitigate significant damage to the Conservation Values of the Property, Grantee may pursue its remedies under this Article without prior notice to Grantor and without waiting for the period provided for cure to expire.

**D. Scope of Relief.** Grantor agrees that Grantee's remedies at law for any violation of the terms of this Conservation Easement may be inadequate and that Grantee shall be entitled to seek injunctive relief described in Paragraph B of this Article, both prohibitive and mandatory, in addition to such other relief to which Grantee may be entitled, including specific performance of the terms of this Conservation Easement. Grantee's remedies described in this Article shall be cumulative and shall be in addition to all remedies now or hereafter existing at law or in equity.

**E. Costs of Enforcement.** If a court or other decision-maker chosen by mutual consent of the Parties determines that any provision of this Conservation Easement has been breached by Grantor, Grantor will reimburse Grantee for any reasonable costs of enforcement, including, without limitation, costs of suit and reasonable attorneys' fees, monitoring fees, any costs of restoration necessitated by Grantor's violation of the terms of this Conservation Easement, the value of any lost Conservation Values, and any other payments ordered by such court or decision-maker. If Grantor prevails in any action to enforce the terms of this Conservation Easement, each Party shall bear its own costs of suit, including, without limitation, reasonable attorneys' fees. Grantor shall not be responsible for the costs of a frivolous action, or an action brought in bad faith by the Grantee, as determined by a court of competent jurisdiction.

**F. Forbearance.** Enforcement of the terms of this Conservation Easement shall be at the discretion of Grantee, and any forbearance by Grantee to exercise its rights under this Conservation Easement in the event of any breach of any term of this Conservation Easement by Grantor shall not be deemed or construed to be a waiver by Grantee of such term, or of any subsequent breach of the same or any other term of this Conservation Easement, or of any of Grantee's rights under this Conservation Easement. No delay or omission by Grantee in the exercise of any right or remedy upon any breach by Grantor shall impair such right or remedy or be construed as a waiver.

14




**G. Waiver of Certain Defenses.**  Grantor hereby waives any defense of laches, estoppel, or prescription.

**H. Acts Beyond Grantor's Control.**  Nothing contained in this Conservation Easement shall be construed to entitle Grantee to bring any action against Grantor for any injury to or change in the Property resulting from causes beyond Grantor's control, including, without limitation, fire, flood, storm, earth movement, insect infestation, disease, airborne or waterborne pollutants introduced by third parties, or from any prudent action taken by any person under emergency conditions to prevent, abate, or mitigate significant injury to any person or the Property resulting from such causes. In the event the terms of this Conservation Easement are violated by acts of trespassers that Grantor could not reasonably have anticipated or prevented, Grantor agrees at Grantee's option to join in any suit or to assign its right of action to Grantee, for the purposes of pursuing enforcement action against the responsible parties.

## ARTICLE 10.  GRANTOR REPRESENTATIONS, WARRANTIES, AND INDEMNIFICATION

**A. Title.**  Grantor hereby represents and warrants that Grantor has good and marketable title to the Property in fee simple and has the right to grant and convey this Conservation Easement, that the Property is free and clear of any and all encumbrances, except as set forth on **Exhibit C** attached hereto and incorporated herein or, if the Property is subject to any mortgage or security deed, such mortgage or security deed has been subordinated to this Conservation Easement, and that Grantee and its successors and assigns shall have the use and enjoyment of all the benefits derived from and arising out of this Conservation Easement. Grantor hereby warrants and shall forever defend title to the Property against the claims of all persons owning, holding or claiming by, through or under Grantor.

**B. Representations and Warranties.**  Grantor represents and warrants that to the best of its knowledge:

1.  No substance defined, listed, or otherwise classified pursuant to any federal, state, or local law as hazardous, toxic, polluting, or otherwise contaminating to the air, water, or soil, or in any way harmful or threatening to human health or the environment, exists or has been released, generated, treated, stored, used, disposed of, deposited, abandoned, or transported in, on, from, or across the Property in violation of applicable law;

2.  There are no underground storage tanks located on the Property, whether presently in service or closed, abandoned, or decommissioned, and no underground storage tanks have been removed from the Property in a manner not in compliance with applicable federal, state, and local laws;

3.  Grantor and the Property are in compliance with all federal, state, and local laws applicable to the Property and its uses;

15



4. There is no pending or threatened litigation in any way affecting, involving, or relating to the Property; no civil or criminal proceedings or investigations have been instigated at any time or are now pending relating to the Property; no notices, claims, demands, or orders have been received, arising out of any violation or alleged violation of, or failure to comply with, any federal, state, or local law, regulation, or requirement applicable to the Property or its use; and there are no facts or circumstances that Grantor might reasonably expect to form the basis for any such proceedings, investigations, notices, claims, demands, or orders; and

5. No person has retained a qualified mineral interest in the Property of a nature that would disqualify this Conservation Easement for purposes of Treasury Regulations, §1.170A-14(g)(4).

**C. Remediation.** If, at any time, there occurs, or has occurred, a release in, on, or about the Property of any substance now or hereafter defined, listed, or otherwise classified pursuant to any federal, state, or local law as hazardous, toxic, polluting, or otherwise contaminating to the air, water, or soil, or in any way harmful or threatening to human health or to the environment, Grantor agrees to take all steps to assure its containment and remediation, including any cleanup that may be required by applicable law.

**D. Control.** Nothing in this Conservation Easement shall be construed as giving rise, in the absence of a judicial decree, to any right or ability in Grantee to exercise physical or managerial control over the day-to-day operations of the Property, or any of Grantor's activities on the Property, or otherwise to become an owner or operator with respect to the Property within the meaning of The Comprehensive Environmental Response, Compensation, and Liability Act of 1980, *as amended* ("CERCLA"), and Georgia's hazardous waste statutes.

**E. Indemnification.** Grantor hereby acknowledges that Grantee has no possessory rights in the Property nor any right or responsibility to operate, control, or maintain the Property. Grantor releases and shall hold harmless, indemnify, and defend Grantee and its members, directors, officers, employees, agents, and contractors, and the heirs, personal representatives, successors, and assigns of each of them (collectively, "Indemnified Parties"), from and against any and all liabilities, penalties, fines, charges, costs, losses, damages, expenses, causes of action, claims, demands, orders, judgments, or administrative actions, including, without limitation, reasonable attorneys' fees, arising from or in any way connected with: (i) injury to or the death of any person, or physical damage to any property, resulting from any act, omission, condition, or other matter related to or occurring on or about the Property, regardless of causes, unless due to the negligent act or intentional misconduct of any of the Indemnified Parties; (ii) the violation or alleged violation of, or other failure to comply with, any federal, state, or local law, regulation, rule, requirement, or ordinance, including, without limitation, CERCLA and Georgia hazardous waste statutes, by any person other than any of the Indemnified Parties, in any way affecting, involving, or relating to the Property; and (iii) the presence or release in, on, from, or about the Property, at any time, of any substance now or hereafter defined or classified pursuant to any federal, state, or local law, regulation, or requirement as hazardous, toxic, polluting, or otherwise contaminating to the air, water, or

16




soil, or in any way harmful or threatening to human health or the environment, unless caused by any of the Indemnified Parties.

## ARTICLE 11.  EXTINGUISHMENT, CONDEMNATION, AND PROCEEDS

A. **Extinguishment**.  It is the unequivocal intention of Grantor and Grantee that the Purpose of this Conservation Easement be carried out in perpetuity.  If circumstances arise in the future such as render the Purpose of this Conservation Easement impossible to accomplish, this Conservation Easement can only be terminated or extinguished, whether in whole or in part, by judicial proceedings in a court of competent jurisdiction, under applicable Georgia and Federal laws.  The amount of the proceeds to which Grantee shall be entitled shall be determined in accordance with the Proceeds paragraph below.  Any and all prior claims shall first be satisfied by Grantor's portion of the proceeds before Grantee's portion is diminished in any way.  Grantee shall use all such proceeds in a manner consistent with the Purpose of this Conservation Easement including but not limited to the costs to monitor, enforce and preserve any portions of the Property that remain subject to this Easement, or, if no remaining portion of the Property is subject to this Easement, to monitor and enforce other easements held by Grantee that are comparable to this Easement and to conserve properties subject to such other easements in a manner consistent with Grantee's conservation purposes under this Easement.  Grantor and Grantee agree that changed economic conditions shall not be considered as circumstances justifying the termination or extinguishment of this Conservation Easement.

B. **Condemnation.**  If this Property is taken, in whole or in part, by exercise of the power of eminent domain or acquired by purchase in lieu of condemnation, Grantee shall be entitled to that portion of the proceeds from the Property's subsequent sale, exchange, or involuntary conversion in accordance with the Proceeds paragraph below, unless state law provides otherwise, and Grantor and Grantee agree to join in all necessary and appropriate actions to recover the full value of such condemnation, including all incidental damages.

C. **Proceeds.**  This Conservation Easement constitutes a real property interest, immediately vested in Grantee at the time Grantor conveys this Conservation Easement to Grantee and constitutes a perpetual conservation restriction.  As required under Treas. Reg. § 1.170A-14(g)(6)(ii), the parties stipulate that the donation of the perpetual conservation restriction gives rise to a property right, immediately vested in the Grantee, with a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift, bears to the value of the Property as a whole at that time.  For the purposes of this Paragraph, that proportionate value of the Grantee's property right shall remain constant. Accordingly, when a change in conditions give rise to the extinguishment of the perpetual conservation restriction granted by the Conservation Easement , the Grantee, on a subsequent sale, exchange, or involuntary conversion of the subject property, must be entitled to a portion of the proceeds at least equal to that proportionate value of the perpetual conservation restriction, unless state law provides that the Grantor is entitled to the full proceeds from the

17

 

conversion without regard to the terms of the prior perpetual conservation restriction. This paragraph C and Article 11 shall be interpreted to adhere to and be consistent with 26 C.F.R. Section 1.170A-14(g)(6)(ii).

**D. Application of Proceeds.** Grantee shall use any proceeds received under the circumstances described in this Article in a manner consistent with the Purpose, which is exemplified by this Conservation Easement.

## ARTICLE 12. ASSIGNMENT/SUCCESSOR GRANTEE

**A. Assignment**. This Conservation Easement is transferable, but Grantee may assign its rights and obligations under this Conservation Easement only to an organization that is a qualified organization at the time of transfer under Section 170(h) of the Code and 26 C.F.R. Section 1.170A-14 (or any successor provision then applicable), and authorized to acquire and hold conservation easements under Georgia law or the laws of the United States. As a condition of such transfer, Grantee shall require that the Conservation Purposes that this Conservation Easement is intended to advance, continue to be carried out and the transferee has a commitment to protect the Conservation Purposes and the resources to enforce this Conservation Easement. Grantee agrees to give written notice to Grantor of any assignment at least sixty (60) days prior to the date of such assignment. The failure of Grantee to give such notice shall not affect the validity of such assignment nor shall it impair the validity of this Conservation Easement or limit its enforceability in any way.

**B. Successor Grantee**. If, at any time, Grantee shall be unwilling or unable to continue as grantee hereunder, including, but not limited to, if Grantee ceases to exist or to be a qualified organization under Section 170(h) of the Code and 26 C.F.R. Section 1.170A-14, or to be authorized to acquire and hold conservation easements under the Georgia Act, then Grantee shall assign its rights and obligations under this Easement only to an organization that is a qualified organization at the time of transfer under Section 170(h) of the Code and 26 C.F.R. Section 1.170A-14 (or any successor provision then applicable), and authorized to acquire and hold conservation easements under the Georgia Act or any successor provision then applicable or the laws of the United States. As a condition of such transfer, Grantee shall require that the Conservation Purposes that this grant is intended to advance, continue to be carried out, and the transferee has a commitment to protect the Conservation Purposes and the resources to enforce this Easement. Grantee agrees to give written notice to Grantor of any assignment at least sixty (60) days prior to the date of such assignment. If Grantee cannot assign this Easement to a qualified successor Grantee, the rights and obligations under this Easement shall vest in such organization as a court of competent jurisdiction shall direct pursuant to applicable Georgia law and consistent with the requirements for an assignment pursuant to Article 12 including that such successor grantee satisfies all of the requirements for an assignment pursuant to this Article 12.



18

**ARTICLE 13.  AMENDMENT**

[Intentionally Omitted.]

**ARTICLE 14.  SUBSEQUENT TRANSFERS**

**A. Transfer.**   Grantor agrees to incorporate the terms of this Conservation Easement by reference in any subsequent deed or other legal instrument by which it transfers any interest in all or a portion of the Property, including, without limitation, a leasehold interest. Grantor further agrees to give written notice to Grantee of the transfer of any interest at least twenty (20) days prior to the date of such transfer, and to provide the name and address of the new Grantor. The failure of Grantor to perform any act required by this Article shall not impair the validity of this Conservation Easement or limit its enforceability in any way.

**B. Merger.**   The parties agree that, notwithstanding the operation of Georgia common law, the terms of this Conservation Easement shall survive any merger of the fee and easement interest in the Property. No deed, transfer, or assignment of any fee title interest in the Property to the Grantee, or any successor holder of this Easement, shall be effective if it will result in the merger of this Conservation Easement with the fee title interest in the Property. The provisions of this paragraph are intended to prevent such merger. The provisions of this paragraph shall apply, and shall be construed to apply, to the Grantee, as holder, and to any successor holder (which must be a qualified organization within the meaning of § 170(h) of the IRC and the corresponding Treasury Regulations) of this Easement.

**C. Documentation of Present Status.**   Upon written request by Grantor, Grantee shall have thirty (30) days to execute and deliver to Grantor any document, including an estoppel certificate, that certifies Grantor's compliance with any obligation of Grantor contained in this Conservation Easement. Such documentation shall describe the condition of the Property, as known by Grantee, as of the date of Grantee's most recent inspection. If Grantor requests more current status information, then Grantee shall conduct an inspection and provide said information at Grantor's sole expense within forty-five (45) days following receipt of Grantor's request.

**ARTICLE 15.  NOTICES**

Any notice, demand, request, consent, approval, or communication that either Party desires or is required to give to the other shall be in writing and either delivered personally or sent by commercial courier service or first class mail, postage prepaid, return receipt requested, and addressed as follows:

> To Grantor:   Log Creek, LLLP
> 1280 Snows Mill Rd.
> Bogart, GA 30622
> Attention:  General Partners

19

To Grantee:   Oconee River Land Trust, Inc.
675 Pulaski St., #2300
Athens, Georgia 30601

## ARTICLE 16.  RECORDATION

Grantee shall record this instrument in timely fashion in the official records of Warren County, Georgia, and may re-record it at any time as may be required to preserve its rights in this Conservation Easement.

## ARTICLE 17.  GENERAL PROVISIONS

**A. Controlling Law.**  The interpretation and performance of this Conservation Easement shall be governed by the laws of the State of Georgia.

**B. Liberal Construction.**  Any general rule of construction to the contrary notwithstanding, this Easement shall be liberally construed in favor of the grant to effect the purpose of this Easement and the policy and purpose of O.C.G.A. §§ 44-10-1, et seq. (the "Georgia Act"), and to qualify as a qualified conservation contribution under the Code and 26 C.F.R. Section 1.170A-14 (the "Conservation Easement Regulations").  The Georgia Act and the Conservation Easement Regulations are sometimes referred to herein collectively as the "Conservation Easement Laws". If any provision in this instrument is found to be ambiguous, an interpretation consistent with the purpose of this Easement that would render the provision valid shall be favored over any interpretation that would render it invalid. This Easement is made pursuant to the Conservation Easement Laws, but the invalidity of such Conservation Easement Laws or any part thereof shall not affect the validity and enforceability of this Easement according to its terms, it being the intent of the parties to agree and to bind themselves, their successors, and their assigns in perpetuity to each term of this instrument whether this instrument be enforceable by reason of any statute, common law, or private agreement in existence either now or hereafter.

**C. Severability.**  If any provision of this Conservation Easement, or the application thereof to any person or circumstance, is found to be invalid, the remainder of the provisions of this Conservation Easement, or the application of such provision to persons or circumstances other than those as to which it is found to be invalid, as the case may be, shall not be affected thereby.

**D. Entire Agreement.**  This instrument and the documents incorporated herein by reference set forth the entire agreement of the Parties with respect to this Conservation Easement and supersede all prior discussions, negotiations, understandings, or agreements relating to this Conservation Easement, all of which are merged herein.

**E. No Forfeiture.**  Nothing contained herein will result in a forfeiture or reversion of Grantor's title in any respect.



20



**F. Joint Obligation.** The obligations imposed by this Conservation Easement upon Grantor shall be joint and several.

**G. Successors.** The covenants, terms, conditions, and restrictions of this Conservation Easement shall be binding upon, and inure to the benefit of, Grantor and Grantee and shall continue as a servitude running in perpetuity with the Property. Except as expressly provided otherwise herein, the terms "Grantor" and "Grantee," wherever used herein, and any pronouns used in place thereof, shall include, respectively, the above-named Grantor and its personal representatives and heirs, and successors and assigns in interest in the Property after the date hereof, and the above-named Grantee and its personal representatives, heirs, successors, and assigns.

**H. Termination of Rights and Obligation.** A Party's rights and obligations under this Conservation Easement terminate upon transfer of the Party's interest in this Conservation Easement or Property, except that liability for acts or omissions occurring prior to transfer shall survive transfer.

**I. Captions.** The captions in this instrument have been inserted solely for convenience of reference and are not a part of this instrument and shall have no effect upon construction or interpretation.

**J. Counterparts.** The Parties may execute this instrument in two or more counterparts, that shall be signed by both Parties, and each counterpart shall be deemed an original instrument as against any Party who has signed it. In the event of any disparity between the counterparts produced, the recorded counterpart shall be controlling.

**K. Contemporaneous Written Acknowledgement.** By Grantee's signature below, this paragraph constitutes that contemporaneous written acknowledgement of the contribution by the donee organization, in this case, Grantee, required by Section 170(f)(8) of the IRC with respect to the property interest conveyed to Grantee by this Conservation Easement. The property interest is the Conservation Easement described in, and evidenced by, this document, and a proper legal description of the Property encumbered by this Conservation Easement is attached hereto as **Exhibit A**. No goods or services were provided by Grantee as consideration, in whole or in part, for the grant of this Conservation Easement by Grantor.

**L. Interpretation Consistent with Conservation Easement Regulations.** In the event of any ambiguity, inconsistency or conflict between the provisions contained herein and the provisions of Section 170(h) of the Code and 26 C.F.R. Section 1.170A-14 (collectively, the "Conservation Easement Regulations"), this Conservation Easement shall be interpreted and construed so that the provisions of the Conservation Easement Regulations shall control.

**ARTICLE 18. EXHIBITS; DOCUMENTATION**

**A. Exhibits. Exhibit A**, Legal Description of the Property, is attached hereto and made a part hereof by reference. **Exhibit B**, Conservation Easement Map, is attached hereto and made a

21




part hereof by reference. **Exhibit C**, Exceptions to Title is attached hereto and made a part hereof by reference.

**B. Baseline Documentation Report.** The Parties acknowledge that the Baseline Documentation Report, dated December 14, 2018 executed by both Grantor and Grantee, and a copy of which is on file at the office of Grantee, accurately and completely describes, to the best of Grantor's and Grantee's knowledge, the uses, structures, Conservation Values, and condition of the Property as of the date hereof.

**TO HAVE AND TO HOLD** this Conservation Easement unto Grantee and its successors and assigns, together with all and singular rights, members, and appurtenances thereof to the same being, belonging or in anywise appertaining, to the only proper use, benefit, and behoove of Grantee forever.

<center>**SIGNATURE PAGE IMMEDIATELY FOLLOWS**</center>

22




**IN WITNESS WHEREOF**, the Parties hereto have set their hands and seals and caused these presents to be executed in their respective names by authority duly given, and their seals affixed, the day and year first above written.

Signed, sealed, and delivered
in the presence of:

Name: _Russell Wills_
  Unofficial Witness

Name: _Karen E. Mims_
  Notary Public

My Commission Expires:
_December 6, 2019_

KAREN E MIMS
OGLETHORPE COUNTY, GEORGIA
[AFFIX NOTARY SEAL]
NOTARY PUBLIC
MY COMMISSION EXPIRES
DECEMBER 6, 2019

**GRANTOR:**

Log Creek, LLLP

By: _____ (L.S.)
Name: Tony D. Townley
Title:   General Partner

By: _____ (L.S.)
Name: Elizabeth A. Townley
Title:   General Partner

*[Signatures continue on following page]*

23

Signed, sealed, and delivered
in the presence of:

Name: _Steffney Thompson_
Unofficial Witness

Name: _Caroline Johnson Hall_
Notary Public

My Commission Expires:
_October 31st, 2022_

**GRANTEE:**

Oconee River Land Trust, Inc.,
a Georgia nonprofit corporation

By: _____
Name: Smith Wilson
Title: Chair

Attest: _____
Name: Roger Nielsen
Title: Secretary

[Affix Notary Seal]



CAROLINE JOHNSON HALL
NOTARY PUBLIC
EXP. OCT. 31, 2022
OCONEE COUNTY, GEORGIA

## EXHIBIT A

All that tract of land, together with improvements thereon, situate, lying and being in the 154th Georgia Militia District, in Warren County, Georgia and being more particularly described as follows:

Commence at a concrete monument on the westerly right of way of Ogeechee River Road, also known as County Road 56, having an 80' right of way, and the southerly right of way of Georgia Railroad, having a 150' right of way;

thence leaving the right of way of Ogeechee River Road and continuing along the southerly right of way of Georgia Railroad N 86°11'25" E a distance of 1464.75' to an iron pin, said iron pin being the point of beginning;

thence N 86°09'47" E a distance of 2582.93' to an iron pin;

thence leaving said right of way S 47°03'01" W a distance of 476.96' to an iron pin;

thence S 04°19'07" W a distance of 2133.12' to a concrete monument;

thence S 88°17'38" E a distance of 1034.08' to an iron pin at a rock;

thence S 03°15'03" W a distance of 885.30' to an iron pin;

thence S 70°34'43" W a distance of 232.32' to an iron pin;

thence N 89°25'17" W a distance of 236.28' to an iron pin;

thence S 63°17'07" W a distance of 1722.17' to an iron pin;

thence S 17°25'17" E a distance of 383.38' to an iron pin;

thence S 12°33'16" E a distance of 842.37' to an iron pin on the northern right of way of Timber Road, also known as County Road 58, having a 30' right of way;

thence continuing along said right of way S 85°03'58" W a distance of 41.87' to a point;

thence with a curve turning to the left with an arc length of 247.86', with a radius of 1075.74', with a chord bearing of N 85°42'41" W, with a chord length of 247.31' to a point;

thence S 85°41'30" W a distance of 119.01' to a point;

thence S 83°56'43" W a distance of 394.91' to a point;

thence with a curve turning to the left with an arc length of 244.86', with a radius of 239.61', with a chord bearing of S 60°59'46" W, with a chord length of 234.34' to a point;

thence S 40°49'17" W a distance of 43.47' to an iron pin;

thence leaving said right of way N 19°27'22" E a distance of 777.28' to an iron pin;

thence N 17°50'30" W a distance of 3028.18' to a concrete monument;

thence N 27°27'45" E a distance of 1055.75' to an iron pin at an 18" sweetgum tree;

thence N 09°13'43" W a distance of 872.25' to an iron pin on the southern right of way of Georgia Railroad, which is the point of beginning;

Said parcel containing 240.00 acres more or less and being more particularly described on a plat of survey entitled "PLAT FOR LOG CREEK, LLLP" by Baseline Surveying & Engineering, Inc., Matthew D. Ulmer, Registered Surveyor, dated December 3, 2018, recorded in Plat Book 14918, page 42, in the Office of the Clerk of the Superior Court of Warren County, Georgia.

**EXHIBIT B**
**Conservation Easement Map**





Exhibit C
Exceptions to Title
Page 1 of 2

1.  The claim of state and county ad valorem taxes for years subsequent to 2018 which are not yet due and payable;

2.  Easements granted to utility companies for the erection and placing of pole and the strings of wire, together with the incidental rights of clearing and inspection;

3.  Right-of-way deeds in favor of governmental authorities for the purpose of constructing roads and roadways.

4.  Riparian rights of owners of property adjacent to any river, stream, branch, or any other waterway flowing into, arising or flowing from, or flowing through the subject property.

5.  Subject to Forest Land Conservation Use Assessment Covenant recorded in Deed Book 8Y, Page 427, Clerk's Office, Warren County Superior Court.

6.  Subject to all matters shown on plat of survey of the Cason Tract prepared by H. M. Brown, Registered Land Surveyor, dated November 7, 1955, and attached to deed recorded at Deed Book 3J, Page 341, said Clerk's Office.

7.  Subject to all matters shown on plat of survey of the Elliot Tract prepared by H. M. Brown, Registered Surveyor, dated June 10, 1959, and attached to deed recorded in Deed Book 3K, Page 179, said Clerk's Office.

8.  Subject to all matters shown on plat of survey referred to in deed from Jennye H. Elliot and Edward C. Elliot to Timber Acquisition Limited Partnership recorded on June 24, 1987 at Deed Book 5C, Page 638, said Clerk's Office.

9.  Subject to Easement in favor of Georgia Power Company dated September 11, 1975 and recorded in Deed Book 3P, Page 293, said Clerk's Office.

00630597.2/011119-000143

Exhibit C
Exceptions to Title
Page 2 of 2

10.   Subject to the rights of others and the public at large to the use of Timber Road AKA County Road 58 - unpaved, a county maintained dirt road which traverses through the Elliot Tract easterly from Ogeechee River Road along and/or within the southern boundary line of the subject property.

11.   Subject to all matters shown on plat of survey of the property dated December 3, 2018 and recorded in Plat Book 14918, Page 42, said Clerk's Office.



# Log Creek
## WARREN COUNTY, GA

## BASELINE DOCUMENTATION REPORT

**Prepared by Elizabeth Branch
As a project for the Oconee River Land Trust**

**Date of Report: 12/14/18**

OCONEE RIVER LAND TRUST                                                    LOG CREEK

**Project/Property Name:   Log Creek (also referred to as "Property" in this report)**

**Baseline Gathered By:   ELIZABETH BRANCH**

**Qualifications**: Elizabeth Branch holds a Master of Science in Wildlife Biology with a certificate in Conservation Ecology and Sustainable Development from the University of Georgia.  She has been principal and owner of Natural Resource Consultants, LLC since 1998 and has extensive experience in land conservation and land management.   She is on the Advisory Board and served as President of the Madison Morgan Conservancy.

**Purpose of Baseline Documentation Report:**
This Baseline Documentation Report (BDR) has been prepared in order to document the subject Property's existing conditions, including conservation values, location and man-made features.  This BDR will also be used by Oconee River Land Trust (ORLT) as a reference point for future monitoring and enforcement activities.

## I. GENERAL INFORMATION

**A. Date Visited**
The Property was visited on December 4, 2018 by Elizabeth Branch. All portions of the tract and each habitat type were inspected on foot and by vehicle.

**B. Owner**
The current owner of the Property is **Log Creek, LLLP** (Grantor). The current Property owner's address is 1280 Snows Mill Road, Bogart, GA 30622.

**C. Location**
The entrance to this tract is located on Timber Road (County Road 58), Warrenton, GA in Warren County, approximately 8 miles southwest of Warrenton, GA. See **Attachment 1** for a location map.

**D. Directions from Warrenton, GA**
To reach the Property from the center of Warrenton, GA, travel southwest on Main Street/US 278 for approximately 0.6 miles. Take right onto Atlanta Hwy/US 278/Rt 12 and then take the first left onto Mayfield Road. Travel approximately 7.6 miles then turn left onto Ogeechee River Rd (County Road 56). Travel approximately 1.7 miles and then turn left onto Timber Road (County Road 58). Travel approximately 0.3 miles and  the entrance to the Property is on the left. See the location map in **Attachment 1**.

**E. Survey and Legal Description**
The legal boundary (survey) of the Property is shown in **Attachment 2**. The legal description is shown in **Attachment 3**.

2

OCONEE RIVER LAND TRUST                                   LOG CREEK

### F. Name of Quad Map, Series, Coordinates of Property
USGS 7.5 min series  Jewell, GA, Quadrangle Map. The center of the Property is at **33° 21' 6.08" N, 82° 46' 44.89" W.**

### G. Size
The Property is approximately 240.0 acres.

## II. INVENTORY REPORT

This baseline documents conditions on the Property as of the date of the report. It is not an exhaustive inventory, and conditions may change over time.

### A. General Description of Property
The Property exists as one tract in western Warren County, GA. It is in the Upper Ogeechee River Watershed HUC 03060201.

The Property is in a rural area surrounded by farms and timber properties.

The Property is primarily planted pine timber with some foodplots and hardwood along the tributaries of the Ogeechee River. The Property is currently used for timber production, outdoor recreation and hunting.

An extensive road system provides access for recreation and future timber harvests. The interior roads are dirt and gravel.

See **Attachment 4** for an aerial view of the Property. For photos of the Property, see **Attachments 15** and **16**.

### B. Topography
The Property is gently rolling. Elevation varies between 420 and 500 feet above MSL, with the lowest points along the tributaries of the Ogeechee River and the highest point along the eastern property line. These topographic features can be seen in **Attachment 5**.

### C. Soils and Geology
The Property is located in the Southern Outer Piedmont Ecoregion of Georgia. **Attachment 6** shows the Property's location within Georgia's ecoregions. The soils in this region tend to be finer-textured than soils in the Coastal Plain Ecoregion. Once widely cultivated, much of Georgia's Piedmont has reverted to pine and hardwood woodlands.

Soils of the Appling sandy loam, Cecil Sandy Clay, Grover sandy loam, Helena loamy coarse sand, and Wedowee loamy sand make up the majority of the Property. A general soils map is presented in **Attachment 7**.



3

The USDA/NRCS classifies farmland based on how valuable it is for agriculture. The Property has approximately 146.9 acres (61%) of land that is classed as **Farmland of Statewide Importance** and 71.3acres (30%) of **Prime Farmland**.

### D. Water Resources

Three tributaries of the Ogeechee River transect the Property. The northern two tributaries run through the Property for approximately 2,380 ft and 2,550 ft before joining and leaving the Property. The third runs for approximately 990 ft in a northerly direction through the Property. An ephemeral stream also flows west through an area of young planted pine near the southern boundary of the Property and empties into the southernmost of the three tributaries. These tributaries join to form a pond just to the west of the property and then travel for approximately 4,300 ft where they flow into the Ogeechee River. After these bodies of water join the Ogeechee River it flows in a southeasterly direction for over 200 miles and then empties into Ossabaw Sound on the Georgia Atlantic coast.

This river is in the Upper Ogeechee River Watershed, portions of which have been designated as **high priority watersheds** by Georgia Department of Natural Resources (GA DNR).

The Property's water resources are identified in **Attachment 9**, which shows a 200-foot riparian buffer on the streams and a 50-foot buffer on the ephemeral stream. **Attachment 8** shows the Property's location in the Upper Ogeechee River Watershed. **Attachment 17** describes the Ogeechee River's journey through the Upper Ogeechee Watershed into the Ogeechee River Basin.

### E. Vegetation and Habitat

Current habitat and land use types are identified in the Ecological Features Map in **Attachment 11**. The approximate acreage of each type is as follows: pine forest (220.7 acres), Mesic Hardwood Forest (16.8 acres), foodplot (2.5 acres), and 2 small Granite Outcrop (less than 1 acre). **Granite Outcrop, Mesic Hardwood Forest** and **Streams** are listed by the GA DNR and State Wildlife Action Plan documents as **high priority habitats** in the Piedmont Ecoregion of Georgia. See **Attachment 18** for descriptions of the kinds of high priority habitat that are found on the Property.

Loblolly pine forest makes up the majority of the Property in three separate stands. The largest stand is mature loblolly pine which has not been thinned. It is densely stocked with very little understory growth. The second is young planted pine that was planted approximately 3-5 years ago and the smallest stand is 20 year old pine that was thinned approximately five years ago and has an open understory. The understory in these stands consists of dog fennel, blackberries, understory saplings, plume grass, beautyberry and others.

The **Mesic Hardwood Forests** are located along the tributaries of the Ogeechee River. This forest is narrow in most places and has a mature overstory, including southern red oak, white oak, green ash, water oak, red maple, yellow poplar, and sweetgum. The mid-





4

and understories consist of understory saplings, honeysuckle, beautyberry, grasses, Christmas fern and river cane.

The foodplots are scattered in the pine forests throughout the Property along the interior roads and old logging decks. Some of the foodplots had been planted in seasonal wildlife foods.

Two small **Granite Outcrops** are located in the planted pine near the center of the Property. They contain various mosses and lichen.

Chinese privet, Nepalese browntop, Japanese honeysuckle, and lespedeza – non-native species that are considered invasive by the Georgia Exotic Pest Council – were observed on the Property. See **Attachment 10** for a list of native and exotic plant species found on the Property, organized according to the kind of habitat in which they were observed.

### F. Agricultural Resources
The Property is being utilized for timber production.

### G. Wildlife
Field signs and individual sightings during the field surveys noted coyotes, gray squirrels, and white-tailed deer. Numerous resident and migrant songbirds, and other common landbirds, were also seen and heard while inspecting the tract, including cardinals, nuthatches, and blue jays. Though not observed on the Property, a host of other species typical of the Georgia Piedmont may be present. **Attachment 19** lists some of these species.

### H. Rare or Endangered Species Known to Exist
No endangered or threatened species are known to occur on the Property. A full rare species survey was not conducted, but the Property has suitable habitat for some rare or endangered plant and animal species. **Attachment 20** lists some of these species.

### I. Cultural Resources
No historical resources were observed on the Property.

### J. Scenic Character and Views from Public Roads/Waters
Scenic views of the Property are available from Timber Road (Route 58).

### K. Existing Man-Made Structures
The man-made structures on the Property are roads. See **Attachment 13** for a map showing the locations of these man-made features.

### L. Evidence of Past Disturbances
No evidence of heavy storms, fires, or other large scale events was noted during visit.

### M. Former Land Uses

5

The Property was likely farmed or used in timber production in the past. Evidence of former timber production and harvest includes old loading docks and the relatively young age of the pine stand.

### N. Current Land Uses
The Property is used for timber production and outdoor recreation (primarily hunting).

### O. Management Plan in Effect, If Any
No management plan currently exists for the tract.

### P. Zoning and Local Planning Restrictions, If Relevant
There are no known zoning or planning restrictions in force that affect the use of this Property.

### Q. Adjacent Land Attributes and Uses; Existing and Potential Conflicts
The Property is adjacent to farms and forested tracts of various sizes. There are no known conflicts with adjacent landowners.

### R. Amount and Type of Current Public Access and Public Use
The landowner and invited guests hike, hunt, and observe wildlife on the Property at this time. No formal plans for public use exist.

### S. Evidence of Presence of Hazardous Waste
No evidence of hazardous waste was noted during field visit.

### T. Proximity to Other Protected Land
ORLT holds two conservation easments within 5 miles of the Property – Sparta Beef and Duck Farm. Ogeechee Wildife Management Area is also located 5 miles to the north and to the south of the Property, and several other privately held conservation easements are located to the south. See **Attachment 14** for a map showing nearby protected properties. Various other county and city parks are also located within 10 miles of the Property.

### U. Benefits of Conservation
The current owner has decided to place the Property under a conservation easement (CE) that protects its conservation values. These conservation values include **high priority streams**, **high priority watersheds**, and **high priority habitats** in the state of Georgia. Protecting these values benefits the public, and the plants and animals that live on the Property and in the larger watershed.

This CE protects streams and plant habitat in the Upper Ogeechee River Watershed, segments of which have been designated **high priority watersheds**, by enhancing stream buffers and reducing non-point source pollution. Enhancing stream buffers and reducing non-point source pollution is critical for protecting water quality. Non-point source pollution – a type of pollution consisting of mud, litter, bacteria, pesticides, fertilizers, and a variety of other pollutants that are washed into rivers and streams by rainwater – is common in



G.J.

6

OCONEE RIVER LAND TRUST                                    LOG CREEK

Georgia's rivers and streams. Stream buffers reduce the amount of these pollutants making it into waterways, thereby improving surface and groundwater quality. Improved surface and groundwater quality benefits people by providing cleaner drinking water and better recreational opportunities. It also provides quality habitat for plants and animals living in the watershed. Rivers and riparian buffers on the Property also provide valuable dispersal corridors for plant and animal species passing through the Property.

This CE protects **high priority habitats** as well, including habitat combinations that are important for many species of plants and animals. High priority habitats that the Property protects include: **Granite Outcrop, Mesic Hardwood Forest** and **Streams**.    See **Attachment 11** for the location of these habitats.

Properly exercised reserved rights and the permitted uses will not negatively impact the conservation values.





7

OCONEE RIVER LAND TRUST                                         LOG CREEK

In compliance with Section 1.170A - 14(g)(5) of the federal tax regulations, LOG CREEK, LLLP, owner of the Property referenced and described by this report, and the OCONEE RIVER LAND TRUST, INC., do hereby acknowledge that this report is an accurate representation of the Property as of the date of the conveyance of the conservation easement referenced in this report by the landowner ("Grantor") to the Oconee River Land Trust ("Grantee").

Sworn to and subscribed before me

_Karen E Mims_

NOTARY PUBLIC

This the __21__ day of __Dec__ 20_18_

My commission expires:

(SEAL)    KAREN E MIMS
OGLETHORPE COUNTY, GEORGIA
NOTARY PUBLIC
MY COMMISSION EXPIRES
DECEMBER 6, 2019

**Log Creek, LLLP**

By: _____

Name: _Tony D. Townley_

Title: _General Partner_

Date: _DEC. 21, 2018_

By: _____

Name: _ELIZABETH A TOWNLEY_

Title: _General Partner_

Date: _DEC. 21, 2018_

Sworn to and subscribed before me

_____

NOTARY PUBLIC

This the _____ day of _____ 20__

My commission expires:

(SEAL)

**Oconee River Land Trust, Inc.**

By: _____

Name: _Smith Wilson_

Title: _Chair_

Date: _12-21-18_

 _E.J._

8

OCONEE RIVER LAND TRUST                                                    LOG CREEK

## III. ATTACHMENTS

1. Location Map
2. Survey
3. Legal Description
4. Aerial Photograph
5. Topographic Map
6. Georgia Ecoregions Map
7. Soils Map
8. Georgia Watersheds Map
9. Riparian Buffer Map
10. Plant List
11. Ecological Features Map
12. Conservation Easement Map
13. Man-Made Features Map
14. Nearby Protected Properties Map
15. Photo Location Map
16. Photos
17. Appendix 1: Water Resources
18. Appendix 2: Vegetation and Habitat
19. Appendix 3: Wildlife
20. Appendix 4: Rare or Endangered Species

Map Disclaimer: Maps contained in this report are not surveys and must not be construed as surveys. The information imparted with these maps is meant to assist the parties in their efforts to clearly depict Property boundaries, describe placement of certain retained and reserved rights, and to calculate acreage figures. Property boundaries, while approximate, were established using the best available information that may include: surveys, tax maps, and field mapping using G.P.S. and/or ortho photos.

Unless otherwise noted, maps were created on December 14, 2018.



9

OCONEE RIVER LAND TRUST                                    LOG CREEK

## ATTACHMENT 1:  LOCATION MAP



Warren County, GA











LOG CREEK

OCONEE RIVER LAND TRUST                                    LOG CREEK

## ATTACHMENT 3: LEGAL DESCRIPTION

All that tract of land, together with improvements thereon, situate, lying and being in the 154th

Georgia Militia District, in Warren County, Georgia and being more particularly described as

follows:

Commence at a concrete monument on the westerly right of way of Ogeechee River Road, also

known as County Road 56, having an 80' right of way, and the southerly right of way of Georgia

Railroad, having a 150' right of way;

thence leaving the right of way of Ogeechee River Road and continuing along the southerly right of

way of Georgia Railroad N 86°11'25" E a distance of 1464.75' to an iron pin, said iron pin being the

point of beginning;

thence N 86°09'47" E a distance of 2582.93' to an iron pin;

thence leaving said right of way S 47°03'01" W a distance of 476.96' to an iron pin;

thence S 04°19'07" W a distance of 2133.12' to a concrete monument;

thence S 88°17'38" E a distance of 1034.08' to an iron pin at a rock;

thence S 03°15'03" W a distance of 885.30' to an iron pin;

thence S 70°34'43" W a distance of 232.32' to an iron pin;

thence N 89°25'17" W a distance of 236.28' to an iron pin;

thence S 63°17'07" W a distance of 1722.17' to an iron pin;

thence S 17°25'17" E a distance of 383.38' to an iron pin;

thence S 12°33'16" E a distance of 842.37' to an iron pin on the northern right of way of Timber

Road, also known as County Road 58, having a 30' right of way;

thence continuing along said right of way S 85°03'58" W a distance of 41.87' to a point;

12

OCONEE RIVER LAND TRUST                                    LOG CREEK

thence with a curve turning to the left with an arc length of 247.86', with a radius of 1075.74', with a

chord bearing of N 85°42'41" W, with a chord length of 247.31' to a point;

thence S 85°41'30" W a distance of 119.01' to a point;

thence S 83°56'43" W a distance of 394.91' to a point;

thence with a curve turning to the left with an arc length of 244.86', with a radius of 239.61', with a

chord bearing of S 60°59'46" W, with a chord length of 234.34' to a point;

thence S 40°49'17" W a distance of 43.47' to an iron pin;

thence leaving said right of way N 19°27'22" E a distance of 777.28' to an iron pin;

thence N 17°50'30" W a distance of 3028.18' to a concrete monument;

thence N 27°27'45" E a distance of 1055.75' to an iron pin at an 18" sweetgum tree;

thence N 09°13'43" W a distance of 872.25' to an iron pin on the southern right of way of Georgia

Railroad, which is the point of beginning;

Said parcel containing 240.00 acres more or less and being more particularly described on a plat by

Baseline Surveying & Engineering, Inc., for Log Creek LLLP, dated 12/03/2018.



13

OCONEE RIVER LAND TRUST                                      LOG CREEK

## ATTACHMENT 4: AERIAL PHOTOGRAPH





14

OCONEE RIVER LAND TRUST                                    LOG CREEK

## ATTACHMENT 5: TOPOGRAPHIC MAP



    

15

OCONEE RIVER LAND TRUST                                        LOG CREEK

## ATTACHMENT 6: GEORGIA ECOREGIONS MAP







OCONEE RIVER LAND TRUST                                    LOG CREEK

## ATTACHMENT 7: SOILS MAP



NRC
Natural Resource Consultants

**Warren County, GA**



17



OCONEE RIVER LAND TRUST                    LOG CREEK

## SOILS MAP LEGEND

| Map Unit Symbol | Map Unit Name | Farmland Classification | Acres | Percent |
|---|---|---|---|---|
| AmB | Appling sandy loam, 2 to 6 percent slopes | All areas are prime farmland | 33.40 | 13.92% |
| AmC | Appling sandy loam, 6 to 10 percent slopes | Farmland of statewide importance | 23.50 | 9.79% |
| CfB2 | Cecil sandy clay loam, 2 to 6 percent slopes, eroded | Farmland of statewide importance | 13.70 | 5.71% |
| CfC2 | Cecil sandy clay loam, 6 to 10 percent slopes, eroded | Not prime farmland | 0.60 | 0.25% |
| CfE2 | Cecil sandy clay loam, 10 to 25 percent slopes, moderately eroded | Not prime farmland | 21.20 | 8.83% |
| GeB | Grover sandy loam, 2 to 6 percent slopes | All areas are prime farmland | 0.00 | 0.00% |
| HeB | Helena loamy coarse sand, 2 to 6 percent slopes | All areas are prime farmland | 9.40 | 3.92% |
| HeC | Helena loamy coarse sand, 6 to 10 percent slopes | Farmland of statewide importance | 73.50 | 30.63% |
| WeB | Wedowee loamy sand, 2 to 6 percent slopes | All areas are prime farmland | 28.50 | 11.88% |
| WeC | Wedowee loamy sand, 6 to 10 percent slopes | Farmland of statewide importance | 36.20 | 15.08% |
| **Totals for Area of Interest** | | | **240.0** | **100%** |

18

OCONEE RIVER LAND TRUST                                    LOG CREEK

## ATTACHMENT 8: GEORGIA WATERSHEDS MAP







OCONEE RIVER LAND TRUST                                    LOG CREEK

## ATTACHMENT 9: RIPARIAN BUFFER MAP



Warren County, GA





20

OCONEE RIVER LAND TRUST                                      LOG CREEK

## ATTACHMENT 10: PLANT LIST (List of Dominant, Co-Dominant and Understory Plant Species Identified on Property)

### Pine Forests

| Common Name | Scientific Name |
|---|---|
| **Dominant Species** ||
| Pine (Loblolly) | *Pinus taeda* |
| **Understory Species** ||
| Bluestem | *Andropogon* spp. |
| Asters | *Aster* spp. |
| Dog Fennel | *Eupatorium capillifolium* |
| Carolina Jessamine | *Gelsemium sempervirens* |
| Lespedeza** | *Lespedeza* spp. |
| Sweetgum | *Liquidambar styraciflua* |
| Japanese Honeysuckle** | *Loniceria japonica* |
| Panic Grass | *Panicum* spp. |
| Oak (Southern Red) | *Quercus falcata* |
| Oak (Water) | *Quercus nigra* |
| Plume Grass | *Saccharum alopecuroides* |
| Greenbrier | *Smilax* spp. |
| Goldenrod | *Solidago* spp. |
| Muscadine Grape | *Vitus rotundifolia* |

### Mesic Hardwood Forests

| Common Name | Scientific Name |
|---|---|
| **Dominant Species** ||
| Sweetgum | *Liquidambar styraciflua* |
| Yellow Poplar | *Liriodendron tulipifera* |
| Oak (White) | *Quercus alba* |





21

OCONEE RIVER LAND TRUST                                                    LOG CREEK

| | |
|---|---|
| Oak (Southern Red) | *Quercus falcata* |
| Oak (Northern Red) | *Quercus rubra* |
| Oak (Water) | *Quercus nigra* |
| **Co-Dominant Species** ||
| Dogwood (Flowering) | *Cornus florida* |
| Persimmon | *Diospyros virginiana* |
| Ash (Green) | *Fraxinus pennsylvanica* |
| Black Cherry | *Prunus serotina* |
| Elm (Winged) | *Ulmus alata* |
| **Understory Species** ||
| River Cane | *Arundinaria gigantea* |
| Christmas Fern | *Polystichum acrostichoides* |
| Blackberry | *Rubus* spp. |
| Greenbrier | *Smilax* spp. |
| Sparkleberry | *Vaccinium arboreum* |

** Denotes exotic species

22

OCONEE RIVER LAND TRUST                                    LOG CREEK

## ATTACHMENT 11: ECOLOGICAL FEATURES MAP







23

OCONEE RIVER LAND TRUST                                    LOG CREEK

## ATTACHMENT 12: CONSERVATION EASEMENT MAP



Legend:
- Special Natural Area
- Forestry Envelope
- Riparian Buffer (200' on Stream; 50' on Ephemeral Stream)
- Granite Buffer (25' on granite outcrop)

- Property Boundary
- County Road
- Interior Road
- Railroad
- Stream
- Ephemeral Stream

County Road 58

RLoGIS Date: 12/20/2018

NAIP 2017 (10/17/2017)

NRC Natural Resource Consultants

**Warren County, GA**

0    feet    660
1 in to 660 ft





OCONEE RIVER LAND TRUST                                    LOG CREEK

## ATTACHMENT 13: TOPOGRAPHIC MAP WITH MAN-MADE FEATURES



Warren County, GA

25

## ATTACHMENT 14:  NEARBY PROTECTED PROPERTIES MAP





## ATTACHMENT 15: PHOTO LOCATION MAP



Warren County, GA

**ATTACHMENT 16: PHOTOGRAPHIC LOG**
**Photographer: Elizabeth Branch**                **Camera:  iPhone 7**
**Date: December 4, 2018**                        **Time: 12:30 PM**
**Weather: Sunny, 50° F, Calm Winds**



**CP1a:  View of Property from Timber Road (County Road 58) facing southwest**
**(33° 20' 38.61" N, 82° 46' 54.18" W, 260°)**



**CP1b: Entrance to Property off of Timber Road (County Road 58) facing east**
**(33° 20' 38.61" N, 82° 46' 54.18" W, 70°)**

28



**CP2: Young planted Loblolly pine**
(33° 20' 51.23" N, 82° 46' 51.59" W, 90°)



**CP3a: Mowed trail within young planted pine stand**
(33° 20' 53.76" N, 82° 46' 50.03" W, 90°)

29



**CP3b: Young planted pine with mowed trail through broomsedge and other grasses**
**(33° 20' 53.76" N, 82° 46' 50.03" W, 290°)**



**C4a: Interior road through mature planted pine**
**(33° 21' 2.56" N, 82° 46' 29.35" W, 340°)**



**CP4b: Thinned planted loblolly pine with dog fennel, blackberry, broomsedge and sweetgum saplings in understory (33° 21' 2.56" N, 82° 46' 29.35" W, 120°)**



**CP5a: Foodplot adjacent to young planted pine along tributary of the Ogeechee River (33° 20' 56.37" N, 82° 46' 37.81" W, 150°)**

31



**CP5b: View of mature planted pine and foodplot from same CP**
(33° 20' 56.37" N, 82° 46' 37.81" W, 60°)



**CP6a: Small Granite Outcrop within planted pine stand**
(33° 21' 6.08" N, 82° 46' 44.89" W, 230°)

32

OCONEE RIVER LAND TRUST



**CP6b: Granite Outcrop with moss and lichen**
**(33° 21' 6.08" N, 82° 46' 44.89" W, 280°)**



**CP7a: Foodplot adjacent to young planted pine and interior road**
**(33° 21' 9.46" N, 82° 46' 40.47" W, 350°)**



**CP7: Interior road running between two age classes of planted Loblolly pine**
**(33° 21' 9.46" N, 82° 46' 40.47" W, 180°)**



**CP8a: Washed out culvert pipe along interior road crossing tributary of Ogeechee River**
**(33° 21' 14.96" N, 82° 46' 41.98" W, 70°)**

OCONEE RIVER LAND TRUST 164 of 666 LOG CREEK



**CP8b: Hardwood along stream adjacent to road crossing
(33° 21' 14.96" N, 82° 46' 41.98" W, 195°)**



**CP9a: Mesic Hardwood Forest along tributary of the Ogeechee River with Christmas fern,
northern red oak, sweetgum, and water oak (33° 21' 15.21" N, 82° 46' 45.5" W, 260°)**



**CP9b: View from hardwood drain at river cane along stream and young planted pine in the distance (33° 21' 15.21" N, 82° 46' 45.5" W, 150°)**



**CP10: Dense stand of Loblolly pine with very little understory (33° 21' 19.37" N, 82° 46' 50.25" W, 40°)**

36



**CP11a: Tributary of the Ogeechee River flowing through Mesic Hardwood Forest with river cane**
(33° 21' 22.86" N, 82° 46' 55.99" W, 305°)



**CP11b: River cane, water oak, sweetgum, and southern red oak along the banks of stream**
(33° 21' 22.86" N, 82° 46' 55.99" W, 135°)



37

OCONEE RIVER LAND TRUST



**CP11c: View of young planted pine adjacent to stream with river cane
(33° 21' 22.86" N, 82° 46' 55.99" W, 70°)**



**CP12a: View of young planted pine along stream from within more mature pine stand
(33° 21' 22.45" N, 82° 46' 47.12" W, 355°)**



38

OCONEE RIVER LAND TRUST                    EXHIBIT 2: LOG CREEK                    168 of 666



**CP12b: Loblolly pine with sweetgum saplings, vaccinium, and muscadine in understory**
**(33° 21' 22.45" N, 82° 46' 47.12" W, 260°)**



**CP13a: Stream flowing through Mesic Hardwood Forest. Note Japanese honeysuckle in**
**foreground**
**(33° 21' 24.52" N, 82° 46' 44.7" W, 120°)**

39



**CP13b: Interior road as it crosses over stream through hardwood drain
(33° 21' 24.52" N, 82° 46' 44.7" W, 75°)**



**CP14a:  Transition between mature planted loblolly pine and young pine with river cane
along the edge (33° 21' 27.86" N, 82° 46' 40.44" W, 345°)**





40

OGEECHEE RIVER LAND TRUST



**CP14b: Trail between two age classes of planted pine**
**(33° 21' 27.86" N, 82° 46' 40.44" W, 65°)**



**CP15a: Young planted pine along tributary to the Ogeechee River near northern property**
**line (33° 21' 30.52" N, 82° 46' 52.14" W, 260°)**

OCOEE RIVER LAND TRUST LOG CREEK



**CP15b: Railroad running along northern property line**
(33° 21' 30.52" N, 82° 46' 52.14" W, 5°)



**CP16a: River cane along road adjacent to planted pine**
(33° 21' 25.4" N, 82° 46' 51.43" W, 55°)

42



**CP16b: Mowed interior road between young planted pine and more mature pine**
**(33° 21' 25.4" N, 82° 46' 51.43" W, 235°)**



**CP17a: Foodplot along interior road overgrown with dog fennel**
**(33° 21' 19.07" N, 82° 46' 41.49" W, 10°)**

43

OCONEE RIVER LAND TRUST    LOG CREEK



**CP17b: Interior road through foodplot with plume grass, dog fennel, and goldenrod (33° 21' 19.07" N, 82° 46' 41.49" W, 135°)**



**CP18a: Planted loblolly pine stand with blackberry, smilax, broomsedge and sweetgum saplings in understory (33° 20' 57.84" N, 82° 46' 46.46" W, 130°)**



**CP18b: Interior trail through planted pine**
(33° 20' 57.84" N, 82° 46' 46.46" W, 320°)

45

## ATTACHMENT 17: APPENDIX ON WATER RESOURCES

The Property is in the Upper Ogeechee River Watershed HUC 03060201. The Ogeechee River is the dominant waterbody in the basin. The Ogeechee River is located in mid- to southeastern Georgia and is flanked by the Altamaha and Oconee River basins to the west and the Savannah River basin to the east. In the headwaters located in Greene County, Georgia, the North and South Fork Ogeechee Rivers join to form the Ogeechee River which runs 245 miles in a southeasterly direction and empties into Ossabaw Sound on the Georgia Atlantic coast. The Ogeechee River basin is located entirely in the State of Georgia and drains approximately 5,540 square miles.

The Ogeechee River is one of Georgia's few remaining free flowing streams and contains excellent habitat for numerous freshwater fish species. The Ogeechee River is a typical blackwater coastal stream, which is a result of tannins from decaying tree roots and other organic materials passing through the sandy soil and staining the water. However, unlike other black water rivers, the Ogeechee has a high pH (near 7.0) due to a large input of carbonate-rich water from Magnolia Springs in Jenkins County, Georgia. Other significant water features are the coastal estuaries, sounds, and the Atlantic Intracoastal Water-Way. There are no large storage reservoirs or hydroelectric plants in the Ogeechee River Basin, but there are many small lakes, reservoirs, and farm ponds.

## ATTACHMENT 18: APPENDIX ON VEGETATION AND HABITAT*

**Granite Outcrops:** Diverse mosaics of exposed granitic rock, herb and shrub dominated patches, and wetland microhabitats. Most have shallow solution pits that collect soil and support various stages of plant A-24 succession. These environments support rare or endemic species of plants and animals. The most important of these habitats contain a variety of solution pits, seepage zones, and bare rock exposures. Some outcrops are monadnocks (rise above the ground) while others

**Mesic Hardwood Forests** Non-wetland forests of floodplains, ravines, and north-facing slopes in the Piedmont. These may include species such as American beech, white oak, northern red oak, bitternut hickory, pignut hickory, shagbark hickory, bigleaf magnolia, yellow poplar, blackgum, dogwood, black cherry, and loblolly pine. Typical shrubs include spicebush, sweetshrub, pawpaw, Oconee azalea, rusty viburnum, and pinxter-flower.

**Streams** In the upper Piedmont, streams are low to moderate gradient and typically contain well-defined riffles and pools. Substrate consists of gravel, pebble, sand, and silt; some bedrock may also be present. Lower Piedmont streams are lower gradient, have fewer riffles and pools, and their substrates have a higher proportion of silt, clay, and detritus than upper Piedmont streams. Turbidity is highly variable, but most of these streams become highly turbid after rain.

*These habitat descriptions are quoted from Appendix pages A-23 and A-25 in Georgia DNR's "Georgia State Wildlife Action Plan.

## ATTACHMENT 19:  APPENDIX ON WILDLIFE

Small mammals such as fox squirrels, wood rats, voles, and shrews may be present. A varity of native reptiles and amphibians may also live here, including various non-venomous water snakes, rat snakes, copperhead snakes, canebrake rattlesnakes, green tree frogs, fence lizards, and green anoles. In addition, neotropical migrants like the gray catbird, field sparrow, pine warbler, and prairie warbler could utilize the forests that occur on this Property.

*See Appendices in Georgia DNR's "Georgia State Wildlife Action Plan."

## ATTACHMENT 20:  APPENDIX ON RARE OR ENDANGERED SPECIES*

Among plants that are rare and unusual in the Georgia Piedmont, and therefore classified by the GA DNR as high priority species in that ecoregion, the following species are known to occur in the kinds of forests and ecosystems that are found on the Property:

*Corydalis flavula* (Yellow Harlequin)
*Silene ovata* (Mountain Catchfly)

Among the animal species that are classified as species of concern in the Georgia Piedmont, the following species are known to occur in the kinds of habitats that are found on the Property:

*Clemmys guttata* (Spotted Turtle)
*Etheostoma parvipinne* (Goldstripe Darter)
*Eurycea hillisi* (Hillis's Dwarf Salamander)
*Fusconaia masoni* (Atlantic Pigtoe)
*Hemidactylium scutatum* (Four-toed Salamander)
*Lampropeltis rhombomaculata* (Mole Kingsnake)
*Moxostoma sp. 4* (Brassy Jumprock)
*Necturus punctatus* (Dwarf Waterdog)
*Peucaea aestivalis* (Bachman's Sparrow)
*Procambarus petersi* (Ogeechee Crayfish)

*See Appendices in Georgia DNR's 2015 "Georgia State Wildlife Action Plan."

47

**Appraisal Report**


**Log Creek LLLP**




**240.00 Acres of Land**
**From Larger 2,546.87 Acre Tract**
**Along the North Side of Warren County Road 58**
**Warren County**
**Georgia, 30828**


**Valuation of the**
**Conservation Easement**


**Kenny & Associates**
**Real Estate Appraisers**

# Table of Contents

| SECTION | PAGE NUMBER |
|---|---|
| Table of Contents | 2 |
| Introduction | 5 |
|     Value Summary | 5 |
|     Appraisal Intent | 8 |
|     Intended Use | 8 |
|         Client and Intended User | 9 |
|         Purpose | 11 |
|     Liability Limitations and User Agreements | 14 |
|     Appraiser Competency | 14 |
|     Certification | 15 |
| | |
| SECTION 1 – EXECUTIVE SUMMARY | |
| | |
|     1.1. Appraisal Problem | 17 |
|     1.2. Appraisal Purpose | 17 |
|     1.3. Executive Summary | 18 |
|     1.4. Subject Photos | 20 |
| | |
| SECTION 2 – APPRAISAL CONDITIONS | |
|     2.1. Basic Assumptions and Limiting Conditions | 27 |
|     2.2. Extraordinary Assumptions | 29 |
|     2.3. Hypothetical Conditions | 29 |
| | |
| SECTION 3 – APPLICABLE TERMS | |
|     3.1. Conservation Easement | 30 |
|     3.2. Charitable Gift Through an Easement | 31 |
|     3.3. Qualified Appraisal & Qualified Appraiser | 32 |
|     3.4. Property Rights Appraised | 38 |
|     3.5. Market Value | 38 |
|     3.6. Value Opinion | 38 |
|     3.7. Report Type | 39 |
| | |
| SECTION 4 – Area and Market Analysis | |
|     4.1. Southeastern United States | 41 |
|     4.2. Regional Area Data | 50 |
|     4.3. Metropolitan Statistical Area | 56 |
| | |
| SECTION 5 – SUBJECT CHARACTERISTICS | |
|     5.1. Marketing and Exposure | 68 |
|         5.1.1. Marketing Time | 68 |

| SECTION | PAGE NUMBER |
|---|---|

5.1.2. Exposure Time — 69
5.2. History — 69
    5.2.1. Current Contracts, Options or Offerings — 69
    5.2.2. Zoning — 70
    5.2.3. Taxes — 70
5.3. Legal Description — 71
    Subject Maps — 74
    5.3.1. Survey — 74
    5.3.2. Location — 75
    5.3.3. Neighborhood — 76
    5.3.4. Aerial Map — 77
    5.3.5. Flood — 78
    5.3.6. Subject Plat — 80
5.4. Site Description — 80

SECTION 6 – ANALYSIS
6.1. Conservation Easement/Contiguous Parcel Overview — 86
    6.1.1. Contiguous/Non-Contiguous Parcel — 88
    6.1.2. Conservation Easement Parcel/Larger Parcel ID — 89
    6.1.3. Enhancement Analysis — 90
    6.1.4. Appraisal Approach — 92
6.2. Scope of Work — 92
6.3. Before Conservation Easement — 107
    6.3.1. Highest and Best Use — 107
    6.3.2. Approaches to Value — 133
        6.3.2.1. Income Approach — 133
            Value Estimate — 186
        6.3.2.2. Sales Comparison Approach — 187
    6.3.3. Highest and Best Use (Excluded Tract) — 189
        6.3.3.1. Sales Comparison Approach — 191
        6.3.3.2. Comparable Land Sales Descriptions — 201
        Value Reconciliation — 210
6.4. After Conservation Easement — 212
    6.4.1. Highest and Best Use — 212
    6.4.2. Income Approach — 214
    6.4.3. Sales Comparison Approach — 215
    6.4.4. Easement Encumbered Land Sales — 216
        Value Estimate — 217
        6.4.4.1. Comparable Sales Description — 218
            Comparable Sales Locations — 228
    6.4.5. Value Reconciliation — 228
        6.4.5.1. Sales Comparison Approach — 228
        6.4.5.2. Sales Comparison Approach — 228
        6.4.5.3. Fair Market Value Indication — 229

SECTION                                                          PAGE NUMBER


SECTION 7 – FINAL RECONCILIATION                                 230
    7.1. Summary of Values                   230
    7.2. Easement Valuation                  230
    7.3. Conservation Easement Property Impact   230

SECTION 8 – ADDENDA
    8.1. Professional Qualifications
    8.2. Liability Insurance
    8.3. Baseline Documentation Report
    8.4. Resource Valuation Report & Technical Memo
    8.5. Deed of Conservation Easement

Log Creek LLLP
EIN: ███████
1280 Snows Mill Road,
Bogart, Georgia 30622

Dear Sir/Madam:

At your request, we have estimated the Fair Market Value of the Conservation Easement, located along the north side of Warren County Road 58, just south of Mayfield Road, in Warren County, Georgia. The purpose of this report is to determine the impact of the conservation easement on the subject property; thus, we have valued the subject property before and after the donation of the Conservation Easement. The effective date of the appraisal (and the valuation conclusions reached herein) is the date of contribution of the conservation easement deed on the subject property.

It is our opinion that the Fair Market Value in Fee Simple Estate, before the conservation easement, of the total Contiguous Family-Owned Parcel of 2,546.87 Acres, consisting of 240.00 Acres of land encumbered by the conservation easement and 2,306.87 Acres Excluded, based on the Highest and Best Use of the 240.00 Acres as a Mining Development and the 2,306.87 Acres as Agricultural/Recreational/Timber Land, located along the north side of Warren County Road 58, just south of Mayfield Road, in Warren County, Georgia, as of December 28, 2018 is:

| Area Encumbered (240.00 Ac) | + | Excluded Tract (2,306.87 Ac) | = | Reconciled Value Before |
|---|---|---|---|---|
| $46,940,000 | + | $4,610,000 | = | $51,550,000 |

**FIFTY-ONE MILLION FIVE HUNDRED FIFTY THOUSAND DOLLARS**

**($51,550,000)**

It is our opinion that the Fair Market Value in Fee Simple Estate subject to the conservation easement for the total Contiguous Family-Owned Parcel of 2,546.87 acres, consisting of 240.00 Acres encumbered by the conservation easement and 2,306.87 Acres Excluded, located along the north side of Warren County Road 58, just south of Mayfield Road, in Warren County, Georgia, as of December 28, 2018 is:

| Area Encumbered (240.00 Ac) | + | Excluded Acreage (2,306.87 Ac) | = | Reconciled Value After |
|---|---|---|---|---|
| $310,000 | + | $4,610,000 | = | $4,920,000 |

**FOUR MILLION NINE HUNDRED TWENTY THOUSAND DOLLARS**

**($4,920,000)**

It is our opinion that the Fair Market Value of the Conservation Easement located along the north side of Warren County Road 58, just south of Mayfield Road, in Warren County, Georgia, as of December 28, 2018 is:

Reconciled Value Before  -  Reconciled Value After  -  Enhancement Value  =  Value of CE
$51,550,000  -  $4,920,000  -  $230,500  =  $46,399,500

Rounded  =  $46,399,000

| FORTY-SIX MILLION THREE HUNDRED NINETY-NINE THOUSAND DOLLARS |
|:---:|
| ($46,399,000) |

Value Before the Conservation Easement          $51,550,000
Land Value After the Conservation Easement      $ 4,920,000
Minus Enhancement Value                         $  230,500
Value of the Conservation Easement              $46,399,000 rd.

As of the date of appraisal, Log Creek LLLP does own property that would benefit from the conservation easement and there are known partnerships or individuals considered to be a "related person" under applicable tax provisions that would benefit from the conservation easement. Accordingly, a reduction in value has been assessed due to the enhancement in value of any other property. As stated throughout this report, approximately 10,079.08 acres of contiguous and non-contiguous land is owned by Log Creek LLLP in Warren County (an entity considered to be a "related person" as defined by Treas. Reg. §267(b)).

Of note, 2,306.87 Acres (309.06 acres of Parcel 016-026, 37.00 acres of Parcel 016-027, Parcel 016-028, Parcel 017-026, Parcel 017-016, Parcel 026-023, and Parcel 026-024) are contiguous to the subject property (240.00 Acres). It is the appraisers' opinion that the contiguous land owned by Log Creek LLLP does benefit from the conservation easement placed on the 240.00 acres of the subject property. A list of the parcels can be found in the chart below.

| Contiguous Parcels | | |
|---|---|---|
| Owner | Parcel # | Acreage |
| Log Creek LLLP | 016-026 | 309.06 |
| Log Creek LLLP | 016-027 | 37.00 |
| Log Creek LLLP | 016-028 | 190.10 |
| Log Creek LLLP | 017-026 | 558.84 |
| Log Creek LLLP | 017-016 | 363.00 |
| Log Creek LLLP | 026-023 | 741.87 |
| Log Creek LLLP | 026-024 | 107.00 |
| | Total: | 2,306.87 |

It is the appraisers' opinion that the non-contiguous land owned by Log Creek LLLP does not benefit from the conservation easement placed on the 240.00 acres of the subject property. This determination is based on the subject property's location in rural Warren County. It is the appraisers' opinion that a buyer would not pay more for any of the properties considered for enhancement due to the location of the parcels compared to the location of the subject property as the majority of the land in the area is rural land or agricultural land. It is the appraisers' opinion that a buyer would not be influenced by a conservation easement due to the rural nature of the area and the availability of undeveloped land. A list of the parcels can be found in the chart below.

| Parcels Considered for Enhancement - Non-Contiguous | | | | | |
|---|---|---|---|---|---|
| Owner | Parcel # | Acreage | Owner | Parcel # | Acreage |
| Log Creek LLLP | 004-001 | 18.00 | Log Creek LLLP | 038-010 | 460.30 |
| Log Creek LLLP | 005-018 | 26.74 | Log Creek LLLP | 038-037 | 31.00 |
| Log Creek LLLP | 011-011 | 160.30 | Log Creek LLLP | 038-038 | 280.24 |
| Log Creek LLLP | 011-013 | 28.38 | Log Creek LLLP | 038-065 | 37.04 |
| Log Creek LLLP | 012-004 | 281.68 | Log Creek LLLP | 045-001 | 150.35 |
| Log Creek LLLP | 013-011 | 430.28 | Log Creek LLLP | 045-031 | 187.64 |
| Log Creek LLLP | 013-013 | 2.00 | Log Creek LLLP | 047-007 | 174.50 |
| Log Creek LLLP | 074-015 | 67.94 | Log Creek LLLP | 052-030 | 84.26 |
| Log Creek LLLP | 060-035 | 14.77 | Log Creek LLLP | 052-031 | 415.87 |
| Log Creek LLLP | 060-037 | 307.50 | Log Creek LLLP | 056-002 | 113.02 |
| Log Creek LLLP | 067-065 | 304.01 | | | |
| Log Creek LLLP | 068-012 | 282.71 | | | |
| Log Creek LLLP | 016-003 | 156.67 | | | |
| Log Creek LLLP | 020-003 | 19.00 | | | |
| Log Creek LLLP | 021-001 | 316.90 | | | |
| Log Creek LLLP | 021-018 | 62.83 | | | |
| Log Creek LLLP | 022-014 | 154.03 | | | |
| Log Creek LLLP | 023-001 | 320.00 | | | |
| Log Creek LLLP | 023-002 | 546.63 | | | |
| Log Creek LLLP | 023-016 | 93.00 | | | |
| Log Creek LLLP | 024-010 | 162.30 | | | |
| Log Creek LLLP | 024-090 | 84.67 | | | |
| Log Creek LLLP | 026-002 | 100.60 | | | |
| Log Creek LLLP | 026-005 | 73.50 | | | |
| Log Creek LLLP | 056-007 | 470.40 | | | |
| Log Creek LLLP | 060-001 | 509.95 | | | |
| Log Creek LLLP | 028-087 | 355.46 | | | |
| Log Creek LLLP | 029-002 | 256.54 | | | |
| Log Creek LLLP | 032-004 | 231.20 | | | |
| | | | | Total: | 7,772.21 |

For the purpose of this report, the subject property refers to the 240.00 acres encumbered by the conservation easement.

For the purpose of this report, the Excluded Tract refers to the 2,306.87 acres excluded from encumbrance of the conservation easement.

For the purpose of this report, the Contiguous Parcel refers to the 2,546.87 acres which includes the 240.00 acres encumbered by the conservation easement and the Excluded Tract, the 2,306.87 acres, excluded from the conservation easement.



## **Intent of Appraisal**

## **Intended Use**

This report is intended for use only by Log Creek LLLP and the Oconee River Land Trust, Inc. The report was prepared for use and submission to aid the IRS and the United States District Court in accurately determining the value of the conservation easement. It is prepared for the owner's use and submission to the IRS and District Court as evidence of the value of a charitable contribution for the subject property due to the placement of a conservation easement. Use of this report by others is not intended by the appraisers. This report is not intended for any other purpose.

## Client and Intended User

The sole intended users of this report are Log Creek LLLP and Oconee River Land Trust, Inc. The client is Log Creek LLLP. The intended users of review are the IRS and the United States District Court in determining the accurate fair market value for federal tax purposes. Intended users include current members and all entities and/or individuals considering an ownership interest in Log Creek LLLP. Other parties or entities who obtain a copy of the report may not rely upon any opinions or conclusions contained in the report unless such party or entity has expressly been identified by Kenny & Associates, Inc. as an intended user.

This appraisal is a qualified appraisal prepared by qualified appraisers under applicable Treasury Regulations. The appraisal was prepared for Income Tax purposes, according to Treasury Regulations. It is not to be distributed or relied upon by others without our express written consent. This letter and express written consent must remain attached to the appraisal report for the opinion of fair market value set forth herein to be valid. Our employment was not conditional upon producing a specific value or any value within a given range. Future employment prospects are not dependent upon producing a specific value. No part of the fee arrangement nor portion of the appraisal fee was based on a percentage of the appraised value. Treas. Reg. § 1.170A-17. The appraisers understand that an intentionally false or fraudulent overstatement of the value of the property described in the qualified appraisal or appraisal summary may subject the appraisers to civil penalty under Section 6701 for aiding and abetting an understatement of tax liability, in addition to the appraisal being disregarded pursuant to 31 U.S.C. 330 (c).

According to Treas. Reg. § 1.170A-17(a)(8) with regard to the timing of receipt of a qualified appraisal: "The qualified appraisal must be received by the donor before the due date, including extensions, of the return on which a deduction is first claimed, or reported in the case of a donor that is a partnership or S corporation, under section 170 with respect to the donated property, or, in the case of a deduction first claimed, or reported, on an amended return, the date on which the return is filed."

The appraisers understand that the Treasury Regulations require the following declaration be made within the appraisal report: "I understand that my appraisal will be used in connection with a return or claim for refund. I also understand that, if there is a substantial or gross valuation misstatement of the value of the property claimed on the return or claim for refund that is based on my appraisal, I may be subject to a penalty under section 6695A of the Internal Revenue Code, as well as other applicable penalties. I affirm that We have not been at any time in the three-year period ending on the date of the appraisal barred from presenting evidence or testimony before the Department of the Treasury or the Internal Revenue Service pursuant to 31 U.S.C. section 330(c)" Treas. Reg. § 1.170A-17(a)(3)(vi). Accordingly, this declaration by the appraiser is made under the section entitled, "Certification."

The analyses, opinions, and conclusions contained herein were developed, and this report prepared, in accordance with the reporting requirements and Standards of OTS 12 CFR 323 and 564. Additionally, the requirements of the Code of Professional Ethics, the Standards of Professional Appraisal Practice of the Appraisal Institute, and the Uniform Standards of Professional Appraisal Practice (USPAP) as promulgated by the Appraisal Foundation and Title XI of the Federal Financial Institutions Reform Act of 1989 were followed in the development of this report.

In preparing this appraisal report we relied on, referenced, reproduced information from, and used sources including, but not limited to, the following: the Uniform Standards of Professional Appraisal Practice (USPAP) by the Appraisal Foundation Code of Professional Ethics; the Standards of Professional Appraisal Practice of the Appraisal Institute; the Resource Valuation Report prepared by Dr. Capps, Capps Geoscience, LLC; Treas. Reg. § 1.170A-13; Treas. Reg. §1.170A-1; Treas. Reg. §1.170A-17; United States Census Bureau data; The Dictionary of Real Estate Appraisal, published by the Appraisal Institute; Title XI of the Federal Financial Institutions Reform Act of 1989; PwC Real Estate Investor Survey; and the publication Valuing Land Affected by Conservation Easements: Guidance from Federal Law and Regulation published by Stephen J. Small for the Lincoln Institute of Land Policy.

Information was also utilized and conveyed based on interviews with market participants, personal research, and third-party services. Sources include, but are not limited to: U.S. Census Bureau, Regional Commission, brokers and owners, the County Development Authority, State Department of Labor Office, Federal and State Department of Transportation, Environmental Protection Division, Utility Corporations, and additional resources.

The Discounted Cash Flow analysis in this report is based on the Extraordinary Assumption that all necessary permits for mining operations are obtainable as indicated by Dr. Capps, Capps Geoscience, LLC. This is in accordance with the Resource Valuation Report prepared by Dr. Capps, Capps Geoscience, LLC, and included in the Addenda, which states: "The property is zoned FOR-AG (Forestry-Agriculture District) and, according to Warren County zoning codes, mining is allowed in FOR-AG zoned lands with a conditional use permit. Community opposition to the quarry seems unlikely because there are existing aggregate quarries in the area. The author's opinion is that it is reasonably probable that the Conditional Use Permit (CUP) will be obtained from Warren County to operate the quarry. In the author's opinion, the subject property's quarry will be permitted as an active mine with the Surface Mining Unit of the Georgia Environmental Protection Division. In addition, in the author's opinion it is reasonably probable that the storm water and air emission permits will be granted for the subject property's quarry." It is the appraisers' opinion that while we are not mining consultants, based on our experience and expertise in valuing real estate with commercial mineral reserves, the analysis within the Resource Valuation Report prepared by Dr. Capps, Capps Geoscience, LLC is credible and thus can be relied upon for the purpose of this appraisal. Further, according to Mr. Paul W. Hitchcock, Hitchcock & Hitchcock, P.C., a fair analysis of the Warren County Land Use Ordinance supports the approval of a conditional use permit for a granite quarry on the subject property. There is no financial public benefit to restricting the subject property to an agricultural use. The Owner and the general public will benefit from the increase in jobs and taxes that a mining operation would bring. The local laws and land use ordinances will reduce any potential negative impacts that the mining operation may bring, especially given the sparsely populated area in which the subject property lies. From a land use perspective, the proposed conditional use is proper; therefore, it is likely that the conditional use permit will be approved. At the time of appraisal, the conservation easement was in place. Therefore, the "before-easement" analysis is based on the hypothetical condition of the conservation easement not being in place and encumbering the subject property since the conservation easement does exist as of the date of this appraisal.

## Purpose

The purpose of this report is to provide an opinion of the Fair Market Value of the Conservation Easement for federal income tax purposes. In order to provide a full understanding of the impact of the conservation easement on the subject property, an analysis of the conservation easement value is included in this report. All approaches to value were considered within this appraisal report. The Income Approach (Discounted Cash Flow Analysis) detailed and utilized in this report is the most commonly accepted approach to valuing properties with subsurface material and has been determined to be the most reliable approach for the subject property. The Income Approach is based on the premise that an owner would hire a contract miner to mine and operate the quarry on the subject property.

The appraisal of property with subsurface material requires a number of different disciplines. A qualified drilling company under the guidance of a Professional Geologist to drill the property, a Qualified Laboratory for testing of the material, a Professional Geologist along with a Professional Engineer to evaluate the reserves on-site based on the physical characteristics of a property, a mining consultant working in tandem with the Professional Geologist and Professional Engineer to evaluate the supply and demand as well as the target market. Further, the mining consultant will establish the permitting schedule, the market pricing, production schedule, the capital expenditures, the operating costs, and the life of mine. Finally, a qualified appraiser, one who specializes in appraisals with subsurface material, will analyze all of the data provided from the experts/professionals above to perform a qualified appraisal. All of the above is only possible on a unique property that has the quality and quantity of material on-site that is financially feasible to extract. The subject property within this appraisal report is unique as detailed in each of the professional reports provided and included in the addenda of this appraisal report.

When valuing land with subsurface material, the subsurface material is a commodity that sells for specific amount in the market. This is similar to a lease or sale of commercial space. The commercial space is a commodity where the price is dictated by the market. The quality of the space, the location, and the size are contributing factors that dictate the value. Similarly, the type of material, the amount of reserves, and the quality of the material are contributing factors that dictate the value of the land. For instance, the value of real property sitting on an economically mineable oil reserve exceeds the value of similar property without an oil reserve even if all things remain equal. Therefore, the value of the subsurface material must be incorporated in the value of real property.

Further, consumers are not willing to pay more for stone due to branding. i.e. No consumer is willing to pay more for subsurface material because it was mined by Vulcan versus a smaller operator. Therefore, it is our opinion, there is not additional intangible value associated with the value of subsurface material as the price is set by the market not based on branding or marketing.

The valuation within this report represents the Fair Market Value of the property not the business value. Due to the use of a contract miner based on what a typical contract miner would charge (market rate). Conversely, Business Value is the value of the business; the summation of all its parts, tangible (real estate, equipment, fixed assets, etc.) and intangible (enterprise value).

Intangible value is defined as the present value of excess earning power of an entity over the normal rate of return. *The Dictionary of Real Estate Appraisal 5th Edition* defines intangible

property as nonphysical assets, including but not limited to franchises, trademarks, patents, copy rights, goodwill, equities, securities, and contracts as distinguished from physical assets such as facilities and equipment.

Our analysis is based on an adequately capitalized property contracting competent mining personnel found in the open market. If we were to value the property based on a specific contract i.e. a long term contract with a local concrete company, a contract that was above market, or based on a contract with a contract miner that could not be found in the open market, or if there were down-market synergies due to an ongoing business, this would constitute a business value. Whereas, our analysis is based on typical/market start-up costs, typical/market operating costs, typical/market (conservative) pricing, and typical/market discounting with additional discounting added to account for the risk of a new market entrant and entrepreneurial incentive. All costs associated with the business are deducted. Therefore, our analysis represents Fair Market Value of the land, not the value of the business.

Further, in order to mine a property, there are a variety of components associated with the mining including machinery, equipment, improvements on-site, etc. However, when a piece of land is mined out, the value of the machinery, equipment, and improvements becomes null as they no longer have any usefulness to the site and typically do not contribute to the value of the property. For land with subsurface material, when the material is gone, there no additional value to the land due to the improvements, machinery, or equipment. In theory, the equipment can be sold; however, for our analysis we have chosen to be conservative and not add any additional salvage value to the DCF.

To help with the understanding of valuing the land:

When appraising a subdivision, the appraiser models within a DCF, the typical/market pricing of the lots, the typical/market capital costs to prepare the lots for sale, the typical operating costs, and the typical/market absorption of the lots. This is then discounted back to the date of valuation to come up with the value of the land. This is the methodology used when appraising the land for a subdivision, not the business value. This is typical appraisal practice to value the land for a subdivision. Just as what was described within my report is typical appraisal practice to value the land with subsurface material, specifically a mineral reserve as defined by the SME Guide for Reporting Exploration Information, Mineral Resources, and Mineral Reserves (SME Guide).

The purpose of this report is to aid the IRS and any court to accurately determine the fair market value of the contribution.

The same valuation analysis and principles generally applies to appraisals in all contexts; however special rules are put in place for conservation easements.

When there is no substantial record of sales of similar conservation easement encumbered properties, the generally accepted method recommends a comparison between the fair market value of the subject property prior to the donation of the conservation easement and the fair market value after the donation of the conservation easement. Moreover, any offsetting increase in value of additional properties owned by the donor is also considered when establishing the fair market value derived from the difference between the subject property before and after the establishment of the conservation easement.

At the time of the appraisal, no viable direct conservation easement sales were available. As such, the appraisers utilized the "before and after" appraisal valuation technique, calculating the difference between the fair market value of the total property before granting the conservation easement and the fair market value of the subject property after granting the conservation easement.

While this report is being prepared for federal income tax purposes, the actual amount of any potential deduction arising from the donation of a conservation easement may depend on a taxpayer's individual circumstances and should be calculated by an accountant or other tax professional of competent skill and knowledge. Therefore, these appraisers have not provided an estimate of the potential tax impact of any charitable deduction associated with the conservation easement.

No special legal instructions exist. Attached is a narrative Appraisal Report, prepared in accordance with USPAP, to substantiate our findings.

Douglas R. Kenny, MAI
KENNY AND ASSOCIATES, INC
RAK/tlk
File Number CE1566121
doug@kennyappraisal.com
kennyappraisal.com
770-823-3816
SSN: ████████████
Kenny & Associates, Inc.
327 Dahlonega Street, Suite 104
Cumming, GA 30040
EIN: ████████

Rick A. Kenny, MAI, SRA
KENNY AND ASSOCIATES, INC
rick@kennyappraisal.com
770-664-8922
SSN: ████████████

Date: March 28, 2022

## APPRAISER'S LIABILITY LIMITATIONS AND INTENDED USER AGREEMENTS

The acceptance of this report and its use by the intended user in any manner, or for any purpose, is an acknowledgement by the intended user that this report is a satisfactory professional product, the intended user has personally read the report, and agrees that the data herein is accurate to the best of the appraisers' ability. It is agreed that the intended user shall limit any and all liability for any damage on account of any error, omission or other professional negligence to a sum not to exceed the fee collected for this report; and only in the case of a gross error that would have materially affected the appraisers' value opinion as of the date of valuation.

Acceptance of this report by the intended user validates that a value opinion is a product of a professionally trained mind and acknowledges that the views and conclusions expressed in this report represent an opinion only, and not established fact. Thus, the appraisers warrant only that the value conclusions are their best opinion estimates as of the effective date of valuation and not any other period in time.

The appraisers do not make any claims, assertions or guarantees regarding professional services outside the scope of the appraisal valuation or the expertise of the appraisers. The appraisers have the right to reevaluate and/or change the content of this report, including, but not limited to, the value conclusion if any information relied upon changes or other facts present themselves. Such professional services include, but are not limited to: deed restrictions, land use covenants, or other limitations on the property rights that may be revealed by an abstract or title insurance policy; easements, encroachments, or other limitations of the title that may be revealed by a survey; legal matters that require specialized knowledge beyond that ordinarily employed by a real estate appraiser; information typically disclosed by an engineering study or environmental survey; the resulting value of any tax advantage as a result of the conservation easement; and any other services covered by the Basic Assumptions and Limiting Conditions as set forth in this report.

The sole intended users of this report are Log Creek LLLP, Oconee River Land Trust, Inc., the IRS, and the District Court. Kenny & Associates, Inc. assumes no responsibility for this report if it is used or relied upon by anyone other than the intended users without written permission.

## APPRAISER COMPETENCY

Doug Kenny, MAI, State Certified General Real Property Appraiser in Tennessee, Alabama, South Carolina, and Georgia has been appraising land for over ten years. Over the past six years, Kenny & Associates, Inc. has experience appraising land throughout the country, completing numerous appraisal valuations of properties similar to the subject property of this appraisal. Doug Kenny, MAI, has specifically appraised conservation easements, and in addition has sought the appropriate level of competency through extensive research and classwork, including the Valuation of Conservation Easements (Appraisal Institute) ultimately obtaining the required knowledge in order to become competent in the appraisal of conservation easements. Therefore, he has met the requirements of the USPAP Competency Rule.

Rick Kenny, MAI, SRA, a State Certified General Real Property Appraiser in Alabama, Arkansas, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Ohio, Florida, South Carolina, Tennessee, Texas, and Virginia, has been appraising land for over 30 years. Over the past six years, Kenny & Associates, Inc. has experience appraising land throughout the

country, completing numerous appraisal valuations of properties similar to the subject property of this appraisal. Rick Kenny, MAI, SRA has specifically appraised conservation easements, in addition has sought the appropriate level of competency through extensive research and classwork, including the Valuation of Conservation Easements (Appraisal Institute) ultimately obtaining the required knowledge to become competent in the appraisal of conservation easements. Therefore, he has met the requirements of the USPAP Competency Rule.

## <u>CERTIFICATION</u>

I certify that, to the best of my knowledge and belief:

− The statements of fact contained in this report are true and correct.

− The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and is my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

− I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved. I am not a person described in Treasury Regulation 1.170A-13(c)(5)(iv).

− The Discounted Cash Flow analysis in this report is based on the Extraordinary Assumption that all necessary permits for mining operations are obtainable as indicated by Dr. Capps, Capps Geoscience, LLC. This is in accordance with the Resource Valuation Report prepared by Dr. Capps, Capps Geoscience, LLC, and included in the Addenda, which states: "The property is zoned FOR-AG (Forestry-Agriculture District) and, according to Warren County zoning codes, mining is allowed in FOR-AG zoned lands with a conditional use permit. Community opposition to the quarry seems unlikely because there are existing aggregate quarries in the area. The author's opinion is that it is reasonably probable that the Conditional Use Permit (CUP) will be obtained from Warren County to operate the quarry. In the author's opinion, the subject property's quarry will be permitted as an active mine with the Surface Mining Unit of the Georgia Environmental Protection Division. In addition, in the author's opinion it is reasonably probable that the storm water and air emission permits will be granted for the subject property's quarry." It is the appraisers' opinion that while we are not mining consultants, based on our experience and expertise, the analysis within the Resource Valuation Report prepared by Dr. Capps, Capps Geoscience, LLC is credible and thus can be relied upon for the purpose of this appraisal. Further, according to Mr. Paul W. Hitchcock, Hitchcock & Hitchcock, P.C., a fair analysis of the Warren County Land Use Ordinance supports the approval of a conditional use permit for a granite quarry on the subject property. There is no financial public benefit to restricting the subject property to an agricultural use. The Owner and the general public will benefit from the increase in jobs and taxes that a mining operation would bring. The local laws and land use ordinances will reduce any potential negative impacts that the mining operation may bring, especially given the sparsely populated area in which the subject property lies. From a land use perspective, the proposed conditional use is proper; therefore, it is likely that the conditional use permit will be approved. At the time of appraisal, the conservation easement was in place. Therefore, the "before-easement" analysis is based on the hypothetical condition of the conservation easement not being in place and encumbering the subject property since the conservation easement does exist as of the date of this appraisal.

− The sole intended users of this report are Log Creek LLLP and Oconee River Land Trust, Inc. The intended user of review is the Internal Revenue Service.

− I have performed no services, as an appraiser or in any other capacity regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

− I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

− My engagement in this assignment was not contingent upon developing or reporting predetermined results.

− The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, the Uniform Standards of Professional Appraisal Practice (USPAP) as promulgated by the Appraisal Foundation, and the real estate appraiser license law, Georgia Statutes administered and enforced by the Georgia Real Estate Appraisal Board. This assignment has met the requirements by a recognized professional appraiser organization (Appraisal Institute). This assignment has been performed within the Competency Provision of USPAP.

− No one provided significant real property appraisal assistance to the undersigned. The appraisers referenced several reports prepared by industry leaders as an aid in determining an appropriate value conclusion. The reports referenced, and included in the Addenda of this Report, include the Resource Valuation Report prepared by Dr. Capps, Capps Geoscience, LLC, the Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement prepared by GeoLogic, LLC (Consulting Geologists), the Surface Mining Land Use Plans prepared by GeoLogic, LLC, and the Baseline Documentation Report prepared by Oconee River Land Trust, Inc. Finally, Betty L. Stilwell, Esq. assisted in the analysis and composition of the Area and Market Analysis Section.

− Doug Kenny, MAI and Rick Kenny, MAI, SRA **have** made a personal inspection of the subject property.

− The appraiser has developed opinions of value and appraisal reviews for a variety of mineral properties, including granite aggregates, dimension stone, sandstone, limestone, sand, sand and gravel, and a variety of other subsurface material. This appraiser has had the opportunity to work with a variety of mining experts (geologists, quarry operators, marketing experts, etc.), and has performed due diligence related to all of the previous quarry and mine appraisal work. The appraiser has developed opinions of value for a substantial number and variety of conservation easement properties.

− This report is a "qualified appraisal" as that term is defined in applicable Internal Revenue Service regulations (Treas. Reg. § 1.170A-17(a)).

− The appraiser regularly performs appraisals for which the individuals receive compensation; meets such other requirements as prescribed by the Secretary in regulations or other guidance; has not been prohibited from practicing before the IRS any time in the three-year period ending on the date of the appraisal, IRC § 170(f)(11)(E)(iii); holds himself out to the public as an appraiser or performs appraisals on a regular basis; is qualified to make appraisals of the type of property being valued; and is not a person specifically prohibited from being a qualified appraiser of a particular property (such as the donor, the donee, or others with a connection to the donor or donee).

− My compensation is not contingent upon the reporting of a predetermined Fair Market Value or direction in Fair Market Value that favors the cause of the client, the amount of the Fair Market Value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event. Further, my fee has not been based in whole or in part upon a percentage of the appraised Fair Market Value of the property, nor has the fee in any way been contingent upon the appraised Fair Market Value.

− Doug Kenny, MAI has successfully completed professional coursework specifically related to mineral properties. Doug Kenny, MAI has successfully completed Mineral Property Valuation 1 – Standards and Guidelines, Mineral Property Valuation 2 – Approaches and Methods, and Environmental Awareness for Resource Planning, these classes were provided by Edumine – Online Continuing Education for Professionals in Mining and the Geosciences (Treas. Reg. § 1.170A-17(b)(2)(A)).

− Rick Kenny, MAI, SRA has successfully completed professional coursework specifically related to mineral properties. Rick Kenny, MAI, SRA has successfully completed International Valuation of Mineral Estates – Mining and Oil & Gas which was provided by the Appraisal Institute (Treas. Reg. § 1.170A-17(b)(2)(A)).

− Doug Kenny, MAI and Rick Kenny, MAI, SRA do a majority of their appraisals for others during the taxable year. Doug Kenny, MAI and Rick Kenny, MAI, SRA have performed less than 50.0% of their appraisals for this client and/or sponsor. (Treas. Reg. § 1.170A-17(b)(5)).

− Neither appraiser is employed by or related to the client and will not receive a benefit in connection with the potential donation discussed herein.

− I understand that my appraisal will be used in connection with an income return or claim for refund. I also understand that, if there is substantial or gross valuation misstatement of the value of the property claimed on the income tax return or claim for refund that is based on my appraisal, I may be subject to a penalty under section 6695A of the Internal Revenue Code, as well as other applicable penalties. I affirm that I have not been at any time in the three-year period ending on the date of the appraisal barred from presenting evidence or testimony before the Department of the Treasury or the Internal Revenue Service pursuant to 31 U.S.C. 330(c).

− The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

− There has been no exclusion of items pertinent to the assignment, nor exclusion of items beyond this assignment.

− The Fair Market Value of the subject property before the conservation easement is $51,550,000. The Fair Market Value of the conservation easement is $46,399,000. The Fair Market Value of the subject property after the conservation easement (residual) is $4,920,000, and the value enhancement on the contiguous parcel is $230,500.

− Doug Kenny inspected the property on December 1, 2021 and Rick Kenny inspected the property was March 24, 2021, the date of appraisal is as of December 28, 2018, the date of the report is March 28, 2022, the donation date is December 21, 2018, and the donation recording date is December 28, 2018.

− As of the date of this report, neither Doug Kenny, MAI nor Rick Kenny, MAI, SRA have been prohibited from practicing before the IRS at any time during the three years preceding the date of the appraisal.

− As of the date of this report, Doug Kenny, MAI and Rick Kenny, MAI, SRA have completed the continuing education program for Designated Members of the Appraisal Institute.

Doug R. Kenny, MAI
Federal Tax ID #███████
Georgia State Certified General #344167
Alabama State Certified General #G01326
Tennessee State Certified General #5435
South Carolina State Certified General #AB.7804CG
SSN: ███████████

Rick A. Kenny, MAI, SRA
Tennessee State Certified General #5434
Georgia State Certified General #628
Alabama State Certified General #G01327
South Carolina State Certified General #AB.7161CG
North Carolina State Certified General #A8280
Louisiana Certified General APR.0000004307-CGA
Kentucky State Certified General #5397
Texas Certified General #TX 1380945 G
Arkansas State Certified General #CG-4649
Mississippi Certified General #GA-1339
Missouri Certified General #2020031001
Ohio Certified General #202000529
Virginia Certified General #4001017925
Florida State Certified General #RZ4090
SSN: ███████████

# SECTION 1 – EXECUTIVE SUMMARY

## 1.1.  Appraisal Problem

The appraisal problem is to determine the Fair Market Value of the conservation easement for the protection of 240.00 Acres of land located along the north side of Warren County Road 58, just south of Mayfield Road, Warren County, Georgia. No special appraisal problems exist. The appraisers have exercised due diligence in determining that the correct property was appraised.

## 1.2.  Appraisal Purpose

The purpose of this appraisal is to provide an opinion of the Fair Market Value of a conservation easement for the protection of 240.00 Acres of land located along the north side of Warren County Road 58, just south of Mayfield Road, Warren County, Georgia. The purpose of this report is to determine the Fair Market Value of the conservation easement. Additionally, in compliance with the Tax Reform Act of 1984, this appraisal was performed for Income Tax purposes. The date of the inspection was March 24, 2021 and the date of the appraisal is as of December 28, 2018. The associated market and area were analyzed as of the effective date of the report indicated on the attached letter of transmittal. Based on the analysis, an exposure time of twelve months is reasonable, defensible and appropriate.

## 1.3. Executive Summary

QUALIFICATIONS : Due to the appraisers' qualifications as described in the appraisal (i.e. experience and education), the appraisers are qualified to make appraisals of the type of property being valued. [Treas. Reg. 1.170A-17(b)]

PROPERTY LOCATION : Log Creek LLLP; 240.00 Acres of land located along the north side of Warren County Road 58, just south of Mayfield Road, Warren County, Georgia

INSPECTION DATE : March 24, 2021

APPRAISAL DATE : December 28, 2018

DATE OF REPORT : March 28, 2022

DONATION DATE : December 21, 2018

DONATION RECORDING DATE: December 28, 2018

INTEREST APPRAISED : BEFORE : Fee Simple
: AFTER : Fee Simple Subject to Conservation Easement

LAND AREA : Conservation Easement: 240.00 Acres (11,891,009 sq. ft.)
Excluded Tract: 2,306.87 Acres (100,487,257 sq. ft.)
Contiguous Parcel: 2,546.87 Acres (110,941,657 sq. ft.)

PARCEL : Conservation Easement: 016-026 & 016-027[1]
Excluded Tract: 016-026[2], 016-027[3], 016-028, 017-026, 017-016, 026-023, & 026-024

ZONING : FOR-AG Forestry-Agriculture District[4]

ACCESS : Ingress/egress to and from Warren County Road 58

FLOOD HAZARD AREA : The subject property is located in Zone X, an area not prone to flooding. Based on mapping provided by GeoLogic, LLC, there are a few streams running through the subject property. According to Mr. Ben Black, GeoLogic, LLC, as currently designed, the quarry and the operations of the plant will avoid wetlands to the extent practical. The creek crossings needed to place the rail loop track will be permitted under a U.S. Army Corps of Engineers Nationwide Permit

---

[1] 240.00 Acres separated from these parcels.
[2] 309.06 Acres separated from this parcel.
[3] 37.00 Acres separated from this parcel.
[4] According to Mr. Paul W. Hitchcock, Hitchcock & Hitchcock, P.C., a fair analysis of the Warren County Land Use Ordinance supports the approval of a conditional use permit for a granite quarry on the subject property. There is no financial public benefit to restricting the subject property to an agricultural use. The Owner and the general public will benefit from the increase in jobs and taxes that a mining operation would bring. The local laws and land use ordinances will reduce any potential negative impacts that the mining operation may bring, especially given the sparsely populated area in which the subject property lies. From a land use perspective, the proposed conditional use is proper; therefore, it is likely that the conditional use permit will be approved.

(PCN 44) for installation of pipe culverts. As such, there are no expected wetlands mitigation costs associated with this quarry. However, for the purpose of this report, a wetland contingency of $500,000 has been budgeted and included in the year one start-up costs. Therefore, any potential wetlands or streams on-site are not considered to affect the highest and best use of the subject property as a granite mine.

DONOR : Log Creek LLLP (EIN# ███████)
1280 Snows Mill Road,
Bogart, Georgia 30622

DONEE : Oconee River Land Trust, Inc.
675 Pulaski Street, Suite 2300,
Athens, Georgia 30601

EASEMENT PROVISIONS : The conservation easement provisions are located in the subject property's deed of conservation easement in the Addenda of this report.

DONOR'S RESERVED RIGHTS : The conservation easement reserved rights are located in the subject property's deed of conservation easement in the Addenda of this report.

HIGHEST AND BEST USE (Before Easement) : Granite Mining (240.00 Acres) and Agricultural/Recreational/Timber Land (Excluded Tract)

HIGHEST AND BEST USE (After Easement) : Agricultural/Recreational/Forestry

SUMMARY OF SALIENT FACTS : No direct conservation easement sales were available at the time of appraisal. The appraisers have utilized the "before and after" appraisal valuation technique. This method calculates the difference between the fair market value of the subject property before granting the conservation easement and the fair market value of the subject property after granting the conservation easement.

VALUATION METHODOLOGY : Before: Subject Property: Income Approach (DCF)
Before: Unencumbered Tracts: Sales Comparison Approach

After: Subject Property: Sales Comparison Approach
After: Unencumbered Tracts: Sales Comparison Approach

**VALUE INDICATION**

**FAIR MARKET VALUE**
  **BEFORE CONSERVATION EASEMENT** : $51,550,000

**FAIR MARKET VALUE**
  **AFTER CONSERVATION EASEMENT** : $4,920,000

**ENHANCEMENT** : $230,500

**FAIR MARKET VALUE OF CONSERVATION EASEMENT** : $46,399,000 rd.

**1.4.** **Subject Photos**



SITE VIEW



WARREN COUNTY ROAD 58



WARREN COUNTY ROAD 58



ENTRANCE INTO THE SUBJECT PROPERTY

CARRY-OVER ATTACHMENT - Exhibit 2 - Page 198 of 666



SITE VIEW



SITE VIEW



SITE VIEW



SITE VIEW

CASE: 17-ATL-Commission Exhibit 2 - Page 200 of 666



SITE VIEW



SITE VIEW

CARRYOVER ATTACHMENT - EXHIBIT C: NORRIS CASON 201 of 666



SITE VIEW



SITE VIEW



SITE VIEW

## SECTION 2 – APPRAISAL CONDITIONS

### 2.1    Basic Assumptions and Limiting Conditions

This appraisal is subject to the following conditions:

1.  This appraisal is for no other purpose than property valuation, and the appraiser(s) are
    neither qualified nor attempting to go beyond that narrow scope.  The reader should be aware that there are also inherent limitations to the accuracy of the information and analyses contained in this appraisal. Before making any decision based on the information and analyses contained in this report, it is critically important to read this entire section to understand these limitations.

2.  The legal description/survey furnished is assumed to be correct.  No responsibility is assumed for matters legal in character nor is any opinion rendered as to the title, which is assumed to be good and marketable.  The value estimate is given without regard to any questions of title, boundaries, encumbrances, or encroachments.

3.  All existing liens and encumbrances have been disregarded unless otherwise stated, and the property is appraised as though free and clear under responsible ownership and competent management.

4.  It is assumed that any proposed or incomplete improvements included in this report are to be completed in accordance with approved plans and specifications and in a workmanlike manner.

5.  Information furnished by others is believed to be reliable and we have found nothing which indicates that the information is unreliable. However, no responsibility is assumed for its accuracy. Information (including projections of income and expenses) provided by local sources, such as government agencies, financial institutions, accountants, attorneys, and others is assumed to be true, correct, and reliable. No responsibility for the accuracy of such information is assumed by the appraiser(s). The comparable sales data relied upon in the appraisal are believed to be from reliable sources.  Though all the comparables were examined, it was not possible to inspect them all in detail.  The value conclusions are subject to the accuracy of this data.

6.  Any sketches, plats, or drawings included in this report are included to assist the reader in visualizing the property. We have made no survey of the property and assume no responsibility in connection with such matters. Any maps, plats, or drawings reproduced and included in this report are intended only for the purpose of showing spatial relationships.  The reliability of the information contained on any such map or drawing is assumed by the appraiser(s) and cannot be guaranteed to be correct.  A surveyor should be consulted if there is any concern on boundaries, setbacks, encroachments, or other survey matters.

7.  Unless otherwise noted herein, it is assumed that there are no encroachments, zoning restrictions, or violations existing on the subject property.  It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless nonconformity has been stated, defined, and considered in the appraisal report. Information and analysis shown in this report concerning these items is based on a thorough investigation. Any significant question should be addressed to local zoning or land use officials and/or an attorney.

8.  It is assumed that all required licenses, consents, or other legislative or administrative authority from any local, state, national government or private entity or organization has been, or can be obtained or renewed for any use on which the value estimate contained in this report is based.  Appropriate government officials and/or an attorney should be consulted if an interested party has any questions or concerns on these items since we have not made a comprehensive examination of laws and regulations affecting the subject property.

9.  We are not required to give testimony or attendance in court by reason of this appraisal, with reference to the property in question, unless arrangements have been made previously thereof.

10. No responsibility is assumed for engineering matters, either structural or mechanical.  Good structural and mechanical conditions are assumed to exist, and no opinion as to these matters is to be inferred or construed from this report.  Although the appraisal may contain information about the physical items being appraised (including their adequacy and/or condition), it should be clearly understood that this information is only to be used as a general guide for property valuation and not as a complete or detailed physical report.  The appraiser(s) are not construction, engineering, environmental, or legal experts, and any statement given on these matters in this report should be considered preliminary in nature.

11.  Disclosure of the contents of this appraisal report is governed by the Bylaws and Regulations of the Appraisal Institute.

One (or more) of the signatories of this appraisal report is a Member (or Candidate Member) of the Appraisal Institute. The Bylaws and Regulations of the Appraisal Institute require each Member and Candidate Member to control the use and distribution of each appraisal report signed by such Member or Candidate Member. Therefore, except as hereinafter provided, the party for whom this appraisal report was prepared may distribute copies of this appraisal report, in its entirety, to such third parties as may be selected by the party for whom this appraisal report was prepared; however, selected portions of this appraisal report shall not be given to third parties without the prior written consent of the signatories of this appraisal report.  Further, neither all nor any part of this appraisal report shall be disseminated to the general public by the use of advertising media or other media for public communication without the prior written consent of the signatories of this appraisal report.

12.  The value estimate applies only to the entire property and cannot be prorated to individual portions or fractional interests. Any proration or division of interest will invalidate the value estimate, unless such proration or division of interests is set forth in the report.

The forecasts or projections included in this report are utilized to assist in the valuation process. They are based on current market conditions, current short-term supply and demand factors, and a continued stable economy. These forecasts are therefore subject to changes in future conditions, which cannot be accurately predicted by the appraiser(s), and these changes could affect the future income and/or value estimates.  Since projected mathematical models and other projections are based on estimates and assumptions, which are inherently subject to uncertainty and variation depending upon evolving events, we do not represent them as results that will actually be achieved.

13.  In this appraisal assignment, the existence of potentially hazardous material such as asbestos, urea formaldehyde foam insulation, radon gas, or any other toxic material, has not been considered.  The appraiser(s) are not qualified to detect such substances and, if desired, recommend that the client retain an expert in this field.

Non-disclosure of environmental problems should not be taken as an indication that such a problem does not exist, however, an expert in the field should be consulted if any interested party has questions on environmental factors. No chemical or scientific tests were performed by the appraiser(s) on the subject property, and it is assumed that the air, water, ground, and general environment associated with the property presents no physical or health hazard of any kind unless otherwise noted in the report.  It is further assumed that the property does not contain any type of dump site and that there are no underground tanks (or any underground source) leaking toxic or hazardous chemicals into the groundwater or the environment unless otherwise noted in the report.

14.  It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations unless noncompliance is stated, defined, and considered in the appraisal report.  A comprehensive examination of laws and regulations affecting the subject property was not performed for this appraisal.

15.  The subject property may or may not be located in or adjacent to a wetlands area.  The appraiser(s) are not qualified in the area of engineering pertaining to the determination of wetlands; therefore, the appraiser(s) are unable to determine the wetlands status of the subject property.  In this report, it is assumed the appropriate permit, if required, can be or has been obtained from the U.S. Army Corps of Engineers.  It is also assumed that the jurisdictional determination study and/or permit regarding construction in a wetlands area, if required, does not result in the alteration of the subject property description contained in this appraisal report.  The appraiser(s) recommend that a pre-application consultation be completed by the property owner with the Corps of Engineers if no permit has been obtained.  The client is urged to retain an expert in this field, if desired.

16.  The Americans with Disabilities Act (ADA) became effective January 26, 1992.  We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA.  It is possible that a compliance survey of the property together with a detailed analysis of the requirements of the ADA could reveal that the property is not in compliance with one or more of the requirements of the act.  If so, this fact could have a negative effect upon the value of the property.  Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

17. Opinions and estimates expressed herein represent our best judgment, but should not be construed as advice or recommendation to act. Any actions taken by you, the client, or any others should be based on your own judgment, and the decision process should consider many factors other than just the value estimate and information given in this report.

18. Acceptance and or use of this appraisal report by the client or any third party constitutes acceptance of these limiting conditions. Appraisal liability extends only to the stated client, not subsequent parties or uses, and is limited to the amount of the fee received by the appraiser(s).

19. This appraisal is an opinion of value. It is not a guarantee. No guarantee is warranted nor intended

## 2.2. Extraordinary Assumptions

USPAP defines an Extraordinary Assumption as: "an assignment specific assumption as of the effective date regarding uncertain information used in an analysis, which if found to be false, could alter the appraiser's opinion or conclusions."

> "Comment: Uncertain information might include physical, legal, or economic characteristics of the subject property, or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis."

The Discounted Cash Flow analysis in this report is based on the Extraordinary Assumption that all necessary permits for mining operations are obtainable as indicated by Dr. Capps, Capps Geoscience, LLC. This is in accordance with the Resource Valuation Report prepared by Dr. Capps, Capps Geoscience, LLC, and included in the Addenda, which states: "The property is zoned FOR-AG (Forestry-Agriculture District) and, according to Warren County zoning codes, mining is allowed in FOR-AG zoned lands with a conditional use permit. Community opposition to the quarry seems unlikely because there are existing aggregate quarries in the area. The author's opinion is that it is reasonably probable that the Conditional Use Permit (CUP) will be obtained from Warren County to operate the quarry. In the author's opinion, the subject property's quarry will be permitted as an active mine with the Surface Mining Unit of the Georgia Environmental Protection Division. In addition, in the author's opinion it is reasonably probable that the storm water and air emission permits will be granted for the subject property's quarry." It is the appraisers' opinion that while we are not mining consultants, based on our experience and expertise, the analysis within the Resource Valuation Report prepared by Dr. Capps, Capps Geoscience, LLC is credible and thus can be relied upon for the purpose of this appraisal. Further, according to Mr. Paul W. Hitchcock, Hitchcock & Hitchcock, P.C., a fair analysis of the Warren County Land Use Ordinance supports the approval of a conditional use permit for a granite quarry on the subject property. There is no financial public benefit to restricting the subject property to an agricultural use. The Owner and the general public will benefit from the increase in jobs and taxes that a mining operation would bring. The local laws and land use ordinances will reduce any potential negative impacts that the mining operation may bring, especially given the sparsely populated area in which the subject property lies. From a land use perspective, the proposed conditional use is proper; therefore, it is likely that the conditional use permit will be approved.

## 2.3 Hypothetical Conditions

The Uniform Standards of Professional Appraisal Practice (USPAP) defines an extraordinary assumption as: "*An assumption, directly related to a specific assignment,*

*as of the effective date of the appraisal results, which, if found to be false, could alter the appraiser's opinions or conclusions.*"

"Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

USPAP SR 1-2(g) comment states: "A hypothetical condition may be used in an assignment only if the use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis, or for purposes of comparison; use of the hypothetical condition results in a credible analysis; and the appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions."

If used in the assignment, extraordinary assumptions and hypothetical conditions may affect the assignment results, and for that reason must be clearly and conspicuously disclosed in the report.

At the time of appraisal, the conservation easement was signed and to the best of the appraisers' knowledge has been recorded. Therefore, the "before-easement" analysis is based on the hypothetical condition of the conservation easement not being in place and encumbering the subject property since the conservation easement does exist as of the date of this appraisal.

## SECTION 3 – APPLICABLE TERMS

### 3.1. Conservation Easement

As defined by the Appraisal Institute: "An interest in real estate restricting future land use to preservation, conservation, wildlife habitat or some combination of those uses. A conservation easement may permit farming, timber harvesting, or other uses of a rural nature as well as some types of conservation-oriented development to continue, subject to the easement."[5]

According to the U.S. Internal Revenue Service's Conservation Easement Audit Techniques Guide, a conservation easement is: "the generic term for easements granted for preservation of land areas for outdoor recreation, protection of a relatively natural habitat for fish, wildlife, or plants, or a similar ecosystem, preservation of open space for the scenic enjoyment of the public or pursuant to a Federal, State, or local governmental conservation policy, and preservation of a historically important land area or historic building. Conservation easements permanently restrict how land or buildings are used. The "deed of conservation easement" describes the conservation purpose, the restrictions and the permissible uses of the property. The deed must be recorded in the public record and must contain legally binding restrictions enforceable by the donee organization. The donor gives up certain rights specified in the Deed of Conservation Easement, but retains ownership of the underlying property. The extent and nature of the donee organization's control depends on the terms of the conservation easement deed. The organization has an interest in the encumbered property that runs with the land, which means that its

---

[5] The *Dictionary of Real Estate Appraisal,* 6th ed. Chicago: Appraisal Institute, 2015.

restrictions are binding not only on the landowner who grants the easement but also on all future owners of the property."

A conservation easement is also defined as: "A nonpossessory interest of a holder in real property imposing limitations or affirmative obligations the purposes of which include retaining or protecting natural, scenic, or open-space values of real property, assuring its availability for agricultural, forest, recreational, or open-space use, protecting natural resources, maintaining or enhancing air or water quality, or preserving the historical, architectural, archaeological, or cultural aspects of real property."[6]

Finally, an additional way to describe a conservation easement is: "A legal agreement between a landowner and a qualified organization that restricts future activities on the land to protect its conservation values."[7]

## 3.2. Charitable Gift Through a Conservation Easement

The value of the charitable gift through the conservation easement vehicle depends on the difference in utility and permitted uses prior to the establishment of a conservation easement and after the establishment of a conservation easement. The consideration given to clearly permitted and prohibited uses is established through the estimation of the extent to which prohibited uses contribute, individually and collectively, to the pre-conservation easement market value of the property compared against how the loss of each prohibited use ultimately affects the property's value post-conservation easement.

For example, the post-conservation easement properties consist of the property rights remaining after the severing of ownership into two groups of rights, the rights of the donor and the rights of the donee. Generally, the donor, and any subsequent owners, retain the right to use the property in ways consistent with the specific terms of the conservation easement and the owner's remaining reserved rights.

Specified uses permitted only after the review and approval of the easement holder possess inherent risks, costs and delays that must be considered by the appraisers. For example, the appraisers must assess the likelihood that any requested usage changes will be approved by the conservation easement holder as well as considering the delays, costs and inconvenience, which may arise when seeking review and approval for a change. Furthermore, the appraisers must consider the likelihood of additional expenses required to comply with any conditions the conservation easement holding organization may place on an approval of requested changes, such as a requirement to use higher quality material, updated designs, additional reviews adding time and cost constraints to the proposed change and the potential requirements to relocate access roads.

Grantors often retain the ability to continue limited recreational uses, subject to the conservation easement in perpetuity. The common appraisal metaphor regarding a "bundle" of property rights helps to illustrate this point. A person granting a conservation easement to a donee relinquishes one or several "sticks" associated with the "bundle" of rights regarding ownership of the burdened land. By relinquishing the ability to develop

---

[6] Uniform Conservation Easement Act, 1981, amended 2007.
[7] *The Conservation Easement Handbook,* 2nd ed. Washington, DC: Land Trust Alliance, 2005.

the land, the property owner diminishes the value if the land is otherwise suitable for development, in addition to any limitations on timbering, hunting lodges, surface mining and other revenue generating activities.

Conservation easements have a significant, but varying impact on the fair market value of conservation easement-burdened property. Statistics show that property tax assessments and federal tax appraisals of conservation easement-burdened lands vary considerably in the weight given to conservation easements in determining the value of the property. An example from the *Boston College Environmental Affairs Law Review*, 1990; Stanley Works v. Commissioner [Stanley Works, 87 TC 389 (1986)], one tax court found that a conservation easement diminished fair market value of the property by 75.0%. Similarly, Stotler v. Commissioner [Stotler, TCM 1987-275], the court held that a conservation easement decreased the market value of the now burdened property by over 91.4%.

Much of the variation in the degree to which conservation easements diminish fair market value can be attributed to the terms of the easements and the individual characteristics of the affected properties. Land Trust entities typically classify easements into three categories based on the extent to which the easement limits development on the subject property: (1) "Forever wild" easements preserve properties in their natural state and are the most restrictive; (2) "Resource protection" easements emphasize the protection and controlled use of natural resources; and (3) "Limited development" easements, the least restrictive conservation easements, generally restrict the amount or kind of development to a greater extent than local zoning.

### 3.3.    Qualified Appraisal

This appraisal for Log Creek LLLP; EIN# ▮▮▮▮▮▮▮ is a "qualified appraisal" and Doug Kenny, MAI and Rick Kenny, MAI, SRA are "qualified appraisers":

Treas. Reg. Section 1.170A-17

(a) *Qualified appraisal— (1) Definition.* For purposes of section 170(f)(11) and § 1.170A–16(d)(1)(ii) and (e)(1)(ii), the term *qualified appraisal* means an appraisal document that is prepared by a qualified appraiser (as defined in paragraph (b)(1) of this section) in accordance with generally accepted appraisal standards (as defined in paragraph (a)(2) of this section) and otherwise complies with the requirements of this paragraph (a).

(2) *Generally accepted appraisal standards defined.* For purposes of paragraph (a)(1) of this section, generally accepted appraisal standards means the substance and principles of the Uniform Standards of Professional Appraisal Practice, as developed by the Appraisal Standards Board of the Appraisal Foundation.

(3) *Contents of qualified appraisal.* A qualified appraisal must include—

(i) The following information about the contributed property:

(A) A description in sufficient detail under the circumstances, taking into account the value of the property, for a person who is not generally familiar with the type of property to ascertain that the appraised property is the contributed property.

(B) In the case of real property or tangible personal property, the condition of the property.

(C) The valuation effective date, as defined in paragraph (a)(5)(i) of this section.

(D) The fair market value, within the meaning of § 1.170A–1(c)(2), of the contributed property on the valuation effective date;

(ii) The terms of any agreement or understanding by or on behalf of the donor and donee that relates to the use, sale, or other disposition of the contributed property, including, for example, the terms of any agreement or understanding that—

(A) Restricts temporarily or permanently a donee's right to use or dispose of the contributed property;

(B) Reserves to, or confers upon, anyone, other than a donee or an organization participating with a donee in cooperative fundraising, any right to the income from the contributed property or to the possession of the property, including the right to vote contributed securities, to acquire the property by purchase or otherwise, or to designate the person having income, possession, or right to acquire; or

(C) Earmarks contributed property for a particular use;

(iii) The date, or expected date, of the contribution to the donee;

(iv) The following information about the appraiser:

(A) Name, address, and taxpayer identification number.

(B) Qualifications to value the type of property being valued, including the appraiser's education and experience.

(C) If the appraiser is acting in his or her capacity as a partner in a partnership, an employee of any person, whether an individual, corporation, or partnership, or an independent contractor engaged by a person other than the donor, the name, address, and taxpayer identification number of the partnership or the person who employs or engages the qualified appraiser;

(v) The signature of the appraiser and the date signed by the appraiser (appraisal report date);

(vi) The following declaration by the appraiser: "I understand that my appraisal will be used in connection with a return or claim for refund. I also understand that, if there is a substantial or gross valuation misstatement of the value of the property claimed on the return or claim for refund that is based on my appraisal, I may be subject to a

penalty under section 6695A of the Internal Revenue Code, as well as other applicable penalties. I affirm that I have not been at any time in the three-year period ending on the date of the appraisal barred from presenting evidence or testimony before the Department of the Treasury or the Internal Revenue Service pursuant to 31 U.S.C. section 330(c)";

(vii) A statement that the appraisal was prepared for income tax purposes;

(viii) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, or the replacement-cost-less-depreciation approach; and

(ix) The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

*(4) Timely appraisal report.* A qualified appraisal must be signed and dated by the qualified appraiser no earlier than 60 days before the date of the contribution and no later than—

(i) The due date, including extensions, of the return on which the deduction for the contribution is first claimed;

(ii) In the case of a donor that is a partnership or S corporation, the due date, including extensions, of the return on which the deduction for the contribution is first reported; or

(iii) In the case of a deduction first claimed on an amended return, the date on which the amended return is filed.

*(5) Valuation effective date—(i) Definition.* The valuation effective date is the date to which the value opinion applies.

(ii) *Timely valuation effective date.* For an appraisal report dated before the date of the contribution, as described in § 1.170A–1(b), the valuation effective date must be no earlier than 60 days before the date of the contribution and no later than the date of the contribution. For an appraisal report dated on or after the date of the contribution, the valuation effective date must be the date of the contribution.

*(6) Exclusion for donor knowledge of falsity.* An appraisal is not a qualified appraisal for a particular contribution, even if the requirements of this paragraph (a) are met, if the donor either failed to disclose or misrepresented facts, and a reasonable person would expect that this failure or misrepresentation would cause the appraiser to misstate the value of the contributed property.

*(7) Number of appraisals required.* A donor must obtain a separate qualified appraisal for each item of property for which an appraisal is required under section 170(f)(11)(C) and (D) and paragraph (d) or (e) of § 1.170A–16 and that is not included in a group of similar items of property, as defined in § 1.170A–13(c)(7)(iii). For rules

regarding the number of appraisals required if similar items of property are contributed, see section 170(f)(11)(F) and § 1.170A–13(c)(3)(iv)(A).

(8) *Time of receipt of qualified appraisal.* The qualified appraisal must be received by the donor before the due date, including extensions, of the return on which a deduction is first claimed, or reported in the case of a donor that is a partnership or S corporation, under section 170 with respect to the donated property, or, in the case of a deduction first claimed, or reported, on an amended return, the date on which the return is filed.

(9) *Prohibited appraisal fees.* The fee for a qualified appraisal cannot be based to any extent on the appraised value of the property. For example, a fee for an appraisal will be treated as based on the appraised value of the property if any part of the fee depends on the amount of the appraised value that is allowed by the Internal Revenue Service after an examination.

(10) *Retention of qualified appraisal.* The donor must retain the qualified appraisal for so long as it may be relevant in the administration of any internal revenue law.

(11) *Effect of appraisal disregarded pursuant to 31 U.S.C. section 330(c).* If an appraiser has been prohibited from practicing before the Internal Revenue Service by the Secretary under 31 U.S.C. section 330(c) at any time during the three-year period ending on the date the appraisal is signed by the appraiser, any appraisal prepared by the appraiser will be disregarded as to value, but could constitute a qualified appraisal if the requirements of this section are otherwise satisfied, and the donor had no knowledge that the signature, date, or declaration was false when the appraisal and Form 8283 (Section B) were signed by the appraiser.

(12) *Partial interest.* If the contributed property is a partial interest, the appraisal must be of the partial interest.

(b) *Qualified appraiser—(1) Definition.* For purposes of section 170(f)(11) and § 1.170A–16(d)(1)(ii) and (e)(1)(ii), the term qualified appraiser means an individual with verifiable education and experience in valuing the type of property for which the appraisal is performed, as described in paragraphs (b)(2) through (4) of this section.

(2) *Education and experience in valuing the type of property—(i) In general.* An individual is treated as having education and experience in valuing the type of property within the meaning of paragraph (b)(1) of this section if, as of the date the individual signs the appraisal, the individual has—

(A) Successfully completed (for example, received a passing grade on a final examination) professional or college-level coursework, as described in paragraph (b)(2)(ii) of this section, in valuing the type of property, as described in paragraph (b)(3) of this section, and has two or more years of experience in valuing the type of property, as described in paragraph (b)(3) of this section; or

(B) Earned a recognized appraiser designation, as described in paragraph (b)(2)(iii) of this section, for the type of property, as described in paragraph (b)(3) of this section.

*(ii) Coursework must be obtained from an educational organization, generally recognized professional trade or appraiser organization, or employer educational program.* For purposes of paragraph (b)(2)(i)(A) of this section, the coursework must be obtained from—

(A) A professional or college-level educational organization described in section 170(b)(1)(A)(ii);

(B) A generally recognized professional trade or appraiser organization that regularly offers educational programs in valuing the type of property; or

(C) An employer as part of an employee apprenticeship or educational program substantially similar to the educational programs described in paragraphs (b)(2)(ii)(A) and (B) of this section.

*(iii) Recognized appraiser designation defined. A recognized appraiser designation means* a designation awarded by a generally recognized professional appraiser organization on the basis of demonstrated competency.

*(3) Type of property defined—(i) In general.* The type of property means the category of property customary in the appraisal field for an appraiser to value.

*(ii) Examples.* The following examples illustrate the rule of paragraphs (b)(2)(i) and (b)(3)(i) of this section:

*Example (1). Coursework in valuing type of property.* There are very few professional-level courses offered in widget appraising, and it is customary in the appraisal field for personal property appraisers to appraise widgets. Appraiser A has successfully completed professional-level coursework in valuing personal property generally but has completed no coursework in valuing widgets. The coursework completed by Appraiser A is for the type of property under paragraphs (b)(2)(i) and (b)(3)(i) of this section.

*Example (2). Experience in valuing type of property.* It is customary for professional antique appraisers to appraise antique widgets. Appraiser B has 2 years of experience in valuing antiques generally and is asked to appraise an antique widget. Appraiser B has obtained experience in valuing the type of property under paragraphs (b)(2)(i) and (b)(3)(i) of this section.

*Example (3). No experience in valuing type of property.* It is not customary for professional antique appraisers to appraise new widgets. Appraiser C has experience in appraising antiques generally but no experience in appraising new widgets. Appraiser C is asked to appraise a new widget. Appraiser C does not have experience in valuing the type of property under paragraphs (b)(2)(i) and (b)(3)(i) of this section.

*(4) Verifiable.* For purposes of paragraph (b)(1) of this section, education and experience in valuing the type of property are verifiable if the appraiser specifies in the appraisal the appraiser's education and experience in valuing the type of property, as described in paragraphs (b)(2) and (3) of this section, and the appraiser makes a declaration in the appraisal that, because of the appraiser's education and experience, the appraiser is qualified to make appraisals of the type of property being valued.

*(5) Individuals who are not qualified appraisers.* The following individuals are not qualified appraisers for the appraised property:

(i) An individual who receives a fee prohibited by paragraph (a)(9) of this section for the appraisal of the appraised property.

(ii) The donor of the property.

(iii) A party to the transaction in which the donor acquired the property (for example, the individual who sold, exchanged, or gave the property to the donor, or any individual who acted as an agent for the transferor or for the donor for the sale, exchange, or gift), unless the property is contributed within 2 months of the date of acquisition and its appraised value does not exceed its acquisition price.

(iv) The donee of the property.

(v) Any individual who is either—

(A) Related, within the meaning of section 267(b), to, or an employee of, an individual described in paragraph (b)(5)(ii), (iii), or (iv) of this section;

(B) Married to an individual described in paragraph (b)(5)(v)(A) of this section; or

(C) An independent contractor who is regularly used as an appraiser by any of the individuals described in paragraph (b)(5)(ii), (iii), or (iv) of this section, and who does not perform a majority of his or her appraisals for others during the taxable year.

(vi) An individual who is prohibited from practicing before the Internal Revenue Service by the Secretary under 31 U.S.C. section 330(c) at any time during the three-year period ending on the date the appraisal is signed by the individual.

*(c) Effective and applicability date.* This section applies to contributions made on or after January 1, 2019. Taxpayers may rely on the rules of this section for appraisals prepared for returns or submissions filed after August 17, 2006.

IRS Form 8283, "Noncash Charitable Contributions Appraisal Summary," is to be completed and included as part of the appraisal. The purpose of this report is to determine the fair market value of the conservation easement. The appraisers have complied with the requirements for a qualified appraiser and this report is a qualified appraisal in compliance with the Tax Reform Act of 1984. Further, although, Treas. Reg. Section 1.170A-17 effective on January 1, 2019, the regulation states, "Taxpayers may rely on

the rules of this section for appraisals prepared for returns or submissions filed after August 17, 2006." Therefore, Treas. Reg. Section 1.170A-17 was utilized for the purpose of Qualified Appraisal and Qualified Appraiser.

### 3.4 Property Rights Appraised

One or more of the following underlined legal estates or interests are valued in this report. Definitions of these estates are quoted from *The Dictionary of Real Estate Appraisal*, Sixth Edition; published by the Appraisal Institute, copyright 2015.

- Fee Simple Estate: *"Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."*

- Leased Fee Interest: *"The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires."*

- Leasehold Interest: *"The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease."*

The opinion of value developed in this report relates to the **Fee Simple Estate** of the Conservation Easement and not a leased interest.

### 3.5 Market Value

"The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. If the contribution is made in property of a type which the taxpayer sells in the course of business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property in the usual market in which he customarily sells, at the time and place of the contribution and, in the case of a contribution of goods in quantity, in the quantity contributed. The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom he customarily sells, but if he sells only at retail the usual market consists of his retail customers" 26 C.F.R. § 1.170A-1(c)(2).

### 3.6 Value Opinion

Opinions of value are typically developed on the basis of one or more of the following dates or situations.

- Fair Market Value "As Is" on the Appraisal Date: Market Value "As Is" on the appraisal date is an opinion of the market value of a property in the condition observed upon inspection and as it physically and legally exists without hypothetical conditions, assumptions, or qualifications as of the date the appraisal is prepared.

- Prospective Market Value "Upon Completion" of Construction: Prospective market value "upon completion" of construction is the future value of a property on the date that construction, conversion, or rehabilitation is completed, based upon market conditions forecast to exist as of that completion date.

- Prospective Market Value "Upon Reaching Stabilized Occupancy:" Prospective market value "upon reaching stabilized occupancy" is the future value of a property when all improvements have been physically constructed and the property has been leased to its optimum level of long-term occupancy at the market rent level.

The value opinion for the subject property encumbered by the conservation easement has been reported on the basis of **Fair Market Value "As Is."** At the time of appraisal, the conservation easement was in place. Therefore, the "before-easement" analysis is based on the hypothetical condition of the conservation easement not being in place and encumbering the subject property since the conservation easement does exist as of the date of this appraisal.

## 3.7 Report Type

According to the Uniform Standards of Professional Appraisal Practice (USPAP), Standards Rule 2-2, an appraisal report must be prepared under one of the following options and prominently state the option used: Appraisal Report or Restricted Appraisal Report. These report types are described as follows:

- Appraisal Report:  The content must be consistent with the intended use of the appraisal and, at minimum: (i) state the identity of the client and any intended users, by name or type; (ii) state the intended use of the appraisal; (iii) summarize information sufficient to identify the real estate involved in the appraisal, including the physical, legal, and economic property characteristics relevant to the assignment; (iv) state the real property interest to be appraised; (v) state the type and definition of value and cite the source of the definition; (vi) state the effective date of appraisal and the date of the report; (vii) summarize the scope of work used to develop the appraisal; (viii) summarize the information analyzed, the appraisal methods and techniques employed, and reasoning that supports the analysis, opinions, and conclusions; exclusion of the Sales Comparison Approach, Cost Approach, or Income Approach must be explained; (ix) state the use of the real estate existing as of the date of value and the use of the real estate reflected in the appraisal; (x) when an opinion of highest and best use was developed by the appraiser, summarize the support and rational for that opinion; (xi) clearly and conspicuously: (1) state all extraordinary assumptions and hypothetical conditions; and (2) state that their use might have affected the assignment results; (xii) include a signed certification in accordance with Standards Rule 2-3.

- Restricted Appraisal Report:  The content must be consistent with the intended use of the appraisal and, at minimum: (i) state the identity of the client, by name or type, and state a prominent use restriction that limits the use of the report to the client and warns that the rational for how the appraiser arrived at the opinions and conclusions set forth in the report may not be understood property without additional information in the appraiser's work file; (ii) state the intended use of the appraisal; (iii) state information sufficient to identify the real estate involved in the appraisal; (iv) state the real property interest appraised; (v) state the type of value and cite the source of the definition; (vi) state the

effective date of appraisal and the date of the report; (vii) state the scope of work used to develop the appraisal; (viii) state the appraisal methods and techniques employed, state the value opinion(s) and conclusion(s) reached, and reference the work file; exclusion of the Sales Comparison Approach, Cost Approach, or Income Approach must be explained; (ix) state the use of the real estate existing as of the date of value and the use of the real estate reflected in the appraisal; (x) when an opinion of highest and best use was developed by the appraiser, state the opinion; (xi) clearly and conspicuously: (1) state all extraordinary assumptions and hypothetical conditions; and (2) state that their use might have affected the assignment results; (xii) include a signed certification in accordance with Standards Rule 2-3.

This report is prepared as an **Appraisal Report.**

## SECTION 4 – AREA AND MARKET ANALYSIS

The demand for aggregate material is driven by population growth, business growth, and housing growth. Therefore, this section focuses on the drivers of aggregate demand.

A study and analysis were conducted focusing on the regional market area relevant to the subject property. The resulting analysis begins with a wide scope concentrating on the Southeastern United States, transitioning to a discussion on the State of Georgia, and concluding with a macro-level analysis of the metropolitan, county and city statistical area.
A combined statistical area is composed of metropolitan statistical areas that have a common nexus, often sharing labor and media markets.

### 4.1 SOUTHEASTERN UNITED STATES REGIONAL ANALYSIS



**Location**

According to the U.S. Census Bureau, the southern region of the United States consists of 16 states as indicated on the map above. However, the southeastern region of the United States commonly excludes Texas, Oklahoma, Missouri, West Virginia and Maryland. The Southeast experiences unique locational advantages due to its positioning and access to major commerce ports and as a result of being bordered on two sides by major bodies of water.

Additionally, the climate in the Southeast allows for additional commerce centers and transit routes for goods through the extensive waterways and rail systems running strategically throughout the region and free of the negative impacts of seasonal weather issues. The southeastern region has also seen an influx of businesses, contributing to an increase in population, workforce, and infrastructure.

**Demographics**

Population growth in the Southeast region has exceeded the rate for the nation since 2016. From 2016 to 2018, the population in the region increased an average of 0.9%, or by approximately 601,000, annually, to 69.59 million, while the population of the nation expanded an average of 0.6% annually (Census population estimates as of July 1, 2018). Strong job growth in the region contributed to the difference in population growth rates during the period. From 2016 through 2018, nonfarm payrolls in the region increased an average of 1.9%, annually, which is higher than the national rate of 1.7% a year.

From 2017 to 2018 Florida accounted for approximately 58.0% of the population growth in the region but only 31.0% of the total population. The population of the state increased by approximately 322,500, or 1.5%, both the largest and the fastest increase in the region. After Florida, the highest population growth rate was in South Carolina where the population expanded by approximately 62,900, or 1.3%. The number of jobs in the state increased 2.4% during the period, equaling Florida for the fastest rate in the region. The populations of North Carolina, Georgia, and Tennessee increased 1.1, 1.0, and 0.9%, or approximately 112,800, 106,400, and 61,200, respectively. The respective populations of Kentucky and Alabama both increased by 0.3%, or approximately 14,550 and 12,750, respectively, while the population of Mississippi declined slightly. Net in-migration averaged 2,775 a year and accounted for 54.0% of total population growth during the period.

Population growth has exceeded the national rate in five of the eight states in the Southeast/Caribbean region.

| | Population Estimate | | | Percentage Change | |
|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2016 to 2017 | 2017 to 2018 |
| United States | 323,071,342 | 325,147,121 | 327,167,434 | 0.6 | 0.6 |
| Southeast/Caribbean Region | 68,392,437 | 69,034,338 | 69,594,513 | 0.9 | 0.8 |
| Alabama | 4,864,745 | 4,875,120 | 4,887,871 | 0.2 | 0.3 |
| Florida | 20,629,982 | 20,976,812 | 21,299,325 | 1.7 | 1.5 |
| Georgia | 10,304,763 | 10,413,055 | 10,519,475 | 1.1 | 1.0 |
| Kentucky | 4,438,229 | 4,453,874 | 4,468,402 | 0.4 | 0.3 |
| Mississippi | 2,988,298 | 2,989,663 | 2,986,530 | 0.0 | -0.1 |
| North Carolina | 10,156,679 | 10,270,800 | 10,383,620 | 1.1 | 1.1 |
| South Carolina | 4,958,235 | 5,021,219 | 5,084,127 | 1.3 | 1.3 |
| Tennessee | 6,645,011 | 6,708,794 | 6,770,010 | 1.0 | 0.9 |
| Puerto Rico | 3,406,495 | 3,325,001 | 3,195,153 | -2.4 | -3.9 |

Note: Population estimates for 2016, 2017, and 2018 are as of July 1.
Source: U.S. Census Bureau

Often, with an influx in population, regions and states struggle to maintain a low unemployment rate. However, the unemployment rate for states in the Southeast all remain near or slightly above the nationwide unemployment rate of 3.9% as of December 2018, except for Mississippi.[8] As of December 2018, unemployment rates in descending order for the Southeast Region are South Carolina with 3.4%, Tennessee with 3.5%, Florida with 3.6%, Alabama with 3.9%, Georgia with 4.0%, North Carolina with 4.0%, Kentucky with 4.2%, and Mississippi with 5.0%.[9]

**Most Populous States**

Based on 2018 estimates, the most populous state in the region is Florida (21,299,325), followed by Georgia (10,519,475) and North Carolina (10,383,600).[10]

---

[8] *Federal Reserve Bank of St. Louis, (FRED)*
[9] *U.S. Bureau of Labor Statistics, Local Area Unemployment Statistics, Unemployment Rates for States, 2018 Annual Averages*
[10] *U.S. Census Bureau*

| State | 2018 Estimate | 2010 Census | Change | Area (in square miles) | Density (people per square mile) |
|-------|---------------|-------------|--------|------------------------|----------------------------------|
| Alabama | 4,887,871 | 4,779,736 | +2.30% | 50,645 | 96 |
| Arkansas | 3,013,825 | 2,915,918 | +3.40% | 52,035 | 58 |
| Florida | 21,299,325 | 18,801,310 | +13.30% | 53,624 | 397 |
| Georgia | 10,429,379 | 9,687,653 | +7.66% | 57,513 | 181 |
| Kentucky | 4,468,402 | 4,339,367 | +2.65% | 39,486 | 113 |
| Louisiana | 4,659,978 | 4,533,372 | +2.80% | 43,203 | 108 |
| Mississippi | 2,986,530 | 2,967,297 | +0.60% | 46,923 | 64 |
| North Carolina | 10,383,620 | 9,535,483 | +8.90% | 48,617 | 213 |
| South Carolina | 5,084,127 | 4,625,364 | +9.90% | 30,060 | 169 |
| Tennessee | 6,770,010 | 6,346,105 | +6.70% | 41,234 | 164 |
| Virginia | 8,517,685 | 8,001,024 | +6.50% | 39,490 | 215 |
| West Virginia | 1,805,832 | 1,852,994 | −2.50% | 24,038 | 75 |

By 2060 the population is projected to reach 404 million with the largest age group being between 18 and 44 years old at 132.3 million with the 45- to 64-year-old age group being close at 97 million.

**Population by Age Group: Projections 2020 to 2060**
The population is projected to reach 404 million by 2060.
(In millions)

| Characteristic | Population | | | | | | Change from 2016 to 2060 | |
|---|---|---|---|---|---|---|---|---|
| | 2016 | 2020 | 2030 | 2040 | 2050 | 2060 | Number | Percent |
| Total population . . . . . . . | 323.1 | 332.6 | 354.8 | 373.1 | 388.3 | 403.7 | 80.6 | 24.9 |
| Under 18 years . . . . . . . . . . . . . . | 73.6 | 73.9 | 75.4 | 76.8 | 77.9 | 79.8 | 6.2 | 8.4 |
| 18 to 44 years . . . . . . . . . . . . . . | 116.0 | 119.2 | 125.0 | 126.3 | 129.3 | 132.3 | 16.3 | 14.1 |
| 45 to 64 years . . . . . . . . . . . . . | 84.3 | 83.4 | 81.3 | 89.1 | 95.4 | 97.0 | 12.8 | 15.1 |
| 65 years and over . . . . . . . . . . | 49.2 | 56.1 | 73.1 | 80.8 | 85.7 | 94.7 | 45.5 | 92.3 |
| 85 years and over . . . . . . . . . . . | 6.4 | 6.7 | 9.1 | 14.4 | 18.6 | 19.0 | 12.6 | 197.8 |
| 100 years and over . . . . . . . . . | 0.1 | 0.1 | 0.1 | 0.2 | 0.4 | 0.6 | 0.5 | 618.3 |

Note: The official population estimates for the United States are shown for 2016; the projections use the vintage 2016 population estimate for July 1, 2016, as the base population for projecting from 2017 to 2060.
Source: U.S. Census Bureau, 2017 National Population Projections.

## Economy

The Southeast has experienced an economic renaissance over the last 35 years due to exponential growth in tourism, financial services, manufacturing, and high-technology industries. Leading this transformation is a wealth of automotive manufacturing drawn by attractive government incentives, research hubs, and in certain cases, access to trade ports.

Increasing levels of global growth boosted economic activity in the Southeast U.S. in the past several years, as rising exports fueled gains at the region's factories and natural resource producers. The region's manufacturing sector is seeing strong demand across many key industries. Output, shipments, and employment are all solidly up in 2018, and the region continues to attract a wealth of capital investment

For the first time in more than a decade, every major industrial economy grew in 2017 and continued to grow in 2018, and the Southeast U.S. benefitted as home to five of the nation's most export-intensive states measured by exports as a share of state Gross Domestic Product (GDP).[11] The region boasts four of the top ten states in the U.S. for tourism: Florida (2), Virginia (6), South Carolina (7), and Georgia (9).[12] The Southeast's unemployment rate declined to 3.6% as of December 2018, according to the U.S. Bureau of Labor Statistics. The unemployment rate for the region averaged 3.6% during the fourth quarter of 2018, down from 4.2% during the fourth quarter of 2017, with declines in six of eight states. Alabama was the only state where the unemployment rate increased, rising slightly from 3.5% to 3.6%. By comparison, the unemployment rate for the nation averaged 3.6% during the fourth quarter of 2018, down from 3.9% a year ago.[13]

---

[11] U.S. Department of Commerce
[12] Business Insider
[13] U.S. Bureau of Labor Statistics

CARRYOVER ATTACHMENT - EXHIBIT C: 221 of 666



Unemployment rates declined in six of the eight states in the Southeast/Caribbean region as well as Puerto Rico, where the rate fell by more than 2 percentage points.

4Q = fourth quarter.
Source: U.S. Bureau of Labor Statistics

    Transportation-related equipment is a major export for the region. Historically, the category has been dominated by motor vehicles but now has shifted to aerospace and aviation products. Over the past decade, the Southeast has seen an upswing in the automotive industry. Numerous new automobile production plants are proliferating, including Mercedes-Benz in Tuscaloosa, Alabama; Hyundai in Montgomery, Alabama; Toyota Motors in Blue Springs, Mississippi; Kia Motors in West Point, Georgia; the BMW production plant in Greer, South Carolina; Volkswagen in Chattanooga, Tennessee; the Ford assembly plant in Louisville, KY; the GM manufacturing plant in Spring Hill, Tennessee; and the Nissan North American headquarters in Franklin, Tennessee. The future is bright for auto manufacturing in the region. In 2015, Volvo Car Corp. announced its plans to invest $500 million in a factory in South Carolina, which was set to open in 2018 and projected to provide 4,000 jobs. Volvo is reported to have received more than $200 million in incentives from the state government, including $120 million in economic development bonds. Overall, the Southeast is home to almost a quarter of the total U.S. auto manufacturing plants in America (see map below).

### Automotive Manufacturing Plants in the Southeast



Source: *Bureau of Economic Analysis, U.S. Department of Commerce*

    Because of the auto industry, opportunities have expanded for support companies such as automobile engine manufacturing, as well as parts, especially tires. The southeast is home to 36.8% of the country's tire manufacturing facilities. The graph below illustrates the region's growth in tire manufacturing which includes the 2015 opening of the Yokohama Tire plant in West Point, Mississippi and the major expansion of the Toyo Tire facility in Bartow County, Georgia.



Source: *U.S. Bureau of Labor Statistics*

Aerospace and aviation are also powerful economic drivers in the region, including a number of NASA facilities such as the Kennedy Space Center in Florida and the Stennis Space Center in southern Mississippi (see map below). The region is home to more than 20.0% of total space vehicle and missile manufacturing facilities in the country. For example, Lockheed Martin, a major player in the industry, operates aeronautics facilities in Mississippi, West Virginia, Florida, and South Carolina. In aircraft engine and parts manufacturing, the Southeast is home to 16.9% of the country's total. In 2015, Boeing opened a $6 million technology and research facility in Huntsville, Alabama. Other operators in the region include Raytheon, Airbus and Embraer. Mobile, Alabama is home to the final assembly line of Airbus' A320 jetliner at a facility which opened in 2015. Mobile, Alabama is also home to a massive, state-of-the art manufacturing facility for the giant German steel company ThyssenKrupp.

**Sampling of Aviation Facilities in Southeast**



Source: *Southeast Aerospace Industry/Courtesy Dorchester County, SC*

In summary, the benefits of economic vitality in the Southeast U.S. include some of the lowest unemployment rates in the nation; the attraction of Fortune 500 companies to establish their headquarters (20 in Virginia, 16 in Florida, 15 in North Carolina, and 14 in Georgia); and population growth (see Most Populous States under Demographics above). The business community has taken note of the economic attractiveness of the Southeast, as three of the top 10 states for business according to Forbes are in the region. The Southeast's population and economic growth has resulted in a Gross Domestic Product (GDP) of nearly $4.4 trillion[14] as of

---

[14] *https://fred.stlouisfed.org*

the fourth quarter of 2018, outpacing the rest of the U.S., and boasting the fifth largest GDP in the world (see chart below).[15]





U.S. Bureau of Economic Analysis

### **Transportation**

Contributing to the Southeast's rapid growth over the last several years is the access to major transportation corridors. Most of the major cities in the Southeast are connected via a robust Interstate system, allowing for the smooth transport of goods, services, personnel, and raw materials. In addition to the Interstate system, the U.S. Department of Transportation (USDOT) is currently in the process of expanding the passenger rail system in the Southeast. USDOT is currently three to four years into the planning and research associated with the development of the Southeastern Rail Corridor, a passenger rail network linking Washington, DC to Atlanta, Savannah, GA, and Jacksonville, FL, as well as several cities in between.

Not only is passenger rail and transportation making strides and investing in the Southeast, but major rail lines are also following suit, or leading the way, by increasing the infrastructure required to support these increased demands. Norfolk Southern Rail and CSX Rail currently operate two of the most extensive industrial rail networks in the Southeast region.

[15] *U.S. Bureau of Economic Analysis*

Additionally, Norfolk Southern Rail is currently working on the $2.5 billion rail infrastructure project, the Crescent Corridor (see map below). The corridor is expected to provide 30 new rail lines along the 2,500-mile Crescent Corridor and in excess of 122,000 jobs through 2030 with connections in Charlotte, NC, Knoxville, TN, Atlanta, GA, Chattanooga, TN, and Birmingham, AL in an effort to meet the growing industry boom in the Southeast.



This expansion is being fueled by both import and export activity, as well as increases in manufacturing employment throughout the region, most notably from port markets such as Savannah, GA, Miami, FL, and Charleston, SC with continued growth expected as the Panama Canal is widened to support larger vessels.[16] The expansion, coupled with the Southeast being one of the fastest growing regional markets in the United States, attracts businesses from all market sectors along with influx of a talented workforce spanning multiple generations.

## Housing

The economic indicators in the Southeast point to the region becoming one of the fastest growing housing markets in the United States. New and developing businesses are being drawn to the region, creating new jobs and new opportunities for many relocating residents as well as locals who are choosing to stay in their geographic area where they are currently employed. In order to meet the demand generated by population and economic growth, the housing market has ramped up single- and multi-family home production throughout most of the region.

---

[16] *Wagner, D. (2017). Southeastern U.S. Experiencing a Growth Spurt. National Real Estate Investor*





According to the U.S. Department of Housing and Urban Development (HUD), almost every state in the region (see charts below) has seen a year-over-year increase in the number of homes sold, simultaneously with a decrease in vacancy rates for both sales and rentals, in addition to every state seeing at least a 2.0% increase in home value.[17]

The number of homes sold increased in six of the eight states in the Southeast/Caribbean region during the past year, while the average sales price increased in all but one.

| | 12 Months Ending | Number of Homes Sold | | | Average or Median | Price | | |
|---|---|---|---|---|---|---|---|---|
| | | 2017 | 2018 | Percent Change | | 2017 ($) | 2018 ($) | Percent Change |
| Alabama (N&E) | November | 98,150 | 101,100 | 3 | AVG | 160,600 | 171,900 | 7 |
| Florida (N&E) | November | 591,100 | 606,400 | 3 | AVG | 256,000 | 274,300 | 7 |
| Georgia (N&E) | November | 228,900 | 237,900 | 4 | AVG | 215,200 | 225,500 | 5 |
| Kentucky (N&E) | November | 78,900 | 77,950 | -1 | AVG | 160,300 | 163,500 | 2 |
| Mississippi (N&E) | November | 13,900 | 14,350 | 3 | AVG | 216,900 | 208,500 | -4 |
| North Carolina (N&E) | November | 219,400 | 225,400 | 3 | AVG | 219,000 | 229,200 | 5 |
| South Carolina (N&E) | November | 117,300 | 118,800 | 1 | AVG | 211,200 | 224,100 | 6 |
| Tennessee (N&E) | November | 169,700 | 169,500 | 0 | AVG | 189,700 | 202,100 | 7 |

AVG = average. N&E = new and existing.
Notes: Data include new and existing single-family homes, townhomes, and condominiums. Data for Mississippi exclude Hinds County, the most populous county in the Jackson metropolitan area.
Source: CoreLogic, Inc., with adjustments by the analyst

[17] Blount, Casey M. (2018) HUD PD&R Regional Report: Region 4: Southeast/Caribbean.
https://www.huduser.gov/portal/periodicals/USHMC/reg//Southeast-Caribbean-RR-4Q18.pdf

### 4.2 GEORGIA REGIONAL AREA DATA

**<u>Location</u>**

The State of Georgia is located within the southeastern section of the United States, located between Florida to the south, Tennessee to the north, Alabama to the west, and both South Carolina and the Atlantic Ocean forming its eastern border.



Georgia covers approximately 58,910 square miles with an estimated population of 10.51 million in 2018, ranking as the eighth most populous state in the nation and largest state east of the Mississippi River in terms of land mass.

Georgia is almost entirely landlocked; however, it contains approximately 110 miles of coastline along the Atlantic Ocean and operates the Port of Savannah, the second largest port on the east coast and largest port in the southeast. Georgia is strategically positioned to provide access and transit to the southeastern regional market with established routes of transportation and freight coupled with the capability of handling immense amounts of freight with the largest single container terminal in North America.

**<u>Geography</u>**

Due to its unique positioning within the southeast, Georgia experiences a range of geographic profiles from its northern mountain ranges to Florida at its southern border and eastern coastline. The northern regions of Georgia experience mostly mountainous topography, a result of being the southern point of the Appalachian Mountain Range and the Blue Ridge Mountain area.

Central Georgia is comprised of the Piedmont Region, an area characterized by rolling hills between the mountains of North Georgia and the Coastal Plains of Southern Georgia, while the largest geographic region, the Upper and Lower Coastal Plains of southern Georgia, is characterized by a plethora of waterways, hardwood swamps and several marshes.

Perhaps one of the most well-known areas is the Okefenokee Swamp, near the lower/Atlantic Coastal Plain.



Physiographic Districts of Georgia

**Demographics**

Georgia has an estimated 2018 population of 10.51 million, ranking as the eighth most populous state in the country. The 2018 median household income is estimated at \$58,756 while the estimated median home value is \$173,700 with median monthly costs for owners with a mortgage of \$1,341.[18] As of December 2018, Georgia's estimated unemployment percentage is 3.6%.[19] In 2018, job growth exceeded the national rate of 1.7%, where nonfarm payrolls expanded 2.2% to 4.55 million jobs, an increase of 97,050 jobs, from 2017.[20] Part of the basis for the low unemployment rate for the state is an influx of workers as an additional 135,000 people entered the workforce, the majority of which have relocated to Georgia.[21]





As workers have begun relocating to the state drawn by the competitive business environment and prospective job growth, so too has Georgia seen an influx of retirement age individuals seeking warmer climates and an attractive cost of living. According to the Georgia Department of Human Services, Georgia currently has the 11th fastest growing population for

---

[18] *Cnbc.com/2018/median-home-values-in-every-us-state*
[19] *St. Louis Federal Reserve Board (FRED)*
[20] *U.S. HUD (2018). HUD Report, Job Growth*
[21] *Kanell, Michael E. (2017) Burst of jobs in Georgia in June, unemployment dips. AJC.com*

residents over 60 years old and a top 10 projected fastest growing population for residents over the age of 85 between 2010 and 2030.

The state of Georgia is poised to continue its growth trend, demographically and economically as new business, employees and people relocate to the state. However, the aging population shown in the graphs above must be considered regarding planning for increased housing and economic requirements. The graphs above depict an aging population continuing to grow throughout the next several decades, and not by a small margin. The projected percentage of change for each age group over 65 is poised to double over the next decade. The economy and housing demand must be prepared to meet the increased demand for the aging population, whether as retirement or assisted living communities.

**Economy**

Georgia offers attractive business incentives to businesses looking to either expand or grow their business in the state as evidenced by the State of Georgia being ranked sixth by Forbes, and first by Site Selection Magazine, for the best States for Business.[22] Several major corporations either call Georgia home or are providing major investments in the infrastructure, transportation, manufacturing and business, ultimately providing more jobs for the workforce and recording a $602.02 billion Gross Domestic Product produced in 2018.[23] In 2018, Georgia's gross domestic product increased by 4.87% for an annual change of 0.03%. Georgia is estimated to be the ninth-largest economy in the United States.[24] A major contributing factor to the economic growth of Georgia is their industry leading Quick Start Program, a training initiative focused on developing the skills of employees for the present and the future. Georgia's Quick Start Program is the longest running initiative of its kind and, to date, has trained over one million employees across multiple industries.[25]

In an attempt to attract further businesses to invest in the state, Georgia has created attractive incentive programs. One of the main draws to the state is its competitive tax climate prior to the implementation of any tax credits. Georgia is on the forefront of business development by instituting the single-factor apportionment tax basis. Property and business taxes in Georgia are kept low through this process, wherein a company's corporate income tax rate of 6.0% is only applied to the portion of a company's sales which occur within the state.

Furthermore, as demonstrated in the chart below, Georgia offers additional tax credit incentives to businesses for creating jobs in counties around the state.

---

[22] *Arend, Mark (2015). Site Selection*
[23] *Federal Reserve Bank of St. Louis (FRED)*
[24] *https://www.ibisworld.com*
[25] *Georgia Quick Start (2017). www.georgia.org*



The top five industries in Georgia are agriculture, film, energy, automotive industry and tourism followed closely by the aerospace industry, business and finance and logistics and transportation. Georgia ranks fourth in the nation for the number of individuals employed in the aviation field, and the job growth outlook for the industry exceeds national averages over the next 10 years. The new program at Chattahoochee Technical College's new $35 Million Aviation Academy at Silver Comet Field at Paulding Northwest Atlanta Airport is projected to fill the deficit in aerospace mechanic jobs. Additionally, several major corporations, such as Home Depot, Coca-Cola, Delta Airlines, UPS, Aflac, Southern Company and both Porsche (US) and Mercedes-Benz, have chosen to establish their headquarters in Georgia.

Currently the largest employer in the state is Delta Air Lines, Inc. with their hub and headquarters located at the busiest airport in the world at Hartsfield-Jackson International Airport in Atlanta, Georgia. Delta Airlines recently partnered with the Savannah College of Art and Design (SCAD) to engage students with the company and address researching, creating and solving a range of topics facing air travel. Georgia now ranks as the top location in the world for the film industry.

Not only is Georgia first in the film industry and has the world's busiest airport, but also the Southern United States busiest port in Savannah. Georgia has a wide range of Department of Defense organizations, the Air Force Reserve Command at Robbins AFB and Ft Benning, home to the US Army's Airborne School, both of which call Georgia home. In addition to the wide range of military bases, Department of Defense industry titans such as Boeing, Lockheed-Martin, BAE Systems, Airbus and Northrop Grumman are all major government contractors in the area.

Due in part to the increase in manufacturing and industrial development, major rail lines such as CSX Rail and Norfolk Southern are investing in the area to create cleaner, more efficient ways to transport goods, materials and final products to ports of call. Their commitment to the growth of the state is demonstrated by the joint effort between the State of Georgia and CSX Rail to create the 42-acre Appalachian Regional Port. The Appalachian Regional Port is a joint effort to provide a 388-mile direct rail route from the regional inland port located in Northwest Georgia to the Port of Savannah, decreasing the distance required for trucks from the region to travel to get product to the worldwide market through Savannah. In December 2018, the Georgia Ports Authority announced plans for a new inland port in Gainesville, just northeast of Atlanta, to

provide further freight rail service to and from the Port of Savannah.[26] Additionally, to foster freight and rail service, the Georgia Ports Authority inaugurated an inland port in Murray County, also in northern Georgia. Furthermore, businesses continue to increase their presence and support the economy by investing large sums of money to expand or develop their footprints, with the automotive manufacturing industry being one of the largest partners. German manufacturer Porsche invested $100 million to build and develop their North American Headquarters and experience center in Atlanta, while Mercedes-Benz is investing $93 million to build a new state of the art headquarters with the capability to double its workforce in the next five years.

| Industry | 2016 Base Employment | 2018 Projected Employment | Employment Change |
|---|---|---|---|
| Food Services and Drinking Places | 357,640 | 386,750 | 29,110 |
| Professional, Scientific, and Technical Services | 239,740 | 255,430 | 15,690 |
| Specialty Trade Contractors | 104,190 | 119,050 | 14,860 |
| Ambulatory Health Care Services | 195,900 | 209,510 | 13,610 |
| Administrative and Support Services | 274,700 | 285,700 | 11,000 |
| Educational Services | 377,440 | 388,390 | 10,950 |
| Warehousing and Storage | 37,580 | 48,030 | 10,450 |
| Hospitals | 181,360 | 190,800 | 9,440 |
| Crop Production | 73,430 | 79,800 | 6,370 |
| Motor Vehicle and Parts Dealers | 63,150 | 68,530 | 5,380 |
| General Merchandise Stores | 104,840 | 109,940 | 5,100 |
| Heavy and Civil Engineering Construction | 22,950 | 27,460 | 4,510 |
| Real Estate | 42,310 | 146,760 | 4,450 |
| Transportation Equipment Manufacturing | 50,730 | 55,000 | 4,270 |
| Merchant Wholesalers, Nondurable Goods | 57,560 | 61,800 | 4,240 |
| Merchant Wholesalers, Durable Goods | 104,060 | 108,290 | 4,230 |
| Management of Companies and Enterprises | 64,090 | 67,820 | 3,730 |
| Construction of Buildings | 36,230 | 39,790 | 3,560 |
| Truck Transportation | 48,380 | 51,640 | 3,260 |
| Rental and Leasing Services | 18,070 | 20,730 | 2,660 |



## Housing

As a result of the growing economy in Georgia, both businesses and prospective workers are flocking to the area and as mentioned above, each is looking for a share of the almost $602.02 billion in gross national product produced each year. Georgia looks forward to continuing its year-over-year growth as the country moves further away from the recession. Almost in parallel to the growing economic environment that made Georgia the #6 or #1, depending on the source, State to do business in, the Real Estate and housing market in the state are booming. For example, since the recession median home prices in Metro-Atlanta have grown by 6.2% year-over-year but remain below the average median home value for almost all other States in the top 10 for business. Additionally, the home equity in the area has grown by more than 45.0% over a three-year period, doubling the national average.[27]

With the influx in population due to the growing economy, more and more residents are moving to the area and looking to enter into the housing market. It is not uncommon for the residential housing market in Georgia to demand higher than asking prices for listed homes within days if not hours. According to the Michael Kanell, first time home buyers account for approximately 42.0% of purchases and add credence to the need for new homes.[28] The chart below demonstrates the remarkable need for housing in Georgia as annual building activity for

[26] Georgia.org
[27] Esajian, JD. (2017). The 10 Hottest Summer Real Estate Markets in 2016. FortuneBuilders.com
[28] Kanell, Michael (2017). Young homebuyers hit "crazy" market in Metro Atlanta. myajc.com

the state has been above 20,000 single-family homes for five years running, while multi-family homes have surpassed 10,000 residents in four of the last five years. The numbers for 2018 presented in the charts below are through the 12-month period ending in December.







Meeting the housing demand for an increase in population is not restricted to the development of single family and multifamily housing. Senior housing is also a contributing factor to the growing housing development throughout the state. The region, state and local areas have all recognized a need to be met in the future and are taking steps to ensure the demand is met prior to the need, as senior housing occupancy is projected to increase by approximately 65.0% over the next year as more and more Baby Boomers reach retirement age.



One way to determine whether the expectations are reflected in the market is to examine the number of construction starts relevant to a particular sector. In the case of an aging population, the number of dedicated senior housing construction starts. If the number of construction starts indicates an increase in

activity similar to the overall projected sector increase, more than likely there is a current shortage relative to the anticipated demand. Conversely, if the number of construction starts falls dramatically below the expected sector increase, the real estate sector most likely has experienced a surplus that must be filled prior to the start of any new construction. In the case of senior housing, construction expectations over the next 12 months are projected to increase by approximately 60.0%, lending credence to the need for additional senior housing development.

**Transportation**

With the economy improving, new business arriving in the state and multiple generations of workforce flocking to the area, transportation is more important than ever. The majority of the labor force in Georgia commute within the state placing a premium on transportation throughout the state as population growth continues.

The Georgia Transportation Authority is trying to stay ahead of the projected growth through the Transportation Funding Act, increasing the dedicated dollars by roughly $400 million per year to transportation expansion and improvement throughout the state.

Additionally, by operating the busiest airport in the world, 80.0% of the U.S. Market is within a two-hour flight time from Georgia; and Georgia's extensive highway and interstate system allows for multiple avenues of travel into and around the state for a diverse and dedicated workforce in addition to business logistics.[29]

## 4.3. Metropolitan Statistical Area



*Warren County, GA*          *Augusta-Richmond County, GA-SC MSA*

**Location**

---

[29] *Georgia Transportation Authority*

Warren County, GA is located in the East Central part of the state (see highlighted area in map of Georgia above left). Warren County, GA is adjacent to the Augusta-Richmond County, GA-SC Metropolitan Statistical Area (see highlighted area in Georgia-South Carolina map above right).

## Geography/Geology

Warren County, GA has a total area of 287 square miles made up of 284 square miles of land and 2.4 square miles of water. The north-to-northeastern quarter of Warren County, north of a line between the county's northwestern corner, Norwood, and Camak, is located in the Little River sub-basin of the Savannah River basin. The southeastern quarter, from Camak in the north, and bordered by a northwest-to-southeast line running through Warrenton, is located in the Brier Creek sub-basin of the larger Savannah River basin. The western half of the county, west of Warrenton, is located in the Upper Ogeechee River sub-basin of the Ogeechee River basin.

Augusta-Richmond County, GA-SC MSA is located in the Piedmont section of the state. The MSA is located approximately halfway up the Savannah River on the fall line, which creates a number of small falls on the river. Augusta, GA marks the end of a navigable waterway for the river and the entry to the Georgia Piedmont section of the state.

For more on the geography of Georgia, see the Georgia Area Market Analysis.

## Demographics

As of 2017, the population was 5,410 with 2,274 households in Warren County. The population in the age group of 18 to 64 is 57.0% in Warren County. In 2018, the population declined to 5,346 and the average age was 44.2 years. In 2018, the percentage of foreign-born citizens in Warren County was 1.46%. In 2017 the median household income was $32,860 and increased to $34,730 in 2018, which is less than the median annual income of $56,712 across the entire U.S.; and the per capita income was $22,916. The cost of living is 80.5 out of 100 (based on a U.S. index of 100). In line with the declining population in Warren County, the Governor's Office of Planning and Budget projects the population in the county for 2020 at 5,229 and a projected population in 2025 of 5,009. As of July 1, 2018, Warren County had 2,2332 households with 2.32 person per household. The age breakdown of the population in Warren County is 22.0% between the ages of 0 and 19, 24.0% between the ages of 20 and 39, 26.0% between the ages of 40 and 59, 16.0% between the ages of 60 and 69, and 14.0% age 70 and over. In terms of education, 75.1% of the population of Warren County in 2018 had a high school degree or higher, and 13.7% of the residents had a bachelor's degree or higher.[30]

In 2018, the population of Augusta, GA was 196,807, the median age was 33.9, which is lower than Georgia's median age, the median household income in 2018 was $42,592, lower than the median income for Georgia at $$61,980, and the per capita income was $22,709. The homeownership rate was 67.4%.[31] In terms of education, 84.3% of the population had at least a high school degree and 21.6% had a bachelor's degree or higher in July 2018.[32] The Augusta-Richmond County GA-SC MSA had a population of 605,903 in 2018,[33] the median age was 38.2 in 2018, a little higher than Georgia's median age of 37.2. Net in-migration averaged 2,775 a

---

[30] *City Data*
[31] *U.S. Census Bureau*
[32] *U.S. Census Bureau*
[33] *Federal Reserve Bank of St. Louis (FRED)*

year and accounted for 54.0% of total population growth during the period. The median household income in 2018 was $52,696, about 90.0% of the amount in Georgia of $61,980, and the per capita income was $28,711, about 90.0% of the amount in Georgia of $32,657, and the homeownership rate was 69.0%.[34] In 2018, the MSA had 214,107 households. In terms of education, 89.2% of the population had a bachelor's degree or higher, and 27.4% of the population had a bachelor's degree or higher in 2018.[35] The MSA's 2020 population is projected to be 612,100 by the U.S. Census Bureau. The population of the MSA is expected to increase at an average annual rate of 0.9%, for the next several years, as continued economic growth and military expansion attracts workers to the area. The number of households in the MSA is expected to grow by 0.8%, annually during the next several years. Renter household growth is expected to account for only 55.0% of total household growth, as a strengthening economy and increased confidence in the housing market attract prospective households to homeownership.



*Source:* *https://www.huduser.gov/portal/pulications/pdf/AugustaGA-comp-17.pdf*

**Economy**

In 2018, the economy of Warren County employed 2,170 people (including 6.3% self-employed). The largest industries in Warren County are manufacturing (585 people), retail trade (294 people), and health care and social assistance (271 people). The county is home to a number of mining, quarrying, and oil-and-gas extraction operations. The most common job groups, by number of people living in Warren County, are production-related (15.3%), office and administrative support occupations (13.0%), sales and related occupations (11.0%), material moving occupations (8.59%), transportation occupations (6.7%), construction/extraction (4.9%), installation/maintenance/repair (4.43%), and education instruction and library occupations (6.51%). The highest-paying industries are wholesale trade ($101,979), mining, quarrying and oil and gas extraction ($60,156), and professional, scientific and technical services ($49,500). The chart below illustrates the share breakdown of the primary jobs held by residents of Warren County.

---

[34] *Census Reporter*
[35] *Census Reporter*



As of December 2018, the unemployment rate in Warren County was 5.0% compared to 3.9% for the United States.[36]  The largest employers in Warren County are ACM Georgia, LLC, Briarwood Academy, Inc., Crm of Warrenton, LLC, Georgia-Pacific Wood Products, LLC, Hawkins Logging & Timber Co., LLC, Heart Wood Products, LLC, Old Castle Industrial Minerals, The Timbermen, Inc., and Tyler Johnson Enterprises, Inc.

Workforce training is readily available to county residents, with two universities (Augusta and Georgia State) and five technical colleges (Augusta Technical, Augusta Technical-Thompson Campus, Oconee Fall Line, and Sanderson) all in close proximity.

Augusta, GA is a regional center of medicine, biotechnology, and cyber security. Augusta University, the state's only public health sciences graduate university, employs over 7,000 people.  Along with University Hospital, the Medical District of Augusta employs over 25,000 people and has an economic impact of over $2.0 Billion.  Augusta-Richmond County, GA-SC MSA employed 267,000 people overall in 2018.[37] Economic conditions in the MSA are strong.  The unemployment rate in Augusta-Richmond County GA MSA in December 2018 was 4.1%.[38] Within the next few years, Augusta is expected to have rapid population growth of 10,000 plus residents due to the announcement of the United States Army Cyber Command that will be located in Fort Gordon.

Augusta's three largest employers are Augusta University, the Savannah River Site (a Department of Energy nuclear facility), and the U.S. Army Cyber Center of Excellence at Fort Gordon, which oversees training for Cyber, Signal Corps, and Electronic Warfare.  In fact, Fort Gordon, home of the U.S. Army Signal Corps and U.S. Army Cyber Command, is the largest employer in Augusta-Richmond County GA, with approximately 26,000 military, civilian, and contractor employees and an estimated economic impact of $2.26 billion.  Between 2017 and 2020, when the U.S. Cyber Command Headquarters is complete, Fort Gordon is expected to expand by an additional 1,200 military and civilian personnel.  Companies that have facilities, headquarters or distribution centers in Augusta include CareSouth, T-Mobile, Coviden, Solo Cup Company, Automatic Data Processing, Graphic Packaging International, Teleperformance, Sitel, E-Z GO, Elanco, Club Car (Worldwide Headquarters), John Deere, Kellogg's, and Delta Air Lines' baggage call center.  Augusta's famous golf course, the Augusta National Golf Club, hosts the first major golf tournament each Spring, known Internationally as The Masters. The Masters brings over 200,000 visitors from across the world to the Augusta National Golf Club.

---

[36] *U.S. Bureau of Labor Statistics*
[37] *Bureau of Labor Statistics*
[38] *Bureau of Labor Statistics*

Augusta also is home to a minor league baseball club, professional minor league ice hockey team, a rugby football team, and an all-female flat track roller derby team. Major colleges and universities in Augusta include Augusta Technical College, Augusta University, Paine College and satellite campuses for East Georgia State College and Georgia Military College.

| Table 2. Major Employers in the Augusta HMA | | |
|---|---|---|
| Name of Employer | Nonfarm Payroll Sector | Number of Employees |
| Fort Gordon | Government | 26,000 |
| Savannah River Site | Government | 11,500 |
| Augusta University | Government | 4,650 |
| University Hospital Summerville | Education & health services | 3,200 |
| Augusta University Health | Education & health services | 3,050 |
| Charlie Norwood VA Medical Center | Government | 2,100 |
| Bridgestone Americas Inc. | Manufacturing | 1,850 |
| East Central Regional Hospital Gracewood campus | Government | 1,500 |
| E-Z-Go/Textron, Inc. | Manufacturing | 1,275 |
| Doctors Hospital Augusta | Education & health services | 1,225 |

*Notes: Excludes local school districts. Savannah River Site and Fort Gordon employment figures include uniform military personnel, federal civilian personnel, and contractors.*
*Sources: Augusta Economic Development Authority; Economic Development Partnership; estimates by analyst*

*Source:* *https://www.huduser.gov/portal/pulications/pdf/AugustaGA-comp-17.pdf*

## **Housing**

As of 2018, there were 2,975 housing units in Warren County with a homeownership rate of 67.7%, which is higher than the national average of 63.6%. In 2018, Warren County had a median property value of $61,300. In 2018, the median monthly housing cost with a mortgage was $968 and without a mortgage is $406, and the median monthly rent was $619. With the low cost of living and easy access to Interstate 20, the Warren County area provides a wide variety of housing options.[39] The home appreciation in 2018 was up 6.4% and home appreciation over the last ten years has been 2.8%. Renters make up 23.0% of the Warren County population.

Augusta-Richmond County, GA-SC MSA had 259,295 housing units in 2018. The median property value in July 2018 was $154,000 and the homeownership rate was 67.4%.[40] Based on preliminary data, single-family home construction, as measured by the number of homes permitted, totaled 2,584 homes during the 12 months ending December 2018, up slightly from 2,560 in 2016, but down from 2,690 in 2017. The apartment market in the MSA is balanced. The apartment vacancy rate was approximately 5.0% during the fourth quarter of 2018 (RealPage, Inc.). The average rent was $887, up 7.0%, from a year ago. Multifamily permitting activity in the MSA decreased during 2018 but has generally been at high levels since the mid-2010s. Based on preliminary data, 283 multifamily units were permitted during the 12 months ending December 2018, down from 648 units during the 12 months ending December 2017. An average of 430 units was permitted each year from 2014 through 2018, the highest figure for a four-year period since 1999 through 2002. From 2017 to 2020, HUD projects demand for 6,325 new homes in Augusta-Richmond, County GA-SC MSA. Demand is expected to be greatest in the $50,00 to $249,999 price range. The below table shows the estimated demand for market-rate sales housing by price range. The graphs below show 2,584 single-family homes were

---

[39] *U.S. Census Bureau*
[40] *https://censusreporter.org*

permitted and 283 multi-family units were permitted for the entire year of 2018[41] (see graphs below).[42]

| Table 4. Estimated Demand for New Market-Rate Sales Housing in the Augusta HMA During the Forecast Period | | | |
|---|---|---|---|
| Price Range ($) | | Units of Demand | Percent of Total |
| From | To | | |
| 130,000 | 149,999 | 550 | 8.0 |
| 150,000 | 199,999 | 1,775 | 26.0 |
| 200,000 | 249,999 | 1,775 | 26.0 |
| 250,000 | 299,999 | 1,375 | 20.0 |
| 300,000 | 349,999 | 680 | 10.0 |
| 350,000 | 399,999 | 340 | 5.0 |
| 400,000 | 499,999 | 200 | 3.0 |
| 500,000 | and higher | 140 | 2.0 |

Notes: The 800 homes currently under construction and a portion of the estimated 20,500 other vacant units in the submarket will likely satisfy some of the forecast demand. The forecast period is June 1, 2017, to June 1, 2020.
Source: Estimates by analyst

*Source:* https://www.huduser.gov/portal/pulications/pdf/AugustaGA-comp-17.pdf




## Transportation

Warren County is easily accessible via Interstate 20/GA 402 and the major roadways of US 278, GA 12, and I-520. The county is also served by the Georgia ports of Savannah and Brunswick as well as the CSX Railroad and the Norfolk Southern Railroad, and airports in Atlanta (Hartsfield-Jackson), Augusta (Augusta Regional), and Thompson-McDuffie County (General Aviation).[43]

Given the transportation infrastructure (see map below), Warren County is in relatively close proximity to such Georgia cities as Atlanta (one and a half hours west), Athens (one hour north), Augusta (40 minutes east), Macon (one and a half hours southwest), and Savannah (one and a half hours southeast), and Columbia, SC (two hours east).[44]

[41] *https://www.huduser.gov*
[42] *PD & R/Economic & Market Analysis Division, Market at a Glance/Augusta-Richmond County, GA-SC MSA, December 2018*
[43] *Warren County Development Authority*
[44] *Warren County Chamber of Commerce*



Augusta, GA is linked to Atlanta to the west and Columbia South Carolina, to the east by Interstate 20.  I-520 (Bobby Jones Expressway) extends from I-20 exit 196 through Augusta's western and southern suburban areas, eventually crossing the Savannah River to South Carolina, in which it is known as Palmetto Parkway.  Major roads and expressways include Interstates 20 and 520, U.S. Highways 1, 25, and 79 and eleven State Routes.  Parts of Augusta are served by the city transit service Augusta Public Transit.  Augusta has two airports, Augusta Regional Airport and Daniel Field.  Freight service is handled by Norfolk Southern Railway's Georgia Division and Piedmont Division through their Augusta Yard and Nixon Yard located near the city. CSX Transportation Atlanta Division and Florence Division Trains serve the Augusta, Georgia area too from the CSX Augusta Yard near Gordon Highway southwest of the city.

According to the Statewide Transportation Improvement Program published by Georgia Department of Transportation (GDOT), below is a list of projects in Warren County.

## Warren

**Project: 0007057**  Type Work: Replace Bridge

Descp: SR 16 @ SHORT CREEK

Length: 0.40

| Total Project Cost: | $ 15,919,853 |
| Total Project Authorizations: | $ 981,569 |
| Total Parcels: | 2 |

| Phase | Fund | Year | Federal | State | Other | Total |
|---|---|---|---|---|---|---|
| PE | STP | 2017 | $497,287 | $124,322 | $0 | $621,609 |
| PE | HPP | 2017 | $287,968 | $71,992 | $0 | $359,960 |
| ROW | STP | 2019 | $49,440 | $12,360 | $0 | $61,800 |
| CST | STP | 2021 | $11,293,657 | $2,823,414 | $0 | $14,117,072 |
| UTL | STP | 2021 | $607,530 | $151,883 | $0 | $759,413 |

**Project: 0008680**  Type Work: Frontage Roads

Descp: I-20 FRONTAGE RD FM CR 187/RIDGE RD TO SR 80 -PHASE II - TIA

Lanes: Exist. 0  Prop. 2  Length: 3.39

| Total Project Cost: | $ 13,262,000 |
| Total Project Authorizations: | $ 2,500,000 |
| Total Parcels: | 0 |

| Phase | Fund | Year | Federal | State | Other | Total |
|---|---|---|---|---|---|---|
| PE | State | 2015 | $0 | $0 | $900,000 | $900,000 |
| PE | HPP | 2021 | $1,398,400 | $0 | $349,600 | $1,748,000 |
| ROW | Local | 2021 | $0 | $0 | $984,000 | $984,000 |
| CST | State | 2014 | $0 | $0 | $1,600,000 | $1,600,000 |
| CST | Local | 2021 | $0 | $0 | $8,030,000 | $8,030,000 |

Project Details: New frontage road location - Improve mobility & connectivity – enhance economic development opportunities

**Project: 0010844**  Type Work: Frontage Roads

Descp: I-20 FRONTAGE RD FM CADLEY ROAD TO RIDGE ROAD - PH I - TIA

Lanes: Exist. 0  Prop. 2  Length: 2.68

| Total Project Cost: | $ 12,602,266 |
| Total Project Authorizations: | $ 2,499,955 |
| Total Parcels: | 8 |

| Phase | Fund | Year | Federal | State | Other | Total |
|---|---|---|---|---|---|---|
| PE | State | 2015 | $0 | $0 | $1,092,800 | $1,092,800 |
| ROW | Local | 2019 | $0 | $0 | $1,837,000 | $1,837,000 |
| CST | State | 2014 | $0 | $0 | $1,407,155 | $1,407,155 |
| CST | HPP | 2020 | $3,599,601 | $0 | $899,900 | $4,499,501 |
| CST | HPP | 2020 | $3,012,648 | $0 | $753,162 | $3,765,809 |

Project Details: New frontage road location - Improve mobility & connectivity – enhance economic development opportunities

**Project: 0012747**  Type Work: RRX Warning Device

Descp: CS 562/BAKER STREET @ CSX #279522W

Length: 0.20

| Total Project Cost: | $ 140,000 |
| Total Project Authorizations: | $ 0 |
| Total Parcels: | 0 |

| Phase | Fund | Year | Federal | State | Other | Total |
|---|---|---|---|---|---|---|
| CST | HSIP | LUMP | $140,000 | $0 | $0 | $140,000 |

Uses Lump Sum Bank: RRX PROTECTION DEVICE FOR FY 2018 - FY 2021

## STATE TRANSPORTATION IMPROVEMENT PROGRAM

*Project:* **0013576**  *Type Work:* Widening

*Descp:* SR 17 FM QUAKER RD/JEFFERSON TO N OF SR 296/WARREN;INC RELOC

*Lanes: Exist.* 2  *Prop.* 4  *Length:* 4.60

| | | |
|---|---|---|
| *Total Project Cost:* | $ 25,222,000 | |
| *Total Project Authorizations:* | $ 0 | |
| *Total Parcels:* | 0 | |

| Phase | Fund | Year | Federal | State | Other | Total |
|---|---|---|---|---|---|---|
| PE | NHPP | 2018 | $1,600,000 | $400,000 | $0 | $2,000,000 |
| ROW | NHPP | After 2021 | $2,076,800 | $519,200 | $0 | $2,596,000 |
| CST | NHPP | After 2021 | $16,500,800 | $4,125,200 | $0 | $20,626,000 |

*Also in Jefferson County*

*Project:* **0013607**  *Type Work:* Replace Bridge

*Descp:* SR 80 @ MIDDLE CREEK 4 MI N OF CAMAK

*Length:* 0.40

| | | |
|---|---|---|
| *Total Project Cost:* | $ 2,347,193 | |
| *Total Project Authorizations:* | $ 350,000 | |
| *Total Parcels:* | 3 | |

*Project Details:* Replaces a load restricted bridge.

| Phase | Fund | Year | Federal | State | Other | Total |
|---|---|---|---|---|---|---|
| PE | Bridge | 2016 | $280,000 | $70,000 | $0 | $350,000 |
| ROW | STP | 2020 | $212,242 | $53,060 | $0 | $265,302 |
| CST | STP | 2021 | $1,385,513 | $346,378 | $0 | $1,731,891 |

*Project:* **0013608**  *Type Work:* Replace Bridge

*Descp:* SR 80 @ HART CREEK 4.5 MI N OF CAMAK

*Length:* 0.40

| | | |
|---|---|---|
| *Total Project Cost:* | $ 2,347,193 | |
| *Total Project Authorizations:* | $ 350,000 | |
| *Total Parcels:* | 4 | |

*Project Details:* Replaces a load restricted bridge.

| Phase | Fund | Year | Federal | State | Other | Total |
|---|---|---|---|---|---|---|
| PE | Bridge | 2016 | $280,000 | $70,000 | $0 | $350,000 |
| ROW | STP | 2020 | $212,242 | $53,060 | $0 | $265,302 |
| CST | STP | 2021 | $1,385,513 | $346,378 | $0 | $1,731,891 |

*Project:* **0013815**  *Type Work:* Replace Bridge

*Descp:* SR 16 @ ROCKY COMFORT CREEK 2.5 MI SW OF WARRENTON

*Length:* 0.40

| | | |
|---|---|---|
| *Total Project Cost:* | $ 2,882,516 | |
| *Total Project Authorizations:* | $ 500,000 | |
| *Total Parcels:* | 3 | |

*Project Details:* Replaces a substandard deteriorated bridge.

| Phase | Fund | Year | Federal | State | Other | Total |
|---|---|---|---|---|---|---|
| PE | STP | 2016 | $400,000 | $100,000 | $0 | $500,000 |
| ROW | STP | 2019 | $208,080 | $52,020 | $0 | $260,100 |
| CST | STP | 2020 | $1,697,933 | $424,483 | $0 | $2,122,416 |

## STATE TRANSPORTATION IMPROVEMENT PROGRAM

**Project: 0015731** *Type Work:* Signing

*Descp:* OFF-SYSTEM SAFETY IMPROVEMENTS @ 19 LOC IN WARREN COUNTY

*Length:* 0.00

| Phase | Fund | Year | Federal | State | Other | Total |
|-------|------|------|---------|-------|-------|-------|
| CST | HSIP | LUMP | $381,626 | $0 | $0 | $381,626 |

*Total Project Cost:* $ 381,626
*Total Project Authorizations:* $ 0
*Total Parcels:* 0

*Uses Lump Sum Bank: ROADWAY SAFETY FUNDS FOR FY 2018 - FY 2021*

---

**Project: M005099** *Type Work:* Resurface & Maintenance

*Descp:* SR 12 FROM SR 12 BYPASS TO MCDUFFIE COUNTY LINE

*Length:* 6.39

| Phase | Fund | Year | Federal | State | Other | Total |
|-------|------|------|---------|-------|-------|-------|
| CST | STP | LUMP | $1,272,461 | $318,115 | $0 | $1,590,576 |

*Total Project Cost:* $ 1,590,576
*Total Project Authorizations:* $ 0
*Total Parcels:* 0

*Uses Lump Sum Bank: MAINTENANCE FOR ANY AREA FOR FY 2018 - FY 2021*

---

**Project: T006049** *Type Work:* MPO/Region Transit

*Descp:* FY 2018-CSRA RC-SEC.5304-PLANNING

*Length:* 0.00

| Phase | Fund | Year | Federal | State | Other | Total |
|-------|------|------|---------|-------|-------|-------|
| TPLN | Transit | 2018 | $16,647 | $0 | $4,162 | $20,809 |

*Total Project Cost:* $ 20,809
*Total Project Authorizations:* $ 0
*Total Parcels:* 0

*Also in Burke, Columbia, Glascock, Hancock, Jefferson, Jenkins, Lincoln, McDuffie, Richmond, Taliaferro, Washington, Wilkes County*

---

**Project: T006060** *Type Work:* MPO/Region Transit

*Descp:* FY 2019-CSRA RC-SEC.5304-PLANNING

*Length:* 0.00

| Phase | Fund | Year | Federal | State | Other | Total |
|-------|------|------|---------|-------|-------|-------|
| TPLN | Transit | 2019 | $16,647 | $0 | $4,162 | $20,809 |

*Total Project Cost:* $ 20,809
*Total Project Authorizations:* $ 0
*Total Parcels:* 0

*Also in Burke, Columbia, Glascock, Hancock, Jefferson, Jenkins, Lincoln, McDuffie, Richmond, Taliaferro, Washington, Wilkes County*

## STATE TRANSPORTATION IMPROVEMENT PROGRAM

**Project: T006076**  *Type Work:* MPO/Region Transit

*Descp:* FY 2020-CSRA RC-SEC.5304-PLANNING

*Length:* 0.00

| Total Project Cost: | $ 20,809 |
| Total Project Authorizations: | $ 0 |
| Total Parcels: | 0 |

| Phase | Fund | Year | Federal | State | Other | Total |
|-------|------|------|---------|-------|-------|-------|
| TPLN | Transit | 2020 | $16,647 | $0 | $4,162 | $20,809 |

*Also in Burke, Columbia, Glascock, Hancock, Jefferson, Jenkins, Lincoln, McDuffie, Richmond, Taliaferro, Washington, Wilkes County*

**Project: T006087**  *Type Work:* MPO/Region Transit

*Descp:* FY 2021-CSRA RC-SEC.5304-PLANNING

*Length:* 0.00

| Total Project Cost: | $ 20,809 |
| Total Project Authorizations: | $ 0 |
| Total Parcels: | 0 |

| Phase | Fund | Year | Federal | State | Other | Total |
|-------|------|------|---------|-------|-------|-------|
| TPLN | Transit | 2021 | $16,647 | $0 | $4,162 | $20,809 |

*Also in Burke, Columbia, Glascock, Hancock, Jefferson, Jenkins, Lincoln, McDuffie, Richmond, Taliaferro, Washington, Wilkes County*

**Project: T006216**  *Type Work:* Rural Transit - Capital/Ops

*Descp:* FY 2018-WARREN COUNTY-SEC.5311-OPERATIONS ONLY
*Length:*

| Total Project Cost: | $ 88,592 |
| Total Project Authorizations: | $ 88,592 |
| Total Parcels: | 0 |

| Phase | Fund | Year | Federal | State | Other | Total |
|-------|------|------|---------|-------|-------|-------|
| 300A1 | Transit | 2018 | $0 | $0 | $44,296 | $44,296 |
| 300A1 | Transit | 2018 | $44,296 | $0 | $0 | $44,296 |

**Project: T006307**  *Type Work:* Rural Transit - Capital/Ops

*Descp:* FY 2019-WARREN COUNTY-SEC.5311-OPERATIONS ONLY
*Length:*

| Total Project Cost: | $ 88,592 |
| Total Project Authorizations: | $ 0 |
| Total Parcels: | 0 |

| Phase | Fund | Year | Federal | State | Other | Total |
|-------|------|------|---------|-------|-------|-------|
| OPR | Transit | 2019 | $44,296 | $0 | $44,296 | $88,592 |

## STATE TRANSPORTATION IMPROVEMENT PROGRAM

*Project:* **T006395**  *Type Work:* Rural Transit - Capital/Ops

*Descp:* FY 2020-WARREN
COUNTY-SEC.5311-OPERATIONS ONLY
*Length:*

| Phase | Fund | Year | Federal | State | Other | Total |
|---|---|---|---|---|---|---|
| OPR | Transit | 2020 | $44,296 | $0 | $44,296 | $88,592 |

| | |
|---|---|
| **Total Project Cost:** | $ 88,592 |
| **Total Project Authorizations:** | $ 0 |
| **Total Parcels:** | 0 |

*Project:* **T006484**  *Type Work:* Rural Transit - Capital/Ops

*Descp:* FY 2021-WARREN
COUNTY-SEC.5311-OPERATIONS ONLY
*Length:*

| Phase | Fund | Year | Federal | State | Other | Total |
|---|---|---|---|---|---|---|
| OPR | Transit | 2021 | $44,296 | $0 | $44,296 | $88,592 |

| | |
|---|---|
| **Total Project Cost:** | $ 88,592 |
| **Total Project Authorizations:** | $ 0 |
| **Total Parcels:** | 0 |

### *Warren Totals Summary*
*County Summary excludes lump sum projects.*

| Project PI# | Year | Phase | Fund | Federal | State | Other | Total |
|---|---|---|---|---|---|---|---|
| 0007057 | 2019 | ROW | STP | $49,440 | $12,360 | $0 | $61,800 |
| 0007057 | 2021 | CST | STP | $11,293,657 | $2,823,414 | $0 | $14,117,072 |
| 0007057 | 2021 | UTL | STP | $607,530 | $151,883 | $0 | $759,413 |
| 0008680 | 2021 | PE | HPP | $1,398,400 | $0 | $349,600 | $1,748,000 |
| 0008680 | 2021 | ROW | Local | $0 | $0 | $984,000 | $984,000 |
| 0008680 | 2021 | CST | Local | $0 | $0 | $8,030,000 | $8,030,000 |
| 0010844 | 2019 | ROW | Local | $0 | $0 | $1,837,000 | $1,837,000 |
| 0010844 | 2020 | CST | HPP | $3,012,648 | $0 | $753,162 | $3,765,809 |
| 0010844 | 2020 | CST | HPP | $3,599,601 | $0 | $899,900 | $4,499,501 |
| 0013576 | 2018 | PE | NHPP | $128,000 | $32,000 | $0 | $160,000 |
| 0013607 | 2020 | ROW | STP | $212,242 | $53,060 | $0 | $265,302 |
| 0013607 | 2021 | CST | STP | $1,385,513 | $346,378 | $0 | $1,731,891 |
| 0013608 | 2020 | ROW | STP | $212,242 | $53,060 | $0 | $265,302 |
| 0013608 | 2021 | CST | STP | $1,385,513 | $346,378 | $0 | $1,731,891 |
| 0013815 | 2019 | ROW | STP | $208,080 | $52,020 | $0 | $260,100 |
| 0013815 | 2020 | CST | STP | $1,697,933 | $424,483 | $0 | $2,122,416 |
| T006049 | 2018 | TPLN | Transit | $999 | $0 | $250 | $1,249 |
| T006060 | 2019 | TPLN | Transit | $999 | $0 | $250 | $1,249 |
| T006076 | 2020 | TPLN | Transit | $999 | $0 | $250 | $1,249 |
| T006087 | 2021 | TPLN | Transit | $999 | $0 | $250 | $1,249 |
| T006216 | 2018 | 300A1 | Transit | $44,296 | $0 | $0 | $44,296 |
| T006216 | 2018 | 300A1 | Transit | $0 | $0 | $44,296 | $44,296 |
| T006307 | 2019 | OPR | Transit | $44,296 | $0 | $44,296 | $88,592 |
| T006395 | 2020 | OPR | Transit | $44,296 | $0 | $44,296 | $88,592 |
| T006484 | 2021 | OPR | Transit | $44,296 | $0 | $44,296 | $88,592 |
| | | | | $25,371,978 | $4,295,037 | $13,031,845 | $42,698,860 |

**NOTE:** Cost estimates in this section show only the County's portion of the project; If the totals are different from the list above it is an indication that the project is in multiple counties.

**Conclusion**

With immediate interstate access, close proximity to major ports, international and commercial airports, and multi-vendor utility services, Warren County offers an ideal location for a granite mine, both in terms of the mining component and the cost-effective transport of products. In addition, the county government is likely to be highly accommodating of a land use that is already prevalent within the jurisdiction. Labor needs will be accommodated by skilled local residents, newly trained individuals, or qualified workers from the region's large workforce or a combination of all three. Relocating workers will find the area highly attractive, given the availability of affordable housing, the overall low cost of living, and the quality of life enhanced by an area rich in outdoor activities and recreational amenities. From all perspectives regionally, statewide, and locally, Warren County is strategically positioned to support a successful mining operation.

## SECTION 5 – SUBJECT CHARACTERISTICS

For purposes of this Section 5 in its entirety, except where otherwise identified, subject property shall mean the total Contiguous Owned Family-Owned Parcel of 2,546.87 acres, consisting of 240.00 acres encumbered by the conservation easement and the 2,306.87-Acre Tract (Excluded Tract) excluded from the conservation easement.

### 5.1. Marketing and Exposure

### 5.1.1. Marketing Time

*Marketing time* is an opinion regarding the amount of time it may take to sell a real or personal property interest at the concluded market value during the period immediately following the effective date of an appraisal. Marketing time differs from exposure time, as exposure time is presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Appraisal Standards Board of The Appraisal Foundation and Statement on Appraisal Standards No. 6, "Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions" address the determination of reasonable exposure and marketing time.) The appraisers analyzed an estimated marketing period for the subject property.

Several real estate brokers and practitioners were consulted to determine the length of time required for the subject property or a property comparable to the subject property to sell, if exposed on the open market for sale at a reasonable and fair price. Our survey of real estate market participants suggests that most properties in the subject market area, if realistically priced, considering current supply and demand, can be marketed and sold (i.e., closed) within a six to 15-month period. Further, according to market participants, FMLS and Costar listing services, the contiguous property without subsurface material would require a marketing time of approximately nine to 12 months.

### 5.1.2. Exposure Time

*Exposure time* is the time period to have occurred prior to the date of the appraisal as required in the definition of the market value. The subject property would be exposed on the market for a reasonable period of time, and then the sale takes place as of the appraisal date. Stated another way, exposure time is an opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market.

The exposure time estimated for the subject property is estimated to be twelve months.

## 5.2. History

According to the county records of Warren County, Georgia, the subject property's surface and mineral estates are owned by Log Creek LLLP. Previous to Log Creek LLLP owning Parcel 016-026, this parcel was owned by Tony D. Townley. Tony D. Townley conveyed Parcel 016-026 to Log Creek LLLP by means of an Omnibus Deed on December 14, 2012 (Deed Book/Page 8V-772) for no consideration. Of note, 191.6 acres of this parcel is to be included in the conservation easement; and the Highest and Best Use prior to the conservation easement is mining.

Also, according to the county records of Warren County, Georgia, the subject property's surface and mineral estates are owned by Log Creek LLLP. Previous to Log Creek LLLP owning Parcel 016-027, this parcel was owned by Tony D. Townley. Tony D. Townley conveyed Parcel 016-027 to Log Creek LLLP by means of an Omnibus Deed on December 14, 2012 (Deed Book/Page 8V-772) for no consideration. Of note, 48.4 acres of this parcel is to be included in the conservation easement; and the Highest and Best Use prior to the conservation easement is mining.

To the best of our knowledge, no other sales involving the subject property have occurred during the last three years. To the best of our knowledge, there have been no other qualified donations of record made in the preceding five years within the subject of this appraisal other than the conservation easement placed on the subject property as of the date of valuation. It should be noted that an acquisition price of a property may be based on land prices in the area and not on the development potential of the property. As is common in these transactions, the seller may not understand the value of the development potential of the property, while the buyer may understand and have the capacity to develop the property. Therefore, the highest and best use as a development property may not be reflected in the purchase price.

### 5.2.1. Current Contracts, Options or Offerings

Treas. Reg. 1.170A-17(a)(3)(ii) states that the appraisal must include the terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donee or donor that relates to the use, sale, or other disposition of the property (in addition to the deed of conservation easement).

Of note, according to the Warren County Tax Assessor's Office, parcels 016-026 and 016-027 have been in a Forest Land Protection Act (FLIPA) covenant since 2011 with an ending date of 2021.

Based on the appraisers' research, and excluding the deed of conservation easement, the subject property is not encumbered by any contracts or options affecting the subject property, except what is otherwise noted above. Additionally, there were no other contracts or options entered into by the donee or donor that relates to the use, sale or other disposition of the subject property that were revealed by the appraisers' research. See Treas. Reg. 1.170A-17(a)(3)(ii).

### 5.2.2. Zoning

According to Mr. Michael Thigpen the Warren County Planning and Code Administrator for Warren County, the subject property is currently zoned FOR-AG Forestry-Agriculture District. The Forestry-Agriculture (FOR-AG) district covers the vast majority of the county and establishes a large minimum lot size (25 acres) for the subdivision of property in order to prevent the subdivision of land for residential use, and to maintain viable tract sizes for agriculture and timber harvesting. The intensive agricultural operations permitted in this land use district may result in odors, dust, noise, or other effects that can be incompatible with single-lot residential development. Except for intra-family land transfers and mortgage lots (smaller lot permitted) and large (25 acres or more) tracts, subdivisions are not permitted. In addition to forestry, agriculture, hunting, public uses, and very low-density single-family dwellings and manufactured homes, this district permits institutional uses and selected commercial uses of a rural nature (e.g., farm and feed store, animal hospital). Individual dwellings in this district may be used in an accessory fashion to operate a cottage industry or home occupation. Other use opportunities exist through the conditional use process.

According to Mr. Paul W. Hitchcock, Hitchcock & Hitchcock, P.C., a fair analysis of the Warren County Land Use Ordinance supports the approval of a conditional use permit for a granite quarry on the subject property. There is no financial public benefit to restricting the subject property to an agricultural use. The Owner and the general public will benefit from the increase in jobs and taxes that a mining operation would bring. The local laws and land use ordinances will reduce any potential negative impacts that the mining operation may bring, especially given the sparsely populated area in which the subject property lies. From a land use perspective, the proposed conditional use is proper; therefore, it is likely that the conditional use permit will be approved.

Therefore, the stated Highest and Best Use of the subject property before the conservation easement, as a granite mine, would be allowed with a conditional use permit.

### 5.2.3. Taxes

According to the Appraisal of Real Estate 15th edition p.92, "real estate taxes are based on the assessed value of real property, hence the term ad valorem ("according to value") taxes. The assessed value of property is normally based on, but not necessarily equivalent to, its market value. The objective of tax assessment is the equitable

distribution of the tax burden based on real property value, but tax assessors do not attempt to develop opinions of value for specific parcels of property for use outside of ad valorem taxation."

Parcels 016-026 and 016-027, of which 240.00 acres have been separated from and encumbered by a conservation easement, is taxed by Warren County based on an assessment made by the Warren County Tax Assessor. The statutory assessment rate is 40.0% of "fair market value." The subject property's taxes are based on the total building structures and land. The 2018 tax records indicate a total value of $628,900 and a 40.0% assessment of $251,560. Therefore, based on the 30.358 millage rate, the 2018 taxes would be $7,636.86. Of note, according to the Warren County Tax Assessor's Office, this parcel has been in a Forest Land Protection Act (FLIPA) covenant since 2011 with an ending date of 2021. According to Ms. Laurie Abbott, Warren County Chief Appraiser, to breach the FLIPA on parcels 016-026 and 016-027, the owner would also have to breach the FLIPA on parcels 016-028, 026-023, and 026-024. The estimated cost to breach the FLIPA in 2018 would be approximately $203,570.53. According to the Warren County Chief Appraiser, the Forest Land Protection Act is easily broken; the cost to breach the FLIPA is included in the year one start-up costs. The existence of the Forest Land Protection Act does not hinder or affect the Legally Permissibility of the subject property as a granite mine.

Of note, the taxes within this section represent the parcels the 240.00 acres of the subject property has been separated from. It is assumed that the subject property, the 240.00 acres encumbered by the conservation easement, will be reassessed separately as new parcels. It is typical for properties under a deed of conservation easement to be reassessed after the conservation easement is in place. It will be the responsibility of the Warren County tax assessors to reassess the subject property based on their time frame and protocol, hence establishing the new assessed value.

## 5.3.  Legal Description

A tract or parcel of land containing 240.00 Acres is located in 154th District, G.M.D. of Warren County Georgia, and more specifically described on the following page. The Legal Description can be found below.

A narrative metes and bounds legal description is available. Furthermore, the exhibits and descriptions included in this report help to sufficiently identify and describe the real estate being appraised. This is in compliance with the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP), as adopted and published by the Appraisal Standards Board of The Appraisal Foundation. The applicable requirements in Standards Rule 2-2 (iii) state: "The appraisal report must summarize information sufficient to identify the real estate involved in the appraisal, including the physical, legal, and economic property characteristics relevant to the assignment." USPAP comments on this requirement as follows:

"Identifying the physical real estate can be accomplished by any combination of a legal description, address, map reference, copy of a survey or map, property sketch and/or photographs."

All that tract of land, together with improvements thereon, situate, lying and being in the 154th Georgia

Militia District, in Warren County, Georgia and being more particularly described as follows:

Commence at a concrete monument on the westerly right of way of Ogeechee River Road, also known

as County Road 56, having an 80' right of way, and the southerly right of way of Georgia Railroad, having

a 150' right of way;

thence leaving the right of way of Ogeechee River Road and continuing along the southerly right of way

of Georgia Railroad N 86°11'25" E a distance of 1464.75' to an iron pin, said iron pin being the point of

beginning;

thence N 86°09'47" E a distance of 2582.93' to an iron pin;

thence leaving said right of way S 47°03'01" W a distance of 476.96' to an iron pin;

thence S 04°19'07" W a distance of 2133.12' to a concrete monument;

thence S 88°17'38" E a distance of 1034.08' to an iron pin at a rock;

thence S 03°15'03" W a distance of 885.30' to an iron pin;

thence S 70°34'43" W a distance of 232.32' to an iron pin;

thence N 89°25'17" W a distance of 236.28' to an iron pin;

thence S 63°17'07" W a distance of 1722.17' to an iron pin;

thence S 17°25'17" E a distance of 383.38' to an iron pin;

thence S 12°33'16" E a distance of 842.37' to an iron pin on the northern right of way of Timber Road,

also known as County Road 58, having a 30' right of way;

thence continuing along said right of way S 85°03'58" W a distance of 41.87' to a point;

thence with a curve turning to the left with an arc length of 247.86', with a radius of 1075.74', with a

chord bearing of N 85°42'41" W, with a chord length of 247.31' to a point;

thence S 85°41'30" W a distance of 119.01' to a point;

thence S 83°56'43" W a distance of 394.91' to a point;

thence with a curve turning to the left with an arc length of 244.86', with a radius of 239.61', with a

chord bearing of S 60°59'46" W, with a chord length of 234.34' to a point;

thence S 40°49'17" W a distance of 43.47' to an iron pin;

thence leaving said right of way N 19°27'22" E a distance of 777.28' to an iron pin;

thence N 17°50'30" W a distance of 3028.18' to a concrete monument;

thence N 27°27'45" E a distance of 1055.75' to an iron pin at an 18" sweetgum tree;

thence N 09°13'43" W a distance of 872.25' to an iron pin on the southern right of way of Georgia

Railroad, which is the point of beginning;

Said parcel containing 240.00 acres more or less and being more particularly described on a plat by

Baseline Surveying & Engineering, Inc., for Log Creek LLLP, dated 12/03/2018.

## Subject Maps

### 5.3.1. Provided Survey



### 5.3.2. Location Map



### 5.3.3. Neighborhood Map



### 5.3.4. Aerial Map



### 5.3.5. Flood Map





Figure 3.
Delineated Resources Overview
GeoLogic, LLC
Norris Cason Tract
Warren County, GA

### 5.3.6. Subject Plat[45]



## 5.4. Site Description

For purposes of this Section 5.4, subject property shall refer to the 240.00 Acres encumbered by the conservation easement.

**Location**

The subject property is located along the north side of Warren County Road 58, just south of Mayfield Road, outside the city limits of Warrenton, Warren County, Georgia. Ingress/egress into and from the subject property is along Warren County Road 58. Of note, the Contiguous Parcel, has access and frontage along Warren County Road 58, Warren County Road 56, and Warren County Road 62. As of the date of this appraisal, the subject property did not have a physical address.

**Topography, Flood Hazard Area, and Soil Conditions**

It is the appraisers' opinion that the subject property has adequate drainage with positive flow. According to Flood Insurance Maps (FIRM) 13301C0175B, dated July 22, 2010, the subject property is located within Zone X, an area not prone to flooding. Based on mapping provided by GeoLogic, LLC, there are a few streams running through the subject property.

---

[45] The subject property is 240.00 acres separated from Parcels 016-026 and 016-027.

According to Mr. Ben Black, GeoLogic, LLC, as currently designed, the quarry and the operations of the plant will avoid wetlands to the extent practical. The creek crossings needed to place the rail loop track will be permitted under a U.S. Army Corps of Engineers Nationwide Permit (PCN 44) for installation of pipe culverts. As such, there are no expected wetlands mitigation costs associated with this quarry. However, for the purpose of this report, a wetland contingency of $500,000 has been budgeted and included in the year one start-up costs. Therefore, any potential wetlands or streams on-site are not considered to affect the highest and best use of the subject property as a granite mine.

The physical inspection of the subject property did not reveal any evidence of adverse soil or subsoil conditions. A formal study was not undertaken and we are not qualified to detect such soil conditions. Therefore, we recommend that the client retain an expert in this field of study, if desired.

Currently, the subject property is wooded land with scenic wood views and some open land. It should be noted that information provided for this appraisal indicates geologists have conducted adequate geological studies to prove a sufficient quantity of granite available for mining development on the subject property. Historically, the surrounding area has remained a noteworthy granite producer in east central Georgia.

## Land Use

The subject property is appropriate for a variety of different uses. Currently, the subject property is located in an area just southwest of the City of Warrenton, Georgia northeast of the City of Milledgeville, Georgia, southwest of the City of Thomson, Georgia, and southwest of Augusta, Georgia. The area immediately surrounding the subject property consists of primarily agricultural development. As detailed in the Zoning section of this report, the subject property is currently zoned FOR-AG Forestry-Agriculture District. The Forestry-Agriculture (FOR-AG) district covers the vast majority of the county and establishes a large minimum lot size (25 acres) for the subdivision of property in order to prevent the subdivision of land for residential use, and to maintain viable tract sizes for agriculture and timber harvesting. According to Mr. Paul W. Hitchcock, Hitchcock & Hitchcock, P.C., a fair analysis of the Warren County Land Use Ordinance supports the approval of a conditional use permit for a granite quarry on the subject property. There is no financial public benefit to restricting the subject property to an agricultural use. The Owner and the general public will benefit from the increase in jobs and taxes that a mining operation would bring. The local laws and land use ordinances will reduce any potential negative impacts that the mining operation may bring, especially given the sparsely populated area in which the subject property lies. From a land use perspective, the proposed conditional use is proper; therefore, it is likely that the conditional use permit will be approved.

Therefore, the stated Highest and Best Use of the subject property before the conservation easement, as a granite mine, would be allowed with a conditional use permit.

## Transportation

The subject property has ingress/egress to and from Warren County Road 58 that provides ground transportation by truck to local County, State and Federal Highways. Georgia Highway 16, a two-lane highway, is located approximately 3.8 miles south of the subject property, U.S. Highway 278, a two-lane highway, is located approximately ten miles northeast of the subject property, Georgia Highway 22, a two-lane highway, is located approximately 11.5 miles west of the subject property, and Interstate-20 is located approximately 17 miles north of the subject property. The two primary modes of transportation available to the subject property are as follows:

1. Trucks – The commonly used means of transportation for shorter distances and as an intermediate form of transportation to rail lines. The expense of operating truck transport is influenced by Federal and State load restrictions, which are generally limited to 20.0 - 25.0 tons and diesel fuel costs.

2. Rail – The CSX Railroad and the Norfolk Southern Railroad are located in Warren County, Georgia. Also of note, the subject property is bordered by the CSX Railroad along its northern border. This will be discussed further later in this report.



Due to the subject property's location in east central Georgia, it is near not only Warrenton, Georgia, but also near South Carolina, Milledgeville, Georgia, and Augusta, Georgia. The subject property's proximity to these markets influences the shipping cost the consumer will incur and thereby the total cost of the product to the end user. Augusta, Georgia is home to multiple military and government facilities that require new development and maintenance. Added to this are the demands for new infrastructure as the region continues to attract manufacturing to the area based on its aggressive tax incentives and lack of union demands. Aggregates are a common building and paving material and a necessary component of asphalt concrete, a necessary part of all new building construction and infrastructure repair and maintenance. The table below displays some of the projected expenditures for the State of Georgia Department of Transportation and the South Carolina Department of Transportation.

### Georgia Department of Transportation

| HWY Table 4: FY 2018-2021 Summary of Highway Projects by MPO Area * | | | | | |
|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | Total |
| Albany | $5,841,487 | $295,000 | $45,000 | $230,000 | $6,411,487 |
| Athens | $4,975,000 | $3,000,000 | $4,300,000 | $12,833,480 | $25,108,480 |
| Atlanta TMA | $779,707,512 | $799,551,146 | $846,234,428 | $564,821,088 | $2,990,314,174 |
| Augusta TMA | $1,913,589 | $77,753,014 | $7,261,167 | $25,200,970 | $112,128,740 |
| Brunswick | $0 | $1,450,000 | $1,000,000 | $2,250,000 | $4,700,000 |
| Cartersville | $11,915,702 | $6,983,850 | $500,000 | $0 | $19,399,551 |
| Chattanooga TMA | $18,556,500 | $3,485,500 | $6,517,500 | $267,500 | $28,827,000 |
| Columbus TMA | $17,500 | $2,318,000 | $9,237,248 | $12,970,646 | $24,543,394 |
| Dalton | $410,000 | $3,546,736 | $250,000 | $0 | $4,206,736 |
| Gainesville | $44,150,018 | $46,044,547 | $14,630,261 | $27,179,837 | $132,004,662 |
| Hinesville | $2,583,000 | $260,100 | $2,518,015 | $0 | $5,361,115 |
| Macon | $0 | $2,330,800 | $40,393,872 | $245,817,447 | $288,542,119 |
| Rome | $3,101,000 | $1,124,000 | $3,750,000 | $7,622,154 | $15,597,154 |
| Savannah TMA | $76,103,146 | $53,342,500 | $111,041,819 | $123,617,500 | $364,104,965 |
| Valdosta | $0 | $41,070,306 | $250,000 | $2,000,000 | $43,320,306 |
| Warner Robins | $6,040,573 | $600,000 | $500,000 | $0 | $7,140,573 |
| MPO Total | $955,315,027 | $1,043,155,499 | $1,048,429,309 | $1,024,810,621 | $4,071,710,457 |
| Rural Area | $990,049,216 | $1,045,088,083 | $1,206,278,199 | $828,632,993 | $4,070,048,490 |
| State Total | $1,945,364,243 | $2,088,243,582 | $2,254,707,508 | $1,853,443,614 | $8,141,758,947 |
| * excludes Transit projects    Rural Area includes the Lump Sum Banks | | | | | |

## Department of Transportation
### Department Financial Summary

| Program/Fund Sources | FY 2017 Expenditures | FY 2018 Expenditures | FY 2019 Original Budget | Amended FY 2019 Budget | FY 2020 Budget |
|---|---|---|---|---|---|
| Capital Construction Projects | $1,453,114,390 | $1,636,931,401 | $1,752,750,821 | $1,752,750,821 | $1,752,750,821 |
| Capital Maintenance Projects | 644,007,140 | 408,777,446 | 447,431,862 | 447,431,862 | 459,498,110 |
| Construction Administration | 131,234,356 | 142,068,174 | 155,934,165 | 155,934,165 | 155,934,165 |
| Data Collection, Compliance, and Reporting | 10,668,403 | 13,166,246 | 11,995,584 | 11,995,584 | 11,995,584 |
| Departmental Administration (DOT) | 80,073,434 | 77,427,070 | 81,012,970 | 81,012,970 | 81,237,970 |
| Intermodal | 110,585,014 | 125,922,938 | 112,090,384 | 112,090,384 | 113,506,110 |
| Local Maintenance and Improvement Grants | 169,545,810 | 176,973,499 | 189,544,365 | 189,544,365 | 192,586,631 |
| Local Road Assistance Administration | 68,086,607 | 45,544,677 | 62,002,378 | 62,002,378 | 62,002,378 |
| Planning | 21,186,658 | 20,314,292 | 25,059,893 | 25,059,893 | 25,259,893 |
| Routine Maintenance | 425,265,865 | 470,356,078 | 455,381,537 | 455,381,537 | 456,358,057 |
| Traffic Management and Control | 127,880,368 | 122,294,834 | 151,857,637 | 151,857,637 | 151,857,637 |
| **SUBTOTAL** | **$3,241,648,045** | **$3,239,776,655** | **$3,445,061,596** | **$3,445,061,596** | **$3,462,987,356** |
| **(Excludes Attached Agencies)** | | | | | |
| **Attached Agencies** | | | | | |
| Payments to State Road and Tollway Authority | $262,242,251 | $254,403,900 | $238,396,986 | $238,396,986 | $238,282,386 |
| **SUBTOTAL (ATTACHED AGENCIES)** | **$262,242,251** | **$254,403,900** | **$238,396,986** | **$238,396,986** | **$238,282,386** |
| **Total Funds** | **$3,503,890,296** | **$3,494,180,555** | **$3,683,458,582** | **$3,683,458,582** | **$3,701,269,742** |
| **Less:** | | | | | |
| Federal Funds | 1,438,261,438 | 1,477,491,810 | 1,600,016,484 | 1,600,016,484 | 1,600,016,484 |
| Federal Recovery Funds | 66 | | | | |
| Other Funds | 214,564,254 | 188,465,829 | 98,044,213 | 98,044,213 | 98,044,213 |
| Prior Year State Funds | 239,497,865 | 198,861,858 | | | |
| **SUBTOTAL** | **$1,892,323,623** | **$1,864,819,497** | **$1,698,060,697** | **$1,698,060,697** | **$1,698,060,697** |
| State General Funds | 85,738,217 | 104,487,542 | 89,954,240 | 89,954,240 | 77,342,738 |
| Motor Fuel Funds | 1,525,828,458 | 1,524,873,516 | 1,895,443,645 | 1,895,443,645 | 1,925,866,307 |
| **TOTAL STATE FUNDS** | **$1,611,566,675** | **$1,629,361,058** | **$1,985,397,885** | **$1,985,397,885** | **$2,003,209,045** |

## Easements and Encroachments

It is the appraisers' opinion that the subject property does not have any adverse easements or encroachments. A study of the plat and an inspection of the subject property revealed the subject property has ingress/egress to and from Warren County Road 58. As noted earlier in this report, the Contiguous Parcel has frontage and ingress/egress along Warren County Road 58, Warren County Road 56, and Warren County Road 62. Furthermore, it is assumed that any access easements to the subject property or various components of the subject property are in place and enforceable. It is the appraisers' opinion that any utility easements do not affect the development potential of the subject property. To the best of the appraisers' knowledge, the subject property does not have any exceptions to title that could potentially preclude the operation of a quarry on the subject property.

Finally, as stated earlier in this report, according to the Warren County Tax Assessor's Office, this parcel has been in a Forest Land Protection Act (FLIPA) covenant since 2011 with an ending date of 2021. According to Ms. Laurie Abbott, Warren County Chief Appraiser, to breach the FLIPA on parcels 016-026 and 016-027, the owner would also have to breach the FLIPA on parcels 016-028, 026-023, and 026-024. The estimated cost to breach the FLIPA in 2018 would be approximately $203,570.53. This will be included in the year one start-up costs.

## Utilities and Services

Utilities and services in the area of the subject property include police/fire protection, electricity, natural gas by a provider of choice and telephone service. Water/sewer service is typically provided by well and septic systems in rural areas of Warren County.

## Size, Shape, and Frontage

The subject property is irregular in shape and located along the north side of Warren County Road 58, just south of Mayfield Road. The subject property has the potential for road development within the subject property in order to facilitate the mining of granite and its transport to market. The Excluded Tract consists of 2,306.87 acres that is irregular in shape with ingress/egress to and from Warren County Road 62 and Warren County Road 56.

## Environmental Hazards

The appraisers are not experts in locating or identifying hazardous waste material. However, during a physical exterior inspection of the subject property, there were not any hazardous materials obvious to the appraisers. If hazardous waste is known to the owner, a qualified expert in the field should be engaged.

## Site Improvements

There are no known significant improvements on the subject property. Furthermore, upon physical inspection of the subject property, the appraisers did not witness any improvements on-site.

## Neighboring Land Uses and Views

Neighboring uses generally include clear to partially wooded agricultural, residential, recreational, vacant, and quarry land.

## Products or Other Components

The subject property is in a predominately undeveloped area just southwest of the Savannah River, just southwest of Clarks Hill Lake, southeast of Oconee National Forest, and east of Lake Oconee. This is a predominately rural area with a large portion of the surrounding land being utilized for agriculture. To the best of the appraisers' knowledge, as detailed earlier in this report, a portion of the subject property is not being utilized for agricultural purposes. Furthermore, to the best of the appraisers' knowledge and based on geological reports, the predominately mineable natural resource below ground level is granite. The appraisers reserve the right to adjust their opinion of value if there are other marketable commercial products on the subject property that were not apparent at the time of inspection.

**Outstanding Rights**

There are no known outstanding rights impacting the subject property such as water, mineral, hunting or fishing rights.

**Reservations**

There are no known reservations of rights, products or components that affect the value of the subject property.

**Post-Conservation Easement Property Description**

Post-conservation easement, there are no known significant changes that impact the subject property's physical characteristics such as location, size, shape, frontage, topography, flood zone, soil/environmental conditions, ingress, egress, utilities and views. There are no other easements or encroachments affecting the subject property, except as permitted by the conservation easement. Based on the terms and restrictions stated in the conservation easement, there is no significant change in products, outstanding rights, or other components.

**Conclusion**

The subject property in its present state possesses significant recreational, educational, natural, aesthetic, wildlife, forest, agricultural, open space and plant habitat features. Several properties in the surrounding area and region have been mined for construction aggregate materials such as granite during the last several years. The subject property has good physical utility for a variety of uses. This opinion is based on the subject property's configuration, usable topography, average accessibility and exposure, and availability of utilities. Prior to granting the conservation easement, the subject property has been undeveloped. Post-conservation easement, the subject property no longer retains the rights associated with mining, development, or subdivision of the subject property.

## SECTION 6 – ANALYSIS

## 6.1. Conservation Easement/Contiguous Parcel Overview

As directed by Treasury Regulation §1.170A-14 (h)(3)(i), the Internal Revenue Service requires the entire contiguous parcel (Contiguous Family-Owned Parcel) be evaluated when a conservation easement appraisal is performed for review by the Internal Revenue Service. The entire parcel must be considered to evaluate any potential impact the conservation easement may have on surrounding parcels, contiguous or non-contiguous that are owned by the donor, related parties and/or the donor's family. If any of these parcels are considered improved or to have benefited in anyway by the presence of the conservation easement, an analysis of the entire parcel is required.

The standard for determining the larger parcel is taken from the Uniform Appraisal Standards for Federal Land Acquisitions, also known as the "Yellowbook." The UASFLA defines the larger parcel as "that tract, or those tracts, of lands which possess a unity of ownership and have the same, or an integrated, highest and best use. Elements of consideration by the appraiser in making a determination in this regard are contiguity, or proximity, as it bears on the highest and best use of the property, unity of ownership, and unity of highest and best use."

The "Contiguous Parcel Rule," Treas. Reg. § 1.170A-14(h)(3)(i), provides that "the amount of the deduction in the case of a charitable contribution of a perpetual conservation restriction covering a portion of the contiguous property owned by a donor and the donor's family as defined Code Section 267(c)(4) is the difference between the fair market value of the entire contiguous parcel of property before and after the granting of the restriction." In the case of this regulation, for tax purposes, "family" does not include a regarded entity such as a partnership.

The "Enhancement Rule," set forth in the fifth sentence of Treas. Reg. § 1.170A-14(h)(3)(i), states that if an easement is donated by a taxpayer over land contiguous or non-contiguous to unencumbered land owned by the taxpayer (donor) or "related parties" as defined in Code § 267(c)(4), the appraiser must offset any enhancement in value attributable to such properties in estimating the value of an easement. Therefore, when a property is owned by the taxpayer (donor), the "donor's family" or a "related person," that benefits from the conservation easement, the property is considered an enhanced parcel, whether or not such property is contiguous." The appraisal must include an analysis of all contiguous and noncontiguous property owned by the donor, the donor's family, or "related persons" (as defined by the Internal Revenue Code) that could potentially be enhanced due to the placement of the conservation easement on the subject property.

Code § 267(c)(4) states that the "donor's family" is limited to the donor's "brothers and sisters (whether by the whole or half-blood), spouse, ancestors and lineal descendants." Parents, children, grandparents, grandchildren, half-brothers, and half-sisters are included in the definition of family. Cousins, nieces, nephews, in-laws, and step relations are not included. Included in the "donor's family" definition is a corporation, a partnership, or a trust, in any combination if they share certain common links. According to the relationships listed in § 267(b) a "related person" includes, the relationships between (1) an individual and members of a family, and (2) an individual and a corporation more than 50.0% in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual. The relationships listed in § 707(b) are those between (1) a partnership and a person owning, directly or indirectly, more than 50.0% of the capital interest, or the profits interest, in such partnership, and (2) two partnerships in which the same persons own, directly or indirectly, more than 50.0% of the capital interests or profits interests.

When evaluating a conservation easement, the subject property and any additional land contiguous or non-contiguous is required by the Internal Revenue Service to be considered. In the case of a charitable contribution of a perpetual conservation restriction, covering a portion of any contiguous property owned by a donor or the donor's family, the amount of the deduction, is the resulting difference between the fair market value of the entire contiguous parcel or property before granting the restriction and the fair market value of the entire contiguous property after granting of the restriction. Conservation easements may increase the value of property in the vicinity, and IRS regulations require that when such increases benefit the donor of the easement, or a member of the donor's family, the easement deduction must be reduced. The "enhancement rule" states that if granting of a perpetual conservation restriction, after 1986, has the effect of increasing the value of any other property owned by the donor or a related person, the amount of the deduction for the conservation contribution shall be reduced by the amount of the increase in the value of the other property, regardless of whether such property is contiguous.

### 6.1.1. Contiguous/Non-Contiguous Parcel Analysis

Treasury Regulation Section 1.170A-14(h)(3)(i) requires that to value the conservation easement, the appraiser must consider contiguous and non-contiguous property owned by a donor and the donor's family (as defined in section 267(c)(4)). As of the date of appraisal, Log Creek LLLP does own property that is contiguous and non-contiguous to the subject property.

As of the date of appraisal, Log Creek LLLP does own property that may benefit from the conservation easement and there are known partnerships or individuals considered to be a "related person" under the Internal Revenue Code that in our opinion benefit from the conservation easement. Accordingly, a reduction in value has been assessed due to the enhancement in value of any other property. It is the appraisers' opinion, the property enhanced by the placement of the conservation easement is the contiguous parcels, specifically the Excluded Tract, 2,306.87 Acres (309.06 acres of Parcel 016-026, 37.00 acres of Parcel 016-027, Parcel 016-028, Parcel 017-026, Parcel 017-016, Parcel 026-023, and Parcel 026-024).

As stated throughout this report, approximately 10,079.08 acres of contiguous and non-contiguous land is owned by Log Creek LLLP in Warren County (an entity considered to be a "related person" as defined by Treas. Reg. §267(b)).

Of note, the Excluded Tract, 2,306.87 Acres (309.06 acres of Parcel 016-026, 37.00 acres of Parcel 016-027, Parcel 016-028, Parcel 017-026, Parcel 017-016, Parcel 026-023, and Parcel 026-024) are contiguous to the subject property (240.00 Acres encumbered by the conservation easement). It is the appraisers' opinion that the contiguous land owned by Log Creek LLLP in our opinion benefits from the conservation easement placed on the 240.00 acres of the subject property. A list of the parcels can be found in the chart below.

| Contiguous Parcels | | |
|---|---|---|
| Owner | Parcel # | Acreage |
| Log Creek LLLP | 016-026 | 309.06 |
| Log Creek LLLP | 016-027 | 37.00 |
| Log Creek LLLP | 016-028 | 190.10 |
| Log Creek LLLP | 017-026 | 558.84 |
| Log Creek LLLP | 017-016 | 363.00 |
| Log Creek LLLP | 026-023 | 741.87 |
| Log Creek LLLP | 026-024 | 107.00 |
| | Total: | 2,306.87 |

It is the appraisers' opinion that the non-contiguous land owned by Log Creek LLLP does not benefit from the conservation easement placed on the 240.00 acres of the subject property. This determination is based on the location of the subject property in rural Warren County. It is the appraisers' opinion that a buyer would not pay more for any of the properties considered for enhancement due to the location of the parcels compared to the location of the subject property as the majority of the land

in the area is rural land or agricultural land. It is the appraisers' opinion that a buyer would not be influenced by a conservation easement due to the rural nature of the area and the availability of undeveloped land. A list of the parcels can be found in the chart below.

| Parcels Considered for Enhancement - Non-Contiguous | | | | | |
|---|---|---|---|---|---|
| Owner | Parcel # | Acreage | Owner | Parcel # | Acreage |
| Log Creek LLLP | 004-001 | 18.00 | Log Creek LLLP | 038-010 | 460.30 |
| Log Creek LLLP | 005-018 | 26.74 | Log Creek LLLP | 038-037 | 31.00 |
| Log Creek LLLP | 011-011 | 160.30 | Log Creek LLLP | 038-038 | 280.24 |
| Log Creek LLLP | 011-013 | 28.38 | Log Creek LLLP | 038-065 | 37.04 |
| Log Creek LLLP | 012-004 | 281.68 | Log Creek LLLP | 045-001 | 150.35 |
| Log Creek LLLP | 013-011 | 430.28 | Log Creek LLLP | 045-031 | 187.64 |
| Log Creek LLLP | 013-013 | 2.00 | Log Creek LLLP | 047-007 | 174.50 |
| Log Creek LLLP | 074-015 | 67.94 | Log Creek LLLP | 052-030 | 84.26 |
| Log Creek LLLP | 060-035 | 14.77 | Log Creek LLLP | 052-031 | 415.87 |
| Log Creek LLLP | 060-037 | 307.50 | Log Creek LLLP | 056-002 | 113.02 |
| Log Creek LLLP | 067-065 | 304.01 | | | |
| Log Creek LLLP | 068-012 | 282.71 | | | |
| Log Creek LLLP | 016-003 | 156.67 | | | |
| Log Creek LLLP | 020-003 | 19.00 | | | |
| Log Creek LLLP | 021-001 | 316.90 | | | |
| Log Creek LLLP | 021-018 | 62.83 | | | |
| Log Creek LLLP | 022-014 | 154.03 | | | |
| Log Creek LLLP | 023-001 | 320.00 | | | |
| Log Creek LLLP | 023-002 | 546.63 | | | |
| Log Creek LLLP | 023-016 | 93.00 | | | |
| Log Creek LLLP | 024-010 | 162.30 | | | |
| Log Creek LLLP | 024-090 | 84.67 | | | |
| Log Creek LLLP | 026-002 | 100.60 | | | |
| Log Creek LLLP | 026-005 | 73.50 | | | |
| Log Creek LLLP | 056-007 | 470.40 | | | |
| Log Creek LLLP | 060-001 | 509.95 | | | |
| Log Creek LLLP | 028-087 | 355.46 | | | |
| Log Creek LLLP | 029-002 | 256.54 | | | |
| Log Creek LLLP | 032-004 | 231.20 | | | |
| | | | | Total: | 7,772.21 |

### 6.1.2.  Conservation Easement Parcel/Larger Parcel Identification

As stated throughout this report, Log Creek LLLP does own property that is considered to be a contiguous parcel. The total Contiguous Family-Owned Parcel of 2,546.87 acres, consists of 240.00 acres to be encumbered by the conservation easement and 2,306.87 acres tract (Excluded Tract) excluded from the conservation easement. The 240.00 acres will be valued based on the highest and best use as a

Mining Development and the Excluded Tract will be valued based on the highest and best use as Agricultural/Recreational/Timber Land. As stated throughout this report, there is no proven or known marketable granite reserves on the Excluded Tract. In the "after" method, each tract of land will be valued separately in order to accurately ascertain the value of the Conservation Easement. Finally, it is the appraisers' opinion that there is a value enhancement for the area excluded from encumbrance by the conservation easement, the Excluded Tract. It is the appraisers' opinion that a buyer would pay more for the Excluded Tract due to the location of the parcels being located next to the subject property.

Based on information provided to the appraisers and their research, no portion or portions of the subject property, the 240.00 acres to be encumbered by the conservation easement, will be excluded from the conservation easement, except for what is noted above, and there are no other adjacent or nearby properties under the same or related ownership that might benefit from the placement of a conservation easement.

### 6.1.3.  Enhancement Analysis

The appraisers evaluated recent market trends in regard to an increase in value attributed to developments that were near large sections of undeveloped land. It is of note that such properties tend to sell for approximately 5.0% to 25.0% more than comparable properties without such proximity to natural habitats. However, the data is very limited in regards specifically, to a conservation easement adjoining a property. As of the date of appraisal, Log Creek LLLP does own property that would benefit from the conservation easement. As stated throughout this report, it is the appraisers' opinion, the contiguous acreage (Excluded Tract) is enhanced approximately 5.0% by the conservation easement placed on the subject property of 240.0 acres. Also, there are no known partnerships or individuals considered to be a "related person" under Treas. Reg. §1.170A that would benefit from the conservation easement. Accordingly, a reduction in value has been assessed due to the enhancement in value to the Excluded Tract.

| Contiguous Parcels | | |
|---|---|---|
| Owner | Parcel # | Acreage |
| Log Creek LLLP | 016-026 | 309.06 |
| Log Creek LLLP | 016-027 | 37.00 |
| Log Creek LLLP | 016-028 | 190.10 |
| Log Creek LLLP | 017-026 | 558.84 |
| Log Creek LLLP | 017-016 | 363.00 |
| Log Creek LLLP | 026-023 | 741.87 |
| Log Creek LLLP | 026-024 | 107.00 |
| | Total: | 2,306.87 |

As stated throughout this report, land non-contiguous to the subject property, is owned by an entity considered to be a "related person" as defined by Treas. Reg. §267(b). It is the appraisers' opinion that the non-contiguous land owned by a related

person does not benefit from the conservation easement being placed on the 240.00 acres of the subject property. This determination is based on the location of the subject property in rural Warren County. It is the appraisers' opinion that a buyer would not pay more for a property located near to a property with a conservation easement as the majority of the land in the area is rural land or agricultural land. It is the appraisers' opinion that a buyer would not be influenced by a conservation easement due to the rural nature of the area and the availability of undeveloped land. A list of the parcels can be found in the chart below.

| Parcels Considered for Enhancement - Non-Contiguous | | | | | |
|---|---|---|---|---|---|
| Owner | Parcel # | Acreage | Owner | Parcel # | Acreage |
| Log Creek LLLP | 004-001 | 18.00 | Log Creek LLLP | 038-010 | 460.30 |
| Log Creek LLLP | 005-018 | 26.74 | Log Creek LLLP | 038-037 | 31.00 |
| Log Creek LLLP | 011-011 | 160.30 | Log Creek LLLP | 038-038 | 280.24 |
| Log Creek LLLP | 011-013 | 28.38 | Log Creek LLLP | 038-065 | 37.04 |
| Log Creek LLLP | 012-004 | 281.68 | Log Creek LLLP | 045-001 | 150.35 |
| Log Creek LLLP | 013-011 | 430.28 | Log Creek LLLP | 045-031 | 187.64 |
| Log Creek LLLP | 013-013 | 2.00 | Log Creek LLLP | 047-007 | 174.50 |
| Log Creek LLLP | 074-015 | 67.94 | Log Creek LLLP | 052-030 | 84.26 |
| Log Creek LLLP | 060-035 | 14.77 | Log Creek LLLP | 052-031 | 415.87 |
| Log Creek LLLP | 060-037 | 307.50 | Log Creek LLLP | 056-002 | 113.02 |
| Log Creek LLLP | 067-065 | 304.01 | | | |
| Log Creek LLLP | 068-012 | 282.71 | | | |
| Log Creek LLLP | 016-003 | 156.67 | | | |
| Log Creek LLLP | 020-003 | 19.00 | | | |
| Log Creek LLLP | 021-001 | 316.90 | | | |
| Log Creek LLLP | 021-018 | 62.83 | | | |
| Log Creek LLLP | 022-014 | 154.03 | | | |
| Log Creek LLLP | 023-001 | 320.00 | | | |
| Log Creek LLLP | 023-002 | 546.63 | | | |
| Log Creek LLLP | 023-016 | 93.00 | | | |
| Log Creek LLLP | 024-010 | 162.30 | | | |
| Log Creek LLLP | 024-090 | 84.67 | | | |
| Log Creek LLLP | 026-002 | 100.60 | | | |
| Log Creek LLLP | 026-005 | 73.50 | | | |
| Log Creek LLLP | 056-007 | 470.40 | | | |
| Log Creek LLLP | 060-001 | 509.95 | | | |
| Log Creek LLLP | 028-087 | 355.46 | | | |
| Log Creek LLLP | 029-002 | 256.54 | | | |
| Log Creek LLLP | 032-004 | 231.20 | | | |
| | | | | Total: | 7,772.21 |

### 6.1.4.  Appraisal Approach

Typically, two approaches are available for determining the Fair Market Value of a conservation easement. The appraisers may value the conservation easement through direct comparison with similar conservation easements previously purchased when data is available, or the appraisers may value the difference in whole interest of the subject property before the conservation easement donation and after the conservation easement donation. The difference is widely considered as the "fair market value of the conservation easement given up" and is substantiated by the IRS regulation 1.170A-14(h)(3) and the publication, Appraising Conservation and Historic Preservation Easement, Second Edition, published by the Appraisal Institute. Both substantiating documents provide guidance for when a lack of adequate conservation easement sales are available by stating: "If no substantial record of comparable marketplace sales (of similarly encumbered properties) exists as a general rule the fair market value of an easement equals the fair market value of the unencumbered property (pre-conservation easement) minus the fair market value of the encumbered property (post-conservation easement). IRS Ruling 73-339 states that the proper method of or valuation of a "before and after" appraisal calculates "the difference between the fair market value of the total property before the granting of the conservation easement and the fair market value after the grant." Of note, it is common for the "before and after" methodology to be used in appraisal practice; specifically, appraisals where condemnation has taken place.

## 6.2.   Scope of Work

The 2016 *Uniform Standards of Professional Appraisal Practice* (effective January 1, 2016) establishes the "Scope of Work Rule" to guide the process of developing assignment results. Scope of Work is simply the work undertaken in developing the assignment and defined as "the type and extent of research and analyses in an assignment." The focus of the scope of work rule is on ensuring that work undertaken is sufficient to develop credible assignment results.

The purpose of this report is to provide an opinion of the Fair Market Value of the Conservation Easement. In order to provide a full understanding of the impact of the conservation easement on the subject property, an analysis of the conservation easement value is included in this report.

An appraisal is generally defined as an opinion of value based on the parameters of the assignment as of a specified date. The valuation of real estate is based on a process of data collection, analysis and conclusions by a nonbiased third party. The purpose and date of this appraisal, along with the property rights appraised, have been previously defined. The Scope of the Appraisal is based on these definitions as follows.

Improved (or proposed) income producing property is best valued through the application of the three traditional approaches to value, i.e., the **Cost Approach**, the **Sales Comparison Approach** and the **Income Approach**.  The initial step in the appraisal process is the market research phase, whereby basic data is collected and refined from all available sources. Data sources include local municipal governments, public records, chambers of commerce, private real estate professionals, owners/investors of comparable properties, on-site management and/or leasing agents at comparable properties, the actual subject property history (when applicable), and real estate publications. The geographic extent of the data

research is consistent with the investment market in which the subject property competes. This information is verified and cross checked for accuracy and applicability.

Information relating to the subject property collected also includes ad valorem tax data, zoning information, utility availability, floodplain information, topography, frontage, access and existing improvements. Building plans are reviewed (if applicable) and the site plan studied as to the relationship of the site and the improvements. The improvements are inspected to determine the physical condition and functional utility. Other properties in the neighborhood are inspected to develop an overall opinion of the character, composition, and future trends of the submarket. The consideration of all these factors, acting in concert, leads to a conclusion of the highest and best use for the subject property, which is the basis of the valuation methodology.

The **Cost Approach** is based on the understanding that market participants relate value to cost. A prudent investor would pay no more for a property than the cost to acquire an equally desirable site and construct improvements of equal desirability and utility without undue delay in time. The Appraisal of Real Estate, 15th Edition, provides the following definition for the Cost Approach. "In the cost approach, the value of a property is derived by adding the appraiser's opinion of the value of the land to an estimated current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation (i.e., deterioration and obsolescence) in the structures from all causes. This approach is particularly useful in valuing new or nearly new improvements and properties that are not frequently exchanged in the market." An inherent weakness in the Cost Approach is the required estimation of depreciation. Depreciation from all causes, especially obsolescence, can exist even in new properties. The difficulty in accurately estimating depreciation tends to weaken the validity of the Cost Approach. Of note, Cost Approach techniques can also be employed to derive information needed in the sales comparison and income capitalization approaches to value, such as cost-related adjustments to account for specific building features and cost-to-cure adjustments to address deferred maintenance.

The first step in the Cost Approach is a valuation of the subject property as though vacant. Recent land sales, listings, and contracts are analyzed, along with the most recent purchase involving the subject property (if appropriate), to estimate a current value for the subject property.

The second phase of the Cost Approach is estimating the replacement cost of the improvements. Replacement cost-new considers typical direct construction costs, plus normal indirect costs and entrepreneurial profit. The replacement costs are typically based on actual construction costs of similar properties and checked by means of a national cost manual. Estimated depreciation, which may include physical deterioration, functional obsolescence, and external (economic) obsolescence, is deducted from replacement cost-new to derive an indication of depreciated replacement cost. The final step is the summation of the land value and the depreciated replacement cost, providing an indication of total property value. It should be noted that the subject property is vacant land, thus the Cost Approach is not applicable.

The **Sales Comparison Approach** is also based upon the theory of substitution as the value is estimated by direct comparison of the subject property with comparable properties which have recently sold. These comparable properties are verified, with differences between the comparables and the subject property noted. The comparable sales are analyzed

with sale prices delineated on an appropriate per unit basis. The sale price per unit reflects the relationship between sale price and value per unit. The analysis of the sales data includes adjustments to the units of comparison based on various dissimilar features and investment characteristics.

The scope of an appraisal for a tract of land is best explained in the 15th Edition of The Appraisal of Real Estate (Page 339), published by the Appraisal Institute, as follows: "Sales comparison may be used to value land that is actually vacant or land that is being considered as though vacant for valuation purposes. Sales comparison is the most common technique for valuing land, and it is the preferred method when comparable sales are available. To apply this method, data on sales of similar parcels of land is collected, analyzed, compared, and adjusted to provide a value indication for the site being appraised. In the comparison process, the similarity or dissimilarity of the parcels is considered."

"The appraiser must perform several tasks in developing an opinion of site value:

1. Gather data on actual sales as well as listings, offers, and options based on the highest and best use.

2. Identify the similarities and differences in the data.

3. Identify the highest and best use of each potential comparable sale and then choose the appropriate sales for analysis.

4. Identify units of comparison that explain market behavior.

5. Adjust the appropriate unit prices of the comparable sales to account for the dissimilar characteristics of the site being appraised

6. Form a conclusion as to the market value of the subject property."

During the course of researching applicable properties for use in determining a valuation for the conservation easement, sales were located throughout the United States. As many comparable sales as possible were located either within the State of Georgia, the Southeast or that had similar defining characteristics to that of the subject property within the United States. However, an inherent weakness of the Sales Comparison Approach for mining developments hinges on the complexity of multi-property sales and the unique physical characteristics of each mining site sale being proprietary information. Many of the sales associated with mining development involve multiple properties, all of which often include differing physical characteristics or mineral resources. Much of the information required to adequately analyze the sale, such as quantity and quality of reserves or annual production volume and the value of equipment are typically considered confidential and propriety, thereby shielded from public knowledge. Furthermore, market participants indicate that comparable data is difficult to find with all the information necessary to make appropriate adjustments as demonstrated by the mineral appraiser, T.R. Ellis of Ellis International Service. Mr. Ellis states: "Minerals Appraisers/Valuers often find great difficulty or failure in attempting to employ the Sales Comparison Approach to the Market Value Appraisal of development and operating stage of mineral properties.

An important factor generally overlooked is a comparison of net operating income (NOI) margins on a per-unit-of-production basis between mineral properties, whether these be demonstrated or forecast margins. NOI margins can vary greatly between mines or quarries that are producing similar products. Ultimately, the expected NOI margin determines what a buyer is willing to pay for an income producing property." As a result of the difficulty and plethora of work required to adequately use the Sale Comparison Approach in determining a supportable value conclusion for properties with subsurface material, Mr. Ellis argues in his paper, *Sales Comparison Valuation of Development and Operating Stage Mineral Properties*, "the great majority of appraisals of the market value of development and operating stage mineral properties are prepared using only an Income Approach Method. The method most commonly used is the Discounted Cash Flow (DCF) method, better known in the mining industry as the net Present Value (NPV) Method."

According to Robert H. Paschall, in *The Appraisal of Mineral Producing Properties*, ASA Valuation, American Society of Appraisers, 1974, "The capitalized income method is the only method appropriate to appraise an active construction-rock operation." Furthermore, according to Donald W. Gentry and Thomas J. O'Neil, Dr., *Mining Investment Analysis*, Society of Mining Engineers, American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc. New York, New York, 1986, page 14, "the preferred method for mining property valuation and the one universally used in the commercial practice is the income approach. Because mines have limited operating horizons and because there are well established markets for mineral commodities, the income approach is widely used in valuing mineral properties. The approach is used commonly by the mining industry in assessing investment rates of return and determining appropriate purchase prices for mines or mineral prospects."

Surface mining facilities are typically purchased for future income based on remaining deposits, grades of material, cost to mine, and processing cost. Mining properties are unique, each located in differing markets, possessing differing material, and operating at differing levels of development and production. Individual site data is often proprietary and considered confidential by the mine operator. Therefore, an investor would place more emphasis on an income approach utilizing known site data when considering an investment in this type of property.

Of note, according to the SME Guide for Reporting Exploration Information, Mineral Resources, and Mineral Reserves, prepared by the Resources and Reserves Committee of The Society for Mining, Metallurgy, and Exploration, Inc., published in July 2017, there are three types of technical studies. These studies are:

- Scoping Study: A Scoping Study is an order of magnitude technical and economic study of the potential viability of Mineral Resources that includes appropriate assessments of realistically assumed Modifying Factors together with any other relevant operational factors that are necessary to demonstrate that at the time of reporting that progress to a Pre-Feasibility Study can be reasonably justified.

- Pre-Feasibility Study: A Pre-Feasibility Study is a comprehensive study that may include a range of options for the technical and economic viability of a mineral project that has advanced to a stage where a preferred mining method, in the case of

underground mining, or the pit configuration, in the case of an open pit (surface) mine, is established and an effective method of mineral processing is determined. It includes a financial analysis based on applicable Modifying Factors and the evaluation of any other relevant factors which are sufficient for a Competent Person, acting reasonably, to determine if all or part of the Mineral Resource may be converted to a Mineral Reserve at the time of reporting. A Pre-Feasibility Study is at a lower confidence level than a Feasibility Study.

- Feasibility Study: A Feasibility Study is a comprehensive technical and economic study of the selected development option for a mineral project that includes appropriately detailed assessments of applicable Modifying Factors together with any other relevant operational factors and detailed financial analysis that are necessary to demonstrate at the time of reporting that extraction is reasonably justified (economically mineable). The results of the study may reasonably serve as the basis for a final decision by a proponent or financial institution to proceed with, or finance, the development of the project. The confidence level of the study will be higher than that of a Pre-Feasibility Study.

Further, according to the CIMVAL Code for the Valuation of Mineral Properties prepared by the Special Committee of the Canadian Institute of Mining, Metallurgy and Petroleum on the Valuation of Mineral Properties (CIMVAL), the valuation approach depends on the stage of exploration or development of the subject property. Properties with subsurface material or Mineral Properties can be categorized for convenience into four types; however, it should be noted that there are no clear-cut boundaries between these types, that the Mineral Property category may change over time, and that it may be difficult to classify some Mineral Properties so they fit in only one specific category. These categories are:

- Exploration Properties: A Mineral Property that does not contain Mineral Reserves or Mineral Resources and for which economic viability has not been demonstrated.

- Mineral Resource Properties: A Mineral Property that contains a Mineral Resource as defined in the CIM Definition Standards, as defined in National Reporting Standards, or other estimates of quantity and grade of mineralization that are reconciled the with the CIM Definition Standards.

- Development Properties: A Mineral Property that contains Mineral Reserves and/or Mineral Resources and for which economic viability has been demonstrated by a Feasibility Study or Pre-Feasibility Study and includes a Mineral Property that has a current positive Feasibility Study or Pre-Feasibility Study but that is not yet in production.

- Production Properties: A Mineral Property with an operating mine, with or without a processing plant, which has been fully commissioned and is in production.

As presented in the chart below, the type of valuation methodology is dependent on the type of property classification (Exploration, Mineral Property, Development, Production) which is derived based on the type of study completed (Scoping, Pre-Feasibility, Feasibility).



Figure 3: Valuation methods depending on the stage of development on the mineral property

Source: MVENMYN

It is the appraisers' opinion, due to the professional reports provided, the subject property is classified as a Development Property with a Pre-Feasibility Study completed at a minimum as of the date of this appraisal. A qualified drilling company under the guidance of a Professional Geologist drilled the subject property, a Qualified Laboratory tested the material, a Professional Geologist along with a Professional Engineer evaluated the reserves on-site based on the physical characteristics of a subject property, a mining consultant working in tandem with the Professional Geologist and Professional Engineer evaluated the supply and demand as well as the target market. Further, the mining consultant established the permitting schedule, the market pricing, production schedule, the capital expenditures, the operating costs, and the life of mine. All of the above is only possible on the subject property as it is a unique property that has the quality and quantity of material on-site that is financially feasible to extract. The subject property within this appraisal report is unique as detailed in each of the professional reports provided and included in the addenda of this appraisal report.

Due to the indicated challenges, based on our research and experience, we have concluded that the Sales Comparison Approach is limited and was not utilized as additional support for the Income Approach – Discounted Cash Flow analysis used in determining a value opinion. Of note, the appraisers recognize that the Sales Comparison Approach should be utilized when it is feasible to do so. However, as is the case with this appraisal report, an inherent weakness of the Sales Comparison Approach for mining developments hinges on the complexity of multi-property and speculative sales. Many of the sales associated with mining development include differing physical characteristics or

mineral resources. Much of the information required to adequately analyze the sale, such as quantity and quality of reserves or annual production volume and the value of equipment are typically considered confidential and propriety, thereby shielded from public knowledge.

The appraisers endeavored to find sales of land where both the buyer and seller had reasonable knowledge of the relevant facts. Specifically, land sales where the seller had a qualified drilling company under the guidance of a Professional Geologist drill the property, a Qualified Laboratory test the material found from the drill results, a Professional Geologist along with a Professional Engineer evaluate the reserves on-site based on the physical characteristics of the property, a mining consultant working in tandem with the Professional Geologist and Professional Engineer evaluate the supply and demand as well as the target market. Further, the mining consultant would have established the permitting schedule, the market pricing, production schedule, the capital expenditures, the operating costs, and the life of mine. All of the above is only possible on a property is unique and has the quality and quantity of material on-site that is financially feasible to extract. However, the appraisers were unable to find any land sales that had all the above-described due diligence similar to the subject property.

The appraisers analyzed sales of mining properties as well as mergers and acquisitions of mining companies. It is the appraisers' opinion that the development of the Sales Comparison Approach may provide a misleading value and thus was not utilized within this appraisal report.

Finally, due to the availability of conservation easement encumbered sales, the Sales Comparison Approach was utilized in determining the value opinion for the subject property post-conservation easement.

The **Income Approach** analyzes the subject property as an investment recognizing the present value of future cash flows. The income approach is integral to investors in understanding when considering potential investment properties as it indicates the potential return on investment, or future income possibilities, based on the current investment. Typically, there are two primary methods in utilizing the income approach, the direct capitalization method and the yield capitalization method, often considered the discounted cash flow analysis (DCF). According to David Lennhoff, MAI, SRA, there is one constant between both methods, the value conclusion as the final value does not change based on which method is used.[46] Understanding the income approach can be difficult, and as such, most appraisers lean towards using the direct capitalization method as it is often easier to follow than a DCF.[47]

The Direct Capitalization approach utilizes a five-step process to indicate the anticipated future income based on a present-day investment. The five-steps are outlined and briefly discussed in the following analysis, in addition to the yield capitalization approach to determine the appropriate method for evaluating any income generation from potential operations on the subject land.  However, the appraisers believe the Yield Capitalization Approach, or the DCF method, is the most applicable income approach for the valuation of the mine.

---

[46] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*
[47] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*

### Fundamental Elements of Investment Evaluation

Income-producing real estate is typically purchased as an investment and investors typically value earning power as the critical element affecting property value. One basic investment premise holds that the higher the earnings, the higher the value, provided the amount of risk remains constant. An investor who purchases income-producing real estate is essentially trading present dollars for the expectation of receiving future dollars.

Step 1 is perhaps the most overlooked, but ultimately one of the most important steps in the process. Defining the length of the investment, the holding period, allows for the proper analysis to be conducted. Without defining the length of time the investor plans on holding the property, or a generally used length of time such as five or ten years to aid in an estimated Return on Investment, determining the appropriate investment amount for future returns over the defined period becomes too arbitrary to adequately predict.

Step 2 in the process is determining which income period is appropriate for analyzing the first year's income. "For most real estate investments, the first income period will be one year's net operating income."[48] Deciding what constitutes the first year's income period establishes the starting point for establishing the following periods income, and as such, establishing the correct income period for the start of the analysis becomes imperative. The potential income periods available for use include the net income expected during the first year of ownership, the net income for the trailing year (the income from the year prior to new ownership), a stabilized year's income or the net income before or after replacement allowance deductions.[49] Establishing the starting point for net income analysis leads directly into the third step, analyzing the potential income from each subsequent period of the investment.

Step 3 pertains to evaluating and analyzing the income in each subsequent period of the investment. This step is important as it allows for the investor to evaluate any anticipated income from the following periods. The primary items to consider during step three regarding expected future income are whether the income will remain level, will it rise and if it rises, will it rise at a standard or variable rate, will it decline or will it be irregular.[50]

Step 4 focuses on reversion. Step 4 and the principle of reversion is directly tied to Step 1 in establishing the length of the holding period for the investment. Reversion literally applies to the moment when the investment property reverts back to its previous or new ownership. This transaction typically has a value associated with the transfer of ownership and reversion attempts to capture this value through its analysis. "In a discounted cash flow analysis, the reversion amount is frequently estimated as some percentage of the unknown present value or by using a terminal capitalization rate and applying direct capitalization at the end of the holding period, i.e., dividing one year's income by a terminal cap rate."[51]

Step 5, also the final step in the process, determines the yield rate for the investment. The yield rate of an investment pertains to the rate of return, inclusive of the initial investment, investors expect to receive from the original real estate investment. This yield rate helps the investors to decide whether a particular investment property provides adequate potential yield compared to the risk associated with the investment. "The present worth of

---

[48] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*
[49] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*
[50] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*
[51] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*

the cash flows, discounted at the yield rate, results in the amount the investor can afford to pay for the investment (its value) if that yield is to be achieved."[52]

### Direct Capitalization Method

The direct capitalization method is often considered the more straight forward of the two methods as a result of requiring only two components for calculation. The two components required for the direct capitalization method are the year's income and the overall capitalization rate. The accuracy of this method hinges on the ability to determine the correct capitalization rate.[53] Examining the contents of *The Appraisal of Real Estate* reveals five methods for determining the overall capitalization rate: Derivation from comparable sales, band of investments- mortgage and equity components, band of investments- land and building components, derivation from effective gross income multipliers and net income ratios and finally, the debt coverage formula.

The first method takes sales comparables in the area where a net income for the property is available, and then divides the income generated by the sale price. Once the rates for the varying sales comparables is generated, the appraiser must reconcile these rates into one established rate, similar to the sales comparison approach of valuation.

The second method, band of investments involving mortgage and equity components, uses one formula to determine the capitalization rate and then another formula to establish a value based on the found capitalization rate. The two formulas are as follows, where Ro is the capitalization rate, M is the loan-to-value ratio, Rm is the Mortgage constant and Re is the Equity Cap Rate. For the second formula Vo is the value, NOI is the net operating income and Ro is the Cap Rate.

$$Ro = M \times Rm + (1-M) \times Re$$

For Value:

$$Vo = NOI \div Ro$$

The remaining methods of the direct capitalization process only concentrate on using one year's net income rather than a combination of values to determine the overall value of the property.[54] As such, simplifying the direct capitalization approach arrives at one formula for determining the overall value of the property: Vo = NOI ÷ Ro. Because the direct capitalization method boils down to this one formula, most appraisers tend to lean towards it use, both because it is straight forward to the reader, the process is relatively simple (despite requiring the same level of analysis) and in an attempt to eliminate as much confusion as possible from those who do not understand real estate valuations fully. Ultimately, the value estimate derived from direct capitalization reflects an amount an investor should be justified in paying to receive an annual income over the holding period of the property, plus the reversionary value at the end of the ownership period.

---

[52] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*
[53] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*
[54] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*

**Yield Capitalization Method**

The yield capitalization method is similar to the direct capitalization approach in analyzing the potential income of a property to determine the real estate's overall value. However, the yield capitalization method, most often analyzed through discounted cash flow analysis, differs from the direct capitalization approach by explicitly accounting for each of the investment criteria examined in the overall income approach. "The income capitalization method using yield capitalization explicitly accounts for each of the five investment criteria".[55]

To perform Yield Capitalization, an appraiser must select an appropriate projection period, forecast all future cash flows or cash flow patterns (including the reversion, if any), choose an appropriate yield (or discount) rate, convert future benefits into present value by discounting each annual future benefit or by developing an overall rate that reflects the income pattern, value change, and yield rate using one of the various yield capitalization formulas. This method is often played out through the use of the discounted cash flow (DCF) method. Using the DCF method, various techniques are used to convert a series of future cash flows received into an indication of value as indicated in the formula expressed below where DCF represents the potential Cash Flow over the holding period of the investment, CFo is the Cash Flow for a respective year and R represents the discount rate. The calculated future cash flow indicates the minimum return acceptable over the life of the investment based on the initial risk accepted.

$$DCF = (CFo \div ((1 + R)^{\wedge}1)) + ((CFn \div ((1 + R)^{\wedge}n))$$

Trevor R. Ellis, MCA, CPG, M. AusIMM, and J. Ballard, Resource Finance Consultant of Ellis International Services in Denver, Colorado discuss and present accepted market rationale for discounted cash flow methodologies and net present value in *Valuation Methodologies for Mines and Mineral Tenements.* They both recommend DCF as the primary method for valuing operating mines, or mineral assets with an indicated resource and a feasibility study containing engineering, production and capital estimates and operating cost data.

Mr. Dennis Kenney, Titan Environmental & Construction Company, Inc., Mr. Stuart Burgess, Burgex Inc. Mining Consultants, Mr. Hans E. Naumann, Jr., P.E., Marshall Miller & Associates, Inc., Mr. David Grayson, formerly a Division President of a Fortune 500 mining company, Mr. Chris Summers, Burgex Inc. Mining Consultants and formerly a Senior Business Analyst of Nyrstar Corporation and formerly a Principal Analyst of Rio Tinto, and finally, Dr. Capps, Capps Geoscience, LLC, all indicate the appropriate methodology for valuing property with proven mineral reserves is the Income Approach, specifically the Discounted Cash Flow.

Detailed property information from the Resource Valuation Report prepared by Dr. Capps, Capps Geoscience, LLC, is included in the Addenda. The Resource Valuation Report details market information, experience as a consultant and expertise in mine development. The information contained in the aforementioned report profiles the income stream and all the necessary expenditures, expenses, and yearly operation of the mine. The appraisers have determined that the most preferred approach to value is the Discounted Cash Flow analysis supported with reliable market data made available in

---

[55] Lennhoff, David C. MAI, SRA (2011). *Direct Capitalization*

the Resource Valuation Report. The DCF method was accepted as the correct method as evidenced by *Whitney Benefits and Peter Kiewit Sons' v. The United States, 1989 (18-CL. CT. 394),* where the plaintiffs allege their land mineable for coal was taken without fair market compensation by the defendants, the United States. After establishing the existence of a sustainable market and ability to mine the coal, the plaintiff and defendants presented arguments pertaining to the appropriate method for establishing the fair market value of the land without the ability to physically mine. The defendants urged the courts to consider the Sales Comparison Approach as the primary method of valuation in addition to presenting the Royalty Method as an alternate to the DCF analysis presented by the plaintiffs as the appropriate method for determining the fair market value of the land. The courts dismissed the Sales Comparison approach as a reliable method in determining the fair market value, due in part, to the vast differences found between mineable land within a given market area. As such, the courts focused on determining the reliability of the DCF analysis and the royalty method, determining the DCF as the most reliable method for determining the fair market value of mineable land. The court stated: "Rather than value the Whitney coal as a fee interest of the two plaintiffs as lessor and lessee, defendant's valuations focus only on the interest held by Whitney Benefits. Thus, in both of its valuations, defendant has disregarded the leasehold interest owned by PKS and merely analyzed the royalty income Whitney could have expected to receive." The key component of the DCF analysis is its ability to determine the value of the land based on the fee simple interest rather than either one or the other, the leased fee interest or the leasehold interest individually. Furthermore, the defendant's expert witness, Dr. John Weir, stated the royalty method exists as a subsection of the Discounted Cash Flow analysis rather than a stand-alone method separate from the DCF analysis.

According to Svetlana Baurens in, *Valuation of Metals and Mining Companies,* the DCF method is not applicable without "reasonably assured mineral reserves." This plan should include rates, test results, capital and operating cost, environmental and reclamation cost, and any other necessary projections. Ms. Baurens states, "It must be taken into consideration that DCF is not applicable to early-stage projects without reasonably assured mineral reserves, workable mining plants with rates, metallurgical test results and process recoveries, capital and operating cost estimates, environmental and reclamation cost estimates and commodity price projections. The reason of this is the theory behind DCF: the value of every asset is simply the present value of the cash flows this asset produces over the lifetime. One must have enough information that we can reasonably estimate cash flows from production. Therefore, DCF is only appropriate for mineral properties in production, very near production or for mineral properties at the stage of development. In these cases, the economic viability of the property will be based on preliminary estimates of production, revenue and cost. Despite the preliminary nature of the underlying estimates, it is still generally accepted that discounted cash flow analysis is the best method of valuing mineral properties at this stage of development."

As stated throughout this report, the subject property has proven mineral reserves. Further, this report details projected pricing, test results, capital and operating costs, environmental and reclamation costs, and other necessary projections for the use of a DCF analysis. Therefore, it is the appraisers' opinion the use of the DCF method was applicable.

The subject property's location in Georgia and its physical characteristics (existing granite deposits), along with the information and recommendations from Dr. Capp's Resource Valuation Report, establishes a discounted cash flow analysis reflecting a mining property as the most reliable method accepted by the industry and has been developed. The expert reports provide enough information that the appraisers can reasonably estimate a value opinion using a cash flow. It is the appraisers' opinion that since mining developments have irregular income patterns, generate income over time, and have depleting resources, the best methodology to value the land is the Income Approach, specifically the Discounted Cash Flow Analysis.

**Royalty Method**

An additional approach, the Royalty Method, is the present value of the income stream based on market comparable royalty rates for mined material over the extraction period. Royalty payments are usage-based payments made by one party (the lessee) to another (the lessor) for use of an asset in order to execute the right to extract mineral reserves. Royalties are typically paid as a percentage of gross sales and alternatively paid as a percentage of net profits or, in some instances, a fixed price per unit sold. A royalty is the right to collect a stream of future royalty payments based on usage and the royalty stream method present values the royalty revenues to provide an estimate of value.

The most significant weakness in the royalty stream method is that the present value of an income stream derived from royalties would reflect only a lessor interest in the mineral right and, therefore, fails to take into account all of the value of fee simple ownership. This is because fee simple ownership of a mineral interest carries a greater bundle of rights than that of a lessor interest, as it would include both lessor AND leasehold ownership rights. Thus, the royalty stream method captures fewer sticks within the bundle of ownership, whereas much greater rights are accorded to a fee simple interest. The royalty stream method can estimate only the value associated with a lessor's ownership interest. In contrast, the DCF method can capture all of the rights associated with the fee simple interest in a site that specifically considers the location and mine plan.

Simply stated, the royalty stream method fails to capture the value of all of the rights of fee simple ownership in real estate that is successfully captured in a correctly conducted discounted cash flow valuation. It does not take into account the benefits from determining a specific mine plan for the subject property or where the mineral reserves will be processed and sold. It does not capture the economic benefits that may accrue in excess of royalty payments derived from market 'comparable' data to a fee simple owner, or properly consider the quality of mineral reserves at a particular location, nor does it capture unique characteristics of the mine site that result in lower costs or better access to markets. It is still a useful method of support to a cash flow method. However, the DCF method enables the appraiser to measure all issues that must be considered in any valuation assignment so that value is not overlooked. Fee simple ownership of a mineral interest is more valuable than a lessor interest only, which does not consider the real estate value that may accrue to the lessee as a leasehold interest. Fee simple ownership carries with it the power and incentive to develop the owner's unique plan to mine and derive maximum value from the property. The DCF method, as outlined here, captures all of the fee simple rights retained by the owner of the subject property to an extent that the royalty stream method cannot.

Industry professionals and peers were consulted to determine whether the Royalty Method held merit in determining the market value of a conservation easement, with the consensus of the industry being, the Royalty Method does not adequately provide a strong indication of overall value due to its challenge in expressing a value based on fee simple ownership. The mineable land condemnation court case from 1989, *Whiney Benefits and Peter Kiewit Sons' v. The United States, 1989 (18-CL. CT. 394)*, clearly supports the industry consensus and determines that the DCF analysis provides a reliable method for determining the fair market value of a potential mining development, while rejecting the royalty method. In summary, the defendant, The United States, presented a valuation based on the Royalty Method technique by means of two separate streams of income in an attempt to countermand the DCF analysis presented by the plaintiffs in the case. The court primarily rejected the royalty method for valuation based on its inability to provide a valuation based on a fee simple interest, composed of both the leased fee position and the leasehold position. The court stated: "Rather than value the Whitney coal as a fee interest of the two plaintiffs as lessor and lessee, defendant's valuations focus only on the interest held by Whitney Benefits. Thus, in both of its valuations, defendant has disregarded the leasehold interest owned by PKS and merely analyzed the royalty income Whitney could have expected to receive." Furthermore, the defendant's expert witness, Dr. John Weir, stated the royalty method exists as a subsection of the Discounted Cash Flow analysis rather than a stand-alone method separate from the DCF analysis.

Regardless, and in an effort to ensure due diligence regarding the valuation of the conservation easement, the appraisers sought royalty rates data, ultimately locating information on royalty rates. However, the data collected from the market is general, non-specific to a property, and has been determined by the appraisers to be unverifiable and inapplicable to the valuation of a conservation easement. As such, the appraisers believe that the royalty method does not appropriately value the overall property. Therefore, based on the above analysis, it is the appraisers' opinion the royalty method does not adequately provide a measure of value and is not used in the appraisal.

## Geographical Area Covered

The subject property is a unique property in that its most probable highest and best use is as a mining site. Additionally, according to the guidelines established by the Appraisal Institute in the 15th Edition of The Appraisal of Real Estate, "The nature of the data collected is greatly dependent on the scope of the assignment, the property type being appraised, and the market conditions within the market area identified by the appraiser...A good comparable sale is a competitive alternative, i.e., a property that the buyer of the subject property would also consider. The selection of comparable sales is directed to some extent by the availability of data." The Appraisal of Real Estate further discusses the importance of including regional or national markets based on the subject's property type or scope of the intended use. "The geographic limits of the appraiser's search for sales data depend on the nature and type of real estate being valued and the available sales information. Certain types of properties have regional, national, and even international markets. Similarly, an appraiser may gather data from a wide geographic area to find competitive properties for a regional shopping mall, large office building, resort hotel, large multiuse complex, or large industrial property" (Page 384).

As such, comparable land sale requirements for conservation easements are much more specific and encompass wider search parameters in terms of proximity to the subject property, the 240.00 acres to be encumbered by the conservation easement, than would be typical for a standard property valuation.

Sales of properties with similar unique characteristics, specifically, proven mineral reserves, similar market, similar physical site characteristics, quality and quantity of the reserves, etc. were researched. A further limiting characteristic of the subject area revolves around the transportation costs associated with the transport and distribution of any resources mined within the subject area, as presented further in the Highest and Best Use and Discounted Cash Flow sections. Due to the unique nature of the subject property's Highest and Best Use, as well as the transportation barriers, the comparable sales utilized from other states are impacted by the same transportation cost restraints, solidifying their applicability as comparable sales. Of note, the typical purchasers of properties with a similar highest and best use as the subject property (mining) are often mining companies that seek opportunities for expanding operations on a regional or national basis. Surface mining facilities are typically purchased for future income based on remaining deposits, grades of material, cost to mine, and processing cost. Mining properties are unique, each located in differing markets, possessing differing material, and operating at differing levels of development and production. Individual site data is often proprietary and considered confidential by the mine operator. Therefore, an investor would place more emphasis on an income approach utilizing known site data when considering an investment in this type of property.

**Time Period Searched**

Due to the uniqueness of the subject property being appraised, every effort was made to find the most current data available relative to the sales analyzed in this report from 2015 through the effective date of the appraisal. The specific nature of the highest and best use of the subject property required broader search parameters considering the date of sale to capture an adequate quantity for analysis both for land sales before implementation of a conservation easement as well as land sales encumbered by a conservation easement.

**Types of Market Data Researched**

Land sales with similar locations, physical traits, zoning and highest and best use characteristics were analyzed in conjunction with ad valorem taxes, zoning information, utility availability, floodplain information, topography, existing improvements and the relevant frontage and access. Furthermore, the appraisers consulted agencies (non-inclusive) such as the Chamber of Commerce, the County Development Authority, State Department of Labor Office, Regional Commission, Federal and State Department of Transportation, U.S. Census Bureau, Environmental Protection Division, Utility Corporations and local websites.

**Extent of Market Data Confirmation**

When dealing with a specialized property, such as a property with mineral reserves, appraisers are encouraged, to consider any available reports from competent

experts in that field. The appraisers took sufficient steps, common in the industry, to ensure the market data presented in this report are deemed accurate and reliable. The appraisers have made every attempt to confirm and authenticate any expert provided information. The reviewed expert provided information was determined to be reliable and to the best of the appraisers' knowledge, accurate. Market data included in this report was verified through multiple sources such as, public records of deeds and easements, subscription data sources, including CoStar among others, and interviews with brokers and/or grantors and grantees. Based on the credentials of Dr. Capps, Capps Geoscience and Mr. Ben Black, Professional Geologist, there is no reason at this time to suspect that the provided information is not credible. Based on the credentials and appraisers' investigation of that information, the appraisers found the analyses credible and reliable.

**References and Data Sources Used**

The appraisers referenced several reports prepared by industry leaders as an aid in determining an appropriate value conclusion. The reports referenced, and included in the Addenda of this Report, include the Resource Valuation Report – Log Creek Quarry Site prepared by Dr. Capps, Capps Geoscience, LLC, the Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement prepared by GeoLogic, LLC (Consulting Geologists), the Surface Mining Land Use Plans prepared by GeoLogic, LLC, and the Baseline Documentation Report prepared by Oconee River Land Trust, Inc.

The appraisal of property with subsurface material requires a number of different disciplines. A qualified drilling company under the guidance of a Professional Geologist to drill the property, a Qualified Laboratory for testing of the material, a Professional Geologist along with a Professional Engineer to evaluate the reserves on-site based on the physical characteristics of a property, a mining consultant working in tandem with the Professional Geologist and Professional Engineer to evaluate the supply and demand as well as the target market. Further, the mining consultant will establish the permitting schedule, the market pricing, production schedule, the capital expenditures, the operating costs, and the life of mine. Finally, a qualified appraiser, one who specializes in appraisals with subsurface material, will analyze all of the data provided from the experts/professionals above to perform a qualified appraisal. All of the above is only possible on a unique property that has the quality and quantity of material on-site that is financially feasible to extract. The subject property within this appraisal report is unique as detailed in each of the professional reports provided and included in the addenda of this appraisal report.

**Conclusion**

The information included in this report associated with the subject property regarding the tonnage estimates, expected yield, expenses, expenditures, reserves and resources over the life of the mine lends itself to use of the Income Approach in determining a value opinion. As such, we have utilized the Income Approach as the primary method in arriving at a value conclusion. The Sales Comparison Approach was deemed nonapplicable. The Royalty Method is not a meaningful indicator of fee simple value and there are no on-site improvements on the subject property. Thus, the Cost

Approach and the Royalty Method were not utilized in determining a value opinion for the Fee Simple Interest of the property.

## 6.3. Before Conservation Easement

### 6.3.1. Highest and Best Use

Highest and Best Use is defined in Chapter 17 Page No. 305, in the 15th edition of "The Appraisal of Real Estate," published by the Appraisal Institute, and adopted by Treasury Regulation § 170, as the reasonably probable use of property that results in the highest value, as of the date of the appraisal.

One must consider the facts known as of the valuation date. At the time there was core drilling, lab testing, geological analysis, and market analysis completed and considered. These specific aspects changed the highest and best use of the subject property.

The highest and best use is described by the Appraisal Institute as the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible and results in the highest value. The four criteria of the highest and best use include legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved specific property with respect to the user and timing of the use is adequately supported and results in the highest present value. This determination is not based on quantitative means nor is it a fact to be found, but instead relies heavily on the appraisers' judgment as well as his analytical skill. It is of note that the highest and best use may differ from the existing use when there are existing improvements, or changes such as the discovery of oil or core drilling of other minerals.

The purpose of determining the Highest and Best use for a specific property is to identify the demand for most profitable potential uses, identify demand for particular property types, compare cost and value if specific market criteria are fulfilled, then of the appropriate potential uses to determine the use that produces the maximum value.

**Potential Income From Mining Development**

Our research and analysis of the subject property, reinforced by drill site tests and geologic scrutiny by Richard Capps, PhD, Georgia RPG, SME Registered Geologist of Dr. Capps, Capps Geoscience, LLC, has resulted in the conclusion that the subject property has the potential to become a granite mine. Granite is the rock most often quarried as dimension stone (a natural rock material that has been cut into blocks or slabs of specific length, width, and thickness). Granite is hard enough to resist most abrasion, strong enough to bear significant weight, inert enough to resist weathering, and it accepts a brilliant polish. These characteristics make it a very desirable and useful dimension stone. Most of the granite dimension stone produced in the United States comes from high-quality deposits in five states: Massachusetts, Georgia, New Hampshire, South Dakota, and Idaho. Granite has been used for thousands of years in both interior and exterior applications. Rough-cut and polished granite is used in buildings, bridges, paving, monuments, and many other exterior projects. Indoors, polished granite slabs and

tiles are used as countertops, tile floors, stair treads, and many other practical and decorative features. However, granite is frequently selected because it is a prestige material, used in projects to produce impressions of elegance, durability, and lasting quality. Granite is also used as a crushed stone or aggregate. In this form it is used as a base material at construction sites, as an aggregate in road construction, railroad ballast, foundations, and anywhere that a crushed stone is useful as fill. The high price often reduces the popularity of a construction material, and granite often costs significantly more than man-made materials in most projects, however, granite is most frequently selected due to its durability. [56] The potential income analysis and detailed business plan, as a result of the mining development, was supplied by Dr. Capps, Capps Geoscience, LLC and is provided in the Addenda.

The standard coarse aggregate specific gravity test is ASTM C-127. Specific gravities can vary widely depending upon aggregate type. Typically, aggregate used in Hot Mix Asphalt (HMA) production will have a bulk specific gravity between about 2.400 and 3.000 with 2.700 being fairly typical of granite used for aggregates. The specific gravity for this subject property average 2.66, which is not only good for HMA material but can be good for many other applications, including general purpose stone, stabilized base, general fill, and sub-grade stabilization. [57]

The Resource Valuation Report concludes: "The results of testing three representative samples from the core holes showed that the rock is of excellent aggregate quarry quality."[58]

## Products/Materials Available on the Subject Property

The subject property is located within the eastern Piedmont Physiographic Province and within the Inner Piedmont lithotectonic belt (Gore, 2013). The Inner Piedmont includes rocks that were once portions of islands and sedimentary and volcanic rocks associated with a pre-Atlantic ocean basin (Clark,2008). Due to plate tectonic motions, this basin slowly closed resulting in deformation and regional metamorphism of the older rocks, and during late stages, the Alleghanian Orogeny which formed the southern Appalachian Mountains (Hatcher, 1978). The rocks are metamorphosed to varying degrees by burial and compression which caused changes in pressure and temperature with little change in composition. Although the bulk chemical composition of the rock changed very little during metamorphism, new minerals formed to match the new pressure and temperature conditions. The relative intensity of these metamorphic changes is related to the structural history of the rocks. Most major rock types of the Earth's crust are included in the original pre-metamorphic lithologies of the region. In general, most of the rocks have been deformed (folded, faulted, and/or crushed) and metamorphosed at least four times and each of these deformations correspond to major tectonic events such as continental collisions, rapidly sinking basins, or rising mountains. Towards the end of the Alleghanian Orogeny (about 350 to 270 Ma), granitic plutons were intruded into the previously deformed and metamorphosed rocks. These plutons include the Appling, Ben Hill, Danburg, Elberton, Palmeto-Tyrone, Panola, Sparta, Stone Mountain, and Town Creek plutons (Lawton, 1976, Dallmeyer, 1978, and Dallmeyer, 1981). Geologists

[56] Geology.com/rocks/granite
[57] Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement
[58] Resource Valuation Report, Capps Geoscience, LLC.

determine the geologic history of the region by mapping the surface and subsurface distribution of these rocks, structural elements such as low and high angle faults and folds, and studying the chemistry and mineralogy of the rocks in detail. These studies identify the rock types and geologic settings in which to discover economically productive sources (deposits) of mineral resources such as the crushed stone aggregate and dimension stone resources of the Sparta granite.[59]



Figure 3: Location of the Log Creek quarry project relative to the physiographic provinces of Georgia (modified after Gore et al., 2013). The Log Creek quarry(red star) is located in the Inner Piedmont Province.

---

[59] Resource Valuation Report, Capps Geoscience, LLC.



Figure 4: Location of the Log Creek quarry project relative to the geology of Georgia. The Log Creek quarry project (star on map) is located within granitic gneiss of the Inner Piedmont Province.(USGS OF 2005-1323; Lawton et al., 1976. For complete geologic units and explanation go to http://mrdata.usgs.gov/sgmc/ga.html.

The regional geology is well represented in the subject property's project area. The pre-metamorphic rocks are Late Proterozoic or early Paleozoic in age, and these were metamorphosed up to staurolite-amphibolite grade in the Devonian Period, about 365 million years ago (Dallmeyer, 1978). About 300 million years ago the body of granitic magma that would form the Sparta Granite intruded these metamorphic rocks, and subsequently cooled and solidified. Geologic mapping and geophysical studies estimate that the nearby Elberton granite is over 35 miles (56 km) long, six miles (9 km) wide, and two to three (3.0 to 5.0 km) miles in depth (Cook, 1979) and the Sparta Granite is likely of similar size. The contacts of the Sparta Granite with surrounding wall rocks are

generally sharp. This contact relationship suggests that the magma body rose through the surrounding rocks by diking and displacement rather than being derived from partial melting of the adjoining rocks. The conditions during crystallization of the granite must have been nearly hydrostatic (equal pressure in all directions) because the composition and texture of the Sparta Granite is very uniform throughout its outcrop area. Foliation is most prevalent along the margins of the pluton. These foliations are likely due to late-stage flow foliation within the granite and not metamorphic foliations (Shroeder, 2010). The mineralogical composition of the Sparta Granite includes quartz, oligoclase feldspar, microcline feldspar, and biotite mica. Common accessory minerals are sphene, zircon, allanite, magnetite, and ilmenite-hematite. Locally zones of muscovite mica (light colored) chlorite (light green micaceous mineral) are present. Pegmatitic and aplitic dikes and segregations rarely cut the granite (Watkins, 1902; Dvoracek, 2003).[60]

<u>Weathering and Alteration</u>

In their October 2018 report (Appendix A), GeoLogic, LLC concluded that the overburden thickness in the quarry area varies from five to a maximum of 54 feet and averages about 26 feet thick in the proposed pit area and according to the Resource Valuation Report, Dr. Capps, Capps Geoscience, LLC agrees with these conclusions. This equates to ultimately removing approximately 2.29 million cubic yards of overburden from the 68-acre ultimate pit. Most of the overburden will be incorporated into privacy berms surrounding the plant, quarry, and overburden storage areas. Any remaining overburden will go to the designated overburden storage area at the subject property.[61]

---

[60] Resource Valuation Report, Capps Geoscience, LLC.
[61] Resource Valuation Report, Capps Geoscience, LLC.



Figure 5: Regional geologic map of the Log Creek project area (modified after Georgia Geologic Survey map of 1976). The primary rock type is granite (gr1) and the geologic map shows nearby thin deposits of Eocene sand (Ei), but none was encountered in the core drilling (Appendix A). For complete explanation of geologic units and symbology on the digital map go to: http://mrdata.usgs.gov/sgmc/ga.html

<u>Drilling and Field Work</u>

    To obtain specific subsurface data, exploration of the subject property was conducted in general accordance with ASTM Practice D-420. The subject property was visited on June 6 and June 14, 2018 by GeoLogic, LLC's geologist. Test locations were selected at those times and staked in the field. Drilling activities were performed between October 1 and October 3, 2018. GeoLogic, LLC advanced four (4) rock core borings (B-1 through B-4) as depicted on the map below to termination depths ranging from 65 to 150 feet below existing grades. Typically, to perform coring, steel casing is initially set in the hole and drilled through the overburden soils to prevent caving. All the borings that were

advanced were done so at the bedrock interface, which occurred at depths ranging from 0 to 54 feet below ground surface. Refusal materials are then cored according to ASTM D-2113, using a diamond-studded bit (NQ designated bit, 1-7/8 inches in diameter) fastened to the end of a hollow, double-tube core barrel. The core barrel is rotated at high speeds with cuttings brought to the surface by circulating water. Core samples of the material penetrated are protected and retained in the swivel-mounted inner tube. Upon completion of each core run, the core barrel is brought to the surface, the core recovery is measured, the samples are removed, and the core is placed in boxes for transportation and storage.[62]

The core samples are returned to the laboratory where the materials are identified and the percent core recovery and rock quality designation (RQD) are determined by a geologist. The percent core recovery is the ratio of the sample length obtained to the depth drilled, expressed as a percent. The RQD is obtained by summing up the length of core recovered, including only the pieces of core that are four inches or longer, and divided by the total length drilled. The percent core recovery and RQD are related to the soundness and continuity of the refusal material. Refusal material descriptions and recoveries are shown on the boring records in the Appendix of the Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement. Their locations are indicated on the attached Site and Boring Location Plan. Photographs of the rock cores collected during the sampling program are also included in the Appendix of the Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement. [63]



| Source: | FIGURE 1 | |
| Google Earth | BORING LOCATION PLAN | |
| Project No.: 18-007 | | GeoLogic |
| Scale: As Shown on Figure | Log Creek LLLP Tract | 400 Lovinggood Trail |
| Drawn by: BB | Ogeechee River Road, Warrenton, Warren County, Georgia | Woodstock, Georgia 30189 |
| Date: 10/21/2018 | October 2018 | |

[62] Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement
[63] Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement

Test Procedures and a Key to Symbols and Classifications are found in the appendix of the Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement. A Glossary of Terms used throughout this report is included in the appendix of the Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement. Refusal material descriptions and recoveries are shown on the boring records found in the appendix of the Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement. Some examples of the drilling and rock core that were recovered during drilling are depicted below. [64]



Soil (overburden) was encountered at depths ranging from 0 to 54 feet below the ground surface (feet-bgs) in all the borings. Refusal is a designation applied to any material that cannot be further penetrated by the soil drilling process and is normally indicative of a very hard or dense material, such as boulders, rock lenses, or the upper surface of bedrock. The borings were extended below the top of bedrock using rock

[64] Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement

coring techniques to boring termination depths of 65 to 150 feet below the ground surface. Rock cores recovered ranged from 0 to 150 feet in boring B-1, 54 to 141 feet in boring B-2, 15 to 65 feet in boring B-3, and from 33 to 91 feet in boring B-4 were described as strong to very strong, solid, Granitic Gneiss. The recovery (REC) and RQD of these samples were typically between 14.0% and 100.0%; and the rock was generally harder and less weathered with depth. [65]

Groundwater levels were checked in the borings at the time of exploration. Groundwater was not encountered in borings performed above auger refusal depths. Fluctuation in groundwater may occur with rainfall variation, construction, surface runoff, and other factors. However, it does not appear that groundwater will significantly impact the proposed construction. Groundwater should be expected at deeper depths within the pit area. [66]

<u>Laboratory Testing</u>

Rock cores recovered from the borings performed were subjected to additional laboratory tests to determine the physical properties of the subsurface rock.

The following laboratory tests were performed:

o LA Abrasion Test (AASHTO T-96/ASTM C-131)
o Specific Gravity and Absorption of Coarse Aggregate (AASHTO T-255/ASTM C-127)
o Clay Lumps and Friable Particles in Aggregate (AASHTO T-112/ASTM C-142)
o Aggregate Soundness Test (ASTM C-88)

The test results indicate that the samples obtained meet both Georgia DOT and South Carolina DOT specifications for use as Group II Class A aggregates for both fine and coarse aggregates used in concrete and roadway materials. [67]

| Table 1 – Absorption and Specific Gravity Results | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sample ID | Absorption (%) | Bulk Specific Gravity Dry | Bulk Specific Gravity SSD | Apparent Specific Gravity | Density Oven Dry (lb/ft³) | Density SSD (lb/ft³) | Apparent Density (lb/ft³) |
| Sample 1 | 0.39 | 2.622 | 2.633 | 2.650 | 163.3 | 163.9 | 165.0 |
| Sample 2 | 0.45 | 2.630 | 2.642 | 2.662 | 163.8 | 164.5 | 165.8 |
| Sample 3 | 0.58 | 2.622 | 2.637 | 2.662 | 163.2 | 164.2 | 165.8 |

The American Society for Testing Materials (ASTM) develops their standards through a consensus of its members and these standards are used throughout the world. The American Association of State Highway Officials (AASHTO) is a standards-setting

---

[65] Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement
[66] Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement
[67] Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement

body which publishes specifications, test protocols, and guidelines and are used in highway design and construction throughout the United States. The AASHTO also represents not only highways, but air, rail, water, and public transportation as well. Furthermore, the AASHTO develops its standards by subcommittees with representation from Departments of Transportation across America as well as the Federal Government. It is not uncommon for AASHTO Standards to reference an ASTM standard, thereby making it essentially a part of their specification, which allows those AASHTO accredited labs to test multiple states by following those standards.

In the following analysis, the term "aggregate" is used to identify all classes of crushed stone used in construction materials.

## LA Abrasion

The Los Angeles (L.A.) abrasion test is a common test method used to indicate aggregate toughness and abrasion characteristics. Aggregate abrasion characteristics are important because the constituent aggregate in hot mix asphalt (HMA) must resist crushing, degradation and disintegration in order to produce a high quality HMA. Aggregates undergo substantial wear and tear throughout their life. In general, they should be hard and tough enough to resist crushing, degradation and disintegration from any associated activities including manufacturing, stockpiling, production, placing and compaction. Furthermore, they must be able to adequately transmit loads from the pavement surface to the underlying layers and eventually the sub-grade. Aggregates not adequately resistant to abrasion and polishing may cause premature structural failure and/or a loss of skid resistance. There is no federal standard L.A. abrasion specification for Superpave mix design; specifications are typically established by state or local agencies. Typically, U.S. state specifications limit the abrasion of coarse aggregate for HMA use to a maximum ranging from 25.0% to 55.0%, with most states using a specification of 40.0% to 45.0%. The LA abrasion test yielded an average of 42.0%.

**The average value for this property of coarse aggregates is 42.0%**.

Typical L.A. Abrasion loss values for granite range from 27.0% to 49.0% (by percent weight). The standard utilized by most states is AASHTO T96 or ASTM C131: Resistance to Degradation of Small-Size Coarse Aggregate by Abrasion and Impact in the Los Angeles Machine.

## Coarse Aggregate Specific Gravity

Aggregate specific gravity is needed to determine weight-to-volume relationships and to calculate various volume-related quantities such as voids in mineral aggregate (VMA), and voids filled by asphalt (VFA). The standard coarse aggregate specific gravity test is ASTM D854. Specific gravities can vary widely depending upon aggregate type. Typically, aggregate used in Hot Mix Asphalt (HMA) production will have a bulk specific gravity between about 2.400 and 3.000 with 2.700 being fairly typical of granite used for aggregates.

**The specific gravity average for this property is 2.66, which is not only good for HMA material but also good for many other applications.**

## Soundness Test

The soundness test (AASHTO T-104, ASTM C-88) determines an aggregate's resistance to disintegration by weathering and, in particular, freeze-thaw cycles. The most common soundness test involves repeatedly submerging an aggregate sample in a saturated solution of sodium or magnesium sulfate. This process causes salt crystals to form in the aggregate pores, which simulate ice crystal formation. The basic procedure is as follows (from Roberts et al., 1996[1]): (1) Oven dry the sample and separate it into specific sieve sizes. (2) Immerse the sample in a saturated solution of sodium or magnesium sulfate and let it remain at a constant temperature for 18 hours. (3) Remove the sample from the solution and dry to a constant weight at $110 \pm 5oC$ ($230 \pm 9oF$). (4) Repeat this cycle five times. (5) Wash the sample to remove the salt; then dry. (6) Determine the loss in weight for each specific sieve size and compute a weighted average percent loss for the entire sample. GDOT specification is less than 15.0%.

**This property has a Magnesium Sulfate Soundness loss of 0.25%.**

A review of all test results indicates the granite material passes the Georgia Department of Transportation standards for use in all coarse aggregate applications. Since Departments of Transportation have the most stringent test requirements and the materials do meet DOT standards, they also meet the specifications and requirements for general construction applications, they can and will be used as such.

## Reserve Estimate

The acreage owned or leased cannot typically be mined completely. Setbacks from easements, roads, property lines, pit slope angles, excessive overburden, and non-mine related areas of the property (e.g., plant, stockpiles, ramps, access roads, etc.) reduce the available acreage for mining. This subject property is uniquely positioned such that there is excellent access to highways for transporting the mined material to market. For the subject property's proposed quarry site, it was estimated that of the available 240 acres, approximately 70± acres on the tract are mineable. Additional investigation of areas further south and southwest of previously examined parts of the site could change this estimate (up or down). This reserve estimate is based on the assumption that the quarry depth will extend to approximately 100 feet below competent bedrock. [68]

It is likely that the quarry could be extended to much greater depths depending on the quarry plan and other factors outlined above. Based on drill log data, the proven/probable proven volume is predicated on a quarry with a depth of 150 feet below the top of bedrock. As noted previously, a variable overburden thickness is present at the site with soils above bedrock ranging from 0 to 54 feet. Removal and possible reuse (e.g., reclamation) or sale of this material is an alternative rather than disposal. The average specific gravity of the rock of 2.66 was estimated from laboratory testing. The resultant unit weight of the rock is estimated at 165 pounds per cubic foot (pcf), from this, the

---

[68] Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement

calculated volume-tonnage conversion factor for the rock is 3,594 short tons per acre per foot (tpa-ft). The following table summarizes the estimated reserves. [69]

| Description | Quantity |
|---|---|
| Approximate Overburden (cubic yards) | 2,823,333 |
| Proven/Probable Proven (short tons) | 37,737,000 |
| Reserve Statement (short tons) | 21,384,300 |

Table 1 – Reserve Estimate

The Reserve Statement represents the minimum quantity of rock available in the proposed quarry and includes a loss factor of 15.0% to account for material lost during crushing, washing, and screening, internally used material, poor-quality rock, and wasted material, as well as nonsalable fines.

Of note, according to the Resource Valuation Report prepared by Dr. Capps, Capps Geoscience, LLC, the 85-million-ton resource within the ultimate 68-acre pit is a conservative estimate of measured (36.4 million tons) and indicated (48.6 million tons) aggregate resource at the subject property's quarry site. However, as noted above, the Proven/Probable Proven (short tons) is 37,737,000 tons. In 2020 Log Creek LLLP requested a Surface Mining Land Use Plans report from GeoLogic, LLC, in order to obtain a detailed mine plan of the subject property. As presented below, the mine plan detailed 36,240,000 tons of rock to a depth of 200 feet from the top of rock. Further, Log Creek, LLLP asked GeoLogic, LLC if it were possible to mine the subject property deeper based on the mines in the area, based on their depths, and the geology of the area. GeoLogic, LLC stated: "GeoLogic, LLC recommends a maximum of 50,000,000 short tons of mineable reserve. This revised estimate is based on a revision to the mine plan to consider resource that is available from elevation 200 to elevation 100 (an additional two, 50-foot benches)." For the purpose of this report, a maximum of 50,000,000 short tons of mineable reserve will be considered.

---

[69] Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Statement

| Description | Quantity |
|---|---|
| Approximate Overburden (cubic yards) | 2,290,000 |
| Measured Resource (short tons) | 36,478,015 |
| Indicated Resource (short tons) | 48,637,354 |
| Total Resource (short tons) | 85,115,369 |
| Proven Reserve (short tons) | 31,006,313 |
| Probable Reserve (short tons) | 41,341,751 |
| Total In-Place Reserve (short tons) | 72,348,063 |
| Mineable Reserve (short tons)* | 50,000,000 |

Table 1 – Reserve Estimate (Aggregate)

*The In-Place Reserve and Mineable (Proven) Reserve outlined in Table 1 is based on a quarry depth of 300 feet inclusive of bench levels 450 to 150 feet. The overall mine plan was assumed to a depth of 300 feet, thus the Mineable Reserve of 50,000,000 tons as shown on Sheet C-01 of the surface mine plans (if the quarry were extended to the top of the 150-foot bench level). This estimate includes both measured and indicated reserves.

| Description | Quantity |
|---|---|
| 450-foot BL | 10,410,000 |
| 400-foot BL | 9,530,000 |
| 350-foot BL | 8,690,000 |
| 300-foot BL | 7,880,000 |
| 250-foot BL | 7,110,000 |
| 200-foot BL | 6,380,000 |
| Total Mineable Reserve (short tons) | 50,000,000 |

Table 2 – Mineable Reserve Estimate (by BL)

















**Legally Permissible**

The subject property consists of 240.00 acres and is located along the north side of Warren County Road 58, just south of Mayfield Road in Warren County, Georgia. The surrounding area primarily consists of agricultural land uses. The concentration of population and supportive commercial and industrial development is located in Warrenton, Georgia to the northeast, Thomson, Georgia to the northeast, Milledgeville, Georgia to the southwest, and Augusta, Georgia to the northeast.

As detailed in the Zoning section of this report, the subject property is currently zoned FOR-AG Forestry-Agriculture District. The Forestry-Agriculture (FOR-AG) district covers the vast majority of the county and establishes a large minimum lot size (25 acres) for the subdivision of property in order to prevent the subdivision of land for residential use, and to maintain viable tract sizes for agriculture and timber harvesting. According to Mr. Paul W. Hitchcock, Hitchcock & Hitchcock, P.C., a fair analysis of the Warren County Land Use Ordinance supports the approval of a conditional use permit for a granite quarry on the subject property. There is no financial public benefit to restricting the subject property to an agricultural use. The Owner and the general public will benefit from the increase in jobs and taxes that a mining operation would bring. The local laws and land use ordinances will reduce any potential negative impacts that the mining operation may bring, especially given the sparsely populated area in which the subject property lies. From a land use perspective, the proposed conditional use is proper; therefore, it is likely that the conditional use permit will be approved.

Of note, according to the Warren County Tax Assessor's Office, this parcel has been in a Forest Land Protection Act (FLIPA) covenant since 2011 with an ending date of 2021. According to Ms. Laurie Abbott, Warren County Chief Appraiser, to breach the FLIPA on parcels 016-026 and 016-027, the owner would also have to breach the FLIPA on parcels 016-028, 026-023, and 026-024. The estimated cost to breach the FLIPA in 2018 would be approximately $203,570.53. According to the Warren County Chief Appraiser, the Forest Land Protection Act is easily broken; the cost to breach the FLIPA is included in the year one start-up costs. The existence of the Forest Land Protection Act does not hinder or affect the Legally Permissibility of the subject property as a granite mine.

Therefore, it is reasonably probable the Highest and Best Use based on the information available and provided by the Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource/Reserve Estimate prepared by GeoLogic, LLC as well as the Resource Valuation Report, prepared by Dr. Capps, Capps Geoscience, LLC, before the conservation easement of the 240.00 acres to be encumbered by the conservation easement, is as a granite mine. Further, based on the above, it is reasonably probable the subject property's Highest and Best Use as a granite mine would be permitted.

There are a variety of uses (based on the reasonably probable conditional use permit being approved), including the potential Highest and Best Use of the subject property before the conservation easement as a granite mine. Therefore, there are not any zoning limitations that would hinder the subject property to be utilized as a mining operation.

Although, the immediate area consists of primarily agricultural properties, several mines are located in Warren County and the surrounding the area, including the Warrenton Quarry owned by Martin Marietta Materials Inc. just south of Warrenton, Georgia and the Warren County Quarry owned by CRH PLC located north of Warrenton, Georgia. Furthermore, there are several mines and dimension stone quarries in the regional area. These mines are located in a primarily residential and agricultural area, demonstrating the acceptance of mining in the surrounding area. Further, the subject property has no legal deed restrictions for operation as a granite quarry.



*Image provided by Google Maps*

The State of Georgia requires mining permits for any mining operations in order to comply with federal, state, and local regulations. Government regulations are necessary for mining operations in order to protect the environment and citizenry as well as the safety of the workers. Several properties in the surrounding area have been previously developed with mining uses, validating the obtainability of the necessary permits.

Predicated on the stated regulations of Warren County it is reasonably probable all necessary permits to operate a granite mine on the subject property can be obtained. This is in accordance with the Resource Valuation Report prepared by Dr. Capps, Capps Geoscience, LLC, and included in the Addenda, which states: "The property is zoned FOR-AG (Forestry-Agriculture District) and, according to Warren County zoning codes, mining is allowed in FOR-AG zoned lands with a conditional use permit. Community opposition to the quarry seems unlikely because there are existing aggregate quarries in the area. The author's opinion is that it is reasonably probable that the Conditional Use

Permit (CUP) will be obtained from Warren County to operate the quarry. In the author's opinion, the subject property's quarry will be permitted as an active mine with the Surface Mining Unit of the Georgia Environmental Protection Division. In addition, in the author's opinion it is reasonably probable that the storm water and air emission permits will be granted for the subject property's quarry." Therefore, the subject property could be legally used for granite mining based on the nature of the region.

The analysis herein validates the legally permissible use of the subject property as a granite mine based on the reasonable probability of a conditional use permit being granted by the planning commission that would allow for a mining operation by Warren County and the lack of legal deed restrictions.

**Physically Possible**

The physical characteristics of a site affecting its possible use(s) include, but are not limited to, location, street frontage, size, shape, street access, availability of utilities, easements, soils and subsoils, and topography.

The subject property is considered to have an average shape. The subject property is just south of Mayfield Road; thus, the subject property has average accessibility to major highways in the region. Specifically, there is accessibility to the subject property from Warren County Road 58. According to Ben Black, P.G., the owner could legally improve its interior roads to be load bearing ready.

The subject property has a gently rolling topography and is currently wooded and open land. According to Flood Insurance Maps (FIRM) 13301C0175B, dated July 22, 2010, the subject property is located within Zone X, an area not prone to flooding. Based on mapping provided by GeoLogic, LLC, there are a few streams running through the subject property. According to Mr. Ben Black, GeoLogic, LLC, as currently designed, the quarry and the operations of the plant will avoid wetlands to the extent practical. The creek crossings needed to place the rail loop track will be permitted under a U.S. Army Corps of Engineers Nationwide Permit (PCN 44) for installation of pipe culverts. As such, there are no expected wetlands mitigation costs associated with this quarry. However, for the purpose of this report, a wetland contingency of $500,000 has been budgeted and included in the year one start-up costs. Therefore, any potential wetlands or streams on-site are not considered to affect the highest and best use of the subject property as a granite mine. No soils or sub-soils are known to adversely affect the development potential of the subject property.

According to the geological report in the Resource Valuation Report by Dr. Capps, Capps Geoscience, LLC and the core drilling, substantial granite resources are located on the subject property. Therefore, the subject property has the characteristics and the ability to be a granite mine.

There are a variety of physically possible uses for the subject property, due to the subject property's location that would conform with the subject property's location, size, shape, soils and subsoils, and topography, including a granite mine.

The geological report that provides evidence of significant granite reserves and the subject property's proximity to transportation routes as well as other mining operations substantiates the physically possible use of the subject property as a granite mine.

**Financially Feasible**

The subject property is located in an area comprised primarily of rural/agricultural/recreational land use. There is residential development to the south of the subject property surrounding the City of Elberton, northeast of the subject property in Warrenton, and east of the subject property surrounding the City of Greenwood, but the primary population epicenter is northeast of the subject property in Greenville, South Carolina, southwest in the City of Athens, Georgia, and southeast of the subject property in Augusta, Georgia. Directly surrounding the subject property, there are some agricultural uses, but is mostly wooded land. The State of Georgia has several programs in place to expand job growth in the region. Based on the Hierarchy of Economic Development, job growth will lead to an increased demand for housing, commercial development and infrastructure.

**Domestic Production and Use**

According to the U.S. Geological Survey, Mineral Industry Surveys, Second Quarter 2018, an estimated 393 million metric tons (Mt) of crushed stone was produced and shipped for consumption in the United States in the second quarter of 2018, an increase of 7% compared with that of the second quarter of 2017. The five leading States, in descending order of production for consumption, were Texas, Pennsylvania, Florida, North Carolina, and Ohio. Their combined total production for consumption in the second quarter of 2018 was 129 Mt and represented 33% of the U.S. total. Production for consumption in the first 6 months of 2018 increased by 3% compared with that of the same period of 2017

Furthermore, the estimated U.S. output of construction sand and gravel produced and shipped for consumption in the second quarter of 2018 was 265 Mt, an increase of 6% compared with that of the second quarter of 2017. The five leading States, in descending order of production for consumption, were California, Texas, Arizona, Michigan, and Washington. Their combined total production for consumption in the second quarter of 2018 was 97.2 Mt and represented 37% of the U.S. total. Production for consumption in the first 6 months of 2018 increased by 7% compared with that of the same period of 2017.

Finally, an estimated 658 Mt of total construction aggregates was produced and shipped for consumption in the United States in the second quarter of 2018, an increase of 7% compared with that of the second quarter of 2017. The five leading States, in descending order of production for consumption, were Texas, California, Pennsylvania, Florida, and Ohio. Their combined total production for consumption in the second quarter of 2018 was 196 Mt and represented 30% of the U.S. total. Production for consumption in the first 6 months of 2018 increased by 5% compared with that of the same period of 2017. The above estimates are based on information reported to the U.S. Geological Survey (USGS) on its quarterly sample survey by construction aggregates producers.

**TABLE 1**

**CRUSHED STONE SOLD OR USED BY PRODUCERS IN THE UNITED STATES, BY DIVISION[1, 2]**

(Thousand metric tons and thousand dollars)

| | 2017 | | | | | | 2018 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Quantity | | | | | Value | Quantity | Percent | Quantity | Percent |
| Region/Division | 1st qtr. | 2d qtr. | 3d qtr. | 4th qtr. | 1st–4th qtr.[3] | 1st–4th qtr.[3] | 1st qtr. | change[4] | 2d qtr. | change[4] |
| Northeast: | | | | | | | | | | |
| New England | 2,580 | 11,500 | 14,900 | 10,100 | 39,000 | 495,000 | 2,620 | 1.8 | 12,500 | 9.3 |
| Middle Atlantic | 18,800 | 41,400 | 44,900 | 35,900 | 141,000 | 1,790,000 | 17,600 | -6.4 | 43,300 | 4.6 |
| Midwest: | | | | | | | | | | |
| East North Central | 28,300 | 55,600 | 64,900 | 52,200 | 201,000 | 1,890,000 | 27,700 | -1.9 | 57,800 | 4.0 |
| West North Central | 23,800 | 39,900 | 42,100 | 32,300 | 139,000 | 1,330,000 | 21,900 | -7.9 | 38,700 | -3.0 |
| South: | | | | | | | | | | |
| South Atlantic | 68,900 | 81,800 | 83,300 | 77,600 | 310,000 | 4,510,000 | 65,400 | -5.0 | 88,900 | 8.8 |
| East South Central | 25,800 | 34,500 | 37,700 | 34,800 | 133,000 | 1,560,000 | 24,900 | -3.3 | 38,300 | 11.0 |
| West South Central | 55,400 | 61,200 | 59,900 | 56,100 | 233,000 | 2,430,000 | 54,900 | -0.9 | 65,500 | 7.1 |
| West: | | | | | | | | | | |
| Mountain | 13,200 | 16,200 | 19,100 | 14,400 | 71,100 | 605,000 | 13,800 | 4.7 | 17,300 | 6.8 |
| Pacific | 14,000 | 21,100 | 24,900 | 22,100 | 82,100 | 827,000 | 17,900 | 27.9 | 25,700 | 21.7 |
| Total[5] | 257,000 | 366,000 | 391,000 | 341,000 | 1,350,000 | 15,600,000 | 251,000 | -2.4 | 393,000 | 7.3 |

[1]Quarterly totals shown are estimates based on a sample survey. Estimated quantities for prior quarters have been recalculated.

[2]Sales region equivalent to U.S. Census Bureau Geographic Division as follows: New England (CT, MA, ME, NH, RI, VT); Middle Atlantic (NJ, NY, PA); East North Central (IL, IN, MI, OH, WI); West North Central (IA, KS, MN, MO, NE, ND, SD); South Atlantic (DE, FL, GA, MD, NC, SC, VA, WV); East South Central (AL, KY, MS, TN); West South Central (AR, LA, OK, TX); Mountain (AZ, CO, ID, MT, NM, NV, UT, WY); Pacific (AK, CA, HI, OR, WA).

[3]Data may not add to totals shown because of independent rounding and differences between projected totals by States and by divisions.

[4]Compared with same period of preceding year; all percentages are calculated using unrounded totals.

[5]Includes all 50 States.

**TABLE 5**

**AGGREGATES SOLD OR USED BY PRODUCERS IN THE UNITED STATES, BY DIVISION[1, 2]**

(Thousand metric tons and thousand dollars)

| | 2017 | | | | | | 2018 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Quantity | | | | | Value | Quantity | Percent | Quantity | Percent |
| Region/Division | 1st qtr. | 2d qtr. | 3d qtr. | 4th qtr. | 1st–4th qtr.[3] | 1st–4th qtr.[3] | 1st qtr. | change[4] | 2d qtr. | change[4] |
| Northeast: | | | | | | | | | | |
| New England | 4,260 | 19,700 | 24,600 | 18,000 | 78,500 | 853,000 | 4,790 | 12.5 | 20,700 | 5.1 |
| Middle Atlantic | 25,900 | 55,400 | 58,900 | 47,500 | 188,000 | 2,270,000 | 23,900 | -7.7 | 56,300 | 1.5 |
| Midwest: | | | | | | | | | | |
| East North Central | 39,700 | 86,800 | 102,000 | 80,600 | 336,000 | 2,860,000 | 38,800 | -2.3 | 91,600 | 5.5 |
| West North Central | 33,400 | 73,800 | 88,600 | 61,000 | 258,000 | 2,070,000 | 30,700 | -8.0 | 69,700 | -5.6 |
| South: | | | | | | | | | | |
| South Atlantic | 82,900 | 98,100 | 99,400 | 93,400 | 373,000 | 5,100,000 | 80,000 | -3.5 | 107,000 | 9.6 |
| East South Central | 30,600 | 41,700 | 45,800 | 41,500 | 171,000 | 1,830,000 | 29,300 | -4.3 | 46,500 | 11.6 |
| West South Central | 83,900 | 91,600 | 88,300 | 85,200 | 349,000 | 3,590,000 | 84,700 | 1.0 | 100,000 | 9.6 |
| West: | | | | | | | | | | |
| Mountain | 41,600 | 67,000 | 73,100 | 59,100 | 249,000 | 2,050,000 | 46,600 | 12.0 | 73,200 | 9.2 |
| Pacific | 39,500 | 63,600 | 71,100 | 64,700 | 239,000 | 2,530,000 | 50,500 | 27.9 | 71,800 | 13.0 |
| Total[5] | 410,000 | 615,000 | 660,000 | 573,000 | 2,260,000 | 23,400,000 | 415,000 | 1.2 | 658,000 | 6.9 |

[1]Quarterly totals shown are estimates based on a sample survey. Estimated quantities for prior quarters have been recalculated.

[2]Sales region equivalent to U.S. Census Bureau Geographic Division as follows: New England (CT, MA, ME, NH, RI, VT); Middle Atlantic (NJ, NY, PA); East North Central (IL, IN, MI, OH, WI); West North Central (IA, KS, MN, MO, NE, ND, SD); South Atlantic (DE, FL, GA, MD, NC, SC, VA, WV); East South Central (AL, KY, MS, TN); West South Central (AR, LA, OK, TX); Mountain (AZ, CO, ID, MT, NM, NV, UT, WY); Pacific (AK, CA, HI, OR, WA).

[3]Data may not add to totals shown because of independent rounding and differences between projected totals by States and by divisions.

[4]Compared with same period of preceding year; all percentages are calculated using unrounded totals.

[5]Includes all 50 States.



Figure 1. Percentage change in the quantity of construction aggregates produced and shipped for consumption in the United States each quarter from 2005 through 2017. All comparisons are versus the same quarter of the prior year.



Figure 2. Estimated annual output of construction aggregates produced and shipped for consumption in the United States from 1945 through 2017.

## **Aggregate Demand Generators Impacting the Subject Property**

Granite is a light-colored igneous rock with grains large enough to be visible with the unaided eye. It forms from the slow crystallization of magma below the Earth's surface. Granite is composed mainly of quartz and feldspar with minor amounts of mica, amphiboles, and other minerals. This mineral composition usually gives granite a red, pink, gray or white color with dark mineral grains visible throughout the rock.

Granite is the best-known igneous rock. Many people recognize granite because it is the most common igneous rock found at the Earth's surface and because granite is used to make many objects that we encounter in daily life. These include counter tops, floor tiles, paving stone, curbing, stair treads, building veneer, and cemetery monuments. Granite is the rock most often quarried as dimension stone (a natural rock material that has been cut into blocks or slabs of specific length, width, and thickness). Granite is hard enough to resist most abrasion, strong enough to bear significant weight, inert enough to resist weathering, and it accepts a brilliant polish. These characteristics make it a very desirable and useful dimension stone. Most of the granite dimension stone produced in the United States comes from high-quality deposits in five states: Massachusetts, Georgia, New Hampshire, South Dakota, and Idaho. Granite has been used for thousands of years in both interior and exterior applications. Rough-cut and polished granite is used in buildings, bridges, paving, monuments, and many other exterior projects. Indoors, polished granite slabs and tiles are used in countertops, tile floors, stair treads, and many other practical and decorative features. Granite is frequently selected because it is a prestige material, used in projects to produce impressions of elegance, durability, and lasting quality. Granite is also used as a crushed stone or aggregate. In this form it is used as a base material at construction sites, as an aggregate in road construction, railroad ballast, foundations, and anywhere that a crushed stone is useful as fill. The high price often reduces the popularity of a construction material, and granite often costs significantly more than man-made materials in most projects, however, granite is most frequently selected due to its durability. [70]

The subject property has the requisite characteristics for a granite mining development as evidenced by the significant presence of substantial granite as verified by the geological survey testing and sampling. The Resource Valuation Report prepared by Dr. Capps, Capps Geoscience, LLC included in the Addenda illustrates the financial feasibility of a granite mining development on the subject property.

According to Vulcan Materials Company there is a list of the factors that will drive future demand for aggregates and thereby driving the future supply of aggregates. On the demand side, these include:

- A growing population of 400 million by 2043, according to the U.S. Census.

- An increase in non-residential construction such as stores, offices, schools and government buildings driven by the increasing population; a decline in the number of people per household, and new home development and the replacement of structurally

---

[70] Geology.com/rocks/granite

sound buildings with more energy efficient and technologically advanced ones (i.e., configured for advanced computer networks).

- An aging, baby boomer population with increased demand for second homes along with the need for more long- and short-term health care facilities and more elderly friendly multifamily developments.

- Aging infrastructure of all types that will need to be upgraded and/or replaced. In particular, highways, roads, ports and rail facilities will be required to handle increased car and truck traffic along with increased imports and exports.

- An increase in the use of Portland cement concrete in the construction of both residential and non-residential buildings due to concrete's resistance to wind damage, environmental efficiency and construction flexibility.



*Most recent graph available*

Additionally, population is increasing in the region as new highway projects are on the horizon, new business development is rebounding in the region and transportation in and out of the region is not limited, thereby validating the potential need for increased aggregate production. Further evidence is provided in the Dr. Capps, Capps Geoscience, LLC Resource Valuation Report, which states: "Industry sources and population data indicate that the subject property quarry's market area has a current need for about

3,226,820 tons of crushed stone per year and a projected need for about 4,033,332 tons per year by 2030."

In summary, the subject property's marketing area for granite is Georgia and South Carolina. Transportation of the granite to the various markets can be accomplished in bulk loads by truck and rail. The system of roadways leading to and from the subject property is extensive with U.S. Highway 278 located just northeast of the subject property and Interstate 20 located just north of the subject property.

The Discounted Cash Flow Approach indicates a granite mining development, such as the subject property, is capable of producing a positive net income. Therefore, granite mining meets the financially feasible requirement.

## Maximally Productive

In order to determine the type of development that would result in maximum productivity from the subject property, an analysis was performed. There are physically possible and legally permissible uses that could produce a positive cash flow such as residential development with large tracts of natural forest and recreational amenities, forestry or agricultural uses, or hunting grounds and associated recreational uses. The chart below provides a sampling of recreational land sales in Alabama, Georgia and South Carolina from 2015 to 2018.

| Recreational Land | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 | Sale 7 |
| Location | Bulloch Co., GA | Newton Co., GA | Walton Co., GA | Bibb Co., AL | Franklin Co., AL | Williamsburg Co., SC | Choctaw Co., AL |
| Date of Sale | 8/23/2018 | 4/12/2016 | 3/1/2016 | 12/16/2015 | 5/14/2015 | 4/30/2015 | 2/3/2015 |
| Price | $355,000 | $1,137,500 | $379,500 | $205,000 | $253,000 | $140,000 | $55,000 |
| Size (Acres) | 114.81 | 218.05 | 122.00 | 108.00 | 240.00 | 53.20 | 47.00 |
| Price/Acre | $3,092 | $5,217 | $3,111 | $1,898 | $1,054 | $2,632 | $1,170 |
| Use | Recreation | Recreation | Recreation | Recreation/Hold | Recreation | Recreation | Recreation |

Current market conditions in eastern Georgia and Warren County, indicate a limited demand and price point for the residential and recreational properties for the aforementioned property types in today's market compared to the anticipated demand for supportive building materials. Based on the definition of maximally productive, the selected land use must yield the highest value of the possible uses.[71] As provided above, there are several possible uses that are legally permissible, physically possible, and potentially financially feasible; however, it is the appraisers' opinion based on the core drillings, geological analysis, and market study, the use that yields the highest value of the land and the highest and best use of the subject property is as a granite mine. As presented in the Discounted Cash Flow section found later in this report, a granite mine, such as the subject property, is capable of producing a significantly higher positive net income. Furthermore, due to the amount and quality of the granite found on the subject property and the positive net income indicated by the DCF, the result is a superior return to the cost of the investment; higher than any other physically possible, legally permissible, and financially feasible use. Therefore, a granite mine is considered to be the maximally productive use of the subject property.

[71] *The Dictionary of Real Estate*, Fifth Edition, page 124

**Conclusion**

The foregoing Highest and Best Use analysis is used to establish the basis for valuation and demonstrate the most feasible use of the subject property. The subject property could be used for residential development, forestry uses or hunting grounds and associated recreational uses. Projected population and economic growth in the area will increase the demand for properties with commercial aggregate reserves, thus making the development of said property types more economically feasible. Furthermore, as presented throughout this report, the subject property has sufficient granite resources for a mine.

Due to the granite reserves on the subject property and considering the foregoing possible land uses compared to developing the subject property as a granite mine; the greatest return on the land under current market conditions is a granite mine development. This conclusion is based on granite resources being present in sufficient quantity to initiate and sustain production, and that it is technically feasible to extract the materials, is legal to mine, continue to mine, or to expand the mine at this location, and that it is economically feasible to exploit the granite resources at this location.

When determining the value of the subject property pre-conservation easement, the appraisers must consider the current use of the subject property as well as objectively assess the likelihood that the subject property would be developed absent the conservation easement restriction. As detailed throughout this report, there are proven resources on the subject property, and market demand for the resources due to their quality, as referenced by the geological studies, independent lab results, various market information, and the Resource Valuation Report provided by Dr. Capps, Capps Geoscience, LLC. Due to the proven resources on the subject property, the quality of the resources, and the market demand for the resources it is reasonably probable that the subject property, absent the restrictions of the conservation easement, would be developed as indicated by the Highest and Best Use conclusion before the conservation easement.

Based on current market conditions, the subject property's location and the abundance of granite reserves on the subject property, the highest and best use of the subject property is as a granite mine.

### 6.3.2. Approaches to Value

#### 6.3.2.1. Income Approach (Potential Granite Mining Development)

Mining facilities are unique and differ greatly in their characteristics, location, the type of product mined and the remaining economic life of the mine. The potential buyer must assimilate a variety of information and often makes a decision with little specific data provided by the mine owner, since it is considered confidential. Generally, the decision to purchase a mine is based on remaining deposits, grades of material, and the cost to mine and process the resource and other known data that is applicable to the Income Approach. Primary considerations when valuing a mine are cash flows both potential and actual, royalties, current market conditions and physicality of the mine. Within the Income Approach, the Discounted Cash Flow Analysis is the preferred

methodology as opposed to the capitalization of income since mining operations are not static and have a finite economic life. This is further supported in the article *Valuation Methodologies for Mines and Mineral Tenements* by Trevor R. Ellis, CMA, CPG, M. AusIMM; Ellis International Services, Denver, CO as published in the newsletter, American Institute of Minerals Appraisers, Vol. 1, No. 5, December 1995, page 1, where "Resource finance consultant, J. Ballard, and other authors discuss discounted cash flow (DCF) methodologies and net present value (NPV). They all recommend DCF as the primary method for valuing operating mines, or mineral assets with at least indicated resources and some form of feasibility study containing engineering, production and capital and operating cost data.

As stated earlier in this report, it is the appraisers' opinion, due to the professional reports provided, the subject property is classified as a Development Property with a Pre-Feasibility Study completed at a minimum as of the date of this appraisal. Therefore, the DCF valuation methodology was relied upon for this appraisal report. Of note, the appraisers recognize that the Sales Comparison Approach should be utilized when it is feasible to do so. However, as is the case with this appraisal report, an inherent weakness of the Sales Comparison Approach for mining developments hinges on the complexity of multi-property and speculative sales. Many of the sales associated with mining development include differing physical characteristics or mineral resources. Much of the information required to adequately analyze the sale, such as quantity and quality of reserves or annual production volume and the value of equipment are typically considered confidential and propriety, thereby shielded from public knowledge. The appraisers analyzed sales of mining properties as well as mergers and acquisitions of mining companies. It is the appraisers' opinion that the development of the Sales Comparison Approach may provide a misleading value and thus was not utilized within this appraisal report.

The Discounted Cash Flow methodology identifies market conditions investors are anticipating as of the date of value and is an appropriate tool for valuing any pattern of regular or irregular income. The Discounted Cash Flow analysis is a procedure in which a yield rate is applied to a set of income streams and a reversion to determine whether the investment property will produce a required yield given a known acquisition price. If the rate of return is known, the Discounted Cash Flow analysis can be used to solve for the present value of the property. If the property's purchase price is known, the Discounted Cash Flow analysis can be applied to find the rate of return. Investors typically employ a Discounted Cash Flow Analysis (DCF) on properties like the subject property and require a minimum of five years of reserves before investing in a mining development. Ultimately, it is the NOI margin that determines what an investor is willing to pay for such a property.

Because subsurface minerals can never be fully and absolutely quantified until they are extracted and because mines have a finite economic life there are multiple variables to consider when estimating the value of a mining development. Therefore, the Discounted Cash Flow methodology is the preferred method since it is appropriate for irregular income. The DCF method is also a commonly used, market accepted method for valuing mining properties in development and production, considering the finite life of a mine and the well-established market for commodities. The appropriateness of the Discounted Cash Flow Analysis in valuing mining properties is based on the following: resources deplete over time, allows the forecasting of production, takes into consideration the time

value of money, pricing and operating costs, and allows the calculation of the discount rate.

In summation, the Discounted Cash Flow Analysis is utilized to provide an estimate of Market Value of the subject property. The Market Value derived from the Discounted Cash Flow Analysis is estimated utilizing the potential income from mining operations, the expenses, and the net income levels over a projection period. The Value by the Discounted Cash Flow Analysis is estimated by adding the present value of the projected income streams and the present value of the reversion. The assumptions employed in the Discounted Cash Flow Analysis are discussed further below. It should be noted that a reversionary value was not included in this analysis. The subject property at the end of the projected Discounted Cash Flow Analysis would have value due to the additional reserves; however, based on the principle of conservatism, the reversionary value was not included.

### U.S. Stone Market Overview

This section contains retroactive market information as was available in December 2018.

The US Stone Mining industry consists of companies that advance mine sites, excavate and quarry dimension stone (i.e. rough blocks or slabs of stone), mine and quarry crushed and broken stone (such as granite and limestone), or beneficiate stone by crushing, grinding, washing, screening, pulverizing, and sizing. The principal product sold by the Stone Mining industry is crushed stone which is primarily used as aggregate in infrastructure, residential, and nonresidential construction projects.



Figure 9: US Stone market products and services segmentation for 2018. It is estimated that 67.8% of the overall US Stone market is made up of crushed limestone and dolomite.

The Stone Mining industry is firmly rooted in the US economy, generating critical base materials for a wide range of construction industries. This industry mines a range of rock types, including granite, limestone, sandstone, basalt, trap rock, pumice, and talc. The majority of these rocks are crushed and transported for use in downstream construction and manufacturing markets. Crushed stone is used as aggregate in foundations for infrastructure, road base, and buildings. Crushed stone is also an input to cement, concrete products, and personal consumer goods. The dimension stone produced by the industry includes high-quality cut and treated stone products, such as marble and slate, which are used in building applications like kitchen countertops, tile, and pavers. The US Stone Quarrying industry is estimated to account for about 90% of the volume of domestic supply of stone. The remaining 10% is generated by sand and gravel aggregate producers, road construction companies through recycling, and companies operating in the nonmetallic mineral product industries.[72]

---

[72] Burgex Inc. Mining Consultants

| US Stone Mining Revenue Outlook (Revised 2018) | | |
|---|---|---|
| Year | Revenue (millions) | Growth |
| 2019 | 16,510.4 | 1.6 |
| 2020 | 16,773.5 | 1.6 |
| 2021 | 17,107.8 | 2.0 |
| 2022 | 17,396.4 | 1.7 |
| 2023 | 17,582.6 | 1.1 |
| 2024 | 17,735.2 | 0.9 |

*Figure 10: Domestic Stone Mining industry revenue has recovered and subsequently leveled off following the financial crash of 2008. Projections by IBISWorld Market Research.*

**US Stone Market – Current Industry Performance**

Over the past five years through 2018, industry revenue grew at an annualized rate of 7.4%. This rate has been impacted by the continuing recovery in downstream construction markets that has been occurring since 2012. Infrastructure construction, as well as residential and commercial construction has experienced strong growth in the past five years, boosting demand for stone industry products. As a result, total industry revenue climbed to $16.7 billion in 2018, resulting from the continuing construction demand and market recovery. Over the next five years to 2024, industry revenue is forecasted to continue to climb at a robust annualized rate of 1.48% to $17.74 billion. This growth is projected to come from sustained demand for commercial and residential construction as well as from large increases in infrastructure spending for road, street, and highway construction. This industry revenue growth will be driven primarily by increases in production, but also through steady price increases for stone products.

Highway and street funding are principally derived from the public sector. Demand from highway, street, bridge, and tunnel construction is estimated to have amplified through 2018, presenting a likely growth opportunity for the industry. National transportation spending for the construction and maintenance of streets, highways, bridges, railways, and other public transportation systems is positively linked with industry performance. Companies contracted by the government for these activities purchase material from the stone industry. As road and infrastructure construction represents such a large portion of the stone market, fluctuations in federal funding for transportation can pose a threat to the industry, since they are exposed to changing political considerations and interests. Federal funding for transportation increased in 2018 and is seen as a positive sign for continued industry growth. [73]

**Residential and Nonresidential Construction**

Aggregate is broadly used in the construction of nonresidential buildings and is typically blended with cement to form concrete. Aggregate is also used in other concrete products such as blocks, tiles, and pipes. Dimension stone is also widely used in the

[73] Burgex Inc. Mining Consultants

construction of buildings, particularly as pavers, floor tiles, panels, and countertops. The value of private nonresidential construction is expected to have increased by about 6.3% through 2018.

The housing construction market is a significant consumer of stone products. Contractors use either concrete, concrete products (which are often blended using aggregate crushed stone), or dimension stone used for roof tiles, floor tiles, and countertops for virtually every project in the residential construction sector. The value of this residential construction is expected to have increased approximately 4.1% through 2018.



Figure 12: The value of residential and nonresidential construction is forecast to grow at annual rates of 4.5% and 3.9% respectively through 2022.

The Stone Mining industry has experienced robust growth since 2012, after enduring declines in each year from 2007 to 2011. The real estate industry's recovery and ensuing boom has translated into increased demand for stone products, as the construction of new homes and commercial buildings surge. Due to raw stone's relative abundance in comparison to other minerals and commodities, there are currently few raw stone source supply concerns for the industry. Furthermore, the price of crushed and dimensional stone products has been steadily increasing over the past decade. It is projected that industry revenue has grown at an annualized rate of 6.5% over the last five years; this overall industry revenue increased to $16.3 billion in 2017.[74]

As empty homes and offices became occupied in the early years of this recovery period, the open supply of housing and commercial space declined, thus driving demand for new construction. Not only is stone a principal construction material in residential and nonresidential construction, it is a key component for road construction and maintenance as well as an input for cement manufacturing. Consequently, as new housing and commercial spaces are developed, these projects require stone for building foundations, parking lots, sidewalks, driveways, roads and for other various construction purposes. In the five years through 2018, the national value of construction is anticipated to have grown at an annualized rate of 8.3%.

---

[74] Burgex Inc. Mining Consultants

As demand circumstances have been improving, profitability has followed in turn, rising from 8.7% of revenue in 2011 to 10.8% in 2017. Industry operators have boosted production in the past five years, due to an increase in construction activity, yet crushed stone supply has not been able to keep up with demand - leading to higher sales prices. Additionally, transportation costs for the industry have decreased with the decline in the crude oil price. Nevertheless, the heavy weight of crushed stone ensures that downstream companies generally seek the closest and most affordable crushed stone supplier. This focus on proximity and price also ensures that long distance trade in the crushed stone segment is quite low. Because of this, both imports and exports only account for a marginal portion of overall crushed stone segment activity.

The significance of the Stone Mining industry as a supplier to the government's infrastructure plans has been a large factor in enabling a solid recovery for the industry following the recession. The association with the US government's ongoing attempts to boost job creation through infrastructure development will remain vital to the stone industry. In the five years through 2018, federal funding for transportation has remained steady. In 2017, the President requested a budget of $98.1 billion for the continuation of infrastructure investments. This came alongside $478 billion in funding for a four-year investment to progress surface transportation by improving infrastructure projects such as roads, bridges, transit systems and railways.[75]

### U.S. Stone Market – Industry Outlook

The Stone Mining industry will continue to have heavy reliance on demand generated from downstream construction industries and, to a lesser extent, on the level of price stability in the crushed stone market. Over the next five years through 2024, the volume of stone production, which includes both crushed and dimension stone, is anticipated to grow steadily. Expected solid growth and demand from road and highway construction, private nonresidential construction and residential construction will drive industry growth over the next five years. However, any major swings in construction activity will have the potential to positively and negatively impact operators in the industry.[76]

Due to the solid growth profile for downstream markets, industry revenue is estimated to grow at an average rate of 1.5% per year, reaching $17.74 billion in 2024. Furthermore, increasing funding for infrastructure programs is expected to help augment demand for the industry's products. In the next five years through 2023, federal funding for transportation is anticipated to rise at an annualized rate of 7.0%. However, it should be noted that federal funding considerations could adversely impact the industry moving forward if administrative interests decrease the available funding for transportation infrastructure.

Investment in construction is likely to drive demand for stone products over the next five years. The principal market for crushed stone is road, street, and highway construction, which is projected to experience strong growth through 2022. This growth will be buoyed by ongoing multi-year federal funding pursuant to the Moving Ahead for

---

[75] Burgex Inc. Mining Consultants
[76] Burgex Inc. Mining Consultants

Progress in the 21st Century Act (MAP-21) and the 2015 five-year Fixing America's Surface Transportation (FAST) Act. The demand for crushed stone will also be reinforced by solid growth in several other infrastructure markets, such as the railroads, pipelines, and water supply markets.[77]

Inside the downstream building markets, the demand for stone products will primarily be supported by booming housing construction and, to a lesser extent, by the growth in the institutional construction market. New housing construction has increased in the five-year period through 2018, driving demand for dimension stone products such as marble and granite countertops, slate tiles, and crushed stone used in foundations and concrete products. Commercial building construction is projected to strengthen moving forward, underpinning demand for dimension stone used in foyers, and crushed stone used as foundation aggregate and for paving parking lots. In the next four years though 2022, the value of combined construction is expected to increase at an annualized rate of 7.3%.

Global cement giants Lafarge and Holcim finalized a union of equals in 2015, establishing the industry tone for the next five years. The stone industry is expected to undergo additional merger and acquisition (M&A) activity, as leading industry players and large-scale building product manufacturers continue to look to join their access to stone quarrying capability across wider regional markets. Nevertheless, additional demand for stone products is expected to encourage smaller local operators to enter the industry, balancing out industry amalgamation. Over the next four years through 2022, the number of enterprises is expected to rise at an annualized rate of 1.1% to 1,465. These smaller operators are likely to enter the industry in regions such as the Southwestern US where abundant supplies of quality stone that meet standards for use in downstream markets are located.[78]

It is anticipated that ongoing industry consolidation will lead freshly merged enterprises to seek synergies in the form of operational cost savings. This will result in the streamlining of operational processes and reduce the need for labor, thereby suppressing employment and wage growth. Employment is forecast to reach an estimated 44,721 workers by 2022, representing an average annual growth rate of 1.3%. Employment growth is projected to lag behind revenue growth not only due to consolidation in mine ownership but also due to ongoing advancements in labor-saving technology. Total US stone mining wages have declined from $2.8 billion in 2007 to an estimated $2.7 billion in 2017. These cost savings and reduction in employment and wage growth will help to bolster profitability of operators across the industry.

The industry will also find increased value in upgraded production efficiencies stemming from the consolidation of mine ownership and the reorganization activity that has taken place over the past decade. As a result, these cost savings will also serve to boost industry profitability over the next five years. Profit growth will be indicative of the expanding housing, infrastructure, and road markets, as increases in supply are expected to be slower than demand growth.

---

[77] Burgex Inc. Mining Consultants
[78] Burgex Inc. Mining Consultants

Demand for crushed stone is greatly dependent on investment in publicly funded infrastructure, which is generally subject to long-term budgetary planning to meet population growth and industrial expansion. Over the 10 years from 2013 to 2023, industry value added (IVA), which measures the industry's contribution to the overall economy, is projected to rise at an average annual rate of 3.0%, while US GDP is projected to grow at an average annual rate of 2.2%. This is a good indicator of industry health.[79]

**US Stone Products Outlook**



Figure 13: The total US stone market value for 2017 is expected to be $17.6 billion Source: www.IBISWorld.com

Crushed Stone

The principal product sold by the Stone Mining industry is crushed stone. Crushed stone is used as aggregate in construction projects and as an input to construction materials and other manufactured products. The production of crushed stone is expected to account for an estimated 96.7% of the value of domestic stone production. The remaining value of domestic production consists of dimension stone. The revenue share of all product segments has remained relatively stable over the past five years because they are all tied to the construction sector, which has uniformly affected demand across products. Crushed rock is typically produced at the mine site, where it is crushed, ground, washed, screened, pulverized, and sized until it is ready for transport to downstream construction markets, construction material markets (e.g. asphalt and concrete), chemical and metallurgical manufacturers, and agricultural markets. According to the US Geological Survey, in 2018 an estimated 68% of the volume of crushed stone production is limestone and dolomite; 15% is granite; 6% is trap rock (i.e. igneous rocks widely known as black granite); and 11% includes sandstone, greenstone, quartzite, marble, calcareous marl, slate, volcanic cinder, scoria, and shell.[80]

Dimension Stone

---

[79] Burgex Inc. Mining Consultants
[80] Burgex Inc. Mining Consultants

In 2018, an estimated 2.8 million tons was produced at a value of approximately $450 million. Dimension stone is typically dressed or sold as rough blocks. Producers of dimension stone extract the stone at a quarry or mine site and fabricate the stone for building interiors and exteriors, memorials, and landscape uses. Products include blocks, tiles, facades, paving, flooring, steps, curbing, countertops, columns, and other architectural applications. According to the US Geological Survey, an estimated 48% of the volume of dimension stone sold is limestone; 23% is sandstone; 18% is granite; 2% is marble, and the remainder is slate and miscellaneous stone. Rough block production, as opposed to dressed stone, represents about 58% of annual dimension stone tonnage. The main uses for rough block are construction (51%) and irregular shaped stone (38%). Dimension stone was produced by 195 companies, operating 251 quarries, in 34 states in 2018 with an average price of $161 per metric ton.[81]

Dimension stone is a globally traded commodity and the United States is a net importer of dimension stone products. In fact, domestic dimension stone consumption consists of roughly similar amounts of imports and domestic products. The United States will continue to increase its dependence on imported dimension stone due to the high level of demand for quality granites, marbles, and specialty stones that are only sourced in other countries. A good example of imported dimension stone is the well-known Carrara marble that has been mined since ancient Roman times in Italy. Many thousands of tons of this marble are imported into the United States annually.

Infrastructure Construction

The stone industry derives the majority of its sales from the supply of crushed stone aggregate to the infrastructure construction market, particularly for the construction and maintenance of highways and streets. Aggregate composed of crushed stone, sand, and gravel comprise the principal materials mixed into the base, sub-base and surface pavement of roads throughout the United States. This aggregate is also an important input into the construction of other heavy infrastructure (e.g. dams, levies, railroads, and harbors). The main source of funding for US road construction comes from federal, state, and local governments, while funding for other heavy infrastructure projects is evenly divided between the public and private sectors. In the five-year period through 2018, federal funding for transportation remained relatively steady. The supply of aggregate for use in the infrastructure construction market regularly generates about 70% of the Stone Mining industry revenue, growing consistently on an annual basis to have reached an expected 74% in 2017.

The Road and Highway Construction industry experienced a host of issues in the five years leading up through 2017, including budgetary constraints and weak investment in transport infrastructure early in the period. Local and state governments, which are the largest sources of infrastructure industry specific project funding, have maintained prudent budgets since the recession, while federal programs like the Highway Trust Fund have stayed somewhat precarious. The industry has only recently resumed to solid growth, due to greater local government spending and the passing of the five-year FAST

[81] Burgex Inc. Mining Consultants

Act in 2015. These improvements will continue to lead to growth in the infrastructure construction segment of the US stone market.[82]

### Georgia Crushed Stone Market Overview

The Southeast region of the US, which alone accounts for nearly 25.4% of US residential population and construction activity, ranks as the largest and most significant region for stone mining and quarrying. This region accounts for a disproportionately large share of industry activity, with 27.7% of establishments, 28.6% of production, and 33.4% of industry employment. This region includes four of the ten largest states in the production of crushed stone (i.e. Georgia, Florida, North Carolina, and Virginia), which partly reflects the existence of adequate raw material deposits in the Southeast, but principally reflects the substantial demand generated by robust construction activity within the region.[83]



*Figure 17: The Southeast region of the US is the largest region for stone mining and quarrying.*

With large mineral deposits and strong transportation infrastructure, Georgia is an important producer of crushed stone, limestone, and sand and gravel for both construction and industrial uses. This production comes primarily from the northern and central regions of the state. According to the latest 2018 USGS Mineral Commodities Report, Georgia accounts for approximately 2.4% of the total US mineral output with an estimated $1.96 billion in production principally from crushed stone, Portland cement, kaolin clays, sand and gravel for construction use, and masonry cement. In 2018, granite and limestone quarries from across the State of Georgia produced 60.1 million tons of crushed stone for a total estimated wholesale value of $838 million.[84]

---

[82] Burgex Inc. Mining Consultants
[83] Burgex Inc. Mining Consultants
[84] Burgex Inc. Mining Consultants

Sales of crushed stone in Georgia during 2018 realized an increase of 3.4% from sales in 2017 according to the latest USGS Mineral Industry Survey. Lower production in the first quarter offset higher production in the final three quarters of the year. Production in quarters two and three of 2018 were up significantly by 12.6% and 11% respectively over the same quarters in 2017. It is estimated that this strong production trend from 2018 will continue through the first two quarters of 2019. Moderate growth is expected to continue through 2019 and beyond. Georgia's population growth is projected at 1.19% a year, which ranks it as the 10th fastest growing state. The population of Georgia has shown strong and consistent growth over the past decade, with a current 2018 population of 10.52 million according to US Census Projections. Along with population growth, Georgia's real gross domestic product is expected to grow by a strong 4% in 2018 to around $595 billion. This steady economic growth should result in the undertaking of new residential, business, industrial, and infrastructure construction projects that will utilize the crushed stone and dimensional stone products produced by the stone industry in the state. Approximately 5.7 tons of crushed stone are required per-capita on an annual basis within the State of Georgia. This calculation has been made based on dividing the total amount of annual crushed stone production by the total population of the state. Based on this per-capita consumption, it is estimated that a total crushed stone demand of approximately 61.1 million tons will exist by 2020 and 67.4 million tons by 2030.[85]

<u>Georgia – Infrastructure Construction</u>

The road and highway construction market constitute a major market segment for the Georgia stone mining industry, keeping in trend with the overall US market. The State of Georgia has allocated a total of $8.811 billion in funding for State Transportation Improvement Program (STIP) highway projects through 2021. Of this funding, approximately $2.2 billion is scheduled to be spent in each year of the program. This funding includes $4.94 billion in federal-aid, $1.92 billion in state funds and $1.28 billion in local funds. The State of Georgia instituted a 6.7% gas tax increase in July of 2015 in order to fund highway and infrastructure improvement projects within the state. This increase was adopted along with a new formula for calculating the state's tax rate and will allow for future rate increases along with inflation and vehicle fuel-efficiency improvements. It is anticipated that this tax will add approximately one billion dollars in new transportation project funding each year.[86]

In order to qualify for use in GDOT projects, several tests are required to ensure aggregates meet certain specifications. The tests include the Los Angeles (LA) abrasion test, the coarse aggregate specific gravity, and the soundness test. The LA abrasion test is a common method used to indicate aggregate toughness and abrasion characteristics. The characteristics are important because the constituent aggregate in hot mix asphalt must resist crushing, degradation, and disintegration in order to produce a high-quality asphalt product. The coarse aggregate specific gravity test is needed to determine the weight-to-volume relationships and to calculate various volume-related quantities such as voids in mineral aggregate (VMA), and voids filled by asphalt (VFA). The soundness test determines an aggregate's resistance to disintegration by weathering and, in particular, freeze-thaw cycles. Operators with crushed stone products that pass these tests will

---

[85] Burgex Inc. Mining Consultants
[86] Burgex Inc. Mining Consultants

qualify for not only GDOT projects but will also meet requirements for use in other construction projects.[87]

<u>Georgia – Building Construction</u>

Within the State of Georgia, almost 15% of crushed stone consumption falls within the residential and nonresidential construction market. Improvements in the economy have led to consistent growth over the five-year period leading up through 2018. New home starts in the Atlanta region increased by more than 3% in 2018 according to Eugene James, Senior Regional Director for Metrostudy. He states that growth has been limited by the availability of new lots. He estimates that this level of growth will sustain or increase in 2019 and beyond as lots become available. Sales of crushed stone for the residential construction market represent approximately $120 million for operators in the state with a projected growth to roughly $170 million by 2022.

Nonresidential construction spending growth will continue through 2018 with an estimated increase of approximately 7% over 2017 according to the Oldcastle 2018 North American Construction Forecast Report. It is estimated that this growth will continue to be led by privately financed projects, with commercial construction continuing to lead the way. With steady growth, it is estimated that this market segment will grow into 2022 and beyond.[88]

## Market Supply Analysis

The subject property is well located to serve the rapidly growing Central Savannah River market area. According to the Resource Valuation Report, the subject property's proposed operation will absorb a significant market share from existing quarries and under-served projects in its average 50 miles market radius.

Stone is a natural resource that has high value of place and whose market is somewhat like that of water. Like water, everyone uses stone and demand is directly proportional to the existing population base and rate of population growth. Markets in areas of high population growth will require more stone than those with stable or declining populations. Stone is purchased from the closest available source that can provide the quantity and quality necessary to match the customers' requirements. When a new stone quarry opens it will immediately begin attracting the nearest customers. In general, the new quarry will immediately begin to absorb market share from existing and future customers that are closer to it than to the established quarries. In addition, the new quarry can also service clients that were beyond the profitable market area (about 50 miles) of the pre-existing quarries.

Once mined and crushed, the largest cost of stone is transportation to the point of application. The local market is served by truck with the buyers paying the cost of transportation (FOB). Stone can be transported for hundreds or thousands of miles where rail service is available and nearby production can greatly improve a given quarry's market area and dramatically increase stone production. Production from the subject

---

[87] Burgex Inc. Mining Consultants
[88] Burgex Inc. Mining Consultants

property's proposed operation will be sold to customers utilizing both trucks to transport the stone and regional rail with loading in the northern portion of the quarry and by a circular rail spur.[89]

Industry standards indicate the customer is responsible for coordinating transportation from the site to the final destination, including all costs associated with the transport and insurance as Free on Board- Origin or Plant (FOB-Origin). Under FOB-Origin/Inspection and Acceptance-Origin terms and conditions, the customer takes full responsibility of the shipment at the producer's site, thereby releasing the producer of all responsibility and liability once the goods are picked up.

**Market Demand Analysis**

Aggregates are basic and fundamental inputs to the building blocks of society and a strong economy. Population is increasing in the region, new highway projects are on the horizon, new business development is rebounding in the region, and transportation in and out of the region is uninhibited.

In general, population change, distance from quarry to point of application, and meeting state specifications for construction usages are the most important factors to a quarry's crushed stone market. The crushed stone industry is highly dependent on construction activity. According to the 2018 USGS Mineral Yearbook "In 2017, 1.33 billion tons of crushed stone valued at more than $15 billion was produced by an estimated 1,400 companies operating 3,700 quarries and 187 sales/distribution yards in 50 States. Leading States were, in descending order of production, Texas, Pennsylvania, Florida, North Carolina, Ohio, Missouri, Georgia, Kentucky, Virginia, and Indiana, which together accounted for more than one-half of the total crushed stone output. Of the total domestic crushed stone produced in 2017, about 70.0% was limestone and dolomite; 13.0%, granite; 6.0%, traprock; 5.0%, miscellaneous stone; 4.0%, sandstone and quartzite; and the remaining 2.0% was divided, in descending order of tonnage, among marble, volcanic cinder and scoria, calcareous marl, slate, and shell. It is estimated that of the 1.39 billion tons of crushed stone consumed in the United States in 2017, 76.0% was used as construction material, mostly for road construction and maintenance; 11.0% for cement manufacturing; 7.0% for lime manufacturing; 4.0% for other chemical, special, and miscellaneous uses and products; and 2.0% for agricultural uses.[90]

The estimated output of crushed stone in the United States shipped for consumption in the first nine months of 2017 was 1.01 billion tons, a slight decrease compared with that of the same period of 2016. Third quarter shipments for consumption decreased slightly compared with those of the same period of 2016. Additional production information, by quarter for each State, geographic division, and the United States, is reported in the U.S. Geological Survey quarterly Mineral Industry Surveys for Crushed Stone and Sand and Gravel.[91]

It is important to note that all USGS production figures are in metric tonnes and must be first converted to short tons for comparison in this paper. The Society of Mining,

---

[89] Resource Valuation Report, Capps Geoscience, LLC.
[90] Resource Valuation Report, Capps Geoscience, LLC
[91] Resource Valuation Report, Capps Geoscience, LLC

Metallurgy, and Exploration (SME) in its annual analysis finds that in 2015 every person in the United States must be provided with over 4.5 short tons of stone in each year and so population increase is the fundamental factor driving an increase in demand for crushed stone. USGS figures are slightly less at a per capita consumption of 4.36 short tons of crushed stone aggregate. The United States Geological Survey tracks mineral commodities such as crushed stone aggregate with production, usage, value data and statistics provided by each state. These summary commodity reports are one of the most commonly used means of assessing market conditions. However, the states are not required to provide this information and industry often withholds some or all of the data. Therefore, the USGS commodity summaries are inaccurate and incomplete but can be useful in demonstrating general trends of production.[92]

According to the Resource Valuation Report, Dr. Capps discussed the reporting procedures and outcomes with Jason C. Willett (email:jwillett@usgs.gov and phone (703) 648-6473), Crushed Stone commodity specialist with the United States Geological Survey (USGS). Mr. Willett provided examples of the report process and derived statistics from the extensive database. Aggregate statistics from more than 10,000 aggregate quarries are updated yearly. In assessing the market of a stone quarry, it is important to know that stone quarry production data is closely held proprietary information. The USGS does not share this information and there are no requirements to report these production figures to public agencies. The states are not required to provide this information and industry often withholds some or all of the data. Therefore, the USGS commodity summaries are inaccurate and incomplete but can be useful in demonstrating general trends of production.

The subject property is well located to serve the aggregate needs of the rapidly growing southern CSX railroad corridor including Atlantic and gulf coast market areas. According to the Resource Valuation Report, the subject property's proposed operation will absorb a significant market share from existing quarries and under-served projects both regionally and in its average forty- to fifty-mile local market radius. Due to transportation costs, most crushed stone aggregate produced in Georgia is sold in Georgia. Because aggregate is a heavy, low cost per ton product, haul distance largely controls the price of aggregate. The USGS Mineral Yearbook statistics for the Georgia crushed stone industry are not current and the last attempted complete report was from 2000. However, according to the USGS Minerals Commodities Summary 2014, crushed stone usage is increasing in Georgia and showed an 8.0% increase in crushed stone production between 2nd quarter 2013 and 2nd quarter 2014.

Industry sources and population data indicate that the subject property's proposed operation 50-mile truck market area used about 3,226,820 short tons of crushed stone aggregate in 2015 and will likely need about 4,033,332 short tons by 2030. This entire market area can be served by Free-On-Board (FOB) truck delivery whereby the buyer must pay to have the goods delivered (typically with the buyer's trucks) and the seller will have no delivery expenses. Georgia Department of Transportation projects including several bids and details of contracts active in 2018 in the market area can be found on the Georgia DOT website.[93]

---

[92] Resource Valuation Report, Capps Geoscience, LLC
[93] Resource Valuation Report, Capps Geoscience, LLC



Figure 6: Local market area showing counties

According to the Resource Valuation Report, there are at least three large region-specific markets that can be served by the subject property's proposed operation. These markets typically are deficient in supply and higher prices are paid for the stone.

o  Market 1: A major market is the rail shipments of aggregate to regions without significant crystalline rocks. The subject property's proposed operation aggregates have physical properties appropriate to road surfaces and are desirable for asphalt production as well as concrete. To the south and east the entire Atlantic and Gulf Coast coastal plain regions are poor in hard rock aggregate resource, which include the Carolinas, Florida, Alabama, Louisiana, Mississippi, and some areas of Texas along the Gulf. The coastal markets include higher dollar applications such as jetty stone as well as other classifications; jetty stone is currently shipped from existing quarries in the subject property's market area.

According to the Resource Valuation Report, the demand for aggregate greatly exceeds the supply because these areas are among those with the highest population increases in the United States.

o Market 2: A growing market for stone is the metropolitan areas of the Gulf coast and Texas. Many of the older quarries nearest to Houston and other Coastal Plain cities are deep and near the end of their productivity. They have no room to expand, but demand remains high because some of them have eliminated existing asphalt operations to expand the quarry into these areas. The subject property's proposed operation can transport aggregate to these areas by CSX railroad and other rail connections. The subject property is well positioned to serve the needs of the rail market, and is nearer to the large Texas and gulf coast markets than other large production quarries. The strength of the regional rail market is shown by the rapid expansion and 24-hour operation of large midwestern quarries such as the Dolese Brothers Richards Spur quarry near Lawton, Oklahoma. The Richards Spur limestone quarry has been in operation since 1907. The quarry was listed as the 15th highest producing quarry in the United States in 2013 and produced more than four million tons in 2016.

o Market 3: Railroad ballast is a large market where demand annually exceeds supply. Annual reports published by Union Pacific, CSX and Norfolk Southern Corporations reveal significant Net Accumulated Depreciation balances of total ballast. Much of this ballast is replaced on six-year cycles and often cannot be directly recycled. In 2014, CSX Corporation reported a Net ballast cost of $2,693 million and a Net Accumulated Depreciation of $679 million which would represent about 336 million tons of ballast aggregate if sold from the subject property's proposed operation at the very conservative price of $8.00 per ton. Using the same price, this represents an increase of over four million short tons from the previous year's CSX ballast depreciation figures. In 2014, Norfolk Southern Corporation reported a Net ballast cost of $2,360 million and a Net Accumulated Depreciation of $498 million which would represent about 295 million tons at the $8.00 per short ton.[94]

**Production**

The timing of the permitting and the startup of a new operation would take a majority of the first year. The ramping up of production takes this into consideration with most likely producing only about three to six months of the first year while working out the plant problems associated with a new operation. The following year would be a full year of production, but not full capacity. This is normal operating procedure with new customer acquisition and production stockpile building. The keys to a fast startup are having qualified management and experienced labor available.

Typically, the first year or two of production in a competitive market is less than succeeding years due to the need to capture a portion of the existing market, but preferably without reducing prices. This can mean initially slow growth for aggregate quarries that rely on the construction market.

[94] Resource Valuation Report, Capps Geoscience, LLC

As detailed earlier in this report, the current available and future markets rely entirely upon the population of the area served by the subject property's quarry. The quarry closest to existing project sites with the necessary products for those projects will eventually acquire that business. The cost of transportation is the strongest factor driving the choice of a quarry for a project. The subject property's quarry would be expected to acquire a small percent of the existing market in the first year of operation and take more of that market in subsequent years.

According to the Resource Valuation Report, the valuation estimates a total of 60.6 million short tons mined and processed over a 25-year period by the subject property's proposed operation with 7.2 million short tons contributed from the FOB truck market and 53.4 million short tons from the rail market. The truck market rate is modeled as 150,000 tons in Year 1, 250,000 in years 2 and 3, and 300,000 tons in years 4 through 25 as the market matures. According to the Resource Valuation Report, a slower production rate for the first three years will allow the establishment of the ultimate quarry site and market for the subject property's proposed operation. The rail market annual production is modeled as escalating over a 25-year period from 1.6-unit trains (about 9,000 tons per unit train) per week or 800,000 tons in Years 1 and 2, 2.0-unit trains per week or 1,000,000 tons per year in Years 3 and 4, 1,336,400 tons in Years 5 through 7 and then the equivalent of adding about half a unit train per year through mine life.[95]

Of note, based on discussions with Mr. Ben Black, GeoLogic, LLC (GeoLogic), and the current mine plan, Mr. Black stated the following, "GeoLogic's review of the mine plan and current rail loadout operations, as well as truck service to the mine indicates that a maximum of about two million short tons per year (tpy) by means of rail, plus about 300,000± trucks per year is reasonable based on site conditions. Initial operations of the mine will only include truck sales while the mine is being developed and rail access constructed.  This initial construction will likely take two to three years to accomplish once construction begins. Peak production of 2.3 million short tons per year will not likely occur until Year 6 or later.  A schedule as follows is considered reasonable:

Year 1 – 150,000 tpy
Year 2 – 250,000 tpy
Year 3 – 350,000 to 500,000 tpy
Year 4 – 750,000 to 1,500,000 tpy
Year 5 – ≥1,500,000 tpy

For the purpose of this appraisal report, the first year will primarily be spent in obtaining permits, site preparation, road construction, hiring management, overburden stripping, starting construction of the rail and plant setup, with no production or sales. Truck production will start in year two with 150,000 tons and ramp up to 250,000 tons in years three and four and increase to 300,000 tons per year from years five through 26. For the purpose of this appraisal report, it is assumed the construction of the rail loop will begin at the end of year one and be completed in year three, with no sales by means of the rail line in years one through three. Production and sales by way of rail will start in year four with 200,000 tons, increase to 700,000 tons in year five, increase to 1,000,000 in

year six, increase to 1,336,000 in years seven through nine, and then based on the Resource Valuation Report, increase approximately a half of unit train per year (approximately 4,500 tons) through the life of the mine. For the purpose of this appraisal, the total production by means of truck would be 7,250,000 tons and 29,308,500 by means of rail. It is the appraisers' opinion this production schedule adequately takes into account the construction of the rail and site limitations.

Additional market research performed by Dr. Capps, Capps Geosciences, LLC included the following sources:

- Clark, S., 2008, Geology of the Southern Appalachian Mountains: Scientific Investigations Map 2830: U.S. Department of the Interior United States Geological Survey.

- Cook, F., Albaugh, D., Brown, L., Kaufman, S., Oliver, J., and Hatcher, R., 1979, Thinskinned tectonics in the crystalline southern Appalachians; COCORP seismicreflection profiling of the Blue Ridge and Piedmont: Geology, v. 7, p. 563–567.

- Dallmeyer, R., 1978, 40Ar/39Ar incremental-release ages of hornblende and biotite across the Georgia inner Piedmont: their bearing on the late Paleozoic-early Mesozoic tectonothermal history: American Journal of Science, v. 278, p. 124–149.

- Dallmeyer, R., Hess, J., and Whitney, J., 1981, Post-magmatic cooling of the Elberton Granite; Bearing on the late Paleozoic tectonothermal history of the Georgia Inner Piedmont: Journal of Geology, v. 89, p. 585–600.

- Dicken, C., Nicholson, S., Horton, J., Foose, M., and Mueller, J., 2007, Preliminary integrated geologic map databases for the United States; Alabama, Florida, Georgia, Mississippi, North Carolina, and South Carolina: USGS Digital Map.

- Dvoracek, D., 2003, Geochemical and geochronological study of the Danberg and Sandy Hill granitoids and associated mafic enclaves, northeastern Georgia [Ph.D. thesis]: University of Georgia, Department of Geology, Unpublished Ph.D. dissertation, 260 p.

- Gore, P., and Witherspoon, W., 2013, Roadside Geology of Georgia: Atlanta, Georgia, Mountain Press Publishing Company, 360 p.

- Hatcher, R., 1978, Tectonics of the Western Piedmont and Blue Ridge, Southern Appalachians: Review and speculation: Am.J.Sci., v. 278, p. 176–304.

- Lawton, D., and others., 1976, Geologic Map of Georgia, Scale 1:500,000: Georgia Geological Survey, scale=1:500,000.
- Schroeder, P., and Allard, G., 2010, Elberton Georgia Granite: Geology and Industry Insights: AAPG Foundation Trustee Associates Field Trip-October 26, 2010.

- Watson, T.L., 1902, Preliminary Report on a Part of the Granites and Gneisses of Georgia: Georgia Geological Survey, Atlanta, Georgia, Bulletin 9-A, 410pp.

- Richard C. Capps holds a PhD and is a SME Registered Geologist with Dr. Capps, Capps Geoscience, LLC. Since 1978 Dr. Capps has been involved in mineral exploration for precious metals, base metals, uranium, and industrial minerals. He has worked extensively on projects in Montana, Nevada, Arizona, and California in the Western U.S.; on exploration projects in South and South Carolina, Alabama, and Georgia in the Eastern USA and international projects including the Nassau Project of Suralco in Suriname and on projects in Mexico.

**Permitting**

It is not anticipated that any permitting difficulties will be encountered for the operation as planned. Georgia is currently ranked 12th in value of nonfuel minerals by state, according to the USGS. A large portion of this value comes from aggregate operations, primarily crushed stone. These statistics indicate a sophistication in the permitting and regulatory framework in the State of Georgia and serve as an indicator of how mining friendly the state is. Based on a review of active aggregate permits and timelines in the state, it is estimated that the entire permitting process for the subject property can be completed within a window of six to eighteen months. A breakdown of the specific permitting processes and application steps can be found in the sections below. It should be noted that a state permit is not required for the operation of a surface dimensional stone quarry, but it is recommended that the subject property apply for a permit for its crushed stone activities.

According to the Resource Valuation Report, in order to open an aggregate quarry in Georgia, a quarry operator must have an approved surface mining permit in place with the Georgia Department of Natural Resources, Environmental Protection Division (Georgia EPD). Other permits required are a Storm Water Discharge Permit and an Air Emissions Permit. According to the Resource Valuation Report, Log Creek, LLLP was in the process of applying for all necessary permits in 2018 and in the appendix of the Resource Valuation Report, is an addendum to the 2018 report containing draft Ecological Survey, Mine Plan, and permit applications. According to Dr. Capps, Capps Geoscience, LLC, it is reasonably probable that the mining, storm water, and air emission permits will be granted for the subject property's proposed operation and that the subject property's proposed operation will obtain a Conditional Use Permit to operate the quarry on the currently zoned FOR-AG land. Typically, the Mined Land Use Plan submitted to the EPD requires a 50-foot buffer surrounding the quarry. Additional plan requirements typically include a limit on the height of berms and overburden storage, a riparian buffer of 50 feet, and the slopes of reclaimed unconsolidated material must not exceed a 3:1 ratio of width to height. In addition, buffers from property lines are generally 75 feet and 300 feet from dwellings. [96]

<u>Surface Mining Permit</u>

The Georgia Environmental Protection Division (GEPD) of the Georgia Department of Natural Resources (DNR) regulates mining activities within the state of Georgia. The Surface Mining Unit of the Land Protection branch of GEPD specifically oversees the issuance, and regulation, of mining permits and activities. Under the regulations set forth

---

[96] Resource Valuation Report, Capps Geoscience, LLC

by the SMU, a Surface Mining Land Use Plan (SMLUP) is required to be submitted as part of the permitting process. This SMLUP is required to include:

1. A title sheet with site location, name, and contact information for the mine operator, plant designer, and a 24-hour emergency contact.

2. A boundary survey with metes and bounds description.

3. An existing conditions description with topographic survey of elevation contours, roads, utilities, streams, wetlands, and easements.

4. A proposed mining plan showing permit boundary, affected acreage, undisturbed buffers and limits of mining, direction of mining progression, proposed contours, mining features (haul roads, stockpiles, plant operations site), a cross section showing anticipated depth of mine pits, potential impacts on neighboring properties, and a comprehensive mitigation and reclamation plan.

5. An erosion and sedimentation control plan, details and notes showing undisturbed buffers for permit boundary and streams, wetlands, site drainage, and a plan using best management practices to control erosion and sedimentation.

6. A posted bond of approximately $2,500 on each acre of proposed disturbance.

## U.S. Army Corps of Engineer Section 404 Permit

A delineation of wetlands and streams within the property boundary is required by the SMLUP. Once these wetlands have been delineated, a buffer is required on all wetlands and streams. If an impact on wetlands is anticipated to occur, permits will be required under Section 404 of the Clean Water Act of 1972. This permit will require coordination with the U.S. Fish and Wildlife Service regarding federally protected species. If stream and wetland impacts are to occur, compensatory mitigation will be required. This compensation can be achieved through the construction of artificial wetlands, or through the purchase of mitigation credits from an approved mitigation bank. It is believed that wetland potential can be easily managed on the subject property based on an analysis of National Wetland Inventory Maps. According to Flood Insurance Maps (FIRM) 13301C0175B, dated July 22, 2010, the subject property is located within Zone X, an area not prone to flooding. Based on mapping provided by GeoLogic, LLC, there are a few streams running through the subject property. According to Mr. Ben Black, GeoLogic, LLC, as currently designed, the quarry and the operations of the plant will avoid wetlands to the extent practical. The creek crossings needed to place the rail loop track will be permitted under a U.S. Army Corps of Engineers Nationwide Permit (PCN 44) for installation of pipe culverts. As such, there are no expected wetlands mitigation costs associated with this quarry. However, for the purpose of this report, a wetland contingency of $500,000 has been budgeted and included in the year one start-up costs. Therefore, any potential wetlands or streams on-site are not considered to affect the highest and best use of the subject property as a granite mine.

## Storm Water and Wastewater Discharge

The Water Protection Branch of the GEPD oversees storm and wastewater discharges. A general permit for storm water discharges associated with industrial activities are issued under the National Pollutant Discharge Elimination System framework. Receiving one of these permits requires the preparation of a Storm Water Pollution Prevention Plan (SWPPP), which discusses potential pollutants, best management practices, good housekeeping measures, sampling and inspection procedures, record keeping plans, maintenance, and a plan for emergency procedures.

Notable for the specific requirements of the subject property is the fact that sediments are considered to be a potential pollutant and will need to be planned for in the SWPPP. These sediments become a key monitoring condition for the wastewater requirements under the NPDES General Permit for Mining and Processing Facilities. When storm water comes in contact with mine process water or wash water, it is also considered to be wastewater and is therefore regulated. These wastewater emissions need to be monitored as follows when they are discharged into waters of the United States:

1. Flow is monitored once per month in million gallons per day.

2. Total Suspended Solids shall not exceed a 50mg/L daily average and a 75mg/L daily maximum as measured once per month.

3. Oil and grease shall not exceed 10mg/L daily average and a 15mg/L daily maximum as measured twice per year.

4. Effluent turbidity (NTU) shall be monitored once per month.

5. Instream turbidity (NTU) shall be monitored once per month at the effluent discharge point. Upstream and downstream of the discharge point will also be measured, if applicable.

6. pH shall not be less than 6.0 or greater than 8.5 as measured once per month.

<u>Ground Water Withdrawal Permit</u>

Unless existing water wells have already been identified for use in dust control for mining and processing activities as outlined in the mine plan, a Ground Water Withdrawal Permit from the Water Protection Branch of GEPD will be required to install a production well. This permit will be required for water withdrawals of greater than 100,000 gallons per day. A submission to GEPD in order to demonstrate that existing domestic wells will not be adversely impacted by the new production well is required.

Air Permitting

Crushed stone mines are known sources of particulate matter, primarily due to the generation of fugitive dust. This dust is generated and distributed by a variety of mining related activities from the moving of mining vehicles to the screening and stockpiling of materials. When determining if an air permit is needed, the emissions from diesel engines and other greenhouse gas emitters will need to be considered. It is anticipated that a permit may be required and that a minor source air construction permit (<100,000 tons of particulate per year) should be adequate. Making a final determination on whether this permit is needed or not will require a detailed evaluation of the proposed mining activities and specific equipment to be used on the site. If required, this permit would be obtained from the GEPD Air Protection Branch.

Mine Safety and Health Administration (MSHA)

Mining activities at the subject property fall within the jurisdiction of the Southeast Division of MSHA in Birmingham, Alabama. An MSHA license and identification number will need to be applied for from this office. In addition to the license, certain daily logs, safety training, and other safety and health related requirements will need to be followed by the mine. It is likely that most of the available mine laborers and management will have experience and requisite training in MSHA safety techniques prior to beginning work at the subject property.

**Operating Costs**

Total start-up costs for a mining development vary due to a range of factors such as site characteristics, materials to be mined, depth of deposits and permitting requirements.

As previously discussed, the subject property contains ample granite deposits and is located in an area of Georgia with permitted aggregate mines existing and operating, indicating the permitting process to not be overly burdensome or costly. It should be noted the subject property is a self-contained property potentially resulting in minimal impact on surrounding properties allowing a more streamlined and efficient permit process.

The subject property's quarry project is wholly owned by Log Creek LLLP and the subject property's quarry will be mined under a mining contract agreement. Additional costs of operating the quarry would be relatively minor startup fees such as establishing electric services.[97] Of note, based on the operating cost modeled within this appraisal report, the contract mining cost estimate of $8.75/ton is consistent, and conservative based on information within this market for contract miners.

The rock quality, mining conditions, and anticipated rate of production at the subject property's proposed operation are very similar to those at currently operating crushed stone aggregate quarries in the area, and these provide a good model for the subject property's proposed operation. Dr. Capps, Capps Geoscience, LLC, is familiar with contract mining costs and services provided under area contract mining and management

---

[97] Resource Valuation Report, Capps Geoscience, LLC

agreements and these include variable costs such as gas and electricity as well as periodic costs such as site preparation, scales, office expenses, labor, quality control, depreciation, equipment mobilization, insurance, property taxes, freight, permitting (consulting) diesel fuel, explosives, supplies, and miscellaneous equipment. A conservative contract mining estimate is about $8.75 per short ton and is consistent with the information obtained from current area operators.[98]

**Market Pricing**

According to the United States Geological Survey 2018 Mineral Commodity Summary, 1.40 billion tons of crushed stone valued at more than $16.6 billion or $11.85/ton was produced by an estimated 1,465 companies operating 3,710 quarries and 176 sales and (or) distribution yards in 50 States. Production and price have shown a steady rise since 2011. The production in 2011 was 1.16 billion tonnes at $9.65/tonne, in 2012 was 1.17 billion tonnes at $9.73/tonne, and in 2013 was 1.25 billion tonnes at $9.75/tonne. The USGS data shows that the third-quarter 2013 shipments for consumption increased by 8.0% over those of the same period in 2012. Since 2018, the most recent USGS Commodity Summary and Mineral Industry Surveys confirm that this upward trend in demand and production continues.

The largest aggregate producing companies in Georgia are Vulcan Materials Company, Martin Marietta Aggregates, and Hanson Aggregates. All of these corporations have active quarries within the subject property's market area, and their presence is clear evidence of a viable aggregates market. Dr. Capps, Capps Geoscience, LLC, reviewed price sheets from all of the producers and asked sales associates about discounting practices. Dr. Capps obtained current public price sheets from Hanson Aggregates. These sales prices and representative historic data are shown below. The current average sales price from a relatively nearby Hanson quarry is $25.26/ton, but high-volume customers generally receive a significant per ton discount over the listed price. The company generally considers volume, product type, and credit history in determining the discount for each customer. Dr. Capps interviewed several sales offices and industry professionals, and the discounts typically range from about one dollar to three dollars. Examples of these discounts are included in Appendix D of the Resource Valuation Report, found in the addenda of this report, in the form of amendments to Georgia State Department of Transportation contracts with the Georgia aggregates industry.[99]

In 2018 using a discount of three dollars per ton, Dr. Capps, Capps Geoscience, LLC concluded a conservative average sale price for the subject property's proposed operation truck market would be $22.00/ton. However, the initial sales might likely be of lower grade stone such as commercial base and so a sales price of $15.05/ton was set as a conservative figure for initial quarry truck market production. Further, according to the Resource Valuation Report, the sales price is $14.00 per ton for rail shipments. It is the appraisers' opinion these prices are reasonable and conservative for this market and have been utilized within this appraisal report.

---

[98] Resource Valuation Report, Capps Geoscience, LLC
[99] Resource Valuation Report, Capps Geoscience, LLC.

**Martin Marietta**

**2018 List Prices**
Effective March 1, 2018*

**North Georgia District**
3525 Paddocks Pkwy. Suite 350
Atlanta, GA 30024
Ph: (678) 965-8555

| PRODUCTS | | Forsyth (770) 887-9711 | Jefferson (706) 652-2439 | Auburn (770) 963-6123 | Lithonia (770) 390-1815 | Newton (770) 385-1838 | Morgan (770) 153-3138 | Red Oak (404) 726-6769 | Tyrone (770) 487-4187 | Six Mile (706) 135-6041 | Paulding (770) 443-0666 | Chattanooga (423) 899-4000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales Rep: Phone: | | James Tuten (404) 456-0087 | | | Jud Dunlevy (404) 821-9921 | | | Tom Thach (404) 456-3350 | | Tom Thach (404) 456-3350 | | |
| **BASE** | Crusher Run (Commercial) | $26.00 | $26.00 | $26.00 | $26.00 | $26.00 | $26.00 | $26.00 | $26.00 | $26.00 | $26.00 | $25.00 |
| | GAB / DGA Pug (GDOT/TDOT) | $26.50 | $26.50 | $26.50 | $26.50 | $26.50 | $26.50 | $26.50 | $26.50 | $26.50 | $26.50 | $25.50 |
| | Recycled Concrete Base | $24.50 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **COARSE** | #3 / #4 Stone | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $26.50 |
| | #5 / #57 Stone | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $26.50 |
| | #6 / #67 Stone | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $29.50 | $26.50 |
| | #7 / #78 Stone | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $29.50 |
| | #89 / #9 Stone | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $29.50 |
| **FINE** | M-10 / #810 Screenings | $28.50 | $28.50 | $28.50 | $28.50 | $28.50 | $28.50 | $28.50 | $28.50 | $28.50 | $28.50 | $26.50 |
| | FM10 / SM10 / W10 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $33.50 | $30.50 |
| | Pond Sand | $22.50 | $22.50 | $22.50 | $22.50 | $22.50 | $22.50 | $22.50 | $22.50 | $22.50 | $22.50 | $22.50 |
| **LARGE** | Surge | $30.50 | $30.50 | $30.50 | $30.50 | $30.50 | $30.50 | $30.50 | $30.50 | $30.50 | $30.50 | $27.50 |
| | Rip Rap I & III / Class A & B | $35.50 | $35.50 | $35.50 | $35.50 | $35.50 | $35.50 | $35.50 | $35.50 | $35.50 | $35.50 | $31.50 |
| | Shot / Graded Solid Rock | $35.50 | $35.50 | $35.50 | $35.50 | $35.50 | $35.50 | $35.50 | $35.50 | $35.50 | $35.50 | $31.50 |

*Prices subject to change without written notice.
Sales tax and freight are not included.
Product pricing does not guarantee availability.
Please call with questions or for verification prior to shipment.

For more information about our locations, please visit: www.martinmarietta.com/products/ag_locator.asp


**Martin Marietta**

**2017 List Prices**
Effective January 1, 2017

**Alabama District - Gulf Coast Yards**
100 Concourse Pkwy, Suite 290
Hoover, AL 35243
(205) 314-6122

**Sales Representatives:**
Bill Wallace (251) 680-1371
Heath Fincher (251) 259-7390

| Products | Code | Theodore Rail (Mobile) (251) 443-8700 | Theodore Marine (Mobile) (251) 443-8700 | Saraland Rail (North Mobile) (251) 675-9012 | Baldwin Yard (Orange Beach) (251) 974-5608 | Dothan Rail (334) 671-1935 | Pensacola Marine (850) 435-4992 | Pensacola Rail (850) 432-8112 | Milton Rail (Northeast Pensacola) (850) 981-9020 | Panama City Marine (850) 913-0063 |
|---|---|---|---|---|---|---|---|---|---|---|
| #1 | 0101 | $35.50 | | $35.50 | | | | | | |
| #4 | 0400 | $35.50 | | $35.50 | $41.50 | $29.75 | | | $35.50 | |
| #57 | 0570 | $35.50 | | $35.50 | $41.50 | $29.25 | | | $35.50 | |
| #57 Gravel | 0571 | $46.50 | | $46.50 | $46.50 | | $46.50 | | $46.50 | |
| #67 | 0670 | $35.50 | | $35.50 | $41.50 | $29.25 | | $35.50 | $35.50 | |
| Bahamalite | 1234 | | $35.50 | | $41.50 | | $37.50 | | | $37.50 |
| #78 | 0780 | $35.50 | | $35.50 | | $30.25 | | | $41.50 | |
| Pea Gravel | 0815 | | $46.50 | $46.50 | $46.50 | | $46.50 | | $46.50 | |
| Brown Gravel | 2020 | | | | | | | | | |
| #89 | 0890 | $36.50 | | $36.50 | | $29.25 | | | $41.50 | |
| #89 Bahama | 1891 | | $34.50 | | $43.50 | | | | | $37.50 |
| #8910 | 2892 | $35.50 | | $35.50 | | | | | $35.50 | |
| Man Sand | 1903 | $37.50 | | | | $29.75 | | | $37.50 | |
| 8254 | 2520 | $34.50 | | $34.50 | $41.50 | $29.25 | | | $35.50 | |
| 8258 | 2521 | $33.50 | | $34.50 | $41.50 | $29.25 | | | $35.50 | |
| Bahama Base | 2523 | | $31.50 | | $41.50 | | $35.50 | | | $35.50 |
| Oversize Gravel | 2047 | | $46.50 | $46.50 | $46.50 | | | | | |
| Class I Riprap | 0016 | $51.50 | | $51.50 | $53.50 | | $53.50 | | $53.50 | |
| Class II Riprap | 0017 | $51.50 | | $51.50 | $53.50 | | $53.50 | | $53.50 | |
| Class III Riprap | 0015 | $56.50 | | | $53.50 | | $56.50 | | | |
| Bank & Shore | 1285 | | | | | | $56.50 | | | |
| Gabion Stone | 0025 | $51.50 | | $51.50 | $53.50 | | | | $53.50 | |
| Fill Material | 2928 | $27.50 | | $27.50 | $30.50 | | | | $30.50 | |
| Granite #67 | 7670 | | $37.50 | | | | | | | |
| Granite #7 | 7700 | | $37.50 | | | | | | | |
| Granite #89 | 7890 | | $37.50 | | | | | | | |
| Granite Scrns | 7906 | | $37.50 | | | | | | | |

*Prices subject to change without written notice.
Sales tax and freight are not included.
Product pricing does not guarantee availability.
Please call with questions or for verification prior to shipment.

For more information about our locations, please visit: www.martinmarietta.com/products/ag_locator.asp



## 2017 List Prices
Effective January 1, 2017

### Alabama District - Alabama Quarries

100 Concourse Pkwy, Suite 290
Hoover, AL 35243
(205) 314-6122

**Sales Representatives:**

John McCullough  (205) 837-1130
Dan Adams  (251) 680-1371

| Products | Code | Maylene Quarry (205) 314-6130 | O'Neal Quarry (205) 664-9025 | Auburn Quarry (334) 521-3281 | Vance Quarry (205) 553-0063 |
|---|---|---|---|---|---|
| #1 | 0101 | | $17.50 | $22.50 | |
| #1 Mod | 2559 | $17.50 | | | |
| #2 | 0200 | | $17.50 | | $17.50 |
| #23 | 2513 | $17.50 | | | |
| #4 | 0400 | $17.50 | $17.50 | $21.00 | $17.50 |
| #467 | 0467 | $17.50 | $17.50 | $21.00 | $17.50 |
| #5 | 0500 | $17.50 | | | |
| #57 | 0570 | $17.50 | $17.50 | $21.00 | $18.50 |
| #6 | 0600 | $18.00 | $18.00 | | |
| #67 | 0670 | $18.00 | $18.00 | | $19.00 |
| #78 | 0780 | $18.50 | $18.50 | $26.50 | $19.00 |
| #89 | 0890 | $18.50 | $18.50 | $26.50 | $19.00 |
| M10 | 2959 | | | $16.50 | |
| #8910 Mod | 2085 | | $16.50 | | $17.50 |
| #8910 | 2892 | $16.50 | $16.50 | $16.50 | |
| Man Sand | 1903 | $17.50 | $17.50 | $25.50 | $17.50 |
| 825A | 2520 | $16.00 | $16.00 | $17.00 | $17.00 |
| 825B | 2521 | $16.00 | $16.00 | $17.00 | $17.00 |
| 825B Pug | 2586 | | $16.50 | $17.50 | |
| 2.5 x 0 | 2301 | | | | $18.50 |
| Surge | 0029 | | $17.50 | $20.50 | $18.50 |
| Class I RR | 0016 | | $19.50 | $25.50 | $22.50 |
| Class II RR | 0017 | | $19.50 | $25.50 | $22.50 |
| Class III RR | 0015 | | | | $25.50 |
| Gabion | 0025 | | $18.50 | | $19.50 |
| 8 X 2 RR | 2060 | | | | $22.50 |
| Quarry Run RR | 0041 | $17.50 | $17.50 | $25.50 | $21.50 |
| Aglime | 1000 | | | $22.00 | |
| #1 Granule | 2612 | | | $25.50 | |

*Prices subject to change without written notice.
Sales tax and freight are not included.
Product pricing does not guarantee availability.
Please call with questions or for verification prior to shipment.

For more information about our locations, please visit: www.martinmarietta.com/products/ag_locator.asp

**Martin Marietta**

**2017 List Prices**
Effective January 1, 2017*

**North Georgia District**
3325 Paddocks Pkwy, Suite 350
Atlanta, GA 30024
Ph: (678) 965-8555

| PRODUCTS | | Forsyth (770) 887-6711 | Jefferson (706) 693-2483 | Auburn (770) 963-6123 | Lithonia (770) 280-1815 | Newton (770) 280-1818 | Red Oak (404) 720-9769 | Tyrone (770) 487-1387 | Six Mile (706) 235-0041 | Paulding (770) 443-0066 | Chattanooga (423) 893-8000 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BASE | Crusher Run (Commercial) | $24.50 | $24.50 | $24.50 | $24.50 | $24.50 | $24.50 | $24.50 | $24.50 | $24.50 | $23.50 |
| | GAB / DGA Pug (GDOT/TDOT) | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $24.00 |
| COARSE | #3 / #4 Stone | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $25.00 |
| | #5 / #57 Stone | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $25.00 |
| | #6 / #67 Stone | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $25.00 |
| | #7 / #78 Stone | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $28.00 |
| | #89 / #9 Stone | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $28.00 |
| FINE | M-10 / #810 Screenings | $27.00 | $27.00 | $27.00 | $27.00 | $27.00 | $27.00 | $27.00 | $27.00 | $27.00 | $25.00 |
| | FM10 / SM10 / W10 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $32.00 | $29.00 |
| | Pond Sand | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 |
| LARGE | Surge | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 | $26.00 |
| | Rip Rap I & III / Class A & B | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $30.00 |
| | Shot / Graded Solid Rock | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $34.00 | $30.00 |

| Sales Rep: | James Tuten | Jud Dunlevy | Tom Thach |
|---|---|---|---|
| Phones: | (404) 456-0087 | (404) 821-9921 | (404) 456-3350 |

*Prices subject to change without written notice.
Sales tax and freight are not included.
Product pricing does not guarantee availability.
Please call with questions or for verification prior to shipment.

For more information about our locations, please visit: www.martinmarietta.com/products/ag_locator.asp



**Vulcan**
Materials Company

**CASH SALES- SOUTH CAROLINA PRICE SUMMARY**
Effective January 1, 2016

| Product | Liberty 864-843-6335 | Pacolet 864-474-2234 | Blacksburg 864-936-7902 | Lakeside 864-299-4797 | Gray Court 864-876-2101 | Lyman 864-439-1152 | Anderson 864-224-8203 | Columbia 803-929-1348 | Dreyfus 803-754-0222 | Blair 803-635-4514 | Greenwood 864-229-0516 | Charleston 843-572-6627 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Manufactured Sand | $22.75 | $22.75 | $22.75 | $22.75 | $22.75 | $22.75 | $22.75 | $22.75 | $22.75 | $22.75 | $22.75 | |
| Residential Base | $9.25 | | $10.50 | | | | | | | | | |
| Surge Stone (Small) | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.25 | $25.25 | $25.25 | $25.00 | |
| Surge Stone (Large) | | $25.00 | $25.00 | | $25.00 | $25.00 | $25.00 | $25.25 | $25.25 | $25.25 | | |
| Rip Rap | $33.50 | $33.50 | | $33.50 | $33.50 | $33.50 | | $33.75 | | | $33.50 | $53.00 |
| #4 Stone | $24.00 | | | | | $24.00 | $24.00 | $24.25 | $24.25 | | $24.00 | $36.00 |
| #5 Stone | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | | $24.25 | | $24.25 | $24.00 | |
| #57 Stone | $25.25 | $25.25 | $25.25 | $25.25 | $25.25 | $25.25 | $25.25 | $25.50 | $25.50 | $25.50 | $25.25 | $36.00 |
| ½" Crusher Run | | | | | | | | $23.00 | | | | $38.75 |
| NCDOT ABC Stone | | | $23.00 | | | | | | | | | |
| 1½" C.R. Stone Base | $18.50 | $18.50 | $18.50 | $18.50 | $18.50 | $18.50 | $18.50 | $18.50 | $18.50 | $18.50 | $18.50 | $32.75 |
| #6M Stone | $27.50 | $27.50 | | $27.50 | $27.50 | $27.50 | | $27.75 | $27.75 | $27.75 | $27.50 | |
| #67 Stone | $28.50 | $28.50 | $28.50 | | | | | $28.75 | | | | $36.00 |
| #789 Stone | $31.25 | $31.25 | $31.25 | $31.25 | $31.25 | $31.25 | $31.25 | $31.50 | $31.50 | $31.50 | $31.25 | $47.25 |
| Screenings | $20.50 | $20.50 | $20.50 | $20.50 | $20.50 | $20.50 | $20.50 | $20.50 | $20.50 | $20.50 | $20.50 | $31.50 |
| #89M Stone | $35.50 | | $35.50 | | | | | $35.75 | | | $35.50 | |

Prices on crushed stone are per ton FOB truck. All prices are net 15th month prox and are subject to South Carolina sales tax and local county tax, if applicable. Any invoice more than 30 days past due will be subject to an interest charge of 1.5% per month.

---

**HANSON AGGREGATES MIDEAST - SOUTHEAST AREA (SC OPERATIONS)**
**2016 PRICE SCHEDULE**
(Effective Date 01/01/2016)
PRICES ARE PER NET TON IN TRUCKS F.O.B. PLANT

| Products | Brewer* | Anderson | Sandy Flat | Pelham | Jefferson | Marlboro | Lowrys | Clinton |
|---|---|---|---|---|---|---|---|---|
| Class A Rip Rap | - | $30.25 | $30.25 | $30.25 | $30.25 | - | $30.25 | $30.25 |
| Class B Rip Rap | - | $30.25 | $30.25 | $30.25 | $30.25 | - | $30.25 | $30.25 |
| Surge | - | $25.00 | $25.00 | $25.00 | $25.00 | - | $25.00 | $25.00 |
| Metallurgical (3"x3/4") | - | - | - | - | - | $44.00 | - | - |
| ASTM #4 | - | $23.50 | $23.50 | - | $23.50 | - | $23.50 | $23.50 |
| ASTM #487 | | | | Call for pricing and availability | | | | |
| SC #5, #6, NC #5 | - | $23.50 | $23.50 | $23.50 | $23.50 | - | $23.50 | $23.50 |
| #57 | - | $25.75 | $25.75 | - | $25.75 | $31.25 | $25.75 | $25.75 |
| #67 | - | $25.75 | $25.75 | $25.75 | $25.75 | $31.25 | $25.75 | $25.75 |
| #6M | - | - | $25.75 | - | $25.75 | - | $25.75 | $25.75 |
| #5M | - | - | $24.50 | $24.50 | - | - | - | - |
| #789, #78M | - | $30.25 | $30.25 | $30.25 | $30.25 | $31.25 | $30.25 | $30.25 |
| #7 | - | - | - | - | $31.25 | - | - | - |
| #89M | - | $31.25 | $31.25 | - | $31.25 | - | $31.25 | $31.25 |
| Fill Sand | - | - | - | - | $12.00 | $12.00 | $12.00 | $12.00 |
| Screenings | - | $17.00 | $17.00 | $17.00 | $17.00 | - | $17.00 | $17.00 |
| Man Sand/Washed screenings | - | $18.50 | $18.50 | - | $18.50 | $18.50 | $18.50 | $18.50 |
| Filter Bed Sand | - | - | - | - | - | $27.00 | - | - |
| 1 1/2" CR, ABC, MBC | - | $17.50 | $17.50 | $17.00 | $17.50 | $20.00 | $17.50 | $17.50 |
| Asphalt Sand | - | $17.00 | $22.00 | - | - | $16.50 | - | - |
| SC13 Sand | - | - | - | - | - | $17.00 | - | - |
| SC10/NC2S Sand | $10.25 | - | - | - | - | $13.00 | - | - |
| 3" CR/ 3" Surge | - | $24.75 | $24.75 | $24.75 | - | - | - | - |
| ASTM C-33 | $10.25 | - | - | - | - | - | - | - |
| Pond Sand | - | - | $3.00 | - | - | - | - | - |
| Asphalt/Fill/Clay Sand | $7.75 | - | - | - | - | - | - | - |
| Washed White Mortar | $14.00 | - | - | - | - | - | - | - |
| Mortar Sand | $9.50 | - | - | - | - | - | - | - |
| Fill Dirt | $5.00 | $5.00 | $5.00 | - | $5.00 | $10.00 | $5.00 | $5.00 |
| Commercial Base | - | $14.50 | - | - | - | - | - | - |

All products are subject to availability and do not necessarily meet Department of Transportation specifications unless certified at the quarry.
Price are subject to North and South Carolina sales tax if applicable. Credit terms are Net 30.
We do not guarantee color.
Prices are subject to change with out notice.

**VULCAN Materials Company**

**CASH SALE - SOUTH CAROLINA PRICE SUMMARY**

Effective January 1, 2017

| Products | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Manufactured Sand | $23.75 | $23.75 | $23.75 | $23.75 | $23.75 | $23.75 | $23.75 | $23.75 | $23.75 | $23.75 | $23.75 | | |
| Residential Base | $11.25 | | $12.50 | | | | | | | | | | |
| Surge Stone (Sm) | $26.00 | $26.00 | $26.00 | $26.00 | $26.00 | $26.00 | $26.00 | $26.75 | $26.75 | $26.75 | $26.00 | | |
| Surge Stone (Lg) | | $28.00 | $28.00 | | $28.00 | $28.00 | $28.00 | $26.75 | $26.75 | $26.75 | $26.00 | | |
| Rip Rap | $34.50 | $34.50 | $34.50 | $34.50 | $34.50 | $34.50 | $34.50 | $35.25 | | | $34.50 | $57.00 | $57.00 |
| #4 Stone | $25.00 | | | | | $25.00 | $25.00 | $25.75 | $25.75 | | $25.00 | $40.00 | $40.00 |
| #467 Stone | | $26.00 | | | $26.00 | | | | | | | | |
| #5 Stone | $25.00 | | $25.00 | $25.00 | $25.00 | | | $25.75 | | $25.75 | $25.00 | | |
| #57 Stone | $26.25 | $26.25 | $26.25 | $26.25 | $26.25 | $26.25 | $26.25 | $27.00 | $27.00 | $27.00 | $26.25 | $40.00 | $40.00 |
| ½" Crusher Run | | | | | | | | $24.00 | | | | $42.75 | $42.75 |
| NCDOT ABC Stn | | | $24.00 | | | | | | | | | | |
| 1½" C.R. Stn Base | $19.50 | $19.50 | $19.50 | $19.50 | $19.50 | $19.50 | $19.50 | $19.50 | $19.50 | $19.50 | $19.50 | $36.75 | $36.75 |
| #6M Stone | $28.50 | $28.50 | | $28.50 | $28.50 | $28.50 | | $29.25 | $29.25 | $29.25 | $28.50 | | |
| #67 Stone | $29.50 | $29.50 | $29.50 | | $29.50 | $29.50 | | $30.25 | | | | $40.00 | |
| #789 Stone | $32.25 | $32.25 | $32.25 | $32.25 | $32.25 | $32.25 | $32.25 | $33.00 | $33.00 | $33.00 | $32.25 | $51.25 | $51.25 |
| Screenings | $21.50 | $21.50 | $21.50 | $21.50 | $21.50 | $21.50 | $21.50 | $21.50 | $21.50 | $21.50 | $21.50 | $35.50 | $35.50 |
| #89M Stone | $36.50 | $36.50 | $36.50 | | | $36.50 | | $37.25 | | | | $51.25 | $51.25 |

---

**HANSON AGGREGATES MIDEAST - SOUTHEAST AREA (SC OPERATIONS)**

**2017 PRICE SCHEDULE**

(Effective Date 01/01/2017)

PRICES ARE PER NET TON IN TRUCKS F.O.B. PLANT

| Products | Brewer* | Anderson | Sandy Flat | Pelham | Jefferson | Marlboro | Lowrys | Clinton | Columbia Sand |
|---|---|---|---|---|---|---|---|---|---|
| Class A Rip Rap | - | $31.25 | $31.25 | $31.25 | $31.25 | - | $31.25 | $31.25 | - |
| Class B Rip Rap | - | $31.25 | $31.25 | $31.25 | $31.25 | - | $31.25 | $31.25 | - |
| Surge | - | - | $26.00 | - | $26.00 | - | $26.00 | $26.00 | - |
| Metallurgical (3"x3/4") | - | - | - | - | - | $45.00 | - | - | - |
| ASTM #4/ #4 | - | - | $24.50 | - | $24.50 | - | $24.50 | $24.50 | - |
| #467 | - | $27.75 | | | Call for availability | | | - | - |
| SC #5, NC #5 | - | - | $25.50 | $25.50 | $25.50 | - | $25.50 | $25.50 | - |
| #6 | - | - | $24.50 | $24.50 | - | - | - | $24.50 | - |
| #57 | - | $27.75 | $27.75 | - | $27.75 | $33.25 | $27.75 | $27.75 | - |
| #67 | - | - | $27.75 | $27.75 | $27.75 | $33.25 | $27.75 | $27.75 | - |
| #6M | - | - | - | - | - | - | $27.75 | - | - |
| #8M | - | - | $24.50 | $24.50 | - | - | - | - | - |
| #789, #NC 78M | - | $31.25 | $31.25 | - | $31.25 | $32.25 | $31.25 | $31.25 | - |
| ASTM #7/ #7 | - | - | $32.25 | - | $32.25 | - | - | - | - |
| #89M | - | $32.25 | $32.25 | - | $32.25 | - | $32.25 | $32.25 | - |
| Fill | $10.00 | $10.00 | $10.00 | $10.00 | $10.00 | $10.00 | $10.00 | $10.00 | $10.00 |
| Coarse Screenings | - | $17.50 | $17.50 | $17.50 | $17.50 | - | $17.50 | $17.50 | - |
| Man Sand | - | $19.25 | $19.25 | - | $19.25 | $19.25 | $19.25 | $19.25 | - |
| Filter Bed Sand | - | - | - | - | - | $28.00 | - | - | - |
| MBC / Crusher Run | - | $18.00 | $18.00 | $17.50 | $18.00 | $20.50 | $18.50 | $18.50 | - |
| SC13 Sand | - | - | - | - | - | - | $17.75 | - | - |
| Natural Asphalt Sand | $11.00 | - | - | - | - | $11.00 | - | - | $11.00 |
| # 1 Construction Stone | - | $25.75 | $25.75 | $25.75 | $25.75 | - | $25.75 | $25.75 | - |
| ASTM C-33/NC-2S/2MS/SC FA-10 | - | - | - | - | - | $11.00 | - | - | $11.00 |
| Sand Clay | $8.50 | - | - | - | - | - | - | - | $8.50 |
| White Mortar Sand (C-144) | $15.00 | - | - | - | - | - | - | - | $15.00 |
| Red Mortar Sand | $10.00 | - | - | - | - | - | - | - | - |
| Commercial Base | - | $15.50 | - | - | - | - | - | $15.50 | - |

All products are subject to availability and do not necessarily meet Department of Transportation specifications unless certified at the quarry.

Price are subject to North and South Carolina sales tax if applicable.   Credit terms are Net 30.

We do not guarantee color.

Prices are subject to change with out notice.



**Hanson** HEIDELBERGCEMENT Group

## 2013 LIST PRICES
Prices are Per Net Ton in Trucks. F.O.B. Plant

| Product | Athens | Fayette | Gainesville | Habersham | Lithonia | Monroe | Sparta | Toccoa | Walton |
|---|---|---|---|---|---|---|---|---|---|
| #2 | | | | | | | | $ 19.00 | |
| #3/#34 | | | | | $ 15.90 | $ 19.40 | $ 20.00 | | |
| #4 | $ 19.50 | $ 19.40 | $ 19.50 | $ 19.40 | $ 19.90 | $ 19.40 | $ 20.00 | $ 19.40 | $ 20.00 |
| #5 | $ 20.65 | $ 20.55 | $ 20.65 | | $ 21.05 | $ 20.55 | $ 21.15 | | |
| #6 | $ 21.30 | $ 21.20 | $ 21.30 | | $ 21.70 | $ 21.20 | | | |
| #7 | $ 26.40 | $ 26.30 | $ 26.40 | $ 26.30 | $ 26.80 | $ 26.30 | $ 26.90 | $ 26.30 | $ 26.90 |
| #8 | $ 26.50 | | | | | | | | |
| #467 | | | | | | | | | |
| #57 | $ 22.65 | $ 22.55 | $ 22.65 | $ 22.55 | $ 23.05 | $ 22.55 | $ 23.15 | $ 22.55 | $ 23.15 |
| #67 | $ 23.20 | | | $ 23.10 | $ 23.60 | | $ 23.70 | | |
| #78 | | | | | | $ 26.40 | | | |
| #89 | $ 26.50 | $ 26.40 | $ 26.50 | $ 26.40 | $ 26.90 | $ 26.40 | $ 27.00 | $ 26.40 | $ 27.00 |
| #810 | | $ 20.15 | | | | | | | |
| #10 Screening | $ 18.25 | $ 17.15 | $ 21.30 | $ 21.20 | $ 18.65 | $ 18.15 | $ 18.75 | $ 21.20 | $ 19.70 |
| Manufactured Sand | $ 19.20 | $ 25.60 | $ 25.70 | $ 25.60 | $ 26.10 | $ 19.10 | $ 19.70 | $ 25.60 | $ 19.70 |
| Pond Sand | $ 15.50 | $ 15.40 | | $ 15.40 | | | | $ 15.40 | |
| Fill Sand | $ 15.50 | $ 15.40 | $ 15.50 | $ 15.40 | $ 15.90 | $ 15.40 | | $ 15.40 | |
| GAB | $ 18.55 | $ 18.45 | $ 18.55 | $ 18.45 | $ 18.95 | $ 18.45 | $ 19.05 | $ 18.45 | $ 19.05 |
| Commercial GAB | $ 16.55 | | | | $ 18.95 | $ 18.00 | $ 18.05 | | |
| Recycled Concrete Base | | $ 18.45 | | | | | | | |
| Surge | $ 21.15 | $ 21.05 | $ 21.15 | $ 22.05 | $ 21.55 | $ 21.05 | $ 21.65 | $ 22.05 | $ 21.65 |
| Type 1 Rip Rap | $ 26.50 | $ 26.40 | $ 26.50 | $ 26.40 | $ 26.90 | $ 26.40 | $ 27.00 | $ 26.40 | $ 27.00 |
| Type 3 Rip Rap | $ 25.15 | $ 25.05 | $ 25.15 | $ 25.05 | $ 25.55 | $ 25.05 | $ 25.65 | $ 25.05 | $ 25.65 |
| Shot Rock | $ 25.15 | $ 25.05 | $ 25.15 | $ 25.05 | | $ 25.05 | | $ 25.05 | |
| **Boulders (Each) | $ 95.00 | $ 95.00 | $ 95.00 | $ 95.00 | | | | $ 95.00 | |

**Products are subject to availability and prices are subject to change
Products do not necessarily meet Department of Transportation specifications.
For certification, please contact the respective quarry. Prices are subject to Georgia Sales Tax, if applicable.
Terms: Net 30 Days (Subject to credit approval.)



**Hanson** HEIDELBERGCEMENT Group

## 2014 LIST PRICES
Prices are Per Net Ton in Trucks. F.O.B. Plant

| Product | Athens | Fayette | Gainesville | Habersham | Lithonia | Monroe | Sparta | Toccoa | Walton |
|---|---|---|---|---|---|---|---|---|---|
| #2 | | | | | | | | $ 19.00 | |
| #3/#34 | | | | | $ 19.90 | $ 19.40 | $ 20.00 | | |
| #4 | $ 19.50 | $ 19.40 | $ 19.50 | $ 19.40 | $ 19.90 | $ 19.40 | $ 20.00 | $ 19.40 | $ 20.00 |
| #5 | $ 20.65 | $ 20.55 | $ 20.65 | | $ 21.05 | $ 20.55 | $ 21.15 | | |
| #6 | $ 21.30 | $ 21.20 | $ 21.30 | | $ 21.70 | $ 21.20 | | | |
| #7 | $ 26.40 | $ 26.30 | $ 26.40 | $ 26.30 | $ 26.80 | $ 26.30 | $ 26.90 | $ 26.30 | $ 26.90 |
| #8 | $ 26.50 | | | | | | | | |
| #467 | | | | | | | | | |
| #57 | $ 22.65 | $ 22.55 | $ 22.65 | $ 22.55 | $ 23.05 | $ 22.55 | $ 23.15 | $ 22.55 | $ 23.15 |
| #67 | $ 23.20 | | | $ 23.10 | $ 23.60 | | $ 23.70 | | |
| #78 | | | | | | $ 26.40 | | | |
| #89 | $ 26.50 | $ 26.40 | $ 26.50 | $ 26.40 | $ 26.90 | $ 26.40 | $ 27.00 | $ 26.40 | $ 27.00 |
| #810 | | $ 20.15 | | | $ 20.65 | | | | |
| #10 Screening | $ 18.25 | $ 17.15 | $ 21.30 | $ 21.20 | $ 18.65 | $ 18.15 | $ 18.75 | $ 21.20 | $ 19.70 |
| Manufactured Sand | $ 19.20 | $ 25.60 | $ 25.70 | $ 25.60 | $ 26.10 | $ 19.10 | $ 19.70 | $ 25.60 | $ 19.70 |
| Pond Sand | $ 15.50 | $ 15.40 | | $ 15.40 | | | | $ 15.40 | |
| Fill Sand | $ 15.50 | $ 15.40 | $ 15.50 | $ 15.40 | $ 15.90 | $ 15.40 | | $ 15.40 | |
| GAB | $ 18.55 | $ 18.45 | $ 18.55 | $ 18.45 | $ 18.95 | $ 18.45 | $ 19.05 | $ 18.45 | $ 19.05 |
| Commercial GAB | $ 16.55 | | | | $ 18.95 | $ 18.00 | $ 18.05 | | |
| Recycled Concrete Base | | $ 18.45 | | | | | | | |
| Surge | $ 21.15 | $ 21.05 | $ 21.15 | $ 22.05 | $ 21.55 | $ 21.05 | $ 21.65 | $ 22.05 | $ 21.65 |
| Type 1 Rip Rap | $ 26.50 | $ 26.40 | $ 26.50 | $ 26.40 | $ 26.90 | $ 26.40 | $ 27.00 | $ 26.40 | $ 27.00 |
| Type 3 Rip Rap | $ 25.15 | $ 25.05 | $ 25.15 | $ 25.05 | $ 25.55 | $ 25.05 | $ 25.65 | $ 25.05 | $ 25.65 |
| Shot Rock | $ 25.15 | $ 25.05 | $ 25.15 | $ 25.05 | | $ 25.05 | | $ 25.05 | |
| **Boulders (Each) | $ 95.00 | $ 95.00 | $ 95.00 | $ 95.00 | | | | $ 95.00 | |

**Products are subject to availability and prices are subject to change
Products do not necessarily meet Department of Tansportation specifications.
For certification, please contact the respective quarry. Prices are subject to Georgia Sales Tax, if applicalbe.
Terms: Net 30 Days (Subject to credit approval.)



## 2015 LIST PRICES
Prices are Per Net Ton in Trucks, F.O.B. Plant

| Product | Athens | Fayette | Gainesville | Habersham | Lithonia | Monroe | Savannah | Sparta | Toccoa | Walton |
|---|---|---|---|---|---|---|---|---|---|---|
| #2 |  |  |  |  |  |  |  |  | $ 19.00 |  |
| #3/#34 |  |  |  |  | $ 19.90 | $ 19.40 | $ 35.00 | $ 20.00 |  |  |
| #4 | $ 20.50 | $ 19.40 | $ 19.50 | $ 19.40 | $ 19.90 | $ 19.40 | $ 35.00 | $ 20.00 | $ 19.40 | $ 20.00 |
| #5 | $ 20.65 | $ 20.55 | $ 20.65 |  | $ 21.05 | $ 20.55 |  | $ 21.15 |  |  |
| #6 | $ 21.30 | $ 21.20 | $ 21.30 |  | $ 21.70 | $ 21.20 |  |  |  |  |
| #7 | $ 26.40 | $ 26.30 | $ 26.40 | $ 26.30 | $ 26.80 | $ 26.30 |  | $ 26.90 | $ 26.30 | $ 26.90 |
| #8 | $ 26.50 |  |  |  |  |  |  |  |  |  |
| #467 |  |  |  |  |  |  |  |  |  |  |
| #57 | $ 22.65 | $ 22.55 | $ 22.65 | $ 22.55 | $ 23.05 | $ 22.55 | $ 36.00 | $ 23.15 | $ 22.55 | $ 23.15 |
| #67 | $ 23.20 |  |  | $ 23.10 | $ 23.60 |  |  | $ 23.70 |  |  |
| #78 |  |  |  |  |  | $ 26.40 |  |  |  |  |
| #89 | $ 26.50 | $ 26.40 | $ 26.50 | $ 26.40 | $ 26.90 | $ 26.40 | $ 38.00 | $ 27.00 | $ 26.40 | $ 27.00 |
| #810 |  | $ 20.15 |  |  | $ 20.65 |  |  |  |  |  |
| #10 Screening | $ 18.25 | $ 17.15 | $ 21.30 | $ 21.20 | $ 18.65 | $ 18.15 | $ 32.00 | $ 18.75 | $ 21.20 | $ 19.70 |
| Manufactured Sand | $ 19.20 | $ 25.60 | $ 25.70 | $ 25.60 | $ 26.10 | $ 19.10 | $ 34.00 | $ 19.70 | $ 25.60 | $ 19.70 |
| Pond Sand | $ 15.50 | $ 15.40 |  | $ 15.40 |  |  |  |  | $ 15.40 |  |
| Fill Sand | $ 15.50 | $ 15.40 | $ 15.50 | $ 15.40 | $ 15.90 | $ 15.40 |  | N/A |  |  |
| GAB | $ 18.55 | $ 18.45 | $ 18.55 | $ 18.45 | $ 18.95 | $ 18.45 | $ 32.00 | $ 19.05 | $ 18.45 | $ 19.05 |
| Commercial GAB | $ 16.55 |  |  |  | $ 18.95 | $ 18.00 |  | $ 18.05 |  |  |
| Recycled Concrete Base |  | $ 18.45 |  |  |  |  |  |  |  |  |
| Surge | $ 21.15 | $ 21.05 | $ 21.15 | $ 22.05 | $ 21.55 | $ 21.05 |  | $ 21.65 | $ 22.05 | $ 21.65 |
| Type 1 Rip Rap | $ 26.50 | $ 26.40 | $ 26.50 | $ 26.40 | $ 26.90 | $ 26.40 | $ 54.00 | $ 27.00 | $ 26.40 | $ 27.00 |
| Type 3 Rip Rap | $ 25.15 | $ 25.05 | $ 25.15 | $ 25.05 | $ 25.55 | $ 25.05 | $ 52.00 | $ 25.65 | $ 25.05 | $ 25.65 |
| Shot Rock | $ 25.15 | $ 25.05 | $ 25.15 | $ 25.05 |  | $ 25.05 |  |  | $ 25.05 |  |
| **Boulders (Each) | $ 95.00 | $ 95.00 | $ 95.00 | $ 95.00 |  |  |  |  | $ 95.00 |  |

**Products are subject to availability and prices are subject to change
Products do not necessarily meet Department of Tansportation specifications.
For certification, please contact the respective quarry. Prices are subject to Georgia Sales Tax, if applicalbe.
Terms: Net 30 Days (Subject to credit approval.)



## Materials Company

### 1771 Lithonia Quarry
### Mon - Fri 6:30 am to 4:30 pm

Prices Effective January 1, 2017

| Product/Size | Price Per Ton |
|---|---|
| Mfg. Sand | $30.95 |
| Pond Screenings | $21.20 |
| Rip Rap III | $34.70 |
| Surge Stone | $27.45 |
| Rip Rap I | $30.70 |
| Quarry Run Rip Rap | $30.70 |
| No. 4 Stone | $26.45 |
| No. 5 Stone | $26.70 |
| No. 57 Stone | $27.70 |
| G.A.B. | $24.95 |
| 1.5" Crusher Run | $24.95 |
| No. 6 Stone | $26.70 |
| No. 67 Stone | $28.20 |
| No. 7 Stone | $31.95 |
| No. 810 Stone | $26.20 |
| No. 890 Stone | $32.70 |
| M-10 | $25.20 |

8648 Covington Highway Lithonia, GA 30058
770-482-8285

*prices and hours are subject to change without notice

AVERAGE 2015 PRICES AT HANSON'S ATHENS, GEORGIA QUARRY

| Product | Price/ton |
| --- | --- |
| #4 | $20.50 |
| #5 | $20.65 |
| #6 | $21.30 |
| #7 | $26.40 |
| #8 | $26.50 |
| #57 | $22.65 |
| #67 | $23.20 |
| #89 | $26.50 |
| #10 screening | $18.25 |
| GAB | $18.55 |
| Commercial GAB | $16.55 |
| Surge | $21.15 |
| Type 1 Rip Rap | $26.50 |
| Type 3 Rip Rap | $25.15 |
| Shot Rock | $25.15 |
| AVERAGE= | $22.60 |



### 2018 CASH List Prices*

| Products ** | Metro Atlanta | North Georgia | Middle Georgia | Southwest Georgia | Coastal Yards | S. Georgia Yards |
|---|---|---|---|---|---|---|
| Crusher Run | $27.50 | $25.30 | $18.50 | $27.25 | $32.75 | $25.25 |
| GAB | $27.50 | $25.30 | $18.50 | $27.25 | $32.75 | $25.25 |
| 3 / 34's / 4's | $28.75 | $27.25 | $21.50 | $28.75 | $34.00 | $30.25 |
| 57's / 56's / 5's | $30.00 | $28.50 | $22.50 | $30.00 | $35.75 | $32.00 |
| 67's / 6's | $30.00 | $29.00 | $24.50 | $30.50 | $35.25 | $32.00 |
| 7's / 78's | $34.15 | $32.50 | $25.75 | $34.00 | $38.50 | $34.25 |
| 89's | $34.85 | $33.50 | $26.25 | $34.75 | $38.50 | $34.00 |
| 810's | $28.75 | $27.00 | $28.75 | $28.50 | $28.75 | $28.75 |
| Man Sand | $33.15 | $31.75 | $33.15 | $33.15 | $33.00 | $33.00 |
| Type 1 RR | $33.00 | $31.50 | $33.00 | $33.50 | $50.00 | $50.00 |
| Type 3 RR | $34.80 | $35.25 | $26.75 | $36.75 | $50.00 | $50.00 |
| Surge | $30.00 | $28.25 | $22.50 | $29.75 | $29.75 | $29.75 |

| | |
|---|---|
| Metro Atlanta | Norcross, Kennesaw, Lithonia, Friendship, Cherokee, Grayson, Siloam, Stockbridge, Forest Park, Griffin, Madras, Lithia Springs, Villa Rica Aragon, Bartow, Adairsville |
| North Georgia | Rabun, Blairsville, Dalton, Dahloneg, Ellijay |
| Middle Georgia | Macon, Postel, Sparta, Augusta |
| Southwest Georgia | Barin, Lagrange |
| Coastal Yards | Savannah, Garden City, Ellabell, Rincon, Springfield, |
| S. Georgia Yards | Jesup, Surrency, Lenox, Valdosta, Waycross, Meigs, Douglas, Atkinson |

* Prices are subject to change without written notice

** Not all Products are available at every plant. Each Plant produces products specific for that plant/geology. Any questions on specific product availability should be directed to your Sales Representative



## 2015 List Prices
Effective January 1, 2015*

**North Georgia District**
3325 Paddocks Pkwy, Suite 350
Atlanta GA 30024
Ph: (678) 985-8555

| PRODUCTS | | Forsyth Quarry (770) 887-6711 | Jefferson Quarry (706) 693-2433 | Auburn Quarry (770) 963-6123 | Red Oak Quarry (404) 766-5211 | Tyrone Quarry (770) 487-2187 | Urbacks Quarry (770) 780-2835 | Newton Quarry (770) 786-1216 | Six Mile Quarry (706) 125-6041 | Paulding Quarry (770) 443-0066 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | NORTH GEORGIA FACILITIES | | | | | | | | |
| RAP | Crusher Run (Commercial) | $20.50 | $20.50 | $20.50 | $20.50 | $20.50 | $20.50 | $20.50 | $20.50 | $20.50 |
| | GAB - State | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 | $21.00 |
| COARSE AGGREGATE | #3 Stone | --- | $24.00 | $24.00 | --- | --- | $24.00 | $24.00 | $24.00 | $24.00 |
| | #4 Stone | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | -- | -- |
| | #5 Stone | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | --- |
| | #57 Stone | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 |
| | #6 Stone | $24.00 | --- | --- | $24.00 | $24.00 | $24.00 | $24.00 | -- | -- |
| | #67 Stone | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | $24.00 | -- | $24.00 |
| | #7 Stone | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 |
| | #78 Stone | -- | -- | -- | -- | -- | $28.00 | $28.00 | | |
| | #89 Stone | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 | $29.00 |
| | #810 Sand | $22.50 | $22.50 | -- | $22.50 | -- | --- | --- | $22.50 | -- |
| FINE AGGREGATE | M-10 Screenings | $22.50 | -- | $22.50 | $22.50 | $22.50 | $22.50 | $22.50 | -- | -- |
| | W-10 Screenings | $27.50 | $27.50 | $27.50 | $27.50 | $27.50 | $27.50 | --- | $27.50 | $27.50 |
| | FM 10 Sand | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | $28.00 | | | |
| | SM 10 Sand | $28.00 | -- | | | -- | | $28.00 | | $28.00 |
| | Pond Sand | $16.50 | $16.50 | $16.50 | $16.50 | $16.50 | $16.50 | $16.50 | $16.50 | $16.50 |
| | Surge | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 |
| LARGE | Type I Rip Rap | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 |
| | Type III Rip Rap | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 |
| | Shot Rock | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 |

| Sales Rep: | James Tuten | Jason Waddell | Tom Thach |
|---|---|---|---|
| Phone: | (404) 456-0087 | (404) 821-9921 | (404) 456-3350 |

*Prices subject to change without written notice.
Sales tax and freight are not included.
Product pricing does not guarantee availability.
Please call with questions or for verification prior to shipment.

For more information about our locations, please visit: www.martinmarietta.com/products/ag_locator.asp



June, 2019

**Market-Specific Pricing Plan Announcement**

Dear Valued Partner,

We would like to share with you our pricing plans moving into the second half of 2019. We feel that these prices are necessary going forward to continue to maintain the outstanding quality and service you deserve from us. The prices below reflect the _minimum pricing_ at each location and market outlined below that we will offer going forward on _bid and quoted work_, effective 7/1/2019. Existing sales orders will remain in effect through their specified expiration date. As always, we encourage you to speak to your sales representative to confirm your pricing, which may be higher than listed below. In addition, in order to help you prepare for the future, Vulcan will have a minimum of $1.00 per ton increase on bid and quoted work effective January 1, 2020. If you have any questions about specific projects already quoted, we will be happy to discuss them. All quotes prior to 7/1/2019 will be honored if executed by 8/1/2019.

| Product | Metro Atlanta | | North Georgia | Southwest Georgia | Middle Georgia | South Georgia | | Coastal Georgia |
|---|---|---|---|---|---|---|---|---|
| | • Bartow  • Cherokee  • Dahlonega  • Forest Park  • Friendship  • Grayson  • Griffin | • Kennesaw  • Lithia Springs  • Lithonia  • Madras  • Norcross  • Stockbridge  • Villa Rica | • Aragon  • Adairsville  • Blairsville  • Dalton  • Ellijay  • Rabun | • Barin  • LaGrange | • Macon  • Pastel  • Sparta  • Augusta  • Siloam | • Jesup  • Lenox  • Waycross  • Douglas | • Surrency  • Valdosta  • Meigs  • Atkinson | • Savannah  • Garden City |
| | Minimum | | Minimum | Minimum | Minimum | Minimum | | Minimum |
| GAB | $13.00 | | $13.00 | $13.00 | $12.00 | $25.00 | | $25.00 |
| 3's / 34's / 4's | $19.00 | | $19.00 | $19.00 | $18.00 | $32.00 | | $32.00 |
| 57's / 56's / 5's | $19.00 | | $19.00 | $19.00 | $18.00 | $32.00 | | $32.00 |
| Surge | $19.00 | | $19.00 | $19.00 | $18.00 | $39.00 | | $48.00 |
| Rip Rap | $21.00 | | $21.00 | $21.00 | $21.00 | $50.00 | | $52.00 |

Sincerely,

Stephen Ashworth
Vice President of Sales – Georgia



October 9, 2020

CUSTOMER
ADDRESS
ADDRESS 2
CITY, STATE  ZIP

Dear Valued Customer,

We would like to take this opportunity to thank you for your business and continued loyalty. Vulcan Materials values our relationship with you and is committed to providing industry leading service and value. This year has been a trying time for our country, state, and local communities. We hope that your organization and families have remained safe during the COVID pandemic.

We feel very fortunate and proud to have been part of an industry deemed "essential" during this unprecedented time. Our employees have taken great pride in being able to safely service our customers and the communities we operate in. While these past few months have been difficult, our industry remains strong as infrastructure, commercial and residential projects continue to move forward. As we all look to 2021, we wanted to share our pricing plans in an effort to assist you with your quoting process. As always your sales representative will be available to discuss these plans as well as discuss your individual projects.

**Effective January 1, 2021, we will implement price increases ranging between $1.25/ton on clean stone products and $0.50/ton on base products shipped from our Childersburg and Notasulga quarries.** These price increases will apply to all contractor and fixed plant prices for products shipping after January 1st. We will honor existing quotes until either the tonnage and/or time requirements are fulfilled.

| Size | Childersburg | Notasulga |
|---|---|---|
| Crusher Run/825B | $15.75 | $15.00/$17.00 |
| 1/2/4 | $18.25 | $21.25 |
| 5/57 | $18.25 | $21.75 |
| 6/67 | $18.25 | $21.75 |
| 7/78 | $18.75 | $22.75 |
| 8/89 | $18.75 | $22.75 |
| 810/8910 | $16.50 | $22.75 |
| Man. Sand | n/a | $22.75 |
| Rip Rap (CL1/CL2) | $26.25* | $26.25 |
| Surge | $17.25 | $19.00 |

*Limited availability - please contact your sales rep

Again, your sales rep is available to discuss job specific material pricing, hauling rates, and value engineering opportunities. We look forward to these conversations and opportunities to provide solutions for your jobsite needs.

We very much appreciate the fact that you have chosen to do business with us, and in return we pledge our continuing efforts to give you the quality and service you deserve.

Best Regards,

Charlie Vines
Area Sales Manager – Central Alabama

Tim Garrett
Vice President Sales - Alabama

SOUTHERN AND GULF COAST DIVISION, VULCAN CONSTRUCTION MATERIALS, LP
P.O. BOX 385016 • BIRMINGHAM, ALABAMA 35238-5016

**Price Escalation**

Industry, construction and finance departments are constantly trying to measure fluctuations in supply and demand and therefore the price or cost of materials or goods sold during the lifetime of projects. Trying to constantly manage the costs associated with fluctuations in the market for most raw materials used in multi-year, large dollar-value projects that require a robust supply of aggregates and raw materials becomes time intensive, inefficient and costly to constantly manage and monitor. As such, most firms employ some method of pre-determined price escalations, a set rate increase, attempting to mitigate large fluctuations in the market prices of aggregates mutually beneficial to both parties over the life of the contract by avoiding large losses or gains by either party. The industry standard for price escalation estimates is typically the Producer Price Index (PPI) produced by the Bureau of Labor Statistics and widely accepted by contracting parties nationwide. The chart below demonstrates the PPI typically used in determining the monthly escalation rates in the cost of raw materials.



A key component in projects being completed on time and within budget is ensuring agreed upon fair and equitable price escalations, at least as far as known material costs are concerned. This necessary consideration, often established in contracts, is demonstrated by the *Mineral Commodity Summaries* published by the U.S. Geological Survey in 2017, "The estimated total output of crushed stone produced for consumption in 2017 was 1.35 billion metric tons."

The importance of an agreed upon rate of escalation is further demonstrated by a study into the percentage increases in metric tons of crushed stone between 2013 and 2014. According to the *U.S. Geological Survey Minerals Yearbook* from 2015: "In 2014, 1,045 operations reported the monetary value of their production with an average unit value of $10.74 per metric ton. In 2015, 1,032 operations reported the monetary value of their production with an average unit value of $11.31 per metric ton, which was an increase of 5.0% compared with that of 2014. Leading U.S. producers reported that prices increased by 7.0% to 8.0% in 2015, which exceeded the historic average for year-over-year increases."

A seven-year crushed stone price trend has been calculated based on USGS price per ton reported numbers. The annual percent changes range from 1.7% to 5.5%, averaging

3.0%. Additionally, a trend analysis of average selling prices of crushed stone producers operating in the southeastern United States over the same timeframe shows an average increase of 3.9%, ranging from 1.7% to 7.1%. For the purpose of the subject property's pro forma, a reasonable annual price increase of 2.5% will be used after the initial price period in Year 1 for crushed stone products.

**Start-Up Costs (Exploration, Permitting, Plant-Equipment)**

Total start-up costs for a mining development vary due to a range of factors such as site characteristics, materials to be mined, depth of deposits and permitting requirements.

As previously discussed, the subject property contains ample granite deposits and is located in an area of Georgia with permitted granite mines existing and operating, indicating the permitting process to not be overly burdensome or costly. It should be noted that, the subject property is a self-contained property potentially resulting in minimal impact on surrounding properties allowing a more streamlined and efficient permit process.

As stated throughout this report, a contract miner will be responsible for start-up costs such as exploration and plant equipment, which is included in the $8.75/ton figures found throughout this report. An additional $150,000 is included in the discounted cash flow analysis in order to account for the cost of procuring the necessary permits for the subject property and an additional $150,000 is included for mobilization and demobilization. According to Mr. Curtis Colwell, Colwell Construction, a contract miner in the southeast, the costs associated with site preparation, overburden removal, erosion barriers, boulder breakage, and associated costs can be estimated at $1,000,000 for an average property. An additional $200,000 has been included as miscellaneous expenses and $500,000 has been included for potential wetland mitigation.

Further, according to Mr. Ben Black, GeoLogic, LLC and presented in the table below, the estimated cost to construct the rail operation at the subject property is as follows:

| Item | Track Work | Earth Work | Box Culverts | Comments |
|---|---|---|---|---|
| Mobilization / Demobilization | $60,000 | $150,000 | $75,000 | |
| Track Construction | $1,860,000 | $744,000 | $358,750 | Box Culvert (260 feet) |
| Turnout | $375,000 | $125,000 | $150,000 | Headwalls (4) |
| Crossing Renewal | $60,000 | $45,000 | $750,000 | Earth Work Around Box |
| Bumping Post | $100,000 | $20,000 | $200,000 | |
| | $2,455,000 | $1,084,000 | $1,533,750 | $5,072,750 |
| | | | 30% contingency | $1,521,825 |
| | | | | $6,594,575 |

Finally, as detailed earlier in this report, the cost to breach the land covenant on the subject property would be $203,570.53. Therefore, the total start-up costs have been estimated to be $8,798,146. This will be included in the DCF found within this report.

## Expenses

Operating expenses for the mining and processing of crushed stone are broken down into several different categories, including the actual mining costs themselves, GSA, property tax, surety bond, reserves for replacement, and reclamation. Many of these costs have been determined based on experience and proprietary information, including information collected from other mineral development properties in the Southern U.S. region. These costs are explored further below.

## Transportation Costs

Transportation costs are generally the responsibility of customer, thus are not included in the Discounted Cash Flow as a line item. This pricing is based on the customer providing transportation from the mine to the job and up to the customer to provide the appropriate quantity of trucks for the project. Transportation to a nearby rail spur is also common; however, this is incorporated into the pricing and not as a line-item expense.

## Management/Administrative Costs/Sales/Marketing

Based on the mining operations nationwide and the Resource Valuation Report prepared Dr. Capps, Capps Geoscience, LLC, for a privately-owned mining operation the administrative and management cost is generally between 2.0% and 4.0% depending on the commodity mined, the size of the operation, and the size of the operating entity. For the subject property, a GSA cost of 3.0% of annual revenue has been used in the pro forma. This higher percentage has been selected to provide the management of the subject property with additional allocated capital for emergence into an established marketplace.

## Surety Bond

A surety bond will need to be posted as part of the permitting process. This bond is $2,500 per each acre of proposed disturbance in the State of Georgia and can be rotated to new areas as the mining progresses, as long as the areas of previous disturbance have been reclaimed to the satisfaction of the GDOL. For the subject property's pro forma, a disturbance area of 240 acres will be assumed at a cost of approximately $600,000. Although the original pit is assumed to be 68 acres, the entire acreage is assumed for the surety bond to be conservative and account for the potential expansion of the quarry in the future.

## Property Taxes

Property taxes are calculated based on the existing use and zoning of the property. The subject property is currently being taxed at approximately $13.03/acre. Once the subject property has been reassessed as a mining property, this tax rate is likely to increase to approximately $30.94/acre, the current property tax rate for mining properties near the subject property in Warren County. A $35.00/acre tax rate has been assumed as a conservative estimate for the subject property. This will start in year two, when it is assumed the subject property will be reassessed.

**Reserve for Replacements**

Cash reserves are held for replacement of any equipment requiring repairs necessitating capital but can be expensed. This rate is generally set at 1.0% of gross revenue, and a 1.0% figure is used conservatively in the pro forma in order to maintain the operating efficiencies needed to maintain competitiveness within the regional market.

Based on the above information and only considering the period of active mining operations, a replacement allowance of $23,139 is used for year 2, $39,530 is used for year 3, and $70,671 is used for year 4, increasing as revenue increases to maintain the 1.0% of gross revenue.

**Contingency**

Most mining operations maintain a contingency expense for unknown expenses that may arise during operations and that fall outside of normal Operations and Management (O&M) budgets. These unexpected circumstances may range from increases in mining regulations, to changing market conditions, to increases in property taxes. This contingency would also include the repair and replacement of equipment if it were to exceed the cash reserves for replacement in any given year. This contingency is generally placed in a range between 1.0% and 3.0%, for the subject property a contingency of 2.0% has been assumed.

**Reclamation**

Reclamation at the end of a mining operation involves plant deconstruction, land grading and planting. The surety bond amount is used to calculate the expenses due as a result of the reclamation once mining operations have ceased. The surety bond amount times the total acreage adjusted at 2.5% per year future value will be due in the final year. The 2.5% is indicative of normal growth rates for reclamation bonds. An adjustment for reclamation expense is reduced by 50.0% to take into account the remaining actual land that requires grading and planting. Most quarries are either left to fill up with water over time and do not require immediate reclamation or are reclaimed in stages as mining operations are moved throughout the property.

Using the above process, reclamation cost at the end of mining operations is estimated to be $300,000 escalated to a future value by 2.50% per year.

**Materials Harvest Cost**

The actual mining cost is the last element and is a variable expense based on tonnage processed, such that the same equipment could produce material at a lower volume or higher volume based on demand. A cost of $8.75/ton was utilized for the contract mining estimate for the subject property, which is consistent with information from current area operators. This calculation is not based on capital investment; it is only based on operating expenses. The mining and production costs are usually broken down into labor (55.0%), mining and production supplies including mobile equipment leases (35.0%) and

utilities (10.0%) for budget purposes (Hard Rock Miner's Handbook). For an escalator, we have chosen to use an increase in mining costs of 2.5% for the duration of this DCF.

Mining operation profits are taken from net income after accounting treatment of depreciation, amortization, depletion, taxes, etc., whereas the GSA expenses for the management of the plant is usually not taken by the investors/developers and is therefore a straight expense to operations.

## Summary of DCF

According to the Resource Valuation Report, the valuation estimates a total of 60.6 million short tons mined and processed over a 25-year period by the subject property's proposed operation with 7.2 million short tons contributed from the FOB truck market and 53.4 million short tons from rail market. The truck market rate is modeled as 150,000 tons in Year 1, 250,000 in years 2 and 3, and 300,000 tons in years 4 through 25 as the market matures. According to the Resource Valuation Report, a slower production rate for the first three years will allow the establishment of the ultimate quarry site and market for the subject property's proposed operation. The rail market annual production is modeled as escalating over a 25-year period from 1.6-unit trains (about 9,000 tons per unit train) per week or 800,000 tons in Years 1 and 2, 2.0-unit trains per week or 1,000,000 tons per year in Years 3 and 4, 1,336,400 tons in Years 5 through 7 and then increase approximately a half of unit train per year (approximately 4,500 tons) through the life of the mine.[100]

Of note, based on discussions with Mr. Ben Black, GeoLogic, LLC (GeoLogic), and the current mine plan, Mr. Black stated the following, "GeoLogic's review of the mine plan and current rail loadout operations, as well as truck service to the mine indicates that a maximum of about two million short tons per year (tpy) by means of rail, plus about 300,000± trucks per year is reasonable based on site conditions. Initial operations of the mine will only include truck sales while the mine is being developed and rail access is constructed. This initial construction will likely take two to three years to accomplish once construction begins. Peak production will not likely occur until Year 6 or later. A schedule as follows is considered reasonable:

Year 1 – 150,000 tpy
Year 2 – 250,000 tpy
Year 3 – 350,000 to 500,000 tpy
Year 4 – 750,000 to 1,500,000 tpy
Year 5 – ≥1,500,000 tpy

For the purpose of this appraisal report, the first year will primarily be spent in obtaining permits, site preparation, road construction, hiring management, overburden stripping, starting construction of the rail and plant setup, with no production or sales. Truck production will start in year two with 150,000 tons and ramp up to 250,000 tons in years three and four and increase to 300,000 tons per year from years five through 26. For the purpose of this appraisal report, it is assumed the construction of the rail loop will begin at the end of year one and be completed in year three, with no sales by means of the

---

[100] Resource Valuation Report, Capps Geoscience, LLC

rail line in years one through three. Production and sales by way of rail will start in year four with 200,000 tons, increase to 700,000 tons in year five, increase to 1,000,000 in year six, increase to 1,336,000 in years seven through nine, and then based on the Resource Valuation Report, increase approximately a half of unit train per year (approximately 4,500 tons) through the life of the mine. For the purpose of this appraisal, the total production by means of truck would be 7,250,000 tons and 29,308,500 by means of rail. It is the appraisers' opinion this production schedule adequately takes into account the construction of the rail and site limitations.

Based on the above analysis, the ability to quickly ramp up production, utilize new and more efficient equipment, account for changes in current and future market pricing trends, and the current deficit in the market area, results in a viable endeavor with a high probability of success. Furthermore, the report states that the granite is of a quality that is currently being utilized by customers within a wider market with shipping available on site and can be easily transported to different regions of the United States should the market conditions dictate.

Additionally, capital requirements for equipment vary from provider to provider. The values provided function as a starting point for cash flow requirements and budget analysis.

## Entrepreneurial Incentive

When analyzing a property with the discounted cash flow analysis detailed in this report, entrepreneurial profit should be considered. Entrepreneurial profit is defined as: "A market-derived figure that represents the amount an entrepreneur receives for his or her contribution to a project and risk; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represents the entrepreneur's compensation for the risk and expertise associated with the development. An entrepreneur is motivated by the prospect of future value enhancement (i.e., the entrepreneurial incentive)."[101] Entrepreneurial incentive is defined as: "The amount an entrepreneur expects to receive for his or her contribution to a project. Entrepreneurial incentive may be distinguished from entrepreneurial profit (often called developer's profit) in that it is the expectation of future profit as opposed to the profit actually earned on a development or improvement."[102] Finally, developer's profit is defined as: "the profit anticipated or earned by the developer of a real estate project."[103] According to market participants, entrepreneurial incentive is typically not included as a line item in the financial analysis of mining operations. Therefore, for purposes of this analysis, entrepreneurial inventive is not included as a line item and considered in the selection of the discount rate.

We have done extensive investigation and continue to do so with respect to the industry methods and standards in regard to entrepreneurial incentive. we have spoke with industry experts and have concluded that within the mining industry, the entrepreneurial incentive is incorporated into the discount rate. Therefore, for the purpose

---

[101] Dictionary of Real Estate Appraisal, Fifth Edition, pages 67-68
[102] Dictionary of Real Estate Appraisal, Fifth Edition, pages 67
[103] Dictionary of Real Estate Appraisal, Fifth Edition, pages 57

of this appraisal, the entrepreneurial incentive will be considered in the selection of the discount rate.

**Discount Rate**

Discount rates as they apply to the appraisal of real estate are best explained using information presented by the Appraisal Institute in the publication *The Appraisal of Real Estate, 15th Edition*, Pages 429-430. The following quotes provide a brief introduction and summary of discount rates and how they apply to the appraisal of real estate.

"Different discount rates are used to discount cash flows applicable to a specific position or interest in defined real estate. Discount rates are different from capitalization rates. With a discount rate, any anticipated changes in income or value are explicit in the cash flows. With capitalization rates, the changes are implicitly accounted for in the rate."

"A yield rate is a rate of return on capital. It is usually expressed as a compound annual percentage rate. The yield rate considers all expected property benefits (both positive and negative over time), including the proceeds from disposition at the termination of the investment, if any. The term interest rate usually refers to the yield rate for debt capital, not equity capital."

"An internal rate of return (IRR) is the yield rate that is earned for a given capital investment over the period of ownership. The internal rate of return for an investment is the yield rate that equates the present value of the future benefits of the investment to the amount of capital invested. The internal rate of return applies to all expected benefits, including all periodic cash flows and the net proceeds from disposition at the investment's termination. It can be used to measure the return on any capital investment, before or after income taxes."

"An overall yield rate ($Y_0$), or property yield rate, is a rate of return on the total capital invested. It considers all changes in income over the investment projection period as well as the reversion at the end of the projection period. It does not, however, consider the effect of debt financing. Rather, it is calculated as if the property were purchased with no debt capital and thus is sometimes called an unleveraged rate or an unlevered rate. The overall yield rate can be viewed as the combined yield on both the debt and equity capital."

"A discount rate reflects the relationship between income and the value that a market will attribute to that income. Four key components can be identified within a discount rate: the safe rate plus considerations of illiquidity, management, and various risks."

"The suitability of a particular rate of return cannot be proven with market evidence, but the rate estimated should be consistent with the data available. Estimating rates requires appraisal judgment and knowledge of prevailing market attitudes and economic indicators."

Furthermore, according to the American Institute of Minerals Appraisers (Dec. 1995, 1:5, 4), there are times when mining operations fail to account for the differing market expectations associated with the mining community. "O'Connor and McMahon believe

that the high discount rates commonly applied to mining projects fail to take into account some fundamental issues. Mining companies are part of an international community and as such should devise their cost of capital accordingly. Using rates significantly above this level, they maintain, is clearly not taking into account market expectations."

Based on the above recommendations from the American Institute of Minerals Appraisers, the appropriate discount rate is settled on only after considering market expectations based on the subject property's location and any potential competition from surrounding properties. As discussed previously, the subject property is located amid an area rich with granite deposits, however, other properties in the area also benefit from the plethora of resources. Despite the abundance of mineral deposits, it is difficult to predict if any surrounding properties will undertake the development of a mining operation. A non-inclusive list of five (5) factors which impact the probability of a surrounding property undergoing the development of a mining operation and thereby creating competition for the subject property's mining operation include:

1. The property owner's motivation and desire to operate a mine

2. The property owner's capital resources and ability to undertake a mining development

3. The specific product mixes on a site and the ease of extracting the materials

4. The access to transportation specific to a property

5. Known plans of the property owner to begin operating a mine on the property.

Moreover, the discount rate for a mineral project is primarily comprised of three (3) principal components:

1. Risk-Free Interest Rate: The value of the long-term, risk-free, real (no inflation) interest rate is approximately 2.5%. Long term averages range from 2.3% to 2.6%.

2. Mineral Project Risk: includes risks associated with reserves (tonnage, mine life, grade), mining (mining method, mining recovery, dilution, mine layout), process (labor factors, plant availability, metallurgy, recoveries, material balances, reagent consumption), construction (costs, schedules, delays), environmental compliance, new technology, cost estimation (capital and operating), and price and market.

3. Country Risk: refers to risks that are related to country-specific social, economic, and political factors.

For the purpose of this analysis, a 11.0% discount rate has been selected to derive the net income levels and arrive at a present worth. This discount rate is appropriate given the risks associated with this type of property and anticipated changes in the investor yield rates over the projection period. The selected discount rate is supported by the property

specific range of discount rates provided by surveys of market participants conducted by RealtyRates.com. RealtyRates.com for industrial properties indicate a range of 7.29% to 16.39% (12.34% avg.) and for special purpose properties a range of 8.32% to 21.36% (15.04% avg.). Therefore, based on the investor surveys, a discount range of 11.00% is reasonable and supported.

| RealtyRates.com INVESTOR SURVEY - 4th Quarter 2018* DISCOUNT RATES | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | New Development | | | Acquisitions | | | Recapitalizations | | |
| Property Type | Min. | Max. | Avg. | Min. | Max. | Avg. | Min. | Max. | Avg. |
| Apartments | 7.20% | 16.10% | 11.46% | 6.26% | 14.01% | 9.97% | 7.12% | 15.94% | 11.34% |
|   Garden/Suburban TH | 7.20% | 14.91% | 10.74% | 6.26% | 12.97% | 9.35% | 7.12% | 14.76% | 10.64% |
|   Hi-Rise/Urban TH | 7.92% | 16.10% | 11.52% | 6.89% | 14.01% | 10.03% | 7.84% | 15.94% | 11.41% |
|   Student Housing | 7.68% | 15.71% | 11.84% | 6.69% | 13.67% | 10.30% | 7.61% | 15.55% | 11.72% |
| Golf | 7.97% | 21.89% | 16.14% | 6.93% | 19.05% | 14.05% | 7.89% | 21.67% | 15.98% |
|   Public Daily Fee Courses | 10.22% | 21.63% | 15.77% | 8.89% | 18.82% | 13.72% | 10.12% | 21.41% | 15.61% |
|   Semi-Private Clubs | 8.49% | 21.89% | 16.31% | 7.39% | 19.05% | 14.19% | 8.41% | 21.67% | 16.15% |
|   Private Clubs | 7.97% | 20.37% | 15.39% | 6.93% | 17.72% | 13.39% | 7.89% | 20.17% | 15.24% |
| Health Care/Senior Housing | 7.37% | 20.66% | 11.69% | 6.41% | 17.97% | 10.17% | 7.30% | 20.45% | 11.57% |
|   Acute Care Facilities | 8.34% | 21.76% | 13.25% | 7.25% | 18.93% | 11.52% | 8.25% | 21.54% | 13.11% |
|   Out-Patient Care Facilities | 7.37% | 15.51% | 10.48% | 6.41% | 13.49% | 9.12% | 7.30% | 15.35% | 10.37% |
|   Congregate Care Facilities | 8.18% | 17.13% | 11.46% | 7.12% | 14.90% | 9.97% | 8.10% | 16.96% | 11.35% |
|   Assisted Living Facilities | 7.62% | 15.96% | 10.69% | 6.63% | 13.89% | 9.30% | 7.54% | 15.80% | 10.59% |
| Industrial | 7.29% | 16.39% | 12.34% | 6.12% | 13.77% | 10.37% | 7.36% | 16.55% | 12.46% |
|   Warehouse/Distribution | 7.29% | 14.26% | 11.18% | 6.12% | 11.98% | 9.39% | 7.36% | 14.40% | 11.29% |
|   R&D/Flex | 8.22% | 16.39% | 12.63% | 6.90% | 13.77% | 10.61% | 8.30% | 16.55% | 12.76% |
|   Climate Controlled/Manufacturing | 7.74% | 15.74% | 11.66% | 6.50% | 13.22% | 9.80% | 7.82% | 15.90% | 11.78% |
| Lodging | 7.88% | 19.84% | 14.38% | 6.62% | 16.67% | 12.08% | 7.64% | 19.25% | 13.95% |
|   Full Service Facilities | 7.88% | 17.10% | 14.51% | 6.62% | 14.36% | 12.13% | 7.64% | 16.58% | 14.07% |
|   Limited Service Facilities | 8.86% | 19.84% | 14.70% | 7.44% | 16.67% | 12.35% | 8.59% | 19.25% | 14.26% |
|   Golf/Gaming/Resort | 8.42% | 18.77% | 13.57% | 7.07% | 15.77% | 11.40% | 8.17% | 18.21% | 13.16% |
| Mobile Home/RV Park/Camping | 7.40% | 18.64% | 12.90% | 6.00% | 15.10% | 10.45% | 7.40% | 18.64% | 12.90% |
|   RV Parks/Campgrounds | 8.08% | 18.64% | 13.37% | 6.55% | 15.10% | 10.83% | 8.08% | 18.64% | 13.37% |
|   Manufactured Housing | 7.40% | 16.92% | 12.14% | 6.00% | 13.70% | 9.83% | 7.40% | 16.92% | 12.14% |
|   Mobile Home Parks | 7.94% | 17.07% | 12.76% | 6.43% | 13.82% | 10.34% | 7.94% | 17.07% | 12.76% |
| Office | 7.31% | 15.88% | 12.30% | 6.36% | 13.82% | 10.70% | 7.24% | 15.73% | 12.18% |
|   Suburban | 7.31% | 14.62% | 11.61% | 6.36% | 12.72% | 10.10% | 7.24% | 14.48% | 11.49% |
|   CBD | 8.27% | 15.88% | 12.48% | 7.20% | 13.82% | 10.85% | 8.19% | 15.73% | 12.35% |
|   Medical | 8.50% | 15.89% | 11.50% | 7.40% | 13.82% | 10.00% | 8.42% | 15.73% | 11.38% |
| Restaurants | 7.76% | 20.45% | 15.55% | 6.53% | 17.39% | 13.22% | 7.45% | 19.64% | 14.93% |
|   Full Service | 10.81% | 20.45% | 15.55% | 9.19% | 17.39% | 13.22% | 10.37% | 19.64% | 14.93% |
|   Fast Food | 7.76% | 19.47% | 14.59% | 6.59% | 16.55% | 12.40% | 7.45% | 18.69% | 14.01% |
| Retail | 7.45% | 17.55% | 13.02% | 6.41% | 15.09% | 11.19% | 7.30% | 17.20% | 12.76% |
|   Anchored | 7.45% | 16.17% | 13.09% | 6.41% | 13.90% | 11.26% | 7.30% | 15.84% | 12.83% |
|   Un-Anchored | 8.13% | 17.55% | 13.77% | 7.00% | 15.09% | 11.85% | 7.97% | 17.20% | 13.50% |
|   Convenience/Gas | 8.44% | 17.65% | 11.51% | 7.26% | 15.18% | 9.90% | 8.27% | 17.30% | 11.28% |
|   Free Standing | 7.79% | 17.16% | 13.59% | 6.70% | 14.76% | 11.68% | 7.64% | 16.82% | 13.32% |
| Self-Storage | 7.49% | 15.47% | 13.14% | 6.37% | 13.15% | 11.17% | 7.49% | 15.47% | 13.14% |
|   Climate Controlled | 7.67% | 15.47% | 12.96% | 6.52% | 13.15% | 11.02% | 7.67% | 15.47% | 12.96% |
|   Mini Storage | 7.49% | 16.54% | 13.15% | 6.37% | 14.06% | 11.18% | 7.49% | 16.54% | 13.15% |
| Special Purpose | 8.32% | 21.36% | 15.04% | 7.15% | 18.37% | 12.93% | 8.15% | 20.93% | 14.74% |
|   Schools/Day Care Centers | 8.32% | 18.49% | 13.66% | 7.15% | 15.90% | 11.75% | 8.15% | 18.21% | 13.39% |
|   Churches/Temples/Synagogues | 9.47% | 21.36% | 15.09% | 8.15% | 18.37% | 12.98% | 9.28% | 20.93% | 14.79% |
| All Properties | 7.20% | 21.89% | 13.13% | 6.00% | 19.05% | 11.21% | 7.12% | 21.67% | 12.96% |

*3rd Quarter 2018 Data          Copyright RealtyRates.com ™

**Resource Valuation Report Discount Rate**

The discount rate for the production transported in the local truck market is 12.5% and the discount rate for production transported by rail is 10.0%.

**Mining Survey Discount Rates**

Below is the PKF Mining Survey from October of 2009. As shown below, it is a summary of discount rates from companies across the world. Further, as shown below, the simple average of the survey below is 11.16%. Excluding the above discount rates for Gem Diamond's Lesotho project and Highland Gold's Rouble denominated cash flows, which reflect higher political or currency risk, the simple average discount rate would be 10.19%.[104]

| Summary of discount rates | |
|---|---|
| Company | % |
| Caledon Resources | 12.00% |
| DiamondCorp | 10.00% |
| Gem Diamonds (Australia project) | 8.60% |
| Gem Diamonds (Lesotho project) | 17.40% |
| GMA Resources | 10.00% |
| Highland Gold (USD) | 10.75% |
| Highland Gold (Rouble) | 14.63% |
| KazakhGold | 10.00% |
| Kenmare Resources | 8.00% |
| Metals Exploration | 10.00% |
| Oxus Gold | 10.00% |
| UK Coal | 12.50% |
| Simple average | 11.16% |
| Source: Latest statutory accounts | |

Furthermore, according to the *KPMG Mining Report 2016*: "the discount rates disclosed by 20 companies ranged from 3.0% to 14.5%. The low end of the range likely applied to producing properties in low-risk jurisdictions, while the high end of the range likely applied to development properties, and/or properties facing moderate-to-high country risk." It should be noted that the United States is considered to have a very low country risk factor. KPMG publishes the results of a survey of reporting major mining companies from across the globe. [105]

**Mining Professionals Opinion on Discount Rates**

Mr. Chris Summers, Burgex Inc., Mining Consultants is a senior financial professional with extensive experience in mining and exploration activities and over 20 years in financial management. Mr. Summers has held various senior finance and business analysis roles with Rio Tinto and Nyrstar and has represented several mining companies as a senior consultant in finance M&A related roles. He has played a vital role in analyzing and reviewing key mining and exploration projects and has helped secure

---

[104] Most recent chart available from PKF LLP
[105] Most recent KPMG Mining Report specifically referencing discount rates.

funding used to advance several high-profile projects. Mr. Summers indicates mining and exploration projects generally employ one of three project valuation approaches. These approaches or methodologies tend to be applied based on the stage of the project and how much information is available. Further, Mr. Summers explains, when there is sufficient information available the preferred approach is almost always the income approach. It is used by the majority of companies in the industry and is generally accepted by industry analysts and management alike.

Mr. Summers states: "The income approach employs the use of the discounted cash flow analysis where future project cash flows are discounted back to their current value. Key components of the analysis are: capital costs, operating costs, revenues and the discount rate. In addition, all cost and revenue forecasts are in cash terms and accounting methodologies and measurements like "accruals" and "profit" do not apply to the valuation."

Mr. Summers indicates larger companies with sophisticated management in place use discount rates between 4.0% to 7.0%. Mid-sized companies with less access to capital and higher risk profiles generally use discount rates between 7.0% to 10.0%. Smaller companies with higher risk profiles use discount rates between 10.0% to 15.0%. According to Mr. Summers, rarely has he seen a project in this industry employ a discount rate above 15.0%. In conclusion, Mr. Summers is of the opinion with sand, gravel and stone operations of small to mid-size generally employ discount rates between 10.0% to 12.0%.

According to the Resource Valuation Report, the discount rate for the production transported in the local truck market is 12.5% and the discount rate for production transported by rail is 10.0%. The base discount rate of 9.5% is calculated from summing current U.S. Treasury Bond rate of 2.5% and industry bond rate based on published Vulcan Materials Corporation (VMC; coupon rates of 7.0% (Discount Rate = 2.5% + 7.0% = 9.5%) published by Morningstar Ratings. An additional 3.0% is added to the base truck market discount rate to allow for the uncertainties inherent in establishing the new quarry in the market area.

**Conclusion**

A Discount Rate is now reconciled from the results of the following methods applied.

- Investor Surveys 7.29% to 21.36%

- Based on the Resource Valuation Report prepared by Dr. Capps, Capps Geoscience, LLC at 12.5% for the truck market and 10.0% for the rail market.

- KPMG Mining Report discount rates ranging from 3.0% to 14.5%

- PKF Mining Survey reports a discount rate range of 8.0% to 12.5% with a weighted average of 10.19%[106]

---

[106] As indicated above the two with higher political or currency risk were not included.

- Mr. Chris Summers concludes to 10.0% to 12.0%

It is our opinion that a discount rate of 11.0% is considered realistic and supportable for this project.

The appraisers have considered the Discount Rate estimate from several methods. Therefore, an overall discount rate of 11.0% is utilized herein. The value opinion of the subject property by the Income Approach is presented below and on the following pages.

**Mid-Year Convention**

The discounted cash flow projections, calculations and analysis included in this report are based on a discount factor derived using mid-year convention analysis. Mid-year convention discount factor analysis uses organization mid-year revenue to establish the discount factor, rather than new-year or end-of-year (EoY) revenue numbers to determine the factor as an alternate method. The appraisers believe using mid-year revenue arrives at a more reasonable estimate for the average monthly revenue generated for the year. This opinion is substantiated by John A. Bogdanksi in the Federal Tax Valuation (para. 3.05[5][b][vi], at 3-135, 2012), "Mid-year convention better reflects the fact that operating revenues are often received throughout the year." Based on the above position regarding discount factor calculations, the present value factor calculated on a mid-year cash flow basis is $\frac{1}{(1+r)^{(n-0.5)}}$

The appraisers analyzed the findings of Dr. Capps, Capps Geoscience, LLC and GeoLogic, LLC as well as previous reports of subsurface material across the Southeast from other mining experts. It is the appraisers' opinion that the analysis provided from Dr. Capps, Capps Geoscience, LLC and GeoLogic, LLC, found in this report and in the addenda of this report supports the conclusions found herein. The appraisers relied on the analyses of the professional geologists and mining consultants provided and referenced throughout this report. However, based on the appraisers' extensive experience appraising properties with subsurface rights and with respect to the aforementioned, the conclusion of value is the appraisers' conclusion.

| Discounted Cash Flow | | 240.0 Acres | | | |
|---|---|---|---|---|---|
| | | Year 1 | Year 2 | Year 3 | Year 4 |
| Product Produced | Price Per Short Ton | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold |
| Total Volume (Short Tons) - Truck | | 0 | 150,000 | 250,000 | 250,000 |
| Weighted Average Price Per Short Ton of Material - Rock Aggregate - Truck | $15.05 | $15.05 | $15.43 | $15.81 | $16.21 |
| Total Volume (Short Tons) - Rail | | 0 | 0 | 0 | 200,000 |
| Weighted Average Price Per Short Ton of Material - Rock Aggregate - Rail | $14.00 | $14.00 | $14.35 | $14.71 | $15.08 |
| Price Appreciation | 2.5% | | | | |
| **Gross Income** | | $0 | $2,313,938 | $3,952,977 | $7,067,095 |
| | | | | | |
| Expenses | | 1 | 2 | 3 | 4 |
| Start-Up Costs (Permitting-Plant-Equipment) | | $8,798,146 | | | |
| Mining Cost Per Short Ton of Material - Aggregate | $8.75  2.50% | $8.75 | $8.97 | $9.19 | $9.42 |
| Total Mining Cost | | $0 | $1,345,313 | $2,298,242 | $4,240,257 |
| General Management/ Sales/Marketing/Administration | 3% | $0 | $69,418 | $118,589 | $212,013 |
| Surety Bond Total Acres Bonded | $2,500  240 Acres | $600,000 | $0 | $0 | $0 |
| Property Taxes $13.03/Acre, then $35.00/Acre | 2.0% | $3,127 | $8,568 | $8,739 | $8,914 |
| Reserves for Replacement | 1% | $0 | $23,139 | $39,530 | $70,671 |
| Contingency Expenses | 2.0% | $0 | $46,279 | $79,060 | $141,342 |
| Sustaining Capex | | | $150,000 | $150,000 | $150,000 |
| Reclamation at End of Life | $300,000  2.5% | | | | |
| **Total Annual Expenses** | | $9,401,273 | $1,642,717 | $2,694,160 | $4,823,197 |
| Total Annual Expenses Less Capital Costs | | $603,127 | $1,642,717 | $2,694,160 | $4,823,197 |
| Total Expenses Per Short Ton Less Capital Costs | | | $10.95 | $10.78 | $10.72 |
| | | | | | |
| Average Selling Price Short Ton of Material - Aggregate | | $14.00 | $15.43 | $15.81 | $15.70 |
| Net Income per Short Ton of Material - Aggregate | | $14.00 | $4.47 | $5.04 | $4.99 |
| Cost as Percent of Revenue | | | 70.99% | 68.16% | 68.25% |
| **Net Annual Income** | | -$9,401,273 | $671,221 | $1,258,816 | $2,243,898 |
| | | | | | |
| Present Value of $1 Based on Discount Rate Below | | 0.94916 | 0.85510 | 0.77036 | 0.69402 |
| Discount Rate | 11.00% | | | | |
| Yearly Present Value of Net Income | | -$8,923,293 | $573,959 | $969,739 | $1,557,301 |
| | | | | | |
| Running Total of Present Value | | -$8,923,293 | -$8,349,334 | -$7,379,595 | -$5,822,294 |

| | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|
| | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold |
| | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 |
| | $16.61 | $17.03 | $17.45 | $17.89 | $18.34 | $18.80 | $19.27 | $19.75 |
| | 700,000 | 1,000,000 | 1,336,000 | 1,336,000 | 1,336,000 | 1,340,500 | 1,345,000 | 1,349,500 |
| | $15.45 | $15.84 | $16.24 | $16.64 | $17.06 | $17.48 | $17.92 | $18.37 |
| | | | | | | | | |
| | $15,801,082 | $20,948,023 | $26,926,921 | $27,600,095 | $28,290,097 | $29,076,028 | $29,883,574 | $30,713,324 |
| | | | | | | | | |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | $9.66 | $9.90 | $10.15 | $10.40 | $10.66 | $10.93 | $11.20 | $11.48 |
| | $9,658,363 | $12,869,768 | $16,601,011 | $17,016,037 | $17,441,437 | $17,926,647 | $18,425,217 | $18,937,511 |
| | $474,032 | $628,441 | $807,808 | $828,003 | $848,703 | $872,281 | $896,507 | $921,400 |
| | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | $9,092 | $9,274 | $9,460 | $9,649 | $9,842 | $10,039 | $10,240 | $10,444 |
| | $158,011 | $209,480 | $269,269 | $276,001 | $282,901 | $290,760 | $298,836 | $307,133 |
| | $316,022 | $418,960 | $538,538 | $552,002 | $565,802 | $581,521 | $597,671 | $614,266 |
| | $150,000 | $150,000 | $150,000 | $150,000 | $150,000 | $150,000 | $150,000 | $150,000 |
| | | | | | | | | |
| | $10,765,520 | $14,285,924 | $18,376,086 | $18,831,691 | $19,298,685 | $19,831,248 | $20,378,471 | $20,940,755 |
| | $10,765,520 | $14,285,924 | $18,376,086 | $18,831,691 | $19,298,685 | $19,831,248 | $20,378,471 | $20,940,755 |
| | $10.77 | $10.99 | $11.23 | $11.51 | $11.80 | $12.09 | $12.39 | $12.70 |
| | | | | | | | | |
| | $15.80 | $16.11 | $16.46 | $16.87 | $17.29 | $17.72 | $18.17 | $18.62 |
| | $5.04 | $5.12 | $5.23 | $5.36 | $5.50 | $5.64 | $5.78 | $5.92 |
| | 68.13% | 68.20% | 68.24% | 68.23% | 68.22% | 68.20% | 68.19% | 68.18% |
| | | | | | | | | |
| | $5,035,561 | $6,662,099 | $8,550,835 | $8,768,403 | $8,991,412 | $9,244,780 | $9,505,103 | $9,772,570 |
| | | | | | | | | |
| | 0.62524 | 0.56328 | 0.50746 | 0.45717 | 0.41186 | 0.37105 | 0.33428 | 0.30115 |
| | | | | | | | | |
| | $3,148,433 | $3,752,621 | $4,339,195 | $4,008,650 | $3,703,246 | $3,430,270 | $3,177,354 | $2,943,029 |
| | | | | | | | | |
| | -$2,673,860 | $1,078,761 | $5,417,956 | $9,426,606 | $13,129,852 | $16,560,122 | $19,737,475 | $22,680,504 |

| Year 13 | Year 14 | Year 15 | Year 16 | Year 17 | Year 18 | Year 19 | Year 20 |
|---|---|---|---|---|---|---|---|
| Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold |
| 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 |
| $20.24 | $20.75 | $21.27 | $21.80 | $22.34 | $22.90 | $23.47 | $24.06 |
| 1,354,000 | 1,358,500 | 1,363,000 | 1,367,500 | 1,372,000 | 1,376,500 | 1,381,000 | 1,385,500 |
| $18.83 | $19.30 | $19.78 | $20.28 | $20.78 | $21.30 | $21.84 | $22.38 |
| | | | | | | | |
| $31,565,886 | $32,441,879 | $33,341,943 | $34,266,735 | $35,216,927 | $36,193,212 | $37,196,301 | $38,226,923 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| $11.77 | $12.06 | $12.36 | $12.67 | $12.99 | $13.31 | $13.65 | $13.99 |
| $19,463,904 | $20,004,780 | $20,560,535 | $21,131,575 | $21,718,317 | $22,321,189 | $22,940,630 | $23,577,093 |
| $946,977 | $973,256 | $1,000,258 | $1,028,002 | $1,056,508 | $1,085,796 | $1,115,889 | $1,146,808 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $10,653 | $10,866 | $11,084 | $11,305 | $11,531 | $11,762 | $11,997 | $12,237 |
| $315,659 | $324,419 | $333,419 | $342,667 | $352,169 | $361,932 | $371,963 | $382,269 |
| $631,318 | $648,838 | $666,839 | $685,335 | $704,339 | $723,864 | $743,926 | $764,538 |
| $150,000 | $150,000 | $150,000 | $150,000 | $150,000 | $150,000 | $150,000 | $150,000 |
| | | | | | | | |
| $21,518,510 | $22,112,159 | $22,722,136 | $23,348,885 | $23,992,864 | $24,654,544 | $25,334,405 | $26,032,945 |
| $21,518,510 | $22,112,159 | $22,722,136 | $23,348,885 | $23,992,864 | $24,654,544 | $25,334,405 | $26,032,945 |
| $13.01 | $13.33 | $13.66 | $14.00 | $14.35 | $14.71 | $15.07 | $15.45 |
| $19.08 | $19.56 | $20.05 | $20.55 | $21.06 | $21.59 | $22.13 | $22.68 |
| $6.07 | $6.23 | $6.39 | $6.55 | $6.71 | $6.88 | $7.06 | $7.23 |
| 68.17% | 68.16% | 68.15% | 68.14% | 68.13% | 68.12% | 68.11% | 68.10% |
| | | | | | | | |
| $10,047,376 | $10,329,720 | $10,619,808 | $10,917,850 | $11,224,063 | $11,538,668 | $11,861,895 | $12,193,978 |
| 0.27131 | 0.24442 | 0.22020 | 0.19838 | 0.17872 | 0.16101 | 0.14505 | 0.13068 |
| $2,725,934 | $2,524,808 | $2,338,479 | $2,165,863 | $2,005,954 | $1,857,820 | $1,720,596 | $1,593,483 |
| $25,406,439 | $27,931,246 | $30,269,725 | $32,435,588 | $34,441,542 | $36,299,362 | $38,019,958 | $39,613,441 |

| Year 21 | Year 22 | Year 23 | Year 24 | Year 25 | Year 26 | Total |
|---|---|---|---|---|---|---|
| Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | Short Tons Sold | |
| 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 7,250,000 |
| $24.66 | $25.28 | $25.91 | $26.56 | $27.22 | $27.90 | |
| 1,390,000 | 1,394,500 | 1,399,000 | 1,403,500 | 1,408,000 | 1,412,500 | 29,308,500 |
| $22.94 | $23.51 | $24.10 | $24.70 | $25.32 | $25.96 | |
| | | | | | | |
| $39,285,829 | $40,373,789 | $41,491,592 | $42,640,053 | $43,820,004 | $45,032,302 | 753,666,525 |
| 21 | 22 | 23 | 24 | 25 | 26 | Total |
| | | | | | | 8,798,146 |
| $14.34 | $14.70 | $15.06 | $15.44 | $15.83 | $16.22 | |
| $24,231,041 | $24,902,950 | $25,593,311 | $26,302,625 | $27,031,409 | $27,780,194 | 464,319,356 |
| $1,178,575 | $1,211,214 | $1,244,748 | $1,279,202 | $1,314,600 | $1,350,969 | 22,609,996 |
| $0 | $0 | $0 | $0 | $0 | $0 | 600,000 |
| $12,482 | $12,732 | $12,986 | $13,246 | $13,511 | $13,781 | 277,563 |
| $392,858 | $403,738 | $414,916 | $426,401 | $438,200 | $450,323 | 7,536,665 |
| $785,717 | $807,476 | $829,832 | $852,801 | $876,400 | $900,646 | 15,073,331 |
| $150,000 | $150,000 | $150,000 | $150,000 | $150,000 | $150,000 | 3,750,000 |
| | | | | | $570,088 | $570,088 |
| $26,750,672 | $27,488,109 | $28,245,793 | $29,024,274 | $29,824,120 | $31,216,001 | 523,535,144 |
| $26,750,672 | $27,488,109 | $28,245,793 | $29,024,274 | $29,824,120 | $31,216,001 | 514,736,998 |
| $15.83 | $16.22 | $16.62 | $17.04 | $17.46 | $18.23 | |
| $23.25 | $23.83 | $24.42 | $25.03 | $25.66 | $26.30 | |
| $7.42 | $7.60 | $7.80 | $7.99 | $8.19 | $8.07 | |
| 68.09% | 68.08% | 68.08% | 68.07% | 68.06% | 69.32% | |
| $12,535,157 | $12,885,679 | $13,245,800 | $13,615,778 | $13,995,883 | $13,816,302 | 230,131,382 |
| 0.11773 | 0.10606 | 0.09555 | 0.08608 | 0.07755 | 0.06987 | |
| $1,475,736 | $1,366,669 | $1,265,643 | $1,172,067 | $1,085,394 | $965,286 | $46,944,235 |
| $41,089,177 | $42,455,845 | $43,721,488 | $44,893,555 | $45,978,949 | $46,944,235 | $46,944,235 |

### 6.3.2.2. Sales Comparison Approach

A fundamental part of the Sales Comparison Approach is using properties with similar highest and best uses; thus, it was necessary to determine the highest and best use of the subject property prior to employing the sales comparison approach. As stated on page 338 of The Appraisal of Real Estate, 15th Edition published by the Appraisal Institute: "Regardless of how physically similar a potentially comparable site is to the subject site, the most comparable sales would have the same or a similar highest and best use. Markets without recent sales of comparable sites are problematic and may require analysis of competing sites where sufficient data are available or alternative land valuation methods may be considered." There are a limited number of mine sales in the United States.

Mr. Trevor R. Ellis, MCA, CPG, M. AusIMM, and J. Ballard, Resource Finance Consultant of Ellis International Services in Denver, Colorado discuss and present rational strategies for discounted cash flow methodologies and net present value in *Valuation Methodologies for Mines and Mineral Tenements.* They both recommend DCF as the primary method for valuing operating mines, or mineral assets with an indicated resource and a feasibility study containing engineering, production and capital estimates and operating cost data.

Not only are there significant obstacles to finding comparable mining sales, the owners of said mines are often averse to discussing the details of transactions. The appraisers performed extensive research and were extremely persistent in the quest for pertinent information relevant to any mine sales. However, since the comparable sales are often in very different geographic and demographic areas, vary in the type of product mined, and limited sales data is attainable from market participants, the Sales Comparison Approach is deemed not applicable in determining the value of a mine. The Income Approach is deemed the preferred method of analysis. According to Mr. Trevor Ellis, Ellis International Services, in the *Sales Comparison Valuation of Development and Operating Stage Mineral Properties*, "Large value adjustments are generally necessary when conducting mineral property transaction comparisons. These can be greater than 100.0% for each fundamental deposit factor such as tonnage, grade, depth, or thickness, and also for non-physical factors such as political or regulatory risk. Adjustments for mineral deposits are typically multiplicative. Therefore, total adjustments may be greater than 10-fold." Therefore, the appraisers did not utilize the Sales Comparison Approach.

Furthermore, predicated on information from mining industry appraisers and engineers and publications such the *Valuation of Properties in the Extractive Industries*, Guidance Note (GN) 14 of the *International Valuation Standards Eighth Edition 2007* (IVSs), "The income approach calculates fair value by discounting estimated future cash flows. Given the difficulties associated with the cost and market approaches, fair values of minerals or oil and gas properties are normally derived using the Income Approach."

Detailed property information from the Resource Valuation Report prepared by Dr. Capps, Capps Geoscience, LLC, is included in the Addenda. Mr. Capp's analysis details market information, experience as a consultant and expertise in mine development. The information contained in the aforementioned report profiles the income stream and all the necessary expenditures, expenses, and yearly operation of the mine. The appraisers have determined that the most preferred approach to value is the Discounted Cash Flow

analysis supported with reliable market data made available in the Resource Valuation Report.

According to Robert H. Paschall, in *The Appraisal of Mineral Producing Properties*, ASA Valuation, American Society of Appraisers, 1974, "The capitalized income method is the only method appropriate to appraise an active construction-rock operation." Furthermore, according to Donald W. Gentry and Thomas J. O'Neil, Dr., *Mining Investment Analysis*, Society of Mining Engineers, American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc. New York, New York, 1986, page 14, "the preferred method for mining property valuation and the one universally used in the commercial practice is the income approach. Because mines have limited operating horizons and because there are well established markets for mineral commodities, the income approach is widely used in valuing mineral properties. The approach is used commonly by the mining industry in assessing investment rates of return and determining appropriate purchase prices for mines or mineral prospects."

As stated earlier in this report, it is the appraisers' opinion, due to the professional reports provided, the subject property is classified as a Development Property with a Pre-Feasibility Study completed at a minimum as of the date of this appraisal. A qualified drilling company under the guidance of a Professional Geologist drilled the subject property, a Qualified Laboratory tested the material, a Professional Geologist along with a Professional Engineer evaluated the reserves on-site based on the physical characteristics of a subject property, a mining consultant working in tandem with the Professional Geologist and Professional Engineer evaluated the supply and demand as well as the target market. Further, the mining consultant established the permitting schedule, the market pricing, production schedule, the capital expenditures, the operating costs, and the life of mine. All of the above is only possible on the subject property as it is a unique property that has the quality and quantity of material on-site that is financially feasible to extract. The subject property within this appraisal report is unique as detailed in each of the professional reports provided and included in the addenda of this appraisal report.

According to Svetlana Baurens in, *Valuation of Metals and Mining Companies*, the DCF method is not applicable without "reasonably assured mineral reserves." This plan should include rates, test results, capital and operating cost, environmental and reclamation cost, and any other necessary projections. Ms. Baurens states, "It must be taken into consideration that DCF is not applicable to early-stage projects without reasonably assured mineral reserves, workable mining plants with rates, metallurgical test results and process recoveries, capital and operating cost estimates, environmental and reclamation cost estimates and commodity price projections. The reason of this is the theory behind DCF: the value of every asset is simply the present value of the cash flows this asset produces over the lifetime. One must have enough information that we can reasonably estimate cash flows from production. Therefore, DCF is only appropriate for mineral properties in production, very near production or for mineral properties at the stage of development. In these cases, the economic viability of the property will be based on preliminary estimates of production, revenue and cost. Despite the preliminary nature of the underlying estimates, it is still generally accepted that discounted cash flow analysis is the best method of valuing mineral properties at this stage of development."

As stated throughout this report, the subject property has proven mineral reserves. Further, this report details projected pricing, test results, capital and operating costs, environmental and reclamation costs, and other necessary projections for the use of a DCF analysis. Therefore, it is the appraisers' opinion the use of the DCF method was applicable.

The subject property's location in the Southeast and its physical characteristics (existing granite deposits), along with the information and recommendations from the Resource Valuation Report, suggest a discounted cash flow analysis reflecting a mining property is appropriate and has been developed. The technical reports analyzed, provide enough information that the appraisers can reasonably estimate a value opinion using a cash flow.

### Determination of Larger Parcel

Appraisals of conservation easements for income tax purposes must consider the conservation easement's impact on any contiguous property, referred to as Contiguous Family-Owned Property (CFOP), owned by the donor or the donor's family. As stated throughout this report, Log Creek LLLP owns contiguous acreage. Since the highest and best use for the subject property is different from the highest and best use of the Excluded Tract, each will be valued separately in the pre-conservation easement scenario and the post-conservation easement scenario.

### 6.3.3. Highest and Best Use (Excluded Tract)

Highest and Best Use is defined in Chapter 17 Page No. 305, in the 15th edition of "The Appraisal of Real Estate," published by the Appraisal Institute, and adopted by Treasury Regulation § 170, as the reasonably probable use of property that results in the highest value, as of the date of the appraisal.

The highest and best use is further described by the Appraisal Institute as the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible and results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physically possible, financially feasible, and maximum productivity. Alternatively, the probable use of land or improved specific property with respect to the user and timing of the use is adequately supported and results in the highest present value. This determination is not based on quantitative means nor is it a fact to be found, but instead relies heavily on the appraiser's judgment as well as his analytical skill. It is of note that the highest and best use may differ from the existing use when there are existing improvements. However, the existing use will continue unless and until the land value in its highest and best use, represents the premise upon which value is based.

The purpose of determining the Highest and Best use for a specific property is to identify the demand for appropriate potential uses, identify demand for a particular property type, compare cost and value if specific market criteria are fulfilled, then of the appropriate potential uses determine the use that produces the maximum value. Based on the determination of the Highest and Best Use, the appropriate comparable properties are then selected for the Sales Comparison Approach

**Legally Permissible**

The Excluded Tract is located on the east and west sides of Warren County Road 56 and the north side of Warren County Road 62. The surrounding area primarily consists of residential and agricultural land uses. The concentration of population and supportive commercial and industrial development is located in Milledgeville, Georgia to the southwest and Augusta, Georgia to the northeast. As stated throughout this report, the subject property is currently zoned FOR-AG Forestry-Agriculture District. This zoning district is comprised primarily of raw land, open farmland and land used for agricultural, livestock, and poultry production.

The owners own no other lands that are contiguous to the subject property other than the Excluded Tract. Therefore, the total acreage unencumbered by the conservation easement is the 2,306.87 acres (Excluded Tract). In general, the area surrounding the Excluded Tract is suited for agricultural/recreational development due to its location along located on the east and west sides of Warren County Road 56 and the north side of Warren County Road 62.

**Physically Possible**

The Excluded Tract and its uses are affected by their physical characteristics which include, but are not limited to: location, street frontage, size, shape, street access, availability of utilities, easements, soils and subsoils, and topography.

Due to the Excluded Tract's positioning and ingress/egress to and from Warren County Road 56 and Warren County Road 62, it is considered to have average access. The Excluded Tract has gently sloping topography and is wooded with some open land. Therefore, the Excluded Tract has the characteristics and the potential for agricultural or recreational development. There are a variety of physically possible uses for the Excluded Tract due to its location that would conform with the Excluded Tract's location, size, shape, and topography.

**Financially Feasible**

The Excluded Tract is located within an agricultural and recreational area. A number of agricultural and recreational uses are located in the area, surrounding the Excluded Tract. This area is well known as recreational, agricultural, and forest land. In the market area, properties such as the Excluded Tract appeal to owners interested in properties that are suited for recreation and/or agricultural/forestry uses. The Excluded Tract is suited for recreational or agricultural/forestry development as evidenced by its location near other recreational land and agricultural/forestry land. Land prices vary based on location, access, visibility, on-site improvements, size, and site development quality. As demonstrated in the Sales Comparison Approach found within this report, sufficient demand exists for an adequate return to the land. In summary, a financially possible use for the Excluded Tract would be recreational or agricultural/forestry development.

**Maximally Productive**

The Excluded Tract was analyzed, and it was determined that the most reasonably probable use that would produce the most benefits was the use of the Excluded Tract as recreational or agricultural/forest land. Although, there were other uses that would potentially produce a positive cash flow, the development that would generate the highest return was agricultural or recreational land. This conclusion was supported by current market conditions, the level of current economic growth in Warren County and the surrounding area and existence of other agricultural developments in the area.

**Conclusion**

The foregoing Highest and Best Use analysis is used to establish the basis for valuation and demonstrate the most feasible use of the Excluded Tract. The Excluded Tract could be used as agricultural/forestry development or recreational use development.

Due to the location of the Excluded Tract, and considering the foregoing possible land uses, developing the Excluded Tract as an agricultural/forestry or recreational development establishes the greatest return to the land under current market conditions. This conclusion is based on the population growth, the economic growth in Georgia, and the aesthetics of the natural surroundings.

Based on current market conditions, the Excluded Tract's location, and the demand in the area, the highest and best use is as an agricultural/forestry or recreational development for the Excluded Tract.

### 6.3.3.1. Sales Comparison Approach (Excluded Tract)

The Sales Comparison Approach is used to determine the fair market value of the Excluded Tract. A fundamental part of the Sales Comparison Approach is using properties with similar highest and best uses; thus, it was necessary to determine the highest and best use of the Excluded Tract prior to employing the sales comparison approach. As indicated on page 363 of The Appraisal of Real Estate, 14th Edition published by the Appraisal Institute, "Regardless of how physically similar a potentially comparable property is to the subject property, the sale property is not truly comparable if it does not have a similar highest and best use as the subject property, and in that case the potentially comparable property should be dismissed from further consideration in the analysis of the subject property."

Valuation of the Excluded Tract by the Sales Comparison Approach, based on the following, utilizes the sales price per acre. Detailed analysis of the comparable sales and a location map follow this discussion.

The Excluded Tract consist of vacant land with no significant improvements or site improvements in Warren County, Georgia; therefore, neither the Cost Approach nor the Income Approach were applicable or meaningful to this analysis.

## Methodology

The comparable sales utilized in this analysis represent the most recent transactions of properties considered to be most similar to the highest and best use of the Excluded Tract, with respect to location and use characteristics. Due to the Excluded Tract's physical characteristics, comparable properties with similar highest and best uses from the region are considered. The adjustments found within this report (qualitative adjustments) are not calculated by a mathematical formula, but represent our professional judgment based on our experience in this market and knowledge of the Excluded Tract, the Excluded Tract's market area, the comparable sales, and information from brokers, property owners, and other market participants involved in the transactions analyzed or transactions similar to the subject property. As stated throughout this report, the Excluded Tract's Highest and Best Use is as agricultural/forestry or recreational development. Based on our professional opinion and an in-depth study of the market, it has been determined the Highest and Best Use of the Excluded Tract before the donation of the conservation easement on the subject property (240.00 acres), is for development as agricultural/forestry or recreational development. Therefore, an analysis of comparable land, was conducted to determine the estimated value of the Excluded Tract. Additionally, as the adjustments presented in the report are qualitative adjustments, the appraisers utilize the [+] symbol to indicate a comparable property is inferior to the Excluded Tract and the [-] symbol to indicate a comparable property is superior to the Excluded Tract, with multiple symbols indicating varying levels of superiority or inferiority. Finally, the appraisers reserve the right to adjust their opinion of value if the development costs are significantly higher or lower than originally anticipated and provided to the appraisers.

## Participant Interviews

The appraisers interviewed a variety of brokers and market participants that are familiar with rural residential and agricultural properties. According to the brokers and market participants, each piece of land is unique, and each buyer or developer is focused on different types of characteristics of each individual property.

All the market participants agreed that every sale is unique, and each sale has its own set of challenges. The appraisers inquired about the importance of physical characteristics to a property and although all agreed that physical characteristics such as location, size, on-site improvements, utility, topography, etc. were important, there was a difference in the overall weight placed on each one. It should be noted that all those interviewed indicated that there was a demand for similar properties and that the demand is driven by local population and economic factors in the area.

The adjustments made throughout this report, were based on market participants interviews, and our general and specific knowledge of rural residential and agricultural land. It should be noted that the professionals interviewed, indicated that due to the uniqueness of each property and each deal, analyzing physical property characteristics based on experience and professional judgment may be appropriate.

**Paired Sales, Grouped Sales, and Secondary Data Analyses**

Paired Data Analysis is based on the premise that two properties are equivalent in all respects but one, the resulting difference can be measured by the difference in price between the two properties. Grouped Data Analysis extends the logic of paired sales analysis to larger data sets. Comparable sales in the Grouped Data Analysis are grouped by an independent variable such as location or date of sale and then the groups are studied as pairs. "Paired data analysis should be developed with extreme care to ensure that the properties are truly comparable and that other differences do not exist". "Although paired data analysis of sales or rents is a theoretically sound method, it may be impractical and produce unreliable results when only a narrow sampling of sufficiently similar properties is available."[107] Finally, Secondary Data Analysis, is utilized to support adjustments derived by other methods that does not directly pertain to the subject or comparable properties. Secondary data describes the general real estate market and is typically collected by a data vendor research firm or government agency like the U.S. Census Bureau or county assessor. It is the appraisers' opinion that the Paired Sales, Grouped Sales, and Secondary Data Analyses are unreliable and impractical due to the amount of relevant data.

**Statistical Data Analysis**

Furthermore, statistical data methods may be used to calculate adjustments to comparable sales. As stated in the *Appraisal of Real Estate* using statistical analysis requires the appraiser to understand and properly apply fundamental statistical concepts. "In applying statistical analysis, the appraiser must be careful not to develop a result that is mathematically precise yet logically meaningless or inappropriate for the particular appraisal."[108] Due to the uniqueness of the Excluded Tract, and the relative size of the data sample, statistical analysis is not considered a reliable technique for this property.

**Trend Analysis**

Trend analysis is a technique to analyze comparable properties and measure/identify trends in the sale prices. It is useful when sales data on highly comparable properties is absent, but a broad database on properties with less similar characteristics is available. Testing various factors that influence sale prices is then performed to measure market sensitivity. Typically, trend analysis is applicable when a large amount of market data is available. However, as in the case of the Excluded Tract, there is not a large pool of relevant data to perform a trend analysis, thus it is the appraisers' opinion that it would not provide a meaningful basis for adjustments to the comparable sales.

**Graphic Analysis**

Graphic analysis is a variant of statistical analysis which involves quantitative techniques used to identify and measure adjustments to the sale prices of comparable

---

[107] *The Appraisal of Real Estate 14th Edition*, (Pages 398-399).
[108] *The Appraisal of Real Estate 14th Edition*, (Page 400).

properties. Upon graphing the comparable data, an appraiser interprets the graphically displayed data visually or through curve fit analysis. The limitations for graphical analysis are similar to statistical analysis as stated earlier in this report.

### Transactional Adjustments

### Financing Terms

When developing an opinion of the value of a property, the appraisers must ascertain whether or not any existing financing is assumable, retireable, or replaceable. Also, the appraisers must estimate the potential value impact of the cost items such as finder's fees, points, and prepayment penalties and the effect of the present worth of participation by lenders, if any. The appraisers should also judge the duration of any favorable or unfavorable influence from mortgages or participations. It should not be assumed that the benefits or detriment due to financing will continue throughout the stated amortization or participation terms. The value impact of a mortgage fluctuates as interest rates rise and fall. The possibility of retiring unfavorable financing prior to its full payout period should also be considered.[109] Based on the aforementioned analysis, the transaction price of one property may differ from that of an identical property due to different financing arrangements. The terms of sale are analyzed individually on each comparable sale included in this report. Cash equivalency adjustments for atypical financing, if required, are made to the individual comparable sales. To the best of the appraisers' knowledge, the terms of the individual comparable sales were all cash to the seller sales; therefore, additional adjustments in this analysis are not required.



Exhibit 2-3 Anticipated Inflation, Interest Rate, and Cap Rate Changes

---

[109] Appraisal Institute, *Cash Equivalency in Valuations*



*Projected Annual Inflation Rate in the United States from 2010 to 2021 (Statista)*

**Conditions of Sale**

    The conditions of sale adjustments are made to reflect the motivations of the buyer and seller. Many transactions are completed with either one side or the other being motivated beyond the typical motivation found within a market, i.e., seller wants to sell quickly and is willing to sell under market or a buyer owns an adjacent parcel and wants the new parcel (plottage) and is willing to pay over market. Furthermore, it is not uncommon for sales to occur due to some type of seller financial duress, where the seller needs the money and is willing to sell under market in order to liquidate quickly. The majority of comparable sales utilized in this analysis represent transactions of typical market conditions. Finally, discussions with real estate brokers that have active listings of similar properties have indicated that, through knowledge of the market, negotiations, and due diligence, a prudent investor would typically make an offer below asking price ranging from 5.0% to 30.0%.

**Market Conditions**

    Adjustments to the comparables for market conditions (date of sale) reflect changes in the market during the time period covered by the data. Real estate and price expectations varies from asset to asset and is based on location. Overall however, according to the National Association of REALTORS®, Research Division, the U.S. Economic Outlook: November 2017, the annual growth rate in the 1st quarter of 2017 was 1.2%, 2nd quarter of 2017 was 3.1%, followed by the 3rd quarter of 2017 of 3.0%

and forecasted at 2.5%, 2.6%, and 3% in the following three quarters.[110] Furthermore, the chart provided below, includes the increases in the Real GDP, interest rates, and other market data. Due to the increase in the national economy and commercial real estate in general, a positive adjustment in this analysis for market conditions would be considered appropriate for sales from early 2013 and older.

### U.S. Economic Outlook: November 2017

| | 2016 Q1 | 2016 Q2 | 2016 Q3 | 2016 Q4 | 2017 Q1 | 2017 Q2 | 2017 Q3 | 2017 Q4 | 2018 Q1 | 2018 Q2 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| U.S. Economy | History | | | | | | | Forecast | | | History | | Forecast | |
| *Annual Growth Rate* | | | | | | | | | | | | | | |
| Real GDP | 0.6 | 2.2 | 2.8 | 1.8 | 1.2 | 3.1 | 3.0 | 2.5 | 2.6 | 3.0 | 2.9 | 1.5 | 2.2 | 2.8 |
| Nonfarm Payroll Employment | 1.7 | 1.4 | 2.0 | 1.4 | 1.3 | 1.2 | 1.3 | 1.6 | 1.7 | | 2.1 | 1.8 | 1.4 | 1.7 |
| Consumer Prices | 0.1 | 2.3 | 1.8 | 3.0 | 3.1 | -0.3 | 2.0 | 2.5 | 2.6 | 2.5 | 0.1 | 1.3 | 2.0 | 2.5 |
| Consumer Confidence | 96 | 95 | 101 | 108 | 118 | 118 | 120 | 124 | 123 | 125 | 98 | 100 | 120 | 125 |
| *Percent* | | | | | | | | | | | | | | |
| Unemployment | 4.9 | 4.9 | 4.9 | 4.7 | 4.7 | 4.4 | 4.3 | 4.3 | 4.2 | 4.2 | 5.3 | 4.9 | 4.4 | 4.2 |
| *Interest Rates, Percent* | | | | | | | | | | | | | | |
| Fed Funds Rate | 0.4 | 0.4 | 0.4 | 0.5 | 0.7 | 0.9 | 1.1 | 1.2 | 1.4 | 1.7 | 0.1 | 0.4 | 1.0 | 1.8 |
| 3-Month T-Bill Rate | 0.3 | 0.3 | 0.3 | 0.4 | 0.6 | 0.9 | 1.1 | 1.2 | 1.4 | 1.6 | 0.1 | 0.3 | 1.0 | 1.8 |
| Prime Rate | 3.5 | 3.5 | 3.5 | 3.5 | 3.8 | 4.0 | 4.3 | 4.4 | 4.6 | 4.9 | 3.3 | 3.5 | 4.1 | 5.0 |
| 10-Year Government Bond | 1.9 | 1.8 | 1.6 | 2.1 | 2.4 | 2.3 | 2.2 | 2.4 | 2.6 | 2.8 | 2.1 | 1.8 | 2.3 | 2.8 |
| 30-Year Government Bond | 2.7 | 2.6 | 2.3 | 2.8 | 3.0 | 2.9 | 2.8 | 3.0 | 3.2 | 3.4 | 2.8 | 2.6 | 2.9 | 3.5 |
| *Mortgage Rates, percent* | | | | | | | | | | | | | | |
| 30-Year Fixed Rate | 3.7 | 3.6 | 3.4 | 3.8 | 4.2 | 4.0 | 3.9 | 4.0 | 4.2 | 4.5 | 3.9 | 3.6 | 4.0 | 4.5 |
| 5/1-Year Hybrid Adjustable | 2.9 | 2.8 | 2.8 | 3.0 | 3.2 | 3.1 | 3.2 | 3.3 | 3.5 | 3.6 | 2.9 | 2.9 | 3.2 | 3.6 |
| **Housing Indicators** | | | | | | | | | | | | | | |
| *Thousands* | | | | | | | | | | | | | | |
| Existing Home Sales* | 5357 | 5477 | 5380 | 5547 | 5620 | 5563 | 5393 | 5380 | 5490 | 5650 | 5250 | 5450 | 5470 | 5670 |
| New Single-Family Sales | 526 | 562 | 588 | 568 | 617 | 605 | 603 | 600 | 640 | 680 | 501 | 561 | 606 | 690 |
| Housing Starts | 1153 | 1158 | 1150 | 1248 | 1238 | 1167 | 1165 | 1180 | 1220 | 1280 | 1112 | 1174 | 1188 | 1300 |
| Single-Family Units | 787 | 756 | 761 | 834 | 839 | 825 | 846 | 850 | 890 | 940 | 715 | 782 | 840 | 950 |
| Multifamily Units | 367 | 401 | 389 | 414 | 399 | 342 | 319 | 330 | 330 | 340 | 397 | 392 | 348 | 350 |
| *Percent Change -- Year Ago* | | | | | | | | | | | | | | |
| Existing Home Sales | 4.9 | 4.2 | -0.2 | 7.1 | 4.9 | 1.6 | 0.2 | -3.0 | -2.3 | 1.6 | 6.3 | 3.8 | 0.4 | 3.7 |
| New Single-Family Sales | 1.6 | 13.9 | 19.8 | 11.7 | 17.3 | 7.7 | 2.6 | 5.6 | 3.7 | 12.4 | 14.6 | 12.0 | 8.0 | 13.9 |
| Housing Starts | 16.8 | 0.2 | -1.0 | 11.0 | 7.4 | 0.8 | 1.3 | -5.4 | -1.5 | 9.7 | 10.8 | 5.6 | 1.2 | 9.4 |
| Single-Family Units | 23.0 | 6.3 | 1.7 | 11.2 | 6.6 | 9.1 | 11.2 | 1.9 | 6.1 | 13.9 | 10.3 | 9.4 | 7.4 | 13.1 |
| Multifamily Units | 5.5 | -9.6 | -5.8 | 10.6 | 8.7 | -14.7 | -18.0 | -20.3 | -17.3 | -0.6 | 11.8 | -1.3 | -11.2 | 0.6 |
| **Median Home Prices** | | | | | | | | | | | | | | |
| *Thousands of Dollars* | | | | | | | | | | | | | | |
| Existing Home Prices | 215.7 | 239.1 | 239.5 | 233.9 | 230.7 | 253.6 | 252.1 | 245.0 | 243.0 | 260.5 | 222.4 | 233.8 | 246.9 | 259.0 |
| New Home Prices | 299.1 | 308.2 | 303.7 | 314.9 | 311.6 | 316.6 | 315.7 | 318.0 | 320.0 | 322.0 | 294.2 | 307.8 | 315.5 | 323.5 |
| *Percent Change -- Year Ago* | | | | | | | | | | | | | | |
| Existing Home Prices | 6.1 | 4.9 | 5.3 | 6.0 | 7.0 | 6.1 | 5.3 | 4.7 | 5.3 | 2.7 | 6.8 | 5.1 | 5.6 | 4.9 |
| New Home Prices | 3.7 | 6.6 | 3.0 | 4.1 | 4.2 | 2.7 | 4.0 | 1.0 | 2.7 | 1.7 | 2.0 | 4.6 | 2.5 | 2.5 |

Quarterly figures are seasonally adjusted annual rates
* Existing home sales of single-family homes and condo/coops

## Physical Adjustments

### Location

Location adjustments are based on locational characteristics, which are different from the Excluded Tract. Location adjustments consider several factors, but focus mainly on macro level economics in each area, such as, the demand for commercial properties in general is higher in Augusta, Georgia than rural Warren County. Adjustments for location reflect distance to infrastructure, distance to metropolitan areas, and economic status of

the comparable metropolitan area. It should be noted that no specific adjustment could be determined from participant interviews; however, knowledge of the comparable market area, and economic indicators found have been applied.

**Visibility**

Visibility adjustments are based on the visibility of the Excluded Tract or comparable properties from the road or any additional visibility afforded to a property based on its location. According to market participants, developers and buyers will pay more for a property if it has additional visibility along another road even if it does not have direct ingress/egress from said road. Furthermore, developers and buyers may pass on a property that has poor or atypical visibility due to its location above or below road grade. Research and interviews with commercial real estate brokers/developers indicated that visibility would be a typical factor for recreational and agricultural properties. Therefore, the appraisers have determined that an adjustment for visibility may be required.

**Utility/Topography/Shape**

The Utility/Topography/Shape adjustment is based on several factors. The utility component of this adjustment is based on the development potential of the Excluded Tract and comparable properties. This adjustment is based on interviews and verification of each comparable. The topography component of this adjustment is based on the topography of the Excluded Tract versus the topography of the comparable properties. According to market participants, the topography of a site can greatly affect the development costs of the site, i.e., a property with severely sloping topography will cost significantly higher to develop than a similar site with level topography. Finally, the shape component of this adjustment is based on the shape of the Excluded Tract versus the relative shape of the comparables. Market participants have indicated that the shape of a property can directly correlate to the development potential of the property. It should be noted that no specific adjustment could be determined from participant interviews; however, knowledge of the comparable market area, and utility/topography/shape of each comparable found have been applied.

**On-Site Improvements**

The on-site improvement adjustment was based upon the improvements on the Excluded Tract and comparable properties. According to market participants, the cost to develop a property can be decreased if the property has been cleared and graded versus a property that is currently heavily wooded. The exact amount a property is increased or decreased based on its on-site improvements varies from property to property and is dependent on a variety of factors. Therefore, this adjustment is based on verification of the comparable properties.

**Zoning**

Zoning adjustments reflect differences in the zoning classifications relative to zoning as compared to the Excluded Tract and based on the comparable zoning

classification. As stated throughout this report, the Excluded Tract is zoned FOR-AG Forestry-Agriculture District.

### **Comparable Land Sales – Excluded Tract**

Of note, due to the size of the Excluded Tract, the appraisers were unable to obtain similarly sized comparable properties, therefore, the sales within this section were the best available as of the date of this appraisal.

| Land Comparison Adjustments Grid - Contiguous Acreage | | | | | |
|---|---|---|---|---|---|
| | **Subject** | **Sale 1** | **Sale 2** | **Sale 4** | **Sale 5** |
| Location | Warren Co, GA | Troup Co, GA | Bartow Co, GA | Polk Co, GA | Appling Co, GA |
| Date of sale | N/A | 12/26/2018 | 10/18/2018 | 8/7/2017 | 1/30/2017 |
| Price | N/A | $2,525,034 | $1,968,000 | $625,000 | $1,550,000 |
| Size (Acres) | 2,306.87 | 552.00 | 617.90 | 1,185.65 | 580.00 |
| Price/Acre | N/A | $4,574 | $3,185 | $527 | $2,672 |
| Size (Sq. Ft.) | 100,487,257 | 24,045,120 | 26,915,724 | 51,646,914 | 25,264,800 |
| Price/Sq. Ft. | N/A | $0.11 | $0.07 | $0.01 | $0.06 |
| Location | Average | Above Ave. | Good | Average | Average |
| Visibility | Average | Average | Average | Average | Average |
| External Influences | Average | Average | Average | Average | Average |
| Utility/Topography/Shape | Average | Average | Average | Average | Average |
| Accessibility | Average | Average | Average | Average | Average |
| View Amenity | None | None | None | None | None |
| On-Site Improvements | Timber/Farmland | Raw Land/Timber | Timber | Raw Land | Timber/Farmland |
| Rights | Fee Simple | Fee Simple | Fee Simple | Conservation Easement | Fee Simple |
| Zoning/Property Type | Agricultural/Res. | Agricultural/Res. | Agricultural/Res. | Agricultural/Res. | Agricultural/Res. |
| Transactional Adjustments | | | | | |
| **Unadjusted Price/Acre** | | **$4,574** | **$3,185** | **$527** | **$2,672** |
| Property rights conveyed | | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$4,574* | *$3,185* | *$527* | *$2,672* |
| Financing terms | | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$4,574* | *$3,185* | *$527* | *$2,672* |
| Expenditures Immediately After Sale | | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$4,574* | *$3,185* | *$527* | *$2,672* |
| Conditions of sale | | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$4,574* | *$3,185* | *$527* | *$2,672* |
| Market Conditions | | 1.00 | 1.00 | 1.00 | 1.00 |
| Physical Adjustments | | | | | |
| *Intermediate adjusted price* | | *$4,574* | *$3,185* | *$527* | *$2,672* |
| Location | | - | - - | Similar | Similar |
| Visibility | | Similar | Similar | Similar | Similar |
| External Influences | | Similar | Similar | Similar | Similar |
| Utility/Topography/Shape | | Similar | Similar | Similar | Similar |
| Accessibility | | Similar | Similar | Similar | Similar |
| View Amenity | | Similar | Similar | Similar | Similar |
| On-Site Improvements | | Similar | Similar | + | Similar |
| Zoning | | Similar | Similar | Similar | Similar |
| Rights | | Similar | Similar | +++ | Similar |
| Size | | - - | - | - | - - |
| Subject by comparison | | - - - | - - - | +++ | - - |

**Adjustment Explanation**

Sale 1, at $4,574/acre for 552 acres required a downward adjustment in order to reflect the Excluded Tract's inferior location: Sale 1 is considered to have an above average location, while the Excluded Tract is considered to have an average location. Sale 1 also required a downward adjustment in order to reflect the Excluded Tract's larger size: according to the Law of Marginal Utility as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 1 indicates that it is superior to the Excluded Tract.

Sale 2, at $3,185/acre for 750 acres required a downward adjustment in order to reflect the Excluded Tract's inferior location: Sale 2 is considered to have an above average location, while the Excluded Tract is considered to have an average location. Sale 2 also required a downward adjustment in order to reflect the Excluded Tract's larger size: according to the Law of Marginal Utility as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 2 indicates that it is superior to the Excluded Tract.

Sale 3, at $527/acre for 1,185.65 acres warranted an upward adjustment in order to reflect the Excluded Tract's superior on-site improvements: Sale 3 was raw land at the time of sale, while the Excluded Tract is partial timberland and partial farmland. Sale 3 also warranted an upward adjustment in order to reflect the Excluded Tract's superior rights: Sale 3 at the time of sale had a conservation easement restriction, while the Excluded Tract is not encumbered by a conservation easement. Finally, Sale 3 required a downward adjustment in order to reflect the Excluded Tract's larger size: according to the Law of Marginal Utility as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 3 indicates that it is inferior to the Excluded Tract.

Sale 4, at $2,672/acre for 580 acres required a downward adjustment in order to reflect the Excluded Tract's larger size: according to the Law of Marginal Utility as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 4 indicates that it is superior to the Excluded Tract.

| Sales Comparison Array - Excluded Tract | | |
|---|---|---|
| Sales | Adjustments | Sales Price/Acre |
| Sale 1 | - - - | $4,574 |
| Sale 2 | - - - | $3,185 |
| Sale 4 | - - | $2,672 |
| Sale 3 | +++ | $527 |

Based on the adjustments made above, the sales were put into an array to show the where the Excluded Tract should be arranged in the array. As presented in the chart above, the Excluded Tract is inferior to Sales 1, 2, and 4, and superior to Sale 3.

After considering all of the comparable sales with respect to time, location, size, on-site improvements, road frontage, and market demand, a sale price per acre of $2,000 is considered reasonable.

The value estimate by the Sales Comparison Approach is as follows:

2,306.87 Acres    x            $2,000            =            $4,613,740

**CORRELATED AND ROUNDED**            =            **$4,610,000**

**Conclusion**

All of the comparable sales analyzed are considered relevant to the analysis involved in deriving an opinion of value. As detailed in the adjustments found within this section, percentage adjustments were not utilized. Qualitative adjustments were utilized as percentage adjustments are highly subjective. The qualitative analysis provides confidence to the opinion of value. Unique factors certainly impact the price of each comparable. Macro location factors such as proximity to the cities and infrastructure play an important role in determining value. Prices are also impacted by the micro location factors such as, distance to local amenities and conveniences.

The sales presented in this analysis were utilized as they were considered the most comparable to the Excluded Tract, based on the Excluded Tract's location and physical characteristics. As secondary consideration and support, other sales have been analyzed and researched. These sales have been excluded from the analysis as they were not considered true comparable properties of the Excluded Tract based on the Excluded Tract's highest and best use or because a full understanding/verification of the comparable sale was not attainable. The appraisers attempted to verify every comparable sale utilized and analyzed. It is the appraisers' opinion that the marketing for the Excluded Tract would be on a regional level attracting developers from other geographic locations other than the immediate subject area or region.

The final value indication was determined by the appraisers' judgment and knowledge of the comparable sales and market area. The average of the value indications is not used nor was the weighted averages applied to the value indication. Although the value opinion is based on the comparable sales that are considered most applicable, the opinion indication was a blend of the comparable sales results. The comparable sales are consistent with the Excluded Tract's highest and best use and provide meaningful indications of value.

Appraisers have broad flexibility in determining appropriate comparable sales for a property. However, this does not alleviate the necessity for a significant responsibility in applying creditable, relevant, and logical evidence. The reasoning behind a sale cannot always be measured in the context of the transaction. Therefore, the appraisers have utilized the information contained in the Sales Comparison approach to assist in developing an opinion of value.

### 6.3.3.2.    Comparable Land Sales Descriptions

## LAND SALE NO. 1

| | |
|---|---|
| LOCATION | : Salem Road, LaGrange, Troup County, Georgia |
| GRANTOR | : Stonewall Preserve LLC |
| GRANTEE | : Travis E. Taylor |
| VERIFICATION | : Mr. Joel Upchurch, Re/Max Results |
| SALE DATE | : December 26, 2018 |
| SALE PRICE | : $2,525,034 |
| DEED BOOK/PAGE | : 1957-441 |
| NUMBER OF ACRES | : 552 |
| NUMBER OF SQ. FT. | : 24,045,120 |
| PRICE PER ACRE | : $4,574 |
| PRICE PER SQ. FT. | : $0.11 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple |
| PARCEL ID # | : 0350-000013 |

**REMARKS:**

The property is in an agricultural area with average accessibility and average exposure. According to Mr. Upchurch, the listing agent, the irregularly shaped site was mostly flat and currently raw land with some timber on-site. Mr. Upchurch also stated this property was unique as it was a well taken care of recreational track with trophy deer and turkey throughout the property. Mr. Upchurch indicated that in his opinion this property was purchased as an arms-length transaction and in his opinion sold at market. Of note, this parcel has been subsequently parceled and is currently under several different ownership names.

This site is located on the east side of Salem Road, just west of Interstate 185, just south of LaGrange, Georgia. The neighboring properties are agricultural with some residential development scattered in the area.





**LAND SALE NO. 2**

| | |
|---|---|
| LOCATION | : Hwy 401-South of Pleasant Valley Rd, Adairsville, Bartow County, Georgia. |
| GRANTOR | : Osprey Timber, LLC |
| GRANTEE | : Freeman Five, LLC |
| VERIFICATION | : Bill Hagemann, South Farm and Forest, LLC |
| OR BOOK/PAGE | : 3042-0354 & 3051-241 |
| SALE DATE | : October/November 2018 |
| SALE PRICE | : $1,968,000 |
| NUMBER OF ACRES | : 617.90 |
| NUMBER OF SQ. FT | : 26,915,724 |
| PRICE PER ACRE | : $3,185 |
| PRICE PER SQ. FT. | : $0.07 |
| UTILITIES | : All available, except sewer, assumed |
| ZONING | : Agricultural |
| INTEREST CONVEYED | : Fee Simple |
| Parcel ID# | : 0062-0110-012 and 0062-0106-001, |

**REMARKS:**

The property is in an area with a mixture of raw and agricultural land and residential sites along a local road with average visibility. According to Mr. Hagemann, the site was mostly flat and raw land with timber on-site. Mr. Hagemann also indicated that there was a two-phase closing between Osprey Timber, LLC and Freeman Five, LLC.

This site is located on the northeast side of Interstate 75, just south of E Pleasant Valley Road, south of Highway 140 and west of Spring Places Road. The neighboring properties are primarily residential and agricultural, and the area has experienced some growth.





## LAND SALE NO. 3

| | |
|---|---|
| LOCATION | : Old Jackson Chapel Road, Polk County, Georgia |
| GRANTOR | : Mossy Rock LLC |
| GRANTEE | : Cedar Chapel LLC |
| VERIFICATION | : Mr. Mike Newsome, US Land & Farm & Polk County Tax Assessor's Office |
| SALE DATE | : August 7, 2017 |
| SALE PRICE | : $625,000 |
| NUMBER OF ACRES | : 1,185.65 |
| NUMBER OF SQ. FT. | : 51,646,914 |
| PRICE PER ACRE | : $527 |
| PRICE PER SQ. FT. | : $0.01 |
| PARCEL NUMBER | : 005-013A |
| DEED BOOK/PAGE | : 1636-435 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple Subject to the Restriction of the Conservation Easement |
| EASEMENT DONEE | : Atlantic Coast Conservancy Inc. |

**REMARKS:**

The property is in an agricultural area with below average accessibility and average exposure. According to Mr. Newsome, the listing agent, the irregularly shaped site was gently rolling and currently raw land. Mr. Newsome also indicated that the site is currently encumbered by a conservation easement currently held by Atlantic Coast Conservancy Inc. It should be noted that the Polk County Tax Assessor's Office also verified that this property was encumbered by a conservation easement. Finally, Mr. Newsome also stated that the conservation easement would restrict any new development or new roads. Mr. Newsome stated that the buyer intended to use the property for recreational use. According to the Deed of Conservation for this property, no more than three subdivisions on the property are allowed and not more than three home sites are allowed on the property.

This site is located on the west side of Old Jackson Chapel Road, in Polk County, Georgia, the neighboring properties are agricultural.





## LAND SALE NO. 4

| | |
|---|---|
| LOCATION | : Moody Cemetery Road, Baxley, Appling County, Georgia |
| GRANTOR | : RLF Bacon Properties, LLC |
| GRANTEE | : Frederick L. Schuster Revocable Trust |
| VERIFICATION | : Mr. Ms. Abbey Lanier, Plantation Property and Land Investments |
| SALE DATE | : January 30, 2017 |
| SALE PRICE | : $1,550,000 |
| DEED BOOK/PAGE | : 538-202 |
| NUMBER OF ACRES | : 580 |
| NUMBER OF SQ. FT. | : 25,264,800 |
| PRICE PER ACRE | : $2,672 |
| PRICE PER SQ. FT. | : $0.06 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple |
| PARCEL ID # | : 0087-002 |

**REMARKS:**

The property is in an agricultural area with average accessibility and average exposure. According to Ms. Lanier and the information packet she provided, the irregularly shaped site was mostly flat and partially timberland and partially farmland at the time of sale. Further, according to the information provided, this farm consists of income producing irrigated and non-irrigated crop land, a small pond, timberland and is bordered to the east by Sweetwater Creek. Of note, the current lease on the property at the time of sale expired on December 31, 2017.

This site is located on the north side of Mayfield Road and the east and west side of County Road 51, just west of County Road 175, in Warren County. The neighboring properties are agricultural with some residential development scattered in the area.





## Location Map



## Reconciliation

The Fair Market Value indicators before the conservation easement are as follows:

SALES COMPARISON APPROACH                                    N/A
INCOME APPROACH (Subject Property)
  $46,940,000[111]

SALES COMPARISON APPROACH (Excluded Tract)      $4,610,000

The Sales Comparison Approach is based upon the theory of substitution. The value is estimated by direct comparison of the subject property with comparable properties which have recently sold, thereby reflecting the actions of buyers and sellers in the marketplace. However, an inherent weakness of the Sales Comparison Approach for mining developments hinges on the complexity of multi-property sales and the unique physical characteristics of each mining site sale being proprietary information. Many of the sales associated with mining development involve multiple properties, all of which often include differing physical characteristics or mineral resources. As stated throughout this report, market participants, buyers and sellers of mines are unwilling to share the physical characteristics of the mines such as the reserves that can be mined as it is proprietary information. Conversely, the Income Approach - Overall Capitalization analysis is an excellent indicator of value, particularly for investment properties, as investors emphasize income generation when underwriting property acquisitions. Due to the indicated challenges, based on our research and experience, the Sales Comparison Approach is limited and inadequate for the valuation of the subject property. The Income Approach – Discounted Cash Flow analysis is used in determining a value opinion. As stated earlier in this report, the Sales Comparison Approach was utilized for the Excluded Tract.

The Income Approach analyzes the subject property as an investment based on the subject property's highest and best use to recognize the present value of future cash flows.  The value estimate derived from the Income Approach reflects the amount an investor would justify paying to receive an annual income over the holding period of the property, plus the reversionary value at the end of the holding period. The subject property is unique in its location and physical characteristics as the highest and best use for the subject property would be as a granite mine. As resources are mined, the raw materials diminish, creating a situation where the mine's income and expenses are neither constant nor stable. Therefore, the DCF, useful in forecasting unstable income and expenses, is a more appropriate valuation method ultimately providing a more reliable value indication. The Income Approach, based on a Discounted Cash Flow analysis, indicates a value of $46,940,000.

Final reconciliation relies on the proper application of appraisal techniques and the appraisers' judgment.[112] Due to the complex nature of the subject property and the challenges associated with finding comparable sales, the value opinion relies on the Income Approach.

---

[111] Rounded from the DCF found earlier in this report.
[112] The Appraisal of Real Estate, 15th Edition, p. 600

CARRYOVER ATTACHMENT - EXHIBIT C: NORRIS CASON

It is our opinion that the Fair Market Value in Fee Simple Estate, before the conservation easement, of the total Contiguous Family-Owned Parcel of 2,546.87 Acres, consisting of 240.00 Acres of land encumbered by the conservation easement and 2,306.87 Acres Excluded, based on the Highest and Best Use of the 240.00 Acres as a Mining Development and the 2,306.87 Acres as Agricultural/Recreational/Timber Land, located along the north side of Warren County Road 58, just south of Mayfield Road, in Warren County, Georgia, as of December 28, 2018 is:

| Area Encumbered (240.00 Ac) | + | Excluded Tract (2,306.87 Ac) | = | Reconciled Value Before |
|---|---|---|---|---|
| $46,940,000 | + | $4,610,000 | = | $51,550,000 |

**FIFTY-ONE MILLION FIVE HUNDRED FIFTY THOUSAND DOLLARS**

**($51,550,000)**

## 6.4. After Conservation Easement

For the purpose of this Section 6.4 in its entirety, subject property shall refer to the 240.00 acres to be encumbered by the conservation easement, except where otherwise identified.

### 6.4.1. Highest and Best Use – Conservation Encumbered Area (240.00 Acres)

Highest and Best Use is defined in Chapter 17 Page No. 305, in the 15th edition of "The Appraisal of Real Estate," published by the Appraisal Institute, and adopted by Treasury Regulation § 170, as the reasonably probable use of property that results in the highest value, as of the date of the appraisal.

The highest and best use is further described by the Appraisal Institute as the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible and results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved specific property with respect to the user and timing of the use is adequately supported and results in the highest present value. This determination is not based on quantitative means nor is it a fact to be found, but instead relies heavily on the appraisers' judgment as well as his analytical skill. It is of note that the highest and best use may differ from the existing use when there are existing improvements. However, the existing use will continue unless and until the land value in its highest and best use, represents the premise upon which value is based.

The purpose of determining the Highest and Best use for a specific property is to identify the demand for appropriate potential uses, identify demand for a particular property type, compare cost and value if specific market criteria are fulfilled, then of the appropriate potential uses determine the use that produces the maximum value. Based on the determination of the Highest and Best Use, the appropriate comparables are then selected for the Sales Comparison Approach.

**<u>Legally Permissible</u>**

The subject property consists of 240.00 acres of land located along the north side of Warren County Road 58 just south of Mayfield Road in Warren County, Georgia. The surrounding area primarily consists of agricultural land uses. The concentration of population and supportive commercial, residential, and industrial development is located in Warrenton, Georgia to the northeast, Milledgeville, Georgia to the southwest, and Augusta, Georgia to the northwest of the subject property. As stated throughout this report, the subject property is zoned FOR-AG Forestry-Agriculture District. Furthermore, other than the conservation easement, there are no legal deed restrictions.

After the conservation easement is in place the subject property forfeits the rights associated with the development of the subject property for granite mining or any other purpose that requires construction or placement of any building structures. Further, any changes or disturbance to the natural habitat are expressly prohibited or restricted. However, the subject property's owner still can continue agricultural and forestry uses that are subject to an approved management plan.

The restrictive nature of the conservation easement limits potential buyers and minimizes the possible uses of the subject property. It especially prohibits the exploration of natural resources harbored in the ground, thereby limiting the competitive value of the land and prohibiting the potential use that would allow it to reach its maximum value. Therefore, the establishment of a conservation easement on the subject property has transformed the highest and best use of the subject property.

The conservation easement is located in the Addenda of this report and fully describes the limitations on the subject property. The limitations can be summarized as legally allowing only activities that do not disturb the subject property in any way, such as agriculture, recreational uses, and forestry.

**Physically Possible**

The subject property and its uses are affected by its physical characteristics which include, but are not limited to: location, street frontage, size, shape, street access, availability of utilities, easements, soils and subsoils, and topography. The placement of the subject property does not make any changes in the physical characteristics of the subject property.

However, the conservation easement prohibits all types of development that disturbs the natural environment in any way, including granite mining, which is particularly disruptive. All other commercial, industrial, or residential uses are also prohibited.

In summation, the conservation easement prohibits the use of the subject property for all types of development that are not specifically noted in the legal requirements of the conservation easement. These limitations include all types of commercial, industrial, residential development and mining. The owner of the subject property may continue to use the subject property for agricultural, forestry, and recreational uses as well as allowing for public enjoyment as specifically outlined in the conservation easement. Therefore, the highest and best use of the subject property has been permanently altered by the placement of the subject property in a conservation easement.

**Maximally Productive**

The subject property was analyzed, and it was determined that the most reasonably probable use that would produce the most benefits was the use of the subject property as a granite mining development. Although, there were other uses that would potentially produce a positive cash flow, the development that would generate the highest return was the development of a granite mine. This conclusion was supported by current market conditions, the level of current population and economic growth in Warren County and existence of other mining operations in the area.

However, post-conservation easement the owners forfeit the right to develop the subject property to its maximally productive use. Instead, the owner elects to preserve the subject property in its natural state and abide by the restrictive language of the legal requirements of the conservation easement. Therefore, the highest and best use of the subject property post-conservation easement for perpetuity will be agricultural, forestry or recreational uses.

**Conclusion**

In conclusion, the subject property had the potential for various uses that could produce a positive cash flow and an adequate return to the cost of the investment, such as development into a large residential lots with an array of amenities or a commercial recreation area. Other uses included a granite mining development due to the large granite deposits in the area, which was concluded to be the development that would generate the highest return on investment. As stated throughout this report, it is the appraisers' opinion that the highest and best use of the subject property is as a granite mine.

However, the owner by placing the subject property in a conservation easement alters the highest and best use since the conservation easement requirements are very restrictive and permanent. Therefore, the financial feasibility and legal permissibility of the subject property are drastically altered. As a result, the highest and best use, after placing a conservation easement on the subject property, is agricultural or forestry use, recreational use as outlined by the conservation easement or conservation of the land for public enjoyment and the preservation of natural forested areas for the benefit of botanical species and wildlife.

### 6.4.2. Income Approach

**Methodology**

The Income Approach is typically used to evaluate income producing properties and forecast their worth. Investors are interested in how much future income can be produced by a property purchased with today's dollars. The Appraisal of Real Estate, 15th Edition, defines the Income Approach as follows: "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principal of anticipation is the fundamental to the approach." Any property that has the capacity to generate income can be evaluated by the income approach. The Appraisal of Real Estate, 15th Edition, further states: "When more than one approach to value is used to develop an opinion of value for an income - producing property, the value indication produced by the income capitalization approach might be given greater weight than that of other approaches in the final reconciliation."

The subject property is restricted by a conservation easement into perpetuity, which changes its potential uses regarding: legally permissible, physically possible, financially feasible, and maximally productive. Thereby, drastically altering its highest and best use. The subject property is no longer a potential income producing mine, but a property that will be maintained as a mature forest to enhance the tranquility of the area, provide recreational opportunities and preserve native ecosystems. Therefore, the Income approach is not applicable to the subject property when restricted by a deed of conservation easement.

### 6.4.3. Sales Comparison Approach

**Methodology**

When valuing a conservation easement, it is necessary to discern the applicability of the Sales Comparison Approach and the appropriate methodology within that approach. Treasury Regulation § 1.170A-14(h)(3)(i) and (ii) allow for two different types of valuation: direct comparison and the indirect analysis. The indirect analysis utilizes the before and after technique. This process focuses on the value of the property after the conservation easement is in place as compared to the value of the property before the conservation easement. This is the procedure most commonly used. The direct comparison technique is used to compare the actual prices paid for conservation easements with similar characteristics and restrictions in a relatively recent time frame. Because conservation easement sales are very limited within a given region, nationwide sales are usually required. However, an overview of the actual prices paid for conservation easements, when available can be used to support the results of the before and after technique.

The utilization of the sales comparison approach for conservation easement valuation not only requires the identification of comparable sales, but also a thorough review of the conservation easement documents and restrictions, to ensure comparability and allow the appraisers to formulate a fully educated opinion of value. Precedent has been established in the judicial system that in-depth knowledge of the restrictions on the conservation easements and specific characteristics of encumbered conservation easements are necessary to obtain a favorable outcome. This can be seen in the court case from 1991, Estate of Elizabeth G. Hughan, Deceased, John W. Hughan, Executor v. Commissioner, Docket No. 23221-88 (61 T.C.M. 2932 (1991)). The comparable sales utilized are considered the best comparable sales available and were fully analyzed in regard to all conservation easement characteristics and restrictions.

### 6.4.4. Conservation Easement Encumbered Land Sales Analysis

The fair market value of the subject property post-conservation easement has been estimated by an analysis of comparable conservation easement encumbered land sales in the southeastern region. These sales are the most recent and relevant within the parameters specific to the subject property. Detailed analyses of the comparable sales and a location map follow this discussion.

| Land Comparison Adjustments Grid - Post Easement | | | | | | |
|---|---|---|---|---|---|---|
| | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 |
| Location | Warren Co, GA | Van Buren Co, TN | Cleveland Co, NC | Polk Co, GA | Jones Co, GA | Webster Co, GA |
| Date of sale | N/A | 7/21/2018 | 9/20/2017 | 8/7/2017 | 7/21/2017 | 06/16/17 |
| Price | N/A | $138,600 | $140,000 | $625,000 | $500,000 | $199,010 |
| Size (Acres) | 240.000 | 395.43 | 39.27 | 1,185.65 | 261.05 | 203.77 |
| Price/Acre | N/A | $351 | $3,565 | $527 | $1,915 | $977 |
| Price/ Sq. Ft. | N/A | $0.01 | $0.08 | $0.01 | $0.04 | $0.02 |
| Location | Average | Average | Average | Average | Average | Average |
| Access | Average | Average | Average | Average | Average | Average |
| Visibility | Average | Average | Average | Average | Average | Average |
| Topography/Shape | Average | Average | Average | Average | Average | Average |
| Utility | Average | Average | Average | Average | Average | Average |
| On-Site Improvements | Raw Land | Raw Land | Raw Land | Raw Land | Small Barn | Raw Land |
| Rights | Restrictive | Similar | Similar | Similar | Similar | Similar |
| Transactional Adjustments | | | | | | |
| Unadjusted Price/Acre | | $351 | $3,565 | $527 | $1,915 | $977 |
| Property rights conveyed | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$351* | *$3,565* | *$527* | *$1,915* | *$977* |
| Financing terms | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$351* | *$3,565* | *$527* | *$1,915* | *$977* |
| Expenditures Immediately After Sale | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$351* | *$3,565* | *$527* | *$1,915* | *$977* |
| Conditions of sale | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| *Intermediate adjusted price* | | *$351* | *$3,565* | *$527* | *$1,915* | *$977* |
| Market Conditions | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Physical Adjustments | | | | | | |
| *Intermediate adjusted price* | | *$351* | *$3,565* | *$527* | *$1,915* | *$977* |
| Location | | Similar | Similar | Similar | Similar | Similar |
| Access | | Similar | Similar | Similar | Similar | Similar |
| Visibility | | Similar | Similar | Similar | Similar | Similar |
| Topography/Shape | | Similar | Similar | Similar | Similar | Similar |
| Utility | | Similar | Similar | Similar | Similar | Similar |
| On-Site Improvements | | Similar | Similar | Similar | - | Similar |
| Rights | | Similar | Similar | Similar | Similar | Similar |
| Size | | + | - - - | +++ | Similar | Similar |
| Subject by comparison | | + | - - - | +++ | - | Similar |

## Adjustment Explanation

Sale 1, at $351/acre for 395.43 acres warranted an upward adjustment in order to reflect the subject property's smaller size: according to the Law of Marginal Utility, as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 1 indicates that it is inferior to the subject property.

Sale 2, at $3,565/acre for 39.27 acres required a downward adjustment in order to reflect the subject property's larger size: according to the Law of Marginal Utility as the acreage

increases, the price per acre decreases. After the appropriate adjustments, Sale 2 indicates that it is superior to the subject property.

Sale 3, at $527/acre for 1,185.65 acres warranted an upward adjustment in order to reflect the subject property's smaller size: according to the Law of Marginal Utility, as the acreage increases, the price per acre decreases. After the appropriate adjustments, Sale 3 indicates that it is inferior to the subject property.

Sale 4, at $1,915/acre for 261.05 acres required a downward adjustment in order to reflect the subject property's inferior on-site improvements: Sale 4 has a barn on-site, while the subject property is raw land. After the appropriate adjustments, Sale 4 indicates that it is superior to the subject property.

Sale 5, at $977/acre for 203.77 acres did not warrant any overall adjustments, Sale 5 indicates that it is similar to the subject property.

| Sales Comparison Array | | |
|---|---|---|
| Sales | Adjustments | Sales Price/Acre |
| Sale 2 | - - - | $3,565 |
| Sale 4 | - | $1,915 |
| Sale 5 | = | $977 |
| Sale 1 | + | $351 |
| Sale 3 | +++ | $527 |

Based on the adjustments made above, the sales were put into an array to show where the subject property should be arranged in the array. As presented in the chart above, the subject property is inferior to Sales 2 and 4, similar to Sale 5, and superior to Sales 1 and 3.

After considering all of the comparable sales with respect to time, location, size, on-site improvements, road frontage, and market demand, a sale price per acre of $1,300, is considered reasonable.

The value estimate by the Sales Comparison Approach is as follows:

240.00 Acres  x $1,300           =        $312,000

**CORRELATED AND ROUNDED**     =        **$310,000**

### 6.4.4.1.    Comparable Land Sales Descriptions

## LAND SALE NO. 1

| | |
|---|---|
| LOCATION | : 395 Van Buren Drive, Spencer, Van Buren County, Tennessee |
| GRANTOR | : Cumberland Property Holdings |
| GRANTEE | : Sullivan Christopher Doan & Donnie Mark Sullivan |
| VERIFICATION | : Mr. Mike Williford, American Forest Management |
| SALE DATE | : July 21, 2018 |
| SALE PRICE | : $138,600 |
| NUMBER OF ACRES | : 395.43 |
| NUMBER OF SQ. FT. | : 17,224,931 |
| PRICE PER ACRE | : $351 |
| PRICE PER SQ. FT. | : $0.01 |
| PARCEL NUMBER | : 053-002.00 |
| DEED BOOK/PAGE | : RB95-277 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple Subject to the Restriction of the Conservation Easement |
| EASEMENT DONEE | : Foothills Land Conservancy Inc. |

**REMARKS:**

The property is in an agricultural area. According to Mr. Williford, the listing agent, the mostly rectangular shaped site was rolling and currently raw land. Mr. Williford also stated that the conservation easement in place would restrict any new development and any significant improvements. Mr. Williford indicated that this property can be used for agricultural, forestry, or recreational purposes. Mr. Clabough with the Foothills Land Conservancy Inc. indicated that this tract can be parceled into four separate parcels with one two-acre residential building envelope per tract. Mr. Clabough also stated that the smallest parcel allowed is a 50-acre parcel. Finally, Mr. Clabough indicated that any forestry or agricultural uses would have to follow an approved management plan.

This site is located in Van Buren County, the neighboring properties are agricultural.





**LAND SALE NO. 2**

| | |
|---|---|
| LOCATION | : Highway 150/Cherryville Road, Cherryville, Cleveland County, North Carolina |
| GRANTOR | : Conservation Trust of North Carolina |
| GRANTEE | : Donald Dedmon Jr. |
| VERIFICATION | : Mr. Rusty Painter, Seller representative |
| SALE DATE | : September 20, 2017 |
| SALE PRICE | : $140,000 |
| NUMBER OF ACRES | : 39.27 |
| NUMBER OF SQ. FT. | : 1,710,601 |
| PRICE PER ACRE | : $3,565 |
| PRICE PER SQ. FT. | : $.08 |
| PARCEL NUMBER | : 2568770620 |
| DEED BOOK/PAGE | : 1751-0441 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple Subject to the Restriction of the Conservation Easement |
| EASEMENT DONEE | : Conservation Trust of North Carolina |

**REMARKS:**

      The property is in an agricultural area. According to Mr. Painter, the seller's representative, the irregularly shaped site was gently rolling and currently raw land. Mr. Painter also indicated that the site is currently encumbered by a conservation easement held by Conservation Trust of North Carolina. Mr. Painter also stated that the conservation easement would restrict any new development or new roads, except for those specifically permitted by an approved forestry or agricultural plan. Mr. Painter indicated that the conservation easement allows for one residential building envelope with three related agricultural buildings. Mr. Painter stated that the buyer was the adjacent property owner.

This site is located on the east side of Highway 150/Cherryville Road, in Cleveland County, North Carolina, the neighboring properties are agricultural and residential.





## LAND SALE NO. 3

| | |
|---|---|
| LOCATION | : Old Jackson Chapel Road, Polk County, Georgia |
| GRANTOR | : Mossy Rock LLC |
| GRANTEE | : Cedar Chapel LLC |
| VERIFICATION | : Mr. Mike Newsome, US Land & Farm & Polk County Tax Assessor's Office |
| SALE DATE | : August 7, 2017 |
| SALE PRICE | : $625,000 |
| NUMBER OF ACRES | : 1,185.65 |
| NUMBER OF SQ. FT. | : 51,646,914 |
| PRICE PER ACRE | : $527 |
| PRICE PER SQ. FT. | : $0.01 |
| PARCEL NUMBER | : 005-013A |
| DEED BOOK/PAGE | : 1636-435 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple Subject to the Restriction of the Conservation Easement |
| EASEMENT DONEE | : Atlantic Coast Conservancy Inc. |

**REMARKS:**

The property is in an agricultural area with below average accessibility and average exposure. According to Mr. Newsome, the listing agent, the irregularly shaped site was gently rolling and currently raw land. Mr. Newsome also indicated that the site is currently encumbered by a conservation easement currently held by Atlantic Coast Conservancy Inc. It should be noted that the Polk County Tax Assessor's Office also verified that this property was encumbered by a conservation easement. Finally, Mr. Newsome also stated that the conservation easement would restrict any new development or new roads. Mr. Newsome stated that the buyer intended to use the property for recreational use. According to the Deed of Conservation for this property, no more than three subdivisions on the property are allowed and not more than three home sites are allowed on the property.

This site is located on the west side of Old Jackson Chapel Road, in Polk County, Georgia, the neighboring properties are agricultural.





**LAND SALE NO. 4**

| | |
|---|---|
| LOCATION | : Homer Chiles Road, Jones County, Georgia |
| GRANTOR | : Dasher Holdings LLC |
| GRANTEE | : Grice Gregory R |
| VERIFICATION | : Mr. Mike Newsome, US Land & Farm |
| SALE DATE | : July 21, 2017 |
| SALE PRICE | : $500,000 |
| NUMBER OF ACRES | : 261.05 |
| NUMBER OF SQ. FT. | : 11,371,338 |
| PRICE PER ACRE | : $1,915 |
| PRICE PER SQ. FT. | : $0.04 |
| PARCEL NUMBER | : J11-00-053 |
| DEED BOOK/PAGE | : 953-320 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple Subject to the Restriction of the Conservation Easement |
| EASEMENT DONEE | : Georgia Agricultural Land Trust |

**REMARKS:**

The property is in an agricultural area with average accessibility and average exposure. According to Mr. Newsome, the listing agent, the irregularly shaped site was rolling and currently raw land. Mr. Newsome also stated that the current conservation easement in place restricts any new development, commercial development, industrial development, residential development, or new roads. Mr. Newsome stated that the use of this property is recreational use. According to the Deed of Conservation, two two-acre building envelopes are allowed and there is an agricultural envelope allowed. Mr. Newsome also indicated there was a barn on-site.

This site is located on Homer Chiles Road, in Jones County, the neighboring properties are agricultural.





### LAND SALE NO. 5

| | |
|---|---|
| LOCATION | : 39 Jordan Road, Preston, Webster County, Georgia |
| GRANTOR | : Copper Hill Investments LLC |
| GRANTEE | : Marvin D Conger and Joyce H. Conger |
| VERIFICATION | : Mr. Mike Matre, Matre Forestry Consulting Inc. |
| SALE DATE | : June 16, 2017 |
| SALE PRICE | : $199,010 |
| NUMBER OF ACRES | : 203.77 |
| NUMBER OF SQ. FT. | : 8,876,221 |
| PRICE PER ACRE | : $977 |
| PRICE PER SQ. FT. | : $0.02 |
| PARCEL NUMBER | : D07-024 |
| DEED BOOK/PAGE | : 139-230 |
| UTILITIES | : All available, except sewer. Assumed |
| INTEREST CONVEYED | : Fee Simple Subject to the Restriction of the Conservation Easement |
| EASEMENT DONEE | : Chattahoochee Valley Land Trust |

**REMARKS:**

The property is in an agricultural area with average accessibility and average exposure. According to Mr. Matre, the broker familiar with this sale, the irregularly shaped site was gently rolling and currently raw land. Mr. Matre also stated that the conservation easement for this property is currently held by the Chattahoochee Valley Land Trust. Mr. Matre indicated that the buyers are planning on using this property for recreational use. Finally, Mr. Matre also stated that the conservation easement restricts any new development. According to the Deed of Conservation, one building envelope of two acres is allowed and construction of a three-acre pond is allowed on-site.

This site is located on the east side of Jordan Road, the north side of Poplar Springs Road and the east side of Highway 41 in Webster County, the neighboring properties are residential and agricultural.





Location Map[113]



### 6.4.5.   After Conservation Easement Reconciliation

#### 6.4.5.1.   Sales Comparison Approach

In the Sales Comparison Approach a comparison is made between the subject property and sales of similar properties, usually in the subject property's market area, with adjustments made for the differences in the properties. Therefore, the Sales Comparison Approach reflects the perceived value of the subject property in a given submarket.

#### 6.4.5.2.   Sales Comparison Approach (Conservation Easement Encumbered Sales)

A scenario similar to the situation stated in Section 6.4.6.1 above, exists when using the Sales Comparison Approach for Conservation Easement Encumbered Sales. For instance, there are a limited number of sales, they are generally dispersed over a wide geographic area and they have different physical qualities. This makes discernment of the market value problematic and clouds the motivation of market participants when dealing with conservation easements. For these reasons, in our analysis we have chosen to use $310,000 as the indicator of value.

---

[113] Location arrows are approximate.

Overall, in selecting a value for the subject property, post-conservation easement, each of value indicators were considered and evaluated by the appraisers using their professional judgment and experience. Thus, the following guidelines set forth in the Appraisal of Real Estate, 15th Edition published by the Appraisal Institute, state: "The final value opinion is not the average of the different value indications derived. No mechanical formula is used to select one indication of value over the others. The strengths and weaknesses of each of the approaches used, and the quantity and quality of the data analyzed, must be considered and addressed in an appraisal report, and an appraiser must explain why one approach may have been relied upon more than another in a particular assignment. Final reconciliation relies on the proper application of appraisal techniques and the appraiser's judgment" [Pages 599-600].

Our final value conclusion is stated in Section 6.4.6.3, Fair Market Value Indication After Conservation Easement shown below. The approach to value reflects the highest and best use of the subject property.

### 6.4.5.3. Fair Market Value Indication After The Conservation Easement

The Fair Market Value indications for the Contiguous Family-Owned Parcel after the conservation easement are as follows:

SALES COMPARISON APPROACH (Encumbered Sales)          $310,000

SALES COMPARISON APPROACH  (Excluded Tract)          $4,610,000

It is our opinion that the Fair Market Value in Fee Simple Estate subject to the conservation easement for the total Contiguous Family-Owned Parcel of 2,546.87 acres, consisting of 240.00 Acres encumbered by the conservation easement and 2,306.87 Acres Excluded, located along the north side of Warren County Road 58, just south of Mayfield Road, in Warren County, Georgia, as of December 28, 2018 is:

| Area Encumbered (240.00 Ac) | + | Excluded Tract (2,306.87 Ac) | = | Reconciled Value After |
|---|---|---|---|---|
| $310,000 | + | $4,610,000 | = | $4,920,000 |

**FOUR MILLION NINE HUNDRED TWENTY THOUSAND DOLLARS**

**($4,920,000)**

## Section 7 – Final Reconciliation

### 7.1.  SUMMARY OF VALUES

| | |
|---|---|
| Value Before the Conservation Easement | $51,550,000 |
| Residual Value After the Conservation Easement | $ 4,920,000 |
| Minus Enhancement Value | $ 230,500 |
| Value of the Conservation Easement | $46,399,000 rd. |

### 7.2. Conservation Easement Valuation

The permissible uses of the subject property of 240.00 acres as encumbered by the conservation easement have been reviewed and it has been determined that these diminished uses have altered the highest and best use of the subject property, and consequently have exerted a downward influence on the fair market value of the subject property. The subject property's owner is permitted various rights, or uses, provided by the reserved rights of the subject property's conservation easement located in the Addenda of this report. However, the uses permitted fall far short of the maximum potential use for the subject property.

### 7.3. Conservation Easement Impact on Property

**7.3.1.** The subject property contains forest and open land that will be permanently protected from future development or conversion.

**7.3.2.**  The preservation of the subject property for outdoor recreation by, or the education of, the general public is within the meaning of Section 170(h)(4)(A)(i) of the Code. Further detail can be found in the in the Deed of Conservation Easement found in the addenda of this report.

**7.3.3.**  Prohibited Uses - The prohibited or restricted uses are delineated in detail in the Deed of Conservation Easement included in the Addenda of this report and incorporated by reference into this appraisal report. The detailed list and description are not repeated here.

**7.3.4.**  Reserved Rights - The reserved rights and permitted uses are delineated in detail in the Deed of Conservation Easement included in the Addenda of this report and incorporated by reference into this appraisal report. The detailed list and description are not repeated here.

**Section 8 – Addenda**

**EXHIBIT 8.1**

**PROFESSIONAL QUALIFICATIONS**



## Rick A. Kenny MAI, SRA
327 Dahlonega Street Suite 104 • Cumming, GA 30040
770.664.8922 • rick@kennyre.com

### EDUCATION

**FLORIDA STATE UNIVERSITY, College of Business**                                        Tallahassee, Florida
**Bachelor of Science in Real Estate and Marketing**

**APPRAISAL EDUCATION- Society of Real Estate Appraisers and Appraisal Institute**
- A.I.R.E.A. Course-       Standards of Professional Practice
- S.R.E.A. Course 101-     Introduction to Appraising Real Property
- S.R.E.A. Course 102-     Applied Residential Property Valuation
- S.R.E.A. Course 201-     Principles of Income Property Valuation
- S.R.E.A. Course 202-     Applied Income Property Valuation
- S.R.E.A. Seminar-        R41B & R41C
- S.R.E.A. Seminar-        Depreciation Analysis
- CCIM Course 101-         Fundamentals of Real Estate Investment & Taxation
- CCIM Course 102-         Fundamentals of Creating a Real Estate Investment
- A.I.R.E.A. Course-       State Certified/Licensed Real Estate Appraisers
- A.I.R.E.A. Course 530- Advanced Sales Comparison
- A.I.R.E.A. Course 510- Advanced Income Capitalization
- A.I.R.E.A. Course 420- Business Practice and Ethics
- A.I.R.E.A. Course 520- Market Analysis Highest and Best Use
- A.I.R.E.A. Course 540- Report Writing and Valuation Analysis
- A.I.R.E.A. Course 550- Advanced Applications
- Valuation of Conservation Easements (Appraisal Institute) (Passed)

### WORK EXPERIENCE

| | |
|---|---:|
| **Kenny and Associates, Inc.-** Owner/Appraiser | *1991 – Present* |
| **The Fulton County Board of Assessors** | *2006-2013* |
| **Weibel & Associates, Inc. -** Appraiser | *1991-1991* |
| **FDIC Atlanta Consolidated Office-** Appraisal Manager | *1990-1990* |
| **FSLIC Atlanta-** National Appraiser Director | *1989-1990* |
| **FSLIC as Rec. for Sunrise Savings & Loan-** Chief Appraiser | 1986-1989 |
| **Sunrise Mortgage Corporation-** Commercial Real Estate Appraiser | 1984-1986 |
| **Appraisal & Acquisition Consultants-** Appraiser Associate | 1984-1984 |
| **Phagan & Associates-** Appraiser Associate | 1983-1984 |

Experience includes 30 years of commercial and residential real estate appraisal and appraisal reviews, real estate sales, feasibility studies and consultations.

### PROFESSIONAL AFFILIATIONS
**MAI, SRA Designation, Appraisal Institute (No. 66318)**
**Georgia Certified General Real Estate Appraiser (No. 628)**
**Atlanta Board of Realtors**
**Licensed Georgia Real Estate Broker**
**Licensed Florida Real Estate Broker**
**National Association of Realtors**
**International Association of Assessing Officers**
**Former Chairman, Fulton County Board of Tax Assessors**

### Instructor for the Following Seminars Given to FSLIC & FDIC Personnel

HP-12C Fundamentals and Application to Real Estate Appraising, Introduction to Real Estate Practices and Principles, Advanced Income Property Valuation, Applied Income Property Valuation, Introduction to Real Estate Appraising, Introduction to Reviewing Appraisals

# State of Alabama

This is to certify that

## Rick Andrew Kenny

having given satifactory evidence of the necessary
qualifications required by the laws of the State of Alabama
is licensed to transact business in Alabama as a

## Certified General Real Property Appraiser

With all rights, privileges and obligations
appurtenant thereto.



LICENSE NUMBER: **G01327**
EXPIRATION DATE: **09/30/2023**

Executive Director
ALABAMA REAL ESTATE APPRAISERS BOARD

000008611



Ron DeSantis, Governor

Julie I. Brown, Secretary

dbpr Florida

# STATE OF FLORIDA

## DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

## FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED GENERAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

### KENNY, RICK ANDREW

327 DAHLONEGA ST SUITE 104
CUMMING      GA 30040

**LICENSE NUMBER: RZ4090**

**EXPIRATION DATE: NOVEMBER 30, 2022**

Always verify licenses online at MyFloridaLicense.com

Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

EXPIRES ON
02-28-2022

# COMMONWEALTH of VIRGINIA
Department of Professional and Occupational Regulation
9960 Mayland Drive, Suite 400, Richmond, VA 23233
Telephone: (804) 367-8500

REAL ESTATE APPRAISER BOARD

CERTIFIED GENERAL REAL ESTATE APPRAISER

RICKY ANDREW KENNY
327 DAHLONEGA ST STE 104
CUMMING, GA 30040

NUMBER
4001017925

Mary Broz-Vaughan, Director

**DPOR**

DPOR-LIC (02/2017)
(DETACH HERE)

Status can be verified at http://www.dpor.virginia.gov

---

**DPOR**

COMMONWEALTH of VIRGINIA
Department of Professional and Occupational Regulation

REAL ESTATE APPRAISER BOARD
CERTIFIED GENERAL REAL ESTATE APPRAISER
NUMBER: 4001017925  EXPIRES: 02-28-2022

RICKY ANDREW KENNY
327 DAHLONEGA ST STE 104
CUMMING, GA 30040

(FOLD)

(SEE REVERSE SIDE FOR PRIVILEGES AND INSTRUCTIONS)

Status can be verified at http://www.dpor.virginia.gov

PATENTS 5,197,766  5,940,199

DPOR-PC (02/2017)

Rick Andrew Kenny
Kenny And Associated, Inc
327 Dahlonega St Suite 104
Cumming, GA 30040

**STATE OF OHIO
DIVISION OF REAL ESTATE
AND PROFESSIONAL LICENSING**

AN APPRAISER LICENSE/CERTIFICATE
has been issued under ORC Chapter 4763 to:

NAME: Rick Andrew Kenny
LIC/CERT NUMBER: 2020000529
LIC LEVEL: Cert. General R. E. Appraiser - Out of State
CURRENT ISSUE DATE: 02/11/2020
EXPIRATION DATE: 02/11/2021
USPAP DUE DATE: 02/11/2022

### State of Missouri

**Division of Professional Registration**
**State Certified General Real Estate Appraiser**

**VALID THROUGH JUNE 30, 2022**
**ORIGINAL CERTIFICATE/LICENSE NO. 2020031001**
**RICK KENNY**
**4170 CUMBERLAND POINT DR**
**GAINESVILLE GA 30504**
**USA**

RICK KENNY
4170 CUMBERLAND POINT DR
GAINESVILLE GA 30504
USA

### State of Missouri

**Missouri Department of Commerce and Insurance**
**Division of Professional Registration**
**Real Estate Appraisers Commission**
**State Certified General Real Estate Appraiser**

**VALID THROUGH JUNE 30, 2022**
**ORIGINAL CERTIFICATE/LICENSE NO. 2020031001**

**RICK KENNY**
**4170 CUMBERLAND POINT DR**
**GAINESVILLE GA 30504**
**USA**

*Vanna Beauchamp*
**EXECUTIVE DIRECTOR**

*Sarah E. Ledgerwood*
**DIVISION DIRECTOR**



License Number  AP-1953                                            NON TRANSFERABLE

# CER TIFIED REAL EST  ATE APPRAISER PERMIT

Issued : 10/29/2020
Expires: 10/28/2022

## Rick A. Kenny

Certified General Appraiser Permit
AS PROVIDED FOR BY THE LAWS OF WYOMING.

Kenny and Associates Inc                    AUTHORIZED BY THE WYOMING CERTIFIED
327 Dahlonega St                             REAL ESTATE APPRAISER BOARD
Cumming GA 30040                             WITNESS MY HAND AND THE
                                             OFFICIAL SEAL AT CHEYENNE, WYOMING.

                                             Nicole Novotny Smith Executive Director




STATE OF ARKANSAS



# APPRAISER LICENSING & CERTIFICATION BOARD

*Attests that*

On this date was certified as a

Rick Andrew Kenny

## STATE CERTIFIED GENERAL APPRAISER

The Arkansas Appraiser Licensing and Certification Board hereby affirms that this Certification is issued in accordance with all the requirements of Arkansas Code Annotated, Section 17-14-101 et seq., and subsequently adopted "Rules and Regulations" and shall remain in force when properly supported by a current pocket identification card.

2/13/2021
Date Issued

CG-4649
Certification Number

*Cary C. Marlowe*

Chairman, AALCB

# STATE OF GEORGIA
# REAL ESTATE APPRAISERS BOARD

### RICK ANDREW KENNY

### 628

IS AUTHORIZED TO TRANSACT BUSINESS IN GEORGIA AS A
## CERTIFIED GENERAL REAL PROPERTY APPRAISER

THE PRIVILEGE AND RESPONSIBILITIES OF THIS APPRAISER CLASSIFICATION SHALL CONTINUE IN EFFECT AS LONG AS THE APPRAISER PAYS REQUIRED APPRAISER FEES AND COMPLIES WITH ALL OTHER REQUIREMENTS OF THE OFFICIAL CODE OF GEORGIA ANNOTATED, CHAPTER 43-39-A. THE APPRAISER IS SOLELY RESPONSIBLE FOR THE PAYMENT OF ALL FEES ON A TIMELY BASIS.

D. SCOTT MURPHY
Chairperson

JEFF A. LAWSON
Vice Chairperson

JEANMARIE HOLMES
KEITH STONE
WILLIAM A. MURRAY

1073710477556726

---

**RICK ANDREW KENNY**

| # | 628 | |
|---|---|---|
| Status | ACTIVE | END OF RENEWAL 08/31/2022 |

CERTIFIED GENERAL REAL PROPERTY APPRAISER

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605



LYNN DEMPSEY
Real Estate Commissioner

1073710477556726

---

KENNY, RICK ANDREW
4170 CUMBERLAND POINT DR
GAINESVILLE, GA 30504

**RICK ANDREW KENNY**

| # | 628 | |
|---|---|---|
| Status | ACTIVE | END OF RENEWAL 08/31/2022 |

CERTIFIED GENERAL REAL PROPERTY APPRAISER

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605

LYNN DEMPSEY
Real Estate Commissioner

1073710477556726



State of South Carolina  BCD **1305232**
Department of Labor, Licensing and Regulation
**Real Estate Appraisers Board**
**RICK A KENNY**
Is hereby entitled in practice as a:
**Certified General Appraiser**
License Number: **7161**
Expiration Date: 06/30/2022
**POCKET CARD**  *Laura L. Smith*
**Administrator**

State of South Carolina  BCD **1305232**
Department of Labor, Licensing and Regulation
**Real Estate Appraisers Board**
**RICK A KENNY**
Is hereby entitled in practice as a:
**Certified General Appraiser**
License Number: **7161**
Expiration Date: 06/30/2022
**OFFICE COPY**  *Laura L. Smith*
**Administrator**

*DO NOT PEEL CARD FROM A CORNER*

**To remove card from backing**
- Bend form back from the outside edge
- Pull card off backing

**State of Mississippi**
**MISSISSIPPI REAL ESTATE APPRAISER LICENSING**
**AND CERTIFICATION BOARD**
LICENSE # GA-1339 N.R.                    STATUS:  ACTIVE

**RICK ANDREW KENNY**

HAS BEEN GRANTED A LICENSE AS A
**STATE CERTIFIED GENERAL APPRAISER**
Effective Date:                                    Expiration Date:
12/01/2021                                          11/30/2023

SIGNATURE OF LICENSEE
Robert E. Praytor, Administrator



Case 3:22-cv-00107-CDL Document 6-1 Filed 10/28/22 Page 419 of 666

RICKY ANDREW KENNY
327 DAHLONEGA ST STE 104
CUMMING, GA 30040

TALCB
TEXAS APPRAISER LICENSING & CERTIFICATION BOARD

# Certified General Real Estate Appraiser

Appraiser: **Ricky Andrew Kenny**
License #: **TX 1380945 G**
License Expires: **11/30/2023**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Occupations Code, Chapter 1103, authorization is granted to use this title: Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB at www.talcb.texas.gov.

Chelsea Buchholtz
Commissioner

# Commonwealth of Kentucky

## Kentucky Real Estate Appraiser's Board

2021 - 22

Hereby grants a

Certified General Real Property Appraiser

To:  Rick Kenny
Kenny and Associates, Inc.
327 Dahlonega St.
Suite 104
Cumming, GA 30040

License № 5397

who has complied with the provisions of Chapter 324A of the Kentucky Revised Statutes IN WITNESS WHEREOF, we have caused the official seal to be fixed and attested for the year shown above.

John G. Kenkel, Jr., Chair
Russ C. Lohan, Vice Chair
Justin W. Noble
William Jeffrey Fultz
John Brewer

This certificate expires  6/30/2022

4307
APR-CGA









RICK ANDREW KENNY

ID NUMBER: 5434
LIC STATUS: ACTIVE
EXPIRATION DATE: December 06, 2023

33991

**TENNESSEE REAL ESTATE APPRAISER COMMISSION**
**CERTIFIED GENERAL REAL ESTATE APPRAISER**
THIS IS TO CERTIFY THAT ALL REQUIREMENTS
OF THE STATE OF TENNESSEE HAVE BEEN MET

ATTN:KENNY AND ASSOCIATES, INC
RICK ANDREW KENNY
327 DAHLONEGA STREET
SUITE 104
CUMMING GA 30040

# State of Tennessee

12774414

**TENNESSEE REAL ESTATE APPRAISER COMMISSION**
**CERTIFIED GENERAL REAL ESTATE APPRAISER**
**RICK ANDREW KENNY**

*This is to certify that all requirements of the State of Tennessee have been met.*



**ID NUMBER: 5434**
**LIC STATUS: ACTIVE**
**EXPIRATION DATE: December 06, 2023**

IN-1313
**DEPARTMENT OF**
**COMMERCE AND INSURANCE**

## STATE OF GEORGIA
# REAL ESTATE APPRAISERS BOARD

### RICK ANDREW KENNY

### 628

IS AUTHORIZED TO TRANSACT BUSINESS IN GEORGIA AS A
## CERTIFIED GENERAL REAL PROPERTY APPRAISER

THE PRIVILEGE AND RESPONSIBILITIES OF THIS APPRAISER CLASSIFICATION SHALL CONTINUE IN EFFECT AS LONG AS THE APPRAISER PAYS REQUIRED APPRAISER FEES AND COMPLIES WITH ALL OTHER REQUIREMENTS OF THE OFFICIAL CODE OF GEORGIA ANNOTATED, CHAPTER 43-39-A. THE APPRAISER IS SOLELY RESPONSIBLE FOR THE PAYMENT OF ALL FEES ON A TIMELY BASIS.

D. SCOTT MURPHY
Chairperson

JEFF A. LAWSON
Vice Chairperson

JEANMARIE HOLMES
KEITH STONE
WILLIAM A. MURRAY

1073710477558728

---

KENNY, RICK ANDREW
4170 CUMBERLAND POINT DR
GAINESVILLE, GA 30504

**RICK ANDREW KENNY**

| | |
|---|---|
| # | 628 |
| Status | ACTIVE |

END OF RENEWAL
08/31/2022

CERTIFIED GENERAL REAL PROPERTY APPRAISER

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605



LYNN DEMPSEY
Real Estate Commissioner

1073710477558726

---

**RICK ANDREW KENNY**

| | |
|---|---|
| # | 628 |
| Status | ACTIVE |

END OF RENEWAL
08/31/2022

CERTIFIED GENERAL REAL PROPERTY APPRAISER

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605

LYNN DEMPSEY
Real Estate Commissioner

1073710477558726

Generated on 8/2/2021 at 1:28:21 PM



OFFICIAL ACADEMIC RECORD
for APPRAISERS – GEORGIA

*This document certifies that*

Rick A. Kenny, MAI, SRA

**GA Appraiser License Number: 628**
Kenny and Associates, Inc.
327 Dahlonega Highway, Suite 104
Cumming, GA 30040

*has attended and passed the exam for this Appraisal Institute program*

**Valuation of Conservation Easements**

*(GA Program License Number: 67553, expires 12/31/2017)*
*at Chicago Chapter Education Center in Chicago, IL.*

*03/20/2017 - 03/23/2017.*

Attendance Hours: 28.0  Exam Hours: 2.0

**The Georgia Real Estate Appraisers Board has approved
this program for 28.0 classroom hours and 2.0 exam hours.**

Attendance was 100% with a passing grade.

Verified by      *Suzanne M. Siradas*      on 03/24/2017
**Suzanne M. Siradas**
Director, Education Resources
State Certification/Licensing

Appraisal
Institute®
*Professionals Providing
Real Estate Solutions*

# Douglas Kenny, MAI

327 Dahlonega Street, Suite 104 • Cumming, GA 30040
770.823.3816 • doug@kennyre.com

## EDUCATION

**GEORGIA INSTITUTE OF TECHNOLOGY, College of Engineering**                    **Atlanta, Georgia**
**Bachelor of Science in Industrial Engineering**                    *August 2007 – December 2010*
- General Track                    GPA: 3.08

**APPRAISAL EDUCATION**                    *January 2011 - Present*
- General Appraiser Income Approach Parts One & Two
- General Market Analysis and Highest and Best Use
- General Appraiser Sales Comparison Approach
- General Appraiser Site Valuation & Cost Approach
- General Appraiser Report Writing and Case Studies
- Real Estate Finance Statistics and Valuation Modeling
- Advanced Concepts and Case Studies
- Advanced Income Approach
- Valuation of Conservation Easements (Appraisal Institute) (Passed)
- Mineral Property Valuation 1 – Standards and Guidelines (Edumine)
- Mineral Property Valuation 2 – Approaches and Methods (Edumine)
- Environmental Awareness for Resource Planning (Edumine)

## WORK EXPERIENCE

**Kenny and Associates, Inc.**                    **Cumming, Georgia**
*MAI Designated Member*                    *April 2016 – Present*

**Kenny and Associates, Inc.**                    **Cumming, Georgia**
*Certified General Appraiser*                    *January 2014 – Present*

**Kenny and Associates, Inc.**                    **Cumming, Georgia**
*Appraiser Trainee*                    *January 2011 – January 2014*
- Research assistant
- Performs property inspections under the supervision of Rick Kenny
- Performs data analysis while creating forecast models to project future market trends

## PROFESSIONAL AFFILIATIONS

**MAI Designation, Appraisal Institute**

**Certified General Real Property Appraiser: Georgia (#344167), Alabama (#G01326), Tennessee (#5435), Oklahoma (#13326CGA), Arkansas (#CG-4471), South Carolina (#AB.7804CG)**

**Licensed Georgia Real Estate Agent**

**Georgia Institute of Technology Alumni Association**

## PROFESSIONAL SKILLS

- Coursework: Engineering Optimization; Safety Engineering; Stochastic; Quality Control Engineering; Engineering Economics; Engineering Statistics; Life Cycle Cost Analysis; Engineering Economy
- Group projects: Gained invaluable leadership experience while working with the admissions department for Georgia Tech: reworking the admissions process, increasing efficiency, and finding the ideal Georgia Tech student more cost effectively.
- Programs: Proficient in Microsoft Excel, Word, PowerPoint, Wintotal, and Apex Medina.

## AWARDS AND ACHIEVEMENTS
- Georgia Tech Tennis Player
- Total Person Award given to one athlete per team for leadership and excellence through the year



# State of South Carolina
# Real Estate Appraisers Board

Having Complied With The Requirements Prescribed By Law, Is Hereby Entitled To Practice As A
Having Satisfied The Qualifications Of The South Carolina Real Estate Appraisers Board And

## CERTIFIED GENERAL APPRAISER

**DOUG ROSS KENNY**

**7804**

In Witness Thereof, The State Of South Carolina Real Estate Appraisers Board By Virtue Of The
Authority Vested In It By Chapter 60, Title 40, Code Of Laws Of South Carolina Has Caused This
Document To Be Issued With Its Seal Imprinted Hereon.

Administrator

Property of South Carolina Real Estate Appraisers Board



ID NUMBER: 5435
LIC STATUS: ACTIVE
EXPIRATION DATE: December 06, 2023

34111

**TENNESSEE REAL ESTATE APPRAISER COMMISSION**
**CERTIFIED GENERAL REAL ESTATE APPRAISER**
THIS IS TO CERTIFY THAT ALL REQUIREMENTS
OF THE STATE OF TENNESSEE HAVE BEEN MET

ATTN:KENNY AND ASSOCIATES, INC
DOUGLAS ROSS KENNY
327 DAHLONEGA ST.
SUITE 104
CUMMING GA  30040

# State of Tennessee

12801174

**TENNESSEE REAL ESTATE APPRAISER COMMISSION**

**CERTIFIED GENERAL REAL ESTATE APPRAISER**

**DOUGLAS ROSS KENNY**

*This is to certify that all requirements of the State of Tennessee have been met.*



**ID NUMBER: 5435**
**LIC STATUS: ACTIVE**
**EXPIRATION DATE: December 06, 2023**

**IN-1313**
**DEPARTMENT OF**
**COMMERCE AND INSURANCE**

# STATE OF GEORGIA
# REAL ESTATE APPRAISERS BOARD

## DOUGLAS R KENNY

## 344167

IS AUTHORIZED TO TRANSACT BUSINESS IN GEORGIA AS A
### CERTIFIED GENERAL REAL PROPERTY APPRAISER

THE PRIVILEGE AND RESPONSIBILITIES OF THIS APPRAISER CLASSIFICATION SHALL CONTINUE IN EFFECT AS LONG AS THE APPRAISER PAYS REQUIRED APPRAISER FEES AND COMPLIES WITH ALL OTHER REQUIREMENTS OF THE OFFICIAL CODE OF GEORGIA ANNOTATED, CHAPTER 43-39-A. THE APPRAISER IS SOLELY RESPONSIBLE FOR THE PAYMENT OF ALL FEES ON A TIMELY BASIS.

D. SCOTT MURPHY
Chairperson

JEANMARIE HOLMES
KEITH STONE
WILLIAM A. MURRAY

JEFF A. LAWSON
Vice Chairperson

1514531340235047

---

**DOUGLAS R KENNY**

| # | 344167 |
| Status | ACTIVE |

**END OF RENEWAL
02/28/2023**

**CERTIFIED GENERAL REAL PROPERTY APPRAISER**

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605

LYNN DEMPSEY
Real Estate Commissioner

1514531340235047

**DOUGLAS R KENNY**

| # | 344167 |
| Status | ACTIVE |

**END OF RENEWAL
02/28/2023**

**CERTIFIED GENERAL REAL PROPERTY APPRAISER**

THIS LICENSE EXPIRES IF YOU FAIL TO PAY RENEWAL FEES OR IF YOU FAIL TO COMPLETE ANY REQUIRED EDUCATION IN A TIMELY MANNER.

State of Georgia
Real Estate Commission
Suite 1000 - International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303-1605

LYNN DEMPSEY
Real Estate Commissioner

1514531340235047

KENNY, DOUGLAS R
327 DAHLONEGA STREET SUITE 104
CUMMING, GA 30040-770

# State of Alabama

This is to certify that



## Douglas Ross Kenny

having given satisfactory evidence of the necessary qualifications required by the laws of the State of Alabama is licensed to transact business in Alabama as a

### Certified General Real Property Appraiser

With all rights, privileges and obligations appurtenant thereto.

LICENSE NUMBER: **G01326**

EXPIRATION DATE: **09/30/2023**

Executive Director

ALABAMA REAL ESTATE APPRAISERS BOARD

# OFFICIAL ACADEMIC RECORD
# for APPRAISERS – GEORGIA

*This document certifies that*

## Doug Kenny, MAI

**GA Appraiser License Number: 344167**

Kenny & Associates
215 Lake Heights Drive  215 Lake Heights Drive
Alpharetta, GA 30022

*has attended and passed the exam for this Appraisal Institute program*

**Valuation of Conservation Easements**

*(GA Program License Number:  67553, expires 12/31/2017)*
*at Chicago Chapter Education Center in Chicago, IL*

*03/20/2017 - 03/23/2017.*

Attendance Hours: 28.0  Exam Hours: 2.0

**The Georgia Real Estate Appraisers Board has approved**
**this program for 28.0 classroom hours and 2.0 exam hours.**

Attendance was 100% with a passing grade.

Verified by  *Suzanne M. Siradas*  on 03/24/2017

**Suzanne M. Siradas**
Director, Education Resources
State Certification/Licensing



Appraisal
Institute®

*Professionals Providing*
*Real Estate Solutions*



**CERTIFICATE**
OF COMPLETION

This certifies that

# Doug Kenny

has successfully completed requirements for certification in the online course

## Environmental Awareness for Resource Planning

and was awarded 0.5 Continuing Education Units

The International Association for Continuing Education and Training (IACET) has approved Edumine as a provider of continuing education and training. Edumine can award Continuing Education Units to those who complete the requirements for certification in an online course.

*Kfreitag*

Katja Freitag, VP Education Solutions

August 15, 2019



# CERTIFICATE
## OF COMPLETION

This certifies that

# Doug Kenny

has successfully completed requirements for certification in the online course

## Mineral Property

## Valuation 2 - Approaches and Methods

and was awarded  1.0  Continuing Education Units

The International Association for Continuing Education and Training (IACET)
has approved Edumine as a provider of continuing education and training.
Edumine can award Continuing Education Units to those who complete the
requirements for certification in an online course.

Katja Freitag, VP Education Solutions

August 13, 2019



# CERTIFICATE
## OF COMPLETION

This certifies that

# Doug Kenny

has successfully completed requirements for certification in the online course

## Mineral Property Valuation

## 1 - Standards and Guidelines

and was awarded  0.6  Continuing Education Units

The International Association for Continuing Education and Training (IACET) has approved Edumine as a provider of continuing education and training. Edumine can award Continuing Education Units to those who complete the requirements for certification in an online course.

Katja Freitag, VP Education Solutions

July 31, 2019

**EXHIBIT 8.2**

**LIABILITY INSURANCE**





**LIA Administrators & Insurance Services**

## APPRAISAL, VALUATION AND PROPERTY SERVICES
## PROFESSIONAL LIABILITY INSURANCE POLICY

### DECLARATIONS

**Aspen American Insurance Company**

(Referred to below as the "Company")
590 Madison Avenue, 7th Floor
New York, NY 10022
877-245-3510

| Date Issued | Policy Number | Previous Policy Number |
|---|---|---|
| 5/11/2021 | AAI000894-07 | AAI000894-06 |

THIS IS A **CLAIMS** MADE AND REPORTED POLICY. COVERAGE IS LIMITED TO LIABILITY FOR ONLY THOSE **CLAIMS** THAT ARE FIRST MADE AGAINST THE **INSURED** DURING THE **POLICY PERIOD** AND THEN REPORTED TO THE COMPANY IN WRITING NO LATER THAN SIXTY (60) DAYS AFTER EXPIRATION OR TERMINATION OF THIS POLICY, OR DURING THE **EXTENDED REPORTING PERIOD**, IF APPLICABLE, FOR A **WRONGFUL ACT** COMMITTED ON OR AFTER THE **RETROACTIVE DATE** AND BEFORE THE END OF THE **POLICY PERIOD**. PLEASE READ THE POLICY CAREFULLY.

1. **Customer ID:** 117387
   **Named Insured:**
   KENNY AND ASSOCIATES, INC.
   RICK KENNY AND ASSOCIATES INC,
   Rick Kenny
   327 Dahlonega St., Suite 104
   Cumming, GA 30040

2. **Policy Period:** From: 05/23/2021   To: 05/23/2022
   12:01 A.M. Standard Time at the address stated in 1 above.

3. **Deductible:** $1000   Each **Claim**

4. **Retroactive Date:** 05/23/1994

5. **Inception Date:** 05/23/2015

6. **Limits of Liability:**   A. $1,000,000   Each Claim
   B. $2,000,000   Aggregate

   Subpoena Response: $5,000 Supplemental Payment Coverage
   Pre-Claim Assistance: $5,000 Supplemental Payment Coverage
   Disciplinary Proceeding: $12,500 Supplemental Payment Coverage
   Loss of Earnings: $500 per day Supplemental Payment Coverage

7. **Covered Professional Services (as defined in the Policy and/or by Endorsement):**

| | Yes | No | |
|---|---|---|---|
| Real Estate Appraisal and Valuation: | | | |
| Residential Property: | X | | |
| Commercial Property: | X | | |
| Bodily Injury and Property Damage Caused During Appraisal Inspection ($100,000 Sub-Limit): | X | | |
| Right of Way Agent and Relocation: | X | | (If "yes", added by endorsement) |
| Machinery and Equipment Valuation: | | X | |
| Personal Property Appraisal: | | X | |
| Real Estate Sales/Brokerage: | | X | (If "yes", added by endorsement) |
| | | X | (If "yes", added by endorsement) |

**EXHIBIT 8.3.**

**BASELINE DOCUMENTATION REPORT**

OCONEE RIVER LAND TRUST                                                           LOG CREEK



## Log Creek
### WARREN COUNTY, GA

## BASELINE DOCUMENTATION REPORT

**Prepared by Elizabeth Branch
As a project for the Oconee River Land Trust**

**Date of Report: 12/14/18**

E.J.    1

**Project/Property Name:  Log Creek (also referred to as "Property" in this report)**

**Baseline Gathered By:  ELIZABETH BRANCH**

**Qualifications**: Elizabeth Branch holds a Master of Science in Wildlife Biology with a certificate in Conservation Ecology and Sustainable Development from the University of Georgia. She has been principal and owner of Natural Resource Consultants, LLC since 1998 and has extensive experience in land conservation and land management. She is on the Advisory Board and served as President of the Madison Morgan Conservancy.

**Purpose of Baseline Documentation Report:**
This Baseline Documentation Report (BDR) has been prepared in order to document the subject Property's existing conditions, including conservation values, location and man-made features. This BDR will also be used by Oconee River Land Trust (ORLT) as a reference point for future monitoring and enforcement activities.

## I. GENERAL INFORMATION

### A. Date Visited
The Property was visited on December 4, 2018 by Elizabeth Branch. All portions of the tract and each habitat type were inspected on foot and by vehicle.

### B. Owner
The current owner of the Property is **Log Creek, LLLP** (Grantor). The current Property owner's address is 1280 Snows Mill Road, Bogart, GA 30622.

### C. Location
The entrance to this tract is located on Timber Road (County Road 58), Warrenton, GA in Warren County, approximately 8 miles southwest of Warrenton, GA. See **Attachment 1** for a location map.

### D. Directions from Warrenton, GA
To reach the Property from the center of Warrenton, GA, travel southwest on Main Street/US 278 for approximately 0.6 miles. Take right onto Atlanta Hwy/US 278/Rt 12 and then take the first left onto Mayfield Road. Travel approximately 7.6 miles then turn left onto Ogeechee River Rd (County Road 56). Travel approximately 1.7 miles and then turn left onto Timber Road (County Road 58). Travel approximately 0.3 miles and the entrance to the Property is on the left. See the location map in **Attachment 1**.

### E. Survey and Legal Description
The legal boundary (survey) of the Property is shown in **Attachment 2**. The legal description is shown in **Attachment 3**.

2

OCONEE RIVER LAND TRUST                                        LOG CREEK

### F.  Name of Quad Map, Series, Coordinates of Property
USGS 7.5 min series  Jewell, GA, Quadrangle Map. The center of the Property is at **33° 21' 6.08" N, 82° 46' 44.89" W.**

### G.  Size
The Property is approximately 240.0 acres.

## II.  INVENTORY REPORT

This baseline documents conditions on the Property as of the date of the report. It is not an exhaustive inventory, and conditions may change over time.

### A.  General Description of Property
The Property exists as one tract in western Warren County, GA. It is in the Upper Ogeechee River Watershed HUC 03060201.

The Property is in a rural area surrounded by farms and timber properties.

The Property is primarily planted pine timber with some foodplots and hardwood along the tributaries of the Ogeechee River. The Property is currently used for timber production, outdoor recreation and hunting.

An extensive road system provides access for recreation and future timber harvests. The interior roads are dirt and gravel.

See **Attachment 4** for an aerial view of the Property. For photos of the Property, see **Attachments 15** and **16**.

### B.  Topography
The Property is gently rolling. Elevation varies between 420 and 500 feet above MSL, with the lowest points along the tributaries of the Ogeechee River and the highest point along the eastern property line. These topographic features can be seen in **Attachment 5**.

### C.  Soils and Geology
The Property is located in the Southern Outer Piedmont Ecoregion of Georgia. **Attachment 6** shows the Property's location within Georgia's ecoregions. The soils in this region tend to be finer-textured than soils in the Coastal Plain Ecoregion. Once widely cultivated, much of Georgia's Piedmont has reverted to pine and hardwood woodlands.

Soils of the Appling sandy loam, Cecil Sandy Clay, Grover sandy loam, Helena loamy coarse sand, and Wedowee loamy sand make up the majority of the Property. A general soils map is presented in **Attachment 7**.



3

The USDA/NRCS classifies farmland based on how valuable it is for agriculture. The Property has approximately 146.9 acres (61%) of land that is classed as **Farmland of Statewide Importance** and 71.3acres (30%) of **Prime Farmland**.

### D. Water Resources
Three tributaries of the Ogeechee River transect the Property. The northern two tributaries run through the Property for approximately 2,380 ft and 2,550 ft before joining and leaving the Property. The third runs for approximately 990 ft in a northerly direction through the Property. An ephemeral stream also flows west through an area of young planted pine near the southern boundary of the Property and empties into the southernmost of the three tributaries. These tributaries join to form a pond just to the west of the property and then travel for approximately 4,300 ft where they flow into the Ogeechee River. After these bodies of water join the Ogeechee River it flows in a southeasterly direction for over 200 miles and then empties into Ossabaw Sound on the Georgia Atlantic coast.

This river is in the Upper Ogeechee River Watershed, portions of which have been designated as **high priority watersheds** by Georgia Department of Natural Resources (GA DNR).

The Property's water resources are identified in **Attachment 9**, which shows a 200-foot riparian buffer on the streams and a 50-foot buffer on the ephemeral stream. **Attachment 8** shows the Property's location in the Upper Ogeechee River Watershed. **Attachment 17** describes the Ogeechee River's journey through the Upper Ogeechee Watershed into the Ogeechee River Basin.

### E. Vegetation and Habitat
Current habitat and land use types are identified in the Ecological Features Map in **Attachment 11**. The approximate acreage of each type is as follows: pine forest (220.7 acres), Mesic Hardwood Forest (16.8 acres), foodplot (2.5 acres), and 2 small Granite Outcrop (less than 1 acre). **Granite Outcrop, Mesic Hardwood Forest** and **Streams** are listed by the GA DNR and State Wildlife Action Plan documents as **high priority habitats** in the Piedmont Ecoregion of Georgia. See **Attachment 18** for descriptions of the kinds of high priority habitat that are found on the Property.

Loblolly pine forest makes up the majority of the Property in three separate stands. The largest stand is mature loblolly pine which has not been thinned. It is densely stocked with very little understory growth. The second is young planted pine that was planted approximately 3-5 years ago and the smallest stand is 20 year old pine that was thinned approximately five years ago and has an open understory. The understory in these stands consists of dog fennel, blackberries, understory saplings, plume grass, beautyberry and others.

The **Mesic Hardwood Forests** are located along the tributaries of the Ogeechee River. This forest is narrow in most places and has a mature overstory, including southern red oak, white oak, green ash, water oak, red maple, yellow poplar, and sweetgum. The mid-



4



and understories consist of understory saplings, honeysuckle, beautyberry, grasses, Christmas fern and river cane.

The foodplots are scattered in the pine forests throughout the Property along the interior roads and old logging decks. Some of the foodplots had been planted in seasonal wildlife foods.

Two small **Granite Outcrops** are located in the planted pine near the center of the Property. They contain various mosses and lichen.

Chinese privet, Nepalese browntop, Japanese honeysuckle, and lespedeza – non-native species that are considered invasive by the Georgia Exotic Pest Council – were observed on the Property. See **Attachment 10** for a list of native and exotic plant species found on the Property, organized according to the kind of habitat in which they were observed.

### F. Agricultural Resources
The Property is being utilized for timber production.

### G. Wildlife
Field signs and individual sightings during the field surveys noted coyotes, gray squirrels, and white-tailed deer. Numerous resident and migrant songbirds, and other common landbirds, were also seen and heard while inspecting the tract, including cardinals, nuthatches, and blue jays. Though not observed on the Property, a host of other species typical of the Georgia Piedmont may be present. **Attachment 19** lists some of these species.

### H. Rare or Endangered Species Known to Exist
No endangered or threatened species are known to occur on the Property. A full rare species survey was not conducted, but the Property has suitable habitat for some rare or endangered plant and animal species. **Attachment 20** lists some of these species.

### I. Cultural Resources
No historical resources were observed on the Property.

### J. Scenic Character and Views from Public Roads/Waters
Scenic views of the Property are available from Timber Road (Route 58).

### K. Existing Man-Made Structures
The man-made structures on the Property are roads. See **Attachment 13** for a map showing the locations of these man-made features.

### L. Evidence of Past Disturbances
No evidence of heavy storms, fires, or other large scale events was noted during visit.

### M. Former Land Uses

 G.J.

5

The Property was likely farmed or used in timber production in the past. Evidence of former timber production and harvest includes old loading docks and the relatively young age of the pine stand.

## N. Current Land Uses
The Property is used for timber production and outdoor recreation (primarily hunting).

## O. Management Plan in Effect, If Any
No management plan currently exists for the tract.

## P. Zoning and Local Planning Restrictions, If Relevant
There are no known zoning or planning restrictions in force that affect the use of this Property.

## Q. Adjacent Land Attributes and Uses; Existing and Potential Conflicts
The Property is adjacent to farms and forested tracts of various sizes. There are no known conflicts with adjacent landowners.

## R. Amount and Type of Current Public Access and Public Use
The landowner and invited guests hike, hunt, and observe wildlife on the Property at this time. No formal plans for public use exist.

## S. Evidence of Presence of Hazardous Waste
No evidence of hazardous waste was noted during field visit.

## T. Proximity to Other Protected Land
ORLT holds two conservation easments within 5 miles of the Property – Sparta Beef and Duck Farm. Ogeechee Wildife Management Area is also located 5 miles to the north and to the south of the Property, and several other privately held conservation easements are located to the south. See **Attachment 14** for a map showing nearby protected properties. Various other county and city parks are also located within 10 miles of the Property.

## U. Benefits of Conservation
The current owner has decided to place the Property under a conservation easement (CE) that protects its conservation values. These conservation values include **high priority streams**, **high priority watersheds**, and **high priority habitats** in the state of Georgia. Protecting these values benefits the public, and the plants and animals that live on the Property and in the larger watershed.

This CE protects streams and plant habitat in the Upper Ogeechee River Watershed, segments of which have been designated **high priority watersheds**, by enhancing stream buffers and reducing non-point source pollution. Enhancing stream buffers and reducing non-point source pollution is critical for protecting water quality. Non-point source pollution – a type of pollution consisting of mud, litter, bacteria, pesticides, fertilizers, and a variety of other pollutants that are washed into rivers and streams by rainwater – is common in



6

OCONEE RIVER LAND TRUST                                                                    LOG CREEK

Georgia's rivers and streams. Stream buffers reduce the amount of these pollutants making it into waterways, thereby improving surface and groundwater quality. Improved surface and groundwater quality benefits people by providing cleaner drinking water and better recreational opportunities. It also provides quality habitat for plants and animals living in the watershed. Rivers and riparian buffers on the Property also provide valuable dispersal corridors for plant and animal species passing through the Property.

This CE protects **high priority habitats** as well, including habitat combinations that are important for many species of plants and animals. High priority habitats that the Property protects include: **Granite Outcrop, Mesic Hardwood Forest** and **Streams**. See **Attachment 11** for the location of these habitats.

Properly exercised reserved rights and the permitted uses will not negatively impact the conservation values.



7



OCONEE RIVER LAND TRUST                                    LOG CREEK

In compliance with Section 1.170A - 14(g)(5) of the federal tax regulations, LOG CREEK, LLLP, owner of the Property referenced and described by this report, and the OCONEE RIVER LAND TRUST, INC., do hereby acknowledge that this report is an accurate representation of the Property as of the date of the conveyance of the conservation easement referenced in this report by the landowner ("Grantor") to the Oconee River Land Trust ("Grantee").

Sworn to and subscribed before me

_Karen L Mims_

NOTARY PUBLIC

This the __21__ day of __Dec__ 20_18_

My commission expires:

(SEAL)    KAREN E MIMS
OGLETHORPE COUNTY, GEORGIA
NOTARY PUBLIC
MY COMMISSION EXPIRES
DECEMBER 6, 2019

**Log Creek, LLLP**

By: _____

Name: _Tony D Townley_

Title: _General Partner_

Date: _DEC. 21, 2018_

By: _____

Name: _ELIZABETH A TOWNLEY_

Title: _General Partner_

Date: _DEC. 21, 2018_

Sworn to and subscribed before me

_____

NOTARY PUBLIC

This the _____ day of _____ 20__

My commission expires:

(SEAL)

**Oconee River Land Trust, Inc.**

By: _____

Name: _Smith Wilson_

Title: _Chair_

Date: _12-21-18_

E.J.

8

OCONEE RIVER LAND TRUST                                                        LOG CREEK

## III. ATTACHMENTS

1. Location Map
2. Survey
3. Legal Description
4. Aerial Photograph
5. Topographic Map
6. Georgia Ecoregions Map
7. Soils Map
8. Georgia Watersheds Map
9. Riparian Buffer Map
10. Plant List
11. Ecological Features Map
12. Conservation Easement Map
13. Man-Made Features Map
14. Nearby Protected Properties Map
15. Photo Location Map
16. Photos
17. Appendix 1: Water Resources
18. Appendix 2: Vegetation and Habitat
19. Appendix 3: Wildlife
20. Appendix 4: Rare or Endangered Species

Map Disclaimer: Maps contained in this report are not surveys and must not be construed as surveys. The information imparted with these maps is meant to assist the parties in their efforts to clearly depict Property boundaries, describe placement of certain retained and reserved rights, and to calculate acreage figures. Property boundaries, while approximate, were established using the best available information that may include: surveys, tax maps, and field mapping using G.P.S. and/or ortho photos.

Unless otherwise noted, maps were created on December 14, 2018.



9

OCONEE RIVER LAND TRUST                                          LOG CREEK

## ATTACHMENT 1: LOCATION MAP



Warren County, GA

  

10

OCONEE RIVER LAND TRUST                    LOG CREEK

## ATTACHMENT 2: SURVEY





OCONEE RIVER LAND TRUST                                                      LOG CREEK

## ATTACHMENT 3: LEGAL DESCRIPTION

All that tract of land, together with improvements thereon, situate, lying and being in the 154th

Georgia Militia District, in Warren County, Georgia and being more particularly described as

follows:

Commence at a concrete monument on the westerly right of way of Ogeechee River Road, also

known as County Road 56, having an 80' right of way, and the southerly right of way of Georgia

Railroad, having a 150' right of way;

thence leaving the right of way of Ogeechee River Road and continuing along the southerly right of

way of Georgia Railroad N 86°11'25" E a distance of 1464.75' to an iron pin, said iron pin being the

point of beginning;

thence N 86°09'47" E a distance of 2582.93' to an iron pin;

thence leaving said right of way S 47°03'01" W a distance of 476.96' to an iron pin;

thence S 04°19'07" W a distance of 2133.12' to a concrete monument;

thence S 88°17'38" E a distance of 1034.08' to an iron pin at a rock;

thence S 03°15'03" W a distance of 885.30' to an iron pin;

thence S 70°34'43" W a distance of 232.32' to an iron pin;

thence N 89°25'17" W a distance of 236.28' to an iron pin;

thence S 63°17'07" W a distance of 1722.17' to an iron pin;

thence S 17°25'17" E a distance of 383.38' to an iron pin;

thence S 12°33'16" E a distance of 842.37' to an iron pin on the northern right of way of Timber

Road, also known as County Road 58, having a 30' right of way;

thence continuing along said right of way S 85°03'58" W a distance of 41.87' to a point;

12

OCONEE RIVER LAND TRUST                                                LOG CREEK

thence with a curve turning to the left with an arc length of 247.86', with a radius of 1075.74', with a

chord bearing of N 85°42'41" W, with a chord length of 247.31' to a point;

thence S 85°41'30" W a distance of 119.01' to a point;

thence S 83°56'43" W a distance of 394.91' to a point;

thence with a curve turning to the left with an arc length of 244.86', with a radius of 239.61', with a

chord bearing of S 60°59'46" W, with a chord length of 234.34' to a point;

thence S 40°49'17" W a distance of 43.47' to an iron pin;

thence leaving said right of way N 19°27'22" E a distance of 777.28' to an iron pin;

thence N 17°50'30" W a distance of 3028.18' to a concrete monument;

thence N 27°27'45" E a distance of 1055.75' to an iron pin at an 18" sweetgum tree;

thence N 09°13'43" W a distance of 872.25' to an iron pin on the southern right of way of Georgia

Railroad, which is the point of beginning;

Said parcel containing 240.00 acres more or less and being more particularly described on a plat by

Baseline Surveying & Engineering, Inc., for Log Creek LLLP, dated 12/03/2018.





13

OCONEE RIVER LAND TRUST                    LOG CREEK

## ATTACHMENT 4: AERIAL PHOTOGRAPH



Warren County, GA

RLoGIS
Date: 12/14/2018

NAIP 2017 (10/17/2017)

0   feet   660
1 in to 660 ft

14



OCONEE RIVER LAND TRUST                    LOG CREEK

## ATTACHMENT 5: TOPOGRAPHIC MAP



Property Boundary
Stream
Ephemeral Stream

RLoGIS
Date: 12/14/2018

USGS Topo

**Warren County, GA**

0    feet   1,500
1 in to  1,500 ft





15

OCONEE RIVER LAND TRUST                                          LOG CREEK

## ATTACHMENT 6: GEORGIA ECOREGIONS MAP







OCONEE RIVER LAND TRUST                                                    LOG CREEK

## ATTACHMENT 7: SOILS MAP



**Warren County, GA**

1 in to 660 ft





17

OCONEE RIVER LAND TRUST

LOG CREEK

## SOILS MAP LEGEND

| Map Unit Symbol | Map Unit Name | Farmland Classification | Acres | Percent |
|---|---|---|---|---|
| AmB | Appling sandy loam, 2 to 6 percent slopes | All areas are prime farmland | 33.40 | 13.92% |
| AmC | Appling sandy loam, 6 to 10 percent slopes | Farmland of statewide importance | 23.50 | 9.79% |
| CfB2 | Cecil sandy clay loam, 2 to 6 percent slopes, eroded | Farmland of statewide importance | 13.70 | 5.71% |
| CfC2 | Cecil sandy clay loam, 6 to 10 percent slopes, eroded | Not prime farmland | 0.60 | 0.25% |
| CfE2 | Cecil sandy clay loam, 10 to 25 percent slopes, moderately eroded | Not prime farmland | 21.20 | 8.83% |
| GeB | Grover sandy loam, 2 to 6 percent slopes | All areas are prime farmland | 0.00 | 0.00% |
| HeB | Helena loamy coarse sand, 2 to 6 percent slopes | All areas are prime farmland | 9.40 | 3.92% |
| HeC | Helena loamy coarse sand, 6 to 10 percent slopes | Farmland of statewide importance | 73.50 | 30.63% |
| WeB | Wedowee loamy sand, 2 to 6 percent slopes | All areas are prime farmland | 28.50 | 11.88% |
| WeC | Wedowee loamy sand, 6 to 10 percent slopes | Farmland of statewide importance | 36.20 | 15.08% |
| **Totals for Area of Interest** | | | **240.0** | **100%** |

18

OCONEE RIVER LAND TRUST                                    LOG CREEK

## ATTACHMENT 8: GEORGIA WATERSHEDS MAP





19

OCONEE RIVER LAND TRUST                                      LOG CREEK

## ATTACHMENT 9: RIPARIAN BUFFER MAP



Warren County, GA

OCONEE RIVER LAND TRUST                                    LOG CREEK

**ATTACHMENT 10: PLANT LIST (List of Dominant, Co-Dominant and Understory Plant Species Identified on Property)**

**Pine Forests**

| Common Name | Scientific Name |
|---|---|
| **Dominant Species** | |
| Pine (Loblolly) | *Pinus taeda* |
| **Understory Species** | |
| Bluestem | *Andropogon* spp. |
| Asters | *Aster* spp. |
| Dog Fennel | *Eupatorium capillifolium* |
| Carolina Jessamine | *Gelsemium sempervirens* |
| Lespedeza** | *Lespedeza* spp. |
| Sweetgum | *Liquidambar styraciflua* |
| Japanese Honeysuckle** | *Loniceria japonica* |
| Panic Grass | *Panicum* spp. |
| Oak (Southern Red) | *Quercus falcata* |
| Oak (Water) | *Quercus nigra* |
| Plume Grass | *Saccharum alopecuroides* |
| Greenbrier | *Smilax* spp. |
| Goldenrod | *Solidago* spp. |
| Muscadine Grape | *Vitus rotundifolia* |

**Mesic Hardwood Forests**

| Common Name | Scientific Name |
|---|---|
| **Dominant Species** | |
| Sweetgum | *Liquidambar styraciflua* |
| Yellow Poplar | *Liriodendron tulipifera* |
| Oak (White) | *Quercus alba* |

21



OCONEE RIVER LAND TRUST                                    LOG CREEK

| Oak (Southern Red) | *Quercus falcata* |
|---|---|
| Oak (Northern Red) | *Quercus rubra* |
| Oak (Water) | *Quercus nigra* |
| **Co-Dominant Species** ||
| Dogwood (Flowering) | *Cornus florida* |
| Persimmon | *Diospyros virginiana* |
| Ash (Green) | *Fraxinus pennsylvanica* |
| Black Cherry | *Prunus serotina* |
| Elm (Winged) | *Ulmus alata* |
| **Understory Species** ||
| River Cane | *Arundinaria gigantea* |
| Christmas Fern | *Polystichum acrostichoides* |
| Blackberry | *Rubus* spp. |
| Greenbrier | *Smilax* spp. |
| Sparkleberry | *Vaccinium arboreum* |

\*\* **Denotes exotic species**

22

OCONEE RIVER LAND TRUST                    LOG CREEK

## ATTACHMENT 11: ECOLOGICAL FEATURES MAP





23



OCONEE RIVER LAND TRUST                                          LOG CREEK

## ATTACHMENT 12: CONSERVATION EASEMENT MAP



 

24

OCONEE RIVER LAND TRUST                                              LOG CREEK

## ATTACHMENT 13: TOPOGRAPHIC MAP WITH MAN-MADE FEATURES



Warren County, GA

0    feet    660
1 in to 660 ft

25





## ATTACHMENT 14: NEARBY PROTECTED PROPERTIES MAP





26

## ATTACHMENT 15: PHOTO LOCATION MAP



RLoGIS
Date: 12/14/2018

NAIP 2017 (10/17/2017)

**Warren County, GA**

0    feet    660

1 in to 660 ft

OCONEE RIVER LAND TRUST          Carryover Attachment - Exhibit C: Norris 465 of 666          LOG CREEK

**ATTACHMENT 16: PHOTOGRAPHIC LOG**
Photographer: Elizabeth Branch
Date: December 4, 2018
Weather: Sunny, 50° F, Calm Winds

Camera:  iPhone 7
Time: 12:30 PM



**CP1a:  View of Property from Timber Road (County Road 58) facing southwest**
(33° 20' 38.61" N, 82° 46' 54.18" W, 260°)



**CP1b: Entrance to Property off of Timber Road (County Road 58) facing east**
(33° 20' 38.61" N, 82° 46' 54.18" W, 70°)

28



**CP2: Young planted Loblolly pine**
**(33° 20' 51.23" N, 82° 46' 51.59" W, 90°)**



**CP3a: Mowed trail within young planted pine stand**
**(33° 20' 53.76" N, 82° 46' 50.03" W, 90°)**

OCONEE RIVER LAND TRUST · LOG CREEK



**CP3b: Young planted pine with mowed trail through broomsedge and other grasses**
(33° 20' 53.76" N, 82° 46' 50.03" W, 290°)



**C4a: Interior road through mature planted pine**
(33° 21' 2.56" N, 82° 46' 29.35" W, 340°)

OCONEE RIVER LAND TRUST



CP4b: Thinned planted loblolly pine with dog fennel, blackberry, broomsedge and sweetgum saplings in understory (33° 21' 2.56" N, 82° 46' 29.35" W, 120°)



CP5a: Foodplot adjacent to young planted pine along tributary of the Ogeechee River (33° 20' 56.37" N, 82° 46' 37.81" W, 150°)



**CP5b: View of mature planted pine and foodplot from same CP**
**(33° 20' 56.37" N, 82° 46' 37.81" W, 60°)**



**CP6a: Small Granite Outcrop within planted pine stand**
**(33° 21' 6.08" N, 82° 46' 44.89" W, 230°)**



**CP6b:  Granite Outcrop with moss and lichen**
**(33° 21' 6.08" N, 82° 46' 44.89" W, 280°)**



**CP7a:  Foodplot adjacent to young planted pine and interior road**
**(33° 21' 9.46" N, 82° 46' 40.47" W, 350°)**



**CP7: Interior road running between two age classes of planted Loblolly pine
(33° 21' 9.46" N, 82° 46' 40.47" W, 180°)**



**CP8a: Washed out culvert pipe along interior road crossing tributary of Ogeechee River
(33° 21' 14.96" N, 82° 46' 41.98" W, 70°)**

34



**CP8b: Hardwood along stream adjacent to road crossing
(33° 21' 14.96" N, 82° 46' 41.98" W, 195°)**



**CP9a: Mesic Hardwood Forest along tributary of the Ogeechee River with Christmas fern,
northern red oak, sweetgum, and water oak (33° 21' 15.21" N, 82° 46' 45.5" W, 260°)**



**CP9b: View from hardwood drain at river cane along stream and young planted pine in the distance (33° 21' 15.21" N, 82° 46' 45.5" W, 150°)**



**CP10: Dense stand of Loblolly pine with very little understory (33° 21' 19.37" N, 82° 46' 50.25" W, 40°)**

36



**CP11a: Tributary of the Ogeechee River flowing through Mesic Hardwood Forest with river cane**
**(33° 21' 22.86" N, 82° 46' 55.99" W, 305°)**



**CP11b: River cane, water oak, sweetgum, and southern red oak along the banks of stream**
**(33° 21' 22.86" N, 82° 46' 55.99" W, 135°)**



37



**CP11c: View of young planted pine adjacent to stream with river cane**
**(33° 21' 22.86" N, 82° 46' 55.99" W, 70°)**



**CP12a: View of young planted pine along stream from within more mature pine stand**
**(33° 21' 22.45" N, 82° 46' 47.12" W, 355°)**





OCONEE RIVER LAND TRUST ATTACHMENT - EXHIBIT 2 C: NORRIS 666 LOG CREEK



**CP12b: Loblolly pine with sweetgum saplings, vaccinium, and muscadine in understory**
(33° 21' 22.45" N, 82° 46' 47.12" W, 260°)



**CP13a: Stream flowing through Mesic Hardwood Forest. Note Japanese honeysuckle in foreground**
(33° 21' 24.52" N, 82° 46' 44.7" W, 120°)



39

OCONEE RIVER LAND TRUST                    EXHIBIT 2: LOG CREEK                    566



**CP13b: Interior road as it crosses over stream through hardwood drain**
**(33° 21' 24.52" N, 82° 46' 44.7" W, 75°)**



**CP14a:  Transition between mature planted loblolly pine and young pine with river cane**
**along the edge (33° 21' 27.86" N, 82° 46' 40.44" W, 345°)**



OCONEE RIVER LAND TRUST          ATTACHMENT - EXHIBIT 7          LOG CREEK          478 of 666



**CP14b: Trail between two age classes of planted pine**
(33° 21' 27.86" N, 82° 46' 40.44" W, 65°)



**CP15a: Young planted pine along tributary to the Ogeechee River near northern property**
line (33° 21' 30.52" N, 82° 46' 52.14" W, 260°)

41

OCOEE RIVER LAND TRUST — LOG CREEK



**CP15b: Railroad running along northern property line**
(33° 21' 30.52" N, 82° 46' 52.14" W, 5°)



**CP16a: River cane along road adjacent to planted pine**
(33° 21' 25.4" N, 82° 46' 51.43" W, 55°)



**CP16b: Mowed interior road between young planted pine and more mature pine**
**(33° 21' 25.4" N, 82° 46' 51.43" W, 235°)**



**CP17a: Foodplot along interior road overgrown with dog fennel**
**(33° 21' 19.07" N, 82° 46' 41.49" W, 10°)**



**CP17b: Interior road through foodplot with plume grass, dog fennel, and goldenrod (33° 21' 19.07" N, 82° 46' 41.49" W, 135°)**



**CP18a: Planted loblolly pine stand with blackberry, smilax, broomsedge and sweetgum saplings in understory (33° 20' 57.84" N, 82° 46' 46.46" W, 130°)**



**CP18b: Interior trail through planted pine**
(33° 20' 57.84" N, 82° 46' 46.46" W, 320°)

45

## ATTACHMENT 17: APPENDIX ON WATER RESOURCES

The Property is in the Upper Ogeechee River Watershed HUC 03060201. The Ogeechee River is the dominant waterbody in the basin. The Ogeechee River is located in mid- to southeastern Georgia and is flanked by the Altamaha and Oconee River basins to the west and the Savannah River basin to the east. In the headwaters located in Greene County, Georgia, the North and South Fork Ogeechee Rivers join to form the Ogeechee River which runs 245 miles in a southeasterly direction and empties into Ossabaw Sound on the Georgia Atlantic coast. The Ogeechee River basin is located entirely in the State of Georgia and drains approximately 5,540 square miles.

The Ogeechee River is one of Georgia's few remaining free flowing streams and contains excellent habitat for numerous freshwater fish species. The Ogeechee River is a typical blackwater coastal stream, which is a result of tannins from decaying tree roots and other organic materials passing through the sandy soil and staining the water. However, unlike other black water rivers, the Ogeechee has a high pH (near 7.0) due to a large input of carbonate-rich water from Magnolia Springs in Jenkins County, Georgia. Other significant water features are the coastal estuaries, sounds, and the Atlantic Intracoastal Water-Way. There are no large storage reservoirs or hydroelectric plants in the Ogeechee River Basin, but there are many small lakes, reservoirs, and farm ponds.

## ATTACHMENT 18: APPENDIX ON VEGETATION AND HABITAT*

**Granite Outcrops:** Diverse mosaics of exposed granitic rock, herb and shrub dominated patches, and wetland microhabitats. Most have shallow solution pits that collect soil and support various stages of plant A-24 succession. These environments support rare or endemic species of plants and animals. The most important of these habitats contain a variety of solution pits, seepage zones, and bare rock exposures. Some outcrops are monadnocks (rise above the ground) while others

**Mesic Hardwood Forests** Non-wetland forests of floodplains, ravines, and north-facing slopes in the Piedmont. These may include species such as American beech, white oak, northern red oak, bitternut hickory, pignut hickory, shagbark hickory, bigleaf magnolia, yellow poplar, blackgum, dogwood, black cherry, and loblolly pine. Typical shrubs include spicebush, sweetshrub, pawpaw, Oconee azalea, rusty viburnum, and pinxter-flower.

**Streams** In the upper Piedmont, streams are low to moderate gradient and typically contain well-defined riffles and pools. Substrate consists of gravel, pebble, sand, and silt; some bedrock may also be present. Lower Piedmont streams are lower gradient, have fewer riffles and pools, and their substrates have a higher proportion of silt, clay, and detritus than upper Piedmont streams. Turbidity is highly variable, but most of these streams become highly turbid after rain.

*These habitat descriptions are quoted from Appendix pages A-23 and A-25 in Georgia DNR's "Georgia State Wildlife Action Plan.

46

## ATTACHMENT 19: APPENDIX ON WILDLIFE

Small mammals such as fox squirrels, wood rats, voles, and shrews may be present. A varity of native reptiles and amphibians may also live here, including various non-venomous water snakes, rat snakes, copperhead snakes, canebrake rattlesnakes, green tree frogs, fence lizards, and green anoles. In addition, neotropical migrants like the gray catbird, field sparrow, pine warbler, and prairie warbler could utilize the forests that occur on this Property.

*See Appendices in Georgia DNR's "Georgia State Wildlife Action Plan."

## ATTACHMENT 20: APPENDIX ON RARE OR ENDANGERED SPECIES*

Among plants that are rare and unusual in the Georgia Piedmont, and therefore classified by the GA DNR as high priority species in that ecoregion, the following species are known to occur in the kinds of forests and ecosystems that are found on the Property:

*Corydalis flavula* (Yellow Harlequin)
*Silene ovata* (Mountain Catchfly)

Among the animal species that are classified as species of concern in the Georgia Piedmont, the following species are known to occur in the kinds of habitats that are found on the Property:

*Clemmys guttata* (Spotted Turtle)
*Etheostoma parvipinne* (Goldstripe Darter)
*Eurycea hillisi* (Hillis's Dwarf Salamander)
*Fusconaia masoni* (Atlantic Pigtoe)
*Hemidactylium scutatum* (Four-toed Salamander)
*Lampropeltis rhombomaculata* (Mole Kingsnake)
*Moxostoma sp. 4* (Brassy Jumprock)
*Necturus punctatus* (Dwarf Waterdog)
*Peucaea aestivalis* (Bachman's Sparrow)
*Procambarus petersi* (Ogeechee Crayfish)

*See Appendices in Georgia DNR's 2015 "Georgia State Wildlife Action Plan."

47

**EXHIBIT 8.4.**

**RESOURCE VALUATION REPORT**

**AND TECHNICAL REPORT**

Case 4:24-cr-00717-ACU  Document 11  Filed 07/22/... Page 486 of 666

# RESOURCE VALUATION REPORT- LOG CREEK QUARRY SITE, WARREN COUNTY, GEORGIA, USA

Effective date: December 20, 2018
Report Date: February 28, 2022

**Report Prepared for:**

**Log Creek, LLLP**

1280 Snows Mill Road
Bogart, Georgia 30622

**Report Prepared by:**



Capps Geoscience, LLC
P.O. Box 2235
Evans, GA 30809
USA

**Signed by QP:**

Richard C. Capps, PhD, Georgia RPG
SME Registered Geologist

# Contents

**1 Summary** **1**

  1.1 Valuation criteria and process . . . . . . . . . . . . . . . . . . . . . . . . 1

  1.2 Conclusions and recommendations . . . . . . . . . . . . . . . . . . . . . 3

**2 Introduction** **4**

  2.1 Terms of reference and purpose of the Report . . . . . . . . . . . . . . . 4

  2.2 Qualification of consultants and site visit . . . . . . . . . . . . . . . . . 5

  2.3 Sources of information . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

  2.4 Units of measure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    2.4.1 Mineral resources . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    2.4.2 Mineral reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**3 Reliance on other experts** **9**

**4 Description and location** **9**

  4.1 Property description, location, and tenure . . . . . . . . . . . . . . . . . 9

**5 Accessibility, climate, local resources, infrastructure and physiography** **10**

  5.1 Topography, elevation, and vegetation . . . . . . . . . . . . . . . . . . . 10

  5.2 Accessibility and transportation to the property . . . . . . . . . . . . . . 10

  5.3 Climate and length of operating season . . . . . . . . . . . . . . . . . . 12

  5.4 Infrastructure availability and sources . . . . . . . . . . . . . . . . . . . 13

    5.4.1 Proximity to population center . . . . . . . . . . . . . . . . . . . 13

    5.4.2 Power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    5.4.3 Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    5.4.4 Mining personnel . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    5.4.5 Potential overburden storage areas . . . . . . . . . . . . . . . . 14

    5.4.6 Potential processing plant sites . . . . . . . . . . . . . . . . . . 14

**6 History** **14**

**7 Geologic setting and mineralization** **14**

  7.1 Regional geology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

  7.2 Property geology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    7.2.1 Weathering and alteration . . . . . . . . . . . . . . . . . . . . . 20

**8 Drilling and exploration**    **20**

8.1 Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

8.2 Mineral resource and reserve estimates . . . . . . . . . . . . . . . 21

**9 Market studies**    **21**

9.1 Demand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     9.1.1 Local demand . . . . . . . . . . . . . . . . . . . . . . . . . 23

     9.1.2 Regional demand . . . . . . . . . . . . . . . . . . . . . . . 23

9.2 Production . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

9.3 Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

9.4 Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**10 Environmental studies, permitting and social or community impact**    **26**

10.1 Environmental studies . . . . . . . . . . . . . . . . . . . . . . . . 26

10.2 Permitting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

10.3 Community impact . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**11 Capital and operating costs**    **27**

**12 Economic analysis**    **27**

12.1 Method of evaluation . . . . . . . . . . . . . . . . . . . . . . . . . 27

12.2 Input parameters . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

12.3 Cash flow forecasts and annual production forecasts . . . . . . . . . . . 32

12.4 Sensitivity analysis and limitations . . . . . . . . . . . . . . . . . . 34

**13 Adjacent properties**    **34**

**14 Other relevant data and information**    **34**

**15 Conclusions and recommendations**    **34**

**16 References and selected bibliography**    **37**

**17 Certificate of Author**    **38**

**18 Curriculum vitae**    **39**

**19 Appendices**    **47**

19.1 Appendix A Exploration/evaluation report . . . . . . . . . . . . . . 48

19.2 Appendix B Addendum to October 2018 report - Ecological Survey, Mine Plan, and Permit Applications . . . . . . . . . . . . . . . . . . . . . . 114

19.3 Appendix C NPV calculations of aggregate production for sensitivity analyses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 378

19.4 Appendix D Aggregate price lists and Georgia Department of Transportation aggregate contract amendments with Aggregate USA, Vulcan Materials, and Martin Marietta . . . . . . . . . . . . . . . . . . . . . . . . 389

19.5 Appendix E USGS Mineral Commodity Summaries . . . . . . . . . . . . 422

19.6 Appendix F Mineral Industry Surveys . . . . . . . . . . . . . . . . . . . 444

19.7 Appendix G Locations of active aggregate quarries relative to Log Creek quarry site . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 460

19.8 Appendix H Georgia DOT approved sources . . . . . . . . . . . . . . . . 462

19.9 Appendix I Georgia population information . . . . . . . . . . . . . . . . 488

19.10 Appendix J USGS standard aggregate production reporting form and graph of United States production . . . . . . . . . . . . . . . . . . . . 501

19.11 Appendix K Zoning opinion letter . . . . . . . . . . . . . . . . . . . . . 505

# List of Figures

1 Regional quarry location map. Projection and datum are NAD 1983, UTM Zone 17N. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

2 Climate chart for Milledgeville, Georgia about 30 miles to the southwest of the Log Creek quarry site . . . . . . . . . . . . . . . . . . . . . . . . 12

3 Map of Georgia physiographic provinces . . . . . . . . . . . . . . . . . 16

4 Geologic map of Georgia, USA . . . . . . . . . . . . . . . . . . . . . . 17

5 Regional geologic map of the Log Creek quarry site in the Inner Piedmont province . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

6 Local 40-mile-radius market area within Georgia Counties . . . . . . . . 29

7 NPV sensitivity for Log Creek quarry site truck market . . . . . . . . . . 35

# List of Tables

1 Definition of terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

2 Population trends of the Log Creek quarry market area and resource base at 4.5 tons per year per capita (Appendix I) . . . . . . . . . . . . . . . 30

CARRYOVER ATTACHMENT - Exhibit 2 - Page 490 of 666

iv

3    Crushed stone aggregate: Key criteria, principal assumptions, and input parameters used in the base case  . . . . . . . . . . . . . . . . . . . . . . .  31

4    Net Present Value (NPV) for FOB truck market aggregate production from the Log Creek quarry, Warren County, Georgia  . . . . . . . . . . . . . . .  32

5    Net Present Value (NPV) for railroad aggregate production from the Log Creek quarry, Warren County, GA . . . . . . . . . . . . . . . . . . . . . . .  33

# 1   Summary

The purpose of this report is to provide a summary of scientific and technical criteria for the proposed Log Creek quarry and to use this information to make a retrospective valuation of the mineral (aggregate) resource and reserves as of 20 December 2018.

This resource valuation report for the Log Creek, LLLP aggregate quarry site ("Log Creek") was prepared by consulting geologist and Qualified Person (QP), Richard C. Capps, PhD at the request of a private company, Log Creek, LLLP. I am a qualified person as defined by the US SEC reporting standards and the policy and standards of the Canadian National Instrument 43-101 and I am a qualified person as a consequence of my education, experience, and professional memberships and licenses. Over the previous 45 years, I have explored and evaluated thousands of mineral properties and valued hundreds of these and I take responsibility for all sections of this report. My clients have included large multinational corporations, public and private junior mining firms, land owners, and federal and state agencies. This valuation and report is prepared to the same standards as these earlier reports and is organized under the structure, principles, and policies of the Society of Mining, Metallurgy, and Exploration (SME) 2014 Guidelines, the CIM 2010 definitions, and the June 2011 Canadian National Instrument 43-101 standards. This mineral valuation follows standard reporting practices and valuation procedures and a general pre-feasibility model.

## 1.1   Valuation criteria and process

The criteria used in the Log Creek, LLLP and in all previous crushed stone aggregate mineral valuations by Capps Geoscience, LLC and the author (QP) follow the income based process of a Discounted Cash Flow (DCF) analysis (Torries, 1998). The DCF is used to determine a Net Present Value (NPV) over the mine life and the first year of the DCF is the first year of full operation of the quarry. The criteria necessary to generate both the DCF and NPV include Production Rate based on Market Demand, Costs, Price, Discount Rate, Proven Mineral Resource, and Proven Mineral Reserve and are here defined as:

*Production Rate (short tons/year) based on Market Demand (short tons/year)*: Crushed stone aggregate is a natural resource that has high value of place and whose market is somewhat like that of water. Like water, everyone uses crushed stone and demand is directly proportional to the existing population base and rate of population growth. Markets in areas of high population growth will require more crushed stone than those with stable

or declining populations. The United States Geological Survey (USGS) tracks commodity production annually and those figures include crushed stone aggregate production. Market Demand, on an annual per capita basis, is determined by dividing the United States production data by the United States population.

A mineral valuation is based on an increase in Market Demand for crushed stone aggregate within the quarry's approximately 50-road mile radius market area and for this proposed valuation the escalation of Market Demand is based on the projected increase in population. The primary sources for county population data in the 50-road mile radius market area are the United States Census Bureau data and the Georgia Governor's Office for Planning and Budget for population projections (See Table 2, Figure 6, and Appendices G and I). The southeastern United States and including the State of Georgia has one of the highest crushed stone aggregate production rates in the country as shown in the annual Mineral Commodity Summaries available from the USGS (See Appendices E and F).

*Costs (US$/short ton)*: The Costs are determined by independent contract mining quotes such as those provided by companies which provide contract mining services. These contract mining quotes and service costs are higher and therefore more conservative than the costs at quarries which operate with their own equipment and personnel.

*Price (US$/short ton)*: The Price is determined from publicly available price sheets provided by local quarries in combination with the effects of discounts sometimes provided to large volume customers.

*Discount rate (%)*: The discount rate as determined for the purpose of valuation is based on the sum of three values. The first value is a representative corporate coupon rate, from Morningstar or other similar sources, and representative of the same market sector (for example aggregate producer Vulcan Materials (VMC)), the second is the US Treasury Bond Rate, and the third is a 0 to 3 percent increase to allow for the uncertainties which may be inherent in establishing the new quarry site.

*Proven Mineral Resource (short tons)*: For the purposes of this report, that portion of a mineral resource for which there is adequate data based on geologic mapping of outcrops, diamond core drilling, physical testing, and exploration to calculate the quantity and quality of the measured mineral resource.

The measured mineral resource is determined by an independent resource evaluation study which includes determining mineable area, thickness of non-salable overburden, quantity, and quality of stone by core drilling and physical, chemical, and mineralogical analyses of representative samples from that drilling. Other studies may be necessary such as wetland delineation, critical species, riparian buffers, rural runoff studies, cultural

inventory and similar potential environmental, engineering and cultural concerns.

*Proven Mineral Reserve (short tons)*: For the purposes of this report, a Proven Mineral Resource is the total 25-year projected production based on market demand as presented in the discounted cash flow analysis.

## 1.2 Conclusions and recommendations

On the basis of the included and attached information the author concludes and recommends that:

• Under the standards as described above, the best practice is to use independent Qualified Persons first for evaluation and then secondly for valuation of a mineral resource. GeoLogic, LLC (GeoLogic) conducted the Log Creek exploration and evaluation (mapping, drilling, and sampling) and finds that the stone at the Log Creek quarry (Figure 1) meets all Georgia Department of Transportation (GADOT) specifications and that the overburden is shallow (Appendix A, October 2018 Evaluation report and Appendix B, Addendum to the October 2018 Evaluation report). Capps Geoscience, LLC and the author (QP) find no know errors in the GeoLogic evaluation report and agree with the conclusions of the Geologic evaluation report. Capps Geoscience and the author find that, based on the October 2018 evaluation report and supporting documents, there are over 85 million tons of mineral resource including 36.4 million tons of measured and 48.6 million short tons of indicated aggregate resource in the Log Creek quarry ultimate 68 acre pit if mined to an elevation of 98.4 feet (elevation to base of measure resource = about 200 feet and to base of indicated resource = 98.4 feet). I am confident that the indicated resources would be changed to measured resources (Proven resources) with additional drilling.

• These resources are more than adequate to meet the market demand reserve of 60.6 million short tons over the 25 year mine life. As calculated in Section 12 of this report, the value of the combined FOB truck market (7.2 million tons) and rail market (53.4 million tons) crushed stone aggregate reserve mined and classified at the Log Creek quarry, is rounded to US$89.8M.

• The property is zoned AR (Agricultural) and, according to Warren County zoning codes, mining is allowed in AR zoned lands with a conditional use permit (Appendix K). Community opposition to the quarry seems unlikely because there are existing aggregate quarries in the area. The author's opinion is that it is reasonably probable that the Conditional Use Permit (CUP) will be obtained from Warren County to operate the quarry.

• In my opinion, the Log Creek quarry will be permitted as an active mine with the

Surface Mining Unit of the Georgia Environmental Protection Division (Appendix B). In addition, in my opinion it is reasonably probable that the storm water and air emission permits will be granted for the Log Creek quarry.

• According to the 2018 USGS Mineral Year Book "In 2017, 1.33 billion tons of crushed stone valued at more than $15 billion was produced by an estimated 1,400 companies operating 3,700 quarries and 187 sales/distribution yards in 50 States. Leading States were, in descending order of production, Texas, Pennsylvania, Florida, North Carolina, Ohio, Missouri, Georgia, Kentucky, Virginia, and Indiana, which together accounted for more than one-half of the total crushed stone output." The most recent USGS Commodity Summary and Mineral Industry Surveys confirms that the upward trend in demand and production continues (Appendices E and F). medbreak

• The most profitable use of the Log Creek Warren County, Georgia tract would be to produce aggregate from the proposed quarry.

# 2 Introduction

## 2.1 Terms of reference and purpose of the Report

This valuation report has been prepared at the request of Log Creek, LLLP whose address is 1280 Snows Mill Road, Bogart, Georgia 30622. On behalf of Log Creek Mr. Tony Townley, Manager, retained Richard C. Capps, PhD, QP of Capps Geoscience, LLC ("CG" or "Capps Geoscience") to prepare a mineral valuation of the proposed Log Creek crushed stone aggregate quarry in Warren County, Georgia. Log Creek intends to use this report to aid investment decisions as part of their overall scope of investment analysis.

The report is prepared as a Canadian National Instrument 43-101 (NI-43-101) Technical Report as this is considered the world standard format for independent reporting for mineral property valuation and disclosure purposes. The quality of information, including conclusions and estimates, contained in this report is consistent with the level of effort involved in Capps Geoscience services based on: i) information available at the time of preparation, ii) data supplied by outside sources, iii) the assumptions, conditions and qualifications established in this report. This report is intended for use by Log Creek subject to the terms and conditions of its agreement with Capps Geoscience and any uses of this report by any third party is at that party's sole risk. The responsibility of disclosure remains with Log Creek, LLLP.

This report provides mineral resource and mineral reserve estimation and a classification of resources and reserves in accordance with the Society for Mining, Metallurgy and Exploration (The 2014 SME Guide), the Canadian CIM Guidelines (November 27, 2010), and United States Securities and Exchange Commission Industry Guide 7.

## 2.2   Qualification of consultants and site visit

The author and Qualified Person for the current report, Richard C. Capps, PhD, QP, Georgia RPG and SME registered member geologist, visited the Log Creek project on 17 February 2021 The author is familiar with the general geology of the area because he has worked in similar geologic settings and mining districts in Georgia and elsewhere.

During the site visit the QP and author of the current report drove roads, studied core and rock samples and walked the quarry area and land parcel. Rock samples were submitted to the laboratory for physical tests from the 4 core holes drilled and reported in the October 2018 evaluation/exploration report (Appendix A). An ecological survey, mine plan, and permit application were completed as an addendum to the October 2018 evaluation report (Appendix B). The physical tests showed that the rocks met all Georgia Department of Transportation standards for aggregate (Appendix H). The rock types, textures, mineralogy, and structure in core are consistent with the outcrop and with those described in the both the publicly available literature and mineral exploration report (Appendix A).

## 2.3   Sources of information

Data used in this report are from a variety of sources including historic internal company reports provided by Log Creek and reports on the Log Creek quarry project area and adjacent areas referenced in this report. The greatest sources of information relied on are the October 2018 evaluation report (Appendix A) and mine plans, ecological survey, and permit applications as addenda (Appendix B) to that report and all provided by Benjamin R. Black, PG of GeoLogic, LLC. It is the author's (QP) opinion that Geologist Benjamin R. Black is fully qualified to evaluate the Log Creek Warren County tract crushed stone aggregate quarry site. Benjamin R. Black is professional respected geologist, has many years of mineral evaluation experience and is a licensed and registered professional geologist in Georgia and many other states.

## 2.4   Units of measure

Most of the historic information regarding the Log Creek quarry site and surrounding areas are in English units and useful terms are provided in Table 1.  Currency is in United States Dollars.  The following units of measurement and conversion factors are provided for clarification.

1 ppm = 1 part per million 1 ppb = 1 part per billion

100 hectares = 1 square kilometers

1 foot = 31.28 cm or 0.3128 meters

1 mile = 1.609 kilometer

1 $m^3$ = 1 cubic meter = 35.31 $feet^3$

1 ton (Imperial) = 2240 pounds

1 short ton = 2000 pounds

1 hectare = 10,000 $m^2$ = 2.471 acres

1 cubic foot = 0.028317 cubic meters

Ma = million years ago

Ga = billion years ago

Geologic terms used are those of standard usage (Table 1).

Table 1: Definition of terms

| Term | Definition |
|---|---|
| Capital Expenditure | All other expenditures not classified as operating costs. |
| Construction aggregate | Construction aggregate, or simply "aggregate", is a broad category of coarse to medium grained particulate material used in construction, including sand, gravel, crushed stone, slag, recycled concrete and geosynthetic aggregates. It is created by mining a suitable rock formation and then using a crusher to break down the stone into different sizes. Crushed stone differs from gravel in that gravel has a more rounded shape and is made by the natural processes of weathering and erosion.According to the USGS, "of the total domestic crushed stone produced in 2018, about 68% was limestone and dolomite; 15%, granite; 6%, traprock; 5%, miscellaneous stone; 4%, sandstone and quartzite; and the remaining 2% was divided, in descending order of tonnage, among marble, volcanic cinder and scoria, calcareous marl, slate, and shell." |
| Crushing | Initial process of reducing ore particle size to render it more amenable for further processing |
| Die grade | High quality dimension stone noted for lack of dikes, sills, fractures and non-uniform textures. Die grade has excellent physical properties for initial quarrying through finished product (monuments; building materials etc.) |
| Dilution | Waste which in unavoidably mined with ore. |
| Dimension stone | According to the United States Geologic Survey (USGS) "dimension stone can be defined as natural rock material quarried for the purpose of obtaining blocks or slabs that meet specifications as to size (width, length, and thickness) and shape". Color, grain texture and pattern, and surface finish of the stone are normal requirements. Durability (essentially based on mineral composition and hardness and past performance), strength, and the ability of the stone to take a polish are other important selection criteria. Although a variety of igneous, metamorphic, and sedimentary rocks are used as dimension stone, the principal rock types are granite, limestone, marble, sandstone, and slate. Other varieties of dimension stone that are normally considered to be special minor types include alabaster (massive gypsum), soapstone (massive talc), and various products fashioned from natural stone." |
| Dip | Angle of inclination of a geological feature/row from horizontal |
| Fault | The surface of a fracture along which movement has occurred |
| Footwall | The underlying side of a fault, orebody or stope |
| Gangue | Non-valuable components of ore |
| Grade | Quality of dimension stone for resale dependent on use. Die grade is the highest and followed by base, coping, quarry run, foundation, and curb |
| Grout | A common term for dimension stone waste rock |
| Hanging wall | The overlying side of a fault, orebody or stope |
| Igneous | Primary crystalline rock formed by the solidification of magma. |
| Lithology | Geological description pertaining to different rock types. In hand specimen or outcrop characterized by textural descriptions based on but not limited characteristics such as mineralogical composition, grain size, and color. |
| Material properties | Physical and chemical properties of rocks mined |
| Measured mineral resource | For the purposes of this report, that portion of a mineral resource for which there is adequate data based on geologic mapping of outcrops, diamond core drilling, physical testing and historic exploration to calculate the quantity and quality, of the mineral resource. See Mineral Resources, Section 2.4.1 for a general description. |
| Metamorphic processes | Pertaining to rocks formed by the recrystallization in the solid state of a pre-existing rock of any type to one with different texture and new minerals by the application of pressure, temperature, and/or deformation of the original rock. Chemically reactive solutions are sometimes also responsible for the change or alteration of the rock. |
| Milling | A general term to describe the process in which the ore is crushed and ground and subjected to physical or chemical treatment to extract the finished product |
| Mineral resource | For the purposes of this report, a Mineral Resource is a concentration or occurrence of rock with physical properties that would pass state Department of Transportation (GADOT and SCDOT) specifications for use as crushed stone aggregate and has reasonable prospects for economic extraction. See Mineral Resources, Section 2.4.1 for a general description. |
| Prospect | An area that is a potential site of mineral deposits, based on preliminary exploration |
| Proven mineral reserve | For the purposes of this report, the total 25-year projected production based on market demand as presented in the discounted cash flow analyses (Tables 5 and 6). See Mineral Reserves Section 2.4.2 for a general description. |
| Saprolite | A chemically weathered rock, mostly soft or friable and commonly retaining the structure of the parent rock since it is not transported. Saprolites contain quartz and a high percentage of kaolinite with other clay minerals which are formed by chemical decomposition of primary minerals, mainly feldspars. |
| Sedimentary | Pertaining to rocks formed by the accumulation of sediments, formed by the erosion of other rocks |
| Stratigraphy | The study of stratified rocks in terms of time and space. |
| Strike | Direction of line formed by the intersection of strata surfaces with the horizontal plane, always perpendicular to the dip direction. |
| Stripping ratio | The ratio of tons of waste rock divided by the tons of mineralization destined for the processing plant |
| Sulfide | A sulfur bearing mineral |
| Tailings | Finely ground waste rock from which valuable minerals have been extracted. |
| Total Expenditure | All expenditures including those of an operating and capital nature. |
| USGS | United States Geological Survey |

### 2.4.1   Mineral resources

The mineral resources and mineral reserves have been classified according to the "CIM Standards on Mineral Resources and Reserves: Definitions and Guidelines" dated November 27, 2010 (CIM) and The SME 2014 Guide for reporting mineral resources and reserves.  The Resources have been classified as Measured, Indicated or Inferred, the Reserves have been classified as Proven, and Probable based on the Measured and Indicated Resources as defined below.

A Mineral Resource is a concentration or occurrence of natural, solid, inorganic or fossilized organic material in or on the Earth's crust in such form and quantity and of such a grade or quality that it has reasonable prospects for economic extraction.  The location, quantity, grade, geological characteristics and continuity of a Mineral Resource are known, estimated or interpreted from specific geological evidence and knowledge.

An 'Inferred Mineral Resource' is that part of a Mineral Resource for which quantity and grade or quality can be estimated on the basis of geological evidence and limited sampling and reasonably assumed, but not verified, geological and grade continuity.  The estimate is based on limited information and sampling gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes.

An 'Indicated Mineral Resource' is that part of a Mineral Resource for which quantity, grade or quality, densities, shape and physical characteristics can be estimated with a level of confidence sufficient to allow the appropriate application of technical and economic parameters to support mine planning and evaluation of the economic viability of the deposit.  The estimate is based on detailed and reliable exploration and testing information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes that are spaced closely enough for geological and grade continuity to be reasonably assumed.

A 'Measured Mineral Resource' is that part of a Mineral Resource for which quantity, grade or quality, densities, shape, physical characteristics are so well established that they can be estimated with confidence sufficient to allow the appropriate application of technical and economic parameters, to support production planning and evaluation of the economic viability of the deposit.  The estimate is based on detailed and reliable exploration, sampling and testing information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes that are spaced closely enough to confirm both geological and grade continuity.

### 2.4.2   Mineral reserves

A Mineral Reserve is the economically mineable part of a Measured or Indicated Mineral Resource demonstrated by at least a preliminary feasibility study. This study must include adequate information on mining, processing, metallurgical, economic and other relevant factors that demonstrate, at the time of reporting, that economic extraction can be justified. A Mineral Reserve includes diluting materials and allowances for losses that may occur when the material is mined.

A 'Probable Mineral Reserve' is the economically mineable part of an Indicated, and

in some circumstances a Measured Mineral Resource demonstrated by at least a preliminary feasibility study. This study must include adequate information on mining, processing, metallurgical, economic, and other relevant factors that demonstrate, at the time of reporting, that economic extraction can be justified.

A 'Proven Mineral Reserve' is the economically mineable part of a Measured Mineral Resource demonstrated by at least a preliminary feasibility study. This study must include adequate information on mining, processing, metallurgical, economic, and other relevant factors that demonstrate, at the time of reporting, that economic extraction is justified.

# 3    Reliance on other experts

The QP's opinion stated in this current document is based on information provided by Log Creek throughout the valuation. Capps Geoscience has relied on the work of earlier consultants in the Log Creek project area in support of the Log Creek valuation. The sources of information include data and reports supplied by Log Creek personnel as well as documents referenced in Section 16 (References). The professional documents included in the appendices of the current report follow standard practices and were performed by Qualified Persons in their own disciplines and contain no known errors.

ASTM testing for construction aggregate properties of rock samples taken from Log Creek quarry site drill core was completed by GeoLogic, LLC on behalf of Log Creek in October 2018. The testing work followed current ASTM Best Practice procedures and is included in this report as Appendix A.

The author is not a lawyer but has reviewed a copy of the title and plat for the property and finds no encumbrances on the property that could interfere with the proposed mining operation on the property. No independent verification of land title was performed by the author but has relied upon Log Creek who, in whole or in part, has contributed descriptions of the tenure, legal, environmental, marketing, pricing, and costs for the Log Creek quarry project and this valuation report.

A draft copy of this report has been reviewed for factual errors by Log Creek, LLLP. Any changes made as a result of these reviews did not affect the conclusions of this document. The opinions given and expressed in this document are given and presented in good faith and in the opinion that the statements and opinions are not false and misleading as of the effective date of the report.

# 4    Description and location

## 4.1    Property description, location, and tenure

The Log Creek project is located about 11 linear miles northeast of central Sparta, Georgia, USA and about 50 linear miles southwest of central Augusta, Georgia, USA (Figure 1;

Appendix G). The approximate center of the Log Creek property is located at coordinates 334,377 East, 3,691,789 North meters (NAD 1983, and Datum UTM Zone 17N, Meters on the USGS Jewell, GA 7.5 minute quadrangle topographic map.

The project parcel is owned by Log Creek and covers an area of about 241 acres. The general boundary of the parcel metes and bounds is provided in Appendix B and is used throughout this document. The author did not perform an independent survey of the property and relied on the supplied survey data which appears to be accurate.

# 5 Accessibility, climate, local resources, infrastructure and physiography

## 5.1 Topography, elevation, and vegetation

The topography is gently sloping to the east and the terrain incised by numerous small dendritic drainages and small streams. The topography is a product of an upland area in a mature stage of erosion. The drainages are incised and some stream robbing is occurring due to headward erosion.

The relief of the property is about 100 feet and elevations above mean sea level range from a low of about 400 feet in the northwestern Log Creek property to a high in the eastern property of about 500 feet. Headward erosion at the property is variable and drainages have generally northeast and northwest trending channels. Property drainage flows into unnamed drainages and then into the Ogeechee River.

The property is mostly in managed pine trees and with smaller woodlots of pine and mixed hardwoods trees and native plants such as sumac and grasses along borders between woodlots and pasture.

## 5.2 Accessibility and transportation to the property

The Log Creek project site is about 14 road miles northeast of Sparta, Georgia and there is sufficient road access to operate a truck market from the property. The quarry site is accessible from well maintained paved public roads which provide access to major paved Highway 16. In turn, Highway 16 provides access to Interstate 20 (by on and off ramps), a major east-west interstate. Direct access to the property is on two lane paved roads through the nearby community of Warrenton. From Warrenton take Highway 16 for about 11 miles to the intersection with Ogeechee River Road and turn right at the intersection. Follow Ogeechee River Road for about 3.4 miles to its intersection with Timber Road and turn right onto Timber Road. Follow Timber Road for about 0.27 miles to the quarry entrance which is on the left.

*Log Creek aggregate quarry site valuation, Warren County, Georgia*      11



Figure 1: Regional quarry location map. Projection and datum are NAD 1983, UTM Zone 17N.

## 5.3   Climate and length of operating season

Mining and construction operations are conducted on a year round basis and with no restrictions on the operating season.

The Property is about 30 miles northeast of Milledgeville, Baldwin County, Georgia USA. The climate of Milledgeville, Georgia (Figure 2) is typical of lower Piedmont areas in the Georgia, USA and lies within the humid subtropical climate zone. The temperatures are on average between 93 degrees F for July highs and 34 degrees F for January lows. Winter snowfall averages about < 1 inch, and Milledgeville averages 47.6 inches of rain per year.



Figure 2: Climate chart for Milledgeville, Georgia about 30 miles to the southwest of the Log Creek quarry site

## 5.4 Infrastructure availability and sources

### 5.4.1 Proximity to population center

The project is about 50 miles southwest of Augusta, Georgia which is the County Seat of Richmond County, Georgia and the consolidated city-county government area has a 2010-census population of about 556,877. Augusta is the largest city in the Central Savannah River Area metropolitan, a trading and marketing area with a 2010 population of about 861,631.

### 5.4.2 Power

Electrical power is available on the property. The local line supplies farms and lots near the Log Creek quarry site.

### 5.4.3 Water

Minimal water is required for plant operation. If needed, water could be produced from the quarry when in production because groundwater seeps into the quarry and must be pumped out. In addition water could be supplied by a small water truck or onsite water well.

### 5.4.4 Mining personnel

Mining personnel are readily available in the Piedmont region of Georgia which has a multi-generational history of aggregate and dimension stone mining. Crushed stone aggregate quarries similar to the proposed Log Creek quarry site hire from this region. Initial quarry setup and operations will be under an agreement with a contract mining company to supply management, personnel, and equipment. A typical quarry operation (See Appendix B for mine plan.) has one or two truck drivers to drive the quarry haul trucks from the pit to primary crushing facility and return, a loader operator to excavate product from the working bench and load it into the haul trucks, three or four workers to operate the primary crusher, screens, and conveyors, and stakers. One and sometimes two employees staff the scale house and maintain records of sales. The Log Creek quarry is proposed as both an FOB truck and rail operation but some quarries have a fleet of trucks that would require a dispatcher. Mechanics and general labor staff keep the operation running. Office personnel include a General Manager/Foreman, accountants receivable staff, and receptionist. Blasting and surveyors are typically hired under contract. Technical specialists such as engineers and geologists are often hired as needed on a contract or consulting basis.

### 5.4.5 Potential overburden storage areas

The Log Creek project will remove about 2.2 million cubic yards of overburden from the 68 acre quarry (Appendix A). The overburden in the proposed pit area consists of silty sand locally overlying firm saprolite. Weathered bodies of competent rock (rind rock) within the saprolite may be shot and set aside as waste rock or possibly sold as commercial ABC base material. The overburden varies is generally between 5 to 54 feet thick but averages about 26 feet thick in the proposed quarry area. Most overburden will be used in privacy berms around the mine site and the remainder overburden will be stored in overburden storage areas.

### 5.4.6 Potential processing plant sites

The processing site is proposed to be located both adjacent to the quarry in the Log Creek quarry site area and within the operating quarry.

## 6 History

Most of the Log Creek quarry site was historically used for agriculture and there is no prior history of aggregate mining. However, several aggregate and dimension stone prospects are in the Log Creek quarry area.

## 7 Geologic setting and mineralization

### 7.1 Regional geology

The Log Creek quarry area is located within the eastern Piedmont Physiographic Province (Figure 3) and within the Inner Piedmont lithotectonic belt (Gore, 2013). The Inner Piedmont includes rocks that were once portions of islands and sedimentary and volcanic rocks associated with a pre-Atlantic ocean basin (Clark,2008). Due to plate tectonic motions, this basin slowly closed resulting in deformation and regional metamorphism of the older rocks, and during late stages, the Alleghanian Orogeny which formed the southern Appalachian Mountains(Hatcher, 1978).

The rocks are metamorphosed to varying degrees by burial and compression which caused changes in pressure and temperature with little change in composition. Although the bulk chemical composition of the rock changed very little during metamorphism, new minerals formed to match the new pressure and temperature conditions. The relative intensity of these metamorphic changes is related to the structural history of the rocks. Most major rock types of the Earth's crust are included in the original pre-metamorphic lithologies of the region. In general, most of the rocks have been deformed (folded, faulted, and/or crushed) and metamorphosed at least four times and each of these deformations

correspond to major tectonic events such as continental collisions, rapidly sinking basins, or rising mountains. Towards the end of the Alleghanian Orogeny (about 350 to 270 Ma), granitic plutons were intruded into the previously deformed and metamorphosed rocks. These plutons include the Appling, Ben Hill, Danburg, Elberton, Palmeto-Tyrone, Panola, Sparta, Stone Mountain, and Town Creek plutons (Lawton, 1976, Dallmeyer, 1978, and Dallmeyer, 1981,).

   Geologists determine the geologic history of the region by mapping the surface and subsurface distribution of these rocks, structural elements such as low and high angle faults and folds, and studying the chemistry and mineralogy of the rocks in detail. These studies identify the rock types and geologic settings in which to discover economically productive sources (deposits) of mineral resources such as the crushed stone aggregate and dimension stone resources of the Sparta granite.



Figure 3: Location of the Log Creek quarry project relative to the physiographic provinces of Georgia (modified after Gore et al., 2013). The Log Creek quarry(red star) is located in the Inner Piedmont Province.



Figure 4: Location of the Log Creek quarry project relative to the geology of Georgia. The Log Creek quarry project (star on map) is located within granitic gneiss of the Inner Piedmont Province.(USGS OF 2005-1323; Lawton et al., 1976. For complete geologic units and explanation go to http://mrdata.usgs.gov/sgmc/ga.html.

.

## 7.2   Property geology

The regional geology is well represented in the Log Creek project area (Figures 4 and 5). The pre-metamorphic rocks are Late Proterozoic or early Paleozoic in age and these were metamorphosed up to staurolite-amphibolite grade in the Devonian Period, about 365 million years ago (Dallmeyer, 1978). About 300 million years ago the body of granitic magma that would form the Sparta Granite intruded these metamorphic rocks, and subsequently cooled and solidified. Geologic mapping and geophysical studies estimate that the nearby Elberton granite is over 35 miles (56 km) long, 6 miles (9 km) wide, and 2 to 3 (3 to 5 km) miles in depth (Cook, 1979) and the Sparta Granite is likely of similar size. The contacts of the Sparta Granite with surrounding wall rocks are generally sharp. This contact relationship suggests that the magma body rose through the surrounding rocks by diking and displacement rather than being derived from partial melting of the adjoining rocks. The conditions during crystallization of the granite must have been nearly hydrostatic (equal pressure in all directions) because the composition and texture of the Sparta Granite is very uniform throughout its outcrop area. Foliation is most prevalent along the margins of the pluton. These foliations are likely due to late stage flow foliation within the granite and not metamorphic foliations (Shroeder, 2010).

   The mineralogical composition of the Sparta granite includes quartz, oligoclase feldspar, microcline feldspar, and biotite mica. Common accessory minerals are sphene, zircon, allanite, magnetite, and ilmenite-hematite. Locally zones of muscovite mica (light colored) chlorite (light green micaceous mineral) are present. Pegmatitic and aplitic dikes and segregations rarely cut the granite (Watkins, 1902; Dvoracek, 2003).

*Log Creek aggregate quarry site valuation, Warren County, Georgia*        19



Figure 5: Regional geologic map of the Log Creek project area (modified after Georgia Geologic Survey map of 1976). The primary rock type is granite (gr1) and the geologic map shows nearby thin deposits of Eocene sand (Ei), but none was encountered in the core drilling (Appendix A). For complete explanation of geologic units and symbology on the digital map go to: http://mrdata.usgs.gov/sgmc/ga.html

### 7.2.1 Weathering and alteration

In their October 2018 report (Appendix A), GeoLogic, LLC concluded that the overburden thickness in the quarry area varies from 5 to a maximum of 54 feet and averages about 26 feet thick in the proposed pit area and the QP and Capps Geoscience agrees with these conclusions. This equates to ultimately removing approximately 2.2 million cubic yards of overburden from the 68 acre ultimate pit. Most of the overburden will be incorporated into privacy berms surrounding the plant, quarry, and overburden storage areas as shown in Appendix A. Any remaining overburden will go to the designated overburden storage area at the Log Creek quarry site.

# 8 Drilling and exploration

GeoLogic, LLC supervised drilling and logged 4 diamond core holes in the proposed initial pit area to a maximum depth of 150 feet (Appendices A and B). The core was examined, logged, photographed, split, and stored in rigid boxes. Representative core samples were tested for physical properties to ASTM best practice standards and are discussed in the GeoLogic, LLC October 2018 evaluation/exploration report and attached as an original document in Appendix A.

## 8.1 Results

The results of testing three representative samples from the core holes showed that the rock is of excellent aggregate quarry quality (Appendix A). All estimates of thickness, overburden distributions, and physical properties used by this QP are from the original core logs (Appendix A).

Rock cores recovered from the borings were subjected to additional laboratory tests to determine the physical properties of the subsurface rock. The following laboratory tests were performed:

- LA Abrasion Test (AASHTO T-96/ASTM C131)
- Specific Gravity and Absorption of Coarse Aggregate (AASHTO T-255/ASTM C127)
- Clay Lumps And Friable Particles In Aggregate (AASHTO T-112/ASTM C142)
- Aggregate Soundness Test (AASHTO T-104/ASTM C88)

The test results indicate that the samples obtained meet Georgia Department of Transportation (GADOT) specifications for use as Group II Type A aggregates for both fine and coarse aggregates used in concrete and roadway materials (Appendix H). The test results are included in the Appendix of the evaluation/exploration report (Appendix A). Los Angeles Abrasion losses on samples from the core holes averaged 42% and ranged from a low of 40 to a high of 44%. Five cycle Magnesium Sulfate Soundness losses ranged from 0.2 to 0.3 percent and averaged 0.25 percent. Absorption averaged 0.47 percent with a range of 0.39 to 0.58%. Specific Gravity averaged 2.637 and ranged from 2.633 to 2.642. Flat and Elongated material was not measured but none was observed in the

test samples. A constant specific gravity may easily be maintained. Aggregates produced from the proposed Log Creek quarry should meet all GADOT specifications for crushed stone aggregates.

## 8.2   Mineral resource and reserve estimates

I examined the Log Creek quarry area and drill core and finds that the quality of the stone is consistent across the property areas and to the depth of drilling.  The 85 million ton resource within the ultimate 68 acre pit is a conservative estimate of measured (36.4 million tons) and indicated (48.6 million tons) aggregate resource at the Log Creek quarry site and (Appendices A and B). This resource is more than adequate to meet the reserve demand of 60.6 million short tons over the quarries project mine life. It is likely that more resource can be added in depth and area by additional drilling.

# 9   Market studies

The Log Creek quarry is well located to serve the rapidly growing Central Savannah River market area (CSRA) and, in the author's (QP) opinion, will absorb a significant market share from existing quarries and under-served projects in its average 50 miles market radius.

Stone is a natural resource that has high *value of place* and whose market is somewhat like that of water.  Like water, everyone uses stone and demand is directly proportional to the existing population base and rate of population growth.  Markets in areas of high population growth will require more stone than those with stable or declining populations.

Stone is purchased from the closest available source that can provide the quantity and quality necessary to match the customers' requirements. When a new stone quarry opens it will immediately begin attracting the nearest customers. In general, the new quarry will immediately begin to absorb market share from existing and future customers that are closer to it than to the established quarries. In addition, the new quarry will service clients that were beyond the profitable market area (about 50 miles) of the pre-existing quarries.

Once mined and crushed, the largest cost of stone is transportation to the point of application. The local market is served by truck with the buyers paying the cost of transportation (FOB). Stone can be transported for hundreds or thousands of miles where rail service is available and nearby production can greatly improve a given quarries market area and dramatically increase stone production. Production from the Log Creek quarry will be sold to both a local truck market and regional rail with loading in the northern quarry site and by a circular rail spur surrounding the quarry (See Mine Plan; Appendix B).

## 9.1   Demand

In general, population change, distance from quarry to point of application, and meeting state specifications for construction usages are the most important factors to a quarry's

crushed stone market. The crushed stone industry is highly dependent on construction activity. According to the 2018 USGS Mineral Year Book "In 2017, 1.33 billion tons of crushed stone valued at more than $15 billion was produced by an estimated 1,400 companies operating 3,700 quarries and 187 sales/distribution yards in 50 States. Leading States were, in descending order of production, Texas, Pennsylvania, Florida, North Carolina, Ohio, Missouri, Georgia, Kentucky, Virginia, and Indiana, which together accounted for more than one-half of the total crushed stone output. Of the total domestic crushed stone produced in 2017, about 70% was limestone and dolomite; 13%, granite; 6%, traprock; 5%, miscellaneous stone; 4%, sandstone and quartzite; and the remaining 2% was divided, in descending order of tonnage, among marble, volcanic cinder and scoria, calcareous marl, slate, and shell. It is estimated that of the 1.39 billion tons of crushed stone consumed in the United States in 2017, 76% was used as construction material, mostly for road construction and maintenance; 11% for cement manufacturing; 7% for lime manufacturing; 4% for other chemical, special, and miscellaneous uses and products; and 2% for agricultural uses.

The estimated output of crushed stone in the United States shipped for consumption in the first 9 months of 2017 was 1.01 billion tons, a slight decrease compared with that of the same period of 2016. Third quarter shipments for consumption decreased slightly compared with those of the same period of 2016. Additional production information, by quarter for each State, geographic division, and the United States, is reported in the U.S. Geological Survey quarterly Mineral Industry Surveys for Crushed Stone and Sand and Gravel."

It is important to note that all USGS production figures are in metric tonnes and must be first converted to short tons for comparison in this paper. The Society of Mining, Metallurgy, and Exploration (SME) in its annual analysis finds that in 2015 every person in the United States must be provided with over 4.5 short tons of stone in each year and so population increase is the fundamental factor driving an increase in demand for crushed stone. USGS figures are slightly less at a per capita consumption of 4.36 short tons of crushed stone aggregate

The United States Geological Survey tracks mineral commodities such as crushed-stone aggregate with production, usage, value data and statistics provided by each state. These summary commodity reports are one of the most commonly used means of assessing market conditions. However, the states are not required to provide this information and industry often withholds some or all of the data. Therefore, the USGS commodity summaries are inaccurate and incomplete but can be useful in demonstrating general trends of production.

The author (QP) discussed the reporting procedures and outcomes with Jason C. Willett (email:jwillett@usgs.gov and phone (703) 648-6473), Crushed Stone commodity specialist with the United States Geological Survey (USGS). Mr. Willett provided examples of the report process and derived statistics from the extensive database. Aggregate statistics from more than 10,000 aggregate quarries are updated yearly (Appendices E, F and Source of the list of mines USGS surveys - http://www.msha.gov/opengovernmentdata/ogimsha.asp and http://www.msha.gov/drs/drshome.htm "look-up page"). In assessing market of a stone quarry, it is important to know that stone quarry production data is closely held proprietary information. The USGS does not share this information and there are no

requirements to report these production figures to public agencies. The states are not required to provide this information and industry often withholds some or all of the data (see Appendix J for example of form and summary production graph). Therefore, the USGS commodity summaries are inaccurate and incomplete but can be useful in demonstrating general trends of production (see production graph Appendix J).

The Log Creek quarry site is well located to serve the aggregate needs of the rapidly growing southern CSX railroad corridor including Atlantic and gulf coast market areas and, in the author's (QP) opinion, will absorb a significant market share from existing quarries and under-served projects both regional and in its average forty- to fifty-mile local market radius (Figure 6 and Appendix G). Due to transportation costs, most crushed stone aggregate produced in Georgia is sold in Georgia. Because aggregate is a heavy, low cost per ton product, haul distance largely controls the price of aggregate.

The USGS Mineral Yearbook statistics for the Georgia crushed stone industry are not current and the last attempted complete report was from 2000. However, according to the USGS Minerals Commodities Summary 2014, crushed zone usage is increasing in Georgia and showed a 8% increase in crushed stone production between 2nd quarter 2013 and 2nd quarter 2014.

### 9.1.1 Local demand

Industry sources and population data indicate that the Log Creek quarry 50 mile truck market area (Figure 6 and Appendices G and I) used about 3,226,820 short tons of crushed stone aggregate in 2015 and will likely need about 4,033,332 short tons by 2030 (Table 2).

This entire market area can be served by Free-On-Board (FOB) truck delivery whereby the buyer must pay to have the goods delivered (typically with the buyer's trucks) and the seller will have no delivery expenses. Georgia Department of Transportation projects including several bids and details of contracts active 2018 in the market area can be found on the Georgia DOT website at

http://www.dot.ga.gov/BS/Projects/ProjectSearch

and also see Georgia DOT bids at

https://connect.ncdot.gov/letting/Pages/default.aspx.

Amendments to representative bids are included with prices in Appendix D.

### 9.1.2 Regional demand

There are at least three large region-specific markets that can be served by the Log Creek quarry. These markets typically are deficient in supply and higher prices are paid for the stone.

Market 1. A major market is the rail shipments of aggregate to regions without significant crystalline rocks. The Log Creek quarry aggregates have physical properties appropriate to road surfaces and are desirable for asphalt production as well as concrete.

To the south and east the entire Atlantic and Gulf Coast coastal plain regions are poor in hard rock aggregate resource and include The Carolinas, Florida, Alabama, Louisiana, Mississippi, and some areas of Texas along the Gulf. The coastal markets include higher dollar applications such as jetty stone as well as other classifications and jetty stone is currently shipped from existing quarries in the Log Creek quarry market area.  It is the opinion of the QP that the demand for aggregate greatly exceeds the supply because these areas are among those with the highest population increases in the United States.

Market 2.  A growing market for stone is the metropolitan areas of the Gulf coast and Texas.  Many of the older quarries nearest to Houston and other Coastal Plain cities are deep and near the end of their productivity.  They have no room to expand, but demand remains high because some of them have eliminated existing asphalt operations to expand the quarry into these areas.  The Log Creek quarry can transport aggregate to these areas by CSX railroad and other rail connections.

The Log Creek quarry site is well positioned to serve the needs of the rail market and nearer to the large Texas and gulf coast markets than other large production quarries.  The strength of the regional rail market is shown by the rapid expansion and 24 hour operation of large midwestern quarries such as the Dolese Brothers Richards Spur quarry near Lawton, Oklahoma.  The Richards Spur limestone quarry has been in operation since 1907.  The quarry was listed as the 15th highest producing quarry in the United States in 2013 and produced more than 4 million tons in 2016.

Market 3.  Railroad ballast is a large market where demand annually exceeds supply.  Annual reports published by Union Pacific, CSX and Norfolk Southern Corporations reveal significant Net Accumulated Depreciation balances of total ballast.  Much of this ballast is replaced on 6 year cycles and often can not be directly recycled.

In 2014, CSX Corporation reported a Net ballast cost of $2,693M and a Net Accumulated Depreciation of $679M which would represent about 336 million tons of ballast aggregate if sold from the Log Creek quarry at the very conservative price of $8 per ton used in this valuation.  Using the same price, this represents an increase of over 4 million short tons from the previous years CSX ballast depreciation figures.

In 2014, Norfolk Southern Corporation reported a Net ballast cost of $2,360M and a Net Accumulated Depreciation of $498M which would represent about 295 million tons at the $8 per short ton used in this valuation.


## 9.2   Production

Typically the first year or two of production in a competitive market is less than succeeding years due to the need to capture a portion of the existing market but preferably without reducing prices.  This can mean initially slow growth for aggregate quarries that must rely on the construction market.

As explained above within this Market Studies section, the current available and future markets rely entirely upon the population of the area served by the Log Creek quarry.  The quarry closest to existing project sites with the necessary products for those projects will eventually acquire that business.  The cost of transportation is the strongest factor driving the choice of quarry for a project.  Log Creek quarry would be expected to acquire a small

percent of the existing market in it's first year of operation and take more of that market in subsequent years.

This valuation estimates a total of 60.6 million short tons mined and processed over a 25 year period by the Log Creek quarry with 7.2 million short tons contributed from the FOB truck market and 53.4 million short tons from rail market (Tables 3, 4, and 5). The truck market rate is modeled as 150,000 tons in Year 1, 250,000 in years 2 and 3, and 300,000 tons in years 4 through 25 as the market matures. The author (QP) sets a slower production rate for the first three years to allow the establishment of the ultimate quarry site and market for the Log Creek quarry. The rail market annual production is modeled as escalating over a 25 year period from 1.6 unit trains (about 9,000 tons per unit train) per week or 800,000 tons in Years 1 and 2, 2 unit trains per week or 1,000,000 tons per year in Years 3 and 4, 1,336,400 tons in Years 5 through 7 and then or the equivalent of adding about half a unit train per year through mine life.

## 9.3   Price

As discussed in Section 9.1 the USGS commodity summary figures are based on voluntary reporting by mining companies and so are inaccurate and incomplete but can show useful trends. According to the United States Geological Survey 2018 Mineral Commodity Summary, 1.40 billion tons of crushed stone valued at more than $16.6 billion or $11.85/ton was produced by an estimated 1,465 companies operating 3,710 quarries and 176 sales and (or) distribution yards in 50 States (Appendix G). Production and price have shown a steady rise since 2011. The production in 2011 was 1.16 billion tonnes at $9.65/tonne, in 2012 was 1.17 billion tonnes at $9.73/tonne, and in 2013 was 1.25 billion tonnes at $ 9.75/tonne. The USGS data shows that the third-quarter 2013 shipments for consumption increased by 8% over those of the same period in 2012 (Appendices E and F).

The largest aggregate producing companies in Georgia are Vulcan Materials Company, Martin Marietta Aggregates, and Hanson Aggregates (Appendix G). All of these corporations have active quarries within the Log Creek market area, and their presence is clear evidence of a viable aggregates market. The author reviewed price sheets from all of the producers and asked sales associates about discounting practices. The author obtained current public price sheets from the Hanson. These sales prices and representative historic data are shown in Appendix D. The current average sales price from a relatively nearby Hanson quarry is $25.26/ton, but high volume customers generally receive a significant per ton discount over the listed price. The company generally considers volume, product type, and credit history in determining the discount for each customer. The author interviewed several sales offices and industry professionals and the discounts typically range from about one dollar to three dollars. Examples of these discounts are included in Appendix D in the form of amendments to Georgia State Department of Transportation contracts with the Georgia aggregates industry.

In 2018 using a discount of three dollars per ton, the author concludes that a conservative average sale price for the Log Creek quarry aggregate truck market would be $22/ton. However, the initial sales might likely be of lower grade stone such as commer-

cial base and so a sales price of $15.05 was set as a conservative figure for initial quarry truck market production and this valuation. The lower price does have a very significant negative effect on the cumulative NPV of the quarry, but the positive NPV suggests the aggregate resource would still be profitable. The sales price is $14.00 per ton for rail shipments.

## 9.4   Conclusion

I conclude that demand is expected to continue as moderate to high in the market area and that the supply from the Log Creek quarry could be absorbed by the market (Appendix G; Figure 6; Table 2).

The major aggregate operations would initially continue to dominate the immediate local market to the west and north but the Log Creek quarry would have a significant advantage over the many of these quarries due to the age of the existing quarries and location to population centers. In addition, physical rock quality (Appendix A) meets the parameters for use in concrete and so would increase the market for the Log Creek quarry aggregate (Appendix H).

# 10   Environmental studies, permitting and social or community impact

## 10.1   Environmental studies

Log Creek has conducted ecological and wetland studies at the quarry site (Appendix B). No additional environmental studies have been requested or performed at the Log Creek quarry site and the author sees no reason to perform phased studies at this time.

## 10.2   Permitting

In order to open an aggregates quarry in Georgia, a quarry operator must be properly zoned and have an approved surface mining permit in place with the Georgia Department of Natural Resources, Environmental Protection Division (Georgia EPD) Surface Mining Unit. Other permits required are a Storm Water Discharge Permit and an Air Emissions Permit. Log Creek, LLC was in the process of applying for all necessary permits in 2018 and Appendix B is an addendum to the 2018 report containing the Ecological Survey, Mine Plan, and permit applications.

In the author's experience it is reasonably probable that the mining, storm water, and air emission permits will be granted for the Log Creek quarry and that Log Creek will obtain a Conditional Use Permit to operate the quarry on these current agricultural lands.

Typically the Mined Land Use Plan submitted to the EPD requires a 50 foot buffer surrounding the quarry. Additional Plan requirements typically include a limit on the height of berms and overburden storage, a riparian buffer of 50 feet, and the slopes of reclaimed unconsolidated material must not exceed a 3:1 ratio of width to height. In addition, buffers from property lines are generally 75 feet and 300 feet from dwellings.

## 10.3   Community impact

A review of the county zoning plan shows that there are no changes affecting the quarry area and there should be no significant community impact. The property must obtain a Conditional Use Permit to operate the quarry. It is the author's opinion (QP) that the Conditional Use Permit will be granted (Appendix K).

# 11   Capital and operating costs

This current valuation focuses on the mineral resource and reserves and not on the project infrastructure. The infrastructure and operating costs are generally about one-half of the average per ton sales price. The Log Creek quarry project is wholly owned by Log Creek, LLLP. Log Creek, LLLP intends to start the quarry under a contract mining agreement.

Additional costs of operating the Log Creek quarry would be relatively minor startup fees such as establishing electric services. The rock quality, mining conditions, and anticipated rate of production at the Log Creek quarry are very similar to those at currently operating crushed stone aggregate quarries in the area, and these provide a good model for the Log Creek quarry. The costs are included within the contract mining agreement and include variable costs such as gas and electricity as well as period costs such as site preparation, scales, office expenses, labor, quality control, depreciation, equipment mobilization, insurance, property taxes, freight, permitting (consulting) diesel fuel, explosives, supplies, and miscellaneous equipment.

The author is familiar with contract mining estimate in this area and a cost per short ton of about $8.75 and is consistent with the information available. This cost will decrease as the quarry operations reverts to the owners using their own equipment and personnel.

# 12   Economic analysis

## 12.1   Method of evaluation

An income based discounted cash flow model was created to evaluate the Log Creek quarry project mineral resource assuming the project is 100% equity financed. All revenues and costs are expressed in US dollars.

Aggregate costs were determined by requesting bid information on contract mining cost which include comminution, fuel equipment, and miscellaneous costs. A contract mining cost of $8.75 is used in this valuation for the truck market and rail production. All crushed stone sales in this document are stated as Free-on-board sales (FOB).

## 12.2   Input parameters

The key criteria, principal assumptions and input parameters used in the *Base Case* are shown in Table 3. The discount rate for the production transported in the local truck market is 12.5% and the discount rate for production transported by rail is 10%. The base discount rate of 9.5% is calculated from summing current U.S. Treasury Bond rate of 2.5% and industry bond rate based on published Vulcan Materials Corporation (VMC; coupon rates of 7.0% (Discount Rate = 2.5%+7.0%=9.5%) published by Morningstar Ratings. An additional 3% is added to the base truck market discount rate to allow for the uncertainties inherent in establishing the new quarry in the market area. The project mine-plan area is 100% owned by Log Creek, LLLP (Appendix B).



Figure 6: Local market area showing counties

Table 2: Population trends of the Log Creek quarry market area and resource base at 4.5 tons per year per capita (Appendix I)

| County | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| Baldwin | 47,858 | 51,125 | 54,384 | 57,682 | 60,988 |
| Bibb | 16,360 | 18,640 | 20,971 | 23,499 | 26,134 |
| Columbia | 117,121 | 134,593 | 153,346 | 174,038 | 193,983 |
| Glascock | 2,854 | 2,952 | 3,029 | 3,091 | 3,135 |
| Greene | 16,360 | 18,640 | 20,971 | 23,499 | 26,134 |
| Hancock | 9,538 | 9,884 | 10,132 | 10,337 | 10,562 |
| Jasper | 14,731 | 17,344 | 20,237 | 23,572 | 27,065 |
| Johnson | 9,698 | 9,979 | 10,272 | 10,555 | 10,849 |
| Jones | 28,931 | 32,905 | 37,004 | 41,534 | 45,743 |
| Laurens | 49,125 | 52,801 | 56,383 | 60,060 | 63,812 |
| Lincoln | 8,289 | 9,060 | 9,733 | 10,356 | 10,931 |
| McDuffie | 22,448 | 24,499 | 26,403 | 28,312 | 30,205 |
| Morgan | 19,432 | 22,019 | 24,787 | 27,832 | 31,090 |
| Oglethorpe | 14,940 | 17,601 | 20,620 | 24,127 | 28,081 |
| Putman | 21,092 | 23,023 | 24,855 | 26,738 | 28,705 |
| Richmond | 201,897 | 209,633 | 217,244 | 224,620 | 231,476 |
| Taliferro | 1,881 | 1,955 | 2,016 | 2,063 | 2,092 |
| Twiggs | 10,434 | 11,187 | 11,866 | 12,547 | 13,041 |
| Warren | 5,871 | 6,051 | 6,166 | 6,248 | 6,335 |
| Washington | 21,372 | 22,477 | 23,326 | 24,000 | 24,588 |
| Wilkes | 10,295 | 10,448 | 10,587 | 10,729 | 10,865 |
| Wilkinson | 10,077 | 10,255 | 10,352 | 10,406 | 10,482 |
| Totals= | 633,892 | 717,071 | 774,684 | 835,845 | 896,296 |

| | |
|---|---|
| Population increase 2030-2015= | 179,225 |
| % increase in population= | 25.0 |
| Tons needed by market in 2015=* | 3,226,820 |
| Tons needed by market in 2030=* | 4,033,332 |
| Tons increase= | 806,513 |

*4.5 tons/person (USGS, 2015 estimate)

Table 3: Crushed stone aggregate: Key criteria, principal assumptions, and input parameters used in the base case

| Item | Key Criterion/Principal Assumptions |
|------|-------------------------------------|
| Quarry operations | Conventional open pit mining |
| | |
| Quarry mining Method | Saprolite is bulldozed and/or excavated, loaded, and hauled, and fresh rock is drilled, blasted, loaded and hauled |
| | |
| | |
| | |
| Total Resource | Total resources of over 85 million short tons including a measured resource of 36.4 million short tons if mined to a depth of 300 feet (about 200 foot elevation) in the ultimate 68 acre pit and an indicated resource of 48.6 million tons if mined to the 98.4 foot elevation of the nearby Martin Marietta quarry floor. Total resource estimate based on example mine plan (Appendix A) are over 85 million short tons. |
| | |
| | |
| Projected mine life | 25 years |
| | |
| | |
| Total proven mineral reserves | Truck market: 7.2 million short tons mined and processed and Rail market: 53.4 million short tons mined and processed |
| | |
| | |
| Total overburden mined | About 2.2 million cubic yards in the 68 acre proposed quarry |
| Saprolite Mining | The gneissic granite and granite pavement is locally exposed at the surface but some saprock and saprolite will be removed. Uses of overburden: Commercial ABC; berm and site preparation around quarry site; overburden storage areas as shown in proposed mine plan and expansion plan (Appendix A) |
| Fresh rock mining | 7.2 million tons total production in the truck market with 150,000 tons mined in Year 1, 250,000 tons in Years 2 - 3, and with about 300,000 short tons produced in years 4 through Year 25 (mine life) and 53.4 million tons in the rail market. The rail market annual production is modeled as escalating over a 25 year period from 1.6 unit trains (about 9,000 tons per unit train) per week or 800,000 tons in Years 1 and 2, 2 unit trains per week or 1,000,000 tons per year in Years 3 and 4, 1,336,400 tons in Years 5 through 7 and then adding about half a unit train per year through 25 year of the rail reserve. Additional reserves are likely with additional drilling in quarry length and depth. |
| Average sales price | An average base sale price of $15.05/ton was used for the truck market. This price is lower than the average local market for ABC (Appendix D. Price Lists). A price of $14.00/ton was used for the rail market. |
| Royalties | None |
| | |
| Operating Costs and Escalation | A base cost of US$8.75 per mined ton is used in this valuation based on typical contract mining costs in the area. The price includes cost for processing overburden and FOB loading: no annual increase is included in this valuation. |
| Depreciation | Depreciation of Mining and processing equipment is accounted for in the cost of production |
| Projected corporate tax rate | This valuation does not include tax rate estimation |
| All Permitting and approvals; construction can begin | Construction can begin within first year after the Log Creek quarry site is permitted by the Georgia EPD as an active quarry site (Appendix A). |
| Construction completed | With in the second year of operation |
| Industry comparable quarries for pricing and discount rate calculation | Operating Martin-Marietta, Vulcan, and Hanson aggregate quarries are with the market area of the quarry site. List price sheets were obtained from nearby quarries and used for sales comparison. Current Corporate bond coupon rates for moneys borrowed by Vulcan Materials Corporation and the current Treasury bond rates were used for discount rate criteria. |
| Discount Rate | 12.5% for truck market calculated from sum of U.S. Treasury Bond rate of 2.5% and industry bond rate based on published Vulcan Materials Corporation (WR) coupon rates of 7.0%. An additional 3% is added to account for uncertainties associated with startup (Discount Rate = 2.5%+7.0%+3%=12.5%). The Discount rate for the rail market is 10%. |

## 12.3   Cash flow forecasts and annual production forecasts

Based on the parameters shown in Table 3 and as calculated in Section 12 of this report, the value of the combined FOB truck market (7.2 million short tons; 12.5% discount rate) and rail market (53.4 million short tons; 10% discount rate) crushed stone aggregate mined and classified at the Log Creek quarry, is rounded to US$89.8M (Tables 4 and 5). This project forecast suggests that the Log Creek quarry site project would be profitable in the first year of full operation

Table 4: Net Present Value (NPV) for FOB truck market aggregate production from the Log Creek quarry, Warren County, Georgia

| Year | Production (short tons) | Sales received (US$) | Cost to produce (US$) | Net Profit (US$) | Present Value (US$) | Cumulative present value (US$) | Base values | |
|---|---|---|---|---|---|---|---|---|
| 1 | 150,000 | $2,257,500 | $1,312,500 | $945,000 | $840,000 | $840,000 | Production Cost per short ton (US$/ton.)= | $8.75 |
| 2 | 250,000 | $3,762,500 | $2,187,500 | $1,575,000 | $1,244,444 | $2,084,444 | Avg. price per short ton (US$/ton)= | $15.05 |
| 3 | 250,000 | $3,762,500 | $2,187,500 | $1,575,000 | $1,106,173 | $3,190,617 | Discount rate (%)*= | 12.5% |
| 4 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $1,179,918 | $4,370,535 | Mine life (years)= | 25 |
| 5 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $1,048,816 | $5,419,351 | Total production (short tons)= | 7,250,000 |
| 6 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $932,281 | $6,351,631 | *Average long term T-bond (2.5%) + average | |
| 7 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $828,694 | $7,180,325 | corporate bond coupon rate (7.0%) for a current | |
| 8 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $736,617 | $7,916,942 | Basic Materials Industry major corporation | |
| 9 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $654,770 | $8,571,713 | | |
| 10 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $582,018 | $9,153,731 | | |
| 11 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $517,350 | $9,671,080 | | |
| 12 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $459,866 | $10,130,947 | | |
| 13 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $408,770 | $10,539,717 | | |
| 14 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $363,351 | $10,903,068 | | |
| 15 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $322,979 | $11,226,046 | | |
| 16 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $287,092 | $11,513,139 | Net Present Value (NPV) Valuation at 12.5% (+30% from Base Discount Rate) for aggregate production | |
| 17 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $255,193 | $11,768,332 | | |
| 18 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $226,838 | $11,995,170 | | |
| 19 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $201,634 | $12,196,804 | | |
| 20 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $179,230 | $12,376,034 | | |
| 21 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $159,316 | $12,535,350 | | |
| 22 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $141,614 | $12,676,964 | | |
| 23 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $125,879 | $12,802,843 | | |
| 24 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $111,893 | $12,914,736 | | |
| 25 | 300,000 | $4,515,000 | $2,625,000 | $1,890,000 | $99,460 | $13,014,196 | | |
| | | | | NPV= | $13,014,196 | | | |

2018 CARRYOVER ATTACHMENT - EXHIBIT C: NORRIS CASON

Table 5: Net Present Value (NPV) for railroad aggregate production from the Log Creek quarry, Warren County, GA

| Year | Production (short tons) | Sales received (US$) | Cost to produce (US$) | Net Profit (US$) | Present Value (US$) | Cumulative present value (US$) | Base values | |
|---|---|---|---|---|---|---|---|---|
| 1 | 800,000 | $11,200,000 | $7,000,000 | $4,200,000 | $3,818,182 | $3,818,182 | Production Cost per short ton (US$/ton.)= | $8.75 |
| 2 | 800,000 | $11,200,000 | $7,000,000 | $4,200,000 | $3,471,074 | $7,289,256 | Avg. price per short ton (US$/ton)= | $14.00 |
| 3 | 1,000,000 | $14,000,000 | $8,750,000 | $5,250,000 | $3,944,403 | $11,233,659 | Discount rate (%)*= | 10.0% |
| 4 | 1,000,000 | $14,000,000 | $8,750,000 | $5,250,000 | $3,585,821 | $14,819,480 | Mine life (years)= | 25 |
| 5 | 1,336,000 | $18,704,000 | $11,690,000 | $7,014,000 | $4,355,142 | $19,174,622 | Total production (short tons)= | 53,428,358 |
| 6 | 1,336,000 | $18,704,000 | $11,690,000 | $7,014,000 | $3,959,220 | $23,133,842 | *Average long term T-bond (2.5%) + average | |
| 7 | 1,336,000 | $18,704,000 | $11,690,000 | $7,014,000 | $3,599,291 | $26,733,133 | corporate bond coupon rate (7.0%) for a current | |
| 8 | 1,340,000 | $18,760,000 | $11,725,000 | $7,035,000 | $3,281,879 | $30,015,012 | Basic Materials Industry major corporation | |
| 9 | 1,808,040 | $25,312,560 | $15,820,350 | $9,492,210 | $4,025,624 | $34,040,636 | | |
| 10 | 1,812,120 | $25,369,680 | $15,856,050 | $9,513,630 | $3,667,916 | $37,708,552 | | |
| 11 | 1,816,242 | $25,427,388 | $15,892,118 | $9,535,271 | $3,342,054 | $41,050,606 | | |
| 12 | 2,292,404 | $32,093,656 | $20,058,535 | $12,035,121 | $3,834,760 | $44,885,367 | | |
| 13 | 2,296,608 | $32,152,512 | $20,095,320 | $12,057,192 | $3,492,539 | $48,377,906 | | |
| 14 | 2,300,854 | $32,211,956 | $20,132,473 | $12,079,484 | $3,180,906 | $51,558,811 | | |
| 15 | 2,305,143 | $32,272,002 | $20,170,001 | $12,102,001 | $2,897,123 | $54,455,934 | | |
| 16 | 2,309,474 | $32,332,636 | $20,207,898 | $12,124,739 | $2,638,696 | $57,094,630 | Net Present Value (NPV) Valuation at 10.0% (+6% from Base Discount Rate) for aggregate production | |
| 17 | 2,781,849 | $38,945,886 | $24,341,179 | $14,604,707 | $2,889,463 | $59,984,094 | | |
| 18 | 2,786,267 | $39,007,738 | $24,379,836 | $14,627,902 | $2,630,957 | $62,615,051 | | |
| 19 | 2,790,730 | $39,070,220 | $24,418,888 | $14,651,333 | $2,395,610 | $65,010,661 | | |
| 20 | 2,795,237 | $39,133,318 | $24,458,324 | $14,674,994 | $2,181,344 | $67,192,005 | | |
| 21 | 3,267,790 | $45,749,060 | $28,593,163 | $17,155,898 | $2,318,286 | $69,510,291 | | |
| 22 | 3,272,388 | $45,813,432 | $28,633,395 | $17,180,037 | $2,110,498 | $71,620,790 | | |
| 23 | 3,277,031 | $45,878,434 | $28,674,021 | $17,204,413 | $1,921,357 | $73,542,147 | | |
| 24 | 3,281,722 | $45,944,108 | $28,715,068 | $17,229,041 | $1,749,189 | $75,291,335 | | |
| 25 | 3,286,459 | $46,010,426 | $28,756,516 | $17,253,910 | $1,592,467 | $76,883,802 | | |

NPV= **$76,883,802**

## 12.4   Sensitivity analysis and limitations

Several model truck market NPV models are shown in Appendix C and plotted to show relative sensitivity to changes in key operating and economic parameters is shown in Figure 7.  By inspection, the Log Creek quarry project is most sensitive to the average sales price (ASP) of aggregate and this is a factor that could be most directly affected by competition and demand.

Appendix C considers NPV valuations for the Log Creek aggregate resource in 10 percent increments of the *Base Case* for discount rate (DR), cost (Cost), and average sales price (ASP). The base model produces an NPV valuation of US$16.4M at 9.5% discount rate for aggregate reserves mined over 25 years.  The QP and author of this study, Richard C. Capps, chooses a conservative US$13M with a 12.5 percent discount rate which is 3% higher than the base case. The 12.5 percent discount rate is 30 percent higher than the base rate of 9.5 percent used in this study as recognition of the risk involved in starting a new quarry.

# 13   Adjacent properties

There are active and inactive aggregate quarry sites near but not adjacent to the proposed Log Creek quarry site.  A map showing the locations of major aggregate quarries relative to the Log Creek quarry site is shown in Appendix G. The nearest active quarry is an Aggregates USA quarry near Sparta, Georgia, about 7.8 miles southwest of the Log Creek quarry site.

# 14   Other relevant data and information

No other additional information or explanation is considered necessary to make the technical report understandable and not misleading.

# 15   Conclusions and recommendations

As calculated in Section 12 and Appendix C this report, the value of the aggregate reserve at the Log Creek quarry is rounded to a total resource valuation of US $89.8M. The criteria and assumptions for this valuation are based on market studies by the author, prices obtained from industry sources, discount rate criteria from publicly available sources, and information provided by Log Creek, LLLP.

It is my opinion, as geologist and QP of Capps Geoscience that, there are total resources (measured and indicated) of over 85 million short tons of aggregate resources and that these resources are more than adequate to complete the quarry reserve demand requirements of 60.6 million short tons over the projected mine life of 25 years if mined to



Figure 7: NPV sensitivity for Log Creek quarry site truck market

an elevation of about 200 feet for the measured resource and 98.4 feet for the indicated resource in the ultimate 68 acre pit (Appendices A and B). The my opinion is that the resource can be expanded in depth and area by additional core drilling.

I conclude that there is both a local truck and a regional rail demand and that the supply from the Log Creek quarry site could be absorbed by this strong local (Table 2) and regional market. The major aggregate operations would initially continue to dominate in the rail market but the Log Creek quarry would be shallower and therefore less expensive to operate.

The most profitable use of the Log Creek quarry site would be to produce and sell crushed stone aggregate.

# 16    References and selected bibliography

Clark, S., 2008, Geology of the Southern Appalachian Mountains: Scientific Investigations Map 2830: U.S. Department of the Interior United States Geological Survey.

Cook, F., Albaugh, D., Brown, L., Kaufman, S., Oliver, J., and Hatcher, R., 1979, Thin-skinned tectonics in the crystalline southern Appalachians; COCORP seismicreflection profiling of the Blue Ridge and Piedmont: Geology, v. 7, p. 563–567.

Dallmeyer, R., 1978, 40Ar/39Ar incremental-release ages of hornblende and biotite across the Georgia inner Piedmont: their bearing on the late Paleozoic-early Mesozoic tectonothermal history: American Journal of Science, v. 278, p. 124–149.

Dallmeyer, R., Hess, J., and Whitney, J., 1981, Post-magmatic cooling of the Elberton Granite; Bearing on the late Paleozoic tectonothermal history of the Georgia Inner Piedmont: Journal of Geology, v. 89, p. 585–600.

Dicken, C., Nicholson, S., Horton, J., Foose, M., and Mueller, J., 2007, Preliminary integrated geologic map databases for the United States; Alabama, Florida, Georgia, Mississippi, North Carolina, and South Carolina: USGS Digital Map.

Dvoracek, D., 2003, Geochemical and geochronological study of the Danberg and Sandy Hill granitoids and associated mafic enclaves, northeastern Georgia [Ph.D. thesis]: University of Georgia, Department of Geology, Unpublished Ph.D. dissertation, 260 p.

Gore, P., and Witherspoon, W., 2013, Roadside Geology of Georgia: Atlanta, Georgia, Mountain Press Publishing Company, 360 p.

Hatcher, R., 1978, Tectonics of the Western Piedmont and Blue Ridge, Southern Appalachians: Review and speculation: Am.J.Sci., v. 278, p. 176–304.

Lawton, D., and others., 1976, Geologic Map of Georgia, Scale 1:500,000: Georgia Geological Survey, scale=1:500,000.

Schroeder, P., and Allard, G., 2010, Elberton Georgia Granite: Geology and Industry Insights: AAPG Foundation Trustee Associates Field Trip-October 26, 2010.

Torries, T. F., 1998, Evaluating Mineral Projects: Applications and Misconceptions, 153pp.

Watson, T.L, 1902, Preliminary Report on a Part of the Granites and Gneisses of Georgia: Georgia Geological Survey, Atlanta, Georgia, Bulletin 9-A, 410pp.

## 17 Certificate of Author

I, Richard Crissman Capps, PhD, a Professional Geoscientist of Evans, Georgia, USA, hereby certify that:

1.      I am a geologist and president of Capps Geoscience, LLC, with physical address at 455 Columbia Industrial Blvd., Suite 1, Evans, Georgia USA 30809-5603 and receive mail at P.O. Box 2235, Evans, GA 30809-5603 and provide geological consulting services. I am responsible for the preparation of the technical report entitled: RESOURCE VALUATION REPORT – LOG CREEK QUARRY SITE, WARREN COUNTY, GEORGIA, USA (the "Technical Report") with an effective date of 20 December 2018 relating to the Log Creek, LLLP, ("Log Creek") quarry site property.

2.      I am a graduate of the University of Georgia, Athens, Georgia with a PhD in Economic Geology awarded in August, 1996, an MS in Geology in 1981 and a BS in Geology in 1974 and have practiced my profession continuously since graduating with an MS in Geology in 1981.

3.      I was a consulting geologist from 1987 until June 2006, an employee of Gold Reef International Inc. from 2006 until 2008, and am currently a consulting geologist.

4.      I was an Associate Professor of Geology at Augusta State University from 1999 until June 2006 and taught geology at Augusta State since 1999. I am a Registered Professional Member of SME and a Registered Professional Geologist in Georgia, USA (License number 000814) and Alabama, USA (License number 1347). I am a member of the Geological Society of Nevada, Society of Economic Geologists, Geological Society of America, and the American Geophysical Union.

5.      Since 1978 I have been involved in mineral exploration for precious metals, base metals, uranium, and industrial minerals. A current Curriculum Vitae is attached. I have worked extensively on projects in Montana, Nevada, Arizona, and California in the western USA; on exploration projects in North and South Carolina, Alabama, Georgia, Kansas, Missouri, and Tennessee in the eastern USA and international projects including the Nassau Project of Suralco in Suriname and on projects in Mexico.

6.      I have read published documents relevant to the Log Creek quarry site area.

7.      I have read the definition of "qualified person" set out in National Instrument 43-101 ("NI 43-101") and certify that by reason of my education, affiliation with a professional association (as defined in NI 43-101) and past relevant work experience, I fulfill the requirements to be a "qualified person" for the purposes of NI 43-101. I have read the National Instrument 43-101 and Form 43-101F1 and this report has been prepared in compliance with National Instrument 43-101.

8.      As of the effective date of the Technical Report, to the best of my knowledge, information and belief, the Technical Report contains all scientific and technical information that is required to be disclosed to make the Technical Report not misleading.

9.      The author and Qualified Person for the current report, Richard C. Capps, PhD, QP, Georgia RPG and SME registered member geologist, visited the Log Creek quarry site on 17 February 2021.

10.      I have had no prior financial involvement with the property that is the subject of the Technical Report and will be compensated for this report and subsequent consultations and testimony and testimony regarding the report at rates as established by and typical of Capps Geoscience, LLC, and my industry. I have not testified during the previous 4 years as an expert witness at trial or by deposition.

11.      I am independent of Log Creek, LLLP applying all the tests in Section 1.5 of NI 43-101. I hereby grant Log Creek, LLLP the use of this Technical Report in support of documents submitted to any financial or regulatory authority and any publication by Log Creek, LLLP including electronic publication.

**SME**
Society for
Mining, Metallurgy
& Exploration
Dr. Richard C. Capps
SME Registered Member No. 4169175
Signature
Date Signed 25 February 2022
Expiration date 31 December 2022

Richard C. Capps, PhD, SME Registered Geologist
Dated at Evans, Georgia, USA, this 28th day of February 2022.

## 18   Curriculum vitae

**Richard C. Capps, PhD, RPG & QP**
**SME Registered Member**

P.O. Box 2235, Evans, GA  30809
Phone: Mobile: 706.836.8855
Office:  706.993.1567

**Exploration & Mining Geologist**

Email: crisscapps@gmail.com

Over 45 years of experience in gold, base metals, uranium and industrial minerals exploration in Nevada, California, Montana, Kansas, Missouri, Arizona, Southeastern United States, Suriname and Mexico.

### PROFESSIONAL EXPERIENCE

**Capps Geoscience, LLC**                                                          **Current, 2012 DBA**
**R. C. Capps & Associates**                                                       **2009-2012**
**Exploration and mining consulting geologist** – Consulting geologist in support of precious and base metals exploration projects and providing NI 43-101 compliant technical reports and valuations studies, for clients in the southeastern USA, Missouri, Kansas, Montana, Nevada, Suriname, and Mexico. Experience in all phases of exploration and mine geology including prospect generation, project evaluation, and claims maintenance.
**Environmental consulting geologist** - Project management of phased environmental mitigation and monitoring projects for American Environmental & Construction Services, Alpharetta, Georgia.

**Gold Reef International, Inc.**                                                    **2006-November 2009**
**Vice President, Exploration** - Acquired, explored and evaluated Nevada mineral resource properties for Gold Reef. Authoring NI 43-101 compliant reports for Nevada prospects. Experience included prospect generation, project evaluation, and claims maintenance.

**Augusta State University**                                                        **1999-2006**
**Associate Professor of Geology** – Taught geology and introductory physics. Research and seasonal consulting work on exploration projects in northern Nevada and Suriname. Nevada exploration included managing a reverse-circulation drilling program in the northern Adobe Range for Carlin-style Jerritt-Canyon type gold mineralization and geologic mapping/geochemical sampling on 10 prospects mostly in Elko, Lander, and Eureka Counties. Suriname exploration included geologic mapping, geologic sampling, and auger programs conducted from fly camps in the jungle of southeastern Suriname as part of Alcoa's Nassau Project. Subsequent Nassau Project work included logging several thousand feet of core from the Gowtu Bergi Prospect (now Merian Gold Mine) for stratigraphic/structural analyses, and petrography/petrology of the mineralized zones.

**R. C. Capps & Associates**                                                        **1996-1999**
**Exploration and mining consulting geologist** – Exploration included geologic mapping and core drilling at the Buzzard Prospect, South Carolina and Deep River Prospect, North Carolina for Cepeda Minerals, Inc. and geologic mapping of Gold Reef of Nevada's Double Mountain Prospect, Elko Country, Nevada.

**Department of Geology, University of Georgia**                                     **1994-1996**
**Research geologist** – Logging detailed lithology, structure, mineralogy, veining, and porosity in drill core of Paleozoic metamorphic rocks from the Savannah River Site (SRS), Aiken, SC. Research supported by an ERDA research grant.

**R. C. Capps & Associates**                                                        **1986-1994**
**Exploration, mining, and environmental consulting geologist** – Gold exploration for Viceroy Gold Corporation and Channel Resources, Inc. Most exploration was in the Castle Mountains, Hackberry Mountain, New York Mountains, and Piute Mountains areas of Clark County, Nevada and San Bernardino County, California. Exploration was along the northern Colorado River extensional corridor for about 15 Ma volcanic-hosted epithermal gold deposits. In general, these deposits are syngenetic with respect to rhyolite dome formation, high and low angle faulting, and detachment surfaces associated with the 15 to 14 Ma extension. As an environmental geologist at the Savannah River Plant, Aiken, S.C, I helped establish a groundwater monitoring program for site.

**Arizona Bureau of Geology and Mineral Technology**                    **1985-1986**
**Field geologist** - Duties included regional geologic mapping in detachment-terrain of west-central Arizona, map compilation, project reports, and collection of samples for geochemistry and age dating.

**Amselco Exploration, Inc.**                                           **1983-1985**
**Exploration geologist** - Exploration for precious metals in Nevada, Arizona, and California. Duties included geologic mapping, geochemical sampling, project management, project evaluation, exploration drilling and supervision of geotechnical personnel. Magnetometry, self potential studies, and geochemistry were utilized during prospect evaluation.

**Marathon Resources Incorporated**                                      **1981-1983**
**Exploration geologist** - Exploration for gold and molybdenum deposits in California and Nevada. Duties included geologic and geochemical mapping, project management, project evaluation, exploration drilling and supervision of geotechnical personnel.

**Chihuahua Volcanics Project**                                          **1977-1981**
**Field geologist** - Joint research project with the National Science Foundation and Consejo De Recursos Minerales, Mexico City, Mexico. The research included exploration for uranium as well as base and precious metals. Uranium mineralization was determined to be associated with Tertiary age rhyolite ash-flows as at the nearby Nopal uranium deposit. Precious and base metal mineralization was associated with Laramide-age rhyolitic intrusions, domes, and co-genetic calcsilicate skarn formation within Albian-age fossiliferous limestones. Duties included geologic mapping and rock chip sampling of about 200 km$^2$ between the western Peña Blanca Mountains on the east and including the Rio Tinto copper district on the west. The Nopal uranium deposit is along the northern border of the field area and the same ash-flow stratigraphy is found in Rio Tinto-western Pena Blanca field area. Samples of the volcanic rocks and mineralization were taken for age determinations, geochemistry, thin-section petrography, and electron-microprobe analyses. A subsequent biogeochemical survey conducted as part of the project utilizing deep rooted plants identified several drill targets beneath alluvial cover in addition to the hard-rock targets identified during outcrop sampling.

**North Carolina State University**                                      **1974-1976**
**Field geologist** - Rural-lands runoff study of the Upper Chowan River Basin, Virginia and North Carolina. Responsibilities included monthly flow and water chemistry at several hundred sites.

**EDUCATION:** PhD Economic Geology, U. of Georgia, 1996; MS Geology, East Carolina University, 1981; BS Geology, East Carolina University, 1974.

**VETTED PUBLIC CANADIAN NATIONAL INSTRUMENT 43-101[1] AND RESOURCE VALUATION TECHNICAL REPORTS**

Capps, R. C., 2020, NI 43-101 Technical Report – Nassau Gold Exploration Project, Sipaliwini District, Suriname, South America. Prepared on behalf of 79North, Ltd., effective date 14 May 2020, 91 pp.

Capps, R. C., 2020, Prefeasibility and Mineral Resource Valuation Report – Tussahaw Crushed Stone Aggregate Quarry Site, Butts County, Georgia USA. Prepared on behalf of Tussahaw Reserves, LLC by Capps Geoscience, LLC effective date 12 July 2020, 812 pp.

Capps, R.C., 2020, NI 43-101 Technical Report – Gold Exploration at the Mary K Prospect, Elk City District, Idaho County, Idaho USA. Prepared on behalf of Bond Resources, Inc by Capps Geoscience, LLC effective date 11 March 2020, 55 pp.

Capps, R.C., 2016, Jefferson Gold Project - NI 43-101 Technical Report on Gold Exploration, Chesterfield County, South Carolina, USA. Prepared on behalf of Pancontinental Gold Corp.by Capps Geoscience, LLC, effective date 15 July 2016, 80 pp.

Capps, R.C., 2016, Resource Valuation Report – Daurity Springs Aggregate Quarry, Chatham County, North Carolina, USA. Prepared on behalf of Little Texas Farms, LLC by Capps Geoscience, LLC effective date 4 July 2016, 375 pp.

Capps, R.C., 2015, NI 43-101 Technical Report on Exploration at the Winston District Gold Project, Broadwater County, Montana, USA. Prepared on behalf of Winston Gold Mining Corp.by Capps Geoscience, LLC, effective date 17 September 2014, 50 pp.

Capps, R.C., 2014, NI 43-101 Technical Report on Exploration at the Jefferson Gold Project, Haile-Brewer Gold Trend, Carolina Slate Belt Province, Chesterfield County, South Carolina, USA. Prepared on behalf of Firebird Resources, Inc by Capps Geoscience, LLC, effective date 7 May 2014, 67pp.

Capps, R.C., 2014, NI 43-101 Technical Report on Exploration at the Buzzard Gold Project, Haile-Brewer Gold Trend, Carolina Slate Belt Province, Chesterfield and Lancaster Counties, South Carolina, USA. Prepared on Behalf of Firebird Resources, Inc. by Capps Geoscience, LLC, effective date 7 May 2014, 84pp.

Capps, R.C., 2014, NI 43-101 Technical Report on Exploration at the Nassau Gold Project, Suriname, South America. Prepared on behalf of Sumin Resources Limited, Road Town, Tortola British Virgin Island by Capps Geoscience, LLC, effective date 14 April 2014, 75 pp.

Capps, R.C., 2013, NI 43-101 Technical Report on Gold Exploration at the Golden Jubilee Prospect, Granite County, Montana, USA. Prepared on behalf of The Gunsinger Group, LLC by Capps Geoscience, LLC., effective date 17 July 2013, 53pp

Capps, R.C., 2013, NI 43-101 Technical Report on Gold Exploration at the Geel Prospect, Madison County, Montana, USA. NI 43-101 Technical Report prepared on behalf of Cougar Minerals Corporation by Capps Geoscience, LLC, effective date 3 June 2013, 44pp.

Capps, R.C., 2013, Madison Gold Mine Project, Technical Report, Silver Star Mining District, Madison County, Montana, USA. NI 43-101 Technical Report prepared on behalf of Coronado Resources Ltd. by Capps Geoscience, LLC, effective date 22 January 2013, 49pp.

Capps, R.C., 2012, Golden Trail Project, Elko County, Nevada, NI 43-101 Report: Prepared on behalf of Montana Gold Mining Company, Inc.; Filed to SEDAR, effective date 19 April 2012, 80pp.

Capps, R.C., 2010, Deep River gold prospect, Moore and Randolph Counties, North Carolina, USA: Prepared on behalf of Erin Ventures, Inc.; Filed to SEDAR, effective date 24 December 2010 and amended date 31 July 2012, 167pp.

Capps, R.C., 2010, Buzzard and Jefferson Prospects: Technical Report on Gold Exploration in the Haile-Brewer Gold Trend, Carolina Slate Belt Province, Chesterfield and Lancaster Counties, South Carolina USA: Prepared on behalf of Firebird Resources, Inc.; Filed to the SEDAR, effective date 18 July 2010, 74pp.

Capps, R.C., 2009, Drumlummon Mine Project, Technical Report on Year 2008-2009 Phase 2 Exploration, Marysville Mining District, Lewis and Clark County, Montana, USA. Prepared by R.C. Capps and Associates on behalf of RX Exploration, Inc.; Filed to SEDAR, effective date 25 September 2009. 119pp.

Capps, R.C., 2008, Golden Badger Project Technical Report, Elko County, Nevada. NI 43-101 report prepared on behalf of Gold Reef of Nevada, Inc., effective date 28 July 2008, 45pp.

Capps, R.C., 2008, Texas Canyon Project - Technical Report Update, Elko County, Nevada. NI 43-101 report prepared on behalf of Gold Reef International, Inc., effective date 2 July 2008, 34pp

Capps, R.C., 2007, Golden Trail Project - Technical Report Update, Elko County, Nevada. NI 43-101 report prepared on behalf of Gold Reef International, Inc., effective date 5 July 2007, 27pp.

Cherrywell, C.H., Capps, R.C. Hollenbeck, P.J., and Saari, S.M., 2020, NI 43-101 Technical Report - SAC - Bolivia Copper-Gold Project, Guarayos Province, Eastern Bolivia South America. Report prepared by Capps Geoscience, LLC on behalf of South American Copper - Bolivia Ltd., effective date 20 December 2020, 159pp.

[1] All geologic, mining engineering and environmental technical reports prepared for Canadian public resource companies are filed to the Canadian Securities Administrators Website www.sedar.com. The principal official documents for Standards of Disclosure for technical reports are National Instrument 43-101 and 43-101F1 (June 2011). The instruments, compliance requirements, and procedures are listed there. The website states: "SEDAR (System for Electronic Document Analysis and Retrieval) is the system used for electronically filing most securities related information with the Canadian securities regulatory authorities. Filing with SEDAR

started January 1, 1997 and is now mandatory for most reporting issuers in Canada. Information on the rules for electronic filing can be found in SEDAR Rules and Forms.

These rules have been established by the Canadian Securities Administrators ("CSA") and are carried out by each provincial securities regulatory authority."

**SYMPOSIUM AND JOURNAL PUBLICATIONS: 2012 TO 2022**

Capps, R. C., Jorgensen, Clark and Noble, P.J.., 2022, Exploration Model Targeting Silver and Gold Mineralization at the Rimrock Project, Lander County, Nevada. Abstract in review. VISION FOR DISCOVERY: GEOLOGY AND ORE DEPOSITS OF THE BASIN AND RANGE, May 2-5, 2022, Reno, Nevada.

Capps, R. C., Jorgensen, Clark and Noble, P.J.., 2022, Geologic Setting of Gold Mineralization at the Independence Valley Project, Elko County, Nevada.  Abstract in review. VISION FOR DISCOVERY: GEOLOGY AND ORE DEPOSITS OF THE BASIN AND RANGE, May 2-5, 2022, Reno, Nevada.

Capps, R. C., Jorgensen, Clark and Noble, P.J., 2022, Gold Mineralization at the Texas Canyon Project, Northeastern Elko County, Nevada, Geological Society of Nevada Symposium in Koutz, F.R. and Pennell, W.M (eds.), 2020: VISION FOR DISCOVERY: GEOLOGY AND ORE DEPOSITS OF THE BASIN AND RANGE, May 2-5, 2022, Reno, Nevada, Poster, and symposium article (in review).

Capps, R. C., Jorgensen, Clark and Noble, P.J., 2020, Gold Mineralization at the Texas Canyon Project, Northeastern Elko County, Nevada, Geological Society of Nevada Symposium in Koutz, F.R. and Pennell, W.M (eds.), 2022: VISION FOR DISCOVERY: GEOLOGY AND ORE DEPOSITS OF THE BASIN AND RANGE, May 2-5, 2020, Reno, Nevada, abstract: p.5-6.

Capps, R. C., Jorgensen, Clark and Noble, P.J., 2015, Gold Mineralization at the Golden Trail Project, northeastern Elko County, Nevada, Lander County, Nevada, Geological Society of Nevada Symposium 2015: NEW CONCEPTS AND DISCOVERIES, May 14 - 24, 2015, Reno, Nevada.

**ALL PUBLICATIONS**

Capps, R. C., Jorgensen, Clark and Noble, P.J., 2020, Gold Mineralization at the Texas Canyon Project, Northeastern Elko County, Nevada, Geological Society of Nevada Symposium in Koutz, F.R. and Pennell, W.M (eds.), 2020: VISION FOR DISCOVERY: GEOLOGY AND ORE DEPOSITS OF THE BASIN AND RANGE, May 14 - 24, 2015, Reno, Nevada, p.5-6.

Capps, R. C., Jorgensen, Clark and Noble, P.J., 2015, Gold Mineralization at the Golden Trail Project, Northeastern Elko County, Nevada, Lander County, Nevada, Geological Society of Nevada Symposium 2015: NEW CONCEPTS AND DISCOVERIES, May 14 - 24, 2015, Reno, Nevada (in press)

[2]Capps, R. C., Jorgensen, Clark, and Noble, P.J., 2010, Geologic Setting of Gold Mineralization at the Rimrock Prospect, Western Sheep Creek Range, Lander County, Nevada, in Steininger, R.C., and others Eds., Geological Society of Nevada Symposium 2010: GREAT BASIN EVOLUTION & METALLOGENY, May 14 - 22, 2010, Reno, Nevada, p. 553-574

[1]Capps, R.C., and Noble, P.J., 2005, Geologic Setting of Gold Mineralization at the Double Mountain Prospect, Northern Adobe Range, Elko County, Nevada, in Rhoden, H.N., Steininger, R.C., and Vikre, P.G., Eds., Geological Society of Nevada Symposium 2005: Window to the World, Reno, Nevada, May 2005, p. 483-496

[2]Capps, R.C., Moye, R.J., LaPoint, D.J., Watson, T.C., Christensen, D., Stollenwerk, M. and Cherrywell, C, 2004, Evidence for syntectonic gold mineralization at Gowtu Bergi, Eastern Suriname, South America (Abstract Paper 9-2). Geological Society of America, Abstracts with Program, Geological Society of America Northeastern and Southeastern Sections Joint Meeting (March 25-27, 2004)

[2]Capps, R.C., Malfait, Wim, and LaPoint, D. J. Bedrock sources of placer gold-mercury at the Witlage Creek Prospect, Eastern Suriname, South America (Abstract Paper 9-1): Geological Society of America, Abstracts with Program, Geological Society of America Northeastern and Southeastern Sections Joint Meeting (March 25-27, 2004)

[2]Capps, Richard C., Murphy, Christopher P., and Wiley, Samantha L., 2001, Archaeological Feature Characterization at the Former Augusta Arsenal, Augusta, Georgia with the Aid of a Portable-Cesium Magnetometer: Abstract 3758, Geological Society of America, Abstracts with programs, Annual Southeastern Section meeting, Raleigh, North Carolina. April 5-6, 2001

[2]Capps, R.C., 2000, Carlin-type Jerritt-Canyon style gold mineralization - northern Adobe Range, Elko County, Nevada (Abstract for Economic Geology Session 36): Geological Society of America, Abstracts with Program, Geological Society of America Annual Meeting, November 9-18, 2000, Reno, Nevada

[2]Capps, Richard C., McDaniel, Ronald D., and Powers, Jonathan, A.,1997, Porphyry gold mineralization at the Deep River prospect, Carolina Slate Belt Lithotectonic Province, Moore and Randolph counties, North Carolina (Abstract # 60007): Geological Society of America, Late Breaking Abstracts, Annual Meeting in Salt Lake City, Utah

[2]Capps, R.C., and Moore, J.A., 1997, Geology and gold mineralization of the Castle Mountains, San Bernardino County, California and Clark County, Nevada: Nevada Bureau of Mines and Geology, NBMG Map 108. Full-color geologic map, structure sections, correlation chart, and text

[2]Capps, R. C., Moore, J.A., Mitchell, L.T., 1996, Geologic setting of Miocene gold mineralization in the Hackberry Mountain area, Getchel Mining District, San Bernardino County, California: Geological Society of Nevada, Geology and Ore Deposits of the American Cordillera Symposium. April 10-13, 1995, p.871-890

Capps, R.C., 1996, Geologic setting of Miocene volcanogenic gold mineralization near the western margin of the Colorado River Extensional Corridor - Eastern Mojave Desert, California and Nevada, unpublished Ph.D. dissertation, Department of Geology, Athens, Georgia, 391 pp.

[1]Capps, R.C., Whitney, J.A., Roden, M.A., La Tour, T.E., Vanko, D.A., 1995, Crystalline basement lithologies from beneath the Savannah River Site (SRS) (Abstract): Geological Society of America, Abstracts with programs, Southeastern section meeting, p.4

[2]Capps, R.C., 1995, Petrogenetic and structural constraints on the occurrence and evolution of Miocene volcanogenic gold mineralization near the western margin of the Colorado River Extensional Corridor in the Castle Mountain - Lanfair Buttes - Hackberry Mountain Area, California and Nevada: (Abstract) in Geology and Ore Deposits of the American Cordillera, Meeting April 10-13, 1995. Program with abstracts. Sponsored by the Geological Society of Nevada and the USGS

[2]Capps, R.C., 1993a, Volcano-tectonic evolution of the Castle Mountains: 22 to 14 Ma (Abstract): Geological Society of America, Abstracts with programs, Cordilleran-Rocky Mountain Sections meeting, v.25, no. 5, p.17-18

[1]Capps, R.C., 1993b, Relative K/Ar ages of Tertiary magmatism and gold mineralization in the Hackberry Mountain - Lanfair Buttes - Castle Mountains area, California and Nevada (Abstract): Geological Society of America, Abstracts with programs, Cordilleran-Rocky Mountain Sections meeting, v.25, no.5, p.18

[2]Capps, R.C. and Moore, J., 1990, Geologic Setting of Mid-Miocene gold deposits in the Castle Mountains, San Bernardino County, California and Clark County, Nevada: Geological Society of Nevada, Great Basin Symposium, Program with Abstracts, April 1-5, 1990, p. 128

[3]Capps, R.C. and Moore, J., 1990, Geologic Setting of Mid-Miocene gold deposits in the Castle Mountains, San Bernardino County, California and Clark County, Nevada: Geological Society of Nevada, Great Basin Symposium, The Geology and Ore Deposits of the Great Basin, Field Trip Guide Book Number 17, Volcanic-Hosted Gold Deposits and Structural Setting of the Mojave Region. Pages 1-23

[2]Capps, R.C. and Moore, J., 1991, Geologic Setting of Mid-Miocene gold deposits in the Castle Mountains, San Bernardino County, California and Clark County, Nevada: Geological Society of Nevada, Great Basin Symposium, v.2, p.1195-1219

Capps, R.C., Reynolds, S.J., Kortemeir, C.P., and Scott, E.A., 1986, Geologic map of the northeastern Hieroglyphic Mountains, central Arizona: Arizona Bureau of Geology and Mineral Technology, Open-file report 86-10, 16p.

Capps, R. C., 1985, Reynolds, S.J., Kortemeier, C.P., Stimac, J.A., and Scott, E.A., 1986, Preliminary geologic maps of the eastern Bighorn and Belmont Mountains, central Arizona: Arizona Bureau of Geology and Mineral Technology, Open-file Report 85-14, 25 p.

[1]Capps, R.C., 1981a, Geology of the Rancho El Papalote area, Chihuahua, Mexico: in Uranium in volcanic and volcaniclastic rocks (Goodell, Philip C., editor; et.al.), AAPG Studies in Geology, No.13, p.243-264

Capps, R.C., 1981b, Geology of the Rancho El Papalote area, Chihuahua, Mexico: Master of Science thesis, East Carolina University, Greenville, North Carolina

[1]Capps, R.C., Bray, John T., Mauger, Richard L., Howell, Linda B., and Sharpe, Carolyn, A., 1981, Geochemical, mineralogical, and biogeochemical studies, Terrazas-El Papalote area, Chihuahua, Mexico.(Abstract): Geological Society of America, 77th annual Cordilleran section meeting - Hermosillo, Mexico, Abstracts with programs, v.13, no. 2, January 1981, page A48

[2]Bussey, Karen E, Capps, Richard C., and Gordon, Judith E., Lichen Communities on Ultramafic and Granitic Substrates - A Comparison in the Central Savannah River Area, Eastern Piedmont, Georgia and South Carolina., Abstract 3146, Geological Society of America, Abstracts with programs, Annual Southeastern Section meeting., Raleigh, North Carolina. April 5-6, 2001

Crowe, Douglas E., [2]Mitchell, T. Langdon, Capps, R. C., 1996, Geology and stable isotope geochemistry of the Jumbo South Au deposit, California: Evidence for meteoric mixing. in Geological Society of Nevada, Geology and Ore Deposits of the American Cordillera Symposium. April 10-13, 1995, p.891-907

Noble, Paula J., Hall, T., [2]Cellura, B.R., and Capps. R.C., 2009, Stratigraphy and structure of the Roberts Mountains allochthon, NV, USA, clarified by radiolarian biostratigraphy. SEPM meeting in Houston, TX, March 15-17, 2009

Roden, Michael, La Tour, T. E., Whitney, J., Anderson, V.M., and Capps, R.C., 2002, Geochemistry and Petrology of Appalachian Basement Beneath Coastal Plain Sediments at the Savannah River Site, South Carolina, U.S.A.: Southeastern Geology, vol. 41, no. 1

[1] La Tour, T.E., Roden, M.F., Whitney, J.A., and Capps, R.C., Geochemistry of metavolcanic rocks below the Savannah River Site: Speculations on affinity and origin. SEGSA for 1997 meeting in Auburn, AL

Mauger, R.L. and Capps, R.C., 1979, Geochemical and mineralogical study of base metal mineralization in the Rancho El Papalote-Tres Hermanos area, near Ciudad Chihuahua, Chihuahua, Mexico. Consejo De Recursos Minerales, Mexico City, Mexico, 31p.

[2]McGahee, E.; Jones, R.; Capps, R.; Myers S. Detection of Calcite in Quartz with Diffuse Reflectance FTIR. Poster presentation and abstract, 223rd National Meeting of the American Chemical Society, Orlando, FL, April 8, 2002

Stimac, J.H., Richard, S.M., Reynolds, S.J., Capps, R.C., Kortemeier, C.P., Grubensky, M.J., Allen, G.A., Grey, F.B., Miller, R.J., 1994, Geologic map of the Big Horn and Belmont Mountains, west-central Arizona: Arizona Geologic Survey Open-File Report No. 94-15. 3 plates and report

Wahl, David E., Reynolds, S.J., Capps, R.C., Kortemeier, C.P., Grubensky, M.J., Scott, E.A., and Stimac, J.H, 1988, Geologic map of the southern Hieroglyphic Mountains, central Arizona: Arizona Bureau of Geology and Mineral Technology, Open-File Report No. 88-1, 6 p.

[1]Vanko, D. A., Capps, R. C., 1995, History of fluids in the basement, Savannah River Site, South Carolina: Vein mineralogy and fluid inclusions (Abstract): Geological Society of America, Abstracts with programs, Southeastern section meeting, p.94

[1] Oral presentation at professional meeting
[2] Poster session presentations at professional meeting
[3] Field tour as part of professional meeting

# 19   Appendices

Appendix A Exploration/evaluation report

Appendix B Addendum to October 2018 report - Ecological Survey, Mine Plan and Permit Applications

Appendix C NPV calculations for sensitivity analyses

Appendix D Price lists and Georgia DOT contracts data

Appendix E USGS Mineral Commodity Summaries

Appendix F USGS Mineral Industry Surveys

Appendix G Locations of major aggregate quarries relative to Log Creek quarry site

Appendix H Georgia DOT approved aggregate sources

Appendix I Georgia population information

Appendix J USGS standard aggregate production reporting form and graph of United States production

Appendix K Zoning opinion letter

## 19.1   Appendix A Exploration/evaluation report

# GeoLogic

---

## REPORT OF PRELIMINARY SUBSURFACE EXPLORATION, GEOLOGICAL EVALUATION, AND RESOURCE/RESERVE ESTIMATE

## LOG CREEK LLLP TRACT

## WARRENTON, WARREN COUNTY, GEORGIA

**GEOLOGIC PROJECT NO. 18-007**

*Prepared For:*

**Log Creek LLLP**
1280 Snows Mill Road
Bogart, Georgia 30622

*Prepared By:*

**GeoLogic, LLC**
**600 Lovinggood Trail**
**Woodstock, Georgia 30189**

**OCTOBER 25, 2018**

# GeoLogic

October 25, 2018

**Log Creek LLLP**
1280 Snows Mill Road
Bogart, Georgia 30622

**Attention:** Mr. Tony Townley

**Subject:** Preliminary Subsurface Exploration, Geological Evaluation and
Resource/Reserve Estimate
Log Creek LLLP
Warrenton, Warren County, Georgia
GeoLogic Project No. 18-007

Mr. Townley:

GeoLogic, LLC (GeoLogic) is pleased to submit this report of our geological evaluation and resource/reserve services for the referenced project. The following report presents methods of exploration employed, site and subsurface conditions encountered, and conclusions and recommendations regarding the geological aspects of the project.

**Background:** We understand that the site is under consideration for a rock quarry and associated structures. The purpose of this exploration was to qualify the rock at the proposed facility and determine excavation conditions and overburden depths.

The proposed quarry site is located on an undeveloped 241-acre tract of land on the east side of Ogeechee River Road near Warrenton, Warren County, Georgia. This tract is composed of two separate parcels (016026 and 016027). The property is bounded to the north by CSX railroad right-of-way and Timber Road to the south, Ogeechee River Road to the west and to the east, more undeveloped agricultural and woodlands. The tract is primarily wooded with planted pine trees and hardwoods. The proposed pit area was assumed to be near the central portion of the site, overlapping the two parcels to allow for proper setbacks from property boundaries.

**Field Work:** To obtain specific subsurface data, exploration of the site was conducted in general accordance with ASTM Practice D-420. The site was visited on June 6 and June 14, 2018 by our geologist. Test locations were selected at those times and staked in the field. Drilling activities were performed between October 1 and October 3, 2018.

We advanced four (4) rock core borings (B-1 through B-4) as depicted on **Figure 1** to termination depths ranging from 65 to 150 feet below existing grades. Typically, to perform coring, steel casing is initially set in the hole and drilled through the overburden soils to prevent caving. All the borings that were advanced were done so at the bedrock interface, which occurred at depths ranging from 0 to 54 feet below ground surface. Refusal materials are then cored according to ASTM D-2113, using a diamond-studded bit (NQ designated bit, 1-7/8 inches in diameter) fastened to the end of a hollow, double-tube core barrel. The core barrel is rotated at high speeds with cuttings brought to the surface by circulating water. Core samples of the material penetrated are protected and retained in the swivel-mounted inner tube. Upon completion of each core run, the core barrel is brought to the surface, the core recovery is measured, the samples are removed, and the core is placed in boxes for transportation and storage.

The core samples are returned to the laboratory where the materials are identified and the percent core recovery and rock quality designation (RQD) are determined by a geologist. The percent core recovery is the ratio of the sample length obtained to the depth drilled, expressed as a percent. The RQD is obtained by summing up the length of core recovered, including only the pieces of core that are 4 inches or longer, and divided by the total length drilled. The percent core recovery and RQD are related to the soundness and continuity of the refusal material. Refusal material descriptions and recoveries are shown on the boring records in the Appendix. Their locations are indicated on the attached Site and Boring Location Plan. Photographs of the rock cores collected during our sampling program are also included in the Appendix of this report.

**Geology:** The site is located in east-central Georgia very near the contact between the Piedmont and the Coastal Plain (i.e., the Fall Line). The Piedmont Geologic Region is an area underlain by ancient igneous and metamorphic rocks up to 600 million years old. More specifically, the site is located south of the Modoc Fault, which forms the western boundary of the Kiokee Belt. The Kiokee Belt is part of the Carolina Superterrane and rock types include gneiss, schist, and amphibolite. The granite (undifferentiated) intruded the Kiokee Belt on both sides of the Modoc Fault some 320 to 300 million years ago when the fault was active. The Modoc Fault is a ductile shear zone thought to be a result of very deep, high temperature shearing that deformed overlying bedrock. The Modoc Fault dips to the northwest.

The bedrock found during drilling varied between granite and granitic gneiss, was strong to very strong (R4 to R5), fine to coarse grained, phaneritic with granitic texture, some evidence of faulting was found in one boring. The bedrock was highly weathered to almost completely unweathered with depth.

It should be noted that no petrographic analysis or thin-section testing of the rock was conducted. The rock description is based on inspection of hand specimens only.

The virgin soils, when present in this geologic area, have been formed by the in-place chemical and physical weathering of the parent rock material. Weathering is facilitated by fractures, joints and by the presence of less resistant rock types. The typical residual soil profile consists of clayey soils near the surface, where soil weathering is more advanced, underlain by sandy silts and silty sands that generally become harder with depth to the top of parent bedrock. The boundary between

soil and rock is not sharply defined. The transitional zone termed "partially weathered rock" is normally found overlying the parent bedrock. Partially weathered rock is defined, for engineering purposes, as residual material with standard penetration resistances exceeding 100 blows per foot. Weathering is facilitated by fractures, joints, and by the presence of less resistant rock types. Consequently, the profile of the partially weathered rock and hard rock is quite irregular and erratic, even over short horizontal distances.

The Geologic Map of Georgia (1976) indicates that the site is underlain by gr1: Granite Undifferentiated.



*Excerpt of Interactive Geologic Map (Source: USGS website, Warren County)*

**Subsurface Conditions:** Soil (overburden) was encountered at depths ranging from 0 to 54 feet below the ground surface (feet-bgs) in all the borings. Refusal is a designation applied to any material that cannot be further penetrated by the soil drilling process and is normally indicative of a very hard or dense material, such as boulders, rock lenses, or the upper surface of bedrock. The borings were extended below the top of bedrock using rock coring techniques to boring termination depths of 65 to 150 feet below the ground surface. Rock cores recovered from 0 to 150 feet in boring B-1, 54 to 141 feet in boring B-2, 15 to 65 feet in boring B-3, and from 33 to 91 feet in boring B-4 were described as strong to very strong, solid, Granitic Gneiss. The recovery (REC) and RQD of these samples were typically between 14% and 100%; and the rock was generally harder and less weathered with depth. Cross sections depicting the subsurface conditions are included in the Appendices.

**Groundwater:** Groundwater levels were checked in the borings at the time of exploration. Groundwater was not encountered in borings performed above auger refusal depths. Fluctuation in groundwater may occur with rainfall variation, construction, surface runoff, and other factors. However, it does not appear that groundwater will significantly impact the proposed construction. Groundwater should be expected at deeper depths within the pit area.

**Laboratory Testing:** Rock cores recovered from the borings performed were subjected to additional laboratory tests to determine the physical properties of the subsurface rock. The following laboratory tests were performed:

- LA Abrasion Test (AASHTO T-96/ASTM C-131)
- Specific Gravity and Absorption of Coarse Aggregate (AASHTO T-85/ASTM C-127)
- Clay Lumps and Friable Particles in Aggregate (AASHTO T-112/ASTM C-142)
- Aggregate Soundness Test (ASTM C-88)

A representative composite sample from borings B-2, B-3, and B-4 and two representative samples from B-1 between 40 and 70 feet and 120 and 150 feet were subjected to these laboratory tests. **The test results indicate that the samples obtained meet Georgia DOT specifications for use as Group II Class A aggregates for both fine and coarse aggregates used in concrete and roadway materials.** The test results are included in the Appendix of this report.

**Site Assessment:** Based on the subsurface conditions encountered by the soil test borings and rock cores, along with the results of laboratory testing and our previous experience with similar sites in north and middle Georgia, the rock is adequate for use as construction aggregates.

Typical overburden depths of about 0 to 54 feet (more or less) should be anticipated to reach competent rock materials. The residual soils encountered in our borings visually appear suitable for reuse as structural fill. Moisture control may be necessary, primarily depending on weather conditions at the time of construction and the time of year at which grading is performed.

Where pit excavations begin to extend to partially weathered rock or below our refusal depths, difficult excavation techniques should be anticipated to facilitate material removal. In mass excavations, partially weathered rock generally requires loosening prior to its removal with conventional earthmoving equipment. Loosening generally consists of pulling a large single tooth hydraulic ripper attached to a Caterpillar D-8K dozer, or equivalent equipment. In general, partially weathered rock with penetration resistances of 50 blows for more than 2 inches of penetration should be considered rippable for planning purposes. Partially weathered rock with penetration resistances of 50 blows for 2 inches or less penetration may require blasting to aid in removal.

The ability of the contractor to rip partially weathered rock is dependent upon the consistency of the material encountered, the number and direction of existing joints and fractures, the equipment used, and the degree of effort employed. Partially weathered rock may be loosened while pulling the ripper in one direction but ripping in another direction may be ineffective due to the direction of dip of the material. The specifications should include requirements to the effect that the contractor should attempt to rip in several directions before the claim of hard rock will be honored. However, in some cases, it may be more advantageous for the contractor to loosen extensive profiles of partially weathered rock or lower quality rock by blasting.

At the base of partially weathered rock, relatively unweathered rock will be encountered. Some of the lower quality rock may be ripped if sufficient joints and fractures are present. However, for planning purposes, we would anticipate that all partially weathered rock with SPT results of 50 blows per 2 inches or less penetration, and unweathered rock, will require blasting to facilitate removal.

The definition of rock for excavation purposes can be a source of conflict during construction. The following definitions have been successfully incorporated into specifications on other projects and are provided for your general guidance.

Rip Rock:   Any material that cannot be removed by scrapers, loaders, pans, dozers, or graders; and requires loosening by using a single-tooth ripper mounted on a crawler tractor having a minimum draw bar pull rated at not less than 56,000 pounds.

Blast Rock:   Any material which cannot be excavated after loosening with a single-tooth ripper mounted on a crawler tractor having a minimum draw bar pull rated at not less than 56,000 pounds (Caterpillar D-8K or equivalent) or by a Caterpillar 973 front-end loader or equivalent; and occupying an original volume of at least one (1) cubic yard.

**Reserve Estimate**: The acreage owned or leased cannot typically be mined completely. Setbacks from easements, roads, property lines, pit slope angles, excessive overburden, and non-mine related areas of the property (e.g., plant, stockpiles, ramps, access roads, etc.) reduce the available acreage for mining. This site is uniquely positioned such that there is excellent access to highways for transporting the mined material to market.

For this proposed quarry site, it was estimated that of the available 241 acres, approximately 70± acres on the tract are minable. Additional investigation of areas further south and southwest of previously examined parts of the site could change this estimate (up or down). This reserve estimate is based on the assumption that the quarry depth will extend to approximately 100 feet below competent bedrock. **Figure 2** depicts the estimated quarry pit area.

It is likely that the quarry could be extended to much greater depths depending on the quarry plan and other factors outlined above. Based on drill log data the proven/probable proven volume is predicated on a quarry with a depth of 150 feet below the top of bedrock.

As noted previously, a variable overburden thickness is present at the site with soils above bedrock ranging from 0 to 54 feet. Removal and possible reuse (e.g., reclamation) or sale of this material is an alternative rather than disposal.

The average specific gravity of the rock of 2.66 was estimated from laboratory testing. The resultant unit weight of rock is estimated at 165 pounds per cubic foot (pcf), from this, the calculated volume-tonnage conversion factor for the rock is 3,594 short tons per acre per foot (tpa-ft).

The following table summarizes the estimated reserves.

| Description | Quantity |
|---|---|
| Approximate Overburden (cubic yards) | 2,823,333 |
| Proven/Probable Proven (short tons) | 37,737,000 |
| Reserve Statement (short tons) | 21,384,300 |

Table 1 – Reserve Estimate

The Reserve Statement represents the minimum quantity of rock available in the proposed quarry and includes a loss factor of 15% to account for material lost during crushing, washing, and screening, internally used material, poor-quality rock, and wasted material, as well as nonsalable fines.

**Closure:** These recommendations apply to this specific project. Subsurface conditions in unexplored locations may vary from those encountered at specific boring locations. The nature and extent of variations between the borings may not become evident until the course of construction.

We will be happy to discuss our recommendations and would welcome the opportunity to provide additional services necessary to complete this project. We look forward to serving as your geotechnical engineer in the future.

Sincerely,
**GeoLogic, LLC**

Benjamin R. Black, MS, PG, EIT
Principal Engineering Geologist

## Attachments

Site and Boring Location Plan / Quarry Layout
Test Procedures
Key to Symbols and Classifications
Boring Logs (4)/Cross Sections (2)
Rock Cores – Photo Logs (4)
Results of Laboratory Testing

Attachment 1: Site and Boring Location Plan



| Source: Google Earth | **FIGURE 1** **BORING LOCATION PLAN** | GeoLogic |
|---|---|---|
| Project No.: 18-007 Scale: As Shown on Figure Drawn by: BB Date: 10/21/2018 | **Log Creek LLLP Tract** Ogeechee River Road, Warrenton, Warren County, Georgia October 2018 | 600 Lovinggood Trail Woodstock, Georgia 30189 |



2018 CARRYOVER ATTACHMENT - EXHIBIT C: NORRIS CASON

CARRYOVER ATTACHMENT - EXHIBIT C: Page 172 of 666

Attachment 2: Test Procedures

# TEST PROCEDURES

The general field procedures employed by GeoLogic, LLC are summarized in the
American Society for Testing and Materials (ASTM) Standard D 420 - Investigating and Sampling Soil
and Rock. This practice lists recognized methods for determining soil, rock and groundwater conditions.
These methods include geophysical and in-situ methods as well as borings.

## Standard Drilling Techniques

To obtain subsurface samples, borings are drilled using one of several alternate techniques depending
upon the subsurface conditions. Some of these techniques are:
In Soils:

a) Continuous hollow stem augers.
b) Rotary borings using roller cone bits or drag bits and water or drilling mud.
c) Hand augers.

In Rock:
a) Core drilling with diamond-faced, double or triple tube core barrels.
b) Core boring with roller cone bits.

Typical drilling methods used are presented in the following paragraphs.

Hollow Stem Augering: A hollow stem augers consists of a hollow steel tube with a continuous exterior
spiral flange termed a flight. The auger is turned into the ground, returning the cuttings along the flights.

The hollow center permits a variety of sampling and testing tools to be used without removing the
auger.

## Sampling and Testing in Boreholes
Several techniques are used to obtain samples and data in soils in the field; however, the most common
methods in this area are:

a) Standard Penetrating Testing
b) Undisturbed Sampling
c) Dynamic Cone Penetrometer Testing
d) Water Level Readings

The procedures utilized for this project are presented below.

Standard Penetration Testing: At regular intervals, soil samples are obtained with a standard 2-inch
diameter split tube sampler connected to an A or N-size rod. The sampler is first seated 6 inches to
penetrate any loose cuttings and then driven an additional 12 inches with blows of a 140-pound
hammer falling 30 inches. Generally, the number of hammer blows required to drive the sampler the
final 12 inches is designated the "penetration resistance" or "N" value, in blows per foot (bpf). The
sampler is designed to retain the soil penetrated, so that it may be returned to the surface for
observation.

Representative portions of the soil samples obtained from each sample are placed in jars, sealed and
transported to our laboratory.

The standard penetration test, when properly evaluated, provides an indication of the soil strength and compressibility. The tests are conducted according to ASTM Standard D1586. The depths and N-values of standard penetration tests are shown on the Boring Logs. Split tube samples are suitable for visual observation and classification tests but are not sufficiently intact for quantitative laboratory testing.

Water Level Readings: Water table readings are normally taken in the borings and are recorded on the

Boring Logs. In sandy soils, these readings indicate the approximate location of the hydrostatic water table at the time of our field exploration. In clayey soils, the rate of water seepage into the borings is low and it is generally not possible to establish the location of the hydrostatic water table through short term water level readings. Also, fluctuation in the water table should be expected with variations in precipitation, surface run-off, evaporation, and other factors. For long-term monitoring of water levels, it is necessary to install piezometers.

The water levels reported on the Boring Logs are determined by field crews immediately after the drilling tools are removed, and several hours after the borings are completed, if possible. The time lag is intended to permit stabilization of the groundwater table which may have been disrupted by the drilling operation.

Occasionally the borings will cave-in, preventing water level readings from being obtained or trapping drilling water above the cave-in zone. The cave-in depth is measured and recorded on the Boring Logs.

## Boring Logs

The subsurface conditions encountered during drilling are reported on a field boring log prepared by the driller or a GeoLogic representative. The log contains information concerning the boring method, samples attempted and recovered, indications of the presence of coarse gravel, cobbles, etc., and observations of groundwater. It also contains the field representative's interpretation of the soil conditions between samples. Therefore, these boring records contain both factual and interpretive information. The field boring records are kept on file in our office.

After the drilling is completed, a geotechnical engineer or geologist classifies the soil samples and prepares the final Boring Logs, which are the basis for our evaluations and recommendations.

## Soil Classification

Soil classifications provide a general guide to the engineering properties of various soil types and enable the engineer to apply his past experience to current problems. In our investigations, samples obtained during drilling operations are examined in our laboratory and visually classified by an engineer or geologist. The soils are classified according to consistency (based on number of blows from standard penetration tests), color and texture. These classification descriptions are included on our Boring Logs.

The classification system discussed above is primarily qualitative and for detailed soil classification two laboratory tests are necessary; grain size tests and plasticity tests. Using these test results the soil can be classified according to the AASHTO or Unified Classification Systems (ASTM D-2487). Each of these classification systems and the in-place physical soil properties provides an index for estimating the soil's behavior. The soil classification and physical properties are presented in this report.

The Key to Symbols and Classifications presents criteria that are typically used in the classification and description of soil and rock samples for preparation of Boring Logs.

Attachment 3: Key to Symbols and Classifications

# KEY TO SYMBOLS AND CLASSIFICATIONS

| SYMBOL | TYPE OF SAMPLE |
|---|---|
| ⊠ | Split Tube Sample (SPT) |
| ◹ | Shelby Tube Sample |
| ▽ | Bulk Sample |
| ◆ | Core Run |

 Asphalt

 Topsoil

 Fill

 Partially Weathered Rock

 Bedrock

 Concrete

## PARTICLE SIZE DEFINITIONS

| COMPONENT | SIZE RANGE |
|---|---|
| Boulders | Larger than 12 inches |
| Cobbles | 3 to 12 inches |
| Gravel | 3 inches to 4.5 mm (Sieve No.4) |
| Coarse Gravel | 3 inches to 3/4 of an inch |
| Fine Gravel | 3/4 of an inch 4.5 |
| Sand | 4.5 mm to 0.074 mm (Sieves No.4 to No.200) |
| Coarse Sand | 4.5 mm to 2.0 mm (Sieves No.4 to No.10) |
| Medium Sand | 2.0 mm to 0.42 mm (Sieves No.10 to No.40) |
| Fine Sand | 0.42 mm to 0.074 mm (Sieves No.40 to No.200) |
| Silt and Clay | Smaller than 0.074 mm (passing sieve No. 200) |

## MOISTURE CONTENT

| | |
|---|---|
| Dry | Absence of moisture, dusty, dry to the touch |
| Damp | Some perceptible moisture, below optimum |
| Moist | No visible water, near optimum moisture content |
| Wet | Visible free water, usually soil is below water table |

## RELATIVE HARDNESS OF ROCK

| | |
|---|---|
| Very Soft | Disintegrates or easily compresses to touch |
| Soft | May be broken with fingers |
| Moderately Soft | May be scratched with nail, edges may be broken with fingers |
| Moderately Hard | Light blow of hammer required to break sample |
| Hard | Hard blow of hammer required to break sample |

## ROCK CONTINUITY

| DESCRIPTION | RQD* |
|---|---|
| Incompetent | Less than 40% |
| Competent | 40% to 70% |
| Fairly Continuous | 71% to 90% |
| Continuous | 91% to 100% |

*RQD=Rock Quality Designation

## RELATIVE DENSITY OR CONSISTENCY VERSUS SPT N-VALUE

| COHESIONLESS SOIL | | | COHESIVE SOILS | | |
|---|---|---|---|---|---|
| Density | N (blows/ foot) | Approximate Relative Density (%) | Consistency | N (blows/foot) | Approximate Undrained Shear Strength (psf) |
| Very Loose | 0 to 4 | 0 to 15 | Very Soft | 0 to 1 | Less than 250 |
| Loose | 5 to 10 | 15 to 35 | Soft | 2 to 4 | 250 to 500 |
| Medium Dense | 11 to 30 | 35 to 65 | Firm | 5 to 8 | 500 to 1000 |
| Dense | 31 to 50 | 65 to 85 | Stiff | 9 to 15 | 1000 to 2000 |
| Very Dense | over 50 | 85 to 100 | Very Stiff | 16 to 30 | 2000 to 4000 |
| | | | Hard | 31 to 50 | Greater than 4000 |
| | | | Very Hard | over 50 | |

## UNIFIED SOIL CLASSIFICATION SYSTEM

| MAJOR DIVISION | | | GRAPHIC SYMBOL | LETTER SYMBOL | TYPICAL DESCRIPTIONS |
|---|---|---|---|---|---|
| **COARSE GRAINED SOILS** | GRAVEL AND GRAVELLY SOILS | Clean Gravels (Little or no fines) | | GW | Well graded gravels, gravel-sand mixtures, little or no fines |
| | | | | GP | Poorly graded gravels, gravel-sand mixtures, little or no fines |
| | MORE THAN 50% OF COARSE FRACTION RETAINED ON NO.4 SIEVE | Gravels with fines (Appreciable amount of fines) | | GM | Silty gravels, gravel-sand-silt mixtures |
| | | | | GC | Clayey gravels, gravel-sand-clay mixtures |
| **MORE THAN 50% OF MATERIAL IS LARGER THAN NO. 200 SIEVE SIZE** | SANDS AND SANDY SOILS | Clean sands (Little or no fines) | | SW | Well graded sands, gravelly sands, little or no fines |
| | | | | SP | Poorly graded sands, gravelly sands, little or no fines |
| | MORE THAN 50% OF COARSE FRACTIONPASSING NO.4 SIEVE | Sands with fines (Appreciable amount of fines) | | SM | Silty sands, sand-silt mixtures |
| | | | | SC | Clayey sands, sand-clay mixtures |
| **FINE GRAINED SOILS** | SILTS AND CLAYS | Liquid Limit less than 50 | | ML | Inorganic silts and very fine sands, rock flour, silty or clayey fine sands or clayey silts with slight plasticity |
| | | | | CL | Inorganic clays of low to medium plasticity, gravely clays, sandy clays, silty clays, lean clays |
| | | | | OL | Organic silts and organic silty clays of low plasticity |
| **MORE THAN 50% OF MATERIAL IS SMALLER THAN NO. 200 SIEVE SIZE** | SILTS AND CLAYS | Liquid Limit greater than 50 | | MH | Inorganic silts, micaceous or diatomaceous fine sand or silty soils |
| | | | | CH | Inorganic clays of high plasticity, fat clays |
| | | | | OH | Organic clays of medium high plasticity, organic silts |
| **HIGHLY ORGANIC SOILS** | | | | PT | Peat, humus, swamp soils with high organic contents |

Note: Dual symbols are used to indicate borderline soil classifications

Attachment 4: Boring Logs (4) and Cross Sections (2)

**GeoLogic**
GeoLogic,LLC
600 Lovinggood Trail
Woodstock, GA 30189
Telephone: 770.726.2585

## BORING NUMBER B-1
PAGE 1 OF 5

**CLIENT**  Log Creek LLLP

**PROJECT NAME**  Log Creek LLLP Tract

**PROJECT NUMBER**  18-007

**PROJECT LOCATION**  East of Mayfield

**DATE STARTED**  10/2/18     **COMPLETED**  10/2/18

**GROUND ELEVATION**  501 ft NGVD     **HOLE SIZE**  1 7/8" inches

**DRILLING CONTRACTOR**  Premier Drilling, LLC

**GROUND WATER LEVELS:**

**DRILLING METHOD**  HSA-Auto Hammer/Coring

**AT TIME OF DRILLING**  ---

**LOGGED BY**  BB     **CHECKED BY**  BB

**AT END OF DRILLING**  ---

**NOTES**

**AFTER DRILLING**  ---

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) | ▲ SPT N VALUE ▲ / □ FINES CONTENT (%) □ |
|---|---|---|---|---|---|---|---|---|
| 0 | | | | | | | | |
| | | Moderately weathered, close fracture spacing, [gr1: granite undifferentiated] 100% Granitic Gneiss, Strong to Very Strong (R4-R5), fine to coarse grained, with hornblende and potassium feldspar, light brownish gray (5YR 6/1) | | | | | | |
| 5 | | | RC 1 | 90 (78) | | | | |
| 10 | | Slightly weathered, close fracture spacing, [gr1: granite undifferentiated] 100% Granitic Gneiss, Strong to Very Strong (R4-R5), fine to coarse grained, with hornblende and potassium feldspar, medium dark gray (N4) | | | | | | |
| 15 | | | RC 2 | 94 (90) | | | | |
| 20 | | | | | | | | |
| 25 | | | RC 3 | 100 (88) | | | | |
| 30 | | | | | | | | |

*(Continued Next Page)*

GEOTECH BH PLOTS - GINT STD US LAB.GDT - 10/21/18 18:18 - F:\GEOLOGIC LLC\LOG CREEK LLLP\18-007 LOG CREEK LLLP TRACT.GPJ

Case 1:18-cv-07137-CDL   Document 1   Filed 11/12   Page 559 of 666

**GeoLogic**

GeoLogic,LLC
600 Lovinggood Trail
Woodstock, GA 30189
Telephone: 770.726.2585

**BORING NUMBER B-1**

PAGE 2 OF 5

**CLIENT** Log Creek LLLP

**PROJECT NAME** Log Creek LLLP Tract

**PROJECT NUMBER** 18-007

**PROJECT LOCATION** East of Mayfield

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) | ▲ SPT N VALUE ▲ / PL ● MC LL / □ FINES CONTENT (%) □ |
|---|---|---|---|---|---|---|---|---|
| 30–35 | | Slightly weathered, close fracture spacing, [gr1: granite undifferentiated] 100% Granitic Gneiss, Strong to Very Strong (R4-R5), fine to coarse grained, with hornblende and potassium feldspar, medium dark gray (N4) *(continued)* | | | | | | |
| 35 | | | RC 4 | 88 (70) | | | | |
| 40–45 | | Unweathered, medium fracture spacing, [gr1: granite undifferentiated] 100%, Pegmatite zones at 56 feet, from 95-97 feet, and 134-136 feet. potassium feldspar and quearts, moderate Pink (10R 7/4) Granitic Gneiss, Strong to Very Strong (R4-R5), fine to coarse grained, with hornblende and potassium feldspar, light brownish gray (5YR 6/1) | | | | | | |
| 45 | | | RC 5 | 100 (83) | | | | |
| 55 | | | RC 6 | 100 (100) | | | | |
| 60 | | | | | | | | |

*(Continued Next Page)*

Case 1:19-cv-07471-VEC Document 1-4 Filed 07-12 Page 560 of 666

**GeoLogic**

GeoLogic,LLC
600 Lovinggood Trail
Woodstock, GA 30189
Telephone: 770.726.2585

## BORING NUMBER B-1
PAGE 3 OF 5

**CLIENT** Log Creek LLLP

**PROJECT NAME** Log Creek LLLP Tract

**PROJECT NUMBER** 18-007

**PROJECT LOCATION** East of Mayfield

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) | SPT N VALUE / FINES CONTENT (%) |
|---|---|---|---|---|---|---|---|---|
| 65 | | Unweathered, medium fracture spacing, [gr1: granite undifferentiated] 100%, Pegmatite zones at 56 feet, from 95-97 feet, and 134-136 feet. potassium feldspar and quearts, moderate Pink (10R 7/4) Granitic Gneiss, Strong to Very Strong (R4-R5), fine to coarse grained, with hornblende and potassium feldspar, light brownish gray (5YR 6/1) *(continued)* | RC 7 | 100 (90) | | | | |
| 70 | | | | | | | | |
| 75 | | | RC 8 | 100 (98) | | | | |
| 80 | | | | | | | | |
| 85 | | | RC 9 | 100 (82) | | | | |
| 90 | | | | | | | | |
| 95 | | | RC 10 | 100 (44) | | | | |

GEOTECH BH PLOTS - GINT STD US LAB GDT - 10/21/18 18:18 - F:\GEOLOGIC LLC\LOG CREEK LLLP\18-007 LOG CREEK LLLP TRACT.GPJ

*(Continued Next Page)*

GeoLogic,LLC
600 Lovinggood Trail
Woodstock, GA 30189
Telephone: 770.726.2585

**GeoLogic**

**BORING NUMBER B-1**
PAGE 4 OF 5

CLIENT  Log Creek LLLP

PROJECT NAME  Log Creek LLLP Tract

PROJECT NUMBER  18-007

PROJECT LOCATION  East of Mayfield

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) | ▲ SPT N VALUE ▲ |
|---|---|---|---|---|---|---|---|---|
| 100 | | Unweathered, medium fracture spacing, [gr1: granite undifferentiated] 100%, Pegmatite zones at 56 feet, from 95-97 feet, and 134-136 feet. potassium feldspar and quearts, moderate Pink (10R 7/4) Granitic Gneiss, Strong to Very Strong (R4-R5), fine to coarse grained, with hornblende and potassium feldspar, light brownish gray (5YR 6/1) *(continued)* | | | | | | |
| 105 | | | RC 11 | 100 (51) | | | | |
| 110 | | | | | | | | |
| 115 | | | RC 12 | 100 (50) | | | | |
| 120 | | | | | | | | |
| 125 | | | RC 13 | 95 (73) | | | | |
| 130 | | | | | | | | |

*SPT N VALUE scale:* PL — MC — LL; 20 40 60 80
□ FINES CONTENT (%) □  20 40 60 80

*(Continued Next Page)*

Case 1:14-cv-07724-PDL Document 1 - Filed 11/12 - Page 11 of 566

**GeoLogic**

GeoLogic,LLC
600 Lovinggood Trail
Woodstock, GA 30189
Telephone: 770.726.2585

**BORING NUMBER B-1**

PAGE 5 OF 5

**CLIENT** Log Creek LLLP

**PROJECT NAME** Log Creek LLLP Tract

**PROJECT NUMBER** 18-007

**PROJECT LOCATION** East of Mayfield

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) |
|---|---|---|---|---|---|---|---|
| 135 | | Unweathered, medium fracture spacing, [gr1: granite undifferentiated] 100%, Pegmatite zones at 56 feet, from 95-97 feet, and 134-136 feet. potassium feldspar and quearts, moderate Pink (10R 7/4) Granitic Gneiss, Strong to Very Strong (R4-R5), fine to coarse grained, with hornblende and potassium feldspar, light brownish gray (5YR 6/1) *(continued)* | RC 14 | 100 (95) | | | |
| 140 | | | | | | | |
| 145 | | | RC 15 | 100 (90) | | | |
| 150 | | | | | | | |

Bottom of borehole at 150.0 feet.

▲ SPT N VALUE ▲
20  40  60  80
PL    MC    LL
20  40  60  80
☐ FINES CONTENT (%) ☐
20  40  60  80

GEOTECH BH PLOTS - GINT STD US LAB.GDT - 10/21/18 18:18 - F:\GEOLOGIC LLC\LOG CREEK LLLP\18-007 LOG CREEK LLLP TRACT.GPJ

**GeoLogic**

GeoLogic,LLC
600 Lovinggood Trail
Woodstock, GA 30189
Telephone: 770.726.2585

**BORING NUMBER B-2**
PAGE 1 OF 5

**CLIENT** Log Creek LLLP

**PROJECT NAME** Log Creek LLLP Tract

**PROJECT NUMBER** 18-007

**PROJECT LOCATION** East of Mayfield

**DATE STARTED** 10/3/18 **COMPLETED** 10/3/18

**GROUND ELEVATION** 514 ft NGVD **HOLE SIZE** 1 7/8" inches

**DRILLING CONTRACTOR** Premier Drilling, LLC

**GROUND WATER LEVELS:**

**DRILLING METHOD** HSA-Auto Hammer/Coring

**AT TIME OF DRILLING** ---

**LOGGED BY** BB **CHECKED BY** BB

**AT END OF DRILLING** ---

**NOTES**

**AFTER DRILLING** ---

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) | ▲ SPT N VALUE ▲ 20 40 60 80 PL MC LL 20 40 60 80 □ FINES CONTENT (%) □ 20 40 60 80 |
|---|---|---|---|---|---|---|---|---|
| 0 | | CLAYEY SAND WITH GRAVEL, (SC-SM) Overburden | | | | | | |
| 5 | | | | | | | | |
| 10 | | | | | | | | |
| 15 | | | | | | | | |
| 20 | | | | | | | | |
| 25 | | | | | | | | |
| 30 | | | | | | | | |

GEOTECH BH PLOTS - GINT STD US LAB.GDT - 10/21/18 18:18 - F:\GEOLOGIC LLC\LOG CREEK LLLP\18-007 LOG CREEK LLLP TRACT.GPJ

*(Continued Next Page)*

| GeoLogic | GeoLogic,LLC<br>600 Lovinggood Trail<br>Woodstock, GA 30189<br>Telephone: 770.726.2585 | **BORING NUMBER B-2**<br>PAGE 2 OF 5 |
|---|---|---|

**CLIENT**  Log Creek LLLP  
**PROJECT NAME**  Log Creek LLLP Tract  
**PROJECT NUMBER**  18-007  
**PROJECT LOCATION**  East of Mayfield

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) | ▲ SPT N VALUE ▲ / PL MC LL / □ FINES CONTENT (%) □ |
|---|---|---|---|---|---|---|---|---|
| 30 | | CLAYEY SAND WITH GRAVEL, (SC-SM) Overburden *(continued)* | | | | | | |
| 35 | | | | | | | | |
| 40 | | | | | | | | |
| 45 | | | | | | | | |
| 50 | | | | | | | | |
| 55 | | Highly weathered, [gr1: granite undifferentiated] 3 feet missing<br>Granitic Gneiss, Light Brownish Gray (5YR 6/1) | RC 1 | 71 (14) | | | | |
| 60 | | Highly weathered, 4 feet missing | | | | | | |

*(Continued Next Page)*

GEOTECH BH PLOTS - GINT STD US LAB.GDT - 10/21/18 18:18 - F:\GEOLOGIC LLC\LOG CREEK LLLP\18-007 LOG CREEK LLLP TRACT.GPJ

**GeoLogic**
GeoLogic,LLC
600 Lovinggood Trail
Woodstock, GA 30189
Telephone: 770.726.2585

**BORING NUMBER B-2**
PAGE 3 OF 5

**CLIENT** Log Creek LLLP

**PROJECT NAME** Log Creek LLLP Tract

**PROJECT NUMBER** 18-007

**PROJECT LOCATION** East of Mayfield

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) | ▲ SPT N VALUE ▲ / □ FINES CONTENT (%) □ |
|---|---|---|---|---|---|---|---|---|
| 65 | | Highly weathered, 4 feet missing *(continued)* | RC 2 | 58 (31) | | | | |
| 70 | | | | | | | | |
| | | Highly weathered, 2.5 feet missing | | | | | | |
| 75 | | | RC 3 | 73 (39) | | | | |
| 80 | | | | | | | | |
| | | Moderately weathered, 1.5 feet missing | | | | | | |
| 85 | | | RC 4 | 88 (49) | | | | |
| 90 | | | | | | | | |
| | | Slightly weathered | | | | | | |
| 95 | | | RC 5 | 52 (17) | | | | |

SPT N VALUE scale: 20 40 60 80
PL MC LL: 20 40 60 80
FINES CONTENT (%): 20 40 60 80

GEOTECH BH PLOTS - GINT STD US LAB.GDT - 10/21/18 18:18 - F:\GEOLOGIC LLC\LOG CREEK LLLP\18-007 LOG CREEK LLLP TRACT.GPJ

*(Continued Next Page)*

GeoLogic,LLC
600 Lovinggood Trail
Woodstock, GA 30189
Telephone: 770.726.2585

**GeoLogic**

# BORING NUMBER B-2
PAGE 4 OF 5

**CLIENT**  Log Creek LLLP

**PROJECT NAME**  Log Creek LLLP Tract

**PROJECT NUMBER**  18-007

**PROJECT LOCATION**  East of Mayfield

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) | ▲ SPT N VALUE ▲ / □ FINES CONTENT (%) □ |
|---|---|---|---|---|---|---|---|---|
| | | Slightly weathered *(continued)* | | | | | | |
| 100 | | | | | | | | |
| | | Slightly weathered Granitic Gneiss with potassium feldspar banding with granite | | | | | | |
| 105 | | | RC 6 | 100 (43) | | | | |
| 110 | | | | | | | | |
| | | Unweathered, 115-117 feet light green rock flour/fault gouge, fault? | | | | | | |
| 115 | | | RC 7 | 100 (58) | | | | |
| 120 | | | | | | | | |
| | | Unweathered Granitic Gneiss, medium light gray (N6) to medium gray (N5) | | | | | | |
| 125 | | | RC 8 | 100 (88) | | | | |
| 130 | | | | | | | | |
| | | Unweathered, High angle fractures, possible fault? | | | | | | |

SPT N VALUE scale: 20 40 60 80
PL — MC ● — LL : 20 40 60 80
FINES CONTENT (%): 20 40 60 80

GEOTECH BH PLOTS - GINT STD US LAB.GDT - 10/21/18 18:18 - F:\GEOLOGIC LLC\LOG CREEK LLLP\18-007 LOG CREEK LLLP TRACT.GPJ

(Continued Next Page)

2018 CARRYOVER ATTACHMENT - EXHIBIT C: NORRIS CASON

**GeoLogic**
GeoLogic,LLC
600 Lovinggood Trail
Woodstock, GA 30189
Telephone: 770.726.2585

**BORING NUMBER B-2**
PAGE 5 OF 5

**CLIENT**  Log Creek LLLP

**PROJECT NAME**  Log Creek LLLP Tract

**PROJECT NUMBER**  18-007

**PROJECT LOCATION**  East of Mayfield

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) | ▲ SPT N VALUE ▲ / □ FINES CONTENT (%) □ |
|---|---|---|---|---|---|---|---|---|
| 135 | | Unweathered, High angle fractures, possible fault? *(continued)* | RC 9 | 100 (33) | | | | |
| 140 | | | | | | | | |

Refusal at 54.0 feet.
Bottom of borehole at 141.0 feet.

GEOTECH BH PLOTS - GINT STD US LAB.GDT - 10/21/18 18:18 - F:\GEOLOGIC LLC\LOG CREEK LLLP\18-007 LOG CREEK LLLP TRACT.GPJ

GeoLogic

GeoLogic,LLC
600 Lovinggood Trail
Woodstock, GA 30189
Telephone: 770.726.2585

**BORING NUMBER B-3**
PAGE 1 OF 3

**CLIENT** Log Creek LLLP

**PROJECT NAME** Log Creek LLLP Tract

**PROJECT NUMBER** 18-007

**PROJECT LOCATION** East of Mayfield

**DATE STARTED** 10/1/18 **COMPLETED** 10/1/18

**GROUND ELEVATION** 486 ft NGVD **HOLE SIZE** 1 7/8" inches

**DRILLING CONTRACTOR** Premier Drilling, LLC

**GROUND WATER LEVELS:**

**DRILLING METHOD** HSA-Auto Hammer/Coring

**AT TIME OF DRILLING** ---

**LOGGED BY** BB **CHECKED BY** BB

**AT END OF DRILLING** ---

**NOTES**

**AFTER DRILLING** ---

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) |
|---|---|---|---|---|---|---|---|
| 0 | | SILT, (SC-SM) Overburden | | | | | |
| 5 | | | | | | | |
| 10 | | | | | | | |
| 15 | | Slightly weathered to moderately weathered, [gr1: granite undifferentiated] Granite, chlorite rich, Strong to Very Strong (R4-R5), fine to medium grained, with potassium feldspar and quartz veins, granitic texture, greenish gray (5GY 6/1) to pinkish gray (5YR 8/1) | | | | | |
| 20 | | | RC 1 | 100 (94) | | | |
| 25 | | | | | | | |
| 30 | | | RC | 100 | | | |

*(Continued Next Page)*

GEOTECH BH PLOTS - GINT STD US LAB.GDT - 10/21/18 18:18 - F:\GEOLOGIC LLC\LOG CREEK LLLP\18-007 LOG CREEK LLLP TRACT.GPJ

▲ SPT N VALUE ▲
20  40  60  80
PL    MC    LL
20  40  60  80

☐ FINES CONTENT (%) ☐
20  40  60  80

GeoLogic,LLC
600 Lovinggood Trail
Woodstock, GA 30189
Telephone: 770.726.2585

**GeoLogic**

**BORING NUMBER B-3**
PAGE 2 OF 3

CLIENT  Log Creek LLLP

PROJECT NAME  Log Creek LLLP Tract

PROJECT NUMBER  18-007

PROJECT LOCATION  East of Mayfield

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) | ▲ SPT N VALUE ▲ / □ FINES CONTENT (%) □ |
|---|---|---|---|---|---|---|---|---|
| 30 | | Slightly weathered to moderately weathered, [gr1: granite undifferentiated] Granite, chlorite rich, Strong to Very Strong (R4-R5), fine to medium grained, with potassium feldspar and quartz veins, granitic texture, greenish gray (5GY 6/1) to pinkish gray (5YR 8/1) *(continued)* | 2 | (63) | | | | |
| 35 | | | | | | | | |
| 40 | | | RC 3 | 100 (82) | | | | |
| 45 | | | | | | | | |
| 50 | | | RC 4 | 100 (82) | | | | |
| 55 | | | | | | | | |
| 60 | | | RC 5 | 100 (82) | | | | |

SPT N VALUE scale: 20 40 60 80
PL ├─ MC ●── LL
20 40 60 80
FINES CONTENT (%): 20 40 60 80

GEOTECH BH PLOTS - GINT STD US LAB.GDT - 10/21/18 18:18 - F:\GEOLOGIC LLC\LOG CREEK LLLP\18-007 LOG CREEK LLLP TRACT.GPJ

*(Continued Next Page)*

**GeoLogic**

GeoLogic,LLC
600 Lovinggood Trail
Woodstock, GA 30189
Telephone: 770.726.2585

**BORING NUMBER B-3**
PAGE 3 OF 3

CLIENT  Log Creek LLLP

PROJECT NAME  Log Creek LLLP Tract

PROJECT NUMBER  18-007

PROJECT LOCATION  East of Mayfield

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) | ▲ SPT N VALUE ▲ |
|---|---|---|---|---|---|---|---|---|

▲ SPT N VALUE ▲
20  40  60  80
PL       MC       LL
|---•---|
20  40  60  80
□ FINES CONTENT (%) □
20  40  60  80

65

Refusal at 15.0 feet.
Bottom of borehole at 65.0 feet.

GeoLogic,LLC
600 Lovinggood Trail
Woodstock, GA 30189
Telephone: 770.726.2585

**GeoLogic**

**BORING NUMBER B-4**
PAGE 1 OF 3

**CLIENT**  Log Creek LLLP

**PROJECT NAME**  Log Creek LLLP Tract

**PROJECT NUMBER**  18-007

**PROJECT LOCATION**  East of Mayfield

**DATE STARTED**  10/3/18    **COMPLETED**  10/3/18

**GROUND ELEVATION**  432 ft NGVD    **HOLE SIZE**  1 7/8" inches

**DRILLING CONTRACTOR**  Premier Drilling, LLC

**GROUND WATER LEVELS:**

**DRILLING METHOD**  HSA-Auto Hammer/Coring

**AT TIME OF DRILLING**  ---

**LOGGED BY**  BB    **CHECKED BY**  BB

**AT END OF DRILLING**  ---

**NOTES**

**AFTER DRILLING**  ---

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) | ▲ SPT N VALUE ▲ / □ FINES CONTENT (%) □ |
|---|---|---|---|---|---|---|---|---|
| 0 | | (SC-SM) Overburden | | | | | | |
| 5 | | | | | | | | |
| 10 | | | | | | | | |
| 15 | | | | | | | | |
| 20 | | | | | | | | |
| 25 | | | | | | | | |
| 30 | | | | | | | | |

GEOTECH BH PLOTS - GINT STD US LAB.GDT - 10/21/18 18:18 - F:\GEOLOGIC LLC\LOG CREEK LLLP\18-007 LOG CREEK LLLP TRACT.GPJ

*(Continued Next Page)*

**GeoLogic**

GeoLogic,LLC
600 Lovinggood Trail
Woodstock, GA 30189
Telephone: 770.726.2585

**BORING NUMBER B-4**
PAGE 2 OF 3

**CLIENT** Log Creek LLLP

**PROJECT NAME** Log Creek LLLP Tract

**PROJECT NUMBER** 18-007

**PROJECT LOCATION** East of Mayfield

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) | ▲ SPT N VALUE ▲ / □ FINES CONTENT (%) □ |
|---|---|---|---|---|---|---|---|---|
| 30 | | (SC-SM) Overburden *(continued)* | | | | | | |
| 35 | | Highly weathered, [gr1: granite undifferentiated] Heavilty weathered Gneiss, missing approximately 7 feet | | | | | | |
| 40 | | | RC 1 | 43 (0) | | | | |
| 45 | | Slightly weathered Granite, Yellowsih gray (5Y 8/1), Strong to Very Strong (R4-R5), fine to medium grained, phaneritic, granitic texture | | | | | | |
| 50 | | | RC 2 | 85 (43) | | | | |
| 55 | | | | | | | | |
| 60 | | | RC 3 | 100 (44) | | | | |

*(Continued Next Page)*

GEOTECH BH PLOTS - GINT STD US LAB.GDT - 10/21/18 18:18 - F:\GEOLOGIC LLC\LOG CREEK LLLP\18-007 LOG CREEK LLLP TRACT.GPJ

| | GeoLogic | GeoLogic,LLC<br>600 Lovinggood Trail<br>Woodstock, GA 30189<br>Telephone: 770.726.2585 | **BORING NUMBER B-4**<br>PAGE 3 OF 3 |
|---|---|---|---|

**CLIENT** Log Creek LLLP      **PROJECT NAME** Log Creek LLLP Tract

**PROJECT NUMBER** 18-007      **PROJECT LOCATION** East of Mayfield

| DEPTH (ft) | GRAPHIC LOG | MATERIAL DESCRIPTION | SAMPLE TYPE NUMBER | RECOVERY % (RQD) | BLOW COUNTS (N VALUE) | POCKET PEN. (tsf) | DRY UNIT WT. (pcf) | ▲ SPT N VALUE ▲ / □ FINES CONTENT (%) □ |
|---|---|---|---|---|---|---|---|---|
| 65 | | Slightly weathered Granite, Yellowsih gray (5Y 8/1), Strong to Very Strong (R4-R5), fine to medium grained, phaneritic, granitic texture *(continued)* | RC 4 | 100 (46) | | | | |
| 70 | | | | | | | | |
| 75 | | | RC 5 | 100 (47) | | | | |
| 80 | | | | | | | | |
| 85 | | | RC 6 | 100 (42) | | | | |
| 90 | | | | | | | | |
| | | Refusal at 33.0 feet.<br>Bottom of borehole at 91.0 feet. | | | | | | |

GEOTECH BH PLOTS - GINT STD US LAB.GDT - 10/21/18 18:18 - F:\GEOLOGIC LLC\LOG CREEK LLLP\18-007 LOG CREEK LLLP TRACT.GPJ





Attachment 5: Rock Cores – Photo Logs (4)

# Rock Cores - Photograph Log

Log Creek LLLP Tract
Warrenton, Warren County, Georgia
GeoLogic Project Number 18-007

Rock Core - Boring B-1

Top: 0'



Bottom: 30.0'

# GeoLogic

### Rock Cores - Photograph Log
Log Creek LLLP Tract
Warrenton, Warren County, Georgia
GeoLogic Project Number 18-007

Rock Core - Boring B-1

Top: 30.0'



Bottom: 60.0'

# GeoLogic

## Rock Cores - Photograph Log
Log Creek LLLP Tract
Warrenton, Warren County, Georgia
GeoLogic Project Number 18-007

Rock Core - Boring B-1

Top: 60.0'



Bottom: 90.0'

# GeoLogic

## Rock Cores - Photograph Log
Log Creek LLLP Tract
Warrenton, Warren County, Georgia
GeoLogic Project Number 18-007

Rock Core - Boring B-1

Top: 90.0'



Bottom: 120.0'

# GeoLogic

## Rock Cores - Photograph Log
Log Creek LLLP Tract
Warrenton, Warren County, Georgia
GeoLogic Project Number 18-007

Rock Core - Boring B-1

Top: 120.0'



Bottom: 150.0'

# GeoLogic

### Rock Cores - Photograph Log
Log Creek LLLP Tract
Warrenton, Warren County, Georgia
GeoLogic Project Number 18-007

Rock Core - Boring B-2

Top: 54.0'



Bottom: 81.0'

# GeoLogic

## Rock Cores - Photograph Log
Log Creek LLLP Tract
Warrenton, Warren County, Georgia
GeoLogic Project Number 18-007

Rock Core - Boring B-2

Top: 81.0'



Bottom: 111.0'

# GeoLogic

## Rock Cores - Photograph Log
Log Creek LLLP Tract
Warrenton, Warren County, Georgia
GeoLogic Project Number 18-007

Rock Core - Boring B-2

Top: 111.0′



Bottom: 141.0′

# GeoLogic

### Rock Cores - Photograph Log
Log Creek LLLP Tract
Warrenton, Warren County, Georgia
GeoLogic Project Number 18-007

Rock Core - Boring B-3

Top: 15.0'



Bottom: 45.0'

## Rock Cores - Photograph Log
Log Creek LLLP Tract
Warrenton, Warren County, Georgia
GeoLogic Project Number 18-007

Rock Core - Boring B-3

Top: 45.0'



Bottom: 65.0'

# GeoLogic

### Rock Cores - Photograph Log
Log Creek LLLP Tract
Warrenton, Warren County, Georgia
GeoLogic Project Number 18-007

Rock Core - Boring B-4

Top: 33.0'



Bottom: 61.0'

# GeoLogic

## Rock Cores - Photograph Log
Log Creek LLLP Tract
Warrenton, Warren County, Georgia
GeoLogic Project Number 18-007

**Rock Core - Boring B-4**

Top: 61.0'



Bottom: 91.0'

Attachment 6: Results of Laboratory Testing



October 19, 2018

Benjamin R. Black
Principal Geologist
GeoLogic, LLC
600 Lovinggood Trail               Phone:  (770) 726-2585
Woodstock, GA 30189           Email:   Benjamin.black@geologicllc.com

Subject:      **Log Creek LLLP Tract Rock Cores**
                  **TEC Services Project No:  TEC 18-1465**
                  **TEC Services Laboratory No:  18-1151**

Dear Mr. Black:

Testing, Engineering and Consulting Services, Inc. (TEC Services) is an AASHTO R18, ANS/ISO/IEC 17025:2005, and Army Corps of Engineers accredited laboratory. TEC Services is pleased to submit this report for the testing performed on the delivered rock core samples labeled as Log Creek LLLP Rock Cores by GeoLogic, LLC. Our services were performed in accordance with our service agreement (TEC-PRO 18-1465) dated July 17, 2018. All test results pertain only to the samples tested.

Nine boxes of rock cores were received on October 10, 2018.  The rock core samples were identified as Log Creek LLLP Tract Hole B-1 (40.0 – 70.0'), Hole B-1 (120.0' –140.0'), Hole B-2 (121.0'-131.0'), Hole B-3 (45.0'-55.0') and Hole 4B-12 (71.0'-81.0').  TEC Services was instructed to test core depths of (40.0'-70.0') from B-1 as Sample 1, core depths of (120.0'- 140.0') from B-1 as Sample 2 and to test the combined depths of B-2, B-3 and B-4 as Sample 3. The core samples were crushed in a jaw type crusher at TEC Services. Pictures of rock cores after crushing and before testing are attached to this report. The crushed rock core samples were then sieved in order to separate the coarse aggregate from the fine aggregate. All testing was performed in accordance with the following ASTM standards:

- ASTM C88-13    *Standard Test Method for Soundness of Aggregates by Use of Sodium Sulfate or Magnesium Sulfate*
- ASTM C127-15    *Standard Test Method for Density, Relative Density (Specific Gravity) & Absorption of Coarse Aggregate*
- ASTM C131-14    *Standard Test Method for Resistance to Degradation of Small-Size Coarse Aggregate by Abrasion and Impact in the Los Angeles Machine*

  

- ASTM C142-17    *Standard Test Method for Clay Lumps and Friable Particles in Aggregates.*

Absorption and Specific Gravity

Absorption and specific gravity were determined in accordance with ASTM C127.  Test results are reported in Table 1.  Photos of the aggregate used to perform ASTM C127 are shown in Figures 1 - 3.

**Table 1 – Absorption and Specific Gravity Results**

| Sample ID | Absorption (%) | Bulk Specific Gravity Dry | Bulk Specific Gravity SSD | Apparent Specific Gravity | Density Oven Dry ($lb/ft^3$) | Density SSD ($lb/ft^3$) | Apparent Density ($lb/ft^3$) |
|---|---|---|---|---|---|---|---|
| Sample 1 | 0.39 | 2.622 | 2.633 | 2.650 | 163.3 | 163.9 | 165.0 |
| Sample 2 | 0.45 | 2.630 | 2.642 | 2.662 | 163.8 | 164.5 | 165.8 |
| Sample 3 | 0.58 | 2.622 | 2.637 | 2.662 | 163.2 | 164.2 | 165.8 |

**Figure 1 ASTM C127 (Sample 1)**



CARRYOVER ATTACHMENT - EXHIBIT C: NORRIS CASON

*Log Creek LLLP Tract Rock Cores*
*TEC Services Project No: TEC 18-1465*
*TEC Services Laboratory No: 18-1151*

*October 19, 2018*

### Figure 2 ASTM C127 (Sample 2)



### Figure 3 ASTM C127 (Sample 3)



*Log Creek LLLP Tract Rock Cores*
*TEC Services Project No:  TEC 18-1465*
*TEC Services Laboratory No:  18-1151*

*October 19, 2018*

Soundness

Soundness testing was performed in accordance with ASTM C88. The purpose of the testing was to determine the soundness of the aggregate when subjected to weathering action in concrete or other applications by a saturated solution of magnesium sulfate and sodium sulfate.  This was accomplished by five repeated immersions in a saturated solution of magnesium sulfate (specific gravity = 1.302) followed by oven drying to partially or completely dehydrate the salt precipitated in permeable pore spaces.  The results of the soundness testing are reported in Tables 2 - 4.  Photos of the aggregate used to perform ASTM C88 are shown in Figures 4 - 6.

**Table 2 - Magnesium Sulfate Soundness – Sample 1**

| Sieve Size | Grading of Original Sample (*% Retained*) | Mass of Test Fractions Before Test (*g*) | Mass of Test Fractions After Test (*g*) | % Passing Designated Sieve After Test | Weighted % Loss |
|---|---|---|---|---|---|
| $1^1/_2$ to 1 in (37.5 to 25.0 mm) | 50.6 | 1,000.4 | 995.9 | 0.4 | 0.2 |
| 25.0 to 19.0 mm (1 to ¾) | 15.2 | 500.0 | 486.7 | 2.7 | 0.4 |
| 19.0 to 12.5 mm (¾ to ½ in) | 8.2 | 670.0 | 664.3 | 0.9 | 0.1 |
| 12.5 to 9.5 mm (½ to ⅜ in) | 2.3 | 325.3 | 317.3 | 2.5 | 0.1 |
| 9.5 to 4.75 mm (⅜ to #4) | 3.3 | 300.3 | 283.7 | 5.5 | 0.2 |

* The weighted loss was determined from the grading created from the crushing process at our facility.

**Table 3 - Magnesium Sulfate Soundness – Sample 2**

| Sieve Size | Grading of Original Sample (*% Retained*) | Mass of Test Fractions Before Test (*g*) | Mass of Test Fractions After Test (*g*) | % Passing Designated Sieve After Test | Weighted % Loss |
|---|---|---|---|---|---|
| $1^1/_2$ to 1 in (37.5 to 25.0 mm) | 42.3 | 1,010.3 | 1,007.9 | 0.2 | 0.1 |
| 25.0 to 19.0 mm (1 to ¾) | 17.9 | 503.4 | 500.9 | 0.5 | 0.1 |
| 19.0 to 12.5 mm (¾ to ½ in) | 8.2 | 670.3 | 610.3 | 9.0 | 0.8 |
| 12.5 to 9.5 mm (½ to ⅜ in) | 2.7 | 330.4 | 291.5 | 11.8 | 0.3 |
| 9.5 to 4.75 mm (⅜ to #4) | 4.2 | 300.0 | 262.1 | 12.6 | 0.5 |

* The weighted loss was determined from the grading created from the crushing process at our facility.

**Table 4 - Magnesium Sulfate Soundness – Sample 3**

| Sieve Size | Grading of Original Sample (*% Retained*) | Mass of Test Fractions Before Test (*g*) | Mass of Test Fractions After Test (*g*) | % Passing Designated Sieve After Test | Weighted % Loss |
|---|---|---|---|---|---|
| $1^1/_2$ to 1 in (37.5 to 25.0 mm) | 45.5 | 1,010.2 | 1,001.6 | 0.9 | 0.4 |
| 25.0 to 19.0 mm (1 to ¾) | 16.7 | 507.0 | 495.8 | 2.2 | 0.4 |
| 19.0 to 12.5 mm (¾ to ½ in) | 8.0 | 670.2 | 656.8 | 2.0 | 0.2 |
| 12.5 to 9.5 mm (½ to ⅜ in) | 2.6 | 330.2 | 310.7 | 5.9 | 0.2 |
| 9.5 to 4.75 mm (⅜ to #4) | 3.7 | 300.5 | 268.8 | 10.5 | 0.4 |

* The weighted loss was determined from the grading created from the crushing process at our facility.

CARRYOVER ATTACHMENT - EXHIBIT C: NORRIS CASON

*Log Creek LLLP Tract Rock Cores*
*TEC Services Project No: TEC 18-1465*
*TEC Services Laboratory No: 18-1151*

*October 19, 2018*

| **Figure 4 Sample 1** | **Before ASTM C88 Testing** | **After ASTM C88 Testing** |
|---|---|---|
| Figures 4a and b. Before and after photographs of aggregate, subjected to Magnesium Sulfate Soundness |  |  |

| **Figure 5 Sample 2** | **Before ASTM C88 Testing** | **After ASTM C88 Testing** |
|---|---|---|
| Figures 5a and b. Before and after photographs of aggregate, subjected to Magnesium Sulfate Soundness |  |  |

| Figure 6 Sample 3 | Before ASTM C88 Testing | After ASTM C88 Testing |
|---|---|---|
| Figures 6a and b. Before and after photographs of aggregate, subjected to Magnesium Sulfate Soundness |  |  |

LA Abrasion

The L.A. Abrasion testing was performed in accordance with ASTM C131.  The crushed rock cores were sieved and recombined to obtain a Grading A. The results of the L.A. Abrasion testing are reported in Tables 5 - 7.   Photos of the aggregate used to perform ASTM 131 are shown in Figures 7 - 9.

**Table 5 – LA Abrasion (Grading A) – Sample 1**

| Passing | Retained on | Grading A Requirements (g) | Test Sample Size (g) |
|---|---|---|---|
| 37.5 mm ($1^1/_2$ in) | 25.0 mm (1in.) | 1,250 ± 25 | 1,252.5 |
| 25.0 mm (1in.) | 19.0 mm ($^3/_4$ in) | 1,250 ± 25 | 1,253.0 |
| 19.0 mm ($^3/_4$ in) | 12.5 mm ($^1/_2$ in) | 1,250 ± 10 | 1,250.6 |
| 12.5 mm ($^1/_2$ in) | 9.5 mm ($^3/_8$ in) | 1,250 ± 10 | 1,250.4 |
| | Total | 5,000 ± 10 | 5,006.5 |
| | Retained on #12 after Test | | 2,805.0 |
| | **Percent Loss** | | **44** |

**Table 6 – LA Abrasion (Grading A) – Sample 2**

| Passing | Retained on | Grading A Requirements (*g*) | Test Sample Size (*g*) |
|---|---|---|---|
| 37.5 mm (1$^1$/$_2$ in) | 25.0 mm (1in.) | 1,250 ± 25 | 1,251.0 |
| 25.0 mm (1in.) | 19.0 mm ($^3$/$_4$ in) | 1,250 ± 25 | 1,253.5 |
| 19.0 mm ($^3$/$_4$ in) | 12.5 mm ($^1$/$_2$ in) | 1,250 ± 10 | 1,250.3 |
| 12.5 mm ($^1$/$_2$ in) | 9.5 mm ($^3$/$_8$ in) | 1,250 ± 10 | 1,250.6 |
| | Total | 5,000 ± 10 | 5,005.4 |
| | Retained on #12 after Test | | 2,825.6 |
| | **Percent Loss** | | **44** |

**Table 7 – LA Abrasion (Grading A) – Sample 3**

| Passing | Retained on | Grading A Requirements (*g*) | Test Sample Size (*g*) |
|---|---|---|---|
| 37.5 mm (1$^1$/$_2$ in) | 25.0 mm (1in.) | 1,250 ± 25 | 1,253.7 |
| 25.0 mm (1in.) | 19.0 mm ($^3$/$_4$ in) | 1,250 ± 25 | 1,250.8 |
| 19.0 mm ($^3$/$_4$ in) | 12.5 mm ($^1$/$_2$ in) | 1,250 ± 10 | 1,250.1 |
| 12.5 mm ($^1$/$_2$ in) | 9.5 mm ($^3$/$_8$ in) | 1,250 ± 10 | 1,251.7 |
| | Total | 5,000 ± 10 | 5,006.3 |
| | Retained on #12 after Test | | 2,991.0 |
| | **Percent Loss** | | **40** |

| Figure 7 Sample 1 | After ASTM C131 Testing |
|---|---|
| Figure 7 after photograph of aggregate, subjected to LA Abrasion |  |

*Log Creek LLLP Tract Rock Cores*
*TEC Services Project No:  TEC 18-1465*
*TEC Services Laboratory No:  18-1151*

*October 19, 2018*

| **Figure 8 Sample 2** | **After ASTM C131 Testing** |
|---|---|
| Figure 8 after photograph of aggregate, subjected to LA Abrasion |  |

| **Figure 9 Sample 3** | **After ASTM C131 Testing** |
|---|---|
| Figure 9 after photograph of aggregate, subjected to LA Abrasion |  |

<u>Clay Lumps and Friable Particles</u>
Testing for clay lumps and friable particles were determined in accordance with ASTM C142.  Test results are reported in Tables 8 - 10. Photos of the aggregate used to perform ASTM 142 are shown in Figures 10 - 12.

ARR-Y-OVER 7 ATT CHMENT 1 - EXHIBIT 2 · NeR R IS 66

*Log Creek LLLP Tract Rock Cores*
*TEC Services Project No:  TEC 18-1465*                                    *October 19, 2018*
*TEC Services Laboratory No:  18-1151*

**Table 8 – Clay Lumps and Friable Particles - Sample 1**

| Size of Particles Making Up Sample | Grading of Original Sample (*% Retained*) | Mass of Test Fractions Before Test (*g*) | % Passing Designated Sieve After Test | Weighted Percent Loss |
|---|---|---|---|---|
| Over 1 $^1/_2$ | 14.2 | 5,021.8 | 0.1 | 0.0 |
| 1 $^1/_2$ to $^3/_4$ in (37.5 to 19.0 mm) | 65.8 | 3,012.1 | 0.1 | 0.1 |
| $^3/_4$ to $^3/_8$ in (19.0 to 9.5 mm) | 10.5 | 2,010.1 | 0.1 | 0.0 |
| $^3/_8$ to No. 4 (9.5 to 4.75 mm) | 3.3 | 1,028.8 | 0.4 | 0.0 |
| | | | **Total Weighted % Loss** | **0.1** |

**Table 9 – Clay Lumps and Friable Particles - Sample 2**

| Size of Particles Making Up Sample | Grading of Original Sample (*% Retained*) | Mass of Test Fractions Before Test (*g*) | % Passing Designated Sieve After Test | Weighted Percent Loss |
|---|---|---|---|---|
| Over 1 $^1/_2$ | 18.0 | 5,074.5 | 0.1 | 0.0 |
| 1 $^1/_2$ to $^3/_4$ in (37.5 to 19.0 mm) | 60.2 | 3,027.5 | 0.1 | 0.1 |
| $^3/_4$ to $^3/_8$ in (19.0 to 9.5 mm) | 10.9 | 2,001.8 | 0.2 | 0.0 |
| $^3/_8$ to No. 4 (9.5 to 4.75 mm) | 4.2 | 1,033.6 | 0.2 | 0.0 |
| | | | **Total Weighted % Loss** | **0.1** |

**Table 10 – Clay Lumps and Friable Particles - Sample 3**

| Size of Particles Making Up Sample | Grading of Original Sample (*% Retained*) | Mass of Test Fractions Before Test (*g*) | % Passing Designated Sieve After Test | Weighted Percent Loss |
|---|---|---|---|---|
| Over 1 $^1/_2$ | 17.3 | 5,069.2 | 0.1 | 0.0 |
| 1 $^1/_2$ to $^3/_4$ in (37.5 to 19.0 mm) | 62.2 | 3,015.0 | 0.1 | 0.1 |
| $^3/_4$ to $^3/_8$ in (19.0 to 9.5 mm) | 10.6 | 2,030.6 | 0.2 | 0.0 |
| $^3/_8$ to No. 4 (9.5 to 4.75 mm) | 3.7 | 1,011.2 | 0.5 | 0.0 |
| | | | **Total Weighted % Loss** | **0.1** |

*Log Creek LLLP Tract Rock Cores*
*TEC Services Project No:  TEC 18-1465*                                                              *October 19, 2018*
*TEC Services Laboratory No:  18-1151*

## Figure 10 ASTM C142 (Sample 1)



## Figure 11 ASTM C142 (Sample 2)



2018 CARRYOVER ATTACHMENT - EXHIBIT C: NORRIS CASON

*Log Creek LLLP Tract Rock Cores*
*TEC Services Project No: TEC 18-1465*
*TEC Services Laboratory No: 18-1151*

*October 19, 2018*



**Figure 12 ASTM C142 (Sample 3)**

We appreciate the opportunity to provide our services to you on this project. Should you have any questions or comments regarding this report, please feel free to contact us at your convenience.

Sincerely,

**TESTING, ENGINEERING, AND CONSULTING SERVICES, INC.**

Brian Smith
Project Manager

Steven Maloof
Project Manager

Attachments: Photos 1 - 3

*Log Creek LLLP Tract Rock Cores*                         *October 19, 2018*
*TEC Services Project No:  TEC 18-1465*
*TEC Services Laboratory No:  18-1151*

**Photo 1: Sample 1 as Received**



*Log Creek LLLP Tract Rock Cores*
*TEC Services Project No: TEC 18-1465*
*TEC Services Laboratory No: 18-1151*

*October 19, 2018*

**Photo 2: Sample 2 as Received**



2018 CARRYOVER ATTACHMENT - EXHIBIT C: NORRIS CASON

*Log Creek LLLP Tract Rock Cores*
*TEC Services Project No: TEC 18-1465*
*TEC Services Laboratory No: 18-1151*

*October 19, 2018*

**Photo 3: Sample 3 as Received**



**19.2 Appendix B Addendum to October 2018 report - Ecological Survey, Mine Plan, and Permit Applications**



# TECHNICAL MEMORANDUM

<u>TO</u>:        Mr. Tony Townley, as Manager for Log Creek LLLP
1280 Snows Mill Road
Bogart, Georgia 30622

<u>FROM</u>:      GeoLogic, LLC
Benjamin Black, PE, PG

<u>DATE</u>:      February 25, 2022

<u>SUBJECT</u>:   **Ecological Survey, Mine Plans, and Permit Applications**
Norris Cason
Ogeechee River Road and Timber Road
Warren County, Georgia

In an effort to ensure that all aspects of the above-referenced project were accurate and in compliance with all applicable codes, rules, and laws, GeoLogic was retained to make additional inquiries regarding delineation of wetlands at the request of the Townley family. In addition, GeoLogic completed a detailed analysis and surface mine planning and design, feasibility analysis, and rail access to the proposed quarry.

A summary of these additional efforts is outlined in the following technical memorandum and attachments. Please note that the ecological survey documented the conditions on the property at the time of the report; these conditions may change over time.

## ECOLOGICAL SURVEY

The following is a summary of findings from field investigations of state and federal waters, protected species habitat identified by the GeoLogic/Woodard & Curran team, and preliminary desktop reviews on the approximately 240-acre Norris Cason property ("the study area") during the on-site ecological field survey conducted from October 12 to 13, 2020 and October 15 to 16, 2020.

**Waters of the US Assessment**: Areas within the study area were classified as wetlands and flagged in the field if they exhibited evidence of all three of the following wetland parameters: hydrophytic vegetation, hydric soils, and wetland hydrology. Areas were classified as stream channels if they exhibited a defined bed and bank, discernible ordinary high-water mark (OHWM), substrate differentiation, and evidence of groundwater contribution and base flow at times other than storm events. Open waters determinations were based upon the presence of an OHWM.

<u>Field studies identified the presence of five (5) wetlands, none of which is classified as a state buffered feature; and seven (7) warm water streams, all classified as buffered waters of the state (25' buffer), within the study area. One (1) of the seven streams (Stream 3) has an intermittent component and a perennial component. No trout waters, open waters, USACE Section 10 regulated (i.e., navigable) waters, tidal wetlands, or non-jurisdictional features were identified within the study area.</u>

*Geological Consulting, Mining and Quarry Evaluations, and Engineering Geology*



The approximate extents of waters and wetlands were determined using in-house research based on evaluation and data synthesis of the following documents: USGS 7.5-minute quadrangle topographic maps; USDA-NRCS Web Soil Survey for Warren County, Georgia; USGS National Hydrography Dataset; U.S. Fish and Wildlife Service (USFWS) National Wetland Inventory (NWI) maps; Aerial photography, as provided by ESRI World Imagery base maps; Field maps and notes taken by GeoLogic and Woodard & Curran personnel.

The field delineation and associated mapping does not include gullies, rills, non-wetland swales, ephemeral channels, or other wet weather conveyance features that are not defined as Waters of the US (WOTUS) by USACE nor as buffered state waters by Georgia Environmental Protection Division (GA EPD).

**Protected Species Habitat Assessment**: Pedestrian surveys of the study area were conducted to determine the potential presence of any species classified as federally threatened or endangered, or their suitable habitat, within the project county. It was determined that four federally protected species have a likelihood of occurring within the project county: the endangered Atlantic sturgeon, the endangered Harperella, the threatened little amphianthus, and the endangered mat-forming quillwort. No protected species habitat was identified within the study area at the time of the field survey. No protected species habitat was identified within the areas to be mined. The threatened little amphianthus and the endangered mat-forming quillwort are covered by the Georgia Granite Outcrop Plants EDGES (Effects Determination Guidance for Endangered & Threatened Species), with no applicable EDGES effects determinations for the study area.

A list of threatened and endangered species for the project county was obtained from the USFWS Information Planning and Conservation (IPaC) System and the Georgia Department of Natural Resources Biodiversity Portal online database. The USACE and USFWS jointly developed Effects Determination Guidance for Endangered & Threatened Species (EDGES) methodology was analyzed for the project study area.

**Environmental Permitting:** Where future planned activities will disturb greater than one acre, a National Pollutant Discharge Elimination System (NPDES) construction stormwater permit will be required. Under the NPDES permit, encroachment into state buffers within the study area may require a state waters buffer variance (SBV) based on the Georgia Erosion and Sedimentation Act (GESA) of 1975 and the applicable state buffer rules. In our opinion there is a strong likelihood that that referenced project would be granted any necessary NPDES permits.

If impacts to jurisdictional waters and/or wetlands cannot be avoided during prospective land development, then impacts resulting from project land-disturbing activities may be authorized under a USACE Section 404 Nationwide Permit (NWP) or Individual Permit (IP) depending on the amount and type of impacts. A compensatory mitigation plan may also be required for impacts to jurisdictional waters and/or wetlands.

NWP 44 authorizes mining activities provided they adhere to the USACE general and regional conditions that apply to the NWPs at the specific time the permit is issued by the USACE. In 2018, NWP 44 was issued under the 2017 NWP program, which had specific general and regional conditions as well as thresholds for impact of up to 300 linear feet of intermittent or perennial stream bed and up to 0.5 acre of wetlands.



<u>Under the designed surface mine plan for the site, an IP will not be required as there will be no impact to wetlands greater than ½ acre.</u>

A copy of the Ecological Report is included in **Attachment A.**

**SURFACE MINE PLANNING**

The resource and reserve estimates outlined in the ***Report of Preliminary Subsurface Exploration, Geological Evaluation, and Resource and Reserve Estimate*** dated October 25, 2018 were based on a theoretical quarry layout that covered approximately 70-acres; however, detailed surface mine plans were not prepared as part of that deliverable. As requested, GeoLogic developed detailed surface mine plans in order to confirm the feasibility of constructing an aggregate quarry on the property and to estimate the quantity of aggregate resource and mineable reserves.

In order to calculate the resource and reserve estimates for the aggregate quarry, GeoLogic used a volumetric (three-dimensional [3D]) approach to estimate the quantities of material that are available to be mined from the quarry. This approach is appropriate based on the assumption that the majority of available mineral reserves will be mined and sold as aggregate. The use of other approaches (e.g., polygonal methods, geostatistical analysis) are not appropriate based on the type of material that is being mined.

To develop the geological and mine planning model, GeoLogic utilized AutoCAD Civil 3D 2021 to create "surfaces" within the model that are used to delineate material (e.g., overburden and bedrock) at different elevations and locations based on the topography and material properties of the site. The quarry is then designed based on the overburden thickness, location and extent of setbacks, access road(s), haul road(s), etc. to create a mine layout that will yield the maximum quantity of material to be mined. Not all material that is present in the subsurface is mineable due to setbacks, pit slope angles, haul roads, mine geometry and other factors. Additionally, some loss of material is expected during drilling, blasting, excavation, crushing, washing, and screening. Losses of these types may range from 5-percent to 20-percent or more[1]. For purposes of this analysis, this was estimated at 15-percent inclusive of all potential sources of loss.

Based on current site limitations, it was determined that an overall pit area of 68-acres was feasible. Constraints that dictated the maximum lateral extent of the pit included the presence of wetlands, creeks, wet-weather ditches, setbacks from these features, a 100-foot setback from property boundaries, overburden storage, and placement of the new railroad loading facility.

Taking into consideration these constraints, the site's topography, and the subsurface geology, GeoLogic then calculated the quantity of overburden material to be stripped and the in-place quantity of mineable material on a top of bench-by-bench basis. For this analysis, overburden thickness was calculated to be approximately 26 feet, which yielded approximately 2.3 million cubic yards of overburden.  Overburden

---

[1] Barksdale, R. D. (Ed.). (2013). Aggregate Handbook (Second Edition), National Stone, Sand & Gravel Association (editor: Richard D. Barksdale), Alexandria, Virginia.



will be used to create the plant site and rail access/loading facility with the remainder being stored on site for use in reclamation, or sale as fill material.

The total estimated mineable reserves in the proposed quarry were calculated to be **50 million tons** of rock. As noted, GeoLogic analyzed the mine plan to determine the quantity of mineable material on a top of bench-by-bench basis. The first top of bench in the proposed mine is the 450-foot bench level (BL), with each successive bench being mined 50 feet below the previous bench. The mine plan, as designed, assumes that the top of each bench will be 40 feet wide and will be 50 feet tall with a 1.5-percent back slope to catch and direct surface water to the pit for collection, treatment, and reuse as part of the aggregate production process. The bench face angle was kept constant across the mine at ¼ to 1 (76-degree slope).

As part of the design, it was assumed that a highwall on two to three sides of the quarry will be developed as each successive bench level is mined down. The mine design assumed that the pit would be mined down to the 150-foot BL for a total mined depth of 300 feet of material. This assumption is reasonable based on the subsurface rock profile found during drilling and geological information for quarries in the area surrounding the site.

***Figure 1.1*** below (excerpt from *The 2017 SME Guide for Reporting Exploration Results, Mineral Resources, and Mineral Reserves*) depicts the relationship between <u>resource</u> and <u>reserves</u> based on increasing level of geoscientific knowledge and confidence.



*Figure 1.1 – 2017 SME Guide for Reporting Exploration Results, Mineral Resources, and Mineral Reserves.*



**Sheet C-01 (Master Plan)** summarizes the quantity of rock and overburden based on the mine plan. **Table 1** (on the following page) summarizes the estimated resource and reserves (based on a 68-acre maximum pit size) for the aggregate stone quarry.

| Description | Quantity |
|---|---|
| Approximate Overburden (cubic yards) | 2,290,000 |
| Measured Resource (short tons) | 36,478,015 |
| Indicated Resource (short tons) | 48,637,354 |
| Total Resource (short tons) | 85,115,369 |
| Proven Reserve (short tons) | 31,006,313 |
| Probable Reserve (short tons) | 41,341,751 |
| Total In-Place Reserve (short tons) | 72,348,063 |
| Mineable Reserve (short tons)* | 50,000,000 |

Table 1 – Reserve Estimate (Aggregate)

**\*The In-Place Reserve and Mineable (Proven) Reserve outlined in Table 1 is based on a quarry depth of 300 feet inclusive of bench levels 450 to 150 feet. The overall mine plan was assumed to a depth of 300 feet, thus the Mineable Reserve of 50,000,000 tons as shown on Sheet C-01 of the surface mine plans (if the quarry were extended to the top of the 150-foot bench level). This estimate includes both measured and indicated reserves.**

**Figure 1** in **Attachment B** depicts the typical bench level detail for the quarry, as currently designed. Mineable quantities of aggregate, per bench level are summarized in **Table 2**. **Sheet C-07** in the attached Surface Mining Land Use Plans depict the summary of reserves for each bench level.

| Description | Quantity |
|---|---|
| 450-foot BL | 10,410,000 |
| 400-foot BL | 9,530,000 |
| 350-foot BL | 8,690,000 |
| 300-foot BL | 7,880,000 |
| 250-foot BL | 7,110,000 |
| 200-foot BL | 6,380,000 |
| Total Mineable Reserve (short tons) | 50,000,000 |

Table 2 – Mineable Reserve Estimate (by BL)

Revised surface mine plans are found in **Attachment B**.



**RAILROAD ACCESS DESIGN**

As part of the design process, GeoLogic developed a detailed railroad access plan for connecting the site to the local CSX Transportation, Inc. (CSX) railroad mainline that runs parallel to the site on the north side of the property. The rail access also allows for approximately two-miles of track to be used as part of the rail loadout facility on the property. The design incorporates all requirements of CSX for the slope and grade of the line to allow for safe and efficient loading of the railcars.

**Sheets C-08** through **C-13** and **Sheets C-21** and **C-22** depict the layout, sections, and CSX details for the railroad design.

**PERMIT APPLICATIONS**

As defined in the Georgia Surface Mining Act, several different permits are required to be prepared along with the Surface Mine Land Use Permit and Plans. These permits include: NPDES (Stormwater and Industrial), Air Quality Permit, Groundwater Extraction Permit, and Wastewater Discharge Permit.

The permits outlined previously are found in **Attachment C**.

**COMPLIANCE CERTIFICATION**

The resume for Benjamin R. Black, PE, PG is included in **Attachment D**.  Compensation for consultation and testimony performed by Benjamin R. Black, PE, PG, and other supporting staff at GeoLogic, LLC was performed on an hourly basis at the rates outlined in the Unit Rate Sheet 2021. This rate sheet covers all rates for all staff engaged by GeoLogic, LLC and are the same rates offered to all clients of GeoLogic, LLC. Any work performed by subconsultants was done so at their cost plus a 20-percent markup.



**Attachment A**

*Norris Cason Tract –*

*Technical Memorandum*

Ecological Report

COMMITMENT & INTEGRITY
DRIVE RESULTS

2005 Sugarloaf Circle | Suite 175
Duluth, Georgia 30097
www.woodardcurran.com

T (770) 396-1662
F (770) 396-0095



**WOODARD
&CURRAN**

# MEMORANDUM

TO:    Mr. Benjamin Black
        Owner/Principal Geological Engineer
        GeoLogic LLC

FROM:  Woodard & Curran
        Reid Heaton and Will Medlin

DATE:    October 26, 2020

**SUBJECT:  Norris Cason Tract
             Warren County, Georgia
             Ecological Field Survey Report**

---

Woodard & Curran is pleased to submit this Ecological Field Survey Report for the Norris Cason Tract (study area) located in Warren County, Georgia. The following information is a summary of findings from preliminary desktop reviews, field investigations of state and federal waters, and protected species habitat identified within the study area.

**Project Description and Study Area**

Woodard & Curran conducted an ecological field survey of the study area on October 12 to 13, 2020 and October 15 to 16, 2020. The study area is approximately 241 acres in size located in the Piedmont region of Georgia. The study area includes planted pine woods, mixed pine-hardwood forest, early successional scrub-shrub forest, palustrine emergent marsh, narrow small stream floodplain forest, and several unpaved, dirt access roads. The ecological field survey area was performed within the entire Norris Cason Tract boundary provided by GeoLogic, LLC. Refer to Attachment A - Figure 1 to view the location and extent of the surveyed study area.

**Waters of the US Assessment**

Waters of the United States (US), including streams and wetlands, are defined by 33 CFR Part 328.3(b) and are protected by Section 404 of the Clean Water Act (33 USC 1344), which is administered and enforced in Georgia by the US Army Corps of Engineers (USACE), Savannah District. The approximate extents of waters and wetlands were determined using in-house research based on evaluation and data synthesis of the following documents:

- USGS 7.5-minute quadrangle topographic maps
- USDA-NRCS Web Soil Survey for Warren County, Georgia
- USGS National Hydrography Dataset
- U.S. Fish and Wildlife Service (USFWS) National Wetland Inventory (NWI) maps
- Aerial photography, as provided by ESRI World Imagery basemaps
- Field maps and notes taken by Woodard & Curran personnel



Wetland boundary locations were determined using the methodology described in the *Regional Supplement to the 1987 Corps of Engineers Wetlands Delineation Manual: Eastern Mountains and Piedmont Region Version 2.0* (USACE 2012). The technique presented in the regional supplement uses a multi-parameter approach that requires positive evidence of three wetland criteria:

1. Hydrophytic vegetation
2. Hydric soils
3. Wetland hydrology

Areas within project study area were classified as wetlands and flagged in the field if they exhibited evidence of all three of the above wetland parameters. Areas were classified as stream channels if they exhibited a defined bed and bank, discernible ordinary high-water mark (OHWM), substrate differentiation, and evidence of groundwater contribution and base flow at times other than storm events. Open waters determinations were based upon the presence of an OHWM. Field studies identified the presence of five wetlands, seven streams, and no open waters within the study area.

Table 1 provides a list of waters and wetlands delineated within the study area. Please refer to Attachment A - Figure 3 for delineated Waters of the US identified within the study area.

## Table 1: Delineated Waters of the US

| Resource ID | Cowardin Classification | Drainage Association | 8-Digit HUC | Amount of Resource in Project Study Area | State Buffered Feature |
|---|---|---|---|---|---|
| Wetland 1 | PFO1/4 | Ogeechee River | 03060201 | 0.272 acres | No |
| Wetland 2 | PEM1Ab | Ogeechee River | 03060201 | 3.372 acres | No |
| Wetland 3 | PFO1/4A | Ogeechee River | 03060201 | 0.255 acres | No |
| Wetland 4 | PFO1/4A | Ogeechee River | 03060201 | 0.093 acres | No |
| Wetland 5 | PFO1/4A | Ogeechee River | 03060201 | 0.069 acres | No |
| Stream 1 (Intermittent) | R4SB56 | Ogeechee River | 03060201 | 94 linear feet, 0.009 acres | Yes; 25 ft |
| Stream 2 (Perennial) | R3UB21 | Ogeechee River | 03060201 | 1,588 linear feet, 0.146 acres | Yes; 25 ft |
| Stream 3 (Perennial) | R3UB21 | Ogeechee River | 03060201 | 2,022 linear feet, 0.234 acres | Yes; 25 ft |
| Stream 3 (Intermittent) | R4SB56 | Ogeechee River | 03060201 | 18 linear feet, 0.003 acres | Yes; 25 ft |
| Stream 4 (Perennial) | R3UB21 | Ogeechee River | 03060201 | 2,522 linear feet, 0.314 acres | Yes; 25 ft |
| Stream 5 (Intermittent) | R4SB432 | Ogeechee River | 03060201 | 872 linear feet, 0.062 acres | Yes; 25 ft |
| Stream 6 (Perennial) | R3UB21 | Ogeechee River | 03060201 | 315 linear feet, 0.017 acres | Yes; 25 ft |
| Stream 7 (Intermittent) | R4SB56 | Ogeechee River | 03060201 | 192 linear feet, 0.018 acres | Yes; 25 ft |



**State Water Buffers**

All seven warm water streams identified during the field survey are buffered waters of the state (25 ft buffer). No trout waters were identified.

**Section 10 Regulated Waters**

No USACE Section 10 regulated (i.e. navigable) waters were identified during the field survey.

**Open Waters**

No open waters were identified during the field survey.

**Tidal Wetlands**

No tidal wetlands were identified during the field survey.

**Non-Jurisdictional Features**

No non-jurisdictional features were identified during the field survey. The field delineation and associated mapping does not include gullies, rills, non-wetland swales, ephemeral channels, or other wet weather conveyance features that are not defined as Waters of the U.S. (WOTUS) by USACE, nor as buffered state waters by Georgia Environmental Protection Division (EPD).

**Protected Species Habitat Assessment**

Under provisions of the Endangered Species Act (ESA) of 1973 (as amended), federal law requires that any action likely to adversely affect a species classified as federally threatened or endangered be subject to review by the USFWS. A list of threatened and endangered species for the project county was obtained from the USFWS Information Planning and Conservation (IPaC) System and the Georgia Department of Natural Resources Biodiversity Portal online database. Woodard & Curran conducted pedestrian surveys to determine the potential presence of listed species or suitable habitat within the project county. Upon conclusion of the ecological field survey, the USACE and USFWS jointly developed Effects Determination Guidance for Endangered & Threatened Species (EDGES) methodology was analyzed for the project study area. Table 2 presents federal listed threatened or endangered species with a likelihood to occur within the project county, the applicability of EDGES, and the EDGES determination (if applicable). No protected species habitat was identified within the project study area during the field survey.



**Table 2: USFWS Protected Species**

| Common Name | Scientific Name | Federal Status | Habitat Present within Project Study Area | Applicable EDGES | Effects Determination |
|---|---|---|---|---|---|
| **Fauna** | | | | | |
| Atlantic sturgeon | *Acipenser oxyrinchus* | Endangered | No | N/A | N/A |
| **Flora** | | | | | |
| Harperella | *Ptilimnium nodosum* | Endangered | No | N/A | N/A |
| Little amphianthus | *Amphianthus pusillus* | Threatened | No | Georgia Granite Outcrop Plants | N/A |
| Mat-forming quillwort | *Isoetes tegetiformans* | Endangered | No | Georgia Granite Outcrop Plants | N/A |

**Environmental Permitting**

If future planned activities will disturb greater than one acre, a National Pollutant Discharge Elimination System (NPDES) construction stormwater permit will be required. Under the NPDES permit, encroachment into state buffers within the study area may require a state waters buffer variance (SBV) based on the Georgia Erosion and Sedimentation Act (GESA) of 1975 and the applicable state buffer rules. If impacts to jurisdictional waters and/or wetlands cannot be avoided during prospective land development, then impacts resulting from project land-disturbing activities may be authorized under a USACE Section 404 Nationwide Permit (NWP) or Individual Permit (IP) depending on the amount and type of impacts. A compensatory mitigation plan may be required for impacts to jurisdictional waters and/or wetlands.

**Access Issues**

Areas near the western boundary of the study area were flooded at the time of the field survey. Several beaver dams were identified in the vicinity of the flooded areas.

**Closing**

We appreciate the opportunity to perform this important work for GeoLogic, LLC. If you have questions concerning this document, please contact Reid Heaton at (770) 679-7221 or Will Medlin at (770) 679-7032.

Sincerely,

Woodard & Curran

Reid Heaton
Ecologist

William L. Medlin, PWS, ENV SP
Principal Ecologist



Attachment A:    Figures
Attachment B:    Project Photographs
Attachment C:    USACE Wetland Determination Data Forms



**Attachment A:  Figures**



Figure 1.
Project Location

GeoLogic, LLC
Norris Cason Tract

Warren County, GA

Legend

☐ Study Area Boundary

GEOLOGIC

N

WOODARD &CURRAN

Project #: 233364.04
Map Created: October 2020

1 inch = 1 miles

0   0.25   0.5        1
|___|___|___|___|___| Miles

Sources: Esri, HERE, Garmin, USGS, Intermap, INCREMENT P, NRCan, Esri Japan, METI, Esri China (Hong Kong), Esri Korea, Esri (Thailand), NGCC, © OpenStreetMap contributors, and the GIS User Community

Third Party GIS Disclaimer: This map is for reference and graphical purposes only and should not be relied upon by third parties for any legal decisions.
Any reliance upon the map or data contained herein shall be at the users' sole risk. **Data Sources: ESRI Street Map 2020**



Copyright:© 2013 National Geographic Society, i-cubed

**Figure 2.**
**USGS Topography**
GeoLogic, LLC
Norris Cason Tract
Warren County, GA

**Legend**
☐ Study Area Boundary

**GEOLOGIC**

N

**WOODARD & CURRAN**

1 inch = 1,000 feet

0  250  500  1,000 Feet

Project #: 233364.04
Map Created: October 2020

Third Party GIS Disclaimer: This map is for reference and graphical purposes only and should not be relied upon by third parties for any legal decisions.
Any reliance upon the map or data contained herein shall be at the users' sole risk. **Data Sources: USGS USA Topography Basemap 2013**



Figure 3.
Delineated Resources Overview

GeoLogic, LLC
Norris Cason Tract

Warren County, GA

This map represents the boundaries of wetlands and Waters of the US delineated within the project study area by Woodard & Curran. These boundaries have been flagged in the field and recorded using a sub-meter GPS unit. These boundaries have not been verified by the US Army Corps of Engineers. Use of this map should be limited to preliminary planning purposes only.

© 2020 Microsoft Corporation © 2020 Maxar ©CNES (2020) Distribution Airbus DS

**Legend**

- ▭ Study Area Boundary
- ▬ Streams
- State Buffers
- Wetlands
- ⚠ Culverts

GEOLOGIC

N

WOODARD & CURRAN

Project #: 233364.04
Map Created: October 2020

1 inch = 700 feet   0  175  350   700 Feet

Third Party GIS Disclaimer: This map is for reference and graphical purposes only and should not be relied upon by third parties for any legal decisions. Any reliance upon the map or data contained herein shall be at the users' sole risk. **Data Sources: Bing Maps Aerial Basemap 2020**



Figure 3a.
Delineated Resources

GeoLogic, LLC
Norris Cason Tract

Warren County, GA

This map represents the boundaries of wetlands and Waters of the US delineated within the project study area by Woodard & Curran. These boundaries have been flagged in the field and recorded using a sub-meter GPS unit. These boundaries have not been verified by the US Army Corps of Engineers. Use of this map should be limited to preliminary planning purposes only.

**Legend**

| | |
|---|---|
| Study Area Boundary | Culverts |
| Streams | |
| State Buffers | |
| Wetlands | |

GEOLOGIC

N

WOODARD & CURRAN

Project #: 233364.04
Map Created: October 2020

1 inch = 400 feet    0  100  200  400 Feet

Third Party GIS Disclaimer: This map is for reference and graphical purposes only and should not be relied upon by third parties for any legal decisions. Any reliance upon the map or data contained herein shall be at the users' sole risk. **Data Sources: Bing Maps Aerial Basemap 2020**



This map represents the boundaries of wetlands and Waters of the US delineated within the project study area by Woodard & Curran. These boundaries have been flagged in the field and recorded using a sub-meter GPS unit. These boundaries have not been verified by the US Army Corps of Engineers. Use of this map should be limited to preliminary planning purposes only.

Figure Extent

Stream 5
Intermittent

Stream 4
Perennial

Stream 7
Intermittent

Stream 6
Perennial

Stream 4
Perennial

Stream 6
Perennial

Wetland 4

Wetland 5

Stream 3
Perennial

Stream 3
Intermittent

**Figure 3b.**
**Delineated Resources**

GeoLogic, LLC
Norris Cason Tract

Warren County, GA

**Legend**

Study Area Boundary    ▲ Culverts

Streams

State Buffers

Wetlands

GEOLOGIC

1 inch = 350 feet    0  87.5  175    350 Feet

N

WOODARD & CURRAN

Project #: 233364.04
Map Created: October 2020

Third Party GIS Disclaimer: This map is for reference and graphical purposes only and should not be relied upon by third parties for any legal decisions.
Any reliance upon the map or data contained herein shall be at the users' sole risk. **Data Sources: Bing Maps Aerial Basemap 2020**



Attachment B:  Project Photographs





**Photo Number: 1**  |  **View Direction: Facing west**  |  **Date: October 12, 2020**
**Description: Representative photograph of Wetland 1.**



**Photo Number: 2**  |  **View Direction: Facing north**  |  **Date: October 12, 2020**
**Description: Representative photograph of Wetland 2.**





**Photo Number: 3** | **View Direction: Facing west** | **Date: October 12, 2020**
**Description: Representative photograph of Stream 1.**



**Photo Number: 4** | **View Direction: Facing north** | **Date: October 13, 2020**
**Description: Representative photograph of Stream 2.**





**Photo Number: 5** | **View Direction: Facing north** | **Date: October 13, 2020**
**Description: Representative photograph of Wetland 3.**



**Photo Number: 6** | **View Direction: Facing west** | **Date: October 15, 2020**
**Description: Representative photograph of Stream 3.**





**Photo Number: 7** | **View Direction: Facing east** | **Date: October 15, 2020**
**Description: Representative photograph of Stream 4.**



**Photo Number: 8** | **View Direction: Facing north** | **Date: October 15, 2020**
**Description: Representative photograph of Stream 5.**





**Photo Number: 9** | **View Direction: Facing east** | **Date: October 16, 2020**
**Description: Representative photograph of Stream 6.**



**Photo Number: 10** | **View Direction: Facing east** | **Date: October 16, 2020**
**Description: Representative photograph of Wetland 4.**





**Photo Number: 11** | **View Direction: Facing southeast** | **Date: October 16, 2020**
Description: Representative photograph of Wetland 5.



**Photo Number: 12** | **View Direction: Facing west** | **Date: October 16, 2020**
Description: Representative photograph of Stream 7.



**Attachment C:  USACE Wetland Determination Data Forms**

**WETLAND DETERMINATION DATA FORM - Eastern Mountains and Piedmont Region**

| | | |
|---|---|---|
| Project/Site: Norris Cason Tract | City/County: Warren County | Sampling Date: 12-Oct-20 |
| Applicant/Owner: GeoLogic LLC | State: GA | Sampling Point: wdp_1 |
| Investigator(s): R. Heaton, R. Singleton | Section, Township, Range: S | T | R |

Landform (hillslope, terrace, etc.): Hillside    Local relief (concave, convex, none): concave    Slope: 3.0% / 1.7 °

Subregion (LRR or MLRA): MLRA 136 in LRR P    Lat: 33.3466047    Long: -82.7812280    Datum: NAD 83

Soil Map Unit Name: AmC - Appling sandy loam, 6 to 10 percent slopes    NWI classification: N/A

Are climatic/hydrologic conditions on the site typical for this time of year? Yes ☒ No ☐ (If no, explain in Remarks.)

Are Vegetation ☐, Soil ☐, or Hydrology ☐ significantly disturbed?    Are "Normal Circumstances" present? Yes ☒ No ☐

Are Vegetation ☐, Soil ☐, or Hydrology ☐ naturally problematic?    (If needed, explain any answers in Remarks.)

## Summary of Findings - Attach site map showing sampling point locations, transects, important features, etc.

| | | |
|---|---|---|
| Hydrophytic Vegetation Present? | Yes ☒ No ☐ | |
| Hydric Soil Present? | Yes ☒ No ☐ | Is the Sampled Area within a Wetland? Yes ☒ No ☐ |
| Wetland Hydrology Present? | Yes ☒ No ☐ | |

Remarks:

This data point is representative of the Wetland 1, Wetland 3, Wetland 4, and Wetland 5. Wetland 1 is a PFO wetland at the headwaters of a stream that begins west of the study area boundary. Tree clearing has occurred in the vicinity of Wetland 1 in the past. Standing water was observed at the time of field studies.

## Hydrology

**Wetland Hydrology Indicators:**

Primary Indicators (minimum of one required; check all that apply)

| | | Secondary Indicators (minimum of two required) |
|---|---|---|
| ☒ Surface Water (A1) | ☐ True Aquatic Plants (B14) | ☐ Surface Soil Cracks (B6) |
| ☒ High Water Table (A2) | ☐ Hydrogen Sulfide Odor (C1) | ☒ Sparsely Vegetated Concave Surface (B8) |
| ☒ Saturation (A3) | ☐ Oxidized Rhizospheres along Living Roots (C3) | ☒ Drainage Patterns (B10) |
| ☐ Water Marks (B1) | ☐ Presence of Reduced Iron (C4) | ☐ Moss Trim Lines (B16) |
| ☐ Sediment Deposits (B2) | ☐ Recent Iron Reduction in Tilled Soils (C6) | ☐ Dry Season Water Table (C2) |
| ☐ Drift deposits (B3) | ☐ Thin Muck Surface (C7) | ☐ Crayfish Burrows (C8) |
| ☐ Algal Mat or Crust (B4) | ☐ Other (Explain in Remarks) | ☐ Saturation Visible on Aerial Imagery (C9) |
| ☐ Iron Deposits (B5) | | ☐ Stunted or Stressed Plants (D1) |
| ☐ Inundation Visible on Aerial Imagery (B7) | | ☐ Geomorphic Position (D2) |
| ☐ Water-Stained Leaves (B9) | | ☐ Shallow Aquitard (D3) |
| ☐ Aquatic Fauna (B13) | | ☐ Microtopographic Relief (D4) |
| | | ☒ FAC-neutral Test (D5) |

**Field Observations:**

| | | |
|---|---|---|
| Surface Water Present? | Yes ☒ No ☐ | Depth (inches): 0.5 |
| Water Table Present? | Yes ☒ No ☐ | Depth (inches): 10 |
| Saturation Present? (includes capillary fringe) | Yes ☒ No ☐ | Depth (inches): 10    Wetland Hydrology Present? Yes ☒ No ☐ |

Describe Recorded Data (stream gauge, monitoring well, aerial photos, previous inspections), if available:

Remarks:

Surface water, saturation, and high water table present. Wetland is located at the headwaters of an offsite stream.

    

# VEGETATION (Five/Four Strata)- Use scientific names of plants.

Sampling Point: __wdp 1__

| Tree Stratum (Plot size: 30 FT) | Absolute % Cover | Dominant Species? Rel.Strat. Cover | Indicator Status |
|---|---|---|---|
| 1. Pinus taeda | 70 | ☑ 77.8% | FAC |
| 2. Salix nigra | 20 | ☑ 22.2% | OBL |
| 3. | 0 | ☐ 0.0% | |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| 7. | 0 | ☐ 0.0% | |
| 8. | 0 | ☐ 0.0% | |
| | 90 | = Total Cover | |

| Sapling-Sapling/Shrub Stratum (Plot size: 15 FT) | | | |
|---|---|---|---|
| 1. Sambucus nigra ssp. canadensis | 2 | 100.0% | FAC |
| 2. | 0 | 0.0% | |
| 3. | 0 | 0.0% | |
| 4. | 0 | 0.0% | |
| 5. | 0 | 0.0% | |
| 6. | 0 | 0.0% | |
| 7. | 0 | 0.0% | |
| 8. | 0 | 0.0% | |
| 9. | 0 | 0.0% | |
| 10. | 0 | 0.0% | |
| | 2 | = Total Cover | |

| Shrub Stratum (Plot size: N/A) | | | |
|---|---|---|---|
| 1. | 0 | 0.0% | |
| 2. | 0 | 0.0% | |
| 3. | 0 | 0.0% | |
| 4. | 0 | 0.0% | |
| 5. | 0 | 0.0% | |
| 6. | 0 | 0.0% | |
| 7. | 0 | 0.0% | |
| | 0 | = Total Cover | |

| Herb Stratum (Plot size: 5 FT) | | | |
|---|---|---|---|
| 1. Juncus effusus | 20 | ☑ 54.1% | FACW |
| 2. Carex lurida | 7 | 18.9% | OBL |
| 3. Rubus argutus | 6 | 16.2% | FACU |
| 4. Eutrochium purpureum | 2 | 5.4% | FAC |
| 5. Chasmanthium latifolium | 2 | 5.4% | FACU |
| 6. | 0 | 0.0% | |
| 7. | 0 | 0.0% | |
| 8. | 0 | 0.0% | |
| 9. | 0 | 0.0% | |
| 10. | 0 | 0.0% | |
| 11. | 0 | 0.0% | |
| 12. | 0 | 0.0% | |
| | 37 | = Total Cover | |

| Woody Vine Stratum (Plot size: 30 FT) | | | |
|---|---|---|---|
| 1. Smilax rotundifolia | 5 | ☑ 100.0% | FAC |
| 2. | 0 | 0.0% | |
| 3. | 0 | 0.0% | |
| 4. | 0 | 0.0% | |
| 5. | 0 | 0.0% | |
| 6. | 0 | 0.0% | |
| | 5 | = Total Cover | |

## Dominance Test worksheet:

Number of Dominant Species That are OBL, FACW, or FAC: __4__ (A)

Total Number of Dominant Species Across All Strata: __4__ (B)

Percent of dominant Species That Are OBL, FACW, or FAC: __100.0%__ (A/B)

### Prevalence Index worksheet:

| Total % Cover of: | | Multiply by: | |
|---|---|---|---|
| OBL species | 27 | x 1 = | 27 |
| FACW species | 20 | x 2 = | 40 |
| FAC species | 79 | x 3 = | 237 |
| FACU species | 8 | x 4 = | 32 |
| UPL species | 0 | x 5 = | 0 |
| Column Totals: | 134 | (A) | 336 (B) |

Prevalence Index = B/A = __2.507__

### Hydrophytic Vegetation Indicators:

- ☐ Rapid Test for Hydrophytic Vegetation
- ☑ Dominance Test is > 50%
- ☑ Prevalence Index is ≤3.0 [1]
- ☐ Morphological Adaptations [1] (Provide supporting data in Remarks or on a separate sheet)
- ☐ Problematic Hydrophytic Vegetation [1] (Explain)

[1] Indicators of hydric soil and wetland hydrology must be present, unless disturbed or problematic.

## Definition of Vegetation Strata:

### Four Vegetation Strata:

**Tree stratum** – Consists of woody plants, excluding vines, 3 in. (7.6 cm) or more in diameter at breast height (DBH), regardless of height.

**Sapling/shrub stratum** – Consists of woody plants, excluding vines, less than 3 in. DBH and greater than 3.28 ft (1 m) tall.

**Herb stratum** – Consists of all herbaceous (non-woody) plants, regardless of size, and all other plants less than 3.28 ft tall.

**Woody vines** – Consists of all woody vines greater than 3.28 ft in height.

### Five Vegetation Strata:

**Tree** - Woody plants, excluding woody vines, approximately 20 ft (6 m) or more in height and 3 in. (7.6 cm) or larger in diameter at breast height (DBH).

**Sapling stratum** – Consists of woody plants, excluding woody vines, approximately 20 ft (6 m) or more in height and less than 3 in. (7.6 cm) DBH.

**Shrub stratum** – Consists of woody plants, excluding woody vines, approximately 3 to 20 ft (1 to 6 m) in height.

**Herb stratum** – Consists of all herbaceous (non-woody) plants, including herbaceous vines, regardless of size, and woody species, except woody vines, less than approximately 3 ft (1 m) in height.

**Woody vines** – Consists of all woody vines, regardless of height.

| Hydrophytic Vegetation Present? | Yes ⦿ No ◯ |
|---|---|

**Remarks: (Include photo numbers here or on a separate sheet.)**

*Indicator suffix = National status or professional decision assigned because Regional status not defined by FWS.

US Army Corps of Engineers

Eastern Mountains and Piedmont - Version 2.0

**Soil**                                                                      Sampling Point: __wdp_1__

**Profile Description: (Describe to the depth needed to document the indicator or confirm the absence of indicators.)**

| Depth (inches) | Matrix Color (moist) | % | Redox Features Color (moist) | % | Type [1] | Loc² | Texture | Remarks |
|---|---|---|---|---|---|---|---|---|
| 0-2 | 7.5YR 3/2 | 100 | | | | | Sandy Clay Loam | |
| 2-10 | 7.5YR 6/1 | 80 | 5YR 4/4 | 20 | C | M | Sandy Clay Loam | |
| 10-20 | 7.5YR 7/1 | 95 | 5YR 4/4 | 5 | C | M | Sandy Loam | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

[1] Type: C=Concentration. D=Depletion. RM=Reduced Matrix, CS=Covered or Coated Sand Grains   ²Location: PL=Pore Lining. M=Matrix

**Hydric Soil Indicators:**

- [ ] Histosol (A1)
- [ ] Histic Epipedon (A2)
- [ ] Black Histic (A3)
- [ ] Hydrogen Sulfide (A4)
- [ ] Stratified Layers (A5)
- [ ] 2 cm Muck (A10) (LRR N)
- [ ] Depleted Below Dark Surface (A11)
- [ ] Thick Dark Surface (A12)
- [ ] Sandy Muck Mineral (S1) (LRR N, MLRA 147, 148)
- [ ] Sandy Gleyed Matrix (S4)
- [ ] Sandy Redox (S5)
- [ ] Stripped Matrix (S6)

- [ ] Dark Surface (S7)
- [ ] Polyvalue Below Surface (S8) (MLRA 147,148)
- [ ] Thin Dark Surface (S9) (MLRA 147, 148)
- [ ] Loamy Gleyed Matrix (F2)
- [x] Depleted Matrix (F3)
- [ ] Redox Dark Surface (F6)
- [ ] Depleted Dark Surface (F7)
- [ ] Redox Depressions (F8)
- [ ] Iron-Manganese Masses (F12) (LRR N, MLRA 136)
- [ ] Umbric Surface (F13) (MLRA 136, 122)
- [ ] Piedmont Floodplain Soils (F19) (MLRA 148)
- [ ] Red Parent Material (F21) (MLRA 127, 147)

**Indicators for Problematic Hydric Soils[3]:**

- [ ] 2 cm Muck (A10) (MLRA 147)
- [ ] Coast Prairie Redox (A16) (MLRA 147,148)
- [ ] Piedmont Floodplain Soils (F19) (MLRA 136, 147)
- [ ] Very Shallow Dark Surface (TF12)
- [ ] Other (Explain in Remarks)

[3] Indicators of hydrophytic vegetation and wetland hydrology must be present, unless disturbed or problematic.

**Restrictive Layer (if observed):**

Type: _____

Depth (inches): _____

**Hydric Soil Present?**   Yes ⊙   No ○

Remarks:

Depleted matrix indicator met.

**WETLAND DETERMINATION DATA FORM – Eastern Mountains and Piedmont Region**

| | | |
|---|---|---|
| Project/Site: Norris Cason Tract | City/County: Warren County | Sampling Date: 12-Oct-20 |
| Applicant/Owner: GeoLogic LLC | State: GA | Sampling Point: **udp_1** |
| Investigator(s): R. Heaton, R. Singleton | Section, Township, Range: S | T R |
| Landform (hillslope, terrace, etc.): Hillside | Local relief (concave, convex, none): convex | Slope: 8.0% / 4.6 ° |
| Subregion (LRR or MLRA): MLRA 136 in LRR P | Lat.: 33.3465018 | Long.: -82.7811805 | Datum: NAD 83 |
| Soil Map Unit Name: AmC - Appling sandy loam, 6 to 10 percent slopes | | NWI classification: N/A |

Are climatic/hydrologic conditions on the site typical for this time of year?   Yes ⬤   No ◯   (If no, explain in Remarks.)

Are Vegetation ☐ , Soil ☐ , or Hydrology ☐ significantly disturbed?   Are "Normal Circumstances" present?   Yes ⬤   No ◯

Are Vegetation ☐ , Soil ☐ , or Hydrology ☐ naturally problematic?   (If needed, explain any answers in Remarks.)

## Summary of Findings - Attach site map showing sampling point locations, transects, important features, etc.

| | | |
|---|---|---|
| Hydrophytic Vegetation Present? | Yes ⬤   No ◯ | |
| Hydric Soil Present? | Yes ◯   No ⬤ | Is the Sampled Area within a Wetland?   Yes ◯   No ⬤ |
| Wetland Hydrology Present? | Yes ◯   No ⬤ | |

Remarks:
Upland pine forest adjacent to Wetland 1.

## Hydrology

**Wetland Hydrology Indicators:**

Primary Indicators (minimum of one required; check all that apply)     Secondary Indicators (minimum of two required)

| Primary | Secondary |
|---|---|
| ☐ Surface Water (A1) | ☐ Surface Soil Cracks (B6) |
| ☐ High Water Table (A2) | ☐ Sparsely Vegetated Concave Surface (B8) |
| ☐ Saturation (A3) | ☐ Drainage Patterns (B10) |
| ☐ Water Marks (B1) | ☐ Moss Trim Lines (B16) |
| ☐ Sediment Deposits (B2) | ☐ Dry Season Water Table (C2) |
| ☐ Drift deposits (B3) | ☐ Crayfish Burrows (C8) |
| ☐ Algal Mat or Crust (B4) | ☐ Saturation Visible on Aerial Imagery (C9) |
| ☐ Iron Deposits (B5) | ☐ Stunted or Stressed Plants (D1) |
| ☐ Inundation Visible on Aerial Imagery (B7) | ☐ Geomorphic Position (D2) |
| ☐ Water-Stained Leaves (B9) | ☐ Shallow Aquitard (D3) |
| ☐ Aquatic Fauna (B13) | ☐ Microtopographic Relief (D4) |
| | ☐ FAC-neutral Test (D5) |

Primary column also includes:
☐ True Aquatic Plants (B14)
☐ Hydrogen Sulfide Odor (C1)
☐ Oxidized Rhizospheres along Living Roots (C3)
☐ Presence of Reduced Iron (C4)
☐ Recent Iron Reduction in Tilled Soils (C6)
☐ Thin Muck Surface (C7)
☐ Other (Explain in Remarks)

**Field Observations:**

| | | | |
|---|---|---|---|
| Surface Water Present? | Yes ◯   No ⬤ | Depth (inches): _____ | |
| Water Table Present? | Yes ◯   No ⬤ | Depth (inches): _____ | |
| Saturation Present? (includes capillary fringe) | Yes ◯   No ⬤ | Depth (inches): _____ | Wetland Hydrology Present?   Yes ◯   No ⬤ |

Describe Recorded Data (stream gauge, monitoring well, aerial photos, previous inspections), if available:
N/A

Remarks:
No hydrology indicators present at the time of field studies.

**VEGETATION (Five/Four Strata)- Use scientific names of plants.**

Sampling Point: __udp 1__

| Tree Stratum (Plot size: 30 FT ) | Absolute % Cover | Dominant Species? Rel.Strat. Cover | Indicator Status |
|---|---|---|---|
| 1. Pinus taeda | 95 | ☑ 100.0% | FAC |
| 2. | 0 | ☐ 0.0% | |
| 3. | 0 | ☐ 0.0% | |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| 7. | 0 | ☐ 0.0% | |
| 8. | 0 | ☐ 0.0% | |
| | 95 | = Total Cover | |
| Sapling-Sapling/Shrub Stratum (Plot size: 15 FT ) | | | |
| 1. Ulmus americana | 2 | ☐ 100.0% | FACW |
| 2. | 0 | ☐ 0.0% | |
| 3. | 0 | ☐ 0.0% | |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| 7. | 0 | ☐ 0.0% | |
| 8. | 0 | ☐ 0.0% | |
| 9. | 0 | ☐ 0.0% | |
| 10. | 0 | ☐ 0.0% | |
| | 2 | = Total Cover | |
| Shrub Stratum (Plot size: N/A ) | | | |
| 1. | 0 | ☐ 0.0% | |
| 2. | 0 | ☐ 0.0% | |
| 3. | 0 | ☐ 0.0% | |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| 7. | 0 | ☐ 0.0% | |
| | 0 | = Total Cover | |
| Herb Stratum (Plot size: 5 FT ) | | | |
| 1. Symphyotrichum lanceolatum | 15 | ☑ 68.2% | FACW |
| 2. Chasmanthium latifolium | 5 | ☑ 22.7% | FACU |
| 3. Callicarpa americana | 2 | ☐ 9.1% | FACU |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| 7. | 0 | ☐ 0.0% | |
| 8. | 0 | ☐ 0.0% | |
| 9. | 0 | ☐ 0.0% | |
| 10. | 0 | ☐ 0.0% | |
| 11. | 0 | ☐ 0.0% | |
| 12. | 0 | ☐ 0.0% | |
| | 22 | = Total Cover | |
| Woody Vine Stratum (Plot size: 30 FT ) | | | |
| 1. Vitis rotundifolia | 2 | ☐ 100.0% | FAC |
| 2. | 0 | ☐ 0.0% | |
| 3. | 0 | ☐ 0.0% | |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| | 2 | = Total Cover | |

**Dominance Test worksheet:**

Number of Dominant Species
That are OBL, FACW, or FAC: __2__ (A)

Total Number of Dominant
Species Across All Strata: __3__ (B)

Percent of dominant Species
That Are OBL, FACW, or FAC: __66.7%__ (A/B)

**Prevalence Index worksheet:**

| Total % Cover of: | | Multiply by: | |
|---|---|---|---|
| OBL species | 0 | x 1 = | 0 |
| FACW species | 17 | x 2 = | 34 |
| FAC species | 97 | x 3 = | 291 |
| FACU species | 7 | x 4 = | 28 |
| UPL species | 0 | x 5 = | 0 |
| Column Totals: | 121 | (A) | 353 (B) |

Prevalence Index = B/A = __2.917__

**Hydrophytic Vegetation Indicators:**

☐ Rapid Test for Hydrophytic Vegetation
☑ Dominance Test is > 50%
☑ Prevalence Index is ≤3.0 [1]
☐ Morphological Adaptations [1] (Provide supporting data in Remarks or on a separate sheet)
☐ Problematic Hydrophytic Vegetation [1] (Explain)

[1] Indicators of hydric soil and wetland hydrology must be present, unless disturbed or problematic.

**Definition of Vegetation Strata:**

**Four Vegetation Strata:**

Tree stratum – Consists of woody plants, excluding vines, 3 in. (7.6 cm) or more in diameter at breast height (DBH), regardless of height.

Sapling/shrub stratum – Consists of woody plants, excluding vines, less than 3 in. DBH and greater than 3.28 ft (1 m) tall.

Herb stratum – Consists of all herbaceous (non-woody) plants, regardless of size, and all other plants less than 3.28 ft tall.

Woody vine stratum – Consists of all woody vines greater than 3.28 ft in height.

**Five Vegetation Strata:**

Tree - Woody plants, excluding woody vines, approximately 20 ft (6 m) or more in height and 3 in. (7.6 cm) or larger in diameter at breast height (DBH).

Sapling stratum – Consists of woody plants, excluding woody vines, approximately 20 ft (6 m) or more in height and less than 3 in. (7.6 cm) DBH.

Shrub stratum – Consists of woody plants, excluding woody vines, approximately 3 to 20 ft (1 to 6 m) in height.

Herb stratum – Consists of all herbaceous (non-woody) plants, including herbaceous vines, regardless of size, and woody species, except woody vines, less than approximately 3 ft (1 m) in height.

Woody vines – Consists of all woody vines, regardless of height.

**Hydrophytic Vegetation Present?** Yes ◉ No ○

**Remarks: (Include photo numbers here or on a separate sheet.)**

*Indicator suffix = National status or professional decision assigned because Regional status not defined by FWS.

US Army Corps of Engineers

Eastern Mountains and Piedmont - Version 2.0

**Soil**                                                                                    Sampling Point: __udp_1__

**Profile Description: (Describe to the depth needed to document the indicator or confirm the absence of indicators.)**

| Depth (inches) | Matrix Color (moist) | % | Redox Features Color (moist) | % | Type [1] | Loc² | Texture | Remarks |
|---|---|---|---|---|---|---|---|---|
| 0-15 | 10YR 3/3 | | | | | | Loam | |
| 15-20 | 10YR 4/4 | 98 | 10YR 4/6 | 20 | C | M | Loam | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

[1] Type: C=Concentration. D=Depletion. RM=Reduced Matrix, CS=Covered or Coated Sand Grains    ²Location: PL=Pore Lining. M=Matrix

**Hydric Soil Indicators:**

- [ ] Histosol (A1)
- [ ] Histic Epipedon (A2)
- [ ] Black Histic (A3)
- [ ] Hydrogen Sulfide (A4)
- [ ] Stratified Layers (A5)
- [ ] 2 cm Muck (A10) (LRR N)
- [ ] Depleted Below Dark Surface (A11)
- [ ] Thick Dark Surface (A12)
- [ ] Sandy Muck Mineral (S1) (LRR N, MLRA 147, 148)
- [ ] Sandy Gleyed Matrix (S4)
- [ ] Sandy Redox (S5)
- [ ] Stripped Matrix (S6)

- [ ] Dark Surface (S7)
- [ ] Polyvalue Below Surface (S8) (MLRA 147,148)
- [ ] Thin Dark Surface (S9) (MLRA 147, 148)
- [ ] Loamy Gleyed Matrix (F2)
- [ ] Depleted Matrix (F3)
- [ ] Redox Dark Surface (F6)
- [ ] Depleted Dark Surface (F7)
- [ ] Redox Depressions (F8)
- [ ] Iron-Manganese Masses (F12) (LRR N, MLRA 136)
- [ ] Umbric Surface (F13) (MLRA 136, 122)
- [ ] Piedmont Floodplain Soils (F19) (MLRA 148)
- [ ] Red Parent Material (F21) (MLRA 127, 147)

**Indicators for Problematic Hydric Soils [3]:**

- [ ] 2 cm Muck (A10) (MLRA 147)
- [ ] Coast Prairie Redox (A16) (MLRA 147,148)
- [ ] Piedmont Floodplain Soils (F19) (MLRA 136, 147)
- [ ] Very Shallow Dark Surface (TF12)
- [ ] Other (Explain in Remarks)

[3] Indicators of hydrophytic vegetation and wetland hydrology must be present, unless disturbed or problematic.

**Restrictive Layer (if observed):**

Type: __N/A__

Depth (inches): _____

**Hydric Soil Present?**    Yes ○    No ◉

Remarks:

No hydric soil indicators met.

**WETLAND DETERMINATION DATA FORM - Eastern Mountains and Piedmont Region**

| | | |
|---|---|---|
| Project/Site: Norris Cason Tract | City/County: Warren County | Sampling Date: 16-Oct-20 |
| Applicant/Owner: GeoLogic LLC | State: GA | Sampling Point: wdp_2 |
| Investigator(s): R. Heaton, R. Singleton | Section, Township, Range: S | T | R |

Landform (hillslope, terrace, etc.): Lowland | Local relief (concave, convex, none): concave | Slope: 2.0% / 1.1 °

Subregion (LRR or MLRA): MLRA 136 in LRR P | Lat.: 33.3480933 | Long.: -82.7812213 | Datum: NAD 83

Soil Map Unit Name: WeC - Wedowee loamy sand, 6 to 10 percent slopes | NWI classification: N/A

Are climatic/hydrologic conditions on the site typical for this time of year? Yes ☒ No ☐ (If no, explain in Remarks.)

Are Vegetation ☒ , Soil ☐ , or Hydrology ☐ significantly disturbed? Are "Normal Circumstances" present? Yes ☒ No ☐

Are Vegetation ☐ , Soil ☐ , or Hydrology ☐ naturally problematic? (If needed, explain any answers in Remarks.)

## Summary of Findings - Attach site map showing sampling point locations, transects, important features, etc.

| | | | |
|---|---|---|---|
| Hydrophytic Vegetation Present? | Yes ☒ No ☐ | | |
| Hydric Soil Present? | Yes ☐ No ☒ | Is the Sampled Area within a Wetland? | Yes ☒ No ☐ |
| Wetland Hydrology Present? | Yes ☒ No ☐ | | |

Remarks:

This data point is representative of the Wetland 2. Wetland 2 is a PEM wetland abutting Stream 2 and Stream 1. Multiple beaver dams observed within Wetland 2. Extensive flooding present throughout Wetland 2 at the time of field studies.

## Hydrology

**Wetland Hydrology Indicators:**

Primary Indicators (minimum of one required; check all that apply)

Secondary Indicators (minimum of two required)

| Primary | Primary | Secondary |
|---|---|---|
| ☐ Surface Water (A1) | ☐ True Aquatic Plants (B14) | ☐ Surface Soil Cracks (B6) |
| ☒ High Water Table (A2) | ☐ Hydrogen Sulfide Odor (C1) | ☐ Sparsely Vegetated Concave Surface (B8) |
| ☒ Saturation (A3) | ☐ Oxidized Rhizospheres along Living Roots (C3) | ☐ Drainage Patterns (B10) |
| ☐ Water Marks (B1) | ☐ Presence of Reduced Iron (C4) | ☐ Moss Trim Lines (B16) |
| ☐ Sediment Deposits (B2) | ☐ Recent Iron Reduction in Tilled Soils (C6) | ☐ Dry Season Water Table (C2) |
| ☐ Drift deposits (B3) | ☐ Thin Muck Surface (C7) | ☐ Crayfish Burrows (C8) |
| ☐ Algal Mat or Crust (B4) | ☐ Other (Explain in Remarks) | ☐ Saturation Visible on Aerial Imagery (C9) |
| ☐ Iron Deposits (B5) | | ☐ Stunted or Stressed Plants (D1) |
| ☐ Inundation Visible on Aerial Imagery (B7) | | ☐ Geomorphic Position (D2) |
| ☐ Water-Stained Leaves (B9) | | ☐ Shallow Aquitard (D3) |
| ☐ Aquatic Fauna (B13) | | ☐ Microtopographic Relief (D4) |
| | | ☒ FAC-neutral Test (D5) |

**Field Observations:**

| | | | |
|---|---|---|---|
| Surface Water Present? | Yes ☐ No ☒ | Depth (inches): | |
| Water Table Present? | Yes ☒ No ☐ | Depth (inches): 10 | |
| Saturation Present? (includes capillary fringe) | Yes ☒ No ☐ | Depth (inches): 8 | Wetland Hydrology Present? Yes ☒ No ☐ |

Describe Recorded Data (stream gauge, monitoring well, aerial photos, previous inspections), if available:

N/A

Remarks:

No surface water present at data point location near wetland boundary. Surface water and beaver dams located in interior of Wetland 2.

US Army Corps of Engineers

**VEGETATION (Five/Four Strata)- Use scientific names of plants.**

Sampling Point: wdp 2

| Tree Stratum (Plot size: 30 FT) | Absolute % Cover | Dominant Species? Rel.Strat. Cover | Indicator Status |
|---|---|---|---|
| 1. Quercus nigra | 5 | ☑ 100.0% | FAC |
| 2. | 0 | ☐ 0.0% | |
| 3. | 0 | ☐ 0.0% | |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| 7. | 0 | ☐ 0.0% | |
| 8. | 0 | ☐ 0.0% | |
| | 5 | = Total Cover | |
| **Sapling-Sapling/Shrub Stratum** (Plot size: 15 FT) | | | |
| 1. Salix nigra | 6 | ☑ 100.0% | OBL |
| 2. | 0 | ☐ 0.0% | |
| 3. | 0 | ☐ 0.0% | |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| 7. | 0 | ☐ 0.0% | |
| 8. | 0 | ☐ 0.0% | |
| 9. | 0 | ☐ 0.0% | |
| 10. | 0 | ☐ 0.0% | |
| **Shrub Stratum** (Plot size: N/A) | 6 | = Total Cover | |
| 1. | 0 | ☐ 0.0% | |
| 2. | 0 | ☐ 0.0% | |
| 3. | 0 | ☐ 0.0% | |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| 7. | 0 | ☐ 0.0% | |
| | 0 | = Total Cover | |
| **Herb Stratum** (Plot size: 5 FT) | | | |
| 1. Arundinaria gigantea | 90 | ☑ 81.8% | FACW |
| 2. Rubus argutus | 20 | ☐ 18.2% | FACU |
| 3. | 0 | ☐ 0.0% | |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| 7. | 0 | ☐ 0.0% | |
| 8. | 0 | ☐ 0.0% | |
| 9. | 0 | ☐ 0.0% | |
| 10. | 0 | ☐ 0.0% | |
| 11. | 0 | ☐ 0.0% | |
| 12. | 0 | ☐ 0.0% | |
| **Woody Vine Stratum** (Plot size: ) | 110 | = Total Cover | |
| 1. | 0 | ☐ 0.0% | |
| 2. | 0 | ☐ 0.0% | |
| 3. | 0 | ☐ 0.0% | |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| | 0 | = Total Cover | |

**Dominance Test worksheet:**

Number of Dominant Species That are OBL, FACW, or FAC: 3 (A)

Total Number of Dominant Species Across All Strata: 3 (B)

Percent of dominant Species That Are OBL, FACW, or FAC: 100.0% (A/B)

**Prevalence Index worksheet:**

| Total % Cover of: | | Multiply by: | |
|---|---|---|---|
| OBL species | 6 | x 1 = | 6 |
| FACW species | 90 | x 2 = | 180 |
| FAC species | 5 | x 3 = | 15 |
| FACU species | 20 | x 4 = | 80 |
| UPL species | 0 | x 5 = | 0 |
| Column Totals: | 121 (A) | | 281 (B) |

Prevalence Index = B/A = 2.322

**Hydrophytic Vegetation Indicators:**

☐ Rapid Test for Hydrophytic Vegetation
☑ Dominance Test is > 50%
☑ Prevalence Index is ≤3.0 [1]
☐ Morphological Adaptations [1] (Provide supporting data in Remarks or on a separate sheet)
☐ Problematic Hydrophytic Vegetation [1] (Explain)

[1] Indicators of hydric soil and wetland hydrology must be present, unless disturbed or problematic.

**Definition of Vegetation Strata:**

**Four Vegetation Strata:**

Tree stratum – Consists of woody plants, excluding vines, 3 in. (7.6 cm) or more in diameter at breast height (DBH), regardless of height.

Sapling/shrub stratum – Consists of woody plants, excluding vines, less than 3 in. DBH and greater than 3.28 ft (1 m) tall.

Herb stratum – Consists of all herbaceous (non-woody) plants, regardless of size, and all other plants less than 3.28 ft tall.

Woody vines – Consists of all woody vines greater than 3.28 ft in height.

**Five Vegetation Strata:**

Tree - Woody plants, excluding woody vines, approximately 20 ft (6 m) or more in height and 3 in. (7.6 cm) or larger in diameter at breast height (DBH).

Sapling stratum – Consists of woody plants, excluding woody vines, approximately 20 ft (6 m) or more in height and less than 3 in. (7.6 cm) DBH.

Shrub stratum – Consists of woody plants, excluding woody vines, approximately 3 to 20 ft (1 to 6 m) in height.

Herb stratum – Consists of all herbaceous (non-woody) plants, including herbaceous vines, regardless of size, and woody species, except woody vines, less than approximately 3 ft (1 m) in height.

Woody vines – Consists of all woody vines, regardless of height.

Hydrophytic Vegetation Present? Yes ☑ No ☐

**Remarks: (Include photo numbers here or on a separate sheet.)**

*Indicator suffix = National status or professional decision assigned because Regional status not defined by FWS.

US Army Corps of Engineers

Eastern Mountains and Piedmont - Version 2.0

**Soil**

Sampling Point: __wdp_2__

**Profile Description:** (Describe to the depth needed to document the indicator or confirm the absence of indicators.)

| Depth (inches) | Matrix Color (moist) | % | Redox Features Color (moist) | % | Type[1] | Loc[2] | Texture | Remarks |
|---|---|---|---|---|---|---|---|---|
| 0-4 | 10YR 3/1 | 100 | | | | | Sandy Clay Loam | |
| 4-8 | 10YR 6/1 | 80 | 5YR 5/6 | 20 | C | M | Sandy Clay Loam | |
| 8-20 | 10YR 6/1 | 70 | 5YR 5/6 | 30 | C | M | Sandy Loam | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

[1] Type: C=Concentration. D=Depletion. RM=Reduced Matrix, CS=Covered or Coated Sand Grains   [2] Location: PL=Pore Lining. M=Matrix

**Hydric Soil Indicators:**

- ☐ Histosol (A1)
- ☐ Histic Epipedon (A2)
- ☐ Black Histic (A3)
- ☐ Hydrogen Sulfide (A4)
- ☐ Stratified Layers (A5)
- ☐ 2 cm Muck (A10) (LRR N)
- ☐ Depleted Below Dark Surface (A11)
- ☐ Thick Dark Surface (A12)
- ☐ Sandy Muck Mineral (S1) (LRR N, MLRA 147, 148)
- ☐ Sandy Gleyed Matrix (S4)
- ☐ Sandy Redox (S5)
- ☐ Stripped Matrix (S6)

- ☐ Dark Surface (S7)
- ☐ Polyvalue Below Surface (S8) (MLRA 147,148)
- ☐ Thin Dark Surface (S9) (MLRA 147, 148)
- ☐ Loamy Gleyed Matrix (F2)
- ☑ Depleted Matrix (F3)
- ☐ Redox Dark Surface (F6)
- ☐ Depleted Dark Surface (F7)
- ☐ Redox Depressions (F8)
- ☐ Iron-Manganese Masses (F12) (LRR N, MLRA 136)
- ☐ Umbric Surface (F13) (MLRA 136, 122)
- ☐ Piedmont Floodplain Soils (F19) (MLRA 148)
- ☐ Red Parent Material (F21) (MLRA 127, 147)

**Indicators for Problematic Hydric Soils[3]:**

- ☐ 2 cm Muck (A10) (MLRA 147)
- ☐ Coast Prairie Redox (A16) (MLRA 147,148)
- ☐ Piedmont Floodplain Soils (F19) (MLRA 136, 147)
- ☐ Very Shallow Dark Surface (TF12)
- ☐ Other (Explain in Remarks)

[3] Indicators of hydrophytic vegetation and wetland hydrology must be present, unless disturbed or problematic.

**Restrictive Layer (if observed):**

Type: __N/A__

Depth (inches): _____

**Hydric Soil Present?**   Yes ☑   No ☐

Remarks:

Depleted matrix indicator met.

**WETLAND DETERMINATION DATA FORM - Eastern Mountains and Piedmont Region**

| | | |
|---|---|---|
| Project/Site: Norris Cason Tract | City/County: Warren County | Sampling Date: 16-Oct-20 |
| Applicant/Owner: GeoLogic LLC | State: GA | Sampling Point: **udp_2** |
| Investigator(s): R. Heaton, R. Singleton | Section, Township, Range: S | R |

Landform (hillslope, terrace, etc.): Hillside    Local relief (concave, convex, none): convex    Slope: 6.0% / 3.4 °

Subregion (LRR or MLRA): MLRA 136 in LRR P    Lat.: 33.3481044    Long.: -82.7810791    Datum: NAD 83

Soil Map Unit Name: WeC - Wedowee loamy sand, 6 to 10 percent slopes    NWI classification: N/A

Are climatic/hydrologic conditions on the site typical for this time of year?    Yes ⦿  No ○    (If no, explain in Remarks.)

Are Vegetation ☐ , Soil ☐ , or Hydrology ☐ significantly disturbed?    Are "Normal Circumstances" present?    Yes ⦿  No ○

Are Vegetation ☐ , Soil ☐ , or Hydrology ☐ naturally problematic?    (If needed, explain any answers in Remarks.)

## Summary of Findings - Attach site map showing sampling point locations, transects, important features, etc.

| | | |
|---|---|---|
| Hydrophytic Vegetation Present? | Yes ○  No ⦿ | |
| Hydric Soil Present? | Yes ○  No ⦿ | Is the Sampled Area within a Wetland?  Yes ○  No ⦿ |
| Wetland Hydrology Present? | Yes ○  No ⦿ | |

Remarks:
Upland managed pine forest adjacent to Wetland 2.

## Hydrology

**Wetland Hydrology Indicators:**

Primary Indicators (minimum of one required; check all that apply)    Secondary Indicators (minimum of two required)

| | | |
|---|---|---|
| ☐ Surface Water (A1) | ☐ True Aquatic Plants (B14) | ☐ Surface Soil Cracks (B6) |
| ☐ High Water Table (A2) | ☐ Hydrogen Sulfide Odor (C1) | ☐ Sparsely Vegetated Concave Surface (B8) |
| ☐ Saturation (A3) | ☐ Oxidized Rhizospheres along Living Roots (C3) | ☐ Drainage Patterns (B10) |
| ☐ Water Marks (B1) | ☐ Presence of Reduced Iron (C4) | ☐ Moss Trim Lines (B16) |
| ☐ Sediment Deposits (B2) | ☐ Recent Iron Reduction in Tilled Soils (C6) | ☐ Dry Season Water Table (C2) |
| ☐ Drift deposits (B3) | ☐ Thin Muck Surface (C7) | ☐ Crayfish Burrows (C8) |
| ☐ Algal Mat or Crust (B4) | ☐ Other (Explain in Remarks) | ☐ Saturation Visible on Aerial Imagery (C9) |
| ☐ Iron Deposits (B5) | | ☐ Stunted or Stressed Plants (D1) |
| ☐ Inundation Visible on Aerial Imagery (B7) | | ☐ Geomorphic Position (D2) |
| ☐ Water-Stained Leaves (B9) | | ☐ Shallow Aquitard (D3) |
| ☐ Aquatic Fauna (B13) | | ☐ Microtopographic Relief (D4) |
| | | ☐ FAC-neutral Test (D5) |

**Field Observations:**

| | | |
|---|---|---|
| Surface Water Present? | Yes ○  No ⦿ | Depth (inches): _____ |
| Water Table Present? | Yes ○  No ⦿ | Depth (inches): _____ |
| Saturation Present? (includes capillary fringe) | Yes ○  No ⦿ | Depth (inches): _____ |

Wetland Hydrology Present?  Yes ○  No ⦿

Describe Recorded Data (stream gauge, monitoring well, aerial photos, previous inspections), if available:
N/A

Remarks:
No hydrology indicators present at the time of field studies.

**VEGETATION (Five/Four Strata)- Use scientific names of plants.**

Sampling Point: **udp 2**

| | Absolute % Cover | Dominant Species? Rel.Strat. Cover | Indicator Status |
|---|---|---|---|
| **Tree Stratum** (Plot size: 30 FT ) | | | |
| 1. Pinus taeda | 95 | ☑ 100.0% | FAC |
| 2. | 0 | ☐ 0.0% | |
| 3. | 0 | ☐ 0.0% | |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| 7. | 0 | ☐ 0.0% | |
| 8. | 0 | ☐ 0.0% | |
| | 95 | = Total Cover | |
| **Sapling-Sapling/Shrub Stratum** (Plot size: 15 FT ) | | | |
| 1. | 0 | ☐ 0.0% | |
| 2. | 0 | ☐ 0.0% | |
| 3. | 0 | ☐ 0.0% | |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| 7. | 0 | ☐ 0.0% | |
| 8. | 0 | ☐ 0.0% | |
| 9. | 0 | ☐ 0.0% | |
| 10. | 0 | ☐ 0.0% | |
| **Shrub Stratum** (Plot size: N/A ) | 0 | = Total Cover | |
| 1. | 0 | ☐ 0.0% | |
| 2. | 0 | ☐ 0.0% | |
| 3. | 0 | ☐ 0.0% | |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| 7. | 0 | ☐ 0.0% | |
| **Herb Stratum** (Plot size: 5 FT ) | 0 | = Total Cover | |
| 1. Rubus argutus | 50 | ☑ 58.8% | FACU |
| 2. Symphyotrichum ericoides var. ericoides | 30 | ☑ 35.3% | FACU |
| 3. Callicarpa americana | 5 | ☐ 5.9% | FACU |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| 7. | 0 | ☐ 0.0% | |
| 8. | 0 | ☐ 0.0% | |
| 9. | 0 | ☐ 0.0% | |
| 10. | 0 | ☐ 0.0% | |
| 11. | 0 | ☐ 0.0% | |
| 12. | 0 | ☐ 0.0% | |
| **Woody Vine Stratum** (Plot size: 30 FT ) | 85 | = Total Cover | |
| 1. Smilax rotundifolia | 3 | ☐ 100.0% | FAC |
| 2. | 0 | ☐ 0.0% | |
| 3. | 0 | ☐ 0.0% | |
| 4. | 0 | ☐ 0.0% | |
| 5. | 0 | ☐ 0.0% | |
| 6. | 0 | ☐ 0.0% | |
| | 3 | = Total Cover | |

**Dominance Test worksheet:**

Number of Dominant Species
That are OBL, FACW, or FAC:   1   (A)

Total Number of Dominant
Species Across All Strata:   3   (B)

Percent of dominant Species
That Are OBL, FACW, or FAC:   33.3%   (A/B)

**Prevalence Index worksheet:**

| Total % Cover of: | | Multiply by: | |
|---|---|---|---|
| OBL species | 0 | x 1 = | 0 |
| FACW species | 0 | x 2 = | 0 |
| FAC species | 98 | x 3 = | 294 |
| FACU species | 85 | x 4 = | 340 |
| UPL species | 0 | x 5 = | 0 |
| Column Totals: | 183 (A) | | 634 (B) |

Prevalence Index = B/A =   3.464

**Hydrophytic Vegetation Indicators:**

☐ Rapid Test for Hydrophytic Vegetation
☐ Dominance Test is > 50%
☐ Prevalence Index is ≤3.0 [1]
☐ Morphological Adaptations [1] (Provide supporting data in Remarks or on a separate sheet)
☐ Problematic Hydrophytic Vegetation [1] (Explain)

[1] Indicators of hydric soil and wetland hydrology must be present, unless disturbed or problematic.

**Definition of Vegetation Strata:**

**Four Vegetation Strata:**

Tree stratum – Consists of woody plants, excluding vines, 3 in. (7.6 cm) or more in diameter at breast height (DBH), regardless of height.

Sapling/shrub stratum – Consists of woody plants, excluding vines, less than 3 in. DBH and greater than 3.28 ft (1 m) tall.

Herb stratum – Consists of all herbaceous (non-woody) plants, regardless of size, and all other plants less than 3.28 ft tall.

Woody vine stratum – Consists of all woody vines greater than 3.28 ft in height.

**Five Vegetation Strata:**

Tree - Woody plants, excluding woody vines, approximately 20 ft (6 m) or more in height and 3 in. (7.6 cm) or larger in diameter at breast height (DBH).

Sapling stratum – Consists of woody plants, excluding woody vines, approximately 20 ft (6 m) or more in height and less than 3 in. (7.6 cm) DBH.

Shrub stratum – Consists of woody plants, excluding woody vines, approximately 3 to 20 ft (1 to 6 m) in height.

Herb stratum – Consists of all herbaceous (non-woody) plants, including herbaceous vines, regardless of size, and woody species, except woody vines, less than approximately 3 ft (1 m) in height.

Woody vines – Consists of all woody vines, regardless of height.

**Hydrophytic Vegetation Present?**   Yes ○   No ◉

**Remarks: (Include photo numbers here or on a separate sheet.)**

*Indicator suffix = National status or professional decision assigned because Regional status not defined by FWS.

US Army Corps of Engineers

Eastern Mountains and Piedmont - Version 2.0

**Soil**

Sampling Point: __udp_2__

**Profile Description:** (Describe to the depth needed to document the indicator or confirm the absence of indicators.)

| Depth (inches) | Matrix Color (moist) | % | Redox Features Color (moist) | % | Type¹ | Loc² | Texture | Remarks |
|---|---|---|---|---|---|---|---|---|
| 0-20 | 10YR 3/6 | 100 | | | | | Loam | Compact |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

¹Type: C=Concentration. D=Depletion. RM=Reduced Matrix, CS=Covered or Coated Sand Grains    ²Location: PL=Pore Lining. M=Matrix

**Hydric Soil Indicators:**

- [ ] Histosol (A1)
- [ ] Histic Epipedon (A2)
- [ ] Black Histic (A3)
- [ ] Hydrogen Sulfide (A4)
- [ ] Stratified Layers (A5)
- [ ] 2 cm Muck (A10) (LRR N)
- [ ] Depleted Below Dark Surface (A11)
- [ ] Thick Dark Surface (A12)
- [ ] Sandy Muck Mineral (S1) (LRR N, MLRA 147, 148)
- [ ] Sandy Gleyed Matrix (S4)
- [ ] Sandy Redox (S5)
- [ ] Stripped Matrix (S6)

- [ ] Dark Surface (S7)
- [ ] Polyvalue Below Surface (S8) (MLRA 147,148)
- [ ] Thin Dark Surface (S9) (MLRA 147, 148)
- [ ] Loamy Gleyed Matrix (F2)
- [ ] Depleted Matrix (F3)
- [ ] Redox Dark Surface (F6)
- [ ] Depleted Dark Surface (F7)
- [ ] Redox Depressions (F8)
- [ ] Iron-Manganese Masses (F12) (LRR N, MLRA 136)
- [ ] Umbric Surface (F13) (MLRA 136, 122)
- [ ] Piedmont Floodplain Soils (F19) (MLRA 148)
- [ ] Red Parent Material (F21) (MLRA 127, 147)

**Indicators for Problematic Hydric Soils³:**

- [ ] 2 cm Muck (A10) (MLRA 147)
- [ ] Coast Prairie Redox (A16) (MLRA 147,148)
- [ ] Piedmont Floodplain Soils (F19) (MLRA 136, 147)
- [ ] Very Shallow Dark Surface (TF12)
- [ ] Other (Explain in Remarks)

³Indicators of hydrophytic vegetation and wetland hydrology must be present, unless disturbed or problematic.

**Restrictive Layer (if observed):**

Type: __N/A__

Depth (inches): _____

Hydric Soil Present?    Yes ○    No ●

Remarks:

No hydric soil indicators met.



**Attachment B**

*Norris Cason Tract –*

*Technical Memorandum*

Revised Mine Plans



SECTION A-A

2:1 EXAGGERATION

# LOG CREEK, LLLP

**1280 SNOWS MILL ROAD**
**BOGART, GA 30622**

# SURFACE MINING LAND USE PLANS

## *NORRIS CASON CRUSHED STONE QUARRY*
## *WARREN COUNTY, GEORGIA*

**PERMIT/IDENTIFICATION NUMBER: XXXX-XX (TBD)**

### SITE DATA:

**PROPERTY OWNER:** TO BE DETERMINED

**SITE ADDRESS:** OGEECHEE RIVER ROAD AND TIMBER ROAD

**24-HOUR EMERGENCY CONTACT:** TO BE DETERMINED

**TOTAL SITE AREA:** 240.00 ACRES



PROJECT LOCATION
LAT: N33.346124
LON: W82.780977

**LOCATION MAP**
SCALE: 1" = 3500'

**NOTE:**
THERE ARE NO NATIONAL REGISTER OF HISTORIC PLACES
IDENTIFIED WITHIN ONE MILE.
(PER ONLINE DATABASE ACCESSED 10/26/2020)



**GEOLOGIC**
GeoLogic, LLC
9465 Main Street - Suite 310
Woodstock, GA 30188
(770) 824-4212
www.geologicllc.net
PEF007535 - Expires 06/30/22

FOR REVIEW ONLY

| SHEET INDEX | |
|---|---|
| SHEET # | SHEET TITLE |
| -- | COVER |
| C-00 | EXISTING CONDITIONS |
| C-01 | MASTER PLAN |
| C-02 | INSTRUMENTATION LAYOUT |
| C-03 | PHASE I MINE PLAN |
| C-04 | PHASE II MINE PLAN |
| C-05 | ULTIMATE MINE PLAN |
| C-06 | ULTIMATE MINE PLAN CROSS SECTIONS |
| C-07 | ULTIMATE MINE PLAN PIT DETAILS |
| C-08 | RAIL PROFILE |
| C-09 | RAIL SECTIONS (1 OF 4) |
| C-10 | RAIL SECTIONS (2 OF 4) |
| C-11 | RAIL SECTIONS (3 OF 4) |
| C-12 | RAIL SECTIONS (4 OF 4) |
| C-13 | RAIL STREAM CROSSING SECTIONS |
| C-14 | RECLAMATION PLAN |
| C-15 | RECLAMATION PLAN CROSS SECTIONS |
| C-16 | SEDIMENT BASIN 1 |
| C-17 | DEWATERING DETAILS |
| C-18 | CONSTRUCTION DETAILS (1 OF 3) |
| C-19 | CONSTRUCTION DETAILS (2 OF 3) |
| C-20 | CONSTRUCTION DETAILS (3 OF 3) |
| C-21 | RAIL DETAILS (1 OF 2) |
| C-22 | RAIL DETAILS (2 OF 2) |





**SUMMARY OF PERMITTED AREAS**

PIT AREA ± 68.0 ACRES
(INCLUDES FUTURE MINE EXPANSION AREA)

PLANT SITE AREA ± 12.5 ACRES
(INCLUDES OFFICE, SHOP & EQUIPMENT STORAGE
AREA, SCALES, STOCKPILES, SEDIMENT PONDS,
ENTRANCE & ACCESS ROADS)

OVERBURDEN STORAGE AREAS ± 33.2 ACRES

UNDISTURBED BUFFERS ± 37.98 ACRES

PERMITTED UNDISTURBED AREA ± 88.72 ACRES

TOTAL PERMITTED AREA ± 202.02 ACRES

TOTAL SITE AREA ± 240.00 ACRES

**SUMMARY OF RESOURCES**

ROCK +/- 50,000,000 TONS *

OVERBURDEN +/- 2,290,000 CU. YDS.

* PIT SHOWN TO A DEPTH OF 300 FT FROM TOP OF ROCK.

**Norris Cason Quarry**
Operated by (To be determined)
Permit # (XXXX-XX)

**EXAMPLE IDENTIFICATION SIGN**
N.T.S.

**LEGEND**

PROPERTY LINE
PERMIT BOUNDARY
STREAM CENTERLINE
SOFT BUFFER
PROPOSED CONTOUR
EXISTING CONTOUR
BUFFER AREA
WETLANDS
100YR FLOOD PLAIN
BORE LOCATION W/
TOFR ELEVATION

GeoLogic, LLC
4372 Shallowford
Industrial Parkway,
Marietta, GA 30066
(770) 824-4212
www.geologicllc.net
PDF0075.01 - 06/30/21

**FOR REVIEW ONLY**

General Notes

1. EXISTING CONTOUR DATA SHOWN FROM
USGS LIDAR, DATED 3-10-2018.

2. MAXIMUM SLOPE OF PIT WALLS 1/4:1 WITH
A MAXIMUM PIT DEPTH OF 300FT FROM TOP
OF ROCK. HAUL ROAD BENCHES INSIDE PIT
TO BE A MINIMUM OF 40FT WIDE WITH A
1/2% BACK SLOPE.

3. MAXIMUM SLOPE OF STOCKPILES 1:1 WITH A
MAXIMUM HEIGHT OF 35FT FROM PLANT
SITE GRADE.

4. STREAMS AND WETLANDS SHOWN AS
IDENTIFIED AND DELINEATED BY THE
WOODARD & CURRAN ECOLOGICAL FIELD
STUDY REPORT DATED OCT. 26, 2020.

5. REVIEW OF THE CURRENT SITE CONDITIONS
AS WELL AS THE AREA SURROUNDING THE
SITE INDICATES THAT THE NEAREST HOME IS
APPROXIMATELY 1,800 FEET SOUTH OF THE
PLANNED PIT. THERE ARE ONLY TWO OTHER
HOMES WITHIN 2,500 FEET
FROM THE PLANNED PIT. THE LOCATION OF
THE PROPERTY WITH RESPECT TO DISTANCE
FROM LARGE NEIGHBORHOODS, SCHOOLS,
AND BUSY ROADS IS IDEAL FOR
DEVELOPMENT OF A QUARRY.

LOG CREEK, LLLP

**SURFACE MINING
LAND USE PLANS -
CRUSHED STONE QUARRY**

CIVIL

**MASTER PLAN**

Project # 20-038
Date 06/30/2021
Scale 1" = 300'

Sheet
**C-01**

0   300'   600'





**LEGEND**

- PROPERTY LINE
- PERMIT BOUNDARY
- STREAM CENTERLINE
- SOFT BUFFER
- PROPOSED CONTOUR
- EXISTING CONTOUR
- BUFFER ZONE
- WETLANDS
- 100YR FLOOD PLAIN

**FOR REVIEW ONLY**

GeoLogic, LLC
9465 Main Street
Suite 310
Woodstock, GA 30188
(770) 824-4212
www.geologicllc.net
P0007531 - 06/30/22

**EROSION CONTROL LEGEND**

**General Notes**

1. EXISTING CONTOUR DATA SHOWN FROM USGS LiDAR, DATED 3-10-2018.
2. STREAMS AND WETLANDS SHOWN AS IDENTIFIED AND DELINEATED BY THE WOODARD & CURRAN ECOLOGICAL FIELD STUDY REPORT DATED OCT. 26, 2020.

**EROSION CONTROL NOTES:**

LOG CREEK, LLLP
**SURFACE MINING
LAND USE PLANS -
CRUSHED STONE QUARRY**
CIVIL
**PHASE I MINE PLAN**

| Project # | 20-038 | Sheet |
| Date | 02/07/2022 | **C-03** |
| Scale | 1" = 300' | |





## LEGEND

| | |
|---|---|
| | PROPERTY LINE |
| | PERMIT BOUNDARY |
| | STREAM CENTERLINE |
| | SOFT BUFFER |
| | PROPOSED CONTOUR |
| | EXISTING CONTOUR |
| | BUFFER ZONE |
| | WETLANDS |
| | 100YR FLOOD PLAIN |
| B-1 500.00 | BORE LOCATION W/ TOFR ELEVATION |

### EROSION CONTROL LEGEND

**FOR REVIEW ONLY**

**General Notes**

1. EXISTING CONTOUR DATA SHOWN FROM USGS LIDAR, DATED 3-10-2018.

2. STREAMS AND WETLANDS SHOWN AS IDENTIFIED AND DELINEATED BY THE WOODARD & CURRAN ECOLOGICAL FIELD STUDY REPORT DATED OCT. 26, 2020.

### EROSION CONTROL NOTES:

1. THE ESCAPE OF SEDIMENT FROM THE SITE SHALL BE PREVENTED BY THE INSTALLATION OF EROSION AND SEDIMENT CONTROL MEASURES AND PRACTICES PRIOR TO, OR CONCURRENT WITH, LAND DISTURBING ACTIVITIES.

2. EROSION CONTROL MEASURES WILL BE MAINTAINED AT ALL TIMES. IF FULL IMPLEMENTATION OF THE APPROVED PLAN DOES NOT PROVIDE FOR EFFECTIVE EROSION CONTROL, ADDITIONAL EROSION AND SEDIMENT CONTROL MEASURES SHALL BE IMPLEMENTED.

3. ANY DISTURBED AREA LEFT EXPOSED FOR A PERIOD GREATER THAN 14 DAYS SHALL BE STABILIZED WITH MULCH OR TEMPORARY SEEDING. TEMPORARY SEEDING SHALL BE APPLIED ACCORDING TO THE GSWCC SEEDING AND FERTILIZATION SCHEDULES.

4. ANY DISTURBED AREAS IDLE FOR 30 DAYS SHALL BE STABILIZED WITH PERMANENT SEEDING. PERMANENT SEEDING SHALL BE TALL FESCUE AND SERICEA LESPEDEZA MIX OR OTHER COMPARABLE MIX APPROPRIATE FOR THE TIME OF APPLICATION.

5. EROSION AND SEDIMENT CONTROL MEASURES SHALL BE INSPECTED ROUTINELY AFTER EACH MAJOR RAINFALL EVENT, AND REPAIRED AS NECESSARY.

6. ADDITIONAL EROSION & SEDIMENT CONTROL MEASURES SHALL BE INSTALLED IF DETERMINED NECESSARY BY ON SITE INSPECTION.

7. SILT FENCE SHALL MEET THE REQUIREMENTS OF SECTION 171 TYPE C TEMPORARY SILT GEORGIA D.O.T. OR GSWCC SPEC. ALL SILT FENCE TO BE WIRE BACKED.

8. SEDIMENT STORAGE VOLUME @ 67 CY/ACRE MUST BE INSTALLED PRIOR TO ANY OTHER LAND DISTURBANCE ACTIVITY AND IN PLACE UNTIL FINAL STABILIZATION OCCURS.

9. STORMWATER WILL BE DISCHARGED FROM THE SITE AT LOCATIONS SHOWN ON C-01 IN ACCORDANCE WITH APPLICABLE LOCAL AND FEDERAL REQUIREMENTS.

GeoLogic, LLC
9465 Main Street
Suite 210
Woodstock, GA 30188
(770) 824-4212
www.geologicllc.net
FO'007533 - 06/30/22

**LOG CREEK, LLLP**

**SURFACE MINING**
**LAND USE PLANS -**
**CRUSHED STONE QUARRY**

CIVIL

**ULTIMATE MINE PLAN**

| Project # | 20-038 | Sheet |
|---|---|---|
| Date | 02/07/2022 | **C-05** |
| Scale | 1" = 300' | |

N



SECTION A-A

SECTION B-B

SECTION C-C

GeoLogic, LLC
9465 Main Street
Suite 310
Woodstock, GA 30188
(770) 824-4212
www.geologicllc.net
#19307535 - 06/30/22

FOR REVIEW ONLY

General Notes

Rev. | Revision/Issue | Date

LOG CREEK, LLLP
SURFACE MINING
LAND USE PLANS -
CRUSHED STONE QUARRY
CIVIL
ULTIMATE MINE PLAN
CROSS SECTIONS

HORIZONTAL
0    300'    600'

VERTICAL
0    150'    300'

Project #: 20-038
Date: 02/07/2022
Scale: AS NOTED

Sheet
C-06





RAIL PROFILE STA 0+00 THRU 20+00

RAIL PROFILE STA 20+00 THRU 40+00

RAIL PROFILE STA 40+00 THRU END

GeoLogic, LLC
9465 Main Street
Suite 310
Woodstock, GA 30188
(770) 824-4212
www.geologicllc.net
#0007535 - 06/30/22

FOR REVIEW ONLY

General Notes

LOG CREEK, LLLP

SURFACE MINING
LAND USE PLANS -
CRUSHED STONE QUARRY

CIVIL

RAIL PROFILE

Project # 20-038
Date 02/07/2022
Scale AS NOTED

Sheet
C-08

HORIZONTAL

VERTICAL





GeoLogic, LLC
5465 Main Street
Suite 310
Woodstock, GA 30188
(770) 824-4212
www.geologicllc.net
KV007533 - 06/30/22

FOR REVIEW ONLY

General Notes

1. PROPOSED GRADE LINE IN ALL SECTIONS REPRESENTS TOP OF OF SUBBASE WITH 6" OF COMPACTED BALLAST.

2. DRAINAGE DITCHES AND BERMS NOT SHOW FOR CLARITY AND WILL BE CONSTRUCTED ACCORDING TO CSX TYPICAL CUT AND FILL DETAILS.

LOG CREEK, LLLP
SURFACE MINING
LAND USE PLANS -
CRUSHED STONE QUARRY

CIVIL
RAIL SECTIONS (2 OF 4)

Project #
20-038

Date
02/07/2022

Scale
AS NOTED

Sheet
C-10

HORIZONTAL
VERTICAL

SECTION @ STA: 18+00
SECTION @ STA: 19+00
SECTION @ STA: 20+00
SECTION @ STA: 21+00
SECTION @ STA: 22+00
SECTION @ STA: 23+00
SECTION @ STA: 24+00
SECTION @ STA: 25+00
SECTION @ STA: 26+00
SECTION @ STA: 27+00
SECTION @ STA: 28+00
SECTION @ STA: 29+00







RAIL CORRIDOR STREAM CROSSING 1

RAIL CORRIDOR STREAM CROSSING 2

SECTION A-A

SECTION B-B

GeoLogic, LLC
9465 Main Street
Suite 310
Woodstock, GA 30188
(770) 824-4212
www.geologicllc.net
#0007535 - 06/30/23

FOR REVIEW ONLY

General Notes

LOG CREEK, LLLP
SURFACE MINING
LAND USE PLANS -
CRUSHED STONE QUARRY

CIVIL
RAIL CORRIDOR STREAM
CROSSING DETAILS

Project #  20-038
Date       02/07/2022
Scale      AS NOTED

Sheet
C-13

HORIZONTAL
VERTICAL









PIT SUMP DEWATERING DETAIL
N.T.S.

WELL DEWATERING DETAIL
N.T.S.

DEEPWELL DETAIL
N.T.S.

GeoLogic, LLC
9465 Main Street
Suite 310
Woodstock, GA 30188
(770) 824-4212
www.geologicllc.net
PE007535 - 06/30/22

FOR REVIEW ONLY

General Notes

LOG CREEK, LLLP
SURFACE MINING
LAND USE PLANS -
CRUSHED STONE QUARRY

CIVIL
DEWATERING DETAILS

Project #
20-038

Date
02/07/2022

Scale
N.T.S.

Sheet
C-17



SURFACE MINING
LAND USE PLANS -
CRUSHED STONE QUARRY

CIVIL
CONSTRUCTION DETAILS
(1 OF 3)

C-18



CRUSHED STONE CONSTRUCTION EXIT

SILT FENCE - TYPE NON-SENSITIVE

SILT FENCE - TYPE SENSITIVE

FASTENERS FOR SILT FENCES

RIPRAP OUTLET PROTECTION

SHOWN ON THE EROSION AND SEDIMENT CONTROL PLAN

GeoLogic, LLC

FOR REVIEW ONLY

LOG CREEK, LLLP
SURFACE MINING
LAND USE PLANS -
CRUSHED STONE QUARRY
CIVIL
CONSTRUCTION DETAILS
(2 OF 3)

Project #: 20-038
Date: 02/07/2022
Scale: N.T.S.
Sheet: C-19

## Ds3 DISTURBED AREA STABILIZATION TABLES

Table 1. Some Permanent Plant Species, Seeding Rates, and Planting Dates

| Species | Rates per Acre | Rates per 1,000 sq. ft | Planting Dates by Region M-L | P | C | Remarks |
|---|---|---|---|---|---|---|
| Bahia, Pensacola Alone or with temporary cover With other perennials | 60 lbs. 30 lbs. | 1.4 lbs. 0.7 lb. | — | 4/1-5/31 | 3/1-5/31 | Low growing; sod producing; will spread into Bermuda lawns. |
| Bahia, Wilmington Alone or with temporary cover With other perennials | 60 lbs. 30 lbs. | 1.4 lbs. 0.7 lb. | 3/15-5/31 | — | — | Same as above |
| Bermuda, Common (Hulled seed) Alone With other perennials | 10 lbs. 8 lbs. | 0.2 lb. 0.1 lb. | — | 4/1-5/31 | 3/15-5/31 | Quick cover; low growing, sod forming; needs full sun. |
| Bermuda, Common (Unhulled seed) With temporary cover With other perennials | 10 lbs. 8 lbs. | 0.2 lb. 0.1 lb. | — | 10/1-2/28 | 11/1-1/31 | Plant with Winter annuals. Plant with Tall Fescue |
| Bermuda Sprigs Common lawn and forage hybrids | 40 cu. ft. 8 lbs. | 0.9 cu. ft. Sod plugs 3' x3' | 4/15-6/15 | 4/1-6/15 | 4/1-5/31 | 1 cu. ft. = 650 sprigs 1 bu. = 1.25 cu. ft. or 800 sprigs |
| Centipede | Block Sod Only | Block Sod Only | — | 11/1-5/31 | 11/1-5/31 | Drought tolerant. Full sun or partial shade. |
| Crown Vetch With winter annuals or cool season grasses | 15 lbs. | 0.3 lb. | — | 9/1-10/15 | 9/1-10/15 | Mix with 30 lbs. Tall Fescue or 15 lbs. Rye; inoculate seed; plant only North of Atlanta. |
| Fescue, Tall Alone With other perennials | 50 lbs. 30 lbs. | 1.1 lbs. 0.7 lb. | 3/1-4/15 or 8/15-10/15 | 9/1-10/15 | — | Can be mixed with perennial Lespedezas or Crown Vetch; not for droughty soils or heavy use areas. |
| Lespedeza, Sericea Scarified | 60 lbs. | 1.4 lbs. | 3/15-5/31 | 3/1-5/15 | 3/1-5/15 | Widely adapted and low maintenance; takes 2-3 years to establish; inoculate seed with EL inoculant; mix with Weeping lovegrass, Common Bermuda, Bahia or Tall Fescue. |
| Unscarified | 75 lbs. | 1.7 lbs. | 9/1-2/28 | 9/1-2/28 | 9/1-2/28 | Mix with Tall Fescue or winter annuals. |
| Seed bearing hay | 3 tons | 138 lbs. | 10/1-2/28 | 10/1-1/31 | 10/15-1/15 | Cut when seed is mature but before it shatters. Add Tall Fescue or winter annuals. |
| Lespedeza Ambro Virgata or Appalow Scarified | 60 lbs. | 1.4 lbs. | 4/1-5/31 | 3/15-5/31 | 3/1-5/15 | Spreading growth with height of 18"-24"; good in urban areas; slow to develop good stands; mix with Weeping Lovegrass, Common Bermuda, Bahia or Tall Fescue. |
| Unscarified | 75 lbs. | 1.7 lbs. | 9/1-2/28 | 9/1-2/28 | 9/1-2/28 | or winter annuals; do not mix with Sericea Lespededeza; inoculate seed with EL inoculant. |
| Lespedeza, Shrub (Lespedeza Bicolor or Lespedeza Thunbergi) Plants | 2' x 3' spacing | | 10/1-3/31 | 11/1-3/15 | 11/15-2/28 | Plant in small clumps for wildlife food and cover. |
| Lovegrass, weeping Alone With other perennials | 4 lbs. 2 lbs. | 0.1 lb. 0.05 lb. | 4/1-5/31 | 3/15-5/31 | 3/1-5/15 | Quick cover; drought tolerant, grows well with Sericea Lespedeza on road banks and other slopes; short lived. |
| Maidencane sprigs | 2' x 3' spacing | | 2/1-3/31 | 2/1-3/31 | 2/1-3/31 | For very wet sites such as river banks and shorelines. Dig sprigs locally. |
| Panicgrass, Atlantic Coastal | 20 lbs. | 0.5 lb. | — | 3/1-4/30 | 3/1-4/30 | Grows well on coastal sand dunes; mix with Sericea Lespedeza but not on sand dune. |
| Red Canary Grass With other perennials | 50 lbs. 30 lbs. | 1.1 lbs. 0.7 lb. | 8/15-10/15 | 9/1-10/15 | — | Grows well in Coastal Plain for wet sites |
| Sunflower, Aztec Maximilian | 10 lbs. | 0.2 lb. | 4/15-5/31 | 4/15-5/31 | 4/1-5/31 | Mix with Weeping Lovegrass or other low growing grasses or legumes. |

1. Rates are for broadcasted seed. If a seed drill is used, reduce the rates by one-half.
2. PLS is an abbreviation for Pure Live Seed. Refer to Glossary for an explanation of this term.
3. The resource areas are defined in the Glossary. See page 60 for Resource Area.
4. Seeding rates are based on pure live seeds (PLS).

Table 2. Fertilizer Requirements for Permanent Vegetation

| Types of Species | Planting Year | Fertilizer (N-P-K) | Rate (lbs./acre) | N Top Dressing Rate (lbs./acre) |
|---|---|---|---|---|
| Cool season grasses | First Second Maintenance | 6-12-12 6-12-12 10-10-10 | 1500 1000 400 | 50-100 30 — |
| Cool grasses and legumes | First Second Maintenance | 6-12-12 0-10-10 0-10-10 | 1500 1000 400 | 0-50 — — |
| Warm season grasses | First Second Maintenance | 6-12-12 6-12-12 0-10-10 | 1500 800 300 | 50-100 50-100 30 |
| Warm season grasses and legumes | First Second Maintenance | 6-12-12 0-10-10 0-10-10 | 1500 1000 400 | 50 — — |

## Ds2 DISTURBED AREA STABILIZATION TABLES

Table 1. Some Temporary Plant Species, Seeding Rates and Planting Dates

| Species | Rates Per 1,000 sq. ft. | Rates per Acre | Planting Dates by Region M-L | P | C |
|---|---|---|---|---|---|
| Barley Alone Barley in Mixtures | 3.3 lbs. 6 lbs. | 3 bu. .5 bu. | 9/1-10/31 | 9/15-11/15 | 10/1-12/31 |
| Lespedeza, Annual Lespedeza in Mixtures | 0.9 lbs. 0.2 lbs. | 40 lbs. 10 lbs. | 3/1-3/31 | 3/1-3/31 | 2/1-2/28 |
| Lovegrass, Weeping Lovegrass in Mixtures | 0.1 lbs. 0.05 lbs. | 4lbs. 2 lbs. | — | — | — |
| Millet, Browntop Millet in Mixtures | .9 lbs. .5 lbs. | 40 lbs. 20 lbs. | 4/15-6/15 | 4/15-6/30 | 4/15-6/30 |
| Millet, Pearl | 1.1 lbs. | 50 lbs. | 5/15-7/15 | 5/1-7/31 | 4/15-8/15 |
| Oats Alone Oats in Mixtures | 2.99 lbs. .7 lbs. | 4 bu. 1 bu. | 9/15-11/15 | 9/15 -11/15 | 9/15 -11/15 |
| Rye (Grain) Alone Rye in Mixtures | 3.9 lbs. .6 bu. | 2 bu. .5 bu. | 8/15-10/31 | 9/15-11/30 | 10/1-12/31 |
| Ryegrass Ryegrass in Mixtures | 1.4 lbs. 0.5 lbs. | 40 lbs. 20 lbs. | 8/15-11/15 | 9/1-12/30 | 10/1-12/31 |
| Sudangrass | 1.4 lbs. | 60 lbs. | 5/1-7/31 | 5/1-7/31 | 4/1-7/31 |
| Triticale Alone Triticale in Mixtures | 3.3 lbs. .6 bu. | 3 bu. .5 bu. | NA | NA | 10/15-11/30 |
| Wheat Alone Wheat in Mixtures | 3.9 lbs. .7 lbs. | 3 bu. .5 bu. | 9/15-11/30 | 10/1-12/31 | 10/15-12/31 |

1. Unusual site conditions may require heavier seeding rates.
2. Seeding dates may need to be altered to fit temperature variations and local conditions.
3. For Major Land Resource Areas (MLRAs), see page 60.
4. Seeding rates are based on pure live seed (PLS).

Table 2. Fertilizer Requirements for Temporary Vegetation

| Types of Species | Planting Year | Fertilizer (N-P-K) | Rate (lbs./acre) | N Top Dressing Rate (lbs./acre) |
|---|---|---|---|---|
| Cool season grasses | First Second Maintenance | 6-12-12 6-12-12 10-10-10 | 1500 1000 400 | 50-100 30 — |
| Cool season grasses & legumes | First Second Maintenance | 6-12-12 0-10-10 0-10-10 | 1500 1000 400 | 0-50 — — |
| Temporary cover crops seeded alone | First | 6-12-12 | 500 | — |
| Warm season grasses | First Second Maintenance | 6-12-12 6-12-12 10-10-10 | 1500 800 400 | 50-100 50-100 30 |

Geologic, LLC
9465 Main Street
Suite 310
Woodstock, GA 30188
(770) 824-4212
www.geologicllc.net
AS1007535 - 06/30/22

FOR REVIEW ONLY

General Notes

LOG CREEK, LLLP

SURFACE MINING LAND USE PLANS - CRUSHED STONE QUARRY

CIVIL CONSTRUCTION DETAILS (3 OF 3)

| Project # | 20-038 | Sheet |
| Date | 02/07/2022 | C-20 |
| Scale | N.T.S. | |