# THIRD DECLARATION OF DOUGLAS R. KENNY

I, Douglas R. Kenny, pursuant to the provisions of 28 U.S.C. § 1746, hereby declare that:

1. I have been asked to help the Court by succinctly summarizing the three appraisals I prepared on the Log Creek tracts in Warren, Wilkes, and Taliaferro Counties.

2. By way of background, I grew up in Roswell, Georgia. From early on, I was exposed to real estate valuation by my father who is a real estate appraiser.

3. I attended and graduated from Georgia Institute of Technology (Georgia Tech) with a degree in industrial engineering.

4. Based on having successfully completed the examination, experience, and demonstration report requirements, I have been designated a Member of the Appraisal Institute (MAI), the highest-level designation available through the Appraisal Institute.

5. Also based on examination and experience requirements, I am a Georgia Certified General Real Estate Appraiser.

6. Through our firm Kenny & Associates, my father, brother, and I appraise real estate on a broad range of properties.

7. While I participate in a wide variety of real estate appraisal projects, I specialize in mineral properties and conservation easements.

8. In developing my skills as an appraiser, I have studied best practices for valuing real estate, including specialized courses on conservation easements and on mineral properties. Both require special knowledge.

9. My Georgia Tech engineering degree aids me in understanding mineral engineering. It also provides me a knowledge base that has helped me establish contacts across the mining industry.

10. Our firm would never value a property with a mineral deposit without extensive analysis by a qualified geologist and/or mining engineer. Without that assistance, I do not believe an appraiser can competently opine on the value of a property with commercial grade mineral deposits.

***Summary of Log Creek Appraisals***

11. I independently researched, analyzed, and appraised the 2018 Norris-Cason easement in Warren County, the 2019 easement on the Brown-Harris tract in Taliaferro County, and the 2019 easement in the Heard Road Thornton tract in Wilkes County, Georgia.

12. The appraisals follow the same valuation procedure, approach, and methods.

13. Using the Norris-Cason appraisal as an example, each of the three appraisals follow this organization:

a. Overview of the Appraisal Process, including explanation of the Residual Method and the Royalty Method (Norris-Cason Appr., pp. 9-11);

b. Executive Summary of the appraisal problem, purpose, core facts, and value indication (Norris-Cason Appr., pp. 19-22);

c. Appraisal Conditions and Applicable Terms (Norris-Cason Appr., pp. 30-42);

d. Area and Market Analysis (Norris-Cason Appr., pp. 43-72);

e. Subject Characteristics (Norris-Cason Appr., pp. 72-92);

f. Analysis of the Conservation Appraisal Approach and Scope of Work (Norris Cason Appr., pp. 92-112);

g. Before-Easement valuation, including foundation reciting most relevant portions of geological reports; independent research and analysis of industry pricing, expenses, and discount rate for DCF components; highest-and-best-use four point analysis; mineral valuation authorities, approach, and methods (Norris-Cason Appr., pp. 113-230);

h. After-Easement valuation including highest and best use four point analysis, comparable sales method, and comparable analysis (Norris-Cason Appr., pp. 257-275); and

i. Final Reconciliation (Norris-Cason Appr., pp. 275-276).

***Appraisal Standards and Principles***

14. As an appraiser, my work and the three Log Creek appraisals comply with the Uniform Standards of Professional Appraisal Practice (USPAP), *The Appraisal of Real Estate* (15th Ed.), and other authoritative sources on valuation in general and the particular type of property in specific.

15. USPAP Standards Rule 1-2 requires an appraiser to "Identify, from sources the appraiser reasonably believes to be reliable, the characteristics of the property ... including: (I) its location and physical, legal, and economic characteristics." ¶ 21. USPAP 2018-2019 Advisory Opin. 22, 128-129, 11.128-30 and 2020-20 Advisory Opin. 22, 119, 11.126-128 require that "the first area the appraiser must address is knowledge of the subject property, which is accomplished by gathering and verifying information about the subject property. In a market value assignment, the relevant characteristics are those that have a significant impact on the property's marketability (*See* Standard 1-2(c))."

16. When appraising a conservation easement for tax purposes, my work also complies with the Treasury Regulations. Those regulations first require that an appraiser determines if sales of comparable easements can be found. Absent comparable sales of easements, the regulations value conservation easements under the "before and after" method as the difference between the fair market value on the unrestricted property before the easement and the fair market value of the restricted property after the easement. Treas. Reg. 1.170A-14(h)(3)(ii) also requires that I "take into account not only the current use of the property," but also its "potential highest and best use." In other words, I must rely upon all relevant facts to determine the property's highest and best use.

17. *The Appraisal of Real Estate* (15th Ed.) p. 178 (Exhibit A) recognizes that the appraisal of mineral rights is highly specialized and appraisers often must work with a geologist or other mining expert for the appraiser to render competent credible results.

18. USPAP Standards Rule 1-4 also provides that, after an appraiser has collected, reviewed, and analyzed the necessary information (which will have informed him as to the property's highest and best use), he must select the valuation approach that is "necessary for credible assignment results."

19. In summary, when I prepared the appraisals in this matter, I (a) collected all relevant facts (conducted due diligence), (b) evaluated all realistic uses of the property, (c) analyzed the relevant facts to determine the highest and best use of the property, (d) selected a valuation methodology based on the highest and best use and relevant facts, and (e) reviewed and evaluated my work for accuracy and reasonableness before reaching my independent conclusions as to fair market value.

***All Relevant Facts***

20. As described in the Log Creek Appraisals, the first job of an appraiser is to gather all potentially relevant facts in an unbiased way.

21. In preparing my appraisals for this case, I therefore first gathered all facts I could find about the subject properties in an unbiased manner.

22. I toured the properties, researched the local economy, geology, population and real estate market factors, trends, and other factors relevant to the valuation of real property.

23. I also reviewed reports by geological and mining experts who I knew were capable, intelligent, and respected in their fields, including Dr. Richard C. Capps with Capps GeoScience, Benjamin Black, PE, PG, with GeoLogic, and Christopher Summers with Burgex Mining Consultants.

24. Those reports contained critical information about the subject properties resulting from geological investigation and market analysis that those individuals were well-positioned to perform.

25. I analyzed and investigated those reports to verify their reasonableness, as described in my appraisals. As also explained in my Log Creek appraisals, I independently verified and analyzed critical points in those reports through knowledgeable industry contacts, authorities, and sources including posted pricing lists, industry capital and operating expenses, markets, and discount rates.

26. Upon determining that those reports represented reliable discussions of certain conditions affecting the subject properties, I recited as precisely as I could the foundation that those geology and mineral economic reports provided and noted the source.

27. The three properties subject to the conservation easements have proven and probable granite reserves that are economically accessible. Market factors would support substantial quarrying activity on those properties, absent the easements.

28. After completing my investigation and evaluation, I drew my own conclusions about highest and best use, valuation approaches, valuation methods, discounted cash flow (DCF) components, and value.

***Realistic Uses of the Properties***

29. Having gathered the facts concerning the subject properties, my next task was to reflect upon realistic uses of the properties.

30. Those possible uses included forestry and recreational activities, leasing the property for mining, and owner-operator contract mining.

***Highest and Best Use***

31. Once I identified the potential uses of the properties, I had to consider their highest and best uses.

32. Highest and best use generally depends on four criteria. They include physically possible, legally permissible, financially feasible, and maximally productive.

33. Each of my Log Creek appraisals discuss each of those criteria in some detail and the sources upon which I relied.

34. As described in detail in my appraisals, it quickly became obvious that, the highest and best use of each property, prior to the easements, was mining the D.O.T. quality granite. There was no close second.

35. As explained in my appraisals, a willing buyer with reasonable knowledge of the relevant mineral facts would purchase this property if it was marketed correctly within the open market. The buyer could then either lease the property to a mining company or mine the property themselves. A landowner with reasonable knowledge of the relevant mineral facts would not lease the property for less than market. Such arrangements are significantly less economically advantageous to the landowner and ordinarily arise when the landowner does not have reasonable knowledge of all relevant facts. We must assume that our hypothetical willing buyer would have that knowledge.

36. Thus, it became clear that the highest and best use of each of the subject properties, before the easement, was granite mining and the most accurate way to value the land and minerals would be by analyzing the property through the owner-operator mining scenario. This allows the appraiser to find the residual value of the land and minerals by deducting all the costs associated with mining the property and discounting the cash flow to the date of appraisal.

***Valuation Methodology***

37. After my factual investigation and highest and best use analysis, I turned to valuation approaches and methods.

38. The first step in valuing the subject properties was to select a valuation methodology based on the properties' highest and best uses and the properties' specific characteristics.

39. There are three primary valuation approaches: the Sales Comparison Approach, the Income Approach, and the Cost Approach.

40. Appraisal authorities generally recognize that the Cost Approach applies to properties with significant improvements and not undeveloped land.

41. Thus, I concentrated on the Comparable Sales Approach and the Income Approach.

42. In the valuation of mineral properties, the Income Approach is generally favored over the Comparable Sales Approach; the field's leading experts and publications acknowledge that the unique characteristics of mineral properties and property nature of their mineral characteristics generally render finding actual comparable sales impractical if not impossible. Without the mineral specs, no adjustments can be made to compare the sale to the subject property.

43. That being said, within the wider world of real estate appraisal, searching for comparable sales is the first step I take in every property valuation assignment. So, that is where I began.

44. I turned to comprehensive local, regional, and national databases to search for sales of properties with characteristics comparable to the subject properties.

45. As I explained in my reports, I was, unsurprisingly, unable to find comparable sales.

46. As the literature in the field explains, market actors generally choose to withhold mineral information when reporting purchases and sales of land. Incomplete data on sales of mineral properties render them incomparable to the subject properties, render adjustments impossible, and the Comparable Sales Approach useless. I was not able to find comparable sales of greenfield drilled mineral properties or with any available quantity or quality mineral data.

47. Therefore, I turned back to the preferred approach, the Income Approach.

48. Two variations of the Income Approach can be applied to mineral properties with commercial levels of known quantity, quality, and overburden depth: the royalty method and the residual method.

49. The residual method values a property as though the landowner will mine the property, either themselves or through a contract miner. Use of a contract miner is one way to extract the residual value of the land and minerals from the value of the mining business.

50. The royalty method values a property as though the landowner will lease the property to a mining company in exchange for a royalty.

51. Therefore, the royalty method is a generally appropriate for a mining lease highest and best use, and the residual method is appropriate for an owner-operator mining highest and best use.

52. Here, as explained above, owner-operator mining is the highest and best use of the properties, based on the wealth of information that would be available to willing buyers seeking to profit from the use of the properties. Therefore, I used the residual method as the correct variation of the Income Approach.

53. The royalty method can be an appropriate method for valuing the mineral property. However, the mining company (lessee) is financially incentivized to get the royalty rate a low as possible. Typically, landowners are not reasonably knowledgeable of the relevant facts and willing to lease their properties to mining companies for less than market. The royalty method creates a leasehold position whereas, the residual method does not create a leasehold position.

54. Here, mining is the highest and best use of the properties. For the subject properties, it is my opinion that the most accurate way to value them is the residual method, the most applicable variation of the Income Approach.

55. This residual method took the form of DCF analyses, as reflected in each of my reports. The components of the DCF are drawn from my analysis of industry data including the geological reports, Vulcan and Martin Marietta posted prices, capital and operating expenses from industry interviews and sources, and discount rates from industry interviews and materials.

***Mineral Property Valuation Sources***

56. The use of a DCF analysis is supported by the majority of the literature in the mineral property valuation space. The following exhibits are excerpts from some of that literature:

a. Exhibit B: Ellis, T.R., *Newsletter*, American Institute of Minerals Appraisers, Vol. 1., No. 5, "Valuation Methodologies for Mines and Mineral Tenements" (Dec. 1995).

b. Exhibit C: Ellis, T.R., Abbott, Jr., D.M., and Sandry, H.J., "Trends in the Regulation of Mineral Deposit Valuation," SME Annual Meeting (Mar. 1999).

c. Exhibit D: Gentry, Donald W. and O'Neil, Thomas J., Dr., *Mine Investment Analysis*, Society of Mining Engineers, American Institute of Mining, Metallurgical, and Petroleum Engineers (1984).

d. Exhibit E: Spooner, Jane, "Mineral Property Valuation: Principles and Procedures 101," Micon International (Mar. 2018).

e. Exhibit F: Stermole, Franklin J. and Stermole, John M., *Economic Evaluation and Investment Decision Methods (16th Ed.)*, Colorado School of Mines (2018).

f. Exhibit G: Baurens, Svetlana, *Valuation of Metals and Mining Companies*, Basinvest (July 2010).

***Reasonableness Check***

57. Finally, I analyzed my DCF analyses for reasonableness. Turning to the literature, market activity, and my own prior experience, I determined that my DCF analyses rendered reasonable valuation conclusions.

58. As described in my expert reports, I was able to find multiple sales of quarries in North Georgia, as well as merger-and-acquisition activity among mining companies that I used to confirm that the results of my DCF analyses were reasonable. While not directly comparable to the subject properties, these transactions confirmed that my analyses rendered values well within a range wherein market actors have been willing to acquire mineral interests.

59. I determined that my DCF analyses were reasonable based on mineral property valuation sources, four quarry sales, and my own experience with the appraisal of mineral properties and Georgia real estate.

***Clarifications***

60. On the subject of my experience, I want to correct one particular point that I did not recall during my deposition in this case.

61. When I was deposed several months ago, I was asked whether I was aware of any instance in which I had rendered an appraisal of a mineral property and a market actor had relied on my appraisal in transacting in that property.

62. At the time, no such instance came to mind.

63. It is very important to me that I provide the most accurate information possible.

64. For that reason, I have reviewed my notes and work files and, in doing so, been reminded of several instances where I performed appraisals of mineral and other properties that were then used to support transactions.

65. For example, the United States Department of Defense hired my firm to appraise at least six easements for the purpose of the DoD buying the easements from owners of vacant land near military bases in several states. One of those appraisals was based upon a mining highest and best use.

66. I have also checked on several other projects and confirmed that other private-party clients have relied on my appraisal in setting a sale price or for lending purposes based upon a mining highest and best use. I have also been contacted in 2024 by a client who would like to use my services to establish a sales price based upon a mining highest and best use. There may be others.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 8, 2024.

Douglas R. Kenny